1
2
3
4                          UNITED STATES DISTRICT COURT
5                        NORTHERN DISTRICT OF CALIFORNIA
6
7    KENYON NORBERT, et al.,                    Case No.  19-cv-02724-SK
8                   Plaintiffs,
9          v.                                   **ORDER REGARDING PLAINTIFFS'
                                                MOTION FOR PRELIMINARY
10   SAN FRANCISCO SHERIFF'S                     INJUNCTION AND DEFENDANTS'
     DEPARTMENT, et al.,                         MOTION TO DISMISS**
11
                   Defendants.
12                                              Regarding Docket Nos. 8, 11, 12; 37, 44, 51
13

14          Plaintiffs Kenyon Norbert, Montrail Brackens, Jose Poot, Marshall Harris, Armando

15   Carlos, Michael Brown, and Troy McAllister ("Plaintiffs") are individuals currently incarcerated

16   in San Francisco County Jail 4 ("County Jail 4") and San Francisco County Jail 5 ("County Jail

17   5").  On May 20, 2019, Plaintiffs filed a class action complaint ("Complaint") for declaratory and

18   injunctive relief and damages, alleging that the conditions of their confinement violate the Eighth

19   and Fourteenth Amendments to the United States Constitution, Sections 7 and 17 of the California

20   Constitution, and 15 C.C.R. 1065.  (Dkt. 1.)  Plaintiffs bring their claims against the San Francisco

21   County Sheriff's Department and the City and County of San Francisco, as well as against Sheriff

22   Vicki Hennessy, Captain Jason Jackson, Captain Kevin McConnell, and Chief Deputy Sheriff Paul

23   Miyamoto in their individual capacities ("Defendants").  (*Id.*)  On June 27, 2019, Plaintiffs filed a

24   motion for a preliminary injunction.  (Dkt. 8.)  Defendants oppose the motion.  (Dkt. 11.)  On

25   August 30, 2019, Defendants moved to dismiss the action.  (Dkt. 37.)  Plaintiffs oppose the

26   motion.  (Dkt. 44.)  Because the two motions are predicated on the same set of facts and raise

27   interlocking legal issues, the Court addresses them simultaneously.

28          In their motion for a preliminary injunction, Plaintiffs ask the Court to issue an order:

United States District Court
Northern District of California

United States District Court
Northern District of California

(1)     requiring that all inmates in County Jails 4 and 5 receive a minimum of one hour per day of time out of their cells and a minimum of three hours per week of outdoor recreation time "distributed over 7 days (and not just in one chunk);"

(2)     requiring that inmates in administrative segregation receive "<u>equal</u> out of cell time, and programs;" and

(3)     requiring that inmates in "disciplinary isolation" receive "genuine and full reviews as required by state regulations."

(Dkt. 8 (emphasis in original).)  Later, in a supplemental memorandum submitted even after opposition and reply, Plaintiffs requested the following:

(4)     that any inmate who has been in administrative segregation more than one year be released to general population "unless defendants comply with the hearing and the hearing demonstrates that the [inmate's] release would 'severely endanger the lives of inmates or staff or the security of the institution';"[1]

(5)     that any inmate held in administrative segregation more than one year be "provided mental health support upon release back into the general population;"

(6)     that inmate held in administrative segregation more than one year be afforded a hearing "as outlined by *Wright v. Rushen*;" and

(7)     within 48 hours of being placed in administrative segregation, the inmate be provided with written notice of the reasons for his placement, with specific guidelines for the process.

(Dkt. 79.)

On August 16, 2019, the Court conducted judicial site visits to both County Jails 4 and 5. Captain Kevin McConnell ("McConnell") led the visits for the Court, Plaintiffs' counsel, and Defendants' counsel.  Plaintiffs' counsel and staff took photographs, videos, and readings with a light meter pursuant to a process the Court developed both to protect inmate privacy and to meet concerns about security.  After the visits, the Court posed written questions to Defendants

---

[1] Plaintiffs cite the district court's preliminary injunction, which was reversed but attached to the appellate court decision as an appendix, in *Wright v. Rushen*, 642 F.2d 1129, 1138 (9th Cir. 1981).

regarding the site visits (Dkt. 36), to which Defendants responded (Dkts. 43 (redacted version), 67 (sealed version)).  And on October 23, 2019, the Court held an evidentiary hearing where both parties and the Court had the opportunity to hear testimony from and ask questions of Plaintiffs' expert witness, Dr. Jamie Zeitzer.  (Dkt. 69.)  For the reasons set forth below, the Court GRANTS IN PART and DENIES IN PART Plaintiffs' motion for a preliminary injunction.

Separate from Plaintiffs' motion for preliminary injunction, Defendants move to dismiss the Complaint.  Defendants argue that Plaintiffs' Eighth Amendment claim is inapposite because Plaintiffs are pretrial detainees held before conviction of a crime.[2]  (Dkt. 37.)  They further contend that Plaintiffs' claims for mental and emotional suffering are precluded by the Prison Litigation Reform Act, and that all state law claims are barred by immunities established in the California Government Code.  (*Id.*)  Defendants maintain that all individual Defendants are entitled to qualified immunity as to all claims.  For the reasons set forth below, the Court GRANTS IN PART and DENIES IN PART Defendants' motion to dismiss.

## I.      INTRODUCTION.

Plaintiffs contend that the amount of light, type of light, and variance in light from day to night are not sufficient to maintain the health of inmates in San Francisco County's jails and that, as a result, the conditions of their confinement violate the Eighth and Fourteenth Amendments.  Plaintiffs also challenge the conditions of confinement for inmates who are required to spend 23 ½ hours in their cells every day.  The determination about the sufficiency of the light inmates receive is scientific and depends to some degree on information that the Court currently does not have.  The Court finds that there is currently insufficient evidence, even accepting the opinion of Plaintiffs' expert witness, to determine if the amount of light, type of light, and variance between light during the day and night support Plaintiffs' claim of harm.  The Court finds that depriving pretrial detainees of access to direct sunlight is not a violation of the Eighth or Fourteenth Amendments for inmates who receive sufficient time out of cell and exercise in indirect sunlight.

However, the Court finds that, for inmates who are required to spend 23 ½ hours in their cell each day, the amount of exercise allotted – 180 minutes per week in County Jail 4 and 210

_____

[2] Throughout this Order, the Court will refer to pretrial detainees separately from inmates who have been convicted but are awaiting sentencing.

United States District Court
Northern District of California

minutes per week in County Jail 5, respectively – is not sufficient to offset Plaintiffs' restriction to their cells.  The conditions of those Plaintiffs' confinement therefore violate the Eighth and Fourteenth Amendments.  The issue is not whether the inmates who are confined to their cells for 23 ½ hours a day are allowed to exercise *outside* but whether the amount of time they receive to exercise out of their cells and spend time out of their cells violates the Constitution.  That society would incarcerate a human being – who has not yet been found guilty and therefore is legally innocent and who has not committed a specific disciplinary violation – by locking him up in a small cell for 23 ½ hours a day is unacceptable.

## II.     BACKGROUND.

Plaintiffs Kenyon Norbert, Montrail Brackens, and Jose Poot are pretrial detainees incarcerated in County Jail 4.  (Dkt. 1.)  Plaintiffs Troy McAllister, Marshal Harris, and Michael Brown are pretrial detainees incarcerated in County Jail 5.  (*Id.*)  Plaintiff Armando Carlos ("Carlos") is a convicted defendant who has not yet been sentenced, and he is incarcerated in County Jail 5.  (*Id.*)  Montrail Brackens ("Brackens") has been incarcerated for six and a half years, spending the first year at County Jail 4 and the remainder at County Jail 5.  (Dkt. 8-5 (Brackens Dec. ¶ 1).)  Marshall Harris ("Harris") has been incarcerated at County Jail 5 for two and a half years.  (Dkt. 8-6 (Harris Dec. ¶ 1).)  Kenyon Norbert ("Norbert") was an inmate at County Jail 5 from July 2014 until March 2019, when he was transferred to County Jail 4, where he has remained since.  (Dkt. 8-8 (Norbert Dec. ¶ 1).)  Jose Poot ("Poot") has been incarcerated for three years in County Jail 4, with the exception of about 8 months in County Jail 5.  (Dkt. 8-9 (Poot Dec. ¶ 1).)

In support of their motion for a preliminary injunction, Plaintiffs provide the declarations of James McFarland ("McFarland") and Candido Zayas ("Zayas") who, though not named plaintiffs at this point in the litigation, provide relevant factual testimony as current inmates at County Jails 4 and 5 and would potentially be members of the class at issue.  (Dkt. 8-7 (McFarland Dec.); Dkt. 8-10 (Zayas Dec.).)  Two of the named Plaintiffs, Troy McAllister ("McAllister") and Michael Brown ("Brown"), did not submit declarations in support of the motion for a preliminary injunction.

/ / /

United States District Court
Northern District of California

1

## A.      General Categories of Confinement.

For both County Jails 4 and 5, inmates are separated into three general groups: (1) general population, (2) administrative segregation, and (3) disciplinary lockdown.[3]  (Dkts. 11-1, 11-2.)

Inmates are placed in administrative segregation only if "deemed necessary for safety and security of inmates and staff."  (Dkt. 11-1 (McConnell Dec. ¶ 4).)  Safety concerns may entail a finding either that the inmate poses a threat to others or that the inmate is vulnerable to other inmates.  (*Id.*)  For example, inmates who have dropped out of gangs are at risk from other inmates and therefore are candidates for administrative segregation.  (Dkt. 11-2 (Freeman Dec. ¶ 11).)  The Department of Corrections reviews administrative segregation placements every two weeks and, when safe, houses inmates in administrative segregation with at least one other inmate.  (*Id.*)

Inmates are placed in "disciplinary lockdown" only for violating rules, and the time an inmate can spend in disciplinary lockdown is limited to 30 days.  (Dkt. 11-2 (Freeman Dec. ¶ 5).)[4]  This lack of recreation time is imposed when "an inmate violates Sheriff Department rules that are rated to have restrictions imposed" and as a result "a supervisor […] recommend[s] 'discipline.'"  (Dkt. 67.)  While in disciplinary lockdown, an inmate is generally not able to exercise in the gym, but some are allowed to do so based on the type of rule the inmate violated.  (Dkt. 11-2 (Freeman Dec. ¶ 5).)  Inmates are usually not housed alone even in disciplinary lockdown.  (*Id.* at ¶ 4.)  Inmates are placed in disciplinary lockdown only after notice and an opportunity to be heard.  (*Id.* at ¶ 13.)

---

[3] Although the terminology regarding the jail structures differs slightly between County Jails 4 and 5, the categories of confinement are consistent.  The record is not completely clear because the inmates who submitted declarations for this motion use different terminology from each other and from Defendants, and it is not always evident whether they are referring to administrative segregation or disciplinary lockdown.  Confusing the matter further is the fact that other jails or prisons appear to use the term "administrative segregation" to refer to placement in disciplinary lockdown.  For clarity, the Court in this Order will refer to the three categories using the terms "general population," "administrative segregation," and "disciplinary lockdown."

[4] There is a possibility, though, that an inmate might spend 30 days in disciplinary lockdown, be released into the general population, violate another rule, and then go back to disciplinary lockdown.  Inmates are always released after 30 days.  (Dkt. 11-2 (Freeman Dec. ¶¶ 4-5).)  The record is silent on the disciplinary lockdown process and whether there is any time required between two consecutive placements in disciplinary lockdown.  One declarant stated that he was placed in disciplinary lockdown for six months.  (Dkt. 8-7 (McFarland Dec. ¶ 3).)

5

United States District Court
Northern District of California

The City and County of San Francisco jail system houses inmates charged with violations of California state criminal laws, but it can also house inmates who are charged with federal crimes in the United States District Court.[5]  The Federal Public Defender for the United States District Court, Northern District of California, noted in an *amicus curiae* brief submitted December 12, 2019, that most federal inmates are held in another county's facility.  (Dkt. 93.)

**B.      County Jail 4.**

County Jail 4 is located at 850 Bryant Street in San Francisco.  (Dkt. 67.)  County Jail 4 is organized into eleven "blocks" designated by letters A, B, C, D, E, F, G, H, J, K, and L.  (*Id.*)  As discussed above, there are three types of housing within County Jail 4: "general population," "administrative segregation," and disciplinary lockdown (also known colloquially as "supermax"). (Dkt. 11-2 (Freeman Dec. ¶ 14-16).)

At maximum capacity, County Jail 4 can house 402 inmates.  (Dkt. 67.)  Of the total number of inmates in County Jail 4 as of July 31, 2019, 93.71% were pretrial detainees.  (*Id.*)  Of those inmates, 22% (77 people) had been housed for longer than one year, while 14.29% (50 people) had been housed for longer than two years, and 10.58% (37 people) had been housed for longer than three years.  (*Id.*)

Although both federal and state law provide that a criminal defendant must have a trial within a certain period of time, criminal defendants can waive that right in order to prepare for trial.  *See*, *e.g.*, *Zedner v. U.S.*, 126 S. Ct. 1976, 1978 (2006) (citing 18 U.S.C. § 3161(c)(1)); *Barsamyan v. Appellate Division of Superior Court*, 44 Cal. 4th 960, 965 (2008) (citing Cal. Penal Code § 1382).[6]  In addition, there are other factors that allow a court to delay the trial beyond the date mandated by statute under both federal and California law.  *See*, *e.g.*, 18 U.S.C. § 3161(h)

---

[5] The U.S. Marshal "assumes custody of all prisoners charged with a federal offense, no matter which agency made the arrest."  https://www.usmarshals.gov/prisoner/.  The U.S. Marshal has contracted with the City and County of San Francisco "to house Federal detainees with the Local Government at the SAN FRANCISCO CITY and COUNTY JAIL 850 Bryant Street [sic], San Francisco[.]"
https://www.usmarshals.gov/foia/IGAs_Cap_Agreements/california/sf_city_county_jail.pdf (capitalization in original).
[6] It is not clear why Plaintiffs here have been incarcerated as pretrial detainees for such long periods of time.  However, Norbert explains that he is "fighting" the criminal charges against him because he is "factually innocent."  (Dkt. 8-8 (Norbert Dec. ¶ 1).) This indicates that his criminal process is lengthier because he is strenuously contesting the charges against him.

(trial court may delay trial if trial is complex, novel issues raised,  multiple defendants involved, or additional time necessary for defense counsel to prepare effectively); 18 U.S.C. § 3161(h) (trial court can consider same factors as in federal statute).  It may be difficult for a person not familiar with the criminal legal system to understand how long a case may take before brought to trial.  Jails were initially created to house pretrial detainees on a short-term basis.  But because of the increasing complexity of criminal trials, the time between arrest and trial can be years.  For example, a local news report dated February 12, 2018, calculated, based on statistics from the State of California, that only 68% of criminal cases are resolved within one year.[7]

Sheriff Vicki Hennessy ("Hennessy") has publicly described conditions in County Jail 4 as "an embarrassment to the city" and "decrepit."  (Dkt. 8-11 (Huang Dec. Ex. E).)

The inmates in County Jail 4 are grouped in cells of 1, 2, 4, 6, or 12 people, depending on the inmate's classification and history.  (Dkt. 11-2 (Freeman Dec. ¶¶ 14-16).)  A and D blocks have louvered windows that, when open, allow in both fresh air and direct sunlight; inmates can see outside.  (Dkt. 11-2 (Freeman Dec. ¶ 17.)  The other blocks do not have windows.

County Jail 4 contains a single designated exercise area, the "gym," which was added in 1985.  (Dkts. 11, 67.)  The gym consists of a single room slightly larger than a regulation basketball court.  (*Id.*)  Rather than windows, the gym has four long rectangular openings that are covered by grates, through which fresh air is allowed to enter the room.  (*Id.*)  The Court observed during the site visit and confirmed with the photographs taken during the site visit that the gym ceiling contains six large square skylights, which have grates over them that allow in some direct sunlight and fresh air.  Attached to the gym is a small multipurpose room with either a frosted piece of glass or clear glass to allow in light.  (Dkts. 67, 11-2 (Freeman Dec. ¶ 18).)

