UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

KENYON NORBERT, et al.,

                    Plaintiffs,

        v.

SAN FRANCISCO SHERIFF'S
DEPARTMENT, et al.,

                    Defendants.

Case No.  19-cv-02724-SK

**ORDER DENYING SECOND MOTION
FOR PRELIMINARY INJUNCTION**

Regarding Docket Nos. 197, 198

On January 11, 2021, Plaintiffs Kenyon Norbert, Montrail Brackens, Jose Poot, Marshall Harris, Armando Carlos, Michael Brown, and Troy McAllister ("Plaintiffs") moved for entry of a second preliminary injunction.  (Dkt. 197.)  Defendants the San Francisco County Sheriff's Department (the "Sheriff's Department"), the City and County of San Francisco (the "City"), Sheriff Vicki Hennessy, Captain Jason Jackson, Captain Kevin McConnell, and Sheriff Paul Miyamoto ("Defendants") filed an opposition on January 25, 2021.  (Dkt. 198.)  The Court held oral argument on February 22, 2021, (Dkt. 202), after which it issued an Order requiring Defendants to provide further factual information (Dkt. 203).  Defendants submitted the requested information (Dkt. 204), and Plaintiffs submitted a response (Dkt. 205).  The Court heard further oral argument on March 15, 2021.

Having considered the submissions of the parties, the relevant legal authorities, and the record in the case, the Court HEREBY DENIES Plaintiffs' motion for a second preliminary injunction without prejudice, for the reasons set forth below.

## BACKGROUND

Plaintiffs are a proposed class of individuals currently incarcerated in San Francisco

United States District Court
Northern District of California

1   County.[1]  Plaintiffs now all reside in newly renamed County Jail 3, in San Bruno.  (Dkt. 197-1.)

2   **A.      Conditions before COVID-19 Pandemic.**

3           On August 16, 2019, the Court conducted a judicial site visit to observe the conditions of

4   confinement at County Jail 3.  At the time of that site visit and prior to the COVID-19 pandemic,

5   County Jail 3 could hold a maximum of 772 inmates.  (Dkt. 67.)  Within County Jail 3, there were

6   three types of housing: "general population," "administrative segregation," and "restricted

7   housing."  (Dkt. 67; Dkt. 11-1 (McConnell Dec. ¶¶ 4, 8).)  Of the total housing capacity at County

8   Jail 3, general population units could house 528 inmates; administrative segregation units could

9   house 96 inmates; and disciplinary lockdown units could house 24 inmates.  (Dkt. 67.)  There

10  were also several smaller housing units for inmates with psychiatric needs, medical needs, and

11  security needs (for gang dropouts).  (Dkt. 11-1 (McConnell Dec. ¶¶ 4, 8).)  Two housing units in

12  County Jail 3 were designated for a charter high school program.  (*Id.*)  Housing units at County

13  Jail 3 were referred to as "pods."  (*Id.*)  Each pod at County Jail 3 was identical and housed 48

14  inmates.  (*Id.*)  During their "free time," each general population "pod" had access to a common

15  area or "day room" that contains phones, a shower, television, tables, and stools.  (Dkt. 11-2

16  (Freeman Dec. ¶ 6).)  The doors to the cells had clear plastic that allows inmates to see into the

17  common areas.  (*Id.*)  Inmates could access the common areas for four and a half hours each

18  weekday and 8 hours each weekend day.  (*Id.*)

19          Inmates in administrative segregation in County Jail 3 were allowed to use the gym.  (Dkt.

20  11-1 (McConnell Dec., ¶ 5); Dkt. 11-2 (Freeman Dec. ¶ 12).)  Inmates in administrative

21  segregation received 30 minutes of exercise, seven days a week, and in addition received 30

22  minutes of time in the day room, seven days a week.  (Dkt. 81 at page 4.)  The backs of the cells

23  have windows that look out to the exterior wall of a building and which allow in "borrowed" or

24  ambient light into each cell.  (Dkt. 11-2 (Freeman Dec. ¶ 7).)  The common room opens into a

26          [1] Plaintiffs' complaint was originally brought on behalf of inmates in County Jail 4 and

27  County Jail 5.  (Dkt. 1.)  However, the San Francisco County Sheriff's Department closed County
    Jail 4, which was located at 850 Bryant Street, effective September 5, 2020.  The Sheriff's

28  Department renumbered the remaining jails, and the former County Jail 5, which is located in San
    Bruno, is now referred to as County Jail 3.

