LAW OFFICES OF YOLANDA HUANG
YOLANDA HUANG, SBN 104543
475 14th Street, Suite 500
Oakland, CA 94612
Telephone: (510) 329-2140
Facsimile:  (510) 580-9410

Attorney for Plaintiffs

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO/OAKLAND DIVISION

| | |
|---|---|
| KENYON NORBERT, TROY MCALLISTER, MARSHALL HARRIS, ARMANDO CARLOS, MONTRAIL BRACKENS, MICHAEL BROWN, and JOSE POOT, on behalf of themselves individually and others similarly situated, as a class and Subclass,<br><br>Plaintiffs,<br><br>vs.<br><br>SAN FRANCISCO COUNTY SHERIFF'S DEPARTMENT, CITY AND COUNTY OF SAN FRANCISCO, SAN FRANCISCO SHERIFF VICKI HENNESSEY; CHIEF DEPUTY SHERIFF PAUL MIYAMOTO; CAPTAIN JASON JACKSON, CAPTAIN MCCONNELL and John & Jane DOEs, Nos. 1 - 50.<br><br>Defendants. | Case No.: 3:19-cv-02724 SK<br><br>**DECLARATION OF YOLANDA HUANG IN SUPPORT OF PLAINTIFFS' MOTION TO COMPEL ACCESS TO COUNTY JAILS 5, 4 AND 2**<br><br>**JURY TRIAL DEMANDED** |

I, YOLANDA HUANG,  declare:

1. I am an attorney at law licensed to practice in the State of California, and admitted to practice before this Court.  Everything stated herein is true of my own knowledge.

1

**DECLARATION OF YOLANDA HUANG IN SUPPORT OF PLAINTIFFS' MOTION TO COMPEL**
*Norbert, et al. v. San Francisco County Sheriff's Dept. et al.,*  United States District Court, Northern District of California, Case No. 3:19-cv-02724 SK

2. I have conducted attorney client interviews in San Francisco County Jail 2, County Jail 4 and County Jail 5. In both County Jail 2 and County Jail 5, there are specific rooms in each of the housing units used for attorney client meetings and interviews, as well as other professional interviews. While I am escorted to the housing unit from the main entrance, once at the housing unit, the inmates can enter and leave the interview room without escort. In fact, if I have multiple clients in one housing unit, I simply have to exit the interview room, approach the deputy, who is generally stationed at the center console, and the deputy will call out the inmate, who then walks on his own power over to the interview room. Ms. Berdux is incorrect that all meetings and interviews require individual deputy escort.

3. All blood draws can take place in the interview rooms. The phlebotomist will bring in his or her own equipment, and will only need a chair for the patient, and a table on which the patient can rest his arm. The blood draws do not have to take place in a medical facility.

4. The planned blood draws for Alameda County Santa Rita Jail are not planned to take place in a medical facility, but will be in Intake-Transfer-Release unit within the jail.

5. Inmate Locator is a feature all the jails in the Bay Area have. It is an online feature which enables the public to see who is in jail. Attached as Exhibit A is a sample page from the defendants' website.

6. Some county jails publish online the inmate locator information in various formats. Both Contra Costa County and Marin County publish a list of everyone arrested within the last 48-72 hours. In addition, Marin County, because of its small jail population, publishes the entire roster of everyone in jail. Attached as Exhibit B is page 1 and 2 of this roster, which is available online.

I make this declaration under penalty of perjury under the laws of the State of California, executed this 15th day of October in Alger County, Michigan.

                               _/s/ Yolanda Huang_
                               Yolanda Huang

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT A

```
 1                UNITED STATES DISTRICT COURT
 2          FOR THE NORTHERN DISTRICT OF CALIFORNIA
 3              SAN FRANCISCO/OAKLAND DIVISION
 4    _____
 5    KENYON NORBERT, TROY MCALLISTER,
 6    MARSHALL HARRIS, ARMANDO CARLOS,
 7    MONTRAIL BRACKENS, MICHAEL
 8    BROWN, and JOSE POOT, on behalf
 9    of themselves individually and
10    others similarly situated, as
11    a class and subclass,
12              Plaintiffs,
13         v.                              Case No.
14    SAN FRANCISCO COUNTY SHERIFF'S       3:19-cv-02724 SK
15    DEPARTMENT, CITY AND COUNTY OF
16    SAN FRANCISCO, SAN FRANCISCO
17    SHERIFF VICKI HENNESSEY, CHIEF
18    DEPUTY SHERIFF PAUL MIYAMOTO,
19    CAPTAIN JASON JACKSON, CAPTAIN
20    MCCONNELL and John & Jane
21    DOEs, Nos. 1-50,
22              Defendants.
23    _____
24
25
```

