**LAW OFFICE OF YOLANDA HUANG**
Yolanda Huang, SBN 104543
PO BOX 5475
Berkeley, CA 94705
Telephone: (510) 329-2140
Facsimile: (510) 580-9410
Email: yhuang.law@gmail.com

**GREENFIRE LAW, PC**
Rachel Doughty, SBN 255904
Richard Brody, SBN 100379
P.O. Box 9055
Berkeley, CA 94707
Telephone: (510) 900-9502
Facsimile: (510) 900-9502
Email: rdoughty@greenfirelaw.com
rbrody@greenfirelaw.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO/OAKLAND DIVISION

| | |
|---|---|
| KENYON NORBERT, TROY MCALLISTER, MARSHALL HARRIS, ARMANDO CARLOS, MONTRAIL BRACKENS, MICHAEL BROWN, and JOSE POOT, on behalf of themselves individually and others similarly situated, as a class and Subclass, | Case No.: 3:19-cv-02724 SK |
| Plaintiffs, | **PLAINTIFFS' POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| vs. | Date:  December 12, 2022 |
| SAN FRANCISCO COUNTY SHERIFF'S DEPARTMENT, CITY AND COUNTY OF SAN FRANCISCO, SAN FRANCISCO SHERIFF VICKI HENNESSEY; CHIEF DEPUTY SHERIFF PAUL MIYAMOTO; CAPTAIN JASON JACKSON, CAPTAIN MCCONNELL, and John & Jane DOEs Nos. 1 - 50. | Time:  9:30 a.m.<br>Dept:  Courtroom C, 15th Floor<br>       Federal District Court<br>       450 Golden Gate Ave.<br>       San Francisco, CA |
| Defendants. | Hon. Sallie Kim, presiding<br><br>Trial Date:  May 7, 2023 |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................IV

TABLE OF EXHIBITS ........................................................................................V

POINTS AND AUTHORITIES ............................................................................1

I.       INTRODUCTION AND SUMMARY OF ARGUMENT ..................................1

II.      ISSUE TO BE DECIDED ............................................................1

III.    STATEMENT OF FACTS...........................................................2

    A.  Conditions of Confinement..............................................................2

    B.  Defendants' Actions Have Caused Both Actual and Threatened Future Harm to the Plaintiff Class Representatives and the Members of the Class ................4

        1. Individuals Incarcerated at the Jail ...............................................5

        2. Expert Witnesses.....................................................................5

IV.   PROCEDURAL HISTORY .........................................................9

    A.  The Allegations in Plaintiffs' Complaint .............................................9

    B.  The Preliminary Injunction Issued by This Court....................................9

    C.  Class Certification .....................................................................10

V.     LEGAL STANDARDS ............................................................10

    A.  Summary Judgment Standard of Review .............................................10

    B.  Legal Standards Regarding Conditions of Confinement for Pretrial Detainees ......11

VI.   LEGAL ARGUMENT .............................................................12

    A.  Genuine Issues of Material Fact Exist Concerning Plaintiffs' Fourteenth Amendment Claims 12

    B.  Defendants are Required by State Law to Provide an Outdoor Exercise Area for all Class Plaintiffs ...........................................................................12

    C.  Because Defendants have failed to comply with State Law by providing an outdoor exercise area at the Jail, and because their failure to do so demonstrates that Defendants are not entitled to judgment as a matter of law, their Motion for Summary Judgment must be denied............13

    D.  Jail Lockdown Procedures For at Least the Past Year Are Informed Primarily by Staffing Decisions Issues Rather than COVID-19 Concerns ...............................15

    E.  An additional negative impact on drafting is the effect on the deputies themselves, who must work overtime on a regular basis despite putting in a full shift at what Plaintiffs concede is a stressful job. ..........................................................................18

    F.  Defendants' Failure to Provide Outdoor Exercise and Denial of Out of Cell Time Violate the Fourteenth Amendment of the United States Constitution ......................19

    G.  Genuine Issues of Material Fact Exist Concerning Plaintiffs' State Law Constitutional Claims 22

H.  This Motion for Summary Judgment is not the Appropriate Method to Challenge Plaintiffs' Claim for Monetary Damages or Injunctive Relief ..................................................22

**VII.  EVIDENTIARY OBJECTIONS (L.R. 7-3)**........................................................................**24**

**VIII.  REQUEST FOR CONTINUANCE**..................................................................................**24**

**IX.  CONCLUSION** ......................................................................................................................**25**

iii

**Plaintiffs' Points and Authorities in Opposition to Defendants' Motion for Summary Judgment**
**Case No.: 3:19-cv-02724 SK**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ...................................................11

*Bell v. Wolfish*, 441 U.S. 520 (1979) ..............................................................................19

*Carey v. Piphus*, 435 U.S. 247 (1978) ............................................................................23

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ..............................................................11

*Clark v. Capital Credit & Collection Servs.*, 460 F.3d 1162 (9th Cir. 2006)) ................11

*Demery v. Arpaio*, 378 F.3d 1020 (9th Cir. 2004). .........................................................19

*Gary H. v. Hegstrom*, 831 F.2d 1430 (9th Cir. 1987) .....................................................19

*LeMaire v. Maass*, 12 F.3d 1444 (9th Cir. 1993) ......................................................10, 21

*Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299 (1986) .........................................23

*Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099 (9th Cir. 2000) ................11

*Norbert v. City and County of San Francisco*, 10 F.4th 918 (2021) ...............................10

*Spain v. Procunier*, 600 F.2d 189 (9th Cir. 1979) ...............................................19, 20, 21

*Willis v. Buffalo Pumps Inc.*, 34 F.Supp.3d 1117 (S.D.Cal. 2014) ................................11

*Wilson v. Seiter*, 501 U.S. 294 (1991) .............................................................................21

**Statutes**

28 U.S.C. § 1746 ..............................................................................................................24

42 U.S.C. § 1983 ..............................................................................................................22

42 U.S.C. § 1988 ..............................................................................................................22

42 U.S.C. §§ 1981 ............................................................................................................22

California Government Code § 11135 ..............................................................................22

**Rules**

Fed. R. Civ. P. 12(b)(6) ....................................................................................................23

Fed. R. Civ. P. 12(g)(2) ....................................................................................................23

Fed. R. Civ. P. 56(a) ...................................................................................................11, 22

Fed. R. Evid. 801(c) .........................................................................................................24

**Regulations**

2001 California Building Code .........................................................................................12

2007 California Building Code .........................................................................................13

2013 California Building Code .........................................................................................13

**Constitutional Provisions**

California Constitution Article I, § 17 ..............................................................................22

California Constitution Article I, § 7 ................................................................................22

**Plaintiffs' Points and Authorities in Opposition to Defendants' Motion for Summary Judgment**
**Case No.: 3:19-cv-02724 SK**

