**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO/OAKLAND DIVISION**

| | |
|---|---|
| KENYON NORBERT, TROY MCALLISTER, MARSHALL HARRIS, ARMANDO CARLOS, MONTRAIL BRACKENS, MICHAEL BROWN, and JOSE POOT, on behalf of themselves individually and others similarly situated, as a class and Subclass, | Case No.: 3:19-cv-02724 SK |
| Plaintiffs, | EXPERT REPORT OF ROSS B. MIRKARIMI |
| vs. | |
| SAN FRANCISCO COUNTY SHERIFF'S DEPARTMENT, CITY AND COUNTY OF SAN FRANCISCO, SAN FRANCISCO SHERIFF VICKI HENNESSEY; CHIEF DEPUTY SHERIFF PAUL MIYAMOTO; CAPTAIN JASON JACKSON, CAPTAIN MCCONNELL and John & Jane DOEs, Nos. 1 - 50. | |
| Defendants. | |

## I.    BACKGROUND AND QUALIFICATIONS

Since 2016, I have served as an independent consultant and contractor on conducting custody death and misuse of force investigations in California jails. I have also served as a Peer Reviewer for the United States Department of Justice—Bureau of Justice Administration for evaluating the policy-technical-and regulatory implementation of municipal and state law enforcement's launch or expansion of its body-worn cameras program. I also serve as an adjunct professor at California State

University, Stanislaus's Criminal Justice Department, teaching "Law Enforcement Administration and Management".

I served as the Sheriff for the City and County of San Francisco from 2012 to 2016. My role as a department head and chief administrator required me to oversee an adjustable annual budget of $193 million, 1,046 sworn-and-civilian personnel, 5 jails (1600 rated beds relative to classification, housing, security, reentry programming, medical/behavioral health, etc.), salary—budgeting congruency,   capital expenditures, staff recruitment, union-labor negotiations, regulatory compliance, reentry--rehabilitation programming, public sector security contracts, ad-hoc patrol-investigations, emergency management, policy-and-legislative management.

As Sheriff, I participated in conferences and meetings with reentry and rehabilitation experts and served on panels, such as at the annual meeting of the National Alliance on Mental Illness in Monterey, and the Realignment Community Partnership in Sacramento.

Our administration helped usher the advent of State Prisoner Realignment (AB 109) into the San Francisco jails. We brokered a pilot program with San Quentin Prison, SF Probation Department, and with funding from the State Senate to lead a customized reentry regiment for Realignment-classified incarcerated individuals. Another milestone was co-representing the Sheriff's Department and its Five Keys Charter High School, at the finalist competition for Harvard University's Kennedy School's biannual competition, "The Innovation in American Government Award". The Sheriff's Department and The Five Keys Charter High School won the 2015 award for demonstrating a durable nexus between recidivism reduction and the completion of an in-custody and post-release diploma-based education.

Before serving as Sheriff, I was twice elected to the San Francisco Board of Supervisors (2005-2012). I authored or sponsored nearly 100 ordinances and charter amendments reflective of criminal justice reform, community policing, environmental-climate protection, poverty abatement, affordable housing, and government ethics. I legislated a series of laws preparing San Francisco for State Prisoner Realignment (AB 109) and the creation of corresponding committees focused on Community Partnership, Sentencing, and Reentry Reform.

As Supervisor, I served on influential committees that governed San Francisco's legislative endeavors and the City's fiscal planning, with accountability for an $8 billion budget. The committees on which I served included Finance-and-Budget, Government Audits, Public Safety, Reentry Council, among others. As a related committee duty, I presided over the Civil Grand Jury investigative and report process that implicated needed reforms of San Francisco's law enforcement agencies and the jails.

My licenses and certifications include the following: a) American Correctional Association, Corrections Executive, CCE. b) National Sheriff's Association, Homeland Security Protection Professional, CHPP. c) National Association for the Civilian Oversight of Law Enforcement, Practitioner, CPO. d) U.S. Department of Transportation, Safety and Security Protection Professional, TSSP. e) ASIS International, Protection Professional, CPP. f) California Peace Officer Standards and Training, 830.1 pc; basic, intermediate, and advanced. g) Federal Law Enforcement Training Center, Advanced Investigations. h) Federal Bureau of Investigation, Leadership Executive Development, LEED. i) National Center for Missing and Exploited Children, Executive Administer. j) California Office of Emergency Services-Specialized Training Institute, Hazardous Materials Technician and Specialist.

My education credentials include a Bachelors of Arts degree in Political Science, Saint Louis University (minor in Russian, Monterey Institute of International Studies); Masters of Arts degree in International Affairs, Golden Gate University; and a Master of Science degree in Environmental Management, University of San Francisco.

My vocational credentials include San Francisco Police Academy, 184th, Class President, and the U.S. Naval Reserves, Naval Intelligence, Honorable Discharge, 2003. My curriculum vitae is attached as Attachment 1.

