**LAW OFFICE OF YOLANDA HUANG**
Yolanda Huang, SBN 104543
PO Box 5475
Oakland, CA 94605
Telephone: (510) 329-2140
Facsimile: (510) 580-9410
Email: yhuang.law@gmail.com

**GREENFIRE LAW, PC**
Rachel Doughty, SBN 255904
Richard Brody, SBN 100379
P.O. Box 9055
Berkeley, CA 94707
Telephone: (510) 900-9502
Facsimile: (510) 900-9502
Email: rdoughty@greenfirelaw.com
rbrody@greenfirelaw.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO/OAKLAND DIVISION

| | |
|---|---|
| KENYON NORBERT, TROY MCALLISTER, MARSHALL HARRIS, ARMANDO CARLOS, MONTRAIL BRACKENS, MICHAEL BROWN, and JOSE POOT, on behalf of themselves individually and others similarly situated, as a class and Subclass,<br><br>Plaintiffs,<br><br>vs.<br><br>SAN FRANCISCO COUNTY SHERIFF'S DEPARTMENT, CITY AND COUNTY OF SAN FRANCISCO, SAN FRANCISCO SHERIFF VICKI HENNESSEY; CHIEF DEPUTY SHERIFF PAUL MIYAMOTO; CAPTAIN JASON JACKSON, CAPTAIN MCCONNELL and John & Jane DOEs, Nos. 1 - 50.<br><br>Defendants. | Case No.: 3:19-cv-02724 SK<br><br>**PLAINTIFFS' PROPOSED FINDINGS OF FACTS AND CONCLUSIONS OF LAW (SUBJECT TO AMENDMENT POST-TRIAL)**<br><br>TRIAL: AUGUST 8, 2023<br><br>HON. SALLIE KIM, PRESIDING |

- 1 -

**Table of Contents**

I.      **INTRODUCTION** ................................................................................................... - 3 -

II.     **FINDINGS OF FACT AND LAW** ....................................................................... - 4 -

   A.  850 Bryant Street (CJ4) ......................................................................................... - 4 -

   B.  1 Moorland Drive (CJ3, or San Bruno) ................................................................. - 4 -

   C.  The BSCC ............................................................................................................... - 5 -

        1.   State Minimum Built Environment for Type II Facilities (Title 24) ............. - 6 -

        2.   State Minimum Conditions of Confinement (Title 15)................................... - 7 -

        3.   No Legal Mechanism for Waiver of BSCC Minimum Requirements........... - 7 -

   D.  Operation of the Jail .............................................................................................. - 9 -

        1.   Testimony of Ken Lomba, President of the San Francisco Deputy Sheriffs'
            Association.................................................................................................... - 9 -

        2.   Testimony of Various Deputies .................................................................... - 9 -

        3.   Testimony of Ross Mirkarimi, Former San Francisco Sheriff ..................... - 9 -

        4.   Testimony of Paul Miyamoto ....................................................................... - 9 -

        5.   Testimony of Dr. Jaime Zeitzer .................................................................... - 10 -

        6.   Testimony of Montrail Brackens ................................................................... - 10 -

        7.   Testimony of Troy McAllister ...................................................................... - 10 -

        8.   Testimony of Jose Poot ................................................................................. - 11 -

        9.   Observations of the Court .............................................................................. - 11 -

   E.  The Science of the Denial of Sunlight ................................................................... - 12 -

        1.   Testimony of Charles Czeisler, M.D. ........................................................... - 12 -

        2.   Testiony of Jaime Zeitzer, Ph.D. .................................................................. - 14 -

   F.  Defendants' Duties Under the 14th Amendment ..................................................... - 15 -

        1.   Evolving Standard.......................................................................................... - 16 -

        2.   Affirmative Duty of Care to Not Cause Long Term Disability in Detainees. - 19 -
            -

        3.   14th Amendment Duties not Discharged for Mere Inconvenience or Lack of
            Funds............................................................................................................. - 21 -

        4.   The Deprivation of Sunlight in the San Bruno Jail Violates the Fourteenth
            Amendment.................................................................................................. - 22 -

**Plaintiffs' Proposed Findings of Facts and Law-- Case No.: 3:19-cv-02724 SK**

1

## I.   INTRODUCTION

2

The Plaintiffs, all pretrial inmates, brought this class action suit seeking declaratory and

3

injunctive relief,[1] asserting that the San Francisco County Sheriff's Office and the City and County

4

of San Francisco, through their actions, have violated the Fourteenth Amendment to the United

5

States Constitution, Article I, Sections 7 and 17 of the California Constitution, and 15 Cal. Code of

6

Regs. § 1065 in that they have created serious and significant harm and the risk of harm to inmates

7

at the San Francisco County Jail at San Bruno ("CJ3") first because inmates are "completely

8

denied all access to sunshine, and completely denied any outdoor recreation," and second, as a

9

result of the policy and practice of locking up inmates in excess of 23 hours a day.[2] ("Complaint,"

10

ECF 1, p. 1)

11

There are two classes of plaintiffs and two sub-classes certified in this case:

12

(a) Class 1 ("Outdoor Class"): All inmates who are pretrial detainees and
have been incarcerated in San Francisco County Jail 3 (formerly known as County

13

Jail 5) located in San Bruno, California, at any point during the time period May
20, 2017 to the present, and who do not have outdoor access as part of their

14

incarceration at San Francisco County Jail 3.

15

(b) Class 2 ("Confinement Class"): All inmates who are pretrial detainees

16

and have been incarcerated in County Jail 3 (formerly known as County Jail 5)
located in San Bruno, California, at any point during the time period from May

17

20, 2017 to the present, and who have fewer than one (1) hour per 24 hour period
of time out of their cells as part of their incarceration at San Francisco County Jail

18

3.

