# Exhibit 1

1              UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3

4    - - - - - - - - - - - - - - -

5    KENYON NORBERT, et al.,      )

6              Plaintiffs,        )

7    vs.                          )  CASE NO.

8    SAN FRANCISCO COUNTY         )  19-cv-02724-SK (LB)

9    SHERIFFS DEPARTMENT, CITY    )

10   AND COUNTY OF SAN            )

11   FRANCISCO, et al.,           )

12             Defendants.        )

13   - - - - - - - - - - - - - - -

14

15          REMOTE DEPOSITION OF ROSS MIRKARIMI

16             TUESDAY, NOVEMBER 1, 2022

17             PAGES 1 - 132; VOLUME 1

18

19

20

21          BEHMKE REPORTING AND VIDEO SERVICES, INC.

22   BY:  ANGELA SINCLAIR, RMR, RPR, CRR, CCRR, CSR NO. 13902

23                   455 MARKET STREET, SUITE 970

24                   SAN FRANCISCO, CALIFORNIA 94105

25                        (415) 597-5600

1

2

3

4

5          Remote Deposition of ROSS MIRKARIMI, taken

6   on behalf of Defendants, located in San Francisco,

7   California, via Zoom videoconference, commencing

8   at 1:05 P.M. PST, TUESDAY, NOVEMBER 1, 2022, before

9   Angela Sinclair, Certified Shorthand Reporter No.

10  13902, pursuant to Notice of Deposition.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   APPEARANCES OF COUNSEL:

 2   FOR PLAINTIFFS AND THE WITNESS:

 3        LAW OFFICE OF YOLANDA HUANG

 4        BY:  YOLANDA HUANG, ATTORNEY AT LAW

 5             (VIA VIDEOCONFERENCE)

 6        528 Grand Avenue

 7        Oakland, California 94610

 8        Telephone: (510) 329-2140

 9        Email:  yhuang.law@gmail.com

10

11     -AND-

12

13        GREENFIRE LAW, PC

14        BY:  RACHEL DOUGHTY, ATTORNEY AT LAW

15             (VIA VIDEOCONFERENCE)

16        2550 Ninth Street, Suite 204B

17        Berkeley, California 94710

18        Telephone:  (510) 900-9502

19        Email:  rdoughty@greenfirelaw.com

20

21

22

23

24

25
```

```
1   APPEARANCES OF COUNSEL (CONTINUED):
2   FOR DEFENDANTS CITY AND COUNTY OF SAN FRANCSICO and
3   VICKI HENNESSY:
4        CITY AND COUNTY OF SAN FRANCISCO
5        BY:  SABRINA BERDUX, DEPUTY CITY ATTORNEY
6             (VIA VIDEOCONFERENCE)
7        1390 Market Street, Sixth Floor
8        San Francisco, California 94102
9        Telephone:  (415) 554-3929
10       Email:  sabrina.m.berdux@sfcityatty.org
11
12   ALSO PRESENT (VIA VIDEOCONFERENCE):
13       FRANCEY BEHMKE, ZOOM TECH
14
15
16
17
18
19
20
21
22
23
24
25
```

```
1                        INDEX

2   TUESDAY, NOVEMBER 1, 2022

3   ROSS MIRKARIMI - VOLUME 1                    Page

4       Examination by MS. BERDUX                 7

5

6                       --oOo--

7       QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:

8                    PAGE        LINE

9                        None.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        EXHIBITS

 2                ROSS MIRKARIMI - VOLUME 1

 3   Number              Description              Page

 4   Exhibit A        Expert report of Ross Mirkarimi

 5                    - 23 pages                      13

 6   Exhibit B        Deposition-Produced Documents

 7                    (Mirkarimi 001126 to 1319)

 8                    - 194 pages                     15

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              TUESDAY, NOVEMBER 1, 2022; 1:05 P.M.
 2                      ROSS MIRKARIMI,
 3                    affirmed as a witness,
 4                     testified as follows:
 5   EXAMINATION BY MS. BERDUX:
 6        A.  For the record, you can call me Ross, by the
 7   way.
 8        Q.  Great.  Likewise.  Call me Sabrina.  It's nice
 9   to meet you.  And I'm sorry I can't introduce myself in
10   person, but we've become well accustomed to Zoom
11   depositions now.  So hopefully it's convenient for you.
12        A.  It's okay.  Until my kids interrupt me, but
13   it's okay.
14        Q.  I can relate.
15             As we are on the record, I'm going to start by
16   giving you some basic admonitions and finding out
17   whether you've ever been in deposition before.
18             Have you ever given a deposition or trial
19   testimony?
20        A.  Yes.
21        Q.  Okay, great.  About how many times have you
22   given testimony under oath?
23        A.  I was in the DA's office for a number of years.
24   So I would say four or five.
25        Q.  Okay, great.  Have you given any deposition or
```

1    trial testimony as an expert?

2         A.  Trial testimony?  I've given deposition, yes,

3    three times.

4         Q.  Okay.  And is that sworn testimony in addition

5    to the testimony that you gave when you were in the DA's

6    office?

7         A.  This is separate of the DA's office.  Correct.

8         Q.  And did I hear you say that you had given sworn

9    testimony while you were with the DA's office about five

10   times?

11        A.  Yeah.  Maybe four, to be safe, because there

12   was mistrials.  So maybe four, to be safe.

13        Q.  Great.  All right.  That's all to say that, is

14   it fair that you've -- to assume that you've heard and

15   understand the standard ground rules or admonitions for

16   a deposition?

17        A.  Yes.  It's been a little while, but yes.

18        Q.  Great.  Well, that is, you know you're under

19   oath today and sworn to tell the truth under the penalty

20   of perjury; right?

21        A.  Right.

22        Q.  Great.  And that you should make sure you

23   understand my questions and speak up if you don't;

24   right?

25        A.  Yes.

1      Q.  Good.  And that you'll have the chance to go

2  back and review and change any errors to your testimony,

3  but any substantive, material, or important changes

4  could be used against you later on to question your

5  credibility; right?

6      A.  Yes.

7      Q.  Okay.  And don't guess or speculate today, but

8  if you can give me your best estimate, I am entitled to

9  have that.  You're familiar with that; right?

10     A.  Yes.

11         (Rachel Doughty enters the Zoom call.)

12  BY MS. BERDUX:

13     Q.  A reminder that we can take a break at any

14  moment for any reason.  I tend to power through, but I

15  do try to take a break every hour or so just to stretch

16  legs, get water, a bio break, whatever's needed.  But if

17  for any reason you need a break and I don't initiate it,

18  it's no problem, just speak up and let me know, okay?

19     A.  Okay.  Yes.

20     Q.  All right.  I'm going to get started.  Just

21  going to ask you some questions about when and how you

22  were retained on this case and kind of what you've done,

23  broad brushstrokes questions.

24         When were you first contacted about being an

25  expert in this case?

1       A.  The end of August 2022.

2       Q.  Who were you contacted by?

3       A.  Ms. Yolanda Huang.

4       Q.  When were you formally retained?

5       A.  About one week later.

6       Q.  What opinions were you retained to provide?

7       A.  I believe it was because of my experience as

8  sheriff for the City and County of San Francisco, and my

9  opinion about the operations within the jails as they

10 are fitted to manage the incarcerated while navigating

11 COVID restrictions and coming out of COVID restrictions.

12      Q.  So --

13      A.  And the third is -- and the third part to that

14 is the restrictions or prohibitions to the rights that

15 are supposed to be provided to the incarcerated in terms

16 of their access to fresh air, exercise, et cetera.

17      Q.  Okay.  And I'll get to those in a moment, but

18 I'm going to keep going with some kind of background

19 baseline questions.

20          How many hours have you spent on this case?

21      A.  I would estimate 40 hours, maybe more.  I'm

22 sure more.

23      Q.  You don't have to give me an exact number

24 unless, of course, you've tracked those hours or have an

25 invoice, but when you are estimating you can give me a

P 0056-000011

1   range.  You know, for example, if it was at least --

2   you're pretty confident it was at least 40 hours but not

3   more than 50 hours or something like that, please do

4   give me that.

5          Are you able to give me a range of the kind of

6   minimum or maximum hours you've spent on this case?

7      A.  40 to 60 hours.

8      Q.  Okay.  And is that including from the time that

9   you were first contacted in August '22 up to and

10  including today?

11     A.  Yes.

12     Q.  Okay.  Did you prepare any invoices for your

13  work?

14     A.  Not yet.  I was instructed to do so afterwards.

15     Q.  After what?

16     A.  Oh, I'm sorry.  After -- as it relates to this

17  deposition, otherwise my invoice was already determined

18  with Ms. Huang with regard to my declaration and my

19  deposition.  That was it.

20     Q.  Okay.  Hold on.  I'm not sure I'm

21  understanding.

22         Let me ask you this:  Did you invoice for any

23  of the time that you've worked on the case up until

24  today?

25     A.  No.  It was included in the price of the

1  arrangement I made with Ms. Huang.

2      Q.  Oh, got it.  Okay.  What is the price?

3      A.  As it's stipulated on the declaration, it was

4  $10,000 separate of the deposition, ergo the invoice to

5  be forthcoming.

6      Q.  Got it.  So you intend to invoice for your time

7  today; right?

8      A.  Correct.

9      Q.  Okay.  And will you send a separate invoice for

10 your trial testimony?

11     A.  Yes.

12     Q.  What will you charge for your trial testimony?

13     A.  I believe it's 500 an hour.  I believe that's

14 what's stated on the declaration, but I can verify that.

15     Q.  And when you're -- I want to make sure we're

16 talking about the same document.  When you're talking

17 about the declaration, are you talking about the

18 document that -- your expert report that you prepared

19 for this case?

20     A.  Correct.  I have it here.  Yes.

21     Q.  Okay.  I am just going to put a copy of that

22 into the chat, have you look over it to make sure we're

23 both looking and talking about the same thing.

24          So I've just put it into the chat here in Zoom.

25 It is C, Marshall Harris, and that's Exhibit C to the

1   expert disclosures in this case.

2          And if you could please open that, take a look

3   at it, and confirm that this is the expert report that

4   you've prepared in this case and, when you say "as

5   stated in my declaration," this is what you're talking

6   about.

7       A.  Okay.  I have it right here in front of me, but

8   sure.

9       Q.  Yeah.  I'm going to attach this as Exhibit A to

10  the deposition transcript.

11         (Deposition Exhibit A was marked.)

12  BY MS. BERDUX:

13      Q.  So you should feel free to review the paper

14  copy, if that's easier to you.

15      A.  It is.

16      Q.  I just want to make sure the electronic copy is

17  the same.

18      A.  Yep, it is the same.  And I'm looking at the

19  fee schedule on page 16.

20      Q.  Great.  Do you have any handwritten notes for

21  this case?

22      A.  Not at the moment.  But I'll give you some, if

23  you'd like.  If I generate any, I will be happy to give

24  you some.

25      Q.  All right.  Great.  Did you take any electronic

P 0056-000014

1  notes?

2       A.  Yes, I did.  I took a couple electronic notes

3  just a little while ago on a document that I e-mailed

4  Yolanda -- what I have before me are two consulting

5  reports from Sabot Consulting and then just a couple

6  electronic notes regarding that -- literally within just

7  the last hour or two.

8       Q.  Oh, okay.  What do those say?

9       A.  Well, I guess we'll get into the substance of

10  it, but for me the notes are trying to sync up to their

11  other expert reports about staffing adequacies or

12  inadequacies.

13       Q.  Okay.  And do you have a file in this case?

14       A.  I do not.

15       Q.  Did you have any materials that you've

16  collected for this case?

17       A.  That has been given to me by the attorney,

18  Yolanda Huang.  I have materials, correct.

19       Q.  Okay.  What materials were given to you?

20       A.  Well, a number of materials, because I believe

21  I've come in on the tail end of what has been

22  percolating for several years now.  So various expert

23  reports and any -- and various communications between

24  her and others within the sheriff's department.

25       Q.  Okay.  Let me put another document in here.

P 0056-000015

 1   We'll mark this as Exhibit B.

 2            (Deposition Exhibit B was marked.)

 3   BY MS. BERDUX:

 4       Q.  And I've put into the chat a PDF entitled

 5   "Deposition-Produced Documents."

 6            If you open the PDF, this is a collection of

 7   documents that are 194 pages long.  The tail -- the end

 8   of this production includes Sabot Consulting reports

 9   and -- which I think you had referred to.  And the

10   document begins with an e-mail correspondence, some

11   printed e-mail correspondences.

12       A.  Yes.

13       Q.  Are these the documents that you were given by

14   Ms. Huang to prepare your opinions?

15       A.  Some of these are familiar to me and some of

16   these are not.  That's all I can say.

17       Q.  What are -- what is not familiar to you?

18       A.  Let's see.  I have not seen the civil grand

19   jury report, but I am familiar with it.  By my own

20   accord I'm familiar with it.  That doesn't mean I wasn't

21   given it.  I just didn't read it either.  So --

22            MS. HUANG:  Mr. Mirkarimi?

23            THE WITNESS:  Yes.

24            MS. HUANG:  If you're looking at the same

25   document that I am, at the bottom right-hand corner I

1    believe it's Bates-stamped Mirkarimi with a number

2    following it.  Just so the record is clear, if you're

3    referring to a particular page, if you would just note

4    it for the record, then we would all be able to follow

5    it later on.

6                THE WITNESS:  Absolutely.

7                MS. HUANG:  Thank you.

8                MS. BERDUX:  Yes.  But I don't know if -- I

9    can't tell what the Bates stamp is on all of the pages.

10   For example, page 9 in the PDF itself, it looks like the

11   Bates stamp is over the page number, but then if we go

12   down to page 11 we can see the Bates stamp.

13               But that's helpful, we'll try to identify the

14   Bates stamp numbers as we go along.

15               MS. HUANG:  And I apologize.  I had to do this

16   because the rest of the staff is dealing with the

17   voluminous documents for Dr. Czeisler.  So it starts off

18   at 1126.  So we can just go from there.

19               MS. BERDUX:  Right.

20   BY MS. BERDUX:

21       Q.  So do you mind, Mr. Mirkarimi, can you tell me

22   or identify for me, either by the Bates stamp if

23   possible or the PDF page number if not, what documents

24   you had in your possession and used to prepare your

25   expert report in this case?

1     A.  I will do my best.  I'll have to go through the

2  almost 200 pages to let you know.

3     Q.  Some of them are -- well, some documents have

4  multiple pages.  Hopefully it's not too cumbersome.

5     A.  Well, it's going to take me a little bit.  So

6  you would like to know what I had or had not seen?

7     Q.  Right.

8     A.  Which?

9     Q.  Both.

10    A.  Okay.

11        MS. HUANG:  And you want him to do it on the

12  record, or do you want to take a break and have him do

13  it and come back?

14        MS. BERDUX:  Yeah, let's take a break.  We

15  don't need to all sit here while we're doing this.

16        MS. HUANG:  How long do you need,

17  Mr. Mirkarimi, do you think, to look at 194 pages?

18        THE WITNESS:  Why don't you give me about 15 or

19  20 minutes, please.

20        MS. BERDUX:  Yeah.  Hopefully you don't have to

21  read every single line, but yeah.

22        THE WITNESS:  Right.

23        MS. HUANG:  Shall we come back at 1:40?

24        MS. BERDUX:  Great.

25        THE WITNESS:  Thank you.

P 0056-000018

```
 1            (Break taken at 1:22 p.m.)
 2   BY MS. BERDUX:
 3        Q.  So have you had a chance to go through
 4   Exhibit B, the PDF of 194 pages?
 5        A.  I did.  I skimmed it all.
 6            And it's probably easier for me to say what I
 7   haven't seen.  Maybe it's been sent to me and I don't
 8   recall seeing it, and that is Bates stamp 00158 through
 9   61, 62 through 65, 1193 through 1200, and 1205 through
10   1240.  The rest look familiar to me.
11        Q.  Okay.  When did you receive this packet of
12   documents, this 194 pages?
13        A.  Geez, I don't -- it would had to have been in
14   September.  Had to have been in September, I suppose.
15   Potentially.
16        Q.  All right.  And the Bates stamps that you
17   identified you had just received today or. . .
18        A.  I'm sorry?
19        Q.  The Bates stamps that you identified that you
20   had not seen before has appeared today for the first
21   time in this Exhibit B that I published to the chat?
22        A.  Well, to my familiarity.  I just don't recall
23   seeing it, that's all.
24        Q.  Okay, great.  Did you review other documents to
25   prepare your expert report that are not included in this
```

1    Exhibit B package?

2        A.  I received several communications from

3    Ken Lomba, the DSA -- Deputy Chief Association

4    president, but they look like they paralleled all this,

5    the documents that are part of this package.

6        Q.  Meaning they're the same?

7        A.  I believe so, correct.  I'd have to go back and

8    check.

9        Q.  Okay.  Are there any e-mails that you received

10   from Ken Lomba that are not included in this package,

11   Exhibit B?

12       A.  There probably are, yes.  There probably are a

13   few nonsubstantive, but I would have to go back and

14   look.

15       Q.  Okay.  I will ask you to do that and give those

16   to Ms. Huang so that those can be produced.

17           Have you ever seen your deposition notice for

18   this case?

19       A.  My deposition notice?

20       Q.  Yes, the City's request for your deposition in

21   a written pleading form.

22       A.  Just the e-mail link.  No.

23       Q.  No.  Okay.  So you never saw a list of

24   documents that my office requested that you bring to

25   your deposition today?

1      A.  No.

2           MS. HUANG:  And I would note for the record

3  that we objected to many of those items, and the ones

4  that we did not object to were produced prior to the

5  deposition.

6  BY MS. BERDUX:

7      Q.  Did you prepare any documents to be produced

8  today at your deposition?

9      A.  Did I prepare any documents to be produced

10  today?

11      Q.  Yes.

12      A.  Well, any notes I might take I think would

13  absolutely be relevant and that I would produce those to

14  you.

15      Q.  Yeah.  I mean, before coming here today, did

16  you gather or assemble any documents that you used for

17  your -- to prepare your opinions in your report in this

18  case?

19      A.  Just notes that I've taken regarding the Sabot

20  Consulting reports.

21      Q.  And those are the notes I think you mentioned

22  you'd jotted down about an hour or so before the

23  deposition?

24      A.  This morning, correct.

25      Q.  This morning.  Okay.

1          When did you receive those Sabot reports?

2     A.  It's been a few weeks.  I just wanted to refer

3 back to them.

4     Q.  Okay.  Did you receive those Sabot reports

5 before or after you wrote your expert report?

6          MS. HUANG:  Which Sabot reports are you

7 referring to?  Are you referring to Mr. Martinez's, or

8 are you referring to the Sabot reports that are attached

9 to production today?

10          THE WITNESS:  Yes.  To be honest with you, I

11 received the Martinez reports after my deposition -- I

12 mean after my expert report and the consulting reports,

13 I believe, came to me, but I did not see those in

14 advance of my expert report.

15          The consulting reports regarding the

16 staffing -- sorry -- from Mr. Cowan.  The reports by

17 Mr. Martinez I did not see until after.

18 BY MS. BERDUX:

19     Q.  Okay.  Do you remember when you received the

20 reports prepared by Mr. Cowan?

21     A.  I don't, but I can find out.

22     Q.  Do you know if you received them before or

23 after you prepared your expert report?

24     A.  I'm going to say I received them before, but I

25 didn't really include them.  Did not include it.  So I

```
 1   don't believe I referred, referenced, or read any of it
 2   before.
 3        Q.  Or relied?
 4        A.  Correct.
 5        Q.  Okay.  Do you know why the reports are marked
 6   "confidential draft"?
 7        A.  No.  I'm sorry, who marked it?
 8        Q.  Who?
 9        A.  Yeah.
10        Q.  I don't know.  Yeah, I was just wondering if
11   you knew why they were marked "confidential draft," that
12   is, the reports of Patrick Cowan.
13        A.  I don't.  Sorry.
14        Q.  That's okay.
15             Okay.  So, yes, please take a look for those
16   e-mails that you would have between you and Mr. Lomba.
17   Those, I believe, should be produced for today.
18             And you mentioned you have handwritten notes.
19   Are those --
20        A.  Well --
21        Q.  I'm sorry, I wasn't sure if you said
22   handwritten or electronic, actually.
23        A.  Yeah, it's just kind of notes to the consulting
24   reports.  But I can submit to you both at the end
25   whatever there is.
```

1      Q.  Great.

2      A.  Yeah.  It -- yeah.  Do you want me to go look

3  at the -- for the e-mails from Mr. Lomba now?

4      Q.  No, not now.  I don't want to delay too much

5  longer.

6      A.  Okay.

7      Q.  But to the extent that they have new

8  information that wasn't produced today, I'll reserve the

9  opportunity to meet and confer with Ms. Huang about

10  asking you about those later.

11      A.  Okay.

12      Q.  Okay.  I think you said you didn't have a file

13  for this case?

14      A.  Maybe I'm misunderstanding you when you're say

15  a file.  Can you clarify what you mean by that?

16      Q.  Sure.  For your work on this case do you have a

17  file, either physical or electronic, where you've

18  collected information, notes, or correspondences

19  pertaining to your work on this case?

20      A.  I have not created a file, no.

21      Q.  All right.  Other than the e-mails from

22  Mr. Lomba, some of the documents that have been marked

23  as Exhibit B, did you review any other documents or

24  materials to prepare your opinions in this case?

25      A.  Well, I certainly did my research with the

P 0056-000024

1    BSCC, Titles 13 and 24.  Those are public documents.

2    And any issues stemming from the recent, the 2021, 2022

3    meetings regarding BSCC and the reforms that have been

4    considered or recommended for the Board of State

5    Community Corrections.

6            And I think that would be the crux of it beyond

7    anything that is before us now.

8        Q.  In your report at pages 22 and 23 there are a

9    list of documents.  And there's a slip sheet at page 21

10   entitled "Attachment 2."

11       A.  I don't have that.  You want to send that to

12   me?  I don't have it.  I'm sorry.

13       Q.  Oh, okay.  The report that you have in front of

14   you, how many pages is it?

15       A.  15 to my signed.

16       Q.  Okay.  And is that the report that you had

17   prepared?

18       A.  Correct.

19       Q.  Okay.  Did you submit any attachments to your

20   report?

21       A.  Hold on.  Well, it was required --

22            MS. HUANG:  I'm going to object as to vague and

23   ambiguous.

24            THE WITNESS:  Yeah, no, I have it, actually.

25            MS. HUANG:  I don't know what you're referring

P 0056-000025

1   to when you say "attachments."  Attachments when he

2   submitted them to you?  Because he didn't submit them to

3   you.  So I'm confused as to what you're trying to get

4   at.

5   BY MS. BERDUX:

6       Q.  Do you have any attachments to your expert

7   report in this case?

8       A.  What was asked of me, my CV.  I have now

9   page 23 in front of me.  So I'm looking at page 23.

10      Q.  What about page 22?

11      A.  Page what?

12      Q.  22.

13      A.  Yes, I have that too.

14      Q.  Okay.  And is page 22 titled "Documents

15  Reviewed"?

16      A.  Yes.

17      Q.  Okay.  And that goes over on to page 23?

18      A.  Yes.

19      Q.  Okay.  Did you prepare --

20      A.  And --

21      Q.  What?

22      A.  Did I prepare what?  I'm sorry.

23      Q.  Did you prepare this list of documents

24  reviewed?

25      A.  I did not.

```
 1        Q.  Do you know who did?
 2        A.  I imagine our attorney.
 3        Q.  Well, don't guess.  If you know, let me know.
 4   But if you don't know, it's okay to say you don't know.
 5        A.  I do not know.
 6        Q.  Okay.  Have you -- okay.
 7            When did you receive the list of documents
 8   reviewed in front of you?
 9        A.  When my declaration was signed or when my
10   witness report was finalized, I believe.
11        Q.  Is this a list of documents that you reviewed
12   to prepare your expert report?
13        A.  I would say some of these documents or a
14   healthy portion of them I've reviewed and seen.  Some of
15   them I have not, based on the descriptions provided.
16        Q.  Okay.  Can you go down the list and tell me
17   what documents you did not review to prepare your expert
18   report for this case?
19        A.  Okay.  Let's see.  That I did not.
20            I did not look -- I did not review Marshall
21   Harris, declaration of Marshall Harris.  I did not -- on
22   the declaration of James McFarland, I believe I did not.
23            Let's see.  Going further down, I don't know
24   what the top of the page "background investigative
25   services, briefing sheet recruitment."  I'm going to
```

1  guess it's just generic, but that doesn't ring a bell.

2       Q.  And that's the top item on page 23?

3       A.  Correct.

4       Q.  Okay.

5       A.  And again, the declarations on the bottom, same

6  people that I mentioned before.  Harris, I don't recall

7  McFarland but I could be mistaken about that, and Joshua

8  BeLoy.  But I believe everything else is fitting.  It's

9  accurate.

10      Q.  Okay.  And how did you obtain these documents

11 that you reviewed?

12      A.  I would --

13          MS. HUANG:  Ms. Berdux, I didn't hear the end

14 of your question.  Could you --

15          MS. BERDUX:  Oh, sure.  No problem.

16 BY MS. BERDUX:

17      Q.  How did you obtain the documents that you

18 reviewed on this list?

19      A.  I would say the large majority, if not all of

20 them, from Yolanda Huang.

21      Q.  And did you keep them anywhere?

22      A.  They may be sporadically in my e-mail system.

23      Q.  Do you know if they had Bates stamps?

24      A.  I don't.

25      Q.  Okay.  I will ask you -- well, would you still

P 0056-000028

1  have all of these documents that were given to you to

2  review?

3        A.  Yes.  If -- yeah, I would.  Some of them don't

4  look familiar to me.  I'm sorry.  But chances are I may

5  have received them and I just never saw them or maybe

6  they were not sent to me, but some of them don't look

7  familiar to me.

8        Q.  Are there others that don't look familiar to

9  you other than those you've already identified?

10        A.  Well, for example, the SFDSA staff white paper,

11  maybe it's referred to as something else, but I'm not so

12  sure that I have seen that.  But I have --

13        Q.  I'm sorry, could you tell me the page and line

14  number?

15        A.  Page 23, line 15.

16        Q.  Okay.  What --

17        A.  I'm not so sure I had seen that before, but I

18  could have.

19             Let's see.  On page 22, lines 26 and 27, I'm

20  not sure that I have seen that.

21        Q.  Is that the steps 1 to 2 denial and step 3

22  grievance denial?

23        A.  Correct.  Or 4.  Step 4.  I can relook at that

24  if we have it.  That's it for now.  But I'll mull this

25  over and let you know if there's anything further that I

P 0056-000029

1   come up with.

2       Q.  Okay.  Thanks.  Let me go through some of these

3   because I can't tell what they are.  So I'm just going

4   to ask you to describe what they are.

5           The item in between -- well, just above

6   line 10, "J# 1_SHF Service and Cost Proposal," what is

7   that?

8           MS. HUANG:  What page?  What item are you

9   looking at?

10          MS. BERDUX:  This is on page 22, the first item

11  under the list of declarations.  It's at line 10

12  approximately.

13          THE WITNESS:  Well, I believe I do know.  That

14  is the controller's -- the San Francisco controller's

15  response to the staffing concerns and problems,

16  especially as it relates to overtime.

17  BY MS. BERDUX:

18      Q.  And did that affect your opinions in this case?

19      A.  What the controller says always affects my

20  opinion.

21      Q.  Yeah.  How so?

22      A.  Well, because as a member of the Board of

23  Supervisors I can tell you that when the controller

24  expounds on particular inadequacies or inefficiencies or

25  deficiencies, that's important.

1      Q.  Do you remember what specific information in

2  this document assisted you in or was important to you in

3  forming your opinions in the case?

4      A.  No, because I think that it was on -- yes and

5  no.  Because it was on the controller's radar about

6  staffing dysregulation, that was significant.  But the

7  controller I do not believe went far enough in their

8  analysis in coming up with any solutions that I thought

9  were long-term or substantive, especially on the eve of

10 COVID.

11     Q.  Okay.  Thank you for that.

12         The next document, "1_3C XCF CPL" at line 11,

13 what is that?

14     A.  I do not know.  I'm sorry.

15     Q.  Do you know what role that played in -- or the

16 significance that that had in forming your opinions in

17 your report?

18     A.  I did not have an opinion.  I don't recognize

19 it as it is stated here.

20     Q.  Okay.  The next item, "1_BVA projections second

21 half FY2018-19," what is that document?

22     A.  If we're talking about the same document, this

23 is the budget analysis -- this is the staffing budget

24 analysis in the second half of 2019 that may have

25 precipitated an audit -- the audit on -- requested

1   probably by the DSA or somebody on staffing itself.

2        Q.  And what's --

3        A.  On staffing deficiencies.

4        Q.  And what was the difference between the one

5   dated 2/21/19 and the one dated 3/5/19?

6        A.  I don't recall.

7        Q.  Okay.  And what specific information did this

8   provide you for your opinions?

9        A.  Other than corroborating numbers, nothing.

10        Q.  Okay.  And when you say "corroborating

11   numbers," do you mean corroborating staffing levels?

12        A.  Correct.

13        Q.  Okay.  And then the next item on here,

14   "1_FY20-21 3 Month ch," what is that?

15        A.  It must be their -- if I recall correctly, it's

16   the first three-month projection, budget projection and

17   staffing analysis.

18        Q.  Anything significant in that analysis that

19   formed your opinions?

20        A.  Well, it provides a snapshot from the previous

21   quarter to the entry of the first fiscal year, and that

22   gives me the onset understanding of what the year was

23   going to look like in staffing.  But it also correlates,

24   of course, with the confrontation with, you know, COVID,

25   the advent of COVID too.  Excuse me.

P 0056-000032

1        Q.  No problem.

2            What is the next document, "SHF service and

3    cost reduction"?

4        A.  I don't recall if this is by the sheriff or by

5    somebody else within the sheriff's department or even

6    DSA, but the recommendations and suggestions to where

7    they can cut costs and conserve and be more efficient.

8        Q.  And do you remember, were there any specific

9    cost or service reduction cost proposals that you either

10   agreed or disagreed with?

11       A.  In some part, yes, that I didn't agree with

12   them in that the reduction proposals themselves I

13   thought skimmed over the import of providing for the

14   incarcerated, that I thought that the suggestions and

15   the proposals -- and this was interspersed throughout a

16   number of documents -- looked empirically at the numbers

17   of staffing but stopped short of understanding the

18   impacts of deficient staffing on to the incarcerated.

19       Q.  And do you remember specifically what proposal

20   you disagreed with?

21       A.  That stems from this document?  No, I do not.

22       Q.  Or anything that you agreed with from this

23   document?

24       A.  It's kind of an inverted question.  I would say

25   that I would take the information as self-evident and

P 0056-000033

1   factual.

2          But if the purpose of the information was to

3   suggest measures for the department to cut costs due to

4   staffing irregularities, then what was conspicuous was

5   what was missing.  Not what was said but what was

6   missing.  And that ergo relates to I don't believe there

7   was sufficient information to discuss the impacts on to

8   those in custody.

9      Q.  Okay.  What specifically was missing in regards

10  to considerations for those in custody?

11     A.  I -- that is the headline.  Everything.

12     Q.  Everything?

13     A.  Well, considering the wave effect of when you

14  are moving staff or when you do not have the capacity to

15  staff or staff appropriately, then the downward impact

16  is of those in custody.

17         And I was lifting from what was said, as I

18  recall this, it is -- it was noticeable that there just

19  wasn't significant information or attention about these

20  potential impacts.

21     Q.  And do you know -- well, these look like

22  proposals.  Do you know if any of those proposals were

23  implemented or not?

24     A.  Well, I would say some may have been, but this,

25  again, teeters on during the COVID security period.  So,

P 0056-000034

```
 1   if anything, a lot of that may have been halted.  So I
 2   do not know.
 3        Q.  Okay.
 4        A.  And if some of it did, it may have not been
 5   done to fruition, just because it was teetering on a
 6   two-year blackout.
 7        Q.  And do you know whether any of the reduction
 8   proposals were or weren't implemented?
 9        A.  As it relates to this document, I do not
10   recall.  I do not recall, no.  I -- no.
11        Q.  Okay.  And the next document, the "2_9-month
12   MOU reserve," what is that?
13        A.  I'm sorry.  I don't recognize that.  It might
14   be something referencing something else or a title to
15   something else that I do, but not just by that title.
16   I'm sorry.
17        Q.  Okay.  That's all right.
18            The next item, "3_FY20-21 12-month final
19   2021-August-05," what is that document?
20        A.  As I recall, it's what it even says.  It's the
21   staffing document, current and projected, for that
22   fiscal year.
23        Q.  And what information contained in that was
24   significant or impacted the opinions that you formed in
25   this case?
```

P 0056-000035

1       A.   If it was this document or another document, I

2   believe what caught my attention was the conversion of

3   senior deputies where there were less senior deputies

4   that were being projected or budgeted for and that there

5   had been a shift or redistribution of staff, and that, I

6   think, made an impression on me.

7       Q.   Okay.  And if that document indicated a shift

8   or loss of senior deputies, what document was used to

9   compare that with?

10      A.   In some cases, my knowledge.  So I'm going to

11  have to figure out if there's another document to

12  compare with.  But I'm aware that there had -- that

13  there was a more robust staffing of senior deputies

14  during my time as sheriff, and less so.  And I know that

15  when you see such a depreciation of staffing of a

16  particular rank, that suggests something.

17      Q.   What does that -- what does the loss of senior

18  deputies suggest?

19      A.   Oh, my reading of that signifies that there's a

20  fundamental shift from being able to manage the

21  San Bruno facility, now called CJ3, which was designed

22  as a direct supervision model.

23           And its staffing requirement will -- this is

24  based on practice -- necessitates some combination of

25  senior deputy and deputy on the platform, sort of on the

1   floor and/or in the crow's nest.  Removing a senior
2   deputy from that position potentially signified that
3   they're being shifted elsewhere.
4           And the impact of that, referencing my comment
5   earlier, is that with adequate staffing in the pods at
6   CJ3 undermines or subverts the ability then to provide
7   programming.
8       Q.  What was the staffing level or what were the
9   staffing levels of senior deputies at County Jail 3?
10  Under your tenure it was County Jail 5; right?
11      A.  Well, it's in my report.  So if you don't mind,
12  I'd like to refer to it.
13      Q.  Oh, you're always free and welcome to refer to
14  your report.
15      A.  Okay.  Thank you.
16          So let me see.  So I reflected that on page 12
17  of my report, line 10, "Evidence of this phasing out is
18  corroborated by the numbers."
19          And I recall that there were -- in 2015 there
20  were 74 staffed senior deputy positions with 14
21  unfilled.  But then I'm realizing that in 2020 there
22  were 38 staffed senior deputy positions with 13
23  unfilled.  And in 2022 there are 23 staffed senior
24  deputy positions with 20 unfilled.
25      Q.  Oh, got it.

1       A.  So that trend is not something that is just a

2   result of deficient staffing or the inability to recruit

3   or staff a deposition.  That looks like a deliberate

4   termination of that rank.

5       Q.  Okay.  And under your tenure, what were the

6   senior deputies' roles at County Jail -- San Bruno

7   County Jail?

8       A.  Well, I think it depends on which jail.  But

9   since we're talking about San Bruno itself and then

10  separate of -- custody senior deputies had other roles

11  too.

12          But in this case a senior deputy pairing with a

13  deputy in a pod to help maintain the security and

14  manage -- help manage the welfare of those that are in

15  custody and the programs and the rehabilitation and the

16  activities were ongoing, 24/7.

17          And that was consistent with my predecessor,

18  Michael Hennessy, and it was fundamental to the idea of

19  having a direct supervision model, having two deputies

20  on the floor on the platform.  And that created a level

21  of -- a level of interaction and rapport that does not

22  occur in a more antiquated, obsolete jail system.

23          So having our deputies be within human reach,

24  not buffered by bars, but being able to interact has

25  well been studied in this direct supervision model to be

1    much more conducive and humane, less driven by the

2    tension resulting from those who are deputies or

3    correctional staff over inmates in a vertical facility,

4    behind bars, walk-the-line type.  And that was their

5    role as senior deputies in our pods.

6        Q.  So you had two -- under your tenure there were

7    two deputies on the floor in each pod?

8        A.  The idea was to do just that if our staff would

9    allow for that.  Correct, that would be the idea.  And

10   that would be the aim and that would be the projection.

11       Q.  Well, did that occur during your tenure, that

12   there were two deputies on the floor in each pod at the

13   county jail in San Bruno?

14       A.  Well, it depends --

15           MS. HUANG:  I'm going to object to that as

16   vague and ambiguous.  When you say "did that occur,"

17   meaning was that the staffing format when Sheriff

18   Miyamoto was sheriff?

19   BY MS. BERDUX:

20       Q.  Right.  Was that the staffing format that you

21   implemented and ordered?

22       A.  That was the staffing format that I continued

23   per my predecessor, Sheriff Mike Hennessy, correct, to

24   ensure that if there was understaffing or any problems

25   with staffing that may have not always been realized.

P 0056-000039

1    But any of the times that I was at the jail, that was

2    usually the case.  And it was not based to assign

3    somebody in the crow's nest, by having somebody who was

4    elevated up in the crow's nest and not have somebody on

5    the floor.

6         Q.  Okay.  And in these staffing documents that you

7    reviewed that showed a decrease in the number of senior

8    deputies, do you know if -- where those senior deputy

9    roles were reduced from?

10        MS. HUANG:  I'm going to object as vague and

11   ambiguous.  I don't think I understood the question.

12   BY MS. BERDUX:

13        Q.  Sure.  Well, let me ask you this:  Where under

14   your tenure did you have senior deputies?  In the pods

15   at San Bruno; right?

16        A.  That would be one area, correct, but we also

17   had larger jail population and we had other requirements

18   of -- that were outside of custody.

19        Q.  Right.  So where else under your tenure did you

20   have senior deputies?

21        A.  In a variety of locations, but I'll have to get

22   back to you if you would like more specifics.

23        Q.  Yeah.  Whatever specifics you have today.

24        A.  Well, I'm just talking about CJ3 San Bruno and

25   as it relates to CJ3 San Bruno in the pods.

1        Q.  Okay.  What about outside of the pods?

2        A.  If they can be assigned to our field division,

3   that they would be assigned to field division, that they

4   would be assigned to admin, they're potentially on admin

5   division as well too or even at hospital.

6        Q.  Okay.  What about at the courts?  Is that where

7   field division senior deputies would be?

8        A.  Inclusive.

9        Q.  Okay.  So the reduction in the senior deputies

10  in the staffing reports that you reviewed, do you know

11  whether those senior deputies roles were cut from the

12  pods or these other divisions?

13        MS. HUANG:  I'm going to object to that as

14  vague and ambiguous.  Are you asking him where the --

15  and vague as to time.  Are you asking him did Sheriff

16  Mirkarimi -- whether the reductions now and where they

17  are coming from, like what positions are being reduced?

18  I'm not sure what you're asking.

19        MS. BERDUX:  Well, yes, exactly.

20  BY MS. BERDUX:

21        Q.  So at page 12 you kindly pointed out to me that

22  there's been a reduction in senior deputy positions from

23  2015 to 2020 and 2022.

24        So I want to know:  Based on your review of

25  documents in this case, do you know where those senior

P 0056-000041

1  deputy positions were cut from, what departments or what

2  divisions?

3      A.  My deduction is that they were cut from

4  custody, that they were cut from custody because there

5  seems to be a parallel of insufficient staff in custody.

6  And where those staff went, I couldn't tell you exactly.

7        But by trend they wouldn't stay as senior

8  deputies until attrition would satisfy that answer over

9  a period of time.  So most likely senior deputies would

10  be promoted up to sergeant or remain at a deputy level.

11      Q.  Okay.  So what do you base your deduction that

12  the senior deputies were cut from custody at county jail

13  in San Bruno?

14      A.  When I looked at the budget documents -- and

15  those are probably in the list, but I also mention it on

16  page 11 of my report, line 10 on the June 30th, 2022,

17  video reports by the San Francisco Sheriff -- addressing

18  the budget and finance committee and the budget was

19  presented and concomitant staffing, which I believe I

20  looked online too, is where I am basing my analysis of

21  the senior deputies.

22      Q.  Did that video state that senior deputy roles

23  were going to be cut from custody at San Bruno Jail?

24      A.  No.  In fact, that's what raised my eyebrows

25  because it should have been.  If, in fact, that is an

1    intentional action by the sheriff to remove, then that

2    should have been, I think, discussed to the Board of

3    Supervisors.

4         Because I believe -- and I even reference this.

5    What I took notice was interesting of what was said but

6    interesting of what was not said in that exchange

7    between the budget committee and the board.

8         Q.  All right.  Other than the information that you

9    pointed out in -- at page 11, is there any other

10   information that you relied upon to deduce that the

11   senior deputy titles were cut from custody in San Bruno

12   Jail?

13        A.  The conversation with Ken Lomba of the DSA

14   spoke to that, and I was trying to get some affirmation

15   or confirmation to see if that was the case.  He seemed

16   also of the opinion that that is the case.

17        Q.  Okay.  When did you have that conversation with

18   Mr. Lomba?

19        A.  I can try to pull up, as I said earlier I would

20   do, any e-mails related to Mr. Lomba.  I'm happy to

21   share that with you.

22        Q.  That would be great.  Thank you.  Not right now

23   because I'll keep going.

24        A.  Sure.

25        Q.  But please look up those documents and e-mails

P 0056-000043

```
 1   and get them to Ms. Huang.
 2           Okay.  Going down the line of documents at
 3   page 22, line 15, "Tables and chart SFO staffing," do
 4   you know what document that was?
 5       A.  Line 22, the three-month budget?  I'm sorry.
 6       Q.  No.  Page 22, line 15.  It's actually in
 7   between --
 8       A.  Oh, got it.  Right.
 9           Yes, I thought we spoke to that.  And it,
10   again, is the projection coming out of the fiscal year
11   deliberations in July in its projection of what they're
12   looking for for the next fiscal year --
13       Q.  And what year --
14       A.  -- for tables and charts.
15       Q.  Oh, sorry.
16           What fiscal year was that?  Just 'cause it's
17   not on --
18       A.  It says fiscal year 2021, but it's final -- '20
19   to '21 and it's final was 2021 August.  So I couldn't
20   tell you if that was August of '20 where that was
21   projected or August of 2021, unless I look at it.  But,
22   nonetheless, it's substantive information regarding
23   staffing.
24       Q.  And the next item, "FW_3-month report," what is
25   that document?
```

P 0056-000044

1        A.  I'm sorry.  I don't recall that document.

2        Q.  And so you don't recall how it factored into

3   forming your opinions.  Fair to say; right?

4        A.  No.

5        Q.  What about the next document, "FW_SHF general

6   fund single file analysis"?  What is that document?

7        A.  I don't recall.  I'm sorry.

8        Q.  That's okay.  And fair to say you don't recall

9   how that forms the basis of your opinions?

10       A.  No.  But I'm trying to be very literal with

11  regard to that specific document, but I know what a

12  general fund single file analysis is.

13          So if we're talking about the -- I'm reaching a

14  little bit, so I don't want to do that, but I know what

15  a general fund single file analysis is.  I just want to

16  be accurate that it is the -- it pertains to this

17  question of staffing.  So I would have to refer back to

18  the document.

19       Q.  Okay.  And do you have that document?

20       A.  I don't know if I do.  I'll have to see, unless

21  it's part of the packet you just sent me.

22       Q.  Do you remember if it's part of the packet that

23  I had just sent you since you're --

24       A.  I don't.  I don't.  But what you just sent me,

25  I can look.

1      Q.  All right.  The next document, "FW_temporary

2   reduction of transfer amount," what is that document?

3      A.  As it's titled, I don't know.

4      Q.  And so, similarly, you don't know how that

5   factored into any opinions that you gave in your expert

6   report?

7      A.  No.

8      Q.  And then the next document, "RE_3-month

9   report - revenue and expenditure projection," what is

10   that document?

11      A.  I don't know if these two are different.

12   Perhaps they are.  But the revenue and expenditure

13   projection is related to the sheriff's forecast staffing

14   and budget general fund capital.

15      Q.  And do you remember if any information from

16   those two documents specifically impacted your opinions

17   in this case?

18      A.  Again, looking for trend as it relates to

19   services provided to the inmates, staffing provided to

20   CJ3 San Bruno, and reliance on overtime or overtime

21   factor and the ability to onboard recruit, hire, onboard

22   new deputies.

23      Q.  Okay.  This next document, "RE_SHF - regular

24   salary savings," what is that?

25      A.  That provides for the staffing budgetary -- the

1    staffing budgetary analysis and attrition.  So regular

2    salary savings and positions that are being budgeted

3    for.

4         Q.  And do you know what year that document was

5    from?

6         A.  I don't recall from this, but I'm guessing that

7    I think what I saw was 2020 as well.

8         Q.  Don't guess.  That raises a red flag.

9         A.  Well -- sorry.  I don't remember then.  I'm

10   sorry.  But I'm trying to recall and I thought it's

11   2020.

12        Q.  Okay.  What about that next document, "RE_SHF

13   OT shortfall"?

14        A.  Leading up, yes, I do remember looking at a

15   number of documents regarding overtime, and again, one

16   of those issues that I thought would be more discussed

17   in the recent budget meeting between the sheriff and the

18   board of supervisors about overtime.  And so I think,

19   even going back, the sheriff overtime shortfall

20   illuminates what has been a chronic problem.

21        Q.  What was that document, that OT shortfall?

22        A.  Other than me reading from the numbers, I

23   couldn't tell you what that document is.

24        Q.  Okay.  What about the next document, what was

25   the -- what is the next document "RE_temporary reduction

P 0056-000047

1    of transfer amount - reminder"?

2        A.  I don't know.  Sorry, by that title I do not

3    know.  No.  Sorry.

4        Q.  So you don't know for the both of those,

5    reminder one and reminder two?

6        A.  Correct.  Not by that title.

7        Q.  What about the next document, "1_SHF_3-month

8    budget report to supervisors"?

9        A.  Right.  Routine to the Board of supervisors --

10   it somewhat mirrors the earlier documents too with

11   regard to the status and projected budget position of

12   the sheriff, which is required of all departments,

13   department heads.

14       Q.  Okay.  And what specifically in that document

15   helped form your opinions or was significant in forming

16   your opinions in this case?

17       A.  Well, I think it just shows -- it showed

18   consistency, continuity with regard to some of the other

19   information that I found concerned -- concerning, just

20   concerning.

21       Q.  And so these revenue -- these documents that

22   are entitled "Revenue and expenditure projections,

23   overtime shortfalls," those look like they were for the

24   fiscal year 2020; is that right?

25       A.  2020/2021, yes.

P 0056-000048

1      Q.  What about --

2      A.  But it's also a biannual budget too sometimes,

3  so it may not always be specific to that.

4      Q.  Okay.  What about prior projections or overtime

5  estimates or documents for fiscal years that preceded

6  these set of documents?

7      A.  Very well they're in some of these and some of

8  these I didn't recognize or we didn't identify.  I'm

9  sure 2018/2019, '19 and '20.  That would make sense

10  typically coming from the controller.  The controller

11  always gives a snapshot of before, current, and

12  projected.

13      Q.  Do you remember any significant differences in

14  those prior fiscal years that were identified in those

15  reports as compared to the current fiscal years that

16  these are reporting on?

17      A.  Related to -- related to the whole entire

18  budget of the sheriff's department or pertaining to CJ3

19  San Bruno?

20      Q.  Yeah.  As it relates to the opinions that

21  you've formed in this case.

22      A.  Right.  Well, the one that stands out relevant

23  to this discussion, I believe, is staffing.  I think

24  that there is a steady decline and reduction of staffing

25  not able to offset the question of attrition, and that

P 0056-000049

1   presenting potential problems looking forward two to
2   five years by the earlier budget documents.
3       Q.  Okay.  This next document, "2018.01.08
4   Arbitrator Cohn's opinion and award only," what is that?
5       A.  If I'm not mistaken, that's the -- I'm
6   recalling that's the arbitrator on behalf of the dispute
7   between the Deputy Sheriff's Association and the sheriff
8   in clarifying the -- I don't know if "definition" is the
9   right word but interpretation of what a full shift is.
10          And it had been trend by the sheriff's
11  department, as alleged by the Deputy Sheriff's
12  Association, that to help with cost reduction, staffing
13  was being orchestrated by current sheriff and
14  potentially the previous sheriff where they were not
15  staffing at a full eight hours, and by staffing one to
16  three or four hours, if I recall this correctly, was
17  helping them then shift or redistribute staff away from
18  other positions.
19          And I believe it was the DSA that wanted
20  clarity of what constitutes a full shift.  And I believe
21  that the outcome of that opinion was that eight hours
22  was determined as a full shift.
23      Q.  All right.  And this next line, "2020 budget
24  request," what was that?
25      A.  Based on that, I couldn't tell you what the

P 0056-000050

1    budget request is.  My only guess -- I'm guessing, so

2    never mind.

3        Q.  Well, don't guess.

4        A.  No, I'm not.  I'm not.

5            On both of those, I don't know.

6        Q.  What about the 2022-2023 budget request?

7        A.  I'm sorry, I do not.

8        Q.  Don't know?

9        A.  Based on that title, I'm not going to guess.

10       Q.  Okay.  What about the next document, "# 210505

11   step 3 grievance with exhibits"?  Do you know what that

12   is?

13       A.  I'm only -- no, I don't.  I believe -- I think

14   I do as a DSA grievance filed, because I've looked at a

15   few documents of DSA grievances filed, but I couldn't

16   tell you which document this is specifically.

17       Q.  What about --

18       A.  And it's a staffing grievance.  That's why.

19       Q.  What about the next document, "E 220223 step 3

20   grievance to ERD"?

21       A.  Similarly, I thought it might be the exact same

22   document because I recall seeing a document, grievance

23   by DSA on staffing.  So either the previous item that

24   you asked me about or this current one I have seen, yes.

25       Q.  Okay.  One of those you've seen, but you're not

P 0056-000051

1  sure about the other?

2       A.  Right, based on the title.

3       Q.  Okay.  What about this -- the next item, the

4  "DSA RFI response"?  What's that?

5       A.  I'm sorry.  Based on the title, I do not know.

6       Q.  The next few I think you don't recall seeing.

7           The last one, the "Unfair labor practice charge

8  with exhibit," what's that?

9       A.  I'm sorry.  Faintly I remember that just being

10  another grievance by the DSA, but I could not give you

11  the substance of it.

12       Q.  All right.  Turning to page 23, the second

13  item, 'cause I think you recall you don't remember

14  seeing the first, "briefing sheet, recruitment 22-23,"

15  what is that?

16       A.  I do recall seeing this.  I don't remember if

17  it's from the sheriff to staff or from another member,

18  but I recall that in terms of their strategy and plan

19  for deputy recruitment.

20       Q.  And did that have any significance on the

21  opinions that you have formed in this case?

22       A.  I was underwhelmed by it.  I thought that the

23  recruitment processes, considering already what we know

24  in terms of how tough it has been to recruit in light of

25  attrition challenges and competition from other

```
 1   agencies, that it could have been more aggressive, more
 2   innovative.
 3       Q.  And when you say "in light of what we know that
 4   it's been tough to recruit," do you mean it's been tough
 5   to recruit deputies to the sheriff's office?
 6       A.  Yes, based on --
 7           MS. HUANG:  Sorry, could you repeat the
 8   question?  It faded out for me at the end.
 9           MS. BERDUX:  Oh, sure.
10   BY MS. BERDUX:
11       Q.  When I heard you say "tough to recruit," do you
12   mean that it has been challenging to recruit deputies to
13   the sheriff's office?
14           MS. HUANG:  Meaning this particular sheriff's
15   office or all sheriff's offices?
16           MS. BERDUX:  All sheriff's offices.
17           THE WITNESS:  No, I'm not speaking for all
18   sheriff's offices.  I'm speaking to this sheriff.  And I
19   believe consistently with our discussion thus far about
20   budgets and staffing and the challenge of the SF
21   Sheriff's Department staffing ratios, that is well known
22   that they are understaffed.
23           And this -- and it was even well -- it was
24   mentioned or reiterated by the sheriff to the Board of
25   supervisors in the June budget finance hearings.  This
```

P 0056-000053

1  recruitment document is a reflection, I think, of

2  that -- of those discussions about the need to offset

3  attrition, resignations, and others in order to

4  supplement staffing, and that's its plan.

5  BY MS. BERDUX:

6      Q.  Do you have any opinions or knowledge that it's

7  been difficult across the country to recruit new

8  deputies to sheriff's offices?

9      A.  Police and deputies and all law enforcement

10 overall, I do, yes, which is why that recruitment plan

11 and strategy is going to have to be stepped up because

12 it becomes competitive due to the struggle of all

13 agencies.  And I believe that it could benefit from some

14 more innovation and just an energized approach than what

15 I read.

16      Q.  Do you know how the compensation compares to

17 new hires for the San Francisco Sheriff's Office as

18 compared to new hire compensation for the rest of the

19 state in sheriff's offices, not police departments?

20         MS. HUANG:  I'm going to object to that as

21 lacking foundation and overbroad that there is any

22 particular, you know, metric for sheriff's office

23 compensations across the state.  So I'm going to object

24 to that as vague and overbroad.

25 BY MS. BERDUX:

P 0056-000054

1       Q.  You can still answer.

2       A.  I'll answer it this way:  I do know that the

3   San Francisco Police Department per capita is the

4   highest-paid law enforcement agency, or in the top two

5   law enforcement agencies in the United States for a city

6   of under 1 million population.

7           And that correlates, of course, with our budget

8   with per capita it's in the top two in the United States

9   as well municipally.  The sheriff's office wage is

10  gauged at about 10 to 17 percent below SFPD.  I would

11  say that the sheriff's department is not the highest in

12  the state of California, but it's also far from being

13  the lowest.

14          And I do understand that, you know, it's worthy

15  of consideration by the sheriff's department of the City

16  and County of San Francisco to incentivize, whether

17  financially or in other benefits, to bring on and

18  recruit.  That's the level of energized persistence and

19  competition that I think we're looking at.

20      Q.  Okay.  So it's your opinion the sheriff's

21  office should pay more to recruit sheriff's office

22  deputies?

23      A.  I think the sheriff's office first needs to pay

24  more in order to do better recruiting and to be more

25  contemporary and modern with their recruiting strategies

P 0056-000055

 1  and methods.  I think that it's a little antiquated in
 2  their approach.
 3          I'm not an expert on recruiting, but I have
 4  been enough -- I've seen agencies around and am familiar
 5  with -- to the premise of your question, it is tough for
 6  everybody.  No question.  Ergo, it's going to require
 7  the stepped-up effort that I had referenced earlier.
 8      Q.  All right.  And are you going to be offering
 9  opinions in this case about what those recruiting --
10  what that stepped-up recruiting strategy should include?
11      A.  I wasn't asked to.  I don't know if anybody
12  really cares what I have to say about that, and I don't
13  know if that's relevant in this particular case.
14      Q.  I won't ask any more questions about it if
15  you're not going to testify about it.  That's why I just
16  asked that question.
17      A.  Yeah.  I mean, some of it, I think, is just
18  kind of self-evident and basic.  I know what other
19  agencies are doing that potentially this agency may not,
20  but I wasn't going to make that part of my presentation.
21      Q.  Perfect.  We'll leave it at that, then.
22      A.  Okay.
23      Q.  Okay.  The next document, "budget request to
24  sheriff," what is that?
25      A.  I don't know by this title.

1      Q.  Or what year it was?

2      A.  I don't know by this title.

3      Q.  "Civil grand jury complaint against SF

4  sheriff," what's that?

5          MS. HUANG:  It's already been asked and

6  answered.  Objection.

7  BY MS. BERDUX:

8      Q.  Well, it's a new item on page 23 in between

9  line 2 and 3.  Do you know what that is?

10     A.  My -- I think, again, it was the civil grand

11 jury.  I was -- I believe it has to do, again, with the

12 staffing deficiency, but I'm not sure based on the

13 title.

14     Q.  Okay.  Do you know how it impacted the

15 formulation of your opinions in this case?

16     A.  Normally civil grand jury investigations or

17 complaints would impact my opinion I wouldn't say

18 considerably, but it has a role most definitely.

19     Q.  Would you --

20     A.  So in this particular case as I was advised in

21 the writing of my report, no.

22     Q.  Okay.  The next document, the "COVID emergency

23 hiring letter," do you know what that is?

24     A.  I'm recalling that, again, it was the

25 permission to hire during COVID.  But also the warning,

P 0056-000057

1    if not, then overtime would have to be the significant

2    default.

3         Q.  And the next item, "W equals FY budget

4    submittal letter," what's that?

5         A.  You know, based on this and the next one, the

6    two titles, I do not know.  But I would only be

7    guessing.

8         Q.  No.  Don't guess.

9         A.  Yeah.  No, I'm not.

10        Q.  Okay.  "Letter to Mayor Breed with incentive

11   promises COVID emergency hiring letter," do you know

12   what that is?

13        A.  Consistent with the line 3 of the same page.

14        Q.  And do you know substantively what the purpose

15   of those letters or those documents were?

16        A.  Yes.  Overall the strategy and approach to

17   shift into an operation that hasn't ever really been

18   done before, and that is is to begin -- to anticipate a

19   larger need for staff that may be sick or get COVID or

20   due to the vacancy of staff, that they're going to need

21   additional help especially with a lockdown facility.  If

22   I'm not mistaken, it was lockdown four.

23             So with a lockdown facility requiring that

24   there would be the needed staff to accommodate those

25   shifts in light of COVID.

1    Q.  Let me ask you some COVID-related questions

2 just to check off a subject matter I intended to ask you

3 about.

4        I mean, you don't take any -- you don't dispute

5 or disagree that the COVID-19 virus or pandemic was

6 dangerous and life-threatening at its inception; right?

7        MS. HUANG:  I'm going to object as vague and

8 ambiguous and overbroad.  Was your question -- could

9 you -- could the reporter please reread the question?

10        (Record read.)

11        MS. HUANG:  The question is at its inception

12 was it dangerous and life-threatening?  I mean, it's

13 vague and ambiguous as to when the COVID-19 pandemic had

14 its inception.

15 BY MS. BERDUX:

16    Q.  Well, let me ask you this.  I thought this

17 would be a noncontroversial issue, but we'll break it

18 down.

19        MS. HUANG:  Well, you need to ask a proper

20 question.

21 BY MS. BERDUX:

22    Q.  What -- do you remember when the COVID pandemic

23 began, when it was declared a pandemic?

24    A.  Oh.  Well, I remember just as we were turning

25 into the year 2020 we were looking at the tidal wave of

1   COVID potentially engulfing, and then I believe it was

2   two or three months later that we were declared in a

3   pandemic.

4          And I understand your question, and I

5   understand the objection because of the broadness of it,

6   but to affirm the position, it was a -- you know, it

7   was -- it created a fundamental shift of emergency

8   concern.  And I think the jail system in San Francisco,

9   with the guidance of the Department of Public Health,

10  acted smartly in managing part of, I think, the COVID

11  threat that was occurring.

12         And I say that not lightly because I was also

13  aware of many of the challenges that were involved in

14  the California prisons who did not take similar measures

15  and whose jails are not designed in the way that our --

16  those prisons are not designed in the way that our jails

17  are and did not take the kind of precautions that I

18  think, you know, were needed.

19      Q.  And that resulted in deaths in those prisons;

20  right?

21      A.  Yes.  And in jails, too, across the board.  So

22  I've been outspoken that I think in many ways

23  San Francisco was smart about the way that it approached

24  prevention and containment of COVID.  And I think, to a

25  large degree, I was glad to see it the way it was

P 0056-000060

1    enacted in the jail system.

2         Q.  And are you aware that there have been no

3    deaths from COVID in San Francisco County jails?

4         A.  I believe I am aware of that.  I'm not sure if

5    there's been infection.  I mean, I do know there's been

6    a number of infections of both the staff and to the

7    inmates.  I was glad to see the effort made for

8    alternatives to incarceration for those inmates

9    qualified as not being security risks.

10        But I also think there was a glaring

11   revelation, both for San Francisco jails as well as

12   jails across the state, where we were not prepared for

13   that question of alternatives to incarceration other

14   than just releasing people on their own recognizance or

15   electronic monitoring in the event another COVID or

16   something like that could occur that basically locks

17   down San Francisco and its public safety and carceral

18   apparatuses, I don't think then and I don't think now we

19   have those contingency plans in place.

20        And I think as it relates to the relevance of

21   this discussion, considering that CJ3 San Bruno is home

22   to about 90 percent of pretrial unsentenced inmates,

23   that throws up considerable flares about the fact that,

24   on one hand, good work was done to contain COVID but, on

25   the other hand, the question is begged about people's

1  rights that are unsentenced in pretrial that are

2  implicated in such needed but drastic measures and our

3  inability, San Francisco-wise government, to be able to

4  find better alternatives to incarceration to protect

5  them.

6       Q.  Are you going to be offering opinions about

7  what those better alternatives to incarceration would be

8  for inmates who are incarcerated during the COVID-19

9  pandemic?

10      A.  I can, if you'd like to.

11      Q.  Well, it's whether you intend to offer those

12 opinions at trial.

13      A.  I believe that I can't help it seeping out,

14 yes.

15      Q.  How are they going to seep out?  Now's my

16 chance to find out.

17      A.  By asking me a question.

18          MS. HUANG:  If we're going to go on to a new

19 topic, can we take a break?  We've been at it for

20 about -- it's five to 3:00.

21          MS. BERDUX:  Yes, let's do that.  How long do

22 you all need?

23          MS. HUANG:  15 minutes.  Come back at ten

24 after?

25          MS. BERDUX:  Great.

```
1              THE WITNESS:  Thank you.
2              (Break taken at 2:55 p.m.)
3  BY MS. BERDUX:
4      Q.  All right.  We're back on the record after a
5  quick break.  All of the same deposition rules apply.
6              Did you speak with plaintiff's counsel during
7  the break?
8      A.  I did.
9      Q.  You did?
10     A.  Yes.
11     Q.  And how long was that conversation?
12     A.  About 90 seconds.
13     Q.  Okay.  And did it change or affect any of the
14 opinions you intend to offer in this case?
15     A.  Opinions, no; in terms of my brevity, yes.
16     Q.  All right.  Back to COVID questions.
17             Are you going to be offering opinions at trial
18 in this case about what the sheriff's office or the City
19 should have done -- and I'm trying to remember what you
20 said -- to find better alternatives to incarcerated
21 individuals during the COVID pandemic?
22     A.  Well, I don't know if I need to look backwards
23 to do that, but it does segue to current practice that
24 even though we're not in COVID and the injunction is
25 behind us, supposedly, that there does need to be plans
```

 1   in place in the eventuality of another pandemic or

 2   something alike.

 3          So, yes, I can offer some opinion on that.

 4      Q.  Well, will you be offering some opinions about

 5   what should be planned for in the future?

 6      A.  Yes.

 7          MS. HUANG:  Sorry, Ms. Berdux, you were taking

 8   a sip and I lost the last few words of your question.

 9          MS. BERDUX:  Oh, sorry.

10   BY MS. BERDUX:

11      Q.  It was, will you be offering those

12   forward-looking opinions in this case?

13      A.  And my answer was affirmative.  Yes.

14      Q.  Okay.  So no critique of the past but, going

15   forward, what is your opinion?

16      A.  Well, I'm sorry, there is slightly a critique

17   of the past, but that's couched also with my praise as I

18   identified as well too.

19          I just think that the City -- this is probably

20   true of any municipality, frankly, who had been

21   confronted by this tragedy.  And that is to be prepared

22   and to, obviously, apply from lessons learned from our

23   jail systems on what we can do so that we are able to

24   manage and navigate, you know, such threats again.

25          And I think that the deficit of alternatives to

P 0056-000064

1  incarceration programming and contingencies on those --
2  on that level is a criticism, and I think that that
3  segues to present and future.
4      Q.  Okay.  Would you agree that this pandemic was
5  unprecedented?
6      A.  I do, of course.
7      Q.  And so going forward, what are the opinions
8  that you are going to offer about what --
9          MS. HUANG:  I'm going to object as a belated
10  objection to that as beyond the scope of his expertise.
11  I mean, we've had many pandemics.  There's been the
12  Black plague.  There was the influenza pandemic of 1917.
13          And, you know, I think it's beyond the scope,
14  with all due respect, Sheriff, of your expertise, to say
15  what is unprecedented and what is not in terms of the
16  pandemic.
17  BY MS. BERDUX:
18      Q.  All right.  What are the opinions that you have
19  for planning for the future?
20      A.  Number --
21      Q.  Yeah.  Go ahead.
22      A.  Sure.  Well, let me just qualify, that in
23  modern history in terms of any kind of unprecedented
24  activity, you know, there is concerns.  There had been
25  natural disasters like Loma Prieta and others, other

1    potential disasters that have put public safety and jail

2    systems on alert and notice and would have to shift into

3    those contingencies.

4          I think the pandemic in one regard was

5    impressive because of the scale of its impacts.  And I

6    like where we were going as a city.  I think what was

7    revealing, not just in San Francisco but I think

8    literally everywhere in California, for jail systems

9    different from prisons because jail systems like

10   San Francisco house so many unsentenced pretrial people.

11         So in answer to your question, I think that

12   there has to be a greater risk assessment and a greater

13   determination of our ability to release people,

14   especially, you know, if they are incarcerated for

15   misdemeanors but also maybe nonviolent felonies and

16   felonies where it's not a threat, and what we might be

17   able to do through our nonprofit service agencies that

18   are already on contract or those that we can contract

19   with to be able to shift those that are custody to those

20   institutions.

21         So that would be along the lines.  And I would

22   go much more into detail, certainly.

23   Q.  Okay.  What do you mean?  What other

24   institutions or options?

25   A.  The nonprofit we can track.  We have -- the

P 0056-000066

1    sheriff's department in the City has a robust system of

2    contracting, as I know the City attorney's office knows,

3    with nonprofit institutions.

4         And nonprofit institutions, whether it be

5    through probation or community corrections, could in

6    advance also be prepared to receive more people coming

7    in from incarceration who had been classified as not a

8    security threat and potentially being released to these

9    institutions and/or maybe their own recognizance or

10   electronic monitoring or a combination thereof.

11        Some of these strategies have been enacted not

12   on the scale that I think they should have.  And I think

13   in the future, again, hoping we never do see the likes

14   of something like this pandemic, but in the event, then

15   I think we need to be better prepared, the sheriff's

16   department.

17        Q.  All right.  And when you say institutions, you

18   included an electronic monitoring program.  You didn't

19   necessarily mean another housing facility?

20        A.  I do, such as a halfway house or such as

21   alternatives to direct incarceration.

22        Q.  Okay.  Do you know how many spaces are

23   available in alternative housing in the city?

24        A.  Yes.  Well, I mean, I don't have the specific

25   number for you today, but that was a number that jumped

P 0056-000067

1  out at me during COVID.  They were maxed out.  So in

2  terms of the housing units and beds potentially

3  available for that population, that is another indicator

4  of where we weren't prepared.  We just didn't have the

5  availability.

6          Naturally, housing has been a sore subject for

7  many years in San Francisco altogether.  So this would

8  just add, you know, to the woe of San Francisco's

9  housing crisis.

10     Q.  And do you know the percentage or the number of

11 inmates that were released due to COVID -- or in order

12 to prevent the spread of COVID and minimize the

13 population?

14     A.  It was actually considerable.  I don't recall

15 at this moment, but I did watch and listen.  With the

16 efforts between District Attorney Boudin and the

17 sheriff's department, there was a substantial diversion

18 of people who were unsentenced.  And I thought that that

19 was really smart the way that they did that.

20          I did not hear really much of backlash from

21 that effort.  So that strategy and template is something

22 to build off.

23     Q.  Right.  And so in terms of the population now,

24 do you know how many inmates or the percentage of

25 inmates are currently in sheriff's office custody in

1  jail, not necessarily other programs -- the percentage

2  or number of inmates that are in custody that are facing

3  misdemeanor charges?

4      A.  I don't have the division of misdemeanor versus

5  felony.  I don't.  But I know that the majority in

6  San Bruno, which is practice, is felony.

7      Q.  And I think I heard you say that you'd

8  recommend that nonviolent or nonthreatening charges of

9  felony could be -- or those inmates might not or should

10  not or could not be incarcerated pending their charges.

11          Do you know how many inmates in San Bruno are

12  currently facing violent felony charges or would be

13  deemed threatening to the public?

14      A.  No.  I don't have that number, nor did I mean

15  to insinuate.  Or if I stated, I misstated.  That wasn't

16  the population I was suggesting that would be candidates

17  I think for, you know, alternatives to incarceration.

18          No, I'm talking about with a -- really with I

19  think a validated predictive tool that would show risk

20  assessments to the inmates, felony or misdemeanor,

21  generally speaking nonviolent, of course, that would not

22  pose the kind of threat where we would feel, meaning the

23  City, would feel more secure about the diversion.

24          And I think, as you had already intimated, that

25  was already demonstrated in part during COVID by the

P 0056-000069

1  substantial release of people from San Francisco's

2  jails, which I think that was a good move.

3          I think what it, again, revealed was -- the

4  delta was that we just didn't have enough housing, we

5  didn't have enough programming, we didn't have enough

6  alternatives outside incarceration to move people in the

7  direction I think we could.

8      Q.  Do you have any knowledge about whether the

9  city is going back to housing more people or to increase

10  the numbers of inmates since those reduction measures

11  were put in place due to the pandemic?

12          MS. HUANG:  I'm going to ask you to restate

13  that question because I don't think I understood it.

14          MS. BERDUX:  Sure.

15  BY MS. BERDUX:

16      Q.  The reduction measures that the City took to

17  reduce its inmate population, do you have any

18  information that those efforts or those policies are

19  going to change or go back to what they were before

20  COVID?

21      A.  I can tell you that the trend line in

22  San Francisco is shifting in such a way where we as a

23  city and as a -- as our public safety entities go, there

24  seems to be less empathy for innovation regarding

25  alternatives to incarceration or emphasis or trying to

P 0056-000070

1    reduce recidivism.

2          I think that there is apparently less energy or

3    support for that and more on the traditional public

4    safety side of crime prevention and crime fighting,

5    which I think will result in an increase in the jail

6    population, yes.

7          Q.  But have you seen it yet?  Have you seen rises

8    in inmate populations?

9          A.  No.  I mean, I think that the jail population

10   is historically at a low right now.  When you're looking

11   at under a thousand, that is historically low.

12         I mean, I was -- under my watch as sheriff, we

13   shut down County Jail 3 because it was my goal to

14   synthesize our jail systems, one, for efficiency but,

15   two, out of necessity of us beginning to realign really

16   the necessity of not having unsentenced people in our

17   jails if they were capable of thriving well outside of

18   jail.  And that was the consequence, and we were able to

19   save 288 beds.

20         Of course, CJ4 and the 850 Bryant was

21   eventually closed down too.  And I was on record early

22   on in my term as sheriff that if we did not get the jail

23   population under a thousand, then there would be a real

24   need to have to build another jail.

25         And somebody coming from my bent in politics,

1    that was a very unpopular sort of declaration which is

2    why our administration worked very hard to find ways to

3    maintain and improve public safety but by reducing the

4    jail population so another jail wouldn't be necessary.

5         And I'm glad to see that, the success of

6    sheriffs that have tried to do something similar in that

7    regard.  But in this particular day and age, in seeing

8    sort of the frustration in public safety challenges that

9    I think are on the minds of everybody, the pendulum

10   politically may be swinging back again the other way

11   where we would see a rise in the jail population.  It

12   wouldn't surprise me at all.

13       Q.  But the sheriff's office doesn't order who

14   should be or shouldn't be held in jail, right, during --

15   while their charges are pending?

16       A.  No.  The sheriff is the custodian, period.  And

17   yet the sheriff, thanks to my predecessor Mike Hennessy

18   and, frankly, before him, his original boss, Richard

19   Hongisto, they injected, which I really aligned myself

20   with, the notion that our jobs as sheriffs is obviously

21   to improve public safety, but the injection was also to

22   not ignore the recidivism factor, and that requires peer

23   review and tested programming to work with misdemeanor

24   and felony sentenced and unsentenced people to the best

25   of our ability so that they do not return.

1            The correlation in our discussion here in my
2    report is that staffing could very well affect the lack
3    of proper staffing, adequate staffing in San Bruno in
4    particular since it's our largest jail -- could very
5    well affect that fundamental outlook of trying to reduce
6    recidivism if, in fact, we are not capable of managing
7    the panoply of programming reentry and rehabilitation.
8            And then having the staff in place, senior
9    deputies, deputies, whoever they may be, so that can
10    happen in a very holistic environment.  And that, I
11    think, is worth talking about.
12            And so people don't often understand that the
13    public safety component -- considering that recidivism
14    in California hovers everywhere above 50 percent, for
15    the most part, and in San Francisco it's been as high as
16    70 percent.  But it varies.  It does vary depending, on
17    when the studies are coming in -- that our job in the
18    public safety equation is to reduce -- help reduce
19    recidivism so people don't return.
20            It's not just about the arresting or the
21    prosecution.  It's about what happens inside the jails
22    so that when people are released they do not return.
23        Q.  And is that programming?
24        A.  That's part of it, yes, absolutely.  Anything
25    from -- and there's a number of programs, thanks to my

1    predecessor under my administration, where we instituted

2    the kind of programs I think that really had durability.

3         Q.  Yeah.  You had a number of programs offered

4    under your tenure; right?

5         A.  Some were -- the credit goes to my predecessor.

6    And there are programs that we also introduced as well

7    too or expanded that started under my predecessor, such

8    as the Five Keys Charter High School.

9         Q.  Yeah.

10        A.  It really is deserving of the accolades and

11   awards that it gets, and so are some of the other

12   programs.

13          But again, those programs don't operate without

14   the corresponding security apparatus and staffing that

15   helps make it flow in a direct supervision model jail.

16   And that was really the import of what San Bruno was

17   about, why I was so determined and enthusiastic to try

18   to carry that forward.

19        Q.  And do you know currently what programs have

20   resumed at county jail now that COVID has -- well, it's

21   not gone but has certainly improved?

22          MS. HUANG:  Assumes facts not in evidence.

23   Objection.

24          THE WITNESS:  Are you -- I couldn't hear that.

25   I'm sorry.

1          MS. HUANG:  I said it assumes facts not in

2     evidence.  She didn't lay out the foundation of what you

3     knew and she didn't lay out -- you know, it was an

4     assumption that there is -- there were a lot of

5     assumptions, unspoken assumptions in that question.

6          THE WITNESS:  Yes, I agree.  I am assuming a

7     number of programs that are -- that have been

8     reactivated or that are pending.  So I'll just leave it

9     there.

10    BY MS. BERDUX:

11         Q.  All right.  Do you know whether any programs

12    that existed at the time that you left your position as

13    sheriff, do you know if any of those programs that

14    existed during your tenure were ever cut?

15         A.  Sure.  Aquaponics.  The aquaponics program was

16    cut.  I think that was a serious mistake.

17         Q.  And other than aquaponics, were there any other

18    programs that were cut after you left office?

19         A.  There's a few, but I'll recall a couple here

20    for you.  The Cisco training program/certification

21    program and the solar installation workforce development

22    program.

23          I try to put an emphasis on workforce

24    development because it had been lacking in previous

25    years.  That -- those, under my understanding, have been

1    cut or paused.

2         Q.   What was the Cisco program?

3         A.   Cisco certifies people who are learning to code

4    in the Cisco system, tech.  And we would import

5    relationships that we had built with various tech giants

6    and encourage them to, you know, bring their teaching

7    skill sets in the jail system.  And we were actually

8    kind of a pilot, and it was working out well.

9         Q.   And do you know why it was cut?

10        A.   Oh, it had to be financial.  I don't.  But I'm

11   going to guess it's financial.

12        Q.   Well, don't guess.

13        A.   Well, I'm sorry.  I don't know.

14        Q.   Okay.

15        A.   I do know there were other programs, like we

16   had budgeted for -- inspired by San Quentin Prison's

17   radio program, which is actually very famous.  They have

18   a radio program.  They also have a robust newspaper.  We

19   had started a San Francisco Jail radio training program.

20   I do know that that was cut due to budgetary issues.

21        Q.   All right.  And --

22        A.   And -- sorry.

23        Q.   The solar installation, do you know why that

24   was cut?

25        A.   I believe that was also budgetary as well.

```
 1   That's all I know.
 2        Q.  Okay.  And how many inmates did you have in
 3   these programs that were cut?
 4        A.  Oh, that varied.  I would say from several to
 5   maybe upwards to a dozen.  It depends on a number of
 6   variables, starting with classification and risk
 7   assessments to those that were really primed that could
 8   benefit from these kind of programs themselves.
 9            So there was a number of check-offs that we
10   would conduct in order to determine the fit of the
11   individuals who would be in these programs.
12        Q.  And that --
13        A.  And that goes for the existing programs too,
14   whether existing or paused or cut programs other ones,
15   whether it's veterans -- veteran-related, whether it's
16   people there for history of violence, whether we're
17   talking about male or female or transgender programs.
18            I mean, if anything, what we did was tailor and
19   customize programs to the population, and we were
20   careful not to just generalize by treating the entire
21   jail system in its general population.  So the question
22   was our ability to customize to the variety of
23   populations and to their criminogenic needs.
24            There was also a very big program we started.
25   That was a result of AB 109, state prisoner realignment.
```

1    That was the creation of the reentry pod.  But because

2    state prisoner realignment had begun to fade out over

3    the years, it's understandable that wasn't continued in

4    that fashion.

5           But one of the changes that we fundamentally

6    made was that we relaxed workplace conditions so that

7    adult probation would work in our jails with our staff

8    side by side in orchestrating the reentry and

9    rehabilitation programs.

10          So the method for us with realignment was that

11   instead of us passing inmates that were being remanded

12   due to state prisoner realignment or those coming back

13   to us predominantly from San Quentin and other prisons,

14   instead of us just passing them on after they were

15   discharged from probation, we decided to get ahead of it

16   by having probation and other nonprofit contractors work

17   with us side by side.  And that worked out, I think,

18   very well.

19        Q.  And when you said you had a few to a dozen

20   participants, was that all of these programs total or

21   per program?

22        A.  Per program.

23        Q.  Okay.  And you mentioned that that, of course,

24   depended on a number of factors, including

25   classification and whether the inmate could safely

1  interact with others in the program; right?

2      A.  It -- of course.  That would be fundamental.

3  The other is that somebody who may not have the

4  beginning skill sets or the high school diploma or the

5  relevance, I think, of them being in that program.

6          So again, instead of just a general overlay,

7  the administration or our administration was sensitive

8  to making sure that those who are participating would

9  get the most benefit because they are a good fit.

10      Q.  And did all of these programs stop during or

11  after your tenure?

12      A.  Well, they were there when I left.

13      Q.  Okay.  That answers the question.

14          What was the aquaponics program?

15      A.  Oh, I loved that program.  And I mentioned this

16  in my expert report.  Aquaponics, we used that as an

17  opportunity to -- in San Bruno, when it was known as CJ5

18  but it's annexed in CJ6 right next door, it was

19  outdoors.

20          And we were able to then use that outdoor annex

21  and space where we would allow fish in the aquaponics

22  program, you know, to create the by-product of carp and

23  the fish being in there so that it could be tended to

24  and teaching a number of inmates what that program, you

25  know, had to offer.

P 0056-000079

1          Potentially then allowing the fruits of their

2    labor in managing the aquaponics program for goods sold

3    or fish sold potentially to be done so in

4    Bayview-Hunters Point where we're looking for a pipeline

5    connection between our jail system and community -- sort

6    of a community connection.  And that was all facilitated

7    by the Five Keys Charter High School.

8         Q.  And did you -- you started the aquaponics

9    program?

10        A.  That was under my watch, yes.

11        Q.  And did that end after you left?

12        A.  I believe so.  I don't believe it's still

13   occurring.  If it is, I'd be very happy to hear that.

14   But I don't think it is.

15        Q.  And what classification of inmates could

16   participate in that program?

17        A.  You know, I would -- I don't have that

18   information in front, but we were very careful because

19   we did the ribbon cutting and there was even a little

20   press about it.  In fact, Matier & Ross in The Chronicle

21   made fun of it, claiming that I wanted to teach them how

22   to grow cannabis.  So it was kind of hilarious, kind of

23   not.  But it -- what it did was it was    multifaceted

24   on a number of levels.

25          One, we're skill building; two, we're trying to

P 0056-000080

1    be future focused in doing something while you're

2    incarcerated but hoping that it has legs as a workforce

3    opportunity when you get out of the system; three, it

4    was outside even though it was in a secured area in one

5    of the annexes, which is, again, I think relevant to

6    this -- my report and this discussion of giving the

7    opportunity of fresh air, sunshine, the ability to work

8    in a secured environment and having the required

9    security precautions in place so that aquaponics then

10   could be facilitated.

11        This was a check-off on many levels, and I

12   thought it was an important success at the time.

13        Q.  Yeah.  And what was the classification of

14   inmates that you had out there in that program?

15        A.  I don't remember, but it would have to -- it

16   would have to -- I don't remember.  I'm sorry.  I can't

17   tell you at the moment.

18        Q.  And do you know what their security level was?

19        A.  Well, I'm guessing that -- I'm guessing that it

20   would have to be on a lower level, of course.  But if

21   we're talking about specific inmates and we're talking

22   about any specific person, I would need to see that

23   information to recall.

24        Q.  Yeah.  And how many people participated in that

25   program?  How many inmates?

P 0056-000081

1      A.  Oh, I think the idea was to start off with

2   maybe several at the moment, but that was not where it

3   was supposed to grow to.  That was where it started.

4      Q.  What did it grow to?

5      A.  I don't know.  I wasn't sheriff.

6      Q.  Well, when you left.

7      A.  I'd say not more than four at the time.  It was

8   a fairly new program toward the end of my

9   administration.

10     Q.  And who funded that?

11     A.  We did.

12     Q.  The sheriff's department?

13     A.  Yeah.  The sheriff's offices had funded it also

14  through Five Keys Charter High School, which was part of

15  the sheriff's office.

16     Q.  And the inmates that participated, was that the

17  only program that offered outdoor access?

18     A.  Yes, I believe so.  I'll have to think about

19  that.  There could be something else.

20     Q.  Is your --

21     A.  I know that I opened up the discussion, and it

22  was a healthy discussion, about revisiting the idea of

23  allowing the inmates to participate in the garden

24  project, since we were hosts to the largest urban garden

25  in the state on sheriff property.  But that did not

P 0056-000082

1   result in us putting inmates on the grounds.

2       Q.  The inmates that participated in the aquaponics

3   program, were they housed at -- in what was then County

4   Jail 5, which is now County Jail 3?

5       A.  I don't know if they all were.  I don't know.

6   I don't recall if they all were.

7       Q.  Was the annex open at that time?  Were they

8   housed in the annex?

9       A.  We retrofitted that annex under our watch.  The

10  annex was always open, but what it was used for was

11  storage.  I mean, there was a number of -- like, for

12  example, before we went outside that annex was also used

13  for I don't want to say building trades, but it was

14  construction-related inside.

15          And there was -- but the doors were open so

16  that you would have natural sunlight coming in.  Again,

17  it wasn't a security threat, but the doors inside and

18  where it would go to an extended part of the jail

19  system, you know, where it was fenced off on all sides,

20  including the top, that did allow.

21          After we -- after we retrofitted that, then

22  that gave us the platform to go to the aquaponics

23  program next.

24      Q.  So were the aquaponics, was the program inside

25  of a building or outside of the building?

P 0056-000083

 1          A.  It was actually both, but it was outside.  The

 2     actual aquarium/aquaponics system was outside, and there

 3     are pictures of this.

 4          Q.  How did inmates get to that space?

 5          A.  They would be escorted by the deputies.

 6          Q.  From whatever jail they were housed or living

 7     in?

 8          A.  Correct.  I mean, our staff was well skilled

 9     with escorting deputies.  That was not an issue.

10          Q.  Okay.  Let me go back to some COVID questions.

11     Well, we got a little offtrack.  Before I go that far

12     back, let me go less farther back.

13              We talked about the additional institutions

14     that you would advise be used to reduce the inmate

15     population and programming.  Are you going to offer any

16     other opinions about what the sheriff's office should do

17     for incarcerated inmates in San Bruno Jail to improve

18     their conditions of confinement?

19              MS. HUANG:  I'm sorry, I didn't hear the entire

20     part of your question.  Could we have it read back,

21     please?

22              (Record read.)

23              THE WITNESS:  To your question, I expect that

24     this will be blended into my answers about contingencies

25     that the City and the sheriff's department can make --

1    it may have already been even considered, I don't

2    know -- you know, toward the event of another pandemic

3    or something of that -- you know, something of that

4    level.

5        So the answer is yes, I will or I can,

6    absolutely.

7    BY MS. BERDUX:

8        Q.  What else?

9        A.  I think that that's it in terms of -- I mean, I

10   can give examples, I think.

11       Q.  Well, yeah, specifics.  I'd like to know what

12   specifically you will say if you're asked on the stand

13   about what other things should be done, plans should be

14   made, et cetera?

15       A.  Is everything -- let me ask a question back,

16   please.  Does everything that I say on the stand need to

17   be vetted now?

18       Q.  Well, it needs to be disclosed.

19       A.  Right.

20       Q.  Yeah, this is my chance.

21       A.  Right.

22       Q.  You know, I have the report.

23       A.  Right.

24       Q.  Theoretically all the opinions you intend to

25   offer should be in your report or a rebuttal report.

1    This is my last chance to find out what your testimony
2    is going to be before you give it at trial.
3         A.  Right.  Yes, so I want to be as consistent with
4    the process as possible.  I only ask that question in
5    case a thought occurs to me that didn't occur, you know,
6    in the composition of my expert report, that's all.
7         Q.  Oh, to be very honest, I will be seeking to
8    exclude any thoughts that occur to you later that were
9    not disclosed.
10        A.  Yeah, that's fine.
11        Q.  And Ms. Huang will do the same.
12        A.  Yeah, that's totally fine.
13             So, yeah, I don't have the enumerated specifics
14   on what those COVID contingencies are.  I just know
15   that -- I mean, I do.
16             That would be, actually, more robust electronic
17   monitoring.  I already said this.  More robust
18   electronic monitoring, a population assessment of bed
19   units, both bed units to house people that are diverted
20   from incarceration that make the -- that are classified
21   as eligible.
22             Halfway house programming.  Kind of a generic
23   term, "halfway house," but the rehabilitation reentry
24   programming for where there aren't housing units but
25   people who are then housed in their own domiciles but

1    then going to reentry programming outside.  Like, for

2    example, substance disorder programming, alcohol, harm

3    reduction, et cetera, that can be made available outside

4    because it already is.  So it's an expansion of what

5    currently exists.

6        Q.  Okay.  And when you had talked about the bed

7    analysis, you meant not keeping misdemeanors or

8    nonviolent felons incarcerated; right?  I just want to

9    make sure I captured your --

10       A.  Predominantly misdemeanor.  And we're talking

11   about unsentenced, of course.

12       Q.  Correct.  Yes.

13       A.  Unless there are circumstances for medically

14   approved where people can be released.  And I think

15   generally that was a practice that was well considered

16   by the City and the sheriff.  So yes.

17       Q.  Okay.  Do you intend to offer any criticisms of

18   the sheriff's office COVID-19 protocols?

19       A.  No.

20       Q.  Did --

21       A.  Except the fact -- except the fact that I think

22   their COVID-19 protocols have extended too long.  And I

23   think that by extending too long, I think they use the

24   excuse of COVID as an overlay to short-shrift the level

25   of staffing and programming for inmates in CJ3.

1      Q.  Okay.  So what COVID protocols are in place

2  currently that you believe have been extended too long

3  or that you will opine have extended too long?

4      A.  Or maybe not currently but recently, I'll say

5  it that way.

6      Q.  Sure.

7      A.  The ability to have out-of-cell time.  This was

8  in my report.

9      Q.  Yeah.

10      A.  Out-of-cell time.  The ability to get a level

11  of exercise, out-of-cell time that they did just not

12  have before.  Understandable to a point during the COVID

13  blackout, but as we were coming out of COVID there was

14  some question about how long that should have persisted,

15  and I think that kind of gets to the corpus of what

16  we're talking about.

17          And then, of course, I think the protocols that

18  extended to the AdSeg, administrative segregation,

19  population were fierce.  And that also is parallel to

20  the earlier comment from general population to them that

21  they may have gone a little too far for too long.

22      Q.  And when you say "the AdSeg protocols," do you

23  mean the AdSeg out-of-cell time?

24      A.  Correct.

25      Q.  Okay.  All right.  Let me break that down a

1    little bit or ask some more questions about it.

2           When would have been or what time period did

3    you believe these COVID protocols as you've laid out,

4    the out-of-cell time, the opportunity for exercise, and

5    the AdSeg out-of-cell time, should have been -- which of

6    those protocols should have -- when should those

7    protocols have been stopped?

8       A.   You know, I'd like to return to you with a more

9    specific date, but I'm going to say first quarter of

10   2022.

11      Q.   Okay.  And is that true even though we had the

12   Omicron variant surge this summer?

13      A.   That's a fair question.  And the answer is

14   maybe, only because the Omicron did throw a wrench in

15   the potential plans.

16      Q.   Okay.  And is your opinion on that affected by

17   any assumptions you have regarding the number of inmates

18   who have received the COVID vaccine?

19      A.   Well, I'm hoping they all have.  So --

20      Q.   They have not.

21      A.   Right.

22      Q.   You know, we don't force vaccines.  You know,

23   city employees --

24      A.   I understand that.  I very much understand

25   that.  I'm kind of buttressing, I think, the question.

1          No, it's actually dependent on the staffing.

2    Again, I think that inmates are who inmates are in that

3    regard, but the staffing as an apparatus is necessary in

4    order to support the level of programming as best as

5    possible and concurrently the security and staffing of

6    both staff in amidst themselves.

7          That's a lot to juggle, but I do believe the

8    San Francisco Sheriff's Department can exercise that

9    bandwidth coming out of COVID even as we might traverse

10   Omicron a little bit better, yes.

11        Q.  All right.  When you were sheriff, how much

12   out-of-cell time did the inmates classified in

13   administrative segregation receive at San Bruno County

14   Jail?

15        A.  It might have been one hour to two hours, but

16   it varies.  And I'm sorry, it differs, but I'm going to

17   say one to two hours.  Potentially more.

18        Q.  Per what?

19        A.  Day.  But I think it depends.  And you're

20   talking about just San Bruno, or are you talking about

21   the other jails?

22        Q.  Yeah, just San Bruno.  This case was only

23   about --

24        A.  Right.

25        Q.  -- the CJ3 and 850 Bryant, but now 850 Bryant's

1    closed.

2        A.  Right, right.  I'm more than happy to update my

3    answer, but I'm going to say what I already said.

4        Q.  Okay.  One to two hours, depending?

5        A.  Right.

6        Q.  On what?

7        A.  I think the classification of that particular

8    member -- inmate.

9        Q.  Okay.  So, in other words, if an inmate in

10   administrative segregation was violent toward other

11   inmates, he would likely have only been allowed out of

12   his cell by himself?  Is that accurate?

13       A.  Correct, correct.

14       Q.  Okay.  And his time out of cell -- or strike

15   that.

16           Depending on what pod he was in at that time,

17   that he needed to be outside of his cell alone would

18   affect the amount of time available to other inmates to

19   be out of cell in that pod; right?

20       A.  That's correct.  In proportion to staffing

21   available that would be able to manage him, that is

22   correct.

23       Q.  Was the amount of time, the one to two hours

24   per day, written in any of the sheriff's office policies

25   or custody manuals or policies and procedures?

P 0056-000091

```
 1        A.  I believe in our manual system -- I don't have
 2   it here -- yes, I mean, I think in the policies that we
 3   had existed -- hold on.  Let me try to review any of
 4   this.
 5            Yeah, I'm trying to recall, but I believe in
 6   our manual -- operations manual as it refers to then CJ5
 7   in terms of our security protocols and our medical
 8   health protocols and protocols concerning AdSeg and
 9   classification, of course.
10        Q.  Okay.  Do you remember what sections of the
11   operations manual identified that one to two hour per
12   day --
13        A.  I don't.  Sorry.
14        Q.  -- out-of-cell time?
15        A.  I do not.  I don't have that in front of me.
16        Q.  And what was the policy during your tenure for
17   out-of-cell time for general population inmates?
18        A.  Seven hours.
19        Q.  And was that codified or written anywhere?
20        A.  I believe it was in the same manuals as a
21   reference to general population.
22        Q.  Okay.
23        A.  If it wasn't in the manuals themselves, then it
24   would have to be in our operation procedures that would
25   be memorialized by memo.
```

1           MS. HUANG:  Ms. Berdux, how much longer do you

2    think you're going to go?

3           MS. BERDUX:  I have a while.

4           THE WITNESS:  Who's being vague?

5           MS. BERDUX:  And I want to go -- I want to turn

6    back to the documents to get through that list.

7           THE WITNESS:  Let me -- can I -- my Airbuds

8    discharged, so I just want to hook them up and my wires

9    are over here.  Can I do that really quickly?

10          MS. BERDUX:  Yeah, of course, absolutely.

11          THE WITNESS:  And it's just about 4 o'clock,

12   and I expect two hungry boys coming home soon.  I think

13   my wife will be able to attend to that, but let's see

14   how the noise level goes; right?  I'm willing to keep

15   going on and, of course, I'm happy to even continue on

16   another day, but I just want to give you the heads-up

17   that we're near the 4 o'clock hour and there will be

18   some noise.

19          MS. BERDUX:  Yes.  And Ms. Huang alerted me to

20   that.  I'm happy to go as long as you're able.

21          THE WITNESS:  Sure.

22          MS. BERDUX:  But if you can't focus or you

23   can't hear we can suspend for the day and resume another

24   time, if that's to happen.

25          MS. HUANG:  Why don't we go off the record for

P 0056-000093

1  a minute, let Sheriff Mirkarimi plug in his Airbuds, and

2  then we need to talk a little bit about scheduling,

3  could we, in this brief break?

4         MS. BERDUX:  Sure, sure.

5         (Break taken at 3:59 p.m.)

6  BY MS. BERDUX:

7     Q.  All right.  Great.  We're back on the record.

8         We're going to keep plugging away until I think

9  your kids come back and the inevitable mayhem comes up.

10 But maybe it won't.  Maybe we'll make it out and we'll

11 see what happens.

12    A.  Yep, yep.

13    Q.  So turning back to the documents that you

14 relied on to form your opinions.  We are at page 23,

15 line 6, letter to the Board of Supervisors?

16        MS. HUANG:  Wait.  I need to go back to that

17 document.  Give me just a moment.

18        MS. BERDUX:  Oh, sure.

19        MS. HUANG:  Are you marking it?

20        MS. BERDUX:  It is already marked as part of

21 his report.  It's Exhibit A.  It's the first document in

22 the chat.

23        THE WITNESS:  Can I ask?  Instead of me just

24 looking at the page, seeing if -- 'cause some of these

25 titles are very -- the way it's written here are very

```
 1   clerical.
 2   BY MS. BERDUX:
 3       Q.  Yeah.
 4       A.  And that's why I'm not affirming if I've seen
 5   it, but that doesn't mean I have it.  It's just the way
 6   that it's identified here.
 7           And I know that we're two-thirds of the way
 8   through this.  I probably should have asked this
 9   earlier.  But does it make a difference if I refer back
10   to it by the file that you sent me?  Because I very well
11   can say with greater specificity if I saw it or didn't
12   see it or if it influenced my opinion.
13       Q.  Yeah, you can refer back to the file that I
14   sent.  And that's kind of why I was asking, oh, do you
15   have an electronic file, because usually when I see
16   names like this I usually have, like, an electronic file
17   that corresponds to these and I can open them up and we
18   can look at them.
19           MS. HUANG:  Maybe what we can do and I would
20   propose, if we are thinking of continuing it to a future
21   date, is that we meet and confer or I work with my staff
22   to get these documents produced.  We can do an amended
23   production, and that way you can have them and you can
24   actually refer to the actual document rather than the
25   title.
```

P 0056-000095

1          Because I can understand how after a month some

2    of these titles are not going to mean very much, like

3    "SFDSA signed letter agreement, longevity."  You know,

4    it would be hard versus seeing the actual document.

5          So if you wanted to, and we had until next

6    Thursday to do this, it gives my staff some time to put

7    it together.

8          MS. BERDUX:  Yeah, that's fine.

9    BY MS. BERDUX:

10    Q.  Although, I do just want to confirm what you

11    looked at.  For example, some of the declarations, I

12    think you were somewhat confident that you hadn't seen

13    before even though they're on this list?

14    A.  Right.  That's right, when I did a quick

15    cursory look of some things I hadn't seen or some things

16    I saw that just didn't make an impression or some things

17    that made an impression.  I understand that.

18    Q.  Yeah.

19    A.  But again, just based on the titles of these,

20    it's obscure.

21    Q.  So let me see if I can ask you this:  Do you

22    have an estimate for the number of documents that you

23    reviewed to prepare your report?

24    A.  (No verbal response.)

25    Q.  And you can give a range; right?  It doesn't

1  have to be exact.  It can be approximately 10 to 15

2  documents or whatever the range is.

3       A.  Yeah.  I'll say 10 to 20 documents.

4       Q.  Okay.  And can you describe what those

5  documents were?

6       A.  In portions I would say they're budgetary

7  policy-related documents pertaining to San Francisco.

8  There were policy documents pertaining to the state of

9  California and the BSCC.

10          There were -- there are policy and budgetary

11 documents referring to other systems, other jail

12 systems, and press would be the other documents.

13      Q.  Okay.  I don't see any -- what press documents?

14      A.  Oh, I just would Google -- like, I'd just

15 Google, tell me what's happening in the San Francisco

16 Sheriff's Department.  That's all.

17      Q.  Okay.  And did you save any of those?

18      A.  No.  But there weren't many.

19          I can give you an example.  There was a press

20 report that came out a few months ago, but one that

21 caught my attention -- but this was before I was invited

22 by Ms. Huang to be an expert witness.  And that was --

23 there was some deficiency in reentry programming, and

24 The Chronicle had covered an article about that.  And

25 that caught my attention and caught my eye.

1      Q.  Okay.  Did --

2      A.  So like --

3      Q.  Okay.  But you didn't save it to a separate

4  file, oh, this is --

5      A.  I did not.

6      Q.  -- I need this for my expert opinions?

7      A.  No, I didn't reference in my declaration or my

8  expert report.  But it did make an impression on me, I

9  will say that, because, one, you don't typically see an

10  article like that and, two, the source was anonymous.

11     Q.  Okay.  And then what are the policy documents

12  from other jails that you looked at?

13     A.  Well, actually, I probably misspoke.  I meant

14  through the BSCC and the state that gave examples of

15  other jail systems.  So that's it.  I was curious to see

16  what their measures -- COVID-related measures were like

17  and what their budgets are.

18         I do this for my own self because that's part

19  of my work in leading investigations in other jails from

20  time to time.  So that coincides, I think, with this

21  discussion too.  So that's it.

22     Q.  And did you, like, save or download those?

23     A.  The only thing I downloaded was what you have

24  and that, I believe -- and that is Titles 15 and 24

25  BSCC.

1      Q.  Yeah.  Okay.

2      A.  And I think the predecessor to BSCC in terms of

3  building code, California Building Code, and any

4  suggestion of giving deference or giving guidelines to

5  the building of jails and providing outdoor access,

6  et cetera.

7      Q.  Okay.  All right.  And then we've gone over

8  some of the policy documents that you've reviewed --

9      A.  Yes.

10     Q.  -- budget and policy documents?

11     A.  And, of course, I mentioned this in the very

12  beginning, the consulting reports from Sabot Consulting

13  that you, the sheriff, the deputy sheriffs, everybody

14  seems to use the same guy.  So yeah.

15     Q.  What significant information did you glean from

16  the BSCC documents or information in regards to what was

17  going on or what policies other jails had?

18          MS. HUANG:  With regard to what?

19  BY MS. BERDUX:

20     Q.  With regard to the opinions that you formulated

21  in this case.

22     A.  Not much.  I didn't find it very enlightening,

23  to be honest.  I didn't find it very enlightening.  I

24  thought that -- and I think this goes to my criticism of

25  the BSCC.  I find it to be a very vanilla institution

1     that is bereft of any kind of enforcement ability.

2          So their, I think, capture of what is happening

3     in other jail systems is interesting, but it's not as

4     informed as it should be.  As a matter of fact, if you

5     go to their website yesterday, which I did, I was just

6     curious what their news releases looked like, just

7     really out of curiosity.  And in terms of their praise

8     for workforce development on their front page, it was an

9     article from 2014.

10         So, I mean, it's just not -- yeah, it just

11    wasn't -- I was underwhelmed.

12         Q.  Okay.  In the 10 to 20 documents that you

13    reviewed to prepare your report in this case, I've got

14    San Francisco budget and policy documents, the

15    information that you just described looking on the BSCC

16    you said for -- that was underwhelming, and press

17    articles?

18         A.  Well, also --

19         Q.  And --

20         A.  Also what I shared with you before -- these are

21    just general categories -- the consulting reports.

22         Q.  Yeah.

23         A.  So external consulting reports and the external

24    reports that were, I guess, commissioned by the city

25    controller, DSA, whomever.  So those as well.

 1     Q.  Those are the reports written by Patrick Cowan?

 2     A.  You had Julian.  I think it's Julian Martinez.

 3     Q.  And Julian Martinez?

 4     A.  Right.  That's my belief, that that's who they

 5  authored.

 6     Q.  Other than those documents, have you reviewed

 7  or relied on anything else to prepare your opinions in

 8  the case?

 9     A.  Well, I discussed -- I mentioned earlier that I

10  spoke with Ken Lomba of the Deputy Sheriff's

11  Association.  And I believe he's in a pivotal position

12  to know or certainly harbor certain opinions.

13         Over the last few years -- I mean, I'm still

14  recognized and known, so I still have random people from

15  the sheriff's department stop me in aisle seven of

16  Trader Joe's or on the street when I'm walking on the

17  street.  These are very random people, and I couldn't

18  give you specifics.

19         But before this issue and my affiliation with

20  Ms. Huang came to this, I mean, I would gather opinions

21  all the time based on bits of information from people I

22  run into that very well could have influenced my opinion

23  about what we're talking about here today.

24     Q.  Okay.  But nothing you can point to

25  specifically in terms of documents, people, or

1    information?

2        A.  No.  My universe, I think, is a little smaller

3    than the others because of the timeline of when I really

4    got involved in this, which is on the tail end of this

5    process.  So the answer is that is sort of my sphere in

6    terms of the information and flow.

7        Q.  Sure.

8        A.  If I come up with anything else, I'm more than

9    happy to disclose that to Ms. Huang to give to you.  So

10   I can't think of anything else, but I also want to be as

11   comprehensive and as thorough as possible.

12       Q.  Yeah, I appreciate that.  That's exactly what

13   we're here for.

14           Let me ask you this:  Did anyone -- in forming

15   your opinions and doing your work on the case, did you

16   work with anybody else?  In other words, did you have

17   any other employees or clerks or research assistants or

18   writers --

19       A.  Not at all.

20       Q.  -- help you with this project?

21       A.  Not at all.

22       Q.  And did you write this report?

23       A.  I did, yes.

24       Q.  Okay.  And I think you mentioned you spent

25   about 40 to 60 hours on the case.  I'd like to get a

1 breakdown of how those hours were spent in terms of how

2 many hours spent reviewing documents, having

3 conversations -- versus having conversations versus

4 report writing versus research, et cetera.

5     A.  Oh, I would say the majority.  Let's say half

6 of it was writing -- was the actual writing, if not

7 more.  So I would say half to two-thirds would be the

8 writing portion of it.  And then the rest would be any

9 review or research that I've already shared with you.

10     Q.  Okay.  How many conversations have you had with

11 Mr. Lomba regarding this case in order to prepare your

12 opinions in your report?

13     A.  You know, by phone or by e-mail?

14     Q.  Either.  Let's do time spent.  How much time

15 have you spent communicating with him?

16     A.  Not a lot.  I would say maybe -- I would have

17 to go back and review, like, any kind of phone calls.

18 Because there's a lot of missed calls, that's for sure.

19         But actual contact, I would say anywhere

20 between six to ten calls.

21     Q.  And how much time did you spend on the phone

22 with him?

23     A.  Sometimes very brief.  And, if anything, maybe

24 one or two conversations could have gone, you know --

25 I'm guessing here, but could have gone maybe 20 minutes,

1    15 to 20 minutes.

2        Q.  Well, don't guess.

3        A.  Sorry.

4        Q.  But if that's a reasonable estimate, then

5    that's okay.

6        A.  Yeah, it is.  It's an estimate.

7        Q.  Okay.  And what did you talk about?

8        A.  Well, I think central to --

9            MS. HUANG:  I'm going to object on attorney

10   work product privilege.  I don't think you're entitled

11   to question the sheriff on the contents of our

12   conversation.  He's told you how many times he's spoken

13   to us, and I think that that's the end of the inquiry.

14           MS. BERDUX:  Well, okay, yeah, let me be more

15   specific.

16   BY MS. BERDUX:

17       Q.  During any substantive phone conversations that

18   you had with Mr. Lomba, was any of plaintiffs'

19   attorneys, including but not limited to Ms. Huang, on

20   the telephone at the time?

21       A.  Never.  Well, maybe -- no, no, I don't believe

22   so.

23       Q.  Okay.  So I think I can ask those questions,

24   then.

25           MS. BERDUX:  Will you still maintain your

1   objection?

2        MS. HUANG:  Your question was, was anyone else

3   on the call besides the sheriff and myself?

4        MS. BERDUX:  No, no, not you.  Was anybody

5   else -- were any of plaintiffs' attorneys on the phone

6   during conversations?

7        MS. HUANG:  I'm plaintiffs' attorney, and I was

8   on the phone.

9        MS. BERDUX:  He just said you weren't.

10       MS. HUANG:  Well, I thought maybe one.  I was

11  trying to recall.

12       MS. BERDUX:  Angela, do you mind reading back

13  my last question and the answer?

14       (Record read.)

15  BY MS. BERDUX:

16   Q.  Okay.  So during the phone conversations that

17  you had with Mr. Lomba, what was discussed?

18       MS. HUANG:  Okay.  So just for clarification,

19  the questions that she can ask you are your

20  conversations with Mr. Lomba but not in terms of your

21  conversations with me or any other attorney that's

22  working on behalf of plaintiffs, okay?

23       MS. BERDUX:  Right.

24       THE WITNESS:  Yes, I understand.

25       The thrust of our conversations were related

P 0056-000105

1  to, obviously, the sheriff's department and issues

2  affecting staffing, which is very much on Mr. Lomba's

3  mind, and the issues related to senior deputy staffing,

4  issues related to recruitment of new deputies, and

5  attrition.  And that was pretty much it.

6  BY MS. BERDUX:

7      Q.  Okay.  What did he tell you about the sheriff's

8  department generally?

9      A.  Oh, I -- he was -- he said that, you know,

10  Sheriff Miyamoto's, you know, trying to manage the

11  department.  I mean, frankly, I can't recall what he

12  said exactly about the sheriff's department in such a

13  general question.  You would have to be more specific.

14      Q.  All right.  What did he tell you about the

15  staffing?

16      A.  What we already all know and what has been well

17  reported, that they are significantly understaffed.  And

18  I think he felt -- and he's relayed this, obviously, in

19  the documents that are even party to this case --

20  concerned that there isn't enough being done to fill

21  those vacancies.

22      Q.  Okay.  And what did he tell you about the

23  senior deputy staffing?

24      A.  That he also believes that there is a

25  phasing-out process.

1    Q.  Did he give you any other details other than

2  that he believes there's a phasing-out process?

3    A.  Well, he gave me a few more details, actually,

4  about where he thinks those deputies are going.  Because

5  they're not being terminated.  They're just being sort

6  of redistributed.  And that's the part that, obviously,

7  addressed me and is relevant to what we're discussing.

8        If they're not going into the jails or are not

9  managing in the pods, that creates, you know, the impact

10  wave of security and safety and, therefore, undermining

11  the ability to provide the kind of programming that

12  San Bruno was well known for and deflecting or

13  defaulting staff because of maybe a deficiency in staff,

14  senior deputy or deputies, to then just having a staff

15  member in the crow's nest which then restricts the kind

16  of programming that would be occurring.

17    Q.  Where did he tell you the senior deputies were

18  being redistributed?

19    A.  Where did he tell me?

20    Q.  Yeah.  Where did he tell you they were being

21  redistributed to?

22    A.  This was kind of vague to me, but the reference

23  is just everywhere.

24    Q.  That's it?

25    A.  Yeah, essentially.

```
1        Q.  Okay.  Anything else he told you about the
2   senior deputy staffing other than the phasing out and
3   where they're being redistributed?
4        A.  No.  Not that I recall, no.
5        Q.  And what about the recruitment and attrition?
6   What did he tell you about that?
7        A.  He feels that it's weak.  Overall, I think he
8   feels it's very weak.
9        Q.  Any details about that?
10       A.  Well, in general terms, in terms of weak, the
11  marketing aspect, the competitiveness.  He's concerned
12  they're just trying to -- they're not putting the effort
13  out.
14           You know, that whining you're hearing, if
15  you're hearing it, is our boxer.  We have a dog and I
16  don't know if she needs me to let her outside or she
17  anticipates my son's coming home, but she's getting very
18  nervous or excited.  She's getting very excited.  Sorry.
19       Q.  Do you want to take a break or try and push?
20       A.  No.  Let's keep going.  But I wanted to
21  disclose where that noise is coming from because it's
22  starting to get loud here.
23       Q.  Oh, I've heard it all.
24       A.  Well, it's a dog noise.
25       Q.  Those I've heard.
```

1        All right.  So other than general discussions
2   that the recruitment was weak, marketing was weak, and
3   the sheriff's office is not being competitive, do you
4   remember any other specific conversations with Ken Lomba
5   about recruitment and attrition issues?
6        A.  Well, they're party to the same.  So attrition
7   issues is I was looking for -- of what I was reading,
8   eventually when I saw the consulting documents and
9   the -- I mean the staffing reports and documents, I was
10  trying to understand those.
11       So I actually called him to ask him about the
12  report of what's the level of attrition and how many
13  deputies you need.  I thought that the consulting
14  reports on staffing were -- were narrow, very, very
15  narrow.
16       Because the staffing reports, I was surprised
17  that the staffing reports were not spoken to by
18  Mr. Martinez in his declaration, which I saw, or his
19  expert report, which I saw after I submitted mine.
20       And I was, frankly, a little confused by that
21  because I don't think that his report syncs up very well
22  with the Sabot Consulting staffing reports on behalf of
23  the City and on behalf of the Deputy Sheriff's
24  Association.
25       So I was a little confused by that information,

1  which is why I called Mr. Lomba ultimately to get at the
2  heart of this question of why, if any, programs for
3  inmates are being shortcut or there's being restrictions
4  still in place at least a few months ago for out-of-cell
5  time for inmates or AdSeg population, why that hadn't
6  been addressed on their side at all.  And I was trying
7  to reconcile sort of those deficits in the reporting
8  itself.
9          Yeah, I think that that was a real -- it's a
10 missing piece in their response and their response to my
11 report about staffing, 'cause I think really the heart
12 of what we're talking about is the fundamental shift
13 away from our commitment to Title 15 and 24 and 14th
14 Amendment rights and the ability to staff in order to
15 provide for those rights, and that really was not at all
16 discussed by Sabot Consulting.
17         And so I wanted to ask Mr. Lomba about that,
18 about the attrition issue.  And yeah, the rest -- and
19 there were -- some of that did influence my thinking
20 process a little bit that I then pen to paper.
21    Q.  When is the last time you had a conversation
22 with Ken Lomba?
23    A.  This morning, as a matter of fact, I did.
24    Q.  What did -- what was that conversation about?
25    A.  He was telling me that he was going to be

1  deposed.  I was not aware of this, by the way, that he

2  was going to be deposed because there had been a long

3  time since we've actually spoken.  I mean, weeks.  That

4  is, I've only been on this thing less than two months.

5          So, and that he was being deposed, and he

6  updated me that -- I asked him were there any updates or

7  anything I can know about.  And he had said that -- to

8  your earlier question, I was curious, any

9  distribution -- the distribution of where is the staff

10 going.

11         And he shared with me that it was some going to

12 adult probation department for security since the

13 sheriff's department is used for contracted security;

14 the San Francisco Public Library; the DPH, Department of

15 Public Health clinics; medical clinics, which has been

16 ongoing as we've assimilated institutional police into

17 our ranks, sheriff's ranks.  And there might have been

18 one or two others.

19         But that was it.  That was the only update.

20 And there have been no numbers, no specifics.  Very

21 general.

22     Q.  And before this morning when was the last time

23 you spoke with him?

24     A.  Well, we started our conversation yesterday, as

25 a matter of fact, but I had to go because we -- I had to

1   go because of Halloween.  So, and then before then it

2   had been many weeks, and I couldn't tell you.

3       Q.  Okay.

4       A.  But I can find it.

5       Q.  And was any of the information that you -- was

6   any of the information that he gave you inconsistent

7   with any of the documents that you reviewed to prepare

8   your report?

9       A.  No, not inconsistent.  No, not at all.  In

10  fact, I think that was one of the questions I had, is I

11  want to understand about continuity and any updates.

12  Obviously, I'm not there at the department and I was

13  looking for any, you know, updated information, if there

14  is any.

15          And he just repeated, frankly, what he

16  repeated -- what he started to say yesterday and what he

17  repeated today was about his disappointment with the

18  recruiting and marketing process.  He was venting.

19      Q.  Okay.  Did he offer any solutions?

20      A.  Only one.

21          MS. HUANG:  Objection.  Vague and ambiguous.

22  Solutions as to what?

23          MS. BERDUX:  For the recruiting.

24          MS. HUANG:  Oh, okay.

25          THE WITNESS:  Only one.  It was only one.  Very

P 0056-000112

1  general.  And that was social media.  That's all he

2  said.  I didn't ask and we didn't get into it.

3  BY MS. BERDUX:

4      Q.  Okay.  I want to rule out or confirm some

5  documents that you have not reviewed in the case.

6          Before I get there, though, you mentioned

7  reviewing the report of Julian Martinez.  Do you know

8  him, who he is, outside of reviewing his report?

9      A.  I've never met him.  I've never had a

10  discussion with him.

11      Q.  Okay.  Do you know what his reputation is in

12  the -- in his professional community?

13      A.  I looked him up and determined or assessed, you

14  know, his history and his ability.

15      Q.  Do you have any opinions about his reputation

16  in his professional community?

17      A.  His reputation --

18          MS. HUANG:  Mr. Lomba's professional --

19          MS. BERDUX:  No, no.  Mr. Martinez.

20          MS. HUANG:  Oh, Mr. Martinez's professional

21  reputation.

22          THE WITNESS:  No.  I mean, I don't really have

23  an opinion about his reputation either way, no.

24  BY MS. BERDUX:

25      Q.  Have you reviewed the deposition transcript of

```
 1   Montrail Brackens in this case?
 2        A.  I believe I have.
 3        Q.  Not the declaration but the deposition
 4   transcript?
 5        A.  That you recently took?
 6        Q.  Yes.  I took his deposition.
 7        A.  No, I do not.  I have not.
 8        Q.  Have you reviewed the deposition of Michael
 9   Brown in this case?
10        A.  And when was that?
11        Q.  Hold on.  Let me get there.
12            Michael Brown's deposition was conducted in two
13   parts on June 4th, 2021, and July 8th, 2021.
14        A.  And when was -- yes, I believe I have.
15            And then when was Brackens' taken?
16        Q.  Brackens' deposition was August 18th, 2022, and
17   August 22nd, 2022.
18        A.  I believe I have.  Was that also in two parts?
19        Q.  That was also in two parts.
20        A.  I believe I have, but I'm trying to recall if I
21   saw both parts.
22        Q.  But those depositions are not included on your
23   list of documents reviewed.
24        A.  Yeah.  That's why I'm reaching a little bit, as
25   you can probably tell in my answers.
```

1            So I would have had to receive them by

2    Ms. Huang.  That's the only way I would have been able

3    to get them or even notice them.

4        Q.  Right.

5        A.  So I'm under the impression I have.  I'm just

6    not pinpointing the time of day.  Have those been sent

7    to me?  I don't -- I want to just verify.

8        Q.  I don't know.  But let me pull up what it looks

9    like.  And I will share my screen.

10       A.  Okay.

11       Q.  So this is a PDF.  This is the title page of

12   the first session of Montrail Brackens.  And it will

13   look like your deposition transcript.

14       A.  Yeah.

15       Q.  Because it'll look like -- it's everything that

16   was said, questions and answers.  This first session

17   went up to --

18       A.  Right.  Can I do a quick search to see if I

19   have it?

20       Q.  Sure.

21       A.  I'll be right back.  I mean, I'm here.  I'm not

22   going anywhere.

23       Q.  Yeah.

24       A.  Let's see.

25           MS. HUANG:  Do you think, Ms. Berdux, you're

```
 1   going to finish by 5:00?
 2          MS. BERDUX:  I don't think so.
 3          MS. HUANG:  Can we agree to take a break at
 4   5:00 and resume on a different day?
 5          MS. BERDUX:  I think so.  Or we can keep going
 6   until the kids get home.
 7          THE WITNESS:  Well, one kid is home.  He's with
 8   Mommy and she's doing us a favor.  So our youngest is
 9   home.  Our other one is en route.  He's a teenager, so
10   he wants to ride the bus now everywhere.
11          MS. BERDUX:  Oh, nice.
12          THE WITNESS:  He wants to understand
13   San Francisco, so he's riding Muni.  So I'm on the edge
14   of my seat as this happens.
15          So let me see.  I'm looking.  Okay.  I have --
16   let's see.  So I have the actual complaint of Norbert,
17   McAllister, Harris, Brackens, Michael Brown, and Jose
18   Poot.  I have that and I did review that.
19          And then I have what is filed on 2019 continued
20   from Terry Kupers and then Jamie Zeitzer.  So I have
21   those.  But you're asking me about his deposition?
22   BY MS. BERDUX:
23      Q.  Right.
24      A.  Yeah, I'm sorry, I don't have that in my
25   system.
```

P 0056-000116

1      Q.   That's okay.  No apology needed.  It's just to

2   know what you have and what you've reviewed.

3          Do you have the deposition transcript of

4   Michael Brown?

5      A.   Let's see.  What I have here -- no, I do not.

6   The one that was taken just a couple months ago?

7      Q.   Michael Brown's deposition was taken in June

8   and July 2021.

9      A.   Oh, 2021.  So what I have is the rebuttal

10  expert -- Norbert versus City rebuttal expert

11  designations.  That's what I have regarding anything

12  implied of Michael Brown.  So the answer, I think, is

13  no.

14     Q.   Okay.  Do you have the deposition or have you

15  reviewed the deposition of Armando Carlos?

16     A.   When was that taken?

17     Q.   November 22nd, 2021.

18     A.   No.  Would these be blended -- would these all

19  be separate documents, or would they actually be

20  conjoined?

21     Q.   It depends on how documents were sent to you by

22  Ms. Huang.

23     A.   Right.  No, I do not have it.

24     Q.   Have you reviewed the deposition of Marshall

25  Harris?

```
1        A.  I'm sorry.  I don't have it, no.  I didn't
2   receive it and I don't have -- unless it's in a
3   different file, but it's just not coming up when I'm
4   doing a search.
5        Q.  Have you reviewed the deposition of Troy
6   McAllister?
7        A.  When was that taken?
8        Q.  In July and August 2022.
9        A.  So, recently?
10       Q.  Yeah.
11       A.  No, I do not have it.
12       Q.  Have you reviewed the deposition of Kenyon
13  Norbert?
14       A.  The -- when was that taken?  'Cause I
15  have -- well, I have more on Norbert.  Hold on.
16       Q.  His deposition was --
17       A.  I have his complaint.  I have the complaint,
18  not the deposition.
19       Q.  Okay.  Have you reviewed the deposition of Jose
20  Poot?
21       A.  And when was that taken?
22       Q.  January and March 2022.
23       A.  No.
24       Q.  Have you reviewed the deposition of Chief Kevin
25  McConnell?
```

1      A.  No, I haven't.  I have seen the references of

2  Chief McConnell in the Julian Martinez report.  So I've

3  seen ample references to Chief McConnell and others in

4  the Martinez report, but not his direct.

5      Q.  Okay.  Have you seen a declaration of Kevin

6  McConnell?

7      A.  I have not, no.

8      Q.  Do you know Kevin McConnell?

9      A.  I do.  He was one of many staff under my

10 administration.

11     Q.  Do you have any opinions about him in his

12 professional capacity?

13     A.  That I thought of him as a very committed and

14 industrious member of the staff and not surprised that

15 he has been elevated to chief, I believe chief deputy.

16     Q.  Have you reviewed the deposition of Captain

17 John Ramirez?

18     A.  The declaration or deposition?

19     Q.  Deposition.

20     A.  Deposition?  No, I do not have that.

21     Q.  Do you know who he is?

22     A.  I do.  I promoted him.  I promoted a lot of

23 these people.

24     Q.  Oh, nice.  Did you also promote McConnell?

25     A.  He was a lieutenant.  So I'm trying to recall

1   if I promoted him to lieutenant or not.  But Ramirez I

2   definitely did promote.

3        So I don't recall specifically on McConnell.

4   But I promoted Freeman, Ramirez, and a few others that

5   are I think mentioned in this case.

6        Q.  And so do you have an opinion about Captain

7   John Ramirez in his professional capacity?

8        A.  Similarly to McConnell.  I think very

9   committed, very industrious and detailed and worthy of

10  his position.

11       Q.  Did you review the deposition of Captain

12  Stephen Tilton?

13       A.  I didn't see the deposition, but I saw the many

14  references of Captain Tilton.

15       Can you hold on one second, please?  I'm going

16  to have to get the door for my son.  Sorry.

17       Q.  Sure.

18       MS. HUANG:  Ms. Berdux, I'm going to have to

19  take a break at 5:00.  I haven't had lunch yet and I

20  think I'm fading fast.

21       MS. BERDUX:  Oh, okay.  No problem.

22       MS. HUANG:  So we can take a 45-minute break,

23  if you really need to continue, or we can continue a

24  different day?

25  BY MS. BERDUX:

1      Q.  When you just stepped away, Ms. Huang indicated

2  that she needs to take a break at 5:00, which is fine

3  for, like, a lunch or a dinner, but I leave it to you

4  whether we come back and just knock it out tonight or on

5  a different day.

6      A.  I'm going to -- as much as I'd like to knock it

7  out tonight, I'm going to have to opt for a different

8  day.

9      Q.  Okay.  So what --

10     A.  We can keep going a little bit right now but --

11  a little bit.

12     Q.  Should we go to 5:00, then?

13     A.  Yes.

14     Q.  Okay.  I understand you reviewed references to

15  Stephen Tilton's deposition?

16     A.  I did.

17     Q.  And the report of Martinez?

18     A.  Yes.

19     Q.  Have you reviewed his deposition?

20     A.  I didn't.  I have not.

21     Q.  And do you know him?

22     A.  I do.

23     Q.  And do you have a --

24     A.  Same opinion as the others.  I believe he's --

25  he was not a captain then and I'm glad he is now.

1    Q.  Did you promote him during your tenure?

2    A.  I did not, no.  But he was actually in my top

3  two of consideration.  So I knew it was just a matter of

4  time before he gets promoted.

5    Q.  Great.  And did you review the declaration of

6  Undersheriff Freeman?

7    A.  I didn't see it.  I know Matthew well, and I

8  saw the references to Matthew Freeman throughout the

9  various documents.

10    Q.  And did you promote him?

11    A.  I did, to chief deputy.

12    Q.  And do you have an opinion about him in his

13  professional capacity?

14    A.  Oh, I think he was one of the best in the

15  department.  For his capacity to advance to becoming an

16  undersheriff, it was a very smart move.

17    Q.  Did you review the deposition of Dr. Lisa

18  Pratt?

19    A.  I did not.

20    Q.  Do you know her?

21    A.  I do.  I don't know her personally, but I know

22  her.  She's certainly been in the news a lot lately too.

23    Q.  Yeah, she has.

24        Was she the head of jail medical during your

25  tenure?

P 0056-000122

1      A.  You know, I don't recall.  She was, but I think

2  it was right near my time.  So I would have to be a

3  little more specific on the time set.

4          But I think she's very capable, very worthy of

5  her position and, quite frankly, I don't think the

6  San Francisco jail system could have done as well around

7  COVID if it wasn't for her and her team.

8      Q.  Did you review her declaration?

9      A.  I did not.

10      Q.  Did you review the deposition of Sheriff Paul

11  Miyamoto?

12      A.  No, I haven't seen it.

13      Q.  I assume you've met him?

14      A.  When was that?

15      Q.  That was on July 11th, 2022.

16      A.  No.

17      Q.  And do you know him?

18      A.  Yes, I do.  He was an opponent of mine in the

19  2011 sheriff's race.  And after my administration took

20  over I invited him to be my assistant sheriff, and the

21  rest is history.

22      Q.  Great.  And do you have an opinion of him in

23  your professional -- do you have an opinion of him in

24  his professional capacity?

25      A.  My opinion is that I think he's a very, very

1    capable sheriff.

2        Q.  Okay.  Did you review any medical records of

3    the plaintiffs in this case?

4        A.  I did.  I'm trying to recall.  Attached to --

5    attached to -- of the plaintiffs, some records attached

6    to -- I don't know if they're directly medical records

7    or if they were actually within the complaints and

8    declarations -- I'm sorry.  Not depositions,

9    declarations regarding the health effects.  So maybe not

10   specific medical records of each of the plaintiffs.

11       Q.  Yeah.  They did outline the symptoms and

12   conditions that they're experiencing.  But apart from

13   their descriptions, did you review any of their actual

14   medical records?

15       A.  I don't believe so.  But information that I

16   think was informative was built into what was sent to

17   me, was that information related to each of the

18   complaints and the plaintiffs.

19       Q.  The City produced a lot of documents in this

20   case and they are identified by Bates numbers, similar

21   to the Bates numbers that you saw on Exhibit B that we

22   looked at today.  But they were Bates-stamped

23   differently.  I'm going to pull up an example.

24           The Bates stamps that we used on the bottom

25   right-hand corner were labeled CCSF-Norbert 000 and then

1   the number.  Did you review any of the City's document

2   productions in this case or documents with the City's

3   produced Bates-stamped number on it?

4        A.  Can I ask my attorney something?  Is that okay?

5        Q.  I think so.

6        A.  Yeah, no, I'm just trying to recall if any of

7   that was -- 'cause if I did, it would have been sent to

8   me.  And I'm just trying to recall if that was sent.  I

9   mean, I can look quickly.  I'm just trying to determine

10  if that has been sent.  So hold on.  Let me first check

11  on my end.

12       Q.  Great.

13       A.  I'm going to mute you for a second.  My wife

14  needs to use the blender.

15       Q.  Okay.

16       A.  So, no, I don't see that from the City's --

17  originating with the City's Bates stamp.

18            But I just did see an e-mail of documents that

19  were sent to you all today by Yolanda at 12:35 p.m.  I'm

20  sorry, I did not see that until just now.  And

21  apparently in that is a host of documents, some I think

22  that we discussed that I didn't confirm because I just

23  didn't see that that was sent to you.

24            So if I had seen that earlier, and that was

25  just sent today a few hours ago, I probably would have

 1  been able to give you some more affirmation on those

 2  documents.  Sorry.

 3      Q.  Yeah, that's okay.  And I'll represent to you

 4  that that e-mail that you just saw was also the same

 5  documents that we took that 20-minute break to have you

 6  look through to see if you recognize or received those

 7  before.

 8      A.  Right.  Now that makes sense to me not knowing

 9  that -- whether I saw those or not, I saw those at one

10  point or another.  But since that was sent to you and

11  sent to me today -- anyway, I appreciate us trying to

12  circle back on that.

13      Q.  Yeah, definitely.  Well, so let me ask you

14  this.

15          Having seen that, that e-mail that just came in

16  with those documents, are those the documents that you

17  received in this case or used or used or relied upon to

18  prepare your report?

19      A.  Well, in some ways I'd say a majority of them,

20  yes.

21          MS. BERDUX:  Oh, Ms. Huang, you're muted.  I

22  can't hear you.  We can't hear you.

23          MS. HUANG:  I want to object to the question as

24  vague and ambiguous and overbroad.

25          So the question is, did you really have an

1    opportunity to review any of the documents in reality,

2    Sheriff?

3              THE WITNESS:  No, not from the time that I

4    received them.  Apparently the time they came in is

5    12:35 p.m., so I just saw the e-mail.

6    BY MS. BERDUX:

7         Q.  Okay.  So to confirm, though -- I think I got

8    the answer, but I want to be clear -- have you received

9    or reviewed any of the City's document productions which

10   are Bates-stamped with the CCSF-Norbert and a number?

11        A.  I don't believe I have, unless they're in that

12   e-mail that was sent at 12:35 p.m.

13        Q.  Got it.  Okay.  Let me see if there are any

14   categories of documents that you've received or reviewed

15   in this case.

16             Have you reviewed the sheriff's COVID policies

17   and procedures?

18        A.  I have, yes.

19        Q.  Have you reviewed any grievances in this case?

20        A.  From inmates or from --

21        Q.  Yeah.

22        A.  I'm sorry?

23        Q.  Yes, from inmates.

24        A.  From inmates.  Grievances, I have not.  I have

25   not seen grievances.

1    Q.  Have you reviewed any of the inmate packets?

2         MS. HUANG:  Excuse me?  Vague and ambiguous as

3    to "inmate packets."

4         MS. BERDUX:  Yeah, let me break that down.

5    Sorry about that.

6    BY MS. BERDUX:

7    Q.  Have you reviewed any inmate disciplinary

8    records?

9    A.  No.

10   Q.  Have you reviewed any inmate booking cards?

11   A.  No.

12   Q.  Have you reviewed any classification records?

13   A.  Of the plaintiffs?

14   Q.  Plaintiffs or -- yes.

15   A.  Of the plaintiffs, classification records.  I

16   believe I saw something about classification, but I

17   thought that that was built into one of the reports that

18   I read.  Not specifically from classification in their

19   normal format, no.  It looked like it was information

20   lifted from classification.

21   Q.  Okay.  So as it's referenced in another expert

22   report but not the records themselves?

23   A.  Correct.

24   Q.  Have you reviewed any housing records or

25   housing of the plaintiffs?

1        A.  Same thing as to the classification.

2        Q.  Have you reviewed any administrative

3    segregation records?

4        A.  Of any of the plaintiffs?  No.  But I have --

5    there was substantial information, I believe, sort of

6    that spanned the various reports of the affected

7    plaintiffs.

8        Q.  Got it.  Have you reviewed any inmate incident

9    reports?

10       A.  Again, referenced in another report.

11       Q.  Not themselves?

12       A.  Right.

13       Q.  Have you reviewed any library records?

14       A.  Not that I recall.

15       Q.  Have you reviewed any commissary records?

16       A.  Not that I recall.

17       Q.  Have you reviewed any call records or call

18   logs?

19       A.  No.

20       Q.  Have you reviewed any video visit logs?

21       A.  No.

22       Q.  Have you reviewed any round sheets or housing

23   observation sheets?

24       A.  I saw a reference to housing round sheets,

25   yeah.

1      Q.  In another report but not the records
2  themselves?
3      A.  Correct.  In fact, I'm interested about rounds
4  and I'm interested about the staffing capacity to
5  effectuate their rounds.  So I think I was looking for
6  that.
7      Q.  Have you reviewed any inmate movement sheets?
8      A.  Referenced, again, in another document.  Not
9  the specific document.
10      Q.  Okay.  Have you reviewed any pod or dorm
11  sheets, log sheets?
12      A.  No.
13      Q.  Have you reviewed any transportation orders?
14      A.  No.
15      Q.  Have you reviewed any red books?
16      A.  Oh, I'm sorry.  On transportation, I saw a
17  reference on transportation.
18      Q.  In another report but not the actual documents
19  themselves?
20      A.  That's correct.  Correct.
21      Q.  Have you reviewed any red books?
22      A.  Again, content from the red book was referenced
23  in another place but not the red book itself, no.
24      Q.  Okay.  We are at 5:01.  I know that you needed
25  to be done at 5:00 today, so I'll stop and pick up where

P 0056-000130

1  we left off next time.  And I think you'll find out if

2  you're available on the 10th?

3          MS. HUANG:  Can we just do this now?  Can you

4  check your calendar very quickly, Sheriff?

5          THE WITNESS:  Yeah.  In fact, can we say

6  1 o'clock again on Thursday, on the 10th?  Is that

7  possible or even earlier?  I can try earlier, but I know

8  1:00 can work.

9          MS. BERDUX:  We have to be slightly in flux

10 because we have another deposition starting that

11 morning.

12          THE WITNESS:  Sure.

13          MS. BERDUX:  I don't mind starting the other

14 deposition, you know, before 10:00 or as early as we can

15 so that we can get to you by 1:00.  But how about --

16          THE WITNESS:  We can say 2 o'clock, if you want

17 to be safe.  Or we can do it, as you said, on standby.

18 So I'm happy to do that.

19          MS. BERDUX:  Okay.

20          MS. HUANG:  Okay.  Let's tentatively set it for

21 the afternoon of the 10th, then.  You're going to get

22 back to me about the 10th for Senator Hancock?

23          MS. BERDUX:  Yeah.

24          MS. HUANG:  Thank you very much, Sheriff.

25          MS. BERDUX:  Thank you so much.  That was a

P 0056-000131

1  long haul, I know.

2          THE WITNESS:  No, thank you.  I appreciate it.

3  And I look forward to talking to you again.

4          MS. BERDUX:  Thanks so much.

5          THE REPORTER:  Ms. Huang, would you like a copy

6  of this Volume 1 transcript?

7          MS. HUANG:  I'll let you know next time.

8          (The deposition adjourned at 5:03 p.m.)

9

10

11        _____

12                    ROSS MIRKARIMI

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1  STATE OF CALIFORNIA            )
 2                                 ) ss.
 3  COUNTY OF CONTRA COSTA COUNTY  )
 4          I hereby certify that the witness in the
 5  foregoing deposition, ROSS MIRKARIMI, was
 6  by me duly sworn to testify to the truth, the whole
 7  truth and nothing but the truth, in the within-entitled
 8  cause; that said deposition was taken at the time and place
 9  herein named; and that the deposition is a true record
10  of the witness's testimony as reported by me, a duly
11  certified shorthand reporter and a disinterested
12  person, and was thereafter transcribed into typewriting
13  by computer.
14          I further certify that I am not interested in
15  the outcome of the said action, nor connected with nor
16  related to any of the parties in said action, nor to
17  their respective counsel.
18          IN WITNESS WHEREOF, I have hereunto set my
19  hand this 11th day of November, 2022.
20  Reading and Signing was:
21  _X_ requested   ___ waived   ___ not requested
22
23
24         _____
25      ANGELA SINCLAIR, RMR, RPR, CRR, CCRR, CSR 13902
```

P 0056-000133

# EXHIBIT C

EXHIBIT _____A_____ PLTF. / DEFT

WITNESS _R. Mirkarimi_

CONSISTING OF _____23_____ PAGES

DATE _11-01-2023_

BEHMKE REPORTING AND VIDEO SERVICES, INC.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO/OAKLAND DIVISION**

| | |
|---|---|
| KENYON NORBERT, TROY MCALLISTER, MARSHALL HARRIS, ARMANDO CARLOS, MONTRAIL BRACKENS, MICHAEL BROWN, and JOSE POOT, on behalf of themselves individually and others similarly situated, as a class and Subclass, | Case No.: 3:19-cv-02724 SK |
| Plaintiffs, | EXPERT REPORT OF ROSS B. MIRKARIMI |
| vs. | |
| SAN FRANCISCO COUNTY SHERIFF'S DEPARTMENT, CITY AND COUNTY OF SAN FRANCISCO, SAN FRANCISCO SHERIFF VICKI HENNESSEY; CHIEF DEPUTY SHERIFF PAUL MIYAMOTO; CAPTAIN JASON JACKSON, CAPTAIN MCCONNELL and John & Jane DOEs, Nos. 1 - 50. | |
| Defendants. | |

## I.    BACKGROUND AND QUALIFICATIONS

Since 2016, I have served as an independent consultant and contractor on conducting custody death and misuse of force investigations in California jails. I have also served as a Peer Reviewer for the United States Department of Justice—Bureau of Justice Administration for evaluating the policy-technical-and regulatory implementation of municipal and state law enforcement's launch or expansion of its body-worn cameras program. I also serve as an adjunct professor at California State

2

P 0056-000135

1  University, Stanislaus's Criminal Justice Department, teaching "Law Enforcement Administration
2  and Management".

3      I served as the Sheriff for the City and County of San Francisco from 2012 to 2016. My role
4  as a department head and chief administrator required me to oversee an adjustable annual budget of
5  $193 million, 1,046 sworn-and-civilian personnel, 5 jails (1600 rated beds relative to classification,
6  housing, security, reentry programming, medical/behavioral health, etc.), salary—budgeting
7  congruency,   capital expenditures, staff recruitment, union-labor negotiations, regulatory
8  compliance, reentry--rehabilitation programming, public sector security contracts, ad-hoc patrol-
9  investigations, emergency management, policy-and-legislative management.

10     As Sheriff, I participated in conferences and meetings with reentry and rehabilitation experts
11  and served on panels, such as at the annual meeting of the National Alliance on Mental Illness in
12  Monterey, and the Realignment Community Partnership in Sacramento.
13  Our administration helped usher the advent of State Prisoner Realignment (AB 109) into the San
14  Francisco jails. We brokered a pilot program with San Quentin Prison, SF Probation Department, and
15  with funding from the State Senate to lead a customized reentry regiment for Realignment-classified
16  incarcerated individuals. Another milestone was co-representing the Sheriff's Department and its
17  Five Keys Charter High School, at the finalist competition for Harvard University's Kennedy
18  School's biannual competition, "The Innovation in American Government Award". The Sheriff's
19  Department and The Five Keys Charter High School won the 2015 award for demonstrating a durable
20  nexus between recidivism reduction and the completion of an in-custody and post-release diploma-
21  based education.

22     Before serving as Sheriff, I was twice elected to the San Francisco Board of Supervisors
23  (2005-2012). I authored or sponsored nearly 100 ordinances and charter amendments reflective of
24  criminal justice reform, community policing, environmental-climate protection, poverty abatement,
25  affordable housing, and government ethics. I legislated a series of laws preparing San Francisco for
26  State Prisoner Realignment (AB 109) and the creation of corresponding committees focused on
27  Community Partnership, Sentencing, and Reentry Reform.

28

3

**EXPERT REPORT OF ROSS B. MIRKARIMI**

As Supervisor, I served on influential committees that governed San Francisco's legislative endeavors and the City's fiscal planning, with accountability for an $8 billion budget. The committees on which I served included Finance-and-Budget, Government Audits, Public Safety, Reentry Council, among others. As a related committee duty, I presided over the Civil Grand Jury investigative and report process that implicated needed reforms of San Francisco's law enforcement agencies and the jails.

My licenses and certifications include the following: a) American Correctional Association, Corrections Executive, CCE. b) National Sheriff's Association, Homeland Security Protection Professional, CHPP. c) National Association for the Civilian Oversight of Law Enforcement, Practitioner, CPO. d) U.S. Department of Transportation, Safety and Security Protection Professional, TSSP. e) ASIS International, Protection Professional, CPP. f) California Peace Officer Standards and Training, 830.1 pc; basic, intermediate, and advanced. g) Federal Law Enforcement Training Center, Advanced Investigations. h) Federal Bureau of Investigation, Leadership Executive Development, LEED. i) National Center for Missing and Exploited Children, Executive Administer. j) California Office of Emergency Services-Specialized Training Institute, Hazardous Materials Technician and Specialist.

My education credentials include a Bachelors of Arts degree in Political Science, Saint Louis University (minor in Russian, Monterey Institute of International Studies); Masters of Arts degree in International Affairs, Golden Gate University; and a Master of Science degree in Environmental Management, University of San Francisco.

My vocational credentials include San Francisco Police Academy, 184th, Class President, and the U.S. Naval Reserves, Naval Intelligence, Honorable Discharge, 2003.  My curriculum vitae is attached as Attachment 1.

**II.    PREPARATION**

I have reviewed the Declarations of Kenyon Norbert and Jose Poot in this matter. The additional documents are in Attachment 2.  I have been asked by plaintiffs' counsel to consider these documents and render opinions about the SF Sheriff's Department budget and policy enablement of

harmful conditions to incarcerated individuals and departmental personnel at SF County Jail in San Bruno also known as CJ 3.

### III.     INSTITUTIONAL INDIFFERENCE TO THE IMPACT OF ADMINISTRATIVE SEGREGATION AND SIMILAR FORMS OF ISOLATING CONFINEMENT

Based on the affidavit of Mr. Norbert, I learned that his carceral condition subjected him to extended periods of Administrative Segregation ("Ad-Seg."). The American Correctional Association defines confinement for at least 22 hours per day as someone who is in Solitary Confinement or another form of isolation, such as Ad-Seg. Between his previous housing at the defunct CJ 4, located at 850 Bryant Street, and his incarceration at CJ 3 in San Bruno, Mr. Norbert was always confined indoors where he was bathed in fluorescent light (no access to sunlight).  Mr. Norbert suffered from severe headaches, anxiety attacks, memory loss, hypersensitivity to routine stimuli, appetite loss, nightmares, night sweats, and a combination of factors that degraded his impulse control. He was cell fed, alone or sometimes with a cell mate. He was permitted 30 minutes per day out of his cell, where he an adjacent room-gym was there, though, it was discouraged from using due to the limited time and space provided. There was no accessible radio or television. The closest T.V. was 50 feet away, making it hard to hear or read the captions. Mr. Norbert was an avid reader, which was useful to help discipline his sanity, but that desire wanned similarly to other incarcerated individuals who lost their appetite due to the toll of extended isolation. In effect, Mr. Norbert spent approximately 23.5 hours day in his cell.

It is my understanding and belief that individuals who suffer confinement for 23.5 hours a day for weeks and months or years, are subject to extreme social and sensory isolation, and environmental deprivation. The United Nations standards, also called the Mandela Rules, state: Every prisoner who is not employed in outdoor work shall have at least one hour of suitable exercise in the open air daily if the weather permits.  There are outstanding questions that speak to the practices and conditions of CJ 3 that dismiss or diminish the consequences of an incarcerated individual to cope with three hours of out of cell time per week, where they also live, eat, sleep, and defecate in the same space for nearly 23 .5 hours per day, and then, exit incarceration or their isolating confinement, and be expected to resume a more civilized existence or a rehabilitated life.

EXPERT REPORT OF ROSS B. MIRKARIMI

P 0056-000138

**IV.    NEEDED REFORM TO ISOLATION CONFINEMENT PRACTICES**

Based on a 2004 report on the California Department of Corrections and Rehabilitation's records of suicides in state prisons, I noted that 73% of inmate suicides occurred in isolation units—though these units accounted for less than 10% of the state's total prison population. I was also aware of the fluctuating number of suicides and attempted suicides in the San Francisco Bay Area County jails, ranged between zero and five (0 to 5) annually over a ten-year period.

In 2013/2014, I requested that members of my administration begin the process for commissioning a peer review study on how San Francisco can substantially diminish or halt its use of Ad-Seg and isolation units. Based on my own research and knowledge of how solitary confinement works for containing volatile and violent high risk incarcerated people, and its deleterious effects over a period of time, I am aware that some of the clinical impacts of isolation exhibit a variety of negative physiological and psychological reactions, including hypersensitivity to stimuli; perceptual distortions and hallucinations; increased anxiety and nervousness; revenge fantasies, rage, and irrational anger; fears of persecution; lack of impulse control; severe and chronic depression; appetite loss and weight loss; heart palpitations; withdrawal blunting of affect and apathy; talking to oneself; headaches; problems sleeping; confusing thought processes; nightmares; dizziness; self-mutilation; and lower levels of brain function, including a decline in EEG activity after only seven days in solitary confinement or Ad Seg..

I am also aware that attempted and effectuated suicides occur about 5-times greater in the solitary confinement/administrative segregation units in California jails, compared to the less restricted and general population units. It is my opinion that the rate of attempted suicides and effectuated suicides in the isolation units of California prisons and jails are much higher than reported. Recognizing these dangers in the state and throughout the nation, organizations including the American Psychiatric Association, Mental Health America, the American Public Health Association, the National Alliance on Mental Illness, and the Society of Correctional Physicians have issued formal policy statements opposing long-term solitary confinement, especially for prisoners with mental illnesses.

**EXPERT REPORT OF ROSS B. MIRKARIMI**

As far as I know, our third-party study on the Overuse of Administrative Segregation did not proceed when I left the SF Sheriff's Office in 2016.

## V.  CONTEXT: SAN FRANCISCO COUNTY JAIL 3, SAN BRUNO

The CJ 3 jail (formerly designated as CJ 5) located in San Bruno, California in San Mateo County, was inaugurated in 2006. The City and County of San Francisco owns the land where its jails are sited. CJ 3 replaced an adjacent jail that was activated in 1934, operating for seven decades, finally succumbing to disrepair and seismic instability. Due to concerns by nearby residents, in 1997, a proposal to build a replacement jail was opposed by the San Bruno City Council. Ultimately, a new San Bruno jail was built. The San Francisco sheriff decided to restrict outdoor access for the incarcerated to stave off the potential for escape.

On the spectrum of categorizing minimum to maximum security detention facilities, CJ 3 is designated by the California Board of State Community Corrections (BSCC) as a Type II facility, defined as "a local detention facility used for the detention of persons pending arraignment, during trial and upon a sentence of commitment". CJ 3 has a rated bed capacity for 768 incarcerated individuals.

The newly built San Bruno jail (CJ 3) consists of 16 cell blocks laid out in a semicircle in front of the deputy station with a central control panel, giving the deputy sheriff a line-of-sight view of the communal area and into each cell through clear polycarbonate walls. Cells hold two incarcerated individuals, so each housing pod has the capacity of 48 incarcerated individuals with an A and B side for a total capacity of 96 people in housing custody units.

In lieu of outdoor access for the incarcerated, each cell block was designed to have an indoor recreation area with a basketball hoop -- replacing an outdoor yard at the old jail. The indoor recreation area was a compensatory measure that was meant to be more accessible for incarcerated individuals.

The advent of the new jail in San Bruno was hailed for its modernized design to operate by a Direct Supervision model that allowed for the managing and monitoring of incarcerated individuals from a raised deck-floor for deputies and senior deputy staff. The deputy presence enabled a safe and secure custody housing environment that capacitated an accessible slate of reentry and rehabilitation

1  services such as, R.S.V.P., Roads to Recovery, C.O.V.E.R., the Five Keys Charter High School, and

2  Parenting Skills & Incarcerated Parent/Guardian—Child Visitation.

## VI.     THE CJ 3 OUTDOOR ACCESS CONUNDRUM AND OPPORTUNITY

Based on international, federal, and state law, all detainees ("the incarcerated") have the right
to outdoor exercise. In practice, the level of access to outdoor exercise can vary greatly between
different categories of the incarcerated housed in minimum to maximum security jails and prisons.
Differences may also be justified on security grounds, such as the incarcerated in disciplinary units,
high security risks, including the sentenced in "supermax" prisons. According to domestic and
international standards, the administrative decision-makers of prisons and jails must take measures to
ensure that all detainees have access to the minimum of one-hour outdoor exercise per day, including
those under segregation or in isolated punishment.

The impact of outdoor exercise is crucial for the mental and physical well-being of the
incarcerated as part of a balanced regime of activities in jail. This is especially true for the longtime
incarcerated. Given, that it has been the practice of San Francisco to require the incarcerated at CJ 3
to spend practically all their time indoors with restricted access to natural light and fresh air, a
mandatory default emerges as the only choice for incarcerated individuals of either using or not using
a meager indoor gym, which is fully enclosed with a ceiling, four walls, and one or two high
windows that provide some natural light but little or no line of sight to the outdoors.

It is my opinion that it is time for San Francisco to revisit and strengthen its regulatory
commitment to Title 15 and Title 24 standards to allow secured outdoor access for incarcerated
individuals. Structurally, CJ 3's design benefits from its easy accessibility to its predecessor jail,
which is located a few hundred feet away and remains unused, standing in part with ample outdoor
space that was once used for a variety of recreational activities. CJ 3 also has a semi-active annex
referred to as CJ 6. In 2014/2015, my administration tested our department's discouragement on
gathering outdoors by launching California's first jail based Aquaponic workforce development
program. I recall, when we cut the ribbon for the program launch outside on a very sunny hot day in a
high fenced patio, two incarcerated participants told me that not only were they excited to be in the
program, that they were blown away that the program was outside…with fish!

8

**EXPERT REPORT OF ROSS B. MIRKARIMI**

P 0056-000141

1   In addition, adjacent to the old and new jail was the largest organic urban garden in any

2   California jail or prison system, known as the Garden Project. Its existence started in 1982. During

3   my administration, I marveled at its vast acreage of crops and the Project's mission to introduce the

4   environmental principals of organic farming to inner-city and disadvantaged youth. At one time in its

5   earlier history, qualified, incarcerated individuals were allowed to work in the garden fields while

6   deputies kept security watch.

7   I discussed with staff the idea of allowing the incarcerated to grow their own food.  At that

8   time, staff did not like this idea because it deviated from the practice of disallowing the incarcerated

9   outside. I then discussed with Aramark, the contracted conglomerate food service provider, what it

10  would take to include our organic crops in the prepared dinners for the incarcerated.  Aramark's

11  representatives replied with a list of regulatory requirements, which we could meet.  However, when

12  I contacted the BSCC about this idea, they said, basically, "good luck".

13  Since CJ 3 is not a supermax prison, it can be retrofitted with state-of-the-art fencing, security

14  monitoring, and adequately trained deputy staff for security response when outdoor access is allowed

15  for the incarcerated. One retrofit consideration is leveraging the unencumbered outdoor plots that hug

16  the pods of the CJ 3 landscape.  These can be converted into recreational yards with high walls and

17  fenced roofing to allow sunlight. There are two annexes adjacent to CJ 3 poised for outdoor access

18  conversion, such as the one we used at CJ 6. With greater detail, a draft plan can serve as the

19  discussion-vehicle for fostering feedback from San Bruno neighbors, the San Bruno City Council,

20  officials in San Mateo County, and all relevant stakeholders.

21  According to the BSCC, Section 1231.2.10, an outdoor exercise area or areas must be

22  provided in every Type II and Type III facility. The minimum clear height must be 15 feet (4572

23  mm) and the minimum number of square feet of surface area will be computed by multiplying 80

24  percent of maximum rated population by 50 square feet (4.7 m2) and dividing the result by the

25  number of one-hour exercise periods per day. The exercise area must contain or provide free access

26  to a toilet, wash basin, and drinking fountain as provided in Section 1231.3. There must be at least

27  one exercise area of not less than 600 square feet (55.7 m2).

28

9

**EXPERT REPORT OF ROSS B. MIRKARIMI**

1    Politically, the San Francisco sheriff and city government will need to burn some shoe leather

2  to educate themselves why they need to come into compliance with the BSCC and the 9th Circuit

3  rendering "(t)hat the denial of fresh air and regular outdoor exercise and recreation constitutes cruel

4  and unusual punishment," see Spain v. Procunier, 600 F.2d 189, 199 (9th Cir. 1979).

5  Unfortunately, the problem of denial of outdoor access has migrated into an urgent problem due to

6  the current policy of prohibiting indoor exercise access or out of cell time for the incarcerated and

7  their right for a minimum one-hour daily access to indoor exercise, recreation, and out of cell time

8  ("walk time").  With the challenges of covid-19 now exceeding two years, mere continued lockdowns

9  and heavily restricted out of cell times are not sustainable solutions.  The Sheriff's Department

10  necessarily must develop alternative solutions, one of which would be to establish outdoor access in

11  order to provide the necessary and required out of cell time, exercise and recreation to all inmates.

12  **VII.    LEVERAGING STAFFING DEFICITS—SUBVERTING THE RIGHTS OF THE**

13  **INCARCERATED**

14    CJ 3's method of Direct Supervision is built into the architecture of the General Population

15  Pods and into the Administrative Segregation and Psychiatric Pods.  Included in the design of CJ 3's

16  pods are high ceiling encased lookout towers also known as the "Crow's Nest". Staffing the Crow's

17  Nest was not meant to be the primary platform for monitoring the incarcerated, but instead, it served

18  as a complement to the two deputies assigned to the floor of a given pod that supervises up to two

19  sides of up to 48 incarcerated individuals.

20    By removing or diminishing the Direct Supervision method of having a deputy and/or a senior

21  deputy monitor and engage with incarcerated individuals on the floor of CJ 3's pods, and instead, rely

22  on a prescribed staffing plan that favors a distanced security method from the Crow's Nest (usually

23  staffed by one deputy), reinvites an antiquated jail management practice that is fraught with problems

24  and susceptibility to blind spots for those incarcerated individuals who want to harm themselves or

25  each other or for those who are in distress and need swift attention.

26    During the COVID-19 Pandemic, all security and safety regimens at jails and prisons

27  throughout the nation were drastically changed to prevent and contain infection. This also translated

28  into a cessation of incarcerated-based reentry services, programs, in-person visitation, and access to

P 0056-000143

1   the outdoors or indoor recreation. With the passing of the Pandemic, many jail operations throughout

2   the state in 2022 are returning to a heightened form of normalcy, including reentry/rehabilitation

3   programming and recreation.

4        San Francisco, however, is going in the wrong direction. Based on an August day in 2022, I

5   learned that CJ 3 had an incarcerated population of 529. According to operational staffing reports, I

6   learned that CJ 3 is authorized to have 187 deputies but is only staffed with 138 deputies, a shortfall

7   of 49, resulting in a 74-percent deputy staffing ratio. While that is a troubling indicator for deficit

8   staffing, it is not a prohibitive factor that justifies the stifling of services to the incarcerated or

9   denying access to indoor exercise.

10       Further, I reviewed the June 30, 2022, video and reports by the San Francisco Sheriff

11  addressing the Budget and Finance Committee of the SF Board of Supervisors. Presented, was a two-

12  year budget, FY 2022-2023, and FY 2023-2024, that approximated an annual budget of $270 million.

13  The Sheriff acknowledged that the Sheriff Department's staffing ratios have relied on a 25-percent

14  funding strategy with over-time funding, and that over the last three years, the department had not

15  kept pace with staff separations and attrition, while also enduring a longer than usual recruitment and

16  onboarding process for new hires.

17       In the same report, I noted that the Sheriff requested funding for 40 new deputies and stated

18  that he will conduct "attrition savings" for an additional 35, totaling 75 newly hired deputies.

19  Further, what was not said nor asked at the June 30th Board of Supervisors Budget Committee

20  hearing were queries about deputy understaffing exceeding a prolonged 10-percent benchmark and

21  denoting potential flags that exacerbate safety and security impacts to custody personnel, custody

22  contracted staff, the incarcerated, and liability to the City. Over the years, public safety-related

23  understaffing has been a familiar theme and reminder from the San Francisco Police Department,

24  where police-driven public relations campaigns motivate constituent concern and City Hall response

25  as effectively or generously as possible. In contrast, pressing staffing issues at the Sheriff's

26  department have been more muted and less visible.

27       To delve more into the potential staffing impacts of San Francisco's jails, I reviewed the 2022

28  Rank Report that preceded the Board of Supervisors' passing of the City's budget in July 2022. I

**EXPERT REPORT OF ROSS B. MIRKARIMI**

P 0056-000144

learned that the Sheriff's department was experiencing a deficit of 153 deputies and 20 senior deputies for a total of 177 unfilled deputy positions. The authorized number for deputy/senior deputies is 808 positions or FTE's, though, there are only 635 active deputy/senior deputy staff, representing a 21-percent understaffing ratio.

On an entwined matter, I learned that there has been a protracted campaign to "sunset" the Sheriff's Senior Deputy classification and rank.  Stemming from correspondence in 2017 and after, it was made clear by the sheriff and senior staff that they will commence with the phasing out of Senior Deputy positions through a process of attrition and out of classification promotions to Sheriff's Sergeant (an admin process known as "TX's") or to Deputy Sheriff.

Evidence of this phasing out is corroborated by the numbers: in 2015, there 74 staffed Senior Deputy positions with 14 unfilled positions. In 2020, there were 38 staffed Senior Deputy positions with 13 unfilled positions. In 2022, there are 23 staffed Senior Deputy positions with 20 unfilled positions.

No matter how valid the reasons are for reengineering deputy staffing, the indicators well suggest a fundamental shift away from a Direct Supervision jail management model, which is necessary to support the cavalcade of CJ 3 reentry and rehabilitation programs and which is also necessary to buttress the basic lawful rights of the incarcerated.

One example that underscores a staffing scenario designed to halt or drastically reduce Direct Supervision at CJ 3 is the phased-out elimination of Senior Deputies while not filling Deputy Sheriff positions, in tandem with attrition, separation and lackluster recruitment. Conveyed to the Board of Supervisors in June 2022, was a prognostication by the Sheriff that over the next two years, the department will try to reduce its overtime reliance of 25-percent down to 10-percent and close the gap of deputy sheriff vacancies, though, there was vague mention of senior deputy positions. What this connotes is that the practice of deploying the Crow's Nest will supersede Direct Supervision in CJ 3 and relegate even further, reentry services and out of cell time for the incarcerated.

Reciprocally, tensions will mount causing safety and security matters to escalate due to misapplication of staff and a disproportionate punishment of excessive confinement of the

**EXPERT REPORT OF ROSS B. MIRKARIMI**

1  incarcerated – their casualty will be a further degradation of BSCC Title 15 and Title 24 right to
2  exercise, natural light, fresh air, imaginary outdoor access, "walk time".

3  These staffing and budget data-points matter based on my own experience as both a
4  department head and as an elected supervisor rendering fiscal decisions amid one of the worst
5  recessions in modern history. As sheriff, my administration's challenge with budget limitations
6  collided with our ambition on tackling chronically high recidivism rates, hovering at 68-percent. This
7  meant finding the fiscal means for implementing effective reentry services within a safe in-custody
8  learning environment.  Under my watch, we hired and onboarded 13 deputies in 2013 and 15 deputies
9  in 2015 for a total of 28 FTE's. While these numbers appear low, the corresponding Rank Report
10 portrayed a more complete staffing picture. In 2013, our department achieved a deputy/senior deputy
11 staffing ratio that culminated with 3.5-percent of understaffing. In 2014, we registered 5-percent of
12 understaffing, and in 2015, we registered 9-percent of understaffing. Fortunately, due to the boon of
13 shuttering the former CJ 3 (288-beds, 850 Bryant Street), we redistributed deputy and senior deputy
14 staff to our other jails, the largest of which is located in San Bruno.

15 Based on my Budget Committee experience, I recall difficult deliberations on reconciling
16 severe budget shortfalls with understaffing scenarios that defaulted to the excessive use of over-time
17 by city departments responsible for public safety, public health, and the uninterrupted 24/7 cycle of
18 running the city. To incentivize a department to correct its disproportionate use of overtime or other
19 excessive spending habits, our committee would require an accountable plan by the department
20 head's progress on proving how they fixed budget mismanagement, while subject to the provisional
21 withholding of that department's partial, but meaningful allotment of annual funding while budget
22 efficiency is restored.

23 **VIII.   THE VISCERAL AND TANGIBLE IMPACT**

24 As Sheriff, when I visited San Bruno, conversed, or ate meals with incarcerated individuals,
25 many would share with me that they liked having the deputies on the floor, someone to talk to or
26 know that they were just there for their security. Some of the incarcerated were shy or embarrassed in
27 sharing that feeling, but as one military veteran told me, to paraphrase, "sometimes, jail and prison
28 can be so scary that everyone is hopped up on tension, and that's when bad things happen".

P 0056-000146

1    Similarly, when I spoke to a variety of line deputies about their feelings about being on the floor with

2    the incarcerated, at first, some tried to probe me because they were talking to their boss, while others

3    were candid, confiding to me that their duty of interacting and being there with those in custody

4    mattered, as if it was "humanizing," said one deputy.

5          Conventionally, it would make sense that with a sustainable reduction in San Francisco's

6    incarcerated population there would be a proportionate reduction in custodial jail staff.  Like the San

7    Francisco Police Department, there are minimum staffing requirements of peace officers that obligate

8    the Mayor and the Board of Supervisors to honor as best they can based on the City's General Fund

9    capacity and based on the 2020 voter approved Proposition E – amended the City Charter to remove

10   the previously established Police staffing baseline levels and requiring staffing level reports and

11   recommendations every two years using rigorous, industry-reputed methodologies.

12         Similarly, it is clear that the routine budget exchanges that occur between the Sheriff's

13   department, Mayor, and the Board of Supervisors, without a quasi-public process that corroborates

14   needed staffing levels in  two year intervals and the reasons for those staffing levels, has resulted in

15   an unsustainable Sheriff's Department staffing level that does not meet the articulated policies of San

16   Francisco.   The San Francisco Sheriff's Department is the second largest law enforcement agency in

17   the city, operating 24/7, 365 days of the year. It is the department that has sole governance of the jails

18   which requires approximately 80-percent of the total FTEs allotted. Given the historical commitment

19   that San Francisco has towards a policy for rehabilitation not mere warehousing, what informs the

20   basic staffing decisions (albeit multiple factors) are particularly these two: a quantitative minimum

21   staffing ratio and a qualitative commitment to programs for rehabilitation not mere warehousing.

22

23

24

25

26

27

28

14

**EXPERT REPORT OF ROSS B. MIRKARIMI**

P 0056-000147

My opinions are subject to revision upon review of additional materials.  Thank-you for this opportunity to review this important institution at a critical juncture.

Date: September 2, 2022

_____
Ross Mirkarimi

My opinions are subject to revision upon review of additional materials.  Thank-you for this opportunity to review this important institution at a critical juncture.

Date: September 2, 2022

Ross Mirkarimi

**EXPERT REPORT OF ROSS B. MIRKARIMI**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

FEE SCHEDULE

Retainer                                                    $10,000.00
Expert Hourly Rate                                       $500.00
Travel Time                                                 $250.00
Direct expenses billed at cost

DEPOSITION AND TRIAL TIME
$1,500 minimum for deposition  (3 hour minimum) – includes wait time.
$1,000 Cancellation fee if canceled within 2 business days
$250 travel time

**EXPERT REPORT OF ROSS B. MIRKARIMI**

P 0056-000149

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# ATTACHMENT 1

**EXPERT REPORT OF ROSS B. MIRKARIMI**

**Ross Mirkarimi**

San Francisco, California, 94110 ▪ 415.412.7526

RMIRK@msn.com ▪ LinkedIn Profile

---

## Subject Matter Expert C.V.

---

**Career Experience**

---

**Principal, (2016-Present), Pro-Civicus Consulting:**

- Adjunct Professor, California State University, 2022: Instructor for the CJ 3160, "Law Enforcement Management and Administration". In-person instruction with routine application of an on-line and remote program through Canvas.
- Peer Review Analyst, U.S. Department of Justice-BJA, 2019-present: Contracted to conduct body-worn camera evaluations on the policy, regulatory, budgetary, and the community-centric programs by local and state law enforcement agencies throughout the nation.
- Peer Review Analyst, U.S. Department of        Justice-BJA, 2022: Contracted to evaluate the Community Policing capacity or prospective federal funding toward American Indian Native Tribal Council police agencies.
- Project Lead, Missouri Department of Health & Senior Services, 2019-2020: Contracted via RFP to supervise 49 analysts to peer review 2,200 (103,000 data pages) applications for state-wide medical cannabis licenses with specialization on manufacturing, cultivation, retail, distribution, and laboratory testing; applied policy, risk, and quantitative analytics.
- Specialized Investigations: Lead investigations on unresolved in-custody deaths and serious injury resulting from misuse of force.

**Sheriff**, **San Francisco (2012--2016):**

Executive Administrator of a $193 million annual budget and department oversight of

1,046 sworn/civilian personnel, capital expenditures, union labor contracts, regulatory

compliance, hiring, adjudicated discipline, reentry/rehabilitation programming, legislation, policy,

co-led emergency management and five jails (rated-1600 beds) with approximately 22,000 annual

bookings and referrals to Pretrial Diversion.

- Co-Launched State Prisoner Realignment Pilot with San Quentin Prison and the SF Probation Department, to collaborate on a jointly delivered customized reentry regiment. Supervised Operating Protocols and contracts for facilitating staff training, reentry/rehabilitation program

implementation, and procurement of a $3 million grant by the State Senate with approval from the California Department of Corrections and Rehabilitation for a vertical reentry case management system.

- Modernized Reentry Program Implementation for criminogenic needs and co-occurring disorders (behavioral and substance abuse), workforce development readiness, and college bound credited courses.

- Replaced antiquated technology and instituted a Jail Management System that enabled greater communication with partner agencies for a more fluid teamwork approach on reentry outcomes and supervision.

- Commissioned Peer-Reviewed Analytics: Violent-Offenders Assessment; Body Cameras Deployment, Crisis Intervention Training, Misuse-of-Force – oversaw and approved survey methodology, analytical classifications, and results computation.

- Winner, 2015: Harvard University's Innovation in American Government Award. With the Five Keys Charter High School, co-represented department at finalist competition. Demonstrated a verifiable nexus for an in-custody diplomas-based education and a substantial reduction in recidivism. Applied $100,000 prize money back in the Five Keys.

- Winner: $80 million State Facility Award: Led two-year multidisciplinary design-and-planning task force to successfully compete for the Board of State Community Corrections funding of a prospective alternative Sheriff-Public Health facility (aggregate budget $400m).

- Shuttered CJ 3: Oversaw the permanent retirement of County Jail 3's 288-rated beds, located on the 6th floor of the Hall of Justice. Applied salary savings and staff redistribution to other SF jails.

**Board of Supervisors, San Francisco, (2005--2012):**

Twice elected to the legislative branch governing San Francisco. Authored nearly 100 ordinances and charter amendments, relative to criminal justice reform, public safety—community policing, law enforcement accountability, poverty abatement, workforce development reform, environmental-climate protection, and government efficiency.

- Committee Chair: Public Safety and Government Audit Committees: Vetted fiscal audits over public safety agencies including jails and community corrections.

- Legislated the City's first Reentry Council: mandating participation of all funded agencies and designated contracted nonprofits; legislated the Community Corrections Partnership Law (applied analytical and case evidence performance metrics).

- Legislated enforceable laws and regulations for S.F. State Prisoner Realignment and the joint distribution of funding for municipal criminal justice agencies co-facilitating local Realignment (AB 109).

- Chair, Local Agency Formation Commission (LAFCO): Led policy advances for the creation and implementation of Community Choice Aggregation – municipalization of clean energy delivery.

P 0056-000152

- State Senate Appointed to the California Coastal Commissioner

**Special Prosecutions Investigator, District Attorney (1996--2005):**

Led cases on corruption, fraud, law enforcement misconduct, complex economic crime, and environmental crime; performed investigations with evidence-based analytics, composed, and executed search/arrest warrants. Lead investigator on seminal cases resulting in landmark consumer restitution and convictions. Detailed Metropolitan Medical Task Force to help develop a response to a domestic terrorism chemical, biological, and radiological incidence.

**Education, Credentials & Licenses**

- Master of Science, Environmental Management University of San Francisco
- Masters, International Affairs, Golden Gate University
- Bachelor of Arts in Political Science, Saint Louis University
- Monterey Institute of International Studies, Russian Language
- Peace Officer Standards and Training 830.1 PC Certified- S.F. Police Academy
- Advanced POST Certification
- Executive Law Enforcement Development 2015 Certification, F.B.I.
- Hazardous Materials Specialist, CA Office of Emergency Services
- Executive Certificate, National Center for Missing and Exploited Children
- Certified (CPO), National Association for Civilian Oversight of Law Enforcement
- Advanced Environmental Crimes & Forensics, Federal Law Enforcement Training Center
- US Navy Reserves, JICIPAC 1194 (Naval Intelligence, TS), Honorable Discharge, 2003
- Certified Protection Professional, (CPP), ASIS International
- Certified Corrections Executive (CCE), American Correctional Association
- Certified, Homeland Security Protection Professional (CHPP), National Sheriff's Association
- Certified, Transportation Security-Safety Professional (TSSP), U.S. Dept. of Transportation

**PREVIOUS CASES**

1. Aurora Vasquez, Hector Lozano v. County of Santa Clara, Department of Corrections, Santa Clara County; Case # 15CV288929
2. Brian Merrell Montgomery v. County of Alpine; Case # A-18-1497
3. Estate of Andrew Chaylon Holland v. County of San Luis Obispo, SLO Sheriff's Department
4. Rickita James v. City of San Mateo, San Mateo Police Department

P 0056-000153

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# ATTACHMENT 2

21
**EXPERT REPORT OF ROSS B. MIRKARIMI**

DOCUMENTS REVIEWED

1 Complaint - Norbert
8.2 Declaration of Terry Kupers
8.3 Declaration of Jamie Zeitzer
Zeiger Testimony Transcript
Declaration of Nicky Garcia,  filed on January 11, 2021,
Declaration of Kenyon Norbert, filed on January 11, 2021, as Document 197-3,
Declaration of Michael Alexis, filed on January 11, 2021, as Document 197-4,
Declaration of Joshua Beloy, filed on January 11, 2021, as Document 197-5,
Declaration of Jose Poot.  filed on January 11, 2021, as Document 197-6,
Declaration of Armando Carlos, filed on January 11, 2021, as Document 197-7,
Declaration of James McFarland , filed on January 11, 2021, as Document 197-8,
Declaration of Marshall Harris , filed on January 11, 2021, as Document 197-9.

J# 1_SHF Service and Cost Reduction Proposals FY2020-21...ntrollers Office - intentional mins
violation for savings.xlsx
1_3C XCF CPL De-appropriation Entry Backup.xlsx
1_BVA Projections 2nd Half FY2018-19_ED_ADD_v2_to MBO SHF 2-21-19.xlsx
1_BVA Projections 2nd Half FY2018-19_ED_ADD_v2_to MBO SHF 3-5-19.xlsx
1_FY20-21 3 Month ch.xlsx
1_SHF Service and Cost Reduction Proposals FY2020-21 (1).xlsx
2_9-Month MOU Reserve (1).xlsx
3_FY20-21 12 Month Final 2021-Aug-05 (1).xlsx
Tables and Chart SFSO Staffing.xlsx
FW_ 3-Month Report - Revenue & Expenditure Projection - Oct 16 2020 -- for our meeting today at
1_30 PM (3).html
FW_ SHF General Fund Single File Analysis - Follow-up.html
FW_ temporary reduction of transfer amount - reminder.html
RE_ 3-Month Report - Revenue & Expenditure Projection - Oct 16 2020 (9).html
RE_ 3-Month Report - Revenue & Expenditure Projection - Oct 16 2020 (9).html
RE_ SHF - Regular Salary Savings.html
Re_ SHF OT shortfall.html
RE_ temporary reduction of transfer amount - reminder (1).html
RE_ temporary reduction of transfer amount - reminder (2).html
1_SHF_3-Month Budget Report to Supervisors 11-20-20 (1).pdf
2018.01.08 Arbitrator Cohn's Opinion and Award only.pdf
( 2020 Budget Request. pdf
4 2022_23 Budget Request.pdf
# 210505 Step 3 Grievance w Exhibits.pdf
E 220223 STEP 3 Greivance to ERD - Minimum Staffing Grievance for SFDSA.pdf
7 220330 DSA RFI response.pdf
220407 Steps 1-2 Denial of Appointment above Entrance Rate Grievance.pdf
220426 Step 3 Grievance Denial of Appointment to Higher Entrance Rate.pdf
220506 Step 4 Grievance Denial of Appointment Above Entrance Rate.pdf
220809 Unfair Labor Practice Charge wExh 1-8; Notice of Appearance; POS.pdf

22

**EXPERT REPORT OF ROSS B. MIRKARIMI**

1   Background Investigative Services.pdf
    Briefing Sheet - Recruitment 22-23.docx
2   Budget request to Sheriff.pdf
    [ Civil Grand Jury Complaint Against SF Sheriff.pdf
3   [ COVID Emergency Hiring Letter - January 26 SFSO (1).pdf
    W= FY 2021-22 Budget Submittal Letter V2.docx
4   # FY2022-23 Budget Submittal Letter Final Signed.pdf
5   Letter to Mayor Breed with incentive promises COVID Emergency Hiring Letter -  January 26 SFSO
    (1).pdf
6   Letter to the Board of Supervisors.pdf
7   Letter to the Sheriff (1).pdf
    Mail - President - Miyamoto Denied Pay Step Increase Outlook.pdf
8   Mail - President - Outlook- Recruiting.pdf
    Mail - President - Recruiting 2 Outlook.pdf
9   Meeting SFDSA arranged to fight for increased budget.  At the meeting Miyamoto did not fight for
10  an increased budget..pdf
    Membership Survey - 2021.pdf
11  Recruiting and Hiring 08032022.pdf
    Salary Savings in the SF Sheriff's Dept (1).pdf
12  See Paragraph 1D retracted all incentives from the budget. FY2022-23 Budget Submittal Letter Final
13  Signed (1).pdf
    SFDSA Side Letter Agreement Longevity MBS 02252020.pdf
14  SFDSA Side Letter Agreement Retention Pay MBS 02252020.pdf
    SFDSA Staff Report Draft v4.docx
15  SFDSA Staff white paper (1).pdf
16  SFSO Job Satifaction Survey Results.pdf
    SHF -Sheriff Staffing Report 06.19.19_0 (1).pdf
17  Staffing Issue request to add incentives for retention - full.pdf
18  Staffing Level Updates.pdf
    STEP 2.pdf
19  1 Complaint - Norbert
    8.2 Declaration of Terry Kupers
20  8.3 Declaration of Jamie Zeitzer
21  Zeiger Testimony Transcript
    Declaration of Nicky Garcia,  filed on January 11, 2021,
22  Declaration of Kenyon Norbert, filed on January 11, 2021, as Document 197-3,
    Declaration of Michael Alexis, filed on January 11, 2021, as Document 197-4,
23  Declaration of Joshua Beloy, filed on January 11, 2021, as Document 197-5,
24  Declaration of Jose Poot.  filed on January 11, 2021, as Document 197-6,
    Declaration of Armando Carlos, filed on January 11, 2021, as Document 197-7,
25  Declaration of James McFarland , filed on January 11, 2021, as Document 197-8,
    Declaration of Marshall Harris , filed on January 11, 2021, as Document 197-9.
26
27
28

23

**EXPERT REPORT OF ROSS B. MIRKARIMI**

8/25/22, 10:27 AM                                    Mail - President - Outlook

## Background Investigative Services

President <president@sanfranciscodsa.com>
Tue 8/23/2022 1:01 PM

To: Miyamoto, Paul (SHF) <paul.miyamoto@sfgov.org>;Engler, Joseph (SHF)
<joseph.engler@sfgov.org>;Carter, Tanzanika (SHF) <tanzanika.carter@sfgov.org>;Scalercio, Frank (SHF)
<frank.scalercio@sfgov.org>

Cc: Sean D. Howell <showell@mastagni.com>;Dan L. Koontz <dkoontz@mastagni.com>;Frank A. Terreri
<fterreri@mastagni.com>

Sheriff Miyamoto & Undersheriff Engler,

Good afternoon,

The SFDSA has brought up on many occasions issues with recruiting and hiring.  We had done a lengthy
research in 2018/19 and found that a bottle neck in the SFSO hiring was background investigation due to
the excessive length of time to complete it, thus losing candidates to other agencies.

We have suggested several times that the department outsource to companies that specialize in
background investigations for law enforcement to assist the SFSO to expedite the process.  We also went
as far as suggesting a firm that was used by other law enforcement agencies and the SFSO has not
responded.

With staffing getting lower every day, we don't believe the department is taking the necessary steps to
aggressively hire and staff the Sheriff's Office.  We have conducted some research and have found that
other SF City & County Departments have in fact outsourced back ground investigations to expedite
there hiring process.

We have attached some of the documentations that support that.

We don't understand how other CCSF departments seem to be more efficient in their hiring and
recruitment process than the SFSO.

We are providing this information, so you can get the SFSO up to speed with hiring and recruiting.


Best regards,

Ken Lomba
SFDSA President
415-513-8973



EXHIBIT _____B_____
WITNESS _R. Mirkarimi_
CONSISTING OF _194_ PAGES
DATE _11-01-2022_
BEHMKE REPORTING AND VIDEO SERVICES, INC.

PLTF.
DEFT.



# San Francisco Sheriff's Office
# Recruitment/Hiring Briefing Sheet

## Summary

The following information outlines the strategies, tactics, and results of the SFSO recruitment efforts for FY 2022-2023. The Administrative and Programs Division is responsible for the production of a separate, comprehensive Hiring Plan that will include much of the information in this briefing sheet. This briefing sheet is a living document that will be periodically updated to provide recipients with the most recent information and data regarding our efforts, and any changes in our strategies in response to the effectiveness of our outreach methods.

## Recruitment Strategies

Goals:

1) Intentional targeted audience to maximize pool of qualified applicants.
2) Community presence and engagement to target specific regional communities and neighborhoods to maximize pool of local applicants
3) Partnerships with military branches to target specific experience and background of service
4) Use of social media tactics to maximize our engagement and build our list of followers to target qualified applicants out of the immediate region.

Tactics and rationale:

*Effectively Embrace SFSO's Social Media Presence*
- Create content that promotes the SFSO to attract the type of person we want to hire.
- Use the most-effective platform for our target audience. Every community is different from where people gravitate to keep connected with their law enforcement and public safety agencies.
- According to an article from Yello, more than half of Generation Z candidates won't even apply if they think the company's recruiting methods are outdated.

*Connect With Applicants on a New Level*
- Use the correct marketing to target suitable candidates
- Show what makes our organization different from the others and what benefits we offer
- Mention your agency's appropriate and relevant benefits. Different age groups will want and expect different things.

*Be A Great Resource (Even If They Are Applying Somewhere Else)*
- Create a positive experience. The more assistance and help given to someone looking to get into the law enforcement profession, the more inclined they are to gravitate towards our agency.
- Answer those questions from people who may not even be applying with us. Show we care about the profession so much that we want to make sure anyone wanting to join it has a great impression of us. This will show the professionalism our organization maintains.

- Create a downloadable infographic with some helpful tips for passing the physical agility exam or motivational quotes from Deputies. Our star, name, and social media handles will constantly be in their sight and on their mind. This might steer people back to complete an application with us.


References:

TOC Public Relations: *Top Three Law Enforcement Recruitment Strategies Jan 28, 2022*

*You can go beyond the seldom-seen PDF article posted on your website or a professionally produced video or radio commercial. You need to relate, entertain, and inform your potential candidates to get them to gravitate to your agency. In our social media classes, we show students how to connect with others by being "real and transparent." We may show you how to have officers who are not intimidated by being on camera make amazing, yet simple and quick, videos to showcase your agency.*

*Using our previously mentioned police officer, a middle-aged mother, picture this; a live (or pre-recorded) Instagram video where this officer is sitting in their patrol car after having just finished a call involving a child who didn't want to go to school (yes, people call the police all the time to fill in as the disciplinarian). In the video, she can speak about using her skills as not only a police officer but a mother to help another parent out. This can resonate with those candidates and might get the ideal one to think to herself, "I can still be a mom, help my community, and enjoy a great career."*

*It would help if you also considered nowadays that today's applicants want to know that they'll be able to use their creativity and skill sets to further the agency's mission. Gone are the days of shutting down new ideas from a young officer or telling them they need to get some experience under their belt before offering a different way of doing something. While there is a little truth to this, shame on those, who don't embrace new ideas from newer officers. It's always amazing to watch an agency bypass the talent they have among their ranks to seek answers elsewhere.*

*Think about that for a moment. Why would a new candidate, or even a newly hired officer, want to work for their agency when their growth was stunted due to an archaic culture?*


# Recruitment: Social Media

Goals:
1) Intentional social media accounts to grow our social audience, with not just a general audience but a targeted audience.
2) Use of social media tactics to maximize our engagement and build our list of followers.

Tactics and rationale:

*Utilize tailored hashtags*
Hashtags are important on all social media platforms.  If you want to grow a niche audience, one of the easiest ways to do so is to use a handful of targeted hashtags in your captions. When you use those top hashtags, your content will be included in a feed featuring only law enforcement and public safety content where enthusiasts will be skimming through.

*Follow similar accounts*
Often, people are nervous about following similar social media accounts, but this is where you can grow your network and garner new ideas.
Maybe the account isn't exactly a competitor, but successful niche social media accounts are usually followed by people interested in that product, mission, or organization type.
We tend to underestimate how often people follow the followers of their favorite social media accounts, so be intentional about who you follow and aim to only follow accounts similar to your brand.

*Engage with other accounts*

Spreading a little love in the form of a like and comment on accounts that you follow will be appreciated. The followers on the accounts you engage with will take notice of your interactions and likely click on your account to see what it's all about.
Engaging in a meaningful way with other accounts is a great way to build genuine connections, leading to garnering more followers who support your brand.

*Optimize social media handle and bio*
Utilizing a social media handle that is transparent in correlation to your business and services is so important on social media. Being as descriptive and succinct as possible with your handle could help you build that targeted audience you desire.
If a person comes across your handle and it's descriptive of your niche, the social media user will likely snoop around on your page and possibly give you a follow.
When it comes to the bio on the social media accounts you manage, it's imperative to be as descriptive as possible in a concise way, never leaving new visitors to your accounts confused about the services your brand offers.

References
TOC Public Relations:  *How to Garner a Targeted Audience on Social Media (Nov 8, 2021)*

## Recruitment: Additional Initiatives

- Napa Valley Police Academy
- Fire Science & Administration Justice Career Fair
- SF Summer Internship & Career Fair
- Army PAYS Program
- Diablo Valley College Public Safety Career Expo
- South Bay Regional Public Safety Career Fair
- Ohlone College Career Fair
- SF State Men's and Women's Basketball teams Recruitment Presentation
- San Jose Law Enforcement Hiring Expo
- Monterey Peninsula College Job & Career Fair
- PRIDE
- Radio announcements
- Bus advertisement
- MOU w/ remaining branches
- Presentations w/ College athletic directors
- Presentations w/ Criminal Justice programs/Administration of Justice
- Housing Project

Recruitment:
Ten (10) candidates scheduled for Santa Rosa 209 July 25 – December 9, 2022
Five (5) candidates scheduled for SB 170 August 1, 2022 – January 27, 2023

**From January 2022 to July 2022 sworn applicant statistics:**

Hired – 20

Withdrew – 7

Disqualified – 22

P 0056-000160

Non Select – 3
In Process – 22

## Recruitment: Strategic Plan Reference

The following is Goal 6 from the Department Strategic Plan currently being finalized for distribution:

*Maximizing Workforce Potential*

To provide the best level of service to the San Francisco community, we must remain highly committed to our public safety workforce.  Recruitment is crucial for maximizing and maintaining a diverse workforce that reflects the community it serves.  Dedication to our employees will come through managing workloads, minimizing stress, encouraging career success and creating succession plans.

**Initiative A:**   Strengthen Recruitment Efforts to Increase Diversity
    Activity: Improve recruitment process for Deputy Sheriffs.
    Activity: Enhance marketing and advertising strategy for recruitment
    Activity: Utilize technology to enhance accessibility, frequency, and delivery of blended training
**Initiative B:**    Create a Department Succession Plan for Employees
    Activity: Enhance human resource management and monitoring
    Activity: Design employee eligibility enhancement and improvement programs
**Initiative C:**   Promote Employee Wellness to Improve Job Satisfaction
    Activity: Develop effective ways of soliciting employee input
    Activity: Develop healthy employee campaign using social media and videos
    Activity: Implement an executive development program
        Milestone: Schedule Blue Courage Leadership classes by 3rd quarter
**Initiative D:**   Enhance Career Success Pathways for Professional Staff
    Activity: Foster civilian employee success thru opportunity and retention efforts
    Activity: Broaden tools and resources for civilian employee advancement
    Activity: Develop mentoring program for leadership/professional development
        Milestone: Design curriculum and operational manual for mentorship

## Community Engagement

Participation in community events have been proven to assist in recruitment. We will continue to attend these events that not only assist in recruiting members of the community that we represent, but also to build public trust and retention of existing employees. Please see below for cited evidence of these claims:

- **Increases retention of employees** *(Best Practices Guide: Recruitment, Retention and Turnover in Law Enforcement by Dwayne Orrick, Director of Public Safety, City of Cordele, Georgia)*
- **Recruiting deputies or officers from the community increases public trust and promotes internal diversity** *(Importance of Police-Community Relationships and Resources, U.S. Department of Justice Community Relations Services)*

P 0056-000161

- **Increasing community engagement is the second most recommended strategy to address hiring shortfalls, after collaborating with other agencies.** (*Assessing the Value of Evidence, Understanding Research on Recruitment and Hiring, Anne Li Kringen, PhD, Associated Proessor, University of New Haven*)
- **Removing deputies from the community actually increases the likelihood of crime and would be detrimental to our mission as a law enforcement agency.** (*Why data-informed community engagement is crime prevention and policing reimagined, Joel Caplan Ph.D, Police1 by Lexipol*)

https://www.transformationstreatment.center/resources/first-responders-veterans/police-community-outreach/

https://www.theiacp.org/sites/default/files/2018-08/BP-Recruitment.pdf

https://www.justice.gov/file/1437336/download

https://www.policechiefmagazine.org/assessing-the-value-of-evidence/?ref=5a6bff0a7d725e810229d50402093847

https://www.police1.com/evidence-based-policing/articles/why-data-informed-community-engagement-is-crime-prevention-and-policing-reimagined-7DCzmJEUoI7p9kBd/

## Recruitment Events

| # of Monthly Recruiting Events | Recruitment | Events | Postponed Recruitment (COVID) | Postponed Events (COVID) | Total Events |
|---|---|---|---|---|---|
| January 2022 | 3 | 3 | 1 | | 7 |
| February 2022 | 2 | 6 | 3 | | 11 |
| March 2022 | 7 | 9 | | | 16 |
| April 2022 | 8 | 6 | | | 14 |
| May 2022 | 5 | 2 | | | 7 |
| June 2022 | 6 | 4 | | | 10 |
| July 2022 | 1 | 2 | | | 3 |
| August 2022 | 2 | | | | 2 |
| September 2022 | 2 | 1 | | | |
| October 2022 | 1 | | | | 1 |
| November 2022 | 1 | | | | 1 |
| December 2022 | | | | | |
| Total | 38 | 33 | 4 | | 75 |

## Testing

| 2022 Written Test | Applicants/ Showed | Applicants Passed | No Shows | 2022 Physical Agility Test | Applicants/ Showed | Applicants Passed | Disqualified | Total |
|---|---|---|---|---|---|---|---|---|
| January 2022 | | | | January 2022 | | | | |
| February 2022 | | | | February 2022 | | | | |
| March 2022 | 145/89 | 65 | 56 | March 2022 | 98 / 65 | 43 | 22 | |
| April 2022 | | | | | | | | |
| May 2022 | | | | May 2022 | | | | |
| June 2022 | 125/57 | 49 | 68 | June 2022 | 90/50 | 31 | 19 | |
| July 2022 | | | | July 2022 | | | | |
| August 2022 | | | | August 2022 | | | | |
| September 2022 | NA | NA | NA | September 2022 | NA | NA | NA | NA |
| October 2022 | NA | NA | NA | October 2022 | NA | NA | NA | NA |
| November 2022 | NA | NA | NA | November 2022 | NA | NA | NA | NA |
| December 2022 | NA | NA | NA | December 2022 | NA | NA | NA | NA |
| Total | | | | Total | | | | |

**Written Tests are scheduled quarterly:**
- March 2022
- June 2022 (2)
- September 2022 (2)
- December 2022 (2)

**PAT Tests are scheduled quarterly:**
- March 2022
- June 2022
- October 2022
- December 2022

## Academy

| # of people in Academy | Currently In Academy | Graduated | Failed | Academy Trained Hire | # of people in CORE | Graduated | Failed | Total |
|---|---|---|---|---|---|---|---|---|
| January 2022 | | | | | | | | |
| February 2022 | | | | | | | | |
| March 2022 | | | | | | | | |
| April 2022 | | | | | | | | |
| May 2022 | 0 | 11 | 1 | 3 | 14 | 14 | 0 | |
| June 2022 | 9 | | | | | | | |
| July 2022 | | | | | | | | |
| August 2022 | NA | | NA | | NA | NA | NA | NA |
| September 2022 | NA | | NA | | NA | NA | NA | NA |
| October 2022 | NA | | NA | | NA | NA | NA | NA |
| November 2022 | NA | | NA | | NA | NA | NA | NA |
| December 2022 | NA | | NA | | NA | NA | NA | NA |
| Total | | | | | | | | |

## Background Investigations



| # of people in backgrounds | Background Applicants | Disqualified | Turned Down Position | Hired | Total |
|---|---|---|---|---|---|
| January 2022 | | | | | |
| February 2022 | 61 | | | | |
| March 2022 | | | | | |
| April 2022 | | | | | |
| May 2022 | | | | | |
| June 2022 | | | | | |
| July 2022 | | | | | |
| August 2022 | NA | NA | NA | NA | NA |
| September 2022 | NA | NA | NA | NA | NA |
| October 2022 | NA | NA | NA | NA | NA |
| November 2022 | NA | NA | NA | NA | NA |
| December 2022 | NA | NA | NA | NA | NA |
| Total | | | | | |

P 0056-000165



**SAN FRANCISCO DEPUTY SHERIFFS' ASSOCIATION, INC.**

*"Serving the Deputy Sheriffs' of San Francisco since 1952"*

| PRESIDENT | VICE-PRESIDENT | TREASURER | SECRETARY | SERGEANT-AT-ARMS |
|---|---|---|---|---|
| Ken Lomba | Christianne Crotty | Scott Osha | John Lawsha | |

February 26, 2018

***Via Electronic Mail***
Sheriff Vicki Hennessy
City Hall, Room 456
1 Dr. Carlton Goodlett Pl.
San Francisco, CA 94103
Email:  Vicki.Hennessy@sfgov.org
cc: Mayor Farrell, Board of Supervisors

The San Francisco Deputy Sheriffs' Association respectfully requests you increase the following
areas of the budget:

**Deputized Staffing:**
Our members are overworked and exhausted.  The staffing numbers need to be increased. With
expansion, promotions, retirements and deputies leaving for other agencies a staffing increase
needs to be in the budget to allow more job requisitions to be filled.

Within the last couple months, two deputies suffered from stress related work conditions due to the
excessive amount of "drafting" (last minute mandatory overtime).  One deputy was under a severe
amount of stress due to the mandatory overtime and threatened to kill himself.  Another deputy
went out on disability due to stress from mandatory overtime.  The deputies have been taken to the
breaking point effecting their health, physical and mental well being.

As for expansion, we do not support any further expansion until the staffing level is increased and
the burden of "drafting" (mandatory overtime) has been greatly reduced.

**Vehicles:**
Our vehicles are in bad shape.  They are aged, high mileage, and worn out.  We would like an
increase in a minimum of 65 vehicle purchases to replace the aged fleet of vehicles starting with all
vehicles with over 120,000 in miles followed by the replacement of 1 K-9 vehicle and the fleet of
inmate transportation vans.

P 0056-000166



**SAN FRANCISCO DEPUTY SHERIFFS' ASSOCIATION, INC.**

*"Serving the Deputy Sheriffs' of San Francisco since 1952"*

| PRESIDENT | VICE-PRESIDENT | TREASURER | SECRETARY | SERGEANT-AT-ARMS |
|-----------|----------------|-----------|-----------|------------------|
| Ken Lomba | Christianne Crotty | Scott Osha | John Lawsha | |

KL to VH
Re: Budget Increase
Page 2

**Training:**

We would like to see an increase in job related training especially training topics related to perishable skills.  Currently we are below average in the amount of firearms training compared to surrounding agencies.  The DSA would like to see an increase in firearms training to a minimum of 3 times a year.  Including patrol rifle training courses and active shooter courses.

We would like to see additional classroom courses related to basic law enforcement, basic investigations, and report writing.

The department Emergency Vehicle Operations Course training is substandard and may be in violation of P.O.S.T. standards.  The E.V.O.C. needs to be done properly and fully to P.O.S.T. standards.

We recommend a budget increase in the above training areas to maintain the knowledge of our members at an industry standard.

**Parking**:

The DSA members are in need of parking.  A budget increase is desperately needed for parking since their is no secure parking offered to my members.  More parking spaces need to be leased and made available to the DSA members.

Best regards,

Ken Lomba
SFDSA President
DSA: 415-696-2428
Cell:  415-513-8973

**Citizen Complaint Form**
City and County of San Francisco
Civil Grand Jury

**IMPORTANT**: The Citizen Complaint Form should be prepared and filed with the Grand Jury **only after all attempts to resolve the issue have been exhausted.** The Grand Jury has no authority to investigate complaints pending before a court of law or disputes between private parties. The Grand Jury does not necessarily investigate all complaints received.

**Person or Agency About Which Complaint is Made**

Name or Agency: San Francisco Sheriff's Department

Address: City Hall, Room 456
1 Dr. Carlton B. Goodlett Place San Francisco, CA 94102

Telephone: 415-554-7225

**Nature of Complaint**
Describe the events in the order they occurred and as concisely as possible:

See attached.

**Contacts**
List persons or agencies contacted/consulted *prior to* this Grand Jury request.

San Francisco Sheriffs Office Administration, Labor Relations, City Attorney's Office.

Witnesses the Grand Jury may contact for further information:

Kenneth Lomba – President, San Francisco Deputy Sheriffs' Association.

**Citizen Complaint Form**
City and County of San Francisco
Civil Grand Jury

Who do you believe the Grand Jury should contact about this matter?

Kenneth Lomba — See above

San Francisco Sheriff and administration

Jail commanders and any Jail Staff injured during investigative period.

**Action Requested**
Describe the action you wish the Grand Jury to take:

See attached.

**Citizen Submitting Complaint**

Name:          Kenneth Lomba, President San Francisco Deputy Sheriffs' Association

*Address:      35 Gilbert Street San Francisco, California 94103

Telephone      415-696-2428

_Signature_                                            6/20/2022

Signature                                              Date

*NOTE: Your address is necessary in order for the Civil Grand Jury Foreperson to acknowledge your submission.

    Complaints must be submitted in writing; complaints are not accepted by phone;

    Any exhibits or supporting documents mailed in with this form will not be returned;

    The Civil Grand Jury does not investigate all complaints received. Investigations are at the discretion of the jury;

**Citizen Complaint Form**
City and County of San Francisco
Civil Grand Jury

_ Investigation of your complaint will not necessarily be confirmed; all investigations remain confidential until the Civil Grand Jury decides to include the findings in the final report;

_ Anonymous complaints may not be responded to if the Civil Grand Jury is unable to contact you for additional information related to the complaint;

_ The Civil Grand Jury cannot investigate activities outside their jurisdiction, criminal activity or disputes between private parties.

                                    Mirkarimi001139

## ATTACHMENT TO GRAND JURY COMPLAINT

**To:**      SAN FRANCISCO CIVIL GRAND JURY

**From:**    SAN FRANCISCO DEPUTY SHERIFFS' ASSOCIATION

**Date:**    JUNE 17, 2022

**Re:**      SAN FRANCISCO COUNTY JAIL–CONTINUED UNDERSTAFFING DANGER

### INTRODUCTION

This Grand Jury has exercised its authority given it by the Penal Code to investigate the conditions of the City and County of San Francisco jails (CCSF) several times over the last decade.

In 2014, 2016 and 2017, this Grand Jury conducted investigations of the CCSF jails, issued findings and made recommendations which have not been implemented by the CCSF Sheriff's Office. (Attached hereto as Exhibits A, B and C are the 2014, 2016 and 2017 reports).

This Grand Jury found there to be grave concerns with the safety and security of the inmates, the deputies who serve the community in those jails, and the other non-sworn staff connected with ensuring the safety and security of the inmates and employees.

Specifically, this Grand Jury found the jails were working at minimum staffing but only by requiring the employees to work "excessive amounts of overtime." This was found the be due to the inadequate attempts to recruit and retain enough deputies to fully staff the jails. This Grand Jury found that work-related injuries increased due to the exhaustion the deputies experienced working excessive overtime. This increase in work-related claims resulted in a considerable increase in workers compensation and other personal injury claims, which generally made the jail less safe for those who serve their community there as well as the inmate population.

In 2014, this Grand Jury relied upon an inspection report by the Board of State and Community Corrections. This 8-year-old report warned that continued staffing at minimums, through the use of excessive overtime would, over time, violate Title 15.

This Grand Jury found that because of the dwindling number of total deputies employed by the CCSF, the excessive overtime and shortage of bodies did not allow for the important inmate programs in existence let along increase the inmate programs that were recommended. Furthermore, the recommended training for deputies could not take place or was inadequate to deal with the mental health and substance abuse as well as many other issues the housed population experiences.

Ultimately, this Grand Jury recommended on three separate occasions in 2014, 2016, and 2017 to "expedite hiring to reduce overtime." The Grand Jury's recommendations have never been followed and the situation has become untenable as the number of deputies is lower now than it was when this Grand Jury made these strong recommendations.

## CCSF JAILS ARE NOW FALLING BELOW MINIMUM STAFFING REGULARLY

When this Grand Jury previously inspected and investigated the conditions in the jails, it determined that the jails were just at minimum staffing, through the excessive overtime worked by the deputies.

Between 2015 and 2017, the San Francisco Deputy Sheriffs' Association (SFDSA) filed several grievances against the Sheriff's Office because the minimum staffing was not being met. The Sheriff sets the minimum staffing each year and it is memorialized in the collective bargaining agreement between the CCSF and the SFDSA.

The arbitrator looked at the staffing levels between 2015 and 2017 to make a determination if the CCSF Sheriff's Office was meeting the minimum staffing requirements. The Sheriff's Office admitted in many cases that numerous times the staffing did not comply with the minimum standards. The CCSF Sheriff's Office defended itself by stating that the number of times this occurred was di minimis.

The arbitrator found that in each of the 6 total grievances filed, the CCSF Sheriff's Office failed to meet the minimum staffing levels that itself set. The remedy the arbitrator ordered was to divide the pay of the understaffed work shift amongst the workers who actually worked the shift. For instance, if minimum staffing is 10 and only 8 are scheduled, then the 8 who work will split the pay for the other 2 positions that did not work.

The arbitration award stated that the additional cost to the CCSF for employees who did not even show up to work should provide adequate incentive to the CCSF to meet the minimum staffing requirement. (Attached hereto as Exhibit D is the Arbitration Award.)

It did not.

Just as this Grand Jury found that paying the dwindling number of deputies more money (overtime compensation) does nothing to make the jail safer for the inmates or staff, does nothing to allow for additional or maintenance of inmate programs and does nothing to obtain necessary training for the deputies to assist with the needs of the inmate population, so does the award of the arbitrator do nothing to accomplish these goals.

As this Grand Jury will see, when it investigates the staffing levels in the last few years, the CCSF is consistently and methodically falling below the minimum staffing. The warning given by the Board of State and Community Corrections to this Grand Jury in 2014 of a Title 15 violation may have come to fruition. Since that report, minimum staffing has NOT been met multiple times and this practice continues while the total number of employed deputies falls.

Just days ago, on June 9, 2022, Sheriff Miyamoto issued a memo to all CCSF jail staff identifying his intentions of – operating below minimum staffing – for a period of the next 8-9 months! The CCSF has clearly recognized the futility of giving the appearance of reaching minimum staffing and has now admitted that it cannot exercise its duty to do so. (Attached hereto as Exhibit E is the June 9, 2022 memo from the Sheriff.)

The CCSF is in fierce competition with its neighboring counties, Alameda and San Mateo, for jail staff. Alameda has been under a consent decree to hire more jail staff. It would be a shame for the CCSF to be under similar governmental oversight. The CCSF is capable of expediting the hiring of staff but has not made it a priority, at the expense of the overworked and exhausted jails staff.

## COMPLAINT

Accordingly, we request that this Grand Jury once again exercise its authority and duty to investigate the CCSF jails. This Grand Jury should demand answers from the CCSF as to why it has failed to comply with its 3 separate recommendations since 2014.

06/20/2022

Date

Kenneth Lomba, President

San Francisco Deputy Sheriffs' Association



# San Francisco Sheriff's Office

INTER-OFFICE CORRESPONDENCE

June 9, 2022

Reference: 2022-063

To:     All SFSO Members

From:   Sheriff Paul Miyamoto

Re:     **Staffing Level Challenges and Updates**

In February I sent an update on plans and intentions to address staffing challenges. While not all proposed plans materialized, we continued to work on filling our open requisitions to increase staffing levels and reduce these burdens. The Mayor increased our budget, giving us the funds needed to fill 75 deputy positions during the remainder of 2022 and beginning of 2023.

We are hopeful that the DSA will work with us to implement what we originally proposed to help equalize the burdens on the Custody Operations Division. THANK YOU to everyone who has continued to assist with the constant drafts and involuntary overtime. To improve workplace conditions, effective immediately:

- All Divisions will have set plans to operate below minimum staffing levels for an extended time period while we fill and train the 75 positions. Post assignments have been prioritized to identify which ones can go unassigned at the safest level possible if we have to operate under reduced levels.

- Involuntary draft limit will be reduced from 3 per week to 2 per week for this extended time period until we fill and train the 75 positions (effective the new pay period, June 11).

- Boost the number of issued tasers. COD deputies will be given priority for assigned body cameras and tasers.

The extended time period will initially be 8-9 months. These changes will be reviewed/updated as we move forward during this time. All policies still apply.

The following are updates to the information shared in February:

> Immediately staff to safe
> operational levels
> *PACE Plan*

We initiated the PACE plan to help offset mandatory overtime and involuntary drafts and proposed the following to the unions:

1. Court Services will change the schedule of **all assigned deputies** to work from 0700 to 1500 hours.

Norbert 3:19-cv-02724 SK                                    Mirkarimi001143

2. Mandatory overtime for all staff for a fixed amount of shifts and/or hours per pay period, based on current staffing data.
    a. All Staff Department wide will be involuntarily drafted on the first day they return from their scheduled RDOs for up to 16 hours total for that day. *For an 8-hour shift this will mean they will be scheduled for an additional 8 hours, for 10 hour shifts an additional 6 hours and for 12 hour shifts an additional 4 hours.*

Results: DSA meet and confer process was delayed by contract negotiations. We have requested to continue meet and confer on these proposals.

Current Plan:

Staffing on involuntary overtime and operating below minimum

Goal: Mitigation plan for operating below minimum for an extended period of time for first quarters of the 2022-23 budget cycle (until hiring and training are completed for the 75 requisitions).

> Request increased budget funding for recruiting, hiring and retention of members

We requested funding for two recruiters to help expand work on engagement strategies and recruitment activities ($371,000/year). We are also requesting additional support for non-personnel services ($1 million) to expand the range of recruitment services currently in use to attract as wide of an applicant pool as we can.
Results: although we did not get funding for incentive bonuses for new hires, the Mayor supports our plan and has proposed an increase in our budget this year reflecting the above requests.

> Employee Wellness and Operational Safety

To support deputy wellness and safety, the Department requested budget support for first-responder-specific Employee Assistance Program (EAP) services negotiated by the City's Health Service System (HSS).
Results: The Mayor supports our plan and has proposed an increase in our budget this year reflecting those requests.

For operational safety, the Department requested body-worn camera program support and an increase in available tasers for training and deployment. Results: funded and in process of assigning BWCs and tasers.

Thank you to everyone for meeting the challenges of low staffing day after day.

*Stay safe, be well, and take care*

1   ALEXANDER COHN
    Arbitrator - Mediator
2   P.O. Box 4006
    Napa, CA 94558.
3   (707) 226-7096

4

5                IN ARBITRATION PROCEEDINGS PURSUANT TO

6                    AGREEMENT BETWEEN THE PARTIES

7   In the Matter of a Controversy                    )
                                                       )
8              between                                 )
                                                       )          **ARBITRATOR'S**
9   **SAN FRANCISCO DEPUTY SHERIFF'S**                 )
    **ASSOCIATION,**                                   )     **OPINION AND AWARD**
10                                                     )
               and                                     )
11                                                     )
    **CITY AND COUNTY OF SAN FRANCISCO,**              )
12  **SHERIFF'S DEPARTMENT.**                          )
                                                       )
13  Involving a dispute over Minimum Staffing          )
    Case No. MIN STAFFING 170761                       )
14

15        This Arbitration arises pursuant to Memorandum of Understanding ("MOU")

16   between the SAN FRANCISCO DEPUTY SHERIFF'S ASSOCIATION, hereinafter

17   referred to as the "Association," and the CITY AND COUNTY OF SAN FRANCISCO,

18   SHERIFF'S DEPARTMENT, hereinafter referred to as the "City" and/or

19   "Department," under which ALEXANDER COHN was selected to serve as sole,

20   impartial Arbitrator, whose decision shall be final and binding upon the parties.

21        Hearing was held on October 6, 2017, in San Francisco, California. The

22   parties were afforded full opportunity for the examination and cross-examination of

23   witnesses, the introduction of relevant exhibits, and for closing argument. Post-

24   hearing briefs were received from the parties on or before December 9, 2017, and

25   the matter was submitted.

26   / / /

27   / / /

28   / / /

1  APPEARANCES:

2      On behalf of the Association:

3          PETER A. HOFFMAN, Esquire, Rains Lucia,
           2300 Contra Costa Boulevard, Suite 500,
4          Pleasant Hill, California 94523.

5      On behalf of the City:

6          JENNIFER S. STOUGHTON, Esquire, Deputy
           City Attorney, Office of the City Attorney,
7          1390 Market Street, 7th Floor, San Francisco,
           California 94102.

8
                              **ISSUE**
9
       Whether the Department violated the minimum staffing
10     provision of the MOU in any and/or all of the six
       grievances which are pending; and if so, what shall be the
11     remedy?

12                **RELEVANT PROVISIONS OF MOU**

13  . . . .

    **ARTICLE I**
14  **REPRESENTATION**
    **I.I      GRIEVANCE PROCEDURE**
15  ...
    53.    *Authority of the Arbitrator.* The decision of the arbitrator... shall be final and
16         binding, unless challenged under applicable law. The arbitrator shall have no
           authority to add to, ignore, modify or amend the terms of this Agreement.
17
    . . .
18
    **ARTICLE II**
19  **EMPLOYMENT CONDITIONS**
    **II.D     ASSIGNMENT OF WORK**
20  ...
    3.     *Staffing Levels.* The Sheriff shall **reasonably determine and adjust** minimum
21         staffing for the Custody Operations Division and Court Services in Appendix B.
           The minimum staffing levels, listed in Appendix B, reflect **staff levels**
22         **currently understood to be consistent with the post assignments the**
           **Department has determined will maintain safe and secure operations** and
23         comply with the Board State and Community Corrections (BSCC) Minimum
           Jail Standards Title 15.[1] (Emphasis added)
24
                              **FACTS**
25
       The salient facts are not in dispute. Between November 1, 2015 and May 23,
26
    2017, the Association filed six separate grievances, alleging that on a number of
27

    ────────────────────────
28     [1]Given the Department's acknowledgment, *infra*, there is no need to set out in detail Appendix B.

1   days during that period staffing levels within the Custody Operations Division and the

2   Field Operations Division (courts) fell below the minimum levels set forth in Appendix

3   B of the MOU.[2] There were 28 shifts on 10 days in which the minimum staffing

4   requirements were not met at the beginning of the shift. The Department does not

5   dispute that staffing on these days failed to comply with the minimum standards. The

6   Association seeks double time for all members who worked while staffing was below

7   the minimum standards, as well as attorney's fees for time spent prosecuting the

8   grievances.[3]

9        The first grievance, filed on December 23, 2015, alleged that nine shifts,

10  starting on November 1, had fallen below the minimum staffing levels.[4] The

11  Department acknowledged that staffing had fallen below the minimums at the start of

12  these shifts, but responded that the staffing shortfalls were *de minimis*, as they

13  represented shortfalls in only 0.007% of shifts.[5] The Association subsequently filed

14  five additional grievances, alleging three violations on October 30, 2016, four

15  violations on December 18, four violations on December 27, four violations on May

16  13-14, 2017, and three violations on May 19, 21, and 23.[6] In most of the cases,

17  staffing was one or two employees short of the minimum levels.[7] However, on

18  December 18, 2016, two divisions were short by four, and one was short by six.[8] On

19  / / /

20  / / /

21

22  [2]JX B-E.

23  [3]JX B-E.

24  [4]JX B1.

25  [5]JX B2.

26  [6]JX C1-E1.

27  [7]AX A-F.

28  [8]AX C.

1  May 14, 2017, there were shortfalls of seven, four, and eight employees.[9] In each

2  case, the Department acknowledged that staffing had fallen below the minimum

3  levels.[10] The Department denied all of the grievances, on the basis that it had made

4  good faith efforts to meet the minimum staffing requirements, that the violations were

5  *de minimis,* and that the Department did not have the authority to grant the requested

6  remedy of double time compensation.[11]

7       In October of 2015, there were 714 sworn personnel represented by the

8  Association.[12] The number increased to 724 in November of 2015.[13] There were 736

9  sworn personnel October of 2016, 727 in December of 2016, and 737 in May of

10 2017.[14]

11      Senior Deputy Eugene Cerbone, Association President, testified that the

12 language in the MOU regarding minimum staffing has stayed essentially the same for

13 many years; that the Department never approached him to seek a modification of the

14 minimum staffing provision; that no proposals were submitted to modify Appendix B,

15 setting forth the minimum staffing levels; and, that there are no exceptions to the

16 minimum staffing levels in the MOU.

17      Chief Deputy Paul Miyamoto is responsible for oversight of the Custody

18 Operations Division (jails) the Classification Unit, the Central Records Unit, and the

19 DNA Collection Unit. He testified that the minimum staffing levels reflected in

20 Appendix B are necessary for compliance with State law; that Association members

21 bid for vacations once a year; that the Department does not take unanticipated sick

22 _____

23 [9]AX E.

24 [10]JX B4-G4.

25 [11]JX B6-G6.

26 [12]AX B2.

27 [13]AX A1.

28 [14]AX B2.

1   leave into account when setting schedules; that when a shift falls below the minimum

2   staffing levels, the Department uses volunteers followed by an involuntary draft

3   system to reach full staffing; that employees are drafted in inverse seniority order;

4   that the Department currently has a staffing shortage; that staffing has been reduced

5   in the past six to seven years due to a long period of hiring freezes, related to political

6   disputes between the Mayor and a former Sheriff; and, that staffing is currently being

7   increased; e.g., the Department has run multiple academies in the past two years in

8   an attempt to increase overall staff.

9       Miyamoto also testified that he was responsible for receiving and processing

10  the grievances; that on the days that staffing fell below the minimum, a Watch

11  Commander was required to write an incident report; that he authorized staffing help

12  to the units that fell below minimum; that on December 18, visiting was canceled for

13  the day; that Advanced Officer Training was also canceled; that lockdown was

14  instituted at one of the facilities, so that one Deputy can watch over two pods instead

15  of one; that no abnormal incidents occurred on December 18; that there were

16  significant staffing shortages on December 27; that staffing was brought up to the

17  minimums mid-shift; that staffing was brought up to minimums mid shift on a few of

18  the other dates at issue; that staffing did not reach the minimum on Mother's Day,

19  due to a large number of sick leave usages; that no discipline was issued for any

20  alleged abuse of sick leave; and, that no safety issues arose as a result of any of the

21  days of staffing shortfalls.

22                          **POSITION OF ASSOCIATION**

23      The grievances must be sustained because the Department violated the MOU

24  by failing to meet the clearly stated minimum staffing levels necessary to ensure the

25  welfare and safety of sworn personnel, civilians, and inmates. The City's approach to

26  the arbitration was to make a variety of excuses for its undisputed violations.

27  However, the City cannot escape the reality that it repeatedly failed to comply with its

28

P 0056-000180

1   obligations under the MOU, and it should not be allowed to escape its duty to remedy

2   these repeated failures. The Association therefore requests double time pay for

3   members working on the days in question, and attorneys' fees and costs, due to the

4   City's willful violation of the MOU and refusal to propose any remedy whatsoever to

5   resolve this matter.

6       The MOU imposes a clear and unmistakable obligation on the Department to

7   meet the minimum staffing requirements in Appendix B. The Department has

8   admitted to 28 separate minimum staffing violations. The only issue is therefore the

9   appropriate remedy for these repeated, brazen violations.

10      The Department's "good faith" attempts to comply with the MOU do not

11  excuse the violations. The staffing shortage cited by the Department does not excuse

12  the violation. The number of sworn personnel steadily increased throughout the

13  period in which the grievances were filed, demonstrating the supposed "staffing

14  shortage" is simply a fabricated excuse put forth in a feeble attempt to avert attention

15  from the Department's own administrative shortcomings. The City has also attempted

16  to blame Association membership for the shortfalls, in another inflammatory blame

17  shifting tactic. No discipline was issued to curtail the alleged bad behavior the

18  Department is now using as an excuse. In fact, the Department always has the ability

19  to ensure minimum staffing by involuntarily calling in Deputies. The Department's

20  failure to use its authority to ensure compliance with the MOU should not render

21  provisions of the MOU intended to ensure safe working conditions unenforceable

22  merely because the Department asserts that it acted in good faith.

23      The remedy provided should provide additional compensation to affected

24  Association members and vacate any economic benefit experienced by the

25  Department. The Arbitrator enjoys broad authority in fashioning a remedy. The

26  members deserve additional compensation for suffering through working conditions

27  that unreasonably compromised their safety, and the Department must not

28

1   experience an economic incentive to continue to violate the minimum staffing

2   requirements in the future. While an economic remedy is undoubtedly standard in

3   contractual staffing grievances,[15] the continuous disregard for employee safety the

4   Department has demonstrated in committing 28 separate minimum staffing violations

5   warrant something more than simply directing the City to compensate employees

6   with the value of the overtime costs avoided by the Department. It would diminish the

7   service of Association members working in dangerous conditions to provide

8   additional compensation that consisted of nothing more than a proportional fraction

9   of the overtime cost savings experienced by the Department as a result of operating

10  below minimum staffing. Further, if the only risk to the Department for violating the

11  minimum staffing requirements is the mere possibility that its economic savings

12  would be temporary, the Department would have an incentive to commit further

13  violations. The Association therefore seeks overtime compensation at twice the

14  employees' regular rate of pay for those employees who suffered through the unsafe

15  working environment the Department created.

16         In arbitration, attorney fees are appropriate where one party acts arbitrarily,

17  capriciously, or in bad faith.[16] An award of attorneys' fees is appropriate here. This is

18  a case that should never have necessitated the Association to incur substantial

19  attorneys' fees by resorting to arbitration. The Department acknowledged its

20  repeated violations but nonetheless refused to fashion or offer any proposed remedy,

21  essentially telling the Association that its negotiated working conditions are

22  unenforceable and therefore illusory. This case has been a frivolous and malicious

23  waste of Association resources, and attorneys' fees are therefore appropriate.

24                           **POSITION OF CITY**

25         The grievances must be denied because the Association has not established

26  _____

27  [15]*See e.g., City of Markham Police Department*, 2014 WL 4832265.

28  [16]*City of Mansfield*, 121 LA 1141 (2005).

P 0056-000182

1    a violation of the MOU. The MOU only requires that the Sheriff "reasonably

2    determine and adjust" minimum staffing levels. There is no dispute that the Sheriff

3    has done so, as reflected in Appendix B. There is no language requiring that the

4    Sheriff maintain staffing levels consistent with Appendix B in every case. Even if the

5    Arbitrator determines that the Department violated the MOU, no monetary remedy is

6    appropriate. There is no basis in any language in the MOU to award the double time

7    sought by the Association, and the Association failed to establish any harm justifying

8    such a remedy.

9            The Department did not violate the MOU. The MOU requires the Sheriff to

10   "reasonably determine and adjust minimum staffing levels" for certain posts listed in

11   Appendix B. The Sheriff indisputably complied with that mandate. The Association

12   asks the Arbitrator to add a requirement to the MOU that the Sheriff comply with the

13   minimum staffing levels at all times. However, the MOU specifically prohibits the

14   Arbitrator from adding to or amending the terms of the MOU. There is no evidence of

15   bargaining history or past practice supporting the Association's interpretation.

16           Even if the Arbitrator determines that the Department violated the MOU, there

17   is no monetary remedy available. The Association seeks overtime compensation at

18   twice the employees' regular rate of pay for all Association members on duty at

19   locations/facilities that fell below minimum staffing during the dates/times identified,

20   and reimbursement for all attorneys' fees and costs incurred by the Association to

21   process the grievances. These draconian remedies are at odds with general

22   principles in labor law, the express provisions of the MOU, and the facts of this case.

23           The MOU does not permit liquidated or punitive damages. The Department

24   already paid the members in question for the shifts they worked. An award of

25   damages would essentially be liquidated or punitive damages. No language in the

26   MOU justifies such an award. In addition, punitive damages require a showing of bad

27   ///

28   ///

faith that would "shock the conscience of the arbitrator."[17] The evidence here shows that the Department took all the necessary and possible steps to bring staffing levels up to minimum, and, when that was insufficient, took measures to redistribute staffing and closed posts and inmate activities. The City is also currently working to address the staffing shortage including by running multiple academies.

The Association also failed to establish any actual harm suffered by its members. There is no evidence of monetary loss by any Deputy. There is likewise no evidence that the staffing shortfalls were undertaken as a cost saving measure. All reasonable steps were taken in an attempt to ensure full staffing. A monetary award would unjustly enrich employees who were already paid in full for time worked, and who caused the problem in the first place through unanticipated sick leave use in large numbers on certain dates. Any harm to the members was *de minimis.* The Department fell below minimum staffing on fewer than fifteen shifts out of almost 12,000 during the time period when the grievances were filed. On some of those occasions, the Department brought staffing levels up to the minimum during the shift.

Finally, the Arbitrator does not have the authority to award attorneys' fees. There is no evidence of the extreme bad faith that would be the necessary predicate for such an award. There is no evidence of any bad faith whatsoever.

**OPINION**

Preliminary Matters

The Association bears the burden in this contract interpretation case. In such cases, the Arbitrator's first obligation is to determine whether disputed language is clear and unambiguous. If so, he must give the language its plain meaning, even if one party finds the result somewhat harsh or contrary to its initial expectations. If, however, disputed language is found unclear and ambiguous, or sometimes silent, extrinsic evidence (bargaining history, past practice, etc.) may be used to help

---

[17]Elkouri & Elkouri, *How Arbitration Works*, 6th Ed. 2003 at 18.3.E.

determine the parties' intent. In addition, words and phrases are rarely interpreted on their own. To give force and effect to the entire agreement, words and phrases must be interpreted in context with their paragraph, section, article, and the MOU as a whole.

On this record, there is no need to unduly extend the analysis. Without question, there is no dispute that the minimum staffing levels were not met at the beginning of the shifts on the dates alleged in the Association's grievances. The City acknowledged as much in its grievance responses. But, it contends that it did not violate the MOU, arguing that, while Article II.D.3 requires that the Sheriff "reasonably determine and adjust minimum staffing," it does not require that the resulting minimum staffing levels that are set must, in every case, be observed. Clearly, the Sheriff determined minimum staffing levels for the departments in question, as reflected in Appendix B of the MOU. However, the City's argument is not persuasive. The purpose and indeed definition of minimum staffing levels are that staffing levels are not permitted to fall below the minimum; i.e., minimum staffing levels are not staffing targets, they are minimums. The City contractually agreed not to allow staffing to fall below the minimum. Article II.D.3 and the minimum staffing levels reflected in Appendix B would have no meaning if the Department was free to disregard them without consequence. Accordingly, it is concluded that the City violated the MOU on each of the occasions alleged in the grievances.

Remedy

The more nettlesome question presented is, therefore, what remedy is appropriate, if any. Initially, an order to the City to cease and desist (i.e., injunctive relief) from further violations of the MOU is appropriate. The City is obliged to comply with the terms of the MOU, and failed to do so on numerous occasions, as alleged in the grievances. The Association also seeks overtime compensation at twice the employees' regular rate of pay for all employees who worked during the shifts that did not meet the minimum staffing requirements.

1    For the reasons that follow, this proposed remedy would not be appropriate,

2  as it would amount to punitive damages. The employees in question were

3  compensated for their work on the days in question, albeit under challenging

4  circumstances.[18] There is no basis in traditional labor contract remedies to order

5  applicable overtime and twice their regular rate of pay for all time worked. Such a

6  remedy is not appropriate in this case. As the City notes, the minimum staffing levels

7  were met in the vast majority of shifts during the time period at issue. More

8  specifically, the City made reasonable efforts to comply with minimum staffing levels.

9  An involuntary draft system was in place to bring in employees on days of low

10  staffing. On some of the days at issue, the minimum staffing levels were reached

11  during or by the end of the shift. Further, on some of the days, it appears that the

12  minimum staffing levels were not reached in part due to excessive sick leave usage

13  on Mother's Day, and two days after Christmas. Put simply, the City's MOU violations

14  were not intentional or carried out in bad faith. In these circumstances, a punitive

15  remedy is not justified.

16    Nonetheless, a monetary remedy is appropriate in view of the repeated MOU

17  violations. The City experienced an economic benefit in the form of lower labor costs

18  on the days when the minimum staffing levels were not reached at the beginning of

19  the shift. Allowing the City to maintain this benefit would eliminate an important

20  incentive for it to ensure that the contractual minimum staffing levels are met. In

21  addition, the employees who worked during the understaffed shifts were harmed by

22  the understaffing because their jobs were made more difficult on those days.

23  Accordingly, the employees who worked during the understaffed shifts should be

24  compensated based on the number of unfilled positions on the shifts at issue for the

25  hours the minimums were not reached, corresponding to the City's savings on those

26  / / /

27

28    [18]The work of sworn peace officers is not the same as factory, clerical, retail sales work, etc.

1    days.[19]

2        The compensation that would have been paid to employees in the unfilled

3    positions will be divided among the employees who actually worked on those days.

4    Thus, during shifts in which a department was understaffed by one, the appropriate

5    daily rate for one employee will divided among the employees who worked during

6    that shift for the understaffed hours. Likewise, for shifts that were understaffed by

7    more than one, the daily rate times the understaffed number for the hours uncovered

8    will be paid out to those who worked. The remedy should provide the City ample

9    incentive to compel it to meet the minimum staffing levels to which it contractually

10   agreed. Repeat offenses could result in steepened costs. The exact remedy due

11   those who worked during understaffed shift hours is remanded to the parties for

12   calculation for sixty (60) calendar days. At the end of that period, either party may

13   invoke the retained jurisdiction of the Arbitrator to resolve any remedy questions.

14       Finally, the Association vigorously argues for an award of attorneys' fees as

15   an additional remedy. Awards of attorneys fees are extremely rare in labor

16   arbitration. As the City notes, in order to justify such a remedy, the party requesting

17   the remedy must establish bad faith on the part of the opposing party that would

18   "shock the conscience" of the Arbitrator. Here, there is no evidence of bad faith on

19   the part of the City that would be necessary for an award of attorneys' fees. The City

20   met the minimum staffing levels for the vast majority of shifts during the past two

21   years. Further, it appears that the City made a good faith effort both to comply with

22   the minimum staffing levels, and to mitigate the impacts on Association members

23   when it was unable to do so. In addition, on this record, there is no reason to

24   conclude that the City's contentions that there was no MOU violation and/or that no

25   remedy was appropriate if there was a violation were put forward in bad faith.

26

27   _____

[19]Apparently, on some shifts, the minimums were met sometime during the shift, although not at the start
of the shift. The heart of the remedy is to cover those hours per shift the department operated below the
28   minimum staffing required at each shift's outset.

1   Accordingly, the grievances are sustained and, as noted below, the remedy is

2   remanded to the parties.

3                                   **AWARD**

4       1.   The City violated the minimum staffing provisions of the MOU in
            all six (6) grievances, which are pending. In accordance with the
5            guidance set out in the above Remedy section of the Opinion,
            incorporated herein by reference, the Remedy is remanded to
6            the parties for sixty (60) calendar days from the date of this
            Award. The parties shall use their best, good faith efforts to
7            resolve the issue. In addition, the City/Department shall cease
            and desist from violating the minimum staffing provision at issue
8            in this matter.

9       2.    The Arbitrator retains jurisdiction over the matter for the sole
            and limited purpose of resolving disputes, if any, over remedy.

10

11  DATED:      January 8, 2017

12

13

14                              ALEXANDER COHN - Arbitrator

15

16

17

18

19

20

21

22

23

24

25

26

27

28

P 0056-000188





# OFFICE OF THE SHERIFF
# CITY AND COUNTY OF SAN FRANCISCO

1 DR. CARLTON B. GOODLETT PLACE
ROOM 456, CITY HALL
SAN FRANCISCO, CALIFORNIA  94102

PAUL M. MIYAMOTO
SHERIFF

January 26, 2022
Reference: 2022-010

The Honorable London N. Breed
Mayor
City and County of San Francisco
1 Dr. Carlton B. Goodlett Place
San Francisco, CA 94102

Dear Mayor Breed:

Re: **SFSO Operational and Financial Challenges Resulting from Covid**

The San Francisco Sheriff's Office (SFSO) is experiencing critical staffing shortages resulting from Covid-related leave, ongoing administrative hiring delays, and  retirements and resignations. The resulting staffing shortage has resulted in mandatory overtime simply to maintain safety in my operation. While overtime can address some of the aforementioned issues, over the long run it creates operational and financial challenges that are not sustainable. In support of a more sustainable solution, I am requesting immediate assistance with filling the more than 200 vacancies I have in the Sheriff's Office, and a supplement of resources in the form of funds for overtime and salaries.

## *Cause for Urgency*

Following the hiring freeze from 2011 to 2015, the SFSO relied on high levels of overtime to meet established levels of service. Hiring restarted in 2016 and by the beginning of 2020, overtime had been reduced to its lowest level in over a decade. However, with the advent of Covid and the City's generous leave policies, combined with state-required staffing minimums, the SFSO once again had to rely increasingly on overtime. The financial challenges that came with high Covid leave resulted in significant scrutiny of every SHF hire to the point that my office has over 200 vacancies.

At the same time, the SFSO has been challenged with keeping Covid out of the jails. Unlike so many jurisdictions across the country, and even in the Bay Area, the SFSO saw zero Covid outbreaks in the period pre-Omicron; zero outbreaks, zero hospitalizations, zero deaths. Even post-Omicron, during which the Custody Operations Division has established an annex for Covid positives, the SFSO has an enviable Covid record with zero deaths. The SFSO was able to rise to the Covid challenge, in spite of Covid-related staff absences, with dedication, planning and significant overtime. However, with mandatory overtime necessary, staff fatigue is placing both the deputy and the incarcerated populations at risk.

To ensure custody operations can maintain core levels of service, the SFSO is detailing sworn deputies from throughout the Department who were assigned to other critical functions. These units dedicated to activities such as reform oversight, implementation, and

coordination, community connections and engagement, investigations, and the implementation of use of force and other training protocols, were all reduced to impossible-to-maintain levels. These units are so understaffed that this work will need to be abandoned entirely.

### Low Staffing Drivers and Impacts

In FY19-20, in response to concerns regarding racial equity, my office was put on a hiring freeze. When the hiring freeze was lifted, concerns about Covid-related expenditures resulted in a personnel-requisition-approval process that takes well over three months. This exacerbated already low staffing levels that were further challenged by significant overtime reductions in the FY20-21 budgeting processes. The unrealistic budget cuts, use of backfill for staffing demands from lack of hiring, and staffing-intensive Covid-mitigation strategies are driving an enormous over-spend above budget in overtime.

Additionally, the vaccine mandate not only meant separations for those not vaccinated, but also was the catalyst for SFSO to transfer full-duty sworn members from regular assignments, including Investigations, Personnel, Planning and Projects Management, to patrol in order to ensure adequate front-line personnel were available to respond to calls for law enforcement services. The work of those members who were assigned back to patrol currently is not being performed, performed on overtime, or absorbed by other members who are then not performing some of their functions.

### Solutions

The current loss of personnel is unsustainable and will need an immediate financial intervention along with a long-term five-year budget planning strategy to respond adequately to public safety demands across the city.

The immediate intervention strategy the SFSO is proposing includes the following.

A. Civilian/Professional Staff Hiring

Immediate civilian hiring is the quickest way to begin to address the gaps caused by the vaccine mandate and delays in prior year hiring. It is SFSO's intent to increase the use of civilians, many on a one-to-one basis, to replace sworn staff. These positions have been approved in the budget and I simply request your support to expedite the personnel-requisition approval process.

B. Hiring Strategy for Sworn Members

Overtime backfill does not represent a sustainable solution and the expansion of Academy classes (including costs to recruit and retain) under an accelerated hiring plan is the only viable long-term solution. The SFSO requests funding for two recruiters to help expand work on engagement strategies and recruitment activities ($371k/yr). The SFSO also requests additional support in non-personnel services ($1m) to expand the range of recruitment services currently in use to attract as wide of an applicant pool as we can. Based on recent Academy class sizes, we expect class sizes of approximately 20 deputies. To bring staffing back to acceptable levels, the SFSO must plan for at least two academy classes annually with a total annual cost of $4,213,872. As with civilian hiring, I also request your support to expedite the personnel-requisition approval process.

C. Overtime Deployment

The existing approved overtime budget is not based on analysis and does not reflect the ongoing workload requirements of the department. For FY21-22, we expect to significantly exceed the base overtime budget allocation and the reason is due to the lack of available staffing to provide for sufficient service coverage. While I appreciate that we received an overtime supplement for FY21-22, such funding must continue into FY22-23 and beyond.

D. Incentives

Other strategies the SFSO is exploring to mitigate potential personnel losses include expediting the hiring process, expanding incentives for lateral hires, and offering greater retention incentives for current sworn personnel. These include:

- FTO pay year-round, not limited to training days, for FTOs who work with probationers as well.
- Offering $50,000 signing bonus for individuals who enter and graduate from the Academy.
  - o Would need to commit to staying with the Department for five years
  - o Would be required to return the entire sum if they leave before 18 months
  - o Would receive a prorated portion if they leave after 18 months, but before five-year period.
- Increasing signing bonus to Lateral Peace Officers
  - o Increase lateral signing bonus
    - □ $10,000 – upon successful completion of FTO program
    - □ $10,000 – upon successful completion of 12-month full duty probationary period
    - □  $10,000 – upon successful completion of 5 years of employment
  - o Allow vacation time and compensation time to be carried over or receive comparable vacation time and compensation time based on years of service
  - o Reduce time for transitional training/academy
- Offering $5000 referral bonus to members who refer individuals who enter and graduate from the Academy
- Sick Pay Buyback (up to 200 hours per fiscal year)
- Compensation Time Buyback (up to 200 hours per fiscal year)
- Vacation Balances (permit members to accrue up to 80 hours over the applicable cap until June 30, 2022)
- 8504 Salary Steps – Eliminating job class 8302 and expanding 8302 steps into 8504 job classification.
- Option for deputies to stay at hotel after working 16-hour shift.

C. Employee Wellness and Safety

Sworn deputies must contend with the long-term impacts of dealing with dangerous situations, sitting for hours in a patrol car, working extended shifts, and adapting to other work-related stressors which can lead to mental and physical health problems such as work fatigue, obesity, heart attacks, alcoholism, substance abuse, and suicide. These stressors can affect a deputy's family, colleagues, and their daily interactions with the public and community. Stress can lead to poor decision making and increase mistakes, both of which may jeopardize the success of the Department and the safety of the public.

In 2021, the Sheriff's Office was the first in the nation to offer wellness and resilience training to all professional staff. We chose Navigating Adversity from Pathfinder Resilience to provide comprehensive health and wellness training on a department-wide basis. Every participant learns to assess their own needs and gain the understanding and tools to create and sustain a healthy and fulfilling life. The 100% online program, a comprehensive eight-week virtual training curriculum that defines wellness in terms of the eight pillars of human health and behavior.

Creating a long term program to continue to support the resilience of deputies provides great benefits to the City. The U.S. Department of Health and Human Services noted that resilient first responders are better able to:
- Care for themselves and others.
- Access needed resources more efficiently and effectively.
- Be physically and mentally healthier and have overall lower recovery expenses and

service needs.
- Miss fewer days of work.
- Get back to routines more quickly (which helps family members as well).
- Work through the strong emotions that come from being a first-responder, without relying on unhealthy coping strategies such as drinking heavily or smoking.
- Return to their day-to-day role and have positive interactions with co-workers and family.
- Have greater job satisfaction and career longevity.

To support deputy wellness and safety, the Department requests budget support for first-responder-specific Employee Assistance Program (EAP) services negotiated by the City's Health Service System (HSS).

In conclusion, the Department will need immediate financial support in the form of a higher overtime allocation, hiring authority to fill vacancies, and financial investments for hiring incentives to continue public safety duties in San Francisco.

Thank you for your time and consideration on this matter.

Paul Miyamoto
Sheriff

P 0056-000192



# OFFICE OF THE SHERIFF
# CITY AND COUNTY OF SAN FRANCISCO

1 DR. CARLTON B. GOODLETT PLACE
ROOM 456, CITY HALL
SAN FRANCISCO, CALIFORNIA  94102



PAUL M. MIYAMOTO
SHERIFF

February 22, 2021
Reference: 2021-006

Edward de Asis, Controller's Budget Office
1 Dr. Carlton B. Goodlett Place, Room 312
San Francisco, CA  94102-4694

Camilla Taufic, Mayor's Budget Office
1 Dr. Carlton B. Goodlett Place, Room 288
San Francisco, CA  94102-4694

Subject:        Budget Submittal for Fiscal Year 2021-22 and Fiscal Year 2022-23

This memo summarizes the budget submittal for the Office of the Sheriff for fiscal years 2021-22 and 2022-23. I appreciate that the Mayor's budget directive focuses on lower expenses and no new FTEs and I believe my budget follows that directive. My proposed budget lowers expenses while providing ongoing, City-priority, services to those most in need.

To put my budget proposal in context, my 2020 budget certification letter noted that my budget for fiscal years 2020-21 and 2021-22 presented significant, unsustainable challenges that needed to be addressed in the subsequent budget cycle. As we have progressed through the first eight months of FY2020-21, many of the challenges specified in my letter have materialized.

Challenges notwithstanding, I am happy to report that, as a result of ongoing efforts by MYR, CON and SHF, we have closed a projected $14 million gap between appropriated funding and actual spending. These efforts include:

1.  Securing $7 million funding to support Covid-related interdepartmental workorders
2.  Documenting $6 million in cost related to City personnel-policy decisions that resulted in a 150 percent increase in sick leave and a 400 percent increase in floating-holiday leave.
3.  Adding $1 million in funding to support increased payments to PERS retirement.

Having addressed these challenges, the Controller's six-month projects successful budget performance in FY2020-21. I am particularly proud of this success given that:

•  In FY2020-21, my office was challenged with a year-to-year budget reduction that was more than four times the City average for public safety departments.
•  Prior to the FY2020-21 cut, from FY2017-18 to FY2019-20 (as noted in my budget submittal letter from a year ago) the non-workorder budget for my office had already been reduced by five percent.

My budget success in FY2020-21 would not have been possible without strict attention to service levels across the Office of the Sheriff including:

•  Closure of the Hall of Justice jail ahead of schedule
•  Reducing the daily operating hours in the Classification unit from 24 to 20 hours
•  Moving a significant portion of personnel training to online platforms
•  Reducing Covid-workorder costs by 80 percent since the beginning of the pandemic

- Adjusting non-Covid personnel assignments to reflect actual service needs (i.e. closure of all but one entrance to City Hall)

These actions have resulted in a 35 percent reduction in non-Covid overtime, from 13,000 to 8,500 hours per payroll period since I became Sheriff in January of 2020.  Non-Covid overtime levels are now at the lowest level since January 2016.

Cost saving from these changes notwithstanding, I understand that the City is facing a budget deficit of more than $650 million over the next two fiscal years and that my office has a budget reduction goal of $13.5 million. While my budget fully supports the Mayor's budget reduction goals, I am also proposing budget enhancements to support service level mandates resulting from new City policies relating to accountability, transparency, and financial justice.

Accordingly, I propose a budget to include the following:

<u>Reductions</u>

1. **Personnel**

    A. **$5,500,000 savings** in lower salary/benefit cost, over a period of two fiscal years, by reducing Covid-related interdepartmental workorders by 90 percent. This plan, when fully implemented by January 2023 is projected to result, on an annualized basis, in an overtime reduction equivalent to 27 FTEs in overtime.

    B. **$8,400,000 savings** in lower salary/benefit cost, over a period of two fiscal years, by returning to pre-Covid rates of both sick and holiday leave. This plan, when fully implemented by January 2023 is projected to result, on an annualized basis, in an overtime reduction equivalent to 45 FTEs in overtime. Regarding the January 2023 implementation timeline: Although Covid-specific sick leave will be substantially utilized by the end of this fiscal year, its indirect impacts, particularly the 3-fold increase in long-term sick leave, will take much longer to correct.

    C. **$1,690,000 additional recovery revenue** from COVID-command to cover the cost of station transfers. The station transfer function was transferred from SFPD to my Office in October 2020 as a COVID-mitigation strategy. Consolidating arrestee movement to the Sheriff's Office reduces COVID infection risk by keeping arrestees out of SFPD vehicles and stations. When this work was transferred to my office it was done as a pilot program without budget to cover the $1.7 million cost.

<u>Requests</u>

1. **Personnel enhancements for accountability, transparency, and financial justice**

    A. Personnel enhancements in support of the Office of Inspector General:

        i. Two (2) new Administrative Analyst FTEs, job class 1822, beginning pay period 7 of FY2021-22, and two (2) additional Administrative Analyst FTEs, job class 1822, beginning pay period 7 of FY2022-23. These positions are needed to coordinate timely, accurate responses to the new Office of Inspector General.

        ii. Workorder funding from the Office of Inspector General for support services to that office, including training as specified in the authorizing ballot measure.

    B. Personnel enhancements in support of body worn cameras (BWC): My office has received no budget enhancements in support of BWCs since we began using them in FY2018-19. Now that we have expanded from 40 to 340 BWCs, I am requesting support in line with the existing support structure at San Francisco Police Department.

        i. One (1) new Attorney FTE, job class 8177, beginning pay period 7 of FY2021-22. This position is needed to manage retention and release policies for BWC footage.

        ii. Three (3) new Legal Assistant FTEs, job class 8173, beginning pay period 7 of

P 0056-000194

FY2021-22, and three (3) additional Legal Assistant FTEs, job class 8173, beginning pay period 7 of FY2022-23. These positions are needed to manage the day-to-day process regarding BWC-footage retention and release.

C. Personnel enhancements in support of Office of Racial Equity:

   i. One (1) new Lieutenant FTE, job class 8310, beginning pay period 7 of FY2021-22. This position will provide dedicated support to the new racial equity plan for the Sheriff's Office and will focus on equitable hiring practices and training on implicit bias, diversity, and workplace inclusion.

   ii. One (1) new Deputy FTE, job class 8504, beginning pay period 7 of FY2021-22. This position is needed to expand recruitment-staff for my office from one to two deputies. This new position would focus on culturally competent staff recruitment so the San Francisco Sheriff's Office can improve hiring practices that already make it one of the most diversified public safety agencies in the state.

D. $1,326,000 to replace Inmate Welfare Fund funding for Rehabilitation Services Coordinators working in the jail. In FY2018-19, working with the City Treasurer, my office eliminated funding for the Inmate Welfare Fund from phone calls and commissary as part of an ongoing effort in support of financial justice. This enhancement replaces funding from incarcerated people and their families.

## 2. Professional Services

A. $369,000 to support the legacy jail management system (JMS). This cost had been borne by Department of Technology until FY2018-19 when the expense was transferred to the Office of the Sheriff. The expense transfer came with funding for FY2018-19 and FY2019-20 only. As recommended by the Re-envision the Jail Work Group, the Office of the Sheriff is replacing the legacy system. However, until this project is completed in FY2022-23, funding must be maintained for the legacy system.

B. $1,222,211 to support the replacement jail management system (JMS). As recommended by the Re-envision the Jail Work Group, the Office of the Sheriff is replacing the legacy system. FY2020-21 funding for this project was budgeted in August of 2021 with support of the Work Group with the proviso that the Office of the Sheriff would request FY2021-22 funding as part of the current budget cycle.

C. $591,084 for storage and licenses related to expansion of body worn cameras to an additional 200 sworn staff. The Office of the Sheriff instituted body worn camera in FY2018-19 with a 40-camera pilot project. Since that time an additional 300 cameras have been put into service. These additional 200 cameras will complete the BWC rollout for the Office of the Sheriff.

D. $307,648 to support recruitment and training costs for 44 new-hire deputies anticipated for FY2021-22. Expenses include pre-hire screening, academy tuition and expenses.

E. $500,000 to replace inmate-funding of telephone services in the jails. As of July 2020, San Francisco became the first county in the nation to eliminate inmate charges for phone calls. In FY2020-21, inmate telephone service was paid for using the remaining fund balance resulting from inmate payments. With that fund balance now depleted, the cost of inmate phone calls becomes a part of the Sheriff's operating budget.

## 3. Community Based Organizations

A. $173,000 for two additional case managers for expand services at the San Francisco Pretrial Diversion Project as a result of ongoing growth of the non-custody justice involved population.

B. $541,069 to replace Inmate Welfare Fund funding for rehabilitation and parent-child services currently provided by Community Works West. In FY2018-19 my office

eliminated funding for the Inmate Welfare Fund from phone calls and commissary as part of an ongoing effort in support of financial justice. This enhancement replaces funding from incarcerated people and their families.

C. $285,990 to support a three percent cost-of-living adjustment for CBO-staff salaries.

**4. Materials and Supplies**

A. $256,296 to support higher cost for in-jail food related to (a) pricing adjustments related to consumer price index, (b) pricing adjustments to consolidate all meal preparation at County Jail 3.  These standards, recently adopted by the City, to address animal welfare, environmental sustainability, nutrition, fair wages, and local economies are expected to result in higher food costs.

B. $787,718 in support of collective bargaining agreement (CBA) required equipment. Equipment includes:

   i. Ballistic vests for employee safety to replace vests more than five years old.

   ii. Ordinance stocks for POST-required range qualification.

   iii. Uniforms for new deputies to replace separations and to reduce overtime.

C. $219,470 for hardware related to expansion of body worn cameras to an additional 200 sworn staff. The Office of the Sheriff instituted body worn camera in FY2018-19 with a 40-camera pilot project. Since that time an additional 300 cameras have been put into service. These additional 200 cameras will complete the BWC rollout for the Office of the Sheriff.

**5. Services of Other Departments**

A. $149,579 to replace grant funding for mental health assessment services from DPH. This service sustains, on a daily basis, ongoing counseling, support, service referrals, and placement into supportive programming for pretrial clients with mental illness.

**6. Equipment**

A. $348,580 to replace seven (7) sedan vehicles 10+ years old with over 100,000 miles.

B. $460,770 to replace seven (7) patrol vehicles 10+ years old with over 100,000 miles.

C. $440,382 to replace seven (7) vans 10+ years old with over 100,000 miles.

D. $651,000 to replace transport bus 20 years old with a history of mechanical problems.

E. $108,500 to purchase handheld narcotics analyzers which will be used as a tool to improve on lifesaving work of deputies as they encounter opioid overdoses in the field. My staff encounter overdoses on an ongoing basis and have been instrumental in saving lives through their intervention.

I appreciate that the Mayor has directed departments to lower expenses and not to add new FTEs in their budget submittals. I believe my budget strikes a fair balance that, overall, lowers expenses while providing ongoing, City-requested, services to those most in need. I look forward to working with you on a budget that supports this essential mayoral priority.

Please contact Crispin Hollings, Chief Financial Officer at 415-554-4316 if you have any questions.

_____

Paul Miyamoto
Sheriff

Phone: 415-554-7225    Fax: 415-554-7050
Website: sfsheriff.com   Email: sheriff@sfgov.org

P 0056-000196



**SAN FRANCISCO DEPUTY SHERIFFS' ASSOCIATION**
"Serving the Deputy Sheriffs' of San Francisco since 1952"

| PRESIDENT | VICE-PRESIDENT | TREASURER | SECRETARY | SERGEANT-AT-ARMS |
|---|---|---|---|---|
| Ken Lomba | Jason Moore | Earl Hays | Danilo Quintanilla | Jim Irving |

June 21, 2022

***Via Electronic Mail***
San Francisco Board of Supervisors
City Hall, Room 244
1 Dr. Carlton B. Goodlett Place
San Francisco, California 94102
email: Board.of.Supervisors@sfgov.org

**Re: SFDSA Demands Civil Grand Jury Investigate the Sheriff's Office**

Dear Board of Supervisors:

Staffing in the San Francisco Jails has become dangerously unsafe with inmates attacking inmates, nurses, sheriff deputies and civilian employees. The San Francisco Sheriff's Office and City and County of San Francisco have understaffed the jails to a dangerously low level, they have not prioritized funding to hire deputies, they have not even prioritized retention of current deputies.

Since 2014 there have been 3 separate reports from the SF Civil Grand Jury warning about the effects of going below minimum staffing levels and to expedite hiring instead of forced overtime. There was even a warning of a possible violation of Title 15 in the future if nothing changes. Unfortunately, the Sheriff's Office has failed to hire the proper number of deputies to create a safe working environment for both the deputies and inmates. The minimum staffing levels have gotten worse, and bottom line: the deputies are exhausted.

In the past reports, the Grand Jury found that because of the dwindling number of total deputies employed by the City and County of San Francisco, the excessive overtime and shortage of bodies did not allow for the important inmate programs in existence let alone increase the inmate programs that were recommended. Furthermore, the recommended training for deputies could not

P 0056-000197



**SAN FRANCISCO DEPUTY SHERIFFS' ASSOCIATION**
"Serving the Deputy Sheriffs' of San Francisco since 1952"

| PRESIDENT | VICE-PRESIDENT | TREASURER | SECRETARY | SERGEANT-AT-ARMS |
|---|---|---|---|---|
| Ken Lomba | Jason Moore | Earl Hays | Danilo Quintanilla | Jim Irving |

pg. 2  Civil Grand Jury Investigation

take place or was inadequate to deal with the mental health and substance abuse as well as many other issues the housed population experiences.

Ultimately, this Grand Jury recommended on three separate occasions in 2014, 2016, and 2017 to "expedite hiring to reduce overtime." The Grand Jury's recommendations have never been followed and the situation has become untenable as the number of deputies is lower now than it was when this Grand Jury made these strong recommendations.

## CCSF JAILS ARE NOW FALLING BELOW MINIMUM STAFFING REGULARLY

Just days ago, on June 9, 2022, Sheriff Miyamoto issued a memo to all City and County of San Francisco jail staff identifying his intentions of – operating below minimum staffing – for a period of the next 8-9 months! The City and County of San Francisco has clearly recognized the futility of giving the appearance of reaching minimum staffing and has now admitted that it cannot exercise its duty to do so.

The City and County of San Francisco is in fierce competition with its neighboring counties, Alameda and San Mateo, for jail staff. Alameda has been under a consent decree to hire more jail staff. It would be a shame for the City and County of San Francisco to be under similar governmental oversight. The City and County of San Francisco can expedite the hiring of staff but has not made it a priority, at the expense of the overworked and exhausted jails staff.

The Civil Grand Jury Complaint against the Sheriff's Office and the City and County of San Francisco was filed on June 20th, 2022.  This Grand Jury should demand answers from the San Francisco Sheriff's Office as to why it has failed to comply with its 3 separate recommendations since 2014.

View the complaint here, Civil Grand Jury Complaint Against SF Sheriff

P 0056-000198



# SAN FRANCISCO DEPUTY SHERIFFS' ASSOCIATION

"Serving the Deputy Sheriffs' of San Francisco since 1952"

| PRESIDENT | VICE-PRESIDENT | TREASURER | SECRETARY | SERGEANT-AT-ARMS |
|-----------|----------------|-----------|-----------|------------------|
| Ken Lomba | Jason Moore | Earl Hays | Danilo Quintanilla | Jim Irving |

**pg. 3  Civil Grand Jury Investigation**

Please feel free to contact me if you have any questions.

Best regards,

Ken Lomba
SFDSA President
president@sanfranciscodsa.com
Cell: (415) 696-2428

P 0056-000199



**SAN FRANCISCO DEPUTY SHERIFFS' ASSOCIATION**
"Serving the Deputy Sheriffs' of San Francisco since 1952"

| PRESIDENT | VICE-PRESIDENT | TREASURER | SECRETARY | SERGEANT-AT-ARMS |
|---|---|---|---|---|
| Ken Lomba | Jason Moore | Earl Hays | Danilo Quintanilla | Jim Irving |

July 21, 2022

***Via Electronic Mail***
***Sheriff Paul Miyamoto***
San Francisco Sheriff
City Hall, Room 456
1 Dr. Carlton B. Goodlett Place
San Francisco, California 94102
email: paul.miyamoto@sfgov.org

**Re: Recruiting & Hiring Analysis and Recommendations**

Dear Sheriff Miyamoto:

The SFSO needs to implement the best ideas that will produce the highest results in a short period of time.  The recruitment and hiring group provides good ideas and has good intentions.

The majority of the marketing ideas seem to be directed to the general audience.   In my experience, this will produce the least results. The SFSO has an extreme urgency to hire, a short timeline and marketing to a general audience will not be a successful plan. We know from recent history of SFSO recruitment marketing that the best marketing with the highest result was word of mouth from current employees.  What this proves is that the other forms of marketing by the SFSO, are producing a return on investment and are not effective.

Recruiting needs to be laser focused and organized. The goal would be to increase applicants, increase hires, reduce withdrawals and reduce disqualifications.  Test marketing methods, then fuel what is working the best.

The recruitment and hiring group brought up some good ideas and some ideas I would not recommend doing as well.  The good ideas that were brought up were social media and search engine advertisements. These two can be targeted geographically and by keywords to target markets increasing results.  The remaining ideas are to advertise via different methods to the general market this will get the least amount of results.  I would keep the Muni Ads, but I do not recommend radio, magazines, nor sporting events for paid advertisements.  You will be getting the

**P.O. Box 77590    San Francisco, CA  94107**
**Phone: (415) 696-2428   www.SanFranciscoDSA.com    Fax: (415) 658-7210**

Norbert 3:19-cv-02724 SK

Mirkarimi001169

P 0056-000200



**SAN FRANCISCO DEPUTY SHERIFFS' ASSOCIATION**
"Serving the Deputy Sheriffs' of San Francisco since 1952"

| PRESIDENT | VICE-PRESIDENT | TREASURER | SECRETARY | SERGEANT-AT-ARMS |
|---|---|---|---|---|
| Ken Lomba | Jason Moore | Earl Hays | Danilo Quintanilla | Jim Irving |

least return on investment there.  If you can do those for free then do that and also turn it into a press release and social media post.  i.e. flying a hiring banner, building banners, radio

Pop tent events, I would recommend keeping that within San Francisco and limit it since the results are low.  I would not offer any overtime for pop tent events, street fairs etc. It should be your civilian recruiter and Deputy Moret.  Anything further, would be a waste of funds.  Deputy Moret had a good idea of having bbqs at these, I think that idea should be carried over and implemented to the deputy sheriff testing. BBQ and drinks should be implemented at the end of the written exam and at the end of the physical agility.  This should be marketed in the notification materials and in a press release.

You have an extreme urgency to hire, a short timeline and I don't see a current successful plan.

I put together a list of recommendations from targeted markets, where to advertise, how to measure your results and in the coming weeks I will put together a system to capture leads that will automatically send information to job seekers, ways to reduce disqualification, and a system to increase successful hires.

Ideally all of this needs to be up to speed and running within two weeks.

**Prioritize what works and what works now:**
1.  Target academy grads/laterals
These are the best candidates. They have passed tests, backgrounds, medical and psych testing and/or the academy. This group should be hired the most and paid at higher steps..

2.  Target industries
      (a) Security Officers

3. Target job searchers

P 0056-000201



**SAN FRANCISCO DEPUTY SHERIFFS' ASSOCIATION**
"Serving the Deputy Sheriffs' of San Francisco since 1952"

| PRESIDENT | VICE-PRESIDENT | TREASURER | SECRETARY | SERGEANT-AT-ARMS |
|---|---|---|---|---|
| Ken Lomba | Jason Moore | Earl Hays | Danilo Quintanilla | Jim Irving |

**Prioritize Marketing to the listed 3**

1. Academy Graduates - start at *Step 3 $51.83*
   - (a) Academy visits
   - (b) Flyers/Posters at academy
   - (c) Personal letter to academy students at academy (every new class two letters, 1st letter from the Sheriff beginning academy, 2nd letter from the Undersheriff towards the end of the academy)
   - (d) Geo target Post academies with social media paid advertisements
   - (e) YouTube geo and keyword targeting

2. Laterals/FTO separations - match rate of pay
   - (a) FTO separations - market to department recruiters we are a place of second chances and if they have a FTO separation we are interested in them and encourage them to apply.  These are valuable candidates that need more training.
   - (b) Email/Fax department training units marketing we are a place of second chances.
   - (c) Contact bay area training units for FTO separations
   - (d) Laterals - market to unions for retiring officers to build a second pension with SFERs. Laterals with patrol/fto/investigation experience can help advance the dept.
   - (e) Press release - SFSO is a place for second chances.  Create a press release that the SFSO is a place of compassion and will provide more training to any law enforcement officer that could not complete a patrol field training program. Two outcomes from this 1) if News Media picks it up it's free advertisement 2) The press release will be on the internet and found by potential applicants via search engines

3. Security Officers
   - (a) Security Officers have been trained in the basics and have an interest towards this career.  They are underpaid and under benefited. This makes them a prime candidate for recruiting. Marketing to them the pay, benefits and career opportunities would lead them to apply.
   - (b) Security Officers are constantly looking for better jobs in the industry.
   - (c) Direct mail campaign to Security Officers promoting pay, benefits, career opportunities, overtime available and assistance throughout the testing process.

P 0056-000202



**SAN FRANCISCO DEPUTY SHERIFFS' ASSOCIATION**
"Serving the Deputy Sheriffs' of San Francisco since 1952"

| PRESIDENT | VICE-PRESIDENT | TREASURER | SECRETARY | SERGEANT-AT-ARMS |
|-----------|----------------|-----------|-----------|-------------------|
| Ken Lomba | Jason Moore | Earl Hays | Danilo Quintanilla | Jim Irving |

     (d) Keyword target Security officers and security officer job, geo target the Bay Area on Social Media and Search Engines

     (e) YouTube geo and keyword targeting

4. Job Searchers

     (a) These are people actively seeking a job whether it's in law enforcement and/or looking for a better career. Targeting job searchers instead of running a general advertisement is far better for return on investments.

     (b) Get listed on popular job boards and pay for a sponsored position

     (c) Geo target the Bay Area on Social Media and Search Engines

     (d) YouTube geo and keyword targeting

**Targeted Media:**

1. Paid Social Media Advertisements

     (a) FaceBook - boosts and ads

     (b) Instagram - boosts and ads

     (c) Twitter - ads

     (d) Tik Tok - ads

2. Video Advertisement

     (a) YouTube

**Targeted Job Boards:**

1. Post on Job Boards and pay for a sponsored position

     (a) Indeed - most Security Officers search Indeed for higher paying jobs

     (b) Google for jobs

     (c) LinkedIn

     (d) Monster

     (e) Facebook

     (f) Craigslist

     (g) https://www.betterteam.com/job-boards

P 0056-000203



**SAN FRANCISCO DEPUTY SHERIFFS' ASSOCIATION**
"Serving the Deputy Sheriffs' of San Francisco since 1952"

| PRESIDENT | VICE-PRESIDENT | TREASURER | SECRETARY | SERGEANT-AT-ARMS |
|-----------|----------------|-----------|-----------|------------------|
| Ken Lomba | Jason Moore | Earl Hays | Danilo Quintanilla | Jim Irving |

**Advertisement should emphasize the following: (*use gif images and videos*)**

1. Great Career
2. Financial Security during recessionary times and during inflationary times.
3. Great Medical(state percentage paid), Dental, Vision Benefits
4. Overtime Available - if you are saving for a house or a car, or just want to pay off bills you can accomplish that faster
5. Leave your $20 hour job for a $40 an hour job
6. We will help you through the process
7. Training provided
8. Recession Proof
9. Inflation Proof - overtime available

**Measuring Conversion Rates for free**

With these two tools you can measure the results.  This way you can fuel what's working best to increase the outcome to hire more deputy sheriffs.  In the long run, this will be more efficient saving time, money with a higher rate of return while reducing low quality candidates creating a powerful system of measuring, testing and increasing conversions.

1. Google Tag Manager
   Google Tag Manager is a marketing tool for improving your marketing ROI. It helps make tag management simple, easy and reliable by allowing marketers and webmasters to deploy website tags all in one place. Tag manager can work with other page builders like Clickfunnels, OptimizePress, Builderall, Leadpages and Instapage.  I will bring up details on page builders in a separate report.
   (a) Google Tag Manager popular tracking use cases are:
   (b) Button click tracking
   (c) Outbound link clicks (track when a visitor clicks a link leading to an external resource (job application))
   (d) File link clicks (e.g. when someone clicks on a link that downloads/opens a PDF file)
   (e) Menu link clicks
   (f) https://tagmanager.google.com/

P 0056-000204



**SAN FRANCISCO DEPUTY SHERIFFS' ASSOCIATION**
"Serving the Deputy Sheriffs' of San Francisco since 1952"

| PRESIDENT | VICE-PRESIDENT | TREASURER | SECRETARY | SERGEANT-AT-ARMS |
|---|---|---|---|---|
| Ken Lomba | Jason Moore | Earl Hays | Danilo Quintanilla | Jim Irving |

2. Google Analytics
Google Analytics offers an easy and free way to track and analyze visitors on your website. You could have thousands or even millions of visitors every month, but those visitors are practically meaningless if you don't know anything about them. With its robust web analytics and reporting tools, Google Analytics can help you make the most out of visitors and potentially turn them into customers.

In addition to tracking the number of visitors, Google Analytics provides key insights into how your website is performing and what you can do to meet your goals. You can track everything from how much traffic your website is getting to where that traffic is coming from and how visitors are behaving. You can even monitor social media activities, track mobile app traffic, identify trends and integrate other data sources to help you make well-informed business decisions.

1. https://analytics.withgoogle.com/
2. Setup Google Analytics UTM Links for each advertisement to track results.
3. Setting up a UTM Link https://youtu.be/JV1H44IQxDU

Best regards,

Ken Lomba
SFDSA President
president@sanfranciscodsa.com
Cell: (415) 696-2428



# OFFICE OF THE SHERIFF
# CITY AND COUNTY OF SAN FRANCISCO

1 DR. CARLTON B. GOODLETT PLACE
ROOM 456, CITY HALL
SAN FRANCISCO, CALIFORNIA  94102



PAUL M. MIYAMOTO
SHERIFF

February 22, 2022
Reference: 2022-008

Edward de Asis, Controller's Budget Office
1 Dr. Carlton B. Goodlett Place, Room 312
San Francisco, CA  94102-4694

Camilla Taufic, Mayor's Budget Office
1 Dr. Carlton B. Goodlett Place, Room 288
San Francisco, CA  94102-4694

Subject:  Budget Submittal for Fiscal Year 2022-23 and Fiscal Year 2023-24

This memo summarizes the budget submittal for the Office of the Sheriff for fiscal years 2022-23 and 2023-24. My budget focuses on Mayor Breed's number one policy priority: Restoring vibrancy to San Francisco, including improved public safety and street conditions. To achieve this policy goal my budget addresses the significant challenges that I have communicated on multiple occasions with both the Mayor and Controller. While these challenges are numerous, the primary ones include:

- Covid leave which has increase in employee absences of more than double what they were pre-Covid.  The cost of this additional leave is projected to be $13 million in the current fiscal year with little evidence of abatement.

- Expansion of the in-custody justice involved population which, in the aftermath of the shutdown of Hall of Justice jail, has taxed my ability to house individuals in a safe manner.

- A slowdown in hiring which has resulted in an ever-greater need for large academy classes for new deputies.

Accordingly, I propose a budget to include the following:

1. **Personnel**

   A. Overtime funding to cover posts vacated due to City Covid-leave policy. Since the advent of Covid-specific leave, employee absence from work has more than doubled. While I hope that increased leave rates will come down, I believe that new City leave offering will result in reductions that, at best, will be slow and gradual. In FY2021-22 leave was addressed with emergency overtime funding of $13 million. I am requesting additional $13 million in overtime funding for both years of the budget to avoid another emergency and the slow-down in hiring decisions that preceded the emergency funding. Finally, to avoid another mid-year overtime supplemental, my budget shifts $10 million from regular salaries to overtime by reducing attrition by $10 million an increasing overtime by the same amount.

   B. Funding to cover the cost of opening annex housing at the San Bruno jail. Despite the closure of the Hall of Justice jail in FY2020-21, San Francisco's larger criminal justice

system continues to move justice-involved people to my custodial care in excess of what is sustainable for current custodial facilities. In FY2021-22, I opened annex housing at the San Bruno jail for Covid-infected persons using funds from the Department of Public Health. In FY2022-23 I expect to need this housing to accommodate the in-custody population in a safe and constitutional manner. For both years of the budget, I am requesting an additional $4,992,000 in the form of reduced attrition savings to support this need.

C. Funding to cover the cost of additional academy classes for 40 new deputies. The City's generous Covid leave policies in FY2021-22 resulted in increases overtime which, in turn, resulted in a very slow process for hiring new deputies. My office now has a deficit of over 100 deputies and overtime now accounts for over 20 percent of total work hours: This is not sustainable. For both years of the budget, I am requesting funding to cover two additional academy classes of 20 deputies each; an additional $4,146,686 in the form of reduced attrition savings to support two additional academy classes of 20 deputies. These additional classes will result in the ability to hire a total of 75 deputies in both FY2022-23 and FY2023-24.

D. In my letter to Mayor Breed of January 26, a copy of which is included in my budget submission, I proposed incentives for hiring and retention. These incentives, also proposed by SFPD, are still in draft form and are not included in my formally quantified budget ask. However, I look forward to working with the Mayor's Office to establish hiring/retention incentives to stem and recover from the current loss of public safety personnel.

E. $1,557,120 in FY2022-23 and $1,572,137 in FY2023-24 for ongoing support of the Sheriff's Office racial equity plan focused on equitable hiring practices and training on implicit bias, diversity, and workplace inclusion. For both years of the budget, I am requesting this funding in the form of reduced attrition savings.

## 2. Professional Services

A. $1,262,000 for software licensing fees to support (1) storage and licenses for the 340 body worn cameras currently in service, (2) incident report writing, (3) storage and tracking of court records, (4) digital forensics, (5) performance appraisals.

B. $453,106 for professional services to support (1) 30 percent increase in alcohol monitoring clients and (2) a projected increase in unit cost for devices with the extension of the current contract into the fourth year.

C. $540,000 for professional services to support (1) digital strategic plan as recommended by City Services Auditor, (2) digital web services for the public, (3) replacement of antiquated Citrix environment, (4) training platform for SHF staff.

D. $1,410,080 in FY2022-23 and $991,036 in FY2023-24 additional funding for the Jail Management System project based on finding from the Phase 1 discovery of the project. SHF expects to present these additional costs to COIT in April 2022.

## 3. Community Based Organizations

A. $775,000 in FY2022-23 and FY2023-24 for ongoing support of Cameo House which serves San Francisco's homeless justice-impacted mothers and families. For the FY2021-22 budget these funds were moved from APD to SHF during the addback process. This request simply makes these funds part of the Sheriff base budget.

B. $265,000 in FY2022-23 and $530,000 in FY2023-24 and thereafter to contract with the Mental Health Association of San Francisco (MHASF) to establish a Peer Support program specifically for the individuals who comprise the top 2% of jail bookings who are also top users of urgent/emergency health services. These individuals are disproportionately male, African American, and homeless during the year of frequent use. MHASF has been at the

forefront of the peer recovery movement, matching participants with trained peer counselors who accompany participants to public assistance, mental health, medical and housing appointments while providing advocacy and emotional support.  In addition, the peer counselors will be able to outreach released clients in the community if participants are initially reluctant to engage.

C. $80,000 to double staffing at the Discharge Planning Office, for dedicated service at the San Bruno Jail, which coordinates cab rides, emergency hotel rooms, hygiene items and clothing to people being released from the jail.

**4. Materials and Supplies**

A. $383,851 in FY2022-23 and $717,204 in FY2023-24 to support higher cost for in-jail food related to (1) unit pricing increase related to lower meal counts following the closure of the Hall of Justice jail and (2) City food standards to address animal welfare, environmental sustainability, nutrition, fair wages, and local economies.

B. $787,718 in support of collective bargaining agreement (CBA) required equipment. Equipment includes:

   i.   Ballistic vests for employee safety to replace vests more than five years old.

   ii.  Ordinance stocks for POST-required range qualification.

   iii. Uniforms for new deputies to replace separations and to reduce overtime.

C. $50,000 to support free commissary for indigent persons in the jail. The free commissary program was started using grant from the Office of the Treasurer. To continue this program, backed by the Treasurer and community advocates, a new source of funding is required.

**5. Services of Other Departments**

A. $1,500,000 increase in funding for workers' comp claims.  Workers' Comp claims have increase City-wide as a result of circumstances well beyond the control of individual City departments including the Sheriff's Office.  However, Workers' Comp expenses have been a hurdle for timely hiring of SHF personnel. While this request in not included in my formally quantified budget ask, I nonetheless look forward to working with the Mayor's Office to budget such expenses realistically and with an eye to improved expense management.

B. $275,000 to Department of Technology to fund (1) VM Ware, (2) replacement of analog phones to digital, (3) video visitation in the jails.

C. $72,000 to Health Service System to fund first-responder-specific Employee Assistance Programming.

**6. Equipment**

A. $400,000 to replace eighteen (18) sedan vehicles 10+ years old with over 100,000 miles, asset numbers: 173-250, 173-251, 173-254, 173-256, 173-258, 173-259, 173-235, 173-247, 173-122, 173-123, 173-128, 173-154, 173-261, 173-236, 173-361, 173-362, 173-F100, 173-F103.

B. $70,000 to replace two (2) patrol vehicles 10+ years old with over 100,000 miles, asset numbers: 173-503, 173-521.

C. $420,000 to replace seven (7) transport vans 10+ years old with over 100,000 miles, asset numbers: 173-601, 173-625, 173-634, 173-636, 173-639, 173-643, 173-645.

D. $1,200,000 to replace two (2) transport buses 15 years old with a history of mechanical problems, asset numbers: 173-712, 173-713.

E. $120,000 for three (3) narcotics analyzers to be used to keep narcotics, including deadly fentanyl, out of the jails.

F. $220,000 for one (1) tray washer to replace the current 20+ year old washer used for food service in the San Bruno jail.

I believe my budget supports the Mayor's policy goal: *To restore vibrancy to San Francisco, including improved public safety and street conditions.* I look forward to working with you on a budget that supports this essential mayoral priority.

Please contact Crispin Hollings, Chief Financial Officer, at 415-554-4316 if you have any questions.

Paul Miyamoto
Sheriff

P 0056-000209

8/24/22, 5:30 PM                                          Mail - President - Outlook

## Re: Step Pay Increase

**Abellana, John (SHF)** <john.abellana@sfgov.org>
Thu 8/11/2022 7:13 PM
To: President <president@sanfranciscodsa.com>

That's weird. Yes there was no signature. Here is his email jamala.sanford@sfgov.org. Let me know if you need anything.

Thanks,
John Abellana

---

**From:** President <president@sanfranciscodsa.com>
**Sent:** Thursday, August 11, 2022 10:48 AM
**To:** Abellana, John (SHF) <john.abellana@sfgov.org>
**Subject:** Re: Step Pay Increase

> This message is from outside the City email system. Do not open links or attachments from untrusted sources.

Hey John

For some reason it doesn't show his email info.

And he didn't put a signature on it?

Thanks
Ken

Sent from my iPhone

On Aug 11, 2022, at 9:49 AM, Abellana, John (SHF) <john.abellana@sfgov.org> wrote:

Get Outlook for iOS

---

**From:** Sanford, Jamala (SHF) <jamala.sanford@sfgov.org>
**Sent:** Wednesday, August 10, 2022 9:12:06 PM
**To:** Abellana, John (SHF) <john.abellana@sfgov.org>
**Cc:** Clark, Carla (SHF) <carla.clark@sfgov.org>
**Subject:** FW: Step Pay Increase

8/24/22, 5:30 PM                                    Mail - President - Outlook

Dep. Abellana,

I have presented the information we discussed to Sheriff Miyamoto.  He has decided not to approve your request for a pay increase.

Please contact me if you have any questions or concerns.

Thank you.

**From:** Clark, Carla (SHF) <carla.clark@sfgov.org>
**Sent:** Wednesday, June 22, 2022 9:26 AM
**To:** Sanford, Jamala (SHF) <jamala.sanford@sfgov.org>
**Subject:** Fw: Step Pay Increase

Captain,

This deputy is requesting an answer regarding his request for a pay increase.

**Sergeant Carla Clark #1418**
**Personnel Manager**
**San Francisco Sheriff's Office**
**City Hall**
**1 Dr. Carlton B. Goodlett Place, Room 456**
**San Francisco, Ca 94102-4676**
**Telephone: (415) 554-4461**
**Work Cell: (415) 361-0420**
**Fax: (415) 554-7050**

**This communication and any accompanying documents are confidential. They are intended for the sole use of the addressee. If you receive this transmission in error, you are advised that any disclosure, copying distribution, or taking of any action in reliance upon this communication is strictly prohibited. Moreover any such disclosure shall not compromise or waive the attorney-client, accountant-client, or other privileges as to this communication or otherwise. If you have received this communication in error, please contact me at the above address. Thank you.**

**From:** Abellana, John (SHF) <john.abellana@sfgov.org>
**Sent:** Wednesday, June 22, 2022 9:23 AM
**To:** Clark, Carla (SHF) <carla.clark@sfgov.org>
**Subject:** Re: Step Pay Increase

Good Morning Sgt. Clark,

Is there any update from your upper chain of command regarding my pay increase?

Regards,
Deputy John Abellana #2456

Get Outlook for iOS

**From:** Abellana, John (SHF) <john.abellana@sfgov.org>
**Sent:** Wednesday, June 15, 2022 8:13:51 AM

P 0056-000211

**To:** Clark, Carla (SHF) <carla.clark@sfgov.org>
**Subject:** Re: Step Pay Increase

Thank you.

Get Outlook for iOS

---

**From:** Clark, Carla (SHF) <carla.clark@sfgov.org>
**Sent:** Wednesday, June 15, 2022 7:49:03 AM
**To:** Abellana, John (SHF) <john.abellana@sfgov.org>
**Subject:** Re: Step Pay Increase

Good Morning,

I am going to forward this up my chain of command.

Sergeant Carla Clark #1418
Personnel Manager
San Francisco Sheriff's Office
City Hall
1 Dr. Carlton B. Goodlett Place, Room 456
San Francisco, Ca 94102-4676
Telephone: (415) 554-4461
Work Cell: (415) 361-0420
Fax: (415) 554-7050

This communication and any accompanying documents are confidential. They are intended for the sole use of the addressee. If you receive this transmission in error, you are advised that any disclosure, copying distribution, or taking of any action in reliance upon this communication is strictly prohibited. Moreover any such disclosure shall not compromise or waive the attorney-client, accountant-client, or other privileges as to this communication or otherwise. If you have received this communication in error, please contact me at the above address. Thank you.

---

**From:** Abellana, John (SHF) <john.abellana@sfgov.org>
**Sent:** Tuesday, June 14, 2022 1:35 PM
**To:** Clark, Carla (SHF) <carla.clark@sfgov.org>
**Subject:** Step Pay Increase

Good Evening Sgt. Clark,

My name is Deputy John Abellana and I have a couple of questions I'm hoping you may be able to answer. I was with the San Francisco Police Department for about a year before I left. Currently, I'm in Class 15 of Core Training and would like to know if this is considered a lateral hire. If you can please offer some information as to what qualifies as a lateral hire and how the salary step increases work. With my previous experience with the San Francisco Police Department, I wanted to ask if this would be enough to begin my pay at Step 2 rather than Step 1. Any information you can provide is greatly appreciated.

Thank you in advance.

Sincerely,
Deputy John Abellana #2456

8/24/22, 5:25 PM                                    Mail - President - Outlook

## Re: Background Investigative Services

President <president@sanfranciscodsa.com>

Tue 8/23/2022 3:30 PM

To: Engler, Joseph (SHF) <joseph.engler@sfgov.org>;Miyamoto, Paul (SHF)
<paul.miyamoto@sfgov.org>;Carter, Tanzanika (SHF) <tanzanika.carter@sfgov.org>;Scalercio, Frank (SHF)
<frank.scalercio@sfgov.org>

Cc: Sean D. Howell <showell@mastagni.com>;Dan L. Koontz <dkoontz@mastagni.com>;Frank A. Terreri
<fterreri@mastagni.com>

Thanks US Engler for the response.

Our members would be happier to see and know that the SFSO is doing everything aggressively to hire,
such as other agencies, in a manner that is productive with results.

**The hiring and recruiting issues that are affecting the department causing below average hiring are
from within.** Many of the pending labor issues are affecting morale which in turn gives the SFSO a bad
reputation. One of the main hiring issues the Sheriff has not resolved is paying fair wages to Academy
Graduates and Laterals.

Secondly, the Sheriff can hire at above pay steps to bolster recruiting. He has yet to do that as well.

On the surface, it doesn't seem like aggressively hiring deputy sheriffs is a priority. With the above
issues and more, it seems like the SFSOs level of urgency for hiring is a lower threshold than the reality
of what is needed.

Why hasn't the wage issue been resolved?

Why hasn't advertising/hiring above 1st Step been initiated?

Best regards,

Ken Lomba
SFDSA President
415-513-8973



From: Engler, Joseph (SHF) <joseph.engler@sfgov.org>
Sent: Tuesday, August 23, 2022 2:38 PM
To: Miyamoto, Paul (SHF) <paul.miyamoto@sfgov.org>; Carter, Tanzanika (SHF) <tanzanika.carter@sfgov.org>;
Scalercio, Frank (SHF) <frank.scalercio@sfgov.org>; President <president@sanfranciscodsa.com>
Cc: Sean D. Howell <showell@mastagni.com>; Dan L. Koontz <dkoontz@mastagni.com>; Frank A. Terreri
<fterreri@mastagni.com>
Subject: Re: Background Investigative Services

P 0056-000214

8/24/22, 5:25 PM                                          Mail - President - Outlook

President Lomba,

There is a communication gap here.  I wasn't suggesting that we aren't working with you and going in a different direction.  I want you to know that we are looking in all directions and at all paths to give the DSA membership, our rank and file personnel, some relief in the workplace during extreme staffing shortages.

I hope that we can continue to discuss strategies in a productive way.

US Engler

Get Outlook for iOS

---

**From:** President <president@sanfranciscodsa.com>
**Sent:** Tuesday, August 23, 2022 1:59:15 PM
**To:** Engler, Joseph (SHF) <joseph.engler@sfgov.org>; Miyamoto, Paul (SHF) <paul.miyamoto@sfgov.org>; Carter, Tanzanika (SHF) <tanzanika.carter@sfgov.org>; Scalercio, Frank (SHF) <frank.scalercio@sfgov.org>
**Cc:** Sean D. Howell <showell@mastagni.com>; Dan L. Koontz <dkoontz@mastagni.com>; Frank A. Terreri <fterreri@mastagni.com>
**Subject:** Re: Background Investigative Services

Sheriff Miyamoto and Undersheriff Engler,

We will advise our membership that the Sheriff is planning to civilianize positions as well as hiring Prop F, instead of aggressively hiring and recruiting.

Also, I have sent a letter which analyzed the recruiting and hiring as well as a steps to enhance recruiting results.  I sent a follow up email to the Sheriff and days later, a text message yesterday.

To this date there has been no response from the Sheriff in regard to our analyzation/suggestions, nor do I believe our recommendations have been implemented.


Best regards,

Ken Lomba
SFDSA President
415-513-8973



---

**From:** Engler, Joseph (SHF) <joseph.engler@sfgov.org>
**Sent:** Tuesday, August 23, 2022 1:10 PM
**To:** Miyamoto, Paul (SHF) <paul.miyamoto@sfgov.org>; Carter, Tanzanika (SHF) <tanzanika.carter@sfgov.org>;
Scalercio, Frank (SHF) <frank.scalercio@sfgov.org>; President <president@sanfranciscodsa.com>

P 0056-000215

**Cc:** Sean D. Howell <showell@mastagni.com>; Dan L. Koontz <dkoontz@mastagni.com>; Frank A. Terreri <fterreri@mastagni.com>
**Subject:** Re: Background Investigative Services

President Lomba,

I appreciate your thoughtfulness and sharing your work product with us.

This morning, I was having a related conversation with Sheriff Miyamoto and Captain Sanford regarding what posts can be civilianized and what posts can be performed with Prop F employees

Thank you

Get Outlook for iOS

---

**From:** President <president@sanfranciscodsa.com>
**Sent:** Tuesday, August 23, 2022 1:01:41 PM
**To:** Miyamoto, Paul (SHF) <paul.miyamoto@sfgov.org>; Engler, Joseph (SHF) <joseph.engler@sfgov.org>; Carter, Tanzanika (SHF) <tanzanika.carter@sfgov.org>; Scalercio, Frank (SHF) <frank.scalercio@sfgov.org>
**Cc:** Sean D. Howell <showell@mastagni.com>; Dan L. Koontz <dkoontz@mastagni.com>; Frank A. Terreri <fterreri@mastagni.com>
**Subject:** Background Investigative Services

This message is from outside the City email system. Do not open links or attachments from untrusted sources.

Sheriff Miyamoto & Undersheriff Engler,

Good afternoon,

The SFDSA has brought up on many occasions issues with recruiting and hiring.  We had done a lengthy research in 2018/19 and found that a bottle neck in the SFSO hiring was background investigation due to the excessive length of time to complete it, thus losing candidates to other agencies.

We have suggested several times that the department outsource to companies that specialize in background investigations for law enforcement to assist the SFSO to expedite the process.  We also went as far as suggesting a firm that was used by other law enforcement agencies and the SFSO has not responded.

With staffing getting lower every day, we don't believe the department is taking the necessary steps to aggressively hire and staff the Sheriff's Office.  We have conducted some research and have found that other SF City & County Departments have in fact outsourced back ground investigations to expedite there hiring process.

We have attached some of the documentations that support that.

We don't understand how other CCSF departments seem to be more efficient in their hiring and recruitment process than the SFSO.

We are providing this information, so you can get the SFSO up to speed with hiring and recruiting.


Best regards,

Ken Lomba
SFDSA President
415-513-8973



P 0056-000217

8/24/22, 5:27 PM                                              Mail - President - Outlook

## Fw: Please read attached letter

President <president@sanfranciscodsa.com>
Fri 8/19/2022 10:09 AM
To: Miyamoto, Paul (SHF) <paul.miyamoto@sfgov.org>;Engler, Joseph (SHF) <joseph.engler@sfgov.org>
Cc: Sean D. Howell <showell@mastagni.com>

Hi Sheriff and US,

Good morning,

Did you read this letter (attached) I sent you?

I wanted to update you on my observations of the SFSO recruitment and hiring.

Although there have been some improvements in recruitment, the pace at which it is being done is too slow.  There is not enough urgency in completing what would get the best results.  They are all over the place.

Good ideas and intentions, but some ideas will get little results while the ones that would get maximum results are not implemented yet and seems like the staff you believe are professionals at it, may not be professionals and have limited knowledge of marketing, specifically online.

Marketing that can be initiated in a day, cost effectively still has not been done and I think you need to start demanding it be done with a deadline, or this will continue to drag.

For instance, you need to be advertising online with ads with sizzle points: We are hiring, you have job security with SFSO, Great Medical & Dental Benefits, Overtime Available, Start Your Career and Earn $, Build up a pensionable retirement.   Ads need to say more than Join our Team.  You need sizzle points to draw their interest.

You need to implement deadlines. For example, it only takes minutes to set up a Facebook or Instagram ad.  Your person appointed to do this may need to go through an identity verification and within 24 hours they are good to advertise.

The problem is not a national problem, the biggest recruiting and hiring problem is within the department.  There needs to be direction and deadlines.  Everything needs to be tested and measured for results. This needs to get up to speed fast, and a fire needs to be lit under them.

Coupled that with the starting wage issues, it will be a rough time trying to hit the needed goal with the current process.

I hope this is helpful.

Best regards,

Ken Lomba
SFDSA President
415-513-8973

P 0056-000218

8/24/22, 5:27 PM                                    Mail - President - Outlook



---

**From:** President
**Sent:** Thursday, July 21, 2022 5:31 PM
**To:** Miyamoto, Paul (SHF) <paul.miyamoto@sfgov.org>
**Cc:** Carter, Tanzanika (SHF) <tanzanika.carter@sfgov.org>
**Subject:** Please read attached letter

Please read attached letter regarding recruiting and hiring.

Regards

Ken Lomba
SFDSA President

P 0056-000219

8/25/22, 10:35 AM                                              Mail - President - Outlook

## RE: Meeting with Budget Director

**Miyamoto, Paul (SHF) <paul.miyamoto@sfgov.org>**

Mon 2/14/2022 8:48 AM

To: President <president@sanfranciscodsa.com>
Cc: Chan, Sarah (SHF) <sarah.e.chan@sfgov.org>

President Lomba,
Good morning.  I am open to meeting with you and Ben and Carol, but curious about the timing.  Our budget is going to be submitted on February 22.  What will be the subject of the meeting on the 23rd?

I am copying Sarah Chan on this email so that we can facilitate the scheduling of the time.

Thanks
PM

Paul Miyamoto
Sheriff of the City and County of San Francisco
City Hall Room 456
1 Carlton B. Goodlett Place
San Francisco, CA 94102
Office: 415-554-7225
www.sfsheriff.com
**Follow us on Twitter @sheriffsf https://twitter.com/SheriffSF**
**Like us on Facebook https://www.facebook.com/SFSheriff**



**SERVICE ★ PROFESSIONALISM ★ PRIDE**
 Please consider the environment before printing this email

**STRICTLY CONFIDENTIAL:**
This message and any attachments are solely for the intended recipient and may contain confidential or privileged information. If you are not the intended recipient, any disclosure, copying, use or distribution of the information included in this message and any attachments is prohibited. If you have received this communication in error, please notify me by reply e-mail and immediately and permanently delete this message and any attachments. Thank you.

---

**From:** President <PRESIDENT@sanfranciscodsa.com>
**Sent:** Friday, February 11, 2022 2:23 PM
**To:** Miyamoto, Paul (SHF) <paul.miyamoto@sfgov.org>
**Subject:** Meeting with Budget Director

This message is from outside the City email system. Do not open links or attachments from untrusted sources.

Hi Sheriff,

Are you available to meet with the Budget Director and Carol Isen on

Mirkarimi001189

2/23: 9 am – 9:30 am or 11:30 am – 12 pm?

Best regards,

Ken Lomba
SFDSA President
415-513-8973



P 0056-000221

8/25/22, 10:30 AM                                Mail - President - Outlook

## RE: Recruiting and Hiring

**Hollings, Crispin (SHF) <crispin.hollings@sfgov.org>**
Wed 8/3/2022 10:26 AM
To: Miyamoto, Paul (SHF) <paul.miyamoto@sfgov.org>;President <president@sanfranciscodsa.com>;Engler, Joseph (SHF) <joseph.engler@sfgov.org>;Lisette Adams <leadams1@yahoo.com>;McConnell, Kevin (SHF) <kevin.mcconnell@sfgov.org>
Cc: Vice President <vicepresident@sanfranciscodsa.com>;Treasurer <treasurer@sanfranciscodsa.com>;Secretary <secretary@sanfranciscodsa.com>;Sgt at Arms <sgtatarms@sanfranciscodsa.com>;Parliamentarian <parliamentarian@sanfranciscodsa.com>;Kropff, Christian (SHF) <christian.kropff@sfgov.org>

Good morning,

Account Codes:
- 5210:  Professional services such as our electronic monitoring with Sentinel
- 5400:  Materials and Supplies
- 5810:  Services of other departments such as testing services from DHR

Crispin Hollings
Chief Financial Officer
San Francisco Sheriff's Office
415-554-4316 (W)
415-999-0015 (C)

---

**From:** Miyamoto, Paul (SHF) <paul.miyamoto@sfgov.org>
**Sent:** Wednesday, August 3, 2022 10:08 AM
**To:** president@sanfranciscodsa.com; Engler, Joseph (SHF) <joseph.engler@sfgov.org>; Lisette Adams <leadams1@yahoo.com>; McConnell, Kevin (SHF) <kevin.mcconnell@sfgov.org>; Hollings, Crispin (SHF) <crispin.hollings@sfgov.org>
**Cc:** Vice President <vicepresident@sanfranciscodsa.com>; Treasurer <treasurer@sanfranciscodsa.com>; Secretary <secretary@sanfranciscodsa.com>; Sgt at Arms <sgtatarms@sanfranciscodsa.com>; Parliamentarian <parliamentarian@sanfranciscodsa.com>; Kropff, Christian (SHF) <christian.kropff@sfgov.org>
**Subject:** RE: Recruiting and Hiring

President Lomba,
Good morning.  I have included in this email request for follow up so that he can best explain the Account Codes.

Thanks
PM

Paul Miyamoto
Sheriff of the City and County of San Francisco
City Hall Room 456
1 Carlton B. Goodlett Place
San Francisco, CA 94102
Office: 415-554-7225
www.sfsheriff.com
**Follow us on Twitter @sheriffsf https://twitter.com/SheriffSF**
**Like us on Facebook https://www.facebook.com/SFSheriff**



SERVICE ★ PROFESSIONALISM ★ PRIDE
 Please consider the environment before printing this email

Norbert 3:19-cv-02724 SK                                Mirkarimi001191

P 0056-000222

8/25/22, 10:30 AM                                   Mail - President - Outlook

**STRICTLY CONFIDENTIAL:**

This message and any attachments are solely for the intended recipient and may contain confidential or privileged information. If you are not the intended recipient, any disclosure, copying, use or distribution of the information included in this message and any attachments is prohibited. If you have received this communication in error, please notify me by reply e-mail and immediately and permanently delete this message and any attachments. Thank you.

**From:** President <PRESIDENT@sanfranciscodsa.com>
**Sent:** Wednesday, July 20, 2022 9:19 AM
**To:** Miyamoto, Paul (SHF) <paul.miyamoto@sfgov.org>; Engler, Joseph (SHF) <joseph.engler@sfgov.org>; Lisette Adams <leadams1@yahoo.com>; McConnell, Kevin (SHF) <kevin.mcconnell@sfgov.org>
**Cc:** Vice President <vicepresident@sanfranciscodsa.com>; Treasurer <treasurer@sanfranciscodsa.com>; Secretary <secretary@sanfranciscodsa.com>; Sgt at Arms <sgtatarms@sanfranciscodsa.com>; Parliamentarian <parliamentarian@sanfranciscodsa.com>; Kropff, Christian (SHF) <christian.kropff@sfgov.org>
**Subject:** Re: Recruiting and Hiring

Good morning Sheriff,

In the budget images you sent, what are Account Codes 5210, 5400, 5810?  Can you define those in detail?

Best regards,

Ken Lomba
SFDSA President
415-513-8973



**From:** President <PRESIDENT@sanfranciscodsa.com>
**Sent:** Saturday, July 16, 2022 2:50 PM
**To:** Miyamoto, Paul (SHF) <paul.miyamoto@sfgov.org>; Engler, Joseph (SHF) <joseph.engler@sfgov.org>; Lisette Adams <leadams1@yahoo.com>; McConnell, Kevin (SHF) <kevin.mcconnell@sfgov.org>
**Cc:** Vice President <vicepresident@sanfranciscodsa.com>; Treasurer <treasurer@sanfranciscodsa.com>; Secretary <secretary@sanfranciscodsa.com>; Sgt at Arms <sgtatarms@sanfranciscodsa.com>; Parliamentarian <parliamentarian@sanfranciscodsa.com>; Kropff, Christian (SHF) <christian.kropff@sfgov.org>
**Subject:** Re: Recruiting and Hiring

Hi Sheriff,

Good afternoon,

In all honesty, this needs a good amount of work.  You have some good basics, but you are not going to produce the numbers that are needed with this plan.  I have read the briefing sheet; it has some good barebone ideas, but we need to be doing more than that in an efficient and systematic way to increase the hires.  You have implemented some good ideas; we just need to fine tune them and expand on them.

I should have something for you by next week.

Best regards,

P 0056-000223

8/25/22, 10:30 AM                                    Mail - President - Outlook

Ken Lomba
SFDSA President
415-513-8973



**From:** Miyamoto, Paul (SHF) <paul.miyamoto@sfgov.org>
**Sent:** Friday, July 15, 2022 3:42 PM
**To:** President <PRESIDENT@sanfranciscodsa.com>; Engler, Joseph (SHF) <joseph.engler@sfgov.org>; Lisette Adams <leadams1@yahoo.com>; McConnell, Kevin (SHF) <kevin.mcconnell@sfgov.org>
**Cc:** Vice President <vicepresident@sanfranciscodsa.com>; Treasurer <treasurer@sanfranciscodsa.com>; Secretary <secretary@sanfranciscodsa.com>; Sgt at Arms <sgtatarms@sanfranciscodsa.com>; Parliamentarian <parliamentarian@sanfranciscodsa.com>; Kropff, Christian (SHF) <christian.kropff@sfgov.org>
**Subject:** RE: Recruiting and Hiring

President Lomba,
Good afternoon and thank you for your feedback on our recruitment efforts.  In the below email string, you have commented on our direction and strategies for recruiting and hiring.  You have also provided recommendations on our current efforts.  I have attached a briefing sheet that summarizes our current Recruiting and Hiring Plans and Strategies. This briefing sheet outlines a summary of the following:
Recruitment:
*Strategies, Social Media, Additional Initiatives, Strategic Plan, Community Engagement, Events*
Data and Information:
*Testing, Academies, Background Investigations*

The briefing sheet is a living document and will continue to change.  In addition, I want to address listed concerns from your two emails in this response in red.  We can work together on following up and including your suggestions in our ongoing briefing sheet updates.  I am looking forward to additional input from you and more engagement between you, the Assistant Sheriff, and our efforts to aggressively recruit and hire immediately and in the coming year. We have an urgent need to get new hires on board as quickly as possible.

*Emails:*
*I attended a Team's recruitment and hiring meeting today.  Thank you for allowing me to get an inside look at this.*  Thank you for attending and I hope that you will continue your engagement and participation.  The Assistant Sheriff has assumed the lead on all of our recruiting efforts and is prioritizing meeting deadlines and adjusting our plans to aggressively market our Sheriff's Office and job opportunities to fill the ranks.  We will continue to make this a priority and hope you will continue to participate.

*I'm extremely concerned with recruiting and hiring.  Everyone at the meeting had good intentions but currently all marketing discussed is mostly generalized marketing and or marketing that requires a lot of time with little to zero results.  It would be like throwing spaghetti at the wall and seeing what sticks as results.  They presented some new marketing ideas for the SFSO, these should be tested daily for results.  Anything that has poor results but gives us exposure should be minimized.  The majority of resources should be placed into what is working the best, once that is determined by testing.*
I understand your concern.  The emphasis and importance of recruiting moving forward is reflected in the assignment of the Assistant Sheriff to oversee our efforts.  Our previous efforts have been structured to maximize reach and exposure.  The new ideas are being acted on now with an immediacy and we will continue to search for more outlets and avenues to recruit. This is why it is imperative to work collectively on this as this is something that will serve the entire department.  Saturation, however, is important to separate us from other agencies.  We will work on how best to collect and monitor results.  Unfortunately, we did not receive

funding for the 2 recruiter positions that were requested to help with data analytics. We will, nevertheless, benefit from everyone's collective effort.
Reference the following sections in the document:
Strategies (page 1)
Additional Initiatives list (page 3)


*The marketing and work time put into marketing, needs to be broken down and prioritized.  The prioritization should be separated by the most efficient form or marketing to the least efficient.  Then each category should be prioritized by the amount of funds and work time placed in each category.  Advertising/Recruitment money needs to be spent wisely.  Every advertising company will take your money and promise you the world, but not all will give you the desired results you need.*
*Ideally all of this needs to be up to speed and running within two weeks.  You have an extreme urgency to hire, a short timeline and I don't see a successful plan.*
The timelines we are working with are based upon realistic, but aggressive, expectations of the process.  We have targeted the next eight months to reach our goal.  We have assigned the Assistant Sheriff to personally oversee this work and continue to prioritize the efforts with funding and resources.  Please see the budget references below.
*I'll send you, my analysis.  If there are any further docs you would like me to look at please send them.*
That would be great and appreciated.
*Every new class of new hires I visit, I survey them on how they found the department and the job opportunity.*
I appreciate that you have information directly from new hires that we can use to help us tailor our strategies.  I am going to ask that Captain Sanford reach out to you, because he does a similar informal survey of new hires regarding how they came to find us as well.
*Over the last 5 classes, the majority of new hires have said they found the job of deputy sheriff via a friend or a relative.  Out of the last 5 classes, two new deputies said they found the opportunity through an Instagram post, 1 from indeed and 1 from a muni add.*
I am glad that you were able to talk to the new hires, but I believe that a true reflection of our recruitment plan effectiveness would be to survey applicants at the time they register, or to survey/talk to applicants who show up to our testing process.  This would reflect the larger pool and how they found out about us.
*What this tells me and should tell your marketing efforts are not working and should be reduced or even stopped since it is not producing.*
*1. The job fairs are not working*
*2. The street fairs are not working*
*3. Pop top events are not working*
*4. Anything else that you are doing that we are not aware of are not working*
*5. Your civilian recruiter is not working*
*6. Passing out recruitment cards is not working*
The above efforts are directly related to in person contact with prospective applicants and were also affected by the previous year where we cancelled participation in a number of those events due to the global pandemic (hereinafter Covid).
*Personnel costs for above recruiting*
July 2021-Dec 2022:      72.5 FTE OT Hours        $6845.81 (approximate)
Jan 2022-July 2022:      117.5 FTE OT Hours       $11,094.93 (approximate)
Note that the cost for the last fiscal year was significantly less.  This is attributable to the cancellation of many events due to Covid.
Please reference the following sections in the briefing sheet provided.  They are relevant to the reasons why we currently employ these strategies:
Community Engagement (pages 4-5) there are hyperlinks attached to the supporting documents


*Every time you market job openings consider it a test and the results of the marketing have to checked for productivity.  Each way you market, should have a separate system to analyze results so you can measure the success or non success.  The DSA has tested social media recruitment ads in the past and sent the dept. the results.  We have proven social media advertising targeting locations and job groups works.*
*We recommend you immediately add new methods of marketing and constantly test and adjust your marketing.*
We currently monitor and document our social media presence.  Our Communications Team is working with the Assistant Sheriff and Captain Sanford to tailor the monitoring of responsiveness to recruitment postings to determine

effectiveness.  Please share with them your results again, since US Freeman is no longer here.

*In February you promised our members you would add 1 million dollars into the budget for hiring incentives and retention incentives. Later you changed your position and removed that from the budget and did not even propose it in contract negotiations.*

I did request $1 million dollars for hiring and retention incentives, consistent with what the SFPD requested for incentives also.  We did not receive funding for either plans in our budgets.  We did not remove it, the Mayor's office did.  We will continue to advocate for hiring and retention incentives.  This request will continue to be made in budget meetings so that the ongoing importance of this ask can be highlighted.

*We recommend you go to the Mayor and BOS and ask for an emergency initiative for more funding to hire and recruit more deputies.*

I appreciate the idea to request emergency funding to immediately fill positions.  I do plan on asking for more approvals once we fill the 75.  However, please note that we have received increases on our budget directly related to recruitment and hiring.  I believe that this will help to support our additional request for continued hiring past the 75.  I am providing both last year's budget and this year's budget for comparison.  Please note we increase from $561K to $6.5 million:

Here is what we spend on Community Outreach and Recruitment for FY21-22

| Fund Code | Project Code | Activity Code | Activity Description | Account Lvl 5 Code | Sum of Revised Budget | Sum of GL Actuals |
|---|---|---|---|---|---|---|
| 10000 | 10001939 | 1 | Community Outreach | 5210 | $19,859.50 | $76,371.35 |
| | | | | 5400 | $0.00 | $2,167.84 |
| | | | Community Outreach Total | | $19,859.50 | $78,539.19 |
| | 10001944 | 1 | Recruitment | 5210 | $50,017.00 | $32,183.62 |
| | | | | 5400 | $98,966.24 | $72,646.38 |
| | | | | 5810 | $362,695.00 | $67,260.73 |
| | | | Recruitment Total | | $511,678.24 | $172,090.73 |
| | | 2 | Background Investigations | 5210 | $26,161.76 | $59,451.17 |
| | | | | 5400 | $3,630.00 | $5,826.86 |
| | | | Background Investigations Total | | $29,791.76 | $65,278.03 |
| 10000 Total | | | | | $561,329.50 | $315,907.95 |
| Grand Total | | | | | $561,329.50 | $315,907.95 |

P 0056-000226

8/25/22, 10:30 AM                                             Mail - President - Outlook

Here is the budget for FY22-23

| Fund Code | Project | Activity | Activity Title | Account Lvl 5 Title | Sum of FY 2022-23 Department | Sum of FY 2022-23 Board | Sum of FY 2023-24 Department | Sum of FY 2023-24 Board |
|---|---|---|---|---|---|---|---|---|
| 10000 | 10001939 | 0001 | Community Outreach | 5210NPSvcs | $19,000.00 | $19,000.00 | $19,000.00 | $19,000.00 |
| | | | Community Outreach Total | | **$19,000.00** | **$19,000.00** | **$19,000.00** | **$19,000.00** |
| | 10001944 | 0001 | Recruitment | 5210NPSvcs | $45,414.00 | $45,414.00 | $45,414.00 | $45,414.00 |
| | | | | 5810OthDep | $362,695.00 | $362,695.00 | $362,695.00 | $362,695.00 |
| | | | Recruitment Total | | **$408,109.00** | **$408,109.00** | **$408,109.00** | **$408,109.00** |
| | | 0002 | Background Investigations | 5010Salary | $714,602.00 | $555,920.00 | $730,648.00 | $577,489.00 |
| | | | | 5130Fringe | $502,283.00 | $388,974.00 | $516,289.00 | $404,949.00 |
| | | | | 5210NPSvcs | $15,000.00 | $15,000.00 | $15,000.00 | $15,000.00 |
| | | | | 5400Mat&Su | $3,630.00 | $3,630.00 | $3,630.00 | $3,630.00 |
| | | | Background Investigations Total | | **$1,235,515.00** | **$963,524.00** | **$1,265,567.00** | **$1,001,068.00** |
| | 10001945 | 0002 | Training - Academy | 5010Salary | $4,393,905.00 | $3,791,716.00 | $4,500,698.00 | $4,052,400.00 |
| | | | | 5130Fringe | $1,574,529.00 | $1,041,925.00 | $1,476,942.00 | $1,027,101.00 |
| | | | | 5210NPSvcs | $154,340.00 | $154,340.00 | $154,340.00 | $154,340.00 |
| | | | | 5400Mat&Su | $258,229.00 | $63,705.00 | $258,229.00 | $63,705.00 |
| | | | Training - Academy Total | | **$6,381,003.00** | **$5,051,686.00** | **$6,390,209.00** | **$5,297,546.00** |
| | | 0003 | Field Training-FTO Program | 5010Salary | $0.00 | $71,534.00 | $0.00 | $71,534.00 |
| | | | | 5130Fringe | $0.00 | $1,824.00 | $0.00 | $1,824.00 |
| | | | Field Training-FTO Program Total | | **$0.00** | **$73,358.00** | **$0.00** | **$73,358.00** |
| | | 0006 | Peer Support | 5010Salary | $0.00 | $240.00 | $0.00 | $240.00 |
| | | | | 5130Fringe | $0.00 | $5.00 | $0.00 | $5.00 |
| | | | Peer Support Total | | **$0.00** | **$245.00** | **$0.00** | **$245.00** |
| **Grand Total** | | | | | **$8,043,627.00** | **$6,515,922.00** | **$8,082,885.00** | **$6,799,326.00** |

*In your latest video update, you did not clearly explain to our members how your funding was obtained to hire 75 deputies. Clearly we know you obtained money for 40 new hires to go to the academy, but you did not explain how in the video you were obtaining the money for the additional 35. In your budget documents and in the BOS videos you stated you would be using money from attrition savings. Explain that please? Are you continuing to eliminate Senior Deputies and repurpose that funding? We are against that, because that will further damage the department budget. We recommend you ask the board for the full amount and stop attrition savings for hiring.*

I received hiring authority for a total of 75 FTEs to begin at the beginning of the fiscal year. Fifteen of the 35 you reference will be academy trained FTE hires and will not require funding for the academy. The additional 20 in the 35 are approvals on unfilled positions that we are carrying over from the completion of this fiscal year. I plan on asking for approval for additional FTEs once we fill these 75.
I am not sure I understand your reference to attrition savings. If it refers to Senior Deputies, I do know that although we are not eliminating any Senior Deputy positions from our authorized staffing levels, we are not planning on filling the positions. Our focus is to recruit and fill Deputy Sheriff positions.

*If you need assistance please let me know. We are here to help.*

Again, I appreciate your interest in helping us with our recruiting efforts. Something you can help with immediately is an increase in your social media support and postings of our recruitment efforts. DSA social media related to recruiting and hiring showed only one posting of a job announcement on Facebook April 5, 2021.
The Sheriff's Office web page has not changed our home page photo for recruiting since February, and recently added a QR code for reference to applications. We are also about to start a "Meet the Deputy" posting campaign that you can help share as well.

Please feel free to post the QR code on any platforms you have.

8/25/22, 10:30 AM                                          Mail - President - Outlook

https://careers.sf.gov/role/?id=743999832956624



Thanks Ken and have a good weekend,
PM

Paul Miyamoto
Sheriff of the City and County of San Francisco
City Hall Room 456
1 Carlton B. Goodlett Place
San Francisco, CA 94102
Office: 415-554-7225
www.sfsheriff.com
**Follow us on Twitter @sheriffsf https://twitter.com/SheriffSF**
**Like us on Facebook https://www.facebook.com/SFSheriff**

 

**SERVICE ★ PROFESSIONALISM ★ PRIDE**

Please consider the environment before printing this email

**STRICTLY CONFIDENTIAL:**
This message and any attachments are solely for the intended recipient and may contain confidential or privileged information. If you are not the intended recipient, any disclosure, copying, use or distribution of the information included in this message and any attachments is prohibited. If you have received this communication in error, please notify me by reply e-mail and immediately and permanently delete this message and any attachments. Thank you.

---

**From:** President <PRESIDENT@sanfranciscodsa.com>
**Sent:** Thursday, July 14, 2022 12:00 PM
**To:** Miyamoto, Paul (SHF) <paul.miyamoto@sfgov.org>; Engler, Joseph (SHF) <joseph.engler@sfgov.org>; Lisette Adams <leadams1@yahoo.com>; McConnell, Kevin (SHF) <kevin.mcconnell@sfgov.org>
**Cc:** Vice President <vicepresident@sanfranciscodsa.com>; Treasurer <treasurer@sanfranciscodsa.com>; Secretary <secretary@sanfranciscodsa.com>; Sgt at Arms <sgtatarms@sanfranciscodsa.com>; Parliamentarian <parliamentarian@sanfranciscodsa.com>; Kropff, Christian (SHF) <christian.kropff@sfgov.org>
**Subject:** Re: Recruiting and Hiring

Thanks Sheriff,

P 0056-000228

8/25/22, 10:30 AM                                                          Mail - President - Outlook

I look forward to seeing this " briefing sheet to be responsive to your email, to include information on our recruitment plans moving forward.  In addition, we will outline current efforts and in our analysis of our methods, include the information you have received from recent hires."

Best regards,

Ken Lomba
SFDSA President
415-513-8973



---

**From:** Miyamoto, Paul (SHF) <paul.miyamoto@sfgov.org>
**Sent:** Wednesday, July 13, 2022 1:14 PM
**To:** President <PRESIDENT@sanfranciscodsa.com>; Engler, Joseph (SHF) <joseph.engler@sfgov.org>; Lisette Adams <leadams1@yahoo.com>; McConnell, Kevin (SHF) <kevin.mcconnell@sfgov.org>
**Cc:** Vice President <vicepresident@sanfranciscodsa.com>; Treasurer <treasurer@sanfranciscodsa.com>; Secretary <secretary@sanfranciscodsa.com>; Sgt at Arms <sgtatarms@sanfranciscodsa.com>; Parliamentarian <parliamentarian@sanfranciscodsa.com>; Kropff, Christian (SHF) <christian.kropff@sfgov.org>
**Subject:** RE: Recruiting and Hiring

President Lomba,
Good afternoon.  The Undersheriff would normally be responsible to help with this, but is on PTO for the remainder of the week.  I have asked Sr. Administrative Analyst Christian Kropff to assist in creating a briefing sheet to be responsive to your email, to include information on our recruitment plans moving forward.  In addition, we will outline current efforts and in our analysis of our methods, include the information you have received from recent hires.  I will work with him on ensuring that your concerns are looked at and your suggestions are considered for incorporation into current recruiting efforts.

I should have this for you by Friday.  I would also like to follow up with you and your executive board on ways in which you can help our recruiting efforts.

Thank you
PM

Paul Miyamoto
Sheriff of the City and County of San Francisco
City Hall Room 456
1 Carlton B. Goodlett Place
San Francisco, CA 94102
Office: 415-554-7225
www.sfsheriff.com
Follow us on Twitter @sheriffsf https://twitter.com/SheriffSF
Like us on Facebook https://www.facebook.com/SFSheriff

SERVICE   PROFESSIONALISM   PRIDE

STRICTLY CONFIDENTIAL:
This message and any attachments are solely for the intended recipient and may contain confidential or privileged information. If you are not the intended recipient, any disclosure, copying, use or distribution of the information included in this message and any attachments is prohibited. If you have received this communication in error, please notify me by

P 0056-000229

reply e-mail and immediately and permanently delete this message and any attachments. Thank you.


-----Original Message-----
From: President <PRESIDENT@sanfranciscodsa.com>
Sent: Wednesday, July 13, 2022 7:55 AM
To: Miyamoto, Paul (SHF) <paul.miyamoto@sfgov.org>; Engler, Joseph (SHF) <joseph.engler@sfgov.org>; Lisette Adams <leadams1@yahoo.com>; McConnell, Kevin (SHF) <kevin.mcconnell@sfgov.org>
Cc: Vice President <vicepresident@sanfranciscodsa.com>; Treasurer <treasurer@sanfranciscodsa.com>; Secretary <secretary@sanfranciscodsa.com>; Sgt at Arms <sgtatarms@sanfranciscodsa.com>; Parliamentary <parliamentarian@sanfranciscodsa.com>
Subject: Recruiting and Hiring


This message is from outside the City email system. Do not open links or attachments from untrusted sources.



Hi Sheriff Miyamoto

Good morning,

Every new class of new hires I visit, I survey them on how they found the department and the job opportunity.

Over the last 5 classes, the majority of new hires have said they found the job of deputy sheriff via a friend or a relative.

Out of the last 5 classes, two new deputies said they found the opportunity through an Instagram post, 1 from indeed and 1 from a muni add.

What this tells me and should tell you your marketing efforts are not working and should be reduced or even stopped since it is not producing.

1. The job fairs are not working
2. The street fairs are not working
3. Pop top events are not working
4. Anything else that you are doing that we are not aware of are not working 5. Your civilian recruiter is not working 6. Passing out recruitment cards is not working

Every time you market job openings consider it a test and the results of the marketing have to checked for productivity. Each way you market, should have a separate system to analyze results so you can measure the success or non success.

The DSA has tested social media recruitment ads in the past and sent the dept. the results.  We have proven social media advertising targeting locations and job groups works.

We recommend you immediately add new methods of marketing and constantly test and adjust your marketing.

In February you promised our members you would add 1 million dollars into the budget for hiring incentives and retention incentives. Later you changed your position and removed that from the budget and did not even propose it in contract negotiations.

We recommend you go to the Mayor and BOS and ask for an emergency initiative for more funding to hire and recruit more deputies.

In your latest video update, you did not clearly explain to our members how your funding was obtained to hire 75 deputies.  Clearly we know you obtained money for 40 new hires to go to the academy, but you did not explain how in the video you were obtaining the money for the additional 35.  In your budget documents and in the BOS videos you

stated you would be using money from attrition savings.  Explain that please?  Are you continuing to eliminate Senior Deputies and repurpose that funding?  We are against that, because that will further damage the department budget. We recommend you ask the board for the full amount and stop attrition savings for hiring.

If you need assistance please let me know. We are here to help.

Regards,

Ken Lomba
SFDSA President

P 0056-000231




# OFFICE OF THE SHERIFF
# CITY AND COUNTY OF SAN FRANCISCO

1 DR. CARLTON B. GOODLETT PLACE
ROOM 456, CITY HALL
SAN FRANCISCO, CALIFORNIA   94102

PAUL M. MIYAMOTO
SHERIFF

February 22, 2022
Reference: 2022-008

Edward de Asis, Controller's Budget Office
1 Dr. Carlton B. Goodlett Place, Room 312
San Francisco, CA  94102-4694

Camilla Taufic, Mayor's Budget Office
1 Dr. Carlton B. Goodlett Place, Room 288
San Francisco, CA  94102-4694

Subject:  Budget Submittal for Fiscal Year 2022-23 and Fiscal Year 2023-24

This memo summarizes the budget submittal for the Office of the Sheriff for fiscal years 2022-23 and 2023-24. My budget focuses on Mayor Breed's number one policy priority: Restoring vibrancy to San Francisco, including improved public safety and street conditions. To achieve this policy goal my budget addresses the significant challenges that I have communicated on multiple occasions with both the Mayor and Controller. While these challenges are numerous, the primary ones include:

- Covid leave which has increase in employee absences of more than double what they were pre-Covid.  The cost of this additional leave is projected to be $13 million in the current fiscal year with little evidence of abatement.

- Expansion of the in-custody justice involved population which, in the aftermath of the shutdown of Hall of Justice jail, has taxed my ability to house individuals in a safe manner.

- A slowdown in hiring which has resulted in an ever-greater need for large academy classes for new deputies.

Accordingly, I propose a budget to include the following:

1. **Personnel**

    A. Overtime funding to cover posts vacated due to City Covid-leave policy. Since the advent of Covid-specific leave, employee absence from work has more than doubled. While I hope that increased leave rates will come down, I believe that new City leave offering will result in reductions that, at best, will be slow and gradual. In FY2021-22 leave was addressed with emergency overtime funding of $13 million. I am requesting additional $13 million in overtime funding for both years of the budget to avoid another emergency and the slow-down in hiring decisions that preceded the emergency funding. Finally, to avoid another mid-year overtime supplemental, my budget shifts $10 million from regular salaries to overtime by reducing attrition by $10 million an increasing overtime by the same amount.

    B. Funding to cover the cost of opening annex housing at the San Bruno jail. Despite the closure of the Hall of Justice jail in FY2020-21, San Francisco's larger criminal justice

system continues to move justice-involved people to my custodial care in excess of what is sustainable for current custodial facilities. In FY2021-22, I opened annex housing at the San Bruno jail for Covid-infected persons using funds from the Department of Public Health. In FY2022-23 I expect to need this housing to accommodate the in-custody population in a safe and constitutional manner. For both years of the budget, I am requesting an additional $4,992,000 in the form of reduced attrition savings to support this need.

C. Funding to cover the cost of additional academy classes for 40 new deputies. The City's generous Covid leave policies in FY2021-22 resulted in increases overtime which, in turn, resulted in a very slow process for hiring new deputies. My office now has a deficit of over 100 deputies and overtime now accounts for over 20 percent of total work hours: This is not sustainable. For both years of the budget, I am requesting funding to cover two additional academy classes of 20 deputies each; an additional $4,146,686 in the form of reduced attrition savings to support two additional academy classes of 20 deputies. These additional classes will result in the ability to hire a total of 75 deputies in both FY2022-23 and FY2023-24.

D. In my letter to Mayor Breed of January 26, a copy of which is included in my budget submission, I proposed incentives for hiring and retention. These incentives, also proposed by SFPD, are still in draft form and are not included in my formally quantified budget ask. However, I look forward to working with the Mayor's Office to establish hiring/retention incentives to stem and recover from the current loss of public safety personnel.

E. $1,557,120 in FY2022-23 and $1,572,137 in FY2023-24 for ongoing support of the Sheriff's Office racial equity plan focused on equitable hiring practices and training on implicit bias, diversity, and workplace inclusion. For both years of the budget, I am requesting this funding in the form of reduced attrition savings.

2. **Professional Services**

A. $1,262,000 for software licensing fees to support (1) storage and licenses for the 340 body worn cameras currently in service, (2) incident report writing, (3) storage and tracking of court records, (4) digital forensics, (5) performance appraisals.

B. $453,106 for professional services to support (1) 30 percent increase in alcohol monitoring clients and (2) a projected increase in unit cost for devices with the extension of the current contract into the fourth year.

C. $540,000 for professional services to support (1) digital strategic plan as recommended by City Services Auditor, (2) digital web services for the public, (3) replacement of antiquated Citrix environment, (4) training platform for SHF staff.

D. $1,410,080 in FY2022-23 and $991,036 in FY2023-24 additional funding for the Jail Management System project based on finding from the Phase 1 discovery of the project. SHF expects to present these additional costs to COIT in April 2022.

3. **Community Based Organizations**

A. $775,000 in FY2022-23 and FY2023-24 for ongoing support of Cameo House which serves San Francisco's homeless justice-impacted mothers and families. For the FY2021-22 budget these funds were moved from APD to SHF during the addback process. This request simply makes these funds part of the Sheriff base budget.

B. $265,000 in FY2022-23 and $530,000 in FY2023-24 and thereafter to contract with the Mental Health Association of San Francisco (MHASF) to establish a Peer Support program specifically for the individuals who comprise the top 2% of jail bookings who are also top users of urgent/emergency health services. These individuals are disproportionately male, African American, and homeless during the year of frequent use. MHASF has been at the

forefront of the peer recovery movement, matching participants with trained peer counselors who accompany participants to public assistance, mental health, medical and housing appointments while providing advocacy and emotional support.  In addition, the peer counselors will be able to outreach released clients in the community if participants are initially reluctant to engage.

C. $80,000 to double staffing at the Discharge Planning Office, for dedicated service at the San Bruno Jail, which coordinates cab rides, emergency hotel rooms, hygiene items and clothing to people being released from the jail.

4. **Materials and Supplies**

A. $383,851 in FY2022-23 and $717,204 in FY2023-24 to support higher cost for in-jail food related to (1) unit pricing increase related to lower meal counts following the closure of the Hall of Justice jail and (2) City food standards to address animal welfare, environmental sustainability, nutrition, fair wages, and local economies.

B. $787,718 in support of collective bargaining agreement (CBA) required equipment. Equipment includes:

   i. Ballistic vests for employee safety to replace vests more than five years old.

   ii. Ordinance stocks for POST-required range qualification.

   iii. Uniforms for new deputies to replace separations and to reduce overtime.

C. $50,000 to support free commissary for indigent persons in the jail. The free commissary program was started using grant from the Office of the Treasurer. To continue this program, backed by the Treasurer and community advocates, a new source of funding is required.

5. **Services of Other Departments**

A. $1,500,000 increase in funding for workers' comp claims.  Workers' Comp claims have increase City-wide as a result of circumstances well beyond the control of individual City departments including the Sheriff's Office.  However, Workers' Comp expenses have been a hurdle for timely hiring of SHF personnel. While this request in not included in my formally quantified budget ask, I nonetheless look forward to working with the Mayor's Office to budget such expenses realistically and with an eye to improved expense management.

B. $275,000 to Department of Technology to fund (1) VM Ware, (2) replacement of analog phones to digital, (3) video visitation in the jails.

C. $72,000 to Health Service System to fund first-responder-specific Employee Assistance Programming.

6. **Equipment**

A. $400,000 to replace eighteen (18) sedan vehicles 10+ years old with over 100,000 miles, asset numbers: 173-250, 173-251, 173-254, 173-256, 173-258, 173-259, 173-235, 173-247, 173-122, 173-123, 173-128, 173-154, 173-261, 173-236, 173-361, 173-362, 173-F100, 173-F103.

B. $70,000 to replace two (2) patrol vehicles 10+ years old with over 100,000 miles, asset numbers: 173-503, 173-521.

C. $420,000 to replace seven (7) transport vans 10+ years old with over 100,000 miles, asset numbers: 173-601, 173-625, 173-634, 173-636, 173-639, 173-643, 173-645.

D. $1,200,000 to replace two (2) transport buses 15 years old with a history of mechanical problems, asset numbers: 173-712, 173-713.

E. $120,000 for three (3) narcotics analyzers to be used to keep narcotics, including deadly fentanyl, out of the jails.

F. $220,000 for one (1) tray washer to replace the current 20+ year old washer used for food service in the San Bruno jail.

I believe my budget supports the Mayor's policy goal: *To restore vibrancy to San Francisco, including improved public safety and street conditions*. I look forward to working with you on a budget that supports this essential mayoral priority.

Please contact Crispin Hollings, Chief Financial Officer, at 415-554-4316 if you have any questions.

Paul Miyamoto
Sheriff

P 0056-000235

**SIDE LETTER AGREEMENT BETWEEN**
**CITY AND COUNTY OF SAN FRANCISCO AND**
**THE SAN FRANCISCO DEPUTY SHERIFFS' ASSOCIATION**

1. This Side Letter Agreement is between the City and County of San Francisco (hereinafter called "City") and the San Francisco Deputy Sheriffs' Association (SFDSA) (hereinafter called "Association") (collectively called "the parties").

2. The intent of this Side Letter Agreement is to add Article III (C) (9) of the Memorandum of Understanding (MOU) between the parties, pertaining to "Longevity Pay." The 07/01/2019-06/30/2022 MOU, Article III (C) (9) shall be added as follows.

   ARTICLE III (C)(9)

   LONGEVITY
   Effective upon adoption, the following longevity increments shall be administered for all unit members at the start of seven (7), fifteen (15), and twenty five (25) years of active service with the County of San Francisco.  Longevity increment shall be five percent (5%) of salary step in rank and shall be administered based upon the employee's regular employment date.

3. The terms and conditions set forth in this Side Letter Agreement have been mutually agreed upon by the designated bargaining representatives of the City and the Association, and will apply to all employees covered by the MOU between the City and the Association.

4. This Side Letter Agreement shall expire upon the expiration of the MOU.


FOR THE CITY                              FOR SFDSA


_____              _____


Date:  _____               Date:  _____


Approved: _____               Ratified: _____


Date:  _____               Date:  _____


Page **1** of **1**

P 0056-000236

**SIDE LETTER AGREEMENT BETWEEN
CITY AND COUNTY OF SAN FRANCISCO AND
THE SAN FRANCISCO DEPUTY SHERIFFS' ASSOCIATION**

1. This Side Letter Agreement is between the City and County of San Francisco (hereinafter called "City") and the San Francisco Deputy Sheriffs' Association (SFDSA) (hereinafter called "Association") (collectively called "the parties").

2. The intent of this Side Letter Agreement is to add Article III (C) (9) of the Memorandum of Understanding (MOU) between the parties, pertaining to "Retention Pay." The 07/01/2019-06/30/2022 MOU, Article III (C) (9) shall be added as follows:

   ARTICLE III (C) (9)

   Retention Pay
   Employees who possess an intermediate POST certificate or higher and have completed the requisite years of service as a sworn member of the Department shall receive the following retention pay:

   Effective upon adoption, eligible employees shall receive the following retention pay:

   | Years of Service | Premium Incremental (Cumulative) | |
   |---|---|---|
   | 10 | 1% | |
   | 15 | additional 2% | (3% total) |
   | 20 | additional 2% | (5% total) |
   | 25 | additional 2% | (7% total) |

   Retention pay shall be included for purposes of retirement benefit calculations and contributions as permitted by the Charter. It is the parties' understanding that this benefit is part of the salary attached to all ranks for employees who completed the above defined conditions.

3. The terms and conditions set forth in this Side Letter Agreement have been mutually agreed upon by the designated bargaining representatives of the City and the Association, and will apply to all employees covered by the MOU between the City and the Association.

4. This Side Letter Agreement shall expire upon the expiration of the MOU.

P 0056-000237

**SIDE LETTER AGREEMENT BETWEEN**
**CITY AND COUNTY OF SAN FRANCISCO AND**
**THE SAN FRANCISCO DEPUTY SHERIFFS' ASSOCIATION**

FOR THE CITY                                        FOR SFDSA


_____          _____


Date: _____          Date: _____


Approved: _____          Ratified: _____


Date: _____          Date: _____

P 0056-000238

11/3/21, 11:35 AM    Online Voting Tool & Election Systems | ElectionBuddy

Menu



2021 Job Satisfaction Survey

Details  >  Ballot  >  Notice  >  Voters  >  Review  >

Pay  >  Results

# 2021 Job Satisfaction Survey

## October 21, 2021 at 1:59pm — November 1, 2021 at 5:15pm
(GMT-08:00) PACIFIC TIME (US & CANADA)

Completed

Actions ⌄

**101 ballots submitted** of 537 eligible voters (49 opened) — **19%**
**2 ballots added** after the election started.
537 emails sent - 0 notices queued

| Voters | Results | Graphed Results | Vote by Vote | Vote Audit |

Export Results ⌄

### How would you rate the Sheriff's ability at running the department? PLURALITY

View comments

| Great | 4 votes |
| | (4.0%) |
| Average | 28 votes |
| | (27.7%) |
| **Poor** | **69 votes** |
| | **(68.3%)** |

Poor wins with 68.3% of the vote.

Norbert 3:19-cv-02724 SK          11 Karimi 004208

https://secure.electionbuddy.com/elections/160038/results          1/34

Online Voting Tool & Election Systems | ElectionBuddy

101 votes
tallied

## How would you rate the Sheriff's ability at running the department? PLURALITY

View comments

## I  nd my job satisfying. PLURALITY

View comments

| | |
|---|---|
| Strongly Agree | 5 votes (5.0%) |
| Agree | 24 votes (23.8%) |
| Undecided | 13 votes (12.9%) |
| Disagree | 23 votes (22.8%) |
| **Strongly Disagree** | **35 votes (34.7%)** |
| Not Applicable | 1 vote (1.0%) |

**Strongly Disagree wins with 34.7% of the vote.**

101 votes tallied

## There is a spirit of teamwork among my co-workers. PLURALITY

View comments

| | |
|---|---|
| Strongly Agree | 14 votes (13.9%) |
| **Agree** | **29 votes (28.7%)** |
| Undecided | 13 votes (12.9%) |
| Disagree | 19 votes (18.8%) |
| Strongly Disagree | 26 votes (25.7%) |
| Not Applicable | 0 votes (0%) |

**Agree wins with 28.7% of the vote.**

101 votes tallied

P 0056-000240

## Sheriff's Of ce offers suf cient opportunities for career advancement.

View comments

PLURALITY

| | |
|---|---|
| Strongly Agree | 7 votes (6.9%) |
| Agree | 21 votes (20.8%) |
| Undecided | 23 votes (22.8%) |
| Disagree | 20 votes (19.8%) |
| **Strongly Disagree** | **26 votes (25.7%)** |
| Not Applicable | 4 votes (4.0%) |

Strongly Disagree wins with 25.7% of the vote.

101 votes tallied

## I have con dence in the fairness of the sheriff's administration. PLURALITY

View comments

| | |
|---|---|
| Strongly Agree | 5 votes (5.0%) |
| Agree | 6 votes (5.9%) |
| Undecided | 16 votes (15.8%) |
| Disagree | 21 votes |

101 votes tallied

(20.8%)

# I have con  dence in the fairness of the sheriff's administration. PLURALITY

View comments

**Strongly Disagree**                                            **53 votes**
                                                                    (52.5%)

Not Applicable                                                    0 votes
                                                                     (0%)

**Strongly Disagree wins with 52.5% of the vote.**

101 votes tallied

# My immediate supervisor is an effective leader. PLURALITY

View comments

Strongly Agree                                                   16 votes
                                                                   (15.8%)

**Agree**                                                         **44 votes**
                                                                    (43.6%)

Undecided                                                         15 votes
                                                                   (14.9%)

Disagree                                                          7 votes
                                                                    (6.9%)

Strongly Disagree                                                 15 votes
                                                                   (14.9%)

Not Applicable                                                    4 votes
                                                                    (4.0%)

**Agree wins with 43.6% of the vote.**

101 votes tallied

P 0056-000242

Online Voting Tool & Election Systems | ElectionBuddy

## Communications are good in my division.

Communications are good in my division.

PLURALITY

PLURALITY

View comments

View comments

| | | |
|---|---|---|
| Strongly Agree | 1 vote | (1.0%) |
| Agree | 25 votes | (24.8%) |
| Undecided | 21 votes | (20.8%) |
| Disagree | 24 votes | (23.8%) |
| **Strongly Disagree** | **29 votes** | **(28.7%)** |
| Not Applicable | 1 vote | (1.0%) |

Strongly Disagree wins with 28.7% of the vote.

101 votes tallied

## The public's safety is more than adequately protected by the sheriff's of ce policies and procedures. PLURALITY

View comments

| | | |
|---|---|---|
| Strongly Agree | 4 votes | (4.0%) |
| Agree | 19 votes | (18.8%) |
| **Undecided** | **34 votes** | **(33.7%)** |
| Disagree | 14 votes | (13.9%) |

101 votes tallied

Mirkarimi001212

# The public's safety is more than adequately protected by the sheriff's of ce policies and procedures. PLURALITY

View comments

| | |
|---|---|
| Strongly Disagree | 29 votes (28.7%) |
| Not Applicable | 1 vote (1.0%) |

**Undecided wins with 33.7% of the vote.**

101 votes tallied

# I have job security. PLURALITY

View comments

| | |
|---|---|
| Strongly Agree | 24 votes (23.8%) |
| **Agree** | **33 votes (32.7%)** |
| Undecided | 14 votes (13.9%) |
| Disagree | 12 votes (11.9%) |
| Strongly Disagree | 17 votes (16.8%) |
| Not Applicable | 1 vote (1.0%) |

**Agree wins with 32.7% of the vote.**

101 votes tallied

# I understand what is expected of me for advancement within the department.

PLURALITY

View comments

| | |
|---|---|
| Strongly Agree | 11 votes (10.9%) |

# I understand what is expected of me for advancement within the department.

View comments

PLURALITY

| | |
|---|---|
| **Agree** | **37 votes** (36.6%) |
| Undecided | 12 votes (11.9%) |
| Disagree | 28 votes (27.7%) |
| Strongly Disagree | 12 votes (11.9%) |
| Not Applicable | 1 vote (1.0%) |

**Agree wins with 36.6% of the vote.**

101 votes tallied

# I feel free to discuss problems with my immediate supervisor. PLURALITY

View comments

| | |
|---|---|
| Strongly Agree | 13 votes (12.9%) |
| **Agree** | **38 votes** (37.6%) |
| Undecided | 15 votes (14.9%) |
| Disagree | 19 votes (18.8%) |
| Strongly Disagree | 15 votes |

101 votes

(14.9%)

# I feel free to discuss problems with my immediate supervisor. PLURALITY

View comments

| | |
|---|---|
| Not Applicable | 1 vote (1.0%) |

**Agree wins with 37.6% of the vote.**

101 votes tallied

# There is little or no favortisim shown in my division. PLURALITY

View comments

| | |
|---|---|
| Strongly Agree | 4 votes (4.0%) |
| Agree | 5 votes (5.0%) |
| Undecided | 18 votes (17.8%) |
| Disagree | 24 votes (23.8%) |
| **Strongly Disagree** | **47 votes (46.5%)** |
| Not Applicable | 3 votes (3.0%) |

**Strongly Disagree wins with 46.5% of the vote.**

101 votes tallied

# If problems arise in my division, they are usually resolved quickly. PLURALITY

View comments

Mirkarimi001215

## If problems arise in my division, they are usually resolved quickly. PLURALITY

View comments

| | |
|---|---|
| Strongly Agree | 3 votes (3.0%) |
| Agree | 16 votes (15.8%) |
| Undecided | 22 votes (21.8%) |
| **Disagree** | **32 votes (31.7%)** |
| Strongly Disagree | 27 votes (26.7%) |
| Not Applicable | 1 vote (1.0%) |

Disagree wins with 31.7% of the vote.

101 votes tallied

## I am informed about what is happening within the department. PLURALITY

View comments

| | |
|---|---|
| Strongly Agree | 5 votes (5.0%) |
| Agree | 27 votes (26.7%) |
| Undecided | 21 votes (20.8%) |
| Disagree | 19 votes (18.8%) |

101 votes tallied

# I am informed about what is happening within the department. PLURALITY

View comments

**Strongly Disagree**                                          **28 votes**
                                                                  **(27.7%)**

Not Applicable                                                   1 vote
                                                                  (1.0%)

Strongly Disagree wins with 27.7% of the vote.

101 votes
tallied

# There are enough officers on my shift to quickly respond to each call for service.

PLURALITY

View comments

Strongly Agree                                                   1 vote
                                                                  (1.0%)

Agree                                                           16 votes
                                                                  (15.8%)

Undecided                                                       11 votes
                                                                  (10.9%)

Disagree                                                        32 votes
                                                                  (31.7%)

**Strongly Disagree**                                          **39 votes**
                                                                  **(38.6%)**

Not Applicable                                                   2 votes
                                                                  (2.0%)

Strongly Disagree wins with 38.6% of the vote.

101 votes
tallied

P 0056-000248

## I understand what is expected of me in my work. PLURALITY

View comments

| | |
|---|---|
| Strongly Agree | 19 votes (18.8%) |
| **Agree** | **56 votes (55.4%)** |
| Undecided | 10 votes (9.9%) |
| Disagree | 5 votes (5.0%) |
| Strongly Disagree | 9 votes (8.9%) |
| Not Applicable | 2 votes (2.0%) |
| | **Agree wins with 55.4% of the vote.** |

101 votes tallied

## SFSO is a better place to work now than it was last year. PLURALITY

View comments

| | |
|---|---|
| Strongly Agree | 3 votes (3.0%) |
| Agree | 4 votes (4.0%) |
| Undecided | 14 votes (13.9%) |
| Disagree | 18 votes (17.8%) |

101 votes tallied

## SFSO is a better place to work now than it was last year. PLURALITY

View comments

| | |
|---|---|
| **Strongly Disagree** | **61 votes** |
| | (60.4%) |
| Not Applicable | 1 vote |
| | (1.0%) |

**Strongly Disagree wins with 60.4% of the vote.**

101 votes tallied

## I feel I am making a contribution to the success of the sheriff's of ce. PLURALITY

View comments

| | |
|---|---|
| Strongly Agree | 16 votes |
| | (15.8%) |
| **Agree** | **34 votes** |
| | (33.7%) |
| Undecided | 26 votes |
| | (25.7%) |
| Disagree | 9 votes |
| | (8.9%) |
| Strongly Disagree | 12 votes |
| | (11.9%) |
| Not Applicable | 4 votes |
| | (4.0%) |

**Agree wins with 33.7% of the vote.**

101 votes tallied

# Co-workers treat me with respect.

Co-workers treat me with respect.

View comments

View comments

PLURALITY
PLURALITY

| | |
|---|---|
| Strongly Agree | 28 votes (27.7%) |
| **Agree** | **59 votes** **(58.4%)** |
| Undecided | 10 votes (9.9%) |
| Disagree | 2 votes (2.0%) |
| Strongly Disagree | 2 votes (2.0%) |
| Not Applicable | 0 votes (0%) |

**Agree wins with 58.4% of the vote.**

101 votes
tallied

## Sheriff's administration has a genuine concern for the welfare of its employees.

View comments

PLURALITY

| | |
|---|---|
| Strongly Agree | 3 votes (3.0%) |
| Agreed | 8 votes (7.9%) |
| Undecided | 13 votes (12.9%) |
| Disagree | 17 votes (16.8%) |
| **Strongly Disagree** | **60 votes** **(59.4%)** |
| Not Applicable | 0 votes |

101 votes
tallied

(0%)

# Sheriff's administration has a genuine concern for the welfare of its employees.

PLURALITY

View comments

Strongly Disagree wins with 59.4% of the vote.

101 votes tallied

# My attitude toward my profession has improved during my employment at the Sheriff's Of ce. PLURALITY

View comments

| | |
|---|---|
| Strongly Agree | 4 votes (4.0%) |
| Agree | 12 votes (11.9%) |
| Undecided | 19 votes (18.8%) |
| Disagree | 27 votes (26.7%) |
| **Strongly Disagree** | **39 votes (38.6%)** |
| Not Applicable | 0 votes (0%) |

Strongly Disagree wins with 38.6% of the vote.

101 votes tallied

# I feel I have access to sheriffs

View comments

administration. PLURALITY

# I feel I have access to sheriffs administration. PLURALITY

<span style="color:orange">View comments</span>

| | |
|---|---|
| Strongly Agree | 5 votes (5.0%) |
| Agree | 20 votes (19.8%) |
| Undecided | 16 votes (15.8%) |
| Disagree | 21 votes (20.8%) |
| **Strongly Disagree** | **35 votes (34.7%)** |
| Not Applicable | 4 votes (4.0%) |

**Strongly Disagree wins with 34.7% of the vote.**

101 votes tallied

# I am satis ed with my present assignment.

PLURALITY

<span style="color:orange">View comments</span>

| | |
|---|---|
| Strongly Agree | 17 votes (16.8%) |
| **Agree** | **33 votes (32.7%)** |
| Undecided | 20 votes (19.8%) |
| Disagree | 15 votes (14.9%) |

101 votes tallied

## I am satis ed with my present assignment.

PLURALITY

View comments

| | |
|---|---|
| Strongly Disagree | 14 votes (13.9%) |
| Not Applicable | 2 votes (2.0%) |

**Agree wins with 32.7% of the vote.**

101 votes tallied

## I seldom feel stressed or stretched to thin because there are an adequate number of deputies on my shift. PLURALITY

View comments

| | |
|---|---|
| Strongly Agree | 4 votes (4.0%) |
| Agree | 7 votes (6.9%) |
| Undecided | 11 votes (10.9%) |
| Disagree | 31 votes (30.7%) |
| **Strongly Disagree** | **45 votes (44.6%)** |
| Not Applicable | 3 votes (3.0%) |

**Strongly Disagree wins with 44.6% of the vote.**

101 votes tallied

P 0056-000254

# I have con dence in the leadership of the sheriff's of ce. PLURALITY

View comments

| | |
|---|---|
| Strongly Agree | 3 votes (3.0%) |
| Agree | 6 votes (5.9%) |
| Undecided | 16 votes (15.8%) |
| Disagree | 31 votes (30.7%) |
| **Strongly Disagree** | **45 votes (44.6%)** |
| Not Applicable | 0 votes (0%) |

Strongly Disagree wins with 44.6% of the vote.

101 votes tallied

# The Sheriff's Of ce is managed ef ciently. PLURALITY

View comments

| | |
|---|---|
| Strongly Agree | 3 votes (3.0%) |
| Agree | 4 votes (4.0%) |
| Undecided | 17 votes (16.8%) |
| Disagree | 22 votes (21.8%) |
| **Strongly Disagree** | **55 votes (54.5%)** |

101 votes tallied

Online Voting Tool & Election Systems | ElectionBuddy

## The Sheriff's Of ce is managed ef ciently.

View comments

PLURALITY

| Not Applicable | 0 votes | (0%) |
|---|---|---|

**Strongly Disagree wins with 54.5% of the vote.**

101 votes tallied

## The Sheriff should never violate the SFDSA Collective Bargaining Agreement contract.

View comments

PLURALITY

| **Strongly Agree** | **72 votes** |
|---|---|
| | **(71.3%)** |
| Agree | 22 votes |
| | (21.8%) |
| Undecided | 3 votes |
| | (3.0%) |
| Disagree | 2 votes |
| | (2.0%) |
| Strongly Disagree | 2 votes |
| | (2.0%) |
| Not Applicable | 0 votes |
| | (0%) |

**Strongly Agree wins with 71.3% of the vote.**

101 votes tallied

## The Sheriff should return the Senior Deputy

View comments

**positions.** PLURALITY

# The Sheriff should return the Senior Deputy positions. PLURALITY

View comments

View comments

| | |
|---|---|
| **Strongly Agree** | **42 votes** |
| | (41.6%) |
| Agree | 23 votes |
| | (22.8%) |
| Undecided | 19 votes |
| | (18.8%) |
| Disagree | 6 votes |
| | (5.9%) |
| Strongly Disagree | 8 votes |
| | (7.9%) |
| Not Applicable | 3 votes |
| | (3.0%) |

**Strongly Agree wins with 41.6% of the vote.**

101 votes tallied

# My immediate supervisor keeps me informed of policy changes. PLURALITY

View comments

| | |
|---|---|
| Strongly Agree | 11 votes |
| | (10.9%) |
| **Agree** | **44 votes** |
| | (43.6%) |
| Undecided | 11 votes |
| | (10.9%) |
| Disagree | 19 votes |
| | (18.8%) |

101 votes tallied

# My immediate supervisor keeps me informed of policy changes. PLURALITY

View comments

| | |
|---|---|
| Strongly Disagree | 14 votes (13.9%) |
| Not Applicable | 2 votes (2.0%) |

**Agree wins with 43.6% of the vote.**

101 votes tallied

# I am satis ed with my opportunities for advancement. PLURALITY

View comments

| | |
|---|---|
| Strongly Agree | 6 votes (5.9%) |
| Agree | 20 votes (19.8%) |
| **Undecided** | **27 votes (26.7%)** |
| Disagree | 23 votes (22.8%) |
| Strongly Disagree | 22 votes (21.8%) |
| Not Applicable | 3 votes (3.0%) |

**Undecided wins with 26.7% of the vote.**

101 votes tallied

# I am satis  ed with the current system of promotions. PLURALITY

I am satis  ed with the current system of promotions: PLURALITY

View comments

View comments

| | | |
|---|---|---|
| Strongly Agree | 3 votes | (3.0%) |
| Agree | 14 votes | (13.9%) |
| **Undecided** | **36 votes** | **(35.6%)** |
| Disagree | 18 votes | (17.8%) |
| Strongly Disagree | 26 votes | (25.7%) |
| Not Applicable | 4 votes | (4.0%) |

Undecided wins with 35.6% of the vote.

101 votes tallied

# The Sheriff should provide parking for the deputies. PLURALITY

View comments

| | | |
|---|---|---|
| **Strongly Agree** | **89 votes** | **(88.1%)** |
| Agree | 8 votes | (7.9%) |
| Undecided | 2 votes | (2.0%) |
| Disagree | 0 votes | (0%) |

101 votes tallied

## The Sheriff should provide parking for the deputies. PLURALITY

<span style="color:orange">View comments</span>

| Strongly Disagree | 2 votes |
| | (2.0%) |
| Not Applicable | 0 votes |
| | (0%) |

**Strongly Agree wins with 88.1% of the vote.**

101 votes
tallied

## I have con  dence in the quality of Internal Affairs investigations. PLURALITY

<span style="color:orange">View comments</span>

| Strongly Agree | 5 votes |
| | (5.0%) |
| Agree | 11 votes |
| | (10.9%) |
| **Undecided** | **37 votes** |
| | **(36.6%)** |
| Disagree | 18 votes |
| | (17.8%) |
| Strongly Disagree | 22 votes |
| | (21.8%) |
| Not Applicable | 8 votes |
| | (7.9%) |

**Undecided wins with 36.6% of the vote.**

101 votes
tallied

Online Voting Tool & Election Systems | ElectionBuddy

# I am satis ed with the department's disciplinary process. PLURALITY

PLURALITY

View comments

View comments

| | |
|---|---|
| Strongly Agree | 2 votes (2.0%) |
| Agree | 10 votes (9.9%) |
| Undecided | 33 votes (32.7%) |
| Disagree | 20 votes (19.8%) |
| Strongly Disagree | 32 votes (31.7%) |
| Not Applicable | 4 votes (4.0%) |

**Undecided wins with 32.7% of the vote.**

101 votes tallied

# I would be treated fairly if accused of wrongdoing. PLURALITY

View comments

| | |
|---|---|
| Strongly Agree | 2 votes (2.0%) |
| Agree | 11 votes (10.9%) |
| Undecided | 34 votes (33.7%) |
| Disagree | 20 votes (19.8%) |

101 votes tallied

P 0056-000261

# I would be treated fairly if accused of wrongdoing. PLURALITY

View comments

| | |
|---|---|
| Strongly Disagree | 28 votes (27.7%) |
| Not Applicable | 6 votes (5.9%) |

**Undecided wins with 33.7% of the vote.**

101 votes tallied

# I have been treated unfairly by a supervisor. PLURALITY

View comments

| | |
|---|---|
| **Strongly Agree** | **25 votes (24.8%)** |
| Agree | 16 votes (15.8%) |
| Undecided | 20 votes (19.8%) |
| Disagree | 24 votes (23.8%) |
| Strongly Disagree | 10 votes (9.9%) |
| Not Applicable | 6 votes (5.9%) |

**Strongly Agree wins with 24.8% of the vote.**

101 votes tallied

P 0056-000262

# I have been harassed by a supervisor.

I have been harassed by a supervisor.

PLURALITY
PLURALITY

View comments
View comments

| | |
|---|---|
| Strongly Agree | 17 votes (16.8%) |
| Agree | 14 votes (13.9%) |
| Undecided | 16 votes (15.8%) |
| **Disagree** | **27 votes (26.7%)** |
| Strongly Disagree | 20 votes (19.8%) |
| Not Applicable | 7 votes (6.9%) |

**Disagree wins with 26.7% of the vote.**

101 votes tallied

# There is favoritism within the Sheriff's Of ce. PLURALITY

View comments

| | |
|---|---|
| **Strongly Agree** | **64 votes (63.4%)** |
| Agree | 27 votes (26.7%) |
| Undecided | 7 votes (6.9%) |
| Disagree | 1 vote (1.0%) |
| Strongly Disagree | 2 votes (2.0%) |

101 votes tallied

P 0056-000263

## There is favoritism within the Sheriff's Office. PLURALITY

View comments

| Not Applicable | 0 votes |
|---|---|
| | (0%) |

**Strongly Agree wins with 63.4% of the vote.**

101 votes tallied

## The Administration should visit work sites more often. PLURALITY

View comments

| **Strongly Agree** | **39 votes** |
|---|---|
| | **(38.6%)** |
| Agree | 27 votes |
| | (26.7%) |
| Undecided | 21 votes |
| | (20.8%) |
| Disagree | 6 votes |
| | (5.9%) |
| Strongly Disagree | 7 votes |
| | (6.9%) |
| Not Applicable | 1 vote |
| | (1.0%) |

**Strongly Agree wins with 38.6% of the vote.**

101 votes tallied

## Please rank your choices for expansion. #1 being your rst choice to #4 being your

View

Mirkarimi001233

## The Sheriff's Of ce provides the professional training required to perform my job safely and effectively. PLURALITY

View comments

| | |
|---|---|
| Undecided | 21 votes (20.8%) |
| Disagree | 23 votes (22.8%) |
| Strongly Disagree | 19 votes (18.8%) |
| Not Applicable | 1 vote (1.0%) |

**Agree wins with 32.7% of the vote.**

101 votes tallied

## The Sheriff's Of ce provided equipment is adequate to assist in performing my duties safely and effectively. PLURALITY

View comments

| | |
|---|---|
| Strongly Agree | 4 votes (4.0%) |
| **Agree** | **38 votes (37.6%)** |
| Undecided | 17 votes (16.8%) |
| Disagree | 27 votes (26.7%) |
| Strongly Disagree | 15 votes 101 votes (tallied) |

## The Sheriff's Of ce provided equipment is adequate to assist in performing my duties safely and effectively. PLURALITY

View comments

| | |
|---|---|
| Not Applicable | 0 votes |
| | (0%) |

Agree wins with 37.6% of the vote.

101 votes tallied

## The Sheriff's Of ce overall response to the COVID-19 Pandemic has been satisfactory.

View comments

PLURALITY

| | |
|---|---|
| Strongly Agree | 4 votes |
| | (4.0%) |
| Agree | 22 votes |
| | (21.8%) |
| Undecided | 17 votes |
| | (16.8%) |
| Disagree | 23 votes |
| | (22.8%) |
| **Strongly Disagree** | **34 votes** |
| | **(33.7%)** |
| Not Applicable | 1 vote |
| | (1.0%) |

Strongly Disagree wins with 33.7% of the vote.

101 votes tallied

P 0056-000266

## The Sheriff's Of ce is consistently understaffed. PLURALITY

View comments

| | |
|---|---|
| **Strongly Agree** | **74 votes** (73.3%) |
| Agree | 23 votes (22.8%) |
| Undecided | 1 vote (1.0%) |
| Disagree | 0 votes (0%) |
| Strongly Disagree | 2 votes (2.0%) |
| Not Applicable | 1 vote (1.0%) |

**Strongly Agree wins with 73.3% of the vote.**

101 votes tallied and
0 abstentions

## The Sheriff's Of ce is recruiting aggressively . PLURALITY

View comments

| | |
|---|---|
| Strongly Agree | 1 vote (1.1%) |
| Agree | 2 votes (2.1%) |
| Undecided | 15 votes (15.8%) |
| Disagree | 22 votes (23.2%) |
| **Strongly Disagree** | **51 votes** (53.7%) |
| Not Applicable | 4 votes (4.2%) |

**Strongly Disagree wins with 53.7% of the vote.**

95 votes tallied and 6
abstentions

## The excessive amount of involuntary
 **is negatively impacting my**

View



11/3/21, 11:35 AM                    Online Voting Tool & Election Systems | ElectionBuddy

**overtime is negatively impacting my**
**The excessive amount of involuntary**
health. PLURALITY

*comments*

*View*
**overtime is negatively impacting my**
*comments*
**health.** PLURALITY

| | |
|---|---|
| **Strongly Agree** | **52 votes** |
| | *(54.2%)* |
| Agree | 16 votes |
| | *(16.7%)* |
| Undecided | 9 votes *(9.4%)* |
| Disagree | 8 votes *(8.3%)* |
| Strongly Disagree | 2 votes *(2.1%)* |
| Not Applicable | 9 votes *(9.4%)* |

**Strongly Agree wins with 54.2% of the vote.**

96 votes
tallied and 5
abstentions

### I had to leave work due to a medical emergency. PLURALITY

*View comments*

| | |
|---|---|
| Yes, I was taken to a hospital emergency room. | 4 votes *(5.3%)* |
| Yes, I was transported by ambulance to the hospital due to a medical emergency | 0 votes *(0%)* |
| Yes, I had to leave work early due to feeling ill. | 12 votes *(15.8%)* |
| **No** | **60 votes** *(78.9%)* |

**No wins with 78.9% of the vote.**

76 votes tallied and
25 abstentions

P 0056-000268

# Martial Status: PLURALITY

| | |
|---|---|
| Single | 26 votes (25.7%) |
| **Married** | **75 votes** (74.3%) |
| | Married wins with 74.3% of the vote. |
| | 101 votes tallied |

## Do you have plans to leave the Sheriff's Office for another agency? please indicate in comments why. PLURALITY

View comments

| | |
|---|---|
| Yes - I will be leaving | 33 votes (32.7%) |
| **No - I won't be leaving** | **68 votes** (67.3%) |
| | No - I won't be leaving wins with 67.3% of the vote. |
| | 101 votes tallied |

## Will you be retiring from the Sheriff's Office in less than 3 years? PLURALITY

View comments

| | |
|---|---|
| I will be retiring in 3 years | 16 votes (15.8%) |
| I will be retiring in 2 years | 9 votes (8.9%) |
| I will be retiring in 1 year or less | 7 votes (6.9%) |
| **No** | **69 votes** |
| | 101 votes tallied |

P 0056-000269

# Will you be retiring from the Sheriff's Of ce in less than 3 years? PLURALITY

View comments

**No wins with 68.3% of the vote.**

101 votes tallied

## My Age is: PLURALITY

| | |
|---|---|
| 21-29 | 4 votes (4.0%) |
| **30-39** | **38 votes** (37.6%) |
| 40-49 | 34 votes (33.7%) |
| 50-59 | 23 votes (22.8%) |
| 60 plus | 2 votes (2.0%) |

**30-39 wins with 37.6% of the vote.**

101 votes tallied

## My Years of service are: PLURALITY

| | |
|---|---|
| **1-5** | **30 votes** (29.7%) |
| 6-10 | 16 votes (15.8%) |
| 11-15 | 18 votes (17.8%) |
| 16-20 | 13 votes (12.9%) |
| 21-25 | 16 votes (15.8%) |
| 26-30 | 6 votes (5.9%) |
| 31 plus | 2 votes (2.0%) |

**1-5 wins with 29.7% of the vote.**

101 votes tallied

Mirkarimi001239

# My highest POST Accreditation is: PLURALITY

| | |
|---|---|
| Basic POST | 23 votes (22.8%) |
| Intermediate POST | 30 votes (29.7%) |
| **Advanced POST** | **48 votes** (47.5%) |

**Advanced POST wins with 47.5% of the vote.**

101 votes tallied

Powered by ElectionBuddy, Inc. © 2008–2021

P 0056-000271

# Key Strategies Could Help the Sheriff Reduce Its Heavy Reliance on Overtime and Better Communicate Its Staffing Needs

## San Francisco Sheriff's Department

The workload of the Sheriff's Department has increased due to new mandates and service requests, while the number of budgeted positions has remained stagnant. The department should improve its staffing practices, such as developing a comprehensive staffing plan, to better determine and communicate its needs to stakeholders.



AUDITS DIVISION

June 19, 2019

City & County of San Francisco
Office of the Controller
City Services Auditor

Norbert 3:19-cv-02724 SK

Mirkarimi001241

P 0056-000272

## About the Audits Division

The City Services Auditor (CSA) was created in the Office of the Controller through an amendment to the Charter of the City and County of San Francisco (City) that was approved by voters in November 2003. Within CSA, the Audits Division ensures the City's financial integrity and promotes efficient, effective, and accountable government by:

- Conducting performance audits of city departments, contractors, and functions to assess efficiency and effectiveness of service delivery and business processes.
- Investigating reports received through its whistleblower hotline of fraud, waste, and abuse of city resources.
- Providing actionable recommendations to city leaders to promote and enhance accountability and improve the overall performance and efficiency of city government.

**Audit Team:**

Tonia Lediju, PhD, Chief Audit Executive
Mark de la Rosa, Audit Deputy Director
Kat Scoggin, Supervising Auditor
Hunter Wang, Auditor-in-charge
Joanna Zywno, Senior Auditor
Rebecca Charlton, Staff Auditor
Alice Duncan-Graves, Staff Auditor
William Zhou, Staff Auditor
Sally Ma, San Francisco Fellow

For more information please contact:

Tonia Lediju, PhD
Chief Audit Executive
Office of the Controller
City and County of San Francisco
(415) 554-5393

 http://www.sfcontroller.org
 @sfcontroller
 https://www.linkedin.com/company/sfaudits/

## Audit Authority

CSA conducted this audit under the authority of the San Francisco Charter, Section 3.105 and Appendix F, which requires that CSA conduct periodic, comprehensive financial and performance audits of city departments, services and activities.

## Statement of Auditing Standards

This performance audit was conducted in accordance with generally accepted government auditing standards. These standards require planning and performing the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for the findings and conclusions based on the audit objectives. CSA believes that the evidence obtained provides a reasonable basis for the findings and conclusions based on the audit objectives.

P 0056-000273



# OFFICE OF THE CONTROLLER
## CITY AND COUNTY OF SAN FRANCISCO

Ben Rosenfield
Controller

Todd Rydstrom
Deputy Controller

June 19, 2019

Sheriff Vicki L. Hennessy
San Francisco Sheriff's Department
City Hall, Room 456
1 Dr. Carlton B. Goodlett Place
San Francisco, CA 94102

Dear Sheriff Hennessy:

The Office of the Controller (Controller), City Services Auditor (CSA) presents its report of the staffing process of the San Francisco Sheriff's Department (Sheriff). The audit's objective was to assess the effectiveness of the Sheriff's staffing processes.

The audit concluded that the Sheriff's workload has increased due to mandates and new service requests, but the City and County of San Francisco (City) did not increase the Sheriff's budgeted staff from fiscal year 2014-15 to 2017-18, requiring the department to increasingly rely on overtime. In addition to understaffing, an understated relief factor and a cascading overtime effect contribute to the Sheriff's heavy reliance on overtime. This overreliance can lead to fatigue and its associated harmful effects.

The Sheriff should improve its staffing practices so it can better communicate its need for more staff to stakeholders and city decision-makers. For example, the Sheriff does not have a centralized and comprehensive staffing plan and does not sufficiently track workload data. Further, some of the Sheriff's processes, including its payroll process, are highly manual and do not facilitate adequate monitoring of staffing data.

The report includes 19 recommendations for the Sheriff to improve its staffing practices. The response of the Sheriff is attached as an appendix. CSA will work with the department to follow up every six months on the status of the open recommendations made in this report.

CSA appreciates the assistance and cooperation of all staff involved in this audit. For questions about the report, please contact me at tonia.lediju@sfgov.org or 415-554-5393 or CSA at 415-554-7469.

Respectfully,

Tonia Lediju, PhD
Chief Audit Executive

cc:  Board of Supervisors
      Budget Analyst
      Citizens Audit Review Board
      City Attorney
      Civil Grand Jury
      Mayor
      Public Library

# Executive Summary

The audit reviewed staffing at the San Francisco Sheriff's Department (Sheriff), focusing on its custody, field operations, programs, and administration functions, which account for 91 percent of its budget. The Sheriff is responsible for a wide variety of law enforcement duties, including providing detention of persons arrested or under court order, operating the county jails, running inmate and post-custody transitional programming, and providing bailiff services to the courts and security services to other city departments. Many of the Sheriff's duties are mandated by law and driven by factors beyond the department's control. The Sheriff operates under constraints from the City's general fund budget, which is subject to voter-approved restrictions and legislative priorities.

## WHAT WE FOUND



**Workload increases, understaffing, inaccurate staffing calculations, and policy decisions have contributed to the Sheriff performing 20 percent of its work on overtime.**

Parts of the Sheriff's workload have been driven up by new mandates and service requests.

From fiscal year 2014-15 to 2017-18:

Bail reform → • Monthly new enrollments in electronic monitoring increased 355 percent
• Participants violating the terms of their monitoring increased 2,382 percent

Expanded hospital facilities → Law enforcement and security services at Department of Public Health facilities increased 42 percent

The Sheriff's budgeted* staff went down 1 percent, but the Sheriff's total hours of work went up 13 percent and the proportion of those hours worked on overtime increased from 14 to 20 percent.

The increase of 141 full-time equivalent (FTE) worth of work is mostly due to new and expanded security requests, increased leave (partially due to cascading overtime), and a hiring surge after years of decreasing staffing levels.

*In full-time equivalent positions*

1,098   1,123   1,209   1,239   Total Work
1,015   1,006   1,056   1,001   FTE Budget

14%   17%   20%   20%   Portion of Total Work Performed on Overtime

2014-15   2015-16   2016-17   2017-18
*Fiscal year*

Leave Due to Overtime Cascade 13 (9%)
New Hire Training at Academy 34 (24%)
Other Training 11 (8%)
Public Health Security 34 (24%)
Payroll Data Does Not Specify Activity 23 (17%)
Other 13 (9%)
Other Leave 13 (9%)

* The number of budgeted FTEs excludes attrition savings. The fiscal year 2018-19 budget includes 1,019 FTE positions.

Excessive work hours present risks to health and safety.

Overreliance on overtime can lead to fatigue, which is associated with harmful effects including:
⊕ Degraded personal health
👁 Loss of focus
✳ Increased irritability and fearfulness
⁇ Decreased decision-making ability

P 0056-000275

5 | Key Strategies Could Help the Sheriff Reduce Its Heavy Reliance on Overtime and Better Communicate Its Staffing Needs

| The Sheriff's staffing plan, processes, systems, and data tracking need improvement to maximize its ability to analyze workload, estimate staffing, and ensure safer scheduling. | | |
|---|---|---|
| The Sheriff does not have a staffing plan that aligns with leading practices. | The department's staffing planning process does not include all recommended elements, hindering the department from analyzing and determining its staffing needs. It makes staffing decisions at the division and unit levels, making cross-division planning difficult. | |
| | **Sheriff's Staffing Planning Process Does Not Fully Comply With Leading Practices** | |
| | Profile Facilities | ✓ **Yes** – Floorplans of the facilities it secures show physical characteristics that influence staffing needs. |
| | Develop a Facility Activity Schedule | ✗ **No** – No facility activity schedule exists showing all programs, activities, services, and security functions occurring in each facility. |
| | Use an Accurate Relief Factor | ⊖ **Partly** – Relief factor is too low and understates staffing needs. |
| | Develop a Staff Coverage Plan | ⊖ **Partly** – Divisions have designated posts, but the Sheriff does not have a department-wide coverage plan. |
| | Develop a Schedule | ⊖ **Partly** – Shift schedules are negotiated in the Sheriff's labor agreements, but the department has not determined whether the schedules are the most efficient for Sheriff operations. |
| The Sheriff should free up the time of sworn staff by civilianizing and take steps to improve its budget position. | ▪ Civilianizing 34 positions would free up the time of sworn personnel for law enforcement duties and reduce administrative costs including $909,000 in annual salaries.<br>▪ The Sheriff does not recover all overhead costs it incurs to provide services to other city departments.<br>▪ Certain union contract terms governing compensatory time off drive cascading use of overtime in the department. | |
| The Sheriff does not consistently track needed data. | The Sheriff does not adequately track or analyze workload data such as criminal investigations caseload and special requests from judges for trial courts security. Nor does it adequately track the impact of staffing decisions such as complete lockdowns logs and inmate program cancellations. | |
| Some processes are highly manual and inefficient. | The Sheriff has some outdated processes, which hinder efficiency and monitoring of its staffing practices. For example, Sheriff staff must process numerous paper timesheets each pay period, including more than one timesheet for any employee that works overtime. | |

# WHAT WE RECOMMEND

The report includes 19 recommendations to improve the Sheriff's overall management of staffing and workload, including recommendations to:

- Develop a master staffing plan for the department for all key functional areas, including jails, field operations, and major security functions, using best practices.
- Renegotiate key union contract terms that contribute to overtime use, including instituting alternate compensatory time accrual practices.
- Reduce administrative costs by civilianizing several key functions, which could free 34 sworn personnel to return to law enforcement duties.
- Implement controls to prevent fatigue, such as limits on excessive work hours.
- Implement technology solutions to modernize manual processes.

Mirkarimi001245

# Table of Contents

Executive Summary ........................................................................................................ 4

Table of Contents ........................................................................................................... 6

List of Exhibits ............................................................................................................... 7

Glossary ........................................................................................................................ 9

Introduction ................................................................................................................. 10

**Chapter 1 The Sheriff's Workload Has Increased, but the City Has Not Funded Additional Staff.....19**

Finding 1.1: The City has not increased the Sheriff's budgeted staff despite the department's increased workload. ........................................................................................................................ 19

Finding 1.2: The Sheriff is addressing increases in its workload due to bail reform and new service requests with hiring and overtime. ....................................................................................................... 22

Finding 1.2.1: The number and risk level of people on court-ordered electronic monitoring have increased, but staffing has not, which risks overwhelming the Sheriff's oversight capacity. ................................ 22

Finding 1.2.2: The Sheriff increased its staffing at Public Health due to increased security needs, but staff still worked an average of 800 hours of overtime per assigned employee to provide coverage in fiscal year 2017-18. ................. 26

Finding 1.3: The Sheriff relies extensively on overtime, which is driven by an underestimated relief factor, staffing levels that are below their established post assignments, and a cascading overtime effect. .............. 27

Finding 1.4: The Sheriff could improve its budget position by civilianizing some positions, allowing sworn staff to return to sworn posts, and recouping overhead costs for services provided. ................................ 30

Finding 1.4.1: By civilianizing 34 positions, the Sheriff can reduce costs and improve staffing in law enforcement functions. ...................................................................................................................... 30

Finding 1.4.2: The Sheriff should further recover additional overhead costs for providing law enforcement services to other departments. ........................................................................................................... 33

**Chapter 2 To Make Data-Driven Decisions and Protect Public Safety, the Sheriff Should Improve and Further Assess Its Strategic Planning, Staffing Practices, and Systems..........................................36**

Finding 2.1: The Sheriff's staffing plan is missing some key elements, preventing the department from accurately estimating and conveying its staffing needs. .......................................................................... 36

Finding 2.2: Sworn employees work excessive hours, risking fatigue and its harmful effects. ........................ 40

Finding 2.3: The Sheriff should better track the data it needs related to its workload and the impacts of its staffing decisions. ............................................................................................................................ 43

Finding 2.4: The Sheriff's systems and practices do not facilitate analyzing or monitoring workload or staffing data. ................................................................................................................................. 45

**Appendix: Department Response.................................................................................................51**

7 | Key Strategies Could Help the Sheriff Reduce Its Heavy Reliance on Overtime and Better Communicate Its Staffing Needs

# List of Exhibits

Exhibit 1: The Sheriff's Functions and Responsibilities ........................................................................................10

Exhibit 2: The Custody Operations Division Represented Almost Half of the Department's Budget in Fiscal Year 2017-18 .......................................................................................................................................................11

Exhibit 3: State and Local Law Mandate Most of the Sheriff's Functions ............................................12

Exhibit 4: External Factors Drive the Sheriff's Workload .........................................................................13

Exhibit 5: The Sheriff's Use of Sworn and Civilian Roles ........................................................................14

Exhibit 6: The Sheriff's Funding Comes Primarily From the City's General Fund ....................................15

Exhibit 7: The Sheriff's Primary Revenue Source Must Also Fund Other Critical Functions and Voter-Mandated Priorities .........................................................................................................................................16

Exhibit 8: The State Only Partially Funds Training and Court Security Mandates.................................16

Exhibit 9: The Sheriff's Total Work Hours Increased by 141 FTEs From Fiscal Year 2014-15 through 2017-18 Mostly Because of Expansion of Public Health Security Services and Increased Leave and Hiring ................20

Exhibit 10: Although the Sheriff Has Hired to Fill Nearly All Its Budgeted Positions, Its Total Work in Fiscal Year 2017-18 Still Exceeded the Budget by 238 FTEs.................................................................................20

Exhibit 11: The City Has a Deliberative Process for Approving Its Budget ...............................................21

Exhibit 12: The Sheriff's Electronic Monitoring Workload Has Increased Drastically, But Assigned Staffing Has Not[a] ........................................................................................................................................................23

Exhibit 13: Enrolling a Person in the Electronic Monitoring Program is Time-Intensive for Sheriff Staff ........24

Exhibit 14: The Number of Electronic Monitoring Participants Who Violated Program Terms Increased 2,382 Percent, Adding Hours to the Sheriff's Workload* ...................................................................................25

Exhibit 15: The Sheriff Has Assigned More Staff to Public Health but Not Enough to Keep Pace With the Increasing Workload ..........................................................................................................................................26

Exhibit 16: The Sheriff's Staffing in the Jails and Inmate Population Have Changed Little Over Four Years ..27

Exhibit 17: The Sheriff Used Significant Overtime to Secure the Courts ..................................................28

Exhibit 18: Compensatory Time Used Can Exponentially Increase the Need for More Overtime....................30

Exhibit 19: Civilianizing 34 Positions Would Better Align Qualifications and Realize $900,000 in Annual Salary Savings....................................................................................................................................................32

Exhibit 20: Most Civilian Job Classifications Receive Lower Annual Salaries and Smaller Pensions* at Retirement Than Their Sworn Counterparts ........................................................................................................33

Exhibit 21: The Sheriff's 5 Percent Charge Covers Only Training of Assigned Staff While Best Practices Include Other Expenses in Indirect Cost Rates ....................................................................................................35

Exhibit 22: The Sheriff's Staff Planning Does Not Include or Only Partially Includes Key Leading Practices ..37

Exhibit 23: To Staff One Post 24 Hours per Day, the Sheriff Must Employ 6.02 FTE Deputies to Provide Relief for Training and Time Off........................................................................................................................38

Exhibit 24: The Sheriff's Current Relief Factors Are Understated..........................................................39

8 | Key Strategies Could Help the Sheriff Reduce Its Heavy Reliance on Overtime and Better Communicate Its Staffing Needs

Exhibit 25: Some Sheriff Employees Worked Long Hours That Can Risk Negative Effects Resembling Intoxication ................................................................................................................................... 41

Exhibit 26: Half of Sheriff Employees Worked More Than 319 Hours of Overtime in Fiscal Year 2017-18 ..... 42

Exhibit 27: Fatigue Has High Risks for Peace Officers ................................................................... 43

Exhibit 28: The Sheriff Does Not Adequately Track or Analyze Data Related to Workload or the Operational Impacts of Understaffing ................................................................................................................ 44

Exhibit 29: The Time a Sheriff Employee Works in Two or More Divisions Is Tracked Separately .................. 46

Exhibit 30: The City's People & Pay System Is Not Configured to Show Staff Shifts Across Days .................. 47

Exhibit 31: The Sheriff's Staff Must Process a Large Stack of Paper Timesheets Each Pay Period .................. 47

Exhibit 32: Payroll is Complicated Because Each Employee May Have Multiple Timesheets ............................ 48

Mirkarimi001248

9 | Key Strategies Could Help the Sheriff Reduce Its Heavy Reliance on Overtime and Better Communicate Its Staffing Needs

# Glossary

| | |
|---|---|
| Admin Code | San Francisco Administrative Code |
| BSCC | Board of State and Community Corrections |
| Charter | Charter of the City and County of San Francisco |
| City | City and County of San Francisco |
| Controller | Office of the Controller |
| CSA | City Services Auditor, Audits Division |
| DataSF | City open data program |
| Deputy | Deputy Sheriff |
| FTE | Full-time equivalent |
| GPS | Global Positioning System |
| Lieutenant | Sheriff's Lieutenant |
| MOU | Memorandum of Understanding |
| OMB | U.S. Office of Management and Budget |
| POST | California Commission on Peace Officer Standards and Training |
| Public Health | San Francisco Department of Public Health |
| RDO | Regular Day Off |
| Sergeant | Sheriff's Sergeant |
| SFMTA | San Francisco Municipal Transportation Agency |
| Sheriff | San Francisco Sheriff's Department |
| Sworn staff | Local law enforcement officers |
| ZSFG | Zuckerberg San Francisco General Hospital |

10 | Key Strategies Could Help the Sheriff Reduce Its Heavy Reliance on Overtime and Better Communicate Its Staffing Needs

# Introduction

## BACKGROUND

**The Sheriff works to meet its core mission of protecting public safety under constraints established by the City's budget and labor agreements.**

The San Francisco Sheriff's Department (Sheriff) of the City and County of San Francisco (City) provides for safe, secure, humane, and constitutional detention of persons arrested or under court order, operates county jail facilities, including in-custody and post-release educational, vocational and transitional programs, and operates alternative sentencing for in-custody and out-of-custody community programs. In fiscal year 2017-18 the Sheriff's average daily jail inmate population was 1,269 and a daily average of 83 participants were on electronic monitoring.[1] The Sheriff's responsibility falls into four primary functional areas, as shown in Exhibit 1.

**Exhibit 1: The Sheriff's Functions and Responsibilities**

| Division | Responsibilities |
|---|---|
| Custody Operations | • Operate safe, secure, and humane county jails, including the booking and release process, the hospital ward, and the classification unit.<br>• Facilitate an environment in which educational and rehabilitation programs can accomplish their mission.<br>• Process and maintain inmate records, information about releases, and warrants. |
| Field Operations | • Provide security and bailiff services to trial courts.<br>• Provide law enforcement services to other city departments, including the Department of Public Health (Public Health), San Francisco Municipal Transportation Agency (SFMTA), San Francisco Public Utilities Commission, and Department of Emergency Management.<br>• Provide mutual aid to other law enforcement agencies, as needed.<br>• Enforce civil court matters, including property seizures, evictions, and restraining orders.<br>• Ensure election ballots are safely delivered and stored.<br>• Provide safe and secure transportation of prisoners, including to other jurisdictions, as needed. |
| Administration and Programs | • Operate in-custody and post-release educational, vocational, and rehabilitation programs.<br>• Monitor participants in alternatives to incarceration, including electronic monitoring.<br>• Ensure a continuum of services as inmates transition to out-of-custody programs.<br>• Monitor community-based organizations providing programs to inmates.<br>• Manage recruitment, hiring, background investigations, jail clearances, personnel, and training.<br>• Conduct criminal investigations. |
| Planning and Special Projects | • Support, enhance, and improve practices, policies, and efficiencies by working closely with other Sheriff divisions and managing special projects.<br>• Provide critical services to the department, including infrastructure management and maintenance, information and technology support, communications, fleet management, and capital project planning. |

Source: Sheriff's website, internal documents, policies and procedures, and city budget documents

---

[1] Due to legal changes to the bail process in 2018, the number of people on electronic monitoring has greatly increased from 83 average daily participants in fiscal year 2017-18 to 238 in the first half of 2018-19.

11 | Key Strategies Could Help the Sheriff Reduce Its Heavy Reliance on Overtime and Better Communicate Its Staffing Needs

Of these functional areas, Custody Operations represented just over half of the department's budget, as shown in Exhibit 2. The audit focuses on Custody Operations, Field Operations, and Administration and Programs, which together account for 91 percent of the Sheriff's budget.

## Exhibit 2: The Custody Operations Division Represented Almost Half of the Department's Budget in Fiscal Year 2017-18



Source: Auditor analysis of Fiscal Year 2017-18 Budget and Appropriation Ordinance

### Most of the services the Sheriff provides are required by law.

When functions are mandated, the department must perform those duties, even if it requires staff to work overtime. Not doing so could present a risk to public safety and cause the department not to comply with local or state law. Many of the Sheriff's functions are mandated, as shown in Exhibit 3.

12 | Key Strategies Could Help the Sheriff Reduce Its Heavy Reliance on Overtime and Better Communicate Its Staffing Needs

## Exhibit 3: State and Local Law Mandate Most of the Sheriff's Functions

| Mandated Function* | Mandate |
|---|---|
| Operate four county jails | San Francisco Charter (Charter), §6.105 |
| Within the jails, provide:<br>▪ Inmate medical care including mental health services<br>▪ Inmate education programs<br>▪ Individual and family social service programs which may include counseling, reentry planning, and legal assistance<br>▪ Religious services for inmates<br>▪ Minimum of three hours of recreation each week<br>▪ Classification of inmates to assign housing and activities according to need and safety<br>▪ General safety and maintenance of facilities | Board of State & Community Corrections (BSCC), Title 15 |
| Provide court security | California Government Code, Article 8.5 |
| Provide election security | Charter, §13.104.5 |
| Provide law enforcement and security services at Public Health hospital campuses and clinics | San Francisco Administrative Code, (Admin Code) §1.59 |
| Enforce civil court matters, such as restraining orders and evictions | Charter, §6.105 |
| Provide electronic monitoring as an alternative to incarceration for pretrial and sentenced individuals and case management | Charter, §6.105 |
| Conduct criminal investigations of alleged crimes committed under the Sheriff's jurisdiction, such as in the jails | California Penal Code, §830.1 |
| Provide academy training (664+ hours) and ongoing training (24+ annual hours) for all sworn staff | California Code of Regulations Title 11, §1005<br>BSCC, Title 15 |
| Maintain inmate records and incident reports | BSCC, Title 15 |
| Participate in city councils, including the Reentry Council, Family Violence Council, and Sentencing Commission | Admin Code, §5.1, §5.19, & §5.25 |
| Report on criminal justice topics, including civil immigration detainees, detentions or traffic stops, searches, and use of force | Admin Code, §12I.5 & §96A<br>California Government Code, §12525.2 |

*Includes only the department's primary mandates, not every function. The department has other alternatives to incarceration, in-custody, and post-custody programs for inmates, and general operations, such as personnel, and peer support, which align with the City's priorities but are not required by law.

Source: San Francisco and California laws and regulations

## Factors outside the Sheriff's control largely drive the type of work the department performs to fulfill its mandated functions.

As shown in Exhibit 4, much of the Sheriff's workload is driven by external factors, such as court orders, new laws, and city rules.

13 | Key Strategies Could Help the Sheriff Reduce Its Heavy Reliance on Overtime and Better Communicate Its Staffing Needs

## Exhibit 4: External Factors Drive the Sheriff's Workload

| External Factor | Effect on Workload |
|---|---|
| **Arrests:** Arrests resulting in a subject being booked into custody must be processed by the Sheriff. | Rates of arrests vary significantly over time providing an unpredictable workload. |
| **Bail Reform:** In January 2018 the California Court of Appeals determined (in the Humphrey decision) that judges would consider both a defendant's ability to pay and alternatives to money bail. | Enrollments in electronic monitoring increased 355 percent from fiscal years 2014-15 to December 2018 (See Finding 1.2.1). The majority of the increase in enrollment is from pre-trial defendants the court has ordered to participate in the program. |
| **Increased Scrutiny and Transparency:**<br><br>▪ **Increased access to peace officer records:** California Senate Bill 1421 and Assembly Bill 748 require increased availability of peace officer personnel records by the public. | ▪ These laws can cause more work for the Sheriff's administrative staff as scrutiny of law enforcement agencies grows and access to records increases. The Sheriff may see more requests for records, including bodycam footage. Staff must redact requested information due to the legal protections afforded to subjects, witnesses, and employees. |
| ▪ **Federal immigration policy and sanctuary status:** 2016 state law requires the Sheriff to inform individuals when U.S. Immigration and Customs Enforcement requests information on that person. | ▪ More such notices had to be sent during the audit period, creating additional work for the Legal Unit. |
| ▪ **Social activism and increased scrutiny:** Increased scrutiny of law enforcement across the U.S has led to many changes in how law enforcement agencies function, including support for the use of body-worn cameras, reviews of policies and procedures, and new laws and regulations regarding use of force. | ▪ A 2015 report of the President's Task Force on 21st Century Policing calls for mandating crisis intervention training for sworn personnel and increased training in addiction, implicit bias, procedural justice, and social interaction. Further, the Sheriff's internal investigations have received more scrutiny. In March 2019 the Sheriff referred 21 open investigations from the previous year to the Department of Police Accountability, with the remaining 46 to be conducted by Sheriff staff.[2] Also, the Sheriff reports the number of complaints has increased in the last two years. |
| ▪ **Policies and Procedures Transparency Law:** California Penal Code Section 13650 requires law enforcement agencies to post their standards, policies, and practices online by January 2020. | ▪ Among the requirements of this law is that the Sheriff, by January 2020, must post online all its policies and procedures, standards, and education and training materials. |
| **Memorandums of Understanding (MOUs):** The Sheriff operates under constraints of MOUs it has with San Francisco Deputy Sheriffs' Association and San Francisco Sheriffs' Managers and Supervisors Association. These agreements dictate minimum numbers of staff the department must schedule on each shift at each jail to maintain safe and secure operations. | The required staffing minimums affect scheduling and the flexibility of scheduling activities, such as inmate programs, in the jails. The MOUs define the minimum numbers of staff on shifts on weekdays, weekends, and holidays. |
| **Civil Service Worker Protection:** The Civil Service Commission considers whether existing civil service classifications (such as sheriff deputies) can perform work when approving contracts for security services. | Civil Service rules require that city departments first consider using the Sheriff for security and law enforcement and prohibits them from contracting for security services without considering a multitude of factors. |

Source: Auditor analysis of Sheriff's workload data

---

[2] *San Francisco Chronicle*, "The Scanner: Misconduct probes in SF Sheriff's Department spiked in 2018," March 2019.

14 | Key Strategies Could Help the Sheriff Reduce Its Heavy Reliance on Overtime and Better Communicate Its Staffing Needs

### The Sheriff has both sworn and civilian staff.

The Sheriff had a salary budget of $138 million for 1,000.53 full-time equivalent (FTE) authorized positions in fiscal year 2017-18.[3] On June 30, 2018, the department had 848 sworn employees and 192 civilian employees, for a total of 1,040 employees, some of whom are part-time. Sworn personnel must complete academy training, which prepares them to exercise their authority to carry out peace officer duties including enforcing civil process, inmate transport, and criminal investigation. Generally, civilians working in law enforcement agencies perform administrative and support functions, such as clerical, financial, and information technology duties, that do not require a sworn officer's specialized training or authority. Exhibit 5 shows roles civilians fill at the Sheriff.

### Exhibit 5: The Sheriff's Use of Sworn and Civilian Roles

| Sworn Personnel | Civilian Personnel |
|---|---|
| ▪ Ensuring inmates in jails, hospitals, and alternatives to incarceration are secure and provided access to medical treatment, legal, recreation, and other programming<br>▪ Providing security and serving as bailiffs in trial courts<br>▪ Executing civil court orders such as serving writs, orders, and other legal papers<br>▪ Transporting inmates securely<br>▪ Providing general law enforcement duties<br>▪ Information technology support<br>▪ Fleet management<br>▪ Processing bails and warrants<br>▪ Personnel activities related to recruitment, hiring, leave, and worker's compensation | ▪ Providing clerical and administrative support<br>▪ Finance, payroll<br>▪ Processing, inquiry, recall, and recordkeeping of warrants<br>▪ Verifying warrant inquiries from law enforcement agencies<br>▪ Network and data services<br>▪ Answering phones<br>▪ Inmate and department legal services |

Source: Auditor analysis of Sheriff letters of agreement, post orders, and job postings

### The Sheriff operates under constraints established in the City's budget.

The Sheriff receives money from the City's general fund (76 percent), the state government (12 percent), reimbursement from other city departments (10 percent), charges for services to the public (2 percent), and the federal government (0.05 percent), as shown in Exhibit 6.

---

[3] The salary ordinance position authority for the Sheriff in fiscal year 2017-18 was 1,159.96, but the budget requires consideration of attrition savings, which occur when the department does not pay for a position after an employee leaves and before a replacement is hired. Taking into account attrition savings, the Sheriff funded 1,000.53 FTE employees in 2017-18.

P 0056-000285

15 | Key Strategies Could Help the Sheriff Reduce Its Heavy Reliance on Overtime and Better Communicate Its Staffing Needs

**Exhibit 6: The Sheriff's Funding Comes Primarily From the City's General Fund**



| General Fund | $176,548,578 |
| State of California | 28,521,978 |
| Reimbursement for law enforcement services from other departments | 22,507,683 |
| Other including charges for services to the public | 4,150,591 |
| Federal grants | 106,139 |
| Total | $231,834,969 |

Source: Fiscal Year 2017-18 and 2018-19 Budget and Appropriation Ordinance

**In allocating general fund revenues to the Sheriff, the City must weigh voter-approved restrictions and legislative priorities.**

The City's budget is divided into governmental funds—which includes the general fund, special revenue funds, capital funds, and debt service funds—and enterprise funds. Enterprise fund revenues are mostly charges for services the City provides, such as utilities, airport, port, hospitals, and transit services. For each enterprise's respective fund, its revenues must be used to cover costs corresponding to that service. The general fund, which provides roughly half of the City's $10 billion annual budget, supports public services that do not generate sufficient service charges or other revenues to cover the cost of their operations. Of the general fund's fiscal year 2017-18 $5.1 billion budget, 24 percent was restricted by voter-approved baselines and mandates, which set aside money for specific uses. These restrictions limit city policymakers' discretion in allocating funds to other public service functions based on legislative and departmental priorities. Exhibit 7 shows these constraints, which are further discussed in Chapter 1.

Mirkarimi001255

16 | Key Strategies Could Help the Sheriff Reduce Its Heavy Reliance on Overtime and Better Communicate Its Staffing Needs

**Exhibit 7: The Sheriff's Primary Revenue Source Must Also Fund Other Critical Functions and Voter-Mandated Priorities**



Source: Fiscal Year 2017-18 and 2018-19 Budget and Appropriation Ordinance

**The Sheriff receives state money that only partially funds state mandates.**

The California Government Code, Article 8.5, requires county sheriffs to provide court security services to courts within their county and partially funds this mandate by allocating a pool of money among the counties. This law also only allows a county to seek an increase in funding if it opens a new court facility. In fiscal year 2018-19 the projected cost of securing San Francisco's courts was $17 million, but the Sheriff received only $12.9 million in state funding in the preceding year. Exhibit 8 shows the constraints on state funding for the Sheriff.

**Exhibit 8: The State Only Partially Funds Training and Court Security Mandates**



Source: Auditor analysis of Sheriff's fiscal year 2017-18 revenue

**Departments reimburse the Sheriff for law enforcement services it provides through work order agreements.**

The Sheriff provides law enforcement services to other city departments, including Public Health, the Municipal Transportation Agency, Public Utilities Commission, and Public Library. For this work, departments reimburse the Sheriff for the direct labor costs of the staff assigned, but they do not reimburse the department for other costs, such as training requirements or payroll support for those staff, which is discussed further in Finding 1.4.2.

Case 3:19-cv-02724-SK   Document 436-1   Filed 08/07/23   Page 288 of 350

P 0056-000287

17 | Key Strategies Could Help the Sheriff Reduce Its Heavy Reliance on Overtime and Better Communicate Its Staffing Needs

# OBJECTIVE

The overall objective of the audit was to assess the effectiveness of the Sheriff's staffing. Specifically, the audit sought to:

- Determine whether the Sheriff has an appropriate framework for managing and monitoring its staffing activities.
- Assess the scheduling of Sheriff staff and how it relates to employee performance, safety, and well-being.

# SCOPE & METHODOLOGY

The scope of the audit includes staffing and operations of the Sheriff's department during fiscal years 2014-15 through 2017-18.

To conduct the audit, the audit team gathered evidence using a variety of procedures and from a range of sources, as outlined below.

## Analyzed data:

- Evaluated city payroll data and performed an overtime analysis.
- Calculated a relief factor for deputy sheriff (deputy) and manager classifications using a weighted calculation of three fiscal years of pay data.
- Evaluated Sheriff workload data from several Sheriff divisions.

## Reviewed information from city departments:

- Interviewed employees and reviewed documents, including policies and procedures, operation manuals, staffing documents, and post orders, from the following Sheriff divisions.
    - Executive management (hiring plan, retirement plans, department staffing demographics, training plans, interviews)
    - Custody Operations (operations manual, staffing plan, post orders, interviews)
    - Field Operations (interviews, letters of agreement)
    - Administration and Programs (staffing report, interviews)
    - Planning and Special Projects (policies and procedures, interviews)
- Reviewed relevant sections of the San Francisco Charter, San Francisco Administrative Code, and California law.
- Reviewed the City's budget book, budget and appropriation ordinance, and salary ordinance.
- Reviewed employee memorandums of understanding and letters of agreement with departments on work orders.
- Interviewed staff of city departments and the Superior Court of San Francisco to determine whether the Sheriff's law enforcement and security services are meeting their needs.
- Reviewed job descriptions and post orders to identify positions filled by sworn personnel that could potentially be civilianized.

18 | Key Strategies Could Help the Sheriff Reduce Its Heavy Reliance on Overtime and Better Communicate Its Staffing Needs

### Reviewed reports completed by the Controller, the Budget and Legislative Analyst, and other jurisdictions:

- City and County of San Francisco, Budget and Legislative Analyst, *Performance Audit of the San Francisco Sheriff's Department's Workers Compensation and Overtime*, 2015.
- City of San Jose, Office of the City Auditor, *Audit of Civilianization Opportunities in the San Jose Police Department*, 2010.
- City and County of San Francisco, Controller's Office, City Services Auditor, *The Department Can Better Address Critical Information Technology Needs with Improved Staffing, Organization, and Governance*, 2018.
- King County, Auditor's Office, *Performance Audit of Jail Overtime*, 2006.
- King County, Auditor's Office, *King County Sheriff's Office Overtime: Better Strategy Could Reduce Hidden Costs and Safety Risks*, 2017.
- Maryland General Assembly, Office of Legislative Audits, *Department of State Police Workforce Civilianization*, 2016.
- City and County of San Francisco, Controller's Office, Budget and Analysis Division, *Fiscal Year 2016-17 Annual Overtime Report*, 2018.
- Various publications by the California Board of State and Community Corrections and California Commission on Peace Officer Standards and Training.

### Reviewed best practices and research:

- D. Liebert and R. Miller, U.S. Department of Justice, National Institute of Corrections, *Staffing Analysis Workbook for Jails,* 2001.
- W. King and J. Wilson, U.S. Department of Justice, Community Oriented Policing Services, *Integrating Civilian Staff Into Police Agencies,* 2014.
- R. Davis, M. Lombardo, D. Woods, C. Koper, and C. Hawkins, *Civilian Staff in Policing: An Assessment of the 2009 Byrne Civilian Hiring Program*, 2013.
- B. Vila, G. Morrison, and D. Kenney, *Improving Shift Schedule and Work-Hour Policies and Practices to Increase Police Officer Performance, Health, and Safety*, 2002.
- B. Vila, D. Kenney, G. Morrison, and M. Reuland, *Evaluating the Effects on Fatigue on Police Patrol Officers: Final Report*, 2000.
- B. Vila and D. Kenney, *Tired Cops: The Prevalence and Potential Consequences of Police Fatigue,* 2002.
- D. Lindsey, *Police Fatigue: An Accident Waiting to Happen,* 2007.
- K. Amendola, D. Weisburd, E. Hamilton, G. Jones, and M. Slipka, *The Impact of Shift Length in Policing on Performance, Health, Quality of Life, Sleep, Fatigue, and Extra-Duty Employment,* 2011.

19 | Key Strategies Could Help the Sheriff Reduce Its Heavy Reliance on Overtime and Better Communicate Its Staffing Needs

# Chapter 1

## The Sheriff's Workload Has Increased, but the City Has Not Funded Additional Staff

## SUMMARY

The City did not increase the Sheriff's staffing budget during fiscal year 2014-15 through 2017-18, contributing to a growing gap between the Sheriff's total work performed and its budgeted staff. Recent events, such as a 2018 California court ruling and the expansion of Zuckerberg San Francisco General Hospital (ZSFG), have increased the Sheriff's workload. The court decision drastically increased San Francisco's use of supervised release (including electronic monitoring), requiring much more Sheriff staff time to adequately supervise electronic monitoring program participants. And because the Sheriff provides law enforcement and security services to the Department of Public Health (Public Health), which oversees ZSFG, the expansion of ZSFG's facilities has increased the Sheriff's workload and staffing needs.

To fill this gap between workload and staffing, in fiscal year 2017-18 the Sheriff consistently relied on overtime to provide 20-28 percent of the hours needed to operate the jails, provide security and bailiff services to the courts, and provide law enforcement and security services to Public Health. However, the Sheriff could reduce its need for overtime and improve its budget position by civilianizing (using civilian classifications to staff) 34 positions and by recouping administrative overhead costs the Sheriff incurs when providing law enforcement and security services to other city departments.

### Finding 1.1: The City has not increased the Sheriff's budgeted staff despite the department's increased workload.

In fiscal year 2017-18 the Sheriff filled nearly all of the vacancies it had in the three prior years. However, the increased hiring did not keep pace with the increased amount of work the department performed. From fiscal year 2014-15 to 2017-18, the Sheriff's total work hours increased by 13 percent (141 FTEs worth of work). As shown in Exhibit 9, this increase is due to expanded security services provided to Public Health (see Finding 1.2.2), increased training because of a hiring surge, and increased use of leave, which is partially due to the increased leave hours accrued by employees working overtime. This increase in work occurred while staffing increased by only 5 percent (43 FTEs worth of work) and budgeted positions decreased by 1 percent (14 FTEs). And as Exhibit 10 shows, even as the Sheriff filled most of its budgeted positions in fiscal year 2017-18, its total work performed still exceeded its budget by 238 FTEs and the proportion of work that it performed using overtime increased from 14 to 20 percent. The gap has grown by more than 186 percent, from 83 to 238 FTEs, at least in part because of increased workloads in key functions, as discussed in Finding 1.2.

20 | Key Strategies Could Help the Sheriff Reduce Its Heavy Reliance on Overtime and Better Communicate Its Staffing Needs

**Exhibit 9: The Sheriff's Total Work Hours Increased by 141 FTEs From Fiscal Year 2014-15 through 2017-18 Mostly Because of Expansion of Public Health Security Services and Increased Leave and Hiring**



Notes:
[a] Before 2018 compensatory time earned was not categorized in the City's systems by activity, so the increase in hours paid to employees in this way cannot be attributed to any specific Sheriff function.
[b] *Other* includes a decrease of 11 FTEs in the jails, an increase of 1 FTE for court security (see Finding 1.3), and small changes in other areas.
Source: Auditor analysis of city payroll data for fiscal years 2014-15 through 2017-18

**Exhibit 10: Although the Sheriff Has Hired to Fill Nearly All Its Budgeted Positions, Its Total Work in Fiscal Year 2017-18 Still Exceeded the Budget by 238 FTEs**



Notes:
[a] The number of budgeted FTEs includes attrition savings required of each department. The fiscal year 2018-19 budget includes 1,019 FTE positions.
[b] The Field Operations Division, Custody Operations Division, and Community Programs unit represent 77 percent of the department's sworn workforce. Posts represent work assignments.
Source: Auditor analysis of city payroll data and budget documents and Sheriff's post assignments

P 0056-000291

21 | Key Strategies Could Help the Sheriff Reduce Its Heavy Reliance on Overtime and Better Communicate Its Staffing Needs

Further, the Sheriff may be insufficiently staffed based on its established post assignments. Although the department has almost enough supervisors—it needs 76 and has 73 FTE supervisors, it is significantly short of deputies based on its established post assignments. The Sheriff needs 761 FTE deputies to fill post assignments in the Field Operations Division, Custody Operations Division, and Community Programs unit, but has only 585 FTE deputies, a shortfall of 176 FTE employees. However, this does not necessarily require the department to hire 176 deputies—the Sheriff may choose to fill a portion of the shortfall with overtime.

Some level of overtime allows the Sheriff to efficiently provide necessary coverage or to quickly respond to short-term variations in workload, such as covering a post when a deputy is sick. In such situations, overtime costs less than it would to hire and train additional full-time staff because, among other reasons, overtime brings no additional costs to the City for health and retirement benefits. However, the department's continued reliance on overtime beyond covering unexpected leaves erodes the cost-effectiveness of not hiring additional deputies. Further, it risks the safety and wellness of its employees, inmates, and the public.

Total work hours and current fixed-post assignments may not precisely reflect the Sheriff's total staffing need. For example, total work hours excludes requests for more security that a city department, such as Public Health, might want, but that the Sheriff cannot provide due to staffing limitations. Total work hours could also include time spent on inefficient practices. Modernizing some of the Sheriff's manual processes, such as scheduling of staff, may improve efficiency, as discussed in Finding 2.4. However, a significant portion of the department's work is to maintain a security presence, which is driven largely by the risk posed by jail inmates and the physical structure of the buildings it secures. Such work has little opportunity for efficiency cost savings.

In allocating the City's general fund, the City did not increase the Sheriff's budgeted staff during the audit period despite increases in the department's workload, as shown in Exhibit 10. Despite its bigger overall budget, the City's budget decisions are constrained by many factors, including large, voter-mandated set-asides and the legislative priorities of those who make budget decisions (as shown in Exhibit 7 in the Introduction).

The Sheriff's budget affects whether those in custody have access to programming that can ease their reentry and reduce recidivism. Although advocacy groups and family members may speak up for those most affected by the Sheriff's budget when the Office of the Mayor (Mayor) meets with community groups or the Board of Supervisors holds public hearings as shown in Exhibit 11, the individuals most directly affected by the Sheriff's budget cannot attend hearings because they are in custody.

## Exhibit 11: The City Has a Deliberative Process for Approving Its Budget

| Prepare Budget | Budget Review | Public Hearings | Final Budget |
|---|---|---|---|
| Based on instructions from the Mayor, departments prepare their budgets. During the audit period, all budget instructions included required budget cuts. The Sheriff works with the Mayor and identifies the department's needs for the upcoming budget. | The Mayor **reviews submitted budgets** and meets with community groups to **provide budget updates** and hear concerns and requests for funding to improve public services. | The Board of Supervisors holds **public hearings** to review departmental requests and solicit public input. | The Board of Supervisors **votes** to approve the final budget. |
| December - February | February - May | May - June | July |

Source: Mayor's proposed budget

Mirkarimi001261

22 | Key Strategies Could Help the Sheriff Reduce Its Heavy Reliance on Overtime and Better Communicate Its Staffing Needs

Although the budget process allows stakeholders to propose their funding priorities, the Mayor and the Board of Supervisors ultimately must decide how to allocate the resources in the general fund. During the four-year audit period, these decisions have not included increasing the Sheriff's staffing despite the department's increased workload, as discussed below.

## Finding 1.2: The Sheriff is addressing increases in its workload due to bail reform and new service requests with hiring and overtime.

Both the Sheriff's electronic monitoring program and law enforcement and security work for Public Health now require more resources due to recent changes beyond the Sheriff's control. In January 2018 a California court ruled that bail amounts be set or adjusted to a level that individuals can afford, unless there is clear evidence the individual is a threat to public safety or a flight risk. In response, the courts have increased the use of supervised release, including electronic monitoring, in San Francisco. The Sheriff also provides law enforcement and security services for Public Health facilities. Since the opening of a new hospital building at ZSFG in 2016, the Sheriff must cover a larger area.

### Finding 1.2.1: The number and risk level of people on court-ordered electronic monitoring have increased, but staffing has not, which risks overwhelming the Sheriff's oversight capacity.

Although the workload of the Sheriff's electronic monitoring program has grown drastically since 2018, staffing for this function has remained relatively static, putting at risk the Sheriff's ability to adequately monitor the program. As discussed in the Introduction, the electronic monitoring program is an alternative to incarceration that allows the department to remotely supervise individuals who would otherwise be in custody.

Since fiscal year 2014-15 the average monthly number of new enrollments in the electronic monitoring program has increased 355 percent, the average daily number of participants monitored has increased 274 percent, and the average number of participants who have violated the terms of their electronic monitoring agreements has increased 2,382 percent. Despite this, as Exhibit 12 shows, staffing for the unit responsible for this program has remained static through June 2018, as the Sheriff decreased regularly assigned staff[4] and increased overtime.

---

[4] CSA defines regularly assigned staff as the total number of regular work and leave hours, excluding overtime hours, expressed in FTE employees.

23 | Key Strategies Could Help the Sheriff Reduce Its Heavy Reliance on Overtime and Better Communicate Its Staffing Needs

**Exhibit 12: The Sheriff's Electronic Monitoring Workload Has Increased Drastically, But Assigned Staffing Has Not[a]**



Notes:

[a] Numbers of FTE employees and electronic monitoring program data rounded to nearest tenth.

[b] The audit period is fiscal years 2014-15 through 2017-18. However, because the steep increase in the electronic monitoring workload began in January 2018, this exhibit includes some 2018-19 data to highlight the upward trend.

Source: Auditor analysis of city payroll data and Sheriff's electronic monitoring data

According to the Sheriff, the number of individuals on electronic monitoring has significantly increased due to a January 2018 court ruling that bail amounts be adjusted to a level that individuals can afford, unless there is clear evidence the individual is a threat to public safety or is a flight risk. Since the decision, which was subsequently codified into state law, the courts have increased the use of pre-trial supervised release (including electronic monitoring) in San Francisco.

Electronic monitoring involves tracking a participant's whereabouts using an ankle monitor with a GPS (Global Positioning System) tracking mechanism or monitoring alcohol intake using a portable breathalyzer. Electronic monitoring is tailored to the individual case and can involve restrictions on where the person can go or whether they can have visitors at home. As shown in Exhibit 13, the process to enroll a participant on electronic monitoring is labor-intensive, and includes running a warrant check, visiting the participant's home, explaining program requirements, and instructing the participant on using the equipment.

24 | Key Strategies Could Help the Sheriff Reduce Its Heavy Reliance on Overtime and Better Communicate Its Staffing Needs

**Exhibit 13: Enrolling a Person in the Electronic Monitoring Program is Time-Intensive for Sheriff Staff**

| Activity | Estimated Staff Hours | |
|---|---|---|
| | Sentenced Enrollee | Pre-Trial Enrollee |
| **1. Public Safety Monitoring Assessment** | | |
| Receive court paperwork, check criminal history, confirm charges, releases, and warrants. | 1-2 | |
| **2. Eligibility Checklist** | | |
| Determine appropriateness of electronic monitoring as an alternative to jail for the sentenced individual by assessing risk:<br>✓ Consider crimes committed by the individual<br>✓ Interview the individual's case manager<br>✓ Review in-custody program participation<br><br>*The department indicated that it does not have discretion to determine whether a pre-trial enrollee is qualified for electronic monitoring, and that liability for these individuals is on the courts. Therefore, this step does not apply to pre-trial participants.* | 2-4 | Not applicable |
| **3. Interview** | | |
| Review program rules with participant. Ensure participant has a residence at which to charge their electronic monitor. | 0.75–2 | |
| **4. Home Check*** | | |
| Schedule home check (up to 50 miles away from San Francisco) to evaluate appropriateness of the home for electronic monitoring, ensure public and Sheriff staff safety, and to clear potential stay-away zone conflicts. Record video of the home and talk to relatives and other housemates, if any. | 2–6* | |
| **5. Release** | | |
| Participant is fitted with an electronic monitor, set up with stay away zones (if applicable), agrees to the terms of monitoring, and released. | 2-4 | |
| **Total Sheriff Staff Hours** | 8-18 | 6-14 |

* For safety reasons, two deputies perform home checks; thus, hours are total of both deputies.

Source: Community Programs' procedures and interviews of Sheriff staff

The Sheriff monitors participants 24 hours per day. According to the Sheriff, one employee is assigned to the electronic monitoring platform and at least two employees on every shift are assigned to conduct compliance checks. When participants violate the terms of their electronic monitoring, this further adds to the Sheriff's workload. For sentenced offenders, Sheriff staff must find and re-arrest the individual, but do not need to secure a warrant. The process for pre-trial defendants, who represent most of the increase in those being electronically monitored, is more involved as shown in Exhibit 14.

25 | Key Strategies Could Help the Sheriff Reduce Its Heavy Reliance on Overtime and Better Communicate Its Staffing Needs

## Exhibit 14: The Number of Electronic Monitoring Participants Who Violated Program Terms Increased 2,382 Percent, Adding Hours to the Sheriff's Workload*

The case study below demonstrates the additional work the Sheriff performs when a participant violates the terms of his or her electronic monitoring.

| Activity | Estimated Sheriff Staff Hour |
|---|---|
| 1. **Pre-Trial Participant Violates Terms of Electronic Monitoring** | |
| Day 1 — Participant violates terms of electronic monitoring agreement by:<br>▪ Leaving designated home zone.<br>▪ Tampering with and removing electronic monitor. | 1 |
| 2. **Sheriff Writes Affidavit for Warrant** | |
| Day 1 — Deputy writes affidavit warrant.<br>Deputy obtains judge's signature. | 2 |
| 3. **Sheriff Follows up** | |
| Day 15 — Member of the public reports finding detached electronic monitoring device.<br>Deputy retrieves device and writes incident report.<br>Participant is still at large. | 2 |
| 4. **Individual Arrested, Taken Into Custody** | |
| Day 122 — Police officer arrests defendant on new charges.<br>Deputy takes defendant into custody, writes a follow-up report. | 1 |
| **Estimated Average Sheriff Staff Hours Required Per Violator** | **6** |
| Average Violations Per Month | 30 |
| **Estimated Additional Sheriff Labor Hours Per Month** | **180  (1.03 FTE)** |

\* From January 2014 to December 2018
Source: Community Programs' case files and interviews of Sheriff staff

**Participants Violating Terms of Their Electronic Monitoring Increased**

# 1210%

**Electronic Monitoring Participants That the Sheriff Considers High Priority for Response Increased**

# 374%

The number of people violating the terms of their electronic monitoring increased 1,210 percent between 2017 and 2018. Each violation creates additional work for Sheriff employees. Further, the number of participants the Sheriff considers as higher priority for response to violations increased 374 percent. Such high priority cases include those accused of domestic violence, weapons, driving under the influence and other serious acts.

Source: Sheriff's electronic monitoring data and interviews of Sheriff staff

In addition to the increase in the number of those being electronically monitored, a greater proportion are now people the Sheriff considers higher priority for responding to violations of monitoring terms (up 374 percent). The number of pre-trial defendants court-ordered to electronic monitoring increased after the Humphrey decision, but both that ruling and California's constitution emphasize that victim and public safety is the primary consideration in determining whether a

26 | Key Strategies Could Help the Sheriff Reduce Its Heavy Reliance on Overtime and Better Communicate Its Staffing Needs

defendant must be detained in jail, released, or enrolled in an alternative program such as electronic monitoring. According to Sheriff staff, the department considers the seriousness of the alleged crime in determining risk to the public and how the department responds to a person's actions. For example, staff stated that someone accused of domestic violence with a stay away zone around the alleged victim's residence who violated that stay away zone would likely trigger a priority response unless a more critical issue was occurring at the same time. This public safety concern emphasizes the need for evaluating the appropriate level of staffing in the Community Programs unit to ensure adequate coverage to monitor participants and respond to violations of monitoring terms.

**Finding 1.2.2: The Sheriff increased its staffing at Public Health due to increased security needs, but staff still worked an average of 800 hours of overtime per assigned employee to provide coverage in fiscal year 2017-18.**

Both the number of employees assigned to Public Health and the number of overtime hours worked by Sheriff staff increased from fiscal year 2014-15 to 2017-18 to meet Public Health's security needs. The Sheriff is responsible for providing law enforcement and security services at Public Health premises, including two major hospital campuses and multiple health clinics. According to Public Health, to determine the appropriate Sheriff staffing level, it conducts an annual assessment to determine how many Sheriff employees will be needed to meet the department's workload. Public Health discusses the assessment with the Mayor and Sheriff. The Mayor then approves the plan and includes funding in Public Health's budget to fund its work order agreement with the Sheriff. According to Public Health, the Sheriff provides law enforcement and security services for over 3 million square feet of property.

**Exhibit 15: The Sheriff Has Assigned More Staff to Public Health but Not Enough to Keep Pace With the Increasing Workload**



Source: Auditor analysis of city payroll data

Increased security work at ZSFG was the primary driver of the large increase in the Sheriff's total work performed for Public Health from fiscal year 2015-16 to 2016-17. The increase corresponds to the opening of the new hospital facility at ZSFG in 2016. However, the total amount of work increased by 42 percent (from 81.4 to 115.2 FTEs), which was greater than the 28 percent growth in regular staff assigned (from 65.0 to 83.3 FTEs). This led to the Sheriff significantly increasing its overtime for Public Health security in this period to an average of 800 hours over the year for each deputy, as shown in Exhibit 15.

27 | Key Strategies Could Help the Sheriff Reduce Its Heavy Reliance on Overtime and Better Communicate Its Staffing Needs

## Finding 1.3: The Sheriff relies extensively on overtime, which is driven by an underestimated relief factor, staffing levels that are below their established post assignments, and a cascading overtime effect.

In addition to overtime accounting for 28 percent of Public Health security hours in fiscal year 2017-18, Sheriff employees work a significant amount of overtime in the jails and courts: 22 percent of jail hours and 20 percent of court hours were overtime in fiscal year 2017-18. The audit identified three potential contributing factors to the high use of overtime: staffing levels below those needed to cover established post assignments, underestimated relief factors, and cascading overtime use due to employees earning compensatory time off for working overtime shifts.

When overtime is used to address temporary and unpredictable fluctuations in the supply of staff, such as when employees are sick, the overtime costs less than hiring and training additional full-time staff, partly because overtime brings no additional costs to the City for health and retirement benefits. As discussed above, the department's continued reliance on overtime beyond covering unexpected leaves erodes the cost-effectiveness of not hiring additional deputies. Also, overtime-related fatigue has been found to have negative consequences, including degrading personal health, reducing focus, and increasing aggression, as discussed in Finding 2.2. Adding staff to key areas may reduce required overtime, reduce the risk of fatigue and its harmful effects, and create employment opportunities.

As noted in the Introduction, the Sheriff operates the county jails and provides security and bailiff services to the courts. Although total work hours were relatively stagnant in these two functions from fiscal year 2014-15 to 2017-18, overtime accounted for significant portions of the hours worked in both areas. Employees' use of compensatory leave that they earn by working overtime could further exacerbate the Sheriff's staffing challenges. In essence, earned compensatory time is a future liability that may cause the Sheriff to more often have staff unavailable for work and, thus, more often need to have available staff work overtime.

### San Francisco's Jails Increasingly Rely on Overtime

As shown in Exhibit 16, the quantity of work (in FTEs) performed in the jails remained relatively constant from fiscal year 2014-15 to 2017-18, as regularly assigned staff decreased and overtime increased.

### Exhibit 16: The Sheriff's Staffing in the Jails and Inmate Population Have Changed Little Over Four Years



Source: Auditor analysis of city payroll data and inmate data from Controller

28 | Key Strategies Could Help the Sheriff Reduce Its Heavy Reliance on Overtime and Better Communicate Its Staffing Needs

According to Sheriff management, the decrease in regularly assigned staff and the corresponding increase in jail overtime likely occurred because the Sheriff reassigned some jail employees to the Field Operations Division and Administration and Programs Division due to increased workload in those divisions. Both the total work performed in the jails (down 2 percent or 10.5 FTEs) and the average daily inmate population (up 3 percent or 36 inmates) changed very little over the four years. However, the number of employees regularly assigned to the jails dropped 12 percent in the same period (from 384.4 to 337.6 FTE). To provide the number of work hours needed in the jails with fewer employees, the Sheriff increased overtime by nearly 61 percent (36.3 FTEs). By fiscal year 2017-18 Sheriff staff working overtime accounted for 22 percent of total hours worked in the jails.

### The Sheriff Requires Overtime to Fulfill Its Mandate to Secure the Courts

Sworn employees provide security for court buildings and serve as bailiffs in courtrooms but require significant overtime to fulfill this responsibility, as shown in Exhibit 17.

**Exhibit 17: The Sheriff Used Significant Overtime to Secure the Courts**



Source: Auditor analysis of city payroll data

Although Sheriff staff worked overtime for an average of more than 20 percent of the total hours used to address the courts' security needs, overtime levels remained steady from fiscal year 2014-15 to 2017-18.

### Current overall staffing levels are well below the Sheriff's current post assignments.

As discussed in Finding 1.1, there is a substantial gap between the number of post assignments the Sheriff has for its Custody and Field Operations divisions and the number of deputies assigned to those divisions. To cover all these post assignments without any overtime would require an additional 176 deputy FTEs or the equivalent hours in existing deputies working overtime.[5] This potential understaffing may also be negatively impacting the Sheriff's operations. From fiscal year 2014-15 to 2017-18, the Sheriff reported at least 16 trainings were cancelled due to staffing shortage. These cancelled trainings included important training such as Creating an Inclusive Environment, Crisis Intervention Training, and range training.

Similarly, as further discussed in Finding 2.3, current staffing levels may have disrupted the delivery of programs in the jails. Training cancellations and disruptions to program delivery in the jails emphasize

---

[5] CSA did not assess the appropriateness of the Sheriff's current post assignments, but looked at what is required to fill existing post assignments.

29 | Key Strategies Could Help the Sheriff Reduce Its Heavy Reliance on Overtime and Better Communicate Its Staffing Needs

the need for the Sheriff to reevaluate current staffing assignments and determine appropriate staffing levels to ensure staff receives trainings and inmates receive program services crucial to rehabilitation.

## The Sheriff underestimates its staffing need by using a relief factor that is too low.

A relief factor is the number of FTE employees needed to fill a post assignment that is continuously covered. For example, if the Sheriff has a relief factor of 1.25 for a given post assignment, then it should employ 1.25 FTE employees to fully cover that post assignment. As discussed further in Finding 2.1, the Sheriff's relief factors are understated, causing the department to underestimate its true staffing need.

## Deputies working overtime shifts can earn extra compensatory leave hours instead of extra pay, but this option causes a cascading effect that increases the Sheriff's need for overtime.

When the Sheriff overly relies on overtime to meet its workload, it risks exponentially increasing the compensatory time off earned (and eventually taken) by its staff. When most Sheriff employees work overtime, they may choose to be paid for that overtime at 1.5 times their base compensation rate or to accrue compensatory time off leave hours at 1.5 times the number of hours they worked. Due to the public safety nature of the Sheriff's work, when a deputy accrues compensatory time and then takes that time as leave, another employee may need to backfill those hours on overtime. If the employee backfilling the position on overtime chooses to accrue and use compensatory time instead of receiving overtime pay, this worsens the problem.

As shown in Exhibit 18, employees earning and using compensatory time has the potential to cause a cascading effect that generates more need for employees to work overtime. From fiscal year 2014-15 to 2017-18, the use of compensatory time in the department increased significantly by over 79,000 hours, to an average of 129.5 hours per employee across the four years. Unless this trend is reversed, the Sheriff's future liability in compensatory time earned could exacerbate the Sheriff's reliance on overtime to meet its staffing needs.

30 | Key Strategies Could Help the Sheriff Reduce Its Heavy Reliance on Overtime and Better Communicate Its Staffing Needs

**Exhibit 18: Compensatory Time Used Can Exponentially Increase the Need for More Overtime**



**Day 1**
- Deputy 1 calls out sick
- Deputy 2 works 8 hours of overtime to fill in for Deputy 1
- Deputy 2 earns 12 (8 x 1.5) hours of compensatory time

**Day 2**
- Deputy 2 takes 12 hours vacation
- Deputy 3 works 12 hours overtime to fill in for Deputy 2
- Deputy 3 earns 18 (12 x 1.5) compensatory time

**Day 3**
- Deputy 3 takes 18 hours vacation
- Deputy 4 works 18 hours overtime to fill in for Deputy 1
- Deputy 4 earns 27 (18 x 1.5) compensatory time

Note: This is a sample scenario of the cascading overtime effects of compensatory time accrual and usage over a 3-day period.
Source: Auditor analysis

## Finding 1.4: The Sheriff could improve its budget position by civilianizing some positions, allowing sworn staff to return to sworn posts, and recouping overhead costs for services provided.

By using sworn officers to fill positions that do not require the skills of a sworn officer, the Sheriff is not effectively allocating personnel resources. Furthermore, the Sheriff did not charge an administrative overhead rate in its work order agreements with other departments until the third quarter of fiscal year 2017-18, preventing the department from fully recouping the costs of its services to other departments. If the Sheriff's budget included civilian positions to perform administrative and support duties and charged an overhead rate for the services it provides, it would decrease its labor costs and increase its revenue.

### Finding 1.4.1: By civilianizing 34 positions, the Sheriff can reduce costs and improve staffing in law enforcement functions.

The Sheriff employed 848 sworn personnel and 192 civilian staff on June 30, 2018. In analyzing the work performed in five Sheriff units, CSA identified positions for which the job responsibilities did not require the training or authority of a sworn employee. As shown in Exhibit 19 below, the Sheriff could civilianize 34 positions, potentially allowing it to realize $900,000 in annual salary savings and to redeploy sworn staff into public safety and law enforcement functions.

302 of 350

31 | Key Strategies Could Help the Sheriff Reduce Its Heavy Reliance on Overtime and Better Communicate Its Staffing Needs

## Benefits of Civilianization

Hiring civilians in law enforcement agencies to perform administrative and support functions provides benefits including freeing up the time of sworn personnel for sworn duties, aligning employees' qualifications with the responsibilities of the positions they occupy, and cost savings from annual salaries, pensions, and premium pay.

### Civilianization Benefits

✓ Frees up the time of sworn personnel for sworn duties
✓ Aligns required qualifications with job duties
✓ Cost savings from:
  ▶ Lower annual salaries
  ▶ Lower pensions at retirement
  ▶ Less premium pay

## Shifting Sworn Personnel to Sworn Duties

The City is not maximizing the benefits of its considerable investment when the Sheriff assigns trained sworn personnel to administrative and support positions. The Sheriff's sworn employees must complete at least 840 hours of training before they begin sworn duties. The Board of State and Community Corrections' core training, which is required to work in jails, consists of at least 176 hours, and the California Commission on Peace Officer Standards and Training (POST) basic training, which is required to work as a law enforcement officer in California, consists of at least 664 hours.

## Aligning Qualifications With Job Duties

Generally, most of the Sheriff's sworn personnel would need additional training to be able to fulfill administrative and support roles. Administrative and support positions require job-specific knowledge, skills, and abilities that, in some cases, are highly technical, such as those required for information technology positions. These requirements help ensure those hired have received the training, education, and experience needed for the job before beginning the work. In contrast, sworn employees are hired as generalists, with few required specific qualifications, and are extensively trained to perform the Sheriff's law enforcement and jail duties after hiring.

## Cost savings

Most civilian job class counterparts to sworn personnel performing administrative and support functions have lower annual salaries than the sworn classifications. As shown in Exhibit 19, the Sheriff could save $908,882 in annual salaries for its administrative costs by civilianizing 34 positions within the functions of records, personnel, electronic monitoring, information technology, and fleet and communications.

32 | Key Strategies Could Help the Sheriff Reduce Its Heavy Reliance on Overtime and Better Communicate Its Staffing Needs

## Exhibit 19: Civilianizing 34 Positions Would Better Align Qualifications and Realize $900,000 in Annual Salary Savings

| Role | Current Class (No.)[a] | Proposed Class | Difference in Annual Salary[b] | | |
|---|---|---|---|---|---|
| **Custody Operations Division: Central Records and Warrants Unit** | | | | | |
| **Supervisor** – Oversees work of records clerks | Senior Deputy (1) | Chief Clerk | $28,288 ▼ | x 1 = | $28,288 ▼ |
| **Records Clerk** – Processes documents related to bookings, bail, jail releases, court appearances, and records requests | Deputy (18) | Senior Legal Processing Clerk | $39,130 ▼ | x 18 = | $704,340 ▼ |
| **Administration and Programs Division: Personnel Unit** | | | | | |
| **Personnel Analyst** – Performs activities related to recruitment, hiring, leave, and worker's compensation | Deputy (4) | Human Resources Analyst | $8,944 ▼ | x 4 = | $35,776 ▼ |
| **Administration and Programs Division: Community Programs Unit** | | | | | |
| **Data Analyst –** Performs activities related to data analysis of electronic monitoring | Sheriff's Sergeant (1) | Administrative Analyst | $35,490 ▼ | x 1 = | $35,490 ▼ |
| **Planning and Projects Division: Information and Technology Support Services** | | | | | |
| **Executive** – Oversees governance and risk management of information technology | Sheriff's Lieutenant (1) | Chief Information Officer (Manager V) | $24,830 ▲ | x 1 = | $24,830 ▲ |
| **Management** – Oversees technical experts who administer networks and data services | Sergeant (1) | IS Engineer—Principal | $39,494 ▲ | x 1 = | $39,494 ▲ |
| **Management** – Oversees the work of Technical Support staff | Sergeant (1) | IT Operations Support Administrator V | $2,392 ▼ | x 1 = | $2,392 ▼ |
| **Technical Support** – Troubleshoot software and hardware problems | Deputy (5[c]) | IT Operations Support Administrator II | $28,912 ▼ | x 5 = | $144,560 ▼ |
| **Planning and Projects Division: Fleet and Communication Unit** | | | | | |
| **Fleet Coordinator** – Oversees fleet budget and purchasing, and upkeep vehicle maintenance | Senior Deputy (1) | Senior Administrative Analyst | $9,126 ▼ | x 1 = | $9,126 ▼ |
| **Communications Coordinator** – Oversees portable, mobile, and control station radios | Deputy (1) | Administrative Analyst | $13,234 ▼ | x 1 = | $13,234 ▼ |
| **Total Annual Savings in Salary $908,882 ▼** | | | | | |

Notes:
[a] Based on number of filled positions in December 2018 and does not account for vacancies.
[b] Based on the highest annual salary within the classification; does not account for premium pays available to sworn classifications.
[c] The Sheriff employs an additional two deputy sheriffs for technical support, which may not be efficient to civilianize if the volume of technical support requests from maximum security areas (where a civilian cannot go without being escorted by a sworn employee) is sufficiently high.

Source: Auditor analysis of Sheriff post orders and of job descriptions and salary ranges from Department of Human Resources

Also, retired civilian employees receive less pension benefits than their retired sworn counterparts, as shown in Exhibit 20. Further, civilian employees are ineligible for premium pays that those in sworn classifications can earn. For example, sworn employees can receive 4 to 6 percent of their salary as premium pay for earning POST intermediate or advanced certification.

33 | Key Strategies Could Help the Sheriff Reduce Its Heavy Reliance on Overtime and Better Communicate Its Staffing Needs

## Exhibit 20: Most Civilian Job Classifications Receive Lower Annual Salaries and Smaller Pensions* at Retirement Than Their Sworn Counterparts

| Sworn Classification | Civilian Classification | Annual Salary Difference | Annual Pension Difference |
|---|---|---|---|
| Senior Deputy | Chief Clerk | $28,288 ▼ | $45,503 ▼ |
| Deputy | Senior Legal Processing Clerk | $39,130 ▼ | $50,434 ▼ |
| Senior Deputy | Human Resources Analyst | $8,944 ▼ | $40,533 ▼ |
| Lieutenant | Manager V (Range A) | $24,830 ▲ | $15,081 ▼ |
| Sergeant | IS Engineer-Principal | $39,494 ▲ | $857 ▼ |
| Sergeant | IT Operations Support Admin V | $2,392 ▼ | $29,759 ▼ |
| Deputy | IT Operations Support Admin II | $28,912 ▼ | $43,384 ▼ |
| Senior Deputy | Senior Administrative Analyst | $9,126 ▼ | $32,281 ▼ |
| Deputy | Administrative Analyst | $13,234 ▼ | $32,566 ▼ |
| Sergeant | Administrative Analyst | $35,490 ▼ | $52,596 ▼ |

*Calculations are based on 30 years of service, retirement at the highest age factor, and the highest pay available to the classification in fiscal year 2018-19. Those retired from sworn classifications may receive up to 90 percent of their final salary; those retired from civilian classifications may receive up to 75 percent.
Source: Auditor analysis of labor agreements, salary information from Department of Human Resources and retirement benefit calculation information from San Francisco Employees' Retirement System

CSA also reviewed the Classification unit in the Custody Operations Division, which is responsible for classifying inmates' security risk levels and identifying safe and appropriate inmate housing needs. According to a Johnson County (Kansas) audit of its Sheriff's Office, staff working in classification functions may be a mix of sworn officers and civilian specialists. After reviewing general post orders and interviewing classification staff, the audit determined that the Sheriff's Classification unit requires sworn personnel's training and knowledge to identify and evaluate inmate behaviors to ensure safety and security of jail facilities.

### Finding 1.4.2: The Sheriff should further recover additional overhead costs for providing law enforcement services to other departments.

The Sheriff provides law enforcement security services to other city departments and the state courts. During the audit period, the Sheriff did not include indirect costs other than the fringe benefits associated with its direct labor costs in its letters of agreement with client departments. However, beginning in the third quarter of fiscal year 2017-18, the department included a 5 percent charge to recover additional indirect costs from Public Health. According to the Sheriff, the 5 percent charge is intended to recover departmental costs related to training for a sworn deputy. However, this method of allocating only partial indirect costs does not align with guidance from the U.S. Office of Management and Budget (OMB) and causes the Sheriff to lose an opportunity to improve its budget position.

Direct costs are the costs of what the client department receives. In this case, the direct costs are the labor hours of Sheriff staff. Indirect costs are necessary expenses the Sheriff incurs to be able to provide services to departments, but do not represent something the client department directly receives. Although indirect costs include training expenses, they also include expenses related to personnel,

34 | Key Strategies Could Help the Sheriff Reduce Its Heavy Reliance on Overtime and Better Communicate Its Staffing Needs

technical services, legal, fleet management, and equipment that support the Sheriff employees providing services to client departments.

When the Sheriff does not fully recoup indirect costs for services provided to departments, it must fund the other indirect costs by diverting its own budget away from other functions. As demand for these services increase, such as the 42 percent increase over four years in services provided to Public Health, the Sheriff's unfunded indirect costs also increase. Appropriately allocating indirect costs for the services provided to client departments aligns with OMB's guidance on classifying costs.

## Other city agencies include overhead when invoicing other city departments for services.

The rates San Francisco Public Works and the Controller's City Services Auditor charge other city departments include indirect costs, such as those of management and support functions. The San Francisco Public Works' Indirect Cost Plan includes indirect costs from bureau administration and department overhead. The bureau's indirect costs include:

- Fringe benefits for direct labor.
- Salary and benefits for indirect labor of employees in support functions such as bureau management, schedulers, and administration.
- Non-labor costs such as materials, supplies, and services of other departments.

The department overhead includes the cost of management, accounting, personnel, and information technology. The City Services Auditor includes materials, supplies, and non-personnel services, such as training, software licensing fees, and services of other departments, in its billable rate.

OMB's guidance on classifying costs is to establish indirect cost pools and allocate the pools to benefited functions relative to the benefits derived. An example of determining overhead costs that applies to the Sheriff providing law enforcement services to other departments is shown in Exhibit 21.

35 | Key Strategies Could Help the Sheriff Reduce Its Heavy Reliance on Overtime and Better Communicate Its
Staffing Needs

**Exhibit 21: The Sheriff's 5 Percent Charge Covers Only Training of Assigned Staff While Best Practices Include Other Expenses in Indirect Cost Rates**

| Step One – Establish indirect cost pools | | |
| --- | --- | --- |
| **Example Pools** | **Example Costs Found in Pools** | |
| Department-wide operations | Indirect costs related to overall Sheriff operations | |
| | ▪ Executive management | ▪ Training required of any sworn employee |
| | ▪ Legal | ▪ Facilities maintenance and capital planning |
| | ▪ Personnel | ▪ Information technology software, hardware, and support |
| | ▪ Fleet management | |
| | ▪ Services provided by other departments | ▪ Infrastructure management, improvement, and maintenance |
| Divisional operations | Indirect costs related to the Sheriff's Field Operations Division* | |
| | ▪ Field operations management | ▪ Administrative support such as scheduling and deployment in response to ad hoc requests for additional services |
| | ▪ Training specific to field operations, such as training for bailiff responsibilities | |
| **Step Two – Allocate indirect costs fairly** | | |
| Example methodology | ▪ Estimate the total hours of service provided to client departments through work order agreements. | |
| | ▪ Divide the indirect cost by the estimated total hours of service to identify an amount that should be added to each direct labor hour charged to the client department. | |

*Law enforcement and security contracts are administered by the units within the Field Operations Division.

Source: OMB Circular A-87, interview of Sheriff staff, relevant sections of fiscal year 2018-19 and 2019-20 Proposed Budget, and documents on Sheriff's organization and unit responsibilities

## Recommendations

The San Francisco Sheriff's Department should:

1. Evaluate staffing levels of the Community Programs unit and determine whether those levels are adequate for safe and effective oversight of the electronic monitoring function.

2. Identify the level of staffing needed to work in mandated functions to reduce the significant levels of overtime worked in those functions.

3. Negotiate for lower compensatory time accrual caps in its labor agreements.

4. Civilianize 34 positions in Central Records and Warrants unit, Personnel unit, Community Programs unit, Information Technology and Support Services unit, and Fleet and Communication unit.

5. Amend its work order agreements with other departments to recover additional indirect costs associated with providing services.

Case 3:19-cv-02724-SK   Document 436-1   Filed 08/07/23   Page 307 of 350

P 0056-000306

36 | Key Strategies Could Help the Sheriff Reduce Its Heavy Reliance on Overtime and Better Communicate Its Staffing Needs

# Chapter 2

To Make Data-Driven Decisions and Protect Public Safety, the Sheriff Should Improve and Further Assess Its Strategic Planning, Staffing Practices, and Systems

## SUMMARY

The Sheriff could improve its strategic planning, staffing practices, and systems by adopting a staffing plan based on leading practices, consistently and effectively tracking all the workload-related data it needs, and improving the use of systems for monitoring workload and staffing.

Because the Sheriff does not have a centralized staffing plan that includes elements recommended by leading practices, it cannot fully understand its staffing needs or convey those needs to key stakeholders. And because the City's budget is constrained by many factors, the Sheriff must accurately convey its needs to its budget stakeholders. To further develop its staffing plan, the Sheriff must track the data it needs related to its workload and monitor the negative impacts to its operations due to staffing issues. For example, the department does not adequately track incidents such as jail lockdowns and disruptions of rehabilitative programs in the jails that occur due to staffing shortages. Furthermore, the department does not track special requests from departments, which inhibits its analysis of its staffing needs. Finally, the department has cumbersome scheduling and timekeeping practices, which create unnecessary work for payroll clerks and hinder the effective monitoring of workload and staffing in programs across the department.

As discussed in Chapter 1, although the Sheriff's workload has increased, the number of budgeted positions in the department has not. To meet this workload, some Sheriff employees work long hours, potentially risking fatigue and its associated harmful effects. To mitigate this risk, the Sheriff must implement timekeeping and scheduling systems and practices that better facilitate the department's monitoring of employees' work hours.

## Finding 2.1: The Sheriff's staffing plan is missing some key elements, preventing the department from accurately estimating and conveying its staffing needs.

The Sheriff does not have a departmental staffing plan that aligns with what the U.S. Department of Justice recommends, hindering the department from fully understanding its staffing needs and conveying those needs to city decision-makers. The Sheriff tracks departmental hiring, separations, and retirement levels, and produces an annual hiring plan. However, as shown in Exhibit 22, the department does not have a unified, master staffing plan that includes all elements recommended by the U.S. Department of Justice's National Institute of Corrections.

37 | Key Strategies Could Help the Sheriff Reduce Its Heavy Reliance on Overtime and Better Communicate Its Staffing Needs

## Exhibit 22: The Sheriff's Staff Planning Does Not Include or Only Partially Includes Key Leading Practices

| Leading Practice | Does the Sheriff Follow? (Yes/No/Partly) |
|---|---|
| **Profile Facilities:** Describe the physical, operational, and human context of the jail, including inmate population data, mission statement, floor plans, and relevant court decisions, among other things. | ✅ Yes |
| **Develop a Facility Activity Schedule:** Identify all programs, activities, support services, and security functions that take place in the facility and chart the times they occur during the period. | ❌ No |
| **Calculate Net Annual Work Hours and Relief Factor:** Collect and analyze "time off" data to determine the number of real staff hours available for scheduling. | ➖ Partly – Methodology does not align with best practices (see Exhibit 23) |
| **Develop a Staff Coverage Plan:** Identify the posts and positions that need coverage and the amount of coverage needed. | ➖ Partly – Divisions have designated posts, but the Sheriff does not have a department-wide coverage plan |
| **Develop a Schedule:** Use the staff coverage plan to develop an approach to staffing the department that efficiently meets coverage needs. | ➖ Partly – Shift schedules are defined in the Sheriff's labor agreements. However, because the department does not have a department-wide staff coverage plan, it cannot determine whether the negotiated schedules are the most efficient and effective for Sheriff operations. |

Source: Auditor analysis of Sheriff staffing planning documents and National Institute of Corrections' *Staffing Analysis Workbook for Jails*, 2001

**Profile the facilities that must be staffed.**

The Sheriff has floorplans of the facilities it secures, which show designated housing areas, watch stations, and other physical characteristics that influence staffing levels in the jails.

**Develop a Facility Activity Schedule.**

The department does not have a facility activity schedule that identifies the times all programs, activities, services, and security functions occur in the jails. Without comprehensive and accurate activity schedules, the department cannot accurately assess its workload or understand what post assignments it must fill, as discussed below.

**Calculate net annual work hours and relief factor.**

To create a valid staffing plan, a department must be able to accurately estimate the actual number of hours the staff is available to work, also known as net annual work hours. This number is used to calculate a relief factor, which is a measure of the number of FTE employees needed to work a post that is continuously covered, considering nonproductive time.

38 | Key Strategies Could Help the Sheriff Reduce Its Heavy Reliance on Overtime and Better Communicate Its Staffing Needs

Full-time employees normally work 2,088 hours per year, but are not productive during all of those hours. Leave and training take employees away from their regular duties. As shown in Exhibit 23, the relief factor is calculated by dividing total work hours by the total *productive* hours in that function. In fiscal years 2015-16 through 2017-18, deputies charged an average of 385,965 hours of nonproductive time per year, leaving 886,116 productive hours per year. A position requiring a deputy to be present 24 hours a day (such as the post to secure the front gate of County Jail 5) results in a relief factor of 6.02. This means the Sheriff must employ 6.02 FTE deputies to fully cover that position without any overtime.

### Exhibit 23: To Staff One Post 24 Hours per Day, the Sheriff Must Employ 6.02 FTE Deputies to Provide Relief for Training and Time Off

| | | | | |
|---|---|---|---|---|
| Total hours charged by deputies | | | 1,272,081 | Total hours |
| Nonproductive hours | | - | 385,965 | Nonproductive hours |
| *Amount of regular work time that is training* | | | *35,308* | |
| *Paid time off charged by deputies* | | ÷ | *327,703* | |
| *Unpaid time off charged by deputies* | | ÷ | *22,954* | |
| **Productive hours** (net annual work hours) | | = | 886,116 | **Productive hours** |
| Relief factor calculation: | Total hours charged by deputies | | 1,272,081 | Total hours |
| | Productive hours | ÷ | 886,116 | Productive Hours |
| FTEs required to cover 8 hours per day, 5 days per week accounting for employee's leave and training. | | = | **1.44*** | **Shift relief factor** (2,088 annual hours) |
| A 24-hour post is 8,760 hours of coverage (24 hours x 365 days). 8,760 annual post hours ÷ 2,088 regular shift hours | | x | 4.20* | |
| FTEs required to cover 24 hours per day, 7 days per week accounting for employee's leave and training. | | = | **6.02** | **Post relief factor** (8,760 annual hours) |

*Numbers rounded to the nearest tenth.

Source: City payroll data and net annual work hours relief factor calculation methodology from National Institute of Corrections' *Staffing Analysis Workbook for Jails,* 2001

The Sheriff's calculations for its relief factors are understated. Although the department appropriately includes unproductive time such as vacation leave, holidays, and training hours, its methodology does not fully consider sick leave or compensatory time off in the calculation of nonproductive time. It is important to include, to the extent possible, all time-off categories in relief factor calculations to yield an accurate estimate of the number of FTE employees needed to fulfill operational needs without routine overtime.

Including only some sick leave and compensatory time off in its calculation is one reason the Sheriff underestimated its relief factor. Further, the Sheriff used a single year (fiscal year 2015-16) of payroll data to calculate its relief factors. However, the National Institute of Corrections recommends using three years of data.[6] By following a more robust relief factor calculation methodology that captures additional nonproductive time and using averages based on three years of data, the Sheriff will be able to better estimate its staffing need. A comparison of the current and proposed shift relief factors for a position that must be staffed five days per week, eight hours per shift and a position requiring coverage at all times is shown in Exhibit 24.

---

[6] U.S. Department of Justice, National Institute of Corrections, *Staffing Analysis Workbook for Jails,* 2001.

39 | Key Strategies Could Help the Sheriff Reduce Its Heavy Reliance on Overtime and Better Communicate Its Staffing Needs

## Exhibit 24: The Sheriff's Current Relief Factors Are Understated

| Deputies | | | Supervisors | | |
|---|---|---|---|---|---|
| 5-Day Week, 8-Hour per Day Shift Relief Factor[a] | | | | | |
| Current[b] | Proposed[b] | Difference | Current[b] | Proposed[b] | Difference |
| 1.35 | 1.44 | 6.7% ▲ | 1.39 | 1.47 | 5.8% ▲ |
| 7-Day Week, 24-Hour per Day (Continuous) Post Relief Factor | | | | | |
| 5.67 | 6.02 | 6.2% ▲ | 5.83 | 6.16 | 5.7% ▲ |

Notes: Hours are based on an average from fiscal year 2015-16 through 2017-18 payroll data.
[a] This shift relief factor can be converted to a continuous post relief factor (the number of FTE employees needed to provide continuous coverage) by multiplying by 4.20. This calculation is shown in Exhibit 23.
[b] Numbers are rounded to the nearest hundredth.
Source: Auditor analysis of city payroll data using relief factor calculation methodology in National Institute of Corrections' *Staffing Analysis Workbook for Jails*, 2001

**Develop a staff coverage plan and schedule.** The department lacks formal guidelines for estimating its sworn staffing requirements, including identifying post assignments that need to be filled and policies for determining future staffing needs. The Sheriff does not have a centralized list of post assignments for the department. It instead tracks post assignments by facility daily or documents post assignments in legal agreements with departments for which the Sheriff provides services. Also, the Sheriff's schedules of programs and activities in the jails are incomplete and inconsistent, as further discussed in Finding 2.3. Both changes—a centralized list of post assignments and complete, consistent schedules of jail programs and activities—would give the department a more informed understanding of its staffing needs.

The Sheriff analyzes sworn staffing based primarily on current-year authorizations, minimum staffing provisions in the department's labor agreement with the Deputy Sheriffs' Association, and legal agreements with other departments. However, without an accurate relief factor, a centralized list of post assignments, or complete activity schedules, the department cannot adequately assess the true number of employees it needs.

After performing the analyses discussed above, the department should develop a report that justifies all aspects of the proposed staffing plan. The U.S. Department of Justice recommends this report contain the staffing analyses completed by the department and a narrative explanation of the implications of the analyses. As discussed in the Introduction, the City has finite resources that it must distribute among many departments that, directly or indirectly, provide important services to the public. The Sheriff must be able to demonstrate to stakeholders the importance of the critical functions and ancillary programs that the department provides and manages.

P 0056-000310

40 | Key Strategies Could Help the Sheriff Reduce Its Heavy Reliance on Overtime and Better Communicate Its Staffing Needs

## Finding 2.2: Sworn employees work excessive hours, risking fatigue and its harmful effects.

Some of the Sheriff's sworn employees work excessive hours, potentially resulting in employee fatigue. Several studies have found that long work hours increase sworn employee fatigue, and fatigue can have detrimental effects on employee health, safety, and performance.[7] For example, one study shows that disruptions of circadian rhythms due to fatigue can decrease an individual's alertness, impair performance, and worsen mood.[8] Other research demonstrates that the effects of fatigue can be similar to the effects of alcohol intoxication. After 17 to 19 hours without sleep, individuals' performance on tests was equivalent to having a blood alcohol content of 0.05 percent, typically resulting in impaired judgment and lowered alertness.[9] More seriously, 24 hours without sleep was equivalent to a blood-alcohol content of 0.10 percent, resulting in clear deterioration of reaction time and control, poor coordination, and slowed thinking.[10,11] Chronic low levels of sleep result in "sleep debt" that can cause impairments resembling intoxication.[12] In one study, people who slept only four hours per night for two weeks had similar impairments to those who stayed awake for 24 consecutive hours.[13]

> ### Correlations in King County
>
> A King County (Washington State) audit of its Sheriff's Office found that working only one additional hour of overtime per week increased the chances that a deputy would be involved in a use-of-force incident the following week by 2.7 percent and increased the odds of an ethics violation the following week by 3.1 percent. The study found that these increased likelihoods were statistically significant.
>
> Source: King County Auditor's Office, *King County Sheriff's Office Overtime: Better Strategy Could Reduce*

Exhibit 25 shows there were many instances in which Sheriff employees may have worked enough hours that their ability to perform public safety duties could have been diminished. In fiscal year 2017-18 there were 194 instances in which an employee was paid for working 180 or more hours in a two-week period, leaving an average of only 11 hours per day for sleep, commuting, errands, socializing, and all other activities.

---

[7] D. Kenney, G. Morrison, M. Reuland, B. Vila, *Evaluating the Effects of Fatigue on Police Patrol Officers,* 2000. This study was funded by the U.S. Department of Justice.

D. Kenney, G. Morrison, B. Vila, *Improving Shift Schedule and Work-Hour Policies and Practices to Increase Police Officer Performance, Health, and Safety,* 2002.

D. Lindsey, M.Ed., *Police Fatigue: An Accident Waiting to Happen,* 2007.

U.S. Department of Justice, National Institute of Justice, *Officer Work Hours, Stress and Fatigue,* 2012.

[8] D. Kenney, G. Morrison, M. Reuland, B. Vila, *Evaluating the Effects of Fatigue on Police Patrol Officers,* 2000. This study was funded by the U.S. Department of Justice.

[9] D. Kenney, G. Morrison, B. Vila, *Improving Shift Schedule and Work-Hour Policies and Practices to Increase Police Officer Performance, Health, and Safety,* 2002.

[10] Ibid.

[11] Centers for Disease Control and Prevention, National Center for Injury Prevention and Control, *Impaired Driving: Get the Facts,* revised 2019.

[12] American Sleep Association, *Sleep Debt: Signs, Symptoms, and Treatments.*

[13] Harvard Medical School, Harvard Health Publishing, *Repaying Your Sleep Debt: Why Sleep is Important to Your Health and How to Repair Sleep Deprivation Effects,* revised 2018.

41 | Key Strategies Could Help the Sheriff Reduce Its Heavy Reliance on Overtime and Better Communicate Its Staffing Needs

## Exhibit 25: Some Sheriff Employees Worked Long Hours That Can Risk Negative Effects Resembling Intoxication

**Sustained Sleep Deprivation –** Excessive work hours can lead to sustained, insufficient nightly sleep, creating a "sleep debt" equivalent to alcoholic impairment.

**24 hours awake**
or two weeks of only
**4 hours nightly sleep**
is equivalent to

**0.10%**
**blood alcohol content**

👁 Lower reaction time
✳ Poor coordination
⁇ Slowed thinking

*It is unsafe to drive with a blood alcohol content above 0.05.[a]*

In fiscal year 2017-18 there were:

**194** instances of Sheriff sworn employees

working 180+ hours in two weeks, leaving an average of only 11 hours per day for sleep, commute, socializing, and all other activities; and an estimated

**675** instances of Sheriff sworn employees

with only 1-7 hours off between shifts[b]

Notes:

[a] The National Transportation Safety Board recommends 0.05 as the legal maximum blood alcohol content for drivers.

[b] Payroll data cannot distinguish between whether these instances were an employee working 17-23 consecutive hours or working two separate shifts with 1-7 hours off in between. According to the Sheriff, it consistently complies with its policy prohibiting employees from working more than 16 consecutive hours. See Finding 2.4 for limitations of the payroll data.

Source: Auditor analysis of city payroll data from fiscal year 2017-18, leading practices from National Transportation Safety Board, Harvard Health, and Police Quarterly, "*Improving Shift Schedule and Work-Hour Policies and Practices to Increase Police Officer Performance, Health, and Safety,*" 2002

Payroll data shows 675 instances in fiscal year 2017-18 where a Sheriff employee was paid for 17 to 23 hours in one day.[14] The Sheriff's overtime policy prohibits employees from working more than 16 consecutive hours. Payroll data cannot show whether these 675 instances were an employee working 17 to 23 consecutive hours or working two separate shifts with 1 to 7 hours off in between.[15] The Sheriff states it complies with the 16-hour limit, which would indicate that the 675 instances were times when an employee had only 1 to 7 hours off between shifts.[16]  The Sheriff's policies do not require a minimum number of hours off between shifts.

The department's overtime policy also does not limit how much overtime an employee can work in a year.[17] CSA evaluated the schedule for three months for a deputy who worked approximately 1,600 hours of overtime in one year.[18] The deputy's schedules show him working:

- 36 days in a row, including nine double shifts.
- 29 days in a row, including eight double shifts.

---

[14] The Sheriff's payroll process is highly manual and vulnerable to errors (see Finding 2.4).  Some of these instances may be due to overtime hours being entered the day after they were worked.

[15] The City's payroll system counts overnight shifts as hours worked on two separate days rather than as a single shift. See Finding 2.4 for more detail on the limitations of the payroll data.

[16] Because of its manual scheduling and timekeeping processes, the Sheriff does not have data to monitor compliance with the policy prohibiting employees from working more than 16 consecutive hours, as discussed in Finding 2.4.

[17] The San Francisco Administrative Code, Section 18.13-1, generally prohibits employees from working overtime that exceeds 25 percent of their regularly scheduled hours in a fiscal year, or 520 hours for a normal FTE employee, without prior approval of the director of human resources.

[18] The schedule was for a single unit and does not include overtime shifts the deputy might have worked in other units.

42 | Key Strategies Could Help the Sheriff Reduce Its Heavy Reliance on Overtime and Better Communicate Its Staffing Needs

- 74 (81 percent) of the 91 days in the period.
- Two weeks of 104 hours per week.

As shown in Exhibit 26, 5 percent of Sheriff employees each worked an average of more than 1,280 hours of overtime in fiscal year 2017-18. In fact, the top 1 percent of overtime earners each worked an average of more than 2,087 overtime hours in the same fiscal year, virtually an entire work year of overtime.

## Exhibit 26: Half of Sheriff Employees Worked More Than 319 Hours of Overtime in Fiscal Year 2017-18



1% worked 2,087 - 3,670 hours of overtime
*On average, 80-111 total hours per week*

4% worked 1,280 - 2,087 hours of overtime
*On average, 65-79 total hours per week*

46% worked 320 - 1,279 hours of overtime
*On average, 46-65 total hours per week*

41% worked 1 - 319 hours of overtime
*To cover unscheduled leave\*, each employee would have worked an average of 319 hours of overtime.*
*On average, 40-46 total hours per week*

8% worked no overtime

\*Unscheduled leave includes all leave categories except vacation and holiday; it includes sick, jury duty, and disability.
Source: Auditor analysis of city payroll data for fiscal years 2015-16 and 2016-17 and SF Financials data for fiscal year 2017-18

Fatigue from excessive consecutive work hours or long and irregular work hours has many potential negative effects. Fatigue tends to increase irritability and fearfulness while diminishing an individual's capacity to make sound decisions, which is especially problematic in high-stress situations like those that can occur in law enforcement. A study by Washington State University found that inadequate sleep may heighten implicit racial biases among peace officers, increasing a stronger association between African-Americans and weapons.[19] Other research conducted on peace officers has found that long and irregular work hours can adversely affect eating and sleeping habits and psychological well-being, raise blood pressure, and result in stress-related disability claims. Exhibit 27 outlines the results of lack of sleep as explained in an FBI Law Enforcement Bulletin.

---

[19] James, Lois. *The Stability of Implicit Racial Bias in Police Officers,* Washington State University, 2018.

43 | Key Strategies Could Help the Sheriff Reduce Its Heavy Reliance on Overtime and Better Communicate Its Staffing Needs

**Exhibit 27: Fatigue Has High Risks for Peace Officers**



- Inability to remain alert to respond to the demands of work
- Memory impairment
- Lack of concentration
- Irritability with coworkers, family, or friends
- Lower frustration tolerance
- Accidents on the job or in the home
- Inattention
- Changes in eating and sleeping habits
- Decreased psychological well-being



- Obesity
- Hypertension
- Stress-related illness
- Changes in metabolic functions
- Alteration of hormonal functions in ways that mimic aging
- Stress-related disability claims

Source: Lindsay, *Police Fatigue: An Accident Waiting to Happen*, 2007

## Finding 2.3: The Sheriff should better track the data it needs related to its workload and the impacts of its staffing decisions.

Because it does not consistently track workload-related data, the department is less able to make efficient staffing and work planning decisions or report areas of growing workload to decision-makers. Although some workload tracking occurs in some Sheriff programs, it is often inadequate. For example, the Sheriff does not sufficiently track and analyze special requests for security from the courts. According to the Sheriff, when the courts make a special request for additional security, such as for a high-profile court case, the department maintains timesheets of the employees who worked on the special request. However, the Sheriff does not analyze the timesheet data to determine how many special requests it has received, how often they are received, or how many employees work on them. In addition, although the Criminal Investigations unit now tracks important information such as the total number of investigative cases, it can enhance its monitoring by tracking and analyzing the time investigators spend on each case.

Besides not tracking all the workload data it should, the Sheriff's analyses and reporting of electronic monitoring data is inconsistent, potentially causing the department to inaccurately estimate workload and the staffing levels needed for the electronic monitoring function. The Community Programs unit collects and analyzes data related to the number of participants, bookings, and noncompliant individuals on electronic monitoring. According to the Sheriff, deputies enter information on each individual enrolled in electronic monitoring and other community programs into the Jail Management System, which has limited data input controls.

Limited controls increase the risk that deputies input inaccurate or inconsistent information into the Jail Management System. For example, the system allows the recorded date of an individual's initial booking in the electronic monitoring program to be later than that person's recorded release date from the program. Thus, these limited controls can impede the Community Programs unit from accurate and consistent reporting of an important public safety issue. Exhibit 28 below highlights this and other examples of inadequate data tracking and analysis.

According to the U.S. Government Accountability Office, an organization should use quality information to achieve its objectives. Quality information should be, among other things, accurate, appropriate, and timely, and the organization should use this information to make informed decisions and evaluate its

P 0056-000314

44 | Key Strategies Could Help the Sheriff Reduce Its Heavy Reliance on Overtime and Better Communicate Its Staffing Needs

performance in achieving key objectives and addressing risks.[20] Adopting a data-driven decision-making process would allow the Sheriff to use indicators to further inform its staffing decisions based on demand for the department's services. By not adequately monitoring or measuring its workload, the Sheriff is less able to analyze its workload and staffing, hindering the department from justifying its staffing needs.

In 2017 the Sheriff began taking steps to analyze its staffing for court security by partnering with DataSF to quantitatively examine staffing at the courts and related budget levels.[21] The Sheriff's agreement with DataSF states that this data science project will allow the Sheriff to better project future requirements to prevent continued personnel and funding shortfalls. Based on the results of the data science project, the Sheriff plans to allocate appropriate staff in accordance with the findings.

## Exhibit 28: The Sheriff Does Not Adequately Track or Analyze Data Related to Workload or the Operational Impacts of Understaffing

| Service Area | Sheriff's Data | | Reason for Rating |
|---|---|---|---|
| | Tracking | Analysis | |
| **Lockdowns:** Occur in situations that could affect jail security and/or seriously threaten the safety of staff or prisoners | ✗ | ✗ | • Not all jail facilities track lockdowns.<br>• County Jail 4 has a log that records lockdowns, but it is incomplete. |
| **Programming Services:** Community-based programs as part of rehabilitative, religious, and reentry services for inmates | ✗ | ✗ | • No tracking of when programming services in jails are canceled.<br>• Program schedules are not adequately maintained. |
| **Court Services Special Requests:** Requests from the courts for additional security services | ✗ | ✗ | • Special requests for court-related security are not adequately tracked or analyzed. |
| **Electronic Monitoring:** Remotely supervise individuals using a device to track their location and alcohol consumption | ✓ | ✓ | • Although Community Programs unit staff tracks and analyzes electronic monitoring data, inaccurate and inconsistent reporting can lead to errors. |
| **Prisoner Legal Service Requests:** Provide legal advocacy, information, and assistance to inmates | ✓ | ✗ | • Although inmate service requests and other items are tracked, the workload database is incomplete.<br>• No analysis of trends related to inmate services requested or provided. |
| **Criminal Investigations:** Conduct criminal investigations, including violence, drug, fraud, threats to public officials, public, and sworn staff cases | ✓ | ✗ | • Although the Criminal Investigation unit tracks the number and type of investigations, the amount of time investigators spend on criminal investigations is not tracked.<br>• No analysis of trends in investigative cases, such as changes in the types of cases received. |

Source: Auditor analysis of Sheriff's workload data and interviews of staff in several Sheriff divisions and units

---

[20] U.S. Government Accountability Office, *Standards for Internal Control in the Federal Government*, 2014.
[21] DataSF is the City's open data program.

Mirkarimi001284

45 | Key Strategies Could Help the Sheriff Reduce Its Heavy Reliance on Overtime and Better Communicate Its Staffing Needs

As with workload data, the Sheriff does not adequately track or analyze the impacts of understaffing on its operations. The Programs unit in the Administration and Programs Division facilitates and oversees the delivery of programs and services that are intended to assist in rehabilitating inmates. These programs and services include in-custody educational and vocational programs, community-based programs, religious services, grief counseling, self-help groups, and post-custody transitional services that assist inmates in reintegrating with the community after incarceration.

According to Custody Operations division staff, understaffing in the jails could lead to a jail lockdown needed to ensure safe operations, which could disrupt the delivery of some programs and services for inmates. However, despite the importance of these services, the department does not track when or how often such disruptions occur due to inadequate staffing levels in the jails. Although the Sheriff's policies state that jail staff is to maintain records of jail lockdowns, the policies are silent on whether lockdown records should contain information on programs that were disrupted or cancelled due to the lockdowns. Staff of both the Custody Operations division and Community Programs unit indicated the department does not have policies or procedures that designate the responsibilities of jail or program staff to maintain information on program disruptions.

During the audit, the Sheriff asked for information related to program disruptions in 2018 from its contractors that deliver some of these services. However, the information received does not indicate why a program was disrupted or cancelled. Thus, the audit compared the Sheriff's records of lockdowns in 2018 to the information provided by the contractors to determine whether services were disrupted during the hours that a jail lockdown occurred due to a staffing shortage. The comparison found that ten scheduled parent-child visits in 2018 were cancelled on dates of jail lockdowns due to staffing shortages in County Jail 4. Although it is unclear whether these visits were cancelled due to a lockdown, it is important that the department begin tracking when rehabilitative programs and services in the jails are disrupted due to staffing challenges so it can demonstrate to stakeholders the importance of having enough employees to enable the delivery of these services.

## Finding 2.4: The Sheriff's systems and practices do not facilitate analyzing or monitoring workload or staffing data.

### The lack of a scheduling system and insufficient coordination hinder strategic planning.

The Sheriff has no practices or centralized system to allow its divisions or units to coordinate their schedules and instead relies on manual tracking of employee schedules and time worked. Further, the Sheriff's divisions set their schedules independently of one another, but often share staff. For example, a deputy who typically works eight-hour shifts at a court may work overtime at a jail. In such cases, no formal process exists for approval by or coordination with the deputy's regular supervisors to ensure they are aware of the overtime worked in another division. Instead, deputies are required only to confirm the overtime with the commander of the unit in which they will work the overtime. Also, according to management, the department expects employees signing up for overtime (not their supervisors) to ensure they comply with the department's policy that prohibits working more than 16 consecutive hours in a workday. This process could result in neither of the employee's supervisors being aware that the deputy will work more than 16 hours in a workday, a violation of Sheriff policy.

46 | Key Strategies Could Help the Sheriff Reduce Its Heavy Reliance on Overtime and Better Communicate Its Staffing Needs

As shown in the sample staff schedule in Exhibit 29, each unit in which an employee works will track, approve, and submit on paper the employee's work hours to the Payroll unit separately. This poses challenges for managing staff workload and fatigue because supervisors may be unaware of the extent of the overtime that an employee works, which could ultimately hinder strategic staffing planning across the department.

**Exhibit 29: The Time a Sheriff Employee Works in Two or More Divisions Is Tracked Separately**



Note: *RDO = Regular Day Off (employee is not regularly scheduled to work)
Source: Auditor analysis based on interviews of payroll staff, review of timesheets, and Sheriff policies and procedures

Without centralized timekeeping, the department would need to spend more time than necessary to confirm whether employees are working more hours than allowed or to determine where and how many hours an employee worked in a given period.

Compounding these challenges is the fact that the City's People & Pay system does not allow the Sheriff to accurately monitor employees' work hours when their shifts span two days. The People & Pay system, in its current configuration, shows how many hours were worked on a given day, but not whether those hours were the continuation of a shift that started the previous day or one of two separate shifts. As mentioned in Finding 2.2 and shown in Exhibit 30, if an employee works 16 consecutive hours spanning two days, the People & Pay system only captures the hours worked on each day.

47 | Key Strategies Could Help the Sheriff Reduce Its Heavy Reliance on Overtime and Better Communicate Its Staffing Needs

**Exhibit 30: The City's People & Pay System Is Not Configured to Show Staff Shifts Across Days**



Source: Auditor analysis based on city payroll data and interviews of Controller's Payroll and Personnel Services Division staff

This system limitation makes it impossible for the Sheriff to systematically monitor whether employees work excessive hours, which would help the department prevent its staff from working while fatigued.

**Timekeeping is manual, leading to inefficiencies and potential errors.**

**Exhibit 31: The Sheriff's Staff Must Process a Large Stack of Paper Timesheets Each Pay Period**



Source: CSA photo

The Sheriff lacks an electronic timekeeping system, and its manual timekeeping process requires significant staff time, is open to human error, and does not allow effective monitoring. As stated above, employees' time is tracked on paper timesheets that supervisors submit to the Payroll unit. An employee's regular work hours are tracked on a timesheet submitted by their regular work unit, but any overtime is tracked and submitted on separate timesheets by the unit where the employee worked the overtime. And because overtime is tracked on daily timesheets, an employee's name will be on multiple timesheets for one pay period, depending on the number of locations where the employee worked overtime. Exhibit 31 shows the quantity of timesheets that Payroll unit staff must process for a single pay period.

48 | Key Strategies Could Help the Sheriff Reduce Its Heavy Reliance on Overtime and Better Communicate Its Staffing Needs

This process also makes it extremely cumbersome for payroll staff to verify employees' time worked. To do so, according to the Sheriff's payroll staff, the payroll team would need to locate all the timesheets on which an employee appears in a pay period, including their regular time and overtime. Payroll staff indicated that, because this would be so laborious to do for every employee, only spot checks are performed to ensure payroll was entered correctly. Exhibit 32 illustrates how one employee's time is tracked on several sheets of paper.

### Exhibit 32: Payroll is Complicated Because Each Employee May Have Multiple Timesheets



Source: Auditor analysis based on interviews of payroll staff and Sheriff's policies and procedures

The manual timesheet process is also open to error. According to payroll staff, supervisors sometimes do not indicate on timesheets what date the overtime was worked. This can make it appear, for example, that the employee worked overtime on the day when the timesheet was submitted, rather than the day before. This creates extra work for the payroll staff and can lead to payroll errors.

While verifying employees' timesheets, the audit found an error in the Sheriff's payroll that caused an employee to be erroneously paid for eight hours of overtime. Although this error may have been an isolated incident, it might have been prevented if the Sheriff did not have a manual time entry process and was able to systematically review all timesheets to reduce the risk of human error.

49 | Key Strategies Could Help the Sheriff Reduce Its Heavy Reliance on Overtime and Better Communicate Its Staffing Needs

Compounding these problems, Sheriff employees have different work weeks based on their rotating day off. Having different work weeks that do not align with the City's work week means that employees become eligible to earn overtime on different days. This means that it is cumbersome to use payroll data to check whether overtime is charged appropriately; it requires payroll staff to check each employee's paper timesheet. According to Sheriff payroll staff, verifying payroll is extremely challenging because the People & Pay system cannot produce reports that match the Sheriff's work weeks and shifts to calculate things such as overtime compensation.

Instead, according to Sheriff staff, as they make the entries, four payroll employees must check whether the information on the hundreds of paper timesheets they are entering complies with overtime rules. This takes much more time and is more prone to human error than a process in which supervisors would enter or approve time directly in the system and payroll staff could then run reports designed to flag hours that do not comply with overtime rules.

### Other departments use systems that facilitate coordinated scheduling and generate shift-specific timekeeping data.

Other city departments, such as the Police Department and SFMTA, which have night shift staff, have scheduling and timekeeping systems that integrate with the People & Pay system. The Police Department's system centralizes timekeeping data and tracks employees' schedules, and SFMTA's system allows the agency to schedule transit operators, track hours of service, plan for relief for staff who are out, and bid out overtime shifts.

According to the U.S. Government Accountability Office, management should use quality information to achieve the entity's objectives.[22] This means that management must design a process to identify timekeeping information needed to achieve the objectives and obtain relevant data from reliable internal and external sources in a timely manner. Further, management must process the obtained data into quality information that supports the department.

As of April 2019, the Sheriff had not implemented a scheduling and timekeeping system that would track shift lengths and work hours. However, in 2018 the Sheriff began evaluating a system intended to streamline the employee scheduling and timekeeping process by allowing the department to view shift types and hours, build employee work schedules, create templates for shift rotations, and, according to staff working on the implementation, allow the department to create schedules online and no longer use paper timesheets for timekeeping. Although a significant improvement, according to Sheriff's management, because employees still start their work weeks on different days, the new system will be unable to automatically check overtime eligibility.

### Recommendations

The San Francisco Sheriff's Department should:

6. Conduct a fixed-post analysis for its jails and field operations, considering jail activity schedules and inmate needs.

7. Calculate relief factors by following the National Institute of Corrections' *Staffing Analysis Workbook for Jails.*

---

[22] *Standards for Internal Control in the Federal Government*, 2014.

Case 3:19-cv-02724-SK   Document 436-1   Filed 08/07/23   Page 321 of 350

P 0056-000320

50 | Key Strategies Could Help the Sheriff Reduce Its Heavy Reliance on Overtime and Better Communicate Its Staffing Needs

8. Implement a staffing plan for the entire department by following the National Institute of Corrections' *Staffing Analysis Workbook for Jails*.

9. Continue to monitor the gap between total work performed and budget net of attrition and incorporate strategies to address this gap into its staffing plan.

10. Implement additional controls to prevent employee fatigue, such as imposing a minimum number of hours between shifts and limiting the number of work hours in a two-week period, except in an emergency.

11. Track and analyze data related to criminal investigation caseloads and use it to inform the department's staffing plan to better monitor impacts of scheduling and staffing decisions.

12. Track and analyze all requests for additional security beyond memorandums of understanding from client departments regardless of whether the Sheriff fulfills the request. This will inform the department's staffing plan to better monitor impacts of scheduling and staffing decisions.

13. Track and analyze instances when the department could not meet minimum staffing levels indicated in its labor agreements or work order agreements in a centralized manner. This will improve the monitoring of the impacts of scheduling and staffing decisions.

14. Create and implement a standardized process for tracking lockdowns, including defined categories for each lockdown's date, time, location, cause, and other applicable information.

15. Track and analyze inmate programming and services cancelled due to lockdowns or understaffing.

16. Implement a scheduling and timekeeping system that allows the coordination of an individual employee's schedule across divisions and provides shift-level timekeeping data for strategic workload analysis and monitoring of excessive work hours.

17. Ensure any new scheduling and timekeeping system integrates with the City's central payroll system and use the system to match staffing needs and staffing availability across the department.

18. Determine what, if any, financial impact would result from moving all staff to a uniform pay period. If the financial impact is acceptable, begin using a uniform pay period by July 1, 2022.

19. To facilitate enforcement and monitoring of existing and new controls to prevent fatigue:

    a. Ensure that its new timekeeping and scheduling system provides overtime approvers access to the prior regular and overtime hours worked by deputies.

    b. Implement a policy that requires overtime approvers to review an employee's actual and planned hours worked prior to approving overtime.

51 | Key Strategies Could Help the Sheriff Reduce Its Heavy Reliance on Overtime and Better Communicate Its Staffing Needs

# Appendix: Department Response



## OFFICE OF THE SHERIFF
## CITY AND COUNTY OF SAN FRANCISCO

1 DR. CARLTON B. GOODLETT PLACE
ROOM 456, CITY HALL
SAN FRANCISCO, CALIFORNIA 94102



**VICKI L. HENNESSY**
**SHERIFF**

June 6, 2019
Reference:  2019-056

Tonia Lediju, PhD
Chief Audit Executive
Office of the Controller
City Hall, Room 316
One Dr. Carlton B Goodlett Place
San Francisco, CA 94102

Dear Dr. Lediju:

Thank you to you and your staff for investing time and thoughtful analysis in reviewing the San Francisco Sheriff's Department staffing process.

I am impressed with your interest and understanding of the challenges we face as well as the professionalism your team showed my department through many meetings and discussions.

The Office of the Controller, City Service Auditor's summary and recommendations validate the frustrations my department has experienced over the last five years. The lack of significant investment in the San Francisco Sheriff's Department Full Time Employees (FTEs), combined with increased mandates and service requests, has resulted in long-term consequences on my department's ability to serve the City and County of San Francisco.  It also has created an avalanche of overtime in lieu of permanent full-time employees.

Since becoming Sheriff in 2016, I have hired 250 sworn members and 150 civilian staff; while we make progress, we find ourselves playing a perpetual game of catch-up, covering retirements and separations that occurred nine years ago coupled with an increased workload as your report highlighted.  The Sheriff's Department has provided information to past Mayoral administrations regarding the need for increased FTEs and a higher relief factor, using the tools recommended in your report. Unfortunately, our previous requests for help have been refused.

Phone: 415 554-7225   Fax: 415 554-7050
Website: sfsheriff.com   Email: sheriff@sfgov.org

Case 3:19-cv-02724-SK   Document 436-1   Filed 08/07/23   Page 323 of 350

P 0056-000322

52 | Key Strategies Could Help the Sheriff Reduce Its Heavy Reliance on Overtime and Better Communicate Its Staffing Needs

In lieu of FTEs, we have filled staffing gaps through overtime – voluntary and involuntary – to compensate for vacancies left unfilled from 2010 through 2015. This has resulted in a department that is out of balance with overtime, which now accounts for up to 22 percent of our personnel costs when it should be no more than 10 percent.

The department's dependence on overtime has other unintended consequences which include:

- Inconsistent and unpredictable jail workforce resulting in the "substitute" teacher effect, i.e. a different deputy every day, reduces our ability to utilize the tenets of direct supervision effectively.
- When overtime runs out, as it did early in the current fiscal year, we are unable to support additional training to deputies in Crisis Intervention Training and Mental Health Disorders.
- Deputies who are consistently drafted to work overtime experience more fatigue and frustration and are more likely to call in sick or take off more time. This creates more vacant positions, which must be filled with more overtime employees, and impacts morale. We attempted to resolve this dilemma in 2017 through our "Fair Share Overtime" program which distributed overtime equally to all deputies instead of a few. The program worked well until the courts overturned Fair Share in response to the union's objection.
- Managers and supervisors on every shift, seven days per week spend much of their shift engaged in administrative work to ensure staffing for all court, hospital, and jail shifts, leaving little time to supervise.
- Administrative positions take second fiddle and therefore, critical support functions such as data collection and analysis as well as transparency goals suffer. Department priority is operations.

The Sheriff also manages and processes a huge amount of booking, jail, and civil court data. For FY 2018/19, I requested funding for three civilian staff to replace deputized staff in our IT Unit to meet the growing demand for department data. My request followed a previous CSA recommendation. The Mayor, at that time, refused my ask, which included a qualified Chief Information Officer for leadership of the unit responsible for strategic planning, day-to-day administration, and project management.

Despite no additional City FTE funding or support, SFSD IT staff forged ahead, in many cases on overtime, and at my direction to address many of the recommendations articulated in your report. These current projects include:

- New, flexible Jail Management software providing daily public reports on jail population composition and trends – a multi-year project to replace our current outdated jail management system.

Phone: 415 554-7225   Fax: 415 554-7050
Website: sfsheriff.com   Email: sheriff@sfgov.org

Mirkarimi001292

53 | Key Strategies Could Help the Sheriff Reduce Its Heavy Reliance on Overtime and Better Communicate Its Staffing Needs

- Centralized scheduling software that will integrate with the City's payroll system and will be fully tested by the end of 2020.
- Subscription service to replace all policies and procedures with fully developed, state-specific policies researched and written by public safety professionals and vetted by public safety attorneys. Department staff will monitor and redact information for public release with each new update to comply with SB 978.
- Purchase, training, and use of Body Worn Cameras to comply with security concerns and produce redacted video for public records requests and AB 748 compliance.
- Development and launch of a new, user-friendly, accessible, and transparent website. We are preparing to post our new training, policies, practices, and operating procedures online in January 2020 to comply with SB 978 "Law Enforcement Agencies: Public Records."

We are grateful that the Office of Controller, City Service Auditor is shining a light on the San Francisco Sheriff's Department's staffing challenges and hope this attention will result in additional department FTE positions, with the appropriate funding for recruitment, testing, backgrounding, hiring and training to meet public demand for our services, public records, information and transparency.

Our fundamental duty is to serve the community. The San Francisco Sheriff's Department remains committed to working with City and County of San Francisco to ensure, in words of the CSA, that we "…improve our staffing practices so we can better communicate our need for more staff to stakeholders and city decision makers." We look forward to fully realizing your recommendations and continuing our partnership with you.

Sincerely,

Vicki L. Hennessy
Sheriff

Phone: 415 554-7225  Fax: 415 554-7050
Website: sfsheriff.com  Email: sheriff@sfgov.org

Case 3:19-cv-02724-SK   Document 436-1   Filed 08/07/23   Page 325 of 350

P 0056-000324

54 | Key Strategies Could Help the Sheriff Reduce Its Heavy Reliance on Overtime and Better Communicate Its Staffing Needs

# Recommendations and Responses

For each recommendation, the responsible agency should indicate in the column labeled Agency Response whether it concurs, does not concur, or partially concurs and provide a brief explanation. If it concurs with the recommendation, it should indicate the expected implementation date and implementation plan. If the responsible agency does not concur or partially concurs, it should provide an explanation and an alternate plan of action to address the identified issue.

| Recommendation | Agency Response | CSA Use Only Status Determination* |
|---|---|---|
| The Sheriff's Department should: | | |
| 1. Evaluate staffing levels of the Community Programs unit and determine whether those levels are adequate for safe and effective oversight of the electronic monitoring function. | ☒ Concur    ☐ Do Not Concur    ☐ Partially Concur<br><br>The SFSD is consistently evaluating staffing levels in this area and others. Since the Humphrey decision, the department has increased staffing to handle the upsurge in electronic monitoring orders from the Superior Court. It is likely the requirements may change again when the federal court issues an order in the Buffin v SF Sheriff lawsuit in the next few months. | ☒ Open<br>☐ Closed<br>☐ Contested |
| 2. Identify the level of staffing needed to work in mandated functions to reduce the significant levels of overtime worked in those functions. | ☒ Concur    ☐ Do Not Concur    ☐ Partially Concur<br><br>The SFSD plans to utilize the National Institute of Corrections (NIC) worksheets in time for the FY 20/21 budget submissions. (We have used this method in the past, specifically in 2013, but our conclusions were not recognized by the then Mayor's budget office.) Please see our response to item #10. | ☒ Open<br>☐ Closed<br>☐ Contested |
| 3. Negotiate for lower compensatory time accrual caps in its labor agreements. | ☒ Concur    ☐ Do Not Concur    ☐ Partially Concur<br><br>The SFSD will be meeting with the affected unions prior to July 1, 2019, to inform them of any changes that are allowable per our newly negotiated labor contract that will meet this goal. | ☒ Open<br>☐ Closed<br>☐ Contested |

* Status Determination based on audit team's review of the agency's response and proposed corrective action.

P 0056-000325

55 | Key Strategies Could Help the Sheriff Reduce Its Heavy Reliance on Overtime and Better Communicate Its Staffing Needs

| Recommendation | Agency Response | CSA Use Only Status Determination* |
|---|---|---|
| The Sheriff's Department should: | | |
| 4. Civilianize 34 positions in Central Records and Warrants unit, Personnel unit, Community Programs unit, Information Technology and Support Services, and Fleet and Communication unit. | ☒ Concur    ☐ Do Not Concur    ☐ Partially Concur<br><br>The SFSD concurs with this plan. In the FY 18/19 budget the SFSD requested a civilian Chief Information Officer (CIO) and two IT specialists (recommended by a previous CSA report) and it was not approved by the Mayor's budget Office. In the FY 19/20 budget discussions we asked for 13 positions and were only allowed to civilianize 7 for the first year however we also will be hiring a CIO for IT. In addition to the civilian positions recommended by the CSA, the SFSD has historically not had civilian support staff in the areas of assisting our executive and command staff. We have one secretary for the entire department and our executive staff has no civilian support personnel for their administrative duties. | ☒ Open<br>☐ Closed<br>☐ Contested |
| 5. Amend its work order agreements with other departments to recover additional indirect costs associated with providing services. | ☐ Concur    ☐ Do Not Concur    ☒ Partially Concur<br><br>The SFSD recently increased our workorder request to add a 5% training fee. Since most of our client departments are general funded as we are, this may present an issue for the Mayor's Budget Office. We will be discussing this with the Mayor's Office and others for our FY 20/21 budget submission. | ☒ Open<br>☐ Closed<br>☐ Contested |
| 6. Conduct a fixed-post analysis for its jails and field operations, considering jail activity schedules and inmate needs. | ☒ Concur    ☐ Do Not Concur    ☐ Partially Concur<br><br>The SFSD has completed this in the past and will update it again using the NIC format for this purpose. In time for the FY 20/21 budget discussions. | ☒ Open<br>☐ Closed<br>☐ Contested |
| 7. Calculate relief factors by following the National Institute of Corrections' *Staffing Analysis Workbook for Jails*. | ☒ Concur    ☐ Do Not Concur    ☐ Partially Concur<br><br>See above. This audit instrument includes the calculation of appropriate relief factors (See answer to #2) In time for the FY 20/21 budget discussions. | ☒ Open<br>☐ Closed<br>☐ Contested |

\* Status Determination based on audit team's review of the agency's response and proposed corrective action.

Mirkarimi001295

56 | Key Strategies Could Help the Sheriff Reduce Its Heavy Reliance on Overtime and Better Communicate Its Staffing Needs

| Recommendation | Agency Response | CSA Use Only Status Determination* |
|---|---|---|
| The Sheriff's Department should: | | |
| 8. Implement a staffing plan for the entire department by following the National Institute of Corrections' *Staffing Analysis Workbook for Jails*. | ☒ Concur ☐ Do Not Concur ☐ Partially Concur<br><br>See above. Also included. In addition, the SFSD has purchased and been testing scheduling software for the last year to allow us more flexibility and data recovery. In time for the FY 20/21 budget discussions. | ☒ Open ☐ Closed ☐ Contested |
| 9. Continue to monitor the gap between total work performed and budget net of attrition and incorporate strategies to address this gap in its staffing plan. | ☒ Concur ☐ Do Not Concur ☐ Partially Concur<br><br>The SFSD currently looks at these figures every month and plans accordingly. The SFSD had a vacancy of 100 sworn positions at the beginning of 2016. Since then we have hired 250 sworn and 150 non-sworn personnel. We know we have an annual separation on average of 50 sworn staff per year. We continue to require funding for recruitment, testing, backgrounds, and training in order to hire sufficient FTEs to close the gap and reduce our dependence on overtime. See response to #10. | ☒ Open ☐ Closed ☐ Contested |
| 10. Implement additional controls to prevent employee fatigue, such as imposing a minimum number of hours between shifts and limiting the number of work hours in a two-week period, except in an emergency. | ☐ Concur ☐ Do Not Concur ☒ Partially Concur<br><br>The SFSD's goal is to reduce our overtime from the current 22% overtime use for all staffing to no more than 10%. This would eliminate much of the concern regarding overtime fatigue. As reported, the SFSD requires additional funding to recruit, test, background, hire and train the appropriate number of FTEs. In the meantime, the overtime policy is dependent on the provisions found in CBAs with the unions. | ☒ Open ☐ Closed ☐ Contested |
| 11. Track and analyze data related to criminal investigation caseloads and use it to inform the department's staffing plan to better monitor impacts of scheduling and staffing decisions. | ☒ Concur ☐ Do Not Concur ☐ Partially Concur<br><br>The SFSD plans to implement better tracking of caseloads in both of our investigative units in the next fiscal year. We hope to have a plan in place for this purpose July 1, 2019. | ☒ Open ☐ Closed ☐ Contested |

* Status Determination based on audit team's review of the agency's response and proposed corrective action.

57 | Key Strategies Could Help the Sheriff Reduce Its Heavy Reliance on Overtime and Better Communicate Its Staffing Needs

| Recommendation | Agency Response | CSA Use Only Status Determination* |
|---|---|---|
| The Sheriff's Department should: | | |
| 12. Track and analyze all requests for additional security beyond memorandums of understanding from client departments regardless of whether the Sheriff fulfills the request. This will inform the department's staffing plan to better monitor impacts of scheduling and staffing decisions. | ☒ Concur    ☐ Do Not Concur    ☐ Partially Concur<br><br>The SFSD generally captures these requests by asking the department seeking service to send an email. We will centralize these to keep better track by July 1, 2019. In the meantime, the SFSD purchased scheduling software last year and will be testing it in FY 19/20. We expect it to assist in all aspects of employee scheduling and provide data for analysis. | ☒ Open<br>☐ Closed<br>☐ Contested |
| 13. Track and analyze instances when the department could not meet minimum staffing levels indicated in its labor agreements or work order agreements in a centralized manner. This will improve the monitoring of the impacts of scheduling and staffing decisions. | ☒ Concur    ☐ Do Not Concur    ☐ Partially Concur<br><br>Until the scheduling software becomes universal, the department will develop and implement a centralized system for tracking the items in this recommendation as well as #14 and #15. Anticipated to have in place by July 1, 2019. | ☒ Open<br>☐ Closed<br>☐ Contested |
| 14. Create and implement a standardized process for tracking lockdowns, including defined categories for each lockdown's date, time, location, cause, and other applicable information. | ☒ Concur    ☐ Do Not Concur    ☐ Partially Concur<br><br>Please see answer to item #13. Same implementation date. | ☒ Open<br>☐ Closed<br>☐ Contested |
| 15. Track and analyze inmate programming and services cancelled due to lockdowns or understaffing. | ☒ Concur    ☐ Do Not Concur    ☐ Partially Concur<br><br>Please see answer to item #13. Same implementation date. | ☒ Open<br>☐ Closed<br>☐ Contested |
| 16. Implement a scheduling and timekeeping system that allows the coordination of an individual employee's schedule across divisions and provides shift-level timekeeping data for strategic workload analysis and monitoring of excessive work hours. | ☒ Concur    ☐ Do Not Concur    ☐ Partially Concur<br><br>The SFSD believes an increase in FTEs, as noted in our answer to #10, will alleviate this problem however the scheduling software should also assist us in gathering data to analyze and determine adjustments to our processes. We hope to have the scheduling software available for the entire department by April of 2020. | ☒ Open<br>☐ Closed<br>☐ Contested |

* Status Determination based on audit team's review of the agency's response and proposed corrective action.

58 | Key Strategies Could Help the Sheriff Reduce Its Heavy Reliance on Overtime and Better Communicate Its Staffing Needs

| Recommendation | Agency Response | CSA Use Only<br>Status Determination* |
|---|---|---|
| The Sheriff's Department should: | | |
| 17. Ensure any new scheduling and timekeeping system integrates with the City's central payroll system and use the system to match staffing needs and staffing availability across the department. | ☒ Concur ☐ Do Not Concur ☐ Partially Concur<br><br>The SFSD purchased scheduling software that will integrate with the city's Emerge payroll system. | ☒ Open<br>☐ Closed<br>☐ Contested |
| 18. Determine what, if any, financial impact would result from moving all staff to a uniform pay period. If the financial impact is acceptable, begin using a uniform pay period by July 1, 2022. | ☒ Concur ☐ Do Not Concur ☐ Partially Concur<br><br>The SFSD is analyzing the ramifications of such a move, due to some of our CBA language and hope to make this move as soon as possible, hopefully at the beginning of FY 19/20. | ☒ Open<br>☐ Closed<br>☐ Contested |
| 19. To facilitate enforcement and monitoring of existing and new controls to prevent fatigue:<br>  a. Ensure that its new timekeeping and scheduling system provides overtime approvers access to the prior regular and overtime hours worked by deputies<br>  b. Implement a policy that requires overtime approvers to review an employee's actual and planned hours worked prior to approving overtime. | ☒ Concur ☐ Do Not Concur ☐ Partially Concur<br><br>It is intended that the Aladtech scheduling software will include the capability to provide this level of oversight. The SFSD will ensure the design provides the ability to allow supervisors the ability to check schedules in order to confirm that staff work no more than 16 hours in a consecutive 24-hour period. It is anticipated this will be rolled out towards the end of FY20/21. | ☒ Open<br>☐ Closed<br>☐ Contested |

* Status Determination based on audit team's review of the agency's response and proposed corrective action.

Mirkarimi001298

P 0056-000329

8/25/22, 10:25 AM                                      Mail - President - Outlook

## Re: Staffing issue

**President** <president@sanfranciscodsa.com>

Thu 4/8/2021 6:36 PM

To: Miyamoto, Paul (SHF) <paul.miyamoto@sfgov.org>;Engler, Joseph (SHF) <joseph.engler@sfgov.org>

Cc: Isen, Carol (HRD) <carol.isen@sfgov.org>;Elsbernd, Sean (MYR) <sean.elsbernd@sfgov.org>;Carter, Tanzanika (SHF) <tanzanika.carter@sfgov.org>

Good evening Sheriff,

I am always available to meet with you.

Best regards,

Ken Lomba
SFDSA President
415-513-8973



---

**From:** Miyamoto, Paul (SHF) <paul.miyamoto@sfgov.org>
**Sent:** Wednesday, April 7, 2021 3:27 PM
**To:** President <PRESIDENT@sanfranciscodsa.com>; Engler, Joseph (SHF) <joseph.engler@sfgov.org>
**Cc:** Isen, Carol (HRD) <carol.isen@sfgov.org>; Elsbernd, Sean (MYR) <sean.elsbernd@sfgov.org>; Carter, Tanzanika (SHF) <tanzanika.carter@sfgov.org>
**Subject:** RE: Staffing issue

President Lomba,
Good afternoon and hope you are well.  I appreciate that you have shared concerns from the deputies regarding recent staffing issues and your concern this will lead to an exodus of staff to other agencies.  I respect your proposals regarding economic based solutions, and anticipate further discussion on these will involve The City.

In the meantime, we are working to address the overtime and staffing conditions created by two issues regarding the tension point between overtime hours cap and increased leave time available for staff.   It has been a struggle to balance the two, and the tension is increased by the fact that we are at the point there is much more involuntary overtime then there is voluntary.  Since the US will be out of the office the next few days, any plans or adjustments we make to alleviate these concerns will be immediately communicated to you by me.

On another note, we are long overdue for a meeting together.  I know that there has been a number of items and issues and you have been more in touch with the US and Captain McConnell, but at some point in the near future, I would like to reconnect with you and catch up.

Stay safe and be well,
PM

Paul Miyamoto
Sheriff of the City and County of San Francisco
City Hall, Room 456

Mirkarimi001299

P 0056-000330

8/25/22, 10:25 AM                                        Mail - President - Outlook

1 Carlton B. Goodlett Place
San Francisco, CA 94102
Office: 415-554-7225
www.sfsheriff.com
**Follow us on Twitter @sheriffsf** https://twitter.com/SheriffSF
**Like us on Facebook** https://www.facebook.com/SFSheriff




**SERVICE ★ PROFESSIONALISM ★ PRIDE**
Please consider the environment before printing this email

**STRICTLY CONFIDENTIAL:**
This message and any attachments are solely for the intended recipient and may contain confidential or privileged information. If you are not the intended recipient, any disclosure, copying, use or distribution of the information included in this message and any attachments is prohibited. If you have received this communication in error, please notify me by reply e-mail and immediately and permanently delete this message and any attachments. Thank you.

---

**From:** President <PRESIDENT@sanfranciscodsa.com>
**Sent:** Wednesday, April 7, 2021 8:26 AM
**To:** Miyamoto, Paul (SHF) <paul.miyamoto@sfgov.org>; Engler, Joseph (SHF) <joseph.engler@sfgov.org>
**Cc:** Isen, Carol (HRD) <carol.isen@sfgov.org>; Elsbernd, Sean (MYR) <sean.elsbernd@sfgov.org>
**Subject:** Staffing issue

      This message is from outside the City email system. Do not open links or attachments from untrusted sources.

Good morning Sheriff Miyamoto,

As you are aware of the major staffing problems the department has along with the massive mandated overtime problem, I wanted to inform you that I am hearing a mass exodus is coming.

Members are reporting to me that they are seeking employment elsewhere and members that are eligible for retirement and ones that are becoming eligible will be retiring sooner than later.

You have a lot invested into these employees with training and not only that their experience, which is valuable. We would hope you and the City would make every effort to retain them.

We are proposing a solution.  Please see attached.

Best regards,

Ken Lomba
SFDSA President
415-513-8973





# Staffing Recommendations for San Francisco Sherriff's Department – San Francisco City and County Jails

**Produced by**:
Sabot Consulting
Patrick Cowan, Consultant

**Submitted**:
April 19,2022



STAFFING RECOMMENDATIONS FOR SAN FRANCISCO SHERRIFF'S DEPARTMENT – SAN FRANCISCO CITY AND COUNTY JAILS

# Table of Contents

**Objective** .......................................................................................................... **1**
**Scope and Methodology** ................................................................................ **2**
**Analysis** ............................................................................................................. **3**
**Conclusion** ........................................................................................................ **8**

CONFIDENTIAL DRAFT

Mirkarimi001303

P 0056-000334



STAFFING RECOMMENDATIONS FOR SAN FRANCISCO SHERRIFF'S DEPARTMENT – SAN FRANCISCO CITY AND COUNTY JAILS

# Objective

The overall objective is to review the staffing recommendations completed for the San Francisco Sheriff's Department (Department) in June 2019 and determine if the current staffing is commensurate with the recommended staffing/required staffing. Additionally, to formulate recommendations on staffing based on current needs and staffing methodologies.

Mirkarimi001304

P 0056-000335



STAFFING RECOMMENDATIONS FOR SAN FRANCISCO SHERRIFF'S DEPARTMENT – SAN FRANCISCO CITY AND COUNTY JAILS

## Scope and Methodology

The scope of this document includes staffing associated with the various functions conducted the Department.

To complete this review, the following items were reviewed:

- Audit completed by the City Services Auditor dated June 19, 2019
- Supervisory Vacancy report dated February 2022
- March 2022 Staffing Report
- Various documents provided

CONFIDENTIAL DRAFT

Mirkarimi001305

P 0056-000336



STAFFING RECOMMENDATIONS FOR SAN FRANCISCO SHERRIFF'S DEPARTMENT – SAN FRANCISCO CITY AND COUNTY JAILS

# Analysis

## Gap in funded positions

The finding of the review identified several areas of concern. The first being that in Fiscal Year 2014-15 the Department utilized 14 percent overtime to complete its necessary functions and had a gap of approximately 83 fulltime employees (FTE). However, by fiscal year 2017-18, the utilizing 20 percent overtime to complete its necessary functions and had a gap of 238 FTEs, as well as a reduction of FTE positions from 1056 in fiscal year 2016-17 to 1,001 in 2017-18. It was also identified, the amount of overtime worked by deputies increased by 26,287 hours in the last six months of 2018 compared to the first six months of 2018.

This gap amounted to 479,808 hours of work (238 multiplied by 168 hours multiplied by twelve months). It is assumed this gap has grown even more with the reduction of deputies from fiscal year 2017-18 to fiscal year 2021-2022. As the gap continues to grow, the amount of overtime incurred by the deputies continues to grow and the amount of compensatory time accrued will also continue to grow (see further explanation below). Therefore, creating an unfunded liability as leave is used or cashed out.

The auditor identified the Department had a shortfall of 176 FTE employees and indicated the Department may not necessarily require all 176 deputies and some overtime can be utilized to fill the shortfall of staff. The auditor did identify some functions could be made more efficient through employing better practices; however, the core functions such as security have less ability to create cost efficient savings.

## Discussion:

The problem associated with the lack of resources, e.g., deputies, the necessary and essential functions must be completed with the use of overtime. This can become problematic since the deputies would be required to work overtime by being forced over or to work on the regular days off. According to the March 2022, Staffing Report, the department has 126 Deputy Sheriff vacancies and 17 Senior Deputy Sheriff vacancies (the number is not account for the 28 position overages identified in various functions which are subtracted from vacancies in other areas). Of these vacancies, 94 are associated with custody operations, Additionally, there are five Sheriff's Sergeant vacancies and five Sheriff's Lieutenant vacancies, which can create more vacancies as promotions deplete the deputy pool as individuals promote up the chain of command.

## Electronic Monitoring

One of the main issues identified by the audit was the lack of staffing to complete the function of electronic monitoring. According to the audit, the program grew by 355 percent and the number of participants grew by 274 percent. However, the staffing remained the static, as the Department reduced assigned staff and increased overtime.

## Discussion:



STAFFING RECOMMENDATIONS FOR SAN FRANCISCO SHERRIFF'S DEPARTMENT – SAN FRANCISCO CITY AND COUNTY JAILS

It is foreseen this function has increased due to bail reform and this function/operation be fully funded and the use of overtime to augment this function be eliminated as a regular occurrence.

**Public Health**

Another item (finding 1.2.2) identified was the staffing required for Public Health. The audit identified the staffing increased by 28 percent, from fiscal year 2014-15 to 2017-18. However, the overtime increased from 16.4 percent to 31.9 percent. According to the report, 800 hours of overtime were worked per assigned employee to provide coverage in fiscal year 2017-18. Public Health currently has six vacancies.

**Discussion:**

As an example, if there are 83 deputies assigned to complete this function, with the overtime incurred, this function required an additional 31.9 FTEs in fiscal year 2017-18. It is assumed public health has become even more burdensome due to Covid 19, driving even more overtime in this function. In fiscal year 2017-18, the public health function required 115.2 FTEs.

**Use of Overtime**

According to finding 1.3 the Department relies extensively on overtime to fill vacancies which occur due to taking sick leave. Additionally, in the jails, overtime increased by 61 percent from fiscal year 2014-15 to 2017-18, even though the inmate population remained steady. According to the Department's management more deputies were being reassigned to the Field Operations Division and Administrative and Programs Division due to an increase in workload. This resulted in a 10.5 FTEs reduction while the inmate population increased by 36. It was also identified that in the same time period, the number of regular assigned staff was reduced by 12 percent (from 384.4 to 337.6 FTEs).

Additionally, the Department utilized a significant amount of overtime to provide coverage for the courts. In fiscal year 2014-15, the Department utilized 21 percent in overtime for court coverage. In fiscal year 2017-18, the Department utilized 20 percent. This was an aggregate of 16 FTEs. Court Services currently has 19 deputy vacancies.

**Discussion:**

The Department identify all current vacant positions and conduct active recruitment to fill those positions. As noted from the discussion above, the Department has a gap of deputies who perform daily essential functions and utilizes overtime to fulfill those duties.

In reviewing the documentation provided, the Department currently has 665 deputies and a Departmental total staffing authorization of 1,008, down from 1,056 in fiscal year 2017-18. This is a reduction of 48 staff for the Department.

According to the March 2022 Staffing Report, the department reports it has 143 vacant deputy positions. However, since the Department subtracts position overages conducting



STAFFING RECOMMENDATIONS FOR SAN FRANCISCO SHERIFF'S DEPARTMENT – SAN
FRANCISCO CITY AND COUNTY JAILS

unbudgeted activities from its vacancies, the actual vacancies are under reported. There
are actually 171 vacant deputy positions. Below is a list of unbudgeted positions:

- Sheriff's Administration, budgeted one deputy, staff three deputies
- Backgrounds / Jail Clearance, budgeted four deputies, staffed seven deputies
- Criminal Investigations Unit, budgeted two deputies, staffed five deputies
- Personnel, budgeted three deputies, staffed four deputies
- Recruitment, budgeted zero deputies, staffed one deputy
- Custody Support, budgeted zero deputies, staffed two deputies
- Field Services Support Unit, budgeted one deputy, staffed nine deputies
- Canine Unit, budgeted one deputy, staffed four deputies
- CARC, budgeted zero deputies, staffed one deputy
- APD, budgeted zero deputies, staffed one deputy
- Planning and Projects Support Staff, budgeted zero deputies, staffed one deputy
- Communications, budgeted one deputy, staffed two deputies

The Department has lost five deputies due to medical issues over the past two years. It
cannot be concluded if these deaths were directly related to being overworked due to the
mandates of overtime and the stress of the job. However, it would appear not funding all
functions correctly, such as electronic monitoring, public health, jail operations, and court
coverage.

It would be surmised public health coverage would have increased in 2020 to current year
due to the rise in Covid 19 positive cases in the jail system, not include is the rise in sick
leave coverage for deputies who have either tested positive for Covid 19 or become ill
with Covid 19. Thereby creating a larger burden on the workforce.

The reduction or elimination of regular days off due to significant events such
demonstrations, elevated security needs, or sporting events, can have a significant
impact on the workforce. In doing so, it requires the Department to shift resources,
require overtime, or backfill utilizing overtime for redirected deputies. It is recommended
the Department explore other options for such events, such as voluntary overtime and
mutual aid agreements with other agencies within the area.

**Mental Health and Security**

Based on the findings from the Grand Jury, the Department has experienced a high rate
of inmates who have mental health concerns. Additionally, closing the CJ 4 High
Security High Security Jail has impacted the Department's ability to house maximum
security inmates safely. These inmates were subsequently distributed to San Bruno CJ
3, 425 7th Street CJ 2, which were not built to house such a population. CJ 2 was initially
built to house minimum to medium custody inmates in a dorm setting. Such a setting is
not secure for housing maximum security inmates. Additionally, such a setting is not
conducive housing inmates with mental health issues.

**Discussion:**

P 0056-000339



STAFFING RECOMMENDATIONS FOR SAN FRANCISCO SHERRIFF'S DEPARTMENT – SAN FRANCISCO CITY AND COUNTY JAILS

The Department needs to assess the needs of the inmate population and provide adequate housing for those inmates in keeping with the custody level and security needs, as well as mental health status. In doing so, it would increase security and provide for staff safety.

**Twelve-Hour Shifts**

The Department currently operates one jail facility utilizing 12-hour shifts, which is currently under review. The argument being that 12-hour shifts at one facility may not align with the other two jail facilities, which are currently on 8-hour shifts. The 12-hour shifts do allow staff extended time off, three days one week and four days the next week, which historically reduces the amount of sick leave being utilized by those staff members. Of the staff surveyed, it appears they do not want to go back to an 8-hour shift. In their comments, they sight work life balance and the cost of commuting to and from work, as well as bridge toll and parking.

**Discussion:**

Shifting all jail facilities to 12-hour shifts would provide cohesion between the jail facilities and better align those facilities. Twelve-hour shifts have been identified as being beneficial to the operations of facilities. The benefits being increased time off, reduced commuting costs and parking costs for the employee, reduction in the use of sick leave, and overall better work cohesion, since there are only two shifts versus three shifts. The other benefit is reduced costs by maximizing staffing and therefore reducing the number of staff required to operate the facility.

So, by keeping and expanding the use of 12-hour shifts in the jails the result would be greater efficiencies and a reduction in the number of staff required to complete the same functions. However, it was noted the program currently in place is not fully staffed and individuals liked the program if it were staffed fully, and overtime were not used to fill the vacant positions (based on survey responses dated April 2022).

Example of posts for 12-hour shifts versus 8-hour shifts:

| 8 Hour Shifts | | | | | |
|---|---|---|---|---|---|
| Five Day a Week Post | | | Seven Day a Week Post | | |
| Hours | 1800 | 1.00 | Hours | 1800 | 1.00 |
| Vacation | 112 | 0.06 | RDO | 832 | 0.46 |
| Sick | 96 | 0.05 | Vacation | 112 | 0.06 |
| Holiday | 80 | 0.04 | Sick | 96 | 0.05 |
| Total | | 1.16 | Holiday | 80 | 0.04 |
| | | | Total | | 1.62 |
| | | | 24 Hours | | 4.87 |

Norbert 3:19-cv-02724 SK

Mirkarimi001309

P 0056-000340



STAFFING RECOMMENDATIONS FOR SAN FRANCISCO SHERRIFF'S DEPARTMENT – SAN FRANCISCO CITY AND COUNTY JAILS

| Annual Coverage Hours | Number of Hours in a Shift | Hours Worked | One Shift with Relief | 24 Hour Coverage |
|---|---|---|---|---|
| 2,920 Hours (8 hours times 365 days) | 8 | 1,800 | 1.62 | 4.87 |
| 4,380 Hours (12 times 365 days) | 12 | 1,800 | 2.43 | 4.87 |

Based on the above model, the relief factors do not change, however, there are efficiencies which are gained using 12-hour shifts. These efficiencies include a reduction of the use of sick leave, the reduction of requests for time off, and the ability to reduce some overlap coverages that impact operations. Such as, during the evening watch, often staffing is predicated on activities which occur early in the shift and are curtailed by 1800 hours. The staffing associated with those activities remain on shift until 2200 hours, therefore costing the Department four hours of straight time for activities and coverage no longer required.

Norbert 3:19-cv-02724 SK

Mirkarimi001310

P 0056-000341



STAFFING RECOMMENDATIONS FOR SAN FRANCISCO SHERRIFF'S DEPARTMENT – SAN FRANCISCO CITY AND COUNTY JAILS

# Conclusion

The Department has and continues to under hire deputies, according to the documentation provided by the Department, from 2019 to 2022, a total of 80 deputies were hired, 105 deputies retired and 65 deputies resigned. Therefore, the Department experienced a deficit of 90 deputies in those years.

Based on the last report provided, the Department has 171 deputy vacancies and based on the number of hires in 2022, the current recruitment and hires are not keeping pace with the number of deputies being lost. Since the Department has been in a deficit in hiring, it would take a large and expansive recruitment effort make the Department whole. Adding to the vacancies, there are five Sheriff's Sergeant vacancies and five Sheriff's Lieutenant vacancies, which will create more vacancies as promotions deplete the deputy pool as individuals promote up the chain of command.

In order to entice new hires, the Department should pursue a strategy of hiring above minimum for those who have relevant experience, to include veterans who have been honorably discharged. By hiring above minimum, for lateral transfers and veterans, an inducement could be created for an area that has a high cost of living.

The Department currently has 59 deputies and 5 senior deputies out on leave longer than 90 days. This large number of deputies on leave creates even a bigger issue since other deputies must work overtime to cover behind those which are on leave due injury or vaccination status. Since overtime was the prevailing theme revealed in the 2018 audit, it would appear to still be the current theme. The recommendation at that time was to establish better recruitment and fill vacancies, as well as establish a true budgetary number for staffed positions. Thereby, not relying on overtime to operate on a daily basis. It was determined the deputies worked more than 44,000 hours of overtime in the first six months of fiscal year 2018-19. This equates to approximately 43.65 FTEs.

The one item not discussed above was the accumulation and use compensatory time off (CTO). In reviewing the overtime report for the first six months of fiscal year 2018-19, it was concluded 23 percent of the excess hours worked by staff who chose to accrue CTO. If this trend holds true, it would appear the Department would realize an increase in overtime funding if the Department terminated the accrual of CTO. This would result in a significant increase in its overtime budget. As indicated above, the deputies worked more than 44,000 hours of overtime in the first six months of that fiscal year.

As identified above, the Department relies heavily on the use of overtime to fund its operation. However, the Department has reduced its budget due to a reallocation in funding. To continue to meet the needs of the community for public safety and provide adequate staffing in the Department, the City of San Francisco needs to fund the Department fully and staff all its operations.

P 0056-000342



STAFFING RECOMMENDATIONS FOR SAN FRANCISCO SHERRIFF'S DEPARTMENT – SAN FRANCISCO CITY AND COUNTY JAILS

The second item of keeping or expanding the 12-hour shifts appears is more difficult to explain since coverage for a seven day a week post is equal for both 12-hour shifts and 8-hour shifts (as detailed above). However, the use of 12-hour shifts creates efficiencies, such as better watch continuity (since there are only two shifts versus three shifts), reduction in sick leave or other leave have been experienced, reduction in costs associated with commuting/parking, reduction in staffing at facilities through better efficiencies, and better work/life balance.

Some of the efficiencies that can be created by reduction of staff which are not required after certain hours of the day or during times of reduced programs for inmates. For instance, the evening watch is usually staffed for operations which occur at the beginning of the shift. However, when those activities cease, the staff remain on the shift until the end of their watch. Thereby creating dead time for those staff. In a 12-hour shift scenario, these staff would be on duty only during the time of the most activity and would come off shift when these activities terminate for the day. These activities can include exercise yard, medical appointments, visiting, etc. Therefore, if the 12-hour shifts were maintained and even expanded, the Department would realize a better use of its resources and will be able cross cover between jail facilities, allowing the program to be more efficient.

P 0056-000343



STAFFING RECOMMENDATIONS FOR SAN FRANCISCO SHERRIFF'S DEPARTMENT – SAN FRANCISCO CITY AND COUNTY JAILS

## Signature

Submitted on behalf of Sabot Technologies, Inc. dba Sabot Consulting to the San Francisco Deputy Sherriff's Association.

| | |
|---|---|
| _____ | ____6/3/2022____ |
| Patrick Cowan | Date |
| Consultant | |
| Sabot Consulting | |

Mirkarimi001313

P 0056-000344



# Staffing Vacancy Review for San Francisco Sherriff's Department – San Francisco City and County Jails

**Produced by**:
Sabot Consulting
Patrick Cowan, Consultant

**Submitted**:
July 19, 2022

P 0056-000345

 STAFFING VACANCY REVIEW FOR SAN FRANCISCO SHERRIFF'S DEPARTMENT – SAN FRANCISCO CITY AND COUNTY JAILS

# Table of Contents

**Analysis** _____ **1**

Mirkarimi001315

P 0056-000346



STAFFING RECOMMENDATIONS FOR SAN FRANCISCO SHERRIFF'S DEPARTMENT – SAN FRANCISCO CITY AND COUNTY JAILS

## Analysis

According to the June 2022 Staffing Report, the department reports it has 179 vacant deputy positions. The department also reported two vacant sergeant positions and one lieutenant position. However, since the Department subtracts position overages conducting unbudgeted activities from its vacancies, the actual vacancies are under reported. See below:

Deputies/Senior Deputies

| Position | Budgeted Deputy | Staffed Deputy | Budgeted Senior Deputy | Staffed Senior Deputy | Vacancy/Overage |
|---|---|---|---|---|---|
| Administration | 1 | 2 | 2 | 0 | -1 |
| Backgrounds / Jail Clearance | 4 | 4 | 1 | 0 | -1 |
| Criminal Investigations | 2 | 3 | 2 | 0 | -1 |
| Personnel | 3 | 4 | | | 1 |
| Recruitment | 0 | 1 | | | 1 |
| Custody Support | 0 | 1 | | | 1 |
| Canine Unit | 1 | 4 | 1 | 0 | 2 |
| HSA | 0 | 1 | | | 1 |
| Communications | 1 | 2 | | | 1 |
| APD | 0 | 1 | | | 1 |
| CARC | 0 | 1 | | | 1 |
| Total | 12 | 24 | 6 | 0 | 6 |

Based on the above chart, there are six unbudgeted deputy positions. This is based on deputy positions and senior deputy positions. If you break the unbudgeted positions down by classification. The deputy positions actually have 12 unbudgeted positions, which would increase the vacancy total to 171 deputies, versus 159 deputies. The 20 senior deputy vacancies is accurate. See below.

Norbert 3:19-cv-02724 SK

Mirkarimi001316

P 0056-000347



STAFFING RECOMMENDATIONS FOR SAN FRANCISCO SHERRIFF'S DEPARTMENT – SAN FRANCISCO CITY AND COUNTY JAILS

Sergeants/Lieutenants

| Position | Budgeted Sergeant | Staffed Sergeant | Budgeted Lieutenant | Staffed Lieutenant | Vacancy/Overage |
|---|---|---|---|---|---|
| Internal Affairs | 3 | 6 | | | 3 |
| Backgrounds / Jail Clearance | 0 | 2 | | | 2 |
| Community Programs | 0 | 0 | 1 | 2 | 1 |
| Criminal Investigations | 0 | 2 | 1 | 1 | 2 |
| Classifications | 1 | 3 | 1 | 1 | 2 |
| Dept of Emergency Mgt | 1 | 2 | 1 | 0 | 0 |
| Sheriff's Patrol Unit | 3 | 3 | 3 | 5 | 2 |
| Planning & Projects Support Staff | 0 | 1 | 0 | 2 | 3 |
| Technical Service | 1 | 2 | 1 | 1 | 2 |
| Total | 9 | 21 | 8 | 12 | 16 |

Based on the above chart, there are 12 unbudgeted sergeant positions and four unbudgeted lieutenant positions. Without reviewing actual appointments, it cannot be determined how these unbudgeted positions are actually effecting the deputy vacancies. However, it could be concluded the 16 unbudgeted positions could be causing additional vacancies in the deputy ranks. This is based on deputies being "bumped up" to fill sergeant vacancies and sergeants being "bumped up" to fill lieutenant vacancies.

Based on the review of the information provided, it can be concluded the 179 deputy vacancies are actually 185 deputy vacancies when you count the unbudgeted activities. This not account for the 16 deputy vacancies created when sergeants and lieutenants are filling unbudgeted positions. It could be surmised there are 201 deputy vacancies for the Department as of June 2022.

P 0056-000348



STAFFING RECOMMENDATIONS FOR SAN FRANCISCO SHERRIFF'S DEPARTMENT – SAN FRANCISCO CITY AND COUNTY JAILS

| RANK | TITLE | CURRENT SWORN | AUTHORIZED SWORN | AVAILABLE POSITIONS |
|------|-------|---------------|------------------|---------------------|
| *8304* | *Deputy Sheriff* | *606* | *765* | *159* |
| *8306* | *Senior Deputy* | *23* | *43* | *20* |
| *8308* | *Sheriff's Sergeant* | *71* | *73* | *2* |
| *8310* | *Sheriff's Lieutenant* | *34* | *35* | *1* |

Norbert 3:19-cv-02724 SK

Mirkarimi001318

P 0056-000349



STAFFING RECOMMENDATIONS FOR SAN FRANCISCO SHERRIFF'S DEPARTMENT – SAN FRANCISCO CITY AND COUNTY JAILS

## Signature

Submitted on behalf of Sabot Technologies, Inc. dba Sabot Consulting to the San Francisco Deputy Sherriff's Association.

_____

Patrick Cowan
Consultant
Sabot Consulting

7/19/2022
Date

Mirkarimi001319