# Exhibit 1

DAVID P. MASTAGNI
JOHN R. HOLSTEDT
CRAIG E. JOHNSEN
BRIAN A. DIXON
STEVEN W. WELTY
STUART C. WOO
DAVID E. MASTAGNI
RICHARD J. ROMANSKI
PHILLIP R.A. MASTAGNI
KATHLEEN N. MASTAGNI STORM
SEAN D. HOWELL
WILLIAM P. CREGER
SEAN D. CURRIN
DANIEL L. OSIER
KENNETH E. BACON
GRANT A. WINTER
JOSHUA A. OLANDER
HOWARD A. LIBERMAN
ZEBULON J. DAVIS
DOUGLAS T. GREEN
MELISSA M. THOM
JASON M. EWERT
JONATHAN D. CHAR



**MASTAGNI ☰ HOLSTEDT**

*A Professional Corporation*

Sacramento Office
1912 I Street
Sacramento, CA
95811
(916) 446-4692
Fax (916) 447-4614
Tax ID #94-2678460

Rancho Cucamonga Office
(909) 477-8920

Chico: (530) 895-3836
San Jose: (408) 292-4802
Stockton: (209) 948-6158
Los Angeles: (213) 640-3529

BRETT D. BEYLER
VANESSA A. MUNOS
KIMBERLY A. VELAZQUEZ
JOSEPH A. HOFFMANN
MICHAEL P. R. REED
JOEL M. WEINSTEIN
TAYLOR DAVIES-MAHAFFEY
SAMUEL S. SIAVOSHI
CARLY M. MORAN
CLARISSA MEDRANO
CHRISTOPHER J. WALSH
BYRON G. DANELL
DAVID E. SNAPP
MONTANA MASSONE
GARRETT PORTER
WILLIAM C. BAIRD
JEDEDIAH J. PARR
STEVEN N. WELCH
JAMES MCKAY
BRIAN GABRIEL
DAVID WITKIN
FRANK A. TERRERI
ROBERT C. ECKI.

*All Correspondence to Sacramento Office*
www.mastagni.com

August 8, 2022

***Via Electronic & U.S. Mail***

Paul Miyamoto, Sheriff
San Francisco Sheriffs' Department
City Hall, Room 456
1 Drive Carlton B. Goodlett Place
San Francisco, California 94102
Email: paul.miyamoto@sfgov.org

> Re:   **Demand to Cease and Desist in Implementing the Crow's Nest Pilot Program, to Restore *Status Quo Ante,* and Demand to Meet and Confer over Implementation and Effects**
> **Our File No.: RET/22-0122**

Dear Sheriff Miyamoto:

This letter is on behalf of the San Francisco Deputy Sheriffs' Association ("DSA") and serves as a demand that the San Francisco Sheriff's Office ("SFSO") cease and desist in the implementation of the Crow's Nest Staffing Pilot Project, a plan designed to reduce staffing at County Jail #3. The SFSO violated the Meyers-Milias-Brown Act ("MMBA") by unilaterally changing matters within the scope of representation and thereby violating its duty to bargain under Government Code § 3505. Demand is herein made that the SFSO cease and desist in its unlawful behavior, restore the status quo ante, and give the DSA notice and the opportunity to bargain over changes to matters within the scope of representation.

## I.    <u>Background</u>

In or around June 2022, you implemented the Crow's Nest Pilot Program without notice and without providing information exclusively to the DSA. In fact, the DSA president was first informed of the change by concerned DSA members. According to your office, the Crow's Nest Pilot Program aims to reduce the number of required staffing positions at County Jail #3. The policy seeks to remove deputies from the pod and stations one deputy in the "Crow's Nest," where said deputy is to conduct safety checks from said spot. Without meeting and conferring with the DSA, you implemented this new policy under the guise of easing staffing challenges and increasing inmate and deputy safety. This purpose, however, is misguided as your policy adversely impacts the working conditions of your deputies, and in addition, you changed the status quo without meeting and conferring with the DSA.

////

DK to Sheriff Miyamoto re Crow's Nest Pilot Program
August 8, 2022
Page 2

## II.    Pilot Program Effects and Impacts on Working Conditions

Staffing deputies in the Crow's Nest creates the following adverse issues:

1. A lack of visibility of inmates from the Crow's Nest Position, thereby increasing potential danger to inmates and in turn potentially increasing the risk exposure to deputies faced with dealing with the aftermath of failed inmate safety checks;
    o Your policy itself notes this downfall of the Crow's Nest position.
    o How is the Crow's Nest a position of "command and control" when visibility is limited?

2. Half as many opportunities to perform safety checks to confirm whether inmates are breathing, which is impossible to do from the Crow's Nest;

3. Slower response times to emergencies, such as heart attacks, seizures, attempted suicides, and fight outbreaks;
    o What happens if an emergency arises and there's only a Crow's Nest deputy available? What happens if the lack of visibility from the Crow's Nest position hinders the Crow Nest deputy's ability to timely respond? Three deputies in a pod allows for quicker response times, rather than primarily relying on radio communications for movement deputies.

