# ATTACHMENT 2

# <u>30th General Report of the CPT</u>

# 30th GENERAL REPORT
# OF THE CPT

European Committee for the Prevention of Torture
and Inhuman or Degrading Treatment or Punishment



1 January – 31 December **2020**



# 30th
# GENERAL REPORT
# OF THE CPT

European Committee
for the Prevention of Torture
and Inhuman or Degrading
Treatment or Punishment

1 January – 31 December **2020**

Council of Europe

**French edition:**

*30ᵉ rapport général du Comité européen pour la prévention
de la torture et des peines ou traitements inhumains
ou dégradants (CPT)*

All requests concerning the reproduction
or translation of all or part of this document should be
addressed to the Directorate of Communication
(F-67075 Strasbourg Cedex or publishing@coe.int).
All other correspondence concerning this document
should be addressed to the Secretariat of the CPT
(European Committee for the Prevention of Torture
and Inhuman or Degrading Treatment or Punishment)

Cover and layout: Document and Publications
Production Department (SPDP), Council of Europe

This publication has not been copy-edited by the
SPDP Editorial Unit to correct typographical
and grammatical errors.

Photographs : © Council of Europe

CPT/Inf(2021)5

© Council of Europe, May 2021
Printed at the Council of Europe

# Contents

| | |
|---|---|
| **FOREWORD** | **5** |
| **ACTIVITIES DURING THE PERIOD 1 JANUARY TO 31 DECEMBER 2020** | **9** |
| Visits | 9 |
| High-level talks with national authorities | 11 |
| Plenary meetings and activities of subgroups | 11 |
| Contacts with other bodies | 12 |
| **INDEPENDENT BORDER MONITORING** | **15** |
| **PUBLICATIONS** | **19** |
| Introduction | 19 |
| Selected publications | 19 |
| **A DECENCY THRESHOLD FOR PRISONS – CRITERIA FOR ASSESSING CONDITIONS OF DETENTION** | **35** |
| Introduction | 35 |
| The essential components of a decency threshold in prison settings | 36 |
| Monitoring compliance with a decency threshold | 37 |
| **ORGANISATIONAL MATTERS** | **43** |
| CPT membership | 43 |
| Bureau of the CPT | 43 |
| Secretariat of the CPT | 43 |
| **APPENDICES** | **45** |
| 1. The CPT's mandate and modus operandi | 45 |
| 2. Signatures and ratifications of the Convention establishing the CPT | 46 |
| 3. The CPT's field of operations (as at 31 December 2020) | 47 |
| 4. CPT members | 48 |
| 5. CPT Secretariat (as at 31 December 2020) | 49 |
| 6. CPT visits, reports and publications | 51 |
| 7. Countries and places of deprivation of liberty visited by CPT delegations | 53 |
| 8. Statement of principles relating to the treatment  of persons deprived of their liberty in the context of the coronavirus disease (Covid-19) pandemic | 62 |
| 9. Follow-up statement regarding the situation of persons deprived of their liberty in the context of the ongoing Covid-19 pandemic | 64 |



" Nowadays, when the prohibition of torture and other forms of ill-treatment is questioned as part of an attempt to challenge human rights and democracy, the CPT's role is more important than ever.

# Foreword

The fourth decade of the CPT's existence started with a very significant year, marked by the global Covid-19 pandemic. When the public health crisis hit Europe, the CPT was about to commence several of its periodic and ad hoc visits planned for the spring of 2020. Instead, the Committee had to take a forced pause, barely managing to complete the programme of its rapid reaction visit to Greece in mid-March. Importantly, it was immediately obvious that the crisis created new grave concerns for the human rights of persons deprived of their liberty.

I am proud to say that the CPT rose to the challenge. Already on 20 March 2020 it issued a "Statement of principles relating to the treatment of persons deprived of their liberty in the context of the coronavirus pandemic". This Statement was the first substantive paper published by a Council of Europe body on the pandemic. In this document, the CPT acknowledged the need to take firm action to combat Covid-19 but also emphasised that protective measures must never result in inhuman or degrading treatment of persons deprived of their liberty. It was made available in 26 languages and sent to all Council of Europe member States with a request to transmit the statement to all governmental and other authorities responsible for the situation of persons deprived of their liberty. Member States were also asked to provide information on the concrete measures taken by the relevant authorities in all types of establishment where persons are deprived of their liberty.

A follow-up statement was issued in July, summarising States' responses to the CPT's request for information on the (often positive) measures implemented, reiterating that human rights should be put first in decision-making in the context of the pandemic and beyond and that those restrictions imposed to contain the spread of the virus must be considered to be only temporary and lifted as soon as they are no longer required (for example as regards contact with the outside world). The CPT was encouraged by the variety of measures taken by many States in line with its Statement of Principles, ranging from alternatives to incarceration and detention of migrants to the use of modern technologies to ensure that persons detained were able to remain in contact with their loved ones.

The Statement of principles also laid the foundations of the Committee's own operational response to the pandemic as it spelled out that monitoring by independent bodies remains an essential safeguard against ill-treatment and that such bodies should take every precaution to observe the 'do no harm' principle. Between March and June 2020, the CPT conducted wide-ranging consultations both internally and externally – with other monitoring bodies, such as the United Nations Subcommittee on Prevention of Torture (SPT) and various national preventive mechanisms, as well as with leading international experts in detention monitoring. As a result, a clear conclusion was reached that the Committee's visits to places of deprivation of liberty across Europe must be resumed whenever possible. To conduct them safely,

the Committee has developed its internal operational guidance on the appropriate protective measures.

The CPT managed to continue its efforts towards preventing torture and other forms of ill-treatment in Europe, often in especially difficult circumstances, and maintained most of its visiting programme. It also carried out several rapid reaction ad hoc visits to examine for itself the situation of migrants in detention. Between July and December 2020, even when the virus was at its most rampant, delegations of the CPT carried out twelve visits, scrupulously respecting reinforced hygiene measures, equipped with the necessary personal protective equipment and closely co-operating with the authorities of the respective States as well as locally with the management of the institutions it was visiting.

The CPT's delegation meetings, bureau meetings and plenary sessions were of course also affected by the virus. The second plenary meeting of the year, in June/July, had to be held, for the first time, in a hybrid format, with more than half of the Committee members physically attending the meeting at the Council of Europe in Strasbourg, the rest participating via video conference. The situation was even more difficult in November, the CPT being compelled to conduct its plenary entirely by video conference. The good news is that while these two meetings were not without their inevitable technical problems, the Committee still managed to adopt all the visit reports that were put before it as well as to discuss future visiting methods and precautions to be taken in the context of Covid-19. The basic programme was thus accomplished.

That said, as somebody who had the privilege of chairing the CPT's plenary sessions for six years, I feel obliged to underline that such meetings are far from being simply formal and technical. They give the Committee an opportunity to discuss its approaches to many complex issues and to develop its jurisprudence in the light of numerous important developments and challenges. Each year, the Committee has but three opportunities for doing so. The summer plenary taught me that managing such complex substantive discussions with a number of participants participating by video link was already a complicated task. Doing this in the entirely video conference format is extremely difficult, and some substantive discussions potentially leading to a significant change in the Committee's jurisprudence had to be deferred to a later date. In other words, while one or two 'virtual' plenaries might be feasible, they will draw exclusively from the jurisprudence developed by the Committee previously under normal circumstances. This is one of the reasons why I am convinced that no effort should be spared in 2021 to return the CPT to its meeting room in Strasbourg once this becomes possible. The same applies to meetings of CPT delegations preparing draft reports, as those are crucial documents not only in the dialogue with the authorities of the State concerned but also as the main engine for development of the jurisprudence of the Committee.

Despite its natural preoccupation with the pandemic and the concentration on fulfilling the core of its mandate in badly affected Europe, the CPT did not neglect its relations with organisations with a wider geographical scope and continued to collaborate with the SPT, issuing a joint statement with the UN body on the occasion of the International Day in Support of Victims of Torture on 26 June. It also further

enhanced co-operation with relevant institutions of the European Union, in particular with the EU Special Representative for Human Rights, the Commissioner for Home Affairs, the European Ombudsman and various senior officials from the European Commission. Developing such partnerships is a crucial aspect of increasing the impact of the Committee's work.

While these are certainly not the best times for Europe and for the CPT, I am confident that the Committee will come out of the current crisis stronger and even more determined to achieve its goals. As a member leaving the CPT in 2021, I wish every success in this to the new President of the Committee and to those colleagues who will be elected to the CPT in the course of this year.

**Mykola Gnatovskyy**

*President of the CPT (March 2015 – March 2021)*



❝ The CPT managed to continue its efforts towards preventing torture and other forms of ill-treatment in Europe, often in especially difficult circumstances, and maintained most of its visiting programme.



# Activities during the period 1 January to 31 December 2020

## Visits

1.      The CPT organised 14 visits totalling 125 days during the year 2020. Six of the visits (totalling 68 days) formed part of the CPT's annual programme of periodic visits for 2020 and eight (57 days) were ad hoc visits which the Committee considered were required in the circumstances. Details of all these visits (dates and places of deprivation of liberty visited) are provided in Appendix 7.

### Periodic visits

2.      Periodic visits were carried out to **Azerbaijan, Finland, Germany, the Republic of Moldova, Monaco** and **Spain.** The main objective of these visits was to examine the treatment and conditions of detention of persons detained in police stations and prisons and to review the measures taken by the relevant authorities to implement recommendations made by the Committee after previous visits to the countries concerned. Particular attention was paid to specific categories of prisoners, for instance, remand prisoners held in police establishments (Finland); those held in solitary confinement for prolonged periods (Germany) and juveniles (Republic of Moldova and Spain). The situation of immigration detainees was also examined in Finland. The CPT continued to pay attention to the treatment of residents in social care homes (Azerbaijan and the Republic of Moldova) and that of patients admitted on an involuntary basis in civil and/or forensic psychiatric establishments in all of the countries visited. Further, the CPT visited other places of detention such as the disciplinary unit of Baku Garrison (Azerbaijan).

3.      In November, the CPT announced its programme of periodic visits for 2021. The following ten countries were chosen: **Austria, Bulgaria, Latvia, Lithuania, Russian Federation, Serbia, Sweden, Switzerland, Turkey** and the **United Kingdom.**[1]

----

1.  For organisational reasons related to the Covid-19 pandemic, the periodic visits to Serbia and Sweden were postponed to 2021.

## Ad hoc visits

4.    In the course of 2020, the CPT carried out ad hoc visits to **Bulgaria, Croatia, France, Greece, Malta, North Macedonia, Ukraine** and **Kosovo**[*].

5.    The objective of the visit to **Bulgaria** in August was to examine whether any progress had been made by the Bulgarian authorities since the 2017 periodic visit of the CPT as regards the implementation of its recommendations concerning the treatment, conditions and legal safeguards offered to psychiatric patients and residents of social care institutions.

6.    The visit to **Croatia** (also in August) focused on the treatment of migrants, assessing conditions of detention and formal pre-removal procedures. The CPT's delegation also visited several temporary reception centres and informal migrant settlements in north-west Bosnia and Herzegovina where it interviewed and medically examined many migrants who claimed they had very recently been apprehended by Croatian law enforcement officials within the territory of Croatia and forcibly returned to Bosnia and Herzegovina.

7.    The visit to **France** in July was the CPT's first since having to suspend its monitoring activities in March as a result of the health crisis affecting Europe. The aim of the visit was to assess the situation of persons deprived of their liberty in Alsace, a region particularly affected by the Covid-19 pandemic. The delegation visited various detention facilities in order to examine the measures taken to protect both detained persons and staff before, during and after a two-month lockdown imposed by the French authorities.

8.    The visit to **Greece** in March was the last to be carried out before the forced interruption of the CPT's monitoring activities. The main objective of the visit was to examine the way in which foreign nationals attempting to enter the country and apprehended by the Hellenic Police or Coast Guard were treated, notably since 1 March 2020, when the processing of asylum requests had been suspended.

9.    During the visit to **Malta** in September, the CPT's delegation examined the treatment and conditions of detention of migrants deprived of their liberty, including families with young children and unaccompanied minors. It visited various places where migrants were being held, notably the detention and reception centres, as well as two police stations.

10.   The focus of the ad hoc visit to **North Macedonia** in December was to examine the treatment and conditions of detention of prisoners held in Idrizovo and Skopje Prisons and, more specifically, to review any progress made since the CPT's December 2019 periodic visit. The delegation also visited the police stations of Bit Pazar, Gazi Baba, Karpoš and Kisela Voda in Skopje. Further, high-level talks were held at the end of the visit (see below).

---

[*]    All reference to Kosovo, whether to the territory, institutions or population, in this report shall be understood in full compliance with United Nations Security Council Resolution 1244 and without prejudice to the status of Kosovo.

11.    The main objective of the visit to **Ukraine** in August was to examine the treatment of persons held in penitentiary institutions, including prisoners serving a life sentence. To this end, the CPT's delegation visited three correctional colonies: No. 25 in Kharkiv, No. 100 in Temnivka (Kharkiv region) and No. 77 in Berdyansk (Zaporizhia region). The delegation also went to the pre-trial establishments (SIZOs) in Kharkiv and Zaporizhia as well as to Temnivka Prison Hospital No. 100, in order to interview prisoners transferred from the above-mentioned colonies.

12.    The CPT visited **Kosovo**[*] in October on the basis of an agreement signed in 2004 between the Council of Europe and the United Nations Interim Administration Mission in Kosovo (UNMIK). In the course of the visit, the delegation examined the treatment and conditions of detention of persons held in several police establishments and prisons, as well as the treatment, living conditions and legal safeguards offered to civil and forensic psychiatric patients in two psychiatric clinics and residents in a social care institution. In this connection, it reviewed the measures taken by the relevant authorities to implement various recommendations made by the Committee after the previous visit carried out in 2015.

## High-level talks with national authorities

13.    It is standard practice for CPT visiting delegations to hold talks with the national authorities, at both the outset and the end of the visit. The end-of-visit talks usually involve the participation of Ministers and are the occasion for the delegation to present its preliminary observations.

14.    The CPT has also continued to seek to intensify its ongoing dialogue with certain States by means of high-level talks both outside and within the framework of visits. Such talks were held in **North Macedonia** on 9 December with the Prime Minister and the Minister of Justice. The discussion highlighted the necessity for the establishment of a professional prison service with clear reporting lines and effective management oversight and there was a recognition that the Ministry of Health needed to play a more proactive role in improving the provision of health care to prisoners. The steps required to provide minimum conditions of detention for persons held in Idrizovo and Skopje Prisons, as well as the development of a purposeful regime were also discussed.

