# ATTACHMENT 3

# Imprisonment, Extract from the 2nd General Report of the CPT

European Committee for the Prevention of Torture
and Inhuman or Degrading Treatment or Punishment
(CPT)



COUNCIL OF EUROPE
CONSEIL DE L'EUROPE

*CPT/Inf(92)3-part2*

# Imprisonment

*Extract from the 2nd General Report of the CPT,
published in 1992*

44.    In introduction, it should be emphasised that the CPT must examine many questions when visiting a prison. Of course, it pays special attention to any allegations of ill-treatment of prisoners by staff. However, all aspects of the conditions of detention in a prison are of relevance to the CPT's mandate. Ill-treatment can take numerous forms, many of which may not be deliberate but rather the result of organisational failings or inadequate resources. The overall quality of life in an establishment is therefore of considerable importance to the CPT. That quality of life will depend to a very large extent upon the activities offered to prisoners and the general state of relations between prisoners and staff.

45.    The CPT observes carefully the prevailing climate within an establishment. The promotion of constructive as opposed to confrontational relations between prisoners and staff will serve to lower the tension inherent in any prison environment and by the same token significantly reduce the likelihood of violent incidents and associated ill-treatment. In short, the CPT wishes to see a spirit of communication and care accompany measures of control and containment. Such an approach, far from undermining security in the establishment, might well enhance it.

46.    Overcrowding is an issue of direct relevance to the CPT's mandate. All the services and activities within a prison will be adversely affected if it is required to cater for more prisoners than it was designed to accommodate; the overall quality of life in the establishment will be lowered, perhaps significantly. Moreover, the level of overcrowding in a prison, or in a particular part of it, might be such as to be in itself inhuman or degrading from a physical standpoint.

47.    A satisfactory programme of activities (work, education, sport, etc.) is of crucial importance for the well-being of prisoners. This holds true for all establishments, whether for sentenced prisoners or those awaiting trial. The CPT has observed that activities in many remand prisons are extremely limited. The organisation of regime activities in such establishments - which have a fairly rapid turnover of inmates - is not a straightforward matter. Clearly, there can be no question of individualised treatment programmes of the sort which might be aspired to in an establishment for sentenced prisoners.  However, prisoners cannot simply be left to languish for weeks, possibly months, locked up in their cells, and this regardless of how good material conditions might be within the cells. The CPT considers that one should aim at ensuring that prisoners in remand establishments are able to spend a reasonable part of the day (8 hours or more) outside their cells, engaged in purposeful activity of a varied nature. Of course, regimes in establishments for sentenced prisoners should be even more favourable.

48.    Specific mention should be made of outdoor exercise. The requirement that prisoners be allowed at least one hour of exercise in the open air every day is widely accepted as a basic safeguard (preferably it should form part of a broader programme of activities). The CPT wishes to

– 2 –

emphasise that **all prisoners without exception** (including those undergoing cellular confinement as a punishment) should be offered the possibility to take outdoor exercise daily. It is also axiomatic that outdoor exercise facilities should be reasonably spacious and whenever possible offer shelter from inclement weather.

49.     Ready access to proper toilet facilities and the maintenance of good standards of hygiene are essential components of a humane environment.

In this connection, the CPT must state that it does not like the practice found in certain countries of prisoners discharging human waste in buckets in their cells (which are subsequently "slopped out" at appointed times). Either a toilet facility should be located in cellular accommodation (preferably in a sanitary annex) or means should exist enabling prisoners who need to use a toilet facility to be released from their cells without undue delay at all times (including at night).

Further, prisoners should have adequate access to shower or bathing facilities. It is also desirable for running water to be available within cellular accommodation.

50.     The CPT would add that it is particularly concerned when it finds a combination of overcrowding, poor regime activities and inadequate access to toilet/washing facilities in the same establishment. The cumulative effect of such conditions can prove extremely detrimental to prisoners.

51.     It is also very important for prisoners to maintain reasonably good contact with the outside world. Above all, a prisoner must be given the means of safeguarding his relationships with his family and close friends. The guiding principle should be the promotion of contact with the outside world; any limitations upon such contact should be based exclusively on security concerns of an appreciable nature or resource considerations.

