1   DAVID CHIU, State Bar #189542
    City Attorney
2   JAMES HANNAWALT, State Bar #139657
    Acting Chief Trial Attorney
3   SABRINA M. BERDUX, State Bar #248927
    KAITLYN MURPHY, State Bar #293309
4   Deputy City Attorneys
    Fox Plaza
5   1390 Market Street, 6th Floor
    San Francisco, California 94102-5408
6   Telephone:      (415) 554-3929 [Berdux]
    Telephone:      (415) 554-6762 [Murphy]
7   Facsimile:      (415) 554-3837
    E-Mail:         sabrina.m.berdux@sfcityatty.org
8   E-Mail:         kaitlyn.murphy@sfcityatty.org

9   Attorneys for Defendants
    CITY AND COUNTY OF SAN FRANCISCO and
10  PAUL MIYAMOTO, IN HIS OFFICIAL CAPACITY

11                  UNITED STATES DISTRICT COURT

12              NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| 13  KENYON NORBERT, TROY MCALLISTER, MARSHALL HARRIS, ARMANDO CARLOS, MONTRAIL BRACKEN, MICHAEL BROWN AND JOSE POOT, ON BEHALF OF THEMSELVES INDIVIDUALLY AND OTHERS SIMILARLY SITUATED, AS A CLASS AND SUBCLASS, | Case No. 19-cv-02724-SK (LB) **DEFENDANTS' [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW FOLLOWING TRIAL** Trial Date:      August 8, 2023 |
| 17          Plaintiffs, | |
| 18          vs. | |
| 19  SAN FRANCISCO COUNTY SHERIFF'S DEPARTMENT, CITY AND COUNTY OF SAN FRANCISCO, SAN FRANCISCO SHERIFF VICKI HENNESSY; CHIEF DEPUTY SHERIFF PAUL MIYAMOTO; CAPTAIN JASON JACKSON, CAPTAIN MCCONNELL AND JOHN AND JANE DOES, NOS. 1 -50, | |
| 24          Defendants. | |

Defs. Findings of Fact and Conclusions of Law
Case No. 19-cv-02724-SK (LB)

n:\lit\li2023\191337\01702636.docx

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................. iv

Findings of Fact ............................................................................................1

I.    County Jail 3 ...................................................................................1

    A.    Weather Issues at County Jail 3 .................................................2

        1.    Fog .............................................................................2

        2.    Rainfall.......................................................................3

        3.    Temperatures..............................................................3

    B.    Layout of County Jail 3..............................................................3

        1.    Pod Common Areas ......................................................4

        2.    Layout of a Cell Inside CJ3 ........................................5

            a.    Light Readings Inside the Cells ........................7

        3.    Gym Layout ................................................................9

    C.    San Francisco Sheriff's Office's Jail Operations.......................10

        1.    Deputy Supervision of Pods.........................................10

        2.    Classification..............................................................11

            a.    Classification Levels ........................................11

            b.    Housing Assignments .......................................13

                i.    General Population................................13

                ii.    Administrative Separation ....................14

            c.    Inmate Movement ............................................17

    D.    Statistics on Inmate Population in County Jail 3 .......................18

II.    The Challenged Policies and Procedures.......................................19

    A.    Plaintiffs' Requested Amount Of Outdoor Access and Out-of-Cell Time 19

    B.    Outdoor Access Prior to COVID ...............................................19

    C.    Out-of-Cell Time Prior to COVID.............................................20

        1.    Administrative Segregation ...........................................20

        2.    General Population.........................................................20

        3.    Programming Opportunities Prior To And During COVID .........21

    D.    Staffing.....................................................................................23

    E.    Safety and Security Issues in the Jail and Lockdowns .............24

    F.    Grievances and Complaints ......................................................25

III.    COVID-19 in the Jail .................................................................26

A.      Risks of COVID...................................................................27

B.      County Jail 3's Policies During COVID..............................28

    1.      Early Outbreak: March 2020-Early 2021 ......................29

    2.      Availability of Vaccination: Mid 2021 ..........................31

    3.      Subsequent Outbreaks: Mid 2021-Summer 2022 ..........32

C.      Mitigation Efforts for Incarcerated Persons.......................34

IV.     Credibility Issues With Respect to Plaintiffs' Critique of the Challenged
Policies...........................................................................................35

V.      Class Representatives and Their Alleged Injuries .........................37

A.      Jose Poot ...........................................................................37

B.      Montrail Brackens...............................................................39

C.      Troy McAlister.....................................................................40

VI.     Causation........................................................................................42

A.      Regulation of Circadian Rhythm .......................................44

B.      Credibility Determinations With Respect to Expert Causation Testimony45

    1.      Dr. Mayer's Credibility.................................................45

    2.      Dr. Czeisler's Credibility ..............................................45

    3.      Dr. Jamie Zeitzer's Credibility .....................................48

Conclusions of Law ........................................................................................49

I.      Plaintiffs Have Not Shown an Injury Caused by the Alleged Conditions of
Confinement...................................................................................51

A.      Many of Plaintiffs Complaints Are Irrelevant to the Challenged
Conditions of Confinement................................................51

B.      Plaintiffs Alleged Injuries Are Not Credible .....................52

    1.      Plaintiffs identified the same injuries in unrelated litigation. ........52

    2.      Plaintiffs alleged injuries are unsupported by their discovery
responses. .....................................................................53

    3.      Plaintiffs complain of diverse alleged injuries from identical
conditions of confinement.............................................54

C.      Plaintiffs Offered No Evidence of Alleged Injuries Beyond the Three
Class Representatives........................................................54

D.      There Is No Evidence Class Members Want the Requested Relief...........55

E.      Plaintiffs Did Not Meet Their Burden to Show Causation .......................57

    1.      Plaintiffs' Lay Witness Testimony Cannot Show Causation.........57

2.      Plaintiffs Offered No Expert Testimony on Causation Related to Out-of-Cell Time and San Francisco Offered Evidence Disproving This Element of Plaintiffs' Claim ............................ 58

II.     San Francisco Has Legitimate Non-Punitive Reasons for the Challenged Policies ....................................................................................... 61

        A.      There Can Be No Reckless Disregard for Class Members Health or Safety From Policies That Cause No Harm ................................ 62

        B.      San Francisco's Policies Were Not Motivated by a Desire to Punish ....... 62

        C.      San Francisco's Purpose in Setting the Challenged Conditions of Confinement Was to Promote Health, Safety, and Security, Not to Punish Class Members ............................................................... 63

                1.      The SFSO's COVID-19 Restrictions Also Furthered the Legitimate Penological Goal of Public Health ............................ 64

                2.      Pre-COVID Policies ..................................................... 67

                        a.      Indoor Recreation Areas ................................... 67

                        b.      Out-of-Cell Time ............................................. 69

                        c.      Inmate Out-of-Cell Time Is Not Dictated by Staffing Issues .......................................... 71

III.    There Are Concerns Regarding the Scope of Any Injunction Plaintiffs Could Have Sought ...................................................................................... 73

        A.      Changed Conditions at County Jail 3 Would Have Mooted Any Injunction ............................................................................ 73

        B.      The Prison Litigation Reform Act ("PLRA") Would Have Limited Any Injunction ............................................................................ 74

                1.      Least Intrusive Remedy Necessary .................................. 75

                2.      Substantial Weight to Adverse Impacts on Public Safety and Operation of the Criminal Justice System ........................ 76

CONCLUSION ......................................................................................... 79

## <u>TABLE OF AUTHORITIES</u>

**State Statutes & Codes**

California Penal Code § 1270 ..................................................................................................24

California Penal Code § 1270.1 ...............................................................................................24

**Federal Cases**

*Allen v. Sakai*
  48 F.3d 1082 (9th Cir. 1994) ...............................................................................................68

*Asplundh Mfg. Div. V. Benton Harbor Eng'g*
  57 F.3d 11190 (3d Cir. 1995) ...............................................................................................58

*Banks v. Booth*
  468 F. Supp. 3d 101 (D.D.C. 2020) .....................................................................................65

*Bell v. Wolfish*
  441 U.S. 520 (1979).............................................................................49, 50, 61, 63, 64

*Bent v. Barr*
  445 F. Supp. 3d 408 (N.D. Cal. 2020) .................................................................................64

*Brown v. Johnson & Johnson*
  2019 WL 2577296 (E.D. Cal. June 24, 2019) ......................................................................58

*Burleson v. Samson*
  2007 WL 2688840 (E.D. Cal. Sept. 13, 2007)......................................................................58

*Castro v. Cnty. of Los Angeles*
  833 F.3d 1060 (9th Cir. 2016) ...............................................................................................62

*Demery v. Arpaio*
  378 F.3d 1020 (9th Cir. 2004) ...................................................................................50, 61

*Dhillon v. Princess Cruise Lines, Ltd.*
  2022 WL 504560 (C.D. Cal. Feb. 18, 2022) ........................................................................58

*Doty v. Cnty. of Lassen*
  37 F.3d 540 (9th Cir. 1994) ...................................................................................................74

*Flores v. Barr*
  2020 WL 2128663 (C.D. Cal. Mar. 28, 2020).......................................................................65

*Flowers v. Ahern*
  2010 WL 2232165 (N.D. Cal. June 3, 2010) ........................................................................63

*Gilmore v. California*
  220 F.3d 987 (9th Cir. 2000) ......................................................................................75, 78

*Gordon v. Cnty. of Orange*
   888 F.3d 1118 (9th Cir. 2018) ................................................................62

*Hawes v. Pac. Gas & Elec. Co.*
   2018 WL 5270499 (C.D. Cal. June 25, 2018) ......................................58

*Hayward v. Procunier*
   629 F.2d 599 (9th Cir. 1980) ...............................................................69

*Hernandez v. Cnty. of Monterey*
   110 F. Supp. 3d 929 (N.D. Cal. 2015) .................................................75

*Houchins v. KQED*
   438 U.S. 1 (1978) .................................................................................50

*Kaur v. U.S. Dep't of Homeland Sec.*
   2020 WL 1939386 (C.D. Cal. Apr. 22, 2020) ......................................64

*LeMaire v. Maas*
   12 F.3d 1444 (9th Cir. 1993) ...............................................................68

*May v. Baldwin*
   109 F.3d 557 (9th Cir. 1997) ...............................................................69

*Miller v. French*
   530 U.S. 327 (2000) .............................................................................75

*Norbert v. City & Cnty. of San Francisco*
   10 F.4th 918 (9th Cir. 2021) .....................................................50, 57, 69

*Norwood v. Vance*
   591 F.3d 1062 (9th Cir. 2010) .............................................................69

*Oluwa v. Gomez*
   133 F.3d 1237 (9th Cir. 1998) .............................................................75

*Pierce v. City & Cnty. of San Francisco*
   2022 WL 17418974 (N.D. Cal. Dec. 5, 2022) .....................................51

*Pierce v. Cnty. of Orange*
   526 F.3d 1190 (9th Cir. 2008) ........................................................63, 68

*Richardson v. Runnels*
   594 F.3d 666 (9th Cir. 2010) ...............................................................69

*Shorter v. Baca*
   895 F.3d 1176 (9th Cir. 2018) .......................................................50, 69

*Spain v. Procunier*
   600 F.2d 189 (9th Cir. 1979) ...............................................................68

*Swain v. Junior*
     457 F. Supp. 3d 1287 (S.D. Fla.) ..........................................................................65

*United States v. York*
     600 F.3d 347 (5th Cir. 2010) ...............................................................................58

*Yamagiwa v. City of Half Moon Bay*
     2007 WL 831804 (N.D. Cal. Mar. 19, 2007)........................................................58

**Federal Statutes**
18 U.S.C. § 3626(a)(1)(A) .........................................................................75, 76, 77

**Rules**
Federal Rule of Civil Procedure 23(b)(2) ...............................................................1, 54

**Constitutional Provisions**
California Constitution, Article I, Section 7 .....................................................1, 49, 79

U.S. Constitution, Fourteenth Amendment..................................1, 49, 66, 74, 75, 76, 79

Defendants City and County of San Francisco and Sheriff Paul Miyamoto, in his official capacity ("San Francisco"), submit the following proposed findings of fact and conclusions of law following a bench trial in this matter from August 8, 2023, through August 17, 2023.

### Findings of Fact

This action centers on County Jail 3 ("CJ3") located in San Bruno, California, which is operated by the San Francisco Sheriff's Office ("SFSO"). Plaintiffs are a class of pre-trial inmates in CJ3 who challenge the amount of out-of-cell time and outdoor access they receive and seek injunctive relief under (1) the Fourteenth Amendment to the United States Constitution, and (2) the parallel provisions of Article I, Section 7 of the California Constitution. The three named Plaintiffs are representatives of a certified class under Rule 23(b)(2) of the Federal Rule of Civil Procedure. The Court certified the following classes and subclasses:

      (1) Class 1 ("Outdoor Class"): All inmates who are pretrial detainees and have been incarcerated in CJ3 at any point during the time period May 20, 2017 to the present, and who do not have outdoor access as part of their incarceration in CJ3;

      (1) Class 2 ("Confinement Class"): All inmates who are pretrial detainees and have been incarcerated in CJ3 at any point during the time period from May 20, 2017, to the present, and who have fewer than one (1) hour per 24-hour period of time out of their cells as part of their incarceration at CJ3;

      (1) Subclass 1 ("Confinement Subclass 1"): All inmates in the Confinement Class who are classified by the SFSO in general population housing; and

      (1) Subclass 2 "Confinement Subclass 2":  All inmates in the Confinement Class who are classified by the SFSO in administrative segregation housing. (ECF No. 238.)

Each class representative—Jose Poot, Montrail Brackens, and Troy McAlister—is a member of Outdoor Class and Confinement Class. Plaintiff McAlister is also a representative of the Confinement Subclass 1, housed in general population and Plaintiffs Poot and Brackens are representatives of the Confinement Subclass 2, housed in administrative segregation.

### I.    County Jail 3

1. CJ3 is located at 1 Moreland Drive in San Bruno, California. (Tr. Vol. 5 906:4-6.)

2.   The San Bruno property holds CJ3 in addition to another jail that was not in use during August 2022, currently known as the CJ3 Annex ("Annex"). The SFSO operates both facilities. (Tr. Vol. 5 1003:16-1004:4.)[1]

3.   CJ3 opened in 2006 and was not designed to include any secure outdoor space. Between 2006 and August 2022 the SFSO had never offered outdoor access to inmates at CJ3. (ECF No. 448 [Stipulation ¶ 3]; Tr. Vol. 5 909:11-15.)

4.   CJ3 houses male felony inmates, more than 90% of whom are pretrial detainees. (ECF No. 448 [Stipulation ¶ 4].)

A.      Weather Issues at County Jail 3

1.      Fog

5.   San Bruno experiences high rates of fog because of its elevation and its proximity to the ocean. (Tr. Vol. 4 786:6-21.) The jail is 611 feet above sea level and there are days when the surrounding clouds are at the same elevation as the jail. (Tr. Vol. 4 783:11-22.) Fog itself acts like a low-lying cloud and obscures visibility. (Tr. Vol. 785:14-786:5.)

6.   Fog impacts visibility at CJ3 and can roll in quickly given the area's high elevation. (Tr. Vol. 4 782:24-783:10.) When present, fog can bring visibility down to less than a quarter of a mile or at certain times close to zero. (Tr. Vol. 4 782:24-783:10.)

7.   Fog at CJ3 is common nearly every day in the spring and summer months, and can happen any time of year. (Tr. Vol. 4 783:23-784:9.) Although fog is most common in the evening and morning hours, it can also occur in the afternoon because of San Bruno's proximity to the bay—the sea breeze carries inland fog that cooled over the ocean. (Tr. Vol. 4 783:23-784:9.)

8.   Fog is also more frequent in San Bruno than in the surrounding areas because of its high relative humidity, which can reach up to 100 percent. (Tr. Vol. 4 786:6-21; 799:21-800:7.)

---

[1]As of August 2022, there were no inmates housed in the Annex. (Tr. Vol. 5 1004:5-9.) The Annex is a dormitory style housing facility. (Tr. Vol. 5 1003:16-1004:4.) This means that unlike the pods in CJ3, the Annex has an open housing area with single and double bunks spread out in a common area where all inmates mix together rather than individual cells each holding one to two inmates. (Tr. Vol. 5 1005:24-1006:6.) For this reason, the Annex cannot be used to house inmates in administrative segregation. (Tr. Vol. 5 1006:8-15.)

9.   When the old CJ3 existed (before it was torn down), an outdoor yard was attached to the jail, but outdoor recreation was cancelled when fog reduced visibility. (Tr. Vol. 6 1208:5-16.) This happened two to three times per week. (Tr. Vol. 6 1208:17-1209: 3.) The yard had to be closed when there were issues because safety and security of the incarcerated and the facility was compromised; escape attempts and fights could go unnoticed.  (Tr. Vol. 6 1207:4-1210:14.) There were no indoor gyms at the old jail, so if the conditions were too foggy to exercise outside, inmates had no recreation at all. (Tr. Vol. 6 1215:10-16.)

### 2.     Rainfall

10. There are also occasions where precipitation or rainfall make outdoor access at San Bruno inclement. While the majority of rainfall in San Bruno occurs between October and April, it can rain any time of year including the summer months. (Tr. Vol. 4 787:25-788:13.) On average, San Bruno experiences 60 days per year of rain and in a wet year the number can double to up to 120 days— meaning that it rains a full one-third of the year. (Tr. Vol. 4 788:14-22.)

11. The San Bruno area receives an average of 19-20 inches of rain per year, with the numbers doubling to 40 inches in a particularly wet year. (Tr. Vol. 4 789:25-790:19.) Rain can occur at any time of day and although thunderstorms are not as common in San Bruno as in other parts of the country, they do occur and lightning can strike from up to 20 to 25 miles away from the thunderstorm itself. (Tr. Vol. 4 790:20-791:10; 791:11-23; 792:20-25.)

### 3.     Temperatures

12. Temperatures in San Bruno can swing between 106 degrees Fahrenheit on the high end down to 26 degrees on the low end. (Tr. Vol. 4 796:6-797:10; 800:1-6.)

### B.     Layout of County Jail 3

13. CJ3 is a jail organized around a high school. (Tr. Vol. 5 1046:8-23.) The center of the building on the second floor is the education corridor, which looks like a typical public high school with classrooms on either side. (Tr. Vol. 5 1046:8-23.)

14. Other counties in the Bay Area used CJ3 as a model for their own facilities. (Tr. Vol. 5 1009:1-10.)

///

15. Spreading out from the education corridor, the jail has a "pod" style structure and is organized into 16 identical pods, named with numbers 1-8 and letters A or B. Each pod has 24 two-person cells arranged in two tiers, for a maximum capacity of 48 inmates. (ECF No. 448 [Stipulation ¶¶ 5-6]; Trial Vol. 5 1116:16-25.) The jail is spread out over two floors, with 8 pods on each floor.

16. Exhibit 1071 is an accurate representation of the first floor of the jail, showing the locations of cells, common areas, and gyms inside each pod. (ECF No. 448 [Stipulation ¶ 18]; Tr. Vol. 5 1117:1-15.)



17. The layout of the pods used for general population housing is identical to the layout of the pod used for administrative segregation housing. (Tr. Vol. 4 868:2-12; Vol. 5 1118:19-25.)

### 1.    Pod Common Areas

18. Inside each pod, there are two tiers of cells, with 12 cells on each tier. (Tr. Vol. 868:13-17.) On the bottom tier, in addition to 12 cells each pod has a central common area with tables, benches, phones, showers and a television. All cells on both tiers face the common area. (ECF No. 448 [Stipulation ¶¶ 3, 6-7].) Each pod also has its own gym, sometimes referred as the yard. (Tr. Vol. 5 1082:1-15.)

19. Exhibits 1154 and 1158 are photographs showing the common area inside of a pod.

20. Exhibit 1165 shows one of the pod televisions in the common area.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



### 2. Layout of a Cell Inside CJ3

21. Each cell in CJ3 has an exterior facing window through which inmates can see outside, including views of trees, grass, and houses. (Tr. Vol. 1 154:17-19; 155:15-18; Vol. 2 305:11-18; Vol. 3 475:8-11.) These windows provide access to sunlight and are sufficient for inmates to tell the passage of time—whether it is day or night outside. (Tr. Vol. 1 155:19-22; Vol. 2 233:12-17; 305:19-21; Vol. 3 473:13-474:6.)

22. Exhibits 1159-1162 and 1172 show photographs of the exterior facing windows in each cell.



23. Exhibit 1172 shows the view out of a window.



24. The cells are big enough for inmates to do large muscle group exercises such as sit-ups, push-ups, burpees, and dips. (Tr. Vol. 2 233:18-234:5; Vol. 7:1584:9-11.) Dr. Lisa Pratt remarked that the creativity with which inmates pursue exercise inside their cells is remarkable, with people using the bunk beds, the floor space, the partition in front of the toilet, and other fixtures in the room. (Tr. Vol. 4 721:13-25.)

///

///

///

///

///

///

///

///

///

Defs. Findings of Fact and Conclusions of Law
Case No. 19-cv-02724-SK (LB)

6

n:\lit\li2023\191337\01702636.docx

25. Exhibit 1156 shows a picture of a cell in CJ3.



26. Each cell has its own air vents next to the window. (Tr. Vol. 1 221:19-21.) Air can also exchange in and out of the cell into the common room through the edges of the door. (Tr. Vol. 1 224:5-7.) The air vents as well as the gap in the door are visible in Exhibit 1156.

27. Fresh air is circulated to the jail, including the housing units, by one of eight air handling units ("AHU") with one AHU serving 48 cells—the equivalent of an A and B side of a pod. (Tr. Vol. 5 1086:20-22; 1091:1-25.) The AHUs are controlled by a computerized system. (Tr. Vol. 5 1087:9-1088:2.) The amount of fresh air coming into the building is controlled and adjusted electronically by the jail's superintendent and the AHU vendor. (Tr. Vol. 5 1088:14-24.)

