# Exhibit A

 1   choice.

 2        Ms. Huang, do you have your next witness?

 3        **MS. HUANG:**  Plaintiffs would like to call Mr. Paul --

 4   Ken Lomba.

 5        **THE COURT:**  Ken Lomba.

 6        **MS. HUANG:**  Ken Lomba, I'm sorry.

 7        (Witness sworn.)

 8        **THE CLERK:**  Okay.  Please be seated, spell your full

 9   name and spell your last name for the record.

10        **THE WITNESS:**  All right.  My full name is Kenneth

11   Lomba, K-E-N-N-E-T-H, L-O-M-B-A.

12                          **KENNETH LOMBA**,

13   called as a witness for the Plaintiffs, having been duly sworn,

14   testified as follows:

15                       **DIRECT EXAMINATION**

16   BY MS. HUANG:

17   **Q.**   Sorry about that, Mr. Lomba.  Thinking about Paul

18   Mirkarimi and my brain went blank.  Thank you for coming down.

19        Mr. Lomba, I'd like to start off with a little bit of your

20   background.

21        Can you tell me how you're currently employed?

22   **A.**   I work for the San Francisco Sheriff's Department.  I'm a

23   deputy sheriff detailed to the union.  I'm the union president

24   of the Deputy Sheriffs' Association.

25   **Q.**   And how long have you been the president of the Deputy

1    Sheriffs' Association?

2    **A.**    Been a little over five years now.

3    **Q.**    And before that were you a deputy sheriff?

4    **A**    Yes, uh-huh.

5    **Q**    With the City and County of San Francisco?

6    **A**    Yes.

7    **Q.**    And so how long have you been employed as a police officer

8    with the City and County of San Francisco?

9    **A.**    About 17 years.

10   **Q.**    And are you POST trained?

11   **A**    Yes.

12   **Q.**    So how long have you been in law enforcement altogether?

13   **A**    Sworn about 27 years, and 1 year unsworn.

14   **Q.**    Now, as the president of the San Francisco Deputy

15   Sheriffs' Association, what are your duties?

16   **A.**    You know, primarily I represent all the deputy sheriffs,

17   the senior deputies, the members of our union and I do a lot of

18   advocacy for them.

19        My job, basically, is, you know, to protect and to enhance

20   their benefits, their work conditions, their contract, advocate

21   for, you know, better conditions for them all the way around.

22   Oh, and also, you know, and protect their rights.

23   **Q.**    And when you talk about work conditions, are you also

24   talking about their safety?

25   **A**    Yes, uh-huh.

1   Q.   Now, is the Deputy Sheriffs' Association only deputy

2   sheriffs?

3   A    No.

4   Q.   Who else does it?  Who else are members?

5   A.   We have senior deputies, we also have associate members as

6   well and -- yeah.

7   Q    But generally not -- not the officers?

8   A.   Generally, no.

9   Q.   Now, are you aware that this lawsuit is about primarily

10  two topics, excessive confinement and the lack of outdoors for

11  inmates at the San Bruno County Jail?

12  A    Yes.

13  Q.   And are you aware that the time period for this lawsuit

14  goes up to mid-August, 2022?

15  A    Yes.

16  Q.   So all of my questions are about that period before August

17  2022, and I would ask that you confine your answers to that

18  period up to August 2022.

19  A.   Okay.  I'll do my best.

20  Q.   Thank you.

21       Now, prior to August 2022 when the COVID emergency

22  protocols were in place, did you have any information on how

23  much time inmates at San Bruno County Jail were locked in their

24  cells?

25  A.   Were locked in their cells?

 1            MS. BERDUX:  Objection.  This is actually beyond the

 2    scope of what he was disclosed as a non-retained expert.

 3            THE COURT:  Can you show me what he was disclosed as?

 4            MS. BERDUX:  Yes, I can.  It's actually at ECF

 5    No. 350-9.

 6            THE COURT:  Okay.

 7            MS. BERDUX:  In sum, the rules and members of his

 8    association, deputy sheriffs; No. 2, the direct supervision

 9    model; No. 3, actual staffing levels; No. 4, the impact of

10    actual sworn custody staff and staffing levels at the jail and

11    the history and development of the sheriff's office goals and

12    values for its custody responsibilities.

13            THE COURT:  I'm going to allow just some background,

14    but I don't want to go into -- go beyond the scope of these

15    topics, so overruled at this point, but keep it brief.

16            MS. HUANG:  Thank you, Your Honor.

17    BY MS. HUANG:

18    Q.    These are just background questions, Mr. Lomba.

19          Did you have an understanding of what the -- how the

20    protocols were applied at San Bruno Jail in terms of the amount

21    of time inmates were locked in their cells during the period

22    when the COVID protocols were in place?

23    A     Yes.

24    Q.    And what was that?

25    A.    You know, based on the information, you know, from my

1   members, the inmates were locked in their cells, on the most

2   part, upwards of 23 hours a day.

3   Q    And did the fact that inmates were locked in their cells

4   23 hours a day affect the work conditions for your members?

5   A    Yes, it did.

6   Q.   How did that affect the work conditions?

7   A.   Well, one, we're severely, you know, understaffed, and the

8   staffing was even reduced -- our minimums were just more so

9   during the COVID time periods and the time periods we're

10  discussing.

11      It did create a lot of issues because when you have the

12  inmates locked in a cell, it's a lot of idle time, so it

13  creates a lot of stress, a lot of anxiety, a lot of -- it gets

14  pent up a lot, so they're easily angered, easily upset,

15  sometimes volatile.

16  Q.   And when inmates are upset and volatile, how does that

17  affect the work conditions for your client -- not your clients,

18  excuse me -- for your members?

19  A.   Members, yeah.  It makes it more difficult.  There's more

20  arguments, less cooperation, you know, sometimes combativeness

21  or fights.

22  Q.   Now, in terms of -- Sheriff Mirkarimi testified that there

23  are four divisions in San Francisco County Jail.  Do you

24  have -- do you agree with that?

25  A    Yes.

LOMBA - DIRECT / HUANG

1   **Q.**   Okay.  And one of the divisions is custody?

2   **A**   Yes.

3   **Q.**   The second one is -- one of the divisions is

4   administration.

5   **A.**   Uh-huh.

6   **Q.**   And then there's patrol?

7   **A.**   The old, yes.

8   **Q.**   And then there's civil?

9   **A.**   Uh-huh.

10   **Q.**   All right.  Which of those four is the largest division?

11   **A.**   Custody.

12   **Q.**   And in August of 2022, what was the size of the custody --

13   how many deputies were assigned to custody, do you know?  Do

14   you remember, or approximately; your best estimate?

15   **A.**   I'd have to look at a staffing report to get the actual

16   number, but I believe we were short staffed, around 150 to 160

17   deputies.

18   **Q.**   That's how many you were short?

19   **A.**   Right.

20   **Q.**   And talking about San Bruno, what happens when the jail is

21   short staffed, for a deputy?

22   **A.**   Well, normally at San Bruno when they're short, you know,

23   on the shift, minus four deputies, they go into a lockdown

24   phase.  Generally, it's either a partial lockdown or a full

25   lockdown, which would be a level three or a level-four

1    lockdown.

2    Q    And what is a level-two lockdown?

3    A.   I believe level-two lockdown is just a lockdown by the

4    deputy, itself, if they see some particular incident uprising

5    or if they have issues within the pod.

6    Q.   So an individual deputy could lock down the pod that they

7    were assigned to, that's a level two?

8    A    Yes.

9    Q.   And then what is a level-four lockdown?

10   A.   Level-four lockdown is a facility lockdown.

11        In the recent past, it's really been generated because of

12   lack of staffing, but, you know, that would have locked down

13   pretty much all movement throughout the facility.  Movement

14   would be limited, you know, usually based on the watch

15   commander discretion.

16   Q    And who has the authority to do a level-four lockdown?

17   A.   I believe the watch commander, and they would have to

18   report it to the, you know, facility commander and above.

19   Q.   And is the watch commander usually the lieutenant at the

20   facility?

21   A.   I mean, it could vary.  It could be the sergeant, I mean,

22   it could be -- it could be a lieutenant.

23   Q.   But it can't be the housing unit deputy who makes that

24   decision?

25   A.   No, not necessarily.  You would have to notify their

 1  supervisors who would be above them.

 2  **Q.**   Now, you said that when you were short more than four

 3  deputies, there's some form of lockdown, either partial or

 4  four -- or a level-four lockdown.  Do you know what the

 5  threshold number is?

 6  **A**    No.

 7  **Q.**   Meaning at what number do you have to be that you start

 8  counting minus 1, minus 2, minus 3, minus 4?

 9  **A.**   We have our minimums codified in our contracts.

10  **Q.**   And in August of 2022, what was that minimum?

11  **A.**   I think on day shift it was 38.  Swing shift, I'm not

12  positive on that.

13  **Q.**   I am going to show you a document -- give me two

14  seconds -- and see if this refreshes your recollection.

15          **MS. BERDUX:**  Could you please identify by exhibit

16  number?

17          **THE COURT:**  Yes.  Would it refresh your memory,

18  Mr. Lomba, to see a document that would help you remember?

19          **THE WITNESS:**  Yes.

20          **THE COURT:**  That's the question you have to ask,

21  Ms. Huang.

22      If we're on direct examination, to refresh the witness's

23  memory, you have to establish that the witness could remember

24  if he or she is shown a document.  Okay?

25          **MS. HUANG:**  Thank you so much.  I always am reminded

1    English was not my first language.

2        Could I have Ms. Doughty put up Exhibit 74 and let's see

3    if this works.

4        Bring it up just -- bring it up just a little bit.

5            MS. BERDUX:  Objection.  This looks like it's dated

6    from 2023, which is well past August 2022.

7            MS. HUANG:  I understand.  I'm just asking if it

8    would refresh his recollection.

9            THE COURT:  Yeah.  So for refreshing recollection,

10   Ms. Berdux, you can show them anything.  Literally in class we

11   say a plate of spaghetti could be used to refresh someone's

12   memory.

13           MS. HUANG:  I remember that.

14       Keep going, see if that has it.

15       Thank you, Ms. Doughty.

16   BY MS. HUANG:

17   Q.   Apparently, this document doesn't seem to have the totals,

18   just the amount numbers of people who have been drafted.

19   A.   Right.

20   Q.   Let's try a different document.  Let's see if Exhibit 17

21   would refresh your recollection.

22       Does this document help your memory?

23   A    Yes, but you would have to be on a different page.  If you

24   could scroll down to the county jails, the CJs.

25           MS. HUANG:  Keep going, Ms. Doughty.

1           THE WITNESS:  Right.   Should be the next one.

2    BY MS. HUANG:

3    Q.   There we go.

4    A.   There we go.

5    Q.   Okay.

6           MS. BERDUX:  Could you please identify the page

7    number?

8           THE COURT:  This is Plaintiffs' 177, page 4 that

9    they're looking at.

10          MS. BERDUX:  Thank you.

11          MS. HUANG:  Yeah.

12          THE COURT:  For purposes of refreshing memory.

13          THE WITNESS:  It doesn't show the shift minimums, but

14   it just shows the overall staffing.

15   BY MS. HUANG:

16   Q.   Okay.   And so why don't we go back a little bit.

17        Is the jail staffed by deputies seven days a week?

18   A    Yes.

19   Q.   365?

20   A    Yes.

21   Q.   And how many shifts are at San Bruno?

22   A.   Three a day.

23   Q.   All right.   So there's a daytime shift?

24   A.   Yep, a swing shift and a mid-shift.

25   Q.   All right.   And each of those shifts are staffed?

**LOMBA - DIRECT / HUANG**

1   A      Yes.

2   Q.     All right.   And is it fair to say that the daytime shift

3   is the largest shift?

4   A      Yes, it is.

5   Q.     And then you have a smaller shift for swing?

6   A      Correct, uh-huh.

7   Q.     And then the smallest shift is graveyard?

8   A.     Right.   Correct.

9   Q.     Do you know what the schedule of the daytime shift is?

10  A.     7:00 a.m. to 3:00 p.m.

11  Q.     And when does the graveyard start?

12  A.     Well, technically, they start at 2:45 for a briefing --

13         Oh, graveyard?   I'm sorry.

14  Q.     No.   Swing.

15  A.     Swings technically start at 2:45 for briefing, and then

16  they go to their assignments at 3:00 p.m.

17  Q.     And when does swing end?

18  A.     It ends at 11:00 p.m.

19  Q.     And what time does graveyard start?

20  A.     About 10:45, and they report to their assignments at 11:00

21  p.m.

22  Q.     And they work until 7:00 a.m.?

23  A      Yes, uh-huh.

24  Q.     Now, how do they -- when is a determination made that a

25  shift is going to be understaffed?

**LOMBA - DIRECT / HUANG**

1    A.   I believe -- well, if it happened throughout the night, I

2    mean, they know what the staffing is going to be for that

3    shift.

4         If there are SLs, then that would increase the -- well, it

5    will decrease the amount of staffing, so they could know at any

6    period -- a supervisor could know any period prior to the

7    beginning of the shift.

8    Q.   So what is an SL?

9    A.   Sick leave, if someone calls in sick.   Sorry.

10   Q.   So presumably the jail knows who is on vacation, correct?

11   A    Yes.

12   Q.   And they would know who is out because of a disability?

13   A    Yes.

14   Q.   And then the only unknown is the number of people who are

15   on sick leave?

16   A    Yes.

17   Q.   All right.   Are there any other reasons which would cause

18   the overall staffing level to fall on a particular day?

19   A.   Possibly.   I mean, if there were some other urgent

20   activity and staffing was diverted away, that would be

21   possible, but that's about it.

22   Q.   And are the statements that we talk about to those four

23   departments static, meaning they don't change, or are deputies

24   moved from assignment to assignment?

25   A.   Normally it's static, but you do -- you do have some

LOMBA - DIRECT / HUANG

1  opportunities, you know, to move to different location, but

2  there's a process to put in for that, put in for a transfer or

3  a satellite unit.

4  Q.   Is there also a process called drafting?

5  A    Yes, uh-huh.

6  Q.   And what is that?

7  A.   That's involuntary overtime.  Some people refer to it as

8  mandated or a mandate.  Our department refers to it as

9  drafting.

10 Q.   And can you explain to me what the process is by which

11 drafting works?

12 A.   So we have basically minimum staffing codified in our

13 contract.  If the department goes below that number, they would

14 normally ask for volunteers to work additional, you know, hours

15 or additional shift to fill in that vacancy.

16     If they don't have volunteers, then they would order them

17 to involuntarily, basically, what we call drafting.  They would

18 be drafted to work.

19 Q.   And why would someone be drafted?

20 A.   Well, I mean, in custody they would be drafted because the

21 department has gone below the minimum staffing levels.

22 Q.   And that could be because someone is sick or someone is on

23 vacation?

24 A.   Correct.  Yeah.

25 Q.   And how often is a deputy sheriff subject to be drafted?

1  A.    Quite often.   There's a pretty long history behind that,

2  but it is very often.

3  Q.    And what is the minimum -- what is the maximum number that

4  someone can be drafted in a -- in a particular time period?

