**Exhibit 1 to YH Decl.**

**Lomba Deposition V. 1**

1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3

4   - - - - - - - - - - - - - - -

5   KENYON NORBERT, et al.,      )

6             Plaintiffs,      )

7   vs.                         )  CASE NO.

8   SAN FRANCISCO COUNTY        )  19-cv-02724-SK (LB)

9   SHERIFFS DEPARTMENT, CITY   )

10  AND COUNTY OF SAN           )

11  FRANCISCO, et al.,          )

12            Defendants.       )

13  - - - - - - - - - - - - - - -

14

15

16          REMOTE DEPOSITION OF KEN LOMBA

17             MONDAY, JANUARY 23, 2023

18             PAGES 1 - 142; VOLUME 1

19

20

21        BEHMKE REPORTING AND VIDEO SERVICES, INC.

22             BY:  LAURA ESPINOSA, CSR NO. 11400

23                455 MARKET STREET, SUITE 970

24              SAN FRANCISCO, CALIFORNIA 94105

25                     (415) 597-5600

1

2

3

4

5

6

7

8              Remote Deposition of KEN LOMBA, Volume 1,

9   taken on behalf of Defendant City and County of San

10  Francisco, with the witness appearing in San Francisco,

11  California, commencing at 10:04 A.M., MONDAY, JANUARY

12  23, 2023, before Laura Espinosa, Certified Shorthand

13  Reporter No. 11400, pursuant to Amended Notice of

14  Deposition.

15

16

17

18

19

20

21

22

23

24

25

```
 1  APPEARANCES OF COUNSEL:
 2  FOR PLAINTIFFS AND THE WITNESS:
 3        LAW OFFICE OF YOLANDA HUANG
 4        BY:  YOLANDA HUANG, ATTORNEY AT LAW
 5              (VIA VIDEOCONFERENCE)
 6        528 Grand Avenue
 7        Oakland, California 94610
 8        Telephone:  (510) 329-2140
 9        Email:  yhuang.law@gmail.com
10
11  FOR DEFENDANTS CITY AND COUNTY OF SAN FRANCSICO and
12  VICKI HENNESSY:
13        CITY AND COUNTY OF SAN FRANCISCO
14        BY:  SABRINA BERDUX, DEPUTY CITY ATTORNEY
15              (VIA VIDEOCONFERENCE)
16        1390 Market Street, Sixth Floor
17        San Francisco, California 94102
18        Telephone:  (415) 554-3929
19        Email:  sabrina.m.berdux@sfcityatty.org
20
21  ALSO PRESENT (VIA VIDEOCONFERENCE):
22        KYMBERLEE BAILEY, ZOOM TECH
23
24
25
```

```
 1                         INDEX
 2   MONDAY, JANUARY 23, 2023
 3   KEN LOMBA - VOLUME 1                            Page
 4     Examination by Ms. Berdux                       6
 5     Examination by Ms. Huang                       100
 6
 7
 8                      ---oOo---
 9
10         QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:
11                     PAGE     LINE
12                      None.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1                        EXHIBITS

2                  KEN LOMBA - VOLUME 1

3     Number              Description                    Page

4                   (No exhibits marked.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              MONDAY, JANUARY 23, 2023; 10:04 A.M.
 2                        PROCEEDINGS
 3                         ---oOo---
 4
 5                        KEN LOMBA,
 6    having been administered the oath, was examined and
 7                   testified as follows:
 8         THE WITNESS:  I do.
 9                        EXAMINATION
10  BY MS. BERDUX:
11     Q.  Good morning, Mr. Lomba.  My name is Sabrina
12  Berdux.  I am a deputy city attorney with the City and
13  County of San Francisco.  And I'm representing the
14  defendants in the case of Kenyon Norbert v. the
15  Sheriff's Office in the City and County of San
16  Francisco.
17          And I'm going to ask you questions about some
18  of the issues related in that case.
19          Are you able to hear me okay?
20     A.  Yeah, but I would like it a little bit louder.
21  But yeah, I can hear you okay.
22     Q.  I'm going to see if I can change my audio
23  settings because I don't want you to have any trouble
24  hearing me.  Although I'm not quite as --
25          BEHMKE SUPPORT:  This is Adam from Behmke
```

1    Reporting.  Would you like help with your audio

2    settings?

3              MS. BERDUX:  Sure.

4              (Off-the-record discussion between Behmke and

5              counsel.)

6              MS. HUANG:  Ms. Berdux, I want to let you know

7    whatever your audio issue is it's not real crisp.

8    Sometimes when you speak quickly I lose words.  I can't

9    tell what they are.  So on those occasions I will let

10   you know and ask you to restate the question.  I think

11   we've had this issue on a number of depositions.

12             MS. BERDUX:  Sure.  Yeah, as always if any of

13   you don't hear or understand my question, please speak

14   up and let me know.  Okay?

15             THE WITNESS:  I can hear you.  It does have an

16   unusual mike sound.  Maybe it's the microphone or

17   something.

18             MS. BERDUX:  Okay.  If it becomes a problem,

19   let me know and we'll troubleshoot it.  We'll figure it

20   out.

21             THE WITNESS:  It will work.

22   BY MS. BERDUX:

23       Q.  Have you ever given deposition testimony

24   before?

25       A.  Yes.

1    Q.  About how many times?

2    A.  Not too many.  I think about two or three

3  times.  That's deposition, not court testimony.

4    Q.  Thank you for that clarification.  That was my

5  next question, is whether you've given any court

6  testimony?

7    A.  Yes, I have.

8    Q.  About how many times?

9    A.  Quite a bit.  I wouldn't have a number.  Yeah,

10  I wouldn't even want to guess, but I've been in the

11  business for about 26 years so...

12    Q.  Yes.  I assume that's been -- your court

13  testimony has been in your professional capacity?

14    A.  Yes.  Uh-huh.

15    Q.  Okay.  And what about deposition testimony,

16  have your depositions been related to your professional

17  work?

18    A.  Yes.

19    Q.  So I think I can go over more quickly the

20  ground rules for a deposition and, of course, you're

21  represented by an attorney that also usually means

22  you've been well prepared and understand the rules for

23  a deposition.  Fair to say?

24    A.  I'm not sure.  I'm not sure what your rules are

25  but go ahead.

1        MS. HUANG:  Ms. Berdux, I'm getting like a
2   little bit of your audio coming in and out so I'm not
3   catching every word.
4        MS. BERDUX:  Is anyone else having problems?
5        BEHMKE SUPPORT:  Counsel, we can try a headset
6   that has a microphone in it if you have that.  If that
7   doesn't work we can have you call in telephonically.
8        THE WITNESS:  That's a good idea.
9        MS. BERDUX:  Let's go off the record and I'll
10  try to track down some headphones.
11       MS. HUANG:  Thank you.
12       (Recess taken at 10:09 AM to 10:12 AM.)
13  BY MS. BERDUX:
14      Q.  Let's go back on the record.
15          Okay.  Mr. Lomba, thanks for the quick tech
16  break.  Still if you have any trouble hearing me or
17  understanding any of my questions, please let me know.
18      A.  Sure.
19      Q.  And I think we were on talking about the rules
20  of the deposition.  And those are common rules that
21  apply to the more formal conversation that we're having
22  today.
23          The first is that you've given an oath to
24  testify under the penalty of perjury.  And you
25  understand the significance of testifying under the

1   penalty of perjury, right?

2       A.  Yes.  Uh-huh.

3       Q.  Okay.  Great.

4           And the second is, well, what we've been

5   dealing with, with some tech issues, to make sure you

6   understand my questions or if there's any gaps in your

7   hearing it or understanding, please speak up and let me

8   know.  If you don't speak up, I'm going to assume you

9   understood my question and we're all allowed to rely on

10  your answer.  Fair enough?

11      A.  Yep.

12      Q.  Great.  It's pretty common that some people

13  answer a question by saying something like, oh, I guess

14  it was three years ago.  Guessing is not reliable or an

15  answer, but sometimes people mean for it to be an

16  estimate and guess is just a common phrase that people

17  use.

18          So if I hear you say, oh, I guess in response

19  to an answer, I'll ask you to clarify whether that was

20  your best estimate based on your knowledge and

21  experience.

22          That being said, if I ask a question that calls

23  for a guess it's okay to say, you know, I don't know or

24  I don't remember.  Okay?

25      A.  Yep.

1    Q.  Great.  You also have the chance to go back and

2    review your deposition transcript.  The transcript

3    takes a couple of weeks to be finalized in written form

4    and that's what the court reporter is here for.  And

5    you can make changes if there were any errors to the

6    transcript.

7         But I just want to caution you that, you know,

8    spelling changes, that's okay.  Some grammatical

9    changes are not a problem, but any substantive or

10   material, important changes to your answers that really

11   change the meaning of your answer could be used against

12   you later on to question your credibility.

13        Do you understand that?

14   A.  Yes, uhm-hmm.

15   Q.  Perfect.  And that's really just a reminder

16   that you're under oath.  Make sure you don't guess and

17   make sure you understand my questions.

18        Easy enough, right?

19   A.  Easy enough.

20   Q.  Great.  So those are the rules I was talking

21   about when I referenced the rules for a deposition.

22   Are you familiar with them?

23   A.  You broke up.

24   Q.  Those rules that I just laid -- laid out and

25   asked you about are the rules that I was speaking about

 1   earlier in regards to giving deposition testimony.  Are

 2   you familiar with them?

 3       A.  Yes.

 4       Q.  Perfect.

 5           MS. HUANG:  Ms. Berdux, I'm going to say that I

 6   still have a little bit of a challenge with your audio.

 7   It's just somewhat muffled and I have to, like, super

 8   pay attention to understand your words.  And I think

 9   it's difficult.

10           MS. BERDUX:  Is anybody else having a problem

11   with the headphones?

12           (Reporter clarification.)

13           MS. BERDUX:  And, Mr. Lomba, are you able to

14   hear me better with the headphones?

15           THE WITNESS:  I hear you better.  My novice

16   background on tech stuff, you got the microphone piece

17   fixed but it could be a bandwidth internet issue but

18   you're like 99 percent.  There are some break-ups, but

19   I think we asked you to repeat the part that was broken

20   up.

21           MS. BERDUX:  Okay.

22           I'm hardwired into my wifi.  If it is going to

23   be a problem --

24           THE WITNESS:  No, no, I'm good.

25

```
 1   BY MS. BERDUX:
 2       Q.  All right.  I'm going to -- or if it becomes a
 3   problem, let me know and we'll pause.  We might have to
 4   come back or possibly do it in person.  But let me
 5   know.  I don't want to be unfair to anybody.
 6           MS. HUANG:  Thank you.
 7   BY MS. BERDUX:
 8       Q.  Okay.  I'm going to start just by asking you
 9   some background questions so I can get to know you, who
10   you are and how you came to be the president of the
11   sheriff's association.
12           Can you please, beginning with high school,
13   what is your educational background?
14       A.  Pretty much high school, but I did take a GED.
15   I didn't complete high school.  I did GED.
16       Q.  And when did you complete that?
17       A.  Oh, I think around 1986 maybe.  Around there.
18       Q.  And when did you become employed as a peace
19   officer?
20       A.  December I think it was 1994.
21       Q.  Great.  And who did you work for?  Who did you
22   begin working for?
23       A.  San Francisco Sheriff's Department.
24       Q.  Were you hired as a deputy?
25       A.  Yes.  Uh-huh.
```

 1     Q.  And I assume you had to go through some
 2  standard training?
 3     A.  Yes.
 4     Q.  What was that?
 5     A.  Went to the San Francisco police academy and
 6  graduated from there.  Went through core course
 7  training and then yearly training with the police
 8  department.
 9     Q.  And how long did the POST training take?
10     A.  Shoot, back then?  It's a little -- I think it
11  might be a little bit longer.  I think it's four,
12  five -- maybe five months back then.  Right around
13  there.
14     Q.  And how long was your core training?
15     A.  Could have been up to eight weeks, but I'm not
16  positive.  It's been awhile.
17     Q.  That's all right.  Is eight weeks an accurate
18  estimate, give or take a week or two?  That's fair?
19     A.  Uhm-hmm.
20     Q.  And how many hours of annual training did you
21  do?
22     A.  It's a minimum of 24.
23     Q.  Every year?
24     A.  Right, right.
25     Q.  Great.  Any other peace officer training

1   certifications programs?

2       A.  Yeah.  So I completed a field training program.

3   I believe that was around 2000 -- year 2000.  I've

4   taken a lot of courses.  You know, interview

5   interrogation courses.  Crisis negotiation courses.

6   Drug identification courses.  A lot of -- a lot of

7   training in another department.  I worked for San

8   Rafael as a police officer for six years.  A lot of

9   training in DVs, specialized cases.  EVOC training.

10  First aid training.  Quite a bit.

11      Q.  Great.  Have you been with the San Francisco

12  Sheriff's Office since you started in 1994?

13      A.  No.  Huh-uh.

14      Q.  Okay.  Walk me through that, since 1994 what

15  your professional background has been.

16      A.  This will be approximate.  I don't have the

17  dates in front of me.

18          So initially with the San Francisco Sheriff's

19  Department I believe it was about two and a half years

20  here, off the top of my head.

21          I started -- when I began I was one of the --

22  within the first group of deputies to open at the time

23  County Jail 8 at the time which is now County Jail 2.

24  425 7th Street.  I think I worked there probably for a

25  little bit over a year and then I went to I think back

 1  then it was County Jail 9 which is now County Jail 1

 2  which is the booking and intake facility.  During that

 3  time I did all duties as a deputy sheriff in custody.

 4  I also started on the emergency service unit.

 5        And the department was a little bit smaller at

 6  the time so I eventually left and went to Marin County

 7  Sheriff's Department.  I was there, Marin County

 8  Sheriff's Department about three years working custody

 9  there.  I was on their street enforcement unit which

10  was similar to ESU.

11        And I actually started the street enforcement

12  unit with a sergeant, another deputy there.  They liked

13  the idea of the ESU.  We did the same thing there but

14  more.  We had more duties and I was involved in

15  stakeouts.  Small investigations.  Assisted small

16  agencies.  Assisted CHP with extra officers, extra

17  patrol during some arrests near of the Golden Gate

18  Bridge.

19        And from there I went on to San Rafael Police

20  Department for about six and a half years where I was a

21  patrol officer.  I worked every beat in San Rafael.  I

22  was very active.  I also handled a lot of

23  investigations for my own cases that I picked up.

24        Then I had my own business for a couple of

25  years.  And that went down, the finances went down

1   during the recession around 2008.  Then I came back to
2   the sheriff's department here to finish.  Basically I
3   decided to come back and finish off my career and
4   that's where I've been.
5       Q.  Great.  When did you come back to the San
6   Francisco Sheriff's Office?
7       A.  August of 2008.
8           And then I'll just continue with the history.
9   So I started off County Jail 3 at the time which was
10  the 6th floor of 850 Bryant.  I was there for over a
11  year.  Might have been a couple years there.
12          And then it closed and then went to CJ8 which
13  is now CJ2.  It may have had a different title for the
14  CJ when I moved.  But went to CJ2 for a little bit.  I
15  think for about six to eight months.
16          Then I went to SFGH hospital 7L7D where I did
17  the majority of my career.  Did a lot of overtime in
18  our patrol unit which was at SFGH, the whole campus
19  area.
20          And around 2016 got involved with DSA.  Well, I
21  got more involved.  I was always on committees doing
22  web pages and stuff like that.  But in 2016 became a
23  board of director.  And then 2018 became president of
24  the association and I am the current president of the
25  association.

1      Q.  Great.  And as president is that a full-time
2  position?
3      A.  Yes.
4      Q.  And when you were on the board of directors,
5  was that also a full-time position?
6      A.  No.
7      Q.  When you were on the board of directors, what
8  other positions did you have or job titles did you use?
9      A.  Shop steward.  All the shop stewards are board
10  of directors.
11      Q.  Okay.  When did you first become involved with
12  the DSA?
13      A.  Well, I think it might have been around 2010
14  when I got onto committees.
15      Q.  And when you first got involved were you
16  still -- were you working at SFGH?
17      A.  Let's see, 2008.  Maybe.  It was either CJ2 or
18  SFGH.
19      Q.  Okay.  Do you remember what year you started at
20  SFGH?
21      A.  I don't know the exact year so, let's see, one,
22  two -- could have been 2011.  Somewhere around there.
23      Q.  And what's the highest rank you received in the
24  sheriff's office?
25      A.  Deputy sheriff.

1       Q.  And what brought you or what took you, I should

2    say, to Marin County and then San Rafael P.D.?

3       A.  At that time it was a little closer to home and

4    I wanted to be involved a little bit more -- I wanted

5    to be more active in law enforcement.

6       Q.  And what got you back to the sheriff's office?

7       A.  I got all that out of my system.  I wanted to,

8    you know, just solidify my career.  And it was kind of

9    a unique opportunity too.  I also felt that I could

10   contribute to the department to improve things.

11      Q.  Great.  And have -- all right.  When you first

12   got involved with the DSA you mentioned I think you

13   started with some committees?

14      A.  Right.

15      Q.  What committees did you start with?

16      A.  Website.

17      Q.  Great.  Anything else before you got on the

18   board of directors?

19      A.  No.

20      Q.  Okay.  And please excuse my ignorance, I just

21   don't know that much about the DSA.

22          What did you do as -- on the board of

23   directors?