"A Block" is divided into six subsections, labeled A1-A6.  (Dkts. 11, 67.)  Inmates housed in A1 and A4 receive one and a half hours of recreation time two days a week.   (Dkt. 67.)  During their recreation time, A Block inmates may be in the gym with other inmates, between 15 and 20 total at any one time.  (*Id.*)  However, inmates housed in A2, A3, A5, and A6 are designated as "restricted housing" or "disciplinary lockdown" inmates and receive zero hours of recreation per

United States District Court
Northern District of California

week.  (Dkts. 67, 11-2 (Freeman Dec. ¶ 4).)  There is no side room or day room for A Block.  (Dkt. 109.)

"B Block" and "C Block" are cell blocks in the general population.  (Dkt. 67.)  Inmates in B and C Blocks receive one and a half hours of recreation time two days a week.[8]  (*Id.*)  During their recreation time, B and C Block inmates may be in the gym with other inmates, up to 20 total at any one time.  (*Id.*)  Inmates in B and C Blocks have sleeping areas into which they are locked at night but also have a very small "side room" where they can sit during the day.  (Dkt. 109.)  The side room is open for more than 12 hours a day, so that inmates can move between the sleeping area and side room during that time, but at night they are locked into the sleeping areas.  (*Id.*)  The side rooms have a metal bench, a metal table, phones, a television, a sink, a shower, and a toilet.  (*Id.*)

"D Block" is a block exclusively for inmates in administrative segregation.  (Dkt. 67.)  Inmates in D Block receive one and a half hours of recreation time two days a week.  (*Id.*)  During their recreation time, D Block inmates may be in the gym with other inmates, between 2 and 8 total at any one time, depending on concerns about security.  (*Id.*)  There is no side room or day room for D Block.  (Dkt. 109.)

"E Block" and "F Block" each contain a limited number of inmates.  (Dkt. 67.)  Inmates in E and F Blocks receive one and a half hours of recreation time two days a week.  (*Id.*)  During their recreation time, E and F Block inmates may be in the gym with other inmates, up to two total at any one time.  (*Id.*)  There is no side room or day room for either E Block or F Block.  (Dkt. 109.)

Though slightly larger than E and F Blocks, "G Block" and "H Block" also contain a small number of inmates.  (Dkt. 67.)  Inmates in G and H Blocks receive one and a half hours of recreation time two days a week.  (*Id.*)  During their recreation time, G and H Block inmates may be in the gym with other inmates, up to 12 total at any one time.  (*Id.*)  Inmates in G and H Blocks

---

[8] Some inmates submitted declarations that they were given only one three-hour block of time for the gym in one week, rather than two visits of one and a half hours each.  (Dkt. 8-5 (Brackens Dec. ¶ 3); Dkt. 8-8 (Norbert Dec. ¶¶ 12-13); Dkt. 8-9 (Poot Dec. ¶ 7).)  Until approximately mid-June 2019, inmates were given one three-hour block per week, but now they have two blocks of 1 ½ hours each per week.  (Dkt. 11-2 (Freeman Dec. ¶ 20).)

have sleeping areas into which they are locked at night but also have a very small "side room" where they can sit during the day.  (Dkt. 109.)  The side room is open for more than 12 hours a day, so that inmates can move between the sleeping area and side room during that time, but at night they are locked into the sleeping areas.  (*Id.*)  The side rooms have a metal bench, a metal table, phones, a television, a sink, a shower, and a toilet.  (*Id.*)

Inmates in Block G also assist in chores within the jail and thus are out of cell an additional four to six hours per shift, but it is not clear how many days per week this occurs.  (Dkt. 109.)

"J Block" has recently been designated specifically for inmates in the "Roads to Recovery" program.  (Dkt. 67.)  Inmates in J Block receive one and a half hours of recreation time two days a week.  (*Id.*)  During their recreation time, J Block inmates may be in the gym with other inmates, between 15 and 20 total at any one time.  (*Id.*)  Inmates in J Block have access to a day room that they can access at least nine hours and forty-five minutes a day, and they are allowed out of their sleeping areas 12 hours a day.  (Dkt. 109.)  The Court observed and confirmed with photographs that this day room is larger than the side rooms described above, and the day room also has louvered windows with direct sunlight.

"K Block" is a block exclusively for inmates in administrative segregation.  (Dkt. 11-2 (Freeman Dec. ¶ 15).).)  Inmates in K Block receive one and a half hours of recreation time two days a week.  (Dkt. 67.)  During their recreation time, K Block inmates may be in the gym with other inmates, between two and six total at any one time, depending on security concerns.  (*Id.*)  There is no side room or day room for K Block.  (Dkt. 109.)

"L Block" is a block for inmates in administrative segregation, "restricted housing," "inmate workers," "special needs housing" or temporary housing.  (Dkt. 109.)  Inmates in L Block receive one and a half hours of recreation time two days a week.  (Dkt. 67.)  L Block does not have a side room or day room.  (Dkt. 109.)  Inmates in Block L also assist in chores within the jail and thus are out of cell an additional four to six hours per shift, but it is not clear how many days per week this occurs.  (Dkt. 109.)

The Court observed during the site visit, as confirmed by photographs taken during the site

United States District Court
Northern District of California

visit, that there are windows at the ends of the hallways in County Jail 4 from which light can enter.  The Court observed during the site visit that the cells and the day rooms are too small to allow inmates to exercise in a meaningful way in the cells.

**C.      County Jail 5.**

County Jail 5 is located in San Bruno and can hold a maximum of 772 inmates.  (Dkt. 67.)  Within County Jail 5, there are three types of housing: "general population," "administrative segregation," and "restricted housing."[9]  (Dkt. 67; Dkt. 11-1 (McConnell Dec. ¶¶ 4, 8).)  Of the total housing capacity at County Jail 5, general population units can house 528 inmates; administrative segregation units can house 96 inmates; and disciplinary lockdown units can house 24 inmates.  (Dkt. 67.)  There are also several smaller housing units for inmates with psychiatric needs, medical needs, and security needs (for gang dropouts).  (Dkt. 11-1 (McConnell Dec. ¶¶ 4, 8).)  Two housing units in County Jail 5 are designated for a charter high school program.  (*Id.*)  Housing units at County Jail 5 are referred to as "pods."  (*Id.*)  Each pod at County Jail 5 is identical and houses 48 inmates.  (*Id.*)  During their "free time" each general population "pod" has access to a common area or "day room" that contains phones, a shower, television, tables, and stools.  (Dkt. 11-2 (Freeman Dec. ¶ 6).)  The doors to the cells have clear plastic that allows inmates to see into the common areas.  (*Id.*)  Inmates may access the common areas for four and a half hours each weekday and 8 hours each weekend day.  (*Id.*)

Inmates in administrative segregation in County Jail 5 are allowed to use the gym.  One source says that they can use the gym for three hours a week on multiple days, but another says at least 30 minutes a day, seven days a week.  (Dkt. 11-1 (McConnell Dec., ¶ 5); Dkt. 11-2 (Freeman Dec. ¶ 12).)  Although the underlying evidence is slightly confusing, Defendants claim in their briefing that inmates in administrative segregation receive 30 minutes of exercise, seven days a week, and in addition receive 30 minutes of time in the day room, seven days a week.  (Dkt. 81 at page 4.)

The backs of the cells have windows that look out to the exterior wall of a building and

---

[9] For consistency, the Court will refer to "restricted housing" area as "disciplinary lockdown" for both County Jails 4 and 5.

which allow in "borrowed" or ambient light into each cell.  (Dkt. 11-2 (Freeman Dec. ¶ 7).)  The common room opens into a gym, which is approximately the size of half of a basketball court.  (*Id.* ¶¶ 6-8.)  The gyms are irregularly shaped but about half the size of a regulation basketball court.  (Dkt. 11 at page 7.)  Two large grates in the ceiling of each gym allow air from outside to enter the building and allow some light, but there are no windows or glass in the gym.  (Dkt. 11-2 (Freeman Dec. ¶¶ 6-8.)

The number of inmates in the gym at any one time may vary.  (Dkt. 67.)  Inmates being housed in administrative segregation pods are allowed out of their cells 30 minutes of exercise 7 days a week.  (Dkt. 11-1 (McConnell Dec. ¶ 5).)  They may be allowed out for a longer period of time, but there is no evidence on how long that is or how frequently that happens.  (*Id.*)  Typically, two inmates are released for their exercise time together; however, if the jail staff deems it safe for multiple inmates to occupy the gym simultaneously, the number of inmates in the gym may increase in groups of two.  (Dkt. 67.)  For each two inmates added to the total, the exercise time is increased by 30 minutes; *e.g.*, four inmates in the gym together would get one hour of time, six would get one and a half hours, etc.  (*Id.*)

Inmates in disciplinary lockdown generally do not receive any recreation time, but some do, depending on the violation of the rules that resulted in the lockdown placement.  (Dkt. 11-2 (Freeman Dec. ¶ 4.).)  However, there is no evidence about the amount of time or frequency with which these inmates are allowed recreation.

Of the total number of inmates in County Jail 5 as of July 31, 2019, 92.85% were pretrial detainees.  (Dkt. 67.)  Of those inmates, 35.05% (191 people) had been housed for longer than one year, while 20.37% (111 people) had been housed for longer than two years.  (*Id.*)  11.20% (61 people) had been housed for longer than three years, and 6.06% (33 people) had been housed for longer than four years.  (*Id.*)

County Jail 5 previously had an outdoor exercise yard that has not been used for 13 years.  (Dkt. 11-2 (Freeman Dec. ¶ 24).)  Currently, the exercise yard is an open field.[10]  The yard is currently not secure.  Because there is no secure pathway between the jail and the exercise yard,

---

[10] The Court observed this yard during the site visit.

Defendants state that transferring inmates to the yard would not be safe unless there were "extraordinary time-consuming and costly measures" put in place, but there is no estimate of that time or expense in the record.  (Dkt. 11-2 (Freeman Dec. ¶ 24).)  In addition, the fences around the yard are crumbling and leaning.  (Dkt. 11-1 (McConnell Dec. ¶11).)

The Court observed during the site visit that the cells are too small to allow inmates to exercise in a meaningful way.

### D.   Solitary Confinement.

Inmates in County Jails 4 and 5 are rarely housed alone.  (Dkt. 11-2 (Freeman Dec. ¶ 4).) Plaintiffs submit a declaration of Terry Kupers, M.D., M.S.P., who defines "solitary confinement" as "more than 22 hours per day of cell confinement" with "very limited opportunity for contact with others beside a cellmate and officers[.]"  (Dkt. 8-2 (Kupers Dec. at page 3).)  Kupers, a board-certified psychiatrist with many years of experience advising and testifying about correctional institutions, opines that the type of confinement that Norbert has experienced leads to serious psychological problems.  (*Id*.)  There is no evidence that Kupers has examined Norbert or seen County Jails 4 and 5.

### E.   No Outdoor Recreation or Exercise Areas for Either County Jail 4 or 5.

There are no outdoor recreational facilities in either County Jail 4 or County Jail 5.  (Dkt. 67.)  Inmates at County Jails 4 and 5 have no access to direct sunlight or outdoor recreation during their time incarcerated at those facilities.  Plaintiffs and the other witnesses describe their access to direct sunlight in stark terms:

(1)  "In the eight (8) years I have been incarcerated, I have never been in sunlight." (Dkt. 8-4 (Carlos Dec. ¶ 1));

(2)  "In the entire time I have been in jail, I have never been given outdoor recreation. In the 6 ½ years I have been a pretrial detainee in San Francisco county jails, I have never had the sunshine on my skin.  Every single prisoner suffers from complete denial of outdoor recreation." (Dkt. 8-5 (Brackens Dec. ¶ 2));

(3)  "No prisoner has access to sunlight or sunshine. [...] In the five (5) years I have been incarcerated, I have never been in sunlight."  (Dkt. 8-8 (Norbert Dec. ¶ 2));

(4)  "In the 4 ½ years I have been a pretrial detainee in San Francisco county jails, I

United States District Court
Northern District of California

have never had the sunshine on my skin."  (Dkt. 8-7 (McFarland Dec. ¶ 2 ));

(5)    "My understanding of the conditions inside San Francisco County Jail is based
upon the almost three (3) years that I have been incarcerated in a San Francisco
County jail […] I have never been in the sunshine since being incarcerated."  (Dkt.
8-9 (Poot Dec. ¶ 2));

(6)    In the 2 ½ years I have been a pretrial detainee in San Francisco county jails, I have
never had the sunshine on my skin."  (Dkt. 8-6 (Harris Dec. ¶ 2));

(7)    "In the 2 years I have been a pretrial detainee in San Francisco county jails, I have
never had the sunshine on my skin. […] It has been very hard for me to be indoors
this entire time.  The only time I am outdoors is the 2 seconds stepping off the bus,
when I have court, before I walk into the Hall of Justice.  I always try to take a
moment and look up and see the sky.  And then, boom, I'm back in.  It always feels
very terrible, and I get sad and depressed."  (Dkt. 8-10 (Zayas Dec. ¶ 2)).

**F.    Plaintiffs' Housing History.**

Each of the named Plaintiffs and inmates who submitted declarations in support of the
preliminary injunction has a unique history of confinement within the San Francisco County Jails.

Brackens was placed in administrative segregation in D Block of County Jail 4 from the
time of his arrest in 2012 until the end of 2013.  (Dkt. 11-2 (Freeman Dec. ¶ 27).)  For three
months of this time, Brackens was held in disciplinary lockdown.  (*Id.*)  At the end of 2013,
Brackens was moved to County Jail 5, where he was again placed in administrative segregation.
(*Id.* ¶¶ 27-28).)  From mid-2016 to March 2018, Brackens was placed in the psychiatric sheltered
housing pod at County Jail 5.  (*Id.* at ¶ 28.)  In March 2018, Brackens was again returned to
County Jail 4, where he was placed in administrative segregation and where he remains.  (*Id.*)
Brackens states that he was housed in "K block" of County Jail 4 for one year and that, although
he asked to be housed "mainline," his requests were denied and that he was told that he was placed
in "segregation" because he had a "high profile case."  (Dkt. 8-5 (Brackens Dec. ¶ 3).)  Brackens
was transferred to County Jail 5 and was "still housed in lock down."  (*Id.* ¶ 4.)  Brackens states
that he was never given a reason for that assignment.  (*Id.*)  Brackens also had only 30 minutes out
of cell per day and had to split that time between using the phone or exercising in the gym.  (*Id.* at

United States District Court
Northern District of California

¶ 7.)  Brackens was then transferred to County Jail 4, where he was placed into the "general population" where 12 people were "crammed into a small cell." (*Id.* ¶ 9.)  He was not used to being with that many people and "refused the housing." (*Id.*)  That led to placement in the "hole," where he was locked up 24 hours a day and let out only to shower.  (*Id.*)  He was placed there for 30 days, still refused his housing assignment, and was then placed into "segregation." (*Id.*)  Brackens is currently in administrative segregation and has never had a hearing.  (Dkt. 79-1 (Supplemental Brackens Dec. ¶ 1).)  He has been told that he is in administrative segregation because he has a high-profile case.  (Dkt. 8-5 (Brackens Dec. ¶ 3).)  Brackens has never had a real review for his placement in administrative segregation.  (Dkt. 8-5 (Brackens Dec. ¶4); Dkt. 79-1 (Supplemental Brackens Dec. ¶ 2).)  He would like to be placed back in the general population and receive mental health support to make the transition back into the general population.  (Dkt. 79-1 (Supplemental Brackens Dec. ¶ 2).)

Norbert has been incarcerated continuously since July of 2014.  (Dkt. 11-2 (Freeman Dec. ¶ 32).)  Norbert was primarily held in administrative segregation pods at County Jail 5; however, since April 2019 he has been held in administrative segregation at County Jail 4.  (*Id.*)  He has never had a hearing and requests mental health treatment if he returns to the general population, where he would like to return.  (Dkt. 79-3 (Supplemental Norbert Dec. ¶¶ 2-3).)  For most of the five years that Norbert has been incarcerated, he has been in a cell, either alone or with one cellmate.  (Dkt. 8-8 (Norbert Dec. ¶ 7).)  During those times, he was allowed out of cell only 30 minutes a day, and that time was a combination of gym time or phone time.  (*Id.*)  He was required to use the phone in his cell, and he was allowed to go to the gym only if his cellmate went with him.  (*Id.*)  Because calling their lawyers was so important to both Norbert and his cellmate, they used their time for the phone and thus lost their time out of cell "most days." (*Id.*)  Because handcuffing and walking to the gym were part of the 30 minutes out of cell, the actual time in the gym was less than 30 minutes.[11]  (*Id.* at ¶ 8.)  Norbert is now housed at County Jail 4, where he was transferred at his request, and he now has one cellmate and the ability to go to the gym for

---

[11] McConnell reports that the system has been changed so that the gym time and phone time are now separate and that Brackens has separate time to use the phone because he is representing himself in his criminal case.  (Dkt. 11-1 (McConnell Dec. ¶ 8).)