United States District Court
Northern District of California

gym, which is approximately the size of half of a basketball court.  (*Id.* ¶¶ 6-8.)  The gyms are irregularly shaped but about half the size of a regulation basketball court.  (Dkt. 11 at page 7.) Two large grates in the ceiling of each gym allow air from outside to enter the building and allow some light, but there are no windows or glass in the gym.  (Dkt. 11-2 (Freeman Dec. ¶¶ 6-8.)

Before the COVID-19 pandemic, the number of inmates in the gym at any one time varied. (Dkt. 67.)  Inmates housed in administrative segregation pods were allowed out of their cells for 30 minutes of exercise 7 days a week.  (Dkt. 11-1 (McConnell Dec. ¶ 5).)  Typically, two inmates were released for their exercise time together; however, if the jail staff deemed it safe for multiple inmates to occupy the gym simultaneously, the number of inmates in the gym could increase in groups of two.  (Dkt. 67.)  For each two inmates added to the total, the exercise time increased by 30 minutes; *e.g.*, four inmates in the gym together would get one hour of time, six would get one and a half hours, etc.  (*Id.*)  Inmates in disciplinary lockdown generally did not receive any recreation time, but some did, depending on the violation of the rules that resulted in the lockdown placement.  (Dkt. 11-2 (Freeman Dec. ¶ 4).)  However, there is no evidence about the amount of time or frequency with which these inmates were allowed recreation.  Of the total number of inmates in County Jail 3 as of July 31, 2019, 92.85% were pretrial detainees.  (Dkt. 67.)  Of those inmates, 35.05% (191 people) had been housed for longer than one year, while 20.37% (111 people) had been housed for longer than two years.  (*Id.*)  11.20% (61 people) had been housed for longer than three years, and 6.06% (33 people) had been housed for longer than four years.  (*Id.*)

County Jail 3 previously had an outdoor exercise yard that has not been used for 13 years. (Dkt. 11-2 (Freeman Dec. ¶ 24).)  At the time of the site visit, the exercise yard was an open field.[2] The yard was not secure.  Because there was no secure pathway between the jail and the exercise yard, Defendants stated that transferring inmates to the yard would not be safe unless there were "extraordinary time-consuming and costly measures" put in place, but there was no estimate of that time or expense in the record.  (Dkt. 11-2 (Freeman Dec. ¶ 24).)  In addition, the fences around the yard were crumbling and leaning.  (Dkt. 11-1 (McConnell Dec. ¶11).)  The Court observed during the site visit that the cells are too small to allow inmates to exercise in a

_____

[2] The Court observed this yard during the site visit.

United States District Court
Northern District of California

meaningful way.

**B.      Conditions in County Jail 3 during COVID-19 Pandemic.**

The global pandemic caused by COVID-19 has forced everyone to make agonizing choices to avoid death.  On the one hand, isolating decreases the risk of serious illness or death, but on the other hand, isolation also can cause serious mental health problems.  Although everyone has faced these terrible decisions, COVID-19 has forced caretakers of inmates in jails and prisons into the extremes of choices.  The caretakers of the San Francisco jail system, who are responsible for the health of the inmates, have been required to ensure that inmates do not become ill but also to provide them with adequate recreation.  And to complicate matters, the inmates in San Francisco jail also have Constitutional rights to attend hearings and trials for their ongoing criminal cases in a timely manner, and their movement in and out of jail to do so increases the risk to them, other inmates, and staff who work in the jail.