Page 1

Page 10:

1   A   Bless you.
2   Q   Thank you. In addition, at the end of this
3   deposition, the court reporter is going to produce a
4   booklet of the transcript, and you will have the
5   opportunity if you wish to review it and make any
6   changes you want to your statements. But please note
7   that if you do make any changes, at the time that your
8   transcript is used in court either at trial or at
9   hearing, counsel, any counsel can comment on the changes
10  you made. Do you understand that?
11  A   I do.
12  Q   All right. Now, are you under the care of a
13  physician for any condition that affects your ability to
14  recall?
15  A   No.
16  Q   Is there any condition that you have that is
17  under the care of a physician that affects your ability
18  to testify?
19  A   No.
20  Q   Is there is any reason why we cannot proceed
21  today?
22  A   No.
23  Q   All right. So, Dr. Pratt, could you please
24  state and spell your full name for the record.
25  A   Lisa, L-I-S-A, Pratt, P-R-A-T-T.

Page 11:

1   Q   And have you ever testified in court before?
2   A   I have.
3   Q   And when was the last time you testified?
4   A   It was a deposition, and it was maybe a year
5   ago. It was a Zoom deposition as well --
6   Q   Was it a civil or a criminal case? Do you
7   know?
8   A   It was a civil case.
9   Q   And were you a party to the case?
10  A   I -- I was a PMK, so no. I -- I was not a
11  named party, I don't think, but it was a case involving
12  a patient in the jail.
13  Q   So you were a witness, in other words.
14  A   Yes, I was witness.
15  Q   All right. So if there's anything that you
16  don't understand or if my question is unclear or, you
17  know, confusing, please let me know, and I will restate
18  the question. If you answer, then everyone can assume
19  that you understood the question and that your answer is
20  answering the question itself. Okay?
21  A   [No audible response.]
22  Q   All right. So are you familiar with the
23  lawsuit that this deposition is pertaining to?
24  A   I am.
25  Q   Have you ever read the complaint?

Page 12:

1   A   I have read the substance of the complaint on
2   different occasions.
3   Q   All right. And currently are you employed by
4   the City and County of San Francisco?
5   A   I am.
6   Q   And what is your job title?
7   A   I am the director of jail health services.
8   Q   ==And as the director of jail health services,==
9   ==what are your duties?==
10  A   I am responsible for the healthcare delivered
11  on behalf of the Department of Public Health in the
12  setting of the San Francisco County Jail.
13  Q   And this would include the two current open
14  jails.
15  A   There are three jails currently open, and it
16  would include all of those.
17  Q   Now, do you -- this is what I would call in-
18  house medical services; is that correct?
19  A   We are basically a contractor to the sheriff's
20  department through the Department of Public Health. And
21  that was codified by the Board of Supervisors some
22  decades ago, that -- and, I'm sorry, I don't know the
23  date -- but that healthcare in the jail would be
24  provided by the Department of Public Health in the City
25  and County of San Francisco.

Page 13:

1   Q   Do you also -- are you also responsible for
2   oversight of healthcare when an inmate leaves a facility
3   to an outside provider?
4   A   No. I am not.
5   Q   So jail health services, then, is a division
6   or department within the San Francisco Department of
7   Public Health.
8   A   Correct.
9   Q   And for a facility such as the jail at San
10  Bruno, are the medical providers on site, or did they
11  travel among the three jails?
12  A   The way our staffing works is that we have a
13  primary site assigned to -- to the employees, so people
14  will generally be -- at County Jail 3 or San Bruno, they
15  may -- if someone else is on vacation or if there's a
16  change in the density of the population, we may reassign
17  someone either temporarily or on a permanent basis,
18  depending on what is happening to work at County Jail 2
19  or County Jail 1. But in general, someone -- each
20  employee is assigned on a regular basis to their sort of
21  home location.
22  Q   And is it your understanding that currently
23  the population, the inmate population of County Jail 3
24  is about I think 500 to 550 individuals?
25  A   I'm sorry. I don't know what the population