**TABLE OF EXHIBITS**

| Exhibit Number | Title | Authentication |
|---|---|---|
| 1 | Charles Czeisler, MD Expert Report | Czeisler Declaration, paragraph 8 |
| 2 | Charles Czeisler, MD Supplementary Expert Report | Czeisler Declaration, paragraph 9 |
| 3 | Jess Ghannam, PhD Expert Report | Ghannam Declaration, paragraph 3 |
| 4 | Jamie M. Zeitzer, PhD October 2022 Exterior Light Monitoring Readings | Zeitzer Declaration, paragraph 9 |
| 5 | Jamie M. Zeitzer, PhD Light Readings Report & Expert Report (July 2022) | Zeitzer Declaration, paragraph 6 |
| 6 | Jamie M. Zeitzer, PhD Light Readings Report (August 2022) | Zeitzer Declaration, paragraphs 6 and 8 |
| 7 | Jamie M. Zeitzer, PhD Curriculum Vitae | Zeitzer Declaration, paragraph 2 |
| 8 | Jamie M. Zeitzer, PhD Light Logger Photos | Zeitzer Declaration, paragraph 9 |
| 9 | Lucas Fogarty Expert Report & CV | Fogarty Declaration, paragraph 11 |
| 10 | Ross Mirkarimi Expert Report | Mirkarimi Declaration, paragraph 8 |
| 11 | 2001 California Building Code-Local Detention Facilities excerpts | Huang Declaration, paragraph 5 |
| 12 | 2007 California Building Code-Local Detention Facilities excerpts | Huang Declaration, paragraph 6 |
| 13 | Title 24 - Minimum Standards for Local Deternion Facilites, 2013 Excerpts | Huang Declaration, paragraph 7 |
| 14 | Title 24 - 2021 Final Proposed Revisions excerpts | Huang Declaration, paragraph 9 |
| 15 | Email correspondence with BSCC re Building Code | Huang Declaration, paragraph 10 |
| 16 | Email correspondence with BSCC re Building Code | Huang Declaration, paragraph 11 |
| 17 | Deposition Transcript of David Mathis, Rough (excerpts) | Brody Declaration, paragraph 2 |
| 18 | Robert M. Bernstein Expert Report | Bernstein Declaration, paragraph 3 |
| 19 | Staff shortages nix programming in SF jails; guards warn they can't take influx | Huang Declaration, paragraph 12 |
| 20 | Defendants' Expert Witness Disclosure | Huang Declaration, paragraph 13 |
| 21 | Defendants' Disclosure of Rebuttal Expert Reports | Huang Declaration, paragraph 14 |
| 22 | Photographs of Jail | Huang Declaration, paragraph 11 |
| 23 | Architectural drawing of Jail Pod | Huang Declaration, paragraph 15 |

| Exhibit Number | Title | Authentication |
|---|---|---|
| 24 | Google Earth overhead image of Jail | Huang Declaration, paragraph 16 |

Plaintiffs' Points and Authorities in Opposition to Defendants' Motion for Summary Judgment
Case No.: 3:19-cv-02724 SK

## POINTS AND AUTHORITIES

### I.  INTRODUCTION AND SUMMARY OF ARGUMENT

Class Representative and class members are individuals who have been incarcerated at the San Francisco County Jail at San Bruno (also known as County Jail 5 and formerly known as County Jail 3) at any time between May 20, 2017, and the present. Some of the Plaintiffs have been incarcerated at the Jail in excess of five years. Ninety-three percent of all inmates in San Francisco County Jails are pretrial detainees. All of the Plaintiffs are or were pretrial detainees, who are presumed innocent under the law while awaiting their day in Court. Under the 14th Amendment, as pretrial detainees they are not subject to punishment. Because the Plaintiffs pretrial detainees and are presumed innocent, they may not be punished while in Jail, except for violations of Jail rules, which is not an issue here. The Defendant City and County of San Francisco ("Defendant" or "CCSF") has complete control over the Jail, and through the San Francisco Sheriff's Department controls every aspect of the Plaintiffs' lives, including all aspects of their living conditions, the amount, if any, when incarcerated individuals are allowed out of their cells, exercise time and location, contents and timing of all meals, any and all access to showers, exercise and contact and communications with family and friends. **(Exh 17, pg. 136:8-13).** Virtually all of the Plaintiffs and class members have no access to natural sunlight, and have never felt sunlight on their skin and bodies during their entire confinement, which stretches to years, other than perhaps for the half a minute between the jail transport bus and court. At the first application for preliminary injunction, Dr. Jamie Zeitzer testified that one of the consequences of denial of sunlight and sleep disruption is damage to the endocrine system, which can result in diabetes. **(ECF 008-3).**  In the intervening period, Class Representative Montrail Brackens has developed full blown, irreversible type 2 diabetes and requires glucose monitoring and insulin injections, three times, daily. (**Decl. Montrail Brackens, ¶3**).

### II.  Issue to be decided

To prevail on their Motion for Summary Judgment, Defendants must show that there are no genuine issues of material fact as to each and every Cause of Action and as to each remaining Defendant. Defendants have not and cannot make such a showing.

**1**

III.   **Statement of Facts**

    A.    **Conditions of Confinement**

This lawsuit currently concerns San Francisco's County Jail at San Bruno ("Jail"). This jail is the largest carceral facility operated by the City and County of San Francisco. Located on former watershed land in San Bruno, the building currently in use was completed in 2006. The Jail was purposely built without any outdoor access for prisoners. (Defendants' Memorandum of Points and Authorities ("Def MPAs"), at 13:19-25.) The facility is located adjacent to the site of the predecessor jail and has a large outdoor area that used to be used for recreation. (**Exh 10, Expert Report of Ross B. Mirkarimi, at 7:6-7, 8:21-23**.)

San Bruno County Jail utilizes a Housing Units design. Each Housing Unit is identical in size and shape. Housing units are circular with halves, designated A and B. In the center of A and B is a guard station. There are a total of eight (8) such housing units. Each half –semi-circle has two tiers, with 12 cells on a tier, for a total of 24 cells. Each cell can hold two inmates so each half can house 48 inmates. (**Exh 10, pg. 7:16-20**)

Each cell has a metal bunk bed, which sleeps two people, a metal toilet with no lid, a metal divider separating the toilet from the beds, a metal sink, and a small seat attached to a writing surface. Each cell has a small vertical window, the window being approximately the width of an adult man's hand. (Decl. of Yolanda Huang ("**Huang Decl. ¶11**); **Decl. of Joshua Beloy, ¶13.**) On the other side of the window, outside the cell, is a utility hallway, approximately 6 to 8 feet wide separating the cell from the exterior of the Jail. Opposite the window, the front of each cell has a clear Lexan wall and a metal door opening into a common area. The cell interior is visible from the guard station. Cells are lit 24 hours a day by either flourescent lights or LEDs. The ceiling light of the cells is directly above the top bunk. (**Huang Decl, ¶ 8, Decl. of Jose Poot, ¶8.**)

The common area the cells face contains metal tables and benches fastened to the floor. (**Huang Decl, ¶ 11**) There is a wall in the common area with four phones attached, and there are two showers. There are no windows in Housing Unit common areas, which are wholly lit by artificial lights, including fluorescent lights and LEDs. The housing units are lit 24 hours a day. Each Housing Unit has a gym room which has a toilet and an area smaller than the size of the

painted in-zone of a basketball court with a basketball hoop.[1] (**Decl. of Troy McAlister, ¶5.**) There is an occluded grate that lets in some outside air in the gym. (**Huang Decl, ¶11** , **Order Regarding Plaintiffs' Motion for Preliminary Injunction, etc., ECF 110, pp. 5:1-20, 10:5-11:6**.)

The Class Representative Plaintiffs are all pretrial individuals incarcerated at the Jail. Each of the Plaintiffs has been subjected to lengthy incarceration at the Jail. Montrail Brackens has been incarcerated in the Jail waiting for over 10 years waiting for his case to go to trial. Jose Poot has been incarcerated in the Jail for six years waiting for his trial. It is an undisputed fact that not a single one of the Class Representatives Plaintiffs has ever been allowed outdoors for recreation or exercise during his entire lengthy custody. It is also undisputed fact that all prisoners inside the Jail are denied access to the outdoors and do not feel sunshine on their skin except, perhaps during half minute walk from the jail bus into the courthouse at 850 Bryant Street. Post-COVID remote trials have eliminated even this brief reprieve.

Inmates have lost all pigmentation of their skin. Armando Castro, who is Filipino and El Salvadorean says his skin became transparent during 10 years of incarceration at Jail. (**ECF 197-7 ¶1**). Jose Poot, a Mayan, has lost all color in his skin and is now completely white and pale. (**Decl. Jose Poot ¶**9)

Prior to March, 2020, only prisoners in administrative segregation--or as prisoners call it, solitary confinement--were locked down 23 hours a day. After March, 2020, all prisoners, all class members, in Jail, were subjected to confinement in their cells for *at least* 23 hours per day. Every other day, prisoners were locked in for over 32 hours in a row. For those prisoners in solitary confinement, their confinement increased as they were only released out of their cells twice a week for a half an hour each time, for showers. (**Decl. Montrail Brackens ¶9**). Defendants, claiming Covid-19 mandates, closed the gym and banned all exercise in the common area of the housing units. All programming stopped. The San Francisco Library stopped making books available. (**ECF 197-6, ¶15**). Despite the availability of vaccines and a return to normalcy in the outside

---

[1] NCAA dimensions for the paint in basketball courts, is14 feet from the center point of the basket to the free throw line, and six feet to each side from the center point of the basket.