## II.    PREPARATION

I have reviewed the Declarations of Kenyon Norbert and Jose Poot in this matter. The additional documents are in Attachment 2. I have been asked by plaintiffs' counsel to consider these documents and render opinions about the SF Sheriff's Department budget and policy enablement of

harmful conditions to incarcerated individuals and departmental personnel at SF County Jail in San Bruno also known as CJ 3.

## III.   INSTITUTIONAL INDIFFERENCE TO THE IMPACT OF ADMINISTRATIVE SEGREGATION AND SIMILAR FORMS OF ISOLATING CONFINEMENT

Based on the affidavit of Mr. Norbert, I learned that his carceral condition subjected him to extended periods of Administrative Segregation ("Ad-Seg."). The American Correctional Association defines confinement for at least 22 hours per day as someone who is in Solitary Confinement or another form of isolation, such as Ad-Seg. Between his previous housing at the defunct CJ 4, located at 850 Bryant Street, and his incarceration at CJ 3 in San Bruno, Mr. Norbert was always confined indoors where he was bathed in fluorescent light (no access to sunlight).  Mr. Norbert suffered from severe headaches, anxiety attacks, memory loss, hypersensitivity to routine stimuli, appetite loss, nightmares, night sweats, and a combination of factors that degraded his impulse control. He was cell fed, alone or sometimes with a cell mate. He was permitted 30 minutes per day out of his cell, where he an adjacent room-gym was there, though, it was discouraged from using due to the limited time and space provided. There was no accessible radio or television. The closest T.V. was 50 feet away, making it hard to hear or read the captions. Mr. Norbert was an avid reader, which was useful to help discipline his sanity, but that desire wanned similarly to other incarcerated individuals who lost their appetite due to the toll of extended isolation. In effect, Mr. Norbert spent approximately 23.5 hours day in his cell.

It is my understanding and belief that individuals who suffer confinement for 23.5 hours a day for weeks and months or years, are subject to extreme social and sensory isolation, and environmental deprivation. The United Nations standards, also called the Mandela Rules, state: Every prisoner who is not employed in outdoor work shall have at least one hour of suitable exercise in the open air daily if the weather permits.  There are outstanding questions that speak to the practices and conditions of CJ 3 that dismiss or diminish the consequences of an incarcerated individual to cope with three hours of out of cell time per week, where they also live, eat, sleep, and defecate in the same space for nearly 23 .5 hours per day, and then, exit incarceration or their isolating confinement, and be expected to resume a more civilized existence or a rehabilitated life.

## IV.    NEEDED REFORM TO ISOLATION CONFINEMENT PRACTICES

Based on a 2004 report on the California Department of Corrections and Rehabilitation's records of suicides in state prisons, I noted that 73% of inmate suicides occurred in isolation units—though these units accounted for less than 10% of the state's total prison population. I was also aware of the fluctuating number of suicides and attempted suicides in the San Francisco Bay Area County jails, ranged between zero and five (0 to 5) annually over a ten-year period.

In 2013/2014, I requested that members of my administration begin the process for commissioning a peer review study on how San Francisco can substantially diminish or halt its use of Ad-Seg and isolation units. Based on my own research and knowledge of how solitary confinement works for containing volatile and violent high risk incarcerated people, and its deleterious effects over a period of time, I am aware that some of the clinical impacts of isolation exhibit a variety of negative physiological and psychological reactions, including hypersensitivity to stimuli; perceptual distortions and hallucinations; increased anxiety and nervousness; revenge fantasies, rage, and irrational anger; fears of persecution; lack of impulse control; severe and chronic depression; appetite loss and weight loss; heart palpitations; withdrawal blunting of affect and apathy; talking to oneself; headaches; problems sleeping; confusing thought processes; nightmares; dizziness; self-mutilation; and lower levels of brain function, including a decline in EEG activity after only seven days in solitary confinement or Ad Seg..

I am also aware that attempted and effectuated suicides occur about 5-times greater in the solitary confinement/administrative segregation units in California jails, compared to the less restricted and general population units. It is my opinion that the rate of attempted suicides and effectuated suicides in the isolation units of California prisons and jails are much higher than reported. Recognizing these dangers in the state and throughout the nation, organizations including the American Psychiatric Association, Mental Health America, the American Public Health Association, the National Alliance on Mental Illness, and the Society of Correctional Physicians have issued formal policy statements opposing long-term solitary confinement, especially for prisoners with mental illnesses.

As far as I know, our third-party study on the Overuse of Administrative Segregation did not proceed when I left the SF Sheriff's Office in 2016.