19

(1) Subclass 1 ("Confinement Subclass 1"): All inmates in the

20

Confinement Class who are classified by the San Francisco County Sheriff's
Office in general population housing.

21

(2) Subclass 2 ("Confinement Subclass 2"): All inmates in the

22

Confinement Class who are classified by the San Francisco County Sheriff's
Office in administrative segregation housing.

23

(ECF 238)

24

25

26

27

---

[1] Plaintiffs also sought damages, which this Court has held were not available when a Rule 12(b)(20 class was certified.

28

[2] Originally Plaintiffs included post-conviction inmates and claims under the 8th Amendment to the U.S. Constitution,
which were dismissed. (ECF 110).  Defendants stated that 93.71% of the inmates at County Jail 4 are pretrial.  ECF 42-1
¶15.

## II.     FINDINGS OF FACT AND LAW

### A.     850 Bryant Street (CJ4)

1.     Originally, this case included the San Francisco jail at 850 Bryant Street ("CJ4"), which has closed during the pendency of this case. Inmates at 850 Bryant Street who were housed in administrative segregation were held in their cells for 23.5 hours per day. The 850 Bryant jail facility had no outdoor facility for inmates. The jail at 850 Bryant Street was closed in 2020, and all inmates moved to the San Bruno jail facility.

### B.     1 Moorland Drive (CJ3, or San Bruno)

2.     The San Francisco jail at 1 Moorland Drive in San Bruno, San Mateo County ("CJ3" or "San Bruno," formerly designated as CJ 5) was inaugurated in 2006. The City and County of San Francisco owns the land where its jails are sited. CJ 3 replaced an adjacent jail that was activated in 1934, operating for seven decades, finally succumbing to disrepair and seismic instability.

3.     The 1934 jail at San Bruno had a large outdoor yard, the outline of which can still be seen on satellite view (e.g., Google Maps).

4.     Due to concerns by nearby residents, in 1997, a proposal to build a replacement jail was opposed by the San Bruno City Council.

5.     On the spectrum of categorizing minimum to maximum security detention facilities, CJ 3 is designated by the California Board of State Community Corrections (BSCC) as a Type II facility, defined as "a local detention facility used for the detention of persons pending arraignment, during trial and upon a sentence of commitment." 24 CCR §1231.1.

6.     CJ 3 has a rated bed capacity for 768 incarcerated individuals. The newly built San Bruno jail (CJ 3) consists of 16 cell blocks laid out in a semicircle in front of the deputy station with a central control panel, giving the deputy sheriff a line-of-sight view of the communal area and into each cell through clear polycarbonate walls. Cells hold two incarcerated individuals, so each housing pod has the capacity of 48 incarcerated individuals with an A and B side for a total capacity of 96

people in housing custody units. Each cell block was designed to have an indoor recreation area with a basketball hoop.

7.     CJ3 was intentionally constructed with no outdoor space for detainees.

8.     CJ3 was designed to operate by a Direct Supervision Model, which is to say that it was constructed to allow for the managing and monitoring of incarcerated individuals from a raised deck-floor for deputies and senior deputy staff.

## C.     The BSCC

9.     California Penal Code § 4015 (adopted 1941) states (emphasis added):

(a) The sheriff must receive all persons committed to jail by competent authority. The board of supervisors shall provide the sheriff with necessary food, clothing, and bedding, for such prisoners, which shall be of a quality and quantity *at least equal to the minimum standards and requirements prescribed by the Board of Corrections for the feeding, clothing, and care of prisoners* in all county, city and other local jails and detention facilities.

10.     California Courts have affirmed utilizing the standards established by the California Board of Corrections (predecessor to the current Board of State and Community Corrections) for the Legislature's intentions on the "minimum standards" in addition to "objective indicia" in assessing the constitutionality of jail conditions. *Inmates of the Riverside County Jail v. Clark* 144 Ca. App. 3d 850, 861 (4th DCA, 1983)

11.     The State Penal Code directs the California Board of State and Community Corrections' ("BSCC") to establish minimal standards for "health and sanitary conditions, fire and life safety, security, rehabilitation programs, recreation, treatment of persons confined in local correctional facilities, and personnel training." Cal. Penal Code § 6030(b).

12.     BSCC has promulgated regulations establishing the minimal physical plant requirements for detention facilities pursuant to Penal Code § 6030(b) in the State Building Code (Title 24 of the California Code of Regulations).

13.     BSCC has promulgated regulations establishing the minimal standards for the operation of detention facilities pursuant to Penal Code § 6030(b) in Title 15 of the California Code of Regulations.

14.     Article XI, section 7 of the California Constitution provides that municipalities may enact and enforce ordinances "not in conflict with general laws." The California legislature has preempted local power to establish minimum standards for local detention facilities, placing that responsibility instead with the Board of State and Community Corrections ("BSCC").[3] Cal. Penal Code § 6030 ("The Board of State and Community Corrections shall establish minimum standards for local correction facilities."); *see also Bldg. Indus. Ass'n v. City of Livermore*, 45 Cal. App. 4th 719, 724-726 (1996)(discussing preemption in analogous delegation of fire safety portions of Building Code).

### 1.      State Minimum Built Environment for Type II Facilities (Title 24)

15.     The BSCC promulgates regulations governing the minimal standards for construction of state and local detention facilities, including CJ3, a Type II Facility. These regulations are found in Title 24 of the California Code of Regulations, which is the State Building Code.[4] BSCC's Building Code regulations require outdoor exercise areas for all Type II facilities:

> An outdoor exercise area or areas must be provided in every Type II and Type III facility. The minimum clear height must be 15 feet (4572 mm) and the minimum number of square feet of surface area will be computed by multiplying 80 percent of maximum rated population by 50 square feet (4.7 m2)[5] and dividing the result by the number of one-hour exercise periods per day.