4. Fewer sworn staff available to respond to emergencies in the common areas of the pods, as indicated in the Pilot Project Proposal;

5. Less walking time for inmates, which will lead to more inmate aggression, outbursts, medical needs, and hospital runs (again, in turn increasing the potential risk to deputies who manage these inmates); and

6. Fewer deputies available to respond to Emergency Response calls via radio to efficiently lock down inmates.

Each of these impacts creates a dangerous environment for both the deputies and the inmates. The unilateral change generates a greater risk of civil liability, employee discipline, and injury to the deputies and inmates. Therefore, reduced staffing adversely affects deputy working conditions and you are subject to meet-and-confer requirements. (Gov. Code § 3505; *Claremont Police Officers Assn. v. City of Claremont* (2006) 39 Cal.4th 623, 631.)

## III.    The Sheriffs' Office Unilateral Change Constitutes an Unfair Labor Practice

The SFSO's unilateral decision to implement the Crow's Nest Staffing Pilot Project violates the MMBA. The MMBA requires the SFSO to meet and confer in good faith with the DSA before implementing any change in policy or past practice altering working conditions. (Gov. Code § 3505; *Building Material & Construction Teamster's Union v. Farrell* (1986) 41 Cal.3d 651, 658.) Government Code § 3504.5 requires the SFSO to provide advanced written notice to each recognized employee organization of any proposed changes "relating to matters within the scope of representation."

////

P 0068-000003

DK to Sheriff Miyamoto re Crow's Nest Pilot Program
August 8, 2022
Page 3

The "scope of representation" includes "all matters relating to employment conditions and employer-employee relations, including, but not limited to, wages, hours, and other terms and conditions of employment." (Gov. Code § 3505.) The Supreme Court of California has long established that staffing changes which affect workplace safety is a mandatory subject of bargaining because it is directly related to conditions of employment. (*Fire Fighters Union v. City of Vallejo*, (1974) 12 Cal. 3d 608, 622.)

### IV.    Conclusion: Cease and Desist, Maintain Status Quo Ante, and Meet & Confer

The DSA believes the Crow's Nest program is subject to bargaining. As such, the DSA demands that the SFSO cease and desist in its continuing violation of the duty to bargain regarding the Crow's Nest Pilot Program implementation, retract its unilateral implementation, and restore the *status quo ante* until the parties have exhausted the meet and confer process.

The DSA further requests that the SFSO contact myself or DSA President Ken Lomba to meet and confer over this change.

Please contact me at (916) 212-0775 or dkoontz@mastagni.com if you have any questions or concerns.

Sincerely,

**MASTAGNI HOLSTEDT, A.P.C.**

DAN L. KOONTZ
Labor Relations Consultant

cc:    Ken Lomba, President SFDSA
       Sean Howell, SFDSA Attorney
       Joseph Engler, Undersheriff

DK/saw

Mirkarimi001291

P 0068-000004

## Background Investigative Services

President <president@sanfranciscodsa.com>

Tue 8/23/2022 1:01 PM

To: Miyamoto, Paul (SHF) <paul.miyamoto@sfgov.org>;Engler, Joseph (SHF)
<joseph.engler@sfgov.org>;Carter, Tanzanika (SHF) <tanzanika.carter@sfgov.org>;Scalercio, Frank (SHF)
<frank.scalercio@sfgov.org>

Cc: Sean D. Howell <showell@mastagni.com>;Dan L. Koontz <dkoontz@mastagni.com>;Frank A. Terreri
<fterreri@mastagni.com>

Sheriff Miyamoto & Undersheriff Engler,

Good afternoon,

The SFDSA has brought up on many occasions issues with recruiting and hiring.  We had done a lengthy
research in 2018/19 and found that a bottle neck in the SFSO hiring was background investigation due to
the excessive length of time to complete it, thus losing candidates to other agencies.

We have suggested several times that the department outsource to companies that specialize in
background investigations for law enforcement to assist the SFSO to expedite the process.  We also went
as far as suggesting a firm that was used by other law enforcement agencies and the SFSO has not
responded.

With staffing getting lower every day, we don't believe the department is taking the necessary steps to
aggressively hire and staff the Sheriff's Office.  We have conducted some research and have found that
other SF City & County Departments have in fact outsourced back ground investigations to expedite
there hiring process.

We have attached some of the documentations that support that.

We don't understand how other CCSF departments seem to be more efficient in their hiring and
recruitment process than the SFSO.

We are providing this information, so you can get the SFSO up to speed with hiring and recruiting.