## Plenary meetings and activities of subgroups

15.    The CPT held three plenary meetings (in March, July and November), in the course of which a total of 15 visit reports were adopted. The meeting in March was held in the presence of members in Strasbourg for the usual full week. Due to the Covid-19 pandemic however, the July and November plenaries were shortened to four days, with the July plenary being held with only some members physically present in Strasbourg, while others participated via video conference. The November plenary was held entirely via video conference.

16.    The different formats of the meetings did not prevent the CPT from continuing its discussion of ongoing intergovernmental activities of the Council of Europe

on matters within the CPT's mandate and of its own internal working methods, including as to how to best carry out visits during the Covid-19 pandemic. During the March meeting, an exchange of views took place between the CPT and judges of the European Court of Human Rights on two topics of common interest, namely the definition of "deprivation of liberty" and procedural obligations under Article 3 of the European Convention on Human Rights.

17.   The two standing subgroups of the CPT, the Working Group on Health and the Working Group on the CPT's Jurisprudence, met either before or during the week of the plenary meetings. The meetings of the subgroups were held via video conference where the physical presence of the members was not possible. The Working Group on Health examines substantive issues of a medical nature related to the CPT's mandate and organises training sessions on the specific tasks that medical members of visiting delegations are required to perform. The task of the Working Group on the CPT's Jurisprudence is to advise the CPT on developments in the Committee's standards as reflected in visit reports and to identify areas where there is room for development of those standards.

## Contacts with other bodies

18.   Despite the difficulties caused by the Covid-19 pandemic, the CPT maintained contact with other bodies within and outside the Council of Europe, mainly via video conference.

The President of the CPT presented the 29th General Report to the Ministers' Deputies at a hearing which took place on 27 May and took part in an informal exchange organised by the Committee of Ministers on humane penal sanctions on 22 October. He also attended a webinar organised by the Committee on Legal Affairs and Human Rights of the Parliamentary Assembly on "Covid-19 and its impact on human rights" on 27 April 2020. In addition, the President gave a presentation during the 25th Council of Europe Conference of Directors of Prison and Probation Services (CDPPS) on 9 and 10 November, and attended the 8th annual meeting of the Secretary General with the Presidents and Secretaries of the Monitoring and Advisory Bodies of the Council of Europe, in person, on 29 June. Furthermore, a representative of the CPT's Secretariat participated in the 10th plenary meeting of the Council for Penological Co-operation on 16 October and another attended an information meeting on the statutory revision process and prospects for possible synergies with the Pompidou Group on 20 October.

19.   Regarding interlocutors **outside the Council of Europe**, the CPT also maintained its close contacts with the United Nations. The President and Deputy Executive Secretary participated in the plenary meeting of the SPT on 15 June via video conference. Furthermore, a joint statement by the President of the CPT and the Chair of the SPT was issued on 26 June, the International Day in Support of Victims of Torture.

In addition, the CPT further enhanced its contacts with the European Union. On 23 and 24 January, meetings were held in Brussels between the 1st Vice-President, the Executive Secretary and Deputy Executive Secretary of the CPT and Mr. Eamon Gilmore, EU Special Representative for Human Rights as well as high-ranking officials

of the European Commission, in particular, of DG-Home, DG-Just and DG-Near. On 17 November, the 1st Vice-President met with Mr Michael O'Flaherty, Director of the EU Agency for Fundamental Rights, and, on 3 December 2020, the President and 1st Vice-President of the CPT held a video conference meeting with Ms Ylva Johansson, EU Commissioner for Home Affairs. Finally, on 16 December, the 1st Vice-President held a video conference meeting with Ms Emily O'Reilly, European Ombudsman.



" Drawing upon its own direct experience of monitoring the apprehension activities of law enforcement agencies at the external borders of the EU, the Committee has also developed a number of criteria that it considers should be met if any new monitoring mechanisms are to be considered effective and independent.

# Independent border monitoring

20.    Throughout 2020, the CPT continued to receive allegations of ill-treatment of migrants apprehended during operations to forcibly remove them across external borders of the European Union (so-called "push backs"). This issue was examined in detail during a number of visits over the course of the year.

The Committee therefore noted with great interest the recent proposal of the European Commission that each EU member State shall establish an "independent monitoring mechanism" to ensure compliance with EU and international law, as well as national rules on detention.[3] The Commission envisages that these mechanisms will also ensure that allegations of violations of the rights of apprehended persons are dealt with effectively and without undue delay. The proposed Regulation foresees a role for the EU Fundamental Rights Agency in supporting EU member States in developing their national monitoring mechanisms, including the safeguards for their independence, as well as the development of their monitoring methodologies and training schemes.[4]

Given the potential for such mechanisms to contribute to the prevention of ill-treatment of persons deprived of their liberty, CPT representatives held high-level talks about the development of independent monitoring mechanisms with the European Commissioner for Home Affairs and the Executive Director of the Fundamental Rights Agency (see also paragraph 19).

21.    Drawing upon its own direct experience of monitoring the apprehension activities of law enforcement agencies at the external borders of the EU, the Committee has also developed a number of criteria that it considers should be met if any new monitoring mechanisms are to be considered effective and independent.

In the Committee's view, if it is to be effective, any such monitoring mechanism should have a mandate to:
  ► conduct unannounced inspections of law enforcement establishments and have access to all files, registers and video recordings in respect of all categories of migrants "diverted" and "intercepted" by law enforcement agencies;

---

3.   Proposal for a Regulation of the European Parliament and of the Council introducing a screening of third country nationals at the external borders and amending Regulations (EC) No 767/2008, (EU) 2017/2226, (EU) 2018/1240 and (EU) 2019/817. Document COM (2020) 612 final (the "Screening Regulation").
4.   See Recital 23 to the Preamble to the Screening Regulation.

- ► inspect all relevant documentation (including shift handover logbooks, shift distribution charts and shift reports) of law enforcement patrols operating on the external borders of the EU as well as access to all recordings of stationary and mobile video and motion-detecting devices covering the external borders;
- ► at its discretion, be present as an independent observer during "diversion" and "interception" operations at the border;
- ► liaise with International Organisations and other relevant stakeholders operating on the other sides of external borders of the EU in order to collect real-time information on possible cases of malpractices.

In order to safeguard its independence, any such mechanism should also be:

- ► free from any institutional connection with the Ministry or other authorities responsible for policing the borders;
- ► adequately staffed by appropriately qualified staff, including medical professionals, and provided with the necessary financial resources;
- ► empowered to produce periodic and ad hoc visit reports with clear recommendations to the competent authorities and to report on the implementation of those recommendations;
- ► entitled to communicate directly with the competent prosecutorial authorities in the event that malpractice is uncovered in the course of its monitoring activities and to secure rapid access to forensic medical examinations for alleged victims of ill-treatment.

In the interests of the prevention of ill-treatment, the CPT will continue to offer its experience and expertise to all relevant parties involved in the development of the independent monitoring mechanisms envisaged in the Screening Regulation.



**"** An 'automatic publication procedure' is set in place when a Government makes a general request to publish all future CPT visit reports and related responses of the authorities concerned.

# Publications

## Introduction

22.    Eighteen CPT visit reports were published in 2020. As of 31 December 2020, 425 of the 461 reports drawn up have been published. A state-by-state table showing the situation as regards publication of CPT visit reports is set out in Appendix 6.

## Selected publications

23.    This section takes a closer look at some of the visit reports and related government responses published in 2020.

### Report on the periodic visit to Greece in March/April 2019 and response of the Greek authorities

*(situation of persons in prisons and police establishments, with a focus on systemic deficiencies in prisons and investigations into allegations of police ill-treatment)*

24.    The CPT found that the Greek prison system remained in a dire state with little progress in addressing the systemic deficiencies of overcrowding, high levels of inter-prisoner violence, chronic staffing shortages, inadequate material conditions and poor health care. The CPT urged the Greek authorities to take concrete action to address these systemic deficiencies – already outlined in previous visit reports. As regards the police, the CPT concluded that the infliction of ill-treatment by the police remained a frequent practice throughout Greece, and that investigations into such allegations could not be considered effective.[5]

25.    The findings of the 2019 periodic visit demonstrated once again that the structural problems of overcrowding and chronic shortage of staff in **prison establishments** in Greece continued to compound the many additional shortcomings and required much more decisive action from the Greek Government as a whole. The CPT recommended that the Greek authorities effectively address the structural reasons driving **prison overcrowding** and that they draw up a follow-up Strategic Plan for the Penitentiary System (2021-2025).

_____

5.    On 18 and 19 November 2019, the CPT held high-level talks with the new Greek Government on these issues.

The report highlighted the critical findings from the visits undertaken to the two largest remand prisons in the country in Athens and Thessaloniki and to three new prisons for sentenced prisoners. At Nigrita Prison, a number of credible allegations were received of **physical ill-treatment** of foreign prisoners by prison officers and external perimeter guards. **Inter-prisoner violence** and intimidation were rife in all prisons visited, often resulting in severe (and sometimes fatal) injuries inflicted by other inmates. The situation at Korydallos Men's Prison remained the most volatile and alarming, requiring an action plan to allow prison staff to regain control of the wings. The CPT called on the Greek authorities to effectively tackle ill-treatment by prison staff as well as inter-prisoner violence, which requires radically increasing **staffing levels** in all the prisons visited without delay in order to guarantee an effective control and a safe environment for prisoners and staff alike. The CPT also made a number of specific recommendations regarding the management of prisons.

**Living conditions** in large parts of the remand prisons and in some of the wings of the prisons for sentenced prisoners visited were poor and inmates held there continued to be detained in conditions which represented an affront to their human dignity, with severe overcrowding in the remand facilities and unacceptable conditions in some of the segregation cells.

26.    The CPT found that the widespread deficiencies regarding **health-care services** in prisons persisted. Problematic issues such as access to health care, medical screening upon arrival or medical confidentiality were all compounded by the severe shortage of health-care staff and the continued lack of integrated management of health-care services. The shortcomings previously identified at **Korydallos Prison Health Centre** (former prison hospital), such as the lack of medical and nursing staff, very poor living conditions and the continued warehousing of the old and infirm equally persisted. The CPT made a series of recommendations for urgent action to improve the quality of care.

27.    In line with the findings of previous visits, the CPT once again concluded that persons detained by the **police** – especially foreign nationals and persons from the Roma community – remained at high risk of being ill-treated. The CPT's delegation received a considerable number of credible allegations of physical and/or psychological **ill-treatment** during detention or questioning. These included some allegations involving baton blows to the soles of the feet (*falaka*) and the application of a plastic bag over the head of a suspect during police interviews to induce a feeling of asphyxiation, as well as a large number of allegations of verbal abuse. The CPT called on the Greek authorities to take action to prevent any form of police ill-treatment, which should include the provision of regular professional training. The CPT also reiterated its concerns in relation to ineffective procedural **safeguards against ill-treatment**. The Greek authorities should notably clarify the legislative provisions on the rights of notification of custody and access to a lawyer by extending their application to criminal suspects as from the very outset of deprivation of liberty and ensure that these rights become fully effective in practice.

Moreover, the report examined the way in which **investigations into allegations of ill-treatment** by police officers were conducted. The CPT's findings suggested that investigations were still not carried out promptly or expeditiously and often

lacked thoroughness. In the CPT's view, the system could not always be considered effective: most cases of alleged police ill-treatment were not the subject of a criminal prosecution and only very few resulted in criminal sentences or even disciplinary sanctions, thereby fostering a culture of impunity. The Committee made a number of recommendations aimed at improving this situation.

28.   The report was also critical of the conditions in which prisoners were **transported** around the country and of the situation of prisoners held in **transfer centres** managed by the Hellenic Police and the CPT recommended that the Greek authorities urgently review the arrangements for transferring prisoners and the operation of these centres. Further, the Committee reiterated that the **conditions of detention** in most police establishments visited remained totally unsuitable for holding detained persons for periods of longer than 24 hours.

29.   In their **response**, the Greek authorities provided information on the measures taken to implement the CPT's recommendations. In particular, the strategic planning of the new political leadership would prioritise security matters and the smooth functioning of prison establishments, with the intention to continue recruiting prison officers, to effectively prevent and address the phenomenon of violence among inmates by transferring prisoners and developing a dynamic security approach, to upgrade the penitentiary system including by building new facilities, and to reinforce prison health-care services. The response also outlined the relevant provisions of the revised Greek Penal Code.

*Report and response published in April 2020*
*(CPT/Inf(2020)35 and CPT/Inf(2020)36)*

## Report on the periodic visit to Hungary in November 2018 and response of the Hungarian authorities

*(situation of persons in police custody, juvenile prisoners, adult male prisoners (including those serving life sentences or very long terms), persons placed in social care homes and immigration issues)*

30.   The CPT noted that most of the persons interviewed by its delegation who were or had recently been in **police custody** did not make any allegations of ill-treatment by police officers. However, the delegation did hear some accounts of resort to unnecessary or excessive force upon apprehension, a few claims of physical ill-treatment shortly after arrival at a police station and several accounts of verbal abuse of a racist nature.

The Committee acknowledged the steps taken to strengthen safeguards against police ill-treatment (notably the right of notification of custody and the right of access to a lawyer). Nevertheless, more remained to be done to ensure the practical implementation of these rights as from the outset of police custody.

The conditions of detention in the police establishments visited were, on the whole, adequate for the duration of police custody (i.e. up to 72 hours). They were nevertheless not appropriate for the prolonged periods for which remand prisoners may be held in such facilities.

31.    The majority of **juvenile inmates** who were interviewed by the delegation stated that they were treated correctly by prison staff. However, in the juvenile unit in Kecskemét, the delegation heard a few allegations of physical ill-treatment of male juveniles by staff and some allegations of verbal abuse. Instances of violence sometimes occurred between male inmates in this unit but the delegation's findings indicated that staff intervened promptly and appropriately. However, inter-prisoner violence remained a serious problem at Tököl Juvenile Prison.