The CPT wishes to emphasise in this context the need for some flexibility as regards the application of rules on visits and telephone contacts vis-à-vis prisoners whose families live far away (thereby rendering regular visits impracticable). For example, such prisoners could be allowed to accumulate visiting time and/or be offered improved possibilities for telephone contacts with their families.

52.     Naturally, the CPT is also attentive to the particular problems that might be encountered by certain specific categories of prisoners, for example: women, juveniles and foreigners.

53.     Prison staff will on occasion have to use force to control violent prisoners and, exceptionally, may even need to resort to instruments of physical restraint. These are clearly high risk situations insofar as the possible ill-treatment of prisoners is concerned, and as such call for specific safeguards.

A prisoner against whom any means of force have been used should have the right to be immediately examined and, if necessary, treated by a medical doctor. This examination should be conducted out of the hearing and preferably out of the sight of non-medical staff, and the results of the examination (including any relevant statements by the prisoner and the doctor's conclusions) should be formally recorded and made available to the prisoner. In those rare cases when resort to instruments of physical restraint is required, the prisoner concerned should be kept under constant and adequate supervision. Further, instruments of restraint should be removed at the earliest possible opportunity; they should never be applied, or their application prolonged, as a punishment. Finally, a record should be kept of every instance of the use of force against prisoners.

54.     Effective grievance and inspection procedures are fundamental safeguards against ill-treatment in prisons. Prisoners should have avenues of complaint open to them both within and outside the context of the prison system, including the possibility to have confidential access to an appropriate authority. The CPT attaches particular importance to regular visits to each prison establishment by an independent body (e.g. a Board of visitors or supervisory judge) possessing powers to hear (and if necessary take action upon) complaints from prisoners and to inspect the establishment's premises. Such bodies can inter alia play an important role in bridging differences that arise between prison management and a given prisoner or prisoners in general.

55.     It is also in the interests of both prisoners and prison staff that clear disciplinary procedures be both formally established and applied in practice; any grey zones in this area involve the risk of seeing unofficial (and uncontrolled) systems developing. Disciplinary procedures should provide prisoners with a right to be heard on the subject of the offences it is alleged they have committed, and to appeal to a higher authority against any sanctions imposed.

Other procedures often exist, alongside the formal disciplinary procedure, under which a prisoner may be involuntarily separated from other inmates for discipline-related/security reasons (e.g. in the interests of "good order" within an establishment). These procedures should also be accompanied by effective safeguards. The prisoner should be informed of the reasons for the measure taken against him, unless security requirements dictate otherwise[1], be given an opportunity to present his views on the matter, and be able to contest the measure before an appropriate authority.

56.     The CPT pays particular attention to prisoners held, for whatever reason (for disciplinary purposes; as a result of their "dangerousness" or their "troublesome" behaviour; in the interests of a criminal investigation; at their own request), under conditions akin to solitary confinement.

The principle of proportionality requires that a balance be struck between the requirements of the case and the application of a solitary confinement-type regime, which is a step that can have very harmful consequences for the person concerned. Solitary confinement can, in certain circumstances, amount to inhuman and degrading treatment; in any event, all forms of solitary confinement should be as short as possible.

In the event of such a regime being imposed or applied on request, an essential safeguard is that whenever the prisoner concerned, or a prison officer on the prisoner's behalf, requests a medical doctor, such a doctor should be called without delay with a view to carrying out a medical examination of the prisoner. The results of this examination, including an account of the prisoner's physical and mental condition as well as, if need be, the foreseeable consequences of continued isolation, should be set out in a written statement to be forwarded to the competent authorities.

57.     The transfer of troublesome prisoners is another practice of interest to the CPT. Certain prisoners are extremely difficult to handle, and the transfer of such a prisoner to another establishment can sometimes prove necessary. However, the continuous moving of a prisoner from one establishment to another can have very harmful effects on his psychological and physical well-being. Moreover, a prisoner in such a position will have difficulty in maintaining appropriate contacts with his family and lawyer. The overall effect on the prisoner of successive transfers could under certain circumstances amount to inhuman and degrading treatment.

---

[1]     This requirement has subsequently been reformulated as follows: the prisoner should be informed in writing of the reasons for the measure taken against him (it being understood that the reasons given might not include details which security requirements justify withholding from the prisoner).