28. Exhibit 1033 is a diagram of the AHU. Exhibit 1034 is a diagram of the heating coils that ensure the air in the AHU is at the right temperature and Exhibit 1035 is a diagram of the exhaust fans in the AHU.

### a.     Light Readings Inside the Cells

29. Dr. Jamie Zeitzer is an expert in the measurement of light. (Tr. Vol. 3 468:22-469:3.) He took approximately one week of light measurements from inside two types of cells inside CJ3—those that still have fluorescent bulbs and those that have transitioned to more modern LED lights, which are recorded in Exhibits 33 (fluorescent) and 32 (LED). (Tr. Vol. 3 442:10-18; 481:7-10.)

30. His light readings are measured in lux—with one lux giving off about as much light as a single candle from a few feet away. (Tr. Vol. 3 441:2-442:1.)

31. Inside the courtroom, the lux levels would vary between 50 or 60 if a person was looking into a dark area to approximately 150 lux looking more directly at the light. (Tr. Vol. 3 441:2-442:1.) A bedroom typically has between 50 and 80 lux; a well-lit bathroom or doctor's office typically has up to 500 lux; and at sunrise, the lux outside will likely reach 10,000 lux. (Tr. Vol. 3 441:2-442:1; 461:14-16; 461:22-24.)

32. From the light reading measurements Dr. Zeitzer took he confirmed there was a day-night light cycle inside the jail cells. (Tr. Vol. 3 446:16-21.)

33. Dr. Zeitzer's light measurements ranged from basically zero at night to the level of a well-lit doctor's office during the day. (Tr. Vol. 3 481:14-17; 482:24-483:5; 499:22-25.) That is as bright as any indoor location would be. (Tr. Vol. 3 481:18-482:22.)

34. Dr. Zeitzer's measurements do not distinguish between the source of the light. (Tr. Vol. 3 484:24-485:3.) In other words, the light meter readings do not distinguish between light from the overhead artificial lighting and sunlight coming through the window. (Tr. Vol. 3 484:24-485:3.)

35. Closing a person's eyes reduces the amount of lux they receive into their eye by 90 percent. (Tr. Vol. 3 483:6-12; 483:18-22.)  None of Dr. Zeitzer's light reading measurements accounted for the reduction in light levels an inmate would experience when sleeping. (Tr. Vol. 3 483:13-17.)

36. Inmates in CJ3 also have access to eye masks. (Tr. Vol. 6 1211:10-1212:10.) If someone wears an eye mask, that would further decrease the amount of lux they experience at night. (Tr. Vol. 2 406:2-4; 3 503:22-25.) None of Dr. Zeitzer's calculations accounted for the effect an eye mask. (Tr. Vol. 3 504:4-7.)

37. After taking these light measurement readings, Dr. Zeitzer did not offer any opinions about whether any class member was experiencing injuries or harm as a result of a disruption to their circadian rhythm caused by their conditions of confinement. (Tr. Vol. 494:2-10.)

///

///

///

1

2

### 3.  Gym Layout

38. Exhibit 1134 is a diagram of the gym in each pod. (Ex. 1134.)



39. Each gym is approximately 1,000 square feet, measuring 21 feet by 40 feet, and includes a toilet and wash area that measure approximately 5 feet by 7 feet. (Tr. Vol. 5 1082: 1-1083:21; 1082:1-15; Exhibit 1134.) The gym also has a basketball hoop. (Tr. Vol. 2 234:19-20.)

40. Each gym has screened windows that allow air to flow directly from outside the jail into the gym and housing unit. (Tr. Vol. 2 235:20-236:8; Vol. 5 1084:13-21; Exhibit 1171.) Each window measures 8 feet by 6 feet and allows natural light into the gym. (Tr. Vol. 3 472:17-473:5; Tr. Vol. 5 1086:4-10; Exhibit 1171.) There are screens and louvers over the windows, to prevent weather intrusion, but do not obstruct air flow.  (Tr. Vol. 5 1085:4-20.)

///

///

///

///

41. Exhibit 1167 and 1171 shows the windows in the gym.





### C.    San Francisco Sheriff's Office's Jail Operations

#### 1.    Deputy Supervision of Pods

42. The jail is a direct supervision facility, which means that deputies are part of the pod housing

community and have a direct line of sight into the cells while patrolling the pod from a central

location. (Tr. Vol. 5 911:22-912:7; 1007:24-1008:9; Tr. Vol. 6 1145:6-1146:16.) This contrasts with the older linear style jails that had no pods or common areas and instead held inmates in large group tanks along linear corridors.

43. CJ3 had been continuously operated as a direct supervision facility since it opened in 2006. (Tr. Vol. 5 1009:12-17.) Captain Stephen Tilton, the Facility Commander of CJ3 from August 2019 to August 2022, applied the direct supervision model in CJ3. (Tr. Vol. 5 1109:25-1110:2; 1114:12-13; Vol. 6 1146:17-1147:21.) Defense expert Julian Martinez confirmed that CJ3 operates as a direct supervision facility. (Tr. Vol. 7 1317:12-1319:5.)

44. The SFSO deputies who work in CJ3 create written records of their activities to share with the next shifts. "Red books" are facility diaries in which deputies keep notes for each shift regarding events in the pods such as any maintenance issues, fights, COVID-19 results, and hospital runs. (Tr. Vol. 6 1137:10-1139:1; Exhibit 1194.)

45. The jail keeps extensive records about what occurs in each pod every day. (Tr. Vol. 6 1302:14-1303:3.) Yet, Plaintiffs offered no documentary evidence supporting their claim that any inmate in administrative separation received less than one hour out of cell every day, or that general population inmates do not receive multiple hours out of cell every day.

## 2.    Classification

46. SFSO has a Classification Unit whose mission is to promote safety in the jails for all staff and inmates by assessing inmates for security risks, escape risks, potential for violence, and vulnerability within the jail population. (Tr. Vol. 4 840:25-841:6; Ex. 1073 at CCSF-NORBERT_009037.) Staff in this unit receive six weeks of specialized training. (Tr. Vol. 4 841:6-25.)

### a.    Classification Levels

47. As of August 2022, CJ3 housed inmates at three classification levels: minimum, medium, and maximum. (Tr. Vol. 4 842:19-843:3.)

48. An inmate's classification level is different from their housing assignment. There are maximum security inmates in general population and minimum security inmates in administrative separation. (Tr. Vol. 4 843:13-18.)

///

49. Although an inmate's classification level does not exclude them from any particular housing assignment, it can impact their housing insofar as it limits who an inmate could have as a cellmate within their pod.

50. The SFSO determines an inmate's classification level based on an objective points-based system to reduce the risk of bias or prejudice in classification assignments. (Tr. Vol. 4 844:5-9; 848:3-25.)

51. Exhibit 1073 includes the criteria the SFSO uses to assign an inmate's classification level, which considers: (1) the severity of an inmate's current charges, (2) the seriousness of the inmate's prior offense history, (3) the inmate's escape history, (4) the inmate's history of institutional discipline, (5) any prior felony convictions, (6) history of alcohol or drug abuse, and (7) any stability factors which can lower a person's classification score. (Ex. 1073 at CCSF-NORBERT_009058-CCSF-NORBERT_009060.)

52. SFSO does not house inmates who are minimum security in the same cell with inmates who are maximum security for safety reasons. (Tr. Vol. 4 843:4-12.) For example, there is a risk to an inmate who is new to the jail system on a low-level charge (minimum security), if they are housed with a more sophisticated inmate with a more serious charge (maximum security). (Tr. Vol. 4 846:10-18.) In that situation, the more sophisticated inmate might prey on the less sophisticated inmate, for example, by preventing the less sophisticated inmate from using the phone or reaching out to others, stealing their commissary, and/or potentially taking physical or sexual advantage. (Tr. Vol. 4 846:16-13.)

53. Over time, the population and classification levels of individuals housed at CJ3 has changed. (Tr. Vol. 5 1012:9-1013:8.) Previously, the jail did not hold inmates who were ordered to have a high bail or charged with serious or violent offenses, such as murder. As an example, the jail did not house individuals who were gang affiliated or who had mental or behavioral health issues. (Tr. Vol. 5 1012:9-1013:8.) Instead, those inmates were housed at County Jail 4 in downtown San Francisco, which was a maximum-security facility. (Tr. Vol. 5 1012:9-1013:8.) However, County Jail 4 closed several years ago and the inmates previously held there are now housed in San Bruno. (Tr. Vol. 5 1012:9-1013:8.)

54. As of August 2022, CJ3 housed inmates accused of serious violent offenses, inmates who were gang affiliated, inmates who had a maximum-security classification, and inmates who had mental or behavioral health issues. (Tr. Vol. 5 1013:9-25.)

### b.     Housing Assignments

55. The primary housing assignments in CJ3 are general population or administrative segregation, although some inmates in the jail system are housed in medical housing or psychiatric sheltered living units. (Tr. Vol. 4 849:21-25.) Entire pods in CJ3 are designated as either general population pods or administrative segregation pods, meaning all inmates in that pod share the same housing assignment. (Tr. Vol. 4 863:13-23.) There are no pods that mix inmates assigned to general population and those assigned to administrative segregation. (Tr. Vol. 4 864:2-10.)

56. The SFSO classifies an inmate into the least restrictive level of housing possible, with due regard for the safety of other prisoners, deputized staff, and members of the public, all while offering inmates the opportunity to participate in jail programs to assist them in preparing for community reentry. (Ex. 1073 at CCSF-NORBERT_009038.)

### i.     General Population

57. The majority of inmates in CJ3 are housed in general population, which is the least restrictive housing assignment. (Tr. Vol. 4 850:15-22.) There are periods of the day where all inmates in a general population pod (maximum 48 inmates) can be out of their cells at the same time. (Tr. Vol. 4 854:8-11.)

58. A general population housing assignment does not mean there is no security or safety risk associated with those inmates. (Tr. Vol. 4 850:4-10.) For example, there are gang affiliated inmates in general population. (Tr. Vol. 4 851:2-7.) In order to house these inmates in general population the jail thinks creatively about how to organize the general population pods and houses inmates affiliated with the same gang (e.g., Nortenos) in one pod (e.g., 1A) and houses inmates affiliated with a rival gang (e.g., Surenos) in a different pod (e.g., 1B), so that both groups get the benefits of general population housing even though inmates from pod 1A and 1B could not be housed together. (Tr. Vol. 4 851:12-17.)

///

### ii.   Administrative Separation

59. At the time this lawsuit was filed, the SFSO had a housing classification referred to as administrative segregation, which has since been renamed administrative separation based on a change in state regulations. However, the change in title did not change the criteria SFSO uses to assess whether an inmate can safely be housed in general population or if they must be housed in administrative separation. (Tr. Vol. 4 849:10-20.) For purposes of this Order, the Court uses the terms administrative separation and administrative segregation interchangeably.

60. One feature of administrative separation is that inmates in this housing assignment have fewer programming and out-of-cell opportunities as compared to inmates housed in general population. (Tr. Vol. 5 884:14-16.)

61. The Sheriff's Office does not use administrative separation as punishment. (Tr. Vol. 6 1181:10-13; Vol. 5 864:11-14.) Instead, the housing classification is used only when necessary for the safety and security of the inmate population, the staff, and/or jail volunteers and visitors. (Tr. Vol. 4 864:15-19.)

62. The reason inmates in administrative separation generally have less out-of-cell time opportunities compared to inmates in general population is that unlike general population, all inmates in an administrative segregation pod (maximum of 48) cannot safely be out of their cells at the same time. (Tr. Vol. 4 862:20-863:12.) The reasons for this are the same reasons that the Classification Unit uses to assess someone's housing assignment. (Tr. Vol. 4 864:20-865:2.)

63. The SFSO uses a questionnaire to assess whether it is necessary to house an inmate in administrative segregation. Exhibit 1241 sets forth the questions the Classification Unit considers, which include: (1) Was the prisoner assaultive (prone to assault staff?) (2) Was the prisoner assaultive (prone to assault other prisoners?) (3) Is the prisoner disruptive in general population? (4) Is the prison an active participant in gang (or other disruptive group activities) while in custody? (5) Is the prisoner likely to need protection from other prisoners? (6) Is the prisoner a documented threat to the safety and security of the facility or to others? (7) Does this prisoner need medical isolation (per request of Jail Health Services)? (8) Does this prisoner request Ad Seg housing? and (9) Is this Ad Seg placement made for any other reason not listed above? (Ex. 1241 at CCSF-NORBERT_041936.)

a. If an inmate is assaultive to staff an administrative segregation housing placement may be necessary to protect the safety and security of staff and visitors because the inmate could attack another staff member or volunteer. (Tr. Vol. 4 855:16-856:7.)

b. If an inmate is assaultive toward other prisoners an administrative segregation housing placement may be necessary to prevent fights among inmates in the pod. (Tr. Vol. 4 856:8-857:3.)

c. If an inmate is disruptive, it may be necessary to place them in administrative segregation because disruptive behavior—such as yelling all night or inciting a riot—can cause tension in the pod and create a security risk. (Tr. Vol. 4 857:4-18.)

d. If an inmate is a member of a gang it may be necessary to place them in administrative segregation to ensure everyone in the jail is housed safely. (Tr. Vol. 4 587:19-858:12.)

e. If an inmate is likely to need protection from other inmates—for example, because they have a high-profile criminal charge or because they are accused of a sexually based crime—it may be necessary to house that inmate in administrative segregation for their own safety to protect them from the threat of violence from other inmates (Tr. Vol. 4 858:13-859:20.)

f. If an inmate is a documented threat to the safety and security of others—for example because they are suicidal or threatening staff—it may be necessary to house them in administrative segregation for their own safety and for the safety of others. (Tr. Vol. 4 859:21-860:9.)

g. If an inmate needs medical isolation—for example because they have a broken arm, have a contagious disease, or need to detox upon entering the jail, they may be placed in a housing assignment other than general population for their own safety and for the safety of others. (Tr. Vol. 4 860:10-23.)

h. There are inmates who request to be housed in administrative segregation rather than general population. The SFSO may house these inmates in administrative segregation based on that individual's own assessment of their safety and security risks if housed in general population. (Tr. Vol. 4 860:24-861:17.)

i. An inmate may also be assigned to administrative segregation for safety and security reasons under the "reasons not listed above" category for example if they are receiving drugs or weapons in the mail. (Tr. Vol. 4 861:18-862:19.)

64. There may be inmates in administrative segregation housed in different cells within the same pod who have a history of fights with each other and it would therefore be unsafe to have them use the common areas together. (Tr. Vol. 4 866:21-867:15.)

65. Nevertheless, the SFSO seeks to maximize the amount of out-of-cell time that inmates in administrative segregation receive by using walk groups of inmates in the same pod who are determined to be able to safely recreate together. (Tr. Vol. 4 865:3-11.) The determination of which inmates in administrative segregation can walk together is determined by SFSO staff, with input from inmates themselves. (Tr. Vol. 4 865:3-11.) The concept of walk groups existed in jail vernacular and in CJ3 specifically prior to COVID—this was not a new invention. (Tr. Vol. 6 1174:13-1175:11.)

66. When possible, the jail has worked to identify larger groups of inmates housed in administrative segregation who could all safely be out of their cells together and then rehoused those individuals in one pod, which then operates with the same level of out-of-cell time available in general population. (Tr. Vol. 4 865:12-866:20.) One example of this is the Special Needs Yard ("SNY"). SNY is a subset of administrative segregation for inmates who are in administrative segregation for their own protection—for example because they are in protective custody based on their charges or are gang drop-outs. (Tr. Vol. 4 865:12-866:9.) The SFSO is able to pull those individuals into a pod together to provide them the same out-of-cell time as someone in general population receives because that combination of inmates does not pose the same kind of safety or security concerns as other administrative segregation pods when out of their cells together. (Tr. Vol. 4 866:1-9.)

///

///

67. Captain Tilton took active role in attempting to reduce the administrative separation population, but the majority of inmates that the Captain attempted to reclassify into general population returned to administrative segregation based on their behavior. (Tr. Vol. 6 1179:25-1180:6.)

68. It is unsafe to ask the SFSO to experiment with reassigning inmates in administrative segregation to general population or to experiment with which inmates within an administrative segregation pod can be out of cell at the same time because those experiments could be a safety or security risk to the inmates and it is inappropriate to experiment with an inmate's safety. (Tr. Vol. 4 867:17-23.)

69. Defendants expert on corrections (Tr. Vol.6 1298:5-7; 1299: 3-7), Julian Martinez, confirmed that administrative separation in CJ3 is used for the same reasons described by SFSO personnel: to protect both staff and incarcerated persons based on escape history, assaultive behavior, gang affiliation, and protective custody needs. (Tr. Vol. 6 1311:7-1312:1.) Mr. Martinez testified that Defendants' practices regarding administrative separation was consistent with other facilities. (Tr. Vol. 6 1312:15-19.)

70. Plaintiffs did not offer testimony that contradicted the evidence of Defendants' appropriate use of administrative separation at CJ3.

### c.     Inmate Movement

71. Another aspect of an inmate's classification is their mandatory restraint ("MR") level. (Tr. Vol. 4 868:18-25.) An MR level refers to the type of restraints and/or security that is required to transport an inmate anytime they leave their cell; there are four MR levels based on an inmate's behavior. (Tr. Vol. 4 869:4-8; 870:13-21; 869:24-870:2.)

72. MR Levels 1 and 2 generally apply to someone housed in general population. (Tr. Vol. 4 869:15-17.)

73. A person classified as MR1 is allowed to walk around the jail without handcuffs. (Tr. Vol. 4 869:9-12.) A person classified as MR2 would need to be handcuffed to be moved from one location to another around the jail. (Tr. Vol. 4 869:13-14.) An inmate who is assaultive could have their MR level raised from MR2 to MR3. (Tr. Vol. 4 870:2-6.)

///

74. A person who is MR3 would need to wear a belly-chain and leg shackles and be escorted by one deputy. (Tr. Vol. 4 869:18-20.) A person who is MR4 would need to wear a belly-chain and leg shackles and be escorted by two deputies. (Tr. Vol. 4 869:21-23.) An inmate could have their MR level raised from MR3 to MR4 if they were an escape risk or had been involved in multiple fights. (Tr. Vol. 4 870:7-12.)

75. It takes significantly longer to transport someone who is an MR3 or MR4 as compared to someone who is an MR1 or MR2 because of the amount of time it takes to put on belly chains and leg shackles. (Tr. Vol. 4 870:22-871:6.)

76. Inmates are transported to court daily from Monday through Friday, except for court holidays. (Tr. Vol. 6 1140:11-12.) A van list is generated each day to identify and ensure court transport. (Tr. Vol. 6 1139:5-1140:10; Exhibit 1266.)

**D.    Statistics on Inmate Population in County Jail 3**

77. CJ3 is rated to hold a maximum of 768 inmates. (ECF No. 448 [Stipulation ¶ 2].)

78. As of August 15, 2022, CJ3 held a total of 532 inmates. (ECF No. 448 [Stipulation ¶ 19].)

    a.  Of those 532 inmates, 306 (57.5%) had been in custody for less than one year; 106 (19.9%) had been in custody greater than or equal to one year, but less than two years; 35 (6.5%) had been in custody greater than or equal two years, but less than three years; 18 (3.3%) had been in custody greater than or equal to three years, but less than four years; and 67 (12.5%) had been in custody greater than or equal to four years. (ECF No. 448 [Stipulation ¶ 19].)

    b.  Of those 532 inmates, 385 (72.3%) were housed in general population; 157 (29.5%) were housed in administrative segregation; and two were recently transferred to the facility and had not yet been assigned a housing classification. (ECF No. 448 [Stipulation ¶ 19].)

    c.  Of the 306 inmates in custody for less than one year; 241 (78.7%) were housed in general population, 63 (20%) were housed in administrative segregation; and two (0.6%) were recently transferred to the facility and had not yet been assigned a housing classification. (ECF No. 448 [Stipulation ¶ 19].)

d.  Of the 106 inmates in custody greater than or equal to one year, but less than 2 years, 67 (63.2%) were housed in general population and 39 (37.14%) were housed in administrative segregation. (ECF No. 448 [Stipulation ¶ 19].)

e.  Of the 35 inmates in custody greater than or equal two years, but less than three years, 22 (62.8%) were housed in general population and 13 (37.1%) were housed in administrative segregation. (ECF No. 448 [Stipulation ¶ 19].)

f.  Of the 18 inmates in custody greater than or equal to three years, but less than four years, 6 (33.3%) were housed in general population and 12 (66.6%) were housed in administrative segregation. (ECF No. 448 [Stipulation ¶ 19].)

g.  Of the 67 inmates in custody greater than or equal to four years, 37 (55.2%) were housed in general population and 30 (44.7%) were housed in administrative segregation. (ECF No. 448 [Stipulation ¶ 19].)

79. The SFSO does not determine how long an inmate remains in its custody. (Tr. Vol. 5 1014:1-6.) The courts determine the speed of an individual's criminal trial and whether to accept a criminal defendant's request for additional time to prepare their case. (Tr. Vol. 5 1014:7-8; 13-15.) The SFSO also has no control over whether a criminal defendant chooses to waive their right to a speedy trial in connection with their underlying criminal case. (Tr. Vol. 5 1014:16-21.)

## II.     The Challenged Policies and Procedures

### A.      Plaintiffs' Requested Amount Of Outdoor Access and Out-of-Cell Time

80. Plaintiffs did not offer any testimony regarding the amount of outdoor access the Fourteenth Amendment requires.

81. Plaintiffs did not offer any testimony regarding the amount of out-of-cell time the Fourteenth Amendment requires.

### B.      Outdoor Access Prior to COVID

82. Prior to August 2022 SFSO undertook efforts explore how it could safely provide outdoor access to incarcerated persons. (Tr. Vol. 5 1073:13-15.) Specifically, the SFSO contemplated using two outdoor yards to the Annex, measuring 40 feet by 80 feet. (Tr. Vol. 5 1077:18-1078:8.)