5  A.    So per week, work week, the maximum hours you can work in

6  a day is 16.   The number of times you could be drafted is 3.

7       But I believe within this timeframe -- I don't have the

8  date or the memo in front of me, it might have happened in

9  2022 -- Sheriff Miyamoto agreed to reduce the amount of

10  drafting instead of three times per week to two times per week,

11  and that was a temporary directive.

12  Q.    This says three times per week.

13  A.    Correct.

14  Q.    So in other words, if there were staffing shortages, an

15  individual deputy sheriff could be required to work three

16  16-hour shifts in addition to their regular shifts?

17  A.    It would be their regular shift plus an 8-hour shift,

18  yeah.

19       So they would work, you know, a total if you were ordered

20  or drafted three times a week, that would be a total of 24

21  additional hours.

22  Q.    And so if you were drafted and worked 16 hours, would you

23  have time to go home, shower, sleep and you'd have to come

24  right back?

25  A.    You would have to, right.

LOMBA - DIRECT / HUANG

1    **Q.**   And this was mandatory?

2    **A.**   Correct.

3    **Q.**   And everybody who was a deputy sheriff was subject to it?

4    **A.**   To a certain degree.  There was levels of how it was done,

5    you know.

6         First, you know, the draft list, we had a list -- the

7    department has a list of who's eligible to draft, and that's

8    divided, you know, per policy by lower half and upper half of

9    the amount of deputies on that shift, lower half meaning less

10   seniority, upper half meaning more seniority, basically.

11        And, you know, through that process the -- you know, let's

12   say this example:  The lower half would be drafted probably

13   more so than the upper half until the point where the drafts

14   got so excessive where they exhaust the lower half on that

15   particular day and then they would have the ability to draft

16   the upper half, and so that's within that shift.

17        And then if they have no one within that shift to draft,

18   then the scope of the drafts get larger within that facility,

19   within that division, within the department, and it kind of

20   grows when you run out of people to order to work.

21   **Q.**   So someone at a jail could be drafted for another

22   assignment within the department?

23   **A.**   Yes.

24   **Q.**   Now, Exhibit 177, which is up, is dated January 2020.  It

25   has on there four jails, correct?

 1          MS. HUANG:  It's kind of small.  Can we make it a

 2   little bit larger?  Thank you.

 3          THE WITNESS:  On here technically there's five.  I

 4   mean, the ward is like a jail built into the hospital.  So you

 5   have CJ1, CJ2, CJ4, CJ5, and then the SFGH ward.

 6   BY MS. HUANG:

 7   Q.   And so CJ4 in this chart was already closed later that

 8   year, correct?

 9   A.   Correct.

10   Q.   And did those deputies then get spread to CJ1, 2 and what

11   is now 3?

12   A.   A little bit, yeah.  They were spread out throughout the

13   department.

14   Q.   Now, how does being subject to drafting affect your

15   members?

16   A.   Well, it disrupts their lives.

17          Technically, they're supposed to be on their off time with

18   their friends, family, you know, unwinding and, you know,

19   participating in their life.

20          The drafting really negatively impacts them.  It exhausts

21   them, it disrupts their lives because it's last minute, you

22   know.

23          And that's primarily due to the understaffing, which, you

24   know, we could go back in history, which, you know, the blame

25   of the understaffing is on the city, the Sheriff's Office, the

LOMBA - DIRECT / HUANG

1     hiring process, the recruiting process.

2     **Q.**   So I wanted to ask you how the numbers are determined as

3     to what the level of staffing that is required in custody.

4           And are you familiar with Section 1027 of Title 15 of the

5     California Code of Regs?

6                 **MS. BERDUX:**  Objection, relevance.

7                 **THE COURT:**  Overruled.

8                 **THE WITNESS:**  I may have read it before, but it does

9     go over staffing, the staffing plans.  I may have read that

10    before.

11    **BY MS. HUANG:**

12    **Q.**   Is the -- how was it determined how many people -- how

13    many deputies are needed to staff the San Bruno Jail or any of

14    the jails?  How was that process -- what was that process?

15    **A.**   Well, the department does a staffing plan.  I believe they

16    report it to the board of directions, maybe another entity, but

17    they have done several, you know, staffing plans.

18          And when they do that, they look at what posts need to be

19    filled and, you know, the -- obviously, you know, the

20    in-custody, the housing units, those are, you know, common, you

21    know, conclusions that those posts need to be filled, but some

22    also may be, you know, classrooms for programs or security of

23    the facility, whether it's the lobby or hallways to the

24    classroom or movement deputies, they calculate that in for

25    movement and transport, you know, the inmates.

LOMBA - DIRECT / HUANG

1    Q.   And then that number is actually finalized in negotiation

2    between your union and the Sheriff's Office?

3    A.   Only -- the only ones that are finalized are primarily

4    custody.  We have a couple other units that are in the

5    minimums, but primarily it's the custody units.  And those were

6    there as a protection for safety.  Safety for -- I guess

7    codified for safety.

8    Q.   Now, have you heard the term "direct supervision"?

9    A.   Yes.

10   Q.   And do you agree that San Bruno is designed to be a direct

11   supervision custodial facility?

12   A.   Yes.

13   Q.   And what does that mean to you?

14   A.   Well, to me it means that the deputies are working within

15   the housing unit, you know, amongst the incarcerated people to

16   basically monitor them, to communicate with them, to engage

17   with them, you know.  They have their deputy station, the

18   podium, you know, inside the housing unit to try to build a

19   level of rapport, you know, with the inmates, with the

20   custodies so they feel more comfortable to speak with them, you

21   know, report any issues or any of their needs.  Also, in a

22   sense, to also be as a role model, too, in a way, so they see

23   more structure, they see someone productive in society.

24   Q.   And is that part of the -- part of the goal of reducing

25   recidivism?

1    **A.**    I believe so, yeah.

2    **Q.**    And if there are inmates in lockdown who are less

3    cooperative, does that make it harder for this direct

4    supervision model?

5    **A.**    Yes, it does.

6    **Q.**    And is it more demanding for a deputy to be employed in a

7    direct supervision model than in, perhaps, a more traditional

8    custodial model?

9    **A.**    I think it is.  I think it adds more stress.

10   **Q.**    You have to be more alert?

11   **A.**    Yes, for sure.

12   **Q.**    And you have to have skills to develop relationships with

13   the inmates?

14   **A.**    Yes, uh-huh.

15   **Q.**    Because you're there by -- you're there amongst them?

16   **A.**    Correct, yeah.

17   **Q.**    And when a deputy is assigned to a housing unit, are they

18   there by themselves?  How many deputies are assigned a housing

19   unit?

20   **A.**    So it depends.  There's been a lot of changes over the

21   years.

22         Normally at San Bruno when it was -- when it started,

23   there was supposed to be three in a housing unit.  So let's

24   say, for example, let's just use, you know, Pod 1, for example.

25   There's two sides to it.  There's an A and a B side.  And

LOMBA - DIRECT / HUANG

1   there's supposed to be three -- one deputy on each side and the

2   third deputy would kind of float back and forth to assist.

3   That's how it was when it was created.

4   Q.   And in August of 2020 -- of 2022, a year ago, were there

5   still sufficient staffing to have three deputies per housing

6   unit?

7   A.   Our staffing has gotten extremely worse after 2020.  I

8   believe it's -- our shortage has doubled since 2019, so it has

9   gotten worse.  And then when we fall below minimums with the

10  lockdowns, it does really reduce the staffing.

11  Q.   I'd like for you to take a look at Exhibit 188.  188 is

12  titled the December 2020 Monthly Staffing Report.  Do you

13  recognize this document?

14  A.   Yes.

15  Q.   And who produces this document?

16  A.   Oh.  The Sheriff's Department.

17  Q.   And how do you get it?

18  A.   They email it to me.

19  Q.   From the Sheriff's Department?

20  A.   Correct.

21  Q.   So you don't create it, but they create it and provide it

22  to you?

23  A.   Yes.

24  Q.   All right.  So on page 1 of this -- tell us what page 1 is

25  about.

1    A.    Page 1 is showing the staff report and the leaves, the

2    requisitions, leaves over 90 days.   Also it's showing available

3    requisitions, so my understanding of that would be available

4    full-time employee positions, funding for those positions, and

5    that's what it's referring to as available requisitions.

6    Q.    So I'm looking at this document, page 1, and it seems to

7    me there's two sections, right?   There's a larger section on

8    the left and three -- three sections on the right.   And under

9    the furthest column to the right, the furthest one on the left

10   says "Sworn."   Do you see that?

11   A.    Yes, uh-huh.

12   Q.    And at the bottom it says "106."   What does that number

13   mean?

14   A.    Those are vacant positions that can be filled, available

15   requisitions.

16          THE COURT:   Where are you pointing to, Ms. Huang?   I

17   don't see 106.

18          MS. HUANG:   At the very bottom where it says "Total

19   available requisitions."

20          THE COURT:   Blue.   Okay.   Got it.

21   BY MS. HUANG:

22   Q.    So those were the open positions on that -- in December

23   2020?

24   A.    Yes.

25   Q.    Could we look at the last page of this?   I believe it's

1    page 4, maybe.

2         All right.  So if we look at the last page, it's

3    telling -- it gives a breakdown of the assignments of the

4    deputies, correct?

5    A.   Yes.

6    Q.   All right.  And if we look at the -- where it says,

7    "Facility and position," it has the -- at that time the four

8    open jails, correct?

9    A.   Yes, uh-huh.

10   Q.   And it says that the allocated positions for CJ3 was 186?

11   A.   Yes.

12   Q.   And the --

13        MS. BERDUX:  Objection.  These are all leading

14   questions.

15        THE COURT:  Sustained.  Can you rephrase?

16   BY MS. HUANG:

17   Q.   Could you tell me how many positions were assigned to CJ3

18   in December of 2020?

19   A.   186.

20   Q.   And how many filled positions were there?  How many -- how

21   many actual employees?

22   A.   Yeah.  So that would be under the -- I guess the column

23   saying "Current," and that's 147.

24   Q.   And then how many positions were unfilled?

25   A.   39, and that's in red.

1   Q.   All right.   And if you look at that, then it says in the

2   last column -- it gives a percentage?

3   A.   79 percent staffed.

4   Q.   Meaning that's a percentage of positions that you had

5   bodies for?

6   A.   Correct.   Sworn staff, uh-huh.

7   Q.   Now, I know that the population, the jail population, in

8   CJ3 fluctuated, correct?

9   A.   Yes.

10  Q.   Did the staffing allocations also fluctuate in terms of

11  the staffing plan to be in synch or to reflect any changes in

12  population?

13  A.   That I'm not sure about.   That's possible.

14  Q.   Is that fluctuation -- would that be reflected anywhere as

15  to what the standard for that fluctuation would be?

16  A.   It might be in a document or email if a pod was closed or

17  on an assignment sheet.

18  Q.   What was the last thing you said?

19  A.   If a pod was closed, if a pod was vacant and closed.

20  Q.   So -- but if a pod was open and it just had fluctuating

21  numbers, would that affect staffing assignments?

22  A.   No, I don't think so.

23  Q.   Could we look at the last page of 188, please.

24              MS. DOUGHTY:   188?

25              MS. HUANG:   What is this?   170 --

1          MS. DOUGHTY:   188?

2               MS. HUANG:   Whatever this is.   188.   The last page.

3          All right.   That's fine.   It wasn't what I wanted.

4    BY MS. HUANG:

5    Q.   Let's look at the staffing levels in six months.   I

6    believe that would be 195.

7          Okay.   Do you recognize this document, which has been

8    marked as Exhibit 195?

9    A.   Yes.

10              MS. BERDUX:   Objection.   I'm not sure that Mr. Lomba

11   needs his memory refreshed.

12              THE COURT:   Well, are you offering it to him to

13   refresh his memory, or are you offering it because you wish to

14   have this admitted into evidence and you're laying foundation?

15              MS. HUANG:   I would like to have this admitted into

16   evidence.

17              THE COURT:   Okay.   So you can lay the foundation

18   first, and then you can ask it be admitted into evidence and

19   then I'll hear the objections because I reserved ruling on

20   this.   So lay the foundation.   That's what Ms. Huang was doing,

21   at least for the first question.

22              MS. HUANG:   Okay.

23              THE COURT:   And you can put it back up.   It's okay.

24   BY MS. HUANG:

25   Q.   Mr. Lomba, that document that we just saw that is titled

1   "Sworn/Non-sworn Monthly Staffing Report July 2021," do you

2   recognize this document?

3   A.   Yes.

4   Q.   And what is this document?

5   A.   The monthly staffing report.

6   Q.   And who produces this monthly staffing report?

7   A.   The Sheriff's Department.

8   Q.   And how do you get it?

9   A.   By email.

10  Q.   And is this monthly staffing report something that you

11  rely on in communications and negotiations with the City?

12  A.   Yes, with the department too.   I mean, I monitor it.

13  Q.   And do you -- is the -- are the numbers in the staffing

14  report treated by you as accurate?   Do you rely on it?

15  A.   Yes.

16  Q.   And does the City also treat it as accurate and rely on

17  it?

18  A.   As far as I know, yes.

19           MS. HUANG:   I'd like to move to have Exhibit 195

20  admitted into evidence.

21           THE COURT:   Okay.   Let me hear the objections.   I

22  understand that there are several on the chart, but I'll hear

23  oral argument on the objections from the defense, and then I'll

24  hear from Ms. Huang again.

25           MS. BERDUX:   Well, it's a 167-page document.   If

1    there's specific pages that are identified and testified to and

2    used, I would withdraw our objections as they are -- I

3    understood your preliminary ruling -- as they are Sheriff's

4    Office records, although they were not produced in discovery.

5              THE COURT:  Okay.  Ms. Huang, are there specific

6    pages of the multi-page Plaintiffs' Exhibit 195 that you want

7    to introduce into evidence?  Because, if so, you have to have

8    Mr. Lomba lay the foundation for each of the different

9    documents in it.  This is the problem with having the

10   multi-page exhibit.

11        In other words, normally you would have one freestanding

12   report, you would say he saw it, he knows it, you ask do you

13   need it admitted into evidence, I would say either yes or no.

14        But this one, are there pages that you want in?  Because

15   right now he's only talked about page 1, maybe page 2, and then

16   it looks like there are some other documents included in there.

17   So tell me what you want admitted.

18              MS. HUANG:  Could we go up to page 7, please,

19   Ms. Doughty?

20              MS. DOUGHTY:  Page 7?

21              MS. HUANG:  No.  This is 8.  There.  That's page 7.

22   BY MS. HUANG:

23   Q.   So, Mr. Lomba, in these monthly staffing reports, are they

24   all formatted fairly similarly?

25   A.   Yes.

1      THE COURT:  Okay.  Here's the problem:  He hasn't

2  even seen the entire document.  You're just showing him like --

3  if you had a hard copy, you could just give him the hard copy,

4  he could leaf through it and say -- talk about it; but,

5  otherwise, if you're going to do it on the screen, that's

6  painful.

7      MS. HUANG:  That's fine.  We can pull out the hard

8  copy.

9      THE COURT:  Okay.

10     (Brief pause.)