24      A.  I was a shop steward so I represented our unit

25   and I represented our members.  Mainly it was like the

```
1   bridge or liaison of communication for the DSA and the
2   members and brought issues to the DSA when they came
3   up.
4          Also I kind of took a little bit more of a
5   proactive stance as a board of director.  And, how
6   should I say, advocated for the DSA to do certain
7   things basically.
8      Q.  Great.  What did you advocate for the DSA to do
9   that it hadn't done before?
10     A.  Oh, one was update our bylaws.  They hadn't
11  been updated since the '90s, I believe.
12     Q.  And substantively how were those updated?
13     A.  Eventually I did it a couple years ago under my
14  term, uhm-hmm.
15     Q.  And what were the notable changes, in your
16  mind?
17     A.  It was it a full rewrite.  Just modernized
18  everything.  There were errors, location errors,
19  referencing another parent union we used to be part of.
20  Yeah, I -- I guess it would be most -- I don't know if
21  every president would do this, but I even put in the
22  bylaws a recall provision which we didn't really have.
23  A recall for no cause provision.  Stuff like that.  We
24  updated our voting process to add online voting and
25  that type.
```

1     Q.  Great.  And at the risk of being overbroad, how
2  would you describe your general duties as president of
3  the DSA?
4     A.  General duties.  Basically when it comes to the
5  members this may sound -- I guess you'd probably hear
6  this a lot in unions.  I dedicate a lot of effort and
7  advocation to wages, work conditions, better
8  scheduling.  And then outside of, you know, advocating
9  for that, for our members, we've -- over the years in
10  my term we really focused on strengthening the DSA
11  financially, politically and with the community.
12     Q.  Great.  Is the DSA the entity responsible for
13  negotiating the employment union contracts with the
14  city?
15     A.  Yes.
16     Q.  And how have you strengthened the DSA?
17     A.  Well, financially we've done a lot.  We're very
18  profitable now.  Although our membership has decreased
19  we maintain profit.  We have a good investment
20  portfolio.  The bylaws was a big lift, actually.  That
21  was a huge change.  Online voting was a significant
22  change.
23          Even small things.  We used to do a Christmas
24  party and the DSA would spend, like, $25,000 for a
25  Christmas party which was held at a hotel location.

```
 1    And our members couldn't even go to the Christmas party
 2    because they were working.  So under my term we cut
 3    that.  We removed that and we basically, you know,
 4    re-purposed that money and we deliver Christmas meals
 5    to deputy sheriffs that are working.  And we give them
 6    good, quality meals.  This year was prime rib and
 7    then -- the option of prime rib or salmon.  So we
 8    really try to take care of our members.
 9         Q.  And since you became president are you -- what
10    are you proud of accomplishing for your members?
11         A.  You have a couple hours?
12             Actually, really proud of a lot of things we
13    accomplished.  It's a fairly big list from big things
14    to small things.  But our contract negotiations have
15    greatly improved, you know, under my administration.
16    Our finances have greatly improved.  We have
17    accumulated a good amount of money and we're continuing
18    to do that.  Also our political strength has improved
19    and our community presence, our PR has improved.
20         Q.  What do the -- what are the finances for the
21    DSA used for?
22         A.  Well, they're used for a lot of things.  Some
23    simple things, you know, to pay our rent on our office.
24    Any extra bills for the office.  Some go to my salary,
25    a portion.  And then we also pay a small amount to the
```

1   board of directors.  They get reimbursed their union
2   dues.  Also with any union I think in San Francisco
3   there's a fair amount of legal costs, whether it's
4   negotiating contracts or defending contract violations,
5   you know, or protecting our members' rights.
6      Q.  Great.  Are there any contract -- specific
7   contract negotiations that you're proud of that you
8   obtained during your term as a president?
9          MS. HUANG:  I'm not hearing what you just said.
10  Could I have that question reread, please.
11         (Record read.)
12         THE WITNESS:  Proud of both of them.  I did
13  two.
14  BY MS. BERDUX:
15     Q.  Great.  Any specific terms that you in
16  particular advocated for?
17     A.  Yeah.  Well, so for the first contract
18  negotiation we had a very huge -- it was a huge fix.
19  So 1994 the city started a position, 8302 position
20  which is like a entry level deputy sheriff.  And they
21  erroneously placed them in SFERS miscellaneous.  Which
22  I'm kind of working on some current issues with that
23  too.  They put them in SFERS miscellaneous retirement
24  system.  That's one of the things on the list I wanted
25  to fix for quite some time.

1            In contract negotiations we did address that

2    and we found during contract negotiations that the city

3    has placed deputy sheriffs erroneously in SFERS

4    miscellaneous for 18 months period of time.  And we

5    found that the fire department and the police

6    department don't do that.  They're only in SFERS

7    miscellaneous for the duration of their academy.  Which

8    we're currently looking at too, because SFERS

9    retirement system changed in 2010, 2012 and it created

10   SFERS sheriffs.  And currently we believe they should

11   be placed in SF sheriffs directly and not in SFERS

12   miscellaneous.

13           But to answer your question, in that contract

14   negotiation we were able to reduce 18 months in the

15   miscellaneous retirement system down to approximately

16   six to seven months, just for duration of the academy.

17   That was a very significant change for the history of

18   the sheriff's department and the city.

19       Q.  Any other particular contract terms or

20   negotiations during your tenure that you advocated and

21   were able to renegotiate or get into the contracts?

22       A.  Yeah.  So there was an issue in 2014 where the

23   longevity incentive was changed which for whatever

24   reason the DSA administration at that time made that

25   change.  A large portion of us didn't agree with it.

1   So what they did was, the longevity incentive paid
2   2 percent at five years for everybody, all deputy
3   sheriffs and senior deputies.  The administration at
4   that time separated it.  I'll kind of make it easy to
5   explain.  They separated it -- well, they separated it
6   for anyone after 2014 would only get that incentive at
7   18 years.  So anyone prior to 2014 maintained it,
8   2 percent at five years and then later, after 2014,
9   everyone else had to wait until 18 years.

10          And I was able to move that back in the first
11  contract to 15 years and then in the next contract I
12  was able to get an additional 2 percent longevity at
13  ten years which benefited all deputies so I think that
14  was pretty significant.

15      Q.  Great.  Any other particular terms you worked
16  on or are proud of during the contract negotiations?

17      A.  Sure.  The city and department have attacked
18  and violated our contract multiple times.  One of which
19  was our compensatory time, earn and burn.  And we had
20  multiple, over the years, you know, grievances and so
21  forth on that.  We were able to win it back and in
22  contract negotiations the city tried to take it away.
23  They tried to zero out our comp time multiple times.
24  We maintained it and won it back.  We retained earn and
25  burn comp time.

1        As a city lawyer I don't know if you've dealt

2   with contract negotiations but the city is very

3   aggressive in contract negotiations.  They usually come

4   to the table and try to take away everything.  So we

5   fight to get everything back plus a little bit more,

6   you know, because of inflation, because of comparisons

7   with other agencies and trying to be competitive.

8        But it's become a routine now where, you know,

9   the city side comes to the table and tries to zero out

10  everything.  We're offering you no raise, no comp time,

11  we're taking this away, we're taking that away.  That

12  that's a standard practice.  In essence, every contract

13  is a big win because I'm fighting against a big

14  mountain or boulder to maintain what we have and get a

15  little bit more.

16       Q.  Great.  And when you say that these

17  negotiations take place with the city do you mean the

18  controller's office or?

19       A.  (Shakes head back and forth.)

20       Q.  No.  Who?

21       A.  HR.  The HR --

22           MS. HUANG:  I just want to say that was another

23  question that I did not hear.  Could we have that

24  reread as well.  Sorry.

25           (Record read.)

1          MS. HUANG:  The question was in the
2   controller's office or with the controller's office?
3          THE WITNESS:  Neither.  It's with DHR.  DHR and
4   then they'll have a city attorney present.  They'll
5   have department representatives and then sometimes --
6   most of the times, from what I've seen, they've hired a
7   lawyer from another firm to be the chair of the
8   negotiations table.
9   BY MS. BERDUX:
10      Q.  What are you working on now for the DSA or what
11  are your kind of next goals, your top items of
12  priority?
13         MS. HUANG:  I'm going to object.
14         MR. HOWELL:  I'm going to object too.  Some of
15  that is attorney-client privilege and work product.
16  BY MS. BERDUX:
17      Q.  Yes, I don't want you to divulge
18  attorney-client privilege or work product.
19         Are you aware of any goals or top items of
20  priority that you can disclose?
21      A.  Sure.
22         MS. HUANG:  Current -- at the current moment?
23         MS. BERDUX:  Correct.
24         THE WITNESS:  Yeah.
25         MS. HUANG:  As of now.

1           THE WITNESS:  Yeah.  So as of now, we are

2    aggressively trying to help the department get staffed

3    up.  We -- the department has recently improved in

4    recruiting, but we are also helping as well.  We have

5    several advertisements to increase staffing.

6           Secondly, another goal or priority of our union

7    is to fix our retirement, like I touched on earlier.

8    And we are trying to work through that through several

9    means to fix the errors in our -- how the retirement

10   system has been applied to the deputy sheriffs.

11   BY MS. BERDUX:

12      Q.  And in terms of that is that the amount of time

13   that deputies are in the SFERS program versus the

14   sheriffs?

15           MS. HUANG:  Objection.  In what program?  I

16   didn't hear that word.

17           MS. BERDUX:  SFERS.  It's an acronym,

18   S-F-E-R-S.

19           THE WITNESS:  Yeah, it kind of sums it up.  I

20   mean, if you could help us, we'd appreciate it.  It's

21   all over that 18-month fight really.  It's a big issue.

22   BY MS. BERDUX:

23      Q.  Okay.  And then the other big goal, that you're

24   able to divulge anyway, is staffing.  Helping the

25   department getting staffed up.

1      A.  Right.

2      Q.  And so you've mentioned the DSA has helped with

3  advertising?

4      A.  Yes.

5      Q.  Great.  What -- can you identify what

6  advertising you all have done?

7      A.  This is our -- this is our secret sauce, our

8  top secret recruiting efforts.  It's pretty much social

9  media.  It's advertising and image.  And directing that

10  image to the sheriff's department, we've been improving

11  the page.

12      Q.  When did the DSA begin helping with

13  advertising?

14      A.  Thank you for asking that.  We did a long time

15  ago.  We did a test ad, might have been 2020, might

16  have been a year before that, right around there.  We

17  did a test ad on social media.  And I presented those

18  results to Undersheriff Freeman at the time.

19          And we spent $200 and I don't remember the

20  exact numbers.  Yeah, it was probably ten.  It was

21  about $200.  And based on the numbers and information I

22  received from the department, they received

23  approximately ten applicants, so the cost of the

24  advertising per applicant was about $20.  So we sent

25  that information and we offered that as a workable

1    recruitment tool.

2         Oh, and then currently in December we did

3    another test run.  I think it was about -- I think

4    about four to six similar style ads.  And basically --

5    oh, okay.  So we did about six ads.  The first two we

6    tested the sheriff's department new recruitment video

7    which came out in December and it was a good video.  So

8    we tested that.  We didn't -- although it was a good

9    video we didn't see the returns that we wanted from the

10   money spent.

11        So then what I did was -- I'm getting down to

12   our secrets here.  What we did was we took pictures

13   from the video and just from an image from the video

14   linking it to the recruitment site we advertised that.

15        And the good thing about it, how it kind of

16   worked fairly well which we're going to improve upon

17   next go round.  But how it worked fairly well was the

18   recruitment video was on the sheriff's department

19   recruitment site.  So we still got the visitor to the

20   video which we wanted.  So what we did was we

21   advertised the image, linked it to the recruitment page

22   and that was in December -- mid-December.

23        It was about a seven- to ten-day ad.  Each one

24   kind of varied.  They all didn't start the same day.

25   And the numbers provided by the department when we

1  checked that time period, within that time period the

2  department received about 50 applicants.  So we were

3  pleased with that.  I'm sure some of that was from what

4  the department was doing but I'm hoping the majority

5  was from the traffic we were driving.

6       So then -- go ahead.

7       Q.  No.  I'm sorry.  Please continue.

8       A.  And then we just started that again several

9  days ago, about five image ads.  And we see a lot of

10 traffic going to the recruitment site, but I don't have

11 the results as of yet.  So I'm kind of interested to

12 know what the results are.

13      Q.  Do you know what the department is doing

14 differently or in tandem to what you all are doing?

15      A.  Do you want the long story or short story?

16           MS. HUANG:  Can we take a quick break at this

17 moment?  I just need to use the ladies room.  It could

18 be just three minutes.

19           MS. BERDUX:  Oh, sure, no problem.

20           (Recess taken at 10:51 AM to 10:55 AM.)

21 BY MS. BERDUX:

22      Q.  Mr. Lomba, if you need a break at any time, let

23 me know.  It's not a marathon.  And, you know,

24 interject as needed.

25           (Record read.)

1           THE WITNESS:  Yeah.  So the longest time they
2    wouldn't advertise online social media.  But what
3    they're doing now is they go to a lot of events.  I
4    think they've done some radio ads.  They did the
5    recruitment video which was excellent.  I know they
6    have a recruiter that works or has been going to
7    schools and universities introducing the opportunity of
8    a career there.
9           I think they've done a billboard and also they
10   have, as far as I know, just a exterior ad or there was
11   an exterior ad on muni.
12          Looks like they are doing some social media now
13   which is good.  But they're advertising the recruitment
14   video which it's good, but I found that advertising the
15   video alone doesn't really produce a great result.
16   BY MS. BERDUX:
17       Q.  Okay.  And so you mentioned the DSA has done
18   some social media test ad runs.  And I think, correct
19   me if I am wrong, you've given that information or the
20   good results of that test run to the sheriff's office?
21       A.  Yeah.  Both initial times and then also once I
22   get the current results I'll provide it to them too.
23       Q.  Great.  And do you know what they've now
24   started doing on social media and when?
25          MS. HUANG:  Objection.  Vague as to who "they"

1  is.

2         THE WITNESS:  Yeah.

3  BY MS. BERDUX:

4     Q.  Yeah.  Let me back up.  When you're referring

5  to the sheriff's office doing their own recruiting

6  methods, who all over there do you have an

7  understanding is in charge of that?

8         MS. HUANG:  I'm going to object.  I didn't hear

9  the end of that question.

10         (Record read.)

11  BY MS. BERDUX:

12     Q.  When you were referring to the sheriff's office

13  undertaking their own recruitment efforts, who were you

14  referring to over there that's in charge of that?

15         MS. HUANG:  Objection.  Vague and ambiguous.

16         Are you asking which individuals or which

17  department?

18         MS. BERDUX:  Whoever it is.  I don't know who

19  it is.

20         THE WITNESS:  Yeah.  So they have I guess a

21  recruitment -- I'm not really sure of his title, if

22  it's manager or director.  But they have a recruitment

23  person.  One of our deputies is part of the recruitment

24  unit.  And then they had like a recruitment -- seems

25  like a committee or a group which they occasionally

1   have calls with.

2          But, yeah, to answer your question on the

3   social media, that is based on what I've seen on social

4   media.  And they do promote on their social media

5   sites, from what -- I've never seen and actually even

6   from hearing from my members we've never seen the

7   sheriff's department, you know, advertise, specifically

8   paid advertisement, right.  I guess there's a

9   difference.  You can post something for free and you

10  might get little to no results or you could have a paid

11  advertisement and target a market and get results.

12         We've never seen it before from the sheriff's

13  department, paid advertising on social media, until

14  recently.  And I saw it on Facebook basically with the

15  video recently within a matter of two weeks, maybe two

16  weeks ago.

17  BY MS. BERDUX:

18     Q.  And do you have an opinion about when the

19  sheriff's office should have begun social media

20  advertising, paid advertising?

21     A.  Yeah.  I would have said probably over a decade

22  ago.  It is the least expensive -- one of the least

23  expensive forms of advertising that you can -- you can

24  target.  And you could basically, you know, check your

25  results and see what your results are, see if it's

1    worth it.  And from my tests, I'd say it's worth it.

2         Q.  And what social media platforms did the DSA

3    test on?

4         A.  Primarily Facebook, but also since Facebook

5    owns Instagram it advertised on Instagram as well.

6    We've tested YouTube and Twitter also.  And the best

7    results I've seen are Facebook and Instagram, the best

8    return for money.

9         Q.  And of course there's significant recruitment

10   efforts because the sheriff's office is understaffed;

11   is that right?

12        A.  Yes.

13        Q.  Do you have an understanding currently about

14   how much the sheriff's office is understaffed?

15        A.  The last report showed negative 164 deputies.

16        Q.  And over how many months or years has the

17   sheriff's office been understaffed?

18        A.  They're always understaffed.  It just varies on

19   the number.  You can go all the way back to Michael

20   Hennessy days and we were understaffed.  But the amount

21   changes.  And that's where the problems lies, when you

22   get further into the negative, right?

23        Q.  Yep.

24             All right.  For an office that's chronically

25   understaffed was there a point in time where it became,

1  you know, like an emergency for sheriff's operations?

2       MS. HUANG:  I'm going to object as to vague and

3  ambiguous as to the definition of the word "emergency."

4  BY MS. BERDUX:

5     Q.  Has there been some point in time where the

6  level of understaffing has become critical to the

7  operations of the sheriff's office?

8       MS. HUANG:  I'm going to also object on to the

9  definition of the word "critical" as well as what

10  portion of the sheriff's office.  And you haven't laid

11  the groundwork as to whether the understaffing applied

12  to all divisions or only certain positions.

13  BY MS. BERDUX:

14     Q.  Do you understand my question okay, Mr. Lomba?

15     A.  To a degree.  I think I can answer it.

16     Q.  Go ahead.

17     A.  So the staffing has really never been an

18  emergency.  It's -- it has become critical, I'd say, in

19  2020 forward.  But I would say it's starting to improve

20  December 22nd forward, but we're still in a large

21  deficit, right.  The problem, if I can touch on it, the

22  problem with staffing is it's become a progressive

23  program that's been growing.  And there were certain

24  circumstances that brought it to the conditions we're

25  at.