1   three hours a week. (*Id.* at ¶¶ 11-13.)  Sometimes the time for gym is so early (7:00 a.m. after a

2   5:00 a.m. breakfast), that Norbert has fallen asleep and misses time at the gym.  (*Id.* at ¶ 13.)

3   Norbert is housed with Brackens in a cell that measures 7 feet by 12 feet.  (Dkt. 79-3

4   (Supplemental Norbert Dec. ¶ 1).)

5        Carlos has been housed in County Jail 5 since 2011, mainly in the general population.

6   (Dkt. 11-2 (Freeman Dec. ¶ 29).)  In August 2018, Carlos was placed in administrative

7   segregation, where he remains.  (*Id.*)  Carlos states that he was placed into "segregation" before

8   his jury trial, but he does not know why he was placed there.  (Dkt. 8-4 (Carlos Dec. ¶ 7).)  He

9   states that no one explained to him why he was placed into segregation.  (*Id.*)  He states: "because

10  I was in trial, the restrictions of segregation did not bother me because I was not at the jail."  (*Id.*)

11  After his trial ended, he was placed into a housing unit where he was "locked down" almost 24

12  hours a day.  (*Id.* at ¶ 8.)  During that period of time, he was allowed out of his cell only 30

13  minutes per day and had to choose to phone or the gym.  (*Id.*)  Because of the time spent walking

14  and handcuffing during the walk, the amount of time in the gym is less than 30 minutes.  (*Id.*)

15  Before, when Carlos was in the general population, he received access to classes and programs,

16  but now he does not.  (Dkt. 79-2 (Supplemental Carlos Dec. ¶ 2).)  In administrative segregation,

17  Carlos is in a cell 23 ½ hours a day.  (*Id.*)  His cell measures 6 feet by 12 feet.  (*Id.*)

18        Harris has been housed in the general population at County Jail 5 since August 2017.

19  (Dkt. 11-2 (Freeman Dec. ¶ 30).)

20        Poot was held in County Jail 5 from June 2016 to January 2018, when he was moved to

21  County Jail 4.  (Dkt. 11-2 (Freeman Dec. ¶ 33).)  Poot was completely denied recreation during a

22  period of disciplinary lockdown from May 2019 to June 2019.  (*Id.*)

23        Non-plaintiff Zayas has been incarcerated at County Jail 5 for two years.  (Dkt. 11-2

24  (Freeman Dec. ¶ 34).)  It is not clear from the current record whether Poot and Zayas have been

25  primarily housed in general population, administrative segregation, or disciplinary lockdown.

26        Non-plaintiff McFarland has been incarcerated at various points since 2009, but has

27  remained continuously incarcerated at County Jail 5 since October of 2014.  (Dkt. 11-2 (Freeman

28  Dec. ¶ 31).)  During that time, McFarland has been housed in either administrative segregation or

    disciplinary lockdown.  (*Id.*)  McFarland states that he has been placed in "various forms of

United States District Court
Northern District of California

segregation," either administrative segregation or disciplinary lockdown, for 18 months, including six months in the "hole." (Dkt. 8-7 (McFarland Dec. ¶ 3).) McFarland says that he was placed in the "hole," where he was locked up for 24 hours with no cellmate, for violating rules. (*Id.*) One time the rule he violated was "possessing a blue ball point pen." (*Id.*) During the 12 months that McFarland was in "segregation" outside the "hole," he had a cellmate but was only allowed out of cell to use the phone or exercise for ½ hour a day. (*Id.* at ¶ 5.)

Non-plaintiff Kishawn Norbert ("Kishawn Norbert"), brother of named Plaintiff Kenyon Norbert, submitted a declaration with the Supplemental Points and Authorities. (Dkt. 79-4 (Kishawn Norbert Dec. ¶ 2).) He is currently being held in administrative segregation and alleges that his placement review consists only of a deputy sheriff who tells him every two weeks that he is "never getting out" of administrative segregation. (*Id.* at ¶ 3.)

Non-plaintiff Roger Dominguez ("Dominguez") also submitted his declaration with the Supplemental Points and Authorities. (Dkt. 79-5 (Dominguez Dec. ¶¶ 2-6).) He was attacked in the general population and then sent to administrative segregation, but his attackers remain in the general population. (*Id.*)

McAllister is a named Plaintiff and a pretrial detainee incarcerated in County Jail 5, and he has been incarcerated since July 29, 2014. (Dkt. 1 (Complaint ¶ 57).)

Brown is a named Plaintiff and a pretrial detainee incarcerated in County Jail 5. (Dkt. 1 (Complaint ¶ 63).) He has been incarcerated for almost one year as of the time the Complaint was filed. (*Id.*)

### G. Plaintiffs' Self-Reported Medical History.

The named Plaintiffs and inmates who submitted declarations in support of the preliminary injunction allege physical and emotional ailments as a result of their conditions of confinement. Generally, Plaintiffs allege that their lack of access to outdoor exercise and sunshine results in "cardiovascular disease, hypertension, negative impacts on blood sugar including adult onset diabetes and lowered insulin sensitivity, headaches, migraines, anxiety and depression, weight increase and obesity" as well as "a variety of health issues resulting from Vitamin D deficiency, including soft bones, muscle weakness, bone pain, cardiovascular disease and cognitive

16

impairment." (Dkt. 1 (Complaint ¶¶ 52-53).)  In particular, McFarland alleges that he suffers from daily migraine headaches and high blood pressure, which he never had before being incarcerated. (Dkt. 8-7 (McFarland Dec. ¶ 5).)  Norbert alleges that he suffers severe headaches, exhaustion, insomnia, back and hip pain, weight gain, poor eyesight, poor circulation, brittle hair, and edema on his feet as a result of his conditions of confinement.  (Dkt. 8-7 (Norbert Dec. ¶¶ 11, 18).)  In his supplemental declaration, he states that he is now been diagnosed as pre-diabetic.  (Dkt. 79-3 (Supplemental Norbert Dec. ¶ 2).)  Poot alleges that he is tired, depressed, and irritable, and regularly has severe headaches.  (Dkt. 8-9 (Poot Dec. ¶ 10).)  Several Plaintiffs report a change in their complexions based on lack of sun exposure.  (Dkt. 8-7 (Norbert Dec. ¶ 2), Dkt. 8-4 (Carlos Dec. ¶ 2), Dkt. 8-9 (Poot Dec. ¶ 3), Dkt. 8-5 (Brackens Dec. ¶ 2).)  Brackens alleges that he suffers from lethargy, anxiety, and a weakened immune system.  (Dkt. 8-5 (Brackens Dec. ¶ 13).) Brackens, in his supplemental declaration, states that he now has been diagnosed with diabetes. (Dkt. 79-1 (Supplemental Brackens Dec. ¶ 1).)  Harris reports that he suffers from depression and worsening eyesight.  (Dkt. 8-6 (Harris Dec. ¶ 8).)

McAllister and Brown described their conditions in the Complaint only because they did not submit declarations.  McAllister is concerned about his health and is in "despair." (Dkt. 1 ¶ 58.)  Brown has experienced "significant body pain, including backpain in his kidney region, depression, anxiety and agitation."  (Dkt. 1 ¶ 63.)

There is no evidence from other sources regarding the Plaintiffs' medical conditions or cause of their ailments.

**H.    Scientific Evidence regarding Harms from Lack of Access to Light.**

Jamie M. Zeitzer, Ph.D. ("Zeitzer") is an Associate Professor and Health Science Specialist in Psychiatry and Behavioral Sciences at Stanford University.  (Dkt. 8-3 (Zeitzer Curriculum Vitae).)  Zeitzer submitted an expert report in support of Plaintiffs' motion for a preliminary injunction.  (Dkt. 8-3 (Zeitzer Dec. Ex. A).)  Zeitzer is recognized worldwide as an expert in sleep and Circadian rhythms and has published over 100 articles and lectured internationally on those topics.  (*Id.*)  Zeitzer also testified before the Court at the evidentiary hearing held on October 23, 2019.  In his written testimony, Zeitzer explained that "[t]he Circadian clock, which is located in

United States District Court
Northern District of California

17

the brain, is responsible for the temporal organization (timing) or a variety of biological activities, including sleep, mood, metabolism, immune function, and cognition." (*Id.*) "A properly timed and functioning Circadian clock is dependent on exposure to regular light-dark cycle." (*Id.*) Individuals with disrupted Circadian rhythms can eventually develop pathologies, including insomnia, depression, diabetes, cancer, and cognitive impairment. (*Id.*) "Exposure to sunlight is an important component in the setting and regulation of the human Circadian rhythm." (*Id.*) This is true because "[t]he more robust the difference between the brightness of light during the day and night, the stronger the signal to the Circadian clock." (*Id.*)

Zeitzer explained during the evidentiary hearing that it is possible to measure ambient light levels using a light detector unit ("LDU") calibrated by the National Institute of Standards and Technology. (Dkt. 75 (Zeitzer Hearing FTR at 9:41).) Prior to the jail site visits, Zeitzer met with a paralegal from Plaintiffs' counsel's office, gave her the LDU, and explained to her how to capture accurate ambient light readings, including the normal exposure to light a person would get in any given room, as well as the uppermost and the lowermost readings. (*Id.* at 9:42, 9:44-47).) Zeitzer explained that the LDU takes in light readings and normalizes them to a unit of measure referred to as "lux," which corresponds to the amount of light taken in by the human eye and consciously seen by the human brain. (Dkt. 75 (Zeitzer Hearing FTR at 9:42; Zeitzer Hearing Transcript at 12:3-9).) Zeitzer clarified that the further a person is from a light source, the lower the intensity of the light the person receives, with the normal calculation being 1 divided by the square root of the distance from the light. (Dkt. 75 (Zeitzer Hearing FTR at 9:43).)

According to Zeitzer, "anything under 10 lux" represents "very dim lighting." (Dkt. 75 (Zeitzer Hearing Transcript at 12:11).) In the United States, indoor lighting in a typical home varies between 100 lux during the day and 50 lux in the evening. (*Id.* at 12:11-14.) In contrast, "a well-lit office" might be 200 to 300 lux, and the light outside on a nice day would be anywhere from 10,000 to 100,000 lux. (*Id.* at 12:15-17.) Zeitzer testified that the type of light received inside "doesn't completely recapitulate what you would get outside" for health purposes, due to color spectrum differences in the composition of the types of light and how those types of light are variously perceived by the light-responsive cells in the human eye and brain. (*Id.* at 16:2-17:6.) Zeitzer explained that generally, the source or type of light (sunlight vs. artificial light) did not

make a difference unless there was a complete absence of "blue light."  (*Id.* at 50:15-20.)  Sunlight filtered through windows supplies sufficient light unless the window is a special type that blocks certain types of light.  (*Id.* at 65:2-19.)  A person can receive the proper differential between light during the day and light during the night from access to natural light from a window instead of being outside.  (*Id.* at 30:15-17.)  And that differential can also be established from artificial light as opposed to natural light.  (*Id.* at 30:18-20.)  Zeitzer does not know what type of windows are in County Jails 4 and 5.  (*Id.* at 65:6-66:12.)

At the evidentiary hearing, Zeitzer elaborated on the meaning of lux readings.  He explained that "the critical part about lighting is that we create a difference between the daytime lighting and the nighttime lighting."  (*Id.* at 21:5-7.)  Health benefits of appropriate lighting are based not only on "the absolute amount of light that one is getting" but on the difference between the light during the day and the light at night.  (*Id.* at 21:7-9.)  As Zeitzer explained: "[I]f you don't have this difference between day and night, then you have a lot of negative health consequences."  (*Id.* at 21:10-11.)  Thus, if a person "were to sleep in absolute hundred percent darkness," dimmer lighting during the daytime would be adequate.  (*Id.* at 22:20-24.)  Circadian rhythm problems due to inadequate light will be "completely obviated" if a person gets sufficient exposure to daylight; Zeitzer notes that "the typical clinical recommendation is 30 minutes […] of natural lighting exposure."  (*Id.* at 23:5, 12-15.)

Zeitzer further hypothesized that some exposure to high intensity sunlight one to two times a week might also be sufficient to ameliorate Circadian problems in people who generally are exposed to poor lighting conditions.  (*Id.* at 28:10-19.)  However, Zeitzer also pointed out the difficulty in conducting direct studies of sunlight deprivation, as depriving people of sunlight over the long term would pose ethical problems, "given what we know about the risk of extended light deprivation or extended exposure to minimal light."  (*Id.* at 24:8-25.)  "As the length of time of exposure to only artificial indoor lighting is extended, the likelihood of disruption to sleep and Circadian rhythms increases, as do the downstream consequences on heart, metabolic, immune, and mental health."  (Dkt. 8-3 (Zeitzer Dec. at 5).)

Zeitzer concluded that the conditions in County Jails 4 and 5, including "total lack of natural sunlight, limited night time [sic] sleep period, and continuous night time illumination will

19

be associated with a variety of both short- and long-term impairments" for inmates.  (*Id.* at 6.)
However, Zeitzer is not a medical doctor and has not examined or treated any of the inmates in
County Jails 4 or 5.  (Dkt. 75 (Zeitzer Hearing Transcript at 41:10-18, 42:10-14, 44:13-24).)

Neither the Court nor Zeitzer had access to data regarding the lux levels in either County
Jail 4 or County Jail 5 at night.  Even when a person's eyes are closed, around 10 percent of the
light in a space still enters the eye; thus, the appropriate reading for light entering a closed eye
would be the lux reading minus 90 percent.  (*Id.* at 39:23-40:14.)  Zeitzer explained at the
evidentiary hearing that methods exist for gathering more fulsome data regarding lux, including
installing LDUs programmed to take periodic light readings over a 24-hour period.  (*Id.* at 32:9-
33:4).)

In summary, the total amount of light a person receives is not the important factor for
health; instead, the difference between light at night and light during the day is significant for
health.  In general, the type of light – whether sunlight or artificial light – is not significant.
However, exposure to a smaller amount of sunlight each week suffices to reset the Circadian clock
because sunlight is usually very bright.  Zeitzer's opinions about the conditions of the inmates in
County Jails 4 and 5 are based on general knowledge and not on any specific medical data for the
individual inmates, and Zeitzer, who is not a medical doctor, has not treated or examined any of
the inmates.

## I.       Light Measurements During Site Visit and Lighting at Night in County Jails 4 and 5.

During the site visits, Plaintiffs' counsel, assisted by Schwartz and a photographer, used
the LDU to take light readings at various locations throughout each jail.  The LDU readings were
recorded using still photographs; for ease of reference, Plaintiffs' counsel produced a chart
cataloging all of the readings, which she introduced at the evidentiary hearing, and which was
marked as "Exhibit 1."  (Dkt. 75 (Zeitzer Hearing Transcript at 10:21-11:15); Dkt. 81-3.)
Defendants did not object to Exhibit 1 at the hearing, and the Court provided further opportunity
for Defendants to review the chart and file any objections after the hearing, which they did not.
(*Id.* at 11:10-15, 70:19-71:14.)  The lux readings inside County Jail 4 varied, from a minimum of
negative 56 lux to a maximum of 10,320 lux facing upward toward the light in the gym.  (Dkt. 81-

3.)  The lux readings inside County Jail 5 varied, from a minimum of negative 4.2 lux to a maximum of 2,039 lux facing upward toward the artificial light in the center of a cell.  (Dkt. 81-3.) Readings taken outside in the parking lot of County Jail 5 on the same day, at roughly the same time as the site visits registered a maximum reading of 28,000 lux facing upward toward the sky. (Dkt. 81-3.)