In attempt to balance these competing interests, the Sheriff's Office and the City changed policies with respect to daily management of County Jail 3.  Defendants instituted lockdown procedures to decrease inmate contact with other inmates apart from their cellmates.  (Dkts. 197-7 (Carlos Dec. ¶ 11); 197-8 (McFarland Dec. ¶ 8); 197-5 (Beloy Dec. ¶ 3); 197-9 (Harris Dec. ¶ 5); 197-4 (Alexis Dec. ¶ 4).)  Defendants completely closed the gym spaces in County Jail 3 to avoid generation of an exposure to aerosols during common exercise time.  (Dkts. 197-5 (Beloy Dec. ¶3); 197-7 (Carlos Dec. ¶ 2); 197-8 (McFarland Dec. ¶ 9).)  Defendants radically limited out of cell time, and limited the use of that time to certain activities, such as showers, phone calls, and cleaning.  (Dkts. 197-5 (Beloy Dec. ¶ 3); 197-8 (McFarland Dec. ¶¶ 9-11).)  Social distancing and masks are required during out of cell time.  (Dkt. 204.)  Inmates are also required to observe masking and social distancing procedures when traveling in and out of the facility for medical and legal reasons.  (*Id.*)  Because they cannot safely share the common space with others, some inmates in administrative segregation are allowed out of cell only every other day, to shower.  (Dkt. 197-6 (Poot Dec. ¶ 2).)  As the declarations attached to Plaintiffs' motion attest, these policies have had agonizing mental and physical health consequences for the inmates in County Jail 3.

United States District Court
Northern District of California

1    There are currently 578 inmates housed in County Jail 3.  (Dkt. 204.)  Of those inmates,

2   161, or 27.8 percent of the total population, are housed in administrative segregation.  (*Id.*)

3   Eligible Sheriff's Department staff members and eligible inmates have begun to receive vaccines.

4   (*Id.*)  As of February 25, 2021, 132 inmates in the Sheriff's Department's custody across all jail

5   facilities had received a first vaccine does, and 93 had received a second dose.  (*Id.*)

6    The Sheriff's Department followed the San Francisco Mayor's order closing gym spaces,

7   and that order was lifted on March 3, 2021.  (Dkt. 204-1 (Miyamoto Dec. ¶ 8).)  Pods are

8   responsible for cleaning common spaces between uses and will be responsible for cleaning gym

9   spaces when they open.  (*Id.*)  The gyms at County Jail 3 have louvered windows which provide

10   access to fresh air; however, the angle of the window openings is fixed and cannot be adjusted to

11   allow for additional air flow or circulation.  (*Id.*)  Inmates are provided with masks and are

12   required to wear them during time out of cell, in transit, and at medical, legal, and court

13   appointments.  (*Id.*)  County Jail 3 currently uses an air filtration system relying entirely on

14   outside air.  (*Id.*)  Masking and social distancing are required during each unit's out of cell time.

15   (*Id.*)

16    The policies for County Jail 3, like those of the United States in general, have changed

17   regularly as the pandemic has waxed and waned.  San Francisco has also consulted with its own

18   health experts on a regular basis.  Sheriff Paul Miyamoto, who took office from Sheriff Vicki

19   Hennessy about two months before the COVID-19 pandemic began, is responsible for overseeing

20   the daily operations of the Sheriff's Department, including its COVID-19 response.  (Dkt. 204-1

21   (Miyamoto Dec. ¶¶ 2-3).)  As part of this response, Miyamoto meets five times per week with the

22   Director of Jail Health Services, who is an employee of the San Francisco Department of Public

23   Health.  (*Id.* ¶ 10.)  The purpose of these meetings is to assess and reassess all aspects of the

24   Sheriff's Department's COVID-19 response, including assessing "all aspects of our operating

25   procedures to identify areas of potential COVID risk."  (*Id.* ¶ 14.)  Miyamoto is aware of the "twin

26   risks COVID-19 poses, including the physical effects of infection and the mental health challenges

27   the pandemic poses to those who have not been infected, especially to incarcerated individuals

28   who are already separated from family, friends, and loved ones."  (*Id.* ¶ 3.)  In response to the

mental health pressures of COVID-19, Miyamoto has implemented policies including building a system for video visits to inmates and making all phone calls from cells free.  (*Id.* ¶¶ 4-5.)  Simultaneously, Miyamoto recognizes that the COVID-19 situation is "dynamic" and the jail "is not a closed system due to incoming inmates, medical, and court visits.  (*Id.* ¶¶ 11 13.)  Miyamoto is actively seeking to distribute the vaccine to Sheriff's Department staff and inmates.  (*Id.* ¶¶ 11, 12.)