1  A  I cannot recall a specific time, but I'm sure
2  I did discuss that at one -- at one time or another.
3  Q  And what was discussed?
4  A  Just that it's important that people -- you
5  know, that what we are -- what we are balancing is the
6  risk of COVID exposure against the -- the harm that can
7  be caused by not having access to things like this. So
8  it has always been about risk mitigation and trying to
9  create some balance between what can -- what -- what
10 kind of movement can safely occur to the maximum level
11 of in my opinion freedom insofar as it exists in the
12 carceral setting and -- you know, and how -- how that
13 looks.
14     So there is never -- certainly, people with
15 active COVID, there are very limited opportunities for
16 people to be out of cell in a place where that could be
17 safe, for example, all the way up to people who don't
18 have COVID and what are -- what can they be doing also
19 out of cell but within, you know, small groups to make
20 sure that they stay safe as well.
21 Q  What specifically did you discuss with anyone
22 from the sheriff's department of what people who do not
23 have COVID can do while incarcerated with regard to
24 movement and exercise from March 2020 through to the
25 present?

Page 78

1  A  I believe I -- I answered that. Again, it is
2  what -- what can people do so that they are exposed to a
3  small number of other people who are all thought to not
4  have COVID, and how can that be done safely so that if
5  there is transmission -- because, remember, it's a
6  disease that transmits without symptoms and even before
7  a test is positive. You know, what are -- that is the
8  principal. I did not discuss anything specifically that
9  I recall about that principal.
10 Q  So you did not specifically discuss with
11 anyone from the sheriff's department what actual
12 activities prisoners could do?
13 A  Well, there were conversations about walk
14 groups, but I did not discuss specifically that walk
15 groups are an exercise that people should have, for
16 example. It was more, when we do walk groups, you know,
17 should it be the whole pod or should it be a smaller
18 number, that kind of thing.
19     And then the -- the sheriff's department told
20 me they were reopening the gym, and they had a plan for
21 how they would do that, again, involving smaller groups
22 of people. They referenced that, and I said, "Okay,"
23 or, "Great," or, you know, something in the affirmative
24 supporting that idea. But those are the only
25 circumstances I -- I can recall.

Page 79

1  Q  Did you ever have any discussions with anyone
2  from the sheriff's department from March of 2020 through
3  to the present about how much time or availability
4  prisoners should have to exercise or movement?
5  A  No.
6  Q  Was it ever discussed in any of the meetings
7  that you had with the sheriff's department?
8  A  The duration of activity? No.
9  Q  Does your department keep track of data such
10 as the number of inmates who are diabetic without -- you
11 know, just data without identifying the individuals?
12 A  Yes.
13 Q  And do you know what number that is, what
14 percentage or what number?
15 A  I don't know right now. We probably -- you
16 mean in particular at CJ3?
17 Q  Sure. Or if you don't have it for CJ3 then
18 for, you know, the sheriff's jails as a whole.
19 A  I would say it's probably around 7 percent of
20 the population, so less than -- less than 80 people,
21 less than -- fewer than 60 people.
22 Q  Okay. What about people who are prediabetic.
23 A  There is a way to -- so a couple of things
24 about the diabetics. People are on medication and they
25 have laboratory values, so we manage the population.

Page 80

1  There are particular things that need to happen in the
2  care of diabetics, and population management is focused
3  on those things.
4      Prediabetics, it's -- it's different. It's
5  a -- it's not a -- it's not a disease, and people are
6  not medicated, and there are not -- the risks that
7  you're looking for with diabetics is to prevent heart
8  disease associated with diabetes, retinopathy,
9  nephropathy, complications of diabetes. In
10 prediabetics, the risk that you're looking to mitigate
11 is the development of diabetes. And so it's a very
12 different circumstance. I know we -- I can't -- we do
13 not have any population tracking of prediabetics.
14 Q  What about vitamin D deficiency? Do you track
15 that?
16 A  We do not do population tracking of vitamin D
17 deficiency.
18 Q  What about hypertension or high blood
19 pressure?
20 A  Hypertension is -- it's kind of a tricky issue
21 in the jail, because people are in a period of -- of
22 stress, as you can imagine. But -- so there's the
23 measurement of hypertension, of high blood pressure, and
24 then there is the disease of hypertension. So we
25 have -- we have population-level information for people