**Plaintiffs' Points and Authorities in Opposition to Defendants' Motion for Summary Judgment**
**Case No.: 3:19-cv-02724 SK**

world, the Jail has not returned to normalcy for inmates. (**Declaration of Troy McAllister, ¶7**).

The excessive confinement, lack of ability to exercise, and sleep disruption due in part to Defendants' deliberate and knowing practice of denying sunlight to class members and due in part to Defendants' deliberate and knowingly harmful conduct of making noise and disrupting and preventing inmates sleep, has resulted in sustained injuries, including insomnia, headaches, and Type 2 diabetes. This Court itself observed during a visit to the Jail that "the cells are too small to allow inmates to exercise in any meaningful way." (**ECF 100, pg. 12:5-6**).

Defendants' rationale for the years of lockdowns do not stand up to scrutiny. Defendants proclaim that this level of excessive confinement was and is required by the Covid-19 outbreak. But outdoor exercise was generally encouraged in the population at large during Covid-19 as a recreational option allowing for social distancing.

It is undisputed that staffing levels of deputy sheriffs' are at a historical low, with over 172 vacant positions among sheriff's deputies assigned to custody staff.[2] Custody staff are subjected to mandatory forced overtime and often reassigned to other sheriffs' departments, resulting in jail-wide lockdowns due to insufficient staffing. During Jail-wide lockdowns, programs stop and prisoners are confined to their cells. Troy McAllister documents that almost 7 days a month, the prisoners are on lockdown and denied out of cell time. (**Decl. Troy McAlister, ¶3**)

**B.      Defendants' Actions Have Caused Both Actual and Threatened Future Harm to the Plaintiff Class Representatives and the Members of the Class**

The harm caused to Plaintiffs, and all class members, is documented by both the Declarations submitted herewith by individuals currently incarcerated at the San Bruno Jail, as well as by the world-class expert witnesses in various fields of medicine designated by the Plaintiffs. Declarations and expert reports from each of these expert witnesses supporting this Opposition are summarized below.

---

[2] The deposition of Ken Loomba, president of the San Francisco Deputy Sheriffs' Association, was originally scheduled for November 8, 2022, then for November 9, 2022, both dates are past the deadline for the filing of this opposition. As of the date of the filing of this Opposition, Plaintiffs are still waiting for a firm date to be set for this deposition/Plaintiffs are requesting an Order allowing them to supplement this Opposition with the deposition transcript of Ken Loomba, when the transcript is available.

**Plaintiffs' Points and Authorities in Opposition to Defendants' Motion for Summary Judgment**
**Case No.: 3:19-cv-02724 SK**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 1.    Individuals Incarcerated at the Jail

**Troy McAllister**. Mr. McAllister was first incarcerated at the Jail in 2015. He has been incarcerated continuously since December, 2020. Mr. McAllister testifies in his attached Declaration that 24 inmates (12 cells x 2 inmates per cell) are currently allowed out of their cells for indoor exercise at the present time. However, due to space constraints, only 8 inmates are permitted to use the small indoor exercise gym at a time. Thus, two thirds of inmates are denied any opportunity to engage in indoor exercise for any meaningful time period each and every day when inmates are not on complete lockdown. Mr. McAllister testifies that this has always been the procedure for use of the small indoor exercise area during the time that he has been incarcerated at the Jail, which includes pre-Covid time. (**McAlister Decl., ¶¶4, 5).**

**Montrail Brackens.**  Mr. Brackens has been incarcerated as a pretrial detainee for 10 years.  (**Brackens Decl., ¶1**) Mr. Brackens has developed diabetes while in custody as a result of inability to exercise and the inappropriate diet provided by Defendants.  (**Brackens Decl., ¶¶ 2-8).**

**Nicky Garcia.**  Mr. Garcia is a pretrial detainee who has been incarcerated for more than 6 years, mostly at the San Bruno Jail.  (**Garcia Decl., ¶2**)  For almost two years during Covid, he was locked in his cell 23 hours a day or more.  (**Garcia Decl., ¶7**)  Mr. Garcia still gets locked down a lot because the deputies say they don't have enough staffing.  Because of a lack of space, not everybody can exercise every day.  (**Garcia Decl., ¶10).**

**Jose Poot**.  Mr. Poot has been in custody as a pretrial detainee for 6 ½ years, of which 2 ½ years have been spent in administrative segregation.  (**Poot Decl., ¶1**).  Mr. Poot is locked in his cell all day, and only gets out of his cell for 15 minutes every other day to shower.  (**Poot Decl., ¶3).**  Due to noise, constant light and the Jail's middle of the night breakfast schedule, Mr. Poot gets very little sleep.  (**Poot Decl., ¶¶ 5-8).**

### 2.    Expert Witnesses

**Charles A. Czeisler, PhD, MD, DABSM, FAASM.**  Dr. Czeisler is one of the world's foremost experts in the field of Sleep Medicine. He is credited with discovering that human beings are subject to a similar circadian system as are shared with other animals and organisms. Dr. Czeisler has prepared two extensive reports in this case (**Exhibits 1 and 2**), containing his

opinions, including the following:

1)      Because of the policies of the San Francisco Sheriff's Office, the Conditions of Confinement at the Jail chronically and totally deprive inmates, including the Plaintiffs in this case, of exposure to natural sunlight, preventing the inmates' skin from being exposed to sunlight, including solar ultraviolet light, for the duration of their incarceration. Extensive epidemiological studies have revealed that the total deprivation of solar light exposure on the skin increases the risk of hypertension and cardiovascular disease, inflammatory bowel disease, multiple forms of cancer, metabolic syndrome, diabetes, death from Covid-19 and all-cause mortality. **(Exh 2, pg. 23).**

2)      The Conditions of Confinement in the Jail induce insomnia through intermittent and regularly occurring noise and disturbances, including the serving of breakfast nightly between 3:30 a.m. and 4:30 a.m. (at least 2 hours before lights are turned on in the Jail each morning), increasing the risk of depression and anxiety disorders, among other conditions. (**Exh 2, p. 24, Exh 17, pp:114:12-115:4**).

3)      Ambient temperatures in the cells of certain inmates may be outside the thermoneutral zone and may be causing sleep interruption and fragmentation, which can adversely affect the neurobehavioral performance of inmates, increasing inflammation and increasing the risk of obesity, invasive cancer, metabolic disease and heart disease, sleep disorders such as obstructive sleep apnea, and increasing the risk of adverse mental health consequences. **(Exh 2, pg. 25**).

4)      Improper sleep surfaces and bedding, which can cause many of the same health issues as in the preceding paragraph. **(Exh 2, pg. 25**).

5)      Meal timing and poor nutritional content of meals is harmful to Plaintiffs. It is Dr. Czeisler's expert opinion that providing inmates their breakfast in the middle of the biological night not only causes sleep interruption and sleep fragmentation, but also elevates blood glucose concentrations compared to eating the same meal at an appropriate time. This practice increases the risk to all inmates at the Jail of obesity, impaired glucose tolerance, cardiometabolic disease, and ultimately diabetes due to misalignment of circadian phase at the time of service of the high-glucose breakfast. (**Exh 2, pg. 25**).

6)      The Conditions of Confinement at the Jail increase the risk for adverse mental health symptoms; increase the risk of development of diabetes or worsening of existing diabetes; increase the risk of development and/or exacerbation of cardiovascular disorders, including hypertension and coronary artery disease; adversely affect the immune system increasing the risk of development of disease from infectious agents such as Covid-19 and monkeypox; and increase the risk of gastrointestinal illnesses, psychiatric disorders, neurologic disorders, and cancer. (**Exh 2, pp. 28-30**).