## V.     CONTEXT: SAN FRANCISCO COUNTY JAIL 3, SAN BRUNO

The CJ 3 jail (formerly designated as CJ 5) located in San Bruno, California in San Mateo County, was inaugurated in 2006. The City and County of San Francisco owns the land where its jails are sited. CJ 3 replaced an adjacent jail that was activated in 1934, operating for seven decades, finally succumbing to disrepair and seismic instability. Due to concerns by nearby residents, in 1997, a proposal to build a replacement jail was opposed by the San Bruno City Council. Ultimately, a new San Bruno jail was built. The San Francisco sheriff decided to restrict outdoor access for the incarcerated to stave off the potential for escape.

On the spectrum of categorizing minimum to maximum security detention facilities, CJ 3 is designated by the California Board of State Community Corrections (BSCC) as a Type II facility, defined as "a local detention facility used for the detention of persons pending arraignment, during trial and upon a sentence of commitment". CJ 3 has a rated bed capacity for 768 incarcerated individuals.

The newly built San Bruno jail (CJ 3) consists of 16 cell blocks laid out in a semicircle in front of the deputy station with a central control panel, giving the deputy sheriff a line-of-sight view of the communal area and into each cell through clear polycarbonate walls. Cells hold two incarcerated individuals, so each housing pod has the capacity of 48 incarcerated individuals with an A and B side for a total capacity of 96 people in housing custody units.

In lieu of outdoor access for the incarcerated, each cell block was designed to have an indoor recreation area with a basketball hoop -- replacing an outdoor yard at the old jail. The indoor recreation area was a compensatory measure that was meant to be more accessible for incarcerated individuals.

The advent of the new jail in San Bruno was hailed for its modernized design to operate by a Direct Supervision model that allowed for the managing and monitoring of incarcerated individuals from a raised deck-floor for deputies and senior deputy staff. The deputy presence enabled a safe and secure custody housing environment that capacitated an accessible slate of reentry and rehabilitation

services such as, R.S.V.P., Roads to Recovery, C.O.V.E.R., the Five Keys Charter High School, and Parenting Skills & Incarcerated Parent/Guardian—Child Visitation.

## VI.   THE CJ 3 OUTDOOR ACCESS CONUNDRUM AND OPPORTUNITY

Based on international, federal, and state law, all detainees ("the incarcerated") have the right to outdoor exercise. In practice, the level of access to outdoor exercise can vary greatly between different categories of the incarcerated housed in minimum to maximum security jails and prisons. Differences may also be justified on security grounds, such as the incarcerated in disciplinary units, high security risks, including the sentenced in "supermax" prisons. According to domestic and international standards, the administrative decision-makers of prisons and jails must take measures to ensure that all detainees have access to the minimum of one-hour outdoor exercise per day, including those under segregation or in isolated punishment.

The impact of outdoor exercise is crucial for the mental and physical well-being of the incarcerated as part of a balanced regime of activities in jail. This is especially true for the longtime incarcerated. Given, that it has been the practice of San Francisco to require the incarcerated at CJ 3 to spend practically all their time indoors with restricted access to natural light and fresh air, a mandatory default emerges as the only choice for incarcerated individuals of either using or not using a meager indoor gym, which is fully enclosed with a ceiling, four walls, and one or two high windows that provide some natural light but little or no line of sight to the outdoors.

It is my opinion that it is time for San Francisco to revisit and strengthen its regulatory commitment to Title 15 and Title 24 standards to allow secured outdoor access for incarcerated individuals. Structurally, CJ 3's design benefits from its easy accessibility to its predecessor jail, which is located a few hundred feet away and remains unused, standing in part with ample outdoor space that was once used for a variety of recreational activities. CJ 3 also has a semi-active annex referred to as CJ 6. In 2014/2015, my administration tested our department's discouragement on gathering outdoors by launching California's first jail based Aquaponic workforce development program. I recall, when we cut the ribbon for the program launch outside on a very sunny hot day in a high fenced patio, two incarcerated participants told me that not only were they excited to be in the program, that they were blown away that the program was outside…with fish!

In addition, adjacent to the old and new jail was the largest organic urban garden in any California jail or prison system, known as the Garden Project. Its existence started in 1982. During my administration, I marveled at its vast acreage of crops and the Project's mission to introduce the environmental principals of organic farming to inner-city and disadvantaged youth. At one time in its earlier history, qualified, incarcerated individuals were allowed to work in the garden fields while deputies kept security watch.

I discussed with staff the idea of allowing the incarcerated to grow their own food.  At that time, staff did not like this idea because it deviated from the practice of disallowing the incarcerated outside. I then discussed with Aramark, the contracted conglomerate food service provider, what it would take to include our organic crops in the prepared dinners for the incarcerated.  Aramark's representatives replied with a list of regulatory requirements, which we could meet.  However, when I contacted the BSCC about this idea, they said, basically, "good luck".