> The exercise area must contain or provide free access to a toilet, wash basin, and drinking fountain as provided in Section 1231.3.

> There must be at least one exercise area of not less than 600 square feet (55.7 m2). The design shall facilitate security and supervision appropriate to the level of custody.

---

[3] Prior to 2012, this authority was lodged in the Corrections Standards Authority, and before 2005 in The Board of Corrections.

[4] Title 24 In 1978, California mandated that building standards be unified in a single code designated as Title 24, the California Building Standards Code. (SB 331, Robbins - https://www.dgs.ca.gov/BSC) *see* California's Health and Safety Code §18938(b) (Uniform Building Codes "shall" apply to all occupancies throughout the state), §18941.5 (localities may adopt more restrictive building standards).

[5] The Uniform Building Code requires 50 square feet per person for exercise. 2019 San Francisco Building Code 1004-Occupant Load.

Type IV facilities shall have an outdoor recreation area or access to community recreation facilities. "

24 Cal. Code Regs. § 1231.2.10.

### 2.        State Minimum Conditions of Confinement (Title 15)

16.        The BSCC promulgates regulations governing the minimal standards for operation of state and local detention facilities, including CJ3, a Type II Facility 15 Cal. Code Regs. § 1010(a).

17.        For inmates in general population, the minimum conditions of confinement require:

(a) The facility administrator of a Type II or III facility shall develop written policies and procedures for a minimum of 10 hours of out of cell time distributed over a period of seven days to include: (1) an opportunity for three hours of exercise. and (2) an opportunity for seven hours of recreation.

15 Cal. Code Regs. § 1065.[6]

18.        The BSCC requires that inmates in administrative segregation at a minimum:

" (h) Exercise. Inmates assigned to ASU [Administrative Segregation Units]  or SPHU ASU[Segregated Program Housing Units] shall be permitted a minimum of one hour per day, five days a week, of exercise outside their rooms or cells unless security and safety considerations preclude such activity. When ASU or SPHU are equipped with their own recreation yard, the yard periods may substitute for other out of cell exercise periods, providing the opportunity for use of the yard is available at least three days per week for a total of not less than 10 hours a week.

15 Cal. Code Regs. § 3343(h).

19.        Additionally, inmates in administrative segregation must minimally be allowed opportunity to shower and shave at least three times a week. Id. at (g).

### 3.        No Legal Mechanism for Waiver of BSCC Minimum Requirements

20.        Neither the BSCC nor the Defendants in this case may grant a waiver from the minimum standards of confinement established in Title 15 and Title 24.

21.        The power of the Board of Corrections to grant variances was revoked in 1986. *See* 15 Cal. Code Regs. § 1011.[7]

---

[6] At the time this case was filed, 15 Cal. Code Regs. § 1065(a) required "[t]he facility administrator of a Type II or III facility shall develop written policies and procedures for an exercise and recreation program, in an area designed for recreation, which will allow a minimum of three hours of exercise distributed over a period of seven days." This was amended to the current requirements, effective April 1, 2023.

[7] The California Code of Regulations Supplement is published weekly, so the historical note of repeal in Register 86, No. 32 means that the action repealing Section 1011 was taken in 1986, week 32. *See* https://oal.ca.gov/ccr_history/#:~:text=The%20CCR%20Supplement%20(Register)%20is%20organized%20by%20year%20and%20number,the%20week%20it%20was%20published (last accessed August 5, 2023).

22.     There is no unilateral right of a local government to ignore the minimum requirements set by the BSCC.

23.     Since 1988, the State has mandated that all local jurisdictions enforce the Building Code. California's Health and Safety Code §18938(b) (Uniform Building Codes "shall" apply to all occupancies throughout the state), §18941.5 (localities may adopt more restrictive building standards). San Francisco has acknowledged this limitation on its power. San Francisco Ordinance 225-22, Section 2(c) (Exhibit 10)(acknowledging that "[l]ocal jurisdictions must enforce the California Building Standards Code but they may also enact more restrictive building standards").

24.     San Francisco has acknowledged its limited power to amend the State Building Code, most recently in its adoption of its own Building Code in 2022. San Francisco Ordinance 225-22 (Nov. 1, 2022), Section 2(c) (acknowledging in the adoption of the 2022 San Francisco Building Code that "[l]ocal jurisdictions must enforce the California Building Standards Code but they may also enact more restrictive building standards").

25.     From 2017 through to the date of the discovery cut off in this case, August 19, 2022, defendant San Francisco Sheriff's Department has not complied with the out of cell requirements of Cal. Code of Reg. 15, § 3343(h), and no prisoner in administrative segregation received 1 hour per day of liberty, and an additional 3 hours per week for yard time or exercise.

26.     From 2017 through to the date of the discovery cut off in this case, August 19, 2022, defendant Sn Francisco Sheriff's Department has not provided any prisoner incarcerated at the San Bruno Jail with the opportunity for outdoor out of cell time.

27.     This Court issued a preliminary injunction on January 31, 2020, which ordered:

> 1.   that defendants provide inmates in administrative segregation no less than one hour in the gym, for five days a week absent disciplinary reasons or other emergency situations; and
>
> 2.   any pretrial detainee who had been confined for more than four years access to direct sunlight for at least one hour a week, absent disciplinary reasons or other emergency situations.

(ECF 110)

- 8 -

**D.     Operation of the Jail**

**1.     Testimony of Ken Lomba, President of the San Francisco Deputy Sheriffs' Association**

28.     From 2017 through to the date of the discovery cut off in this case, August 19, 2022, Defendant San Francisco Sheriff's Department has not complied with the physical space requirements of Cal. Code of Reg. 24 § 1231.2.10 for outdoor recreation space for incarcerated prisoners at CJ3.