Best regards,

Ken Lomba
SFDSA President
415-513-8973




# San Francisco Sheriff's Office
# Recruitment/Hiring Briefing Sheet

## Summary

The following information outlines the strategies, tactics, and results of the SFSO recruitment efforts for FY 2022-2023.  The Administrative and Programs Division is responsible for the production of a separate, comprehensive Hiring Plan that will include much of the information in this briefing sheet.  This briefing sheet is a living document that will be periodically updated to provide recipients with the most recent information and data regarding our efforts, and any changes in our strategies in response to the effectiveness of our outreach methods.

## Recruitment Strategies

Goals:

1) Intentional targeted audience to maximize pool of qualified applicants.
2) Community presence and engagement to target specific regional communities and neighborhoods to maximize pool of local applicants
3) Partnerships with military branches to target specific experience and background of service
4) Use of social media tactics to maximize our engagement and build our list of followers to target qualified applicants out of the immediate region.

Tactics and rationale:

*Effectively Embrace SFSO's Social Media Presence*
- Create content that promotes the SFSO to attract the type of person we want to hire.
- Use the most-effective platform for our target audience. Every community is different from where people gravitate to keep connected with their law enforcement and public safety agencies.
- According to an article from Yello, more than half of Generation Z candidates won't even apply if they think the company's recruiting methods are outdated.

*Connect With Applicants on a New Level*
- Use the correct marketing to target suitable candidates
- Show what makes our organization different from the others and what benefits we offer
- Mention your agency's appropriate and relevant benefits.  Different age groups will want and expect different things.

*Be A Great Resource (Even If They Are Applying Somewhere Else)*
- Create a positive experience.  The more assistance and help given to someone looking to get into the law enforcement profession, the more inclined they are to gravitate towards our agency.
- Answer those questions from people who may not even be applying with us. Show we care about the profession so much that we want to make sure anyone wanting to join it has a great impression of us. This will show the professionalism our organization maintains.

- Create a downloadable infographic with some helpful tips for passing the physical agility exam or motivational quotes from Deputies. Our star, name, and social media handles will constantly be in their sight and on their mind. This might steer people back to complete an application with us.

References**:**

TOC Public Relations: *Top Three Law Enforcement Recruitment Strategies* Jan 28, 2022

*You can go beyond the seldom-seen PDF article posted on your website or a professionally produced video or radio commercial. You need to relate, entertain, and inform your potential candidates to get them to gravitate to your agency. In our social media classes, we show students how to connect with others by being "real and transparent." We may show you how to have officers who are not intimidated by being on camera make amazing, yet simple and quick, videos to showcase your agency.*

*Using our previously mentioned police officer, a middle-aged mother, picture this; a live (or pre-recorded) Instagram video where this officer is sitting in their patrol car after having just finished a call involving a child who didn't want to go to school (yes, people call the police all the time to fill in as the disciplinarian). In the video, she can speak about using her skills as not only a police officer but a mother to help another parent out. This can resonate with those candidates and might get the ideal one to think to herself, "I can still be a mom, help my community, and enjoy a great career."*

*It would help if you also considered nowadays that today's applicants want to know that they'll be able to use their creativity and skill sets to further the agency's mission. Gone are the days of shutting down new ideas from a young officer or telling them they need to get some experience under their belt before offering a different way of doing something. While there is a little truth to this, shame on those, who don't embrace new ideas from newer officers. It's always amazing to watch an agency bypass the talent they have among their ranks to seek answers elsewhere.*

*Think about that for a moment. Why would a new candidate, or even a newly hired officer, want to work for their agency when their growth was stunted due to an archaic culture?*

## Recruitment: Social Media

Goals:
1) Intentional social media accounts to grow our social audience, with not just a general audience but a targeted audience.
2) Use of social media tactics to maximize our engagement and build our list of followers.

Tactics and rationale:

*Utilize tailored hashtags*

Hashtags are important on all social media platforms.  If you want to grow a niche audience, one of the easiest ways to do so is to use a handful of targeted hashtags in your captions. When you use those top hashtags, your content will be included in a feed featuring only law enforcement and public safety content where enthusiasts will be skimming through.

*Follow similar accounts*

Often, people are nervous about following similar social media accounts, but this is where you can grow your network and garner new ideas.

Maybe the account isn't exactly a competitor, but successful niche social media accounts are usually followed by people interested in that product, mission, or organization type.

We tend to underestimate how often people follow the followers of their favorite social media accounts, so be intentional about who you follow and aim to only follow accounts similar to your brand.

*Engage with other accounts*

Spreading a little love in the form of a like and comment on accounts that you follow will be appreciated. The followers on the accounts you engage with will take notice of your interactions and likely click on your account to see what it's all about.

Engaging in a meaningful way with other accounts is a great way to build genuine connections, leading to garnering more followers who support your brand.