As regards material conditions, the cells in both establishments visited were extremely austere and impersonal and the overall atmosphere in the establishments was bleak. Moreover, at Tököl Juvenile Prison, cells were holding up to six juveniles. In the CPT's opinion, a well-designed juvenile detention centre should provide pleasant and personalised conditions of detention for young persons and juveniles should normally be accommodated in individual bedrooms.

At Tököl Juvenile Prison, the CPT's delegation gained an overall positive impression of the programme of activities provided to juveniles. In the juvenile unit in Kecskemét, the programme of activities appeared to be less developed which was particularly problematic for remand prisoners who were locked in their cells unless they were participating in an organised activity.

32.    Most **adult male prisoners** (including inmates serving life sentences or very long terms) with whom the delegation spoke at Budapest and Szeged Strict and Medium Security Regime Prisons considered that they were treated respectfully by prison staff. That said, at the Budapest Strict and Medium Security Regime Prison "Right Star" building, the delegation received a few isolated allegations of disproportionate reactions by staff – involving the use of force – to breaches of discipline by certain inmates. Despite the measures that had been taken following the death of an inmate after the use of force by staff in 2016, there were still grounds for concern as regards the treatment of prisoners held at Budapest Strict and Medium Security Regime Prison. In this context, the CPT made several recommendations concerning the use of force and the supervision of staff.

As regards the reducibility of sentences of life and whole life imprisonment, the CPT recalled that since 2007 it had drawn the attention of the Hungarian authorities to the dehumanising effect of depriving a prisoner of any realistic hope of release and to the need to develop an appropriate review mechanism.

The material conditions observed in the cells of both HSR Units[6] and the "Right Star" building at Budapest Strict and Medium Security Regime Prison were, in general, satisfactory.

The report underlined that an immediate observation had been made by the delegation under Article 8 (5) of the Convention establishing the CPT in relation to a so-called "raging cell" at Szeged Strict and Medium Security Regime Prison. The cell was completely dark, in a poor state of repair, measured only a little more than 3 m² and was fitted with a ceiling-mounted sprinkler that enabled it to be doused in water. While the Committee did not dispute that "crisis" situations resulting from

---

6.    Budapest and Szeged special regime units for prisoners serving lengthy sentences

particular prisoners' aggressive or agitated behaviour may require suitable facilities in prisons, the facilities seen at Szeged did not respect human dignity.

33.    The delegation received no allegations of deliberate physical ill-treatment of residents by staff in the **social care home** in Szentgotthárd; some instances of violence between residents occurred but staff appeared to react immediately and appropriately.

Material conditions in the institution's two accommodation buildings were rather poor. The conditions in the larger dormitories which had seven to ten beds were crowded and the dormitories were poorly equipped. More generally, large-capacity dormitories may have a counter-therapeutic, depersonalising effect on residents and compromise their privacy and safety.

The CPT underlined the impressive efforts by the staff and their caring attitude. That said, the staffing levels were clearly insufficient, and the Committee was concerned by the increasing number of vacancies. As regards activities and care, the vast majority of residents had no regular organised activity, no individual care plans were prepared for them and their treatment was limited to pharmacotherapy.

The CPT noted that a number of residents were *de facto* deprived of their liberty without benefiting from any appropriate safeguards and recommended that a clear and comprehensive framework governing the involuntary placement and stay of residents in social care homes be put in place.

34.    As regards **immigration issues**, the delegation found that there were still no effective safeguards to prevent ill-treatment of persons returned by Hungarian police officers through the border fence towards Serbia and no legal remedies capable of offering such persons effective protection against their forced removal and/or *refoulement*, including chain *refoulement*.

35.    In **response** to the report, the Hungarian authorities provided detailed information on the education for police officers and various training programmes which had taken place in recent years, on the steps taken to tackle the phenomenon of inter-prisoner violence at Tököl Juvenile Prison and on the improvements in material conditions, as well as in the programme of activities for juveniles in both establishments visited. The authorities also submitted general information on de-institutionalisation plans in the country and re-confirmed their commitment to support the transition process towards community-based care and independent living for social care home residents.

*Report and response published in March 2020*
*(CPT/Inf(2020)8 and CPT/Inf(2020)9)*

## Report on the ad hoc visit to Poland in September 2019 and response of the Polish authorities

(*treatment of persons in police custody*)

36.    The objective of the CPT's seventh visit to Poland, and its very first ad hoc visit, was to review the implementation of the Committee's long-standing recommendations concerning the treatment of persons in police custody.

The majority of persons interviewed by the delegation, who were or had recently been in police custody, stated that they had been treated by the police in a correct manner. However, the delegation did hear a number of allegations of **physical ill-treatment**. Most of these allegations referred to the use of excessive force at the time of apprehension or immediately after apprehension, in respect of persons who were reportedly already under control and who did not resist (or no longer resisted) arrest. The ill-treatment allegedly consisted mainly of violently pushing a person face down to the ground (or face to a wall), kneeling over the person, including on his/her face or stepping on him/her, occasionally accompanied by slaps, kicks and/or punches. There were also numerous allegations of painful and prolonged handcuffing behind one's back, and some persons alleged having been lifted by their handcuffs and/or dragged on the ground while cuffed. The delegation also heard a small number of allegations of physical ill-treatment consisting of slaps and, in one case, kicks in the course of questioning inside the police establishment.

The delegation's findings during the 2019 visit clearly indicated that persons taken into police custody in Poland continued to risk being ill-treated, in particular at the time of apprehension. This was a source of ongoing serious concern to the CPT and demonstrated the need for the Polish authorities to step up their efforts in this area. In the light of the above, the Committee once again called upon the Polish authorities to rigorously pursue their efforts to combat ill-treatment by the police.

37.    The complete absence of progress as regards the fundamental **safeguards against ill-treatment** advocated by the CPT, namely the right of access to a lawyer and to a doctor, the right to notify one's detention to a third party and the right to be informed of the these rights, was the source of the Committee's deepest concern after the 2019 ad hoc visit to Poland. It was the CPT's view that serious deficiencies observed once again by its delegation were of a persistent and systemic character, which appeared in an even more negative light when set against the ongoing phenomenon of ill-treatment of persons in police custody.

38.    Based on the delegation's findings, the Committee considered that if no expedient and decisive action was taken by the Polish authorities, the risk of persons in police custody being subjected to ill-treatment was likely to increase further in the near future. The CPT hoped that its report would enable the Polish authorities at the highest level, beginning with the Minister of Internal Affairs and Administration, to become fully aware of this risk and to take long-overdue remedial and preventive action.

The CPT stressed that if no progress were made by the Polish authorities to radically improve the level of their co-operation with the Committee, including as regards the implementation of the CPT's long-standing recommendations, the Committee could well be obliged to have recourse to Article 10, paragraph 2, of the Convention and to make a public statement on the matter. The CPT hoped that urgent and decisive action by the Polish authorities would render such a measure unnecessary.

39.    In their **response**, the Polish authorities provided information on the measures taken to implement the recommendations made in the CPT's report.

*Report and response published in October 2020*
*(CPT/Inf(2020)31 and CPT/Inf(2020)32)*

## Report on the ad hoc visit to Portugal in December 2019 and response of the Portuguese authorities

*(treatment of persons deprived of their liberty by law enforcement agencies and of patients held at the psychiatric clinic of Santa Cruz do Bispo Prison)[7]*

40.   In the course of the 2019 visit, a considerable number of allegations were again received from detained persons of **ill-treatment** by the Judicial Police (PJ), Public Security Police (PSP) and the National Republican Guard (GNR). The alleged ill-treatment took place at the time of apprehension, as well as during time spent in a police station. It consisted primarily of slaps, punches and kicks to the body and/or head as well as, on occasion, the use of batons or sticks. Allegations were also received of verbal abuse and excessively tight handcuffing. The report detailed a number of cases of alleged physical ill-treatment.

The findings of the CPT's delegation appeared to indicate that the infliction of ill-treatment, particularly on persons of African descent and foreign nationals, was not infrequent. The report stated that the Portuguese authorities must recognise that the existence of ill-treatment by police officers was a fact, and that it was not caused by a few rogue officers. The CPT put forward a number of recommendations to tackle ill-treatment which covered recruitment, training (including on interview and investigative techniques), accountability and the development of a police culture which views the resort to ill-treatment as unprofessional. Further, all police stations should be suitably equipped to enable audiovisual recording of police interviews.

41.   As regards the **effectiveness of investigations into allegations of ill-treatment** by law enforcement officials, the report outlined the importance of ensuring that such investigations were carried out promptly and thoroughly. To this end, the CPT recommended that the Prosecutor General's Office be provided with additional resources. The CPT stated that protocols were required to ensure that whenever a case of alleged ill-treatment, or of injuries indicative of ill-treatment, was forwarded to the prosecutor's office from the prison authorities, a representative of the Prosecutor General's Office or from the General Inspectorate of Home Affairs (IGAI) interviewed the person concerned within 48 hours with a view to determining whether a forensic medical examination was necessary and what further investigative steps were required. In addition, the CPT recommended that the disciplinary process should run in parallel with the criminal investigation, given the very long periods (five years or more) required for a criminal case to be dealt with by the courts.

As regards **safeguards** against ill-treatment, the rights of detained persons to notify a family member or a person of confidence about their situation and to have access to a doctor operated generally satisfactorily. However, the majority of persons interviewed stated that they only met an *ex officio* lawyer at the court hearing before a judge. The CPT reiterated that persons detained by the police should have the right of access to a lawyer as from the very outset of their deprivation of liberty.

---

7.   A further focus of the visit was the treatment of various categories of prisoners, notably those held on remand and in disciplinary segregation as well as vulnerable prisoners.

42.    In respect of the **Psychiatric Clinic of Santa Cruz do Bispo Prison**, the CPT again found that the Clinic remained prison-like and unable to provide a therapeutic environment for the care and treatment of psychiatric patients. The CPT concluded that the current treatment and conditions of many of the patients that were held in this Clinic could well amount to inhuman and degrading treatment.

The CPT recognised that the Portuguese authorities were attempting to find an appropriate solution to this unacceptable situation. However, pending the closure of the Psychiatric Clinic, the CPT recommended that action be taken to reduce further the number of patients held in the facility and to put in place a structured programme of therapeutic activities for patients. At the same time, to combat inter-patient violence and intimidation, it was essential that the nursing and health-care assistant staffing levels be significantly increased and that prison officers no longer work in the wards.

The CPT again recommended that specific written guidelines on the use of *pro re nata* (PRN) medication (so-called "SOS medication") and on the use of means of restraint for psychiatric patients in institutions under the Ministry of Justice be drawn up in line with the Committee's requirements. The measure of seclusion, which was known to cause disorientation and anxiety for certain patients, also needed to be properly regulated and subject to a number of safeguards.

43.    In their **response**, the Portuguese authorities provided information on the steps being taken to address the CPT's recommendations regarding police ill-treatment and improving the treatment of persons held in the Psychiatric Clinic of Santa Cruz do Bispo Prison as well as in other prisons. Reference was also made to a working group set up by the Ministries of Justice and Health to review the current Mental Health Law.

*Report and response published in November 2020*
*(CPT/Inf(2020)33 and CPT/Inf(2020)34)*

**Report on the periodic visit to Turkey in May 2017 and response of the Turkish authorities**

*(situation of persons in police custody, immigration detention and prisons)*

44.    The CPT's delegation received a considerable number of allegations from detained persons (including women and juveniles) of recent physical ill-treatment by **police/gendarmerie** officers, in particular in the Istanbul area and in south-eastern Turkey. Most of those allegations concerned excessive use of force at the time of apprehension. In addition, many detained persons claimed that they had been physically ill-treated inside law enforcement establishments, with a view to extracting a confession or obtaining information, or as a punishment. The latter allegations concerned mainly slaps and punches (including to the head and face), as well as blows with a truncheon, hose pipe or other hard object. In a number of cases, the alleged ill-treatment was of such severity that it could, in the Committee's view, be considered as amounting to torture. The CPT recommended that a clear and firm message that all forms of ill-treatment of detained persons were illegal and would be punished accordingly be delivered to all law enforcement officials from the highest political level, namely the President of the Republic.

Most of the detained persons interviewed indicated that they had access to a lawyer whilst in police custody. However, many of them claimed that they had been sub-jected to informal questioning by law enforcement officials without the presence of a lawyer, prior to the taking of a formal statement (in the presence of a lawyer). Further, the entire system of routine medical controls at the beginning and at the end of police custody appeared to be fundamentally flawed, since law enforcement officials were usually present during such controls and these controls were often carried out without any physical examination.

45.     The delegation also examined the situation of foreign nationals in several **immigration detention** facilities in Istanbul and Izmir. Most of the foreign nationals interviewed by the delegation spoke positively about the manner in which they were treated by staff. That said, the delegation received some allegations of physical ill-treatment and verbal abuse by custodial staff in several of the removal centres visited.

The report welcomed the policy decision of the Turkish authorities to no longer hold unaccompanied minors in removal centres. That said, the Committee recommended that a thorough review be carried out of the situation of accompanied minors in all removal centres, with a view to ensuring appropriate (health-) care and the provision of psychosocial and educational activities for children.

In all the removal centres visited, improvements were observed in terms of health-care staffing levels, with a nurse being on duty around the clock and a doctor usually being present on workdays. However, it remained the case that no medical screening was usually carried out of newly admitted foreign nationals and that there was still a total lack of medical confidentiality.

46.     The CPT expressed serious concern that the size of Turkey's prison population continued to grow at an alarming rate and that most of the **prisons** visited were grossly overcrowded. The overcrowding had a negative impact on many aspects of life in the establishments, often leading to extremely cramped accommodation, limited access to out-of-cell activities and overburdened health-care services. Whilst acknowledging the measures taken by the Turkish authorities to address the problem, the Committee called upon the authorities to take concerted action to curb prison population inflation and to intensify their efforts to eradicate prison overcrowding.

Hardly any allegations were received of recent physical ill-treatment of inmates by staff in the prisons visited. However, at Batman M-type Prison and Diyarbakır, Siirt and Trabzon E-type Prisons, many prisoners were being held under conditions of detention which could easily be considered as inhuman and degrading, due to severe overcrowding in the living units. The CPT recommended that the Turkish authorities take urgent measures in these establishments to address the problem of overcrowding.