///

83. In addition to the outdoor areas at the Annex, the SFSO also considered using a catwalk between CJ3 and the Annex to provide outdoor access. (Tr. Vol. 5 1076:15-20.) The catwalk has a chain link fence (but no walls), from floor to ceiling on both sides of the walkway. (Tr. Vol. 5 1077:6-17.)

84. The SFSO started modifications to the outdoor space prior to August 2022. This included moving a fence, adding a sallyport (gated area), making modifications to flooring, and performing concrete work. (Tr. Vol. 5 1075:2-14.) However, the outdoor space was not available for use in August 2022 because it still lacked a number of security requirements. (Tr. Vol. 5 1075:15-22.) As of August 2022, additional work was still needed to strengthen fence lines, develop a drone prevention mechanism, and update the jail's video systems. (Tr. Vol. 5 1080:6-17.)

85. Additionally, COVID-19 limited the SFSO's ability to move incarcerated persons to the outdoor space because movement would have to occur through the CJ3 hallways and there were restrictions on movement due to social distancing protocols and cleaning protocols. (Tr. Vol. 5 1081:4-25.)

## C.   Out-of-Cell Time Prior to COVID
### 1.   Administrative Segregation

86. Prior to COVID, inmates in administrative segregation received out-of-cell time one hour per day and had access to the gym during that time. (Tr. Vol. 1 157:4-6; 157:11-14: Tr. Vol. 6 1148:21-23.)

87. Multiple cells within an administrative segregation pod—up to four cells (8 inmates)—would be offered out-of-cell time together. (Tr. Vol. 6 1148:25-1149:20.)

88. If inmates in administrative separation received an hour of out cell time and there were additional hours in the day available, deputies were instructed to begin the cycle of out-of-cell time again. (Tr. Vol. 6 1149:24-1150:24.) Out-of-cell time was available from 8:00 a.m. to 10 a.m., from 12 p.m. to 2:00 p.m. and from 3:30 p.m. or 4:00 p.m. until 9:00 p.m. (Tr. Vol. 6 1153:19-1155:1.)

### 2.   General Population

89. Prior to COVID-19, inmates in general population were out of their cell for most of the day. (Tr. Vol. 2 236:25-237:18; 1153:4-13.) Specifically, inmates came out of their cells around 8:00 a.m.

for programming, ate lunch and went back to their cells for 20 to 30 minutes, then came out for more programming and free time, then went back into their cells from 2:00 pm to 3:00 pm, and then came out again for dinner and stayed out until the cells were closed for bedtime around 9 or 10 pm. (Tr. Vol. 2 237:15-238:10.)

90. During this out-of-cell time, inmates in general population had access to the gym all day long except when they were in programming in the education corridor. (Tr. Vol. 2 238:11-14.) That programming, described in more detail below, included educational, rehabilitation, anger management, and/or parenting classes. (Tr. Vol. 238:23-239:11.)

### 3.    Programming Opportunities Prior To And During COVID

91. The programming opportunities in the SFSO jail system have won several awards. It is the only government agency that has won the Harvard Kennedy School of Government's Innovations in Government award twice for its programming. (Tr. Vol. 5 1045:23-1046:7.)

92. During intake into SFSO jail, inmates have an orientation where programming staff provide presentations about the programming opportunities in the jails. (Tr. Vol. 5 1047:1-19.) Inmates who want to participate in programming can fill out an action request. (Tr. Vol. 5 1047:1-19.) The classification process is a second opportunity to connect eligible inmates with programming. (Tr. Vol. 5 1047:1-19.)

93. The determination of whether the SFSO opens a program to inmates in administrative segregation or only those in general population is based on whether the programming material is designed to be offered individually or as part of a group. Group programs can only be offered to those in general population while individual programs can be offered to individuals of any housing classification. (Tr. Vol. 5 1058:23-1059:3.)

94. The Programs Unit at the SFSO spends considerable time thinking about how to increase programming access to inmates in administrative segregation. (Tr. Vol. 5 1059:4-7.)

95. Prior to COVID-19, the jail offered programming to inmates in administrative segregation where the program could be modified to be provided one-on-one services. (Tr. Vol. 5 1052:4-1056:5.) For example, the COVER program, which was offered to veterans, had a group component for those in general population, but for those in administrative segregation, staff members would meet with that

inmate individually and work through the program materials with them one-on-one. (Tr. Vol. 5 1052:4-1056:5.)

96. During COVID, when all programming converted to independent study, inmates in both general population and administrative segregation were able to continue work in the COVER program using the independent study model previously applied to inmates in administrative segregation. (Tr. Vol. 5 1056:6-12.)

97. The Roads to Recovery Program is a substance abuse and disorder treatment program the jail offers to inmates. (Tr. Vol. 5 1051:15-20.) The RSVP Program is a batterers' intervention and violence prevention program also offered to inmates in CJ3. (Tr. Vol. 5 1051:21-23.) Prior to COVID-19, both of these programs were offered to inmates in general population because the learning model was based on all of the participants living in the same housing pod. (Tr. Vol. 5 1051:24-1052:1; 1053:2-11.) However, during COVID, the in-person aspect of the programs had to be shut down as a result of social distancing and so the programs continued as independent study packets for individuals to complete own their own. (Tr. Vol. 5 1053:12-25.) At that point, the SFSO opened the programs up to inmates in administrative segregation. (Tr. Vol. 5 1053:12-25.)

98. The jail also offers educational programming to inmates. (Tr. Vol. 156:16-22.) Inmates in general population are able to participate in programming in the education corridor in a high school setting while inmates in administrative segregation are able to complete independent study courses to earn a GED or high school diploma in their pod. (Tr. Vol. 1056:16-1057:7.)

99. Prior to COVID-19, the SF Public Library distributed books and resource materials to inmates. (Tr. Vol. 5 1057:8-22.) During the early phase of COVID-19, the library staff was not permitted into the jail so the SFSO programming staff distributed the library books that were already in the jail. (Tr. Vol. 5 1057:23-1058:6.) Librarians were allowed back into the jail by May of 2021 and were back working with inmates in August 2022. (Tr. Vol. 2 239:12-20; Vol. 5 1058:7-10.)

100.     The jail also has resources for non-English speakers. Non-native English speakers in the jail have access to language lessons and the jail's library also includes books in other languages including Spanish. (Tr. Vol. 1 156:14-15.) Staff provide inmates with enrichment activities that are not

language based, such as sudoku puzzles, so that inmates who speak any language can use them. (Tr. Vol. 1 155:23-156:7.)

101.     CJ3's programming opportunities during COVID were restricted because of public health concerns from the pandemic. Volunteers were prohibited from entering the jail until vaccinations became available to prevent spread of the virus. (Tr. Vol. 5 1059:8-1060:5.) Once vaccinations were available, the SFSO prioritized getting vaccinated volunteers, such as those from the library, COVER, Roads to Recovery, and RSVP programs back in the jail first. (Tr. Vol. 5 1059:8-1060:5.) This transition to letting vaccinated volunteers back into the jail began in May of 2021. (Tr. Vol. 5 1059:17-1060:12.)

102.     Captain Tilton worked with the educational programming staff to have packet materials dropped off and distributed when group programming was not possible. (Tr. Vol. 6 1170:7-1171:14.) To the extent possible, programming returned to CJ3 during COVID, as exhibited by Plaintiff McAlister's participating in group programming for three hours a day in approximately July 2021. (Tr. Vol. 2 293:19-24; 294:15-24.)

103.     None of the programming restrictions implemented during the first phase of COVID-19 were intended to punish inmates. (Tr. Vol. 1060:13-17.) They were instead implemented as a best practice, in consultation with the Department of Public Health, to protect inmate health and safety during a global pandemic. (Tr. Vol. 5 1060:18-23.)

**D.     Staffing**

104.     The jail operates on three shifts: day, swing, and night. The Sheriff determines the minimum staffing levels for each shift at CJ3 in concert with the collective bargaining agreements negotiated between the Sheriff's executive command leadership, unions and the City's Department of Human Resources. (Tr. Vol.5 1120:5-23.)

105.     Lockdowns occur due to staffing shortages, if the facility is more than four deputized staff short of its minimum staffing levels for that shift. (Tr. Vol. 1192:22-24; 1198:12-20.) However, staffing issues are not the only things that can cause a lockdown.

106.     Staffing levels in CJ3 were affected by COVID. Pursuant to health orders in place, employees with COVID could not come to work. (Tr. Vol. 3 650:19-23; Tr. Vol. 6 1132:11-13.)

107.     Unlike many other professions, deputies working in CJ3 could not transition to remote work during COVID and had to show up at the jail in-person. During COVID, staffing challenges resulted operating CJ3 below staffing minimums due to employee's disability leave, military leave, FMLA leave, COVID status, and family COVID status. (Tr. Vol. 6 1131:22-1132:11.) Even just signs of symptoms of COVID-19 would result in employees being directed to stay home from work. (Tr. Vol. 6 1132:14-21.) The SFSO also lost approximately 25 staff members due to the City's vaccination requirement. (Tr. Vol. 6 1133:7-12.)

108.     Julian Martinez confirmed that there is a nationwide staffing shortage in corrections. (Tr. Vol. 7 1313:8-17.)

109.      Plaintiffs did not offer any evidence to contradict Defendants confirmation that a nationwide staffing shortage exists.

**E.     Safety and Security Issues in the Jail and Lockdowns**

110.     In order for a criminal defendant to be detained pre-trial in California, the Superior Court must first determine that releasing the individual "will compromise public safety and or will not reasonably assure the appearance of the defendant as required" for their criminal trial. Cal. Pen. Code §§ 1270, 1270.1. Accordingly, there are safety and security issues that come along with operating a jail.

111.     For example, within the same jail there are inmates who have keep away orders from each other, which prevents those individuals from recreating together. (Tr. Vol. 6 1178:13-1179:1.) Approximately 70-75% of the jail population has at least one keep away order.  (Tr. Vol. 6 1179:2-24.)

112.     The jail also has to deal with shanks, drugs, and fights. Shanks are jail made weapons and they are found in jail five to seven times per week, sometimes multiple times per shift. (Tr. Vol. 6 1183:20-1186:5.) Drugs are also common in jail, found multiple times per week. (Tr. Vol. 6 1187:1-1188:7.) Fights occur in jail often, five to seven times per week. (Tr. Vol. 6 1188:10-18.)

113.     Inmates in CJ3 also throw feces, urine, and other liquids at civilians in jail and Sheriff's Office staff in jail. (Tr. Vol. 6 1189:1-23.) This activity is referred to as "gassing."

114.     When shanks are found, drugs are found, gassing occurs, or fights occur, CJ3 is locked down. (Tr. Vol. 6 1189:24-1191:2.)

115.     A lockdown inside the jail will also occur if the SFSO is performing a security search because a security search requires 10 to 12 deputized staff to perform a security search of a single pod to look for weapons or other contraband items. (Tr. Vol. 6 1191:5-6; 1191:17-24; 1197:15-1196:20.) These searches occur four to six times per month and the lockdown is lifted once the security search, and necessary debrief, incident report writing, and administrative tasks are completed, usually between three and four and a half hours later. (Tr. Vol. 6 1191:25-1192:19; 1196:21-25; 1197:14.)

116.     Lockdowns also occur because of power outages. (Tr. Vol. 6 1193:21-1194:12.)

117.     Plaintiffs offered no evidence regarding the number of lockdowns that occur at CJ3 due to security issues arising from shanks, drugs, fights, gassing, health emergencies, power outages, as compared to those caused by staffing shortages.

118.     Julian Martinez confirmed that the SFSO did whatever it could do to avoid lockdowns from staffing shortages including forced overtime, voluntary overtime, and redirecting staff from other departments. (Tr. Vol. 7 1313:18-1314:25; 1327: 3-6.)

119.     Mr. Martinez confirmed that as a last resort, a lockdown is used when a facility is short staffed, and this not unique to the San Francisco Sheriff's Office. (Tr. Vol. 7 1315:1-12.)

120.     Out-of-cell time must be limited during a lockdown caused by a staff shortage to ensure the safety and security of incarcerated persons and staff, specifically, without sufficient staff, emergencies could not be responded to. (Tr. Vol. 7 1315:13-23.) Riots and fights are a real threat in jail that requires staff response both in corrections and at CJ3. (Tr. Vol. 7 1315:24-1316:17.)

121.     Plaintiffs offered no evidence to contradict that a lockdown is necessary for the safety and security of incarcerated persons and staff if there is a shortage of staff at CJ3.

## F.     Grievances and Complaints

122.     The SFSO maintains a grievance policy for inmates to raise concerns with the SFSO. (Tr. Vol. 5 1141:8-1142:10.) The class representatives are familiar with the grievance policy and have used it. (Tr. Vol. 1 171:2-4; Vol. 2 232:8-23; Vol. 2 306:2-16.) The jail received thousands of grievances each year. (Tr. Vol. 5 1142:15-16; Ex. 1088.)

123.     SFSO also employs bilingual deputies to support the grievance process so that inmates are not required to complete their grievances in English. (Tr. Vol. 6 1136:4-1137:8.)

124.     Plaintiffs did not enter into evidence any grievances regarding the challenged conditions of confinement. (*See e.g.,* Tr. Vol. 2 233:2-11.) To the extent Plaintiffs discussed grievances at all, there was no evidence of any such grievances before 2019. (Tr. Vol. 1 171:5-20; Vol. 2 232:24-2.)

125.     Incarcerated persons also have access to Prisoner Legal Services, who have staff assist inmates with filing paperwork, conducting research, work on publications, voter outreach, crafting letters, etc. (Tr. Vol. 6 1134:13-23.) Prisoner Legal Services personnel are onsite at CJ3 often, and have free access to incarcerated persons either upon request or simply walking around the pods. (Tr. Vol. 6 1134:25-1135:16.) They continued to work through COVID. (Tr. Vol. 6 1135:18-19.)

126.     Additional oversight over CJ3 conditions and operations exist, from the Department of Police Accountability, an internal affairs unit, industrial hygienist inspections, and Department of Public Health inspections. (Tr. Vol. 6 1133:13-1134:12.)

127.     Plaintiffs offered no evidence of any violations or complaints regarding the challenged conditions found or reported by the any of these alternative avenues for inmates to raise complaints.

**III.     COVID-19 in the Jail**

128.     San Francisco responded to COVID-19 by taking steps to decrease the transmission of the virus, including in its jails.

129.     Dr. Lisa Pratt is the Director of Jail Health Services under the umbrella of the San Francisco Department of Public Health. She worked directly with SFSO staff to implement COVID-19 protocols in CJ3 to mitigate the risks of transmission and infections. (Tr. Vol. 3 615:25-616:4; 630: 3-631:9.)

130.     The COVID-specific policies that limited incarcerated person's out-of-cell time and the effects therefrom were made after balancing the risks to inmates from less out-of-cell time against the risk of death from COVID exposure. (Tr. Vol. 4 717:19-718:11; 737:22-738:21.)

131.     Plaintiffs offered no evidence or witnesses to contradict or legitimately criticize the COVID-19 protocols that the SFSO implemented in consultation with Dr. Pratt and Plaintiffs produced no medical expert to critique the SFSO's policy changes in response to COVID-19. (Tr. Vol. 2 415:23-25.)

132.     Additionally, the Court finds Dr. Pratt's testimony regarding COVID-19 credible. Plaintiffs attempted to impeach Dr. Pratt with a prior investigation involving Dr. Pratt's disclosure of additional employment. (Tr. Vol.4 745:7-756:5.) Dr. Pratt credibly testified that she sought, received, and understood that she had prior written approval for her additional employment. (Tr. Vol. 4 760:20-764:17) Dr. Pratt's secondary employment did not interfere with her work as the Director of Jail Health; she worked up to 16-hour days for Jail Health Services in order to manage COVID. (Tr. Vol. 4 754:19-755:25; 772:1-20; 773:18-774:4.) The Court finds that Plaintiffs' attempted impeachment was immaterial.

**A.     Risks of COVID**

133.     Inmates who experienced COVID-19 described typical symptoms, such as having difficulty breathing, experiencing muscle weakness and fatigue to the point where they could not stand up for long periods of time, strong discomfort, and feelings of emotional distress based on the concern for the risk of permeant health effects. (Tr. Vol. 7 1587:11-1588:13.) The inmates who experienced COVID-19 wish they had not caught the virus. (Tr. Vol. 7 1589:12-15.)

134.     However, the risks of COVID-19 in the jail did not stop at the risks posed to an individual patient. An outbreak of COVID-19 in CJ3 created risks not just for the inmate population, but for the entire Bay Area. An outbreak in jail would lead to inmates being sent to local hospitals and could overwhelm the San Francisco health system, which could in turn impact the entire Bay Area community; if there were not enough beds for sick people in San Francisco, patients would be transported to hospitals in neighboring counties, creating a cascading effect. (Tr. Vol. 3 631:10-632:16.)

135.     In fact, COVID-19 did overwhelm city-wide health systems in other areas like New York, Los Angeles, and Wisconsin, where there the number of COVID-19 hospital admissions were so high that there were not enough beds or ventilators for patients. (Tr. Vol. 3 632:17-633:4.) In those areas, the grim reality is that mortality rates from COVID-19 were so high there was ultimately not enough space in morgues for people that had died. (*Id*.) But the health system in the Bay Area was able to avoid that level of crisis. (*Id*.)

///

136.     The risk of COVID-19 transmission among inmates was higher than the risk of transmission in the general population because jails are by definition congregate living centers. Inmates within the same pod exposed each other to COVID-19. (Tr. Vol. 1593:2-5.) Inmates are also exposed to SFSO staff who have to come into the jail to operate the facility, and are exposed to individuals at local hospitals when they have to travel for medical care. All of these are additional avenues of potential transmission.

137.     Because of the SFSO's COVID-19 protocols, although inmates have contracted COVID-19 (Tr. Vol. 1584:15-18), CJ3 has never had an in-custody death from COVID-19. (Tr. Vol. 3 629:13-17; Vol. 6 1279:4-9.) This stands in contrast to other local jails and prisons which were unsuccessful in preventing COVID-19 deaths in their facilities. (Tr. Vol. 3 629:18-630:2.)

    **B.      County Jail 3's Policies During COVID**

138.     As Director of Jail Health Services, Dr. Pratt was involved in discussing and implementing COVID protocols in CJ3, in coordination and communication with Department of Public Health COVID command, San Francisco General Hospital, and the SFSO "every day all day." (Tr. Vol. 3 634:9-16.)

139.     The restrictions for incarcerated persons in jail ebbed and flowed as they did for the population in the City under public health orders. (Tr. Vol. 3 644:24-645:2.) Those ebbs and flows can generally be categorized into three general periods: (1) the early outbreak from roughly March 2020 through early 2021; (2) mid-2021 when vaccinations became available; and (3) subsequent outbreaks in the jail from mid-2021 through summer 2022.

140.     For example, Plaintiff McAlister confirmed that out-of-cell time in his general population pod was limited to one hour per day at first, but it was then increased to one and a half hours per day, and then with a resurgence of COVID-19 it was reduced to one hour per day, but then again by April 2022 it was increased to one and a half hours, and increased again to two and a half hours per day in July 2022. (Tr. Vol. 5 299:8-25.)

141.     Masking in the jail remained a requirement during the entirety of COVID. (Tr. Vol. 2 300:4-7.)

///

1.     **Early Outbreak: March 2020-Early 2021**

142.     During this the early phase of COVID—from March 2020 through early 2021, the SFSO was extremely concerned about the potential for a COVID-19 outbreak in the jail's congregate living setting. (Tr. Vol. 5 1030:7-25; Vol. 3 631:10-632:16.) The jail is designed to bring individuals—inmates, staff, and volunteers, in and out on a continuing basis, so the SFSO's initial concern was limit the exposure of COVID-19 into the jail. (Tr. Vol. 5 1030:7-25; Vol. 3 633:5-22.)

143.     At this time no one fully understood the ways COVID-19 was transmitted and there was no vaccine. Accordingly, the Sheriff personally worked on issues related to COVID every day and spoke with members of his staff and other city partners including the Department of Public Health every week. (Tr. Vol. 5 1031:20-1032:9; Vol. 3 634:20-635: 3; Vol. 6 1162:12-22.) Dr. Pratt was in direct communication with the CJ3 facility commander of CJ3, Captain Tilton. (Tr. Vol. 3 640:23-641:6; Vol. 6 1162:23-1163:9.)

144.     The SFSO prepared a written protocol describing their modified operations in CJ3 in response to COVID; Dr. Pratt had direct involvement in preparing these changes. (Tr. Vol. 3 639:25-640:8; Tr. Vol. 6 1164:17-25.) The SFSO updated and adjusted CJ3's COVID-19 protocols in real time as needed in response to the evolving situation and made these protocols publicly available on their website. (Tr. Vol. 3 640:9-22; Vol. 3 637:11-639:1 Tr. Vol. 6 1165:1-12; Tr. Vol. 6 1173:4-1174:11.)

   a.   Incarcerated persons coming into custody as of December 2020 had to quarantine in a downtown San Francisco location for two or three weeks before being housed anywhere else in the jail system, and had to quarantine again for another two or three weeks when transferred from downtown San Francisco to CJ3 in San Bruno. (Tr. Vol. 2 297: 3-21.)

   b.   Those who left CJ3 temporarily, such as for a hospital visit, also had to quarantine again on their return. After spending a month at the hospital for a surgery, Plaintiff McAlister went through this quarantine procedure before reentering housing at CJ3. (Tr. Vol. 2 298:5-25.)

c.   The jail modified its air handling system to support inmate health during COVID. The fresh air intake for the air handling units was increased to provide 100 percent fresh air. (Tr. Vol. 5 1089:3-23; 1090:1-21.) The air filters in the air handling units were also upgraded. (Tr. Vol. 5 1089:24-25; 1092:10-1093:4.) Dr. Pratt met with the SFSO facility personnel to ensure sufficient air filtration that would not contribute to the transmission of COVID in CJ3, which was confirmed by her investigation. (Tr. Vol. 4 659:14-660:23.) Dr. Pratt confirmed that fresh air was being provided into CJ3 through its HVAC system. (Tr. Vol. 4 726:19-727:2.)

d.   The SFSO closed down its gyms during the early phases of COVID. At this time, the jail's policy mirrored the shelter in place policy in the general community. (Tr. Vol. 5 955:14-17; 1031:1-10.) The CDC and the Department of Public Health orders closed down gyms all gyms, so Captain Tilton closed down the gyms in CJ3 in accordance with those public health orders. (Tr. Vol. 6 1161:25-1162:11.) The gyms were re-opened as soon as the health orders allowed. (Tr. Vol. 5 965:17-20.)