11     MS. HUANG:  Your Honor, why don't we just do it with

12  another -- 179.

13     THE COURT:  Okay.

14     MS. HUANG:  And I'm going to -- if I may approach,

15  I'll show Mr. Lomba --

16     THE COURT:  179.

17     MS. HUANG:  -- 179.

18     Ms. Doughty, would you put 179 on?

19     MS. DOUGHTY:  I have it.  Here's 195.

20     MS. HUANG:  Let's just go with 179.

21     THE COURT:  You found 179?

22     LAW CLERK:  No.  We found 195.

23     THE COURT:  Now she's switched to 179.

24     MS. HUANG:  Just for convenience, because we couldn't

25  put our hands on it.

1          THE COURT:  Okay.  So we're back to 179; is that

2     correct?

3          MS. HUANG:  Yes.

4          THE COURT:  Okay.

5          LAW CLERK:  Do you need the exhibit?

6          THE COURT:  Why don't you leave 195 out, just in

7     case.

8        Okay.  It is not my staff's job to find your exhibits for

9     the witnesses.

10          MS. HUANG:  I appreciate Ms. Block's help.

11          THE COURT:  She is helping to be nice, but I can tell

12     you --

13          MS. HUANG:  She is wonderful.  I really appreciate

14     it.

15          THE COURT:  -- it is not my staff's job to look for

16     your exhibits for the witness.

17          MS. HUANG:  I understand.

18     BY MS. HUANG:

19     Q.   So, Mr. Lomba, you have a hard copy -- I'm sorry it's not

20     color -- of 179.  The color version is on the screen.  And I

21     believe the first seven pages are a chart very similar to the

22     first page; is that correct?

23     A.   Yes.

24     Q.   And then the remainder of it is actually a printout of the

25     individuals who are employees; is that right?

**LOMBA - DIRECT / HUANG**

1    A.    Yes.

2    Q.    All right.   So let's just talk about the first seven pages

3    and not the individuals who are employees.

4          So is the format of all the monthly staffing reports

5    identical except for the content of the numbers?

6    A.    Yes.

7    Q.    And so the first basic staffing report, then, gives you

8    the available requisitions and who's on leave; is that right?

9    A.    Yes.

10   Q.    All right.   So if we're looking on the first page of

11   Exhibit 179 --

12             MS. HUANG:   Please leave that up, Ms. Doughty.

13   BY MS. HUANG:

14   Q.    It shows you that for deputy sheriffs, how many positions

15   are open?   This is looking at the first column of numbers?

16   A.    Yes.

17   Q.    Okay.   And what's that number?

18   A.    Of the open positions?

19   Q.    Yes.

20   A.    Sixty-four for deputy sheriffs.

21   Q.    All right.

22         And then it goes on in each section with the open

23   positions for the remaining deputy positions, correct?

24   A.    Yes.

25   Q.    So, in the second section, what's the number for the

LOMBA - DIRECT / HUANG

1   number of open positions for senior deputies?

2   A.   Twelve.

3   Q.   And for sergeants?

4   A.   Fourteen.

5   Q.   And for lieutenants?

6   A.   Two.

7   Q.   And for the chief deputy?

8   A.   One.

9   Q.   All right.  So the total number of open positions then

10  is -- is that tallied under "Total Available Requisitions," the

11  first number under "Sworn"?

12  A.   Yes.  Under "Current Sworn Staffing" --

13  Q.   Yes.

14  A.   -- shortage 93.

15  Q.   Okay.  So let's take a look at page 2 of 179.

16          THE COURT:  Ms. Huang, are you trying to get this

17  document into evidence?

18          MS. HUANG:  I am.

19          THE COURT:  Okay.  Let me just show you how it's

20  done.

21      Mr. Lomba, could you look at Plaintiffs' Exhibit 179, just

22  leaf through it, leaf through the whole thing?

23          THE WITNESS:  Okay.

24          THE COURT:  You've got it in front of you?

25          THE WITNESS:  Okay.

1     **THE COURT:**  Is Exhibit 179 a document that you

2   received in one whole package, or did you get them in separate

3   pieces?

4     **THE WITNESS:**  Yes, one whole package.

5     **THE COURT:**  Okay.  And this is something you received

6   from San Francisco County --

7     **THE WITNESS:**  Sheriff's Office.

8     **THE COURT:**  -- Sheriff's Office?

9     **THE WITNESS:**  Yes.

10     **THE COURT:**  Okay.  All right.

11       Now, Ms. Huang, he's identified it, he's authenticated it,

12   you can move it into evidence and I'll hear the objections.

13   Okay?  Do you want to move it into evidence?

14     **MS. HUANG:**  I would like to move just the first seven

15   pages into evidence.

16     **THE COURT:**  Okay.  All right.  Objections?

17     **MS. BERDUX:**  Untimely produced.  It was not produced

18   in advance of the close of discovery; rather, shortly in

19   advance of Mr. Lomba's deposition.

20     **THE COURT:**  And you did have a chance to depose him

21   on it?

22     **MS. BERDUX:**  I did.

23     **THE COURT:**  Okay.  And it came from San Francisco.

24   Is there any doubt about that?

25     **MS. BERDUX:**  No.

1          THE COURT:  Okay.  I'm going to overrule the
2    objection.  I'm going to admit Plaintiffs' Exhibit 179, pages 1
3    through 7 into evidence.
4          (Trial Exhibit 179 received in evidence.)
5          THE COURT:  So, Ms. Huang, the reason I wanted -- I
6    demanded to have a hard copy for the plaintiff -- for the
7    witnesses is that it's actually hard for a multi-page document
8    for the witness to do exactly what I had Mr. Lomba do, which is
9    just to take a quick look at the document and say, yes, this is
10   something I received, it came in a package, I got it as a
11   whole, instead of having Ms. Doughty scroll through each page.
12   That will take forever for him to do that.  It's much faster
13   for the witness and for me, frankly, to look through it that
14   way.
15         Mr. Brody, I'm designating you as the person to hand the
16   witness the hard copy exhibits.  My staff is not going to do
17   that job.  You have three people sitting over there, so one of
18   you has got to do that or, Ms. Huang, you can do that if you
19   have the access to the documents.
20         I don't mean to make you do it, Mr. Brody, but I'm
21   assuming it's going to be easier for you, Ms. Huang, if
22   somebody else is helping you.
23         So the idea is, you get the exhibit, you can put it up on
24   the screen, but if you want Mr. Lomba to look at it, to
25   authenticate it and identify it, it's much faster for Mr. Brody

1    or someone from your team just to hand him the binder with the

2    document, she can look at it, you can ask him about the

3    document as a whole, then you can ask for it to be admitted

4    into evidence, then there's discussion about it, and then I'll

5    make a ruling.

6             MS. HUANG:  That's fine, Your Honor.

7             THE COURT:  Okay.

8             MS. HUANG:  I was trying to short circuit because

9    these are all the same, rather than having to do each one, but

10   I'm happy to do each one.

11            THE COURT:  Sadly, for purposes of evidence

12   introduction, you will have to take them one by one.

13            MS. HUANG:  That's fine.  All right.

14            THE COURT:  So it is a slow process, which is why

15   trial is sometimes not that fun, but if the other side has not

16   agreed that they're admitted in evidence, then we have to go

17   through this process for each exhibit that you want admitted

18   into evidence.

19        This is the part where if we had a jury, they would be

20   asleep.

21   BY MS. HUANG:

22   Q.   Mr. Lomba, I'd like to show you what's been marked as

23   Exhibit 185, December 2020.

24            MS. HUANG:  May I approach?

25            THE COURT:  Yes.

1    BY MS. HUANG:

2    Q.   Could you look at that and look at each page?

3    A.   Okay.

4    Q.   Mr. Lomba, did you receive that in one package?

5    A.   Yes.

6    Q.   And did you receive that from the City and County of

7    San Francisco?

8    A.   Yes, Sheriff's Office.

9    Q.   And the Sheriff's Office.

10          MS. HUANG:   I'd like to move at this time that

11   Exhibit 185, the first seven pages, be moved into evidence.

12          THE COURT:   Okay.   Any objections?

13          MS. BERDUX:   Same objections as previously made just

14   for the record.

15          THE COURT:   Okay.   And for the record, I want to

16   confirm that you did receive this before Mr. Lomba's

17   deposition?

18          MS. BERDUX:   That's right.

19          THE COURT:   And there's no question about the fact

20   that they are from the San Francisco County Sheriff's Office?

21          MS. BERDUX:   That's correct.

22          THE COURT:   Okay.   Overruling the objection,

23   Exhibit 185 will be admitted into evidence.

24      (Trial Exhibit 185 received in evidence.)

25          THE COURT:   Let me also just make a suggestion to the

1    parties because --

2              MS. BERDUX:  Pages?

3              THE COURT:  Pages 1 through 7.

4              MS. BERDUX:  Thank you.

5              THE COURT:  -- sometimes the sheer tedium of the

6    process forces the other side to capitulate.

7         Here's what I would recommend:  If there's no disagreement

8    about the authenticity of the documents and there's no

9    disagreement that Mr. Lomba actually received them, then, Ms.

10   Huang, you could make a group admission -- if the defense

11   agrees to this -- if Ms. Huang wants to make a group

12   introduction into evidence of these reports, you could make

13   your objections because these are all based on the same

14   bases -- these are for the monthly staffing reports -- and I

15   will rule on all of them as a group.

16        But that's only if the defense actually agrees to that

17   process; otherwise, we'll go through this slow process one by

18   one.  But think about, on the defense side, if you want to make

19   that agreement.  You're preserved for the record.  Your

20   arguments are preserved for the record in terms of the

21   timeliness of the production, so think about that.

22              THE WITNESS:  Can I make a correction to one of the

23   last questions you asked?

24   BY MS. HUANG:

25   Q.   Sure.

LOMBA - DIRECT / HUANG

1   A.   So you asked for the divisions of the department, and the

2   fourth one you brought up you said was civil.   It should be

3   projects and planning or planning and projects and also

4   indicates that -- the four divisions on the last page, page 7.

5   Q.   There were actually five divisions, correct?   I was wrong

6   on the four divisions.

7   A.   No, I think there's four.

8   Q.   Okay.   Then --

9   A.   Administration and programs is one, custody operations,

10  two, field operations and then planning.   Oh, maybe correction.

11  They got staffing number five, so maybe five.   You're correct.

12  Sheriff's administration, administration of programs, custody

13  operations, field operations and planning and projects.

14  Q.   All right.

15  A.   Looks like they're all staffed.

16  Q.   And that's for exhibit what that you're reading off of?

17  A.   This is the last exhibit you --

18  Q.   There's a number at the top in tiny, tiny digits.

19  A.   P0185.

20  Q.   And what's the date on it?

21  A.   September 2020.

22            MS. HUANG:   Ms. Berdux, are you willing to stipulate?

23            THE CLERK:   This was already admitted, wasn't it?

24            THE COURT:   Oh, that one was, but I'm talking about

25  the process.

 1              MS. HUANG:  Yeah.  About the process.  Do you want us
 2   to go through all of these?
 3              MS. BERDUX:  No.  I'd like to identify which ones.  I
 4   believe that -- yeah, I just wanted to identify the page.
 5              THE COURT:  All right.  So Ms. Huang, let's do this:
 6   Let's take a 10-minute break so that you could figure out which
 7   documents belong in this category.  You can talk to Ms. Berdux
 8   and Ms. Murphy about it, and then if there is an agreement on
 9   that, then we'll come back and we'll put on the record the
10   specific trial exhibit numbers, your objections as a group and
11   my ruling as a group, which I think you know what I'm going to
12   say.
13         Okay.  So ten minutes.  We'll be back at 11:05.
14                   (Recess taken at 10:57 a.m.)
15                 (Proceedings resumed at 11:05 a.m.)
16              THE COURT:  We're back on the record, the lawyers are
17   present, the plaintiffs are not present by their choice.
18         Proceed, Ms. Huang.
19              MS. HUANG:  During the break, counsel for plaintiffs
20   and defendants have reached an agreement.  We have agreed that
21   the first seven pages of Exhibit 177 to 201 may be admitted
22   into evidence, subject to any objections they want to raise.
23              THE COURT:  Okay.
24              MS. BERDUX:  Sure.  Defense object to the timeliness
25   of the production as occurring after fact discovery but confirm

1  that they are Sheriff's Office documents.  That's not the

2  issue.

3          THE COURT:  Okay.  And the defendant did have a

4  chance to depose Mr. Lomba on Exhibits 177 through 201, pages 1

5  through 7.

6          MS. BERDUX:  That's correct.

7          THE COURT:  Okay.  I'm overruling that objection.

8  I'm admitting into evidence pages 1 through 7 of Plaintiffs'

9  Exhibits 177 through 201.  Okay?  Problem solved.  Great.

10      (Trial Exhibits 177-201 received in evidence.)

11 BY MS. HUANG:

12 Q.  So looking at page -- Exhibit 177, page 4., do you see

13 that on your screen, Mr. Lomba?

14 A.  Yes.

15 Q.  So this tells you what the staffing in the custody

16 division was when?

17 A.  For January 2020.

18 Q.  All right.  And at that time, there were four jails?

19 A.  Four, but I always count the wards because it's a built-in

20 jail in the hospital, so --

21 Q.  All right.  So was CJ --

22 A.  -- it would be five.

23 Q.  Excuse me.  Was CJ5 at that time now CJ3?

24 A.  Yeah.  That may be an error.

25 Q.  And the total staffing application or the total FTEs for

LOMBA - DIRECT / HUANG

1   CJ3, was what in January of 2020?

2   A.   Total is 163 deputies, looks like, on this report.

3   Q.   And how many positions were missing?

4   A.   Looks like 13.  They had 150 currently staffed, and they

5   were minus -- I'm sorry -- minus 13.

6   Q.   Now, if we look at the page 7 of Exhibit 177, can you tell

7   me whether or not that is a tally of the total staffing for the

8   Sheriff's Department?

9   A.   Yes.

10  Q.   Okay.  So -- and is that the bottom box down there?

11  A.   Yes, department totals.

12  Q.   Right.  And there are five departments listed on this?

13  A.   Five divisions.

14  Q.   Five divisions.  And could you tell us what those

15  divisions are?

16  A.   Well, according to the report, they have sheriff's

17  administration, administration and programs division, custody

18  operations division, field operations division, planning and

19  projects division.

20       It just -- just for a little history, I mean, throughout

21  the years sometimes, you know, either the sheriff or the

22  undersheriff, they make some changes and, you know, either

23  rename or expand the divisions, so I believe that happened in

24  the course of the years.

25  Q.   And in January of 2020, what was the total number of

LOMBA - DIRECT / HUANG

1   deputies assigned to custody?

2   **A.**   So total assigned would be under total actual, which is

3   478.

4   **Q.**   And what was the total number authorized?

5   **A.**   Authorized is 546.

6   **Q.**   And so custody in January of 2020 was short how many

7   positions -- I mean how many actual bodies?

8   **A.**   According to the report, looks like minus 68.

9   **Q.**   And did that number continue to increase, the number of

10  positions which custody was short?

11  **A.**   It did.   It's a lot harder now.