1    Q.  Okay.  What were those things that got it to
2    the conditions that we're at?
3    A.  There were several.  Okay.  So let's touch on
4    how the city operates for a second.
5         So the city does salary savings.  They call it
6    by many names.  Salary savings, cost savings, attrition
7    savings.  Basically in this case the sheriff's
8    department per budget is supposed to have a set number
9    of full-time employees.  FTEs they call it.  Now, a lot
10   of departments or businesses may go below that set
11   number to a certain percentage and that gives them a
12   savings because they're not filling all the full-time
13   positions.  I think you probably understand this.  You
14   probably know this.
15        So whether it's a 10 percent cushion or a
16   5 percent cushion, that gives some savings because the
17   city is not paying for the benefits and the retirement,
18   right.  And the training as a matter of fact.  You
19   know, the training adds up too.
20        And that could be workable to a degree because
21   you can balance it with overtime, but the balance is
22   with voluntary overtime when you have enough employees
23   that want to volunteer to work that overtime for
24   whatever they want in their life, right.
25        Now, my research, going back to the Michael

1    Hennessy days, he -- from the research in the documents
2    that I have, he maintained about a 50 to 60 negative
3    staffing.  And then from that point forward it just
4    increased, the negative amount of staffing, to this
5    date.
6         Q.  I'm sorry, I just want to -- I don't mean to
7    interrupt your train of thought.  But when you say 50
8    to 60 negative staffing, do you mean 50 to 60 FTEs?
9         A.  Correct.  Yeah.  Negative -- unfilled FTEs, I
10   guess, would be better.
11        Q.  Great.
12        A.  So the current conditions, what made it you
13   know, quote, unquote, critical, in 2020 was -- the
14   first thing was the department wasn't aggressively
15   recruiting.  The second thing, the mayor put an
16   initiative together and froze testing for nine months.
17   So now the department couldn't recruit.  The testing
18   was frozen for nine months under some equity study.
19          Also after that the city terminated about 25
20   unvaccinated deputies.  And then on top of that during
21   2020 and 2021 or about 2022, let's say, the department
22   promoted deputies to sergeants and they skipped the
23   senior deputy position.  When they promoted deputies to
24   sergeant, which was a lot how I feel, you removed
25   deputies from the line staff and you impacted your

1   staffing shortage.  And this -- obviously this has

2   happened, you know, during that nine-month freeze and

3   after.

4          So that is kind of, in a summary, of what

5   hugely impacted this.

6          Also, the city over the years seems to have

7   reduced the level of FTEs the department should have.

8   And in my research I've even contacted the controller,

9   Ben Rosenfield, and he says, you know in summary, that

10  his report, the controller's report that he did in 2019

11  was the sheriff's department's reliance on overtime.  I

12  may have the title accurate, I think.

13         But he says that report holds true to today.

14  And that was about I think a little bit less than a

15  year ago when I spoke with him.  And he says one of the

16  problems is when the sheriff's department -- by the

17  time the sheriff's department gets its budget, some

18  cases the budget is reduced, whether it's from the

19  mayor or from the board of supervisors.

20         When the budget is reduced he says the sheriff

21  comes out of the gate in a negative and he's already

22  impacted.  And that was one of the big problems.  That

23  was the main problem with budgeting and achieving

24  funding for more FTEs.

25     Q.  Okay.  That's helpful.  Thank you.

1     A.  Sure.

2     Q.  Okay.  So if I understood you right, the

3  sheriff's office always operated at a FTE deficit back

4  to the days of Michael Hennessy when it was about 50 to

5  60 people.

6          How -- if you can quantify, how did those

7  deficit numbers change to get to this critical moment

8  where we're at, 164?

9     A.  Yeah.  So it -- from Michael Hennessy to our

10 current sheriff it kind of fluctuated, but not too bad.

11 It might have hit 70 to 80.  But, you know, Sheriff

12 Vicki Hennessy really got aggressive at recruiting and

13 hiring when she was building it up.

14         But what hit us hard was 2020 the hiring freeze

15 for nine months.  That was tough.  And then losing --

16 then promoting deputies to sergeant but then losing 25

17 deputies by the city, yeah.

18    Q.  And those 20 deputies that were lost were

19 because they did not comply with the city's vaccination

20 mandate?

21    A.  Correct.

22    Q.  Do you have an estimate for the number of FTEs

23 that could have been hired during that nine-month

24 hiring freeze or any estimate for the number of FTEs or

25 deputies that we lost because of that?

1          MS. HUANG:  I'm sorry.  I missed the first part

2     of your question.

3          (Record read.)

4          MS. HUANG:  I'm going to object to that as

5     vague and ambiguous and compound.

6     BY MS. BERDUX:

7          Q.  You can go ahead.

8          A.  So it's -- it's tough to know what, but what we

9     did was we did a comparison with San Mateo and Alameda.

10    Alameda hired 131 deputies in one year.  I believe that

11    was 2021.  And then San Mateo, I believe they hired

12    close to 60.

13         So we should have been, you know, somewhere

14    within those averages.  Traditionally in probably the

15    last maybe two decades I guess we haven't, you know,

16    done a number like 131 or 133.  But we should have been

17    around 60.

18    BY MS. BERDUX:

19         Q.  Okay.  Yeah.  So you kind of anticipated my

20    next question which is, you know, the last ten years is

21    there an average number of deputies that the sheriff's

22    office would onboard per year?

23         A.  You know, I don't have a yearly study on that,

24    but I would -- I would think it would be right around

25    60, yeah.

1    Q.  Okay.  Okay.  And you mentioned that hiring and

2  recruitment has started to get better recently.  When

3  did that start -- I should say when did you start to

4  notice a difference in the hiring?

5    A.  Good question.  Good question.

6        Ever since I was DSA -- long story short, I

7  guess.  Ever since I was DSA president we've been

8  advocating for more staffing and better recruiting.  I

9  started DSA president in 2018.  In June of 2022 is when

10 we saw recruitment start to improve.  And over six

11 months -- you know, matter of fact, I sent them a

12 letter, which I may have supplied to you, on recruiting

13 and our suggestions and our suggestions on what they

14 were doing basically.

15        And they actually -- looks like they listened

16 to some of them.  But it took them about six months to

17 really try to fine tune what they were doing.  They're

18 improving, but it's not -- obviously it's not perfect.

19 Yeah.  So there's some improvement and I would say the

20 results of that improvement we're starting to see this

21 fall.

22    Q.  Great.  How many -- let me back up.  I

23 apologize.

24        When was this hiring freeze?

25    A.  I think the mayor started it June of 2020.  I

 1   believe it went on for about nine months.
 2       Q.  Okay.
 3       A.  It's not titled a hiring freeze.  I'm just
 4   calling it a hiring freeze because she stopped testing.
 5   They were doing a equity research so we couldn't test.
 6   In essence to me it's like a hiring freeze.
 7       Q.  The effect was you couldn't hire anybody?
 8       A.  Right.
 9       Q.  Okay.  After this nine-month period did the
10   sheriff's office start onboarding more deputies?
11       A.  No.
12           MS. HUANG:  This is the nine-month hiring
13   freeze?
14           MS. BERDUX:  Yeah.
15   BY MS. BERDUX:
16       Q.  When did hiring begin after this nine-month
17   period?
18       A.  Yeah, I don't have that information.
19       Q.  You mentioned you start -- I think you
20   mentioned you started to see the efforts of the
21   recruitment people, deputies are starting to get hired
22   I think you said beginning in the fall.  Did I hear
23   that right?
24       A.  Fall of 2022.
25       Q.  Okay.  And do you have an estimate for the

1  number of deputies that have been hired since the fall

2  2022?

3      A.  I think we're close to 20.

4      Q.  Great.  And do you have any information about

5  how many other deputies are, well, in line might be the

6  wrong word, but do you have any information about any

7  additional hiring plans or candidates?

8      A.  Matter of fact, I asked for data the other day.

9  They didn't have it.  All I know is that during the

10 period that we advertised there were 50 applicants.

11 Outside of that I don't have any -- they haven't

12 provided any data.

13     Q.  Okay.  Do you have any information about how

14 many of the applicants -- how many applicants are

15 actually qualified to begin training?

16     A.  The information I do have, you know, came from

17 one of the background investigators who I believe they

18 just have a general or rough percentage.  And his

19 percentage was two out of every 15 backgrounds.

20     Q.  Two out of every 15 background checks means

21 that two out of every 15 applicants are eligible to

22 hire?

23     A.  It might -- that might not be exact because

24 there's, like, three to four tests prior to that they

25 have to pass to get to the background stage.

1          Q.  Oh, got it.  I'm sorry.  Do you mind describing
2     for me the process from application to hiring that an
3     applicant has to go through to get hired?
4          A.  From what I know, it's, you know, application
5     written exam, physical agility and an oral board
6     interview.
7          Q.  And then does the background check come after
8     that?
9          A.  Uhm-hmm, yes.
10         Q.  Okay.  Do you have any information about the
11    percentage of applicants that don't make it past each
12    of these stages, exam, physical, oral, background
13    check?
14         A.  No, I don't.
15         MS. HUANG:  I just lost the last part of your
16    question, I'm sorry.  All the sounds run together and I
17    can't tell what the words are.
18         (Record read.)
19         MS. HUANG:  So the question was asking what --
20    the percentage of drop off after each of these
21    segments; is that correct?
22         MS. BERDUX:  Yeah.
23    BY MS. BERDUX:
24         Q.  I think you said --
25         A.  No, I don't.

1    Q.  Do you have any estimate for, overall, the

2  number of applicants that make it to hiring from the

3  beginning?

4    A.  No, I don't.

5    Q.  Do you have any opinion that the sheriff's

6  office should change or modify its requirements or

7  qualifications to be hired?

8        In other words, it's a pretty rigorous hiring

9  process to take an exam, have the physical, have an

10  oral board and a background check; is that fair?

11    A.  I have three things.  One, I think they should

12  provide the background packet and medical questionnaire

13  sooner.  I think they should give it to them maybe

14  after the written so they could -- so the applicant can

15  prepare, have it all prepared and done, turn it in

16  quicker.

17        I think they should test in one day which I've

18  suggested.  You know, do your written, your oral board

19  and your physical agility all in one day.  And then

20  give them the background packet immediately.  And then

21  they turn it back in and off to the races, right.

22        They don't do that right now, but I think they

23  should streamline that.  There were some issues in the

24  past with the application process and this is

25  another -- actually, this is another big change I think

1  that I accomplished under my administration.  They've

2  always hired for 8302.  There was no job notification

3  for academy grads or laterals.  Sheriff at the time,

4  Ross Mirkarimi, had a separate application process or

5  job notification for academy graduates and laterals,

6  but it appeared to be a temporary that was stopped.

7       So I think that hindered the process.  We had a

8  lot of issues going forward because of that.  So the

9  fastest way to hire someone and get them in service is

10  to hire an academy graduate or lateral.  That's the

11  fastest way.  Obviously in entry level they have to go

12  through academy training and more training when they're

13  in service so that time is reduced a lot.

14       Under my term, we --

15       MS. HUANG:  Wait, wait, wait.  This is a

16  narrative and there's no question pending.  I don't

17  think this is the question that Ms. Berdux asked.

18       THE WITNESS:  She did ask if there's anything

19  that would better the qualifications to get deputies

20  hired and I think those were hindrances.

21       MS. HUANG:  The question was on qualifications.

22  Let's answer the question she asked.  So is there

23  anything to improve the qualifications of the people

24  applying.

25       MS. BERDUX:  I don't think that was my

1   question.  I'll continue with my question.

2   BY MS. BERDUX:

3       Q.  Mr. Lomba, you were describing the

4   recommendations that you have to assist with the hiring

5   process.  You mentioned streamlining the testing and

6   background checks.  You also mentioned advertising and

7   opening postings for academy graduates and lateral

8   applications.

9           What else?

10          MS. HUANG:  These are -- you're asking him

11  about the recommendations he has or recommendations he

12  has made?

13          MS. BERDUX:  Any opinions he has.

14          MS. HUANG:  Any opinions you have on how to

15  expedite the hiring process.  Thank you for the

16  clarification.

17          THE WITNESS:  The other problem was once that

18  was fixed and they are now posting job classification

19  for academy graduates and laterals, the other problem

20  was pay.  They weren't paying them appropriately.  They

21  were paying them at training pay and that was something

22  we recently fixed also.

23          Yeah.  That's all I have on that.

24  BY MS. BERDUX:

25      Q.  Great.  With that -- is that what you meant to

1   continue saying before you were interrupted?

2       A.  Correct, yeah.

3       Q.  Okay.  Thank you.

4           And that difference in pay, that applied to the

5   academy graduates and lateral hires?

6       A.  Yes.

7       Q.  Okay.  And when did that change?

8       A.  Recently.  In January.

9       Q.  Oh, this year?

10      A.  Correct.

11      Q.  Great.  Congratulations.

12      A.  Thank you.  Yeah.  That's -- yeah, we're now at

13  industry standard I think.

14      Q.  Great.  Is there -- are you aware whether there

15  has been in the last couple of years to today a state

16  or nationwide staffing shortage in corrections?

17      A.  There is for law enforcement and corrections.

18  It's a little more difficult, but with the comparisons

19  I've given you it's not impossible.  Alameda hired 131.

20  I mean, we're negative 164.  If -- it's doable, but

21  it's not being done.

22      Q.  Do you know after Alameda County's 161 hirings

23  whether they were still negative or not in their FTE

24  positions?

25          MS. HUANG:  I'm going to object to that as

 1  irrelevant and beyond the scope.
 2  BY MS. BERDUX:
 3      Q.  If you know, you can still answer.
 4      A.  I think my data showed around 131, but I do
 5  not.
 6      Q.  Okay.  So they were still down 131 after that
 7  161 --
 8      A.  I'm sorry.  I don't want to create confusion.
 9          My data shows that they hired 131, around 131
10  in that year.  You said 161.  I just wanted to correct
11  that.  So it was around 131 that year.  I don't know
12  how many they're short.  I don't know their negative.
13      Q.  Okay.  Thank you.  Thank you for fixing that.
14          And what about San Mateo, I think you had
15  numbers for their hiring.  Do you know after they made
16  those hires whether they were still in the negative and
17  by how much?
18          MS. HUANG:  This is for 2022?
19          THE WITNESS:  I do not know.
20  BY MS. BERDUX:
21      Q.  Do you have any information about why a
22  surrounding county to San Francisco would appeal to a
23  new applicant versus applying to San Francisco?
24          MS. HUANG:  I'm going to object to that as
25  vague and ambiguous and overbroad and lack of

 1  foundation.
 2  BY MS. BERDUX:
 3      Q.  Did you understand what I was getting at,
 4  Mr. Lomba?
 5      A.  Yes.
 6      Q.  Okay.  Go ahead.
 7      A.  I think it's a lack of knowledge.  They
 8  don't -- I would say going -- prior to this recent
 9  advertising campaign not too many people knew about us,
10  not too many people knew we were hiring.  The sheriff's
11  department relied on the deputies doing the recruiting.
12  It was word of mouth.  It worked for a certain time
13  period, but there's a time period where morale
14  decreased so the members -- our members -- the word of
15  mouth decreased, in essence.
16      Q.  Yeah.
17      A.  So there's a lack of knowledge.  And then
18  secondly, there's a lack of competitiveness.  San
19  Francisco's not doing anything to attract law
20  enforcement competitively.
21      Q.  What do you mean?  What would -- if San
22  Francisco were to -- were to recruit competitively what
23  would they have to do?
24      A.  Well, we all get wages, benefits.  But once the
25  nationwide issue you brought up with law enforcement,

 1   you know, being more difficult to recruit, other
 2   departments cities agencies pivoted and they adjusted.
 3   They made adjustments so they started improving their
 4   competitiveness, like hiring bonuses.  Higher wages.
 5   You know, there's a lot of things that can be improved.
 6   Improving benefits, adding benefits.  We've been asking
 7   multiple times for the city to do that and we have not
 8   been successful.
 9          But in order to -- just like Google or Yahoo or
10   Salesforce, if you need staffing you do things to
11   attract staffing.  And right now we're just doing the
12   same thing we did, I don't know, three years ago, four
13   years ago, five years ago.  There's nothing -- that I'm
14   aware of there's nothing new that San Francisco's doing
15   to attract law enforcement.
16          But, you know, if you look at Alameda, they
17   have hiring bonuses.  They even have a hiring bonus for
18   entry level.  San Mateo, hiring bonuses.  Antioch,
19   $40,000 hiring bonuses.  I mean, just like with
20   anything I'm sure you could think too that if you need
21   staffing and you're not getting it with what you're
22   offering, you got to increase your offerings.
23       Q.  Do you know how the pay to San Francisco
24   sheriff's deputy new hires compares to the comparable
25   positions in our surrounding counties?

1       A.   The new hires, I believe it's a little bit
2    lower than the surrounding, yeah.
3       Q.   And what about the benefits offered, do you
4    know how those compare to the surrounding counties?
5       A.   In some cases our benefits are good, yeah.
6    Like I believe San Mateo or Alameda may not have as
7    good, like, medical benefits or something like that,
8    yeah.
9       Q.   Any other differences in benefits that you're
10   aware of?
11      A.   We have some incentives, you know, that are a
12   little bit better.  But then also they have some -- San
13   Mateo and Alameda have a very unique wage provision in
14   their contract which we tried to get last contract and
15   the city fought us against it.  I think that wage
16   provision would be really helpful.
17           Some problems that faced us against Alameda
18   County, Alameda County had earn and burn comp time.
19   They had a smaller amount.
20           MS. HUANG:  What was that that they had, earn
21   something?
22           THE WITNESS:  Earn and burn compensatory time.
23           MS. HUANG:  Earn and burn?
24           THE WITNESS:  Yeah.  Earn and burn.  It's
25   almost like a credit card in a way.  If you buy

1    something and you pay your limit down, then you buy

2    something again.  So it's earn and burn compensatory

3    time.

4         Alameda has it.  Ours was stopped multiple

5    times over the last -- over my last two terms.  Matter

6    of fact, Alameda had theirs at 80 hours.  Ours is 160,

7    although it was stopped multiple times.  The sheriff

8    even raised it during the COVID emergency.  He raised,

9    from what I was told, their earn and burn another 40

10   hours and brought it up to 120.  But things like that.

11        We do have good benefits.  We do have good

12   incentives.  Sometimes their contracts are violated.

13   Sometimes they're stopped.  And that kind of sends out

14   the wrong message.

15   BY MS. BERDUX:

16        Q.  You mentioned wage.  What was that wage

17   difference?

18        A.  So after this last contract I think we got up

19   to top wage in the Bay Area which was helpful to us.

20   But in Alameda and San Mateo's contract they have a

21   provision to -- if anyone else has a higher wage than

22   them -- or, actually, they have a provision where they

23   work off each other to maintain the highest wage.

24        So I believe -- I'm not positive, but I know

25   Alameda may or may not have a contract coming up and

1    San Mateo is pending within their contract negotiations

2    unless they closed it already.  Last I heard they were

3    still in a pending position.  But once they finalize

4    their contracts they'll be above us.  And we have no

5    provision to compete with them until next contract

6    negotiations.