During the site visit, the sunlight in the gym in County Jail 4 appeared to be brighter and more direct than the sunlight in the gym in County Jail 5.  The light readings support this general impression, as the lumen readings for the gym in County Jail 4 were .44 klux, .28 klux, .023 klux, 10.32 klux (under sunlight), 6.29 klux (under sunlight), and 1.257 klux (under sunlight).  (Dkt. 81-3.)  In contrast, the light readings for the gym in County Jail 5 were .24 klux, .02 klux, and .038 klux.  (*Id.*)  These readings are much lower than the readings from the outdoor parking lot of County Jail 5, which were 0.28 Mlux, 0.47 Mlux, and .042 Mlux.  (*Id.*)

For comparison, Zeitzer provided some hypothetical lux readings as examples.  Ten lux is very dim lighting.  (Dkt. 75 (Zeitzer Hearing Transcript at 12:10-11).)  Typical indoor lighting in a home in the United States is 50 lux in the evening and slightly under 100 lux during the day.  (*Id.* at 12:11-14.)  A well-lit office is 200-300 lux.  (*Id.* at 12:15.)  Light outside in California is between 10,000 lux to 100,000 lux.  (*Id.* at 12:15-17.)

As McConnell explained during the Court's site visit, some form of light is always on in both County Jails 4 and 5, including during nighttime hours.  The amount of light is reduced at night, but the Court does not have access to data or other factual information regarding the amount or nature of that light, and the readings taken during the visits were only obtained during the day.

Plaintiffs also allege that the lights are on continuously inside the jails.  Carlos, housed in County Jail 4, states that there is a fluorescent ceiling light that is very bright and that is on all night.  (Dkt. 8-4 (Carlos Dec. ¶ 4); Dkt. 79-2 (Supplemental Carlos Dec. ¶ 3).)  Norbert reports the same and that the light in the hall, which is on all night, enters the cell at night.  (Dkt. 8-8 (Norbert Dec. ¶ 4); Dkt. 79-3 (Supplemental Norbert Dec. ¶ 1).)  Defendants provided no information about light at night and did not deny that lights are on at all times.

/ / /

## III.     PRELIMINARY INJUNCTION ANALYSIS.

In a sprawling complaint and motion for preliminary injunction, Plaintiffs seek sweeping relief.  The focus of Plaintiffs' claims has shifted as the evidence became clearer in this case.  The Court has attempted to review and analyze all arguments Plaintiffs make, even if they do not articulate the correct theory or cite appropriate case law because of the importance of the issues at stake.

A plaintiff seeking a preliminary injunction must demonstrate: "(1) likely success on the merits; (2) likely irreparable harm absent preliminary relief; (3) [that] the balance of equities tips in [Plaintiffs'] favor; and (4) that an injunction is in the public's interest."  *Doe v. Kelly*, 878 F.3d 710, 719 (9th Cir. 2017) (citations omitted).  A "possibility" of irreparable harm is insufficient; rather it must be "likely" absent an injunction.  *Am. Trucking Ass'n, Inc. v. City of L.A.*, 559 F.3d 1046, 1052 (9th Cir. 2009).  Alternatively, "'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest."  *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).  Plaintiffs bear the burden to show that these factors are met.  *DISH Network Corp. v. FCC*, 653 F.3d 771, 776-77 (9th Cir. 2011).

### A.     Likelihood of Success on the Merits for Claims Based on Denial of Outdoor Exercise.

Plaintiffs argue that the absolute denial of outdoor exercise violates both the Eighth Amendment and the Fourteenth Amendment.  The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." The Fourteenth Amendment provides in relevant part: "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

The Ninth Circuit has explained that the "status of the detainees determines the appropriate standard for evaluating conditions of confinement."  *Gary H. v. Hegstrom*, 831 F.2d 1430, 1432

United States District Court
Northern District of California

1    (9th Cir. 1987).  The Eighth Amendment, which prohibits cruel and unusual punishment, "applies

2    to convicted prisoners."  *Id*.  (internal citation and quotation omitted).  "By contrast, the more

3    protective fourteenth standard applies to conditions of confinement when detainees . . . have not

4    yet been convicted."  *Id*.  (internal citation omitted).

5          The Supreme Court has not addressed the issue of a right to outdoor exercise directly but

6    has alluded in *dicta* to the fact that a denial of outdoor exercise for inmates might violate the

7    Eighth Amendment in some circumstances.  The Supreme Court explained:

8          *Some* conditions of confinement may establish an Eighth Amendment
           violation "in combination" when each would not do so alone, but only when
9          they have a mutually enforcing effect that produced the deprivation of a
           single, identifiable human need such as food, warmth, or exercise – for
10         example, a low cell temperature at night combined with a failure to issue
           blankets.  Compare *Spain v. Procunier*, 600 F.2d 189, 199 (CA9 1979)
11         (outdoor exercise required when prisoners otherwise confined in small cells
           almost 24 hours per day), with *Clay v. Miller*, 626 F.2d 345, 347 (CA4
12         1980) (outdoor exercise not required when prisoners otherwise had access
           to dayroom 18 hours per day).
13

14

15   *Wilson v. Seiter*, 501 U.S. 305 (1991) (emphasis in original).

16         The Supreme Court has not addressed the right to outdoor exercise under the Fourteenth

17   Amendment but has addressed the general rights of pretrial detainees, "those persons who have

18   been charged with a crime but who have not yet been tried on the charge."  *Bell v. Wolfish*, 441

19   U.S. 520, 525 (1979).  The Court stated:

20         In evaluating the constitutionality of conditions or restrictions of pretrial
           detention that implicate only the protection against deprivation of liberty
21         without due process of law, we think that the proper inquiry is whether
           those conditions amount to punishment of the detainee.
22

23   *Id*. at 535.  "Restraints that are reasonably necessary to the institution's interest in maintaining jail

24   security do not, without more, constitute unconstitutional punishment."  *Id*. at 540.  The "effective

25   management of the detention facility . . . is a valid objective that may justify imposition of

26   conditions and restrictions of pretrial detention and dispel any inference that such restrictions are

27   intended as punishment."  *Id*. at 540.  In *Bell v. Wolfish*, the Supreme Court considered the

28

United States District Court
Northern District of California

23

practice of "double bunking" and held that "the Government concededly may detain [the defendant] to ensure his presence at trial and may subject him to restrictions and conditions of the detention facility so long as those conditions and restrictions do not amount to punishment, or otherwise violate the Constitution." *Id.* at 536-537.  The Court found that prison officials "must be free to take appropriate action to ensure the safety of inmates and corrections personnel and to prevent escape or unauthorized entry." *Id*. at 547.

The key to the analysis under the Fourteenth Amendment is whether a specific practice in a facility for pretrial detainees equals "punishment."  Thus, a "court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." *Id*. at 538.  If there is no "expressed intent to punish," that analysis "generally will turn on 'whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it].'" *Id*. (citing *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69 (1963) (brackets in original).  If the condition is "reasonably related to a legitimate nonpunitive objective, it does not, without more, amount to punishment." *Id.*  Legitimate objectives include both insuring that the pretrial detainee is available for trial and to facilitate the effective management of the jail. *Id*. at 539-540.

Although the Fourteenth Amendment governs the rights of a pretrial detainee, the Eighth Amendment provides a "minimum standard of care." *Jones v. Johnson*, 782 F.2d 769, 771 (9th Cir. 1986.)  Thus, the Ninth Circuit has held that "pretrial detainees' rights under the Fourteenth Amendment are comparable to prisoners' rights under the Eighth Amendment" and therefore applied the "same standards" to analyzing the rights of pretrial detainees. *Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998) (citing *Redman v. Cty. of San Diego*, 942 F.2d 1435, 1441 (9th Cir. 1991).)  And in *Demery v. Arpaio*, the court explained the difference between the analysis under the Eighth Amendment and Fourteenth Amendment:  "Both distinctions are critical because the Fourteenth Amendment prohibits all punishment of pretrial detainees, while the Eighth Amendment only prevents the imposition of cruel and unusual punishment." 378 F.3d 1020, 1029 (9th Cir. 2004).  An independent constitutional violation is not required to find that punishment

exists. *Id*. at 1030.

The Ninth Circuit has not clearly ruled that preventing inmates from direct access to sunlight is a violation of the Eighth Amendment or Fourteenth Amendment, but several cases have found violations of those amendments where inmates were denied outdoor exercise. The first case to address this issue is *Spain v. Procunier*, 600 F.2d 189 (9th Cir. 1979), where the Ninth Circuit held: "we do not consider it necessary to decide whether deprivation of outdoor exercise is a *per se* violation of the eighth amendment." *Id*. at 199. In *Spain*, the court addressed the lack of outdoor exercise for inmates in the "adjustment center" ("AC") – inmates who were confined because they had disciplinary problems or were disruptive. *Id*. at 192. The court affirmed the district court's order requiring that all inmates who had been confined in the AC for four years or more be allowed to exercise outdoors for one hour a day, five days a week, "unless inclement weather, unusual circumstances, or disciplinary needs made that impossible." *Id*. at 199-200. The court affirmed the district court's finding that the "denial of fresh air and regular outdoor exercise and recreation constitutes cruel and unusual punishment." *Id*. at 199. Some inmates in the AC were "permitted to exercise one at a time in a corridor fronting on eight or nine cells." *Id*. Those exercise periods were "set for one hour a day, five days a week, but in practice the exercise times were often far shorter than one hour and less frequent than five days a week." *Id*. In addition, a subgroup, inmates on the first floor of the AC, "were never permitted any outdoor exercise or recreation." *Id*.

In analyzing the need for outdoor exercise in *Spain*, the Ninth Circuit explained that the district court had found that "several factors combined to make outdoor exercise a necessity." *Id*. The AC inmates were in "continuous segregation, spending virtually 24 hours every day in their cells with only meager out-of-cell movements and corridor exercise" and with "minimal" contact with other inmates. *Id*. at 199-200.

The court rejected arguments by the State of California that concerns about safety and risk of escape justified a denial of outdoor exercise. *Id.* at 200. "The cost or inconvenience of providing adequate facilities is not a defense to the imposition of a cruel and unusual punishment." *Id.* The court concluded: "In light of all the conditions existing in the AC, it was cruel and unusual punishment for a prisoner to be confined for a period of years without opportunity to go

outside except for occasional court appearances, attorney interviews, and hospital appointments." *Id.*

Similarly, in *Wright v. Rushen*, 642 F.2d 1129 (9th Cir. 1981), the Ninth Circuit recognized that a court must consider conditions of confinement "in the context of the prison environment, especially when the ill-effects of particular conditions are exacerbated by other related conditions." *Id*. at 1133. The *Wright v. Rushen* court, like the Supreme Court in *Wilson v. Seiter*, specifically referred to *Spain*, where outdoor exercise was required because inmates were otherwise confined to small cells almost 24 hours per day, and compared it to *Clay v. Miller*, where outdoor exercise was not required because inmates had access to a "day room" for 18 hours a day. *Id*. *Wright v. Rushen* reversed the district court's preliminary injunction finding a violation of the Eighth Amendment based on the "totality of the circumstances" and ordering a certain amount of outdoor exercise per day. *Id*. at 1134. The Ninth Circuit remanded to the district court for consideration of issues such as concerns about security and costs. *Id*. The implication of the ruling in *Wright v. Rushen* and the citation to *Clay v. Miller* is that the Eighth Amendment does not require outdoor exercise when inmates otherwise have ample access to recreation out of their cells.

Later, in *Toussaint v. Yockey*, 722 F.2d 1490 (9th Cir. 1984), the Ninth Circuit upheld a preliminary injunction requiring outdoor exercise for inmates because they were confined to their cells for 23 ½ hours per day while in administrative segregation and because over 1,000 inmates had been confined to these conditions of administrative segregation for over a year. *Id.* at 1492-93.

The court then addressed a similar situation in *Allen v. Sakai*, 48 F.3d 1082 (9th Cir. 1992). There, the court held, analyzing the issue of qualified immunity, that "after *Spain* and *Toussaint*, defendants cannot legitimately claim that their duty to provide regular outdoor exercise to [plaintiff] was not clearly established." *Id*. at 1088. The court found that the plaintiff had alleged the violation of a "clearly established law." *Id*. In that case, even though the goal was to provide the plaintiff with five hours of outdoor exercise per week, he received only 45 minutes of outdoor exercise in a six-week period and was confined to his cell for almost 24 hours a day. *Id*. at 1087. The court also noted that the "length and severity" of the denial of outdoor exercise "may be

critical questions at trial," but they were not "dispositive" at the stage of summary judgment.  *Id.* at 1088.

Other decisions made general statements indicating a right to outdoor exercise.  In *Keenan*, the court stated that "[d]eprivation of outdoor exercise violates the Eighth Amendment rights of inmates confined to continuous and long-term segregation."  *Keenan v. Hall*, 89 F.3d 1083, 1089 (9th Cir. 1996) (internal citation omitted).  The *Keenan* court found that confinement to one room measuring either 10 feet by 12 feet or 8 feet by 12 feet with a fourth perforated wall admitting sunlight only through the top third of the wall for six months without any "outdoor exercise" potentially constituted violation of the Eighth Amendment, reversed the grant of summary judgment for defendants, and remanded the case for trial.  *Id.* at 1088-90.

And the court in *LeMaire* later stated that "this circuit has determined that long-term denial of *outside* exercise is unconstitutional."  *LeMaire v. Maass*, 12 F.3d 1444, 1458 (9th Cir. 1993) (emphasis in original).  The court clearly articulated a difference between in-cell exercise, out-of-cell exercise, and outdoor exercise in finding that an institutional denial of "outside" exercise is generally unconstitutional, barring individualized disciplinary needs.  *Id.*  Nevertheless, the Ninth Circuit found that the denial of outdoor exercise, which occurred during "most of a five-year period of incarceration" was constitutional because the denial was based on plaintiff's repeated violation of rules, including attacks on correctional officers, and his vow to repeat those attacks.  *Id.*  However, the court distinguished its ruling from *Spain*, because the decision regarding plaintiff in *LeMaire* was made on an individual basis, as opposed to an institutional decision to deny all inmates outdoor exercise in *Spain*.  *Id.*  The court noted that an individualized assessment based on the behavior of the inmate could justify a denial of outdoor exercise.  *Id.*

In *Lopez*, the court cited *Allen* and held that denial of outdoor exercise for six and a half weeks potentially violated the Eighth Amendment and thus that there was a genuine issue of material fact as to whether defendants were deliberately indifferent to his needs. *Lopez v. Smith*, 203 F.3d 1122, 1132-33 (9th Cir. 2000).

However, the court later explained in *Norwood*: "*Allen* does not hold that a prisoner's right to outdoor exercise is absolute and indefeasible, or that it trumps all other considerations." *Norwood v. Vance*, 591 F.3d 1061, 1068 (9th Cir. 2010).  The court held that the reason that

plaintiffs in *Allen* survived summary judgment is that prison officials relied upon "inconsequential logistical concerns" to justify the denial of outdoor exercise. *Id.* (citing *Allen*, 48 F.3d at 1088). In *Norwood*, the court found that denying an inmate the right to outdoor exercise can be justified if it is necessary to "bring violence under control." *Id.* at 1069. There, the plaintiff was denied outdoor exercise in "four separate extended lockdowns over the course of two years." *Id.* at 1065. The court further held that, although exercise is "one of the basic human necessities protected by the Eighth Amendment, . . . a temporary denial of outdoor exercise with no medical effects is not a substantial deprivation." *Id.* at 1070 (internal citation and quotation omitted). Thus, the court found that the individual defendants were entitled to a defense of qualified immunity. *Id.*

Specifically with regard to pretrial detainees, no court has addressed the right of pretrial detainees to outdoor exercise. However, one court has addressed the issue of access to exercise, and another addressed the issue of access to direct sunlight. *See Pierce v. County of Orange*, 526 F.3d 1190, 1208 (9th Cir. 2008) (addressing amount of exercise); *Rutherford v. Pitchess*, 710 F.2d 572, 579 (9th Cir. 1983) (addressing lack of clear windows). In *Rutherford*, the court considered a challenge by pretrial detainees to the conditions of the Los Angeles County jail under the Fourteenth Amendment and stated that "we also are conscious of the fact that pre-trial detainees, who have not been convicted of any crime, retain important constitutional rights which must be protected." 710 F.2d at 575. The Ninth Circuit overturned the district court's requirement that Los Angeles County reinstall transparent windows for pretrial detainees. *Id.* at 579. The inmates argued that they had a psychological need for exposure to the outside world and that the combination of lack of windows, inadequate rooftop exercise, overcrowding, and lack of indoor recreational activities, violated their Fourteenth Amendment rights. *Id.* The district court had held that the lack of windows was similar to "loading a detainee with chains and shackle and throwing him in a dungeon" and inferred an intent to punish that violated the Fourteenth Amendment. *Id.* The Ninth Circuit disagreed and found that Los Angeles County had a legitimate reason for covering the windows because inmates had previously broken windows, and those actions "seriously interfered with security at the facility." *Id.*

In *Pierce*, the Ninth Circuit addressed the right of pretrial detainees to a certain amount of

exercise without addressing the right to *outdoor* exercise under both the Eighth and Fourteenth Amendments.  The court held that 90 minutes of exercise a week or less than 13 minutes a day does not meet constitutional standards.  526 F.3d at 1208, 1212.  The court found that the County had "provided nothing more" than "a generalized reference to institutional security concerns" to justify the minimal amount of exercise provided, and thus the County failed to meet its burden to show that the restriction was reasonably related to the institutional concern.  *Id*. at 1212.