San Francisco has been largely successful in diminishing the spread of COVID-19 within County Jail 3.  Through January 21, 2021, San Francisco County Jails[3] have recorded 112 cases of COVID-19.  (Dkt. 198-10 (Berdux Dec. Ex. I).)  As of the same date, there were 3 active cases in custody, 13 recovered cases in custody, and 38 isolated cases in custody.  (*Id.*)  From April 12, 2020, to January 20, 2021, San Francisco County Jails booked 8,402 inmates, administered 10,613 COVID-19 tests, and had only 112 recorded positive cases.  (*Id.*)  Other jails and prisons have not been as lucky.  At San Quentin State Prison, there were 2,200 confirmed cases of COVID-19 and 28 deaths among inmates as of October 2020.  *See In re Von Staich*, 56 Cal. App. 5th 53, 60, 270 Cal. Rptr. 3d 128, 134, *review granted and cause transferred sub nom. Staich on H.C.*, 477 P.3d 537 (Cal. 2020) (citing CDCR, Population COVID-19 Tracking, https://www.cdcr.ca.gov/covid19/population-status-tracking/ ).  Additionally, San Quentin State Prison recorded 298 confirmed cases and one death among staff members.  *Id.*  Santa Rita Jail in Alameda County has seen two large spikes in COVID-19 infections, one in July of 2020 when 110 inmates and a dozen staff members tested positive, and a second in January of 2021 when 76 inmates and 6 staff members tested positive.  *See* Angela Ruggiero, "Santa Rita Jail sees second biggest COVID outbreak of the pandemic," THE MERCURY NEWS, Jan. 7, 2021 at 10:27 a.m., Updated Jan 7, 2021 at 3:44 p.m., https://www.mercurynews.com/2021/01/07/santa-rita-jail-sees-second-biggest-covid-outbreak-of-the-pandemic/.

Against this backdrop, Plaintiffs have genuine complaints that the measures Defendants have taken are too harsh.  Plaintiffs submit the declarations of seven current inmates detailing the

---

[3] As counsel for Defendants pointed out at oral argument, disaggregated data reflecting the number of infections at only County Jail 3 is not currently available.

United States District Court
Northern District of California

United States District Court
Northern District of California

changes in conditions of confinement due to the COVID-19 pandemic ("COVID-19").  Plaintiffs allege that the structure and layout of County Jail 3 has not been changed since the Court's site visit.  (Dkts. 197-2 (Garcia Dec. ¶ 8 (describing window size)); 197-4 (Alexis Dec. ¶¶ 3-6 (describing windows and cell size)); 197-5 (Beloy Dec. ¶¶ 3-5 (describing common area and POD structure)); 197-9 (Harris Dec. ¶¶ 4-5, 9, 11 (describing cell and POD time)).  However, since March 2020, when COVID-19 begin spreading rapidly in the San Francisco County area, the Sheriff's Department instituted a lockdown procedure limiting general population inmates to one hour per day of out of cell time.  (Dkts. 197-7 (Carlos Dec. ¶ 11); 197-8 (McFarland Dec. ¶ 8); 197-5 (Beloy Dec. ¶ 3); 197-9 (Harris Dec. ¶ 5); 197-4 (Alexis Dec. ¶ 4).)  Inmates are no longer allowed to access the gym during their time in common areas.  (Dkts. 197-5 (Beloy Dec. ¶3); 197-7 (Carlos Dec. ¶ 2); 197-8 (McFarland Dec. ¶ 9).)  Their time in the common area may be used for showers, phone calls, accessing cleaning materials, and socializing, but not for exercising.  (Dkts. 197-5 (Beloy Dec. ¶ 3); 197-8 (McFarland Dec. ¶¶ 9-11).)  During the allotted time in the common area, 4 cells are allowed out at a time, with a morning shift and an afternoon shift.  (Dkts. 197-5 (Beloy Dec. ¶ 4); 197-8 (McFarland Dec. ¶ 11.  Inmates in administrative segregation are allowed out of cell only every other day, to shower.  (Dkt. 197-6 (Poot Dec. ¶ 2).)