Page 81

21 (Pages 78 - 81)

Page 82:

1   with hypertension on medication, and that's the only
2   kind of -- but people have periods of high blood
3   pressure even when they don't have the disease of
4   hypertension, especially in a stressful environment.
5        Like, for example, I might be hypertensive
6   right now, but I don't have hypertension.
7      Q   I understand that. Of the people who have a
8   significant enough issue with high blood pressure that
9   require medication, do you know what percentage of your
10  population that is?
11     A   I don't. It is known, but I don't know it
12  right now.
13     Q   But that is something that your department
14  charts or keeps track of.
15     A   We don't keep track of it in the sense of
16  month to month we follow what percentage of the
17  population has hypertension? No. That's not -- but we
18  do keep track of the -- the sort of factors that you
19  want to manage in hypertensives. Like does this person
20  with hypertension, has -- have they had their retinal
21  screening? Have they -- you know, are the medication
22  adherent? So as you asked the question, the answer is
23  no. But we do other tracking of the population of
24  hypertension.
25     Q   Do you have any activities that you take that

Page 83:

1   tracks the total number or the percentages of inmates
2   with hypertension?
3      A   No.
4      Q   Do you have any form of tracking for anyone
5   who -- for inmates who may have confusion or memory
6   issues?
7      A   That falls into the category of -- of high
8   risk condition in the jail, and you may have seen we
9   have policies and procedures around that. So confusion
10  or memory loss are people that get a sort of more
11  intensive level of surveillance by the medical staff
12  and -- and/or may require medical housing, depending
13  on -- you know, those conditions can put people at risk
14  for -- for harm in a carceral setting if they can't sort
15  of maintain boundaries and get things together. So
16  that's -- that's a circumstance under which we would ask
17  the sheriff's department to put this person in medical
18  housing.
19        I don't control movement of people, but I do
20  in some circumstances get to assign housing to medical
21  housing. So that would be a circumstance where we,
22  depending on the condition of the patient, would put
23  that person either in the MOU at CJ3 or in C pod at
24  County Jail 2.
25     Q   When someone needs a medical diet, whether it

Page 84:

1   be a diabetes diet or a high blood pressure diet, does
2   that require a medical order from your department to the
3   sheriff's department?
4      A   Yes.
5      Q   Do you track how many of those you have
6   issued?
7      A   No.
8      Q   You don't.
9      A   We can get the report, but I don't -- it's not
10  something --
11     Q   Who keeps that report, the sheriff's
12  department?
13     A   Aramark. Yeah, their contractor.
14     Q   Aramark, you said, has the report.
15     A   They have a dietitian that works with us when
16  there's a need for a medical diet.
17     Q   All right. And do you -- does your department
18  keep track of the number of people, inmates who suffer
19  from migraine?
20     A   We don't track migraine as a population
21  management condition. Any of these conditions can be
22  pulled into a report from the medical record, but
23  I'm -- I'm not exactly sure what you're asking when you
24  ask that question.
25     Q   Whether that is something that your department

Page 85:

1   keeps track of. And for issues like anxiety or
2   depression, is that mainly something that behavioral
3   health takes care of?
4      A   [No audible response.]
5      Q   If there's medication that's involved, who
6   writes a prescription?
7      A   Behavioral health is a division of jail health
8   services. So we are all one healthcare entity. The
9   psychiatrists may write prescriptions, write orders for
10  people who need medication. We have a clinical
11  pharmacist who specializes in psychiatry, and she may
12  write for the medication. A primary care provider
13  typically in consultation with behavioral health or with
14  a psychiatrist may write a prescription or an order for
15  medication.
16     Q   And do you keep track of how many people are
17  on medication for anxiety?
18     A   For anxiety?
19     Q   Yeah.
20     A   Well, that is a little bit of a complicated
21  question. There are -- it depends on what kind of
22  medication you're asking about and whether the patient
23  has comorbid conditions.
24        So anxiety disorders, there's a large bucket
25  of different diagnoses that constitute anxiety. I'm not

22 (Pages 82 - 85)