**Jamie Zeitzer, PhD.** Dr. Zeitzer is an associate professor of Psychiatry and Behavioral Sciences, and is also a Health Science Specialist in the Veterans Administration Palo Alto Health Care System. Dr. Zeitzer is recognized worldwide as an expert in sleep and circadian rhythms.  He has published more than 100 articles and lectured internationally on these topics. Dr. Zeitzer has developed numerous expert opinions in this case, including but not limited to the following:

1)      The reports of total lack of natural sunlight, limited nighttime sleep period, and continuous nighttime illumination are associated with a variety of both short- and long-term impairments. Short term deficits likely include a reduced ability to regulate mood, changes in appetite and associated hormones, reduced memory and cognitive ability, and impaired immune function. Longer-term deficits likely include increased depression and anxiety, development or worsening of diabetes, dementia-like symptoms, increased incidence or recurrence of breast or colon cancer, increased vulnerability to communicable diseases, and a decline in mental function. (**ECF 8-3, pg. 6:7-11**).

2)      Dr. Zeitzer's opinion is that exposure to the lighting in general use at the Jail is insufficient for human health, even though Defendants are now belatedly attempting to "cover their tracks" by installing new LED lighting in certain areas at the Jail. (**ECF 8-3, pg. 6:7-11**).

**Jess Ghannam, PhD.** Dr. Ghannam is a Clinical Professor of Psychiatry in the Department of Psychiatry and Behavioral Sciences at the University of California San Francisco. Dr. Ghannam is an expert and has published articles in the area of the impart of trauma, PTSD, brain injury, and torture.

It is Dr. Ghannam's expert opinion that the conditions sustained in the past, including pre-

**Plaintiffs' Points and Authorities in Opposition to Defendants' Motion for Summary Judgment**
**Case No.: 3:19-cv-02724 SK**

Covid, and that were ongoing at the Jail as of September 2022, constitute solitary confinement, as described by the National Commission on Correctional Health Care. It is also Dr. Ghannam's expert opinion that the Conditions of Confinement at the Jail have caused and contributed to a worsening of inmates' overall mental health that could result in profound chronic, life-long disability, as well as chronic psychiatric and neurocognitive impairments. (**Exh 3, pp. 5-6**).

**Robert M. Bernstein, M.D, FACE.** Dr. Bernstein is a Board-Certified Endocrinologist, who currently serves on the editorial board of the journal *Endocrine Research*. Dr. Bernstein examined medical records pertaining to Class Representative Plaintiff Montrail Brackens, and has developed numerous expert opinions, including but not limited to the following, which are set forth in the Bernstein Decl. and Dr. Bernstein's expert report dated October 7, 2022. (**Exh 8**). The following are among Dr. Bernstein's expert opinions, which are found at **Exh 8, pp. 4-6**:

1)      Mr. Brackens has not received appropriate medical care during the time that he has been incarcerated at the Jail, leading to the preventable progression of Mr. Brackens' pre-diabetic condition into full onset diabetes. Early intervention would, more likely than not, have helped Mr. Brackens to reverse his pre-diabetes and/or avoid development of diabetes itself.

2)      Mr. Brackens has microalbuminuria, which is an early indicator of kidney damage. Dr. Bernstein's expert opinion is that the kidney damage could have been delayed or prevented by earlier treatment of Mr. Brackens' diabetes.

3)      The consequences for diabetes are potentially quite serious and include injury to eyes (diabetic retinopathy, cataracts, glaucoma), kidneys (diabetic nephropathy, nerves (diabetic neuropathy), heart and blood vessel diseases, periodontal disease, skin disease, poor circulation in the feet. These serious complications can be prevented by appropriate therapy early in the course of the disease.

**Lucas Fogarty.** Mr. Fogarty is the Medical Director and Founder of DASH Sports Education, and a licensed Physician's Assistant. Mr. Fogarty instructs members of the public on the care and treatment of diabetes. Mr. Fogarty also suffers from Type I diabetes. It is Mr. Fogarty's expert opinion that the San Francisco Sheriff's Department has not provided Plaintiff Montrail Brackens with appropriate treatment and care for his diabetes. (**Exh 9, pp. 6-9**).

By contrast to Plaintiffs' experts, David Mathis M.D., the primary medical expert for Defendants, has no specific expertise in either the areas of the health effect of prolonged sleep deprivation or prolonged lack of exposure to natural sunlight. (**Exh 17: pp.37:15-38:10**).

## IV.   Procedural History

### A.   The Allegations in Plaintiffs' Complaint

On May 20, 2019, Plaintiffs filed the complaint initiating this lawsuit ("Complaint"). The Complaint sets forth allegations of (1) cruel and unusual denial of outdoor recreation, and (2) cruel and unusual imposition of confinement and denial of out of cell time. Plaintiffs allege that these actions by Defendants each constitute violations of the 8th and 14th Amendments of the United States Constitution, as well as violations of Article I, Sections 7 and 17 of the California Constitution, and 15 California Code of Regulations, § 1065. (**ECF 1**).

The Court granted Defendants' Motion to Dismiss in part. The remaining claims include claims for violating of the 14th Amendment and violation of Article I, Section 7 as to all Plaintiffs. (**ECF 110, pp. 57:20-58:3**).

### B.   The Preliminary Injunction Issued by This Court

This Court's Order Regarding Plaintiffs' Motion for Preliminary Injunction and Defendants' Motion to Dismiss was issued on January 31, 2020, two months prior to the commonly recognized onset of the COVID-19 pandemic. (**ECF 110, pg. 58:4-7**). After an exhaustive review of case precedent from both the United States Supreme Court and the Ninth Circuit, this Court stated that: "The Ninth Circuit thus has found that outdoor exercise is necessary when inmates or pretrial detainees are held in cells with little opportunity for out-of-cell movement, where the incarceration is lengthy, and where this is no concern about safety that requires elimination of outdoor exercise." (**ECF 110, pp. 30:21-31:1**). This Court found that the complete denial of outdoor exercise for an inmate confined for more than four years is punishment, stating that: "Although inmates expect to be deprived of access to the outdoors, they do not expect and society does not expect that inmates should be deprived of all access to the outdoors for a long period of time–up to eight years." (**ECF 110, pg. 37:13-18**) This Court also found "...that confining a pretrial detainee, an innocent person, in a situation where he does not see

direct sunlight for years is not rationally related to the non-punitive nature of confinement and violates the Fourteenth Amendment." (**ECF 110, pg. 38:5-7**).

This Court's Order was largely upheld on appeal. *Norbert v. City and County of San Francisco*, 10 F.4th 918 (2021). The 9th Circuit Court of Appeal confirmed that "we have stated that 'the long-term denial of *outside* exercise is unconstitutional." *Id.*, p. *20* (citing *LeMaire v. Maass*, 12 F.3d 1444, 1458 (9th Cir. 1993). Unlike the present fact scenario, this Court's Preliminary Injunction and findings were made concerning pre-Covid-19 lockdowns, which continue to this day. As the 9th Circuit noted in its decision, at the time that this Court's Preliminary Injunction was issued "most inmates in CJ5 spend eight hours per day out of their cells between free time and programming. They can exercise in both the day rooms and gyms." *Id.*, p. *29.* It is undisputed that pre-trial incarcerated individuals at the Jail have been confined to their cells 22 ½ hours per day since early 2020. (**Exh 17, pp. 108:18-109:10).**

### C.    Class Certification

On July 27, 2022, subsequent to the issuance of the trial court Order and later appellate decision discussed above, this Court issued its Order Granting Stipulation for Class Certification. Pursuant to Fed. R. Civ. P. 23(a) and 23(b)(2), the Court's Order creates two classes of Plaintiffs. Class 1 (the "Outdoor Class") consists of all inmates who are pretrial detainees who have been incarcerated at the Jail at any point during the time period May 20, 2017, to the present and who do not have outdoor access as part of their incarceration at the Jail. Class 2 (the "Confinement Class") consists of all inmates who are pretrial detainees and who have been incarcerated at the Jail at any point during the time period from May 20, 2017, to the present and who have fewer than one (1) hour per 24 hour period of time out of their cells as part of their incarceration at the Jail. Plaintiffs Montrail Brackens, Troy McAllister, and Jose Poot are the representatives for both the Outdoor Class and the Confinement Class. (**ECF 238, pp. 1:24-2:26**).