Since CJ 3 is not a supermax prison, it can be retrofitted with state-of-the-art fencing, security monitoring, and adequately trained deputy staff for security response when outdoor access is allowed for the incarcerated. One retrofit consideration is leveraging the unencumbered outdoor plots that hug the pods of the CJ 3 landscape.  These can be converted into recreational yards with high walls and fenced roofing to allow sunlight. There are two annexes adjacent to CJ 3 poised for outdoor access conversion, such as the one we used at CJ 6. With greater detail, a draft plan can serve as the discussion-vehicle for fostering feedback from San Bruno neighbors, the San Bruno City Council, officials in San Mateo County, and all relevant stakeholders.

According to the BSCC, Section 1231.2.10, an outdoor exercise area or areas must be provided in every Type II and Type III facility. The minimum clear height must be 15 feet (4572 mm) and the minimum number of square feet of surface area will be computed by multiplying 80 percent of maximum rated population by 50 square feet (4.7 m2) and dividing the result by the number of one-hour exercise periods per day. The exercise area must contain or provide free access to a toilet, wash basin, and drinking fountain as provided in Section 1231.3. There must be at least one exercise area of not less than 600 square feet (55.7 m2).

Politically, the San Francisco sheriff and city government will need to burn some shoe leather to educate themselves why they need to come into compliance with the BSCC and the 9th Circuit rendering "(t)hat the denial of fresh air and regular outdoor exercise and recreation constitutes cruel and unusual punishment," see Spain v. Procunier, 600 F.2d 189, 199 (9th Cir. 1979). Unfortunately, the problem of denial of outdoor access has migrated into an urgent problem due to the current policy of prohibiting indoor exercise access or out of cell time for the incarcerated and their right for a minimum one-hour daily access to indoor exercise, recreation, and out of cell time ("walk time").  With the challenges of covid-19 now exceeding two years, mere continued lockdowns and heavily restricted out of cell times are not sustainable solutions.  The Sheriff's Department necessarily must develop alternative solutions, one of which would be to establish outdoor access in order to provide the necessary and required out of cell time, exercise and recreation to all inmates.

## VII.  LEVERAGING STAFFING DEFICITS—SUBVERTING THE RIGHTS OF THE INCARCERATED

CJ 3's method of Direct Supervision is built into the architecture of the General Population Pods and into the Administrative Segregation and Psychiatric Pods.  Included in the design of CJ 3's pods are high ceiling encased lookout towers also known as the "Crow's Nest". Staffing the Crow's Nest was not meant to be the primary platform for monitoring the incarcerated, but instead, it served as a complement to the two deputies assigned to the floor of a given pod that supervises up to two sides of up to 48 incarcerated individuals.

By removing or diminishing the Direct Supervision method of having a deputy and/or a senior deputy monitor and engage with incarcerated individuals on the floor of CJ 3's pods, and instead, rely on a prescribed staffing plan that favors a distanced security method from the Crow's Nest (usually staffed by one deputy), reinvites an antiquated jail management practice that is fraught with problems and susceptibility to blind spots for those incarcerated individuals who want to harm themselves or each other or for those who are in distress and need swift attention.

During the COVID-19 Pandemic, all security and safety regimens at jails and prisons throughout the nation were drastically changed to prevent and contain infection. This also translated into a cessation of incarcerated-based reentry services, programs, in-person visitation, and access to

the outdoors or indoor recreation. With the passing of the Pandemic, many jail operations throughout the state in 2022 are returning to a heightened form of normalcy, including reentry/rehabilitation programming and recreation.

San Francisco, however, is going in the wrong direction. Based on an August day in 2022, I learned that CJ 3 had an incarcerated population of 529. According to operational staffing reports, I learned that CJ 3 is authorized to have 187 deputies but is only staffed with 138 deputies, a shortfall of 49, resulting in a 74-percent deputy staffing ratio. While that is a troubling indicator for deficit staffing, it is not a prohibitive factor that justifies the stifling of services to the incarcerated or denying access to indoor exercise.

Further, I reviewed the June 30, 2022, video and reports by the San Francisco Sheriff addressing the Budget and Finance Committee of the SF Board of Supervisors. Presented, was a two-year budget, FY 2022-2023, and FY 2023-2024, that approximated an annual budget of $270 million. The Sheriff acknowledged that the Sheriff Department's staffing ratios have relied on a 25-percent funding strategy with over-time funding, and that over the last three years, the department had not kept pace with staff separations and attrition, while also enduring a longer than usual recruitment and onboarding process for new hires.

In the same report, I noted that the Sheriff requested funding for 40 new deputies and stated that he will conduct "attrition savings" for an additional 35, totaling 75 newly hired deputies. Further, what was not said nor asked at the June 30th Board of Supervisors Budget Committee hearing were queries about deputy understaffing exceeding a prolonged 10-percent benchmark and denoting potential flags that exacerbate safety and security impacts to custody personnel, custody contracted staff, the incarcerated, and liability to the City. Over the years, public safety-related understaffing has been a familiar theme and reminder from the San Francisco Police Department, where police-driven public relations campaigns motivate constituent concern and City Hall response as effectively or generously as possible. In contrast, pressing staffing issues at the Sheriff's department have been more muted and less visible.