29.     From 2017 through to the date of the discovery cut off in this case, August 19, 2022, Defendant San Francisco Sheriff's Department complied with the out of cell time and requirements of Title 15 at CJ3 for neither detainees in general population nor for those in administrative segregation/separation.

**2.     Testimony of Various Deputies**

30.     Inmates have no control over the lighting in CJ3.

31.     The Defendants maintain total control over the lighting at CJ3.

32.     Inmates have no control over whether they receive outdoor access at CJ3.

33.     The Defendants maintain total control over inmates' outdoor access at CJ3.

**3.     Testimony of Ross Mirkarimi, Former San Francisco Sheriff**

34.     Ross Mirkarimi was the elected San Francisco Sheriff from January 7, 2012, to March 20, 2012.

35.     There is no penological justification for denying every inmate in San Bruno jail access to sunlight.

36.     There is no penological justification for inflicting excessive night light on every inmate in San Bruno jail.

**4.     Testimony of Paul Miyamoto**

37.     Paul Miyamoto is the elected San Francisco Sheriff. He took office on January 8, 2020.

### 5.    Testimony of Dr. Jaime Zeitzer

38.    Artificial light is on 24/7 at the San Bruno County Jail.

39.    Prisoners are exposed to bright artificial light during the nighttime.

40.    The cells are double bunked, and the prisoners on the top bunk are exposed to considerable artificial light at night.

### 6.    Testimony of Montrail Brackens

41.    Class Representative Montrail Brackens has been incarcerated over 11 and a half years.

42.    When Mr. Brackens first entered the jail in 2012, he weighed 180 pounds. He is 5' 9" tall. Mr. Brackens currently weighs approximately 250 pounds.

43.    Defendants were monitoring Mr. Brackens for blood sugar issues, and on August 16, 2019, they diagnosed Mr. Brackens as diabetic. Since October 4, 2019, Mr. Brackens has been an insulin dependent diabetic.

44.    During the majority of his time in custody in a San Francisco County Jail, Mr. Brackens was housed in administrative segregation, where he received less than one hour out of cell per day, and less than 3 hours of exercise or gym opportunity per week.

45.    During the entirety of his time in the custody of the San Francisco Sheriff, Mr. Brackens has been afforded a total of less than 5 minutes hours.  Mr. Brackens outdoor time was solely the transit time from the bus into the Bryant Street Courthouse.

### 7.    Testimony of Troy McAllister

46.    Class Representative Troy McAllister, has been incarcerated a number of times in San Francisco County Jails.

47.    During each of his incarcerations, he was never permitted outside, nor provided with the opportunity to have outside access.

48.    His first incarceration in a San Francisco County jail was in 2009 at 850 Bryant Street, which lasted approximately 13-14 months. During his entire time at 850 Bryant Street, Mr. McAllister had no access to the outdoors and never felt sunlight on his skin. During these 13-14

months, Mr. McAllister, who is 6 feet tall, gained approximately 250 pounds and developed high blood pressure for which he was placed on medication while incarcerated at 850 Bryant Street.

49.     In 2012, Mr. McAllister was sent to San Quentin, a California State Prison. San Quentin has an outside yard(s) for prisoners. Mr. McAllister was provided access to an outdoor yard and direct sunlight every day during his time at San Quentin. During the incarceration at San Quentin, Mr. McAlister lost weight, and his blood pressure normalized, allowing him to go off of the high blood pressure medications he was prescribed while incarcerated at 850 Bryant Street.

50.     In July 2015, Mr. McAllister was incarcerated and placed in a San Francisco County Jail, this time at CJ3. When he first came to CJ3, his blood pressure was normal, 115/74. His weight was 182 pounds. By September, after two months of incarceration at CJ3, his diastolic pressure was up to 91. At the end of six months, he was diagnosed with hypertension. By March 2017, he was diagnosed with hyperlipidemia. In 2018, Troy McAllister weighed 212 pounds. Mr. McAllister never went outside or felt sunlight on his skin during this first incarceration at CJ3.

51.     Mr. McAllister was released from CJ3 in 2020. He was out of custody for 8 months, from Spring until December 31, 2020.

52.     Mr. McAllister returned to CJ3 on December 31, 2020, where he remains as a pre-trial detainee.   McAllister's current weight is 250 pounds.

### 8.     Testimony of Jose Poot

53.     Jose Poot has been incarcerated at CJ3 as a pre-trial detainee since 2016. When he first arrived, he weighed 135 lbs. He is 5' 4" tall. He now weighs 185 lbs.

54.     Jose Poot feels exhausted all of the time, regardless of time of day. Yet, when he attempts to go to bed, he cannot sleep. He reports memory problems, a lack of energy, and poor appetite.

### 9.     Observations of the Court

55.     The Court found at the time the preliminary injunction issued that inmates at the San Bruno facility who were housed in administrative segregation were held in their cells for 23 hours per

day. They were provided 30 minutes per day in the dayroom, 7 days a week, and access to the gym, 30 minutes, 7 days a week.

56.     This Court previously held in an order on a motion to dismiss in this case that:

> for inmates who are required to spend 23 ½ hours in their cell each day, the amount of exercise allotted–180 minutes per week in County Jail 4 [CJ4, 850 Bryant] and 210 minutes per week in County Jail 5 [CJ3, San Bruno], respectively – is not sufficient to offset Plaintiffs' restriction to their cells. The conditions of those Plaintiffs' confinement therefore violate the Eighth and Fourteenth Amendments. The issue is not whether the inmates who are confined to their cells for 23 ½ hours a day are allowed to exercise outside but whether the amount of time they receive to exercise out of their cells and spend time out of their cells violates the Constitution. That society would incarcerate a human being – who has not yet been found guilty and therefore is legally innocent and who has not committed a specific disciplinary violation – by locking him up in a small cell for 23 ½ hours a day is unacceptable.