*Optimize social media handle and bio*

Utilizing a social media handle that is transparent in correlation to your business and services is so important on social media. Being as descriptive and succinct as possible with your handle could help you build that targeted audience you desire.

If a person comes across your handle and it's descriptive of your niche, the social media user will likely snoop around on your page and possibly give you a follow.

When it comes to the bio on the social media accounts you manage, it's imperative to be as descriptive as possible in a concise way, never leaving new visitors to your accounts confused about the services your brand offers.

References

TOC Public Relations:  *How to Garner a Targeted Audience on Social Media (Nov 8, 2021)*

## Recruitment: Additional Initiatives

- Napa Valley Police Academy
- Fire Science & Administration Justice Career Fair
- SF Summer Internship & Career Fair
- Army PAYS Program
- Diablo Valley College Public Safety Career Expo
- South Bay Regional Public Safety Career Fair
- Ohlone College Career Fair
- SF State Men's and Women's Basketball teams Recruitment Presentation
- San Jose Law Enforcement Hiring Expo
- Monterey Peninsula College Job & Career Fair
- PRIDE
- Radio announcements
- Bus advertisement
- MOU w/ remaining branches
- Presentations w/ College athletic directors
- Presentations w/ Criminal Justice programs/Administration of Justice
- Housing Project

Recruitment:

Ten (10) candidates scheduled for Santa Rosa 209 July 25 – December 9, 2022

Five (5) candidates scheduled for SB 170 August 1, 2022 – January 27, 2023

**From January 2022 to July 2022 sworn applicant statistics:**

Hired – 20

Withdrew – 7

Disqualified – 22

Non Select – 3

In Process – 22


# Recruitment: Strategic Plan Reference

The following is Goal 6 from the Department Strategic Plan currently being finalized for distribution:

*Maximizing Workforce Potential*

To provide the best level of service to the San Francisco community, we must remain highly committed to our public safety workforce.  Recruitment is crucial for maximizing and maintaining a diverse workforce that reflects the community it serves.  Dedication to our employees will come through managing workloads, minimizing stress, encouraging career success and creating succession plans.

**Initiative A:**    Strengthen Recruitment Efforts to Increase Diversity
> Activity: Improve recruitment process for Deputy Sheriffs.
> Activity: Enhance marketing and advertising strategy for recruitment
> Activity: Utilize technology to enhance accessibility, frequency, and delivery of blended training

**Initiative B:**    Create a Department Succession Plan for Employees
> Activity: Enhance human resource management and monitoring
> Activity: Design employee eligibility enhancement and improvement programs

**Initiative C:**    Promote Employee Wellness to Improve Job Satisfaction
> Activity: Develop effective ways of soliciting employee input
> Activity: Develop healthy employee campaign using social media and videos
> Activity: Implement an executive development program
> Milestone: Schedule Blue Courage Leadership classes by 3rd quarter

**Initiative D:**    Enhance Career Success Pathways for Professional Staff
> Activity: Foster civilian employee success thru opportunity and retention efforts
> Activity: Broaden tools and resources for civilian employee advancement
> Activity: Develop mentoring program for leadership/professional development
> Milestone: Design curriculum and operational manual for mentorship


# Community Engagement

Participation in community events have been proven to assist in recruitment. We will continue to attend these events that not only assist in recruiting members of the community that we represent, but also to build public trust and retention of existing employees. Please see below for cited evidence of these claims:

- **Increases retention of employees** *(Best Practices Guide: Recruitment, Retention and Turnover in Law Enforcement by Dwayne Orrick, Director of Public Safety, City of Cordele, Georgia)*
- **Recruiting deputies or officers from the community increases public trust and promotes internal diversity** *(Importance of Police-Community Relationships and Resources, U.S. Department of Justice Community Relations Services)*

- **Increasing community engagement is the second most recommended strategy to address hiring shortfalls, after collaborating with other agencies.** (*Assessing the Value of Evidence, Understanding Research on Recruitment and Hiring, Anne Li Kringen, PhD, Associated Proessor, University of New Haven*)
- **Removing deputies from the community actually increases the likelihood of crime and would be detrimental to our mission as a law enforcement agency.** (*Why data-informed community engagement is crime prevention and policing reimagined, Joel Caplan Ph.D, Police1 by Lexipol*)

https://www.transformationstreatment.center/resources/first-responders-veterans/police-community-outreach/

https://www.theiacp.org/sites/default/files/2018-08/BP-Recruitment.pdf

https://www.justice.gov/file/1437336/download

https://www.policechiefmagazine.org/assessing-the-value-of-evidence/?ref=5a6bff0a7d725e810229d50402093847

https://www.police1.com/evidence-based-policing/articles/why-data-informed-community-engagement-is-crime-prevention-and-policing-reimagined-7DCzmJEUoI7p9kBd/