The CPT visited, for the first time in Turkey, two specialised prisons for inmates suffering from chronic somatic and/or mental illnesses, namely Istanbul-Metris and Izmir-Menemen R-type Prisons. The Committee gained a favourable impres-sion of the material conditions and the somatic care provided to inmates at these establishments. That said, the delegation observed significant delays in transferring seriously ill prisoners from ordinary prisons to an R-type prison, which resulted in a

deterioration of the state of health of the persons concerned (e.g. bed sores, malnutrition, etc.). Further, the presence of psychiatrists was clearly insufficient in both R-type prisons visited.

As regards the health-care services in the other prisons visited, the CPT expressed serious concern about the severe shortage of doctors and nurses. Further, major shortcomings were once again observed regarding the medical screening of newly arrived prisoners, the recording and reporting of injuries and the continued lack of respect for medical confidentiality, despite the specific recommendations repeatedly made by the Committee in previous visit reports.

47.    In **response** to the report, the Turkish authorities referred to initial and in-service training programmes for law enforcement officers, covering subjects such as professional policing, proportionality of the use of force, and human rights. Further, the Committee was informed that the removal centre in Izmir-Işıkkent, which was criticised in the report on account of its poor material conditions, had been withdrawn from service shortly after the visit, along with several other sub-standard removal centres. In parallel, one new removal centre had been opened, and the construction of 15 removal centres was underway. As regards prisons, the Turkish authorities provided information on the measures taken or envisaged to address the problem of overcrowding and other issues of concern raised in the report.

*Report and response published in August 2020*
*(CPT/Inf(2020)22 and CPT/Inf(2020)23)*

## Report on the ad hoc visit to Turkey in May 2019 and response of the Turkish authorities

*(treatment of persons detained by law enforcement agencies; situation of prisoners held at Imralı F-type Prison)*

48.    As was the case during the CPT's 2017 visit to Turkey, the delegation received a considerable number of allegations of physical ill-treatment (including excessive use of force) by **police/gendarmerie** officers from persons who had recently been taken into custody (including women and juveniles). The allegations mainly consisted of slaps, kicks, punches and truncheon blows after the persons concerned had been brought under control. A significant proportion of the allegations related to beatings during transport or inside law enforcement establishments, apparently with the aim of securing confessions or obtaining other information, or as a punishment. Further, numerous detained persons claimed to have been subjected to threats and/or severe verbal abuse. Moreover, a number of allegations were once again received relating to excessive use of force and/or physical ill-treatment by members of the mobile motorcycle intervention teams (so-called 'Yunus') in Istanbul. In a number of cases, the allegations of physical ill-treatment were supported by medical evidence.

The CPT gained the impression that, compared to the findings of the 2017 visit, the severity of alleged police ill-treatment had diminished. However, the frequency of allegations remained at a worrying level. The Committee stressed once again the need for more decisive action by all relevant authorities in order to combat the phenomenon of police ill-treatment in Turkey and reiterated its recommendation that a clear and firm message of "zero tolerance" of ill-treatment be delivered to

all law enforcement officials, from the highest political level, namely the President of the Republic.

Further, the CPT found that the system of mandatory medical controls at the outset and end of police/gendarmerie custody remained fundamentally flawed. In particular, in the vast majority of cases, law enforcement officials continued to be present during medical controls and such controls were often carried out without any physical examination. Moreover, several persons claimed that they had been threatened by police officers not to show their injuries.

The report noted that, in all the law enforcement establishments visited, detention facilities were in a good state of repair and generally clean. That said, due to major structural deficiencies, they were unsuitable for detention lasting more than a few days. In particular, many police custody cells did not have access to natural light, and in none of the establishments visited had arrangements been made to enable detained persons to have access to the open air.

49.    As during previous CPT visits, no allegations were received of ill-treatment of prisoners by staff at **Imralı F-type High-Security Prison**. Further, the health-care services and material conditions of detention remained generally satisfactory. However, the CPT noted that the situation regarding the prisoners' regime had not improved at all since its 2016 visit and called upon the Turkish authorities to ensure that all prisoners held at Imralı Prison are allowed to associate together during daily outdoor exercise, as well as during all other out-of-cell activities. The Committee also stressed the importance of developing a sustainable system of regular visits by family members and lawyers for all prisoners held at Imralı Prison.

50.    In **response** to the report, the Turkish authorities referred to various training activities for police and gendarmerie officers and provided information on the number of criminal and disciplinary proceedings relating to alleged ill-treatment by law enforcement officials. The response also referred to the authorities' ongoing efforts to further improve material conditions in police detention facilities.

*Report and response published in August 2020*
*(CPT/Inf(2020)24 and CPT/Inf(2020)25)*

## Report on the ad hoc visit to Ukraine in August 2020

*(treatment of persons held in correctional colonies; situation of life-sentenced prisoners)*

51.    The visit was an opportunity for the CPT's delegation to review the treatment of prisoners at two correctional colonies in the Kharkiv area, namely Colonies Nos. 25 and 100. The delegation also visited for the first time Colony No. 77 in Berdyansk.

52.    At **Colony No. 25**, the delegation received a number of credible allegations of physical ill-treatment by prison officers which related to 2019, consisting of punches, kicks and blows with rubber truncheons. The alleged ill-treatment had mainly taken place in the offices of operational officers, occasionally with the help of inmates (so-called "duty prisoners") who had a designated role to assist staff. In a few cases, the alleged ill-treatment was of such severity that it could be considered to amount to torture (e.g. extensive beating, infliction of burns to the buttocks, asphyxiation

using a plastic bag, etc.). In stark contrast to the above, as regards the year 2020, the delegation received hardly any allegations of physical ill-treatment by staff of Colony No. 25.

53.   At **Colony No. 100**, the delegation received several credible allegations of recent physical ill-treatment by staff from prisoners. The alleged ill-treatment mainly consisted of punches, kicks, truncheon blows, twisting of the arms and/or legs, being kept in stress positions, being forced to exercise physically beyond the point of exhaustion, and squeezing of the testicles, and in some cases apparently also involved "duty prisoners". The impression gained by the delegation in the course of the visit to Colony No. 100 was that prisoners who did not always comply with staff orders ran a significant risk of being ill-treated. The CPT recommended that a firm message be delivered at regular intervals to the management and staff of this colony that any form of ill-treatment of prisoners was unacceptable and would be punished accordingly.

54.   The report highlighted that **Colony No. 77** stood out among the establishments visited, due to the pervasive climate of fear among inmates. The CPT pointed out that, during its many visits to the 47 Council of Europe member States over the last 30 years, it had hardly ever visited a prison with such large-scale refusals of prisoners to be interviewed. Nevertheless, the delegation was able to gather sufficient information to enable it to conclude that Colony No. 77 was managed through a system of intimidation and violence. It appeared that the ill-treatment of prisoners was mainly meted out by "duty prisoners" – usually with the knowledge and acquiescence of the management – and often took the form of beating on the soles of the feet and/or the buttocks with a plastic pipe. The CPT recommended that a comprehensive inquiry be carried out from the central level into how Colony No. 77 functioned and that the management and staff of this colony receive a clear message that any prison official committing or aiding and abetting ill-treatment would be held accountable.

55.   At the time of the visit, some 75% of the life-sentenced prisoners held at Colony No. 100 were no longer systematically handcuffed when taken out of their cells. The CPT stressed the need to build upon this positive development, making sure that routine handcuffing of prisoners was an exceptional measure, was always based on an individual risk assessment and was reviewed on a regular and frequent basis.

That said, the Committee noted that life-sentenced prisoners continued to be subjected to certain anachronistic and demeaning practices (such as making them to run in the corridor in a half-squatting position or to walk bent over at the waist with their hands lifted during escorts) and called upon the Ukrainian authorities to put an immediate end to such practices. The CPT was also concerned to note that the great majority of life-sentenced prisoners at Colony No. 100 continued to be locked up in their cells for 23 hours per day, their only out-of-cell activity being one hour of outdoor exercise which was taken in small cubicles. The Committee called upon the Ukrainian authorities to develop the regime for these prisoners, in particular by providing a range of out-of-cell communal activities.

*Report published in December 2020*
*(CPT/Inf(2020)40)*

## Report on the ad hoc visit to the United Kingdom in May 2019 and response of the United Kingdom authorities

(*situation of inmates held in prisons and juvenile detention institutions)*

56.    This targeted ad hoc visit to England focussed on the persistently high levels of violence in the local male adult prisons and juvenile detention centres, as well as on broader concerns regarding regimes, the use of force, segregation and use of means of restraint. The visit was a direct follow-up to the CPT's April 2016 visit to the United Kingdom and to the discussions held with Ministers in London in April 2017.

57.    The CPT visited three prisons (HMP Doncaster, Liverpool and Wormwood Scrubs), where it focussed on **inter-prisoner violence, prisoner-on-staff assaults and staff-on-prisoner violence**. Levels of violence – in all forms – had reached "record highs" and the CPT found that none of the establishments visited could be considered safe. Equally, prisoner-on-staff violence had increased by 15% from the previous year across prisons in England and Wales. In each of the three prisons visited, there had been recent serious attacks by prisoners on staff and on other inmates, resulting in severe injuries and hospitalisation. The CPT recommended that far greater investment be made in preventing these forms of violence at the three prisons visited and across the wider prison estate and that specific measures be taken around monitoring, anti-violence interventions, staffing and accountability procedures.

A new and deeply concerning finding was the infliction of unjustified violence by staff on prisoners in two of the three prisons visited, namely Liverpool and Wormwood Scrubs. In particular, the CPT found that an informal practice of "preventive strikes" was emerging (i.e., "preventively" punching compliant prisoners whom staff perceived might, at some point in the future, become a threat). The CPT recommended that the authorities explicitly prohibit the reprehensible practice of "preventive strikes" by prison officers on inmates and ensure that prison staff understand that ill-treatment will result in disciplinary sanctions or criminal prosecution.

58.    The CPT found that many **safeguards** and accountability procedures remained underdeveloped in the prisons visited, including the existing reporting procedures and governance systems to monitor and tackle violence by staff. Notably, the complaints' system needed reform to ensure its procedural effectiveness, fairness and transparency, as did the recording of use of force and internal prison investigations. Further, the CPT considered that the use of Body Worn Video Cameras should be made mandatory for every interaction involving the use of force by staff on inmates.

The CPT acknowledged that the various measures to be taken by the authorities to tackle the violence represented a positive start, but they remained insufficient to address the root causes of the prison crisis.

59.    The report also recognised that many **staff** were working under immense pressure, in challenging circumstances. This was exacerbated by the poor staff retention rate which meant that the actual numbers of staff in direct contact with prisoners in accommodation areas had not changed significantly since the CPT's 2016 visit. Action to bolster the retention of newly recruited and freshly trained front-line custodial staff was required, which should include extending the initial training programme and providing adequate psychological support and remuneration.

60.     In the three prisons visited, high numbers of prisoners suffered from **mental health disorders** and a considerable number of prisoners had self-harmed, some severely, in the previous year. The CPT found several persons suffering from severe mental health disorders who were being held in a segregation unit rather than being treated in an appropriate hospital environment. It also noted delays in transfers to hospitals and shortcomings in the ACCT (self-harm prevention) procedure. The CPT recommended that measures be taken to ensure that the self-harm and suicide prevention strategies in prisons be made more effective.

61.     Equally, the alarmingly high levels of **substance use** in prisons remained of concern to the CPT, with drug-taking omnipresent in the establishments visited. The CPT recommended that additional resources be allocated to ensuring that the 2019 Prisons Drugs Strategy was more effectively implemented in all prisons in England and Wales. Further, the Drugs Strategy should be complemented by other measures, such as ensuring adequate ratios of staff and drug free units.

62.     In **response** to the report, the United Kingdom authorities provided detailed information on the situation in prisons, including measures underway to increase recruitment and provide longer training periods for new-entrant prison staff, anti-violence interventions, measures to bolster physical and procedural security at prisons to stop the in-flow of drugs into prisons and the offender management Key Worker scheme, among other things.

*Report and response published in April 2020*
*(CPT/Inf(2020)18 and CPT/Inf(2020)19)*



> The failure to reach a minimum decency threshold can lead to situations in which prisoners are exposed to inhuman and degrading treatment.



# A decency threshold for prisons – criteria for assessing conditions of detention

## Introduction

63.    2020 will forever be remembered as the year the Covid-19 pandemic wrought havoc across the globe, including in the lives of persons deprived of their liberty and their families. Elsewhere in this General Report, the CPT sets out the basic principles that must be respected in order to protect the human rights of all persons living in places of detention during the ongoing pandemic.[8] The undeniable need to take firm action to combat Covid-19 must never result in inhuman or degrading treatment of persons deprived of their liberty.

The CPT also perceives the pandemic as playing out within a pre-existing longer-term budgetary crisis in the prison systems of several Council of Europe member States. During its prison visits in recent years, the Committee has increasingly found that significant cuts have been made in the basic essentials needed for prisoners to maintain a dignified life. Lowering prison food or heating budgets inevitably impacts negatively on prisoners' quality of life. If reductions of this nature occur at the same time as developments such as increasing prisoner admissions (most notably of those with long sentences), as well as a reduction of visits and activities and a lack of work opportunities, the cumulative effect is to impinge significantly on the basic right of prisoners to live a safe, humane, healthy and dignified life while deprived of their liberty.

64.    Having regard to the likely longer-term economic impact of the Covid-19 pandemic, the CPT is concerned that the negative effects upon prisoners of pre-existing austerity measures may become exacerbated by even deeper budgetary restrictions. If this happens, it will be experienced most acutely by very poor and vulnerable prisoners, who constitute a significant proportion of the prison population throughout the Council of Europe region.

---

8.    See the CPT's Statement of principles relating to the treatment of persons deprived of their liberty in the context of the coronavirus disease (Covid-19) pandemic of 20 March 2020 (set out in Appendix 8) and the Follow-up statement regarding the situation of persons deprived of their liberty in the context of the ongoing Covid-19 pandemic of 9 July 2020 (set out in Appendix 9).

The CPT has seen that poverty among prisoners can be heightened by austerity policies; the scarcer or more expensive items become in a prison, the greater the likelihood that this will create or exacerbate inequalities among the inmate population and potentially impair their future welfare. Those without an income from families or outside sources are completely dependent on prison incomes, often at very low wages. Income disparities can foster bullying, as can debt, as well as other situations conducive to inter-prisoner intimidation or violence. Equally, very low incomes for prisoners may mean that they simply cannot afford the bare essentials such as keeping in contact with their families by telephone, the ability to make small purchases, such as additional food, from the prison shop or even to buy stamps, letter writing materials or reading materials. Depriving prisoners of this small degree of personal autonomy can have adverse psychological and physical consequences and impair their prospects of reintegrating into society. This is particularly the case when families also suffer from poverty and are not in a position to be able to help their imprisoned family-members.