145.    Although inmates could not exercise inside the gyms, they did have access to the common rooms inside their pod and were permitted to use those areas as part of a walk group. The size of the walk groups was limited in order to mitigate transmission. (Tr. Vol. 3 636:4-637:9.) These walk groups were a form of exercise. (Tr. Vol. 732:11-16.)

146.    Inmates also continued to exercise in their cells as they did before and after COVID. (Tr. Vol. 718:21-719:12.) In cell exercise included using the bunk, bars, floor space and as an example included burpees. (Tr. Vol. 721:13-25.)

147.    The jail also spread out its inmate population because the jail was not at its maximum capacity, which allowed inmates more out-of-cell time in their walk groups. For example, although the number of administrative separation inmates could be housed in three pods at CJ3, for social distancing safety measures, they were spread over four pods with fewer inmates in each pod. (Tr. Vol. 6 1177:9-1178:9.)

148.     COVID-19 was the only reason for the policy changes the jail put in place during this period. (Tr. Vol. 5 1033:21-1034:4.) Absent another pandemic, the SFSO has no plans to re-implement these restrictions. (Tr. Vol. 5 1034:6-13.)

### 2.     Availability of Vaccination: Mid 2021

149.     About one year into the pandemic, by mid-2021 the SFSO was putting a renewed focus on balancing the twin risks of COVID-19—that is the risk of death from infection against the risk of mental health issues associated with quarantine and isolation. (Tr. Vol. 5 1031:1-19.) Captain Tilton's goal was to increase out-of-cell time as much as possible. (Tr. Vol. 6 1166:25-1167:14.)

150.     During this period the Sheriff was considering COVID every day and speaking with members of his staff and other city partners including the Department of Public Health every week. (Tr. Vol. 5 1031:20-1032:9.) COVID restrictions were constantly evolving as the COVID emergency changed. (Tr. Vol. 6 1163:12-1164:11.)

151.     Restrictions in jail were able to be eased or lifted beginning in February 2021 when vaccines first became available. (Tr. Vol. 3 641:7-20.) The SFSO worked to encourage inmates to accept COVID-19 vaccines. (Tr. Vol. 6 1165:13-1166:20; 1168:7-1169:5.) However, inmates retain medical autonomy and the SFSO could not mandate that inmates agree to receive COVID-19 vaccines. (Tr. Vol. 3 644:5-8.)

152.     The SFSO worked to decrease COVID restrictions where inmates chose vaccination. For example, Captain Tilton instructed deputies to increase the amount of out-of-cell time incarcerated persons received by increasing the size of walk groups. (Tr. Vol. 6 1174:13-1175:11.) In pods with high vaccination rates the SFSO expanded the numbers of people that would walk together during out-of-cell time, which led to longer amounts of out-of-cell time per person. (Tr. Vol. 3 643:1-14.) This was a similar approach taken for the non-incarcerated public; that is, with proof of vaccination, people could go out with fewer restrictions. (Tr. Vol. 3 643:15-644: 3.) Vaccinations provided the means by which inmates could be out of their cells more. (Tr. Vol. 6 1165:13-1166:21.)

153.     In this timeframe the Sheriff also relaxed the COVID-19 restrictions to allow inmates to use the gym inside their pods as soon as the public health orders made it lawful to do so. (Tr. Vol. 5 1037:25-1038:6.)

154.     In-person visiting resumed in June 2021. (Tr. Vol.  1203:4-10.)

155.     Librarians were welcomed back to jail by at least July 2021. (Tr. Vol. 6 1176:16-1177:4.)

156.     However, these relaxed procedures occasionally coincided with an increase in COVID-19 transmissions at CJ3. The jail experienced its first COVID-19 outbreak—defined as three or more related COVID cases—in the summer of 2021. (Tr. Vol. 3 641:21-642:25; 1169:13-1170:2.) The outbreak reemphasized the need for ongoing preventative measures such as masking, social distancing, quarantining, and isolating. (Tr. Vol. 3 644:9-24.)

157.     COVID-19 was the only reason for the policy changes the jail put in place during this period. (Tr. Vol. 5 1033:21-1034:4.) Absent another pandemic, the SFSO has no plans to re-implement these restrictions. (Tr. Vol. 5 1034:6-13.)

### 3.     Subsequent Outbreaks: Mid 2021-Summer 2022

158.     During this period the Sheriff was considering COVID every day and speaking with members of his staff and other city partners including the Department of Public Health every week. (Tr. Vol. 5 1031:20-1032:9.) In August 2022 there were still COVID protocols in jail as there were still public health orders that applied to congregate living settings, such as distancing, masking, testing, vaccination, isolation, quarantine. (Tr. Vol. 3 645: 3-23; Vol. 6 1214:16-1215:5.) The jail remained a high risk setting for COVID pursuant to public health orders. (Tr. Vol.3 647:6-8.)

159.     By August 2022, the jail had relaxed many of its COVID-19 precautions. Group and in-person programming had been reinstated (Tr. Vol. 5 1056:13-15; Vol. 6 1214:6-7; 1214:14-15); in person visiting had resumed (Tr. Vol. 6 1214:4-5); librarians were back working in the jail (Tr. Vol. 6 1214:8-9); clergy were back visiting inmates (Tr. Vol. 6 1214:12-13), and the pod gyms were open (Tr. Vol.6 1214:10-11).

160.     It was Dr. Pratt's and the SFSO's intent during August 2022 to provide as much freedom and liberalize restrictions as quickly as possible and as safely as possible. (Tr. Vol. 3 648:13-649:14.)

161.     During this time, general population inmates received up to three or hours out-of-cell time per day, although it was walked back if there were surges or positive COVID tests in the pod;

administrative segregation inmates in the worker pod has six to eight hours of out-of-cell time per day. (Tr. Vol. 6 1167:15-1168:6; 1275:23-1276:5.) The total amount of out-of-cell time for inmates in administrative separation did not change much during COVID as compared to the out-of-cell time they had prior to COVID. (Tr. Vol. 192:4-17.) In August 2022, administrative separation inmates had one hour out-of-cell time. (Tr. Vol. 6 1275:15-22.)

162.    During this out-of-cell time inmates were allowed out in walk groups and could use the phones, shower, and socialize in the common area. (Tr. Vol. 5 963:21-964:5.) However, walk groups remained limited because the jail was dealing with not only another surge of COVID, just like the community, but an additional risk of MPOX. (Tr. Vol. 645:24-646:23.)

a.   Plaintiff McAlister and Plaintiff Brackens confirmed that by July 2022 the gyms were open and six to eight inmates were able to use them at a time. (Tr. Vol. 2 242:12-16; 300:1-3.)

b.   During this same time frame of July 2022, up to 12 cells (24 inmates) were let out of their cells at a time. (Tr. Vol. 2 300:12-301:2)

163.    Although San Francisco produced thousands of jail records, Plaintiffs proffered no documentary evidence, such as red book entries or walk logs, that supported their claim that any inmate in administrative separation did not receive at least one hour out of cell every day, or that general population inmates did not receive multiple hours out of cell every day. (Tr. Vol. 6 1302:14-1303:3.[2]

164.    The SFSO would have implemented these out-of-cell restrictions during COVID-19 regardless of its staffing levels because the decisions regarding out-of-cell time during this period were

---

[2] Deputies also perform security rounds of each pod as part of the direct supervision model in order to confirm an inmate's status, well-being, and overall safety and security. (Tr. Vol. 6 1269:20-1271:7; Exhibit 1180.) The SFSO documents these rounds on a standard form. (Tr. Vol. 6 1271:8-18; Exhibit 1180.) However, these forms are not used to document walk time or walk groups. (Tr. Vol. 6 1271-1272:4.) Plaintiffs' attempted to use Exhibit 1192 to identify time periods in which inmates were given out-of-cell time. (Tr. Vol. 6 1243:20-21; 1244:18-23; 1246:6-7.) This attempt was not successful as Captain Tilton testified that this exhibit was not used for the purpose Plaintiffs thought it was—i.e. it was not used to document walk time. Plaintiffs did not introduce any walk logs, which are the correct document that would substantiate or negate the testimony regarding the amount of out-of-cell time the SFSO provided inmates.

not made as a result of staffing limitations, but because of the state and local health directives in place to manage the public health emergency. (Tr. Vol. 5 1019:11-19.)

165.     Even during this later period where the jail was increasing out-of-cell time for inmates, there were new strains of COVID-19 resistant to the initial vaccines and outbreaks in the jail that required the SFSO to again change the out-of-cell time policies. CJ3 experienced six to seven outbreaks in 2021 and 2022 to which the jail needed to respond. (Tr. Vol. 1172:11-1173:3.) For example, CJ3 experienced an outbreak of COVID-19 during the summer of 2022. (Tr. Vol. 7 1588:8-10.) Plaintiff McAlister's pod experienced an outbreak in between July 7, 2022 and August 15, 2022 in which eight people contracted COVID. (Tr. Vol. 2 302:22-303: 3.) Inmates who were transported to Zuckerburg San Francisco General Hospital for unrelated reasons returned and developed COVID shortly after. (Tr. Vol. 1 242:1-7.) After the outbreak in Plaintiff McAlister's pod was managed, out-of-cell time in the pod was gradually increased. (Tr. Vol. 2 303:6-9.)

166.     COVID-19 was the only reason for the policy changes the jail put in place during this period. (Tr. Vol. 5 1033:21-1034:4.) Absent another pandemic, the SFSO has no plans to re-implement the restrictions it put in place during this period. (Tr. Vol. 5 1034:6-13.)

### C.    Mitigation Efforts for Incarcerated Persons

167.     To support inmates who were sheltering in place, the SFSO implemented a tablet program to connect inmates with their communities and families outside the jail, which involved partnering with other City agencies and installing a WiFi system in a jail that had previously been designed without one. (Tr. Vol. 5 1032:10-1033:10.) This platform was released in June 2020, did not exist before COVID-19 and cost between $3 to $5 million. (Tr. Vol. 5 1036:10-16; 1099:17-23; Vol. 6 1171:15-24.) The video visit program, which continues today, was initially offered to provide inmates access to their legal counsel and then expanded to family visits and visits from the general public. (Tr. Vol. 5 1033:7-10.) When the program first started, 88 video visits were completed in one month; but by February 2021 there were 299 video visits accomplished. (Tr. Vol. 6 1200:24-1202:4; Exhibit 1131.) These video visits also made it possible for inmates to remotely attend funerals of loved ones who passed away from COVID where they would not have otherwise been able to attend. (Tr. Vol. 2

245:1-20.) Video visits continued even when in person visiting resumed. (Tr. Vol. 6 1203:11-1204:7.) The video visiting infrastructure is in every pod in CJ3. (Tr. Vol. 6 1204:15-23.)

168.    During COVID the SFSO also routed the sound for the television into the cells, whereas previously sound was limited to common areas, so that inmates would have access to programming including the news even when they were not out of cell. (Tr. Vol. 5 1098:24-1099:16.)

169.    Although librarians were not permitted in jail during public health department shelter in place orders, CJ3 had books in storage and deputized staff passed out books. (Tr. Vol. 6 1225:18-1226:11.) Plaintiffs' counsel attempted to impeach Captain Tilton regarding librarians providing books in jail but this was ineffective because Captain Tilton confirmed that books that were passed out were already in jail, it was simply that library services did not bring in new books. (*Id*.; Vol. 6 1265:14-1269:5.)

170.    Even if the jail had a secure outdoor space, the SFSO could not have used it during COVID to provide outdoor access to inmates given the restrictions regarding social distancing and the number of individuals who could be out together. (Tr. Vol. 5 1010:7-11.)

**IV.    Credibility Issues With Respect to Plaintiffs' Critique of the Challenged Policies**

171.    Mr. Ross Mirkarimi is the former Sheriff for San Francisco and testified as an expert witness on behalf of Plaintiffs regarding jail policies and procedures. As the trier of fact, I find his testimony on key areas regarding jail operations not credible.

172.    Mr. Mirkarimi was suspended as Sheriff without pay after pleading guilty to misdemeanor false imprisonment, was found in a vote of four to one by the San Francisco Ethics Commission that he committed official misconduct, and had permanent removal sought by the City Attorney's Office, the same office defending the City in this matter. (Tr. Vol. 1 56:25-57:23.) Although he denied being biased against the City and County of San Francisco, the Court finds that Mr. Mirkarimi was biased against the City based on the numerous adverse actions taken against him by the City.

173.    Mr. Mirkarimi served as Sheriff for four years, but was suspended for 7 months, showing that he did not have a sufficient experiential basis to support his opinions. (Tr. Vol. 1 57:14-18.) Mr. Mirkarimi held no other position with the Sheriff's Office; he was never a deputy, senior

deputy, lieutenant, captain, chief, assistant chief, or undersheriff. (Tr. Vol. 1 57:24-58:16.) Mr. Mirkarimi has never actually worked in a county jail. (Tr. Vol. 1 57:24-58:1.)

174.     Mr. Mirkarimi gave testimony regarding the mental health impacts of conditions of confinement on incarcerated persons even though he has no expertise in any related field including as a doctor, nurse, psychiatrist, or social worker. (Tr. Vol. 1. 58:17-59:11.)

175.     Mr. Mirkarimi's work in this matter was minimal and limited. He was paid a flat fee of $10,000 to write a report based on 194 pages of materials that he received within two days of the date his report was due. (Tr. Vol. 1 59:23-60:14.)

176.     There were also places where Mr. Mirkarimi's testimony revealed that he did not have a grasp on what materials he relied on in forming his opinions and suggesting his opinions were guided by Plaintiffs' counsel more than any independent expertise.

> a.   For example, Mr. Mirkarimi's report included a list of documents that he purportedly reviewed although he did not prepare that list and it included documents he in fact had never seen. (Tr. Vol. 1 60:20-25.)
>
> b.   At trial, Mr. Mirkarimi was impeached multiple times after stating that he reviewed certain documents when during his deposition he stated under oath that he had not reviewed them. (Tr. Vol. 1 61:19-69:12.)
>
> c.   And of the documents that he did review, Mr. Mirkarimi could not identify the significance they held to his opinions, further undercutting his credibility. (Tr. Vol. 1 65:9-66:12; 69:14-70: 3.)

177.     Mr. Mirkarimi's opinions were also reached without review or reliance on a number of significant materials including: Plaintiffs' depositions or the depositions of any SFSO employees including Chief Kevin McConnell, Captain Ramirez, Captain Tilton, Dr. Lisa Pratt, Sheriff Miyamoto, any document produced by Defendants during discovery, any inmate grievances, or any inmates' disciplinary records, any classification records, or medical records. (Tr. Vol. 1 70:16-80:79:14; 82:8-86:8.) Here again, Mr. Mirkarimi was impeached at trial multiple times when he testified that he had reviewed these materials after admitting during his own deposition that he had not. (Tr. Vol. 1 70:16-72:5; 72:17-73:8, 73:10-74:14; 74:19-75:8; 75:11-76:2; 76:4-19; 79:21-80:7.)

178.    There were also places where the underlying information on which Mr. Mirkarimi said he relied for his opinions actually stated the opposite of the opinions he reached. For example, Mr. Mirkarimi opined that the Sheriff's Office was moving away from a direct supervision model and stated this opinion was based on a discussion with Ken Lomba. (Tr. Vol. 1 87:4-20; 88:8-11.) However, Mr. Mr. Lomba confirmed that he told Mr. Mirkarimi that the direct supervision model will "always carry on." (Tr. Vol. 3 592:19-593:1.)

179.    In another instance Mr. Mirkarimi offered opinions critiquing the jail's policies when the policies in place during his tenure as Sheriff were not demonstrably different. For example, incarcerated persons in administrative segregation during Mr. Mirkarimi's tenure as Sheriff were out of their cell one to two hours per day yet he criticized the current SFSO for offering similar access. (Tr. Vol. 1 96:25-97:4.) This undercuts his credibility.

180.    Mr. Mirkarimi opined that outdoor access should be provided at CJ3 even though he never advocated for outdoor access and "orchestrated and assembled" a team of City employees to prepare a formal proposal of 139 pages to build a new jail facility in San Francisco that did not have any outdoor access. (Tr. Vol. 1 102:6-12; 104: 3-14; 105: 3-9.) In fact, although Mr. Mirkarimi stated he believed incarcerated persons should have outdoor access, during the entirety of his tenure as Sheriff he was never able to offer outdoor access to more than four lower level security inmates. (Tr. Vol. 1 98:21-99:1; 99:5-13; 100:13-15.)

181.    Taken together these factors undermine Mr. Mirkarimi's credibility with respect to his critiques of the SFSO.

**V.    Class Representatives and Their Alleged Injuries**

182.    All three of the Class Representatives—Poot, Brackens, and McAllister—chose to return to jail after they completed their testimony rather than staying in the courtroom. (Tr. Vol. 2 370:22-372-18.)

### A.    Jose Poot

183.    Plaintiff Poot was most recently booked into the SFSO jail system on June 14, 2016. He was housed in CJ3 during August 2022. (ECF No. 448 [Stipulation ¶¶ 12-13]; Tr. Vol. 1 128:24-

129:2; 129:15-17.) He has been in general population and administrative segregation at different times during his incarceration. (Tr. Vol. 1 129:3-5.)

184.     Plaintiff Poot waived his right to a speedy trial in connection with the criminal charges that led to his incarceration in CJ3 during the pendency of this litigation. (Ex. 1173 [RFA 3].)

185.     Although Plaintiff Poot is seeking outdoor access a part of this litigation, since August 2022 the SFSO has offered him outdoor access via a catwalk area and Plaintiff Poot has refused that opportunity. (Tr. Vol. 1, 167:11-168:5.)

186.     Plaintiff Poot also has never been approached by any other inmate who wanted to join this lawsuit, does not remember ever speaking about this lawsuit with any other inmate, and does not remember ever speaking about the conditions of confinement at issue in this lawsuit with any other inmate. (Tr. Vol. 1 168:6-168:24; 170:13-25.)

187.     Plaintiff Poot experienced stress from causes unrelated to this lawsuit including the seriousness of his underlying criminal charges, the uncertainty around his criminal trial, and family health issues. (Tr. Vol. 1 165:9-166:17.)

188.     Plaintiff Poot filed a separate lawsuit against San Francisco alleging that the lighting conditions in the jail and nighttime noise in the jail were disturbing his sleep ("*Poot* lawsuit").[3] That lawsuit did not concern any allegations about the conditions of confinement at issue in this litigation—outdoor access and out-of-cell time. *Id*. However, in this lawsuit and in the *Poot* lawsuit Plaintiff Poot answered sworn interrogatories regarding the alleged injuries he attributed to the conditions of confinement in both cases and identified word-for-word the same injuries, down to the same unusual punctuation. (Compare Ex. 1177 and 1178.)

189.     Plaintiff Poot has used the grievance procedure in San Francisco County jail, but did not file a grievance regarding outdoor recreation at any point prior to 2019. (Tr. Vol. 171:5-20.)

190.     The San Francisco County Jail offered Plaintiff Poot Vitamin D supplements that he refused to take. (Tr. Vol. 1 172:3-6.)

///

---

[3] The Court took judicial notice of the existence and contents—but not the truth—of the allegations in the Poot Complaint.

### B.   Montrail Brackens

191.      Plaintiff Brackens was most recently booked into the SFSO jail system on December 11, 2012 and was housed in CJ3 during August 2022. (ECF No. 448 [Stipulation ¶¶ 8-9].) He has been housed in both general population and administrative segregation during his period of incarceration. (Tr. Vol. 1 184:20-185:5.) When the jail sought to reclassify Plaintiff Brackens back into general population, he refused the housing assignment, preferring to stay in administrative segregation. (Tr. Vol. 1 240:12-241:11.) There have also been times when Plaintiff Brackens was housed in administrative segregation where he preferred to be housed alone rather than having a cellmate. (Tr. Vol. 2 241:20-23.)

192.      Plaintiff Brackens and Plaintiff Poot have spoken with each other prior to filing this lawsuit and Plaintiff Brackens considers Plaintiff Poot to be one of his "associates" and a "constituent." (Tr. Vol. 2 247:20-25.)

193.      Plaintiff Brackens waived his right to a speedy trial in connection with the criminal charges that led to his incarceration in CJ3 during the pendency of this litigation. (Ex. 1173 [RFA 3].)

194.      Plaintiff Brackens was a named plaintiff in the *Poot* lawsuit. (Tr. Vol. 2 243:2-4.) The *Poot* lawsuit did not concern any allegations about the conditions of confinement at issue in this litigation—outdoor access and out-of-cell time. However, in this lawsuit and in the *Poot* lawsuit Plaintiff Brackens answered sworn interrogatories regarding his alleged injuries in each lawsuit and identified word-for-word the same injuries, down to the same unusual punctuation. (Compare Ex. 1177 and 1178; Tr. Vol. 243:5-8.)

195.      Plaintiff Brackens uses the jail commissary and orders items including candy bars, gummy worms, chips, ramen, and powered drinks, (Tr. Vol. 2 228:16-230:4.)