12  **Q.**   And was it a constant increase of short positions?

13  **A.**   I think it -- I think -- I don't know if it was constant,

14  but it did increase over 2020 and over 2021 and -- yeah.   It

15  may have fluctuated throughout 2022.

16  **Q.**   So I'd like to take a look -- let's just leave it.

17       Let's take a look at the end of this series, which is

18  Exhibit 201.   Mr. Lomba, can you tell me what month this is a

19  staffing report for?

20  **A.**   December 2021.

21  **Q.**   All right.   And if we look at December 2021 and we look at

22  page 4, is that also the breakout for the custody division?

23  **A.**   Yes, uh-huh.

24  **Q.**   Okay.   So in the custody division, how many jails were

25  operational in 2021?

LOMBA - DIRECT / HUANG

1    A.   I would say four, because I'm including the wards.

2    Q.   Okay.  And for CJ3, what was the allocation?  I mean, how

3    many -- how many positions were authorized versus how many

4    positions were filled?

5    A.   Authorized is 187.

6    Q.   And how many positions were empty?

7    A.   Negative 45.

8    Q.   And so you had a total of how many positions?

9    A.   Well, authorized is 187.  Current is 142, so 142 is

10   staffed.  That's what was available during that month at CJ3.

11        And then the negative 45 is the negative amount of

12   staffing of deputy sheriffs.

13   Q.   So that would be the number of empty positions?

14   A.   Yes.

15   Q.   All right.  If you compare that to the number on that page

16   in Exhibit 177 -- if Ms. Doughty would put that up -- could you

17   tell us, then, what was -- how many more empty positions

18   developed in that period of time?

19   A.   Could we go back to the previous one?

20   Q.   That would be Exhibit 201?  Okay.

21   A.   So looks like a negative 32.  Yeah.  So additional

22   reduction of 32 deputies.

23   Q.   Part of the difficulties in the interim between January of

24   2020 and -- is it true that between January 2020 and December

25   2021 one of the jails was closed and that was CJ4?  Is that

1    what happened?

2    A.    CJ4 was closed, yeah.

3    Q.    Okay.   So would it be more helpful to look at the total

4    numbers?

5    A.    Yes.

6    Q.    Okay.   So let's look at January of 2020.   If we look at

7    the total numbers -- if you look at the bottom total in the

8    first row, what was the total numbers of deputies that custody

9    had been allocated?

10   A.    So they were authorized for 546, and they currently had at

11   that time 478.

12   Q.    Okay.   And if we look at the December 2021, which is

13   Exhibit 201 --

14   A.    So there's some changes, and in 2021 the authorization

15   number has changed.   Total authorized is now 491.

16   Q.    And what were the actual number of filled positions in

17   December of 2021?

18   A.    Filled were 402.

19   Q.    And so you had how many empty positions in December of

20   2021?

21   A.    Looks like a negative 89.

22   Q.    And so from -- from January of 2020, to December of 2021,

23   what was the total number reduction that the custody division

24   experienced?   Can you figure that out?

25   A.    I'll have to see the numbers side by side again.

LOMBA - DIRECT / HUANG

1    Q.   Okay.   Do you want side by side of just the first column?

2    A.   I mean, however you'd like to do it.

3         MS. HUANG:   Is that possible, Ms. Doughty, to have

4    them side by side?

5         MS. DOUGHTY:   Yes.

6         MS. HUANG:   177 and 201, just the first seven pages.

7    Thank you.

8         MR. BRODY:   Here's 201, and maybe he can look at 177

9    on the screen.

10        MS. HUANG:   Maybe that will work.

11   BY MS. HUANG:

12   Q.   Mr. Lomba, I'm showing you the paper copy of 201, and

13   maybe we can look at -- oh.   She's done it.   177 on the screen.

14   It's 177.   Yeah.   Good.

15   A.   Yep.

16   Q.   Can you look at it on the screen and make the comparison?

17   A.   Yeah.   That's better.   You're moving the wrong way.

18        MS. DOUGHTY:   You'll have to direct me.

19        THE WITNESS:   If you can move the image to the right.

20   Just kind of keep going, keep going.   That's good, but we need

21   to get on to custody operations.

22        So on the January 2020 -- yep.   I think it's above.   There

23   you go.   Right there.   That's good.

24        So do you want me to answer the question, or are you going

25   to --

1          I'd like to just point out on the January 2020 report

2    where it says "CJ5," the total authorized is 163.   The total

3    authorized on December 2021 for the same facility, different

4    title, CJ3, is 187, so there's a 24 difference.   They seem to

5    increase the need for deputies by 24 in 2021.

6    BY MS. HUANG:

7    Q.    So between January of 2020 and December of 2021, the

8    number of authorized positions for the San Bruno Jail

9    increased?

10   A.    Correct.

11   Q.    And -- but the actual number of deputies between January

12   2020 and December 2021 decreased?

13   A.    So correct.   Yeah.   The current authorized didn't really

14   change much.   2020 looked like it was 150, and then 2021 was

15   142, which is less.

16   Q.    Was it 142, or was it 187 for CJ3?

17   A.    Well, authorized is 187.   What they had currently there

18   was 142 in 2021.

19   Q.    So -- and that was how many empty positions in December

20   2021?

21   A.    Forty-five.

22   Q.    And as a result of all of these empty positions, did it

23   create even more forced overtime or mandatory overtime?

24   A.    Yeah.   As the negative staffing, you know, goes up.   It

25   creates more drafts.

LOMBA - DIRECT / HUANG

1    **Q.**   All right.   I'd like for you to take a look at page 7

2    of -- I guess you have 201.   Is that what you have, in paper?

3    **A.**   Yes.

4    **Q.**   All right.   And if Ms. Doughty would put up page 7 of

5    Exhibit 177.

6         And if you would look at the totals on the bottom.

7    **A.**   Yep.

8    **Q.**   Okay.   So if you look at the totals on the bottom, the

9    custody division then contains all of custody, correct?

10   **A.**   Custody operation division, yes.

11   **Q.**   All right.   And in January of 2020, what was the total

12   allocation for custody?

13   **A.**   We have to flip back to that screen.

14        So for December it's 491, and there's 491 authorized and

15   402, 402 positions filled.

16   **Q.**   So in December of 2021, how many empty positions did

17   custody have?

18   **A.**   According to this, negative 89.

19   **Q.**   Okay.   And then contrasting that with January of 2020, how

20   many positions were allocated for all of custody?   That should

21   be on your screens.

22        **MS. HUANG:**   Can we have 177 on the screen,

23   Ms. Doughty, please.   Page 7 of 177.

24        We need you to open up the entire page.   Thank you.

25   BY MS. HUANG:

**LOMBA - DIRECT / HUANG**

1   Q.   What did you have there for custody in January of 2020?

2   A.   So January 2020 the authorized -- the amount for custody

3   was 546.   And then what was the actual sworn is 478.

4   Q.   So between January of 2020 and December of 2021, the

5   actual number of deputies in custody dropped by how much?   Can

6   you tell what the difference between 478 and 402?   Is that 76,

7   sir?

8   A.   Yes, but let me -- if you give me a second just to think

9   about this for a second, because the chart's giving the totals,

10  so -- I mean, the totals we're talking about, we're going to be

11  really close to the amount of negative deputies because

12  according to this chart, if you look in the right-hand corner

13  where it says, "Total Staffing by Division," they're also

14  including supervisors, so -- and when I reference deputies, I

15  mean deputies and senior deputies, but also in this number, the

16  total sworn negative there, including a very small amount of

17  maybe the cap -- the lieutenants, captains, sergeants and maybe

18  the chiefs possibly, but that's going to be a very, very small

19  number compared to the amount of deputies.

20       If you want to get to more of an actual precise number,

21  we'll have to look at the 8304 and the 8306, you know, boxes on

22  this.

23  Q.   And where would those boxes be?

24  A.   It would be the top of the table, I guess the first two

25  boxes that say 8304 then 8306.

LOMBA - DIRECT / HUANG

1    Q.    I see.   On this page?

2    A.    Yes.

3    Q.    Okay.

4    A.    Those two classifications are basically the line staff

5    that do -- you know, they're posted at the positions.

6    Q.    All right.   So looking at 8304 and 8306 in December of

7    2021, what are the numbers of unfilled positions?

8    A.    So this looks like -- looks like 124 or negative 124.

9    Q.    And if you look at 8304 and 8306 in the January 2020 for

10   Exhibit 177, what's the total number of unfilled positions for

11   those two categories?

12   A.    If you blow up the January 2020 a little bit, magnify

13   it -- sorry.

14       Huh.   So this is -- so there was a -- this is kind of

15   interesting.   I don't have all the documents in front of me,

16   but there was a time period where they were taking senior

17   deputy positions and converting the FTE and they were moving

18   that to sergeant and to deputy.

19       So this 86 is slightly confusing because they reduced the

20   authorized amount of senior deputies on this one.   They show it

21   as negative 15 in the top column, and then their final

22   authorizations is 51, so I'm just going to use their final

23   totals, so we're looking at a negative 83.

24   Q.    So based on the comparison of these two charts, how many

25   more empty positions did the basic line custody staff suffer

LOMBA - DIRECT / HUANG

1   between January of 2020 and December of 2021?

2   A.   I mean, it looks like -- what is that, 41 difference,

3   83 -- 124 minus 83.

4   Q.   So that's what -- the increase in the reduction of

5   staffing in that --

6   A.   Time period?

7   Q.   -- not quite two-year period was an additional 41 empty

8   positions?

9   A.   Yeah, it seems like it.

10  Q.   All right.   If you would look, then, back on the lower

11  right-hand corner of page 7, it also lists the other

12  departments, correct, or divisions?

13  A.   Yes.   Yeah.

14  Q.   Including two administrative positions, the sheriff admin

15  and the admin and programs division, correct?

16  A.   Yes.

17  Q.   And then there's the field operations and planning project

18  in addition to custody?

19  A.   Yes.

20  Q.   Now, if you compare the staffing levels in those divisions

21  between December 2021 and January of 2020, can you tell me

22  whether or not those divisions suffered significant reductions

23  of staffing?   Let's take planning and projects to begin with.

24  A.   No, they did not.

25  Q.   That stayed the same?

LOMBA - DIRECT / HUANG

1   A.   It increased by one, it looks like.

2   Q.   So planning projects had an increase.  All right.

3        What about field operations?

4   A.   They were negative 37.

5   Q.   All right.  Did field operations also have an increase

6   between December of 2020 and -- January 2020 and December 2021?

7   A.   Let's see here.

8   Q.   It looks to me like there may have been an increase of

9   five positions.

10  A.   Yes.  They're at 86 percent.  I believe they used to be at

11  80 percent.  The print's kind of small on here.

12  Q.   So the actual numbers of bodies in the field increased by

13  5, yeah?

14  A.   Yes.

15  Q.   And what about --

16  A.   Yes.

17  Q.   -- admin?  Admin and programs, did that change at all?

18  A.   Admin and programs?  Looks like their authorized went up

19  to 82, so that increased by 31.

20  Q.   And their actuals?

21  A.   Sixty-one, and they were plus 10 in January of 2020.

22  Q.   So admin and programming had an increase in the staffing?

23  A.   In January of 2020 it looks like.

24  Q.   Okay.  And what about sheriff's admin?

25  A.   Compared to 2021 -- well, in 2020 they were negative 15.

LOMBA - DIRECT / HUANG

1    In 2021 of December, they were negative 24.

2    Q.    But the total bodies were how many?

3    A.    Total authorized in 2020 was 44.   Total authorized in 2021

4    was 46.

5    Q.    All right.   And then how many did they actually have?

6    A.    They had 29 in 2020 and 22 in 2021.

7    Q.    So they had a reduction of five positions?

8    A.    About seven.

9    Q.    About seven.

10        But the largest reduction was in custody?

11   A.    Yes.   Uh-huh.

12   Q.    Now, Mr. Lomba, we don't have the numbers through August

13   of 2022 in front of us, but do you recall whether this trend

14   that we're seeing between January of 2020 and December 2021

15   continued with custody having significant reductions in actual

16   staffing?

17   A.    Yes, and there were some what we found when we went

18   through the staffing reports.   We found that there were

19   additional positions that were basically not budgeted really.

20   They were unfunded, and they were in positions where there was

21   some growth and, technically, that growth wasn't budgeted, and

22   those positions should have been, you know, where the need was,

23   you know, primarily in custody.

24        Also, I'd like to add, I mentioned earlier about the

25   senior deputy conversion.   The department converted vacant

**LOMBA - DIRECT / HUANG**

1   senior deputy positions, and when they converted that money,

2   they used that to add additional sergeant positions.

3        And there's a significant problem with that because the

4   deputies and the senior deputies, they're the line staff.  And

5   when the Sheriff's Department stopped the testing for the

6   senior deputies and reduced their positions and funded more

7   sergeant positions -- and when they did promotions, they

8   basically, you know, lack of words, kind of shot themselves in

9   the foot and short staffed, you know, the line staff.  So they

10  created part of the staffing problem.

11  **Q.**   And was that a deliberate policy to phase out the senior

12  sergeants -- the senior deputy position?

13  **A.**   Yeah, we believe so.

14  **Q.**   And was there -- did you have any concern that by

15  promoting or eliminating the senior deputy position that that

16  was going to negatively affect the ability to do direct

17  supervision at the San Bruno Jail?

18  **A.**   Yes.  He just, you know, took away part of our front-line

19  staffing, which made it more difficult, which caused more

20  drafts.

21       And then you have our deputy sheriffs, our members are

22  more exhausted, you know.  It just all adds up.

23  **Q.**   Now, is your association concerned about the excessive

24  confinement of prisoners in their cells?

25  **A.**   Yes, uh-huh.

1  Q.   And does your association support reducing or allowing

2  prisoners more out-of-cell time?

3  A.   Yes.

4  Q.   And why is that?

5  A.   Well, you know, a lot of times I reference the job we do

6  as working in inner city, and it truly is.  Whether we're

7  patrolling outside, we are still patrolling inside, and we're

8  amongst the community.  And, you know, that's our job.  We want

9  to make it safe, you know.  We need to protect their property.

10  We also look out, you know, and respect their constitutional

11  rights.  And that's, you know, primarily our goal.  So it gets

12  really difficult when you're severely understaffed.

13       And you can't blame the national narrative as much because

14  there are a lot of issues from the Mayor's Office and the

15  Sheriff's Department that contributed to the short staffing.

16  If we didn't have those issues, if those issues didn't occur,

17  we would be far better staffed during that time and today.

18  Q.   When you're saying the national narrative, what do you

19  mean by that?

20  A.   Well, a lot of people point to a national narrative saying

21  that we're not getting applicants, you know, we're not getting

22  enough applicants.

23       If you look at the history of the Sheriff's Department and

24  how they recruited, we used to get applicants based off of

25  referral.  We never did a lot of advertising.  It was very

1    limited or very minute.

2        Now fast forward, you know, to, you know, 2020, the

3    funding movement, you know.  The mayor was trying to reform and

4    make a lot of changes and do a lot of reductions with law

5    enforcement.

6        The Sheriff's Department really wasn't aggressive at

7    advertising and recruiting, and they had to build up to that.