7         Q.  Okay.  And does San Francisco now have any earn

8    and burn benefit?

9         A.  Well, our contract was violated and it was

10   stopped.  But the sheriff's department is in the

11   process of wanting to settle that.  The sheriff had put

12   out a letter recently saying she was going to return

13   it.  I believe the date was February 4th.

14        Q.  And how long has it been stopped for?

15        A.  Since 2020.  I think March, to be exact, of

16   2020.

17        Q.  And can you just tell me how that works, the

18   earn and burn?

19        A.  You can compare it to like a credit card, like

20   if you make a purchase and then you pay down your

21   purchase.  So you buy something for, like, $100 and now

22   you have a $100 balance and then you can pay that down.

23   Then you can buy something again, right.  So it's earn,

24   burn and then earn again.

25             So same thing as compensatory time.  Instead of

1  working for money at overtime rate, you're basically
2  being given time.
3      Q.  Oh.
4      A.  And that time you can take off later.  And you
5  can reach up to 160 hours, which is your limit, your
6  balance limit.  And then you can use some of that and
7  then you can work more overtime as compensatory time
8  and build it back up.
9      Q.  Got it.  So you can have longer vacations and
10  stuff like that?
11      A.  You could, yeah.
12      Q.  Or more time off?
13      A.  Correct.
14      Q.  Now, I want to back up to the other problem as
15  you identified it, getting rid of the senior deputy
16  position.
17          And so let me ask this.
18          In terms of rank, did it go deputy, senior
19  deputy and then sergeant when senior deputy was a role?
20      A.  Right.  Correct.
21      Q.  And at some point the sheriff's office, what,
22  decided to no longer promote people to the senior
23  deputy level; is that right?
24      A.  Correct.
25      Q.  So now the new ranking system is just deputy to

1   sergeant?

2       A.  Correct, yeah.

3       Q.  Okay.  So why is that a problem or how did that

4   change things?

5       A.  Well, the senior deputy was kind of like a

6   hybrid supervisor.  They worked -- when they weren't

7   used as a supervisor in a supervisor role, they worked

8   as a deputy.  So they still maintained, you know,

9   staffing.

10      Q.  And do sergeants -- now do they no longer work

11  in deputy roles?

12      A.  They never have.  They do not.

13      Q.  Okay.  Before the sheriff's office decided to

14  remove the senior deputy position do you know how many

15  spots there were for senior deputies?

16      A.  Oh.  I don't have the numbers in front of me,

17  but I believe...

18      Q.  Best estimate is okay.  Doesn't have to be

19  exact, but if it's within the range of a few, that's

20  fine.

21      A.  I was told by other deputies that have been

22  here quite sometime we used to have upward of 120

23  senior deputies.  But when they started to phase the

24  senior deputies out, I believe we were about 70.

25      Q.  But it will eventually be zero; is that your

1  understanding?

2      A.  That was the direction, but I've been

3  advocating for the return of the senior deputies and

4  pointing out this problem.  And recently the

5  undersheriff advised me that the sheriff is willing to

6  return the senior deputies in next fiscal year, 2023 to

7  2024.  Yeah.  So that should be coming up.

8      Q.  Oh, okay.  When was it announced that the

9  senior deputy role would no longer be staffed?

10      A.  I think 2018 when they were phasing it out.

11      Q.  And so the number of senior deputies dropped

12  over, what is it now, the last five years from 120 to

13  70?

14      A.  No, no.  I think it was more 70ish around 2018.

15  120 was probably, you know, before I was -- way before

16  I was DSA president.  It was probably quite some time

17  ago.

18      Q.  Oh, okay.  Right at the time immediately before

19  this change or phasing out was started there were about

20  70 senior deputy positions?

21      A.  Right.  Right around 70.

22      Q.  Got it.  Do you know what they are now?

23      A.  I haven't looked, you know, this week, but as

24  far -- within the last couple of months it was about

25  24.

1    Q.  Okay.  And your expectation is that those roles

2  will again be offered or opened in the next fiscal year

3  which begins July 1st, 2023; is that right?

4    A.  Yes, correct.

5    Q.  Congratulations.

6    A.  Thank you.  I hope so.

7    Q.  And who announced that?

8    A.  The undersheriff.

9    Q.  And where did the senior deputies work, where

10  are they posted?

11    A.  They can work anywhere, anywhere a deputy can

12  work.  So throughout the sheriff's department.

13    Q.  Was there -- to your knowledge, were they -- do

14  you know how they were assigned to different locations

15  or duties?

16    A.  Well, that's been changing, but yeah.  So --

17    Q.  That's fair.  I'm sorry.  I don't want to

18  interrupt.  But so you know what I'm wondering --

19    A.  Yeah.

20    Q.  -- obviously it's changed over time.  So right

21  before it was phased out where were they posted?

22    A.  Yeah.  Well, sometimes they even had them

23  written into work order contracts, senior deputies at

24  contracted positions.  But largely we used to have some

25  on every shift and then some at specific areas on the

1  off watches when the sergeants weren't there.
2  Sometimes they would be on a swing shift or a night
3  shift.
4       Q.  Okay.  And the sheriff's office doesn't just
5  operate at the county jails.  Obviously they're also at
6  the courts, the hospital, right, kind of all over the
7  place.
8            Was there ever an allocation of senior deputies
9  to different -- what's the right word -- to different
10 postings?
11      A.  I think the sheriff's department has -- I would
12 say they have a list of where the senior deputies are.
13 And they do have some positions that are allocated for
14 senior deputies directly, but I don't have that.  I
15 don't have those numbers with me.
16      Q.  Okay.  And as the number of senior deputies
17 dropped from 70 down to 24, did those postings or
18 assignments change, if you're aware?
19           MS. HUANG:  I'm going to object to that as
20 vague and ambiguous.  Is the question asking where
21 senior deputies are posted within the department
22 organizational?
23           MS. BERDUX:  That was my question.
24 BY MS. BERDUX:
25      Q.  I believe the answer was the sheriff's office

1   has that data, right?

2       A.   Yeah.

3       Q.   Okay.  But since the number of senior deputies

4   changed from 70 down to now we're at 24, do you know if

5   their postings changed?

6            MS. HUANG:  You mean the location of where

7   they're posted?

8            MS. BERDUX:  Right.

9            THE WITNESS:  Yeah.  So based on your question

10  the -- so the department does supervisor changes every

11  so often.  It might be yearly.  It might be biyearly.

12  I know some of the locations probably have not changed

13  but I'm not aware.  The best answer -- the best person

14  that could answer that question is from the department

15  itself.

16  BY MS. BERDUX:

17      Q.   Okay.  Do you know what locations have not

18  changed?

19      A.   No, I don't have that data.

20      Q.   Do you know if there were ever specific

21  locations or postings that senior deputies were

22  specifically used for?

23           MS. HUANG:  This is by posting?

24           MS. BERDUX:  No, just in general.

25

```
 1  BY MS. BERDUX:
 2      Q.  Was there ever, you know, a specific --
 3      A.  I think just to answer your question --
 4          MS. HUANG:  Wait, wait, wait.  Let's get the
 5  question straight.  I don't think I understand what
 6  you're asking, Ms. Berdux.
 7          MS. BERDUX:  Madam Court Reporter, would you
 8  mind reading back my last complete question.
 9          (Record read.)
10          MS. HUANG:  I'm going to object to that as
11  vague and ambiguous.  I don't understand what the
12  question is asking.
13  BY MS. BERDUX:
14      Q.  Did you understand my question, Mr. Lomba?
15      A.  Yes.  There are, but I don't have that
16  information.
17      Q.  Okay.  Do you know if there were ever a
18  specific number of senior deputies assigned to county
19  jails?
20          MS. HUANG:  I'm going to object to that as
21  vague and ambiguous.  He's testified that the number
22  has gone from a high number to 24.  So at what point in
23  time was there a specific -- are you inquiring about?
24  BY MS. BERDUX:
25      Q.  Any time.
```

1    A.  Can you repeat --

2         MS. HUANG:  As of today, Mr. Lomba, are there a

3    number of posted, you know, that you know of.

4         THE WITNESS:  I know the department maintains

5    that.  I don't know of all the locations off the top of

6    my head right now.

7    BY MS. BERDUX:

8    Q.  But my question was different than the one

9    Ms. Huang interjected.

10        Do you know if there were ever a specific

11   number of senior deputies assigned to county jails?

12        MS. HUANG:  In the course of the history of the

13   San Francisco Sheriff's Department?

14        MS. BERDUX:  Yeah.

15        THE WITNESS:  You know, I think there was, but

16   I don't have that information.

17   BY MS. BERDUX:

18   Q.  Okay.  And do you know if that has changed

19   since 2018 when the senior deputy role was phased out?

20   A.  It has changed because I've seen the reduction.

21   Q.  And do you know by how many senior deputies

22   have been reduced at county jails since the phase out?

23   A.  You know, you just kind of refreshed my

24   recollection.  I think I sent you the document on that,

25   is we found in a PRA request a phase-out plan by the

1    department.  And the phase-out plan shows you the

2    locations and where the deputy -- senior deputies were

3    going to be phased out via retirement or whatever else

4    that came up.

5        Q.  Okay.  Great.

6            MS. HUANG:  Do you remember the name of that

7    document, sir?

8            THE WITNESS:  It had to have been something

9    with senior deputies, but I'd have to search for that.

10   BY MS. BERDUX:

11       Q.  Yes, we have a number of documents.  And thank

12   you to you and your counsel for forwarding those.

13           And since they've been mentioned, let me ask

14   you about that, about how you collected these

15   documents.

16           My -- you're here today because my office

17   served you with a deposition notice and subpoena,

18   right?

19       A.  Yes.

20       Q.  Okay.  And your attorney produced a number of

21   documents to us.  Did you compile those documents in

22   response to our deposition notice?

23       A.  Yes, but also based on the response in the

24   e-mail when I questioned on what documents you wanted.

25       Q.  Okay.  Great.  And how much time did you spend

1    looking for those documents?

2        A.  Several days.

3        Q.  Thank you for taking that time.

4        A.  Sure.

5        Q.  I know a fair amount of what you do is

6    protected by work product, attorney-client and other

7    privileges.

8            Were there any documents that you withheld or

9    were not produced because they were protected or

10   confidential?

11       A.  There may have been.  I'd have to review

12   everything.  When I e-mailed your office I'm not sure

13   if you were in the chain, but I think I told them there

14   were a lot of documents.  And I asked specifically what

15   do you need.  And they said to send you documents that

16   I would be speaking on on this incident.

17           So I sent you quite a bit, but there could be

18   more.  I mean, if you want the daily drafting, e-mails

19   that I get, it could be several hundred of those.  And

20   I believe I sent you the data we found from the CFO

21   Crispin where he gave info to the controller's office

22   stating that they were going below minimums and using

23   that as a cost savings.

24           But those are the only things that come to

25   mind.  And there was a letter to the board of

1  supervisors that described that in his letter to the

2  board of supervisors.  Yeah.  I mean, if you want me to

3  send all the global drafting on the daily basis that I

4  have, I can send you that too.

5        MS. HUANG:  That would be great.  I would

6  request it.  If you're willing to do it, that would be

7  wonderful.  If you would CC us separately, that would

8  be helpful.

9        THE WITNESS:  Take me another day.

10        MR. HOWELL:  Counsel, what's our plan for

11  taking a lunch break or some kind of break here?

12  When -- do you mind if we go off the record?

13        MS. BERDUX:  Yeah, let's go off the record.

14        (Off the record at 11:55 AM to 11:59 AM.)

15        MR. HOWELL:  Thank you for that.  We'll see you

16  around 1:30 today.

17        MS. BERDUX:  We'll be back at 1:30.

18              (Lunch recess taken.)

19                   ---oOo---

20

21

22

23

24

25

```
 1              MONDAY, JANUARY 23, 2023; 1:34 P.M.
 2                    P R O C E E D I N G S
 3                         ---oOo---
 4
 5         MS. BERDUX:  Let's go back on the record.
 6   BY MS. BERDUX:
 7      Q.  Good afternoon, Mr. Lomba.  We took about an
 8   hour and a half break.  Hope you had a chance to get
 9   some lunch.  And, again, if you need any additional
10   breaks for the afternoon, please speak up and let me
11   know.  And we have a hard stop today at 4:00.  We'll
12   address that if we need to schedule it for another day,
13   but I'm going to do my best to keep it to the material.
14         Okay.  We were talking about some documents
15   that you produced and I think there was some additional
16   documents and data you sent over to us.
17         While we're on that subject, other than
18   reviewing the documents is there anything -- I should
19   say looking for the documents and producing them.  Is
20   there anything else that you did to prepare for your
21   deposition in this case?
22      A.  No.  Uh-huh.  Spoke with my attorney earlier
23   and that was it.
24      Q.  Definitely don't tell me anything that you've
25   spoken about with your attorney.  That's privileged
```

1    information and I certainly don't want to get in the

2    way of that.

3         Did you ever speak with Ms. Yolanda Huang about

4    this case?

5    A.  Who's that again?

6    Q.  Yolanda Huang, the plaintiff's --

7    A.  Oh, yes.

8    Q.  When did you first speak with her about this

9    case?

10   A.  Oh, it was a long time ago.  You know, I can't

11   remember the exact date, but it was probably -- I think

12   it's been over six months now but...

13   Q.  And that's okay if you don't remember the exact

14   date.  No problem at all.

15   A.  Let's call it the last time I spoke with

16   Yolanda was sometime around October.

17   Q.  Okay.

18   A.  And some e-mails recently, I believe.  I've

19   seen the e-mail correspondence going back and forth.

20   Q.  About scheduling?

21   A.  Yeah.

22   Q.  Was there anything substantive in the e-mail

23   exchanges about what your testimony would be about?

24   A.  No.

25   Q.  Before October do you remember how many months

1  before that you first spoke with Ms. Huang?

2     A.  I'd have to look to figure out but it's

3  anywhere -- initially since we initially spoke about

4  this at the beginning, it was anywhere from six to

5  eight months ago maybe.  I'd have to research my

6  records on that.

7     Q.  Okay.  And how did that come about?  Did she

8  call you or --

9     A.  No.  I believe I reached out to her because I

10  heard about the ongoing case of the inmates against the

11  department.  And we were going through a very

12  significant, you know, staffing problem as you brought

13  up too so I approached her on it.

14     Q.  Okay.  And how long did you speak for?

15     A.  I don't remember.

16     Q.  What did you speak about?

17     A.  The staffing problems.

18     Q.  Okay.

19     A.  Maybe a little bit about sunlight issues, but

20  majority of it was staffing problems, sunlight and

21  maybe recreation or physical -- physical recreation.

22     Q.  Okay.  So if my math is correct, six months ago

23  would be about June of last year up to eight months ago

24  would be April.  So April to June, do you think that's

25  the time frame in which you first reached out to

 1  Ms. Huang?
 2      A.  I'm not sure.  I'd have to, you know, try to
 3  figure that out.  I don't remember an exact date.
 4      Q.  Oh, yeah.  That's okay.  That's why I was just
 5  asking, you know, for months if you could --
 6      A.  Yeah, that's possible.  That's possible.  I
 7  would have to try to look back and figure it out.
 8      Q.  Is there a way that you can figure out when you
 9  first reached out to her?
10      A.  Maybe.  I'm not positive but --
11      Q.  And did you give her a call or send her an
12  e-mail or what was your first contact?
13      A.  I believe it was a phone call.
14      Q.  And were you able to talk about the issues in
15  the case right away?
16      A.  Yes.  I don't think so right away.  I think it
17  may have been like a -- no, it wasn't right away.
18      Q.  Do you remember then when you first were able
19  to have a substantive or meaningful conversation with
20  her about the case?
21      A.  It's been awhile.  I don't.
22      Q.  Did you follow up with any e-mails with her?
23      A.  Yeah.  I believe so.  The documents that I
24  sent, I sent the Sabot Consulting documentation that we
25  had done up to them.

1      Q.  Do you remember when you sent that over?

2      A.  I don't.

3      Q.  Do you have -- are you able to put or find out

4  in your in-box -- I'm not sure what your in-box looks

5  like, but on mine you can type in someone's name and

6  find out when the first e-mail correspondence was with

7  a person.  Are you able to easily do that?

8      A.  I could try.

9      Q.  That would be great.  We don't have to do that

10  right now, unless you can multitask, but we can do that

11  on a break if that works for you?

12      A.  Uhm-hmm.

13      Q.  And when you sent over that Sabot Consulting

14  report, would that have been one of the first

15  communications you had by e-mail with Ms. Huang?

16      A.  Yeah, I don't remember.

17      Q.  All right.  Well, when you have a chance,

18  whether it's on a break, I'll just ask you to see if

19  you can filter out by date when the first e-mail

20  correspondence was that you had with Ms. Huang.

21      A.  Sure.

22      Q.  Thank you.

23          Okay.  When you did speak substantively with

24  Ms. Huang what did you talk about?

25      A.  Oh, staffing problems, just like I mentioned to

1    you.  Everything we spoke about so far on the depo
2    primarily related to staffing problems.  And then, you
3    know, a little bit about, you know, access to sunlight
4    and physical recreation.
5         Q.  And what did you tell her specifically about
6    the staffing problems?
7         A.  Exactly what I told you about the mayor doing
8    the equity study, preventing testing for nine months.
9    You know, the loss of the 25 deputies.
10        Q.  Due to the COVID vaccine?
11        A.  Yeah, right.  Some of the recruiting issues,
12   our staffing shortages, yeah.
13        Q.  We've gone over quite a bit regarding the
14   staffing challenges, right, the negative number of FTE
15   spots that are outstanding.  We've gone over the
16   recruitment efforts.  We've gone over the senior deputy
17   level drawdown.  Is there anything else substantively
18   that you remember speaking with Ms. Huang about
19   regarding staffing issues that we haven't talked about?
20        A.  We've had some deaths, deputies pass away.
21   We've had four deputies pass away, several on duty.
22   I'm not sure if I brought that up.
23        Q.  No.
24        A.  I don't think I have.  Anything related to the
25   cause of our staffing issues.  Right off the top of my

1    head I can't think of anything else.  Those are, like,

2    the primary -- I think those are the primary issues.