The Ninth Circuit's most recent consideration of prison conditions for pretrial detainees came in *Shorter v. Baca*, 895 F.3d 1178 (9th Cir. 2018).  The court weighed the conditions of pretrial detainees under the Fourteenth Amendment by employing the standards set forth in previous cases analyzing the Eighth Amendment.  *Id*. at 1185-86.  The court summarized the law in holding: "We have confirmed, time and time again, that the Constitution requires jail officials to provide outdoor recreation opportunities, *or otherwise meaningful recreation*, to prison inmates."  *Id*. at 1185 (emphasis added).  The court also stated that "we have concluded that *all* inmates are entitled to an individualized evaluation and recreation, barring inclement weather, unusual circumstances, or severe and imminent security risks."  *Id*. at 1186 (emphasis in original).

Other circuits have reached similar decisions regarding outdoor exercise in finding that inmates have a right to exercise, but no other circuit has specifically held that an inmate has a right to outdoor exercise.  *See*, *e.g*., *Blake v. Hall*, 668 F.2d 52, 57 (1st Cir. 1981) (confinement in "dungeon" for 30 days without natural light or ventilation and without any opportunity for out-of-cell or outdoor exercise may amount to cruel and unusual punishment); *Anderson v. Coughlin*, 757 F.2d 33, 35 (2d Cir. 1985) (citations omitted) ("some opportunity for exercise must be afforded to prisoners"); *Peterkin v. Jeffes*, 855 F.2d 1021, 1028-29 (3d Cir. 1988) (in considering deprivation of outdoor exercise, court must consider "(1) the opportunity to be out of the cell, (2) the availability of recreation within the cell, (3) the size of the cell, and (4) the duration of confinement"); *Mitchell v. Rice*, 954 F.2d 187, 192 (4th Cir. 1992) (denial of out-of-cell exercise may constitute cruel and unusual punishment); *Maze v. Hargett*, 200 F.3d 814 (5th Cir. 1999) (deprivation of outdoor exercise can constitute a violation of the Eighth Amendment, but the court must consider the size of the inmate's cell, the amount of time the inmate spends locked in his cell

every day, and the overall length of confinement); *Mayfield v. Ellett*, 102 F.3d 549 (5th Cir. 1996)

(pretrial detainee was allowed to exercise in dayroom and jail gym with frosted skylight, so no

violation of Fourteenth Amendment); *Wilkerson v. Maggio*, 703 F.2d 909, 911-12 (5th Cir. 1983)

(inmate was not allowed any outdoor exercise for five years but was allowed one hour every day

of out-of-cell exercise with windows and fresh air and thus no Eighth Amendment violation);

*Rodgers v. Jabe*, 43 F.3d 1082, 1088-89 (6th Cir. 1995) (qualified immunity for defendants

because it was not clearly established how much exercise time an inmate should have); *French v.

Owens*, 777 F.2d 1250, 1255 (7th Cir. 1985) (lack of exercise is Eighth Amendment violation

where "movement is denied and muscles are allowed to atrophy" and the health of the inmate is

"threatened"); *Wishon v. Gammon,* 978 F.2d 446, 449 (8th Cir. 1992) (applying the Third Circuit's

four-factor test from *Peterkin* above and finding no constitutional violation); *Apodaca v.

Raemisch*, 864 F.3d 1071, 1078-79 (10th Cir. 2017) (denial of outdoor exercise is not *per se*

violation of eighth amendment; inmates in administrative segregation were prohibited from

outdoor exercise for 11 months but were in recreation room five times a week); *Lowe v. Raemisch*,

864 F.3d 1205, 1208-10 (10th Cir. 2017) (summarizing law of Tenth Circuit in which denial of

outdoor exercise can be constitutional violation under some circumstances); *Bass v. Perrin*, 170

F.3d 1312, 1316 (11th Cir. 1999) (complete denial of outdoor exercise time for several years did

not violate Eighth Amendment because of attack on another inmate, murder of correctional

officer, and escape attempt); *Wilson v. Blankenship*, 163 F.3d 1284, 1291-94 (11th Cir. 1998) (no

need to provide outdoor exercise where no facility existed and confinement was brief).[12]

     The Ninth Circuit thus has found that outdoor exercise is necessary when inmates or

pretrial detainees are held in cells with little opportunity for out-of-cell movement, where the

incarceration is lengthy, and where there is no concern about safety that requires elimination of

---

[12] The reason other circuits may focus on "out-of-cell exercise" as opposed to "outdoor exercise" may be that, in other parts of the country, cold weather makes outdoor exercise impractical.  For example, in other circuits, inmates have opposed outdoor exercise by challenging forced exercise outdoors with insufficient clothing or forced exercise outdoors in inclement weather.  *See*, *e.g.*, *Anderson v. Coughlin*, 757 F.2d 33, 34 (2d Cir. 1985).

outdoor exercise.

The references by the Supreme Court in *Wilson v. Seiter* and by the Ninth Circuit in *Wright v. Rushen* to the Fourth Circuit's ruling in *Clay v. Miller* indicate that access to day rooms or other indoor exercise areas, without a showing of actual harm, can make up for lack of outdoor exercise. All of these factors are interrelated, and there is no bright line test to determine if and when inmates are entitled to outdoor exercise – as opposed to "meaningful recreation."

Although the Ninth Circuit has not explicitly adopted the test set forth by the Third and Fifth Circuits, the cases cited above show that the Ninth Circuit, in deciding whether a deprivation of outdoor exercise constitutes a violation of the Eighth Amendment, also considers the factors set forth by the Third Circuit in *Peterkin*: "(1) the opportunity to be out of the cell, (2) the availability of recreation within the cell, (3) the size of the cell, and (4) the duration of confinement."  855 F.2d at 1028-1029; *see also Pierce*, 526 F.3d at 1212 ("Determining what constitutes adequate exercise requires consideration of 'the physical characteristics of the cell and jail and the average length of stay of the inmate.'") (citing *Housley v. Dodson*, 41 F.3d 597, 599 (10th Cir. 1994)).

### 1.  Scientific Evidence Regarding Access to Light Is Inconclusive.

The evidence in the record at this point is inconclusive as to whether the lack of access to direct sunlight creates a medical risk for inmates in County Jails 4 and 5.  Zeitzer's opinion is that harm occurs when there is not a large enough difference between the light during the day and the light during the night.  Because there are no measurements of the light during the night and only measurements during the day, it is impossible for the Court to determine if Plaintiffs are suffering harm caused by an insufficient difference between light during the day and light during the night. Plaintiffs have not met their burden on this issue, given the evidence currently available.

Access to sunlight from cells, common areas, and gyms differs between County Jails 4 and 5.  In County Jail 5, each inmate has access to a window with sunlight – albeit weak – in each cell. In County Jail 4, only inmates in Blocks A and D have access to louvered windows with direct sunlight and fresh air, and other inmates have no direct access to any natural light from their cells other than from ambient light from windows at the ends of the hall.  Inmates in both County Jails 4 and 5 have access to sunlight that is filtered through grates covering skylights in the gym in

County Jail 5 and opaque side windows and an opaque skylight in County Jail 4.

Plaintiffs complain about the type of harms (depression, anxiety) that Zeitzer links to lack of adequate difference between light during the day and light at night. However, the issue is one of causation. For example, it is understandable that an inmate awaiting trial for a long period of time is depressed and anxious, but the question here is whether lack of direct sunlight caused additional harm. The evidence at this time is not clear, and Plaintiffs do not meet their burden to show that the conditions caused their physical problems because the evidence at this time does not show causation between the lack of direct sunlight and the medical problems.

To the extent that Plaintiffs claim harm from lack of direct sunlight, as opposed to lack of a sufficient difference between light at night and light during the day, the evidence does not support that claim. Zeitzer opined that the type of light that a person receives generally does not matter, as long as the light source does not filter out certain types of light, and Zeitzer does not know what type of light inmates receive. Thus, Plaintiffs have not met their burden for purposes of this motion for preliminary injunction to show that the amount of light or type of light they receive is harmful to them.

### 2. General Concerns about Safety Do Not Justify Compete Denial of Outdoor Exercise.

Defendants cannot justify their denial of outdoor exercise based on a generalized concern about safety. Here, Defendants' nonspecific reasoning for their concerns about safety is similar to *Spain*, where the defendants provided only general explanations about safety and the Ninth Circuit rejected those concerns as a justification for denial of outdoor exercise. 600 F.2d at 200. This case is not like *Norwood*, where defendants were able to justify facility-wide lockdowns over long periods of time based on specific events. 591 F.3d at 1065-70. Defendants here claim that they are not able to provide outdoor exercise in a safe manner because there is no enclosed space outdoors for inmates to exercise. The City and County of San Francisco now claims that it lacks manpower to oversee pretrial detainees to exercise in the open field and that the pretrial detainees could escape because there are no viable fences. However, the City and County of San Francisco cannot create the problem of having no secure outdoor exercise area and then claim that concerns

United States District Court
Northern District of California

about safety require the denial of outdoor exercise.  For example, the City and County of San Francisco could not construct a jail for 100 pretrial detainees when there is clear information that there are 200 pretrial detainees, place the pretrial detainees in an overcrowded jail, and then claim that valid penological interests require San Francisco to detain the pretrial detainees in those overcrowded conditions because of concerns about security.  When the City and County of San Francisco most recently constructed the County Jail 5, it chose not to renew the outdoor exercise area.  Instead, the City and County of San Francisco constructed an indoor exercise area at the County Jail 5 with opaque windows.  In essence, Defendants argue that they can only provide outdoor exercise by refencing the field and escorting inmates there one-by-one, and that system is too expensive.  But the Ninth Circuit rejected expense as an excuse in *Allen*, 48 F.3d at 1088, and *Spain*, 600 F.2d at 200.  The City and County of San Francisco created the problem and cannot justify denying outdoor exercise with this self-created situation.

### 3.        Compliance with State Law Does Not Equal Compliance with the Constitution.

Defendants argue that the amount of time provided to inmates in County Jails 4 and 5 is sufficient because they comply with state law and regulations.  However, it is axiomatic that compliance with a state law or regulation does not necessarily equal compliance with the U.S. Constitution.

### 4.        Eighth Amendment Analysis of *Peterkin* Factors.

The Court applies the standards set forth in *Peterkin* to analyze whether deprivation of outdoor exercise for inmates complies with constitutional standards.  Those four standards are, as stated above: the opportunity to be out of cell, the opportunity to exercise in cell, the size of the cell, and the duration of confinement.  855 F.2d at 1028-29.  In order to analyze the situation, the Court must assess the inmates in County Jails 4 and 5 separately, because the time spent out of cell differs in each location.  In addition, the Court must analyze the deprivation of outdoor exercise for inmates based on the type of their placement – whether general population, administrative segregation, or disciplinary lockdown – again because their total amount of out-of-cell time differs in each placement.

1

2

### i.        Length of Incarceration.

3

As noted above, Plaintiffs have been incarcerated for different periods of time, up to eight

4

years.  Different cases have found that deprivation of outdoor exercise constitutes a violation of

5

the Eighth Amendment.  *Thomas v. Ponder*, 611 F.3d 1144, 1151 (9th Cir. 2010) (denial of access

6

to "out of cell" exercise and denial of access to outdoor exercise yard for almost 14 months

7

constituted Eighth Amendment violation); *Lopez v. Smith,* 203 F. 3d 1122, 1132-33 (9th Cir.

8

2000) (six and a half weeks); *Keenan*, 83 F.3d at 1088-190 (6 months); *Allen*, 48 F.3d at 1086 (six

9

weeks); *Toussaint*, 722 F.2d at 1492 (one year); *Spain*, 600 F.2d at 200 (four years).  In those

10

cases, there is no indication that there were any out-of-cell exercise or indoor exercise areas

11

available for some of the inmates, as there are here.  Therefore, the holdings of those cases are

helpful but not dispositive in analyzing this issue.

12

### ii.        Inmates in General Population in County Jail 5.

13

The evidence shows that inmates in the general population in County Jail 5 have access to

14

adequate amounts of exercise and fresh air but not at the same time.  The obvious benefit of

15

outdoor exercise is that an inmate receives exercise, light that is bright enough to offset any night

16

light, and fresh air at the same time.  County Jail 5 has day rooms that are larger than the cells and

17

to which inmates in the general population have significant access.  Based on the site visit, the

18

Court notes that the day rooms in County Jail 5 are not large enough for vigorous exercise but do

19

allow some space for some limited exercise.  General population inmates are allowed between

20

four and half to eight hours access to the day room per day and 30 minutes of gym time, seven

21

days per week.  The Court finds that the access to the day room and gym are sufficient to offset

22

the denial of outdoor exercise and thus that Plaintiffs do not meet their burden to show likelihood

23

of success on the merits that the conditions of confinement for inmates in the general population in

24

County Jail 5 violate the Eighth Amendment.

### iii.        Inmates in Administrative Segregation in County Jail 4.

25

Inmates in administrative segregation in County Jail 4 have access to the gym for three

26

hours total in a week, with no day room access.  They are thus in their cells 23 ½ hours a day.  The

27

cells are too small to allow any meaningful recreation.  The Court finds that the out-of-cell time

28

United States District Court
Northern District of California

United States District Court
Northern District of California

for inmates in administrative segregation in County Jail 4 is insufficient under the standard of *Spain* and *Toussaint* and thus that the amount of exercise they receive violates the Eighth Amendment. Just as in *Spain* and *Toussaint*, where inmates were confined to cells 23 ½ hours a day, the Court finds that confinement to cells for 23 ½ hours a day violates the Eighth Amendment. The issue in County Jail 4 for inmates in administrative segregation is not the denial of outdoor exercise but a denial of outdoor exercise without a meaningful alternative of out-of-cell time.

### iv.   Inmates in Administrative Segregation in County Jail 5.

Inmates in administrative segregation in County Jail 5 have access to the gym 30 minutes per day, seven days per week – for a total of 210 minutes a week, and an additional 30 minutes per day, seven days a week, in the day room. They are thus in their cells 23 hours a day. The cells are too small to allow any meaningful recreation. Given that the relief that the Ninth Circuit ordered in *Spain* was to provide one hour a day, five days a week of outdoor exercise, the Court finds here that the amount of time inmates in administrative segregation in County Jail 5 barely meets constitutional standards.

### v.   Inmates in General Population in County Jail 4.

County Jail 4 is different from County Jail 5 in that the "day room" areas differ. Inmates in the general population in County Jail 4 are allowed only 90 minutes of gym time, two days a week, with 12 hours per day in a day room or side room. The cells in County Jail 4 are too small to allow any meaningful recreation. The smaller side rooms for most inmates are not large enough for meaningful exercise. The day room for Block J inmates is larger and could allow some very limited exercise, and the day room for Block J has louvered windows that allow fresh air and direct sunlight. Although the side rooms that inmates in the general population can use are small, the Court finds that the total amount of out-of-cell time barely meets constitutional scrutiny. Plaintiffs have not prevailed on the likelihood of success on the merits prong in showing that the combination of access to the gym for 180 minutes a week with 12 hours of access daily to the side rooms violates the Eighth Amendment.

/ / /

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### vi.    Inmates in Disciplinary Lockdown.