**C.    Procedural History.**

In their complaint, Plaintiffs allege that conditions of confinement at County Jail 3 violate the Eighth and Fourteenth Amendments to the United States Constitution, Sections 7 and 17 of the California Constitution, and 15 C.C.R. 1065.  (Dkt. 1.)  Plaintiffs contend that the amount of light, type of light, and variance in light from day to night are not sufficient to maintain the health of inmates in County Jail 3 and that those inmates confined to their cells for 23 ½ hours per day do not receive adequate exercise.  As a result, Plaintiffs argue, the conditions of their confinement at County Jail 3 violate the Eighth and Fourteenth Amendments.  Plaintiffs moved for preliminary injunctive relief (Dkt. 8), and on January 31, 2020, the Court entered an Order granting in part and denying in part Plaintiffs' initial motion for a preliminary injunction.  (Dkt. 110.)  The Court ordered Defendants to provide inmates in administrative segregation in County Jails 4 and 5 exercise in the gym for at least one hour a day, five days a week, unless disciplinary reasons or

1    other emergency situations prevent compliance.  (*Id.*)  The Court further ordered Defendants to

2    provide any pretrial detainee who had been confined for more than four years access to direct

3    sunlight for at least one hour a week, unless disciplinary reasons or other emergency situations

4    prevent compliance.  (*Id.*)  In the same Order, the Court addressed Defendants' motion to dismiss

5    the complaint and granted it in part and denied it in part.  (*Id.*)

6         On February 28, 2020, Defendants filed a notice of appeal of the Court's preliminary

7    injunction to the Ninth Circuit Court of Appeals.  (Dkt. 127.)  Simultaneously, Defendants filed a

8    motion to stay application of the preliminary injunction pending appeal.  (Dkt. 128.)  Plaintiffs

9    filed a notice of cross-appeal on March 13, 2020.  (Dkt. 139.)  Defendants complied with the

10   portion of the preliminary injunction requiring increased recreation time for inmates held in

11   administrative segregation, and the parties stipulated to a stay of the direct sunlight portion of the

12   preliminary injunction and of the appeals while they discussed settlement.  (Dkts. 138, 150.)  The

13   parties engaged in lengthy, confidential settlement discussions but ultimately failed to reach a

14   resolution of this matter.  (Dkts. 153, 156, 159, 175, 178, 180.)  On October 5, 2020, the Court

15   held a case management conference and set a renewed briefing schedule on Defendants' motion to

16   stay.  (Dkt. 184.)  Plaintiffs opposed the motion to stay.  (Dkts. 186, 187, 188.)  Defendants

17   submitted a reply in support of the motion to stay.  (Dkt. 189.)  On December 3, 2020, the Court

18   denied the motion to stay as moot, finding that the preliminary injunction at issue expired on April

19   30, 2020, under the terms of the Prison Litigation Reform Act ("PLRA").  The Ninth Circuit heard

20   oral argument on the parties cross-appeals on March 11, 2021.

21        In this Court, Plaintiffs brought a motion to certify a class on December 4, 2020 (Dkt. 191)

22   and the instant second motion for a preliminary injunction on January 11, 2021.  In their second

23   motion for a preliminary injunction, Plaintiffs request that the Court renew and expand the initial

24   preliminary injunction.  (Dkt. 197.)