## V.    Legal Standards

### A.    Summary Judgment Standard of Review

In order to be granted summary judgment, the moving party has the twofold burden of demonstrating that there is no genuine dispute as to any material fact and the movant is entitled to

**10**

---

judgment as a matter of law. Fed. R. Civ. P. 56(a). Summary judgment is only appropriate when, viewing the facts in the light most favorable to the nonmoving party, there is no genuine issue of material fact which would preclude summary judgment as a matter of law. *Id*. A fact is "material" if proof of its existence or non-existence might affect the outcome of the litigation, and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247–248 (1986).

The moving party bears the burden of proof and "must produce either evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). The moving party is only entitled to summary judgment if, after it has satisfied its burden, the non-moving party fails to present, by affidavits, depositions, answers to interrogatories, or admissions on file, "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Where "the defendant is moving for summary judgment based on an affirmative defense for which it has the burden of proof, the defendant 'must establish beyond peradventure all of the essential elements of the ... defense to warrant judgment in [its] favor.'" *Willis v. Buffalo Pumps Inc.*, 34 F.Supp.3d 1117 (S.D.Cal. 2014) (*citing Clark v. Capital Credit & Collection Servs*., 460 F.3d 1162, 1177 (9th Cir. 2006)).

### B.     Legal Standards Regarding Conditions of Confinement for Pretrial Detainees

Ninety-two percent of the prisoners in the Jail are pretrial detainees. Pre-trial inmates are entitled to the protection of the 14th Amendment. Pre-trial inmates are not allowed to be subjected to punishment, absent violation of jail rules, which is not an issue in this case. Defendants' Motion must be denied because genuine issues of material fact exist as to whether the actions taken by the Defendants constitute punishment in violation of the 14th Amendment to the United States Constitution.

**Plaintiffs' Points and Authorities in Opposition to Defendants' Motion for Summary Judgment**
**Case No.: 3:19-cv-02724 SK**

VI.     **Legal Argument**

    A.      **Genuine Issues of Material Fact Exist Concerning Plaintiffs' Fourteenth Amendment Claims**

All Class Representatives and all members of the Class certified by this Court are Pre-Trial Detainees formerly and currently housed at the Jail. Because they are all pre-trial detainees, the appropriate inquiry is whether Plaintiffs' Constitutional rights insured by the 14th Amendment have been violated and continue to be violated on a daily basis by the Defendants. The answer to that question is an emphatic "yes."

    B.      **Defendants are Required by State Law to Provide an Outdoor Exercise Area for all Class Plaintiffs**

Defendants concede that the Jail does not have an outdoor exercise area. They state that "the jail (CJ5) does not have a secure outdoor space for exercise and was never constructed with one." (**Def. MPAs, pg. 2:25**). Defendants further admit that "County Jail 5, which was opened in 2005, does not provide outdoor recreation by design." (**Def. MPAs, pg. 13:19-25**). This admission alone is sufficient to demonstrate a genuine issue of material fact sufficient for the denial of Defendants' Motion for Summary Judgment. This Court also found that "there are no outdoor recreational facilities (at) County Jail 5. Inmates at County Jail 5 have no access to direct sunlight or outdoor recreation during their time incarcerated at those facilities." (**ECF 110, pg. 12:16-19**).

Construction of the Jail was completed in 2006. At the time that it was built, construction of the Jail was governed by the 2001 California Building Code. *See*, History of the California Building Standards Code, Title 24 (www.dgs.ca.gov/BSC/About/History-of-the-California-Building-Standards-Code–Title-24). At that time and continuing to the present date, and as confirmed by Ross B. Mirkarimi, the former Sheriff for the City and County of San Francisco, the San Bruno Jail has been designated as a Type II Local Detention Facility. (**Exh 10, pg. 7:11-15**). The 2001 edition of the California Building Code Section 470A.1 defined a Type II Facility as "...a local detention facility used for the detention of persons pending arraignment, after arraignment, during trial and upon a sentence of commitment."

Section 470A.2.10 of the 2001 edition of the California Building Code mandated that an outdoor exercise area be provided at all Type II facilities, stating that:

An outdoor exercise area or areas must be provided in every Type II and Type III

**12**

facility. The minimum clear height must be 15 feet (4572 mm) and the minimum number of square feet of surface area will be computed by multiplying 80 percent of maximum rated population by 50 square feet…and dividing the result by the number of one-hour exercise periods per day.

There must be at least one exercise area of not less than 600 square feet…The design shall facilitate security and supervision appropriate to the level of custody. The exercise area must contain or provide free access to a toilet, wash basin, and drinking fountain as provided in Section 470A.3. (**Exh 11**)

The requirement for an outdoor exercise area in every Type II and Type III facility has been a continued requirement since that time. *See*, highlighted pertinent portions of the 2007 and 2013 California Building Codes (**Exhs. 12 and 13**). Despite contentions by one of the Defendants' expert witnesses that the BSCC intends to relax these requirements, the requirement for outdoor exercise areas remains in the language of Title 24, section 1231.2.10 of the Building Standards Code, based on the proposed changes approved by the BSCC Board. (**Exhs. 14, 15 and 16**). Proposed 2021 revisions specifically require that the Outdoor Exercise Area provide "Natural light and access to fresh air." (**Exh 14, pg. 17**).

      C.    **Because Defendants have failed to comply with State Law by providing an outdoor exercise area at the Jail, and because their failure to do so demonstrates that Defendants are not entitled to judgment as a matter of law, their Motion for Summary Judgment must be denied.**

This Court has previously found that there are no outdoor recreational facilities at the Jail. The Court has also previously found that inmates at the Jail have no access to direct sunlight or to outdoor recreation during their time incarcerated at that facility. (**ECF 110, pg. 12:16-19**). These findings were contained in this Court's Order dated January 31, 2020, issued at least three months before the Covid-19 pandemic was widely recognized and months before nationwide shutdowns.

Defendants' attempt to address these issues in Paragraph 3 of the Declaration of Captain Kevin McConnell. However, the statements of Captain McConnell are inadmissible because they are based on hearsay statements and are not alleged to be representative of current conditions. (**ECF 259-6, pg. 2:15-21**).

Genuine issues of material fact also exist concerning the lack of necessity for the onerous lockdown procedures which pre-date the COVID-19 pandemic and still are in existence, despite the widespread availability of vaccines for the past year and a half. In addition, genuine issues of

13

material fact exist concerning Defendants' failure to provide access to outdoor recreation.

Plaintiffs' Motion for Preliminary Injunction and Related Relief was filed on June 27, 2019, approximately one year before the Jail issued any Covid-19 related lockdown procedures. (**ECF 8**). Plaintiffs' Motion specifically alleged that "defendants' policies and practices have resulted in all of the prisoners in San Francisco County jails being deprived of outdoor recreation, being totally deprived of access to sunlight and the subset of all prisoners at County Jail 4 and County Jail 5 being locked up in small cells for up to 24 hours a day, 6 days a week, resulting in deprivation of Vitamin D, an essential human vitamin…" (**ECF 8, pg. 2:8-15**).

Declarations supporting the Motion for Preliminary Injunction were submitted by seven Plaintiffs. Class representative Montrail Brackens testified in his sworn Declaration that he was a pretrial detainee and as of the date of June 24, 2019, had been incarcerated for 6 ½ years. He testified that the only access he had had to sunlight at the Jails was the "five seconds when you step off the bus to go to court." Mr. Brackens testified that he had not seen the sun for 2,384 days as of the date of his Declaration. Mr. Brackens also testified that he had only been allowed out of his cell 30 minutes per day, and that those 30 minutes were the only time each day he had for access to phones as well as gym time. (**ECF 8-5**).