To delve more into the potential staffing impacts of San Francisco's jails, I reviewed the 2022 Rank Report that preceded the Board of Supervisors' passing of the City's budget in July 2022. I

learned that the Sheriff's department was experiencing a deficit of 153 deputies and 20 senior deputies for a total of 177 unfilled deputy positions. The authorized number for deputy/senior deputies is 808 positions or FTE's, though, there are only 635 active deputy/senior deputy staff, representing a 21-percent understaffing ratio.

On an entwined matter, I learned that there has been a protracted campaign to "sunset" the Sheriff's Senior Deputy classification and rank.  Stemming from correspondence in 2017 and after, it was made clear by the sheriff and senior staff that they will commence with the phasing out of Senior Deputy positions through a process of attrition and out of classification promotions to Sheriff's Sergeant (an admin process known as "TX's") or to Deputy Sheriff.

Evidence of this phasing out is corroborated by the numbers: in 2015, there 74 staffed Senior Deputy positions with 14 unfilled positions. In 2020, there were 38 staffed Senior Deputy positions with 13 unfilled positions. In 2022, there are 23 staffed Senior Deputy positions with 20 unfilled positions.

No matter how valid the reasons are for reengineering deputy staffing, the indicators well suggest a fundamental shift away from a Direct Supervision jail management model, which is necessary to support the cavalcade of CJ 3 reentry and rehabilitation programs and which is also necessary to buttress the basic lawful rights of the incarcerated.

One example that underscores a staffing scenario designed to halt or drastically reduce Direct Supervision at CJ 3 is the phased-out elimination of Senior Deputies while not filling Deputy Sheriff positions, in tandem with attrition, separation and lackluster recruitment. Conveyed to the Board of Supervisors in June 2022, was a prognostication by the Sheriff that over the next two years, the department will try to reduce its overtime reliance of 25-percent down to 10-percent and close the gap of deputy sheriff vacancies, though, there was vague mention of senior deputy positions. What this connotes is that the practice of deploying the Crow's Nest will supersede Direct Supervision in CJ 3 and relegate even further, reentry services and out of cell time for the incarcerated.

Reciprocally, tensions will mount causing safety and security matters to escalate due to misapplication of staff and a disproportionate punishment of excessive confinement of the

incarcerated – their casualty will be a further degradation of BSCC Title 15 and Title 24 right to exercise, natural light, fresh air, imaginary outdoor access, "walk time".

These staffing and budget data-points matter based on my own experience as both a department head and as an elected supervisor rendering fiscal decisions amid one of the worst recessions in modern history. As sheriff, my administration's challenge with budget limitations collided with our ambition on tackling chronically high recidivism rates, hovering at 68-percent. This meant finding the fiscal means for implementing effective reentry services within a safe in-custody learning environment.  Under my watch, we hired and onboarded 13 deputies in 2013 and 15 deputies in 2015 for a total of 28 FTE's. While these numbers appear low, the corresponding Rank Report portrayed a more complete staffing picture. In 2013, our department achieved a deputy/senior deputy staffing ratio that culminated with 3.5-percent of understaffing. In 2014, we registered 5-percent of understaffing, and in 2015, we registered 9-percent of understaffing. Fortunately, due to the boon of shuttering the former CJ 3 (288-beds, 850 Bryant Street), we redistributed deputy and senior deputy staff to our other jails, the largest of which is located in San Bruno.

Based on my Budget Committee experience, I recall difficult deliberations on reconciling severe budget shortfalls with understaffing scenarios that defaulted to the excessive use of over-time by city departments responsible for public safety, public health, and the uninterrupted 24/7 cycle of running the city. To incentivize a department to correct its disproportionate use of overtime or other excessive spending habits, our committee would require an accountable plan by the department head's progress on proving how they fixed budget mismanagement, while subject to the provisional withholding of that department's partial, but meaningful allotment of annual funding while budget efficiency is restored.

## VIII.   THE VISCERAL AND TANGIBLE IMPACT

As Sheriff, when I visited San Bruno, conversed, or ate meals with incarcerated individuals, many would share with me that they liked having the deputies on the floor, someone to talk to or know that they were just there for their security. Some of the incarcerated were shy or embarrassed in sharing that feeling, but as one military veteran told me, to paraphrase, "sometimes, jail and prison can be so scary that everyone is hopped up on tension, and that's when bad things happen".

Similarly, when I spoke to a variety of line deputies about their feelings about being on the floor with the incarcerated, at first, some tried to probe me because they were talking to their boss, while others were candid, confiding to me that their duty of interacting and being there with those in custody mattered, as if it was "humanizing," said one deputy.