(ECF 110, p. 3:-4:8)

### E.     The Science of the Denial of Sunlight

#### 1.     Testimony of Charles Czeisler, M.D.

57.     Dr. Charles Czeisler is the Baldino Professor of Sleep Medicine and Director of the Division of Sleep Medicine at Harvard Medical School and an Associate at Harvard University in Molecular and Cellular Biology. He is the Division Chief of Sleep Medicine at Brigham and Women's Hospital in Boston. Among his awards are the J.E. Wallace Sterling Lifetime Achievement Award in Medicine by Stanford University in 2019, and the Adrian Gold Medal from the Royal College of London. Dr. Czeisler was inducted into the Royal College of Physicians, London, UK in 2007 and is a full member of the Institute of Medicine of the National Academies.

58.     Expert Charles Czeisler testified that there is a scientific consensus that prolonged and total deprivation of the sun's rays onto bare skin causes a variety of severe health problems. These are:

> i.     Difficulty sleeping at night, sleep interruption, sleep deficiency, insomnia, or sleep apnea,
>
> ii.     Obesity, especially weight gain while in jail,

iii.   Hypertension and cardiovascular disease

iv.   Diabetes/high blood sugar,

v.   Digestive diseases, such as ulcers, Crohn's Disease, ulcerative colitis, and Inflammatory bowel disease,

vi.   Bone disease such as osteoporosis,

vii.   Multiple forms of cancer including prostate cancer, liver cancer and lung cancer,

viii.   Metabolic Syndrome,

ix.   Migraine headaches, epilepsy,

x.   Death from COVID-19 and all-cause mortality.

59.   The negative physiological effects of the impacts of sunlight deprivation listed in paragraph 58 may be observed a portion of the population starting after two months of sunlight deprivation.

60.   Approximately 20 percent of the general population are genetically predisposed to more rapidly feel the physiological effects of sunlight deprivation listed in paragraph 58.

61.   Other elements of the conditions of confinement exacerbate the effects of sunlight deprivation in class members. For instance, excessive night light disrupts the circadian rhythm and human metabolic processes. The lack of sunlight coupled with the excessive night time light caused by artificial light being on 24 hours per day, 7 days per week causes the prisoners' to have disruption of their circadian rhythm.

62.   Circadian timing synchronizes the daily oscillation of internal clocks of different tissues such as liver, skeletal muscle, adipose tissue and pancreas. The synchronization of different tissue clocks produces coordination of the metabolic processes including glucose metabolism, lipid metabolism, mitochondrial oxidation and insulin secretion. The disruption of the prisoner's circadian timing disrupts the molecular clock which affects melatonin production and cortisol production, which contributes to obesity, diabetes and other metabolic diseases.

- 13 -

63.     Disruption of the human circadian rhythm causes pathologies in metabolic tissues. The physiological injuries may be seen as soon as 30 days after denial of sunlight.

64.     Vitamin D deficiency is an indicator of lack or insufficient skin exposure to sunlight. However, supplementing with oral Vitamin D is not a replacement for skin exposure to sunlight. Supplementing with oral Vitamin D does not prevent or ameliorate most of the physiological harms caused by the lack of sunlight including the increased risks of hypertension and cardiovascular disease, inflammatory bowel disease, multiple forms of cancer, metabolic syndrome, diabetes, death from COVID-19 and all-cause mortality.

65.     Dr. Czeisler testified that it was his opinion that depriving pre-trial detainees of all access for sunlight constitutes reckless disregard for inmates' health or safety.

66.     Dr. Czeisler testified that scientists cannot ethically create an experiment in which people are deprive themselves of direct sunlight for more than 30 days because such a study is unethical.

### 2.     Testiony of Jaime Zeitzer, Ph.D.

67.     The exposure to artificial light at night:

   i.     disturbs the inmates' sleep,

   ii.     inducing excessive daytime sleepiness,

   iii.     impairing the neurobehavioral performance of inmates and

   iv.     increases the risk of medical conditions including:

      a)     obesity

      b)     metabolic syndrome and diabetes,

      c)     cardiovascular disease,

      d)     sleep disorders,

      e)     multiple forms of cancer and

   v.     increases the risk of adverse mental health consequences including symptoms of depression, anxiety an attention deficit hyperactivity disorder.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**F.    Defendants' Duties Under the 14ᵗʰ Amendment**

68.    The Plaintiffs are pretrial detainees, and so their rights are evaluated under the 14ᵗʰ Amendment to the U.S. Constitution.

69.    The Fourteenth Amendment provides: "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

70.    The Ninth Circuit recently explained the test governing the claims of pretrial detainees in this case:

> Precedent teaches that "the Fourteenth Amendment is more protective than the Eighth Amendment 'because the Fourteenth Amendment prohibits all punishment of pretrial detainees.'" By this standard, "[f]or a particular governmental action to constitute punishment, (1) that action must cause the detainee to suffer some harm or 'disability,' and (2) the purpose of the governmental action must be to punish the detainee." This requires showing at least reckless disregard for inmates' health or safety.

*Norbert v. City & Cnty. of San Francisco*, 10 F.4th 918, 928 (9th Cir. 2021) (citations omitted).

71.    "Courts evaluating the claims of pretrial detainees under the Fourteenth Amendment may nevertheless rely on the same analytical framework for those sentenced under the Eighth Amendment." *Hernandez v. County of Monterey*, 110 F. Supp. 3d 929, 934 (ND CA, 2015). If a prison condition violates the Eighth Amendment standards for convicted prisoners, then it necessarily violates the more demanding standard under the Fourteenth Amendment which prohibits *any* punishment, and not just cruel and unusual punishment. *Thomas v. Baca*, 514 F. Supp. 2d 1201 (C.D. Cal. 2007).