## Recruitment Events

| # of Monthly Recruiting Events | Recruitment | Events | Postponed Recruitment (COVID) | Postponed Events (COVID) | Total Events |
|---|---|---|---|---|---|
| January 2022 | 3 | 3 | 1 | | 7 |
| February 2022 | 2 | 6 | 3 | | 11 |
| March 2022 | 7 | 9 | | | 16 |
| April 2022 | 8 | 6 | | | 14 |
| May 2022 | 5 | 2 | | | 7 |
| June 2022 | 6 | 4 | | | 10 |
| July 2022 | 1 | 2 | | | 3 |
| August 2022 | 2 | | | | 2 |
| September 2022 | 2 | 1 | | | |
| October 2022 | 1 | | | | 1 |
| November 2022 | 1 | | | | 1 |
| December 2022 | | | | | |
| Total | 38 | 33 | 4 | | 75 |

## Testing

| 2022 Written Test | Applicants/ Showed | Applicants Passed | No Shows | 2022 Physical Agility Test | Applicants/ Showed | Applicants Passed | Disqualified | Total |
|---|---|---|---|---|---|---|---|---|
| January 2022 | | | | January 2022 | | | | |
| February 2022 | | | | February 2022 | | | | |
| March 2022 | 145/89 | 65 | 56 | March 2022 | 98 / 65 | 43 | 22 | |
| April 2022 | | | | | | | | |
| May 2022 | | | | May 2022 | | | | |
| June 2022 | 125/57 | 49 | 68 | June 2022 | 90/50 | 31 | 19 | |
| July 2022 | | | | July 2022 | | | | |
| August 2022 | | | | August 2022 | | | | |
| September 2022 | NA | NA | NA | September 2022 | NA | NA | NA | NA |
| October 2022 | NA | NA | NA | October 2022 | NA | NA | NA | NA |
| November 2022 | NA | NA | NA | November 2022 | NA | NA | NA | NA |
| December 2022 | NA | NA | NA | December 2022 | NA | NA | NA | NA |
| Total | | | | Total | | | | |

**Written Tests are scheduled quarterly:**            ● March 2022

- June 2022 (2)
- September 2022 (2)
- December 2022 (2)

- March 2022
- June 2022
- October 2022
- December 2022

**PAT Tests are scheduled quarterly:**

## Academy

| # of people in Academy | Currently In Academy | Graduated | Failed | Academy Trained Hire | # of people in CORE | Graduated | Failed | Total |
|---|---|---|---|---|---|---|---|---|
| January 2022 | | | | | | | | |
| February 2022 | | | | | | | | |
| March 2022 | | | | | | | | |
| April 2022 | | | | | | | | |
| May 2022 | 0 | 11 | 1 | 3 | 14 | 14 | 0 | |
| June 2022 | 9 | | | | | | | |
| July 2022 | | | | | | | | |
| August 2022 | NA | | NA | | NA | NA | NA | NA |
| September 2022 | NA | | NA | | NA | NA | NA | NA |
| October 2022 | NA | | NA | | NA | NA | NA | NA |
| November 2022 | NA | | NA | | NA | NA | NA | NA |
| December 2022 | NA | | NA | | NA | NA | NA | NA |
| Total | | | | | | | | |

## Background Investigations



**Open Investigations**

Total: 107

- [1] Unassigned
- [48] Active
- [4] Pending DQ
- [2] Pending Withdrawal
- [52] Pending Hire

| Active | 107 |
|---|---|
| Unassigned | 1 |
| Open | 48 |
| Pending Withdrawal | 2 |
| Pending DQ | 4 |
| Pending Hire | 52 |
| Finalized | 209 |
| Completed | 48 |
| Disqualified | 107 |
| Withdrawn | 54 |

| # of people in backgrounds | Background Applicants | Disqualified | Turned Down Position | Hired | Total |
|---|---|---|---|---|---|
| January 2022 | | | | | |
| February 2022 | 61 | | | | |
| March 2022 | | | | | |
| April 2022 | | | | | |
| May 2022 | | | | | |
| June 2022 | | | | | |
| July 2022 | | | | | |
| August 2022 | NA | NA | NA | NA | NA |
| September 2022 | NA | NA | NA | NA | NA |
| October 2022 | NA | NA | NA | NA | NA |
| November 2022 | NA | NA | NA | NA | NA |
| December 2022 | NA | NA | NA | NA | NA |
| Total | | | | | |

P 0068-000013

# SAN FRANCISCO DEPUTY SHERIFFS' ASSOCIATION, INC.

*"Serving the Deputy Sheriffs' of San Francisco since 1952"*

| PRESIDENT | VICE-PRESIDENT | TREASURER | SECRETARY | SERGEANT-AT-ARMS |
|-----------|----------------|-----------|-----------|------------------|
| Ken Lomba | Christianne Crotty | Scott Osha | John Lawsha | |

February 26, 2018

***Via Electronic Mail***
Sheriff Vicki Hennessy
City Hall, Room 456
1 Dr. Carlton Goodlett Pl.
San Francisco, CA 94103
Email:  Vicki.Hennessy@sfgov.org
cc: Mayor Farrell, Board of Supervisors

The San Francisco Deputy Sheriffs' Association respectfully requests you increase the following areas of the budget:

**Deputized Staffing:**

Our members are overworked and exhausted.  The staffing numbers need to be increased. With expansion, promotions, retirements and deputies leaving for other agencies a staffing increase needs to be in the budget to allow more job requisitions to be filled.