In several Council of Europe member States, the CPT has seen the results of prison austerity policies affecting prison budgets and numbers and availability of staff. This, in turn, has a direct impact on the reduction of prisoners' regimes of activities, access to work and time outside of their cells and outdoors. Fewer staff to accompany and supervise prisoner movements around the prison has led to rotational lock-downs and prisoners spending more time locked in cells and missing activity slots or work, as well as having their time outdoors reduced (see paragraph 80). The CPT has seen examples where this has led to prisoners being left for over 21 hours per day with very little to structure their day, which in turn has fostered boredom, frustration and even violence, as well as having an adverse impact on their mental health.

65.     Consequently, the Committee has decided to devote the substantive chapter of this year's General Report to setting out what it regards as the basic requirements to enable prisoners to live decently in a prison, and to describing some of the benchmarks that it uses to monitor whether or not those requirements are being met. In so doing, the CPT recognises that certain of the fundamental social and economic rights of detained persons are indivisible from their right to be treated humanely, as is required by Article 3 of the European Convention on Human Rights.

The CPT hopes that, by setting out these criteria for a decency threshold that should be respected in all prisons at all times, it may assist member States to develop policies to mitigate the worst effects of austerity measures on prisoners.

66.     The criteria in the following section have been developed in relation to prison settings, but could be considered of relevance *mutatis mutandis* in a variety of other places of detention. This is a subject to which the CPT intends to return in greater detail during the years to come.

## The essential components of a decency threshold in prison settings

67.     During its prison monitoring work over the last three decades, the CPT has identified the essential elements that are necessary to maintain humane living conditions for prisoners.

In many of its visit reports, the Committee has highlighted the failure to meet the basic needs of prisoners in individual establishments. However, it wishes here to emphasise that, in the CPT's view, the following elements constitute a decency threshold that must be maintained in every prison in every Council of Europe member state.

The failure to reach a minimum decency threshold can lead to situations in which prisoners are exposed to inhuman and degrading treatment.

68.   The Committee considers that all persons deprived of their liberty in prisons should be provided, at minimum, with:

- ▶ ready access to sufficient clean drinking water;
- ▶ adequate food: both in quantity and nutritional value;
- ▶ decent sleeping and living conditions and the means to keep clean: proper sanitation, including toilet and shower facilities, washing water, cleaning products, laundry, personal hygiene products;
- ▶ effective access to, and fair remuneration for, work; ready access to other activities; and
- ▶ regular possibilities to remain in contact with the outside world.

Moreover, it is axiomatic that all prisoners must have ready access to adequate health-care services free-of-charge, without discrimination on the grounds of their legal status, and on an equivalent basis to those available in the outside community.[9]

In the following section, the CPT sets out the manner in which it monitors compliance with this minimum decency threshold and provides more detailed guidance on the benchmarks that indicate whether or not that threshold has been reached and is being maintained.

## Monitoring compliance with a decency threshold

### Ready access to sufficient clean drinking water

69.   In a number of countries, the CPT has found prisoners being held without ready access to sufficient quantities of clean drinking water.

For example, the Committee has encountered prisoners, including those serving life sentences, held in cells in which the water supply is only turned on for a few hours every day. In other establishments, some cells have been found to have no water supply or the tap water available has been unfit for human consumption.

———

9.   See the CPT's longstanding standards on "Health care services in prisons", document CPT/Inf(93)12-part, available in 25 languages at: https://www.coe.int/en/web/cpt/prison-health-care. During the current pandemic, it is also essential that there be adequate measures to protect and prevent the spread of Covid-19; see the CPT's Statement of principles relating to the treatment of persons deprived of their liberty in the context of the coronavirus disease (Covid-19) pandemic of 20 March 2020 and Follow-up statement regarding the situation of persons deprived of their liberty in the context of the ongoing Covid-19 pandemic of 9 July 2020.

In certain establishments without proper drinking water supplies, CPT delegations have encountered the practice of obliging prisoners to pay for bottled water from their own meagre funds, obliging them to choose between obtaining water and securing other basic essentials not provided in prison.

It is regrettable that it remains necessary for the CPT to emphasise that all prisoners should have continuous access, in their cells, to sufficient quantities of free and clean drinking water.

## Adequate food: both in quantity and nutritional value

70.    The CPT monitors whether all prisoners are provided, without cost, with three adequately nutritious and sufficiently calorific meals a day, at least one of which is hot.

This is still not always the case in every Council of Europe member State. Examples of prisoners being provided with insufficient quantities of food and/or with food of inadequate nutritional value can be found in a number of the CPT's visit reports. It also remains the case that, in certain Council of Europe member States, the religious and/or medically required dietary needs of prisoners are not properly taken into account. In extreme cases, this can result in prisoners being presented with the choice of eating food that is forbidden by their religion, or going hungry. Moreover, the health of those with pre-existing medical conditions (e.g., diabetics, those suffering from food allergies, etc.) may be compromised if their dietary needs are not met.

Equally, the CPT examines the manner and circumstances in which food is served to prisoners. Even when food is sufficient in quantity and of adequate quality, the Committee has encountered it being served in a manner that is unsanitary and undignified (for example, from a bucket on the floor), leading some prisoners to refuse to eat it. The CPT has also seen instances where prisoners are obliged to eat their meals on their beds in multi-occupancy rooms beside open, unscreened, often filthy toilets and in severely cramped conditions. Aside from being unsanitary, such situations also facilitate vermin infestations (see paragraph 75). All prisoners should be able to eat in hygienic conditions.

71.    The CPT considers that a wide variety of foods should be made available in the right proportions to enable prisoners to maintain an adequately nutritious, sufficiently calorific and well-balanced diet, as well as access to plenty of fluids.[10]

Prison menus should also include options for religious, cultural or medically required dietary needs. Specially adapted food should be available for elderly prisoners who may have difficulty chewing and digesting. Detained minors, young adults and pregnant and breast-feeding women prisoners should be provided with additional food to meet their particular nutritional needs.

---

10.    See also Rule 22. 2 of the European Prison Rules, Recommendation Rec (2006)2-rev of the Committee of Ministers to member States on the European Prison Rules (Adopted by the Committee of Ministers on 11 January 2006, and revised by the Committee of Ministers on 1 July 2020), "the requirements of a nutritious diet, including its minimum energy and protein content, shall be prescribed in national law".

## Decent conditions and cleanliness

72.    The CPT has developed long-standing and detailed standards on decent sleeping and living conditions,[11] which it is unnecessary to repeat here. Suffice it to say that all prisoners must have their own bed, personal locker, a living space with appropriate furniture, and benefit from heating, artificial and natural light, ventilation and access to fresh air, as well as from sufficient personal living space.

73.    To reach a decency threshold, all prisoners must also be provided with the means to keep themselves clean, including ready access to a clean fully-functioning toilet, proper sanitation, warm washing water, shower (if possible on a daily basis, but at least twice a week),[12] cleaning products, laundry facilities and personal hygiene products.

However, it remains the case that CPT delegations encounter examples of prisoners being deprived of toilet paper if they cannot pay for it, and women prisoners not being issued with sanitary pads and tampons.

Prisoners should be systematically provided with sufficient supplies of basic personal hygiene products free of charge upon admission and on a regular basis thereafter. Particular attention must be paid to the specific sanitary needs of women and girls.

74.    Not only should each prisoner have a bed, clean pillow, blanket and mattress, but they should also be provided with a clean mattress of reasonable quality and durability; mattresses should be changed if irreparably damaged and at least every few years. All too often, the CPT still finds old, bed-bug-ridden, thin, torn, stained foam mattresses in places of detention. The bedsheets and pillowcases of prisoners should also be changed for clean bedclothes at sufficiently frequent intervals (at least twice a month). Every newly arrived prisoner should receive a complete set of clean bedclothes.

Prisoners should be supplied with, or allowed to retain, a sufficient amount of clothing. The prison should supply indigent prisoners with clean clothing appropriate to seasonal weather conditions. Prisoners should be provided with several sets of underwear which are personal to them; these should be washed and returned to them regularly so that they have a clean set of underwear at frequent intervals (i.e., more than once a week).

75.    The CPT has encountered extremely unsanitary conditions in many prisons in Council of Europe member States, including rats, cockroaches, vermin, bedbugs, lice infestations in prisoners' cells, on their clothes, hair and beds.

The necessary cleaning products should be made available, free of charge, to allow prisoners to maintain their own cells in a clean and hygienic state.

---

11.  For full details, see: https://www.coe.int/en/web/cpt/standards#prisons.
12.  See also Rule 19.4 of the European Prison Rules: "adequate facilities shall be provided so that every prisoner may have a bath or shower, at a temperature suitable to the climate, if possible daily but at least twice a week (or more frequently if necessary) in the interest of general hygiene".

## Effective access to, and fair remuneration for, work, as well as ready access to other activities

76.    A satisfactory programme of purposeful activities (work, education, sport, training, etc.) is of crucial importance for the well-being of prisoners.

Fairly remunerated work and/or paid vocational training should be available for all prisoners, to enable them to maintain some structure and meaning in their days and in order that they can afford the basics of a decent and humane existence in prison, which are not already provided by the prison. This includes, *inter alia*, telephone credit to call home at regular intervals, correspondence materials, and the ability to purchase additional food and other prison-shop products, or to save their earnings, thereby conserving some degree of personal autonomy.

77.    All unemployed prisoners and prisoners of retirement age should also be placed in a position to meet their basic needs. Some prisoners may have adequate pensions; however, those with insufficient incomes should receive additional financial assistance in prison to enable them to purchase basic items (such as those mentioned previously, cf. paragraph 64) that are not provided free of charge by the prison authorities.

78.    The CPT also takes into account whether the prices of products purchasable by prisoners exceed retail prices with the result that basic items remain unaffordable to those without private means or outside support.

79.    While a minimum wage in prisons has yet to be established across the Council of Europe region, the CPT considers that prisoners should have the right to fair remuneration to encourage them to work, to help them finance their lives in prison in a decent manner, to keep them purposefully occupied and, ultimately, to prepare them for release and reduce recidivism. In the case of any mandatory financial deductions and contributions (e.g., to electricity costs, social insurance or living expenses), these should not disproportionately diminish a prisoner's net income from work, education, training or welfare benefits.

To achieve this, and as a desirable guideline, the CPT invites member States of the Council of Europe that have not yet done so to consider introducing a fair minimum prison wage. This could be inflation adjusted/index-linked and should constitute an adequate amount to allow all prisoners to afford basic items in the prison shop catalogue, which should itself reflect, at a maximum, external retail prices.

80.    The CPT has repeatedly emphasised that all prisoners[13] must benefit from a minimum of access to one hour's daily outdoor exercise and/or time in the open air, and two hours in the case of juvenile inmates. This remains a fundamental right for all prisoners, including during the Covid-19 pandemic.[14]

---

13. Including prisoners held under all types of regimes (protection, removal from association, disciplinary, separation, etc.). Equally, those prisoners separated from the general prisoner population should be ensured at least 2 hours of meaningful human contact each day, irrespective of the regime under which they are held.
14. See Principle 7 of the CPT's Statement of principles relating to the treatment of persons deprived of their liberty in the context of the coronavirus disease (COVID-19) pandemic, of 20 March 2020.

As regards time out of cell more generally, the CPT recalls that the goal should be to provide prisoners with at least 8 hours out of their cells engaged in purposeful activities.

## Regular possibilities to remain in contact with the outside world

81.   The CPT greatly welcomes the increasing availability of in-cell telephones and secure prison mobile phones, as well as internet-based solutions to enable prisoners to maintain their family relations and contact with the outside world. These innovations usefully supplement existing landline telephones located in communal areas. The CPT underlines that all prisoners should have ready and regular access to affordable means to stay in contact with the outside world.

However, in a number of Council of Europe member States, it has found that the pricing of these services (usually provided by outside contractors) can render them unaffordable to prisoners without private means or outside support. For example, in one particular member state, it is currently impossible for a prisoner earning the standard prison wage to afford the deposit for a secure prison mobile phone, let alone the call charges. As a result, maintaining regular contact with the outside world has become a privilege of the better-off prisoner.

Prison administrations should ensure that all prisoners have the right to regular visits and are able to afford, on the basis of their prison wages/income, to call their family at regular intervals. Telephone call charges should not exceed those in the outside community; extra allowances or subsidies may need to be made available to those with inadequate incomes, including indigent, unemployed or retired prisoners.

Particular attention should also be paid to persons who do not receive frequent visits (including those whose families live far away and foreign nationals) for whom maintaining regular contact with the outside world by telephone or internet-based solutions has particular importance. In this regard, the CPT has been pleased to observe, in a number of Council of Europe member States, that additional financial support and/or assistance with transport is provided to families who cannot afford to travel to visit prisoners held far from their homes; this constitutes good practice.



**"** Twenty-five of the CPT's members were men and 15 were women.

# Organisational matters

## CPT membership

82.    On 31 December 2020, the CPT comprised 40 members. The seats in respect of Bosnia and Herzegovina, Cyprus, Italy, Liechtenstein, Malta, Poland and the Russian Federation were vacant. The CPT hopes that the election of members in respect of the vacant posts may take place soon.

Twenty-five of the CPT's members were men and 15 were women. Consequently, applying the "less-than-40%" criterion used by the Parliamentary Assembly in Resolution 1540 (2007), women were slightly under-represented in the Committee. It should be noted that Resolution 1540 stipulates that a list of candidates which does not include at least one man and one woman will be rejected, except when all candidates on the list are of the under-represented sex. The Committee therefore hopes that future lists of candidates will include more women.

83.    In the course of 2020, two members were re-elected: Dagmar Breznoščáková (Slovak Republic) and Răzvan Horaţiu Radu (Romania), and several members of the CPT resigned: Gaia Pergolo (Italy), Costakis Paraskeva (Cyprus), Esther Marogg (Liechtenstein), Vincent Micallef (Malta) and Thomas Feltes (Germany) (the latter with effect from midnight on 31/12/2020). The CPT wishes to thank them for their contribution to the Committee's work.