196.      Plaintiff Brackens could not name any inmates he had ever discussed the issues in this lawsuit with, anyone he had ever heard talk about lack of access to fresh air in the jail, or anyone he heard talk about their lack of outdoor recreation in the jail. (Tr. Vol. 2 230:23-231:17.) He has also never heard another inmate complain about their access to the gym. (Tr. Vol. 2 231:18-232:6.)

///

///

197.     Although Plaintiff Brackens is seeking additional gym time in this litigation, there are times in the past few months when additional gym time was offered to him and he refused to use it. (Tr. Vol. 236:12-20.)

198.     Similarly, although Plaintiff Brackens is seeking outdoor access in this litigation, the jail has offered him outdoor access in the past few months and he has refused to take advantage of it on multiple occasions. (Tr. Vol. 2 245:21-246:2; 246:18-22.)

199.     Plaintiff Brackens has submitted grievances in the San Francisco County jails, but did not file a grievance related to either outdoor until 2019. (Tr. Vol. 2 232:13-14; 232:24-233:2.) Plaintiff Brackens did not keep a copy of any of those grievances and refused to provide defense counsel with the names of the family members to whom he allegedly sent his grievances. (Tr. Vol. 2 233:3-11.)

200.     Plaintiff Brackens went to the hospital in April 2022 because he was fasting for Ramadan. (Tr. Vol. 2 227:25-228:10.)

201.     Plaintiff Brackens admitted that he felt depressed because of the limitations on family visits, frequency of phone access, and quality of the food in jail. (Tr. Vol. 2 243:9-22.) Plaintiff Brackens missed important family events while incarcerated, including family funerals during COVID that he was able to appear for by Zoom, but not in person. (Tr. Vol. 2 245:1-20.) He also felt both depressed and anxious because of concerns for his physical safety. (Tr. Vol. 2 243:23-244:25.)

### C.     Troy McAlister

202.     Plaintiff McAlister was most recently booked into the SFSO jail system on December 31, 2020 and was housed in CJ3 during August 2022. (ECF No. 448 [Stipulation ¶¶ 10-11].)

203.     Plaintiff McAlister waived his right to a speedy trial in connection with the criminal charges that led to his incarceration in CJ3 during the pendency of this litigation. (Ex. 1173 [RFA 3].)

204.     Plaintiff McAlister claimed he gained weight from eating jail food. (Tr. Vol. 2 267:15-23; 268: 3-21.)

205.     Plaintiff McAlister claimed he has high blood pressure from being in jail. (Tr. Vol. 2 269:9-270:5; 270:17-271: 3.)

206.     Plaintiff McAlister was active in jail, working for three and half years in laundry for five to six hours per day. (Tr. Vol. 295:18-296:10.)

207.     Plaintiff McAlister also played half-court basketball with four to six other people in the gym in his pod when he was not working. (Tr. Vol. 2 296:11-20.)

208.     Plaintiff McAlister's weight and blood pressure in CJ3 did not improve even though he went outside once or twice a week for two semesters as part of the aquaponics program at CJ3 in 2015. (Tr. Vol. 2 273:2-6; 273:17-23; 274:2-7; 274:18-22.)

209.     Plaintiff McAlister's weight gain upon returning to jail in 2021 was due to a leg injury that prevented him from exercising. (Tr. Vol. 2 275:6-15.)

210.     Plaintiff McAlister had a gunshot wound to his leg that occurred in August 2020, could not exercise in jail because of his leg wound, and it caused ongoing limitations as of August 2022. (Tr. Vol. 286:13-23.)

211.     Plaintiff McAlister purchased food from the commissary, including purchasing 10 to 20 items ramen and chips every couple of weeks. (Tr. Vol. 2 303:21-304:17.) Plaintiff McAlister purchased these items for himself. (Tr. Vol. 2 315:7-16.)

212.     Plaintiff McAlister experienced nervousness in jail. (Tr. Vol. 2 275:16-20.)

213.     Plaintiff McAlister felt like a loner in jail, but that was because he was afraid of being hurt in jail as he's seen people get jumped in jail multiple times. (Tr. Vol. 2 287:2-290:9.)

214.     Plaintiff McAlister never felt hopeless. (Tr. Vol. 2 276:12-17.)

215.     Plaintiff McAlister felt tired because he woke up throughout the night. (Tr. Vol. 2 9-24.) But he woke up due a swollen prostate for which no medical physician testified was specifically caused by any conditions of confinement. (Tr. Vol. 2 279:9-13.)

216.     Plaintiff McAlister was refreshed by daily 30- to 60-minute naps, did not suffer from sleep attacks, did not fall asleep while sitting in a chair or taking a class. (Tr. Vol. 2 279:19-280:17.

217.     Plaintiff McAlister's tiredness and sleep habits are not caused by out-of-cell time or access to sunlight. (286:24-287:2.)

218.     Plaintiff McAlister's crankiness is not caused by out-of-cell time or access to sunlight. (287:12-20.)

219.     Plaintiff McAlister had colitis one time during his incarceration for which no medical physician testified was caused by conditions of confinement. (Tr. Vol. 2 280:21-281:12.)

220.     Plaintiff McAlister has had leg cramps which he does not attribute to outdoor access and which no medical physician has testified was caused by conditions of confinement. (Tr. Vol. 2 283:4-16; 286:9-12)

221.     Plaintiff McAlister has a history of abusing methamphetamines since 2000. (Tr. Vol. 2 286:5-6.)

222.     Plaintiff McAlister had no behavioral health treatment in jail from 2015 to 2020 (Tr. Vol. 2 291:13-16.) Plaintiff McAlister had behavioral health treatment when he returned to jail in December 2020, but that treatment was not related to the conditions in jail, rather it concerned the death of a loss that he asserted his 5th Amendment privilege over answering further questions. (Tr. Vol. 2 291:17-292:11.)

223.     Plaintiff McAlister has been in and out of jail since 1995 without memory of any periods during which he was not incarcerated for longer than 6 months. (Tr. Vol. 2 292:22- 293: 3.)

224.     It is hard for Plaintiff McAlister to be away from his family. (Tr. Vol. 2 293:4-5.)

225.     It is stressful for Plaintiff McAlister to have uncertainty regarding his criminal case. (Tr. Vol. 293:6-8.)

226.     Plaintiff McAlister is worried about his mother dying while he is incarcerated. (Tr. Vol. 2 293:9-11.)

**VI.     Causation**

227.     The evidence presented contained insufficient facts to show that Plaintiffs alleged injuries were caused by the challenged conditions. (Tr. Vol. 6 1338:23-1339:17; Vol. 7 14:38:5-13.)

228.     Plaintiffs presented no evidence of epidemiological measurement. (Tr. Vol. 7 1444:5-8.) Epidemiology assesses whether the rates of a given alleged injury are increased in one group as compared to the population as a whole. (Tr. Vol. 6 1339:21-1340:8.) There was no evidence of how frequently the majority of alleged injuries—for example diabetes or Vitamin D deficiency—occur in the general population and therefore no way to determine whether the rates of those alleged injuries were higher among class members. (Tr. Vol. 7 1435:5-23.) And where there was evidence of a frequency among the general population, it did not show significantly different results as compared to Plaintiffs. For example, Dr. Czeisler testified that about 60 percent of American adults experience

insufficient sleep each month and one in five experience insomnia. (Tr. Vol. 2 404:10-18.) Therefore, the rates of sleep issues among the three inmates who testified on this subject are  not sufficient to show anything medically distinguishable from sleep issues in the general population.

229.     Plaintiffs also presented no evidence regarding the dose response effect of the alleged conditions of confinement. (Tr. Vol. 6 1342:25-1343:16; Vol. 1439:13-1440:2.) In other words, Plaintiffs presented no evidence that their alleged injuries would be remedied by the change in conditions of confinement that they seek. (Tr. Vol. 6:1345:20-1346:14.)

230.     Additionally, the only medical records admitted into evidence are those of the three named class representatives. (Exs. 9, 1272, 1276, 1278.) In August 2022, the jail housed over 500 inmates. (ECF No. 448 [Stipulation ¶ 19].) The Court finds medical records from less than 1% of the current inmate population are insufficient to show class-wide harm. (Tr. Vol. 6 1341:5-20.)

231.     Where there is insufficient evidence of causation at a population level, it is scientifically inappropriate to go on to explore the related question of whether there is evidence of causation at the individual level. (Tr. Vol. 6 1343:17-1344:22.) Therefore, where there is insufficient evidence to show causation among the class, it is inappropriate for the Court to perform a more individualized inquiry as to whether or not there is causation among the three class representatives.

232.     Even if it were appropriate to look at causation as to the three class representatives, the expert testimony showed that there was ample evidence of alternative causation for the injuries Plaintiffs alleged as demonstrated by San Francisco's psychiatric expert Dr. Michael Rogers, who reviewed thousands of pages of medical records from the named Plaintiffs and other class members and determined that their symptoms had causes separate and apart from the challenged conditions of confinement. (Tr. Vol. 7, 1477:5-14)

233.     Even Dr. Czeisler admitted that incarcerated individuals suffer from stressors unrelated to the alleged conditions of confinement in this case including the uncertainty of their pending criminal trials and being separated from their families. (Tr. Vol. 2 403:19-25.) The class representatives' testimony confirmed this—identifying issues about their pending criminal charges and confinement that caused them stress or emotional discomfort separate and apart from the challenged

1 | conditions of confinement. (Tr. Vol. 1 165:9-166:17; Vol. 2 243:9-22; 245:1-20; 243:23-244:25; Tr.

2 | Vol. 3 286:24-287:2.287:12-20; 293:4-11.)

3 | 234. Plaintiffs retained experts also never treated or examined any of the class members

4 | (including the class representatives) or communicated with any of Plaintiffs' treatment providers. (Tr.

5 | Vol. 2 395:5-7, 395:18-21; Vol. 3 484:4-7; 12-15.)

6 | 235. Plaintiffs presented no evidence of a natural experiment—comparing the alleged

7 | injuries of class members in CJ3 against a sister jail or prison that had outdoor access, which would

8 | have been helpful in assessing the issue of causation; nor did they present any scientific literature

9 | showing studies or rates of these alleged injuries in other jails. (Tr. Vol. 6 1341:21-7; Tr. Vol. 7

10 | 1438:14-24.)

11 | **A.   Regulation of Circadian Rhythm**

12 | 236. The critical difference in terms of helping someone regulate their circadian rhythm is

13 | not the absolute amount of light they receive during the day, but the difference between the amount of

14 | light they receive during the day as compared to at night. (Tr. Vol. 3 477:11-19.) There is no agreed-

15 | upon published standard for what the delta between daytime light and nighttime light should be. (Tr.

16 | Vol. 3 477:20-24.) However, a person who slept in total darkness could only need exposure to 50 to

17 | 100 lux during the daytime to regulate their circadian rhythm. (Tr. Vol. 3 479:17-20.) If a person had

18 | some light exposure at night, they would need closer to 200 to 300 lux during the daytime to regulate

19 | their circadian rhythm. (Tr. Vol. 3 479:21-480:20.) Dr. Zeitzer's light readings show this difference

20 | between the day and nighttime light levels in CJ3. (Exs. 32-33.)

21 | 237. A person can regulate their circadian rhythm by artificial light or access to light through

22 | a window as opposed to going outside. (Tr. Vol. 3 475:20-476:1.) Having light filter through plastic or

23 | lexan glass would not disrupt the circadian effects of light. (Tr. Vol. 3 479:8-10.) So, for example, the

24 | presence or absence of UV spectrum light within light does not have much impact, if any, on the

25 | ability of a person to regulate their circadian rhythm. (Tr. Vol. 3 506:23-507:11.)

26 | 238. Additionally, activities like having a set schedule for when the lights come on and off

27 | as there is in the jail can help a person regulate their circadian rhythm. (Tr. Vol. 3 476:13-23.)

28 | ///

239.     In terms of regulating a person's circadian rhythm, the exposure to light that matters is the light received through a person's eyes rather than whether or not they receive any exposure to light on their skin. (Tr. Vol. 3 477:9.)

240.     It is not required for a person to exercise outdoors to regulate their circadian rhythm and Plaintiffs presented no expert to offer an opinion as to whether the amount of exercise SFSO offers inmates should occur indoors as compared to outdoors. (Tr. Vol. 2 416:19-417:5.)

**B.     Credibility Determinations With Respect to Expert Causation Testimony**

241.     The trier of fact may decide which testimony to believe and which testimony not to believe. Ninth Circuit Model Jury Instruction No. 1.14. As the trier of fact, I have made the findings below with respect to witness credibility on the issue of causation.

**1.     Dr. Mayer's Credibility**

242.     The Court finds Dr. Mayer a credible witness on the issues of causation.

243.     Dr. Mayer is an expert in the fields of epidemiology, biostatistics, and public health. (Tr. Vol. 6 1336:3-5.) Dr. Mayer has been a tenured professor at a number of universities over the past 50 years and authored hundreds of articles in scientific journals. (Tr. Vol. 7 1432:3-1433:2; 1433:12-17.) He has also testified as an expert hundreds of times. (Tr. Vol. 7 1335:12-18.)

244.     Dr. Mayer's tone and demeanor were consistent across his direct and cross-examinations. He was not impeached with a prior sworn statement on any issues of material significance to the case. Additionally, Plaintiffs presented no rebuttal expert to critique any of his opinions.

245.     Additionally, Dr. Mayer's opinions are consistent with those put forward by Dr. Rogers, which also weighs in favor of his credibility.

**2.     Dr. Czeisler's Credibility**

246.     As the trier of fact, I have made the findings below with respect to Dr. Czeisler's credibility on the issue of causation. Dr. Czeisler is Plaintiffs' retained expert in the fields of sleep medicine, circadian rhythm, sunlight and the effects of light on human physiology. (Tr. Vol. 2 330:14-16; 331:6-8.) The Court found that Dr. Czeisler's testimony on the issue of causation was not credible for the reasons described below.

247.     Dr. Czeisler's key opinion regarding causation—referenced in his testimony as Opinion No. 8—did not appear in his first timely expert report due on September 2, 2022, and instead only appeared in his untimely supplemental report submitted two months later on November 1, 2022—one day before his deposition. (Tr. Vol. 2 394:11-17; 415:15-20.) Dr. Czeisler also admitted that his original expert report in this matter was based on a misunderstanding of the foundational issue—whether or not the class members received outdoor access at the jail. Although the evidence showed that Plaintiffs' counsel informed him of this critical fact prior to his first report, he "didn't really hear" it. Instead, he based his first, and his only timely, report on the assumption that inmates had outdoor access. Dr. Czeisler testified that he learned that inmates did not have outdoor access only when he read the Defendants' expert report. (Tr. Vol. 2 354:14-19; 356:15-20.) The Court would expect that an expert who can command just under $1,000 an hour for their work would pay more attention to the crucial bases of his opinions. (Tr. Vol. 2 411:21-23.) His failure to do so creates doubt concerning his expert opinions and his credibility.

248.     None of the studies Dr. Czeisler discussed as support for his expert opinion concerned similar conditions to those at issue in this case. For example, he discussed a NASA study in which individuals were deprived of light for 520 days, but admitted that in that case the individuals involved in the study did not have access to any windows whatsoever, unlike the inmates in CJ3. (Tr. Vol. 2 394:18-24.) And as to the studies on which he relied that concerned jails or prisons, Dr. Czeisler was unable to recall whether those jails had windows inside an inmate's cell. He also could not recall whether those facilities included indoor recreation areas. (Tr. Vol. 2 414:5-12.)

249.     Dr. Czeisler's examination did not provide the details of any of his analysis—he simply offered an ultimate opinion without showing his work. (Tr. Vol. 6:1346:24-1347:9.)

250.     Dr. Czeisler's testimony regarding alleged injuries included no measure of the frequency of those alleged injuries in the general population as a starting point to show changes in those frequencies among the population at CJ3 as would be required to establish causation. (Tr. Vol. 6 1347:10-20.) The academic literature he referenced did not show a relationship between the variables actually at issue in this case given the challenged conditions of confinement. (Tr. Vol. 6:1348:20-1349:9.) This is perhaps because Plaintiffs retained him one month before his expert report was due

and he only spent approximately 70 to 75 hours on the case before his first deposition. (Tr. Vol. 2 410:2-23; 411:17-20.) Dr. Czeisler proposed to offer a theory of class-wide injury without providing any data showing that the incidence of those alleged injuries (e.g., sleep disruption) was higher in the jail than among non-incarcerated populations. (Tr. Vol. 7 1435:5-23.). His opinions contain no epidemiological work, which would be required to show causation at a class-wide level. (Tr. Vol. 7:1436:211437:20; 1438:25-1439:12.)

251.     Dr. Czeisler was unable to keep his answers responsive to the direct questions asked despite multiple instructions from the Court to do so. Even when the Court attempted to clarify by asking Dr. Czeisler direct questions he continued to provide non-responsive answers. (See e.g., Tr. Vol. 2 356:1-4; 369:16-22; 416:5-24.) Defendants successfully impeached him on key issues related to his opinions. For example, he testified at trial that his opinions were not in any part based on data provided by Dr. Jamie Zeitzer. Defendants read into the record his sworn deposition testimony where he testified that he relied on Dr. Zeitzer's data to form his opinions. (Tr. Vol. 2 405:4-15.) Dr. Czeisler also spoke with Dr. Zeitzer during breaks in his direct and cross examination and tried to minimize these conversations, before having to admit that the two had discussed the case while on the stand. (Tr. Vol. 2 406:12-17.)

252.     There is also evidence that Dr. Czeisler lacked the objectivity required by experts, and instead engaged in pure advocacy. For example, Dr. Czeisler's report included a diagram of a jail cell that Dr. Zeitzer had created and included in his own report. Dr. Czeisler modified the labels in that diagram to make them more favorable to Plaintiffs. (Tr. Vol. 2 407:4-22.) The figure in Dr. Zeitzer's report refers to an "exterior window." Although Dr. Czeisler has never been to CJ3, he changed the description of the same window to "a narrow interior window facing utility corridor." (Tr. Vol. 2 401:14-16; 407:23-408:2.) This raises concerns regarding the accuracy of his testimony.

253.     The list of prior testimony Dr. Czeisler was required to provide revealed that in the past four years every case in which he has testified, he has testified on behalf of a Plaintiff in a civil lawsuit, again cutting against his credibility as an unbiased expert. (Tr. Vol. 2 412:23-413:5.)

254.     Dr. Czeisler has no work experience related to correctional settings and admits his fields of expertise does not extend to assessing security or administrative concerns in a jail. (Tr. Vol. 2

400:6-8; 402:16-403:3.) He has never worked on another project related to the effects of lighting in the context of a jail or prison or conducted any research on incarcerated individuals. (Tr. Vol. 2 395:25-396:5; 400:9-12.) This is the only case where he's testified in a lawsuit regarding jail conditions. (Tr. Vol. 2 399:12-15.) He had no educational background or training focused on treating patients in a correctional setting and is not affiliated with any professional organizations focused on treating individuals in a correctional setting. (Tr. Vol. 2 399:16-18; 399:25-400:5.)

255.     Dr. Czeisler has also received far more salary from his consulting work than any of the other experts in this matter. In the prior three years, he has made more than three quarters of a million dollars from his consulting work. (Tr. Vol. 2 408:9-410:1.) In this case in particular he charged just under $1,000 per hour. (Tr. Vol. 2 411:21-23.)

256.     As described elsewhere, the Court also credits the criticisms both Dr. Mayer and Dr. Rogers levied against Dr. Czeisler's opinions in their role as rebuttal experts.

257.     For the above stated reasons, the Court does not credit Dr. Czeisler's opinions on the issue of causation.

### 3.     Dr. Jamie Zeitzer's Credibility

258.     Dr. Zeitzer is Plaintiffs' retained expert in the fields of light measurements. (Tr. Vol. 3 468:22-469:3.) There are two aspects of his testimony that suggest his testimony should be afforded less credibility when he is offering opinions favorable to Plaintiffs.

259.     First, by the time of trial Dr. Zeitzer had spent 100 hours working on this case over the course of five years, yet had not billed Plaintiffs for any of that time. (Tr. Vol. 3 486:6-22.) He donated his time to Plaintiffs because he believes in their cause. (Tr. Vol. 3 486:23-25.) However, Dr. Zeitzer did charge for one portion of his work in this case—he charged San Francisco $500 an hour for the time it took to take his deposition. (Tr. Vol. 3 487:1-8.) While it is admirable for an expert to donate their time to a litigation matter, charging one side but not the other is a factor that impacts a witness's credibility. The decision to donate time to one party because you believe their case is an important cause while charging the side opposing the lawsuit to take your deposition is an indication that the expert's opinions are not neutral and that they have a stake in the outcome of the trial.

///

260.     Second, this is not the only matter for which Dr. Zeitzer has testified on behalf of Plaintiffs' counsel. (Tr. Vol. 3 487:20-488:2.) He is also testifying for Plaintiffs' counsel Ms. Yolanda Huang in a lawsuit referred to as *Upshaw* regarding conditions at the Santa Rita Jail in Alameda County. (Tr. Vol. 3 487:20-488:2.) Dr. Zeitzer gave opinions in both cases regarding the potential injuries that an inmate could suffer. (Tr. Vol. 3 488:13.) Every short- and long-term injury he previously identified as a potential harm in *Upshaw* he also identified as a potential harm in this case as well. (Tr. Vol. 3 490:23-493:8.) However, the challenged conditions of confinement *Upshaw* are different than those at issue in this case in meaningful ways. Specifically, *Upshaw* concerned lack of an opportunity to sleep. (Tr. Vol. 3 488:14-18; Ex. 1270.) *Upshaw* made no allegations about outdoor access or the amount of out-of-cell time inmates received. (Tr. Vol. 3 388:19-489:1; *Upshaw*, N.D. Cal. 3:18-cv-7814, Ex. 1270.) The Court finds that the fact that Dr. Zeitzer has identified the same potential injuries based on different conditions of confinement undercuts his credibility as to those potential injuries.