8    And a lot of it, I'd like to think, is pressure from our union,

9    because we advocated for a lot of that.

10       We did multiple analyses on the recruiting process, what

11   we felt they should be doing, the target markets they were

12   missing.  And, you know, over time they -- you know, they

13   started to do that, and that was probably around July of 2022

14   when the sheriff started increasing recruiting efforts, and

15   then it started to get a little bit better as we went forward.

16       But what we found also prior to that, there were

17   bottlenecks, you know, in the hiring process.  We did research

18   in 2018, found a bottleneck to be on the backgrounds unit.  And

19   then you obviously fast forward and there was issues with

20   recruiting, lack of advertising.  This -- you know, when the

21   short staffing -- in lieu of the short staffing you got to be

22   aggressive at recruiting, you got to be aggressive at

23   marketing, you got to be aggressive at hiring.  That wasn't

24   really happening.  The department is starting to get better.

25   There's still a lot of room for growth on that, but --

1      And then if you add to it what the Mayor's Office did, you

2  know, they delayed hiring for nine months with their equity --

3  equity study.  She did an equity study in 2020, froze testing

4  for nine months.

5      She decided to, you know, take money away from the budget

6  and reapply that to the community.  That all affects, you know,

7  the sheriff's budget and hiring process.

8      And then also, you know, fast forward to the COVID

9  vaccine, the hard stance that the City took that you must be

10  vaccinated.

11      They didn't -- they weren't big on accommodating anyone

12  that had religious exemptions.  They approved very few, if any,

13  religious exemptions.  And they wouldn't allow the one or two

14  people that they did approve to go to work, so we lost probably

15  upwards of another 40 deputies there, whether they were

16  directly separated or left before being separated or retired

17  before being separated.

18      So the problem we're in with the staffing shortage during

19  this time, during current times, a large part of it is due to

20  the mayor and, you know, our recruiting and hiring system.

21  Q.   When you say that in the past there wasn't a lot of

22  advertising, it was word of mouth --

23  A.   Right.

24  Q.   -- what was the reason why people would -- Sheriff's

25  Departments would refer people to work in San Francisco?  Was

**LOMBA - DIRECT / HUANG**

1  there a motivating factor that had them encouraging people to

2  apply?

3  **A.**   Well, sure.   I think, you know, at the time everyone knew

4  it was just a really good job, a really good career and, you

5  know, the applicants, the recruits had the opportunity to apply

6  what they felt was their purpose in life.

7  **Q.**   And does the fact that there is so much mandatory overtime

8  affect the willingness of deputies to refer people to this job?

9  **A.**   Yes, it does.

10      You know, that kind of refreshes my memory.   We had

11  additional problems, too, with the hiring process.   Not only

12  did we have the ability to hire recruits and train them, we had

13  the ability to hire academy graduates and laterals, and we had

14  a significant pay problem when they hired academy graduates and

15  laterals.   They were underpaid, which we had to fight for them

16  as a union to get them paid correctly.

17      So when this happens to your employees, and they share

18  what's going on with their friends, their families, other job

19  seekers, you know, that does become significant.

20  **Q.**   And in terms of the impediments to hiring, does this

21  include the amount of time it takes to be processed from the

22  time you apply to going through all the hoops to be hired?

23  **A.**   Yes, uh-huh.   San Francisco --

24  **Q.**   How long does it take now if -- in case someone is

25  interested in applying for a Sheriff's Department position and

1    to the final outcome?  How many months does that take?

2    A.   Well, now it's very unusual.  It takes -- the last group

3    that we hired, I asked them about the hiring process.  They

4    said it took them a year and a half to two years to get hired.

5         In 2018, when we were -- and, you know, back then, you

6    know, not realizing that being back then minus 70 deputy

7    sheriffs, you know, we were really fighting to reduce that.

8    You know, fast forward to today, we're like 160 negative.

9         MS. BERDUX:  Objection, outside the scope of current

10   conditions.

11        THE COURT:  Sustained.

12   Why don't you stop, Mr. Lomba, there.

13        THE WITNESS:  Okay.

14   BY MS. HUANG:

15   Q.   So, Mr. Lomba, is it correct that people are applying for

16   positions and not being able to get hired?

17   A.   They are applying and we do have a backlog of background

18   packets in our background unit, yep.

19   Q.   And is some of this due to the management by the sheriff

20   himself?

21   A.   I mean, it has to be.  I mean, I'm not the fly on the

22   wall, I don't know what the reasoning is, but the Sheriff's

23   Department oversees that, manages it.  They know they have a

24   negative staffing.  They know they're -- they have applicants

25   coming in.  They're doing testing monthly, but the output is

1    not there on the hiring unit.

2              MS. HUANG:  Thank you.  No further questions.

3              MS. DOUGHTY:  I'm sorry.  Wait.

4              MS. HUANG:  Oh, sorry.

5    BY MS. HUANG:

6    Q.   Sorry.  These concerns that you've expressed about

7    staffing, have you actually expressed those to Sheriff Miyamoto

8    himself?

9    A.   Yes.

10   Q.   And he's aware of your concerns?

11   A.   Yes, uh-huh.

12   Q.   And are you aware of other voices raising these concerns

13   and expressing them to Sheriff Miyamoto?

14   A.   Yes.

15   Q.   Now, are the reports that we've reviewed, are they

16   accurate?

17             MS. BERDUX:  Calls for speculation.

18             THE COURT:  Sustained.

19             MS. HUANG:  I'd like to move and get -- and have

20   Mr. Lomba qualified as a fact expert.

21             THE COURT:  I'm sorry, what's a fact expert?

22             MS. HUANG:  Someone who's able to testify on his

23   opinions without being a retained expert.

24             MS. BERDUX:  I don't understand.

25             THE COURT:  You're already qualified as an expert.

1    You don't have to have him qualified as a fact --

2              MS. HUANG:  That's fine.  I'm being careful.

3              THE COURT:  Okay.  Cross-examination?

4              MS. BERDUX:  Yes.

5         I'm going to stand here now, so I'm closer to the witness

6    deposition transcripts, if needed.

7                        **CROSS-EXAMINATION**

8    BY MS. BERDUX:

9    **Q.**   Good morning, Mr. Lomba.

10   **A.**   Morning.

11   **Q.**   Still morning.  Nice to see you again.

12   **A.**   Same here.

13   **Q.**   I'm just going to go -- I'm going to start where Ms. Huang

14   started a little bit, asking you a little bit about your

15   background.

16        Your highest level of education is high school?

17   **A.**   Some college, but, yeah, high school.

18   **Q.**   And you obtained a GED rather than diploma?

19   **A.**   Yes.

20   **Q.**   And you were first employed by the Sheriff's Office in

21   1994?

22   **A.**   Yes.

23   **Q.**   And you worked there for about two and a half years?

24   **A.**   Yes.

25   **Q.**   And then you left the office and didn't come back until

**LOMBA - CROSS / BERDUX**

1    2008; is that right?

2    A.    Yes.

3    Q.    While you were at the Sheriff's Office, the majority of

4    your career was actually at San Francisco General Hospital, now

5    Zuckerberg?

6    A.    Yep.  Uh-huh.  Yes.

7    Q.    And you did a lot of overtime as a patrol unit at the

8    hospital?

9    A.    Yes.

10   Q.    And you became president of the Deputy Sheriffs'

11   Association in 2018?

12   A.    Yes.

13   Q.    And if I say or start to refer to DSA, you and I both know

14   that we're talking about the Deputy Sheriffs' Association?

15   A.    We are the originals.

16   Q.    Great.  And that's a full-time job?

17   A.    Yes, uh-huh.

18   Q.    And prior to becoming the president of the DSA, you did

19   not rise above the rank of deputy at the Sheriff's Office,

20   correct?

21   A.    Correct.

22   Q.    And you actually never worked at CJ3 or as it was formally

23   known as CJ5?

24   A.    I think I was either overtime or detailed there a couple

25   times.

1      I've also worked at the 6th floor, which, you know, the

2   name of the 6th floor has changed a couple of times too, and at

3   4257 Street as well, which that name has changed a couple times

4   too.

5      And if you go all the way back to '94 -- I might as well

6   add it in -- I worked in booking also.

7            **MS. BERDUX:**  I'd like to read from Volume 1 of the

8   deposition, page 81.

9            **THE COURT:**  What line?

10            **MS. BERDUX:**  Beginning at line 4.

11            **THE COURT:**  Okay.

12  **BY MS. BERDUX:**

13      ▪**QUESTION:**  Okay.  Before I forget, we went over your

14      career history, but are you able to estimate for me the

15      number of months or years that you spent working in, well,

16      now County Jail 3, formerly County Jail 5, the facility in

17      San Bruno?

18      ▪**ANSWER:**  I never worked there.  County Jail 3 I worked at

19      was the 6th floor, 850 Bryant.  They've gone through a

20      couple of number realignments."

21      Ending at line 11.

22            **THE COURT:**  Thank you.

23  **BY MS. BERDUX:**

24  **Q.**  Your role as the president of the DSA is to advocate for

25  your members' pay, their working conditions and also to focus

 1   on strengthening the power of the DSA; fair?

 2   **A.**    Sure, plus what I added earlier.

 3   **Q.**    And the DSA was responsible for negotiating employment

 4   union contracts with the City, right?

 5   **A.**    Yes.

 6   **Q.**    And you're quite proud of the financial improvements to

 7   the DSA, right?

 8   **A.**    They could be better.

 9   **Q.**    And those finances of the DSA pay your salary and your

10   office space?

11   **A.**    Could you repeat that question?

12   **Q.**    Sure.  The finances of the DSA pay your salary and office

13   space?

14   **A.**    No, not necessarily.

15            **MS. BERDUX:**  I'd like to read from page 22, line 20.

16            **THE COURT:**  All right.

17   BY MS. BERDUX:

18       **"QUESTION:**  What do the -- what are the finances for the

19       DSA used for?

20       **"ANSWER:**  Well, they're used for a lot of things, some

21       simple things, you know, to pay our rent on our office,

22       any extra bills for the office.  Some go to my salary, a

23       portion.  And then we also pay a small amount to the board

24       of directors.  They get reimbursed their union dues.

25       Also, with my union, I think San Francisco, there's a fair

1    amount of legal costs, whether it's negotiating contracts or

2    defending contract violations, you know, or protecting our

3    members' rights."

4         Ending at page 23, line 5.

5    **A.**   I would like to point out you stated that the DSA pays my

6    salary.  The DSA does not pay my salary fully, like I stated in

7    the depo.

8    **Q.**   Let's talk about some of the staffing issues.  One of your

9    primary goals going forward as president of the DSA is to help

10   the Sheriff's Office increase its staffing; fair?

11   **A.**   We have.

12   **Q.**   And you initiated some social media advertising for the

13   DSA to help with recruitment?

14   **A.**   We have, but it's not our responsibility.

15   **Q.**   And the Sheriff's Office did a number of things, too,

16   including radio ads, a recruitment video that you characterized

17   as excellent, going to schools and universities to introduce

18   career opportunities, billboards and ads on Uni, right?

19   **A.**   Correct, but, like I stated today, those increases in

20   recruitment happened in July going forward 2022, and slowly

21   progressed.  So that was a buildup from July going forward.

22        They have gotten better.  The video I had referenced came

23   out in December of 2022.

24   **Q.**   And so it's true the Sheriff's Office -- the Sheriff's

25   Office recruitment efforts have included radio advertisements,

LOMBA - CROSS / BERDUX

1   a recruitment video characterized as excellent, going to

2   schools and universities to introduce career opportunities,

3   paying for billboards and ads on Uni, correct?

4   A.   A lot of that happened in the fall of 2022.

5         MS. HUANG:   Objection, Your Honor, outside the scope.

6   BY MS. BERDUX:

7   Q.   But it's correct?

8         THE COURT:   Stop, stop.   Two people can't talk at the

9   same time.

10      Okay.   Ms. Huang?

11        MS. HUANG:   It goes beyond the discovery cutoff and

12   Ms. Berdux has been very insistent on that, and I would object

13   to questioning of it.

14        THE COURT:   So I'm going to sustain it because he did

15   say correct when he first answered the question, Ms. Berdux, so

16   you don't need to hammer on this issue.

17        MS. BERDUX:   Okay.

18        THE COURT:   And there was no objection the first time

19   you asked.

20   BY MS. BERDUX:

21   Q.   Do you believe that your social media targets resulted in

22   a majority of new applicants?

23   A.   Yes.

24   Q.   There's no dispute to your testimony that the Sheriff's

25   Office was understaffed in August 2022, the parameter of our

LOMBA - CROSS / BERDUX

1   discussion; fair?

2   A.   Uh-huh.

3   Q.   Oh, is that a yes?

4   A.   Yes, uh-huh.

5   Q.   Sorry.  That's just to clarify for the record later can.

6        But in your testimony it did not become critical until

7   2022?

8   A.   It's always been critical, but what we felt is the

9   department wasn't doing what's necessary.  They weren't

10  marketing correctly.  Job fairs are great.  Doing a lot of

11  them, that's great, but you're primarily promoting the

12  department.  It doesn't produce applications, and that's pretty

13  well known in the law enforcement industry.

14       What we proposed to the department, which they weren't

15  doing -- they were doing generalized advertising, just a

16  blanket advertisement -- we proposed they go after job seekers;

17  security officers, military, veterans, academy graduates and

18  laterals.  And since the department had not done that, amongst

19  ourselves we decided, as a union, to help the sheriff, and we

20  did that.

21            MS. BERDUX:  Move to strike as nonresponsive.

22            THE COURT:  Sustained.

23  BY MS. BERDUX:

24  Q.   The Sheriff's Office has always operated at a deficit of

25  full-time employees back to the days of Michael Hennessey when

LOMBA - CROSS / BERDUX

1   there was a deficit of 50 to 60 full-time employees, right?

2   **A.**   They were at a deficit back then, but not as great as it

3   is during 2022.

4   **Q.**   And from Michael Hennessey to your current sheriff it also

5   fluctuated, the deficit?

6   **A.**   Well, it's increased.   I mean, it's not a fluctuation.

7   It's a drastic increase.

8   **Q.**   And Sheriff Vicki Hennessy became really aggressive in

9   recruiting?

10  **A.**   Is that a question?

11  **Q.**   Yes.   Can you agree that Sheriff Vicki Hennessy became

12  really aggressive at recruiting?

13  **A.**   I wouldn't say real aggressive, no.

14  **Q.**   I'd like to read from page 40 at line 6.

15          **THE COURT:**   Okay.

16  **BY MS. BERDUX:**

17          "**QUESTION:**   How, if you can quantify, how did those

18      deficit numbers change to get to this critical moment

19      where we're at, 164?

20          "**ANSWER:**   Yeah.   So it -- for Michael Hennessey to our

21      current sheriff, it kind of fluctuated, but not too bad.

22      It might have hit 70 to 80, but, you know, Sheriff Vicki

23      Hennessy really got aggressive at recruiting and hiring

24      when she was building it up, but what hit us hard was

25      2020, the hiring freeze for nine months.   That was tough.