3          Oh, I may have talked about the civil grand

4    jury reports, the controller reports, yeah.

5      Q.  Okay.  I'll follow up with those in a minute.

6          Are there any other factors that you're aware

7    of that contributed to the staffing issues, other than

8    what we've talked about?  For example, you just brought

9    up four deaths of deputies, that's tragic.  But any

10   abnormal attrition rates or any early retirements that

11   were unanticipated, basically any other factors that

12   contributed to the staffing shortage?

13     A.  There was a period of time where morale was a

14   little bit down and I think that increased some

15   retirement.  I think it's turning around.

16         We have another issue that's actually causing,

17   you know, problems to the deputies which could be

18   contributing.  I don't know if you remember that County

19   Jail 4 closed in 2020?

20     Q.  Yes.

21     A.  And that was a maximum security facility.  When

22   that closed they moved all the maximum security inmates

23   to CJ5 predominantly and some to CJ2.  Those two

24   facilities weren't built for maximum security so a lot

25   of issues surrounding that in trying -- the sheriffs

1  trying to do updates and kind of bandaid areas to try

2  to make it more like a maximum security.  But that's a

3  huge problem in itself.

4       The sheriff's department really needs a maximum

5  security facility which has been neglected.  You know,

6  the city has built a lot of new buildings recently for

7  a lot of the city departments, but if you really want

8  to remedy the situation, that's one big component the

9  sheriff's department needs.  I mean, we need a facility

10  built for maximum security.

11       If you look at the changes that occurred in the

12  last couple of years in the criminal justice system,

13  we're not housing as many misdemeanants or medium

14  security inmates as much.  The majority of inmates or

15  incarcerated people right now are charged with,

16  obviously, felonies, but 245s and above.  That's the

17  majority of our population.

18       So we're dealing with a more -- if you will,

19  higher crime rate or higher -- more of a sophisticated

20  population that are more into violent crimes and above.

21  So that's a big problem which I think the sheriff is

22  trying to deal with, but really the only true remedy is

23  that we need a maximum security facility.

24    Q.  And how does that change in the population with

25  the severity of crimes alleged?  How does that manifest

1    itself in jails?  Why is it a problem for deputies
2    today?
3        A.  Basically you just condensed everybody into two
4    jails and you let -- you condensed more of the serious
5    offenders into the two jails that aren't built to
6    handle that.
7            So there's a lot of upgrades and outfitting
8    that needs to be done that hasn't been done.  And by
9    not doing that it harms the deputies and the employees.
10   I'm sure it harms some incarcerated people too because
11   the security need or the security devices or
12   construction needed to make it as safe as possible
13   isn't there in all cases.
14           So by having a properly built facility that
15   addresses that it would reduce a lot of risk, and it
16   would be more safe for everybody.  And that does
17   increase the stress level on the deputies because
18   there's only so much they can do, especially if that
19   safety function or how something is built to safely
20   transport someone or move them from one area to the
21   other area and remove restraints safely without being
22   attacked is kind of a big deal.
23       Q.  Yeah.  That was helpful.  You just gave me a
24   particular example of an increased safety concern.  For
25   example, transporting people and removing the

1    restraints.

2         Are there any other kind of specific examples

3    that you have about how the population in jails now is

4    more challenging and stressful for deputies to handle?

5    A.  Well, we have -- well, like I said, you

6    condensed two jail -- or one jail into two areas so we

7    also went from a linear jail to medium security direct

8    supervision jails.  So it's not as -- the job is -- the

9    job has become more difficult in a way trying to manage

10   incarcerated people that are maximum security.  And

11   when it becomes more difficult to do that, you know,

12   stress levels go up, tension levels go up.

13        And there's actually, you know, some cases

14   there could be a change in how things are done and a

15   change does increase stress levels and tension.  If

16   you're getting increased stress levels and tensions,

17   you're looking at more arguments, more fights, more

18   attacks maybe.  Things that could have been avoided.

19   Q.  I've heard that the direct supervision model is

20   more rehabilitative for people in jail than the linear

21   style.  Is that accurate, to your knowledge, or --

22   A.  I don't know if there's any data proving that.

23   I mean, it could be -- I would lean more to it being

24   more accurate just because, you know, for like a medium

25   security environment or non ad seg, non special

 1   housing, you know, it is more of -- has a little more
 2   social environment to it.  So I think that is helpful,
 3   yeah.
 4        Q.  And how is having maximum security people in
 5   jail, how is that different or how has the difficulty
 6   increased between a linear jail cell versus the pod
 7   structure?
 8            (Court reporter clarification.)
 9   BY MS. BERDUX:
10        Q.  How is it more challenging to have maximum
11   security inmates in a direct supervision jail versus
12   linear?
13        A.  Well, in this case our direct supervision is
14   not built for it so a lot of the maximum security
15   inmates that are specifically in ad seg, they have
16   different degrees of security and they have to be
17   handcuffed or waist chained and/or leg shackled.  And
18   some of the areas of the jail aren't set up for that,
19   either to remove those restraints or put those on,
20   those restraints on safely.
21            So there are doors within, you know, the pods
22   that don't have handcuff ports.  So if you can imagine,
23   moving someone that's high security and if they had a
24   roommate or if there's two of them and you're putting
25   them in a yard for recreation and there's no handcuff

1   ports on the door, you have to do it while the door is
2   open.  And when you're removing cuffs and leg shackles
3   and all that, there's been times where deputies have
4   been attacked because the door is open.  It leaves
5   their whole body, you know, visible for available for
6   attack.
7          Now, if we had, like, for example, handcuff
8   ports in all those doors, it reduces the chance of that
9   attack.  You know, things like that.  That would be,
10  like, big improvements.
11         And I'm not sure, but we -- in the past even
12  the showers didn't have those, didn't have, like, a
13  secure handcuff port.  I think some areas they tried to
14  upgrade it.  I'm not sure if they're all upgraded or
15  not.  But that was another issue too.  And then you can
16  get attacked while giving them the opportunity to
17  shower or something like that.
18         But yeah, that was one of the main issues.
19         We obviously have to transport them to court
20  from San Bruno which presents a whole other issue in
21  itself because we have equipment failures with the
22  buses.  So the buses that the department bought via
23  contract due to the contracting process by bid did not
24  give us the most reliable buses.
25         The most reliable buses -- I mean, if you've

1  ever seen them -- are MCI.  You'll see the Google buses
2  and all those, I think those are MCI.  Or state prison
3  buses are MCI or L.A. County, MCI.  MCI has been known
4  as the more reliable, especially in this industry,
5  transportation bus.  The department has been trying to
6  get those but the process -- the contract bidding
7  process hasn't been aligning with that company.
8      So now we've had very long history of bus
9  problems and bus breakdowns.  And it's just, you know,
10 it's not the best, you know, the way things are set up
11 right now.
12     Q.  Are there any other specific types of examples
13 that you can share that have caused increased stress or
14 difficulty or challenges on deputies because of the
15 increased maximum security inmates that are being
16 housed in San Bruno?
17     A.  Obviously the biggest one is the understaffing.
18 That's forcing our deputies to work more.  You know,
19 just like in the civil grand jury reports and the
20 controller reports that they point out is true, you
21 know, we're getting exhausted.  And it all comes down
22 to, you know, basically just points to one thing, you
23 know, is the city doing everything they can to attract
24 law enforcement officers, one.  And are they recruiting
25 aggressively to fill those positions.  You know, that's

1  kind of what it comes down to.
2       And the gap in the FTEs is too great.  It's not
3  feasible.  I mean, you could -- maybe 7 percent --
4  7 percent of total FTEs probably is workable for
5  voluntary overtime, yeah.
6     Q.  Okay.  Thank you for that.
7       You mentioned -- also going back to your
8  discussions with Ms. Huang, you talked about recreation
9  and outdoor access.  Did I hear that right?
10    A.  Right.
11    Q.  Okay.  And what did you talk about in regards
12 to outdoor access?
13    A.  I can just tell you what I know.
14      There isn't any outdoor access.  So the gym at
15 CJ2 is the upper level of the facility, it's an indoor
16 gym.  County Jail 3 has concrete yards and that's it.
17 So there's recreation areas, but yeah, the only outdoor
18 access would probably be going to court.  Going to
19 court or coming back.  Unless there was some special
20 circumstance where maybe they had to attend a funeral
21 or something like that.
22    Q.  Did you have any other substantive discussions
23 with Ms. Huang about outdoor access?
24    A.  No, I don't think so.  I mean, that's the gist
25 of it.

1    Q.  And what about recreation, did you have any
2  discussions with her about recreation?
3    A.  Same thing.  To me it's the same thing.
4    Q.  Okay.  Before I forget, we went over your
5  career history, but are you able to estimate for me the
6  number of months or years that you spent working in --
7  well, now County Jail 3, formerly County Jail 5, the
8  facility in San Bruno?
9    A.  I never worked there.  County Jail 3 I worked
10  at was the 6th floor 850 Bryant Street.  They've gone
11  through a couple of number realignments.
12    Q.  Yeah.  Okay.  What is the total amount of time
13  that you've spent as -- working in the jails?
14    A.  Oh.  Tough question now.
15    Q.  Estimates are fine.  You don't have to be
16  exact.
17    A.  Shoot.  I think 19 -- is that right?  Around 19
18  years.  Right around there, yeah.
19    Q.  Okay.  Let me back up to your deposition prep.
20      You worked on locating and sending us the
21  documents.  Thank you for that.
22      You also spoke with Ms. Huang.  Are there any
23  other substantive conversations that you had with
24  Ms. Huang that we have not discussed?
25    A.  I don't think so.

1       Q.  And other than speaking with Ms. Huang and

2   looking for those documents, searching for those

3   documents, have you done anything else to prepare, of

4   course, besides speaking with your attorney?

5       A.  No.

6       Q.  Are you being compensated for your time

7   testifying?

8       A.  Well, not specifically for testifying, but I am

9   being compensated.  I'm on duty.

10      Q.  Okay.  Yes.  As president of the DSA?

11      A.  Right.

12      Q.  But are you being paid anything extra for your

13  time?

14      A.  I wish, no.  No.  Not at all.

15      Q.  Have you ever seen the disclosure of you as a

16  witness in this -- in the case?

17      A.  Disclosure?  What do you mean?  I don't

18  understand.

19      Q.  Yep.  I'm sorry, that's like a legal term of

20  art.

21          But in this lawsuit both sides disclosed expert

22  witnesses and nonretained expert witnesses.  And you

23  were identified, that's how you came to be sitting here

24  today.

25      A.  Yeah.

1    Q.  Have you ever seen that written disclosure?

2    A.  I don't think so.

3    Q.  Okay.  Did you talk to Ms. Huang about what you

4  could testify about?

5    A.  No.  Huh-uh.  I believe Ross Mirkarimi is

6  another expert witness.  I did speak to him.  I think

7  she mentioned his name and we did connect and I talked

8  to him.

9    Q.  Oh, great.  When did you speak with him?

10   A.  The last time I spoke with him was around

11  October.

12   Q.  Okay.  And how long did you spend speaking with

13  him?

14   A.  Maybe 20 minutes.

15   Q.  Is that the only conversation you had with him?

16   A.  No.  We had a couple prior to that.  I mean, I

17  guess he was preparing his expert report and he had

18  some questions.

19   Q.  Okay.  Approximately how many conversations did

20  you have with him?

21   A.  Could have been three or four.

22   Q.  And in total how much time did you spend

23  talking with him?

24   A.  In total, maybe an hour.

25   Q.  Okay.  And what questions did he have and what

 1  information did you give?

 2      A.  A lot of it was about the Sabot reports that we

 3  did.  And I briefed him the same as I did Ms. Huang,

 4  like I was telling you, on the staffing.

 5      Q.  That Sabot report, was that for San Francisco

 6  or was that the Alameda County one?

 7      A.  That's the one we did.  The DSA did that one.

 8      Q.  When did the DSA do that?

 9      A.  I have to look.  Off the top of my head, I'm

10  thinking March and June.  Those might be the months but

11  I'm not positive.

12      Q.  In what year?

13      A.  I have to check.  I'm not sure if it was '22 or

14  '21.  I have to check.

15      Q.  And did you work directly with Sabot on that

16  report?

17      A.  Yes.

18      Q.  Who did you work with?

19      A.  Patrick Cowan.

20      Q.  And what was the takeaway from that report?

21      A.  He did a great job.  He actually brought out

22  some things that I didn't realize.  So kind of like in

23  short, the takeaways which he added to what I already

24  knew was that the -- there were unbudgeted positions

25  within our department where people were assigned.  In

1   that also -- just by doing that that impacts, you know,

2   our staffing in a way too because they should have been

3   in budgeted positions.

4           And then he reviewed the controller's report.

5   I think he concurred a lot with the controller's report

6   and the excessive amount of overtimes.

7           He mentioned in the report the excessive amount

8   of overtime, the rate of overtime which kind of stood

9   out to me that was at a high of 30 percent, according

10  to his studies.  And he did talk about the promotional

11  piece where deputies were going to sergeant which was

12  impacting staffing as well.

13          He brought up that FTEs were reduced over time

14  by the city which I really didn't realize until he

15  brought that up.  That they were at I think about

16  1060ish and we were reduced to close to 1000 over time.

17          It was probably more, but it's -- it's all in

18  the report.

19      Q.  And what did you do with that report when you

20  received it?

21      A.  Well, my attorney might get mad, but I read it

22  and gave it to my attorneys.  Yeah.  And then, you

23  know, you have a copy, Yolanda has a copy and I believe

24  Ross Mirkarimi has a copy.

25      Q.  Did you ever give it to anybody at the

1   sheriff's office?

2       A.  I have to check.  I don't -- I don't recall if

3   I gave them a copy of it or not.  I don't think so.

4   But I talked about it with them a lot.  And the good

5   thing is, though, I think they've been really trying to

6   fix a lot of issues which I'm really happy about.  And

7   I think they are -- or they have reduced a lot of the

8   unbudgeted positions.  Some where they placed deputies

9   in unbudgeted positions, they pushed them out.  So

10  there's some reduction there.

11      Q.  And I'm so sorry, what does that mean

12  practically?

13      A.  Unbudgeted?  I'm sorry?

14      Q.  Yeah, yeah.  Like what was happening -- I mean,

15  I know what an unbudgeted position might be but if you

16  can -- go ahead.

17      A.  Right.  So they added positions that weren't

18  basically budgeted for, right.  So if you think about

19  the sheriff's department -- this is how I think of it.

20  So the city has a city charter which has

21  responsibilities of the sheriff.  Those are the key

22  responsibilities and that's what the -- how I

23  interpreted, that's what the people of San Francisco

24  are paying for tax wise, right.  So that encompasses

25  their budget.

 1          So the budgeted positions, you know, within the

 2   department which the department, you know, advocates

 3   for with the mayor, the board of supervisors and so

 4   forth, you know, probably speak for themselves.  Like,

 5   for example, the jails, the courts, civil service,

 6   right.  Normally I would say the other positions will

 7   be contracted, so it's paid for by somebody else,

 8   right, they're being paid for.

 9          Now, an unbudgeted position is basically, in

10   this case, they added an additional person to personnel

11   which wasn't budgeted for.  So when you make a move

12   like that you're taking from somewhere else.  They

13   added additional positions to K-9, additional positions

14   to criminal investigations, additional positions to

15   adult probation department but I believe they

16   eventually contracted that.

17          And then the CARC office, that wasn't being

18   paid for, but we had a deputy there so that's

19   unbudgeted.  There were a few others.  Those are just

20   off the top of my head.

21     Q.  Do you know approximately how many unbudgeted

22   positions there were?

23     A.  For deputy sheriffs, from what I remember, I

24   think he said 12 in the report.  And that's not

25   encompassing, you know, supervisors, sergeants and

1  above because we didn't look into that too much.  Well,

2  actually, he may have had that in his report.  I think

3  he did have that in his report.  But I remember for

4  deputy sheriffs there were 12.

5      Q.  Okay.  And what has that been reduced down to?

6      A.  You know, I'm not positive, but I think it's

7  got to be at least 50 percent by now.  Because I know

8  they only have three people in personnel.  They removed

9  a K-9 position.  And I think they removed a couple

10 extra of the criminal investigator positions.  And

11 there could have been some other in there, but I know

12 of those.

13     Q.  And was there a need in those areas for people

14 or why were they put there, those unbudgeted positions?

15     A.  You know, I don't know.  I don't know if there

16 was -- I'm sure the department felt there was a need

17 but I'm not aware of one, yeah.

18     Q.  And now that the unbudgeted positions have been

19 reduced, where did those people go?

20     A.  I think they went back to -- as far as I know,

21 I think some went back to their prior assignments.  I'm

22 not sure about all.

23     Q.  Do you have any idea where those prior

24 assignments were coming from?

25     A.  I think one was City Hall.  I know that one for

1   sure, yeah.

2       Q.  Do you know if any or how many were from San

3   Bruno County Jail, or I should say CJ3?

4       A.  I can't say for sure.  I don't know.

5       Q.  Has the sheriff's office taken any other steps

6   that the Sabot report addressed?

7       A.  Yeah, I think so.  Let's see.  The sheriff's

8   made some good changes this year.  Recently he reduced

9   the mandatory amount of drafts to two.  So although I'd

10  like to see that's permanent, that's temporary.  What

11  that does is it cycles through a larger group of

12  deputies, if not all the deputies in the facilities.

13  So that relieves some of the exhaustion, right, gives

14  them time to recover.

15          We recently agreed with the department to hire

16  part-time deputies which the DSA agreed upon.  So we

17  have some relief there.

18          Shoot.  I know there was something else, I just

19  can't think of it right now.  There was another --

20  there was something else I was thinking of too.  Shoot.

21  I lost the other one.  It might come back to me in a

22  little bit.

23      Q.  Please interject if it comes back to you.  I

24  know sometimes things pop into people's heads.

25          When did the sheriff's office start trying to

1    address some of these issues in the staffing?

2        A.  Well, I think, you know -- I think they started

3    addressing it in June of 2022 when they started to

4    formulate better recruitment efforts.