In seeking preliminary injunctive relief, Plaintiffs then ask that the Court require Defendants to "provide all prisoners in disciplinary isolation genuine and full review as required by state regulations[.]"  (Dkt. 8.)  There is no evidence that Plaintiffs have been denied review when placed in disciplinary lockdown, and the only evidence is that they are given full review. Therefore, Plaintiffs fail to meet their burden to show likelihood of success on this issue.

Second, to the extent that Plaintiffs complain that inmates in disciplinary lockdown lack access to any exercise, Defendants are justified in denying outdoor exercise to inmates on disciplinary lockdown.  Courts have clearly held that denial of outdoor exercise for disciplinary reasons is constitutional, even if for extended periods of time based on new infractions.  *See, e.g.*, *Noble v. Adams*, 646 F.3d 1138 (9th Cir. 2011) (finding qualified immunity appropriate for individual defendants who put in place a lockdown that deprived inmates of exercise yard for slightly over a year); *May v. Baldwin*, 109 F.3d 557 (9th Cir. 1997) (deprivation of outdoor exercise for 21 days while in disciplinary segregation unit did not constitute violation of Eighth Amendment); *LeMaire*, 12 F.3d at 1458 (denial of out of cell exercise warranted, even for most of five-year period of time, because inmate continuously attacked guards and other inmates); *Hayward v. Procunier*, 629 F.2d 599 (9th Cir. 1980) (temporary denial of outdoor exercise because of lockdown did not constitute Eighth Amendment violation); *Norwood*, 592 F.2d at 1065-70 (four extended lockdowns over a two-year period that deprived inmate of outdoor exercise during lockdown was constitutional).

### 5.  Fourteenth Amendment Analysis.

All but one of the Plaintiffs are pretrial detainees.  Thus, the Court must analyze their status both under the Eighth and Fourteenth Amendments.[13]  Although, as noted above, courts have analyzed the right to outdoor exercise under the Eighth Amendment, even for pretrial detainees, the Court finds that a separate analysis of the Fourteenth Amendment is appropriate.  Even if the Eighth Amendment does not require outdoor exercise for inmates held for lengthy periods of time,

---

[13] Only the Eighth Amendment applies to Carlos, the only inmate who has been convicted among the named Plaintiffs.  His claim for damages for past violations of the Fourteenth Amendment remains, but his prospective claim for injunctive relief is based only on the Eighth Amendment.

the Fourteenth Amendment does.

Under the Fourteenth Amendment analysis prescribed in *Bell v. Wolfish*, the Court finds that the denial of outdoor exercise is punishment if for a lengthy period of time. Defendants' express intent is to maintain the safety of the jails, because there is no fenced, contained outdoor exercise area for the inmates. Because there is no "expressed intent to punish," the analysis is whether the denial is "excessive in relation to the alternative purpose assigned" to it and whether the denial is "reasonably related to a legitimate nonpunitive objective;" if so, "it does not, without more, amount to punishment." *Bell v. Wolfish*, 441 U.S. at 538. Defendants argue that their legitimate objective here is to effectively manage the jail, which is a valid concern under *Bell v. Wolfish. Id.* at 539-40. But as discussed above, San Francisco created the problem at issue by deliberately constructing a jail without access to direct sunlight. Thus, San Francisco cannot create the problem and then claim a legitimate need for safety based on its choice about construction of the jail. The Court finds that complete denial of outdoor exercise for an inmate confined more than four years is punishment because the denial of outdoor exercise significantly exceeds and is independent of the "inherent discomforts of confinement." *Demery*, 378 F.3d at 1030. Although inmates expect to be deprived of access to the outdoors, they do not expect and society does not expect that inmates should be deprived of all access to the outdoors for a long period of time – up to eight years. Even if the evidence shows that access to direct sunlight is not medically necessary, forcing people to live without direct sunlight for many years is simply punishment. As a point of comparison, scientific studies cannot even create a scientific experiment in which people voluntarily deprive themselves of direct sunlight because such a study is unethical. If even a voluntary study of that nature is unethical, then inmates' involuntary confinement here amounts to punishment. However, depriving people of access to direct sunlight is not punishment if for a short period of time. Society expects that inmates will be deprived of many of the benefits of freedom.

The purpose of pretrial detention is to confine a criminal defendant to ensure that he appears for trial and that he does not create a risk to the public before trial. Stripped of its legalese, *Bell v. Wolfish* stands for the proposition that the conditions of confinement are merely to

37

make sure that the criminal defendant remains ready to appear for trial in a safe manner in the jail. Thus, any condition of confinement that exceeds that goal constitutes punishment. Here, the condition of confinement that strips the ability to see direct sunlight for a period of years is not necessary to ensure that Plaintiffs are ready to appear for trial in a safe manner in County Jails 4 and 5. For that reason, the Court finds that confining a pretrial detainee, an innocent person, in such a situation where he does not see direct sunlight for years is not rationally related to the non-punitive nature of confinement and violates the Fourteenth Amendment.

In this case, although there is no clear guidance from the appellate courts on this issue, the Court finds that depriving an inmate of access to direct sunlight for more than four years is punishment. For purposes of the preliminary injunction, the Court chooses the four-year mark for the Constitutional cut-off because *Spain* discusses that period of time as a lengthy time for incarceration. *Spain* addressed a situation in which inmates were incarcerated for four years without outdoor exercise, and its progeny discuss situations under the more difficult standard of the Eighth Amendment, in finding that deprivation of outdoor exercise for shorter periods with no alternative violates the Eighth Amendment. Although other courts discuss shorter periods of deprivation as constitutional violations, the Court anchors this decision to the bellwether opinion in *Spain*.[14]

Although the Court realizes that any injunction draws an arbitrary line, the Court bases this decision to provide a certain amount of time in direct sunlight partially on Zeitzer, who recommends 30 minutes of sunlight per day. The Court also takes into consideration that the medical evidence is unclear because there are not readings for the light in the cells at night. And given that inmates receive sunlight, albeit filtered, throughout the day, it is unclear if Zeitzer's recommendation would be the same for them. Zeitzer also opined that 30 minutes of sunlight one to two times a week might suffice to re-set the Circadian rhythm. Thus, the Court ORDERS Defendant the City and County of San Francisco to provide all pretrial detainees in the general

---

[14] At jury trial, a jury who considers the claims under 42 U.S.C. §1983 for monetary damages can decide if they believe that deprivation of direct sunlight for shorter period of years constitutes a violation of the Fourteenth Amendment.

United States District Court
Northern District of California

population and administrative segregation who have been incarcerated for more than four years access to direct sunlight at least one hour a week, absent disciplinary issues such as placement in disciplinary lockdown or other emergency issues that prevent this access.  This injunction does not apply to inmates in disciplinary lockdown.  Again, this amount of time spent in direct sunlight is slightly different from the amount Zeitzer recommends, but the Court is also concerned about the practical ability of the City and County of San Francisco to provide access to direct sunlight.

> **B.    Likelihood of Success on the Merits for Claims Based on Administrative Segregation.**

Plaintiffs who are in administrative segregation in both jails claim that Defendants have violated and are continuing to violate their Eighth and Fourteenth Amendment rights by subjecting them to "harm caused by excessive confinement, inadequate physical exercise, social isolation and environmental deprivation through forcing members of the sub-class to suffer confinement of up to 23.5 hours a day in small, inadequate cells, including eating, sleeping, and defecating in those cells." (Dkt. 1 (Complaint, ¶¶ 70, 74).)

As noted above, in a supplemental memorandum submitted even after opposition and reply, Plaintiffs requested entirely new and very detailed relief regarding administrative segregation.[15]  Specifically Plaintiffs added a request for the following: a hearing, written notice of the reasons for placement into administrative segregation, immediate release into the general population after one year in administrative segregation, and mental health treatment for those re-housed in the general population.  (Dkt. 79.)  Plaintiffs' claim is essentially that Defendants are depriving them of their right under the due process clause not to be held in administrative segregation without procedural safeguards listed above, such as a hearing and written notice.[16]  It is undisputed that inmates placed into administrative segregation do not have a hearing, and several Plaintiffs state that they were placed into administrative segregation without an explanation other than an oral one.  Defendants do not contest these allegations.

---

[15] Plaintiffs fail to comply with Fed. R. Civ. P. 7(b)(1)(B) in adding a request for relief not identified in their original motion.  However, Defendants had an opportunity to respond to the additional relief Plaintiffs requested and also did not object to the addition.  Therefore, the Court considers this requested relief.

[16] Plaintiffs do not appear to claim that placement in disciplinary lockdown violates the Fourteenth Amendment.

The question under the Fourteenth Amendment is whether Plaintiffs have a right to the specific relief they seek under the due process clause when they are placed in administrative segregation.  The answer is no.

Plaintiffs cite *Wright v. Rushen*, 642 F.2d 1129, 1138 (9th Cir. 1981) for the proposition that the court ordered the State of California to release all inmates who had been in administrative segregation for over a year and ordered the State to provide hearings for disciplinary matters. (Dkt. 79 at 8-9.)  This citation is not controlling, as the Ninth Circuit specifically vacated the district court's injunction on that issue and merely included the injunction as an appendix to the opinion.  *Wright v. Rushen*, 642 F.2d at 1131 ("The preliminary injunction is appended to this opinion.")  The court concluded: "The preliminary injunction is vacated and the case is remanded to the district court for further proceedings consistent with this opinion."  *Id.* at 1135.  Given this ruling, Plaintiffs' citation to a preliminary injunction that has been vacated in its entirety as controlling authority is not persuasive.[17]

Whether pretrial detainees are entitled to due process for placement in administrative segregation for non-disciplinary reasons is an open question under Ninth Circuit law.[18]  The due process clause protects two types of interest: the due process clause itself (substantive due process) and laws of the states (procedural due process).  *See Meachum v. Fano*, 427 U.S. 215, 223-27 (1976); *see also Valdez v. Rosenbaum*, 302 F.3d 1039, 1044 (9th Cir. 2002) (due process claim is based either on procedural or substantive due process).

### 1.    Procedural Due Process.

The first question of procedural due process is whether state law creates a liberty interest in the relief sought here: placement in the general population.  The Court finds that state law here does not create that liberty interest.  "A state law must satisfy two requirements in order to create a liberty interest protected by the Constitution.  First, the law must set forth "'substantive

---

[17] Similarly, Plaintiffs cite *Apodaca v. Raemisch*, 139 S.Ct. 5 (2018), for authority for their position, but they fail to identify it as a "statement of Justice respecting the denial of certiorari." The statements in *Apodaca* are not controlling authority.

[18] The only case the Court was able to find that addressed this issue directly found that a pretrial detainee does not have due process rights to a hearing if placed in administrative segregation for non-disciplinary reasons, but it is an unpublished Ninth Circuit opinion that the Court cannot cite.

United States District Court
Northern District of California

1    predicates' to govern official decision making" and, second, it must contain "explicitly mandatory

2    language," *i.e.*, a specific directive to the decisionmaker that mandates a particular outcome if the

3    substantive predicates have been met.  *Kentucky Dep't of Corrections v. Thompson*, 490 U.S. 454,

4    462-63 (1989) (quoting *Hewitt v. Helms*, 459 U.S. 460, 472 (1983))."  *See also Valdez*, 302 F.3d at

5    1044 n.3.

6            California Code of Regulations, title 15, § 1053 provides that each administrator of a local

7    detention facility shall develop written policies and procedures which provide for the

8    administrative segregation of inmates who are determined to be prone to escape or assault staff or

9    other inmates or likely to need protection from other inmates, if such administrative segregation is

10   determined to be necessary in order to obtain the objective of protecting the welfare of inmates

11   and staff.  Such segregation shall consist of separate and secure housing, but shall not involve any

12   other deprivation of privileges than is necessary to obtain the objective of protecting the inmates

13   and staff.  *Id.* § 1053.  This language, in conjunction with a deprivation of "real substance," could

14   be construed to create a liberty interest in freedom from administrative segregation under *Sandin*.

15   District courts that have considered this issue have been split on whether county jail regulations

16   sufficiently create a protected liberty interest.  *See Henderson v. City and County of San*

17   *Francisco*, No. C 05-234 VRW, 2006 WL 3507944 , at *14 (N.D. Cal. 2006) (applying *Hewitt* and

18   concluding that the language of § 1053 does not create liberty interest); *Abenth v. Palmer*, No. C

19   97-2526 CRB, 1999 WL 118003, at *2 (N.D. Cal. 1999) (same, but also applying analysis under

20   *Sandin* of "atypical and significant hardship"); *Mitchell v. Plummer*, No. C 95-4346 CRB, 1998

21   WL 381992, at *6 (N.D. Cal. 1998) (applying *Hewitt* and concluding without elaboration that

22   language of state regulation governing state prison created liberty interest for pretrial detainee in

23   county jail because he had status both as a pretrial detainee and post-conviction defendant); *Ledet*

24   *v. Hennessy*, No. C-93-1361 EFL, 1995 WL 251422, at *3 (N.D. Cal. 1995) (applying *Hewitt* and

25   concluding that language of state regulation governing state prisons and jail policy and procedure

26   created protected liberty interest in freedom from administrative segregation in county jail).

27           The Court finds that the state regulation at issue does not create a liberty interest because it

28   "does not require, in explicitly mandatory language, that if substantive predicates are met, a

1    particular outcome must follow." *Abenth*, 1999 WL 118003, at *2 (citing *Smith v. Noonan*, 992

2    F.2d 987, 989 (9th Cir. 1993)).  In *Smith*, the court held that a provision that merely raises

3    procedural requirements for placement into administrative segregation without predicates leading

4    to a required result does not create a liberty interest for an inmate.  992 F.2d at 989 (internal

5    citations omitted).  Here, the regulation at issue provides that a jail "shall develop" procedures for

6    administrative segregation, but there is no requirement for action after those procedures are

7    created.  In other words, there is a predicate, but no required result.  In contrast, in *Toussaint v.*

8    *McCarthy*, 801 F.2d 1080, 1091-92 (9th Cir. 1986), the state regulation governing state prisons in

9    California had both predicates: regulations creating the procedure by which an inmate is moved to

10   administrative segregation and the required result, with mandated release that "shall occur at the

11   earliest possible time[.]"  *Id.* at 1097-98.

### 2.      Substantive Due Process.

13          The second question is whether the denial of placement in the general population violates

14   substantive due process under *Bell v. Wolfish*.  The Court finds that that placement in

15   administrative segregation for non-disciplinary reasons is not "punishment" in violation of the

16   substantive due process prong.  The due process clause, as noted above, creates a protectible

17   interest for pretrial detainees to be free of punishment.  Thus, the question is whether placement in

18   administrative segregation as opposed to placement in the general population is punishment that is

19   not allowed under *Bell v. Wolfish*.  As noted above, under *Bell v. Wolfish*, a court must first

20   examine whether the restriction at issue is intended to be punishment.  441 U.S. at 538.  Here, the

21   undisputed evidence is that Defendants placed some Plaintiffs in administrative segregation

22   because of safety concerns and not because of disciplinary concerns.  The next question is whether

23   the restriction is "excessive in relation to the alternative purpose assigned" to it.  *Id.*  If the

24   condition is "reasonably related to a legitimate nonpunitive objective," it is not punishment.  *Id.*

25   Maintaining the safety of the jail and effectively managing the facility are legitimate, non-punitive

26   goals.  *Id.* at 539-40.  Here, the goal of administrative segregation – separate from disciplinary

27   lockdown – is to ensure the safety of the inmates for a variety of reasons.  For this reason,

28   placement in administrative segregation for non-disciplinary reasons does not constitute

United States District Court
Northern District of California

1 punishment under *Bell v. Wolfish*.

2     Separately, although Plaintiffs do not make this argument, the Court considers whether

3 placement in administrative segregation for a long period of time without the opportunity to

4 contest it is "punishment" for pretrial detainees.  One aspect is the temporal nature of the

5 limitation.  *Valdez*, 302 F.3d at 1047 (internal citations omitted) (denial of telephone privileges for

6 pretrial detainee did not violate substantive due process partially because the denial was in place

7 for only a "short time" and existed "only as long as it serves its state purpose.")  The Court here

8 finds that the placement in administrative segregation can be lengthy, but there is not sufficient

9 evidence to determine whether the placement is too long for its purpose.  Although the inmates

10 complain that they wish to be released from administrative segregation into the general population,

11 they provide no evidence about whether the conditions of their placement have changed.[19]

### 3.    Procedural and Substantive Due Process for Lack of Access to Programs, Mental Health Treatment, and Same Amount of Exercise as General Population.