25                                    **DISCUSSION**

26   **A.    Legal Standard.**

27        A plaintiff seeking a preliminary injunction must demonstrate: "(1) likely success on the

28   merits; (2) likely irreparable harm absent preliminary relief; (3) [that] the balance of equities tips

*United States District Court*
*Northern District of California*

8

1   in [Plaintiffs'] favor; and (4) that an injunction is in the public's interest." *Doe v. Kelly*, 878 F.3d

2   710, 719 (9th Cir. 2017) (citations omitted).  A "possibility" of irreparable harm is insufficient;

3   rather it must be "likely" absent an injunction. *Am. Trucking Ass'n, Inc. v. City of L.A.*, 559 F.3d

4   1046, 1052 (9th Cir. 2009).  Alternatively, "'serious questions going to the merits' and a balance

5   of hardships that tips sharply towards the plaintiff can support issuance of a preliminary

6   injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and

7   that the injunction is in the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127,

8   1135 (9th Cir. 2011).  Plaintiffs bear the burden to show that these factors are met. *DISH Network

9   Corp. v. FCC*, 653 F.3d 771, 776-77 (9th Cir. 2011).

10          The PRLA provides that, in "any civil action with respect to prison conditions," a "court

11   may enter a temporary restraining order or an order for preliminary injunctive relief." 18 U.S.C. §

12   3626(a).  That "[p]reliminary injunctive relief shall automatically expire on the date that is 90 days

13   after its entry, unless the court makes the findings required under subsection (a)(1) for the entry of

14   prospective relief and makes the order final before the expiration of the 90-day period." The

15   PLRA governs prospective relief in the prison context where violations of federal law are at issue.

16   *See Handberry v. Thompson*, 446 F.3d 335, 344 (2d Cir. 2006).  The PLRA defines "the term

17   'prisoner'" to mean "any person subject to incarceration, detention, or admission to any facility

18   who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of

19   criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary

20   program." 18 U.S.C. § 3626(g).  The PLRA further defines "the term 'prison'" to mean "any

21   Federal, State, or local facility that incarcerates or detains juveniles or adults accused of, convicted

22   of, sentenced for, or adjudicated delinquent for, violations of criminal law." *Id.*  The PLRA thus

23   mandates that a preliminary injunction entered by a district court expires after 90 days.

24   *Mayweathers v. Newland*, 258 F.3d 930, 936 (9th Cir. 2001).  A court may enter a renewed

25   injunction pending appeal, as long as the renewed injunction does not alter the *status quo* on

26   appeal. *Id.*

27          The Ninth Circuit has affirmed provisional class certification for the purposes of entering

28   injunctive relief. *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1041 (9th Cir. 2012)

United States District Court
Northern District of California

9

1    (district court did not abuse its discretion in certifying provisional class where commonality,

2    typicality, and adequacy requirements of Rule 23(a) were met).

3    **B.    Analysis.**

4    First, the Court recognizes that a renewed or new injunction pending appeal of the first

5    injunction must be carefully crafted not to alter the *status quo* pending appeal. *Mayweathers*, 258

6    F.3d at 936. Given the changed circumstances imposed by the COVID-19 pandemic, construction

7    of such an injunction seems impossible. The circumstances in County Jail 3 have altered so

8    significantly since the Court's initial site visit and injunction that another injunction would

9    necessarily reflect those changed circumstances and thus could not preserve the posture of the first

10   injunction, which is currently on appeal.

11   Second, the Court finds that Plaintiffs have not carried their burden of showing that all four

12   factors required for entry of a preliminary injunction are met. In particular, the public interest

13   counsels against injunctive relief at this time. As discussed above, the Sheriff's Department is

14   engaged in a thorough and specific analysis of the risks to the inmate population posed by

15   COVID-19 on a daily basis. Defendants have struck a balance between protecting inmates'

16   mental health and protecting them from contracting COVID-19. The Court is not well-positioned

17   to second guess the Sheriff's nuanced decision-making in that regard and declines to upset that

18   delicate balance.

19   Finally, the Court notes that it need not address the issue of provisional class certification

20   here because it denies the motion for injunctive relief. The Court will address Plaintiffs' pending

21   motion for class certification in a separate order.

<b>CONCLUSION</b>

23   For the reasons set forth above, the Court DENIES Plaintiffs' second motion for a

24   preliminary injunction without prejudice.

25   **IT IS SO ORDERED**.

26   Dated: March 23, 2021



SALLIE KIM
United States Magistrate Judge