Defendants' Request that the Court grant Summary Judgment to Defendants as to their Policies since the February 2020 Covid-19 Outbreak must be denied. (**Def. MPAs, pp. 15:24-17:26**). Plaintiffs' evidence demonstrates that a significant portion of the lockdowns at the Jail have been the result of deliberate staffing decisions by Sheriff Miyamoto to divert jail staff to other activities outside the Jail. The lack of sufficient staffing has resulted in incarcerated individuals at the San Bruno Jail being locked in their cells for an excessive period of time. In addition, there are disputes of material fact as to whether there were any other less draconian alternatives to the complete lockdowns, even within the current physical layout of the Jail. Furthermore, Defendants have known since the Court's Order (**ECF 110**), that the pretrial detainees have a constitutional right to outdoor recreation. Yet, Defendants have taken no action in the two and a half year period since, to make outdoor access available. (**McCallister Decl., ¶¶ 4, 5**). Outdoor recreation was one of the major recommendations of the CDC to the American

population, as a means of ameliorating the deleterious effects of the Covid lockdown, a recommendation Defendants ignored.

### D. Jail Lockdown Procedures For at Least the Past Year Are Informed Primarily by Staffing Decisions Issues Rather than COVID-19 Concerns

Prior to March 2020, all inmates in administrative segregation were locked in their cells for no less than 23 hours per day. At the advent of the Covid-19 pandemic, Defendants made the decision to lock down all inmates in the entire Jail for no less than 23 hours per day. Administrative segregation inmates, including Montrail Brackens, were locked down even further, provided out of cell time only twice a week for showers. This came at the same time as authorities were urging millions of Americans to walk and exercise outdoors as a way of dealing with the human isolation of the Covid-19 pandemic, and which would have been available to Plaintiffs had Defendants not violated State law by failing to construct an outdoor exercise yard at the Jail.

The vast majority of inmates at the Jail have been kept locked in their cells 22 ½ hours per day. They have been locked in their cells 22 ½ hours per day since prior to the onset of the Covid-19 pandemic. They remain locked in their cells 22 ½ hours per day at the current time despite the widespread availability of three different vaccines for the past year and a half. Inmates at the Jail also have only one and a half hours per day to use the phones, shower and indoor recreation yard. (**Brackens Decl. ¶9; McCallister Decl. ¶3, Exh 17, pp. 108:18-109:10**)

Despite Defendant CCSF's contention that the continuing lockdown of inmates at the Jail is due to the Covid-19 pandemic, Plaintiffs' evidence is to the contrary, creating a genuine issue of material fact. The overwhelming evidence is that the current lockdown is primarily due to Defendants' deliberate management choices, resulting in a shortage of Sheriff's deputies.

The individuals who were and are entering and leaving the Jail on a daily basis are Sheriff's deputies and employees. The prisoners are on lockdown and have largely not been exposed to Covid-19, except through proximity to Defendants' employees. Yet, instead of forming cohorts and permitting those cohorts to have greater out of cell time, or promoting and making available more effective masking, or creating outside spaces so that lockdowns could be eased, Defendants maintained, against generally accepted public health advice, for over two years the

Plaintiffs' Points and Authorities in Opposition to Defendants' Motion for Summary Judgment
Case No.: 3:19-cv-02724 SK

intense and extremely deleterious lockdowns. And during these lockdowns, even the meager one hour out of cell times were frequently eliminated due to management staffing decisions, so that base-wide lockdowns were imposed, all prisoner out of cell times were prohibited and even that one hour out of cell time was denied.

**Ross B. Mirkarimi** is an expert witness who will testify on behalf of the Plaintiffs. Mr. Mirkarimi served as the Sheriff for the City and County of San Francisco from 2012 to 2016. Before serving as Sheriff, Mr. Mirkarimi served as a member of the San Francisco Board of Supervisors from 2005 to 2012.  Mr. Mirkarimi reviewed Declarations from Kenyon Norbert and Jose Poot in this matter, along with an extensive array of other documents. Mr. Mirkarimi has reached numerous expert opinions in this case, including but not limited to the following:

1)      Mr. Norbert was subjected to extended time in Administrative Segregation ("Ad-Seg"). During that confinement, he spent approximately 23.5 hours a day in his Ad-Seg cell. He had no access to outdoor recreation. He was always confined indoors where he was bathed in fluorescent light without access to natural sunlight. These conditions subjected Mr. Norbert to extreme social and sensory isolation and environmental deprivation. (**Exh 10, p. 5:5-28**).

2)      The rate of attempted suicides and effectuated suicides in the isolation units of California prisons and jails are much higher than reported. (**Exh 10, pg. 6:21-23**).

3)      Based on international, federal, and state law, all detainees ("the incarcerated") have the right to outdoor exercise. The impact of outdoor exercise is crucial for the mental and physical well-being of the incarcerated as part of a balanced regime of activities in jail. This is especially true for the longtime incarcerated. Given that it has been the practice of San Francisco to require the incarcerated at the Jail to spend practically all their time indoors with restricted access to natural light and fresh air, a mandatory default emerges as the only choice for incarcerated individuals of either using or not using a meager indoor gym, which is fully enclosed with a ceiling, four walls, and one or two high windows that provide some natural light but little or no line of sight to the outdoors. (**Exh 10, pg. 8:4-5, 12-18**).

4)      The Jail has easy access to its predecessor jail, which has ample outdoor space that was once used for a variety of recreational activities. (**Exh 10, pg. 8:19-24**)

**Plaintiffs' Points and Authorities in Opposition to Defendants' Motion for Summary Judgment**
**Case No.: 3:19-cv-02724 SK**

5)      Since the Jail is not a supermax prison, it can be retrofitted with state-of-the-art fencing, security monitoring, and adequately trained deputy staff for security response when outdoor access is allowed for the incarcerated. One retrofit consideration is leveraging the unencumbered outdoor plots that hug the pods of the Jail's landscape. These can be converted into recreational yards with high walls and fenced roofing to allow sunlight. There are two annexes adjacent to the Jail poised for outdoor access conversion. (**Exh 10, pg. 9:13-18**)

6)      Staffing shortages have significantly caused an escalation in safety and security matters and a disproportionate punishment of excessive confinement of the incarcerated individuals at the Jail. (**Exh 10, pp. 12:26-13:2**)

**Ken Lomba** is the President of the Deputy Sheriffs' Association. Mr. Lomba has been designated as a rebuttal fact witness by Plaintiffs' counsel.[3] Mr. Lomba was interviewed by Mission Local and was quoted in an article entitled "Staff Shortages Nix Programming in SF Jails; Guards Warn They Can't Take Influx," written by Joe Eskenzazi and published on July 25, 2022. (**Exh 19**). Mr. Lomba's testimony at deposition is expected to be substantially similar to his quote in that article, where he states "we don't have the deputy staff to properly run the jail." The article quotes a letter from the Deputies' Union stating that the lack of adequate deputy staffing will directly result in "less walking time for inmates, which will lead to more inmate aggression, outbursts, medical needs and hospital runs (again, in turn increasing the potential risk to deputies who manage these inmates)." (**Exh 19**).

Mr. Lomba is expected to testify that staffing shortages at the Jail are caused by several factors. First, the San Francisco Sheriff's Office is failing to attract and retain Sheriff's deputies, due to current Sheriff Miyamoto's policy of paying training grade pay to both new graduates of the Academy and to lateral transfers (who often have many years of experience in law enforcement). Mr. Lomba is further expected to testify that as of September 2022, the Sheriff's Office was short 182 deputy positions. The Custody Division, which provides staffing for all jails under the jurisdiction of Defendant CCSF, was short 108 people. As of September 2022, the Custody

---

[3] Due to scheduling issues caused primarily by defense counsel, Mr. Lomba is not scheduled to be deposed in this case until November 7, 2022, two days after this Opposition is due. Plaintiffs' counsel will seek leave of the Court to supplement this Opposition with excerpts from Mr. Lomba's deposition once the transcript becomes available.

Division was operating at 75% of the normal total of individuals

Second, Mr. Lomba is expected to testify that deputies at the Jail are subject to enforced overtime, known as "drafting." Deputies at the Jail are often "drafted" to work overtime at the end of their shifts, often at other non-jail locations, including providing services at San Francisco 49ers games. According to Mr. Lomba's anticipated testimony, drafting occurs on virtually a daily basis.