Conventionally, it would make sense that with a sustainable reduction in San Francisco's incarcerated population there would be a proportionate reduction in custodial jail staff.  Like the San Francisco Police Department, there are minimum staffing requirements of peace officers that obligate the Mayor and the Board of Supervisors to honor as best they can based on the City's General Fund capacity and based on the 2020 voter approved Proposition E – amended the City Charter to remove the previously established Police staffing baseline levels and requiring staffing level reports and recommendations every two years using rigorous, industry-reputed methodologies.

Similarly, it is clear that the routine budget exchanges that occur between the Sheriff's department, Mayor, and the Board of Supervisors, without a quasi-public process that corroborates needed staffing levels in  two year intervals and the reasons for those staffing levels, has resulted in an unsustainable Sheriff's Department staffing level that does not meet the articulated policies of San Francisco.   The San Francisco Sheriff's Department is the second largest law enforcement agency in the city, operating 24/7, 365 days of the year. It is the department that has sole governance of the jails which requires approximately 80-percent of the total FTEs allotted. Given the historical commitment that San Francisco has towards a policy for rehabilitation not mere warehousing, what informs the basic staffing decisions (albeit multiple factors) are particularly these two: a quantitative minimum staffing ratio and a qualitative commitment to programs for rehabilitation not mere warehousing.

**EXPERT REPORT OF ROSS B. MIRKARIMI**

My opinions are subject to revision upon review of additional materials.  Thank-you for this opportunity to review this important institution at a critical juncture.

Date: September 2, 2022

_____

Ross Mirkarimi

My opinions are subject to revision upon review of additional materials.  Thank-you for this opportunity to review this important institution at a critical juncture.

Date: September 2, 2022

Ross Mirkarimi

**EXPERT REPORT OF ROSS B. MIRKARIMI**

## FEE SCHEDULE

| | |
|---|---:|
| Retainer | $10,000.00 |
| Expert Hourly Rate | $500.00 |
| Travel Time | $250.00 |

Direct expenses billed at cost

## DEPOSITION AND TRIAL TIME

$1,500 minimum for deposition  (3 hour minimum) – includes wait time.

$1,000 Cancellation fee if canceled within 2 business days

$250 travel time

**EXPERT REPORT OF ROSS B. MIRKARIMI**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# ATTACHMENT 1

**Ross Mirkarimi**

San Francisco, California, 94110 ▪ 415.412.7526

RMIRK@msn.com ▪ LinkedIn Profile

---

## Subject Matter Expert C.V.

---

**Career Experience**

---

**Principal, (2016-Present), Pro-Civicus Consulting:**

- Adjunct Professor, California State University, 2022: Instructor for the CJ 3160, "Law Enforcement Management and Administration". In-person instruction with routine application of an on-line and remote program through Canvas.
- Peer Review Analyst, U.S. Department of Justice-BJA, 2019-present: Contracted to conduct body-worn camera evaluations on the policy, regulatory, budgetary, and the community-centric programs by local and state law enforcement agencies throughout the nation.
- Peer Review Analyst, U.S. Department of         Justice-BJA, 2022: Contracted to evaluate the Community Policing capacity or prospective federal funding toward American Indian Native Tribal Council police agencies.
- Project Lead, Missouri Department of Health & Senior Services, 2019-2020: Contracted via RFP to supervise 49 analysts to peer review 2,200 (103,000 data pages) applications for state-wide medical cannabis licenses with specialization on manufacturing, cultivation, retail, distribution, and laboratory testing; applied policy, risk, and quantitative analytics.
- Specialized Investigations: Lead investigations on unresolved in-custody deaths and serious injury resulting from misuse of force.

**Sheriff**, **San Francisco (2012--2016):**

Executive Administrator of a $193 million annual budget and department oversight of

1,046 sworn/civilian personnel, capital expenditures, union labor contracts, regulatory

compliance, hiring, adjudicated discipline, reentry/rehabilitation programming, legislation, policy,

co-led emergency management and five jails (rated-1600 beds) with approximately 22,000 annual

bookings and referrals to Pretrial Diversion.

- Co-Launched State Prisoner Realignment Pilot with San Quentin Prison and the SF Probation Department, to collaborate on a jointly delivered customized reentry regiment. Supervised Operating Protocols and contracts for facilitating staff training, reentry/rehabilitation program

implementation, and procurement of a $3 million grant by the State Senate with approval from the California Department of Corrections and Rehabilitation for a vertical reentry case management system.