72.    As this Court has explained in this case:

> The key to the analysis under the Fourteenth Amendment is whether a specific practice in a facility for pretrial detainees equals 'punishment.' Thus, a 'court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose.' If there is no 'expressed intent to punish,' that analysis 'generally will turn on 'whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the

- 15 -

alternative purpose assigned [to it].' If the condition is 'reasonably related to a
legitimate nonpunitive objective, it does not, without more, amount to
punishment.' Legitimate objectives include both insuring that the pretrial detainee
is available for trial and to facilitate the effective management of the jail.

(ECF 110 at 24 (internal citations omitted)).

### 1. Evolving Standard

73.     What constitutes punishment changes over time as society's expectations change. The Supreme Court has held that the Eighth Amendment's imposition of constitutional limits upon punishment, is to be interpreted "in a flexible and dynamic manner", [citing *Gregg v. Georgia,* 428 U.S. 153, 171 (1976)]. *Rhodes v. Chapman*, 452 U.S. 337, 345. In the seminal case of *Trop v. Dulles*, 356 U.S. 86 (1958), the U.S. Supreme Court held that the words of the eighth amendment "are not precise," and "their scope is not static." *Id.* at 100-01. Therefore, "[t]he Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Id.* at 101.

74.     A good example of a shift over time is exposure to second hand smoke. In *Helling*, the Supreme Court held that the evolving standard of decedent extended to second-hand smoke:

> Also with respect to the objective factor, determining whether McKinney's conditions of confinement violate the Eighth Amendment requires more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by exposure to [environmental tobacco smoke]. It also requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk. In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate.

*Helling v. McKinney*, 509 U.S. 25, 36 (1993).

75.     The Supreme Court has instructed that judgments regarding the Eighth Amendment needs to be based upon "'objective indicia' derived from history, the action of state legislatures, and the sentencing by juries. *Gregg v. Georgia*, supra, at 176-187; *Coker v. Georgia*, supra, at 593-596." *Rhodes v. Chapman*, supra. at 346-347.

76.     In this case, the state legislature has spoken. For decades California has placed lodged authority solely with the BSCC to set *minimum* standards for (1) the physical structure within which

detainees can be housed (Title 24), including the availability of sizeable outdoor space at all Type II detention centers, without exception, and for (2) the operation of detention facilities (Title 15), including out of cell time. The Defendants have violated these minimum standards.

77.     In *Inmates of the Riverside County Jail v. Clark* (1983, "*Riverside*"), California's 4th District Court of Appeal court sustained a finding that housing conditions of pretrial detainees was punishment without due process of law in violation of Cal. Const. art. I, § 7, and housing conditions for sentenced prisoners constituted cruel or unusual punishment in violation of Cal. Const. art. I, § 17. The appellate court affirmed the reliance of the court below on the "objective indicia" found in Cal. Code Regs. tit. 15, §§ 1000 et seq. to determine reasonable criteria and contemporary standards of decency. *See* 144 Cal.App.3d 850 at 860-861. In so holding, the California 4th District Court of Appeal noted that although it would be inappropriate for a court to rely inappropriately upon the BSCC's standards "as fixing constitutional minima," "[i]t was proper for the court to accord great weight to the Board of Corrections' minimum standards" and to consider those along with the court's own observations of the facility and testimony regarding "contemporary standards of decency which prevail in California."[8] *Inmates of the Riverside Cty. Jail v. Clark*, 144 Cal. App. 3d 850, 861 (1983).

78.     In *Castro v. City of Los Angeles*, the 9th Circuit held that Los Angeles's adoption of the California Building Code, which contained certain requirements for "sobering cells" which were not complied with at a Los Angeles jail, was "substantial evidence" supporting a finding "that the County knew that its cell design might lead to a constitutional violation among its inhabitants. 833 F.3d 1060, 1076-1077 (9th Cir. 2016). Here San Francisco also has adopted the Building Code, which contains Title 24's requirement for outdoor recreation facilities at all detention facilities. San Francisco Ordinance 225-22 (2022).

79.     *Castro* was relied upon by *Grizzle v. Cty. Of San Diego*, in which the court ruled in favor of detainee plaintiff, holding:

> Taking Plaintiff's allegations as true, Sheriff Gore, as the relevant policymaker, had actual and constructive notice that the implemented schedule violated Plaintiff's right to outdoor yard time. *See* CAL. CODE REGS., tit. 24 § 1231.2.10 (2018) ("An outdoor

---

[8] Note that here, like in *Riverside*, the Court has observed the facility at issue. *See* ECF 110, p. 12:16-18.

exercise area or areas must be provided in every Type II and Type III facility."). Like in *Castro*, where the county's failure to conform to approved ordinances constituted as deliberate indifference, Plaintiff's allegations that Sheriff Gore's failed to conform to the approved requirements suggests the County was deliberately indifferent. Similarly, Plaintiff has sufficiently alleged that Sheriff Gore knew from Plaintiff's notice, and should have known, that the implemented schedule's consequence of forcing detainees to choose between constitutionally protected sleep and exercise violated their rights. Plaintiff alleges sufficient facts that the County, through its schedule and customs derived from it, was deliberately indifferent to his constitutional rights. Plaintiff adequately alleges the County is liable for these claims.