Within the last couple months, two deputies suffered from stress related work conditions due to the excessive amount of "drafting" (last minute mandatory overtime).  One deputy was under a severe amount of stress due to the mandatory overtime and threatened to kill himself.  Another deputy went out on disability due to stress from mandatory overtime.  The deputies have been taken to the breaking point effecting their health, physical and mental well being.

As for expansion, we do not support any further expansion until the staffing level is increased and the burden of "drafting" (mandatory overtime) has been greatly reduced.

**Vehicles:**

Our vehicles are in bad shape.  They are aged, high mileage, and worn out.  We would like an increase in a minimum of 65 vehicle purchases to replace the aged fleet of vehicles starting with all vehicles with over 120,000 in miles followed by the replacement of 1 K-9 vehicle and the fleet of inmate transportation vans.

P 0068-000014

# SAN FRANCISCO DEPUTY SHERIFFS' ASSOCIATION, INC.

*"Serving the Deputy Sheriffs' of San Francisco since 1952"*

| PRESIDENT | VICE-PRESIDENT | TREASURER | SECRETARY | SERGEANT-AT-ARMS |
|-----------|----------------|-----------|-----------|------------------|
| Ken Lomba | Christianne Crotty | Scott Osha | John Lawsha | |

KL to VH

Re: Budget Increase

Page 2

**Training:**

We would like to see an increase in job related training especially training topics related to perishable skills.  Currently we are below average in the amount of firearms training compared to surrounding agencies.  The DSA would like to see an increase in firearms training to a minimum of 3 times a year.  Including patrol rifle training courses and active shooter courses.

We would like to see additional classroom courses related to basic law enforcement, basic investigations, and report writing.

The department Emergency Vehicle Operations Course training is substandard and may be in violation of P.O.S.T. standards.  The E.V.O.C. needs to be done properly and fully to P.O.S.T. standards.

We recommend a budget increase in the above training areas to maintain the knowledge of our members at an industry standard.

**Parking**:

The DSA members are in need of parking.  A budget increase is desperately needed for parking since their is no secure parking offered to my members.  More parking spaces need to be leased and made available to the DSA members.

Best regards,

Ken Lomba
SFDSA President
DSA: 415-696-2428
Cell:  415-513-8973

P 0068-000015

**Citizen Complaint Form**
City and County of San Francisco
Civil Grand Jury

**IMPORTANT**: The Citizen Complaint Form should be prepared and filed with the Grand Jury **only after all attempts to resolve the issue have been exhausted.** The Grand Jury has no authority to investigate complaints pending before a court of law or disputes between private parties. The Grand Jury does not necessarily investigate all complaints received.

### Person or Agency About Which Complaint is Made

| | |
|---|---|
| Name or Agency: | San Francisco Sheriff's Department |
| Address: | City Hall, Room 456 |
| | 1 Dr. Carlton B. Goodlett Place San Francisco, CA 94102 |
| Telephone: | 415-554-7225 |

### Nature of Complaint

Describe the events in the order they occurred and as concisely as possible:

See attached.

### Contacts

List persons or agencies contacted/consulted **prior to** this Grand Jury request.

San Francisco Sheriffs Office Administration, Labor Relations, City Attorney's Office.

Witnesses the Grand Jury may contact for further information:

Kenneth Lomba — President, San Francisco Deputy Sheriffs' Association.

P 0068-000016

**Citizen Complaint Form**
City and County of San Francisco
Civil Grand Jury

Who do you believe the Grand Jury should contact about this matter?

Kenneth Lomba — See above

San Francisco Sheriff and administration

Jail commanders and any Jail Staff injured during investigative period.

## Action Requested

Describe the action you wish the Grand Jury to take:

See attached.

## Citizen Submitting Complaint

Name:        Kenneth Lomba, President San Francisco Deputy Sheriffs' Association

*Address:        35 Gilbert Street San Francisco, California 94103

Telephone        415-696-2428

Signature _____         Date  6/20/2022

*NOTE: Your address is necessary in order for the Civil Grand Jury Foreperson to acknowledge your submission.