A list of CPT members as at 31 December 2020 is set out in Appendix 4.

84.    The next biennial renewal of the CPT's membership is due to take place at the end of 2021, the terms of office of 21 members of the Committee expiring on 19 December of that year. The CPT trusts that all the national delegations concerned in the Parliamentary Assembly will put forward lists of candidates in good time, so as to enable the Bureau of the Assembly to transmit them to the Committee of Ministers by the end of June 2021 at the latest. If the election procedure for all the seats can be completed before the end of 2021, this will greatly facilitate the planning of the CPT's activities for the following year.

## Bureau of the CPT

85.    In 2020, the composition of the Committee's Bureau remained unchanged; it consisted of Mykola Gnatovskyy (Ukraine) – President, Mark Kelly (Ireland) – 1st Vice-President, and Therese Maria Rytter (Denmark) – 2nd Vice-President.

## Secretariat of the CPT

86.    Several changes took place in the CPT Secretariat in 2020. One staff member was seconded to another department of the Council of Europe, one staff member who had taken up other duties in the Council of Europe returned to the CPT Secretariat and two staff members were absent on extended leave.



" Whilst acknowledging the clear imperative to take firm action to combat Covid-19, the CPT must remind all actors of the absolute nature of the prohibition of torture and inhuman or degrading treatment.

# Appendices

## 1. The CPT's mandate and modus operandi

The CPT was set up under the 1987 Council of Europe Convention for the Prevention of Torture and Inhuman or Degrading Treatment or Punishment (hereinafter "the Convention"). According to Article 1 of the Convention, "[t]he Committee shall, by means of visits, examine the treatment of persons deprived of their liberty with a view to strengthening, if necessary, the protection of such persons from torture and from inhuman or degrading treatment or punishment."

The work of the CPT is designed to be an integrated part of the Council of Europe system for the protection of human rights, placing a proactive non-judicial mechanism alongside the existing reactive judicial mechanism of the European Court of Human Rights.

The CPT implements its essentially preventive function through two kinds of visits – periodic and ad hoc. Periodic visits are carried out to all States Parties to the Convention on a regular basis. Ad hoc visits are organised when they appear to the Committee "to be required in the circumstances".

When carrying out a visit, the CPT enjoys extensive powers under the Convention: access to the territory of the State concerned and the right to travel without restriction; unlimited access to any place where persons are deprived of their liberty, including the right to move inside such places without restriction and access to full information on places where persons deprived of their liberty are being held, as well as to other information available to the State which is necessary for the Committee to carry out its task.

The Committee is also entitled to interview in private persons deprived of their liberty and to communicate freely with anyone whom it believes can supply relevant information.

Each State Party to the Convention must permit visits to any place within its jurisdiction "where persons are deprived of their liberty by a public authority". The CPT's mandate thus extends beyond prisons and police establishments to encompass, for example, psychiatric hospitals, social welfare institutions, military detention facilities, immigration detention centres, and establishments in which juveniles may be deprived of their liberty by judicial or administrative order.

Two fundamental principles govern relations between the CPT and States Parties to the Convention – co-operation and confidentiality. In this respect, it should be emphasised that the role of the Committee is not to condemn States, but rather to assist them to prevent the ill-treatment of persons deprived of their liberty.

After each visit, the CPT draws up a report which sets out its findings and includes, if necessary, recommendations and other advice, on the basis of which a dialogue is developed with the national authorities. The Committee's visit report is, in principle, confidential; however, most of the reports are eventually published at the request of the Government concerned.

## 2. Signatures and ratifications of the Convention establishing the CPT (as at 31 December 2020)

The European Convention for the Prevention of Torture and Inhuman or Degrading Treatment or Punishment (ECPT) was opened for signature by the member States of the Council of Europe on 26 November 1987. Since 1 March 2002, the Committee of Ministers of the Council of Europe has been empowered to invite any non-member State of the Council of Europe to accede to the Convention.

| Member States of the Council of Europe | Date of signature | Date of ratification | Date of entry into force |
|---|---|---|---|
| Albania | 02/10/1996 | 02/10/1996 | 01/02/1997 |
| Andorra | 10/09/1996 | 06/01/1997 | 01/05/1997 |
| Armenia | 11/05/2001 | 18/06/2002 | 01/10/2002 |
| Austria | 26/11/1987 | 06/01/1989 | 01/05/1989 |
| Azerbaijan | 21/12/2001 | 15/04/2002 | 01/08/2002 |
| Belgium | 26/11/1987 | 23/07/1991 | 01/11/1991 |
| Bosnia and Herzegovina | 12/07/2002 | 12/07/2002 | 01/11/2002 |
| Bulgaria | 30/09/1993 | 03/05/1994 | 01/09/1994 |
| Croatia | 06/11/1996 | 11/10/1997 | 01/02/1998 |
| Cyprus | 26/11/1987 | 03/04/1989 | 01/08/1989 |
| Czech Republic | 23/12/1992 | 07/09/1995 | 01/01/1996 |
| Denmark | 26/11/1987 | 02/05/1989 | 01/09/1989 |
| Estonia | 28/06/1996 | 06/11/1996 | 01/03/1997 |
| Finland | 16/11/1989 | 20/12/1990 | 01/04/1991 |
| France | 26/11/1987 | 09/01/1989 | 01/05/1989 |
| Georgia | 16/02/2000 | 20/06/2000 | 01/10/2000 |
| Germany | 26/11/1987 | 21/02/1990 | 01/06/1990 |
| Greece | 26/11/1987 | 02/08/1991 | 01/12/1991 |
| Hungary | 09/02/1993 | 04/11/1993 | 01/03/1994 |
| Iceland | 26/11/1987 | 19/06/1990 | 01/10/1990 |
| Ireland | 14/03/1988 | 14/03/1988 | 01/02/1989 |
| Italy | 26/11/1987 | 29/12/1988 | 01/04/1989 |
| Latvia | 11/09/1997 | 10/02/1998 | 01/06/1998 |
| Liechtenstein | 26/11/1987 | 12/09/1991 | 01/01/1992 |
| Lithuania | 14/09/1995 | 26/11/1998 | 01/03/1999 |
| Luxembourg | 26/11/1987 | 06/09/1988 | 01/02/1989 |
| Malta | 26/11/1987 | 07/03/1988 | 01/02/1989 |
| Republic of Moldova | 02/05/1996 | 02/10/1997 | 01/02/1998 |
| Monaco | 30/11/2005 | 30/11/2005 | 01/03/2006 |
| Montenegro | | | 06/06/2006 [15] |
| Netherlands | 26/11/1987 | 12/10/1988 | 01/02/1989 |
| North Macedonia | 14/06/1996 | 06/06/1997 | 01/10/1997 |
| Norway | 26/11/1987 | 21/04/1989 | 01/08/1989 |
| Poland | 11/07/1994 | 10/10/1994 | 01/02/1995 |
| Portugal | 26/11/1987 | 29/03/1990 | 01/07/1990 |
| Romania | 04/11/1993 | 04/10/1994 | 01/02/1995 |
| Russian Federation | 28/02/1996 | 05/05/1998 | 01/09/1998 |
| San Marino | 16/11/1989 | 31/01/1990 | 01/05/1990 |
| Serbia | 03/03/2004 | 03/03/2004 | 01/07/2004 |
| Slovak Republic | 23/12/1992 | 11/05/1994 | 01/09/1994 |
| Slovenia | 04/11/1993 | 02/02/1994 | 01/06/1994 |
| Spain | 26/11/1987 | 02/05/1989 | 01/09/1989 |
| Sweden | 26/11/1987 | 21/06/1988 | 01/02/1989 |
| Switzerland | 26/11/1987 | 07/10/1988 | 01/02/1989 |
| Turkey | 11/01/1988 | 26/02/1988 | 01/02/1989 |
| Ukraine | 02/05/1996 | 05/05/1997 | 01/09/1997 |
| United Kingdom | 26/11/1987 | 24/06/1988 | 01/02/1989 |

---

15. On 14 June 2006, the Committee of Ministers of the Council of Europe agreed that the Republic of Montenegro was a Party to the Convention with effect from 6 June 2006, the date of the Republic's declaration of succession to the Council of Europe Conventions of which Serbia and Montenegro was a signatory or party.

## 3. The CPT's field of operations (as at 31 December 2020)



Note: This map is not an official representation of States bound by the Convention. For technical reasons, it has not been possible to show the entire territory of certain of the States concerned.

### States bound by the Convention

| | | | |
|---|---|---|---|
| Albania | Estonia | Lithuania | Russian Federation |
| Andorra | Finland | Luxembourg | San Marino |
| Armenia | France | Malta | Serbia |
| Austria | Georgia | Republic of Moldova | Slovak Republic |
| Azerbaijan | Germany | Monaco | Slovenia |
| Belgium | Greece | Montenegro | Spain |
| Bosnia and Herzegovina | Hungary | Netherlands | Sweden |
| Bulgaria | Iceland | North Macedonia | Switzerland |
| Croatia | Ireland | Norway | Turkey |
| Cyprus | Italy | Poland | Ukraine |
| Czech Republic | Latvia | Portugal | United Kingdom |
| Denmark | Liechtenstein | Romania | |

### 47 States; prison population: 1,528,343 prisoners

**(Main source: Council of Europe Annual Penal Statistics (SPACE I – 2020); data as at 31 January 2020)**

It should be noted that, in addition to prisons, the CPT's mandate covers all other categories of places where persons are deprived of their liberty: police establishments, detention centres for juveniles, military detention facilities, immigration detention centres, psychiatric hospitals, social welfare institutions, etc.

## 4. CPT members

**in order of precedence (as at 31 December 2020)**

| Name | Elected in respect of | Term of `res |
|------|----------------------|-------------|
| Mr Mykola GNATOVSKYY, President | Ukraine | 19/12/2021 |
| Mr Mark KELLY, 1st Vice-President | Ireland | 19/12/2023 |
| Ms Therese Maria RYTTER, 2nd Vice-President | Denmark | 19/12/2021 |
| Mr Georg HØYER | Norway | 19/12/2021 |
| Ms Marika VÄLI | Estonia | 19/12/2021 |
| Ms Julia KOZMA | Austria | 19/12/2021 |
| Mr Régis BERGONZI | Monaco | 19/12/2021 |
| Mr Jari PIRJOLA | Finland | 19/12/2023 |
| Mr Djordje ALEMPIJEVIĆ | Serbia | 19/12/2021 |
| Mr Vytautas RAŠKAUSKAS | Lithuania | 19/12/2023 |
| Mr Davor STRINOVIĆ | Croatia | 19/12/2021 |
| Mr Nico HIRSCH | Luxembourg | 19/12/2021 |
| Mr Alexander MINCHEV | Bulgaria | 19/12/2021 |
| Mr Hans WOLFF | Switzerland | 19/12/2023 |
| Mr Per GRANSTRÖM | Sweden | 19/12/2021 |
| Mr Ömer MÜSLÜMANOĞLU | Turkey | 19/12/2021 |
| Mr Philippe MARY | Belgium | 19/12/2023 |
| Ms Marie LUKASOVÁ | Czech Republic | 19/12/2023 |
| Ms Dagmar BREZNOŠČÁKOVÁ | Slovak Republic | 19/12/2023 |
| Mr Ceyhun QARACAYEV | Azerbaijan | 19/12/2023 |
| Mr Răzvan Horaţiu RADU | Romania | 19/12/2023 |
| Ms Vânia COSTA RAMOS | Portugal | 19/12/2023 |
| Ms Slava NOVAK | Slovenia | 19/12/2021 |
| Mr Thomas FELTES | Germany | 31/12/2020 |
| Mr Vincent DELBOS | France | 19/12/2021 |
| Ms Chila VAN DER BAS | Netherlands | 19/12/2021 |
| Mr Vitalie NAGACEVSCHI | Republic of Moldova | 19/12/2021 |
| Mr Alan MITCHELL | United Kingdom | 19/12/2021 |
| Mr Gergely FLIEGAUF | Hungary | 19/12/2021 |
| Ms Tinatin UPLISASHVILI | Georgia | 19/12/2021 |
| Mr Juan Carlos DA SILVA OCHOA | Spain | 19/12/2021 |
| Ms Elsa Bára TRAUSTADÓTTIR | Iceland | 19/12/2023 |
| Ms Ifigeneia KAMTSIDOU | Greece | 19/12/2023 |
| Mr Gordan KALAJDJIEV | North Macedonia | 19/12/2023 |
| Mr Aleksandar TOMCUK | Montenegro | 19/12/2023 |
| Ms Solvita OLSENA | Latvia | 19/12/2023 |
| Ms Kristina PARDALOS | San Marino | 19/12/2023 |
| Ms Vanessa DURICH MOULET | Andorra | 19/12/2023 |
| Ms Helena PAPA | Albania | 19/12/2023 |
| Mr Arman TATOYAN | Armenia | 19/12/2023 |

On 31 December 2020, the seats in respect of the following States were vacant: Bosnia and Herzegovina, Cyprus, Italy, Liechtenstein, Malta, Poland and the Russian Federation.