**Conclusions of Law**

261.     Plaintiffs alleged the SFSO violated their rights under the Fourteenth Amendment to the United States Constitution and the parallel provisions of Article I, Section 7 of the California Constitution based on two challenged conditions of confinement: (1) outdoor access and (2) out-of-cell time.

262.     The same legal standard applies to Plaintiffs' claims for injunctive relief under both statutes. (ECF No. 325 at 34 ("Article I Section 7 of the California Constitution mirrors the Fourteenth amendment").) Accordingly, the Court analyzes the federal and state law claims together.

263.     Plaintiffs have the burden of proving their claims by a preponderance of the evidence. Ninth Circuit Model Jury Instruction No. 1.6.

264.     The Fourteenth Amendment prohibits conditions that "amount to punishment" of a pretrial detainee. *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). However, "[n]ot every disability imposed during pretrial detention amounts to 'punishment' in the constitutional sense" because pretrial confinement, "no matter how modern," the facility, will always result "in restricting the movement of a detainee in a manner in which he would not be restricted if he simply where free to walk the streets

pending trial." *Id*. At 537. "[T]o constitute punishment, the harm or disability caused by the government's actions must either significantly exceed, or be independent of, the inherent discomforts of confinement." *Demery v. Arpaio*, 378 F.3d 1020, 1030 (9th Cir. 2004).

265.     For a challenged condition of confinement to violate the Fourteenth Amendment, it "must cause the detainee to suffer some harm or disability, and the purpose of the governmental action must be to punish the detainee." *Norbert v. City & Cnty. of San Francisco*, 10 F.4th 918, 928 (9th Cir. 2021) (internal citation and quotation marks omitted).

266.     In the Ninth Circuit, jails must provide pre-trial inmates "outdoor recreation opportunities, or otherwise meaningful recreation." *Shorter v. Baca*, 895 F.3d 1176, 1185 (9th Cir. 2018). The Ninth Circuit has never held that every jail must include outdoor space (whether or exercise or solely for outdoor access) nor has it held that under the circumstances presented in CJ3— where the jail provides fresh air and windows to all inmates in their cells and offers exercise and recreation opportunities through a dedicated indoor common area with a gym—that the jail violates the Fourteenth Amendment. This Court declines Plaintiffs' invitation to extend the law farther than the Ninth Circuit has set its bounds.

267.     Courts are "ill-equipped" to deal with the problems of prison administration. *Houchins v. KQED*, 438 U.S. 1, 8 (1978) (per Chief Justice Berger, with two Justices joining and one concurring in judgment). "[T]he problems that arise in the day-to-day operation of a corrections facility are not susceptible to easy solutions" and for this reason courts afford prison officials "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell*, 441 U.S. at 547. That caution is appropriate here, where Plaintiffs invite the Court to upend the SFSO's reasoned policy decisions which have been in place for more than fifteen years.

268.     The Court finds Plaintiffs have not met their burden to show the challenged conditions of confinement caused them harm and San Francisco presented evidence that rather than implementing these challenged conditions for the purpose of punishment, the SFSO implemented the challenged policies based on concerns regarding safety, security, and public health, especially given that the challenged policies were set in response to, and during the COVID-19 pandemic.

269.     In so holding, this Court's opinion is consistent with Judge White's recent order granting summary judgment in favor of San Francisco on identical claims concerning another jail the SFSO operates—County Jail 2 ("CJ2") in downtown San Francisco. Like CJ3, SFSO designed and constructed CJ2 without any outdoor space. *Pierce v. City & Cnty. of San Francisco*, 2022 WL 17418974, at *1 (N.D. Cal. Dec. 5, 2022). Instead, the jail has an indoor gym and atrium shared among all inmates. *Id*. Prior to COVID inmates each had 3-hours per week of access to the gym and during COVID gym access was cut off. On these facts Judge White granted summary judgment in favor of San Francisco and against Plaintiffs on competing summary judgment motions holding, "the provision of three hours of indoor recreation time per week, distributed over time, does not violate constitutional limitations" and that there was no constitutional concern with limiting use of the indoor facilities during COVID because San Francisco had the intention to restart exercise programs "in the fall of 2022." *Id*. at *3. There is no reason for the Court to reach a different conclusion here.

# I.     Plaintiffs Have Not Shown an Injury Caused by the Alleged Conditions of Confinement

270.     Plaintiffs and class members have not met their initial burden to show they were injured by the challenged conditions of confinement for four reasons. First, many of the complaints Plaintiffs raised at trial are irrelevant to the two specific conditions they challenged. Second, Plaintiffs claimed injuries are not credible because they are contradicted by Plaintiffs' own prior sworn statements. Third, there is evidence neither Plaintiffs nor the class members actually care about the injunctive relief they seek. Fourth, even if Plaintiffs had demonstrated injury, they have not met their burden to show that the challenged conditions of confinement caused those injuries.

## A.     Many of Plaintiffs Complaints Are Irrelevant to the Challenged Conditions of Confinement

271.     This lawsuit is limited to the claims Plaintiffs raised in their Complaint. Plaintiffs challenged two specific conditions of confinement: the lack of outdoor access at CJ3 and the amount of out-of-cell time inmates in CJ3 received indoors. (ECF No. 1.) Plaintiffs never sought to amend their complaint to add claims based on other conditions of confinement at any point in the past four years. Nevertheless, Plaintiffs' presentation of evidence at trial concerned complaints that addressed much broader issues in the jail, for example those regarding nighttime sleep conditions.

272.     The Court previously granted Defendants' motion to exclude as irrelevant Plaintiffs' complaints about jail conditions beyond the two challenged in this lawsuit. (ECF No. 387 at 7.) That order included excluding, among other things, complaints about sleep disruptions, the jail's lighting schedule, and the quality of items available for purchase in the jail commissary. (*Id*.) To the extent Plaintiffs raised complaints about these irrelevant conditions at trial, they cannot form the basis of a demonstrable injury in this case tied to the specific claims alleged in the Complaint.

273.     Plaintiffs' irrelevant complaints related to sleep disruption are especially out of place in this lawsuit because Plaintiffs filed and settled a separate lawsuit challenging their nighttime sleep conditions in the jail. On the same day that Plaintiffs filed this action, they also filed a complaint in *Poot, et al. v. San Francisco County Sheriff's Department et al.,* Case No. 4:19-cv-2722 (N.D. Cal., filed May 20, 2019). *Poot* was a putative class action that concerned sleep issues in CJ3, including the jail's lighting schedule and evening noises that interrupted inmate sleep. The same counsel—Ms. Yolanda Huang—brought both actions and the same inmates—Jose Poot and Montrail Brackens were named as Plaintiffs and putative class representatives in both cases. Plaintiffs objected to relating the two lawsuits when they were originally filed, and as a result the cases proceeded separately before different judges. (Poot ECF No. 28.) Plaintiffs settled the *Poot* action and the district court entered judgment on the matter. (Poot ECF No. 100, 102.) Plaintiffs therefore cannot smuggle complaints about sleep disruption into this litigation.

**B.     Plaintiffs Alleged Injuries Are Not Credible**

274.     The Court has significant concerns with veracity of Plaintiffs' alleged injuries, both from a lack of outdoor access and out-of-cell time.

**1.     Plaintiffs identified the same injuries in unrelated litigation.**

275.     Plaintiffs Poot and Brackens identified word for word—including the same unusual punctuation—the same injuries in this case as they did in the *Poot* litigation. (Compare Ex. 1177 [No. 3] and 1178 [No. 17].) This is significant because the *Poot* complaint concerned entirely different conditions of confinement. (Poot ECF No. 1.)

276.     That Plaintiffs signed statements under oath that the alleged injuries they claim here were caused by unrelated conditions of confinement undermines their credibility. Plaintiffs cannot

recycle their claimed injuries from one lawsuit to another. The fact that Plaintiffs' responses appeared to be not just similar, but directly copied and pasted from one case into another deepens this concern.

277.     Substantively, these identical discovery responses mean Plaintiffs have already admitted that their alleged injuries in this case were in fact caused by conditions unrelated to those challenged in this case and therefore Plaintiffs cannot meet their burden here.

**2.     Plaintiffs alleged injuries are unsupported by their discovery responses.**

278.     This was not the Court's only concern with Plaintiffs' discovery responses. Many of the injuries Plaintiffs presented at trial in this matter were not referenced in their discovery responses. For example, each of the three named Plaintiffs testified to weight gain while in custody. However, none listed weight gain as a physical injury they attributed to the alleged conditions of confinement in this case in their discovery responses. (Ex. 1177 [No. 3].) Therefore, weight gain cannot form the basis of Plaintiffs' claims against San Francisco. This is separate and apart from the fact that weight gain, on its own, is not an injury.

279.     Perhaps the most egregious example of the differences between the injuries Plaintiffs alleged during discovery and those they proclaimed at trial was Plaintiff McAlister. Plaintiff McAlister did not list any alleged injuries as a result of the alleged conditions of confinement in his discovery responses. (Ex. 1177 [No. 3].) The same is true of another now dismissed class representative Armando Carlos. (*Id*.) Perhaps this is because McAlister and Carlos were not a named as Plaintiffs in the *Poot* action and Plaintiffs' counsel did indeed simply copy and paste the discovery responses from one lawsuit for other, but taking both men at their words as stated under oath, they admitted during discovery that they did not believe the challenged conditions of confinement caused them any injuries whatsoever.

280.     This discrepancy between what Plaintiffs identified as their alleged injuries during fact discovery and what they presented at trial demonstrates Plaintiffs were not in fact injured by any of their conditions of confinement.

///

///

///

### 3. Plaintiffs complain of diverse alleged injuries from identical conditions of confinement.

281.    It is also noteworthy that the injuries Plaintiffs allege are not uniform even among the small number of inmates who testified at trial. This is a Rule 23(b)(2) class action brought on the basis that the class members all suffered identical injuries. However, even among the class members who identified any injuries in their discovery responses, the alleged injuries Plaintiffs identified varied drastically from person to person. (Ex. 1177 [No. 3].) For example, Plaintiff Poot—and only Plaintiff Poot—believed the challenged conditions caused him memory loss whereas Mr. Harris—and only Mr. Harris—believed the challenged conditions caused him to suffer a Vitamin D deficiency and swelling in his urethra. (*Id*.) Mr. Brown—and only Mr. Brown—believed the challenged conditions caused him to experience rashes, and Plaintiff Brackens—and only Plaintiff Brackens—believed the challenged conditions caused him to develop diabetes. (*Id*.) Memory loss, Vitamin D deficiency, swelling of the urethra, rashes, and diabetes are not conditions so similar that one would expect them to be caused by the same circumstances.

282.    If Plaintiffs cannot agree among themselves the kind of injuries the challenged conditions of confinement are supposed to have caused, they cannot meet their burden to demonstrate a violation of the Fourteenth Amendment. And in a case where Plaintiffs only remedy could be injunctive relief narrowly tailored to a specific injury, Plaintiffs who cannot show they suffered similar injuries cannot show they would benefit from the same injunction.

### C. Plaintiffs Offered No Evidence of Alleged Injuries Beyond the Three Class Representatives

283.    Plaintiffs did not present any evidence of class-wide harm through witness testimony or otherwise. Only four inmates testified at trial. There is no evidence any other inmates suffered an injury of any kind, let alone alleged injuries substantially similar to those the class representatives alleged. Plaintiffs had no testimony from any medical expert who had actually spoken with class members and did not introduce medical records from any class members beyond the class representatives into evidence.

///

///

284.     Even if the Court were to credit the disparate and dubious alleged injuries the class representatives claim, there is no basis in fact or law for the Court to conclude that other inmates and class members have suffered similar injuries.

### D.     There Is No Evidence Class Members Want the Requested Relief

285.     The Court also has pause finding Plaintiffs satisfied their burden to show injury because the record contains evidence neither the class representatives nor the class members actually care about changing the challenged conditions of confinement. The complaints Plaintiffs raised in this lawsuit appear to be novel, advanced by a fewer than a handful of inmates out of the thousands who have been housed at CJ3 since Plaintiffs filed their lawsuit in 2019.

286.     Only four inmates out of a facility that houses more than 500 testified on behalf of Plaintiffs. (ECF No. 448 [Stipulation ¶ 19].) As described above, given the variations in the types of injuries class members allege, that small size cannot be due to the fact that each class member's testimony would have been identical. It is meaningful that Plaintiffs could not find more—of either past or present inmates—to support their case. Even among the named Plaintiffs, when the lawsuit was filed there were originally seven named Plaintiffs, yet by the time of trial, more than half did not attend to testify on behalf of the claims they supposedly supported. (ECF No. 1.)

287.     And the class members who testified at trial admitted that they had never discussed this lawsuit or the challenged conditions with other inmates or heard anyone else in the jail complain about the challenged conditions. Plaintiff Poot testified that he has never been approached by any other inmate who wanted to join this lawsuit, does not remember ever speaking about this lawsuit with any other inmate, and does not remember ever speaking about the conditions of confinement at issue in this lawsuit with any other inmate. (Tr. Vol. 1 168:6-168:24; 170:13-25.) Plaintiff Brackens could not name any other inmates he had ever discussed the lawsuit with, anyone he had ever heard talk about lack of access to fresh air in the jail, or anyone he heard talk about their lack of outdoor recreation in the jail. (Tr. Vol. 2 230:23-231:17.) He has also never heard another inmate complain about their access to the gym. (Tr. Vol. 2 231:18-232:6.)

288.     Plaintiffs also presented no evidence of grievance or complaints filed by any other inmate about these conditions even though they are longstanding. The SFSO maintains a grievance

policy for inmates to raise concerns with the jail and have them responded to and addressed. (Tr. Vol. 5 1141:8-1142:10.) The robust grievance system addresses thousands of complaints each year. (Tr. Vol. 5 1142:15-16; Ex. 1088.) And yet, Plaintiffs did not enter a single grievance into evidence regarding the challenged conditions of confinement. (See e.g., Tr. Vol. 2 233:2-11.) To the extent Plaintiffs discussed grievances they did not admit, there was no suggestion of any such grievances before 2019. (Tr. Vol. 1 171:5-20; Vol. 2 232:24-2.) CJ3 was completed in 2006—which means it was operating for thirteen years before Plaintiffs suggest anyone every filed a grievance regarding the challenged conditions. (ECF No. 448 [Stipulation ¶ 3]; Tr. Vol. 5 909:11-15.) The class representatives themselves had been in SFSO custody prior to 2019, yet did not file grievances regarding these issues during that time. (ECF No. 448 [Stipulation ¶¶ 8-9, 12-13].) Given that the first grievances occurred around the same time this lawsuit was filed, it lends further support to the argument that this an attorney-driving lawsuit, not one about which the vast majority of inmates have any strong feelings.

289.     Indeed, Plaintiffs' themselves do not seem want the relief they seek. Plaintiff Poot, who is housed in general population, admitted that since the end of COVID-19 the jail has offered him outdoor access in a catwalk area with a chain link fence open to the outside, but he has turned down the opportunity to use it. (Tr. Vol. 1, 167:11-168:5.) Plaintiff Brackens, who is housed in administrative segregation, admitted that since the end of COVID-19 the jail as offered him both additional indoor out-of-cell time and an opportunity for outdoor access at the CJ3 Annex and that he has refused both. (Tr. Vol. 2 236:12-20; Vol. 2 245:21-246:2; 246:18-22.) The fact that Plaintiffs have been offered and turned down the very relief they seek is evidence that they have not been injured. It also discredits Plaintiffs claim that their requested relief would remedy any such alleged injuries.

290.     Finally, and perhaps most tellingly, Plaintiffs did not want to be present in Court for their litigation. All three class representatives declined to appear in court for the majority of the trial despite multiple admonitions from the Court that attending trial was their right. (Vol. 2 370:22-372:19; Vol. 3 436:4-7; Vol. 4 656:4-6; Vol. 6 1273:18-21.) Plaintiffs left after their own testimony concluded, demonstrating they prefer the conditions at CJ3 to those inside the courtroom. Although all Plaintiffs have the right to choose whether to appear at trial, in this case the alternative was for Plaintiffs to be in

the very jail about which they complain. By stating their preference to stay in jail rather than attend trial, Plaintiffs undercut their own arguments regarding injury.

291.     Taken together—the lack of inmate testimony at trial, the admission that the class representatives had never heard any other inmates complain about the challenged conditions, the lack of grievances regarding the challenged conditions, Plaintiffs' refusal to take advantage of gym time and outdoor access when it was offered, and Plaintiffs' preference to remain in jail rather than attend their trial—suggests that there are no meaningful concerns among the inmate population regarding the challenged conditions of confinement and this is instead an attorney driven lawsuit.

### E.     Plaintiffs Did Not Meet Their Burden to Show Causation

292.     Even if the Court credited the alleged injuries Plaintiffs presented—which it does not—Plaintiffs nevertheless fail to show a constitutional violation because they lacked evidence on the element of causation. That is, Plaintiffs have not shown either CJ3's outdoor access policy or its out-of-cell time policies caused their alleged injuries, and that an injunction increasing the amount of either would remedy the injuries Plaintiffs' alleged.

293.     Plaintiffs did not even take the basic step of identifying for the Court which of their alleged injuries they argue were attributable to the jail's outdoor access policy as compared to which of their alleged injuries they argued were attributable to the jail's out-of-cell policies. These are two separate claims.

294.     During their direct examinations the three class representatives spent considerable time discussing their health ailments. But they spent no time tying those alleged ailments to any specific condition of confinement. Throughout this litigation Plaintiffs have struggled to establish and stick to the boundaries of their claim. *Norbert*, 10 F.4th at 928  (recognizing Plaintiffs' claims shifted from outdoor exercise time to exposure to direct sunlight). It is not the Court's job to sift through the testimony and guess as to which injuries Plaintiffs intended to connect to which of the two challenged condition of confinement. This was Plaintiffs' burden and they have not met it.

### 1.     Plaintiffs' Lay Witness Testimony Cannot Show Causation

295.     Plaintiffs' own testimony also did not identify any injuries caused by their lack of out-of-cell time or outdoor access. Nor could they. The law is well established that issues of medical

causation are outside the competency of a lay witness and must be established through expert testimony. Determining the nature, extent, and cause of an injury requires the "specialized medical knowledge" of a medical expert. *Burleson v. Samson*, No. 2:00-cv-02591-JKS, 2007 WL 2688840, at *2 (E.D. Cal. Sept. 13, 2007); *Asplundh Mfg. Div. V. Benton Harbor Eng'g*, 57 F.3d 11190, 1207 (3d Cir. 1995) (reversing an ordering new trial where district court improperly permitted lay opinion as to the issue of causation); *United States v. York*, 600 F.3d 347, 361 (5th Cir. 2010)  (holding testimony regarding the cause of bruises and the length of time it would take those bruises to develop required expert medical opinion); *Yamagiwa v. City of Half Moon Bay*, No. C 05-4149 VRW, 2007 WL 831804, at *6 (N.D. Cal. Mar. 19, 2007) ("lay opinion is not definitive evidence of causation").

296.     The "mechanisms of causation are beyond the experience of laypeople" and cannot be established without expert testimony. *Dhillon v. Princess Cruise Lines, Ltd.*, Case No. 2:20-CV-11661-GJS, 2022 WL 504560, at *3 (C.D. Cal. Feb. 18, 2022); *see also Brown v. Johnson & Johnson*, Case No. 1:17-cv-01285-AWI-EPG, 2019 WL 2577296, at *6 (E.D. Cal. June 24, 2019) ("Evidence of specific causation cannot be Plaintiff's lay opinion. Instead, Plaintiff must present evidence from which a jury could conclude, without engaging in speculation, that his [medical condition] resulted from his [use of defendant's medication]. Expert evidence is required to meet this burden.") (citations omitted); *Hawes v. Pac. Gas & Elec. Co.*, No. EDCV 16-1623-DMG (KK), 2018 WL 5270499, at *6 (C.D. Cal. June 25, 2018), *report and recommendation adopted*, No. EDCV 16-1623-DMG (KK), 2018 WL 5270513 (C.D. Cal. Oct. 19, 2018), *aff'd*, 821 F. App'x 827 (9th Cir. 2020) ("Plaintiff is not a qualified expert in the medical field. Therefore, while his own statements may be used to establish his symptoms, to the extent they purport to establish the cause of Plaintiff's injuries, they are inadmissible lay opinion").

### 2. Plaintiffs Offered No Expert Testimony on Causation Related to Out-of-Cell Time and San Francisco Offered Evidence Disproving This Element of Plaintiffs' Claim

297.     Plaintiffs needed to present expert testimony on the issue of causation. They did not.

298.     As to out-of-cell time, Plaintiffs presented no evidence that a lack of out-of-cell time caused any of their alleged injuries. Dr. Czeisler is the only medical doctor Plaintiffs presented and his

opinions were wholly dedicated to the alleged impacts of a lack of exposure to sunlight. He offered no opinions regarding out-of-cell time inside the jail.

299.     As to outdoor access, the Court finds Dr. Czeisler's testimony was insufficient and not credible to show causation based on the lack of detail in his opinions, the information on which he relied, his credibility issues, and the reliable and comprehensive testimony from both Dr. Mayer and Dr. Rogers rebutting his opinions as described above.

300.     San Francisco also presented evidence that Plaintiffs' alleged injuries were not caused by the challenged conditions of confinement.

301.     San Francisco's psychiatric expert, Dr. Michael Rogers (Tr. Vol. 7, 1456:20-21), determined that there were alternative causes for Plaintiffs' alleged injuries and criticized Dr. Czeisler for overlooking these alternative causes. (Tr. Vol. 7, 1477:5-14).

302.     Dr. Rogers analyzed the specific medical history of inmate Mr. Kenyon Norbert found his complaints were not related to out-of-cell time or outdoor access. (Tr. Vol. 7 1478:23-1481:21.) Mr. Norbert's medical records showed he reported a variety of complaints to medical professionals regarding emotional distress that were the result of external circumstances such as a death in the family and going to court. (Tr. 1482:20-1483:4.) There was no evidence Mr. Norbert reported to any medical professionals that his issues were caused by the challenged conditions of confinement. Dr. Rogers confirmed Mr. Norbert had several diagnoses including substance abuse and transient adjustment disorder which are alternative causes for the symptoms he described. (Tr. Vol. 7 1483:18-1484:10.)