LOMBA - CROSS / BERDUX

1     And then losing -- then promoting deputies to sergeant but

2     then losing 25 deputies by the City, yeah."

3     Ending at line 17.

4     And so you agree the hiring freeze in 2020 hit the

5  department hard?

6  A.    Yes.

7  Q.    And losing deputies that refused to get vaccinated?

8  A.    Yes.

9  Q.    But you don't know how many deputies the Sheriff's Office

10  would have onboarded during that time period, although you

11  guessed it was about 60 people?

12  A.    Would have onboarded?

13  Q.    Right.

14  A.    I wouldn't be able to predict that.

15  Q.    Did you estimate it was about 60 people?

16  A.    I don't recall.

17          MS. BERDUX:   I'd like to read from page 41, line 19.

18          THE COURT:   Okay.

19  BY MS. BERDUX:

20     "QUESTION:   Okay.   Yeah.   So you kind of anticipated my

21     next question, which is, you know, the last 10 years is

22     there an average number of deputies that the Sheriff's

23     Office would onboard per year?

24     "ANSWER:   You know, I don't have a yearly study on that,

25     but I would think it would be right around 60, yeah."

LOMBA - CROSS / BERDUX

1          Ending at line 25.

2          So the nine-month freeze would have affected the

3    proportionality in the year of onboarding 60 new hires; fair?

4    A.    I don't know for sure, because the nine-month freeze there

5    was no attempt to recruit.  The sheriff could have -- although

6    the testing, the written testing was stopped, the sheriff could

7    have recruited academy grads and laterals.

8    Q.    Recruiting started to improve in June 2022, right?

9    A.    I don't think so.  Advertising started improving in 2022

10   of June.  That's when they started doing more advertising or

11   began advertising more so than what they did before.

12             MS. BERDUX:  I would like to read from page 42, line

13   1.

14             THE COURT:  Okay.

15   BY MS. BERDUX:

16        "QUESTION:  Okay.  Okay.  You mentioned hiring and

17        recruitment has started to get better recently.  When did

18        that start?  I should say when did you start to notice a

19        difference in the hiring?

20        "ANSWER:  Good question.  Good question.  Ever since I was

21        DSA -- long story short, I guess -- ever since I was DSA

22        president, we've been advocating for more staffing and

23        better recruiting.  I started DSA president in 2018.  In

24        June of 2022 is when we saw recruitment start to improve."

25        The remainder of the answer potentially touches on

```
1    timelines after August 2022.  Permission to end there --

2              THE COURT:  Yes.

3              MS. BERDUX:  -- at line 9?

4              THE COURT:  That's fine.  Yes.  Line 10.

5              MS. BERDUX:  Thank you.

6              THE COURT:  Line 10 --

7              MS. BERDUX:  Yes, line 10.

8              THE WITNESS:  Can I clarify what you stated on the

9    depo?

10   BY MS. BERDUX:

11   Q.    There's no question.  I just read it into the record and

12   move on, but Ms. Huang will have the chance to follow up.

13   A.    Okay.

14             THE COURT:  Ms. Berdux, it's noon now.  Is this a

15   good time for you to stop?

16             MS. BERDUX:  Sure.

17             THE COURT:  Okay.  Let's take a break now, and we'll

18   come back at 12:30, and then we'll go from 12:30 to 2:30.

19   Okay?

20       All right.  We're in recess.

21                  (Recess taken at 12:00 p.m.)

22             (Proceedings resumed at 12:29 p.m.)

23             THE COURT:  All right.  We're back on the record.

24   All the lawyers are present.  The plaintiffs are not, because

25   they have decided not to.  But Melinda had pointed out to me
```

 1  earlier and Sarah pointed out to me earlier and I overrode them

 2  because I thought I had actually admitted -- qualified

 3  Mr. Lomba as an expert, but apparently I did not, and Ms.

 4  Doughty reminded us during the break.

 5      So here are the categories that I understand Ms. Huang had

 6  offered Mr. Lomba as an expert:  The role of members, i.e.,

 7  deputy sheriffs within the Sheriff's Department, the direct

 8  supervision model, the actual staffing levels, the impact of

 9  county staffing levels on something, and I can't read my

10  handwriting on that last category.

11          MS. HUANG:  The county jail of San Bruno.

12          THE COURT:  I'm sorry?  The impact of staffing levels

13  on CJ3 at San Bruno?

14          MS. HUANG:  Yes.

15          THE COURT:  Okay.  Anything else?

16          MS. HUANG:  The impact of the actual staffing levels

17  on the jail's ability to provide programming, cell time,

18  showers, phone, the impact of the jail's lockdown and decrease

19  in out-of-cell time, programming, phone access and so forth on

20  the sworn custody staff's job duties and job safety, and also

21  on the history and development of the Sheriff's Department

22  goals, values and objectives for its custody responsibilities.

23          THE COURT:  Okay.  So here are the areas that I will

24  qualify -- I'm willing to consider:  The role of the deputy

25  sheriffs, the direct supervision model, the actual staffing

 1    levels during the relevant time period, the impact of counting

 2    staffing levels at San Bruno County Jail and on inmates.  I'll

 3    just say impact on the inmates in general and then the goals

 4    and the -- the goals and the rules?  The goals and the rules?

 5          MS. HUANG:  The goals, values and objectives for its

 6    custody's responsibilities.

 7          THE COURT:  The goals, values and objectives of the

 8    San Francisco County Sheriff.  That's what I'm willing to do.

 9       But, Ms. Huang, you've mentioned a bunch of things that

10    I'm not -- they weren't even discussed, and so they are not

11    going to come into --

12          MS. HUANG:  That's fine.

13          THE COURT:  I'm not going to qualify him as an expert

14    on them.

15       Now, Ms. Berdux?

16          MS. BERDUX:  I would just object to the category of

17    expertise on the impact on the inmates.  Mr. Lomba never even

18    worked there.

19          THE COURT:  Okay.  All right.  I'm going to allow it

20    only to the extent that he testified that, generally speaking,

21    it's -- it creates a more difficult working environment.  That

22    was the opinion that he offered, and I would allow that.  And

23    then I'm limiting it to that, because the direct has closed for

24    Mr. Lomba.

25       So he's going to be qualified as an expert on the role of

1   the sheriff's deputies, the direct supervision model, which is

2   related to the impact of staffing levels on the inmates, i.e.,

3   their relationship with the correctional officers, the actual

4   staffing levels and the goals, values and objectives of the

5   Sheriff's Department.  Those are the areas on which I'm

6   qualifying Mr. Lomba as an expert.

7            MS. HUANG:  Thank you.

8            THE COURT:  Okay?  All right.  And my apologies for

9   missing that.  I thought I had dealt with it earlier.

10       All right.  We were in the middle of cross-examination

11  with Mr. Lomba.  You can come on up and we'll continue with

12  that.  Thank you.

13       And you are still under oath, Mr. Lomba.

14  BY MS. BERDUX:

15  Q.   Now we're at afternoon.  Good afternoon.

16  A.   Good afternoon.

17  Q.   We left off about -- talking about when the recruitment

18  efforts began.  And following up on that, recruitment efforts

19  began, in part, because the department had 75 full-time

20  employee slots that they were able to fill; is that right?

21  A.   Could you repeat the question?

22  Q.   Sure.

23  A.   I don't quite understand what you're --

24  Q.   Yeah.  Let me ask it this way:  The recruitment efforts

25  began or ramped up in 2022, in part, because the Sheriff's

LOMBA - CROSS / BERDUX

 1    Office had 75 full-time employee slots that they were able to

 2    fill, FTEs?

 3    A.    I wouldn't necessarily -- they ramped up just because of

 4    that.   They also ramped up because the sheriff went around and

 5    gave the opportunity of every deputy sheriff to speak with him

 6    for at least 15 minutes about issues, you know, within the

 7    facilities, and staffing is a huge priority.   The drafting is

 8    very exhausting on the deputies, and they brought that to his

 9    attention.

10         And also, from our union, we've been, you know,

11    advocating, you know, to the sheriff to ramp it up as well.

12    Q.    And he got 75 full-time employee slots to fill?

13    A.    You're saying from the Mayor's Office 75?   Okay.

14    Q.    That's right.

15    A.    Okay.

16    Q.    So he received 75 full-time employee slots that he was

17    able to fulfill?

18    A.    From what I understand, it's 75 deputy positions.

19    Q.    Yes.

20    A.    Right.

21    Q.    Great.   And those positions are controlled or have to be

22    offered, I should say, or allowed by the Mayor's Office?

23    A.    Oh, I see what you're saying.   Okay.

24         So how the process works is, the Sheriff's Office has a

25    budget, and they also -- it's known as -- so the money given to

LOMBA - CROSS / BERDUX

1   them is the funded budget.  So there's the written budget and

2   the funded budget.  So they get funded.

3        Now, they're funded for the vacancies.  So the 75

4   positions you're talking about, the FTE requisites, were clear

5   to hire immediately.

6        Now, traditionally, you know, with the process and with

7   the process of the controller, sometimes the requisitions are

8   slowed down.  Well, they gave them basically, the Sheriff's

9   Department, the ability to fill them immediately with no

10  slowdowns, basically.

11  Q.   And that came from the Mayor's Office approval?

12  A.   I believe so.  And -- but when it comes to positions,

13  they're funded to fill the vacancies.  It's in the budget.

14  Those vacancies are funded.

15  Q.   Let me talk about some application issues.

16       Only 2 out of every 15 applicants make it through the

17  background checks stage before they can be hired, right?

18  A.   I don't believe that's my statistic.  I'm not sure.

19  Q.   I'd like to read from page 44, beginning at line 13.

20       THE COURT:  Okay.

21  BY MS. BERDUX:

22  Q.   It's volume 1:

23       "QUESTION:  Do you have any information about how many of

24       the applicants -- how many applicants are actually

25       qualified to begin training?

LOMBA - CROSS / BERDUX

1    "ANSWER:   The information I do have, you know, came from

2         one of the background investigators who I believe they

3         just have a general or rough percentage, and his

4         percentage was 2 out of every 15 backgrounds."

5         Ending at line 19.

6    A.   Okay.   I agree that, too, to be a rough estimate.

7    Q.   And even before an applicant gets to the background check,

8    they first have to apply, then take a written exam and take a

9    physical agility test and have an oral interview, right?

10   A.   Yes.

11   Q.   And you don't know the number of applicants that make it

12   to actual hiring from the beginning of the application process?

13   A.   I don't have those statistics right now.

14   Q.   You talked a little bit about a nationwide narrative, but

15   you did agree at your deposition that there is a nationwide

16   staffing shortage in corrections, right?

17   A.   In law enforcement, yes.   But we are subpar to that.

18   Q.   And the office, the Sheriff's Office, has never operated

19   at 100 percent staffing?

20   A.   Yeah, correct, as far as I know.

21   Q.   I'd like to move on to a few questions about COVID.   COVID

22   impacted staffing shortages at CJ3, didn't it?

23   A.   Yes, it did.

24   Q.   And when COVID peaked in the community, it would also

25   affect deputies, right?

1   **A.**   Yes.

2   **Q.**   And deputies who caught COVID -- deputies caught COVID in

3   proportional numbers to the public, who also caught COVID,

4   right?

5   **A.**   I don't know about that statistic.

6          **MS. BERDUX:**   I'll read from page 175, it's volume 2,

7   beginning at line 4.

8          **THE COURT:**   Hang on.  What page again?

9          **MS. BERDUX:**   175.

10         **THE COURT:**   Okay.

11  **BY MS. BERDUX:**

12         "**QUESTION:**   And I assume that tracked with the peaks of

13     COVID numbers in the Bay Area, right?   Membership caught

14     COVID in -- you know, proportional to COVID numbers in the

15     community, right?

16     "**ANSWER:**   I believe so.   I think the peak, if I remember

17     right, was in the fall."

18     Colloquy omitted with permission?

19         **THE COURT:**   Yes.

20  **BY MS. BERDUX:**

21  **Q.**   So ending at line 9 and picking back up at line 18,

22  continuing answer:

23     "**ANSWER:**   I believe, if I remember right, the peaks

24     were -- it was in December, it was the winter months, and

25     then I think it was the spring, if I remember right.

LOMBA - CROSS / BERDUX

1        There were a couple of peaks."

2        Ending at line 21.

3        And so to confirm, there were at least two to three peaks

4   of COVID that you recall in the Bay Area?

5   **A.**   I don't recall.   I don't remember.

6              MS. BERDUX:   Reading from page 175, line 23.

7   BY MS. BERDUX:

8        "QUESTION:   You identified two peaks.   Were there more

9        than two, do you know?

10       "ANSWER:   It could have been two to three.   I don't know

11       if there's more than that."

12       Ending at page 176, line 1.

13       Your deputies followed the public health guidelines to

14   stay home from work during periods of infection with COVID,

15   right?

16  **A.**   Yes.

17  **Q.**   And those instructions to stay home from work came from

18   the Department of Public Health, Human Resources and the

19   Sheriff's Office, right?

20  **A.**   Yes.

21  **Q.**   I'd like to talk a little bit about security issues and

22   the closing of County Jail 4.

23       One of the items that you believe contributed to deputy

24   morale is the closure of County Jail 4 in 2020, because it was

25   a maximum security facility; fair?

LOMBA - CROSS / BERDUX

1    A.    Okay.

2    Q.    And that's because the population of inmates does not

3    include as many misdemeanants or minimum security inmates but,

4    instead, a majority with felonies, 245s and above, right?

5    A.    Uh-huh.

6    Q.    Is that a yes?

7    A.    Yes, uh-huh.

8    Q.    And one of the maximum security features that you

9    identified as lacking down at San Bruno is a handcuff port that

10   might work to prevent some attacks on deputies that you know

11   have occurred?

12   A.    Yes.

13   Q.    And when you say "high risk," you mean administrative

14   separation inmates?

15   A.    Yes.

16   Q.    I'm going to ask you a little bit about the population

17   changes.   The population change -- excuse me.

18        The population of incarcerated persons now includes people

19   charged with more serious crimes, right?

20   A.    Yes.

21   Q.    And that started with realignment, also known as AB109?

22   A.    I don't think it really started with realignment with us.

23   We didn't have a huge impact with the realignment.

24   Q.    And can you tell me what a 245 means?

25   A.    Generally, it's assault with a deadly weapon or aggravated

1  assault.

2  Q.   And the City has tried to reduce the jail population by

3  putting people on ankle monitoring instead, right?

4  A.   Yes.  Really over the years they tried to reduce it in

5  many ways.

6  Q.   I have a question about senior deputies, a few, sorry, not

7  a question.

8       You initially had a complaint that the Sheriff's Office

9  was no longer filling senior deputy positions, right?

10 A.   Yes.

11 Q.   But your expectations, at least in July of last year, was

12 that those roles would again begin being offered, right?

13 A.   Of last year?  Of this year.

14      We've been advocating for the return of the senior deputy

15 in their testing for quite sometime.

16 Q.   But you don't know if the senior deputies were used at

17 County Jail 3, because you didn't know where they were posted?

18 A.   There are -- I'm aware of right now -- well, during that

19 time period there were more than one senior deputy at CJ3.