5            And then I'd say, let's see, right around from

6    November until now they've been on track trying to fix

7    a lot of issues and work with us to resolve issues

8    which has been really good.  So I think the

9    relationship has gotten a lot better.  They're not, you

10   know, violating our contract or anything like that.

11   They're working with us.  I think it's been going

12   really well.

13       Q.  That's good to hear.  Let me back up.  I had

14   some follow-up questions about that senior deputy

15   position.

16           When that was ruled out, I think in 2018 or so,

17   did I hear that right?

18       A.  The phasing out?  Yeah.

19       Q.  The phasing out.  Is that something that the

20   DSA had to agree to?

21       A.  Yes and no.

22           THE WITNESS:  So, Sean, can I talk about that?

23   I should be, right?  It's all past.

24           So basically if it was the removal of, you

25   know, a current senior deputy that would be impacts on

1  us.  But what they were doing was as senior deputies

2  retired or left they were not filling the positions,

3  they were, in essence, phasing them out, right.

4      Q.  Right.

5      A.  So they were re-purposing the money and when

6  they didn't fill the senior deputy position 2018, I

7  think in 2019 they split the money of the vacant

8  positions that weren't filled and they used that money

9  for some deputies and some sergeants.  And after 2019,

10 I'm not sure how many new vacated positions they had or

11 if there was money to split, but at that point they

12 just promoted a deputy to sergeant which was a pretty

13 good amount.

14     Q.  Okay.  Was there ever a loss in the number of

15 FTEs from the phasing out of the senior deputies?

16     A.  Well, I think -- to me I think there was.  I

17 don't think it was a great loss, but I think -- this is

18 just rumor.  I haven't factually researched it, but I

19 heard I think it was in 2019 -- between the period of

20 2018 to maybe the end of 2019, I mean, there was a

21 rumor that they used funding from the senior deputy

22 position to pay for the chief of staff.  I don't know

23 if that's factual or not.  I never really dug into it.

24         I don't think the split was -- it was probably

25 close, but I don't think it was -- the split was fully

1 accurate.  But we didn't even agree to that split.

2 That was department re-purposing the money.

3     Q.  Well, you kind of answered what my next

4 question was going to be.  But beyond the rumor about

5 trying to pay for the chief of staff, do you know of

6 any other reasons why the senior deputy position was

7 phased out?

8     A.  Well, there's different arguments to it.  I

9 think from what the department has told me they felt

10 there wasn't a clear and concise description of the job

11 duties.  So senior deputy could do a deputy position

12 and a senior deputy as a supervisor, like a hybrid like

13 I mentioned before.  But they felt it wasn't -- the

14 position wasn't really being used correctly or the job

15 description weren't clear.

16          There were talks in the past and we were open

17 to this.  We said, okay, let's redefine or clean up the

18 job description.  And then there were talks about

19 making the senior deputies into more responsibilities

20 as trainers as well.  And we're open to that.  And then

21 I think the department didn't like the fact that the

22 senior deputy wasn't draftable and they couldn't

23 mandate the senior deputy to work involuntary overtime

24 as a deputy.

25          So we were open to changing that as long as we

1  can maintain, you know, the senior deputy position

2  because by the end of the day it's a good position for

3  the deputies, a stepping stone on their way up through

4  the supervisor ranks.  Good for experience and so

5  forth.  But that's -- that's what I have on that.

6      Q.  Okay.  Did the phasing out of the senior deputy

7  position result in a few more regular deputies?

8          MS. HUANG:  Excuse me.  I didn't hear.  Can I

9  have it repeated?

10 BY MS. BERDUX:

11     Q.  Did the phase out of the senior deputy role

12 result in having a few more deputies, sheriff deputies?

13     A.  It didn't increase the amount of deputy FTEs

14 overall, but they did spend some of the money to hire

15 deputies to fill the vacancies.

16     Q.  And others were promoted even higher to

17 sergeant; is that right?

18     A.  Right.

19     Q.  Okay.  You talked about a couple of things that

20 the sheriff has taken to address the staffing issues:

21 increase recruiting, hiring part-time deputies and

22 reducing unbudgeted positions.

23          Are there any other specific actions that

24 you're aware of the sheriff's office taking to try to

25 help the staffing shortage?

1          MS. HUANG:  Excuse me.  Excuse me.  Try to what

2     the staffing shortage?

3          MS. BERDUX:  Improve.

4          MS. HUANG:  Try to improve the staffing

5     shortage.  Okay.  Thank you.

6          THE WITNESS:  We did -- there's maybe one --

7     well, it didn't really affect staffing.

8          I don't -- I can't think of any others.

9     BY MS. BERDUX:

10     Q.  Are there any other recommendations by the

11     Sabot Consulting report that the sheriff's office could

12     do but haven't done or started yet to improve the

13     staffing shortage?

14     A.  Well, the only other thing I think of is there

15     seems to be, like I said, when we're talking about the

16     controller, the sheriff's budget needs to be increased

17     because he doesn't have -- doesn't have the proper

18     relief factors configured in with our staffing.  The

19     relief factor is too low.  And obviously you know about

20     the staffing shortage, the overtime.

21          So the main -- the bigger elephant in the room

22     would probably be increased budget so the sheriff has,

23     you know, more money to get into more aggressive

24     recruiting.  Oh, yeah, that reminds me a little bit.

25     Sabot also recommended 12-hour shifts across the board

1    at all the facilities so deputies have time off to
2    recover.
3            But, you know, yeah, the biggest elephant in
4    the room is probably funding, more funding so we don't
5    get into that issue.  Properly staffed.  And then if
6    there's a budget cut or a supervisor does a cut, then
7    the sheriff's running out of the gate out of a
8    negative.  I'm sure you know the controller's job and
9    understand his position, if the sheriff runs his budget
10   as a negative and the controller is monitoring that,
11   the controller basically controls the funds and
12   basically says I can't provide you funds until you
13   provide me a plan on how you're going to get back in
14   budget.  That seems to -- seems to happen -- that
15   happened a couple of times which slowed down hiring
16   too.
17           But, yeah, so end of the day appropriate
18   budget, a little bit higher budget so you can get the
19   staffing correctly, get the money for staffing, the
20   money for recruiting.  And then, you know, Sabot
21   mentioning 12-hour shifts across the board which also
22   relates back to staffing and staffing recovering so
23   they're not exhausted.
24       Q.  Okay.  It will -- do you or the DSA have a
25   position on 12-hour shifts?

1      A.  Yeah.  They seem to be the norm in the Bay
2  Area.  The members like them.  They could actually have
3  a life outside of work so we're supportive of that.
4      Q.  Has that been addressed or considered at all,
5  to your knowledge, between the DSA and the sheriff's
6  office?
7      A.  Yeah, yeah.  We're slowly getting there.
8          CJ2 is 12 hours.  City Hall is on a 12-hour
9  shift.  Community programs is 12 hours.  SFGH, 7D7L is
10  12 hours.  I'm not sure if I missed anything.  City
11  Hall, yeah.  So, yeah, slowly getting there.
12          CJ1 and CJ3 we're hoping at some point we can
13  get them to 12-hour shifts.  But we really have to ramp
14  up the recruiting obviously.  So hopefully get to that
15  point.
16      Q.  And that will help -- 12-hour shifts, in your
17  opinion, that will help quality of life for the
18  deputies and help with their exhaustion and recovery
19  from their shifts?
20      A.  It could help with recruiting too, yeah.
21      Q.  And that's something that the sheriff's office
22  is moving toward, in your opinion, trying to make that
23  happen?
24      A.  Yeah.  The biggest, you know, I guess hurdle is
25  we have to get the staffing.  That's the priority.  We

```
 1    have to get the staffing up.
 2        Q.  Do you have any recommendations by Sabot that
 3    the sheriff's office hasn't done or can do as far as
 4    working on?
 5            MS. HUANG:  Objection.  Compound.
 6    BY MS. BERDUX:
 7        Q.  You can go ahead.  It's basically the anything
 8    else question.
 9        A.  Without reviewing the report in front me I
10    can't think of any.
11        Q.  Fair enough.
12            You worked for the sheriff's office under
13    Sheriff Mirkarimi, right?
14        A.  Yes, uh-huh.  And Michael Hennessy as well.
15        Q.  Great.  What is your impression of
16    Mr. Mirkarimi's tenure as sheriff?
17        A.  You know, I think he did a good job overall.
18    He really tried to make some positive changes.  I know
19    he did -- he had a really good push with our patrol
20    unit and got them POST certified and brought on --
21    which I thought was kind of -- it was kind of -- I
22    mean, he brought on a good undersheriff.  I think it's
23    Federico Rocha.
24            But the interesting thing about him was he
25    brought something which was kind of unique too, was he
```

1   was able to get our warrants unit sworn in as marshals
2   as well.  I thought that was pretty cool.
3        But, yeah, overall outside of all the
4   controversy I think he did, you know, a good job.
5        Q.  And what about Sheriff Vicki Hennessy?
6        A.  I think she did pretty good too.  One thing --
7   one thing about Vicki is she spent her time thinking
8   about something and then she made a decision and she
9   stuck with the decision.  So she did work to get
10  staffing up.  She did advocate with the mayor's office
11  a lot like all the sheriffs do.  I think she did the
12  best she could.
13       Q.  How about Sheriff Miyamoto?
14       A.  Sheriff Miyamoto, he's doing good.  I've known
15  him for quite a while.  He's had some changes in his
16  administration.  We had some hiccups early on, but, you
17  know, he's very -- he's doing a great job right now.
18  He's very big on advocating for us so I think we're on
19  the right track.  We just, you know, we got to -- like
20  I was saying, we got to get the funding up hopefully.
21       I don't want to totally speak out of pocket or
22  go too long but the way I kind of see things is we're a
23  city and county.  Seems like you city departments get
24  funded better and the quote/unquote county sheriff's
25  department is not funded appropriately.  I think if

1    that was addressed, if we had a maximum security
2    facility, I think things would fall in place a lot
3    better.
4        Q.  I don't think I've ever deposed anybody from
5    any department that said they have enough money.
6        A.  Well, I could counter argue some of those other
7    departments, I'll tell you that.  I mean, they get new
8    buildings.  I can go on but --
9        Q.  I hear ya.  I hear ya.  Okay.
10            Do you have any knowledge of the actual
11   staffing levels at CJ3?
12            MS. HUANG:  At what time?  Objection.  Vague as
13   to time.
14   BY MS. BERDUX:
15       Q.  Yeah.  First currently.
16       A.  Yeah.  So percentage wise from what I remember
17   I believe they're about 70 percent capacity of what
18   their staffing should be.
19       Q.  Okay.  And have they ever been at a higher
20   percent of what their staffing should be?
21       A.  Yeah.
22       Q.  When?
23       A.  Oh.  At least 2019.
24       Q.  And in 2019 what percentage of staffing did
25   they have?

1      A.  Oh, I don't know.  I don't have those numbers
2  in front of me.
3      Q.  Has it ever operated at a hundred percent?
4      A.  I don't think so, no.
5      Q.  Do you have any kind of estimate for what the
6  average percentage of staffing it's operated at?
7      A.  Right now, I don't.  I could review it and get
8  it, but I don't have it right now.
9          MS. BERDUX:  I'm going to pass for a moment.  I
10  know Ms. Huang has some questions.  We have about an
11  hour and a half before we have to go -- before we have
12  a hard stop for today.  But I want to make sure she
13  gets that chance.
14          MS. HUANG:  It is now 2:32.  How are you doing,
15  Mr. Lomba?  Would you need a break at this point?
16  You've been going for about an hour.
17          THE WITNESS:  I think I'm okay.  I could keep
18  going.
19                    EXAMINATION
20  BY MS. HUANG:
21      Q.  I want to go over some of the things that you
22  guys have covered.  And what -- I understand when
23  you're talking about how CJ3 was not built for maximum
24  prisoners.  Do you have anything in writing that says
25  what CJ3 was designed for?

1     A.   Probably.  There actually was a really good

2  article by the SF Chronicle that really described CJ3

3  and its purpose.  You know, I believe Mike Hennessy

4  quoted on it.  I think it was -- I think it was around

5  2005 if I remember right.  Yeah.

6     Q.   Would you have a copy of that article by any

7  chance?

8     A.   I think I do have a digital copy or PDF printed

9  copy.

10     Q.   Okay.  So 2005 would have been before the new

11  building was open, correct?  Was it about the old

12  building or was it about this new building that exists

13  now?

14     A.   When did the new building open?  It was about

15  the new one.

16     Q.   2006.  So it was before?

17     A.   It was right -- it was probably -- so if the

18  article was 2005 it was prior to it being populated by

19  incarcerated people, but they were in there taking

20  photos and they did photos of the jail.

21     Q.   If I got this right, you've not actually served

22  as a sheriff's staff member doing detentions in the San

23  Bruno Jail, you only worked in CJ4 which is the

24  850 Bryant facility, correct?

25     A.   For the most part, I wasn't assigned to CJ3 San

1  Bruno.  I think I maybe did one day of overtime there

2  and that was probably it.  But that's about it.

3      Q.  Other than that one day, have you been through

4  San Bruno or are you, like, familiar with the way it's

5  laid out and the way the pads are and so forth?

6      A.  Yeah, I do go through there to go visit our

7  members.

8      Q.  So some of the items that you talked about, the

9  main item that I got about why CJ3 is not designed for

10  maximum security is the whole thing of having secured

11  doors with handcuff ports; is that correct?

12      A.  Maybe that's not the only thing.  But, yes.

13  But then there's also separation of gangs.  So in this

14  you bring up a good point.

15          In a pod setting with like maximum security

16  inmates if there's more than one gang, then you have to

17  separate the gangs as well and any keep-aways and that

18  type of stuff.  That gets a little more difficult, you

19  know, with maximum security inmates because, you know,

20  I hate to say it but sometimes they present more

21  housing safety issues like that.

22      Q.  So if I recall correctly, even when CJ4, the

23  850 Bryant Street, was up and running, the sheriff

24  operated maximum security out of San Bruno; isn't that

25  right?

1      A.  Yeah, I don't remember.  I'm not sure if they
2   did or how many were there.
3      Q.  So you're not sure whether or not they had at
4   least one, maybe two housing units for administrative
5   segregation?
6      A.  I'd have to look at the past documents over
7   there on the housing.
8      Q.  Okay.  So if, in fact, there were
9   administrative segregation housed at San Bruno, did you
10  understand that the sheriff had been either ignoring
11  or -- the security issues for a while?
12     A.  I don't know if ignoring is the right word.
13  Just thinking back at it what you're saying because of
14  the closure of CJ3 before CJ4 I think you're right.
15  There probably were a portion of max -- maximum
16  security incarcerated people at CJ3, but it increased
17  when CJ4 closed.
18          But I don't know if ignoring is the right word.
19  I'm not sure what the delays were, but we did a lot of
20  advocating for handcuff ports and things of that nature
21  to be installed.
22     Q.  What period of time did that start, the
23  advocating of handcuff ports?
24     A.  It could have been any time after 2018.  I
25  think part of the problem is the construction of CJ3,

 1  the doors had to be specially ordered.  If I remember
 2  correctly they had to order special doors to get
 3  handcuff ports built into the doors.  There's a lot of
 4  specialty work that was needed to get that stuff done.
 5      Q.  I've not actually ever witnessed anyone
 6  handcuffed through a door at any of the facilities in
 7  the city of San Francisco, but am I correct in
 8  understanding that the -- that the slot that is used
 9  for meals is also the handcuff port?
10      A.  Yes.
11      Q.  So it does double duty?
12      A.  Yes, correct.  And it helps out, you know, a
13  lot with safety.
14      Q.  Now, when you -- when you have someone who is
15  administrative segregation or maximum and they're being
16  released from their cell into the common area for
17  recreation or showers or phone or whatever, are they
18  required to be handcuffed before they can be brought
19  out or are they allowed to simply come out of the cell?
20      A.  Depends on the situation.  So if it was for
21  recreation time they normally -- yeah, they normally
22  would go in restraints to the yard and then the
23  restraints would come off there.
24      Q.  But if they're not being moved, like in San
25  Bruno the common area's right outside the cell.  There

1  is no yard, right?

2      A.  Correct.

3      Q.  So they would simply not -- they would not have

4  to be handcuffed to be released from their cell for

5  recreation?

6      A.  I'm not sure how they did that at CJ3, if the

7  deputies let them in the common areas unrestrained.

8      Q.  So that's not something you personally had to

9  do because you only worked there one day?

10     A.  Right.

11     Q.  All right.  And is that -- is the issue of

12  security something that comes up -- that your members

13  bring up to you?

14     A.  Yes.  Uh-huh.

15     Q.  And so they're concerned that there isn't -- so

16  in addition to not having enough handcuff ports, are

17  there any other issues that they bring up about

18  security at San Bruno?

19     A.  I guess since we're short-staffed the amount of

20  walk time and amount of walk time kind of fluctuates.

21  In the past in the non ad seg pods, let's say for

22  example day shift, they would probably have about maybe

23  four hours of walk time where they're out in the common

24  area for maximum security.  And then on swing shift

25  they probably have, like, maybe another three hours or

1  a little bit more.

2        With, you know, the lack of staffing, that's

3  been changing.  And we call it walk time, the out time

4  basically.  It's been changing and fluctuating.  It's

5  not the same way it was before.

6     Q.  So is it that there's now less walk time,

7  meaning out-of-cell time, because of the staffing

8  shortages?

9     A.  Yes.

10    Q.  And as a result of the reduction in the

11  out-of-cell times have your members observed that

12  there's greater emotional distress or emotional

13  upsetness among the inmates?

14        MS. BERDUX:  Calls for speculation.

15  BY MS. HUANG:

16    Q.  Have your members been reporting that to you as

17  a concern of theirs?

18    A.  Yes.  Uh-huh.

19    Q.  And when inmates are distressed or upset does

20  that affect your members' jobs?

21    A.  Yes, it does.

22    Q.  And how?

23    A.  It makes it a little more difficult.  So it

24  increases tension and stress.  So just like with

25  anybody, they could be easily agitated.  And then also

1   being locked, you know, in the cell seems to in some

2   cases, you know, create unnecessary, like, fights and

3   so forth and other activities.  We've had increase in

4   pruno making and stuff like that so, yeah.

5       Q.  And if someone said to you that a significant

6   contributor to improve mental health among inmates is

7   to have human interaction, would you agree with that

8   statement?