14     Plaintiffs also demand access to the same "programs" as the inmates in the general

15 population and mental health treatment for inmates who move from administrative segregation to

16 the general population.  However, Plaintiffs fail to provide any evidence about the programs or

17 show that they have a due process right to access programs.  And Plaintiffs fails to provide

18 evidence that they sought mental health treatment upon return to the general population but that

19 they were denied mental health treatment.  Thus, Plaintiffs do not meet their burden to show

20 probability of success on the merits based on their demands regarding lack of access to programs

21 and lack of access to mental health treatment upon return to the general population.

22     Plaintiffs also demand that inmates in administrative segregation receive the same amount

23 of exercise that inmates in the general population receive.  The undisputed facts show that inmates

---

26    [19] Plaintiffs also complain that they do not know why they have been placed into
administrative segregation.  Defendants have provided reasons for some in responding to this
27 motion, but Plaintiffs will be entitled to evidence in the process of discovery to determine why
Defendants placed them in administrative segregation to litigate the isuse of whether placement in
28 administrative segregation is narrowly tailored to the safety needs of the jails under the *Bell v. Wolfish* standard.

United States District Court
Northern District of California

1    in administrative segregation receive the same amount of exercise as inmates in the general

2    population but that the difference lies in the amount of out-of-cell exercise inmates in both groups

3    receive.  To the extent that the combined amount is insufficient for inmates in administrative

4    segregation, the Court addresses that issue above.

5            **C.      Likelihood of Success on the Merits of Other Claims.**

6            Plaintiffs focus their arguments regarding the likelihood of success on the merits for their

7    motion for preliminary injunction on the Eighth and Fourteenth Amendment but ignore the claims

8    they assert under state law.  The Court considers some of those state law claims below in

9    analyzing the motion to dismiss and dismisses several claims.  To the extent that the Court

10   dismisses state law claims below, the Court also finds that Plaintiffs fail to establish the likelihood

11   of success on the merits of those claims.  Thus the Court addresses only the surviving claims for

12   violations of Articles I, Sections 7 and 17 of the California Constitution here in analyzing the

13   likelihood of success on the merits.

14           Article I, Section 7 provides in relevant part: "A person may not be deprived of life,

15   liberty, or property without due process of law[.]"  Plaintiffs allege that they have a liberty

16   interest, but it is not clear what that liberty interest is.  Plaintiffs allege:  "Incarceration without

17   any access to sunlight, sunshine, outdoor exercise, and in other situations total lacking of outdoor

18   air, coupled with isolation and confinement in excess of 23 hours a day, imposes an atypical,

19   substantial, and different hardship on the prisoner in relation to the ordinary incidents of

20   incarcerated life, so as to create a liberty interest protected by due process."  (Dkt. 1 (Complaint ¶

21   77).)  Article I, Section 17 provides: "Cruel or unusual punishment may not be inflicted or

22   excessive fines imposed."  Plaintiffs allege that they are suffering from cruel and unusual

23   punishment from "total denial of access to sunlight and sunshine, denial even to natural daylight,

24   and isolation form the outdoors."  (*Id.* at ¶ 81.)

25           California courts give "respectful consideration" to the United States Supreme Court's

26   interpretation of parallel texts.  *People v. Buza*, 4 Cal. 5th 658, 684-685 (2018).  However, the

27   California Constitution "is, and has always been, 'a document of independent force.'"  *Id.* at 684

28   (citing *American Academy of Pediatrics v. Lungren*, 16 Cal. 4th 307, 325 (1997)).  For example,

United States District Court
Northern District of California

United States District Court
Northern District of California

1    one notable area in which California Constitutional law provides broader protection to California

2    residents than the U.S. Constitution does is the area of privacy.  *American Academy of Pediatrics*

3    *v. Lungren*, 16 Cal. 4th at 325-326 (internal citations omitted).

4        The only cases addressing the right to due process under the California Constitution for

5    placement in administrative segregation do so under the law as it existed in 1979 and 1982 and

6    cite to federal law that has since evolved.  *See, e.g.*, *In re Davis*, 25 Cal. 3d 384 (1979); *Inmates of*

7    *Sybil Brand Inst. for Women v. Cty. of Los Angeles*, 130 Cal. App. 3d 89 (1982).  In *Davis*, the

8    California Supreme Court addressed the issue of a right to a hearing for an inmate who is charged

9    but awaiting a disciplinary hearing and found that they were entitled to a hearing "on their

10   administrative segregation before the disciplinary hearing."  25 Cal. 3d at 389.

11       In *Sybil Brand*, the court held that pretrial detainees who were assigned to "administrative

12   segregation" because of "combative or erratic behavior" were entitled to a hearing, written notice,

13   and an opportunity to challenge the placement.  130 Cal. App. 3d at 106-08.  The court also held

14   that outdoor recreation, twice a week, for a total of four hours, did not constitute cruel and unusual

15   punishment.  *Id*. at 105.

16       The Court was unable to find any other authority addressing the right to outdoor exercise

17   under the California Constitution.

18       Both *Davis* and *Sybil Brand* cited almost exclusively federal case law which pre-dates the

19   majority of cases cited in this Order.  In addition, the facts of *Sybil Brand* are slightly different

20   from the facts here, as *Sybil Brand* addresses the issue of administrative segregation for

21   disciplinary issues, which is not disputed in this case.  Given the cases above, which rely upon

22   different facts and outdated federal precedent, it is unclear how the California Supreme Court

23   would rule on the issues presented here.  But it appears that the California Supreme Court follows

24   federal interpretation of the parallel texts of the U.S. Constitution.  Given that, the Court here will

25   apply the same analysis above for the federal analysis to these California Constitutional claims

26   and reach the same result as above.

27       **D.      Irreparable Harm.**

28       A plaintiff seeking a preliminary injunction must demonstrate that irreparable injury is

United States District Court
Northern District of California

likely in the absence of preliminary relief.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 21 (2008).  A mere possibility of irreparable injury is insufficient.  *Id.*  "Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages." *Ariz. Dream Act v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014) (citation omitted).  "[A] deprivation of constitutional rights always constitutes irreparable harm."  *Fyock v. City of Sunnyvale*, 25 F. Supp. 3d 1267, 1282 (N.D. Cal. 2014) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).  "[F]or some kinds of constitutional violations, irreparable harm is presumed."  *Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011) (quoting 11A Wright et al., *Federal Practice and Procedure* § 2948.1 (2d ed. 1995) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.")).  "[D]eprivation of […] constitutional rights under the Eighth Amendment is itself sufficient to establish irreparable harm."  *Norsworthy v. Beard*, 87 F. Supp. 3d 1164, 1193 (N.D. Cal. 2015).  Alleged infringement of the Fourteenth Amendment may also alone constitute irreparable harm.  *Griffin v. Padilla*, 408 F. Supp. 3d 1169, 1186 (E.D. Cal. 2019).  Irreparable injury may inhere in "the consequent emotional stress, depression and reduced sense of well-being" brought on by a constitutional violation.  *Chalk v. U.S. Dist. Court Cent. Dist. of California*, 840 F.2d 701, 709 (9th Cir. 1988).  This type of physiological and psychological distress constitutes a "non-monetary deprivation" that "is a substantial injury."  *Id.*

Here, Plaintiffs argue that they have suffered and are suffering violations of their Eighth and Fourteenth Amendment rights.  To the extent that the Court has found that they have established the likelihood of success on the merits, the Court finds that they have established irreparable harm.

### E.    Balance of the Hardships.

The Court finds that the balance of the hardships weighs in favor of Plaintiffs for the claims on which they can prove likelihood of success on the merits: those of inmates in administrative segregation who are confined to their cells for 23 ½ hours a day and pretrial detainees who have been denied access to direct sunlight for more than four years.

The City and County of San Francisco argues that requiring more exercise time would be

burdensome on the City and County of San Francisco. However, Courts have made clear that practical difficulties that arise justify only an occasional and brief deprivation of exercise outside. *Allen*, 48 F. 3d at 1088. The Court must consider concerns about security and costs, but those are not the overwhelming concerns. *Wright v. Rushen*, 642 F.2d at 1134 (court must consider concerns about remedial measures that might impair security and cost too much); *Spain*, 600 F.2 at 199 (cost or inconvenience generally not an excuse). These generalized concerns about security and cost are not sufficient to tip the balance in favor of the City and County of San Francisco. Although there will be increased costs, the Court here orders relief for a narrow population of inmates. Moreover, Defendants have provided no information about the specific costs and concerns about security at issue. This is similar to *Pierce*, where the "county has provided nothing more to justify this almost complete denial of exercise than a generalized reference to institutional security concerns" and has "made no showing that such a severe restriction is reasonably related to satisfying those concerns." *Id*. at 1212-13.

### F.    Public Interest.

"[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Melenderes v. Arpaio*, 695 F.3d 900, 1002 (9th Cir. 2012). Further, "there is the highest public interest in the due observance of all the constitutional guarantees." *U.S. v. Raines*, 362 U.S. 17, 27 (1960). That public interest extends to ensuring constitutionally appropriate treatment of inmates. *See McNearney v. Washington Dept. of Corrections*, 2012 WL 3545267, at *12 (W.D. Wash. Jun. 15, 2012); *Norsworthy*, 87 F. Supp. 3d at 1194.

### G.    Injunctive Relief.

After balancing the four factors, the Court finds that the balance of equities tips in favor of an injunction on limited grounds. The Court follows the ruling in *Spain*, where the Ninth Circuit ordered that the prison allow outdoor exercise one hour a day, five days a week for inmates who were assigned to the AC "for a period of years." 600 F.2d at 199. The Court ORDERS that the City and County of San Francisco provide inmates in administrative segregation in County Jails 4 and 5 exercise in the gym for at least one hour a day, five days a week, unless there are disciplinary reasons or other emergency situations that prevent compliance. The Court ORDERS

United States District Court
Northern District of California

1 the City and County of San Francisco provide any pretrial detainee who had been confined for

2 more than four years access to direct sunlight for at least one hour a week, again unless there are

3 disciplinary reasons or other emergency situations that prevent compliance.

4   Defendants argue that the Court must issue relief that is narrowly tailored to comply with

5 18 U.S.C. § 3626.  The relief that the Court orders here is narrowly tailored to address the specific

6 subgroups of inmates who do not receive a sufficient amount of combined time out of cell or in

7 the gym.

### IV. MOTION TO DISMISS ANALYSIS.

9   Plaintiffs bring claims as to all Defendants pursuant to the Eighth Amendment to the

10 United States Constitution; the Fourteenth Amendment to the United States Constitution; Article I,

11 section 7 of the California Constitution; Article I, section 17 of the California Constitution;

12 common law negligence; and common law intentional infliction of emotional distress.  (Dkt. 1.)

13 Defendants make various arguments that each of these claims should be dismissed.  The Court

14 addresses each claim, as well as certain issues that dispose of claims as to certain Defendants,

15 below.

16   Defendants bring their motion to dismiss for failure to state a claim pursuant to Federal

17 Rule of Civil Procedure 12(b)(6).  Rule 12(b)(6) authorizes a motion to dismiss where the

18 pleadings fail to state a claim upon which relief can be granted.  When considering a motion to

19 dismiss under Rule 12(b)(6), the Court construes the allegations in the complaint in the light most

20 favorable to the non-moving party and takes as true all material allegations in the complaint.

21 *Sanders v. Kennedy*, 794 F.2d 478, 481 (9th Cir. 1986).  Even under the liberal pleading standard

22 of Rule 8(a)(2), "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief'

23 requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of

24 action will not do."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citing *Papasan v.

25 Allain*, 478 U.S. 265, 286 (1986)).  Rather, a plaintiff must instead allege "enough facts to state a

26 claim to relief that is plausible on its face."  *Id.* at 570.

27   "The plausibility standard is not akin to a probability requirement, but it asks for more than

28 a sheer possibility that a defendant has acted unlawfully. . . . When a complaint pleads facts that

1   are merely consistent with a defendant's liability, it stops short of the line between possibility and

2   plausibility of entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting

3   *Twombly*, 550 U.S. at 557) (internal quotation marks omitted).  If the allegations are insufficient to

4   state a claim, a court should grant leave to amend, unless amendment would be futile.  *See, e.g.*,

5   *Reddy v. Litton Indus., Inc.*, 912 F.2d 291, 296 (9th Cir. 1990); *Cook, Perkiss & Lieche, Inc. v. N.*

6   *Cal. Collection Serv., Inc.*, 911 F.2d 242, 246-47 (9th Cir. 1990).

7       Here, because the motions for preliminary injunction and to dismiss were filed almost at

8   the same time, the evidence disclosed in the process of litigating the preliminary injunction

9   revealed that some of the allegations of the Complaint are inaccurate.  However, to the extent that

10  the Court considers the motion to dismiss, the Court accepts as true the allegations of the

11  Complaint.

12      **A.      San Francisco Sheriff's Department as Defendant.**

13      Because the San Francisco Sheriff's Department is not a separate entity from the City and

14  County of San Francisco, the Court GRANTS the motion to dismiss it from this action.  The Ninth

15  Circuit has held that a sheriff's department is appropriately dismissed from a complaint when the

16  department "is, in fact, a non-jural entity," "that is, it lack[s] separate legal status from the County

17  and therefore was incapable of suing or being sued in its own name." *Melendres v. Arpaio*, 784

18  F.3d 1254, 1260 (2015) (relying on Arizona state court holding that sheriff's department at issue

19  was non-jural entity).  There is no California state court precedent directly holding that the San

20  Francisco Sheriff's Department is a non-jural entity.  However, courts in the Northern District of

21  California have recognized that the San Francisco Sheriff's Department is not a separate legal

22  entity from the City and County of San Francisco and dismissed claims against it on that basis.

23  *See, e.g.*, *Bertone v. City and Cnty. of San Francisco, et al.*, 2012 WL 1947100, at *1 n.1 (N.D.

24  Cal. May 30, 2012) (sheriff's department "not separate legal entit[y] and [is] operated by the City

25  and County of San Francisco); *Saunders v. Garay, et al.*, 2014 WL 4386727, at *3 n.4 (N.D. Cal.

26  Sept. 4, 2014) ("The San Francisco Sheriff's Department is not a separate legal entity from the

27  City and County of San Francisco.").  Because the City and County of San Francisco operate the

28  San Francisco Sheriff's Department, the Court considers that allowing suit against it in this case

United States District Court
Northern District of California

49

1   would be superfluous, as the City and County of San Francisco is a defendant.  The Court

2   therefore DISMISSES all claims against the San Francisco Sheriff's Department WITH

3   PREJUDICE.

4       **B.      Eighth Amendment Claims.**

5       Defendants argue that Plaintiffs' claims under the Eighth Amendment should be dismissed

6   as to each Plaintiff who is a pretrial detainee.  (Dkt. 37.)  The Court agrees.  The Eighth

7   Amendment protection against cruel and unusual punishment applies only to inmates who have

8   been tried and convicted.  *Ingraham v. Wright*, 430 U.S. 651, 669-70 (1977).  As noted above, the

9   standards of the Eighth Amendment are instructive in analyzing the Fourteenth Amendment,

10  which is the applicable clause for pretrial detainees.  Here, all of the Plaintiffs except Carlos are

11  pretrial detainees.  (Dkt. 1 ¶ 60.)  Carlos may therefore maintain an Eighth Amendment claim.[20]

12  The remainder of the Plaintiffs may maintain their Fourteenth Amendment claims, but not their

13  Eighth Amendment claims.  At oral argument, Plaintiffs' counsel indicated that the Eighth

14  Amendment claims were brought to preserve them in the event that any of the Plaintiffs' status

15  changed from pretrial to post-trial pending the adjudication of this matter.  Such advance

16  preservation is not necessary.  Federal Rule of Civil Procedure 15 allows the Court to grant a party

17  leave to amend a pleading "freely" "when justice so requires."  As the Court made clear at oral

18  argument, it will permit amendment of the Complaint in the event that the status of any of the

19  Plaintiffs changes.  Defendants further indicate that they would not object to such amendment.

20  (Dkt. 51.)  Discovery would likely be the same for both claims, so there is no practical effect on

21  the conduct of the litigation by dismissing the Eighth Amendment claims of pretrial detainees.