Because the largest body of deputies are custodial and work at the Jail, they provide the most available number to be drafted. Security requires that when the minimum number of deputies at the Jail falls below a minimum number, there can be no inmates out of cell and the Jail is on basewide lockdown. In addition, defendant Miyamoto has instituted staffing reductions at the housing unit level. "By removing or diminishing the Direct Supervision method of having a deputy and/or a senior deputy monitor and engage with incarcerated individuals on the floor of CJ 3's pods, and instead, rely on a prescribed staffing plan that favors a distanced security method from the Crow's Nest (usually staffed by one deputy), reinvites an antiquated jail management practice that is fraught with problems and susceptibility to blind spots for those incarcerated individuals who want to harm themselves or each other or for those who are in distress and need swift attention." (**Exh 10, pg. 10:14-25**). These deliberate staffing choices mandate reduced out of cell time for inmates, reduced programming, and more lockdowns.

The negative impact of drafting on the inmate population at the Jail is substantial. Drafting results in fewer deputies being present at the Jail. When two or less deputies are available for the staffing of a particular pod, all inmates in that pod are placed on lockdown in their cells, because at least 2 deputies must staff the "Crow's Nest" at all times.

**E.    An additional negative impact on drafting is the effect on the deputies themselves, who must work overtime on a regular basis despite putting in a full shift at what Plaintiffs concede is a stressful job.**

Dr. Czeisler's recommendations take the negative impact on deputies into account. He recommends, for example: "Development and implementation of work schedule policies for work hours of supervisors and deputies staff the jail on a 24/7 basis. These policies should include maximum number of consecutive work hours; the minimum number of off-duty hours between shifts; the maximum number of weekly work hours in any running 7-day interval; the minimum

number of days off in any running 7-day interval and in any running 30-day interval; the maximum number of consecutive overnight shifts; and training of staff work schedulers in work-schedule design principles" (**Exh 2, pg. 35 ¶e**)

### F.   Defendants' Failure to Provide Outdoor Exercise and Denial of Out of Cell Time Violate the Fourteenth Amendment of the United States Constitution

As this Court confirmed in its Order on Motion to Dismiss and Preliminary Injunction, the Ninth Circuit has held that the "status of the detainees determines the appropriate standard for evaluating conditions of confinement." *Gary H. v. Hegstrom*, 831 F.2d 1430, 1432 (9th Cir. 1987). For pre-trial detainees, including all named and class Plaintiffs in this action, the 14th Amendment applies to conditions of confinement when detainees have not yet been convicted. *Id*. at 1432. As this Court has confirmed, the Supreme Court has not addressed the right to outdoor exercise under the Fourteenth Amendment but has addressed the general rights of pretrial detainees, "those persons who have been charged with a crime but who have not yet been tried on the charge." *Bell v. Wolfish*, 441 U.S. 520, 525 (1979). The Court stated: "In evaluating the constitutionality of conditions or restrictions of pretrial detention that implicate only the protection against deprivation of liberty without due process of law, we think that the proper inquiry is whether those conditions amount to punishment of the detainee." *Bell v. Wolfish*, id., 441 U.S. 520, 520.

This Court's Order confirms that "the key to the analysis under the Fourteenth Amendment is whether a specific practice in a facility for pretrial detainees equals "punishment." (**ECF 110, pg. 24:7-8**). The Fourteenth Amendment prohibits all punishment of pretrial detainees, while the Eighth Amendment only prevents the imposition of cruel and unusual punishment. An independent constitutional violation is not required to find that punishment exists. *Demery v. Arpaio*, 378 F.3d 1020, 1029-1030 (9th Cir. 2004). Therefore, the proper inquiry here is whether there is a genuine issue of material fact as to whether the actions of Defendants here constitute punishment of the pre-trial detainee plaintiffs. The answer is an unqualified "yes."

It is instructive to look at the facts and holding in *Spain v. Procunier*, 600 F.2d 189 (9th Cir. 1979), which support a finding that the actions of the Defendants here certainly constitute punishment as alleged in Plaintiffs' Complaint. *Spain v. Procunier* involved a lawsuit brought by

six of the most dangerous convicted prisoners at the San Quentin Prison. Their lawsuit claimed

that they were subjected to cruel and unusual punishment in violation of the Eighth Amendment.

Each of the six plaintiffs had either been charged or convicted of violent acts while in prison even

before an outbreak of further violence on August 21, 1971. On that date, it was alleged that each of

the prisoners had responsibility in some degree for crimes in which three prison officers and two

inmates were slain. *Id.* at 192. The prisoners were assigned to the adjustment center (known as the

AC) at San Quentin. Some of the prisoners had been held in the AC for four and one-half years

when their action was filed. *Id.* One of the claims made by the *Spain* Plaintiffs was that, similar to

the claims here, they had been denied any outdoor exercise, even though the inmates were

permitted to exercise indoors in a corridor fronting eight or nine cells one hour per day, five days

per week. *Id.* at 199. The trial court found "that the denial of fresh air and regular outdoor exercise

and recreation constitutes cruel and unusual punishment." *Id.* At 200. The *Spain* trial court ordered

the defendants to provide plaintiffs the right of outdoor exercise one hour per day, five days a

week unless inclement weather, unusual circumstances or disciplinary needs made that impossible.

*Id.* at 200.

   The trial court's order was affirmed on appeal. The 9th Circuit panel reviewed case law

from other Circuits and found that "there is substantial agreement among the cases in this area that

some form of regular outdoor exercise is extremely important to the psychological and physical

well-being of the inmates". *Id.* at 200. The appellate court stated that "the cost or inconvenience of

providing adequate facilities is not a defense to the imposition of a cruel punishment." *Id.* at 201.

The Court further found that "it was cruel and unusual punishment for a prisoner to be confined

for a period of years without opportunity to go outside except for occasional court appearances,

attorney interviews, and hospital appointments". *Id.* at 201. Finally, the 9th Circuit noted that

"...when confronting the question whether penal confinement in all its dimensions is consistent

with the constitutional rule, the court's judgment must be informed by current and enlightened

scientific opinion as to the conditions necessary to insure good physical and mental health for

prisoners." *Id.*

   The plaintiffs here are pre-trial detainees who are presumed innocent--not convicted

violent felons. Yet they have been subjected to conditions similar to or worse than those that were deemed to constitute cruel and unusual punishment by the *Spain v. Procunier* court. The Plaintiffs here have presented this Court with scientific evidence from renowned experts that the conditions imposed upon the Plaintiffs are causing significant physical and psychological harm to them.

The central issue here is whether the actions of the Defendants amount to punishment. The 9th Circuit held in *Spain v. Procunier*, under the more exacting 8th Amendment standard, that under substantially similar conditions, not only did the actions complained of amount to punishment, those actions also constituted cruel and unusual punishment. Clearly then, there are genuine issues of material fact as to whether the actions taken against the Plaintiffs here constitute punishment under the 14th Amendment.

The 9th Circuit has determined that, in the stricter 8th Amendment context, "...ordinarily the lack of outside exercise for extended periods is a sufficiently serious deprivation and thus meets the requisite harm necessary to satisfy Wilson's objective test [Was the deprivation sufficiently serious?]. Exercise has been determined to be one of the basic human necessities protected by the Eighth Amendment." *LeMaire v. Maass*, 12 F.3d at 1457 (referencing the holding in *Wilson v. Seiter*, 501 U.S. 294 (1991)). The *LeMaire* Court also confirmed that "...this circuit has determined the long-term denial of outside exercise is unconstitutional." *Id.* at 1458. Although the curtailment of outdoor exercise privileges was upheld in *LeMaire*, its decision was directly linked to inmate LeMaire'*s* "own misconduct, which raise(d) serious and legitimate security concerns within the prison." *Id.* By contrast, the failure to construct an outdoor exercise yard and to deny all outdoor exercise and to all pre-trial detainees at the Jail has nothing to do with any objective findings concerning these pre-trial detainees. Defendants' unsupported opinion is that "the construction of County Jail 5 provides inmates the same sunlight and fresh air opportunities that would otherwise be afforded when an inmate recreates outdoors." (**Def MPAs, pg.** 15:10-11). This unsupported opinion is disputed by Plaintiffs' experts. (**Exhs 1,2 3 and 4**). Common sense alone dictates that an individual who has not seen sunlight in years, who has developed a Vitamin D deficiency as a result and who has lost skin pigmentation as a result is not receiving the same sunlight and fresh air opportunities as someone who has access to outdoor recreation.