- Modernized Reentry Program Implementation for criminogenic needs and co-occurring disorders (behavioral and substance abuse), workforce development readiness, and college bound credited courses.
- Replaced antiquated technology and instituted a Jail Management System that enabled greater communication with partner agencies for a more fluid teamwork approach on reentry outcomes and supervision.
- Commissioned Peer-Reviewed Analytics: Violent-Offenders Assessment; Body Cameras Deployment, Crisis Intervention Training, Misuse-of-Force – oversaw and approved survey methodology, analytical classifications, and results computation.
- Winner, 2015: Harvard University's Innovation in American Government Award. With the Five Keys Charter High School, co-represented department at finalist competition. Demonstrated a verifiable nexus for an in-custody diplomas-based education and a substantial reduction in recidivism. Applied $100,000 prize money back in the Five Keys.
- Winner: $80 million State Facility Award: Led two-year multidisciplinary design-and-planning task force to successfully compete for the Board of State Community Corrections funding of a prospective alternative Sheriff-Public Health facility (aggregate budget $400m).
- Shuttered CJ 3: Oversaw the permanent retirement of County Jail 3's 288-rated beds, located on the 6th floor of the Hall of Justice. Applied salary savings and staff redistribution to other SF jails.

**Board of Supervisors, San Francisco, (2005--2012)**:

Twice elected to the legislative branch governing San Francisco. Authored nearly 100 ordinances and charter amendments, relative to criminal justice reform, public safety—community policing, law enforcement accountability, poverty abatement, workforce development reform, environmental-climate protection, and government efficiency.

- Committee Chair: Public Safety and Government Audit Committees: Vetted fiscal audits over public safety agencies including jails and community corrections.
- Legislated the City's first Reentry Council: mandating participation of all funded agencies and designated contracted nonprofits; legislated the Community Corrections Partnership Law (applied analytical and case evidence performance metrics).
- Legislated enforceable laws and regulations for S.F. State Prisoner Realignment and the joint distribution of funding for municipal criminal justice agencies co-facilitating local Realignment (AB 109).
- Chair, Local Agency Formation Commission (LAFCO): Led policy advances for the creation and implementation of Community Choice Aggregation – municipalization of clean energy delivery.

◆   State Senate Appointed to the California Coastal Commissioner


**Special Prosecutions Investigator, District Attorney (1996--2005):**

Led cases on corruption, fraud, law enforcement misconduct, complex economic crime, and environmental crime; performed investigations with evidence-based analytics, composed, and executed search/arrest warrants. Lead investigator on seminal cases resulting in landmark consumer restitution and convictions. Detailed Metropolitan Medical Task Force to help develop a response to a domestic terrorism chemical, biological, and radiological incidence.

**Education, Credentials & Licenses**

◆   Master of Science, Environmental Management University of San Francisco
◆   Masters, International Affairs, Golden Gate University
◆   Bachelor of Arts in Political Science, Saint Louis University
◆   Monterey Institute of International Studies, Russian Language
◆   Peace Officer Standards and Training 830.1 PC Certified- S.F. Police Academy
◆   Advanced POST Certification
◆   Executive Law Enforcement Development 2015 Certification, F.B.I.
◆   Hazardous Materials Specialist, CA Office of Emergency Services
◆   Executive Certificate, National Center for Missing and Exploited Children
◆   Certified (CPO), National Association for Civilian Oversight of Law Enforcement
◆   Advanced Environmental Crimes & Forensics, Federal Law Enforcement Training Center
◆   US Navy Reserves, JICIPAC 1194 (Naval Intelligence, TS), Honorable Discharge, 2003
◆   Certified Protection Professional, (CPP), ASIS International
◆   Certified Corrections Executive (CCE), American Correctional Association
◆   Certified, Homeland Security Protection Professional (CHPP), National Sheriff's Association
◆   Certified, Transportation Security-Safety Professional (TSSP), U.S. Dept. of Transportation


## PREVIOUS CASES


1. Aurora Vasquez, Hector Lozano v. County of Santa Clara, Department of Corrections, Santa Clara County; Case # 15CV288929
2. Brian Merrell Montgomery v. County of Alpine; Case # A-18-1497
3. Estate of Andrew Chaylon Holland v. County of San Luis Obispo, SLO Sheriff's Department
4. Rickita James v. City of San Mateo, San Mateo Police Department

**EXPERT REPORT OF ROSS B. MIRKARIMI**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# ATTACHMENT 2

**EXPERT REPORT OF ROSS B. MIRKARIMI**

DOCUMENTS REVIEWED

1 Complaint - Norbert
8.2 Declaration of Terry Kupers
8.3 Declaration of Jamie Zeitzer
Zeiger Testimony Transcript
Declaration of Nicky Garcia,  filed on January 11, 2021,
Declaration of Kenyon Norbert, filed on January 11, 2021, as Document 197-3,
Declaration of Michael Alexis, filed on January 11, 2021, as Document 197-4,
Declaration of Joshua Beloy, filed on January 11, 2021, as Document 197-5,
Declaration of Jose Poot.  filed on January 11, 2021, as Document 197-6,
Declaration of Armando Carlos, filed on January 11, 2021, as Document 197-7,
Declaration of James McFarland , filed on January 11, 2021, as Document 197-8,
Declaration of Marshall Harris , filed on January 11, 2021, as Document 197-9.