No. 17-CV-813-JLS, 2018 U.S. Dist. LEXIS 131014, at *24-25 (S.D. Cal. Aug. 3, 2018).[9]

80.    The Northern District of California, in *Pierce v. City and Cnty. of San Francisco*, relied in part upon Title 15 of the Code of Regulations, which are also promulgated by the BSCC to establish minimum standards for local detention facilities, to determine the constitutionality of conditions of confinement in another San Francisco detention facility.[10] *See Pierce*, No. 19-cv-07659-JSW, 2022 U.S. Dist. LEXIS 218869, at *8 (N.D. Cal. Dec. 5, 2022).

81.    Additionally, the California Attorney General issued an opinion that the BSCC's standards do not impose an unfunded mandate or a "new program" on localities, but simply establish what is objectively "suitable" for conditions of confinement in California.[11] California Attorney General Opinion 99-1214 (May 2, 2000). Put another way, the BSCC's standards simply memorialize current community standards of decency. The Attorney General's opinion cited to *Riverside* for the principle that "minimum standards set by Board for local detention facilities reflect constitutional requirements."[12] *Id.* That 2000 Attorney General opinion, which dealt with juvenile facilities, noted that the BSCC's "minimum standards" "constitute objective criteria which are needed to ensure that facilities remain suitable places for the confinement of minors." *Id.*

---

[9] Notably, the Court also held that the *Grizzle* "Plaintiff has alleged a constitutional violation in being denied outdoor exercise for eight months." 2018 U.S. Dist. LEXIS 131014 at 13. Eight months is far less time than what has been served by many of the class members in this case.

[10] In other respects, the circumstances of *Pierce* are distinguishable, fact based, and offer at most, persuasive authority. *See NASD Dispute Resolution, Inc. v. Judicial Council*, 488 F.3d 1065, 1069 (9th Cir. 2007) ("a district court opinion does not have binding precedential effect")

[11] Opinions of the Attorney General, while not necessarily controlling, should be accorded "great weight" as to the meaning of a constitutional provision or statute. *City of San Diego v. Shapiro*, 228 Cal. App. 4th 756, 773 (2014); *Cty. of Fresno v. Clovis Unified Sch. Dist.*, 204 Cal. App. 3d 417, 427 (1988); *Cent. Delta Water Agency*, 653 F.Supp. 2d at 1079 (such opinions are "judicially noticeable persuasive, but non-binding authority").

[12] California's Penal Code Section 2600 specifically requires that a person's deprivation of rights following conviction may only be "as is reasonably related to legitimate penological interests."

82.     This Court previously acknowledged that modern sensibility is that deprivation of sunlight is punishment, ruling that even if the Eighth Amendment does not require outdoor exercise for inmates held for lengthy periods of time, the Fourteenth Amendment does.[13] This Court, after a site visit to CJ3, ruled that:

> Even if the evidence shows that access to direct sunlight is not medically necessary, forcing people to live without direct sunlight for many years is simply punishment. As a point of comparison, scientific studies cannot even create a scientific experiment in which people voluntarily deprive themselves of direct sunlight because such a study is unethical. If even a voluntary study of that nature is unethical, then inmates' involuntary confinement here amounts to punishment.[14]

### 2.     Affirmative Duty of Care to Not Cause Long Term Disability in Detainees.

83.     Conditions of confinement that will cause a substantial number of pre-trial detainees to contract a long-term disability violate affirmative duty of care imposed upon jails.

84.     Unsafe conditions that pose an unreasonable risk of serious injury to an inmate's future health violate contemporary standards of decency. *See Banks v. Booth* 459 F. Supp. 3d 143, 153 (D.D.C. 2020)(inmates' claimed injury of the risk to contracting. Covid-19 is legally cognizable risk). "A jail violates both Amendments if it incarcerates inmates under conditions posing a substantial risk of serious harm to their health or safety (the objective prong), …. Unsafe conditions that "pose an unreasonable risk of serious damage to [an inmate's] future health" may satisfy this objective prong, even if the damage has not yet occurred and may not affect every inmate exposed to the conditions." *Hernandez v. County of Monterey*, 110 F. Supp. 3d 929, 934 (N.D. Cal. 2015).

85.     The United States Supreme Court has imposed on jails and prisons, the affirmative duties of care and protection for prisoners. Its treatment of medical care is instructive. Administrators of jails cannot simply deny prisoners medical care because "the Eighth Amendment's prohibition against cruel and unusual punishment, made applicable to the States through the Fourteenth Amendment's Due Process Clause, [cite omitted] requires the State to provide adequate medical care

---

[13] ECF 110 at 37.
[14] ECF 110 at 37 (citations omitted).

to incarcerated prisoners. 429 U.S., at 103-104. *We reasoned that because the prisoner is unable 'by reason of the deprivation of his liberty [to] care for himself,' it is only 'just' that the State be required to care for him.* [cite omitted] [emphasis added]. *Deshaney v. Winnebago County Dep't of Social Services*, 489 U.S. 189, 198-199.

86.     Similarly, the Supreme Court has held that those who are imprisoned, have a substantive right to safe conditions. *Farmer v. Brennan*, 511 U.S. 825 (1994)(inmates have the right to safety from injury suffered at the hands of another). The Court in *Farmer*, supra. at 834 cited Helling v. McKinney, 509 U.S. 25, (1993) for the proposition that "evolving standards of decency that mark the progress of a maturing society" is what should guide jurisprudence.

87.     *Helling*, cited above as authority regarding the standards of decency shifting to reflect changes in American society, is also instructive upon the duty owed by Defendants to prevent long-term disability. The *Helling* defendant prison had argued the claimant was not suffering immediate injury due to the environmental tobacco smoke and that the Eighth Amendment does not protect prisoners from future health problems. *Helling*, 509 U.S. at 33. The Court held that a prisoner stated an actionable claim for exposure to environmental tobacco smoke, as scientific consensus had arisen regarding its deleterious effects. *Id.* at 35. Before *Helling*, federal courts were divided on the actionability of prisoners' exposure to environmental tobacco smoke. *Gizzi*, *supra*, at 1117-18 (describing a circuit split on exposure to environmental tobacco smoke in prisons). Following *Helling*, prisoners successfully pleaded that smoke-filled environments violated their rights under the Eighth Amendment.