  _  Complaints must be submitted in writing; complaints are not accepted by phone;

    _  Any exhibits or supporting documents mailed in with this form will not be returned;

    _  The Civil Grand Jury does not investigate all complaints received. Investigations are at the discretion of the jury;

**Citizen Complaint Form**

City and County of San Francisco

Civil Grand Jury

_ Investigation of your complaint will not necessarily be confirmed; all investigations remain confidential until the Civil Grand Jury decides to include the findings in the final report;

_ Anonymous complaints may not be responded to if the Civil Grand Jury is unable to contact you for additional information related to the complaint;

_ The Civil Grand Jury cannot investigate activities outside their jurisdiction, criminal activity or disputes between private parties.

P 0068-000018

# ATTACHMENT TO GRAND JURY COMPLAINT

**To:**    SAN FRANCISCO CIVIL GRAND JURY

**From:**    SAN FRANCISCO DEPUTY SHERIFFS' ASSOCIATION

**Date:**    JUNE 17, 2022

**Re:**    SAN FRANCISCO COUNTY JAIL–CONTINUED UNDERSTAFFING DANGER

## INTRODUCTION

This Grand Jury has exercised its authority given it by the Penal Code to investigate the conditions of the City and County of San Francisco jails (CCSF) several times over the last decade.

In 2014, 2016 and 2017, this Grand Jury conducted investigations of the CCSF jails, issued findings and made recommendations which have not been implemented by the CCSF Sheriff's Office. (Attached hereto as Exhibits A, B and C are the 2014, 2016 and 2017 reports).

This Grand Jury found there to be grave concerns with the safety and security of the inmates, the deputies who serve the community in those jails, and the other non-sworn staff connected with ensuring the safety and security of the inmates and employees.

Specifically, this Grand Jury found the jails were working at minimum staffing but only by requiring the employees to work "excessive amounts of overtime." This was found the be due to the inadequate attempts to recruit and retain enough deputies to fully staff the jails. This Grand Jury found that work-related injuries increased due to the exhaustion the deputies experienced working excessive overtime. This increase in work-related claims resulted in a considerable increase in workers compensation and other personal injury claims, which generally made the jail less safe for those who serve their community there as well as the inmate population.

In 2014, this Grand Jury relied upon an inspection report by the Board of State and Community Corrections. This 8-year-old report warned that continued staffing at minimums, through the use of excessive overtime would, over time, violate Title 15.

This Grand Jury found that because of the dwindling number of total deputies employed by the CCSF, the excessive overtime and shortage of bodies did not allow for the important inmate programs in existence let along increase the inmate programs that were recommended. Furthermore, the recommended training for deputies could not take place or was inadequate to deal with the mental health and substance abuse as well as many other issues the housed population experiences.

Ultimately, this Grand Jury recommended on three separate occasions in 2014, 2016, and 2017 to "expedite hiring to reduce overtime." The Grand Jury's recommendations have never been followed and the situation has become untenable as the number of deputies is lower now than it was when this Grand Jury made these strong recommendations.

    

## CCSF JAILS ARE NOW FALLING BELOW MINIMUM STAFFING REGULARLY

When this Grand Jury previously inspected and investigated the conditions in the jails, it determined that the jails were just at minimum staffing, through the excessive overtime worked by the deputies.

Between 2015 and 2017, the San Francisco Deputy Sheriffs' Association (SFDSA) filed several grievances against the Sheriff's Office because the minimum staffing was not being met. The Sheriff sets the minimum staffing each year and it is memorialized in the collective bargaining agreement between the CCSF and the SFDSA.

The arbitrator looked at the staffing levels between 2015 and 2017 to make a determination if the CCSF Sheriff's Office was meeting the minimum staffing requirements. The Sheriff's Office admitted in many cases that numerous times the staffing did not comply with the minimum standards. The CCSF Sheriff's Office defended itself by stating that the number of times this occurred was di minimis.

The arbitrator found that in each of the 6 total grievances filed, the CCSF Sheriff's Office failed to meet the minimum staffing levels that itself set. The remedy the arbitrator ordered was to divide the pay of the understaffed work shift amongst the workers who actually worked the shift. For instance, if minimum staffing is 10 and only 8 are scheduled, then the 8 who work will split the pay for the other 2 positions that did not work.

The arbitration award stated that the additional cost to the CCSF for employees who did not even show up to work should provide adequate incentive to the CCSF to meet the minimum staffing requirement. (Attached hereto as Exhibit D is the Arbitration Award.)

It did not.

Just as this Grand Jury found that paying the dwindling number of deputies more money (overtime compensation) does nothing to make the jail safer for the inmates or staff, does nothing to allow for additional or maintenance of inmate programs and does nothing to obtain necessary training for the deputies to assist with the needs of the inmate population, so does the award of the arbitrator do nothing to accomplish these goals.