## 5. CPT Secretariat (as at 31 December 2020)

| CPT Secretariat |
| --- |
| Mr Régis BRILLAT, Executive Secretary |
| Secretariat:  Ms Catherine GHERIBI, Personal Assistant<br>             Ms Antonella NASTASIE, Assistant to the Committee |

| Transversal Support Division |
| --- |
| Mr Michael NEURAUTER, Deputy Executive Secretary, Head of Division |
| Mr Patrick MÜLLER, Research, information strategies and media contacts |
| Ms Claire ASKIN, Archives, publications and documentary research |
| Ms Morven TRAIN, Administrative and budgetary questions |

## Divisions responsible for visits

| Division 1 | | |
| --- | --- | --- |
| ..., Head of Division<br>Mr Julien ATTUIL<br>Mr Petr HNATIK<br>Ms Aurélie PASQUIER<br>Ms Yvonne HARTLAND, Administrative Assistant<br>Secretariat: Ms Oana MOLDOVEAN | | |
| Albania | Hungary | Monaco |
| Andorra | Kosovo* | Netherlands |
| Belgium | Latvia | Norway |
| Czech Republic | Liechtenstein | Slovak Republic |
| Estonia | Luxembourg | Slovenia |
| France | Republic of Moldova | |

| Division 2 | | |
|---|---|---|
| Mr Borys WODZ, Head of Division<br>Mr Elvin ALIYEV<br>Ms Almut SCHRÖDER<br>Ms Dalia ŽUKAUSKIENĖ<br>Secretariat: Ms Natia MAMISTVALOVA | | |
| Armenia | Finland | Poland |
| Austria | Georgia | Russian Federation |
| Azerbaijan | Germany | Sweden |
| Bulgaria | Iceland | Turkey |
| Denmark | Lithuania | Ukraine |

| Division 3 | | |
|---|---|---|
| Mr Hugh CHETWYND, Head of Division<br>Ms Francesca GORDON<br>Ms Muriel ISELI<br>Mr Cristian LODA<br>Ms Françoise ZAHN, Administrative Assistant<br>Secretariat: Ms Catherine THEREAU | | |
| Bosnia and Herzegovina | Malta | Serbia |
| Croatia | Montenegro | Spain |
| Cyprus | North Macedonia | Switzerland |
| Greece | Portugal | United Kingdom |
| Ireland | Romania | |
| Italy | San Marino | |

## 6. CPT visits, reports and publications (as at 31 December 2020)

### Visits carried out in pursuance of Article 7 of the European Convention for the Prevention of Torture and Inhuman or Degrading Treatment or Punishment

| States | Periodic visits | Ad hoc visits | Reports sent | Reports published | Reports not published |
|---|---|---|---|---|---|
| Albania * | 6 | 7 | 13 | 13 | 0 |
| Andorra | 4 | 0 | 4 | 4 | 0 |
| Armenia | 5 | 5 | 10 | 9 | 1 |
| Austria * | 6 | 0 | 6 | 6 | 0 |
| Azerbaijan | 5 | 7 | 11 | 11 | 0 |
| Belgium | 7 | 2 | 10 [a] | 10 [a] | 0 |
| Bosnia and Herzegovina | 5 | 3 | 8 | 7 | 1 |
| Bulgaria * | 7 | 6 | 13 | 13 | 0 |
| Croatia | 5 | 1 | 6 | 5 | 1 |
| Cyprus | 7 | 0 | 7 | 7 | 0 |
| Czech Republic * | 6 | 2 | 8 | 8 | 0 |
| Denmark * | 6 | 1 | 7 | 7 | 0 |
| Estonia | 5 | 1 | 6 | 6 | 0 |
| Finland * | 6 | 0 | 5 | 5 | 0 |
| France | 7 | 8 | 15 | 13 | 2 |
| Georgia | 6 | 2 | 8 | 8 | 0 |
| Germany | 7 | 3 | 9 | 9 | 0 |
| Greece | 7 | 10 | 16 [b] | 16 | 0 |
| Hungary | 6 | 4 | 10 | 10 | 0 |
| Iceland | 5 | 0 | 5 | 5 | 0 |
| Ireland | 7 | 0 | 7 | 7 | 0 |
| Italy | 7 | 7 | 14 | 14 | 0 |
| Latvia | 5 | 3 | 8 | 8 | 0 |
| Liechtenstein | 4 | 0 | 4 | 4 | 0 |
| Lithuania | 5 | 2 | 7 | 7 | 0 |
| Luxembourg * | 4 | 1 | 5 | 5 | 0 |
| Malta | 5 | 4 | 9 | 8 | 1 [c] |
| Republic of Moldova * | 7 | 9 | 16 | 13 | 3 [d] |
| Monaco * | 3 | 0 | 2 | 2 | 0 |
| Montenegro | 3 | 0 | 3 | 3 | 0 |
| Netherlands | 6 | 5 | 13 [e] | 13 [e] | 0 |
| North Macedonia | 6 | 8 | 13 | 12 | 1 |
| Norway * | 5 | 1 | 6 | 6 | 0 |
| Poland | 6 | 1 | 7 | 7 | 0 |
| Portugal | 7 | 4 | 11 | 11 | 0 |
| Romania | 6 | 5 | 10 [f] | 10 [f] | 0 |
| Russian Federation | 7 | 22 | 25 [g] | 4 | 21 |
| San Marino | 4 | 0 | 4 | 4 | 0 |
| Serbia | 4 [h] | 1 | 5 [h] | 5 [h] | 0 |
| Slovak Republic | 6 | 0 | 6 | 6 | 0 |
| Slovenia | 5 | 0 | 5 | 5 | 0 |
| Spain | 8 | 10 | 17 | 17 | 0 |
| Sweden * | 5 | 1 | 6 | 6 | 0 |
| Switzerland | 6 | 1 | 7 | 7 | 0 |
| Turkey | 7 | 24 | 29 [i] | 27 | 2 |
| Ukraine * | 7 | 8 | 15 | 15 | 0 |
| United Kingdom | 8 | 15 | 23 [j] | 22 [j] | 1 |

\*   States which have authorised publication of all future visit reports of the CPT ("automatic publication procedure").

(a)   Including one report on the visit to Tilburg Prison (Netherlands) in 2011.

(b)   These 16 reports cover 17 visits carried out.

(c)   Report published in 2021.

(d)   Two reports concerning visits to the Transnistrian region and one report concerning a visit to Prison No. 8 in Bender.

(e)   Including a separate report on the visit to Tilburg Prison in the context of the periodic visit in 2011. Also including two separate reports covering the 1994 visit to the Netherlands Antilles and to Aruba.

(f)   These 10 reports cover 11 visits carried out.

(g)   These 25 reports cover 28 visits carried out.

(h)   Including one visit organised in September 2004 to Serbia and Montenegro.

(i)   These 29 reports cover 31 visits carried out.

(j)   Including two separate reports covering the 2010 visit to Jersey and Guernsey.

## Monitoring of the situation of persons convicted by international tribunals or special courts and serving their sentence in a State Party to the Convention

### Germany

Three visits carried out in 2010, 2013 and 2020 in pursuance of an Exchange of Letters dated 7 and 24 November 2000 between the International Criminal Tribunal for the former Yugoslavia (ICTY) and the CPT, and an Enforcement Agreement concluded in 2008 between the ICTY and the Government of the Federal Republic of Germany.

### Portugal

One visit carried out in 2013 in pursuance of the above-mentioned Exchange of Letters between the ICTY and the CPT, and the Agreement between the United Nations and the Portuguese Government on the Enforcement of Sentences of the ICTY dated 19 December 2007.

### United Kingdom

Four visits carried out in 2005, 2007, 2010 and 2019 in pursuance of the above-mentioned Exchange of Letters between the ICTY and the CPT, and the Agreement between the United Nations and the Government of the United Kingdom of Great Britain and Northern Ireland on the Enforcement of Sentences of the ICTY dated 11 March 2004.

Two visits carried out in 2014 and 2018 in pursuance of an Exchange of Letters between the Residual Special Court for Sierra Leone (RSCSL) and the CPT dated 20 January and 5 February 2014, and an Agreement between the RSCSL and the United Kingdom Government dated 10 July 2007.

One visit carried out in 2019 in pursuance of an Exchange of Letters between the International Criminal Court (ICC) and the CPT dated 2 and 9 November 2017, and the Enforcement Agreement between the Government of the United Kingdom of Great Britain and Northern Ireland and the ICC on the enforcement of sentences imposed by the ICC, adopted on 8 November 2007.

### Visits carried out on the basis of special arrangements

### Kosovo*

One visit carried out in 2007 on the basis of an agreement signed in 2004 between the Council of Europe and the United Nations Interim Administration Mission in Kosovo (UNMIK) and an exchange of letters concluded in 2006 between the Secretaries General of the Council of Europe and the North Atlantic Treaty Organization (NATO). Two separate reports were transmitted to UNMIK and NATO. The report to UNMIK has been published (together with the response provided by UNMIK).

Three visits carried out in 2010, 2015 and 2020 on the basis of the above-mentioned agreement between the Council of Europe and UNMIK. The reports on the 2010 and 2015 visits have been published (together with the responses provided by UNMIK), and the report on the 2020 visit is under preparation.

## 7. Countries and places of deprivation of liberty visited by CPT delegations *(January – December 2020)*

### Periodic visits

### Azerbaijan

*11/12/2020 – 22/12/2020*

***Establishments under the Ministry of Internal Affairs***

- ▶ Temporary Detention Centre of the Main Department for Combating Organised Crime, Baku
- ▶ Detention Unit for Persons under Administrative Arrest, Baku
- ▶ Binagadi District Police Department and Temporary Detention Centre, Baku
- ▶ Garadakh District Police Department and Temporary Detention Centre, Baku
- ▶ Narimanov District Police Department and Temporary Detention Centre, Baku
- ▶ Sebail District Police Department and Temporary Detention Centre, Baku
- ▶ Yasamal District Police Department and Temporary Detention Centre, Baku
- ▶ Police Station No. 11, Baku
- ▶ Police Station No. 22, Baku
- ▶ Police Station No. 38, Baku
- ▶ Astara District Police Station and Temporary Detention Centre
- ▶ Jalilabad District Police Station and Temporary Detention Centre
- ▶ Khachmaz District Police Station and Temporary Detention Centre
- ▶ Lankaran City District Police Station and Temporary Detention Centre
- ▶ Lerik District Police Station and Temporary Detention Centre
- ▶ Masally District Police Station and Temporary Detention Centre
- ▶ Salyan District Police Station and Temporary Detention Centre
- ▶ Shabran District Police Station and Temporary Detention Centre
- ▶ Siyazan District Police Station and Temporary Detention Centre

***Establishments under the authority of the Ministry of Justice***

- ▶ Gobustan Prison
- ▶ Penitentiary Establishment No. 4
- ▶ Baku pre-trial detention facility, Zabrat
- ▶ Pre-trial detention facility No. 3, Shuvalan
- ▶ Correctional Establishment for Juveniles in Baku

***Establishment under the authority of the State Security Service***

- ▶ Investigative isolator and temporary detention facility, Baku

*Establishments under the authority of the Ministry of Health*
- ► Lankaran Regional Psychiatric Hospital
- ► Salyan Regional Psychiatric Hospital
- ► Sumgayit Psychiatric Hospital

*Establishment under the authority of the Ministry of Labour and Social Protection of Population*
- ► Psycho-neurological social care institution No. 1, Baku

*Establishment under the authority of the Ministry of Defence*
- ► "Hauptvacht" (disciplinary unit) of Baku Garrison

## Finland

*07/09/2020 – 18/09/2020*

*Establishments under the responsibility of the Ministry of the Interior*
- ► Police detention facilities ("police prisons") in Espoo, Haukipudas, Helsinki (Pasila), Kemijärvi,   Kuusamo, Mikkeli, Raahe, Turku, Vantaa and Ylivieska
- ► Töölö Custodial Facility for Intoxicated Persons, Helsinki
- ► Metsälä Detention Unit for Foreign Nationals, Helsinki
- ► Border Guard detention facility at Kuusamo Border Crossing Point

*Establishments under the responsibility of the Ministry of Justice*
- ► Oulu Prison
- ► Turku Prison

*Establishments under the responsibility of the Ministry of Social Affairs and Health*
- ► Sairila Residential School
- ► Sippola Residential School
- ► Kellokoski Hospital

## Germany

*01/12/2020 – 14/12/2020*

Baden-Württemberg
- ► Freiburg Prison (targeted visit to interview remand prisoners)

Bavaria
- ► St. Georgen-Bayreuth Prison
- ► Bayreuth-City Police Station
- ► Munich Police Headquarters (*Polizeipräsidium, Polizeiinspektion* ED 6)

### Berlin
- ► Prison for Women, Berlin (locations Lichtenberg and Pankow)
- ► Police Detention Centre, Tempelhofer Damm 12
- ► Federal Police Station, Central Railway Station

### Brandenburg
- ► Potsdam Police Station West

### Lower Saxony
- ► Rosdorf Prison (targeted visit to interview remand prisoners and inmates held in solitary   confinement)
- ► Celle Prison (targeted visit to interview inmates held in solitary confinement)

### Hamburg
- ► Asklepios Forensic Psychiatric Clinic
- ► Hamburg Police Station 11
- ► Federal Police Station, Central Railway Station

### North Rhine-Westphalia
- ► Gelsenkirchen Prison
- ► Düsseldorf Police Headquarters
- ► Gelsenkirchen Police Headquarters

### Saxony-Anhalt
- ► Uchtspringe Forensic Psychiatric Clinic

### Schleswig-Holstein
- ► Lübeck Prison (targeted visit to interview remand prisoners and inmates held in solitary confinement)

In the course of the visit, the delegation also examined the treatment and conditions of detention of one person convicted by the International Criminal Tribunal for the former Yugoslavia (ICTY) who is serving his sentence in Germany (see page 30).

## Republic of Moldova

*28/01/2020 - 07/02/2020*

***Establishments under the authority of the Ministry of the Interior***
- ► Police Department and Temporary Detention Isolator in Chişinău
- ► Police Inspectorate in Bălţi
- ► Police Inspectorate and Temporary Detention Isolator in Cahul
- ► Police Inspectorate in Cantemir
- ► Police Inspectorate and Temporary Detention Isolator in Cimişlia
- ► Police Inspectorate in Comrat

► Police Inspectorate and Temporary Detention Isolator in Hîncești

► Police Inspectorate and Temporary Detention Isolator in Fălești

► Police Inspectorate and Temporary Detention Isolator in Florești

► Police Inspectorate in Taraclia

### Establishments under the authority of the Ministry of Justice

► Penitentiary No. 1 (Taraclia Prison)

► Penitentiary No. 5 (Cahul Prison)

► Penitentiary No. 13 (Chișinău Prison)

The delegation also carried out a targeted follow-up visit to Penitentiary No. 10 (Goian Juvenile Prison) in order to examine the steps that have been taken to implement the recommendations made by the CPT after the previous visits to tackle the phenomenon of inter-prisoner violence.