303.     Dr. Rogers reached similar conclusions after reviewing the medical records of the three named class representatives.

304.     Dr. Rogers reviewed Plaintiff McAlister's medical records in excess of 2,800 pages dating back to 2014, and his deposition transcripts. (Tr. Vol. 7 1487: 3-8.) Dr. Rogers found that there was no evidence of psychiatric symptomology relevant to Plaintiff McAlister as a result of his conditions of confinement. (Tr. Vol. 1487:10-23.) In supporting this opinion, Dr. Rogers confirmed Plaintiff McAlister's medical records were devoid of involvement with the jail's behavioral health providers. (Tr. Vol. 7 1487:1-23.) Rather, Plaintiff McAlister's reported anxiety came up in the

context of his use of methamphetamines. (Tr. Vol. 7 1488:7-13.) Plaintiff McAlister's sleep difficulties were not attributed to conditions of confinement, but were pre-existing. (Tr. Vol. 7 1488:14-21.) Dr. Rogers opined that the appropriate psychiatric diagnosis for Plaintiff McAlister is substance use disorder, which was not caused by the inability to outside at CJ3 or out-of-cell time at CJ3. (Tr. Vol.7 1489:2-17.)

305.     Dr. Rogers reviewed the medical records and deposition of Plaintiff Brackens. (Tr. Vol. 7 1491:11-12.) He found that Plaintiff Brackens was prescribed Elavil in jail for pain and headaches that pre-dated his incarcerated. (Tr. Vol. 7 1491:14-1493:11.) Dr. Rogers opined Plaintiff Brackens' reported symptoms of depression and headaches were not caused by an insufficient amount of out-of-cell time because there were no contemporaneous complaints; rather his medical history showed obesity, use of opioids while in jail, and withdrawal from opioids which were the probable causes for Plaintiff Brackens feelings. (Tr. Vol.7 1493:12-1495:13.) Dr. Rogers opined that there is no appropriate psychiatric diagnosis for Plaintiff Brackens that can be attributed to inability to go outside while in CJ3. (Tr. Vol. 7 1495:17-20.) Rather, Plaintiff Brackens' appropriate diagnosis is substance use disorder with possible mood symptoms caused by withdrawal from substance abuse; withdrawal is known to cause the complaints that Plaintiff alleges. (Tr. Vol. 1495:21-1499:21.) Dr. Rogers also confirmed Plaintiff Brackens' difficulty sleeping was caused by his preexisting back pain and his weight gain could not be attributed to out-of-cell time or outdoor recreation because Plaintiff Brackens came to jail obese. (Tr. Vol. 7 1500:17-21; 1505:15-23; 1507:1-23.)

306.     Dr. Rogers reviewed the medical records of Plaintiff Poot from 2016 through May 2021, and his deposition. (Tr. Vol. 7 1507:25-1508:8.) Dr. Rogers opined that the only appropriate diagnosis for Plaintiff Poot is a history of alcohol use disorder, as Plaintiff Poot's condition actually improved in jail from the time he was first admitted and followed closely by jail behavioral health. (Tr. Vol. 7 1508:9-1509:15.) Dr. Rogers found no evidence Plaintiff Poot's self-reported any depression caused by a lack of out-of-cell time or an inability to go outside. (Tr. Vol. 7 1509:16-19.) Plaintiff Poot did not seek behavioral health treatment from 2016 to 2019 until the filing of this lawsuit. (Tr. Vol.7 1510:23-1511:11; ECF No. 1.) When Plaintiff Poot presented for treatment in August 2019, investigation of his complaints of feeling sleepy and depressed revealed that his mother had a heart

attack, which was the source of his concern. (Tr. Vol. 7 1512:12-1513: 3.) Dr. Rogers opined Plaintiff Poot's sleeping difficulty was not related to the inability to go outside while housed at CJ3. (Tr. Vol. 1513:5-7.) Rather, the actual treatment records noted that trouble sleeping in 2016 was attributable to a tooth ache. (Tr. Vol. 1513: 16-1514:12.) There were no treatment records showing Plaintiff Poot ever complained he did not have sufficient out-of-cell time or that he could not go outside. (Tr. Vol. 1514:5-15.) Dr. Rogers found no evidence in Plaintiff Poot's records that he had headaches, mood changes, poor communications, mental focus, memory loss or cognitive function issues caused by the conditions of confinement. (Tr. Vol. 7 1514:16-1515:19.) The only diagnoses attributable to Plaintiff Poot is alcohol use disorder and substance use disorder; neither of which are attributable to lack of out-of-cell time or lack of outdoor access. (Tr. Vol. 7 1515:20-1516:8.)

307.    Dr. Rogers finally offered rebuttal testimony in response to Dr. Czeisler and concluded Dr. Czeisler did not adequately consider causes of Plaintiffs' alleged injuries other than out-of-cell time or outdoor access, of which there were several as described above. (Tr. Vol. 7 1529:6-1530:18.) The detailed and fact-intensive explanations Dr. Rogers provided stand in sharp contrast to the superficial high-level opinions Dr. Czeisler offered on the issue of causation and is a reason the Court credits Dr. Roger's testimony on the issue of causation.

308.    For all of these reasons, Plaintiffs' claims fail.

## II.    San Francisco Has Legitimate Non-Punitive Reasons for the Challenged Policies

309.    The Court finds in favor of San Francisco for the separate and independent reason that that SFSO had legitimate non-punitive reasons for both of the challenged policies including safety and security in the jail as well as public health.

310.    "If a particular condition or restriction of pre-trial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.'" *Bell*, 441 U.S. at 539. "[T]o constitute punishment, the harm or disability caused by the government's action must either significantly exceed, or be independent of, the inherent discomforts of confinement." *Demetry v. Arpaio*, 378 F.3d 1020, 1030 (9th Cir. 2004.)

311.    An intent to punish requires "at least reckless disregard for inmates' health or safety." *Norbert*, 10 F.4th at 928. This standard is high and does not include a "mere lack of due care." *Castro*

*v. Cnty. of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016). Instead, Plaintiffs must show that "the defendant did not take reasonable available measures to abate [a substantial risk of suffering serious harm], even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious." *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018) (citations omitted).

312.    Here, neither San Francisco's outdoor access nor its out-of-cell time policies demonstrate the intent to punish necessary to state a claim because (1) the SFSO did not act with a reckless disregard for inmate health or safety; (2) the policies were not born out of any intent to punish class members and, instead, (3) the challenged policies are the result of legitimate non-punitive policy decisions to preserve and protect the health, safety, and security of the inmates, staff, and volunteers inside CJ3 as well as the San Francisco community at large.

### A.    There Can Be No Reckless Disregard for Class Members Health or Safety From Policies That Cause No Harm

313.    As an initial matter, there can be no reckless disregard of a risk to an inmate's health or safety when there is no demonstrated risk to an inmate's health or safety. And as demonstrated above, Plaintiffs have not presented sufficient evidence to meet their burden to show that their health or safety were in fact at risk based on by the challenged conditions of confinement. Accordingly, the SFSO's policies cannot show a reckless disregard for such health or safety risks. *Castro*, 833 F.3d at 1070 (precedent requires "a substantial risk of serious harm to the plaintiff that could have been eliminated through reasonable and available measures that the officer did not take, thus causing the injury that the plaintiff suffered").

314.    San Francisco provides all inmates in CJ3 access to fresh air, space and time for recreation, and visual access to the outdoors through transparent, but fixed windows.  No federal case has ever held that in such circumstances, a jail violates the Fourteenth Amendment.

### B.    San Francisco's Policies Were Not Motivated by a Desire to Punish

315.    There is no evidence that the out-of-cell time offered to incarcerated persons at CJ3, or the lack of outdoor access, is any way related to punishment.

///

316.     Instead, each and every SFSO employee who testified about the jail's policies credibly confirmed the policies were not motivated by an intent to punish. (*See e.g.,* Tr. Vol. 6 1181:10-13 [administrative segregation was not used as punishment]; 1060:13-17 [programming changes were not used as a punishment].) San Francisco presented uncontested evidence that the SFSO seeks to maximize and increase out-of-cell time to the incarcerated. (Tr. Vol. 6 1149:24-1151:14; 1151:15-1152:24; 1153:4-13; 1273:25-1274:9.)

317.     Additionally, the award-winning programming that the SFSO offers to inmates—both those in general population and administrative segregation—shows that the jail is not designed to punish inmates. (Tr. Vol. 5 1045:23-1046:7.) When the jail implemented its COVID-19 protocols programming made paper copies of program materials available for inmates to do inside their cells. (Tr. Vol. 6 1170:7-1171:14.) This is because the decreased out-of-cell time was not intended as a punishment, but as a COVID-19 precaution. (Tr. Vol. 1060:13-23.)

### C.     San Francisco's Purpose in Setting the Challenged Conditions of Confinement Was to Promote Health, Safety, and Security, Not to Punish Class Members

318.      Where a policy has no express intent to punish, it violates the Fourteenth Amendment only where it is not "rationally related to a legitimate nonpunitive government purpose" or "appear[s] excessive in relation to that purpose." *Bell*, 441 U.S. at 561.

319.     Maintaining jail security, order, and discipline are legitimate governmental objectives, and restrictions that serve these purposes, without more, do not constitute unconstitutional punishment. *See, e.g. Pierce v. Cnty. of Orange*, 526 F.3d 1190, 1205 (9th Cir. 2008) ("Legitimate nonpunitive governmental objectives include 'maintaining security and order' and 'operating the [detention facility] in a manageable fashion'" (quoting *Bell*, 441 U.S. at 540, n.23)); *Candler v. Santa Rita Cnty. Jail Watch Commander*, No. 11-CV-01992-CW, 2015 WL 333298, at *5-6 (N.D. Cal. Jan. 26, 2015) ("Maintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both prisoners and pretrial detainees." (quoting Bell, 441 U.S. at 546-47)); *Flowers v. Ahern*, No. 08-04179 CW, 2010 WL 2232165, at *4 (N.D. Cal. June 3, 2010) ("[S]tates must be able to maintain security and order at pretrial facilities, and restraints that are reasonably related to an interest in maintaining jail security are

not, without more, unconstitutional punishment.") (citations omitted). Protection of public health is also a legitimate government objective.

320.     To determine whether conditions of detention are reasonably related to maintaining security and order and manageable operation of the facility, courts should defer to the expert judgment of jail officials, unless there is substantial evidence that indicates the officials have exaggerated these concerns.  *Bell*, 441 U.S. 540 n.23.

321.     The Court finds that both the challenged outdoor access policy and the challenged out-of-cell time policies are rationally related to the legitimate non-punitive government interests in (1) public health and safety and (2) maintaining security, order, and discipline in the jail.

### 1.     The SFSO's COVID-19 Restrictions Also Furthered the Legitimate Penological Goal of Public Health

322.     Plaintiffs chose to litigate this case based on the conditions in CJ3 that existed in August 2022 rather that August 2023. In doing so, they made the SFSO's COVID-19 policies part of the case because the COVID-specific state of emergency in San Francisco was not removed until February 28, 2023—six months after the close of fact discovery. The Court finds that the challenged policies were caused by COVID-19 and the SFSO's interest in protecting public health and preventing the spread of a deadly disease is a legitimate government purpose, one that is not intended to punish, and is rationally related to the once-in-a-century threat the world faced.

323.     The public health concerns that arise out of a global pandemic are legitimate government interests. *See Kaur v. U.S. Dep't of Homeland Sec*., Case No. 2:20-cv-03172-ODW (MRWx), 2020 WL 1939386, at *4-5 (C.D. Cal. Apr. 22, 2020) (recognizing "the public's interests are containing COVID-19" and "that the risk of infection and severe illness or even death is high, especially in [detention] facilities"); *Bent v. Barr*, 445 F. Supp. 3d 408, 420 (N.D. Cal. 2020) ("[T]he substantial medical and security challenges that would almost certainly arise in the event of a COVID-19 outbreak in a prison or detention facility" also factor are legally relevant). There is no Ninth Circuit case law holding that jails cannot implement temporary restrictions on out-of-cell time and recreation during a pandemic spread by respiration.

///

324.     Policies that increase the spread of COVID-19 in jails increase the risk of death not only to other inmates, but to staff and the public, while also increasing the burden on local healthcare facilities. See e.g., *Swain v. Junior*, 457 F. Supp. 3d 1287, 1314 (S.D. Fla.), *vacated and remanded on other grounds*, 961 F.3d 1276 (11th Cir. 2020) (holding that reducing the spread of COVID-19 in correctional settings "advances the public interest by reducing the chance of community spread in [the county] linked to COVID-19 cases at [the jail]"); *Flores v. Barr*, Case No. CV 85-4544-DMG (AGRx), 2020 WL 2128663, at *8 (C.D. Cal. Mar. 28, 2020) (recognizing the "public's interest in preventing outbreaks of COVID-19" among incarcerated individuals because they can infect "staff, spread to others in geographic proximity, and likely overwhelm local healthcare systems). As the District Court for the District of Columbia stated "No man's health is an island" and a COVID positive inmate "risk[s] infecting others inside the [jail]" in addition to staff members that "live in the community," and as such "ordering . . . precautions to lower the risk of infections for Plaintiffs also benefits the public." *Banks v. Booth*, 468 F. Supp. 3d 101, 124 (D.D.C. 2020), *appeal dismissed, case remanded*, 3 F.4th 445 (D.C. Cir. 2021), *and appeal dismissed, case remanded*, 3 F.4th 445 (D.C. Cir. 2021) (internal quotation marks omitted).

325.     It is undisputed that the SFSO reduced out-of-cell time and closed its gyms to curb the transmission of COVID. By August 2022, while SFSO was not offering outdoor access, inmates in administrative segregation were out of their cell no less than one hour per day and inmates in general population were out of their cell no fewer than three to four hours per day. (Tr. Vol. 6 1167:15-1168:6; 1275:23-1276:5; 1275:15-22.) The out-of-cell time restrictions that existed in August 2022 were directly related to the ongoing COVID pandemic and its necessary protocols. (Tr. Vol. 6 1214:18-1215:5; Tr. Vol. 3 645: 3-646:9; Tr. Vol. 4 752:6-15.) In August 2022, CJ3 remained a high-risk setting under public health orders. (Tr. Vol. 3 647:6-8.) At this time, the SFSO's goal was to provide as much freedom and ease restrictions as quickly and safely as possible. (Tr. Vol. 3 648:14-649:14.)

326.     Although some inmates may have preferred additional out-of-cell time in August 2022, risk that the SFSO was balancing the challenged policies against was death. (Tr. Vol. 4 717:19-718:11; 737:22-738:21.) San Francisco also submitted testimony that the SFSO and Department of Public Health weighed the risk of mortality against the mental health strains associated with less out-of-cell

time. (Tr. Vol. 5 1031:1-19.) Given the deference that prison officials are afforded regarding operation of their facilities, the Court cannot say that the SFSO's COVID-19 specific policies violated the Fourteenth Amendment.

327.     Dr. Pratt credibly and thoroughly explained that the jail's modified policies, including the SFSO's decision to close the gym and reduce the size of walk groups, which led to less out-of-cell time for inmates, was done for the benefit of public health. That includes both the health of inmates in a congregate living setting as well as community-wide health outcomes.

328.     Inmates cannot escape exposure to their cellmates and the SFSO deputies who are required to come to work in-person to supervise the jails. Each of these is a potential avenue for COVID exposure. By August 2022, librarians and other non-SFSO volunteers were also coming back into CJ3 for programming and could have infected inmates with COVID-19. The same is true for inmates who go to court or had to go to the hospital for treatment—those too are potential avenues for COVID exposure. The risks of infection from these avenues was not hypothetical. Plaintiff McAlister, for example, tested positive for COVID-19 shortly after returning from the hospital for unrelated treatment. (Tr. Vol. 1 242:1-7.) There was an outbreak of COVID-19 in the jail during the summer of 2022. (Tr. Vol. 7 1588:8-10.) While the SFSO encouraged inmates to receive the COVID-19 vaccinations when eligible, inmates retain medical autonomy and the SFSO could not force inmates into accepting vaccination. (Tr. Vol. 3 644:5-8.)

329.     Dr. Pratt explained that an outbreak of COVID outbreak in the jail could overwhelm the City's hospital resources, getting so bad that hospitals would not even have space in their morgues to maintain the bodies of those who succumbed to the virus. She described cities like New York and Los Angeles where this unfortunate scenario became a reality. (Tr. Vol. 3 632:17-633:4.) Incredibly, thanks to the SFSO's policy changes, although there were outbreaks of COVID-19 in CJ3, not a single person in CJ3 died from COVID-19. This statistic is even more impressive when compared against other local jails and prisons which were unsuccessful in preventing COVID-19 deaths in their facilities. (Tr. Vol. 3 629:18-630:2.)

330.     The SFSO could also not have offered outdoor access to inmates during COVID because ability to move incarcerated persons through the jail to outdoor space would have to occur

through the CJ3 hallways and there were restrictions due to social distancing protocols and cleaning protocols. (Tr. Vol. 5 1081:4-25.)

331.     Dr. Pratt's testimony regarding the risks of COVID-19 was unchallenged. Plaintiffs produced no medical expert to critique any of the SFSO's policy changes in response to COVID-19, including its restrictions on out-of-cell time and outdoor access. (Tr. Vol. 2 415:23-25.)

### 2.     Pre-COVID Policies

332.     There is no need to consider whether the SFSO's pre-COVID-19 policies also have a legitimate non-punitive government interest because the challenged policies are those in place during COVID. However, the Court also finds that even putting aside the public health concerns brought on by COVID-19, the SFSO had legitimate non-punitive reasons for its policies and those policies are consistent with the Fourteenth Amendment.

### a.     Indoor Recreation Areas

333.     The SFSO's decision to build an indoor recreation area rather than an outdoor recreation area was based on concerns over safety and security, and in an attempt to extend the amount of exercise time inmates receive.

334.     Each of the 16 gyms in CJ3 provide fresh air and access to sunlight through screened windows that measure approximately 8 feet by 6 feet as shown in Exhibits 1167 and 1171. (Tr. Vol. 2 235:20-236:8; Vol. 5 1084:13-21; 472:17-473:5; Tr. Vol. 5 1086:4-10; Exhibit 1171.) This actually provides inmates more of an opportunity to exercise than the outdoor facilities at older linear style jails because weather and visibility issues with the outdoor yard led to recreation time being cancelled multiple times per week at the old jail. (Tr. Vol. 6 1208:17-1209: 3; 1207:4-1210:14.)

335.     CJ3 is situated in a particular foggy part of San Bruno. (Tr. Vol. 4 786:6-21; 783:11-22.) Fog acts like a low-lying cloud and decreases visibility. (Tr. Vol. 785:14-786:5.) The fog can roll in quickly and can bring visibility down close to zero, which would prohibit the SFSO from using any outdoor areas given the associated security concerns. (Tr. Vol. 4 782:24-783:10; 782:24-783:10.) The old 1930s jail at San Bruno had an outdoor recreation yard and outdoor access was cancelled two to three times per week because of visibility constraints from the fog, which created security concerns. (Tr. Vol. 6 1208:5-16; 1208:17-1209:3; 1207:4-1210:14.) The jail had no indoor gyms, so when it was

too foggy to use the outdoor space, inmates had no access to recreation at all. (Tr. Vol. 6 1215:10-16.) And because the jail was a linear style area, there was no open common area inside a pod for inmates to use on rainy or foggy days. In contrast, CJ3's design that includes one indoor gym in each pod creates fewer circumstances where the SFSO needs to cancel recreation time because of weather or visibility issues.

336.     Fog is not the only weather-related concern at CJ3. During a rainy year it can rain as many as one out of every three days at the jail, with up to 40 inches of rain per year. (Tr. Vol. 4 788:14-22; 789:25-790:19.)  And the temperature swings in the area span from 26 degrees in the winter up to over 100 degrees in the summer. (Tr. Vol. 4 796:6-797:10; 800:1-6.) The jail's decision to build its exercise space indoors prevents inmates from losing the opportunity to exercise because of inclement weather.

337.     Additionally, there is no controlling Ninth Circuit case law that would require an absolute right to outdoor recreation. *See Spain v. Procunier*, 600 F.2d 189 (9th Cir. 1979) ("we do not consider it necessary to decide whether deprivation of outdoor exercise is a per se violation of the eighth amendment"); *Pierce v. Cnty of Orange*, 526 F.3d 1190, 1212-1213 (reaffirming Spain's holding that "we need not hold that there is a specific amount of weekly exercise that must be afforded to detainees who spent the bulk of their time inside their cells").

338.     There is no Ninth Circuit case law that would require a sheriff's office to undertake new construction to build an outdoor recreation area in a jail where one does not already exist given the specifications of CJ3's indoor facilities. The cases that have addressed the issue of outdoor access at all addressed the issue tied to outdoor recreation in jails that did not have an indoor gym. In those cases, inmates lack of an opportunity for outdoor exercise and recreation meant a complete lack of opportunity for exercise and recreation of any kind. This is especially true for older linear style jails that did not have a pod structure and did not offer any kind of internal common area. *See e.g., Allen v. Sakai*, 48 F.3d 1082, 1087 (9th Cir. 1994) (addressing outdoor exercise simply because the jail's recreation facilities were outside); *LeMaire v. Maas*, 12 F.3d 1444 (9th Cir. 1993) (no indication that inmate was given opportunity to exercise indoors but outside of his cell or that the court considered the possibility that the inmate would be offered exercise in indoor locations with natural light and fresh

air); *May v. Baldwin*, 109 F.3d 557 (9th Cir. 1997) (court did not consider the distinction between indoor and outdoor exercise; *Richardson v. Runnels*, 594 F.3d 666 (9th Cir. 2010) (no discussion of outdoor versus indoor recreation); *Norwood v. Vance*, 591 F.3d 1062 (9th Cir. 2010) (same); *Hayward v. Procunier*, 629 F.2d 599 (9th Cir. 1980) (same); *Norbert v. San Francisco Sheriff's Dep't*, 10 F.4th 918, 929-930 (9th Cir. 2021) (recognizing that in *Spain* "it is apparent that the prison in Spain did not have adequate indoor recreation options").