20          MS. BERDUX:  I'd like to read from page 60, line 4,

21 volume 1.

22          THE COURT:  What page?

23          MS. BERDUX:  Sixty.

24          THE COURT:  Sixty you're on?

25          MS. BERDUX:  Sixty.

1    **THE COURT:**  Okay.

2        **THE WITNESS:**  I don't have the exact number.

3        **THE COURT:**  Okay.

4    BY MS. BERDUX:

5    **Q.**   Okay.  Beginning at line 4:

6        "**QUESTION:**  Okay.  And the Sheriff's Office doesn't

7    operate at the county jails.  Obviously they're also --

8    just at the county jails.  Obviously they're also at the

9    courts, the hospital, right, kind of all over the place.

10   Was there ever an allocation of senior deputies to

11   different -- what's the right word -- to different

12   postings?

13   "I think the Sheriff's Department has --

14       **THE COURT:**  Answer.  Answer.

15   BY MS. BERDUX:

16       "**ANSWER:**  I think the Sheriff's Department has -- I would

17   say they have a list of where the senior deputies are, and

18   they do have some positions that are allocated for senior

19   deputies directly, but I don't have that.  I don't have

20   those numbers with me."

21   And you don't know whether there was ever a specific

22   number of senior deputies assigned to county jails, right?

23   **A.**   There is a chart.  There is a document.  I believe I sent

24   it to you.

25   **Q.**   You don't know that.  You didn't know it when you gave

LOMBA - CROSS / BERDUX

1   deposition testimony?

2   A.   I gave you the documents.

3   BY MS. BERDUX:

4   Q.   I'd like to read from page 63, beginning at line 8:

5        "QUESTION:  But my question was different than the one

6        Ms. Huang rejected.  Do you know if there were ever a

7        specific number of senior deputies assigned to county

8        jails?"

9        Colloquy -- is it okay to omit that?

10           THE COURT:  Yes.

11           MS. BERDUX:  Excuse me.  Exclude that.

12   BY MS. BERDUX:

13   Q.   Then the question ends at line 11 and picks back up,

14   answer at line 15:

15        "ANSWER:  You know, I think there was, but I don't have

16        that information."

17        Ending at line 16.

18   A.   Yeah.

19           THE COURT:  Thank you.

20   BY MS. BERDUX:

21   Q.   But the phasing out of the senior deputy role at first did

22   actually result in hiring more Sheriff's Departments, didn't

23   it?

24   A.   Not proportionally to the value of the FTE.  So the funded

25   value of a senior deputy was, I believe, split in half, and

1   half went to fund sergeants, the other portion went to fund

2   deputies.

3        We also later found out that some of the senior deputy

4   funding went to fill a civilian position.  It was Nancy

5   Crowley's at the time.  And I'm not sure if it was PIO or what

6   her position was at the time; chief of staff, maybe.

7          MS. BERDUX:  Move to strike as nonresponsive.

8          THE COURT:  Sustained.

9          MS. BERDUX:  I'd like to read from page 93, beginning

10  at line 11.

11         THE COURT:  Why don't you ask the question again, and

12  then you can do that --

13         MS. BERDUX:  Sure.

14         THE COURT:  -- if it's impeachment.

15  BY MS. BERDUX:

16  Q.   The phasing out of the senior deputy role resulted in the

17  hiring of more sheriff's deputies, didn't it?

18         THE COURT:  And so, Mr. Lomba, I had -- I struck your

19  answer because you didn't answer the question, so can you

20  answer that question?

21         THE WITNESS:  Okay.  It did increase funding to hire

22  senior deputies, but, overall, we lost positions because the

23  funding was split to fund sergeants as well.

24         MS. BERDUX:  Move to strike and permission to read

25  from the deposition at page 93, line 11 through 15.

1          THE COURT:  I'm not going to strike it.  You can read

2    the pages.

3    BY MS. BERDUX:

4    Q.    Beginning at line 11:

5          "QUESTION:  Did the phaseout of the senior deputy role

6          result in having a few more deputies, sheriffs deputies?

7          "ANSWER:  It didn't increase the amount of deputy FTEs

8          overall, but they did spend some of the money to hire

9          deputies to fill the vacancies."

10         Ending at line 15.

11         You communicated with Ross Mirkarimi to help prepare him

12   for his report?

13   A.    I did communicate with him, yes.

14   Q.    And you communicated by email?

15   A.    Yes.

16   Q.    And you set up an email account to communicate with him?

17   A.    I had an email account, and I communicated with him, yes.

18   Q.    And did you begin those communications around August 25th,

19   2022?

20   A.    You know, I don't recall.  It was awhile ago.

21   Q.    If I had a copy of that email, would that refresh your

22   memory?

23   A.    Sure.

24         MS. BERDUX:  All right.  If you turn to the second

25   page, please.

LOMBA - CROSS / BERDUX

1      **THE COURT:**  Why don't you ask the question?

2    **BY MS. BERDUX:**

3    **Q.**  Does this refresh your memory?  I'll refer you to the

4    second page of the document that you began communications with

5    Mr. Mirkarimi on August 25th, 2022, by email.

6    **A.**  Yes.

7    **Q.**  And does this -- and you had a few, I should say, yeah, a

8    few exchanges by email on August 25th, 2022, between you and

9    him, right?

10   **A.**  Well, let me see what you have in the document.

11       Yes.

12   **Q.**  And you gave him a bunch of numbers and statistics in

13   response to his request for those, right, staffing numbers,

14   information from rank reports?

15   **A.**  I did answer some questions, yes.

16   **Q.**  And those communications continued on August 31st, 2022 --

17   do you remember that? -- by email, I should say.

18       You don't have the document in front of you, but if that

19   would help, I can offer it to you to review.

20   **A.**  Yeah.  That would be great, if you can.

21   **Q.**  Sure.

22   **A.**  I don't have the specific dates.

23   **Q.**  Does this refresh your memory that you had some email

24   communications with Ross Mirkarimi on August 31st, 2022?

25   **A.**  Yes, uh-huh.

1    Q.   And a few of these back-and-forth communications you

2    provided information regarding the phasing out of senior

3    deputies to Mr. Mirkarimi, right?

4    A.   I did talk about the senior deputies, yes.  Could you

5    point to where the phasing out is?  Oh, I see it.  Yes.

6    Q.   Sure.  That was on the third page, actually?

7    A.   Yep.

8    Q.   And he asked you what your theory was about the phasing

9    out of senior deputies, right?

10   A.   Yes.

11   Q.   And you told him:  "As a business decision it's a bad

12   idea.  It's a bad for the union at this time.  It reduces my

13   membership.  But for the individual employee, it's beneficial

14   as an increased promotional opportunity with a higher

15   retirement payout."

16       That's what you told him about the position, right, the

17   phasing out of senior deputies?

18   A.   Yes.

19   Q.   And he also asked you how the phasing out of senior

20   deputies would affect direct supervision at CJ3, right?

21   A.   Yes.

22   Q.   And you told him, "Direct supervision will always carry on

23   with deputy sheriffs.  Direct supervision can be reinstated by

24   returning the deputies in the pods, not isolated in a tower

25   with poor visibility"?

**LOMBA - CROSS / BERDUX**

1    **A.**   Right.  Correct.

2    **Q.**   Great.

3         And you also had some communications with Mr. Mirkarimi by

4    email on September 1st, 2022, right?

5    **A.**   Do you have a copy of that?

6    **Q.**   I do.  Would you like a copy?  Would that refresh your

7    memory?

8    **A.**   Yes.

9    **Q.**   And on September 1st, 2022, Mr. Mirkarimi asked you what

10   your suggestions were for how you could make the outdoor annex

11   space at San Bruno accessible for inmates' use, right?

12   **A.**   Yes, uh-huh.

13   **Q.**   Are you aware that Mr. Mirkarimi was paid $10,000 to

14   prepare a report that he submitted the day after September 1st,

15   2022, that lifted the information that you gave him?

16   **A.**   I don't remember any of that, discussing any dollar

17   amounts or anything like that.

18   **Q.**   Let me ask you about the crow's nest.

19        The Sheriff's Office did test a new staffing point to have

20   just one deputy in that crow's nest, the observational area

21   upstairs in the middle of the pod, right?

22   **A.**   Right, uh-huh.

23   **Q.**   And that was only a test pilot program that was tried in

24   one pod, right?

25   **A.**   Right.

1  **Q.**   And it ended?

2  **A.**   Yes.

3  **Q.**   You've confirmed that the Sheriff's Office has a staffing

4  shortage, right?

5  **A.**   Yes.

6  **Q.**   And in the midst of this staffing shortage, you engaged

7  with SFPD on Twitter to try to get the Sheriff's Office to post

8  people at the airport in addition to the other duties that the

9  Sheriff's Office has?

10 **A.**   I did, and I proposed it to the sheriff.  And when I made

11 that proposal to the sheriff, it included that he has to hire

12 up and follow the hiring process that the airport has in the

13 SFPD MOU, which is -- and does not affect the current staffing,

14 because which is, it states, that the airport will fund part of

15 the testing, will pay for the academy and pay for the FTE in

16 full, separate and apart from the budget.

17          **MS. BERDUX:**  Thank you.  No further questions.

18          **THE COURT:**  Okay.  Redirect?

19                    <u>**REDIRECT EXAMINATION**</u>

20 **BY MS. HUANG:**

21 **Q.**   Now, Mr. Lomba, there were some discussions that you had

22 with Ms. Berdux about recruitment, and I want to go back on to

23 that subject.

24          I believe that in 2022, did your union have some

25 significant efforts to help with recruitment?

LOMBARDI - REDIRECT / HUANG

1   **A.**   Yes.   Yes.

2   **Q.**   And did that start in the early part of the year, or maybe

3   I should start with do you remember when that effort really

4   started in 2022?

5   **A.**   We started in the fall of 2022 to help with advertisement

6   recruiting.   We have always advocated and provided, you know,

7   suggestions, research and analysis to the sheriff to improve

8   recruiting and hiring and the hiring process.

9   **Q.**   Were you really advocating that the sheriff take a more

10  assertive stance in doing recruiting?

11  **A.**   Yes.

12  **Q.**   And that was before you were even -- before you even

13  started the help with the advertising?

14  **A.**   Going all the way back to 2018 when I started as DSA

15  president, we have advocated and brought up, you know,

16  recruitment, hiring problems, staffing issues and advocated for

17  an increase in staffing.

18  **Q.**   I'd like to -- I'll show you what's been marked as

19  Exhibit 63.   Is Exhibit 63 one of your efforts to bolster

20  recruiting?

21  **A.**   If you could scroll down a little bit.

22          **THE COURT:**   You really do need a hard copy.   You just

23  can't do it on the screen like this.

24          **MS. DOUGHTY:**   I know.   I'm trying to get it.

25          **THE COURT:**   So I sustained the ruling, the objection

1    to this particular document, so are you going to try to

2    introduce it into evidence?

3            MS. HUANG:  I am.  I believe that Ms. Berdux opened

4    the door on this.

5            THE COURT:  Okay.  I'll hear him out.  Why don't you

6    lay the foundation, and then I'll hear the question.

7            MS. HUANG:  It's 63, sir.

8            MS. BERDUX:  Your Honor, should I state my objection?

9    Currently I don't believe this opened the door to anything.

10           THE COURT:  So one of the complaints about this

11   document was that it was a couple of different things attached,

12   or is it just -- how many pages are in this document?

13           MS. HUANG:  I believe this document is three.

14           THE COURT:  Okay.  All right.

15           MS. BERDUX:  This is not -- this is from the DSA,

16   though, and is not a Sheriff's Office document.

17           THE COURT:  Correct.

18           MS. BERDUX:  And we objected that this was not

19   produced in the course of discovery.

20           THE COURT:  It was not.

21           MS. HUANG:  It was produced as part of Sheriff

22   Mirkarimi's production to you for his expert witness.

23           THE COURT:  And yet, he's not the one testifying

24   about it.  If he were testifying about it, it would be one

25   thing, because he relied upon it, but it's not part of his

1    testimony.  So let me see where this goes.

2         You can renew your objection, Ms. Berdux.  I want to hear

3    more about it, and then you can renew your objection.

4    BY MS. HUANG:

5    Q.   Mr. Lomba, even before Sheriff Miyamoto took office, were

6    you encouraging and urging him to increase recruitment?

7    A.   Yes.

8    Q.   And is Exhibit 63 an example of your efforts to get the

9    sheriff to increase recruitment?

10   A.   Yes.

11   Q.   And was the staffing levels an issue even before Sheriff

12   Miyamoto took office?

13   A.   It was.

14   Q.   And you gave him very specific suggestions of how he could

15   improve recruitment and hiring?

16   A.   Yes.

17   Q.   And that's what this letter is?

18   A.   Yes.

19        MS. BERDUX:  I'd like to move this into evidence,

20   Your Honor.

21        THE COURT:  Okay.  It's also hearsay.  And what's the

22   hearsay exception?  That was one of the objections listed on

23   the chart, hearsay.

24        MS. HUANG:  It is --

25        THE COURT:  And double hearsay.  There's double

1    hearsay in it.

2              MS. HUANG:  It's for the issue of notice, Your Honor,

3    that notice was provided, and it's to -- not for the specific

4    details of the information, but it was that the concern was

5    communicated.

6              MS. BERDUX:  He's already testified to that.  He

7    doesn't need a document.

8              THE COURT:  Yeah.  We don't need the document.  I'm

9    excluding the document from evidence.

10        Mr. Lomba has testified at length about his numerous

11   efforts to increase staffing in the Sheriff's Department.  I've

12   heard it.  I understand it.  This document is not necessary,

13   and it still is hearsay.

14   BY MS. HUANG:

15   Q.   And these efforts that you had to encourage --

16             THE COURT:  Please take it down.

17   BY MS. BERDUX:

18   Q.   -- the sheriff to increase recruitment was consistent,

19   correct?

20   A.   Yes.

21   Q.   And you did it frequently?

22   A.   Yes.

23   Q.   And you wrote to the sheriff?

24   A.   Yes.

25   Q.   And you emailed the sheriff?

1    **A.**   Yes.

2    **Q.**   And you called the sheriff?

3    **A.**   Yes.

4    **Q.**   And you spoke to him when you saw him?

5    **A.**   Yes.

6              **MS. BERDUX:**  Objection, leading.

7              **THE COURT:**  Sustained.

8    BY MS. HUANG:

9    **Q.**   And finally, in 2022, did you -- did you and the Sheriff's

10   Association decide that you were going to take affirmative

11   action yourself?

12   **A.**   Yes.

13   **Q.**   And you took affirmative action yourself by --

14             **MS. BERDUX:**  Objection, leading.

15             **THE COURT:**  Sustained.

16   BY MS. HUANG:

17   **Q.**   What affirmative action did you take?

18             **MS. BERDUX:**  And objection, outside the scope of the

19   current conditions.  I believe Mr. Lomba described fall of 2022

20   efforts after August --

21             **THE COURT:**  I'll allow it, but move on, Ms. Huang.

22   BY MS. HUANG:

23   **Q.**   What were the efforts that you took in 2022 up to August?