9       A.  Yes.

10      Q.  And that this human interaction is actually

11  face-to-face interaction, it's not simply doing

12  complex -- complex activities like crossword puzzles?

13      A.  Right, right.

14      Q.  Now, one of the things that you're aware of

15  that the sheriff tried to implement in the early part

16  of 2022 was reducing the number of deputies assigned to

17  a housing unit.  Do you recall that?

18      A.  Yes.

19      Q.  And that was when he removed people from --

20  what was the right terminology -- direct supervision to

21  placing a deputy in the crow's nest?

22      A.  Right.

23      Q.  By doing that he actually reduced one whole

24  position in a housing unit, correct?

25      A.  Correct, yeah.

1    Q.  Is that still being practiced, this assigning

2   just one deputy to the crow's nest at San Bruno?

3    A.  It is supposed to have ended.  It should have

4   been phased out by now.  I think the end date was

5   January 17th or 18th.

6    Q.  And did you support or oppose the staffing

7   configuration change?

8    A.  We opposed it.

9    Q.  And why?

10    A.  Well, one, they just initiated it without doing

11   a meet and confer and it was in this case.  Although

12   we're at a staffing shortage, but reducing, you know, a

13   deputy within the pods creates a safety issue.  It also

14   affects response time too to the pod.  In that instance

15   actually it -- the pilot program, although it continued

16   for a couple of months, it did prove that it wasn't

17   successful.

18    Q.  And by having fewer deputies on duty, that not

19   only reduces the amount of out-of-cell time, but it

20   reduces the availability of activities to inmates too,

21   doesn't it?

22    A.  Yes, I would say so.

23    Q.  There are fewer -- if there are fewer deputies,

24   then there are fewer deputies available to escort

25   inmates or to supervise programming; is that correct?

1       A.  It made it a lot more difficult, yeah.

2       Q.  And as a result, those out-of-cell activities

3   were also reduced, these activities for inmates?

4       A.  Yes.

5       Q.  And did your members then report that as a

6   result of this increase in lockdown they observed more

7   conflict between inmates?

8       A.  They believe so.  That's -- they found, you

9   know, quite a bit of pruno being made.  They reported

10  to me an increase in jail made weapons.  And then we

11  had multiple fights in there and even attacks on sworn

12  staff.  Oh, and an attack -- not really a physical

13  attack, but an indecent exposure I believe on a nurse.

14      Q.  All of that makes the work for deputies more

15  difficult?

16      A.  Sure, yeah.  It's more difficult to manage.

17      Q.  And on top of that, deputies were then at that

18  time forced to do a certain minimum amount of overtime?

19      A.  We do -- there is forced overtime and I believe

20  there was a cap -- it was complicated then.  But, yeah,

21  there is forced overtime.

22      Q.  You're saying now that currently the

23  requirement is minimum of two drafts per pay period; is

24  that right?

25      A.  Right.  It was three then.  You're right.

1      Q.  So two drafts means -- a pay period is two
2  weeks, is that a pay period or --
3      A.  So the drafting is per week.  So it would be
4  two per week and it was three per week.
5      Q.  So --
6      A.  So RDO to RDO.  From day off to day off would
7  be the exact verbiage.
8      Q.  In other words, in a week's schedule you could
9  be required to work two additional shifts?
10     A.  Correct.
11     Q.  So if you're working graveyard you could be
12 required to work a daytime shift -- two daytime shifts
13 in that period?
14     A.  Correct, yeah.
15     Q.  Do any of your members report not just the
16 stress of having to work, but any negative health
17 impacts from not having time to have adequate sleep,
18 especially the ones who work graveyard?
19     A.  Well, we've had a lot of -- well, we've had
20 some ailments and then we've had some deaths which
21 everyone, you know, is highly concerned about and
22 suspicious about.  The workload is one of the issues,
23 you know, that a lot of the members bring up.  So we've
24 had, like, heart attacks.  We've had strokes.  And then
25 we've had deaths, yeah.  And it's honestly -- it's been

 1   an unusual amount in the last couple of years.
 2       Q.  When the Sabot report came out -- I'm going to
 3   look at the Sabot report in a minute.  That came out --
 4   hold on.  I have too many things open on my computer
 5   here.  Date of this report is April 19th, 2022.  This
 6   was a report commissioned by the sheriff's department.
 7   Do you know when it was first commissioned?
 8       A.  So the odd -- the strange thing about this is,
 9   which I did not even know, I didn't know the sheriff's
10   department used Sabot to do their own research.  And
11   then we found Sabot because we heard they used them in
12   Alameda.  Alameda used them.  So we went to Sabot to do
13   some research for us.  So we have our two and then
14   apparently the sheriff's department has one too.
15       Q.  I'm going to share my screen and I'm going to
16   share this piece.
17           This is the document that I believe that was
18   provided to me by the city attorney as a document
19   provided by you.  And this says "Staffing
20   Recommendations Submitted April 19th, 2022, for the San
21   Francisco Sheriff's Department."  Do you see that?
22       A.  Yes.
23       Q.  Now, page 2 is a table of contents and page 3
24   is the objective.
25           Now, it says the objective was to review the

1    staffing recommendations made in June of 2019.  And so

2    I'm a little confused.  Is this the report that Sabot

3    did or Sabot did on behalf of the sheriff's department

4    or is this on behalf of DSA?

5        A.  That's ours because Patrick Cowan is on it.

6        Q.  Okay.  And this was based upon examining the

7    staffing recommendations that the sheriff's department

8    made in June of 2019.  Am I understanding that

9    correctly?

10       A.  Oh, you know why.  Okay.  You're absolutely

11   right.  You know why it's that, it's because of the

12   controller's office report.  That was 2019.  Yep.

13       Q.  The controller -- so the controller's office

14   did a report in 2019 and then this report for you was

15   to evaluate how well those recommendations would work;

16   is that correct?

17       A.  Right.  We provided the controller's report to

18   Sabot, yeah.

19       Q.  And then if this report came out in April of

20   2022, you were only able to share it after it was

21   actually produced by Patrick Cowan, correct?

22       A.  Right.

23       Q.  Before you commissioned this report had you had

24   discussions with the sheriff's department about the

25   concerns you had on the staffing shortages?

1      A.  Oh, yeah.  We've been advocating, you know, for
2  staffing since I took office.
3      Q.  And before this report came out had they taken
4  any of your recommendations and implemented them?
5      A.  Oh boy.  As it relates to staffing with us
6  advocating for recruiting, no, not until June of 2022.
7  And we didn't know about the unbudgeted positions until
8  we got the report.
9          We did bring up and advocated for, you know,
10  pointed out the relief factor's incorrect.  And we did
11  bring up what was in the controller's report on the
12  contracts, under pricing contracts, and we were
13  advocating for that.  We did a lot of advocating based
14  off of the controller's report.  And then I guess, you
15  know, as it relates to the controller's report I think
16  that was about it.  But we did a lot of advocating off
17  that controller's report.
18          The 12-hour shifts, the department did start
19  going to 12-hour shifts at some of the facilities.  I
20  hope that answers your question.
21      Q.  Now, something else happened.  What you said
22  was that in July the sheriff started making some of the
23  changes that you had been advocating for, correct, it
24  was started in July?
25      A.  Yeah, June to -- June, July, yeah.

1     Q.  And another thing that happened in July was
2  there was some local news articles about the problems
3  that were happening in San Francisco County Jail,
4  correct?
5     A.  Right, right.
6     Q.  And did that press also encourage the sheriff
7  to make some changes?
8     A.  You know, I can't speak for him, but it might
9  have.
10     Q.  That's when you noticed a change in the way he
11  was approaching the problem?
12     A.  Right.  At least with recruiting, yeah.
13     Q.  And was that also the start of the first time
14  that they were using social media to recruit?
15     A.  No.  Well, so there's paid advertising and free
16  advertising.  They've always posted on their social
17  media pages.  But the paid advertising is what counts
18  because you target -- you can get to more people.  So
19  that didn't -- that didn't start probably until
20  December.  I first started noticing it in December.
21     Q.  Now, did -- and I'm a little confused.  When
22  you were talking about in the beginning of your
23  testimony, did your -- did the DSA pay for some paid
24  social media advertising before December, is that what
25  you guys were doing?

1      A.  Yes.  Uh-huh.

2      Q.  Okay but -- but -- uh-huh.  Go ahead.

3      A.  Just in short, you know, just to repeat what I

4  said earlier, we did a short test.  I think it may have

5  been 2019, 2020, and we provided the results to

6  Undersheriff Freeman.  And then December we did a group

7  of ads.  Right now we have a group of ads going on as

8  well.

9      Q.  Okay.  And when you're saying that the attitude

10  that the sheriff and the sheriff's department had in

11  terms of taking your concerns about staffing seriously,

12  when did you first notice that attitude change?

13      A.  Hmm...  I would say the first instance was, you

14  know, June 2022, and as we move forward, November

15  forward, we've made some significant progress.

16      Q.  I'm going to bring up another document.  Hold

17  on.  I hope what you're looking at is a chart that

18  says, "Tables and Charts on Staffing Three County

19  Comparison."  Is that what you're seeing?

20      A.  Yes, uh-huh.

21      Q.  So this is one of the documents that the city

22  indicated that you provided.  I wanted to know who

23  created this Excel spreadsheet?

24      A.  Our secretary on our board based off of the

25  data that we've received from information requests.

1    Q.  So this was information requests that you had
2    made to San Mateo --
3    A.  Yes.
4    Q.  -- and she --
5    A.  And Alameda.
6    Q.  What is your secretary's name?
7    A.  Danello Quintenia.
8    Q.  So what this is showing is that -- the red and
9    orange chart -- that this was the total staffing loss
10   for San Mateo in 2019, 2020, 2021.  So it was 48, 43
11   and 47; is that correct?
12   A.  Yeah, their attrition, correct.
13   Q.  And the green show the number they actually
14   hired?
15   A.  Correct.
16   Q.  So if you subtracted the green from the orange,
17   it would tell you what their actual net loss would be;
18   is that right?
19   A.  Yeah, I guess so, uh-huh.
20   Q.  So I'm showing you -- I just clicked the tab
21   that says ACSO tables.  I assume that stands for the
22   Alameda County Sheriff's Office.
23   A.  Right.
24   Q.  And it's the same color configuration, green,
25   orange and blue, with the orange indicating total

1  staffing attrition.  And then the green would be total
2  staff hired.  And if you look at the green it would
3  show you that there were net increases in every single
4  year for Alameda County?
5       A.  Okay.  Uhm-hmm.
6       Q.  Is that correct?
7       A.  Yes, uh-huh.
8       Q.  So, for example, in 2022 they hired 49
9  positions, but they only lost 26 positions which means
10 that they had a net increase of 23 deputies?
11      A.  Right.
12      Q.  So the second tab is SFSO and can you see that
13 okay?
14      A.  Yeah.
15      Q.  All right.  So in SFSO you can see that in
16 2022, for example, it shows that there was a total
17 staff loss of 15 and there was only four hires; is that
18 right?
19      A.  So for 2022 I think it is at the time of when
20 the data was made.  I think we hired more than four in
21 2022, but maybe not a lot more, but it may have been at
22 the time the data was made.
23      Q.  And do you know when this data was compiled?
24      A.  The chart was made -- I'd have to look.
25      Q.  Okay.

1       A.  I have to look back.

2       Q.  So it was done in 2022 then, right, the chart

3   was done in 2022?

4       A.  Yes.

5       Q.  So if we look at 2021 it would have been after

6   the year end there was a total --

7       A.  Right.

8       Q.  -- staff loss in San Francisco of 62; is that

9   right?

10      A.  Right.

11      Q.  And there was only 15 hired, right?

12      A.  Right.

13      Q.  So that means that you would have had a loss of

14  47 total, decrease of 47 positions?

15      A.  Right.

16      Q.  And then in every one of the year of 2019,

17  2020, 2021, and 2022 the number of staff hires is less

18  than the number of people who have left the department?

19      A.  Right.

20      Q.  And so when you're talking about -- you were

21  saying that there was, like, 100 and -- I can't

22  remember the exact number -- 170 plus people short,

23  that's part of what contributed to the lack of

24  significant hiring from 2019 to 2022?

25      A.  Right.

1    Q.  And every year --

2        MS. BERDUX:  Sorry.  A belated objection.

3    Incomplete hypothetical.

4    BY MS. HUANG:

5    Q.  And the chart, at least as it's presented,

6    shows that every year from 2019 to 2022 there are fewer

7    people hired?

8    A.  Right.

9    Q.  I wanted to ask you about the earn and burn.

10   All right.  When you earn and burn it's -- as I

11   understand it, it's basically comp time off; is that

12   correct?

13   A.  Uhm-hmm, right.  Uhm-hmm, correct.

14   Q.  If you work an extra hour of overtime, do you

15   get one hour off as compensatory time or time and a

16   half off?

17   A.  Time and a half.

18   Q.  Time and a half off.  And earn and burn was

19   stopped in March of 2020?

20   A.  Right.

21   Q.  Was that a decision by Sheriff Miyamoto or who

22   made that decision?

23   A.  It was a -- it came from the assistant -- I

24   think the assistant sheriff at the time who is now the

25   Undersheriff Johnson, but I don't think it was purely

1  her decision, but you know.

2      Q.  She's the one who announced it?

3      A.  Yeah, she announced it.

4      Q.  All right.  It wasn't a decision that was

5  announced by the mayor or someone else, it was within

6  the department that they were going to stop earn and

7  burn?

8      A.  Right.

9      Q.  I understand that one of the reasons why there

10 was a decrease in the number of deputies is the policy

11 was adopted at some point to remove the senior deputy

12 positions, correct?

13     A.  One more time.

14     Q.  To do away with the senior deputy, is that --

15 am I getting the right name?  Senior deputies?

16     A.  Uhm-hmm.

17     Q.  And when you say that sergeants were promoted,

18 were they promoted out of the senior deputies positions

19 or was it across the board promotions from deputies in

20 general?

21     A.  Good question.  Both.  Whoever took the test,

22 it was open to deputies and senior deputies.

23     Q.  So senior deputies also had to take the test in

24 order to qualify for a promotion to sergeant?

25     A.  Correct.

1    Q.  And as people were promoted out of senior

2  deputy positions or retired they did not refill those

3  senior deputy positions?

4    A.  Correct.

5    Q.  Do you know how many -- let me stop the share.

6  Do you know how many sergeants were -- positions were

7  created or promoted between 2019 to 2020 -- 2022?

8    A.  Roughly.  I would say between 15 and 20.

9    Q.  And so when those 15 or 20 were promoted from

10  deputies to senior deputies did that then leave a hole

11  of 15 to 20 in your -- in the deputy sheriff's

12  positions?

13    A.  Yes, uh-huh.

14    Q.  Okay.  I'm going to share another document.

15  Before I do that, let me just show you this.

16      I'm just showing you a folder.  The top says

17  2022-11-04 files from Lomba.  And this to me looks like

18  a folder of Excel spreadsheets that are all labeled in

19  some form staffing reports.

20    A.  Right.

21    Q.  Do you see that?

22    A.  Yes, uh-huh.

23    Q.  They're just staffing reports as of the date of

24  the labels; is that correct?

25    A.  Yes.

1      Q.  I'm going to pick one arbitrarily because I
2  don't -- and they go up to -- I think the last one that
3  I have is May 2021.  So I'm going to pick that as the
4  one I have last.  Is that all right?
5      A.  Sure.
6      Q.  Can you see it, it's a multicolor sheet?  Do I
7  have to stop and reshare?  No, I have to stop and
8  reshare.
9          It's very tiny.  I'm not sure how to make it
10  bigger.
11      A.  If you hit control and then the plus sign it
12  might bring it up.
13      Q.  Control...
14      A.  And the plus sign.
15      Q.  Let me see if I can make this bigger in some
16  way.
17      A.  Click on view on top of Excel.
18          There you go.
19      Q.  Oh, now that's too big.
20          BEHMKE SUPPORT:  Counsel, you can also try
21  using control and then the wheel on your mouse as well.
22  That kind of helps change it.
23  BY MS. HUANG:
24      Q.  I'm not real sure what this -- okay.  Let me
25  see.

1          BEHMKE SUPPORT:  Use the wheel on your mouse to
2    go zoom in, zoom out.
3          MS. HUANG:  I have a Mac.  It's not working.
4    BY MS. HUANG:
5       Q.  So what I want to know was -- I'm not sure what
6    I'm looking at.  Do you know what this is of, where
7    this data comes from?
8       A.  From the department, from the sheriff's
9    department.
10      Q.  Does it come in this format or did your office
11   reformat this?
12      A.  Just like that.
13      Q.  It comes just like this?
14      A.  Right.
15      Q.  So on the very bottom if you can see it says
16   staffing report, satellite listing, facility listing.
17   If I click facility listing -- I have to make this
18   bigger again.  Hold on.
19          Can you read that?
20      A.  Pretty small, no.
21      Q.  Let me try and make it bigger.  Hold on.
22          Is that better?
23      A.  A little bit.
24      Q.  Let me keep going.  I just don't want to make
25   it so big that we kind of get blown away by it.

```
 1          Okay.  How's that?
 2      A.  Good.
 3      Q.  So this is as the department provides it.  And
 4  I just want to see if I understand it, that this gives
 5  you all the rank.  This is administration and it shows
 6  there are 33 people who are administrators.  Is this
 7  all people who are downtown?
 8      A.  No, not necessarily.
 9          Some people could be on leave.  Sometimes when
10  people are on leave they send their, quote, unquote,
11  file for their assignment downtown under
12  administration.
13      Q.  I see.
14          MS. BERDUX:  I'm going to -- hold on.  Belated
15  objection.  It misstates.  I think you said 33 people
16  in administration.  It misstates the document.
17          MS. HUANG:  You're right.
18  BY MS. HUANG:
19      Q.  It begins at 12 and ends at 34.  There's a
20  missing line so it's actually 34 minus 12 which is 22
21  minus one is 21.
22          And you're here as well as No. 24, correct?
23      A.  Yes.
24      Q.  All right.  And then --
25      A.  Do you want to --
```

1        Q.  Go ahead.

2        A.  If you want to see, like, the staffing numbers

3   you can go to rank report.  It's the tab on the bottom.