22  Accordingly, the Court DISMISSES Plaintiffs' Eighth Amendment claims as to all Plaintiffs

23  except Carlos WITHOUT PREJUDICE.

24      **C.      Eighth and Fourteenth Amendment Claims against Individual Defendants.**

25      Defendants argue that the Plaintiffs have not stated valid claims under the Eighth and

26

27      [20] As stated above in the discussion of the motion for a preliminary injunction, Carlos was
    a pretrial detainee from his arrest in July 2011 until his conviction in September 2018.  He
28  therefore retains a historical claim for damages under the Fourteenth Amendment alongside his
    Eighth Amendment claim, but has no claim for injunctive relief under the Fourteenth Amendment.

United States District Court
Northern District of California

1  Fourteenth Amendments as to the individual Defendants because they can claim the defense of

2  qualified immunity.  The Court agrees and concludes that qualified immunity requires dismissal of

3  both the Eighth and Fourteenth Amendment claims against the individual Defendants.

4          The assertion of qualified immunity requires the reviewing court to address two questions:

5  whether, taken in the light most favorable to the party asserting the injury, the facts alleged show

6  that the officers' conduct violated a constitutional right and whether the right at issue was clearly

7  established at the time of the alleged violation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  This is

8  not a rigid inquiry, and the second question may be addressed before the first, particularly in cases

9  still subject to factual development. *Pearson v. Callahan*, 555 U.S. 223, 239 (2009); *Henderson v.*

10  *City and Cnty. of San Francisco*, No. C-05-234 VRW, 2006 WL 3507944 (N.D. Cal. Dec. 1,

11  2006) ("If the court finds a material factual dispute whether a constitutional violation has

12  occurred, then the court determines whether the right infringed was clearly established at the time

13  of the alleged violation.") (citing *Wilson v. Layne*, 526 U.S. 603 (1999)).  "'[W]hether an official

14  protected by qualified immunity may be held personally liable for an allegedly unlawful official

15  action generally turns on the 'objective legal reasonableness' of the action, assessed in light of the

16  legal rules that were 'clearly established' at the time it was taken.'" *Messerschmidt v. Millender*,

17  565 U.S. 535, 546 (2012) (quoting *Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (citation

18  omitted)).  Thus, if an official could reasonably have believed she was complying with established

19  law at the time of the violation, qualified immunity may be appropriate even where a

20  constitutional right was violated. *Id.*

21          The Supreme Court has repeatedly, and recently, "reiterate[d] the longstanding principal

22  that 'clearly established law' should not be defined at a high level of generality." *White v. Pauly*,

23  137 S. Ct. 548, 552 (2017); *see also Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (the Supreme

24  Court has repeatedly told courts, "and the Ninth Circuit in particular" about this rule).  Instead,

25  "the clearly established law must be 'particularized' to the facts of the case." *White*, 137 S. Ct. at

26  552 (quoting *Anderson*, 483 U.S. at 640).  "Except in the rare case of an 'obvious' instance of

27  constitutional misconduct . . . [p]laintiffs must identify a case where an officer acting under similar

28  circumstances as defendants was held to have violated the Fourth Amendment." *Sharp v. Cty. of*

United States District Court
Northern District of California

*Orang*e, 871 F.3d 901, 911 (9th Cir. 2017) (emphasis in original) (internal brackets omitted). "In the absence of 'a case directly on point,' [courts] compare 'specific factors' relevant to the excessive force inquiry to determine whether a reasonable officer would have known that the conduct in question was unlawful." *Isayeva v. Sacramento Sheriff's Dept.*, 872 F.3d 938, 947 (9th Cir. 2017).

The Court has found, as noted above, that Plaintiffs are unlikely to prevail on their claim that denial of outdoor exercise violates their Eighth and Fourteenth Amendment rights, with the exception for inmates held in custody longer than four years.  In addition, the Court has found that limiting the amount of exercise, even indoors, of 180 minutes per week for inmates in administrative segregation in County Jail 4 violates their Constitutional rights because of the lack of out-of-cell time.

Thus, in analyzing the right to outdoor exercise, there is no clear and binding precedent in the Ninth Circuit establishing that the denial of outdoor exercise for inmates in custody over four years violates the Constitution.  *Spain*, 600 F.2d at 199; *Shorter v. Baca*, 895 F.3d at 1185.  The ruling in *Allen* appeared to create a bright line rule, 48 F.3d at 1088, but, as noted above, the Court in *Norwood*, applying the doctrine of qualified immunity, granted summary judgment to individual defendants who had denied plaintiffs the right to outdoor exercise and held that *Allen* did <u>not</u> recognize an absolute right to outdoor exercise.  *Id.* at 1068.  There is no case in which the court found that a lack of outdoor exercise is unconstitutional when exercise is offered in other ways.  The case law cited above is not clear, as outlined by the summary of cases addressing this issue.  And even in determining the amount of exercise, without even considering the issue of outdoor exercise, *Pierce* specifically held that there is no specific amount of exercise necessary. 526 F.3d at 1212.

Given that the facts of this case are not similar to any of the cases cited above in which courts found a constitutional violation for denial of outdoor exercise, the Court must apply the doctrine of qualified immunity and grant summary judgment to the individual defendants.  The key differences between this case and the cases cited above are the length of time the inmates spend in their cells, the amount of time they have to exercise, their access to sunlight – even if not

1   direct sunlight – and their access to fresh air.  Even if the Court ultimately finds a constitutional

2   violation in its consideration of the merits of this case, the Court concludes that the right at issue

3   was not clearly established at the time of the violations alleged by Plaintiffs.  The cases show an

4   acknowledgement of the importance of outdoor recreation but not a constitutional entitlement to

5   such recreation that would have been clear to a reasonable officer at the time of the violations

6   alleged here under the standard set forth in *Saucier*.

7        Whether the individual defendants are entitled to qualified immunity against the claim by

8   inmates in administrative segregation is a closer call.  As noted above, both the inmates in

9   administrative segregation here and inmates in *Spain* were confined to their cells for 23 ½ hours a

10  day.  The only difference is that, in *Spain*, the inmates were only allowed to exercise in the

11  corridors, but the inmates in administrative segregation here are allowed time to exercise in the

12  larger gym with windows.  *Pierce* is closer to the facts of this case, but in *Pierce*, the court found

13  that 90 minutes of exercise per week was not sufficient where pretrial detainees were held in

14  county jail for an average of 110 days (and an average of 312 days for "third strike offenders).

15  526 F.3d at 1212.  Here, inmates in both County Jails 4 and 5 have more exercise than inmates in

16  *Pierce* did (180 minutes of exercise per week in County Jail 4 and 210 minutes of exercise per

17  week in County Jail 5).  In addition, there are no cases finding that amount of exercise in a gym

18  (even if indoors) insufficient under the Eighth or Fourteenth Amendments.  The facts of *Pierce*

19  and other cases are not sufficiently similar to the facts of this case to put reasonable officials on

20  notice that their actions in limiting the amount of out-of-cell time and exercise time for inmates in

21  administrative segregation for non-disciplinary reasons violated the Fourteenth Amendment.

22       Accordingly, the individual Defendants are entitled to qualified immunity.  The Court

23  DISMISSES all claims for violation of the Eighth and Fourteenth Amendments against individual

24  Defendants WITH PREJUDICE.

25       **D.    California Constitutional Claims.**

26       Plaintiffs bring claims for relief under sections 7 and 17 of Article I of the California

27  constitution.  (Dkt. 1 ¶ 76-82.)  As cited above, Article I, Section 7 provides for due process of

28  law, and Article I, Section 17 prohibits cruel or unusual punishment.  Plaintiffs allege that the

United States District Court
Northern District of California

53

conditions of their confinement, with no access to sunlight, "outdoor air," or outdoor exercise, and with confinement to their cells over 23 hours per day violates their due process rights.  (Dkt. 1, ¶¶ 77-78.)  Plaintiffs allege that they are suffering from cruel and unusual punishment from "total denial of access to sunlight and sunshine, denial even to natural daylight, and isolation from the outdoors."  (Dkt. 1, ¶ 81.)  In addition, Plaintiffs claim that confinement to their cells for 23 ½ hours a day is cruel and unusual punishment.  (Dkt. 1, ¶ 81.)

"It is well established that the California constitution does not create a "constitutional tort cause of action for damages to remedy an asserted violation of the due process 'liberty' interest under article I, section 7(a)."  *Katzberg v. Regents of Univ. of California*, 29 Cal. 4th 300, 326 (2002).  Similarly, there is no private right of action for damages for violation of article I, section 17 of the California constitution, which prohibits cruel and unusual punishment.  *Giraldo v. Dept. of Corrections & Rehabilitation*, 168 Cal. App. 4th 231, 253-57 (2008).  However, despite the prohibition on actions for damages, a party may still seek equitable relief for violations of sections 7 and 17 of the California constitution.  *See* 29 Cal. 4th at 307 ("it is also clear that, like many other constitutional provisions, this section supports  an action, brought by a private plaintiff against a proper defendant, for declaratory relief or injunction"); 168 Cal. App. 4th at 257 (finding section 17 supports a private action for injunctive relief).  Plaintiffs therefore have properly sought injunctive relief under these provisions here.  At oral argument, Plaintiffs conceded that their claims under the California Constitution are limited to injunctive relief.  To the extent that the Complaint seeks damages for violation of the California Constitution, the Court DISMISSES that claim for relief WITH PREJUDICE.

Because qualified immunity is a creature of federal law, it does not shield the individual Defendants from Plaintiffs' state constitutional claims.  The Court was unable to find case law suggesting that individual Defendants could not be enjoined for California constitutional violations, and neither party cited any case supporting or opposing the issue of liability of individual Defendants for injunctive relief under the California Constitution.  However, because there might be a mismatch between certain individual Defendants' actual authority and the issues presented in this case, that injunctive relief against those defendants would be inappropriate.  For

54

example, it would be meaningless to order that an undersheriff alter the conditions of confinement for certain inmates if that person lacks the authority to make policy changes dictating conditions of confinement.  It further seems that, even to the extent an individual defendant could affect policy, claims for injunctive relief could only be brought against such a person in her official, rather than personal, capacity.  Accordingly, the Court concludes that a claim under the California Constitution against Defendant Sheriff Hennessey in her official capacity may be maintained because she has policymaking authority over the conditions of confinement at issue here; the Court DENIES the motion to dismiss the claims under the California Constitution against Defendant Sheriff Hennessey in her official capacity.[21]  However, the Court DISMISSES WITH PREJUDICE the claims under the California Constitution against Sheriff Hennessey in her individual capacity.  Similarly, the Court DISMISSES WITH LEAVE TO AMEND any claim for negligence and emotional distress against Defendants Captain Jason Jackson, Captain Kevin McConnell, and Chief Deputy Sheriff Paul Miyamoto, either in their individual or official capacities.  Plaintiffs must plead that the individual Defendants have the ability to provide the requested relief.

### E.        Common Law Claims Against City and County of San Francisco.

Defendants argue that immunities created by the California Government Code preclude Plaintiffs' common law claims for negligence and intentional infliction of emotional distress.  The Court agrees.  California Government Code section 844.6 provides that "a public entity is not liable for […] an injury to any prisoner."  Under this provision, "public entities […] are immune from liability for […] intentional infliction of emotional distress and negligence."  *Wright v. State of California*, 122 Cal. App. 4th 659, 672 (2004).  Plaintiffs' claims against the City and County of San Francisco for intentional infliction of emotional distress and negligence therefore fail.  Accordingly, the Court DISMISSES WITH PREJUDICE Plaintiffs' claims against the City and County of San Francisco for intentional infliction of emotional distress and negligence.

---

[21] Hennessy has indicated publicly that she will not run for re-election.  Therefore, when her position ends, the Court will dismiss her as a defendant in her official capacity and will entertain a motion from Plaintiffs to substitute the new Sheriff.

1

### F.     Common Law Claims Against Individual Defendants.

Similarly, California Government Code section 820.6 provides that "[i]f a public employee acts in good faith, without malice, and under the apparent authority of an enactment that is unconstitutional, invalid or inapplicable, he is not liable for any injury cause thereby."  "Under section 820.6, 'good faith' reflects a subjective intention to act under the authority of the governing enactment, and to enforce or comply with those rules."  *O'Toole v. Superior Court*, 140 Cal. App. 4th 488, 505 (2006).  As such, good faith does not require a public officer "to second-guess […] policy by engaging in a constitutional analysis to predict whether a court will uphold the public entity's" decisionmaking.  *Id.* at 507.

Here, Plaintiffs allege, in the claim for negligence, that Defendants have a legal duty not to violate their constitutional rights, including the right not to be subject to cruel and unusual punishment, and to be deprived of out-of-cell time.  (Dkt. 1, ¶ 85.)  Plaintiffs further allege that Defendants violated their duties to Plaintiffs by denying them access to the outdoors and by confining them to cells for 23 hours a day.  (Dkt. 1, ¶ 86.)  In the claim for intentional infliction of emotional distress, Plaintiffs claim that Defendants' "conduct in adopting a [sic], policies, customer, and practices of incarcerating inmates where they are completely denied all access to outdoor recreation, to outdoor light, sunshine and sunlight," and confinement to cells for 23 hours a day, is "extreme and outrageous conduct" causing emotional distress.  (Dkt. 1, ¶ 90.)  Plaintiffs fail to allege facts showing malicious intent.  Therefore, Plaintiffs' claims against the individual officer Defendants for intentional infliction of emotional distress and negligence also fail.  The Court DISMISSES WITH LEAVE TO AMEND any claim for negligence or emotional distress against the individual defendants.  Plaintiff must plead facts showing both that their actions arose out of malice.

### G.     Prison Litigation Reform Act.

Finally, Defendants proffer that the Prison Litigation Reform Act ("PLRA") precludes Plaintiffs' federal claims for relief because Plaintiffs have not sufficiently established physical harm from Defendants' course of conduct.  Plaintiffs' ability to prove physical harm goes squarely to the merits of this case.  Here, Plaintiffs allege significant, if not severe, physical injury resulting

1   from their lack of ordinary exposure to sunlight.  (Dkt. 1.)  On a motion to dismiss, the Court takes

2   these factual allegations as true.  *Sanders*, 794 F.2d at 481.  Defendants' argument that the PLRA

3   bars Plaintiffs' federal claims is without merit.  The Court DENIES the motion to dismiss based

4   on this argument.

5       **V.      CONCLUSION.**

6           In summary, the Court finds that confining inmates in County Jail 4 who are in

7   administrative segregation and confined to their cells for 23 ½ hours a day violates the more

8   stringent standard of the Eighth Amendment and thus violates the Fourteenth Amendment.  The

9   Court finds that inmates in the general population in both County Jails 4 and 5 and in

10  administrative segregation in County Jail 5 receive an adequate amount of exercise and access to

11  day rooms to satisfy the Eighth Amendment.  The Court finds that the temporary denial of any

12  exercise to inmate in disciplinary lockdown does not violate the Eighth or Fourteenth

13  Amendments.  The Court declines to rule that an inmate generally has the right of access to direct

14  sunlight, but the Court finds that depriving a pretrial detainee of lack of access to direct sunlight

15  for more than four years constitutes punishment.  The Court finds that inmates in administrative

16  segregation for non-disciplinary reasons do not have a procedural or substantive due process right

17  to a hearing and written notice for the reasons for their placement.

18          Thus, the Court GRANTS IN PART and DENIES IN PART Plaintiffs' motion for a

19  preliminary injunction.

20          The Court GRANTS the motion to dismiss and DISMISSES WITH PREJUDICE claims

21  against the San Francisco Sheriff's Department, Eighth Amendment claims asserted by all

22  Plaintiffs except for Armando Carlos, Eighth and Fourteenth Amendment claims against all

23  individual Defendants, claims for damages under the California Constitution, claims against

24  Sheriff Hennessey for violation of the California Constitution in her individual capacity, and

25  common law claims against the City and County of San Francisco.

26  / / /

27  / / /

28  / / /

United States District Court
Northern District of California

The Court GRANTS the motion to dismiss and DISMISSES WITH LEAVE TO AMEND the claims for violation of the California Constitution against the individual Defendants and common law claims against the individual Defendants.

**IT IS SO ORDERED**.

Dated: January 31, 2020



_____

SALLIE KIM
United States Magistrate Judge