**Plaintiffs' Points and Authorities in Opposition to Defendants' Motion for Summary Judgment**
**Case No.: 3:19-cv-02724 SK**

### G. Genuine Issues of Material Fact Exist Concerning Plaintiffs' State Law Constitutional Claims

Plaintiffs have asserted state law claims under Article I, §§ 7 and §17 of the California Constitution, as well as under California Government Code § 11135. Defendants assert that Plaintiffs' claims under Article I, §17 are now inapplicable because this section of the California Constitution is California's equivalent to the Eighth Amendment, and is therefore inapplicable because all of the Plaintiffs and class consist only of pre-trial detainees rather than convicted individuals. Defendants do not challenge Plaintiffs' claims under Article I, §7 of the California Constitution. (**Defs' MPAs, pg. 18:11-27**)

Article I, § 7 of the California Constitution provides in pertinent part that "(a) A person may not be deprived of life, liberty, or property without due process of law or denied equal protection of the laws". Article I, § 17 of the California Constitution provides in pertinent part that "cruel or unusual punishment may not be inflicted or excessive fines imposed." Plaintiffs, all of whom are pre-trial detainees, will continue to proceed under Article I, § 7 of the California Constitution.

### H. This Motion for Summary Judgment is not the Appropriate Method to Challenge Plaintiffs' Claim for Monetary Damages or Injunctive Relief

Defendants request that the Court strike Plaintiffs' prayer for compensatory damages, punitive damages, and injunctive relief. This request must be denied for at least two separate reasons. First, because summary adjudication has not been sought and because granting any of the three requests would not completely dispose of any of Plaintiffs' Causes of Action, it must be denied. Fed. R. Civ. P. 56(a). It is correct that Rule 56(g) provides that "if the court does not grant all the relief requested by the motion, it may enter an order stating any material fact—including an item of damages or other relief—that is not genuinely in dispute and treating the fact as established in the case." However, Defendants' erroneously contend that Plaintiffs are not entitled to seek compensatory damages. This is substantially different from a finding that a particular item of damages is undisputed.

Plaintiffs' claims have been asserted under 42 U.S.C. §§ 1981, 1983 et seq., and § 1988. (**ECF 1, pg. 25-28**). When § 1983 plaintiffs seek damages for violations of constitutional rights,

the level of damages is ordinarily determined according to principles derived from the common law of torts. *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 306 (1986). The Supreme Court has stated that the primary purpose of the damages remedy in § 1983 litigation is "to compensate persons for injuries caused by the deprivation of constitutional rights." *Carey v. Piphus*, 435 U.S. 247, 264 (1978). Here, Plaintiffs, through their own testimony and that of the expert witnesses retained on their behalf, have demonstrated that there is a genuine issue of material fact as to physical and emotional damages caused by the actions of Defendants.

Second, Plaintiffs contend that the proper way to challenge Plaintiffs' claims for monetary damages and for the one form of injunctive relief mentioned by Defendants is through a Motion to Strike or other direct challenge to the pleadings. While Defendants filed a Motion to Dismiss Plaintiffs' Complaint previously, that Motion apparently did not address the prayer for both compensatory damages or punitive damages. Indeed, issues pertaining to Plaintiffs' claims for the recovery of monetary damages are not addressed in this Court's Order pertaining to Plaintiffs' request for the issuance of a Preliminary Injunction. (**ECF 110**).

Fed. R. Civ. P. 12(g)(2), which addresses how defenses are to be asserted, provides that: "(2) Limitation on Further Motions. Except as provided in Rule 12(h)(2) or (3), a party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion."

Defendants previously filed a Motion to Dismiss all of the Plaintiffs' Claims pursuant to Rule 12(b)(6). The Court issued its Order granting in part and denying in part that Motion on January 31, 2020. (**ECF 110**). Because Defendants had the opportunity to challenge the Plaintiffs' requests for both compensatory and punitive damages, but chose not to do so at that time, their request to strike Plaintiffs' claim for monetary damages is untimely under Rule 12(g)(2).  In addition, it appears that Defendants' Answer in this case does not challenge Plaintiffs' right to seek compensatory damages. (**ECF 125**, filed February 26, 2020).

Defendants also seek Summary Judgment on the issue of the availability of compensatory damages on the basis that the trial in this case would be unworkable because of the number of Plaintiffs and the quantum of evidence to be considered by the Jury. (**Def. MPAs, pg. 20:11-26).**

However, Defendants' concerns are case management issues, not summary judgment issues. This is not the first class action heard by this Court or a Court in the Northern District. This Court will manage this case as appropriate. Complexity of a case is not a basis for denying the Plaintiffs and class members the right to trial and the right to seek to recover compensatory damages..

Defendants seek to strike Plaintiffs' Prayer for Injunctive Relief in the Form of Medical Treatment based on their contention that "...the Department of Public Health provides adequate medical care to inmates." (**Def. MPAs, pg. 22:17-22**). As discussed above, the proper way to challenge this claim is through a Motion to Strike, not a Motion for Summary Judgment. Second, the record in this case dating from the submission of Plaintiffs' successful Motion for Preliminary Injunction has documented that the Defendants and the Department of Public Health are not providing adequate medical care to inmates.

## VII.   Evidentiary Objections (L.R. 7-3)

**Material Objected To:** Declaration of Captain Kevin McConnell in Opposition to Motion for Preliminary Injunction, filed 10/24/22 (ECF 259-6)

**Grounds for Objection:** (1) Paragraph 3, pg. 2:15-21. Hearsay. (Fed. R. Evid. 801(c). Captain McConnell's statements as to what may or may not have been told to him by an unidentified person from the California Bureau of State and Community Corrections is a hearsay statement. (2) Improper Declaration.  (28 U.S.C. § 1746). The Declaration states that it was executed "under penalty of perjury under the laws of the State of California."

## VIII.   Request for Continuance

As indicated by the Declaration of Yolanda Huang, filed herewith, the vast majority of expert depositions occurred in the week preceding Monday, November 7, 2022, the date on which this Opposition was due. Five more depositions are scheduled for the week on which this Opposition must be submitted. This has largely been the result of scheduling decisions made by Defendants' counsel, who set depositions of their own experts at the very end of the discovery cut-off for expert witnesses, even though Plaintiffs' counsel requested that these depositions take place earlier. (**Huang Decl., ¶3**).  Accordingly, Plaintiffs' counsel has been unable to complete expert

discovery before the submission of this Opposition and has been unable to obtain official transcripts for the depositions which have been taken. In the event that this Court is not inclined to deny the Motion for Summary Judgment outright, Plaintiffs request leave of the Court to supplement their Opposition with such subsequently received evidence.

## IX.    CONCLUSION

For the reasons set forth herein, Plaintiffs respectfully request that this Court deny outright the Defendants' Motion for Summary Judgment.


Respectfully Submitted by:


Dated: November 7, 2022            LAW OFFICE OF YOLANDA HUANG
                                By:  */s/ Yolanda Huang*
                                    YOLANDA HUANG
                                    ATTORNEY FOR PLAINTIFFS


Under N.D. Cal. Local Rule 5-1(h)(3), in lieu of a signature, I attest that I obtained the concurrence from Yolanda Huang on November 6, 2022, for the filing of this document.


    /s/ Rachel S. Doughty
    Rachel S. Doughty

Plaintiffs' Points and Authorities in Opposition to Defendants' Motion for Summary Judgment
Case No.: 3:19-cv-02724 SK