J# 1_SHF Service and Cost Reduction Proposals FY2020-21...ntrollers Office - intentional mins violation for savings.xlsx
1_3C XCF CPL De-appropriation Entry Backup.xlsx
1_BVA Projections 2nd Half FY2018-19_ED_ADD_v2_to MBO SHF 2-21-19.xlsx
1_BVA Projections 2nd Half FY2018-19_ED_ADD_v2_to MBO SHF 3-5-19.xlsx
1_FY20-21 3 Month ch.xlsx
1_SHF Service and Cost Reduction Proposals FY2020-21 (1).xlsx
2_9-Month MOU Reserve (1).xlsx
3_FY20-21 12 Month Final 2021-Aug-05 (1).xlsx
Tables and Chart SFSO Staffing.xlsx
FW_ 3-Month Report - Revenue & Expenditure Projection - Oct 16 2020 -- for our meeting today at 1_30 PM (3).html
FW_ SHF General Fund Single File Analysis - Follow-up.html
FW_ temporary reduction of transfer amount - reminder.html
RE_ 3-Month Report - Revenue & Expenditure Projection - Oct 16 2020 (9).html
RE_ 3-Month Report - Revenue & Expenditure Projection - Oct 16 2020 (9).html
RE_ SHF - Regular Salary Savings.html
Re_ SHF OT shortfall.html
RE_ temporary reduction of transfer amount - reminder (1).html
RE_ temporary reduction of transfer amount - reminder (2).html
1_SHF_3-Month Budget Report to Supervisors 11-20-20 (1).pdf
2018.01.08 Arbitrator Cohn's Opinion and Award only.pdf
( 2020 Budget Request. pdf
4 2022_23 Budget Request.pdf
# 210505 Step 3 Grievance w Exhibits.pdf
E 220223 STEP 3 Greivance to ERD - Minimum Staffing Grievance for SFDSA.pdf
7 220330 DSA RFI response.pdf
220407 Steps 1-2 Denial of Appointment above Entrance Rate Grievance.pdf
220426 Step 3 Grievance Denial of Appointment to Higher Entrance Rate.pdf
220506 Step 4 Grievance Denial of Appointment Above Entrance Rate.pdf
220809 Unfair Labor Practice Charge wExh 1-8; Notice of Appearance; POS.pdf

Background Investigative Services.pdf
Briefing Sheet - Recruitment 22-23.docx
Budget request to Sheriff.pdf
[ Civil Grand Jury Complaint Against SF Sheriff.pdf
[ COVID Emergency Hiring Letter - January 26 SFSO (1).pdf
W= FY 2021-22 Budget Submittal Letter V2.docx
# FY2022-23 Budget Submittal Letter Final Signed.pdf
Letter to Mayor Breed with incentive promises COVID Emergency Hiring Letter -  January 26 SFSO (1).pdf
Letter to the Board of Supervisors.pdf
Letter to the Sheriff (1).pdf
Mail - President - Miyamoto Denied Pay Step Increase Outlook.pdf
Mail - President - Outlook- Recruiting.pdf
Mail - President - Recruiting 2 Outlook.pdf
Meeting SFDSA arranged to fight for increased budget.  At the meeting Miyamoto did not fight for an increased budget..pdf
Membership Survey - 2021.pdf
Recruiting and Hiring 08032022.pdf
Salary Savings in the SF Sheriff's Dept (1).pdf
See Paragraph 1D retracted all incentives from the budget. FY2022-23 Budget Submittal Letter Final Signed (1).pdf
SFDSA Side Letter Agreement Longevity MBS 02252020.pdf
SFDSA Side Letter Agreement Retention Pay MBS 02252020.pdf
SFDSA Staff Report Draft v4.docx
SFDSA Staff white paper (1).pdf
SFSO Job Satifaction Survey Results.pdf
SHF -Sheriff Staffing Report 06.19.19_0 (1).pdf
Staffing Issue request to add incentives for retention - full.pdf
Staffing Level Updates.pdf
STEP 2.pdf
1 Complaint - Norbert
8.2 Declaration of Terry Kupers
8.3 Declaration of Jamie Zeitzer
Zeiger Testimony Transcript
Declaration of Nicky Garcia,  filed on January 11, 2021,
Declaration of Kenyon Norbert, filed on January 11, 2021, as Document 197-3,
Declaration of Michael Alexis, filed on January 11, 2021, as Document 197-4,
Declaration of Joshua Beloy, filed on January 11, 2021, as Document 197-5,
Declaration of Jose Poot.  filed on January 11, 2021, as Document 197-6,
Declaration of Armando Carlos, filed on January 11, 2021, as Document 197-7,
Declaration of James McFarland , filed on January 11, 2021, as Document 197-8,
Declaration of Marshall Harris , filed on January 11, 2021, as Document 197-9.

**EXPERT REPORT OF ROSS B. MIRKARIMI**