88.     The appellate courts in ten Circuits, including the 9th Circuit, have recognized state liability for state created danger. The protections of the Due Process Clause is triggered due to the State's affirmative act of restraining the individual's freedom to act on his own behalf--through incarceration, institutionalization, or other similar restraint of personal liberty--which is the "deprivation of liberty"

89.     In *Irish v. Fowler*, the 1st Circuit held that "under the state-created danger substantive due process doctrine, officers may be held liable for failing to protect plaintiffs from danger created

- 20 -

or enhanced by their affirmative acts." 979 F.3d 65, 67 (1st Cir. 2020)(cert. denied *Fowler v. Irish.*, 2021 U.S. LEXIS 4115 (U.S., Oct. 4, 2021). The context in that case was that the defendant police had left a voice message with a suspect in a criminal investigation triggering a criminal rampage by the recipient in which the plaintiff was harmed. In overturning a district court's grant of summary judgment on the basis of qualified immunity, the 1st Circuit noted steps that the defendant police failed to take to prevent harm, such as running a criminal background check or contacting the suspect's probation officer, and in so doing the court noted that the defendants failed to follow proper procedure and state law. *See also Okin v. Vill. of Cornwall-on-Hudson Police Dep't*, 577 F.3d 415, 428 (2d Cir. 2009); *Sanford*, 456 F.3d at 304-05; *Doe v. Rosa*, 795 F.3d 429, 439 (4th Cir. 2015); *Jane Doe v. Jackson Loc. Sch. Dist. Bd. of Educ.*, 954 F.3d 925, 932 (6th Cir. 2020); *D.S. v. E. Porter Cnty. Sch. Corp.*, 799 F.3d 793, 798 (7th Cir. 2015); *Fields v. Abbott*, 652 F.3d 886, 891 (8th Cir. 2011); *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1066 (9th Cir. 2006); *Estate of B.I.C. v. Gillen*, 710 F.3d 1168, 1173 (10th Cir. 2013); *Butera v. District of Columbia,* 235 F.3d 637, 652, 344 U.S. App. D.C. 265 (D.C. Cir. 2001).

### 3.     14th Amendment Duties not Discharged for Mere Inconvenience or Lack of Funds

90.     This Court has made clear that under the Fourteenth Amendment, a defendant cannot excuse a harm or disability on grounds such as generalized security concerns or expense but must have a legitimate excuse such as a specific security concern.

> Defendants cannot justify their denial of outdoor exercise based on a generalized concern about safety. . . . Defendants here claim that they are not able to provide outdoor exercise in a safe manner because there is no enclosed space outdoors for inmates to exercise. The City and County of San Francisco now claims that it lacks manpower to oversee pretrial detainees to exercise in the open field and that the pretrial detainees could escape because there are no viable fences. However, the City and County of San Francisco cannot create the problem of having no secure outdoor exercise area and then claim that concerns about safety require the denial of outdoor exercise. . . . When the City and County of San Francisco most recently constructed the County Jail 5, it chose not to renew the outdoor exercise area. Instead, the City and County of San Francisco constructed an indoor exercise area at the County Jail 5 with opaque windows. In essence, Defendants argue that they can only provide outdoor exercise by refencing the field and escorting inmates there one-by-one, and that system is too expensive. But the

Ninth Circuit rejected expense as an excuse in *Allen*, 48 F.3d at 1088, and *Spain*, 600 F.2d at 200. The City and County of San Francisco created the problem and cannot justify denying outdoor exercise with this self-created situation.

Dkt. No. 110 at 33.  ("Budgeting concerns, inconvenience, and even some safety concerns generally do not serve as legitimate government objectives.") (citing *Spain v. Procunier*, 600 F.2d 189, 200 (9th Cir. 1979)).

### 4.   The Deprivation of Sunlight in the San Bruno Jail Violates the Fourteenth Amendment

91.     Other prison conditions that produce injuries similar to those caused by the lack of sunlight, such as diabetes, hypertension, and cancer, have also been found to violate the Fourteenth and Eighth Amendments. *See*, *e.g.*, *Ball v. LeBlanc*, 792 F.3d 584 (5th Cir. 2015) (high temperature and humidity in prison causing diabetes and hypertension violated Eighth Amendment); *Masonoff v. DuBois*, 899 F.Supp. 782 (D. Mass.1995) (exposure to asbestos fibers potentially causing cancer violated Eighth Amendment); *Woulard v. Food Service*, 294 F. Supp. 2d 596 (D. Del. 2003) (inadequate medical care, resulting in bowel disease and diabetes, was Eighth Amendment violation).

92.     The evidence presented establishes that the prison condition depriving inmates of direct sun exposure causes obesity, diabetes, hypertension, and cancer, akin to the conditions causing the same and similar conditions and found to be unconstitutional by the *Ball*, *Masonoff*, and *Woulard* courts.

93.     The same is true of conditions of excessive confinement.

94.     Defendants have failed to identify any plausible penological justification for the total denial of sun light for pretrial detainees. There is no penological justification for failing to comply with Title 24's requirements for outdoor exercise space, and that there is no penological justification for the excessive lockdown of inmates at the San Bruno County jail and failure to provide no less than one hour of out of cell time per day with three hours of exercise opportunity per week.

Respectfully Submitted by:


Dated: 8/7/2023                              LAW OFFICE OF YOLANDA HUANG

                                     By:  */s/ Yolanda Huang*
                                          Yolanda Huang
                                          ATTORNEY FOR PLAINTIFFS