As this Grand Jury will see, when it investigates the staffing levels in the last few years, the CCSF is consistently and methodically falling below the minimum staffing. The warning given by the Board of State and Community Corrections to this Grand Jury in 2014 of a Title 15 violation may have come to fruition. Since that report, minimum staffing has NOT been met multiple times and this practice continues while the total number of employed deputies falls.

Just days ago, on June 9, 2022, Sheriff Miyamoto issued a memo to all CCSF jail staff identifying his intentions of – operating below minimum staffing – for a period of the next 8-9 months! The CCSF has clearly recognized the futility of giving the appearance of reaching minimum staffing and has now admitted that it cannot exercise its duty to do so. (Attached hereto as Exhibit E is the June 9, 2022 memo from the Sheriff.)

The CCSF is in fierce competition with its neighboring counties, Alameda and San Mateo, for jail staff. Alameda has been under a consent decree to hire more jail staff. It would be a shame for the CCSF to be under similar governmental oversight. The CCSF is capable of expediting the hiring of staff but has not made it a priority, at the expense of the overworked and exhausted jails staff.

## COMPLAINT

Accordingly, we request that this Grand Jury once again exercise its authority and duty to investigate the CCSF jails. This Grand Jury should demand answers from the CCSF as to why it has failed to comply with its 3 separate recommendations since 2014.

06/20/2022

Date

Kenneth Lomba, President

San Francisco Deputy Sheriffs' Association

**San Francisco Sheriff's Office**

INTER-OFFICE CORRESPONDENCE

June 9, 2022

Reference: 2022-063

To:        All SFSO Members

From:     Sheriff Paul Miyamoto

Re:        **Staffing Level Challenges and Updates**

In February I sent an update on plans and intentions to address staffing challenges. While not all proposed plans materialized, we continued to work on filling our open requisitions to increase staffing levels and reduce these burdens. The Mayor increased our budget, giving us the funds needed to fill 75 deputy positions during the remainder of 2022 and beginning of 2023.

We are hopeful that the DSA will work with us to implement what we originally proposed to help equalize the burdens on the Custody Operations Division. THANK YOU to everyone who has continued to assist with the constant drafts and involuntary overtime. To improve workplace conditions, effective immediately:

-   All Divisions will have set plans to operate below minimum staffing levels for an extended time period while we fill and train the 75 positions. Post assignments have been prioritized to identify which ones can go unassigned at the safest level possible if we have to operate under reduced levels.

-   Involuntary draft limit will be reduced from 3 per week to 2 per week for this extended time period until we fill and train the 75 positions (effective the new pay period, June 11).

-   Boost the number of issued tasers. COD deputies will be given priority for assigned body cameras and tasers.

The extended time period will initially be 8-9 months. These changes will be reviewed/updated as we move forward during this time. All policies still apply.

The following are updates to the information shared in February:

> Immediately staff to safe
> operational levels
> *PACE Plan*

We initiated the PACE plan to help offset mandatory overtime and involuntary drafts and proposed the following to the unions:

1.  Court Services will change the schedule of **all assigned deputies** to work from 0700 to 1500 hours.

NORBERT 3:19-CV-02724                    Mirkarimi001309

2. Mandatory overtime for all staff for a fixed amount of shifts and/or hours per pay period, based on current staffing data.
    a. All Staff Department wide will be involuntarily drafted on the first day they return from their scheduled RDOs for up to 16 hours total for that day. *For an 8-hour shift this will mean they will be scheduled for an additional 8 hours, for 10 hour shifts an additional 6 hours and for 12 hour shifts an additional 4 hours.*

Results:  DSA meet and confer process was delayed by contract negotiations.  We have requested to continue meet and confer on these proposals.

Current Plan:

Staffing on involuntary overtime and operating below minimum

Goal: Mitigation plan for operating below minimum for an extended period of time for first quarters of the 2022-23 budget cycle (until hiring and training are completed for the 75 requisitions).

> Request increased budget funding for recruiting, hiring and retention of members

We requested funding for two recruiters to help expand work on engagement strategies and recruitment activities ($371,000/year).  We are also requesting additional support for non-personnel services ($1 million) to expand the range of recruitment services currently in use to attract as wide of an applicant pool as we can.
Results: although we did not get funding for incentive bonuses for new hires, the Mayor supports our plan and has proposed an increase in our budget this year reflecting the above requests.

> Employee Wellness and
> Operational Safety

To support deputy wellness and safety, the Department requested budget support for first-responder-specific Employee Assistance Program (EAP) services negotiated by the City's Health Service System (HSS).
Results: The Mayor supports our plan and has proposed an increase in our budget this year reflecting those requests.
For operational safety, the Department requested body-worn camera program support and an increase in available tasers for training and deployment. Results: funded and in process of assigning BWCs and tasers.

Thank you to everyone for meeting the challenges of low staffing day after day.

*Stay safe, be well, and take care*

NORBERT 3:19-CV-02724          2          Mirkarimi001310