### Establishments under the authority of the Ministry of Health, Labour and Social Protection

► Chișinău Psychiatric Hospital

► Forensic Psychiatric Unit of the Centre for Forensic Medicine in Chișinău

► Temporary Placement Centre for Persons with Disabilities in Badiceni

► Temporary Placement Centre for Persons with Disabilities in Bălți

## Monaco

*15/09/2020 - 18/09/2020*

► Detention cells of the Court of Justice

► Central Directorate of Public Security

► Monaco Remand Prison

► Department of Psychiatry and Medical Psychology, and the Gerontology Department and Memory Centre (Rainier III Clinic) at the Princess Grace Hospital (CHPG)

## Spain

*13/09/2020 – 28/09/2020*

### National Police establishments

► Police Station, Algeciras

► Police Station, Castellón de la Plana

► Police Station, Madrid (Centre)

► Police Station, Madrid (Hortaleza)

► Police Station, Madrid (Moratalaz)

► Police Station for Minors (G.R.U.M.E.), Madrid

- ► Police Station, Seville (Blas Infante)
- ► Police Station, Valencia (Zapadores)

**Local Police establishments**
- ► Local Police Station of Utrera

**Prison establishments**
- ► Ávila Women's Prison (Brieva)
- ► Castellón II Prison
- ► Madrid V Prison (Soto del Real)*
- ► Madrid VII Prison (Estremera)
- ► Seville I Prison*
- ► Seville II Prison
- ► Valencia Prison (Picassent)*
- ► Alicante Penitentiary Psychiatric Hospital
- ► Seville Penitentiary Psychiatric Hospital

*Targeted visits to interview newly arrived prisoners on remand.

**Juvenile establishments**
- ► Juvenile Detention Centre, "La Marchenilla", Algeciras (Andalusia)

## Ad hoc visits

### Bulgaria

*10/08/2020 – 21/08/2020*

**Establishments under the Ministry of Health**
- ▶ St Ivan Rilski State Psychiatric Hospital
- ▶ Byala State Psychiatric Hospital
- ▶ Tsarev Brod State Psychiatric Hospital

**Establishments under the Ministry of Labour and Social Policy**
- ▶ Home for persons with learning disabilities in Kudelin
- ▶ Home for persons with learning disabilities in Samuil
- ▶ Home for persons with mental disorders in Govezhda

### Croatia

*10/08/2020 – 14/08/2020*

**Establishments under the Ministry of the Interior**
- ▶ Cetingrad Border Police Station
- ▶ Donji Lapac Border Police Station
- ▶ Korenica Border Police Station
- ▶ Intervention Police Unit of the Karlovac Police Administration (Mali Erjavec)
- ▶ Ježevo Reception Centre for Foreigners

### France

*06/07/2020 – 10/07/2020*

**Law enforcement establishments**
- ▶ Geispolsheim Administrative Detention Centre
- ▶ Haguenau Police Station
- ▶ Strasbourg Police Headquarters
- ▶ Bischwiller Local Gendarmerie Brigade
- ▶ Fegersheim Local Gendarmerie Brigade
- ▶ Geispolsheim Local Gendarmerie Brigade

**Prisons**
- ▶ Strasbourg Remand Prison

**Health-care establishments**
- ▶ Psychiatric and addiction treatment units of Strasbourg University Hospital

*Other establishments*
- ► Strasbourg Court holding cells

## Greece

*13/03/2020 – 17/03/2020*

*Police and border guard establishments in the Evros region*
- ► Alexandropoulis Police Station
- ► Didimoticho Police Station
- ► Feres Police and Border Guard Station
- ► Isaakio Police and Border Guard Station
- ► Metaxades Police and Border Guard Station
- ► Neo Cheimonio Police and Border Guard Station
- ► Orestiada Police Station
- ► Soufli Police and Border Guard Station
- ► Tychero Police and Border Guard Station
- ► The Poros facility under the authority of the Feres Police and Border Guard Station

*Police establishments in Samos*
- ► Detention cells under the authority of the Hellenic Police at the Coastguard Premises
- ► Vathi Police Station

*Immigration detention facilities*
- ► Fylakio Reception and Identification Centre, Evros region
- ► Fylakio Pre-removal centre, Evros region
- ► Malakasa detention camp, Attica

## Malta

*17/09/2020 - 22/09/2020*

*Law enforcement and immigration detention facilities*
- ► Marsa Initial Reception Centre
- ► Hermes Block, Lyster Barracks
- ► Ħal Far Reception Centre / "China House"
- ► Safi Detention Centre
- ► Floriana Police Station and Lock-Up
- ► Zejtun Police Station

## North Macedonia

*07/12/2020 - 09/12/2020*

### Prisons

- ▶ Idrizovo Prison
- ▶ Skopje Prison

### Police establishments in Skopje

- ▶ Bit Pazar
- ▶ Gazi Baba
- ▶ Karpoš
- ▶ Kisela Voda

## Ukraine

*04/08/2020 – 13/08/2020*

### Correctional colonies

- ▶ No. 25 in Kharkiv
- ▶ No. 100 in Temnivka (Kharkiv region)
- ▶ No. 77 in Berdyansk (Zaporizhia region)

### Other prison establishments

- ▶ Kharkiv Pre-trial Establishment (SIZO)
- ▶ Temnivka Prison Hospital No. 100
- ▶ Zaporizhia SIZO

## Kosovo*

*06/10/2020 – 16/10/2020*

### Police stations

- ▶ Drenas Police Station
- ▶ Istog/Istok Police Station
- ▶ Klinë/Klinavac Police Station
- ▶ Mitrovicë/Mitrovica South Police Station
- ▶ Pejë/Peć Police Station
- ▶ Prishtinë/Priština Regional Police Station

### Immigration detention centres

- ▶ Vranidoll Detention Centre for Foreigners

### Prison establishments

- ► Dubrava Prison
- ► High Security Prison at Gërdoc-Podujeva/Grdovac-Podujevo
- ► Mitrovica/Mitrovicë Detention Centre
- ► Prishtinë/Priština Detention Centre

The delegation also carried out a targeted visit to Lipjan/Lipljan Correctional Centre for Juveniles and Lipjan/Lipljan Correctional Centre for Women to interview newly admitted juvenile remand prisoners, juveniles held under an educational measure and female remand prisoners.

*Psychiatric establishments*

- ► Psychiatric Clinic of Prishtinë/Priština University Clinical Centre
- ► Forensic Psychiatric Institute at Prishtinë/Priština University Clinical Centre

*Social welfare establishments*

- ► Shtime/ Štimlje Special Institution for persons with learning disabilities

## 8. Statement of principles relating to the treatment of persons deprived of their liberty in the context of the coronavirus disease (Covid-19) pandemic

(issued on 20 March 2020)

The Coronavirus disease (Covid-19) pandemic has created extraordinary challenges for the authorities of all member States of the Council of Europe. There are specific and intense challenges for staff working in various places of deprivation of liberty, including police detention facilities, penitentiary institutions, immigration detention centres, psychiatric hospitals and social care homes, as well as in various newly established facilities/zones where persons are placed in quarantine. Whilst acknowledging the clear imperative to take firm action to combat Covid-19, the CPT must remind all actors of the absolute nature of the prohibition of torture and inhuman or degrading treatment. Protective measures must never result in inhuman or degrading treatment of persons deprived of their liberty. In the CPT's view, the following principles should be applied by all relevant authorities responsible for persons deprived of their liberty within the Council of Europe area.

1) The basic principle must be to take all possible action to protect the health and safety of all persons deprived of their liberty. Taking such action also contributes to preserving the health and safety of staff.

2) WHO guidelines on fighting the pandemic as well as national health and clinical guidelines consistent with international standards must be respected and implemented fully in all places of deprivation of liberty.

3) Staff availability should be reinforced, and staff should receive all professional support, health and safety protection as well as training necessary in order to be able to continue to fulfil their tasks in places of deprivation of liberty.

4) Any restrictive measure taken vis-à-vis persons deprived of their liberty to prevent the spread of Covid-19 should have a legal basis and be necessary, proportionate, respectful of human dignity and restricted in time. Persons deprived of their liberty should receive comprehensive information, in a language they understand, about any such measures.

5) As close personal contact encourages the spread of the virus, concerted efforts should be made by all relevant authorities to resort to alternatives to deprivation of liberty. Such an approach is imperative, in particular, in situations of overcrowding. Further, authorities should make greater use of alternatives to pre-trial detention, commutation of sentences, early release and probation; reassess the need to continue involuntary placement of psychiatric patients; discharge or release to community care, wherever appropriate, residents of social care homes; and refrain, to the maximum extent possible, from detaining migrants.

6) As regards the provision of health care, special attention will be required to the specific needs of detained persons with particular regard to vulnerable groups and/or at-risk groups, such as older persons and persons with pre-existing medical conditions. This includes, inter alia, screening for Covid-19 and pathways to intensive

care as required. Further, detained persons should receive additional psychological support from staff at this time.

7) While it is legitimate and reasonable to suspend non-essential activities, the fundamental rights of detained persons during the pandemic must be fully respected. This includes in particular the right to maintain adequate personal hygiene (including access to hot water and soap) and the right of daily access to the open air (of at least one hour). Further, any restrictions on contact with the outside world, including visits, should be compensated for by increased access to alternative means of communication (such as telephone or Voice-over-Internet-Protocol communication).

8) In cases of isolation or placement in quarantine of a detained person who is infected or is suspected of being infected by the SARS-CoV-2 virus, the person concerned should be provided with meaningful human contact every day.

9) Fundamental safeguards against the ill-treatment of persons in the custody of law enforcement officials (access to a lawyer, access to a doctor, notification of custody) must be fully respected in all circumstances and at all times. Precautionary measures (such as requiring persons with symptoms to wear protective masks) may be appropriate in some circumstances.

10) Monitoring by independent bodies, including National Preventive Mechanisms (NPMs) and the CPT, remains an essential safeguard against ill-treatment. States should continue to guarantee access for monitoring bodies to all places of detention, including places where persons are kept in quarantine. All monitoring bodies should however take every precaution to observe the 'do no harm' principle, in particular when dealing with older persons and persons with pre-existing medical conditions.

## 9. Follow-up statement regarding the situation of persons deprived of their liberty in the context of the ongoing Covid-19 pandemic

(issued on 9 July 2020)

Following its Statement of principles relating to the treatment of persons deprived of their liberty in the context of the coronavirus disease (Covid-19) pandemic issued on 20 March 2020, the CPT requested all member States to provide an account of the concrete measures taken in prisons as well as in various other types of establishment.

The CPT would like to express its appreciation for the constructive and detailed written responses received from almost all member States. The information provided suggests that, in many States, steps have been taken promptly to protect persons deprived of their liberty from possible infection and to introduce measures to compensate for restrictions imposed for public health reasons.

In particular, most member States refer to the increased use of non-custodial measures as alternatives to detention, such as suspension/deferral of the execution of sentences, advancement of conditional release, temporary release, commutation of imprisonment into house arrest or extended use of electronic monitoring. Measures of this nature can clearly have a positive impact on the widespread phenomenon of prison overcrowding. Further, many responses reference steps taken to facilitate detained persons' contact with the outside world in order to counter-balance restrictions imposed for public health reasons. Such measures include providing access to video calls over the Internet or granting more frequent and longer access to the telephone for as long as a ban on visits is being imposed. As regards immigration detention, some member States indicate that detention orders have been suspended and/or that immigration detention centres have been temporarily withdrawn from service.

Moreover, in various types of establishment, medical screening upon admission has reportedly been significantly improved, with a view to identifying detained persons infected with Covid-19 and providing them with health care that respects the principle of equivalence of care. This is also an essential means of reducing the risk of ill-treatment, through the accurate recording and proper reporting of injuries on arrival.

The CPT must stress that the ongoing crisis demonstrates the clear need to put human rights first, in decision-making in the context of the pandemic and beyond. Each measure taken by the authorities of member States should be based on a thorough assessment of its concrete implications for the human rights of all persons concerned. In short, respect for human rights should become a reflex for all officials.

From the CPT's perspective, the pandemic also hit the hardest in those places of deprivation of liberty where previous recommendations made by the Committee had not been implemented. This relates to the entire spectrum of the CPT's mandate: from prisons to social care homes, from psychiatric hospitals to immigration detention centres.

As regards the situation of prisoners, the CPT is now witness to a pandemic crisis taking place against the background of pre-existing flaws in various criminal justice

systems. As the responses from member States have shown, resolute action is only now being taken – in crisis mode – on some issues that have been the subject of CPT recommendations for very many years. The Committee urges the relevant authorities of all member States to progressively move from the management of risks to seizing opportunities that the pandemic has created. Certain emergency measures put in place temporarily must be made sustainable. This applies in particular to the increased use of alternatives to deprivation of liberty, with a view to putting an end to the phenomenon of overcrowding. In this regard, further steps are needed to reduce the use of remand detention, to refrain, to the maximum extent possible, from the detention of migrants, and to make further progress in the deinstitutionalisation of mental health care.

Importantly, temporary restrictions imposed to contain the spread of the virus must be lifted as soon as they are no longer required. This relates, in particular, to limitations on arrangements for detained persons to contact the outside world and reductions in the range of activities available to them.

Finally, the CPT wishes to recall the crucial importance for the prevention of ill-treatment of monitoring of detention places by independent national and international human rights bodies. The findings of such bodies can be of great assistance to member States in assessing the practical impact of their policies upon persons deprived of their liberty. Consequently, the Committee welcomes the fact that, in several countries, National Preventive Mechanisms (NPMs) and other national monitoring bodies have resumed visits to places of deprivation of liberty, whilst taking precautions to observe the 'do no harm' principle, and it hopes that this positive trend will be followed as soon as possible by other relevant bodies across Europe.

The Committee has recently resumed its own visiting activities and looks forward to being able to observe directly the measures taken by member States to protect the human rights of persons deprived of their liberty during this difficult time.

The CPT carries out visits to places of detention, in order to assess how persons deprived of their liberty are treated. These places include prisons, juvenile detention centres, police stations, holding centres for immigration detainees, psychiatric hospitals, social care homes, etc.

After each visit, the CPT sends a detailed report to the state concerned. This report includes the CPT's findings, and its recommendations, comments and requests for information. The CPT also requests a detailed response to the issues raised in its report. These reports and responses form part of the ongoing dialogue with the states concerned.

The CPT is required to draw up every year a general report on its activities, which is published. This 30th General Report, as well as previous general reports and other information about the work of the CPT, may be obtained from the Committee's Secretariat or from its website (http://www.cpt.coe.int/).

PREMS 050821

ENG

**www.coe.int**

The Council of Europe is the continent's leading human rights organisation. It comprises 47 member states, including all members of the European Union. All Council of Europe member states have signed up to the European Convention on Human Rights, a treaty designed to protect human rights, democracy and the rule of law. The European Court of Human Rights oversees the implementation of the Convention in the member states.



COUNCIL OF EUROPE

CONSEIL DE L'EUROPE