339.     In the context of outdoor recreation, Ninth Circuit case law consistently holds that "otherwise meaningful recreation" can be sufficient even without outdoor recreation opportunities. *Shorter*, 895 F.3d at 1185. The Court holds the gyms in CJ3 offer meaningful recreation opportunities and are therefore consistent with the Fourteenth Amendment.

### b.     Out-of-Cell Time

340.     Prior to COVID, inmates in general population were out of their cell for most of the day. (Tr. Vol. 2 236:25-237:18; 237:15-238:10.) Plaintiffs have not argued this amount of out-of-cell time is a Fourteenth Amendment violation and the Court finds it is not.

341.     Prior to COVID, inmates in administrative segregation received out-of-cell time one hour per day and had access to the gym during that time. (Tr. Vol. 1 157:4-6; 157:11-14: Tr. Vol. 6 1148:21-23.) The jail worked to identify inmates who could safely be out of their cells together in a single "walk group" and where time allowed, the jail would have each walk group out of their cell for one hour at a time and then cycle back through the walk groups again. (Tr. Vol. 6 1149:24-1150:24.) Out-of-cell time was available from 8:00 a.m. to 10 a.m., from 12 p.m. to 2:00 p.m. and from 3:30 p.m. or 4:00 p.m. until 9:00 p.m. (Tr. Vol. 6 1153:19-1155:1.) Giving the SFSO its due deference with respect to safety and security issues in the jail, the Court finds this policy complies with the Fourteenth Amendment.

342.     The administrative segregation housing classification is used only when necessary for the safety and security of the inmate population, the staff, and/or jail volunteers and visitors. (Tr. Vol. 4 864:15-19.) Sergeant Gomez explained the reason inmates in administrative separation generally have less out-of-cell time opportunities compared to inmates in general population is that unlike

general population, all inmates in an administrative segregation pod (maximum of 48) cannot safely be out of their cells at the same time. (Tr. Vol. 4 862:20-863:12.)

343.     Incarcerated persons are housed in administrative separation for a number of reasons, including assaults, drug use, gang activity, or the need for protection. (Tr. Vol.4 851:25-852:19.) The SFSO has a questionnaire that sets out nine specific criteria the jail considers when assessing housing placement. (Ex. 1241.) For example, an inmate can be housed in administrative segregation because they have been assaultive to staff, assaultive toward other inmates, engage in disruptive behavior like yelling all night or inciting a riot, or actively participate in a gang. (*Id.*; Tr. Vol. 4 855:16-858:12.) An inmate may also be housed in administrative segregation because they request it—as Plaintiff Brackens did—or because they need protection from other inmates because they have a high-profile criminal charge or a sexually-based crime that makes them a target among the inmate population. (Ex. 1241; Tr. Vol. 4 858:13-861:17.)

344.     Jails can be dangerous places and the SFSO's policies to limit the size of walk groups in administrative segregation is appropriate given the safety and security risks they must guard against. The Court credits testimony from witnesses who discussed the number of weapons, drugs, and fights in jail, with the SFSO finding or stopping each incident multiple times per week. (Tr. Vol. 6 1183:20-1186:5; 1187:1-1188:7; 1188:10-18.)

345.     The evidence also shows that the majority of inmates have at least one other inmate that they cannot be housed with, or out of cell at the same time as. These relationships are logged as "keep away orders" and 70-75% of inmates have at least one keep away order. (Tr. Vol. 6 1178:13-1179:24.)

346.     The SFSO takes steps to maximize the amount of out-of-cell time inmates in administrative segregation receive. When possible, the jail has identified large groups of inmates housed in administrative segregation who could all safely be out of their cells together (but could not safely be housed in general population) and then rehoused those individuals in one pod, which then operates with the same level of out-of-cell time available in general population. (Tr. Vol. 4 865:12-866:20.) One example of this is the Special Needs Yard, which houses inmates in administrative segregation for their own protection—for example because they are in protective custody based on their charges or are gang drop-outs. (Tr. Vol. 4 865:12-866:9.)

347.     These are all legitimate safety and security reasons for the restriction on out-of-cell time for inmates in administrative segregation.

348.     It would be inappropriate for the Court to order the SFSO to experiment with a system that required the SFSO to use larger walk groups for inmates in administrative segregation because there is a risk to the safety of inmates, staff, and volunteers to having inmates who cannot safely recreate together out of their cells at the same time and it is inappropriate to experiment with inmate safety. (Tr. Vol. 4 867:17-23.)

### c.   Inmate Out-of-Cell Time Is Not Dictated by Staffing Issues

349.     Plaintiffs spent considerable time at trial discussing staffing shortages within the SFSO and labor disputes between the SFSO and the Deputy Sheriff's Association suggesting that the reason the SFSO does not offer outdoor access or additional out-of-cell time is because of staffing. This claim is not supported by the record. The record shows that staffing concerns are not the limiting factor in the amount of out-of-cell time or outdoor access the SFSO provides inmates in CJ3.

350.     As to out-of-cell time, there is no evidence that if the SFSO had more staff they could offer additional out-of-cell time to inmates. The testimony is that the limiting factor on out-of-cell time for inmates housed in administrative segregation is the size of their walk group, which is based on the combination of inmates who can safely recreate together. A walk group does not require additional deputy supervision simply because it includes 10 or 12 rather than 8 inmates.

351.     As to outdoor access, there is evidence that staffing issues have not impacted the SFSO's ability to offer outdoor access. Both Plaintiffs Poot and Brackens admit the SFSO has offered them outdoor access despite the jail's current staffing levels. This proves that staffing levels in the jail are not the reason that the jail did not offer outdoor access in August 2022.

352.     Staffing issues are only relevant to the extent staffing shortages trigger a temporary lockdown of CJ3, which would lead to a suspension of out-of-cell time for inmates for the duration of the lockdown. Out-of-cell time is limited during a lockdown because by definition a lockdown is a time when unrestricted movement in the jail is not safe for staff or incarcerated persons. (Tr. Vol. 1315:13-23.)

///

353.     Lockdowns can be caused by staffing shortages when the number of deputies on-site is four below the minimum staffing level. (Tr. Vol. 1192:22-24; 1198:12-20.) When lockdowns occurred due to staffing shortages, the Sheriff's Office implemented the mitigation efforts it could to avoid disruption of jail operations including out-of-cell time. (Tr. Vol. 6 1326:16-1327:6.) The SFSO is able to minimize the frequency of lockdowns triggered by staffing issues by offering deputies voluntary overtime, requiring mandatory overtime, or redirecting deputies from other work assignments to support the custody division at CJ3. (Tr. Vol. 6 1192:25-1193:16; Vol. 7 1313:18-1314:25; 1327: 3-6.)

354.     Plaintiffs have not shown how many lockdowns at CJ3 were caused by staffing as opposed to other factors despite evidence that the SFSO keeps records of lockdowns. Witnesses testified that lockdowns can be caused by a number of factors including finding shanks or drugs, an inmate "gassing" staff, fights among inmates, security searches of a pod for contraband or power outages. (Tr. Vol. 1189:24-1191:6; 1193:21-23.) All of these are legitimate non-punitive safety and security reasons for a lockdown that are consistent with the Fourteenth Amendment.

355.     Additionally, for the lockdowns that do occur, Plaintiffs presented no evidence about their length—whether they lasted for ten minutes, an hour, or two hours. A lockdown only restricts an inmate's out-of-cell time when it occurs during hours of the day when an inmate would typically be out of his cell. The evidence shows that lockdowns at CJ3 are lifted as soon as possible. (Tr. Vol. 6 1192:17-21.) Again, Plaintiffs made no effort to submit testimony or evidence showing the length of these lockdowns.

356.     COVID also contributed to lockdowns due to temporary staffing shortages. Unlike many other professions, deputies working in CJ3 could not transition to remote work during COVID and had to show up at the jail in-person. During COVID, staffing challenges resulted operating CJ3 below staffing minimums due to employee's disability leave, military leave, FMLA leave, COVID status, and family COVID status. (Tr. Vol. 6 1131:22-1132:11.) Even just signs of symptoms of COVID-19 would result in employees being directed to stay home from work. (Tr. Vol. 6 1132:14-21.) Staffing levels in CJ3 were affected by COVID. Pursuant to health orders in place, employees with COVID could not come to work. (Tr. Vol. 3 650:19-23; Tr. Vol. 6 1132:11-13.) Additionally, the SFSO also lost approximately 25 staff members due to the City's vaccination requirement. (Tr. Vol. 6

1133:7-12.) Lockdowns triggered by staffing shortages caused by COVID-19 have a legitimate non-punitive purpose to protect public health.

### III. There Are Concerns Regarding the Scope of Any Injunction Plaintiffs Could Have Sought

357.    Plaintiffs have not met their burden to show they are entitled to any injunctive relief and therefore the Court is not required to consider the parameters of any potential injunction.

358.    However, the doctrines of mootness and the statutory limits imposed by the Prison Litigation Reform Act ("PLRA") would have impacted the scope of any injunctive relief the Court could have ordered.

### A.    Changed Conditions at County Jail 3 Would Have Mooted Any Injunction

359.    This case is unique in that the Plaintiffs asked the Court to order injunctive relief based upon conditions all parties agree are no longer in place. As part of the summary judgment order, the Court ruled that "because the only issue before the Court now is injunctive relief, the only relevant assessment is to determine the current state of conditions in County Jail 3." (ECF No. 325 at 21.) Plaintiffs filed an administrative motion for clarification asking the Court to determine whether "current conditions" referred to those at the close of fact discovery—in August 2022—or at the time of trial—in August 2023. (ECF No. 337.) In response, the Court issued an order setting the timing for "current conditions" during trial as the close of fact discovery, August 19, 2022. (ECF No. 339 at 1.) August 2022 was approximately six months before the COVID-19 public health emergency was lifted in February 2023.

360.    At the final pre-trial conference, the Court gave the parties the option to have the Court consider the case at trial based on the conditions in the jail as of August 2023—the time of trial—if all parties stipulated. (ECF No. 384 at 1.) Although Defendants agreed to the proposal, Plaintiffs refused, thereby requiring the case to be tried based on the August 2022 COVID-modified policies. (ECF No. 403.)

361.    It is undisputed that the SFSO changed the polices at CJ3 in response to COVID-19 and that since the end of COVID-19 the jail has modified both its out-of-cell policies and its outdoor access policies to permit all inmates in custody for four years or longer an opportunity for weekly

outdoor access and provide all inmates in administrative segregation no fewer than 10 hours per week out-of-cell time. (Tr. Vol. 1, 167:11-168:5; Tr. Vol. 2 236:12-20; Vol. 2 245:21-246:2; 246:18-22; ECF Nos. 359-5, 259-6, 376.) Poot and Brackens testified that they have received opportunities for outdoor access and additional out-of-cell time, respectively. (Tr. Vol. 1, 167:11-168:5; Tr. Vol. 2 236:12-20; Vol. 2 245:21-246:2; 246:18-22.)

362.        The August 2023 conditions at the jail are relevant to any injunctive relief requested in this case. *Doty v. Cnty. of Lassen*, 37 F.3d 540 (9th Cir. 1994). *Doty* was a Fourteenth Amendment jail conditions case against Lassen County regarding overcrowding in what the court referred to as the "old jail." When the lawsuit was filed, Lassen County was in the process of designing and constructing a new jail. *Id*. At 542. However, the new jail was not completed by the close of fact discovery. The new jail opened nine months after the bench trial concluded. *Id*. One month after the new jail opened—ten months after the bench trial concluded—the trial judge issued an order granting the plaintiffs' relief as to the old jail. Lassen County appealed and the Ninth Circuit reversed the portion of the injunction concerning the old jail, holding the injunction was improper because "[w]hen the district court entered its injunction, it is undisputed that the County had transferred all of its inmates to the New Jail and was no longer using the Old Jail. As a result, the question of the need for [an injunction concerning the old jail] was moot." *Id*. At 544. The injunctive relief ordered was inappropriate because an injunction must do "no more and no less than correct [a] particular constitutional violation," and beyond that, "federal courts have no role in the formulation of prison policy." *Id*. at 543.

363.        Since the August 2022 conditions raised at trial were caused by the COVID-19 pandemic (Tr. Vol. 4 752:10-19), there is no risk that the SFSO will revert to those policies absent another global health crisis. Therefore, it would be error for this Court to issue an injunction requiring the SFSO to implement a policy that is already in place.

**B.        The Prison Litigation Reform Act ("PLRA") Would Have Limited Any Injunction**

364.        Any injunction would have been bounded by the provisions of the Prison Litigation Reform Act ("PLRA"). The PLRA operates explicitly "to restrict the equity jurisdiction of federal

1    courts" and "creates a more exacting standard for federal courts to follow." *Gilmore v. California*, 220

2    F.3d 987, 999, 1007 (9th Cir. 2000). Claims for injunctive relief like those in this case sound in equity.

3         365.      The PLRA "has restricted courts' authority to enforce prospective relief concerning

4    prison conditions, requiring that such relief be supported by findings and precisely tailored to what is

5    needed to remedy the violation of a federal right." *Miller v. French*, 530 U.S. 327, 347 (2000)

6    (citations omitted). The statute requires that a court grant prospective relief in a case concerning prison

7    conditions only when it "finds that such relief is narrowly drawn, extends no further than necessary to

8    correct the violation of the Federal Right, and is the least intrusive means necessary to correct the

9    violation of the Federal right." 18 U.S.C. § 3626(a)(1)(A). "No longer may courts grant or approve

10   relief that binds prison administrators to do more than the constitutional minimum." *Hernandez v.*

11   *Cnty. of Monterey*, 110 F. Supp. 3d 929, 941 (N.D. Cal. 2015). And in considering any prospective

12   relief, the Court must "give substantial weight to any adverse impact on public safety or the operation

13   of a criminal justice system caused by the relief." 18 U.S.C. § 3626(a)(1)(A).

14        366.      Plaintiffs failed to meet the PLRA's exacting standards for ordering an injunction in

15   two key respects. First, Plaintiffs have not presented a sufficient record for the Court to determine the

16   least intrusive remedy necessary to correct their alleged violations of the Fourteenth Amendment.

17   Second, any proposed injunction would have significant adverse effects on public safety and the

18   operation of the criminal justice system in San Francisco.

19                  **1.**      **Least Intrusive Remedy Necessary**

20        367.      Plaintiffs have not created a record sufficient for the Court to determine the least

21   intrusive remedy necessary to correct the violation of a federal right. The PLRA requires a district

22   court to "make the factual findings mandated by the PLRA" before granting prospective relief. *Oluwa*

23   *v. Gomez*, 133 F.3d 1237, 1239 (9th Cir. 1998) (finding error when district court order failed to

24   include specific factual findings to support its ruling under the PLRA). Plaintiffs had the burden to

25   show that the SFSO's policies and procedures caused them injury. Even assuming they had met that

26   burden, which they have not, Plaintiffs also needed to show that they suffered an injury from the

27   "current conditions" that they would not suffer under the proposed injunctive relief. In other words, in

28   order for this Court to issue an injunction that extends no further than necessary Plaintiffs were

required to state the amount of out-of-cell time and outdoor access that they were requesting to remedy their alleged injuries and present competent evidence that if they received the desired changes, the alleged injuries would be resolved. For example, if Plaintiffs had requested an additional hour of out-of-cell time per week, they would need to show that the incremental change of one additional hour of out-of-cell time would make a difference in alleviating the injuries to the class.

368.     Plaintiffs utterly failed to produce any evidence on this point. None of Plaintiffs' witnesses offered any testimony regarding how much out-of-cell time inmates would need to have to remedy the alleged harms that the SFSO's current out-of-cell time policies allegedly caused. And none of Plaintiffs' witnesses offered any testimony regarding how many minutes per week or month or year inmates would need to have outdoor access to remedy the alleged harms that the SFSO's current outdoor access policies allegedly caused. On this issue, it is not a question of whether or not the Court credits the testimony Plaintiffs presented, there simply is no evidence in the record. Without this testimony, the Court has insufficient information to make the specific factual findings to show that any injunction extends no further than necessary to correct the violation of the Fourteenth Amendment. 18 U.S.C. § 3626(a)(1)(A).

## 2.     Substantial Weight to Adverse Impacts on Public Safety and Operation of the Criminal Justice System

369.     Second, the Court is bound by the PLRA to give substantial weight to any adverse impact a proposed injunction would have on public safety and the operation of the criminal justice system. 18 U.S.C. § 3626(a)(1)(A).

370.     It is undisputed that any injunction that required additional outdoor access would also require the SFSO to staff more deputies in CJ3. The outdoor areas themselves would require deputies to supervise while inmates were outdoors and additional deputies would be required to support transportation given the restrictions that apply to MR3 and MR4 inmates. (Tr. Vol. 4 869:4-8; 870:13-21.) A person who is MR3 would need to be escorted by one deputy. (Tr. Vol. 4 869:18-20.) A person who is MR4 would need to be escorted by two deputies. (Tr. Vol. 4 869:21-23.)

371.     Any injunctive relief that required the SFSO to dedicate more of its staff to the Custody Division and jail supervision would have an impact on public safety by shifting deputies currently

working in other roles. In addition to running San Francisco's jails, the SFSO also has responsibility for security within the San Francisco Superior Court, service of civil process, and providing law enforcement services to other City departments including the Department of Public Health and hospitals, the Public Utilities Commission, the Municipal Transportation Administration, and City Hall. (Tr. Vol. 5 998:18-999:10.) These services would be impacted if the Court required the jail to divert staff from these positions to the Custody Division to safely implement any injunctive relief requiring more outdoor access or out-of-cell time. The safety concerns created by staffing issues are not an issue that can be resolved simply by a request for increased funding because of the amount of time it takes to recruit, hire, and train new staff.

372.    An individual interested in applying to the SFSO must pass a background check, which includes looking into their personal history, job history, a medical examination, psychological examination, and polygraph, as well as attending training academies. (Tr. Vol. 5 1015:14-1016:2.) The SFSO cannot short-circuit this process because the role of a deputy is one that requires high levels of integrity and judgment and the SFSO uses its background check process to ensure that they do not hire individuals who are not well-suited to the job. (Tr. Vol. 5 1016:3-24.) Only two out of every 15 applicants who start the application process make it through the background check phase, which demonstrates the difficulty and time required to fill any additional staffing positions that would be required to respond to an injunction. (Tr. Vol. 3 48:15-582:6.)

373.    The relevance of staffing concerns and their impact on public safety in the context of the PLRA's limitation on the scope of any injunctive relief is a separate inquiry from the relevance of staffing concerns on the underlying merits of Plaintiffs' Fourteenth Amendment claim and whether San Francisco has a legitimate non-punitive purpose for its policies because the PLRA expresses Congress' intention that Courts consider the impact any proposed injunction would have on public safety. 18 U.S.C. § 3626(a)(1)(A).

374.    Any injunctive relief will also have an impact on San Francisco's criminal justice system. It is undisputed that approximately 12 percent of inmates in CJ3 have been in SFSO jail for four years or longer. (ECF No. 448 [Stipulation ¶ 19].) To the extent the Court views the pace of these

criminal trial as concerning, it is a problem over which the SFSO has no control and one which an injunction in this case cannot correct.

375.     It is the San Francisco Superior Court, not the SFSO, that determines whether to remand a criminal defendant into the SFSO's custody pending trial and how long an inmate remains in the jail awaiting trial. (Tr. Vol. 5 1014:1-6.) It is the San Francisco Superior Court, not the SFSO, that determines whether to accept a criminal defendant's request for additional time to prepare their criminal case and it is the inmate himself decides whether he wishes to waive his right to a speedy trial in connection with his underlying criminal offenses. (Tr. Vol. 5 1014:7-8; 13-21.) All three Class Representatives acknowledge that they have waived their right to a speedy trial in connection with the criminal charges that led to their incarceration in CJ3 during the pendency of this case. (Ex. 1173 [RFA 3].) This lawsuit is not the proper forum to remedy the pace of criminal trials in the San Francisco Superior Court and the SFSO is not the correct defendant to provide such relief.

376.     The PLRA's limitations on the power of Courts to issue injunctive relief in cases regarding conditions of confinement build off the common law restraints that dictates "where a court seeks to correct a constitutional violation established in the course of litigation, the court's exercise of equitable discretion must heel close to the identified violation and respect the interests of state and local authorities in managing their own affairs, consistent with the Constitution." *Gilmore*, 220 F.3d at 1005.

///
///
///
///
///
///
///
///
///
///

1

## CONCLUSION

2    For the reasons set forth above, Plaintiffs and the certified class do not prevail in their

3 declaratory and injunctive relief action. Defendants are not liable under either the Fourteenth

4 Amendment to the United States Constitution or Article I, Section 7 of the California Constitution as

5 to the claims alleged.

6

7 Dated:  September 7, 2023

8               DAVID CHIU
                City Attorney

9               JAMES HANNAWALT
                Acting Chief Trial Deputy

10              SABRINA M. BERDUX
               KAITLYN MURPHY

11              Deputy City Attorneys

12

13          By: _/s/  Sabrina M. Berdux_____
             SABRINA M. BERDUX

14

15             Attorneys for Defendants
             CITY AND COUNTY OF SAN FRANCISCO and

16            SHERIFF PAUL MIYAMOTO, IN HIS OFFICIAL
             CAPACITY

17

18    IT IS SO ORDERED.

19

20 Dated: _____   _____

21             HONORABLE SALLIE KIM
             United States Magistrate Judge

22

23

24

25

26

27

28