24   **A.**   Well, like we're talking, all the past attempts to get the

25   Sheriff's Department to recruit more and so forth and the

1   analysis we've done and the research we've done that we've

2   provided, you know, to the Sheriff's Office.  We, you know,

3   amongst the board, we decided, you know, these steps weren't

4   being taken, so we were going to do it and show them, show them

5   how to do it, show them how -- and also, to see if it was

6   successful.

7        So what we did was, we started off with advertising the

8   sheriff's recruitment video, the December video.

9        And then we noticed that we were getting -- and we -- when

10  we advertised that, we linked that to the sheriff's recruitment

11  page.  And then we noticed that we were getting some views, and

12  we were getting some click-throughs, but we weren't satisfied

13  with that.

14       So then we tested out a different ad, and we used an

15  image, and the image went to the sheriff's recruitment page

16  with the video.  So we got better results with that.  We got

17  more traffic driven to the recruitment page with the video.  So

18  we were happier with the results on that.

19       And what we did was, we targeted on social media to the

20  San Francisco Bay Area and we targeted -- we attempted to

21  target, like, security officers and veterans and, you know,

22  people in the Bay Area to be more of a niche target, and we saw

23  results.

24       We saw increase in traffic to the recruitment page.  We

25  had good comments and then we wanted to improve upon it and

LOMBARDI - REDIRECT / HUANG

1   take it to another level, so then we created a lead capture

2   page, and that had an image, information, and we felt that

3   there was a missing component in recruiting, and we added what

4   we felt was the missing component.

5       And we basically said to the job-seeker that, you know,

6   we'll help you through the process.  We'll take you by the hand

7   and help you through the process.

8       So we provided them, you know, motivation via email.  We

9   explained the benefits, the wages, the medical benefits, so

10  forth, retirement a little bit.

11      And then we also provided them practice tests and tips,

12  which we felt the Sheriff's Department wasn't doing.

13      The Sheriff's Department had a practice test for the

14  physical agility, but they didn't have it for the oral board

15  and the written.  And their failure rate at the oral board was

16  pretty high, so we provided tips in there.

17      And then we also gave them, in advance, a blank background

18  packet, if you will, a personal history questionnaire and the

19  medical history questionnaire so they knew what it said, what

20  to fill out.

21      And we also, in the emails, let them know what documents

22  you need in advance to prepare, because you need specific

23  documents.  You need certified birth certificate, certified,

24  you know, school transcripts and so on.

25      So we did a lot of preparatory work, and we provided that

1    to them too.   And that, we felt, was pretty successful.

2         And then as we were advertising that and getting those

3    leads, we also did some advertisements on some specific

4    job-seeker page -- pages like Indeed.   And then when we were

5    doing that as well, we were able to establish, you know, a

6    database, if you will, a database of leads.

7         And then we directed our database of leads from Indeed to

8    our lead capture page with our auto-responder and information,

9    and we also took as many of the -- in the database, as many

10   phone numbers as we had, and we started an SMS campaign, a

11   group, an SMS group.   And then we would send them text

12   messages, and we would remind them of when the tests are, when

13   the application deadlines are, and we just connected with them.

14   And, you know, we did that for several months, and we ended up

15   stopping past this, you know, after 2022.

16   Q.   And was the sheriff doing any of this before the Sheriff's

17   Association took the initiative?

18              MS. BERDUX:   Calls for speculation.

19              THE COURT:   Do you know?   Why don't you lay the

20   foundation.

21   BY MS. HUANG:

22   Q.   Do you know what the recruitment effort of the sheriff was

23   before you -- before the Sheriff's Association undertook

24   this -- these -- all these efforts that you've described?

25   A.   Yes.   From what I was told, that there had been a lot of

1  job fairs.

2          MS. BERDUX:  Hearsay.

3          THE COURT:  Sustained.

4  BY MS. HUANG:

5  Q.   Do you know whether or not the sheriff was providing

6  support to help recruits navigate the system the way you

7  described?

8  A.   Not the way we described.

9  Q.   Do you know whether or not the sheriff had linked

10 electronic communications, through texting and through web

11 pages and through Facebook?

12         MS. BERDUX:  Calls for speculation.

13         THE WITNESS:  Not the way we did it.

14         THE COURT:  Overruled.

15     She's asking him if he knows.

16     Technically, the answer is, yes, I know; and then you're

17 supposed to say, what was it, what's the answer?  But I'm

18 smushing them into two and allowing you to do that.

19     Mr. Lomba, don't answer any question -- she's asking you

20 do you know.  If you don't know, you have to say, "I don't

21 know."  Okay?

22         THE WITNESS:  Yes, I know email and phone.

23 BY MS. HUANG:

24 Q.   And is this effort that you describe the Sheriff's Office

25 of using, the recruiting methods that you've described, was

LOMBARDI - REDIRECT / HUANG

1   that -- what was your purpose for doing that?

2   **A.**   To increase applicants and hires, to increase the amount

3   of deputies being hired.

4   **Q.**   And was this also to model for the sheriff what you

5   thought would be a successful recruiting effort?

6   **A.**   Yes.

7   **Q.**   And was that recruiting effort that you described

8   successful?

9              **MS. BERDUX:**  Calls for speculation.

10             **THE COURT:**  Overruled.

11  **BY MS. HUANG:**

12  **Q.**   Do you know?

13             **THE COURT:**  Why don't you find out if he knows?

14             **THE WITNESS:**  Yes.

15  **BY MS. HUANG:**

16  **Q.**   Do you know how many recruits you were able to send over

17  to the sheriff?

18  **A.**   I don't have that data specifically, but I do know they

19  have a huge backlog in background investigations right now, so

20  I believe our efforts significantly helped that.

21  **Q.**   And the backlog is due to the fact that they have a number

22  of recruit applicants?

23  **A.**   Yes.

24  **Q.**   Now, in addition to the recruiting efforts that you just

25  testified about, did you also take other efforts to help the

1    Sheriff's Department, such as, perhaps, consultants?

2              MS. BERDUX:  Objection.

3              THE COURT:  Ms. Huang, let me just make a general

4    observation.  You know, we just talked about what Mr. Lomba's

5    qualifications as an expert witness are, and recruiting is

6    nowhere in that list that you provided to me earlier today, not

7    even in your overall list.  So, technically, he's not qualified

8    to talk about this, and I've heard a lot about it.  I actually

9    don't need to hear any more about the recruiting.  I think I

10   get the picture.  I understand.

11             MS. HUANG:  Okay.

12   BY MS. HUANG:

13   Q.   Now, in terms of the crow's nest, do you remember when the

14   decision came down to eliminate the crow's nest?

15   A.   I don't remember the exact day or date.

16   Q.   Okay.  I'm going to show you a document and ask you if it

17   refreshes your recollection.

18        I believe it's document 68, and it's in the binder in

19   front of you, if you would pull that up and take a look.

20        I would direct your attention to the second paragraph on

21   the first page and see if that refreshes recollection.

22             THE COURT:  Okay.  He hasn't established -- has he

23   established that he doesn't remember?  You can only refresh

24   someone's memory if he says I don't remember.

25             MS. HUANG:  Yeah, I believe he did.  He didn't

LOMBARDI - REDIRECT / HUANG

1    remember when that happened.
2            THE COURT:  Okay.  You're trying to figure out when
3    the date is.  Okay.  That's fine.
4            THE WITNESS:  You were looking for the implementation
5    date or --
6    BY MS. HUANG:
7    Q.   That's right.
8    A.   Yep.  So June -- in or on around June 2022.
9    Q.   And once you found out that he intended to implement the
10   crow's nest pilot program, what -- what was your reaction to
11   it?
12   A.   Well, we weren't happy with it and we sent him, you know,
13   a cease-and-desist letter, you know, on it.
14   Q.   And what were the problems that you felt having the crow's
15   nest would create for housing units and housing unit deputies?
16   A.   Well, we felt that it was a very big safety issue, because
17   having the deputy in the crow's nest removed them from, I
18   guess, the general area of the pod.
19        And there was a lot of visual issues of trying to see in
20   some of the rooms to check on inmate safety.  They even gave
21   the deputies binoculars to try to assist with that.
22        And the deputy in the crow's nest technically really
23   couldn't do rounds as it was described in policy and how we
24   were trained to do -- to do it.
25   Q.   And was there also concern that you had about the impact

LOMBARDI - REDIRECT / HUANG

1    on inmates?

2    A.   Yes.  Uh-huh.

3    Q.   And what was that impact?

4    A.   Well, that they were locked inside in their cells for long

5    periods of time.

6    Q.   And was there a concern that that would lead to more

7    inmate aggression?

8    A.   Yes.

9    Q.   And possible injuries and hospital runs?

10            MS. BERDUX:  Objection, leading.

11            THE COURT:  Sustained.

12   BY MS. HUANG:

13   Q.   Would that have led to other consequences?

14   A.   Yes, it would have.

15   Q.   And what were those other consequences?

16   A.   Well, keeping them locked inside for long periods of time

17   would increase stress, anxiety, you know, could create

18   combative situations where there were -- and I believe there

19   were multiple fights, you know, during that period, but it

20   would increase hospital runs, it would increase injury to other

21   inmates, increase injuries to deputies as well.

22   Q.   Was there also a concern about the availability or the

23   response time of deputies to what was happening on the floor?

24            MS. BERDUX:  Objection, leading.

25            THE COURT:  Sustained.

```
 1                THE WITNESS:   Yes, there was.
 2                THE COURT:   Sustained.   You can't answer the question
 3      if I say sustained.
 4                THE WITNESS:   Oh, I'm sorry.
 5      BY MS. HUANG:
 6      Q.    Did you have any other response -- concerns about the
 7      crow's nest?
 8      A.    If I could review the document, I think I --
 9      Q.    Sure.  Why don't you take a look at page 2.
10      A.    Yeah.  I think I covered a large amount of them.
11            In addition would be, you know, fewer deputies to respond
12      because it was, you know, a reduction, you know, in that pod as
13      well, less walk times also.
14      Q.    Now, there was also a question from Ms. Berdux with regard
15      to the nationwide shortage of applicants for peace officer
16      positions.   Do you recall that?
17      A.    Yes.
18      Q.    And you had a comment that you wanted to offer.   Do you
19      remember what that comment was?
20      A.    Oh, I do, yes.
21            So, you know, law enforcement, due to the nationwide
22      narrative, has been affected morale-wise, but the Sheriff's
23      Office recruiting and hiring is far below the cause of that.
24      Our recruiting and hiring is subpar in addition to the
25      narrative.   We should not have this low of staffing.
```

 1           MS. HUANG:  Thank you.  I have no further questions.

 2           THE COURT:  Recross?

 3           MS. BERDUX:  No.  Thank you.

 4           THE COURT:  Okay.  Is this witness excused?

 5           MS. HUANG:  Yes.  Thank you, Mr. Lomba.

 6           THE COURT:  Okay.  I have a couple of questions.

 7           THE WITNESS:  Sure.

 8           THE COURT:  And again, I'll see if people want to

 9    object.  I'm not offended if you want to object.

10        So Mr. Lomba, you're not currently employed by the

11    San Francisco County Sheriff's Department; is that correct?

12           THE WITNESS:  Well, so the way it works out

13    contractually, I am.  I'm a deputy sheriff --

14           THE COURT:  Oh, okay.

15           THE WITNESS:  -- detailed to the union.  The

16    Sheriff's Department pays for a portion, you know, of my wages

17    and then the DSA pays the rest.

18           THE COURT:  I see.  Is that part of the collective

19    bargaining agreement?

20           THE WITNESS:  Yes.

21           THE COURT:  Got it.  Okay.

22        How much does a beginning deputy sheriff, entry level,

23    make?

24        Oh.  And, I'm sorry, did anyone object to that question

25    about his employment?

1          MS. BERDUX:  No.

2          MS. HUANG:  No, Your Honor.

3          THE COURT:  Okay.

4          THE WITNESS:  That's a good question.  We've had a

5   couple raises recently.  I believe it's -- it's right around --

6   it might be up to $42 an hour right now, right around there.

7          THE COURT:  Okay.  What was -- any objections to

8   that?

9          MS. BERDUX:  No.

10          THE COURT:  Okay.  And what was it before?  You said

11   a couple of raises.  What was the lower point?

12          THE WITNESS:  Are you referencing the problem with

13   the pay --

14          THE COURT:  Yeah.

15          THE WITNESS:  -- when I brought that up?

16          THE COURT:  Yeah.

17          THE WITNESS:  So what was happening was, an academy

18   graduate or a lateral, per our contract, the sheriff could hire

19   them at a higher step, because they already completed training.

20   Instead of starting at the first step and going through the

21   academy, these applicants already completed it, and that's a

22   savings to the department.

23      The past history of the department is to pay them at a

24   higher step, usually like Step 2 if they're laterals, a lot of

25   experience, maybe a Step 3.  And to do that, you would send a

 1    letter, you know, to the sheriff, list your training and

 2    experience, and then they give you a pay increase.

 3         I hate to say it.  Unfortunately, under Sheriff

 4    Miyamoto -- we had academy graduates and laterals coming over

 5    at Step 1, and when they would send a letter in with their

 6    experience, their training, they were not getting an increase.

 7    And as a union, you know, we brought that up, advocated and

 8    fought for it.  And it took quite some time, but eventually we

 9    got it.

10         So now our end result, if they're an academy graduate,

11    they'll start at second step.  If they're lateral, they have a

12    possibility of second or third step.

13              THE COURT:  I work for the government.  I understand

14    the step system.

15         Any objection to that question?

16              MS. BERDUX:  No.

17              MS. HUANG:  No, Your Honor.

18              THE COURT:  Okay.  When people are working overtime,

19    do they get additional pay?  Do they get time-and-a-half pay?

20              THE WITNESS:  Yes, they do.

21              THE COURT:  Under the terms of the agreement?

22              THE WITNESS:  Yes.

23              THE COURT:  Okay.  Any objection to that question?

24              MS. BERDUX:  No.

25              MS. HUANG:  No, Your Honor.

1          THE COURT:  Okay.  All right.  That's all I have.

2  Thank you.

3          THE WITNESS:  Thank you.

4          THE COURT:  All right.  Mr. Lomba, you can step down.

5      (Witness excused.)

6          THE COURT:  Okay.  Let me just tell you that I'm a

7  little puzzled by the fact that Mr. Lomba is testifying as an

8  expert, because I didn't hear a lot of opinions in his

9  testimony.

10      He gave a lot of factual background about what happened

11  during the course of his dealings as DSA president with the

12  Sheriff's Department, and opinions are things like it's bad --

13  he gave some; for example, it's bad for everyone when inmates

14  are locked in their cells because it makes them agitated and

15  anxious and it's more difficult for the correctional officers

16  also, so both sides it's bad for them.  That's an opinion.  I

17  accept that type of opinion.

18      A lot of what Mr. Lomba talked about, first of all, was

19  about recruitment, which was not even in the list that was

20  provided to me as an area of expertise and appeared to be just

21  factual.

22      So after this is over, I might ask for some briefing on

23  what part of Mr. Lomba's testimony I can actually take into

24  consideration, since he was offered as an expert witness.

25      And I know there was a lot of fighting about the fact that