4   It says rank.  That gives you a clearer --

5        Q.  Excellent.

6        A.  -- way to identify the shortages.

7        Q.  Okay.  So this is produced by the sheriffs and

8   it tells you that as of May 21st, 2021, there are 102

9   unfilled positions for deputy sheriff, right?  And

10  there were 13 unfilled positions for senior deputy?

11       A.  Right.

12       Q.  And of the sergeants there are six and there

13  are only two positions available for lieutenants and

14  sergeants and all the admin positions were filled; is

15  that right?

16       A.  Right.

17       Q.  Has that -- has this pattern where basically

18  the empty positions were primarily deputy sheriff and

19  senior deputy, has that been a historic pattern?

20       A.  No, it's on the high level.  If you're looking

21  at May 2021 as Sabot pointed out, you know, the

22  department counts approximately 12 budgeted positions

23  into that number that are unbudgeted.  So you should

24  add 12 to that number basically.

25       Q.  So it's really 123 plus 12, is that what you're

1   saying?

2       A.  102 plus 12.

3       Q.  102 plus 12.  Okay.

4       A.  Oh, I see what you were reading.  Total, yes.

5   I'm just looking at deputies, senior deputies, five.

6       Q.  You're saying actually instead of 102 being

7   vacant there was actually a hundred and --

8       A.  14.

9       Q.  -- 14 because it's plus 12?

10      A.  Right.

11      Q.  All right.  And is this normal that all the

12  rank positions, lieutenant, captains, so forth, that

13  those are pretty much all full and it's just deputies

14  that are -- that have the empty positions?

15      A.  Yeah, it seems to have been like that.

16      Q.  In May of 2021 or historically?

17      A.  You know, I don't know if I looked at that

18  historically.  Over the last couple of years it caught

19  our eye when we really -- start really taking a close

20  look at this as the numbers, you know, got ahead of,

21  you know, negative 70, negative 80.

22      Q.  So if we look at cadet rosters -- I'm not real

23  sure what I'm looking at when I look at cadet rosters.

24  Are these people in training or is this like a

25  mentoring program for cadets?

1     A.  Can I show you the easiest way.  If you go to
2  the first tab, staffing report.
3     Q.  Uh-huh.
4     A.  And this will show you where the overages are
5  and where the unbudgeted positions are and the
6  percentages of staffing.  So if you slowly go down and
7  just keep going.  You can keep going.  We'll get to the
8  more -- like you can stop there for a second.  Or go up
9  a little bit.
10        So this kind of gives you an idea where the
11  unbudgeted positions are so you can see like
12  backgrounds, jail clearance.  They were budgeted in
13  their reports, budgeted for four, they have seven.
14  They're three over.  Shows you community programs is
15  down 13.
16     Q.  So if we look at the first line which has
17  somebody in it, it says background, jail clearance,
18  officers.
19        So is the black four positions or --
20     A.  Right.
21     Q.  And then seven is -- four is actual, seven is
22  budgeted?
23     A.  No, no.  The other way.  Four is budgeted,
24  seven is actual.  And then the three shows you the
25  overage.  And then they break it down to a percentage

1   showing they're at 175 percent staffing.

2       Q.  I see.

3       A.  You can take that idea, that concept all the

4   way down to the jail staffing.

5       Q.  Okay.  In the jail staffing, what we have is

6   you have 69 for CJ1 budgeted.  There's only 44 staff so

7   they're minus 25, yeah.  CJ2 is 106.  They have 112 so

8   they are plus six.  And CJ3 is 186.  They're at 145 so

9   minus 41.  They're at 78 percent, yeah?

10      A.  At that time, yeah.

11      Q.  Okay.  So in terms of the sheriff's department,

12  are there certain things that are considered core

13  responsibilities for the department, like certain

14  programs or certain responsibilities?

15      A.  Well, I would say the core responsibilities are

16  outlined in the city charter.

17      Q.  Do you know what they are off the top of your

18  head?

19      A.  It's jails, courts, civil unit and then also

20  handling any subpoenas by the board of supervisors.

21      Q.  And is the civil unit like service of unlawful

22  detainers and eviction notices?  Is that what the civil

23  unit is?

24      A.  Yes.

25      Q.  Is there anything in there for the other things

1  that the jail does, that the sheriffs do, such as

2  events or this kind of stuff?

3      A.  I don't think so.

4      Q.  Where would I find where the postings for

5  things that are not in the core responsibilities, is

6  that field operations?  Are all those things field --

7      A.  It would be under field.

8      Q.  Okay.  Field operations.

9          Okay.  So here on K-9 they have 300 percent.

10 That's what you were talking about, yeah?

11     A.  Correct.

12     Q.  And field support staff is at 1300 percent.

13 And then transportation was at 240.  Those are the

14 places you were talking about that were high, that had

15 the unfunded positions?

16     A.  Not normally -- yes, I think that time period

17 transportation may have been a little unusual because

18 we were doing station transfers for the police.  I

19 think it fell in that time frame.  That's why you see

20 that 240 there, 240 percent.

21     Q.  So -- sorry, go ahead.

22     A.  You're right.

23     Q.  So when we look at this facility and positions

24 8304 to 8504, what does that stand for, do you know?

25     A.  Oh.  Those are the job classifications.  And

1    it's -- primarily it's deputy sheriff.  Those are just

2    two classifications because they fell under two

3    different retirement systems.

4         Q.  And then what is 8306?

5         A.  That's the senior deputy position.

6         Q.  8308, is that sergeant?

7         A.  Yes.

8         Q.  And 8310, that would be lieutenant?

9         A.  Correct, yes.

10        Q.  8312 would be captains?

11        A.  Yes, uh-huh.

12        Q.  And then what is 8317?

13        A.  Chief, chief deputy.

14        Q.  Chief deputy, okay.

15             So except for -- let's see.  Is this sheet here

16   where it says "Facility/Position," is that everything

17   other than detentions or is there another sheet that I

18   can look at to see what other positions there are?

19        A.  I think that covers all, you know, assignments.

20        Q.  So if we have facilities and then we have

21   assignments.  This is nonsworn.  That's your civilian

22   staff.  I've lost the page where I was looking at.

23             These are all sworn officers.  I'm just --

24             (Reporter technical issues.)

25             (Recess taken at 3:24 PM to 3:29 PM.)

BY MS. HUANG:

    Q.  I'm going to share my screen again.  I'm going
to go back to -- so I wanted to ask you at the bottom
there is a facility listing and satellite listing.  I'm
not sure what the differences are.  We are now on
facility listing.  Can you see the screen pretty well,
it's that same May 2021 staffing report?

    A.  Right.

    Q.  So we talked about admin.  All right.  We
talked about admin.  Then we get to backgrounds.  And
what is backgrounds, what is the job responsibility of
people in backgrounds?

    A.  Are you on the satellite tab?

    Q.  I'm on the facility listing on the satellite.
It's very similar.

    A.  Okay.  Yes.

    Q.  If we go up to facilities it has backgrounds,
although I think the people are slightly -- this is
5/31/21 and this one is -- are these the same people?
I can't tell.

    A.  Most likely.  If you want to flip back to the
other one.  Yeah, I see some of the names matching.

        So I don't know why they did that, but the
difference is the satellite is a -- the term they use
for satellite is a unit that a deputy or a senior

1  deputy can voluntarily sign up for.  And usually what
2  happens is when they sign up for that position a list
3  is created because there's usually a fairly decent
4  turnout of volunteers.  And then they go by seniority,
5  whoever has the most seniority.  Then they fill
6  vacancies in the satellite units.  And those positions
7  are for five years at a time.
8       The facility unit, I would think that would be
9  just, you know, like mandatory assigned units that
10 aren't five-year rotations.
11    Q.  So what is the background assignment?
12    A.  Those are deputies that are trained in
13 background investigations.  So they do the background
14 investigations of the applicants that are coming in.
15    Q.  All the people that have applied, all four of
16 them in 2021, you have seven people doing background
17 checks; is that correct?
18    A.  Right.
19    Q.  And what's CARC?
20    A.  You know, I forget the terminology, but CARC is
21 the unit that was picked up in the past.  I believe
22 it's a -- some type of a rehabilitation office or
23 clinic, if you will, and they have a deputy posted
24 there for law enforcement services.
25    Q.  City Hall security, that's like working City

1  Hall?

2      A.  Right.

3      Q.  And then the civil division, we talked about

4  that.  That's service of subpoenas and legal papers,

5  correct?

6      A.  Correct, yeah.

7      Q.  Classification.  Is that also a satellite,

8  classification?

9      A.  Yes.  Uh-huh.

10     Q.  So that's classification.  And then there's

11 community programs.  What are the community programs

12 that you're aware of?

13     A.  So community programs handles the ankle

14 monitoring, the community service.  You know, where I

15 guess, you know, if someone is sentenced to community

16 service they would go there to get their work

17 dispatched out to DPT or whatever.

18     Q.  What's court services?

19     A.  That's the courts and that's both or all the --

20 I think all the courts unless we have JJC on here.

21 That's Hall of Justice courts and Civic Center courts.

22     Q.  And DEM?

23     A.  Department of Emergency Management.  It's a

24 dispatch center.

25     Q.  PUC has one.  San Francisco General Hospital?

1      A.  That's the -- let me see.  Oh, I think that is
2  SFGH 7D7L.  That's the ward, if you will, the small
3  jail that's in the hospital.
4      Q.  And this is for people who are receiving
5  treatment at the hospital or these are for people who
6  are housed at the hospital?
7      A.  Treatment.  Right now it's been majority -- or
8  over the years it's been majority psych treatment.
9      Q.  SPU stands for?
10      A.  Sheriff's patrol unit.  That would be the SFGH
11  campus.
12      Q.  So this is, like, patrolling the hospital
13  grounds?
14      A.  Correct.
15      Q.  That continues.  That's a fairly good sized
16  crew.  Is it 24/7 that the campus is patrolled?
17      A.  Exactly, yes.
18      Q.  Transportation.  Is this simply driving people
19  to and from court?
20      A.  Yep.  Courts, pickups, out of county pickups.
21  Yep.
22      Q.  That's quite a number for a total population
23  of -- you know.
24      A.  Yeah, it takes a lot.  Right now I usually talk
25  to the transportation unit.  Every day they send out

1   three buses and a couple of vans behind the buses.

2   It's a whole caravan, you know, bringing people back

3   and forth to court.  Some people have protective

4   custody issues.  They have to be separated.  Gangs have

5   to be separated.  Medical conditions have to be

6   separated.  It's pretty expensive.

7       Q.  Warrant services, I understand that.  And then

8   that's it.

9           So for facility listing, we're going to go

10  through that very quickly.  I just wanted to see if

11  facility listing is the same thing as satellite.

12  Community programs.  DEM.  CARC.  CCCH.  That was not

13  something we saw before.

14      A.  Civic Center courthouse.

15      Q.  Civic Center courthouse.  And this is the civil

16  courthouse.  Okay.

17          Then we have the county jails.  Special records

18  and warrants.  Classifications.  Clinics.

19          COD?

20      A.  I think that's custody operations division.

21  It's like an admin office area.

22      Q.  DNA.  Is that DNA testing?

23      A.  Collection.

24      Q.  Fleet.  Is that fleet maintenance?

25      A.  Yes.

1    Q.  FOD is?

2    A.  Field operations division.  It's another

3  office --

4    Q.  What is --

5    A.  That's like their centralized office for the

6  field where they coordinate all the field activities,

7  the field units, SPU, all of that.

8    Q.  So are field units everything that is not at

9  the jails?

10   A.  Almost everything.  It doesn't include

11  personnel.  I mean, that would be like kind of common

12  sense that that would be field personnel and training

13  and all that stuff.  Field are the vehicles, the patrol

14  units.  Anything that's field activity basically.

15   Q.  Does this field office include people who are

16  doing patrol?  Are these like the patrol officers as

17  well?

18   A.  No.  I believe majority are -- let me see.  So

19  it depends on the time frame.  This time frame may be

20  unique because of COVID stuff.

21       So this time frame I believe is when they sent

22  out -- was it 2021?  There was a time where they sent

23  out deputies on the street during the COVID emergency.

24  Looks like there's a lot of deputies assigned here.

25  Let's see.  We have sergeants there.  So you have one,

1  two, three, four -- yeah, I'm not positive what the --

2  it looks like a handful of extra deputies there.  I'm

3  not positive what they're assigned to.

4        But there was a time where the department

5  beefed up the field unit during some of the peak of

6  COVID to do station transfers for the police and to

7  patrol the hotels.

8     Q.  Okay.  City Hall security.  Hall of Justice.

9  Hall of Justice.  I thought that there was already a

10  criminal up here or was that the other sheet.  I guess

11  that was the other sheet.  That's what happens when

12  you -- so City Hall, Hall of Justice, criminal

13  investigations.  How many cases do you think San

14  Francisco sheriffs handle, active cases that they need

15  to have seven investigators in the investigation unit?

16        MS. BERDUX:  Objection.  Calls for speculation

17  and incomplete hypothetical.

18  BY MS. HUANG:

19     Q.  If you know.

20     A.  I'm sorry.  Did you say if I know?

21     Q.  If you know what their responsibilities are,

22  how many cases they handle in the criminal

23  investigation unit?

24     A.  I don't know the number, but they -- like

25  you're stating, they do handle the criminal

1  investigations, crimes in the jail.  Drugs being

2  delivered, mailed in.  Sodomy cases.  Fights.  Thefts.

3  I believe they are doing investigations from SFGH as

4  well.  Crimes that need further investigations that

5  happened on the SFGH campus.

6      Q.  Okay.  And you have ten for IT, three for K-9.

7  And HSA stands for?

8      A.  Human services agency.

9      Q.  That's your HR.  Medical examiners, patrol

10  unit.  Oh, that's for -- this is to escort medical

11  examiners to crime scenes?

12      A.  No, it's law enforcement of the building.

13      Q.  MTA.  Planning and projects.  San Francisco

14  General Hospital ward.  And then there's quite a

15  significant patrol unit.

16          In addition to what we've seen, that there's

17  specific designations like San Francisco General, where

18  does the sheriff's office patrol because the county and

19  the city are contiguous.  That's -- the police

20  department does most of the patrol in San Francisco,

21  correct?

22      A.  Right.  Yeah, the campus is really big.  So I

23  don't know the exact acreage, but it's several blocks.

24  And we're not just talking just the length and width of

25  the blocks.  There's also height to the building so

1  some buildings are maybe seven to eight floors high.

2  So it's a pretty large campus.  And, you know, there's

3  underground, believe it or not.  The hospital has

4  underground tunnels and a basement.  So it's pretty

5  extensive.  And that's 24/7.

6      Q.  Okay.  So this is all San Francisco hospital,

7  academy training, warrant services, YGC.

8          Okay.  Is there anything that we haven't

9  covered?  Let me ask you, I had heard that the

10  sheriff's department was expanding its contract

11  services including the airport and football games and I

12  don't see that reflected in this sheet.  Do you know if

13  that's included?

14      A.  We're not at the airport.  They do have a

15  contract with Levi's Stadium, but that's volunteer

16  overtime.

17      Q.  So that wouldn't be reflected on this?

18      A.  No.

19      Q.  Are there any other jobs that, you know, or

20  contracts that the sheriff's department has that's not

21  reflected on this that's voluntary overtime?

22      A.  No.  Obviously we got, like we were talking

23  about, the Levi's Stadium and 10A.  So that's all

24  voluntary.  So your regular assignments -- I think all

25  the regular assignments are posted here.  I can't think

1   of anything else.

2       Q.  So if you volunteer for Levi or for Levi's

3   Stadium, does that still obligate you to your two

4   drafts a week or does that take the place of a draft?

5       A.  It does not take the place of the draft and it

6   has to be on their RDO.

7       Q.  What is RDO?

8       A.  Regular day off.

9           MS. HUANG:  Okay.  I think that I am finished

10  for this topic, and I don't want to start another topic

11  because we only have 12 minutes left.  What would you

12  like to do, Ms. Berdux?  You want to ask a few more

13  questions or do we want to try to schedule it for

14  another day?  I don't know how much you have left.

15          MS. BERDUX:  I've got a subject matter.  How

16  much time do you think -- I mean, it sounds like either

17  way we're going to have to come back; is that right?

18          MS. HUANG:  I just have a few more documents

19  that --

20          MS. BERDUX:  You want to go through.

21          MS. HUANG:  Yeah, that we're going to go

22  through.  We've gone through a lot of these already.

23          Why don't we go off the record and then maybe

24  we can talk about follow-up dates.

25          MS. BERDUX:  Okay.

```
1            (Recess taken at 3:49 PM to 3:50 PM.)

2            MS. HUANG:  9:00 tentatively on February 3rd

3   and let's see if we can finish this.

4            Madam Court Reporter, can I get a rough draft?

5   It doesn't have to be cleaned up.  I just need to get

6   the context.

7            REPORTER:  Yes, ma'am.

8            (Proceedings were recessed at 3:54 P.M.)

9                        ---oOo---

10

11

12

13

14

15

16

17

18

19            _____

20                       KEN LOMBA

21

22

23

24

25
```

1  STATE OF CALIFORNIA      )

2                           ) ss.

3  COUNTY OF CONTRA COSTA   )

4          I, Laura Espinosa, hereby certify that the

5  witness in the foregoing deposition, KEN LOMBA, Volume

6  1, was by me duly sworn to testify to the truth, the

7  whole truth nothing but the truth, in the

8  within-entitled cause; that said deposition was taken

9  at the time and place herein named; and that the

10 deposition is a true record of the witness' testimony

11 as reported by me, a duly certified shorthand reporter

12 and a disinterested person, and was thereafter

13 transcribed into typewriting by computer.

14         I further certify that I am not interested in

15 the outcome of the said action, nor connected with nor

16 related to any of the parties in said action, nor to

17 their respective counsel.

18         IN WITNESS WHEREOF, I have hereunto set my hand

19 this 1st day of February, 2023.

20 Reading and Signing was:

21 ____requested  _____waived  __X__not requested

22

23                                    *Laura K Espinosa*

24                          _____

25                          LAURA ESPINOSA, CSR NO. 11400