**Exhibit 2 to YH Decl.**

**Lomba Deposition V. 2**

```
 1              IN THE UNITED STATES DISTRICT COURT

 2               NORTHERN DISTRICT OF CALIFORNIA

 3

 4   - - - - - - - - - - - - - - -

 5   KENYON NORBERT, et al.,      )

 6               Plaintiffs,      )

 7   vs.                          )  CASE NO.

 8   SAN FRANCISCO COUNTY         )  19-cv-02724-SK (LB)

 9   SHERIFFS DEPARTMENT, CITY    )

10   AND COUNTY OF SAN            )

11   FRANCISCO, et al.,           )

12               Defendants.      )

13   - - - - - - - - - - - - - - -

14

15

16            REMOTE DEPOSITION OF KEN LOMBA

17               FRIDAY, FEBRUARY 3, 2023

18              PAGES 143 - 228; VOLUME 2

19

20

21         BEHMKE REPORTING AND VIDEO SERVICES, INC.

22               BY:  LAURA ESPINOSA, CSR NO. 11400

23                   455 MARKET STREET, SUITE 970

24                  SAN FRANCISCO, CALIFORNIA 94105

25                             (415) 597-5600
```

 1

 2

 3

 4

 5

 6

 7

 8          Remote Deposition of KEN LOMBA, Volume 2, taken

 9   on behalf of Defendant, via Zoom videoconference,

10   with the witness appearing in San Francisco,

11   California, commencing at 9:14 A.M., FRIDAY, FEBRUARY

12   3, 2023, before Laura Espinosa, Certified Shorthand

13   Reporter No. 11400, pursuant to Notice of Deposition.

14

15

16

17

18

19

20

21

22

23

24

25

```
1    APPEARANCES OF COUNSEL:

2    FOR PLAINTIFFS AND THE WITNESS:

3         LAW OFFICE OF YOLANDA HUANG

4         BY:  YOLANDA HUANG, ATTORNEY AT LAW

5              (VIA VIDEOCONFERENCE)

6         528 Grand Avenue

7         Oakland, California 94610

8         Telephone:  (510) 329-2140

9         Email:  yhuang.law@gmail.com

10

11   FOR DEFENDANTS CITY AND COUNTY OF SAN FRANCSICO and

12   VICKI HENNESSY:

13        CITY AND COUNTY OF SAN FRANCISCO

14        BY:  SABRINA BERDUX, DEPUTY CITY ATTORNEY

15             (VIA VIDEOCONFERENCE)

16        1390 Market Street, Sixth Floor

17        San Francisco, California 94102

18        Telephone:  (415) 554-3929

19        Email:  sabrina.m.berdux@sfcityatty.org

20

21

22

23

24

25
```

```
 1   APPEARANCES OF COUNSEL (CONTINUED):
 2   FOR THE DEPONENT:
 3        MASTAGANI HOLSTEDT A.P.C.
 4        BY: GARRETT PORTER, ATTORNEY AT LAW
 5             (VIA VIDEOCONFERENCE)
 6        1912 I Street
 7        Sacramento, California 95811
 8        Telephone:  (916) 491-4217
 9        Email:  gporter@mastagni.com
10
11   ALSO PRESENT (VIA VIDEOCONFERENCE):
12        FRANCEY BEHMKE, ZOOM TECH
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                          INDEX

 2    FRIDAY, FEBRUARY 3, 2023

 3    KEN LOMBA - VOLUME 2                          Page

 4      Examination by MS. BERDUX                   149

 5      Examination by MS. HUANG                    178

 6      Further Examination by MS. BERDUX           216

 7      Further Examination by MS. HUANG            226

 8

 9                        ---oOo---

10

11        QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:

12                     PAGE      LINE

13                        None.

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                         EXHIBITS

2                  KEN LOMBA - VOLUME 2

3    Letter              Description              Page

4    Exhibit A   Excel Spreadsheet - Lockdown Dates

5                of Jail 3, 2 pages                201

6    Exhibit B   Excel Spreadsheet - Lockdown dates

7                County Jail No. 2, 2 pages        208

8    Exhibit C   Email:  CJ 3 Safety Mail,

9                6 pages                           209

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              FRIDAY, FEBRUARY 3, 2023; 9:14 A.M.

 2                      PROCEEDINGS

 3                       ---oOo---

 4

 5                      KEN LOMBA,

 6    having been administered the oath, was examined and

 7                  testified as follows:

 8        THE WITNESS:  I do.

 9                     EXAMINATION

10   BY MS. BERDUX:

11      Q.  Good morning, Mr. Lomba.  It's good to see you

12   again.

13      A.  Good morning.  Same here.

14      Q.  Thanks for coming back to finish your

15   deposition today.

16          Barring any unforeseen circumstances we will be

17   done today.

18          MS. HUANG:  Before we go can we confirm how

19   much time we have left for today just so we can keep

20   track of the time.

21          THE WITNESS:  I have a meeting I have to

22   attend.

23          BEHMKE SUPPORT:  You want the time from the

24   last one?

25          MS. BERDUX:  Yeah.
```

```
 1          BEHMKE SUPPORT:  I don't have that readily
 2   available, but I can go back and pull together the
 3   numbers, but it's going to take me just a minute.
 4          MS. BERDUX:  That will be great.
 5          Are you able to put it in the chat so we can
 6   keep going?
 7          BEHMKE SUPPORT:  Yeah, I can do to that.
 8          MS. BERDUX:  Mr. Lomba, did I hear you say you
 9   have a meeting?
10          THE WITNESS:  I'm not sure how long this will
11   take but if this is a long process I have a meeting.
12          MS. BERDUX:  I don't think we have enough time
13   to go that long.
14          THE WITNESS:  Oh, okay.
15          MS. BERDUX:  Seven hours is the maximum amount
16   of time we have for a deposition.
17          THE WITNESS:  Oh, okay.
18          MS. BERDUX:  Are we still on the record?
19          REPORTER:  Uhm-hmm.
20   BY MS. BERDUX:
21      Q.  I'm going to keep asking you questions, but I
22   want to make sure that you remember the ground rules or
23   the admonitions that I gave at the beginning of the
24   deposition last time.  And those ground rules were to
25   make sure you tell the truth, don't guess, give me your
```

1    best estimate and make sure you understand my

2    questions.

3          Do you remember those?

4       A.  Yeah.  And I think from what I stated last time

5    my time frames and numbers are approximate, but I think

6    they're fairly close without having the data in front

7    of me.

8       Q.  That's exactly fine.  No problem at all.  A

9    common example that I use is this, you know, if I asked

10   you when was the last time you went to the doctor, you

11   might not remember the exact date if it's been awhile.

12   But if you go every year around your birthday, you

13   might remember, oh, it's approximately six months ago

14   because I go every year on my birthday.  And that's an

15   estimate, right.  It doesn't have to be exact.  As long

16   as it's a good estimate for you.

17          So I appreciate that.  Thank you for giving me

18   your estimates when you can.

19      A.  Sure.

20      Q.  Okay.  Have you by any chance reviewed your

21   testimony from last session?

22      A.  No, huh-uh.  I haven't even gotten a copy.

23      Q.  That's okay.  I don't think a formal copy is

24   ready yet so that's not out of the ordinary.  But

25   sometimes rough, you know, unfinalized copies are

1    requested so I was just curious.

2         Okay.  I think we left off with Ms. Huang

3    asking you questions last time, but I'm going to pick

4    up with some questions this time and I'll turn it over

5    to her again in a moment.

6         But you did send some additional documents

7    yesterday, right?

8         A.  Yes.

9         Q.  Okay.  And can you summarize what those

10   documents were?

11        A.  Well, there was a large amount of daily e-mails

12   from the sheriff's department.  And usually they occur

13   or usually they're sent out for every shift.  I'm on

14   that e-mail chain and they basically show kind of like

15   the daily minimums of that shift or that oncoming

16   watch.  It will show up in departments over, at minimum

17   or under minimum or even -- under minimum can be a

18   point where they do involuntary drafting.  And another

19   word for that is mandating.  Our department uses

20   drafting?  But it even shows when they go below that.

21        So this current time going back to 2020 even

22   the minimums as they state in the e-mail as they call

23   it a minimum isn't our contractual minimum.  The

24   minimums they're referencing that they're meeting are

25   even lower than our contractual minimum.

1           Because during COVID, more so it happened at

2     the peak, they created a COVID minimum, COVID-19 or

3     however you want to call it during the pandemic

4     emergency minimum where it was reduced staffing.  And

5     in general, they reduced the minimums by two across the

6     board from our contractual minimums.  That's kind of

7     where that is, I think.  I think that kind of explains

8     that.  At least on that portion of the e-mail.

9           So on that portion I sent a bundle.  I sent a

10    lot.  There are thousands of these e-mails because it's

11    a two to three times a day thing and I just can't pull

12    them all.  And I reference that in what I sent you

13    guys.  It's way too time consuming for us to go through

14    all the e-mails and convert them to PDFs.  I think the

15    department or the city should provide that if that's

16    what you intend to, I don't know, need or use or

17    whatever.

18    Q.  But in any event -- oh, sorry.  Go ahead.

19    A.  Sorry.  I was just addressing that piece.  I

20    know there's other parts of e-mails I sent you to

21    answer your questions.  So there's another group of

22    e-mails, a smaller group which was related to the

23    budget.  But what was interesting was as a cost savings

24    measure, the CFO, Crispin Hollings, introduced an idea

25    of going below minimum -- physically below minimum into

1    a negative during the shift.  And he introduced that
2    idea as a cost savings and he laid out a chart which I
3    sent you, the amount of savings they would get.
4           So the problem with this is, and there's been
5    debate over this and we actually won the debate in a
6    minimums grievance arbitration.  And sometimes, and I
7    think you know as the city attorney or as attorneys on
8    the call, a lot of things come down to an argument over
9    interpretation.  And sometimes they're strategically
10   used to whoever's benefit, right.
11          So there was a policy over minimums and it said
12   the department has to start the shift at minimum.  So
13   someone came up with this interpretation in the past.
14   And I think it was and it was -- I won't state -- it's
15   only opinion what I think, why it was used in this
16   manner, but in our ruling it was clarified.
17          So for the longest time the department was
18   starting the shifts at minimum and they were saying we
19   started at minimum so now we're in compliance.  As we
20   go into the shift, they released people early or for
21   whatever reason.  Nonetheless, people were released
22   early.  And during the shift physically the department
23   went under minimums.
24          So that became a contentious debate in our
25   minimums grievance.  And in arbitration the Arbitrator

1    Cowan basically told the department, no, if you have a

2    minimum, the minimum is throughout the shift.  I mean,

3    to me, obviously, and to him, I mean, that makes sense,

4    right, because you are supplying an employee for, you

5    know, to accomplish the department's mission, to get

6    the duties done and for safety, right.  That's really

7    what it comes down to.

8         Which -- so now going forward to this letter

9    that I sent you, Crispin Hollings strategically went

10   below minimums.  And he set it out in the chart after

11   several hours, whatever, we save this much money.  I

12   know from members and supervisors they told me this had

13   occurred particularly at CJ 3, but it may have occurred

14   in other areas too so I sent you that.  And he doesn't

15   clearly explain what he's doing in the letter to the

16   board of supervisors, but he has a sentence in there

17   that suggests what he's doing, but then accompanied by

18   that chart you could clearly see what he was doing.

19        Yeah, so that was another batch of e-mails.

20        And then I sent you an e-mail from one of our

21   members.  This was pretty much what I was trying to

22   explain in the first day of the depo.  Just interesting

23   enough, the assistant sheriff went by County Jail 3 and

24   day shift briefing as she was talking.  And one of our

25   members who's really an advocate for safety brought up

1    some topics to her and then he sent an e-mail to the
2    assistant sheriff, the undersheriff, maybe a few others
3    and me.  And it kind of highlights what I was saying
4    and a little bit more about some of the safety items or
5    how should I say construction or necessary changes in
6    construction we need to make it safer for everybody.
7    Yeah.
8          And then I think -- was that all I sent?
9          Oh, and I sent a couple from some PRA requests
10   where we showed the department went into level 4
11   lockdowns being understaffed.  I think that was all the
12   groups.
13   Q.  Great.  Thank you for that summary.  That's
14   really helpful.
15         Now, I'd like to go back and ask you some
16   questions about those.
17         When you're talking about minimums I assume
18   that this is the minimum number of staff that should be
19   on duty during any particular shift and that that's
20   identified in your union agreement with the sheriff's
21   office.  Is my understanding correct?
22   A.  Yeah, pretty much.  But to add to that, the
23   department does either a yearly or a bi-yearly staffing
24   plan.  And we -- our minimums are, you know, a little
25   bit I think in alignment with our staffing plan or

1    maybe a little bit less than, at least prior to our

2    last contract of 2022 because we updated them in 2022.

3            Prior to that I think they were a little bit

4    below the staffing plan and also below what the

5    controller recommended.  So the -- what the department

6    does, from my understanding with speaking to Chief

7    McConnell, they look at what the department needs to

8    function and safety, right.  So -- and this is based on

9    what the people of San Francisco want.  This is based

10   on what the politicians want, the board of supervisors,

11   the mayor.

12           So they look at what positions need to be

13   filled to accomplish their goal to make sure it's safe,

14   for one.

15           Secondly, to do what they're required to do.

16           Thirdly, to fill and supply staffing to keep

17   the programs going, right.

18           The controller pointed out several times a flaw

19   in the department's minimums and the controller pointed

20   out that we do not use the correct relief factor.

21   So -- and he's correct.  I even spoken to department

22   admin and they say the relief factor is too low.  But

23   everything's, you know, been -- I don't know.  The

24   department has really done their best to keep things

25   going within their budget and everything's been really

1  like they squeeze the blood out of the turnip to the
2  max.  They try to cut everything back to make the
3  budget work, right.
4        But the problem is when you don't have the
5  right relief factor, you're going to create a shortage.
6  I'm sure you understand that you have vacation days,
7  you have time off, unexpected illnesses, bereavement
8  days and all this stuff.  If you don't have the correct
9  relief factor, you don't have the supply of staffing to
10  manage that shortage when it comes up, whether it's
11  planned or an emergency.  And that's, like, an ongoing
12  problem with -- within our department and that's
13  related to the size of the budget.
14  Q.  And tell me, what is the relief factor?
15  A.  It's -- I'd have to get it, but it is a
16  percentage.  And I believe it's quoted in the
17  controller's report, the June 19th controller's report
18  where it says the sheriff's department relies on, you
19  know, exorbitant amount of overtime.
20        He points it out there.  In my discussion, my
21  conversation with Ben Rosenfield was purely that, that
22  the budget needs to be increased because right out of
23  the gate when the sheriff starts his budget, if there's
24  any cut from the mayor or from the board of
25  supervisors, he's out the gate in a negative.  When

1    he's out of the gate in a negative it implodes when we

2    get closer to the end of the budget and then he's

3    restricted by the controller.  And then it slows down

4    our hiring because there's a lot of control mechanisms

5    in place to release money.  And the department does its

6    best to give the controller a plan how they're going to

7    get back in budget.

8           And I think this is the cause of a lot of the

9    problems because the department is looking for ways to

10   balance its budget to get back in compliance so it can

11   get back on track to hiring, to get funding released

12   for FTEs.  And, unfortunately, there's been times where

13   they came at us and violated our contract and affected

14   us financially.  And we're fixing all that now and it's

15   just really not a good cycle.  That's kind of where

16   we're at.

17      Q.  It sounds kind of like a rock and a hard place,

18   right.  I mean, the sheriff's office is only given

19   whatever budget they're given despite requests and

20   things still have to be staffed and moved forward?

21      A.  Yeah.  How long --

22           MS. HUANG:  Excuse me, objection.  This is

23   turning into a conversation and I'm going to object to

24   the form of the question and as an inappropriate

25   question.  I'm not referring to you, Mr. Lomba.  I'm

1    referring to no soliloquy.

2    BY MS. BERDUX:

3        Q.  And is the sheriff's office currently in

4    violation of any union agreements or contracts?

5            MS. HUANG:  I didn't hear the last part of your

6    question, Ms. Berdux.  Could you speak up a little bit,

7    please.

8    BY MS. BERDUX:

9        Q.  Is the sheriff's office currently in violation

10   of any union agreements or contracts?

11       A.  Well, we're in the process of fixing a lot of

12   things and right now we're in a good spot, a good

13   relationship to fix things.  But there are maybe, like,

14   one for two things that haven't gone to grievance that

15   we're working to fix.  So I think it's in the process

16   of being fixed.  So it hasn't gotten to the form of a

17   grievance.

18       Q.  And what are those things that you're working

19   on?

20       A.  One of it is related to seniority.  So it's an

21   interpretation thing.  So we had deputies leave the

22   department from '21 to '22.  Some deputies wanted to

23   come back and they returned.  There's an interpretation

24   by the department that when you return, if you're a

25   8306 -- I'm sorry, if you're 8304 classification, you

1    can return with your seniority.  If you're 8504

2    classification, you cannot return with your seniority.

3          So we had a group of deputies that have

4    returned that are 8504s that have not regained their

5    seniority.  You have to do this within six months of

6    leaving.

7          MS. HUANG:  Tell us what 8504 means.

8          THE WITNESS:  They're both deputy sheriffs.

9    The only difference is around -- there's some changes

10   in the retirement system from 2010 to 2012.  Basically

11   the 8504s are on a different retirement system.

12   They're on the SFERS retirement system.  The 8304s are

13   on the CalPERS retirement system.  They just made a

14   different classification for that.

15         So there's some interpretation there.  And they

16   reference -- the person in personnel referenced civil

17   service rules.  So I asked them to point out where in

18   the civil service rules.  He pointed out where.  I read

19   it.  I didn't see it.  I mentioned that to him and then

20   I sent it to our attorneys to review.  They didn't see

21   anything that prevents 8504s returning and regaining

22   their seniority.

23         There was some reference to 8302, which is an

24   entry level, nonacademy trained deputy, but that didn't

25   even -- that didn't even comport to what they were

1    suggesting.  That was totally different.  That didn't
2    even relate to what they were comparing to to the 8304,
3    8504.  So we couldn't find anything.

4         And then there's a department policy that says,
5    you know, any sworn staff could return and regain their
6    seniority within six months.  It doesn't prevent
7    anybody outside of the 8304 class in the department
8    policy.

9         So the department's looking into that.  They're
10   checking with civil service.  That is one thing pending
11   that we feel on -- we feel we have a strong position
12   on.
13   BY MS. BERDUX:
14        Q.  And are there any other pending things you're
15   working on currently?
16        A.  We're resolving one last grievance which is a
17   payroll issue over overtime at alternative shifts.

18        The seniority piece was one that we're
19   resolving, outside of the grievance so far.

20        I think that may be it.  That may be the only
21   one pending right now.  Yeah, I believe so.  I think
22   that may be it.

23        Q.  All right.  Now, turning to the e-mails that
24   you sent about staffing and drafts.

25        I think one of the earliest -- the earliest

1    e-mail that you produced was from December '22 and I
2    think one of the most recent was January this year.
3    Does that sound about right?
4         A.   Yeah.   Uhm-hmm.
5         Q.   Okay.   And then of course --
6              MS. HUANG:   Ms. Berdux, when you're saying
7    December '22, you're meaning not the date, December 22,
8    you're referring to the year, December of 2022; is that
9    correct?
10             MS. BERDUX:   That's right.
11             MS. HUANG:   All right.
12   BY MS. BERDUX:
13        Q.   And this is just a sampling and these types of
14   e-mails go back years?
15        A.   Yeah, probably at least throughout my term.
16   Probably before that.   I'm not sure how they structured
17   it before that.
18        Q.   And have you noticed a trend that -- from these
19   e-mails that the drafts are getting better or less
20   severe in terms of demand on your membership?
21        A.   From me, yeah, it looks like it is getting
22   better.   And the DSA is trying to help too.   We've
23   entered into an agreement so the department can hire
24   part-time deputies.   So we've done that.   We're
25   probably going to expand on that, hopefully, as we get

```
 1   more interest.  You know, the department reduced
 2   drafting from three days to two days, although that's
 3   temporary.  I would like to see that permanent but so
 4   far there's been no movement on that.
 5          But we are also -- so -- and I hope this
 6   continues.  I think our -- we're getting an increase in
 7   applications so I hope that results in an increase in
 8   hiring.  So I hope our negative staffing goes down.  I
 9   mean, that's all of our goals.
10          But yes, I think there is some improvement.
11   You probably have to do a longer sampling, maybe until
12   June or something like that.  But I think -- so far I
13   think it's heading the right way.
14      Q.  Great.  And when did you begin to notice an
15   improvement?
16      A.  Probably January, actually.  Yeah, 'cause a lot
17   of these things are fairly new that we implemented.
18          MS. HUANG:  This is January of 2023?
19          THE WITNESS:  Correct, 2023.
20          MS. HUANG:  So -- thank you.
21   BY MS. BERDUX:
22      Q.  Okay.  And when you produced the budget from
23   Mr. Hollings proposing to operate below minimums, do
24   you know why that was proposed?
25      A.  No.
```

1    Q.  Did -- do you know if it had anything to do
2  with trying to come in or trying to reduce overtime or
3  drafting?
4    A.  I don't know -- yeah, I really can't make an
5  opinion on why they did that.  All I could see --
6       MS. HUANG:  I'm going to object on lack of
7  foundation.  Are you talking about the motivation of an
8  individual who sent out that chart?  What is -- vague
9  and ambiguous, sorry.
10 BY MS. BERDUX:
11   Q.  Go ahead.  You can continue answering.
12   A.  Only from what I could tell, you know, by the
13 documents, you know, that it was a financial savings.
14 And usually that happens when there's budgetary
15 problems.
16   Q.  And that's as much as you know about that?
17   A.  Correct.
18   Q.  Thank you.
19       And then the lockdown reports that you sent,
20 were those reports that -- or spreadsheets that you
21 created or were they kept by someone else and sent to
22 you?
23   A.  Those were from the department.  We did an
24 information request and that's what they sent us.
25   Q.  Oh, got it.  Okay.  And if I was looking at

```
 1   them correctly, I think they went back to -- hold on.
 2   I'm just pulling it up as we speak.  But I think it --
 3   the time period went from July 2021 to December 2021.
 4   Is that --
 5       A.  Sounds about right.
 6           MS. HUANG:  Objection.  Vague and ambiguous.
 7   What are you referring to in terms -- for that time
 8   frame?
 9           MS. BERDUX:  The spreadsheet of the level 4
10   lockdowns?
11           MS. HUANG:  Is that the title of the
12   spreadsheet?
13           MS. BERDUX:  Yeah, County Jail No. 3 lockdowns.
14   BY MS. BERDUX:
15       Q.  And can you summarize what this data told you?
16       A.  Basically --
17           MS. HUANG:  The document speaks for itself.
18   BY MS. BERDUX:
19       Q.  Go ahead.
20       A.  Basically it told me that they were locking
21   down the facilities, reducing, you know, the time out
22   for the incarcerated people and that is done because of
23   a lack of staffing.
24       Q.  And on particular dates it identifies a number
25   of drafts.  Does that mean that whatever number of
```

```
 1    drafts is identified that's how many people had to be
 2    called in for forced overtime?
 3         A.   Correct, yeah.  Uhm-hmm.
 4         Q.   When a number of drafts are identified does
 5    that include forced or voluntary overtime or is it only
 6    forced overtime?
 7         A.   If it says drafts, then it's forced only.
 8         Q.   Okay.
 9         A.   Yep.
10         Q.   And do you continue to get any of these reports
11    or have you gotten any since December of 2021?
12         A.   2021.
13         MS. HUANG:  Objection.  Misstates his
14    testimony.
15    BY MS. BERDUX:
16         Q.   Go ahead.
17         A.   No, I haven't.
18         Q.   All right.  I received some e-mails from
19    Mr. Mirkarimi and they were a part of his expert file.
20         Have you ever seen his expert report?
21         A.   No.
22         Q.   Oh.  Okay.  There's an e-mail from
23    Mr. Mirkarimi from an e-mail address named
24    khern22@proton.me.  Is that you?
25         A.   Yes, that's mine.
```

1      Q.   What was the purpose for using that e-mail

2   instead of the president e-mail for the DSA?

3      A.   No real purpose.   It was just, you know, back

4   and forth communication with him, you know, mainly on

5   this.

6      Q.   Okay.   You also had in your document production

7   from yesterday a news article about the new CJ 3

8   opening?

9      A.   Oh, right, yep.

10      Q.   And what was the purpose of putting that in

11   there?

12      A.   You guys asked for it.

13      Q.   Oh, okay.   Nothing --

14      A.   I'll go over the purpose, actually.

15           So I brought it up in the depo.   It was

16   discussed in the first depo.   You guys asked for a

17   copy.

18      Q.   Oh.

19      A.   It's kind of good that you guys did because it

20   references in there, as I highlighted in the e-mail,

21   basically that CJ 5 at that time, 3 at this time wasn't

22   built for high-risk inmates.   And that's why we're

23   bringing up these safety issues.

24      Q.   Do you have an understanding about when CJ 3

25   started housing more high-risk inmates?

1      A.  Could you repeat the question one more time?

2      Q.  Of course.  When CJ 3 began housing more

3   high-risk inmates?

4      A.  Well, I think it started happening when it was

5   a six floor of 850 Bryant Street.  At that time it was

6   called CJ 3.  And when CJ 3 -- it was a slow close.  So

7   they slowly phased it out.  And it was, like -- with

8   the group of inmates at CJ 3 they had to move them

9   elsewhere.  So all the jails -- they started moving

10  them to all the jails, basically, the ones at that time

11  that were in existence.

12          Then in 2020 CJ4 which was the 7th floor of 850

13  Bryant Street closed.  And that created a further

14  impact which CJ4 had the most, you know, difficult to

15  manage AD-SEG inmates.  And then those were moved out

16  when CJ floor closed and that was another impact to the

17  existing jails, to the housing areas.

18     Q.  And when you say high risk what do you mean?

19     A.  High risk mainly being mostly AD-SEG I would

20  say, yeah.  AD-SEG, maybe some special needs, PC pods.

21  Yeah.

22     Q.  PC pods?  I'm sorry, I don't know if --

23     A.  Protective custody, yeah.

24     Q.  Okay.  Thank you for providing that in your

25  updated production.

1          I will represent to you that I received just

2    four e-mails from Mr. Mirkarimi.  Do you remember if

3    you have any more than that with him?

4          A.  That should be about right.  It was a handful

5    of e-mails.

6          Q.  Okay.  Since your deposition have you spoken

7    either with Mr. Mirkarimi or Ms. Huang?

8          A.  Well, I spoke -- oh, since my deposition.  Not

9    with -- not with Ross Mirkarimi, but with Yolanda

10   Huang, yes.

11         Q.  And when did you speak?

12         A.  Just yesterday.

13         Q.  And what did you talk about?

14         A.  We talked about different things about

15   staffing.  The future problems that we might have which

16   I hope we don't have because currently our FTE

17   situation, as far as I know unless it's changed, I was

18   last told that we have unrestricted -- at least 75

19   unrestricted FTEs that we could immediately fill.

20   That's what I was last told.  Hopefully that hasn't

21   changed.

22         Now, we're helping -- and I told this to

23   Yolanda too.  We're helping the department with

24   recruiting and we're trying to increase applicants and

25   help people through the process more of like a hands-on

1    approach, you know, customer service type approach with

2    the applicant.  And hopefully that becomes successful.

3         But the only thing is what happens after the 75

4    FTEs.  You know, what's -- that was kind of our

5    discussion.  What is going to happen after the 75 FTEs.

6    Are we going to go back to the old way where it's

7    difficult to fill the FTEs or can we just fill the

8    FTEs.  Technically that's the way it should be.  We

9    have a staffing shortage.  We should be able to hire

10   and fill without restriction.  So it's kind of an

11   unknown right now.

12        I hope it stays the way it is, unrestricted,

13   and we can just, you know, put a lot of effort into

14   hiring and just do it.  I even talked to the

15   undersheriff recently.  I said, hey, you know, if we

16   all work at this and we really hustle, I think we can

17   make a really big impact in the coming months.

18        And I'm sure you heard about the hiring bonuses

19   the board of supervisors are talking about.  We're

20   trying to get on that too.  So we're trying to fix the

21   problem going forward.  So I don't know.  Hopefully.

22   Fingers crossed.

23        Q.  And who or how would it be decided whether you

24   can continue to fill open FTEs after this 75?

25        A.  I think the mayor's office.  The mayor's office

1    and the controllers.  This is where it gets sticky with

2    the budget.

3         So -- and, you know, if you look at the way the

4    city government is built, city and county, right, how

5    many county leaders really are there in the city.  I

6    mean, you can probably consider the board of

7    supervisors, you know, technically county leaders

8    because that's how it is in other cities.  And then

9    there's the sheriff.  I can't think of anyone else.

10        If you look at what's going on in the city, all

11   the city departments, you know, are getting new

12   buildings, maybe have less problems, better funding.

13   But the sheriff's department is always struggling, not

14   getting the new buildings, budgets being impacted.  And

15   there's a history of this.  And that's kind of what we,

16   at least, face.  It's an uphill battle.  If we're

17   not -- if we don't get some movement on the budget,

18   it's always going to be a struggle.

19        And I think for you, for the city side, this is

20   the problem you face because when it becomes a

21   struggle, then you get lawsuits.  Whether it's from,

22   you know, the clientele, the incarcerated people, or if

23   it's from our union or another union or whatever.  So I

24   think if that was a little bit -- if that was worked on

25   a little bit, it would be better for everybody I think.

1        Q.  Thank you for that.  Is there anything in your

2    member's contract that would raise any issues for

3    grievance if inmates were escorted out of County Jail 3

4    to receive access to the outdoors?

5            MS. HUANG:  I'm going to object to that as

6    vague and ambiguous and incomplete hypothetical.

7    BY MS. BERDUX:

8        Q.  You can still answer.

9        A.  Anything in our contract?  No, I don't think

10   so.

11       Q.  And let me ask an underlying question.

12           If there is a grievance by the DSA or

13   membership, it's because it arises from obligations in

14   the contract, right?

15       A.  Yeah.  Uhm-hmm.  Exactly.  Yeah.

16       Q.  There's no other sources for grievances.  I

17   could just go to the contract and find out what would

18   give rise to a grievance potentially?

19       A.  Yeah.  There's one caveat in there, negotiation

20   responsibilities.  There's that one as well.  But,

21   yeah, that's in the contract.

22       Q.  All right.  And I understand you spoke with

23   Ms. Huang about what possible staffing issues might

24   arise in the future and I think I heard you say that's

25   dependent upon what the board of supervisors, the mayor

1    or the controller allows you to do to fill FTE

2    positions, right?

3        A.  Pretty much.  But allowing us to fill it, yeah,

4    it -- as long as they don't -- yeah.  If they don't

5    restrict it due to be funding.  That's the main thing.

6    That's what has happened.

7        Q.  Is there anything else that you discussed with

8    Ms. Huang?

9        A.  No, I think that's -- I think that about covers

10   it.  We discussed FTEs.  The budget.  We talked about

11   the jails and the staffing.  And I think that was about

12   it.

13       Q.  Great.  Do you expect that improvement in

14   drafting will continue as your office is helping with

15   recruiting and getting people onboarded?

16       A.  I expect that, yeah, I hope so.  I mean, that's

17   the goal.  Yeah.

18       Q.  Did COVID -- did the COVID-19 pandemic impact

19   staffing shortages during the pandemic at CJ 3?

20       A.  The pandemic affect staffing shortages.  Yeah,

21   it probably did because -- but when it did would be the

22   question.  So there were peaks in COVID when COVID hit

23   and our membership caught COVID.  So there were peaks

24   and valleys.  So there were times where it impacted it

25   more so than what it is.

 1     Q.  Yeah.  And so obviously if members caught COVID
 2  they couldn't go to work?
 3     A.  Right.
 4     Q.  And I assume that that tracked with the peaks
 5  of COVID numbers in the Bay Area, right?  Membership
 6  caught COVID in, you know -- proportional to COVID
 7  numbers in the community, right?
 8     A.  I believe so.  I think the peaks, if I remember
 9  right, was in the fall.  It was around --
10        MS. HUANG:  I'm going to object to the
11  question.
12        Ms. Berdux, you can't testify.  If you want to
13  state a question, ask him his knowledge, that's fine.
14  BY MS. BERDUX:
15     Q.  Go ahead.
16        MS. HUANG:  I'm going to say misstates the
17  evidence.
18        THE WITNESS:  I believe, if I remember right,
19  the peaks were -- it was in December.  It was the
20  winter months.  And then I think it was the spring, if
21  I remember right.  There were a couple of peaks.
22  BY MS. BERDUX:
23     Q.  You identified two peaks.  Were there more than
24  two, do you know?
25     A.  It could have been two to three.  I don't know

1   if there's any more than that.
2        Q.  And did your membership follow the public
3   health guidelines for, you know, staying home from work
4   during periods of infection with COVID?
5        A.  I believe so.
6            MS. HUANG:  I didn't hear the entire question.
7   Could I have it reread, please.
8            (Record read.)
9            MS. HUANG:  Objection.  Lack of foundation.
10  BY MS. BERDUX:
11       Q.  Let me ask it this way.
12           Was your membership instructed to follow local
13  public health guidelines about quarantine and isolating
14  if and when they were infected with COVID-19?
15       A.  Yes.
16           MS. HUANG:  Objection.  Lack of foundation.
17  Incomplete statement.  Vague and ambiguous.  Who
18  informed him, did the union inform him?
19           MS. BERDUX:  That was exactly my question.
20           MS. HUANG:  Who informed him?
21  BY MS. BERDUX:
22       Q.  Who were they informed by to comply with local
23  department of public health orders about quarantine and
24  isolation if they were infected or came into contact
25  with an infected person?

1          MS. HUANG:  If you know who informed them.  Did

2     you inform them?  Did the city inform them?  Did you

3     receive those messages or in communications?

4          MS. BERDUX:  Ms. Huang, I just asked him that

5     question.  You are free to follow up with any

6     additional questions you have after I'm done.

7          THE WITNESS:  Yes.  So I think it came down on

8     multiple levels.  I think it was from DPH, the health

9     officer, DHR and the department.

10    BY MS. BERDUX:

11        Q.  Thank you.  You sent over, per your last

12    deposition session yesterday, a bunch of documents

13    responsive to our requests.

14          Was there anything that you weren't able to get

15    to, in other words am I missing anything?

16        A.  There are a lot of documents out there, but I

17    think I provided you within my knowledge, you know,

18    everything that I could think of.  The only thing is

19    the daily global drafts.  I believe the department or

20    the city should provide that.  That's too much.  That's

21    within their control.

22        Q.  All right.  Fair enough.

23          MS. BERDUX:  All right.  I've gone almost an

24    hour, just under.  So that puts us at about five hours

25    for the deposition.

 1            I'll pass to you, Ms. Huang, for now so we can

 2    complete this in time.

 3            MS. HUANG:  Do you have anything more or are

 4    you done?

 5            MS. BERDUX:  Not currently, unless I've got

 6    follow up to your questions.

 7            MS. HUANG:  Okay.

 8                         EXAMINATION

 9    BY MS. HUANG:

10       Q.  Just a few questions, Mr. Lomba.

11           When did the sixth floor of 850 Bryant close?

12       A.  Which floor?

13       Q.  Sixth floor.

14       A.  Oh, it's been awhile.  Yeah, I don't know the

15    exact year, but it had to have been around -- well, it

16    was a slow close so it phased out slowly.  They started

17    closing out tanks or pods, whatever you want to call

18    them, it might have been around -- between 2010 and

19    2012.

20       Q.  So it was a while ago?

21       A.  Right.

22       Q.  And what was the population of the 6th floor

23    before it was -- the phase out started?

24       A.  You know, I don't have those numbers in front

25    of me.  But I do remember as they were phasing out

1    obviously the numbers were going down, but I don't have
2    those numbers in front of me.
3        Q.  Do you have a ballpark?  Are we talking 500?
4    Are we talking 250?  What are we talking about?
5        A.  I think CJ -- or the 6th floor used to be able
6    to hold between -- this is an estimation, I think
7    between 250 and 300.
8        Q.  And do you recall what the population of the
9    7th floor was?
10       A.  I think it was less.  It was a smaller jail
11   than the 6th floor.
12       Q.  So am I correct in understanding that by 2012
13   the phase out of the 6th floor had been completed?
14       A.  My guesstimation or my estimate would be, yes,
15   I believe so.  It was around that time period.
16       Q.  And you became the -- is your -- the president
17   of your union in 2018?
18       A.  Right.
19       Q.  So the transfer of what you call high-risk or
20   maximum security inmates to San Bruno had taken place
21   and was, in fact, the status quo at the time that you
22   became president?
23       A.  From the 6th floor, yes.
24       Q.  And then do you recall when the 7th floor
25   closed?

1     A.  I believe it was 2020, around August, summer of

2     2020.

3         Q.  And do you have any idea of the prisoners on

4     the 7th floor, what their classification levels were?

5         A.  It was mixed.  I would say, you know, medium

6     and max and then, you know, a lot of AD-SEG there.

7         Q.  Do you know how many AD-SEG prisoners they had

8     on the 7th floor?

9         A.  No, I don't.  I don't know what the breakdown

10    is.

11        Q.  Do you know which cells or which housing units

12    were designated AD-SEG on the 7th floor?

13        A.  It's been awhile.  It was the -- there was the

14    back half of CJ 4.

15        Q.  That would have been D?

16        A.  Maybe.  Could have been D.  And then it could

17    have gone -- I don't recall how many it went up to, but

18    E and F possibly.  There were two side tanks too that

19    were really -- they're AD-SEG, but really more the

20    problematic AD-SEGers, MR4s maybe, MR3s, MR4s.  And

21    then there was a whole strip of AD-SEG I think on both

22    sides.  I think it was -- depends -- so the -- how they

23    lettered them.  So the center rows were more the max

24    GP.  The outer rows, if I remember right, were all

25    AD-SEG.  And then they had some smaller tanks in the

1   back that were really the higher-risk, high
2   problematic, you know, ad segs as well.
3       Q.  Now, who makes a determination on these
4   classifications?
5       A.  Primarily our classifications unit.  There
6   could be some input from deputies.  Some input from
7   supervisors.
8       Q.  Have you ever worked in classifications?
9       A.  No.
10      Q.  Do you know what the classification standards
11  are for the San Francisco Sheriff's Department?
12      A.  Standards?  No, I don't.
13      Q.  So you don't know what criteria they use in
14  making decisions?
15      A.  I have an idea on some of the criteria they
16  use.
17      Q.  Have you ever seen any written documents on
18  their criteria?
19      A.  I don't think so.  I don't recall.
20      Q.  And you've never received any training on how
21  to make classification determinations?
22      A.  Not specifically determinations at their level.
23  I could tell you what I know.
24      Q.  No.  I'm asking -- the question is, have you
25  ever received any training on how to -- on

1    classification criterias?

2        A.  On some criteria, yes.  But on the duties of

3    the job of a classification officer, no.

4        Q.  What training have you received on

5    classification?

6        A.  Well, it may have been in our core class and

7    through on-the-job training.

8        Q.  Core class in POST, when you were receiving

9    your basic POST training?

10       A.  Not basic POST, but mostly the corrections

11   course, core class, and then on-the-job training.

12       Q.  Okay.  Now, so is it fair to say that when you

13   became president in 2018 there have been maximum

14   security inmates at the San Bruno County Jail since at

15   least 2010?

16       A.  Yes.

17       Q.  Is all of CJ 2, the one on 7th Street, minimums

18   or what are the classifications at CJ 2?

19       A.  CJ 2.  I think all the jails are fairly mixed

20   right now, yeah.

21       Q.  Do all the jails have minimums and maximums and

22   is there AD-SEG at CJ 2?

23       A.  There are some AD-SEG at CJ 2.  I would be

24   surprised if we had any minimums.  It would be a very,

25   very small percentage.

1        Q.  But most -- many of the housing units at CJ 2
2    are open floor plan units; is that correct?
3        A.  Many of them are.  Yeah, many of them are.
4        Q.  And do you know whether or not -- let me take
5    that back.  Those were originally designed for minimum
6    security inmates, correct?
7        A.  The original purpose of 425 7th Street, the
8    jail, was for work furlough and it ended up turning
9    into a jail.  Yeah, it wasn't really intended for, you
10   know, AD-SEG inmates.
11       Q.  So work furlough is generally considered
12   minimum risk; is that right?
13       A.  Yeah.
14       Q.  So 425 7th Street was designed for low-risk or
15   minimum-risk prisoners?
16       A.  Right, correct.
17       Q.  And do you know whether in -- at what point
18   mediums and high-risk prisoners were moved into CJ 2?
19       A.  Oh, well, probably minimum, medium, max right
20   from opening.  But we had a variety of jails where we
21   could support, you know, the higher level inmates and
22   they were able to balance it throughout different
23   jails.
24            But when the 7th floor 850 Bryant Street
25   closed, that's when more of the housing impacts kind of

1    occurred because they had to move everybody out which

2    was mandated I guess, if you will, directive, you know,

3    city and all.  They had to move those incarcerated

4    people to what we had available and that was 425 7th

5    Street in San Bruno.

6         Q.  So do you know whether or not currently at

7    425 7th Street there are people -- let me ask it again.

8         Is the nature of the charge one factor in

9    deciding whether someone is -- what classification

10   they're assigned?

11        A.  Sometimes, yeah.  Uh-huh, yes.

12        Q.  San Francisco, if someone is charged with a

13   serious violent felony, like a 187, does that translate

14   into being considered a more -- a higher security risk?

15        MS. BERDUX:  Objection.  Incomplete

16   hypothetical and calls for speculation.

17   BY MS. HUANG:

18        Q.  If you know, sir?

19        A.  I'm not positive, but I think in general I have

20   seen incarcerated people charged with 187 in, if you

21   will, a tank or a pod, not necessarily in AD-SEG.  I

22   think there have to be more circumstances to get them

23   into AD-SEG.

24        Q.  There has to be conduct, in other words?

25        A.  Could be more than that, but that's one of

```
 1   them.  Could be conduct.  Could be for protection
 2   purposes.  It could be the heinousness of the crime.
 3   It could be, like you're suggesting, the criminal
 4   itself.  Yeah.  The conduct is a factor.
 5       Q.  And when you say "tank," that is the dormitory
 6   type setting?
 7       A.  Depends on -- depend on what you mean by
 8   dormitory.
 9           So I guess, like, the linear jails I would say
10   had -- we referenced the cell block or their housing
11   area as a tank sometimes.  It was just a square housing
12   area, you know, concrete walls and then the bars.
13           The dormitory --
14       Q.  But there are no more tanks now, correct?  The
15   tanks are all at 850 --
16       A.  Yeah.
17       Q.  -- and so CJ 3 no longer have tanks?
18       A.  Yeah.
19       Q.  What do you call the open cell areas at CJ 2?
20   What's the name for that, so I refer to it correctly?
21       A.  So like you're suggesting a dormitory area, we
22   refer to, on most cases, a pod.
23       Q.  A pod.  Thank you for that.  I want to keep the
24   nomenclature correct.
25           So in terms of the CJ 2, right, do you know of
```

1  any individuals who are considered high risk or high

2  security moved into a pod at CJ 2?

3      A.  I know there have been.  I don't know

4  specifically the names.

5      Q.  And am I correct in understanding that -- I

6  don't know if it's currently, but at least previously

7  there was a lot of programming in the pods at CJ 2?

8      A.  Correct.

9      Q.  And are you aware of whether or not individuals

10  who are considered high risk because they committed a

11  violent felony or a terrible, heinous crime and were

12  place into CJ 2 were able to improve their behavior

13  from being placed there?

14      A.  Well, that's tough.  I mean, am I aware, no,

15  I'm not.  That would be something that would need

16  research and data I think.  But I'm not aware of that.

17      Q.  But you are aware that people who are

18  considered higher risk have been housed in the pods at

19  CJ 2?

20      A.  They been at CJ 2.  They could be on AD-SEG at

21  CJ 2 as well.  But, yes.

22      Q.  Do you know how many AD-SEG beds are in CJ 2?

23      A.  I don't know the number, but I know it's

24  probably a smaller number than anywhere else, than CJ

25  3.

1      Q.  Do you have any numbers of how many total
2  AD-SEG beds are in CJ 3 at this point -- how many, you
3  know, inmates are designated AD-SEG?
4      A.  I think there's six pods.  I think each pod has
5  48 so -- and that's if it's filled with 48 too.  I
6  don't know if it's filled with 48.  So that would be
7  two per bunk.  If they're AD-SEG most likely it would
8  be single bunks.  It could be -- if it's filled it
9  could be 24, possibly -- you know, possibly times six.
10  That might get you a rough number.  It's probably less
11  than that.
12      Q.  Do you know if the percentages of AD-SEG have
13  increased in terms of the total population?  Are you
14  aware of any tracking of that?
15      A.  Over the last couple of years -- so since the
16  7th floor closed, that impacted the other jails.  So, I
17  mean, if you subtracted that jail and you reconfigure
18  the numbers, you'll probably see an increase at those
19  jails.
20          Now, with the state of the current politics and
21  what's going on with the criminal justice system and
22  changes, I've been told that our incarcerated people
23  population, the charges have changed.  So we are at the
24  majority of charges where they are mostly felon in 245
25  which is commonly known as assault with a deadly weapon

1    and higher type of charges.

2          So there is some change obviously in our

3    populations because there's change in what the -- what

4    the politicians want and how they're changing the

5    criminal justice system.  So we are getting more

6    serious offenders.

7       Q.  Do you have any -- do you get any of that data

8    as to, you know, the types of inmates and the

9    breakdowns?

10      A.  I've gotten it verbally.  I believe I requested

11   it once.  I did not receive it, but I haven't asked for

12   it again, no.

13      Q.  And these political changes, the criminal

14   justice system changes, are these changes that came out

15   of realignment?

16      A.  A little bit.  Some of that is from that, yeah,

17   from the state.  And then some of it is local.

18      Q.  And why don't you tell me if -- in addition to

19   realignment for San Francisco, what are these other

20   changes that you're referencing?

21      A.  Within the city?  From what I'm seeing I think

22   they're redirecting low -- well, they're redirecting

23   some crimes away from the jails from what I'm seeing.

24   You know, then you have to encompass that with it

25   appears to be, you know, the police shortage or the

1    morale of the police officers.  So I think there's a

2    lower amount of arrests.  And then I think there's

3    redirecting of some types of charges to other entities.

4         Then also I think they're trying to reduce the

5    jail population and instead of putting the incarcerated

6    person in jail, they're putting them on ankle

7    monitoring or some type of program through community

8    programs.

9    Q.  And in terms of time frame is that -- can you

10   give me a time frame when -- let's just take, like,

11   2015, which is the year after realignment started, to

12   2018, did these changes occur during that period, in

13   that four-year period?

14   A.  I wouldn't say we were heavily -- yeah, I don't

15   think all the major changes happened then, but I think

16   it was a slow build up, yeah.  I think the changes -- a

17   lot -- there was build up with that up to this date to

18   present time.  But I think also on top of that is what

19   the city has done trying to divert the lower offenders

20   to different types of programs.

21   Q.  Now, you're aware that I believe when COVID

22   started Sheriff Miyamoto's website reported that the

23   average jail count -- I'll try rephrasing that.

24        Are you aware that after 850 Bryant was

25   completely closed that for I think most of the first

1    half of 2021 the average daily count in the jails was
2    about, you know, 750 inmates?
3        A.   Yeah, that's possible.   750 to 800, yeah.
4        Q.   Okay.   And I'm looking at the website today
5    which I will share my screen.
6             Can you see that all right, sir?
7        A.   Yes.
8        Q.   This is the website for the San Francisco
9    Sheriff's Department today.   Do you recognize it?
10       A.   Yes.
11       Q.   All right.   And you see that the count today as
12   of February 3rd, the 5:00 a.m. count was 798?
13       A.   Yes.
14       Q.   So from 2021 to now the numbers have not varied
15   too much.   Maybe 40 or 50 at the most, correct, on
16   average?
17       A.   Right.
18       Q.   When you're talking about your description of
19   the type of population in the jails, has that
20   description -- does that apply to that entire period
21   between 2021 and today?
22       A.   Yes.
23       Q.   And does it apply to the period of time between
24   2018 and 2021?
25       A.   That I'm not sure because that information I

1    got within the last four to six months.

2         Q.  Okay.  When you're saying that you got the

3    information on the composition of the inmates in San

4    Francisco County Jails within the last four to six

5    months, what is the source of that information?

6         A.  Speaking to one of the -- the, I guess,

7    managers -- I guess manager is a correct term --

8    managers of the department and that's Chief McConnell.

9         Q.  Has there been any concerns that your members

10   have raised about having -- about the classification of

11   inmates housed at CJ 2?

12        A.  Yeah, a lot of -- at CJ 2?  A lot of it is, you

13   know, safety issues.  So like we're discussing CJ 2,

14   most of the bed space is kind of like open bed space.

15   They're not rooms.  There's no doors on them.  That

16   makes it a little bit less safe, you know, for the

17   employees, for the deputies, even for the incarcerated

18   people.

19            In this day and age it would be better if it

20   was -- CJ 2 was modified to something like CJ 3 where

21   each room was enclosed with a door and a handcuff port.

22   But yeah, that makes it a little bit more challenging

23   without that.

24        Q.  Do you get data on the number of inmate fights

25   at CJ 2?

1       A.  You don't get any specific data.  Occasionally
2    I might hear from it from supervisors, but mostly I'll
3    hear from it from my members.
4       Q.  So it's anecdotal?
5       A.  Yeah.
6       Q.  Do you get any data on members being injured by
7    inmates at any of the jails?
8       A.  That would be my same answer.  Sometimes from
9    management and then mostly from members.
10      Q.  Okay.  But nothing that's official or concrete,
11   it's anecdotal?
12      A.  Right.
13      Q.  Do you have -- just based upon your anecdotal
14   information, have any information on, since you've
15   become president in 2018, whether the numbers of inmate
16   fights at CJ 2 have increased at all or decreased?
17      A.  I have no data on that.
18      Q.  Do you have any impression or sense for the
19   period of time from 2018 when you became president to
20   the present of whether or not there have been more or
21   fewer or the same number of assaults on deputies by
22   inmates at CJ 2?
23      A.  No data, but same answer, just what I hear, you
24   know, from our members.
25      Q.  Do you think it's increased, decreased or

1   stayed the same, assaults on members from -- by

2   inmates?

3       A.  I think it's increased, yeah.

4       Q.  And do you know by how much it's increased?

5       A.  I don't.

6       Q.  And in terms of CJ 3, do you have any

7   impression in terms of inmate-on-inmate assaults from

8   2018 to the present, whether it's increased, decreased

9   or stayed the same?

10      A.  I don't have data, but I think it's increased.

11  We had an issue over there where the department

12  implemented a pilot program which they called a crow's

13  nest pilot program.  We were not in favor of that.

14  We've monitored that and I think there were an increase

15  of incidents within that pilot program, whether it was

16  fights and it was discovery of pruno and jail made

17  weapons.

18      Q.  So the crow's nest was a change from the direct

19  supervision model that used to be at the jail, is that

20  correct?

21      A.  Yes.

22      Q.  And from that date through the present do you

23  have any anecdotal information on whether or not

24  assaults by inmates on deputies increased, decreased or

25  stayed the same?

 1     A.  No, I don't have any data.  Just information
 2  from members.
 3     Q.  And what did members tell you?  Is it your
 4  impression that it stayed the same, decreased or
 5  increased?
 6     A.  I think it's increased.
 7     Q.  Is it primarily in the pods that had the crow's
 8  nest staffing or was it -- what was it?
 9     A.  I think it was both.  There were a couple in a
10  crow's nest staffing -- I'm sorry.  There were a couple
11  attacks in the pod where the crow's nest pilot program
12  was implemented.  Some I believe were on deputies and
13  some were on supervisors and then outside of that unit
14  as well.
15     Q.  Why do you think that there was a greater
16  incidence of violence when they took away the direct
17  supervision model?
18        MS. BERDUX:  Calls for speculation.  Incomplete
19  hypothetical.
20  BY MS. HUANG:
21     Q.  Sir, you can answer the question if you
22  understood the question.
23     A.  Well, the incarcerated people in that pod
24  weren't happy with that change and there was a
25  reduction in time out and that was one of the factors.

1      Q.   Time out meaning out-of-cell time?

2      A.   Correct.

3      Q.   And that's because there weren't deputies who

4   could do that job assignment allowing inmates out of

5   cell?

6      A.   Right.  In that structure specifically, yeah.

7      Q.   Okay.  Thank you.  Do you know how many

8   part-time deputies have been hired?

9      A.   Part time?  I think we have approximately 11 to

10   15, right around there.

11      Q.   And what's the FTE equivalent?

12      A.   Oh, that's tough.  So they're 8504s, but they

13   can only work 960 hours a year.

14      Q.   So it would be whatever the total number times

15   960; is that correct?

16      A.   Yeah.  And that's what we agreed to.  The

17   department has additional positions so they call them

18   Prop Fs.  I guess that was the part-time position

19   proposition.  I believe they're a little bit over 20

20   part-time Prop Fs.  But within our agreement with the

21   DSA to where they count towards minimums, you know,

22   assigned to courts and a couple positions at CJ1 there

23   should be about 11.

24      Q.   Now, I'm going to change topics again.  I'm

25   just cleaning up a few questions that I didn't

1    understand.
2            Chris Hollin [sic], was he part of the
3    controller's office when he wrote -- when he did that
4    chart of doing strategically below minimum staffing?
5        A.  Crispin Hollings?  He was the CFO of the
6    sheriff's department.
7        Q.  CFO of the sheriff's department.
8            So this idea of jiggering the minimums that
9    came within the sheriff's administration, that wasn't
10   from the city controller?
11       A.  Correct.
12       Q.  And when you talk about having to go through
13   arbitration to do -- to challenge the way they were
14   doing the staffing with the minimums, when did that
15   arbitration take place?
16       A.  Oh.  That was 2018, I believe.
17       Q.  So how long -- and when did the arbitrator's
18   decision come out to change --
19       A.  Actually, so the arbitration was probably 2017.
20   The decision came out 2018.
21       Q.  And after that the department stopped doing
22   that?
23       A.  Um --
24       Q.  When did the department stop using that method?
25       A.  You know, that's a good question.  Obviously

1    they kind of did it later, but I think they may have
2    stopped temporarily.  But then obviously they came up
3    with Crispin's -- you know, the plotted out strategy he
4    put out.
5        Q.  So if I understand the way that strategy work,
6    at the beginning of the shift there would be minimum
7    staffing.  And then during the shift to reduce overtime
8    people who were working overtime left, were allowed to
9    leave; is that right?
10       A.  Correct.  Early.
11       Q.  Allowed to leave early.  As a result then the
12   staffing at the jail fell below the minimum; is that
13   right?
14       A.  Yes, during those time periods.
15       Q.  And when it fell below the minimum they then
16   did a lockdown?
17       A.  You know, I'm not positive on that.  They did
18   do lockdowns.  I don't know if they did lockdowns
19   because they dropped the staffing.  I don't know that
20   for sure.  But I know they did do the level 4
21   lockdowns.
22       Q.  Well, isn't a level 4 lockdown acquired when
23   your staffing falls below minimum.  Isn't that a
24   basic --
25       A.  It is required per policy.

1      Q.  So do you know when -- do you know -- let me
2   start again.
3          Is it correct that they're not doing that
4   staffing configuration starting at minimum and then
5   dropping below minimum during the shift?  Is that
6   stopped as of now?
7      A.  I don't know for a fact if it stopped.
8      Q.  In other words, it could still be going even
9   though the arbitrator said the sheriff's department was
10  wrong in using that staffing strategy?
11     A.  It's possible.  We do have a current grievance
12  on staffing minimums that's eventually going to go
13  before arbitration.  And any data produced from the
14  beginning of that grievance to, you know, arbitration
15  obviously we're going to use.
16     Q.  So is that data public?  Is that data that the
17  public can get ahold of?  Are you allowed to share it?
18     A.  I don't think I have it all.  We've done public
19  records requests and I don't think we've obtained all
20  the data we've asked for.  But that's -- I leave that
21  up to my attorneys.
22     Q.  Then is there any consequence to the sheriff's
23  department for violating the arbitrator's finding, the
24  one that came out in 2018?
25     A.  There was a consequence back then.  I don't

1   know how this future one or this current one is going

2   to be decided.  But the consequence before, the

3   department had to pay the deputies that were impacted,

4   you know, by the staffing shortage.  So I believe the

5   arbitrator divided up the -- let's say, you know, if

6   one who was below one deputy, they would divide the

7   cost of the -- the cost of that deputy and distribute

8   it to the deputies that had to carry the weight of that

9   workload.

10      Q.  What document would I ask for to find out how

11   many times or when this jiggering of the staffing took

12   place?  Is there a name for that document?

13      A.  There's probably several but probably the best

14   one to identify it would be the payroll overtime

15   sign-up sheets because in order to really determine

16   that you'd have to see what they're paying the deputy.

17   And they're not going to pay the deputy for eight hours

18   if they're leaving two or three -- at a two- or

19   three-hour point.  So you need to see how many hours

20   they're paying the deputy and that should be the

21   overtime payroll sheet.

22      Q.  Okay.  And is that the documents that you've

23   been trying to get from the city, but not have received

24   all of them?

25      A.  We have asked -- correct.  We have asked for

1   those.  I don't think I've gotten any of those.

2       Q.  And you basically -- the union basically uses

3   Public Records Act requests?

4       A.  I use a combination.  Public Records Act and

5   Meyers-Milias-Brown Act, I believe.

6           MS. HUANG:  We've been going for an hour and 40

7   minutes.  I have to look for one document and I just

8   have a few questions on that one document.  So do you

9   want to take a break, Ms. Berdux, or do you want to ask

10  a few questions while I look for this document?

11          MS. BERDUX:  I'll leave that up to our court

12  reporter and you, Mr. Lomba, if you need a break.

13          THE REPORTER:  I'm super tired today.  I would

14  love a break if that's possible.

15          MS. HUANG:  I'm pretty confident that I can

16  finish soon.  All right.  Just to let you guys know, I

17  don't have that many more questions.  Ten to 11:00.

18  Thank you.

19          (Recess taken at 10:39 AM to 10:55 AM.)

20  BY MS. HUANG:

21      Q.  I just have two documents that I want to go

22  over and then I'm done.  I did put in the chat a

23  request for the e-mail to send the document to.

24          Hang on just a minute.  I can't tell looking at

25  this -- yeah, I think this is it.

1           What I have on the screen is the document and

2    this will be marked next in order.

3           MS. HUANG:  Would that be 4, Ms. Court

4    Reporter, Exhibit 4 or is it D?  And it is a one, two,

5    three, four, five, six page Excel spreadsheet.

6           BEHMKE SUPPORT:  For the last Lomba there was

7    no exhibits marked.

8           MS. HUANG:  So what number would this be if

9    it's the next in order?

10          BEHMKE SUPPORT:  For the case or for this

11    witness?  Because there wasn't --

12          MS. HUANG:  Ms. Berdux marked a document.

13          BEHMKE SUPPORT:  I'm sorry, I didn't catch

14    the -- I don't have the number of that one that she

15    marked.

16          MS. HUANG:  This is A.  This the first exhibit.

17          (Deposition Exhibit A was marked for

18          identification.)

19    BY MS. HUANG:

20    Q.  So this is Exhibit A, Mr. Lomba.  And it's an

21    Excel spreadsheet that I believe you produced

22    yesterday.  And can you identify what this is an Excel

23    spreadsheet of?

24    A.  That is the Excel spreadsheet of the lockdowns

25    at the jail.  I think it says jail 3, that one.

1        Q.  That would be San Bruno, correct?

2        A.  Yes.

3        Q.  And how was this Excel spreadsheet compiled?

4   Do you know who compiled it?

5        A.  I don't know the person that compiled it, but

6   it's from the sheriff's department.

7        Q.  This is a document the sheriff's department

8   provided you?

9        A.  Yes.

10       Q.  And you understand this to be then -- this

11  first page where it says County Jail No. 3 lockdowns

12  July 2021, it shows you the days in which there were

13  lockdowns for the month of July 2021, correct?

14       A.  Yes.

15       Q.  Now, on July 2nd it says "one global minus 4 at

16  11:00."  Can you tell me what that means?

17       A.  Okay.  So it says one global, is that what

18  you're saying?  So one global would be one drafted.

19  And then minus 4 at 11:00 would be four below staffing.

20  I guess four understaffed would be a clearer term.

21       Q.  And does that mean then that the lockdown

22  occurred at 11:00 because they were four below minimum?

23       A.  That, I don't know.  Unless there's a time on

24  there to the left I can't see the -- it's a little

25  small but unless there's a time indicated on there, I

1    don't know that.  All I know is that there's a

2    lockdown.

3        Q.  Sometime on that day?

4        A.  Right.

5        Q.  And let me see if I can make this a little

6    larger.  Is that better?

7        A.  Yeah, that's helpful, yep.

8        Q.  So for July 2nd where it says "minus four at

9    11:00," does that tell you what time the lockdown took

10   place?

11       A.  Not necessarily.  It just tells me there was

12   one person drafted, you know -- it was a department

13   wide draft, not just a unit or facility draft.  It was

14   department wide in that they were understaffed by four

15   at 11:00, 1100 hours.

16       Q.  And the 16th is the next day.  There's an entry

17   where it says "seven draft minus four at 1300 hours."

18   Do you see?

19       A.  Yes.  So you want me to explain that?

20       Q.  Sure.

21       A.  So based on that terminology seven drafted

22   would be seven drafted internally so within that

23   facility.  And then understaffed by four at 1300 hours.

24       Q.  So if I understand the mechanism, the people in

25   the first shift, the shift before, seven people were

1    drafted in order to cover the incoming shift; is that
2    right?
3        A.  Yes.  The way I understand it is looks like
4    seven drafted to be at minimum.  And then at 1300 they
5    went four below minimum understaffed.
6        Q.  This suggests to you that at 1300, four of the
7    seven people who were drafted went home?
8        A.  Yes.
9        Q.  And on the 17th it says six draft and minus six
10   at 11:00.  Do you see that?
11       A.  Yes.
12       Q.  And that means that there were six drafted
13   internally at CJ 3 and then six people left at 11:00,
14   meaning then they were six below?
15       A.  Correct.
16       Q.  And that would be the same interpretation with
17   different numbers for July 19th and July 23rd?
18       A.  Yes.
19       Q.  I'm going to look at the next tab which is the
20   August.
21           So this tab, is it correct, is the lockdowns
22   for August 2021 that the sheriff's office provided you?
23       A.  Yes.
24       Q.  And when we're saying lockdowns this is a
25   lockdown in the entire jail?

1      A.  I believe so, yeah.  It would be a level 4
2  lockdown.
3      Q.  And that's what level 4 means, the entire jail
4  is locked down?
5      A.  Yes.
6      Q.  And that means that no inmate in that jail is
7  going to get out of cell time like for the 14th of
8  August after 11:00 a.m.?
9      A.  Correct.
10      Q.  And everybody then is forced to stay inside
11  their cell that whole -- the rest of that day?
12      A.  Yes.
13      Q.  And that means there's no visiting?
14      A.  At least that shift.  At least that shift.
15      Q.  Meaning it could have changed at the next
16  shift, but --
17      A.  Correct.
18      Q.  All right.  And what happens when you have a
19  level 4 lockdown?  And I don't know if August 14th is a
20  weekday or a court day.  What happens when people come
21  back from court and there's a lockdown, do you know
22  what the process is?
23      A.  They'll get processed back in.  But level 4
24  lockdown will basically stop all activity, you know.  I
25  think the only exception may be a legal visit, but

1    everything else is stopped, you know, if there's
2    visiting, programs, you know, walk times.  That's it.
3        Q.  Including showers too, right?
4        A.  Yes.
5        Q.  So in August of 2021 the sheriff reports two
6    base wide lockdowns; is that correct?
7        A.  Looks like it, yep.
8        Q.  I should make this bigger too.  My apologies.
9    Let's look at ...
10        Now, I have clicked the tab for September 2021,
11    although the top of the sheet -- and the dates on the
12    left-hand column say September, although the top says
13    August 2021.  Do you see that?
14        A.  Yeah.
15        Q.  I'm going to assume that it was a typo and that
16    this is really September.  But in any event, what we
17    see here is that there are one, two, three, four, five,
18    six days in which there were level 4 lockdowns?
19        MS. BERDUX:  Objection.  Calls for speculation
20    per your assumption.
21    BY MS. HUANG:
22        Q.  Is that your understanding of what this chart
23    means, sir?
24        A.  Yes, but it doesn't clarify if it's the full
25    day or a shift.  That's the only thing I don't see

 1   clarification on.
 2       Q.  We're looking at the sheet that's the fourth
 3   sheet which at the top says July 2021 but the left
 4   column says October.  Do you see that?
 5       A.  Oh.  Yeah.
 6       Q.  And there are quite a number of lockdowns noted
 7   for October and let me count them.  One, two, three,
 8   four, five, six, seven, eight, nine, ten, eleven.
 9           Do you see that?
10       A.  Yes.
11       Q.  And same question, this indicates to you that
12   at some point during the day at CJ 3 there was a
13   lockdown on these dates?
14       A.  Yes.
15       Q.  Looking at the next sheet which is the fifth
16   sheet -- I guess they never changed the header.  It
17   still says July 2021 at the top, but it's November on
18   the left-hand side.  And it indicates --
19       A.  Right.
20       Q.  -- there were four lockdowns at some point in
21   the day at CJ4 in the month of November; is that right?
22       A.  Right.
23       Q.  And then looking at December, according to this
24   chart, December is -- there were no lockdowns; is that
25   right?

```
 1        A.   Yeah, according to the chart.
 2        Q.   Now, have you had an opportunity to verify
 3   whether the data on this chart of lockdowns at CJ 3 is
 4   accurate?
 5        A.   No.
 6        Q.   Okay.  I want to just show you the next
 7   document in order.  I'm going to close this.  I'll have
 8   to share the next chart which is different.
 9             REPORTER:  Do you want this marked, Ms. Huang?
10             MS. HUANG:  Yes, this will be B.
11             (Deposition Exhibit B was marked for
12             identification.)
13   BY MS. HUANG:
14        Q.   I'm going to make this bigger.
15             Can you see this all right, Mr. Lomba?
16        A.   Yes.
17        Q.   This at the top says "Copy of lockdown dates
18   County Jail No. 2," and it's in a slightly different
19   format, do you see that, than the last --
20        A.   Okay.
21        Q.   -- Excel spreadsheet.
22             So this has five columns with a start, end date
23   and total time, none of which is filled out, right?
24        A.   Right.
25        Q.   And then it has a column that says "Reasons"
```

1    which indicates what the drafts are.

2           So do you have any understanding of why this is

3    a different format than the other Excel chart?  Has

4    anyone explained to you why they were doing it

5    differently?

6        A.  No.

7        Q.  So this is for December which has some data,

8    but is not complete.  And this Excel only has two

9    charts on it for November 2021, December 2021.  And I

10   would note that at the top they also have July 2021 on

11   there, even though the far left column says November.

12          And this chart is also the same.  It has the

13   reasons for the drafts, but it does not have start or

14   end time or total time of any information, correct?

15       A.  Correct, yeah.

16       Q.  And this is also from the sheriff's department?

17       A.  Yes.

18       Q.  Last -- the last document I want to have marked

19   which would be 3.

20          (Deposition Exhibit C was marked for

21          identification.)

22          THE REPORTER:   C.

23   BY MS. HUANG:

24       Q.  Okay.  We're not doing numbers.  Hold on.

25          I'm trying to make it bigger.  Sorry, hold on.

1    It's just a little difficult between Adobe and -- all

2    right.

3           It is an e-mail, it appears, that was produced

4    yesterday from Greg Petty.  The title is "CJ 3 safety

5    mail - president - Outlook - 2."  Do you recognize this

6    document?

7         A.  Yes.

8         Q.  And what is this?

9         A.  As I stated earlier, it was an e-mail from

10   Deputy Petty to the assistant sheriff and everybody in

11   that e-mail chain in regards to, I think, a topic or

12   maybe a suggested topic of discussion in briefing when

13   the assistant sheriff was there.  And he e-mailed her

14   expanding on the safety issues at CJ 3.

15        Q.  Okay.  So Tanzanika Carter is the assistant

16   sheriff?

17        A.  Yes.

18        Q.  And I just want to go through who received

19   this.  John Carter, is he -- he's the commander of CJ 3

20   at the moment?

21        A.  John Garcia, yeah.

22        Q.  Garcia, sorry.  And Kevin Fisher-Paulson is

23   who?  Can you identify that person?

24        A.  He's the chief of the custody division right

25   now.

1    Q.   And Kevin McConnell, what is his title?

2    A.   He's the chief of field operations right now.

3    Q.   And James Pineda?

4    A.   He's a lieutenant, CJ 3.

5    Q.   And Jennifer Collins?

6    A.   Sometimes it's hard to keep track.  I'm not

7    sure if Jennifer is a captain now or a lieutenant, but

8    she's at CJ 3 also.

9    Q.   And Yvette Williams?

10   A.   Sergeant at CJ 3.

11   Q.   And this was following a visit by Assistant

12   Sheriff Carter, correct?

13   A.   Yes, uh-huh.

14   Q.   Were you present at the visit?

15   A.   No.

16   Q.   So in this the first paragraph he's talking

17   about Espinosa and eight other deputies we have lost

18   out here at Bruno over the last three years.  What is

19   that referring to?

20   A.   Deputies passing away, deaths.

21   Q.   Of active duty deputies?

22   A.   Not all active duty.  Some -- he is combining

23   in some recently retired.  So the deputies there are

24   kind of a little bit shocked and they're kind of

25   correlating accumulation of deaths over the last couple

1     of years.  There are a couple -- I think there was --
2     there are a couple of active deputies and a few that
3     retired recently.  And they're kind of combining them
4     and they're kind of surprised by it all.
5          Q.  People dying so suddenly?
6          A.  Right, right.
7          Q.  And that's what you understand that he's
8     referring to in his second paragraph about the stresses
9     of the environment?
10         A.  Yes, uh-huh.
11         Q.  And the health and wellness of sworn staff; is
12    that correct?
13         A.  Yes.  Uhm-hmm.
14         Q.  The third paragraph that says with that said,
15    he's talking about his primary safety concern which is
16    the lack of ports on doors?
17         A.  Correct.
18         Q.  And the places where he identifies that there
19    aren't ports on doors are interview rooms in the
20    housing units, medical holding tanks, legal visiting,
21    intake and some gym and yard doors; is that right?
22         A.  Yeah, correct.
23         Q.  Okay.  The second concern that he references in
24    the next paragraph is the lack of security shower doors
25    in the housing units?

 1        A.   Correct.

 2        Q.   Now, he says in each AD-SEG pod there is one

 3   security door?

 4        A.   Which --

 5        Q.   Under where it says the second concern is the

 6   lack of security in the showers.

 7        A.   Uhm-hmm.

 8        Q.   He says each AD-SEG pod has one security door,

 9   but they want another one; is that right?

10        A.   Yes, uh-huh.

11        Q.   That means that in each of the six AD-SEG pods

12   that you've identified, those all have a security

13   shower door?

14        A.   I believe so, yes.

15        Q.   The next paragraph that begins "The third

16   concern," you see that?

17        A.   Yes.

18        Q.   Is he's reporting that the sheriff's department

19   is short on padlocks and keys for restraints?

20        A.   Right.

21        Q.   And that's true, that the sheriff's department

22   is being -- that the deputies are required to use flex

23   cuffs when they're transporting inmates?

24        A.   If he's bringing it up, he's pretty thorough.

25   You know when you document something like this I would

1    say, yes.

2        Q.  Are you aware of any issues where an inmate has

3    broken a flex cuff?

4        A.  No, but, you know, it's possible.  And

5    obviously there's a possibility if the flex cuff isn't

6    applied right sometimes they could slip out of it so

7    those would be those two issues.

8        Q.  In terms of deputies at -- at CJ 3, not every

9    deputy is assigned a pair of cuffs and a key?  It's not

10   standard issue?

11       A.  Oh, so yes, it is.  So what he's referencing

12   to -- with the padlocks, you know, during

13   transportation they use belly chains and they also use

14   kind of like a group restraint.  So it would be like a

15   six -- usually up to a six-man restraint where everyone

16   is kind of like chained to each other in a double line

17   basically.  Three on each side sometimes.  I think he

18   may be referring to that and/or waist restraints.

19       Q.  Okay.  So these are not actually handcuffs?

20       A.  Right, yeah.  Transportation -- when you're

21   moving large amounts of inmates there's additional

22   restraints used.  And a lot of these restraints are

23   made from chains and that's where the padlocks come

24   into play.

25       Q.  Okay.  And then I want to look at the last

 1  paragraph where -- which begins with "I will reiterate
 2  what I said at muster today."  Do you see that at the
 3  bottom?
 4      A.  Yes.
 5      Q.  He says that there have been nine deaths in a
 6  very short time.  Do you see that?
 7      A.  Yes.  Uh-huh.
 8      Q.  Do you know what that time frame is?
 9      A.  If I remember correctly it was from 2020 to
10  present so over two years it should be.
11      Q.  And he said in that time we have -- we had very
12  few visits from upper brass to check in on us and see
13  how we're doing?
14      A.  Yeah, that's what he stated.
15      Q.  And that's over the same period as well, 2020
16  to the date of this e-mail?
17      A.  Yes.
18          MS. HUANG:  I have no further questions.  Thank
19  you very much, Mr. Lomba.  This is all wonderful
20  information and very helpful.
21          THE WITNESS:  Sure.
22          MS. BERDUX:  I have some follow-up.  Do you
23  want to take this off your shared screen now?
24          MS. HUANG:  Sure, sorry.
25          MS. BERDUX:  That's all right.

1                    FURTHER EXAMINATION

2     BY MS. BERDUX:

3         Q.  Okay.  Starting backwards a little bit,

4     Mr. Lomba.

5             Do you have any information regarding the cause

6     of death of those sheriffs staff or former staff being

7     caused by work conditions or work stress?

8         A.  Maybe three of them, yes.

9         Q.  Maybe three of them.  Okay.

10        A.  Yeah.

11        Q.  What information do you have?

12        A.  I was told through members of the family that

13    one of the officers was under -- felt he was under a

14    large amount of stress from the overtime that he worked

15    that specific night.

16            Another case was kind of a built-up, long-term

17    stress.  A deputy felt that he was -- unduly took the

18    brunt of an incident that wasn't his fault.

19            And then another one was another deputy -- and

20    this is just from friends or other deputies stating

21    that this specific deputy stated this and felt this

22    way, that he was under a lot of stress from a

23    particular supervisor.

24        Q.  Okay.  And other than hearing this information

25    from family members and other deputies, do you know if

1    any medical doctors opined that work stress or working

2    conditions caused any of these staff members' deaths?

3        A.  No, I do not.

4        Q.  When I spoke with you last session I had asked

5    when you first came in contact with Ms. Huang.  I

6    believe you called her and we narrowed down the time

7    frame of approximately April to June 2022.  And I think

8    you were going to go back and check some e-mails to

9    find out when your first e-mail contact with her was.

10   Did you do that?

11       A.  Yeah.  It turned out to be longer than that.

12   It was, you know, if I remember it was a little bit

13   over a year.

14       Q.  One year ago from when?  Today?

15       A.  Yes.

16       Q.  So, like, February 2022?

17       A.  Yeah, right around there.  It was a little bit

18   over a year so it could have been February 22nd.  It

19   could have been, yeah, right around there.  A little

20   bit before.

21       Q.  And when you began those communications what

22   did you communicate about?

23       A.  Well, initially we're having a lot of problems

24   at the sheriff's department and we were -- a lot of it

25   around staffing issues, understaffing.  We were trying

1    every way to fix those problems, but none of them

2    seemed to be successful.  And we just realized that,

3    you know, although we're taking the brunt of, you know,

4    the staffing issues because we're working it, we're

5    taking the workload of the staffing -- the negative

6    staffing shortfall, that we had really no recourse to

7    make it better.

8          We've advocated, you know, we voiced our

9    opinions.  We've done grievances and nothing rally

10   seemed to matter.  But -- and, you know, based on some

11   of the things that were going on in the news it just

12   seemed like really if the inmates were harmed by the

13   negative staffing, they had a stronger case.  So I just

14   looked out lawyers who were handling the cases like

15   that and that's how I found Yolanda Huang.

16   Q.   And how much time did you spend communicating

17   when you first got in touch in February 2022?

18   A.   I think it was off and on.  It wasn't like -- I

19   can't really say for sure.  I know it's been off and

20   on.

21   Q.   Okay.  So you've been in regular contact with

22   Ms. Huang since February 2022 regarding staffing

23   issues?

24   A.   I don't know what you mean by regular.  It's

25   been infrequent, I guess, but we have been talking

1   about that for sure.

2       Q.  Okay.  Yeah, how often would you say on average

3   you communicated with Ms. Huang beginning in

4   February 2022?

5       A.  Hard to tell, but, you know, maybe -- I can't

6   even really say for sure, but I would estimate maybe

7   once or twice a month or something like that.  It's --

8   yeah.

9       Q.  And was that by phone and e-mail, one or both,

10  either?

11      A.  Probably both.

12      Q.  Did she ever talk to you about being a witness

13  in this case?

14      A.  Yeah.  Uh-huh.

15      Q.  When did that first come up?

16      A.  Oh, man.  Trying to narrow down dates is tough.

17  Geez.  Maybe -- I'm going to widen my time frames a

18  little bit.  Maybe four to eight months.  Something

19  like that.

20      Q.  That would have been the time frame of April to

21  June 2022 when that came up?

22      A.  Possibly, yeah.

23      Q.  Okay.  Well, possibly that, like, raises a red

24  flag for me.  It's -- I don't want you to guess but if

25  that's your best estimate based on the timeline of

1    communications that you've had with her, that's a fine
2    estimate that few month window.  Is that your best
3    estimate, that --
4        A.  I think so, yeah.  I think that's my best
5    estimate.
6        Q.  Okay.  And what did you tell her about serving
7    as a witness in the case?
8        A.  What did I tell her about it?  What do you
9    mean?  I don't understand.
10       Q.  Oh, well, what was the conversation, you know,
11   did -- I assume she asked if you would be a witness in
12   the case and what was your response?
13       A.  My response is I was okay with it.
14       Q.  Did she ever ask if you wanted to be an expert
15   in the case?
16       A.  You know, I don't remember.  I don't know.
17       Q.  Okay.  When did you first have any
18   communication with Mr. Mirkarimi about this case?
19       A.  That was a long time ago too.  Let's see.  I
20   don't know.  Maybe August 2022.  Maybe August, July.
21   July, August.
22       Q.  Okay.  And how did you get in touch with him?
23       A.  Boy, I can't remember -- I can't remember if,
24   you know, I had his number or he called me.  I don't
25   remember.

1      Q.  And what information did you give him?

2      A.  Pretty much the same thing with discussions

3  with Yolanda Huang.  But he asked about sunlight and

4  recreation time and stuff like that.  I talked about

5  staffing and all of that.

6      Q.  Do you know if Mr. Mirkarimi ever worked as a

7  deputy in any county jails?

8      A.  As a deputy?

9      Q.  Yeah.

10      A.  No.  Not in San Francisco as far as I know.

11      Q.  Is there any information that you gave him that

12  we haven't talked about today or at your last

13  deposition?

14      A.  I gave him what I explained to you.  Also I

15  gave him a picture.  It was a Google map image.  I

16  think that may have been about it.  I think that was

17  about it.

18      Q.  What was the picture for?

19      A.  Oh, to show the -- like the recreation yards.

20      Q.  At the annex, the old CJ 6?

21      A.  Yeah, it did show an overview of the annex

22  yard.

23      Q.  And what was that for?

24      A.  Recreation time.  I was telling -- he was

25  asking about recreation time and possibilities of

1    doing, like, yard time and this and that.  And I said

2    there was an old yard, you know, there and we would

3    have to -- if it was going to be implemented my opinion

4    would be we'd have to strengthen it up.  I don't think

5    it had a -- if I remember right.  I don't think it had,

6    like, a ceiling type of fence.  And my suggestion was

7    to put a ceiling type of fence and fix and repair the

8    existing fence.

9        Q.  So you've identified areas of possible outdoor

10   access to him?

11       A.  Yeah, uh-huh.

12       Q.  Did he identify any opportunities for outdoor

13   access to you?

14       A.  Outdoor -- oh, he knew about that and he knew

15   that there could be -- taken out there through the

16   walkways.  So I guess the answer would be yes.

17       Q.  And did he ask you about any updates or

18   modifications that would have to be made to make that

19   outdoor space secure for inmate use?

20       A.  I don't know if he asked me, but I'm the type

21   of person where I share my opinion a lot.  I'm not sure

22   if he asked me or not.

23       Q.  The lockdown reports that you went over with

24   Ms. Huang that were marked as exhibits from July 2021

25   to December 2021, were the lockdowns identified in

1    those spreadsheets due only to staffing shortages?

2        A.  Identified there, it looked like it, yeah.

3        Q.  Did lockdowns occur for reasons other than

4    staffing shortages?

5        A.  Level 4 lockdown, just from my memory on it I

6    don't think so.  I think that was -- it specifies in

7    the policy how many deputies if you're understaffed

8    that there must be a level 4 lockdown.

9        Q.  You mentioned that there was an increase in

10   incidents when the crow's nest pilot program was

11   started.  Do you remember that?

12       A.  Right.  Uhm-hmm.

13       Q.  Do you have any way to quantify the number of

14   increased incidents as a result of that policy?

15       A.  I had members notify me of the fights.  I don't

16   have it in front of me.  So inmate fights, there were

17   multiple and there were multiple attacks on staff,

18   including supervisors, and I believe on deputies.  Oh,

19   and there was an incident of exposure to a nurse,

20   indecent exposure.

21            And then I think it was more than once on the

22   detection of pruno.  I'm not positive on the jail made

23   weapons.  I'm not sure how many they found on that.

24   What else?  I think that was it, right?  Yeah, I think

25   that was about it.

1      Q.  And do you have any information to quantify,
2    you know, the increase, the number of increased
3    incidents as a result of the crow's nest policy?
4      A.  Well, just from reports from my members telling
5    me this, they all wanted it to end.  They said it was
6    bad.  They even told me that the supervisors didn't
7    agree with the pilot program.  They wanted it to end.
8    And that it was causing more problems.  They said it
9    was a failed pilot program, that's how they reported it
10   to me.
11     Q.  Do you know if it was implemented throughout
12   the entirety of the jail?
13     A.  It was not.
14         MS. HUANG:  Objection.  Vague and ambiguous.
15   Implemented entirely at the jail?
16   BY MS. BERDUX:
17     Q.  In every pod.  Was it implemented in every pod?
18     A.  No.
19     Q.  Do you know how many pods?
20     A.  Just one.
21     Q.  Okay.  And is it still being used?
22     A.  It's supposed to have been ended.  We had a
23   grievance on that and we advocated it to end and then
24   the undersheriff of the department agreed to end it.
25   And I think the end date -- I think it was around

1   January 17th so it should have ended.

2        Q.  How long did that pilot program last?

3        A.  Oh, geez.  I'm not sure the start date, but it

4   had to have been I think at least around five months,

5   right around there.

6        Q.  About five months give or take a few weeks?

7        A.  Yeah.  I'd have to look back to find the start

8   date, but I think it's been at least five months.

9        Q.  And so when that crow's nest pilot program

10  began is when you started -- or some point during it

11  you heard that incidents of fights and attacks were

12  increased in that pod?

13       A.  Right.

14       Q.  Do you know what pod it was?

15       A.  5A.

16       Q.  Do you know of any other pods or time periods

17  in which this crow's nest policy was implemented in?

18       A.  In any other pods, no.

19       Q.  Or any other times?

20       A.  No.

21       Q.  And to be clear, this crow's nest policy, I've

22  been calling it that, but that's where instead of

23  having two deputies on the floor in the pod you just

24  have one deputy up in the crow's nest in the top middle

25  of the pod; is that right?

```
 1        A.  Uhm-hmm, correct.
 2        Q.  You mentioned that -- I think you mentioned
 3   even supervisors and higher ranking sheriff's office
 4   personnel didn't like this either?
 5        A.  Correct.
 6        Q.  Did anybody advocate for it after this pilot
 7   program was tested?
 8            MS. HUANG:  Objection.  Vague and ambiguous as
 9   to time.
10   BY MS. BERDUX:
11        Q.  Did anyone think that it was a good idea or
12   that it should be continued or expanded?
13            MS. HUANG:  At any time?
14   BY MS. BERDUX:
15        Q.  Any time.
16        A.  Not that I'm aware of.
17            MS. BERDUX:  All right.  Those are all of my
18   questions, Mr. Lomba.  Thank you for your time.
19            MS. HUANG:  I have just one question.
20                    FURTHER EXAMINATION
21   BY MS. HUANG:
22        Q.  Mr. Lomba, when you and I talked and I asked
23   you about testifying in this case do you recall telling
24   me that you would require a subpoena?
25        A.  We did talk about, you know, different deputies
```

1   and I think it did, you know, come down to me.  I do
2   remember something about being subpoenaed.
3        Q.  And you felt that you would be willing to be
4   honest and straightforward, but that you would not be
5   willing to appear voluntarily without a subpoena; is
6   that correct?
7        A.  Correct.
8             MS. HUANG:  No further questions.  Thank you so
9   much.
10            MS. BERDUX:  That's it.  Thank you so much.
11            MS. HUANG:  Okay.
12            REPORTER:  Ms. Huang, you want a copy of the
13   transcript?
14            MS. HUANG:  Absolutely.  And I e-mailed the
15   exhibits to the e-mail.
16            (Proceedings were recessed at 11:41 A.M.)
17                        ---oOo---
18
19
20
21             _____
22                      KEN LOMBA
23
24
25

```
 1   STATE OF CALIFORNIA        )
 2                              ) ss.
 3   COUNTY OF CONTRA COSTA     )
 4             I, Laura Espinosa, hereby certify that the
 5   witness in the foregoing deposition, KEN LOMBA, Volume
 6   2, was by me duly sworn to testify to the truth, the
 7   whole truth nothing but the truth, in the
 8   within-entitled cause; that said deposition was taken
 9   at the time and place herein named; and that the
10   deposition is a true record of the witness' testimony
11   as reported by me, a duly certified shorthand reporter
12   and a disinterested person, and was thereafter
13   transcribed into typewriting by computer.
14             I further certify that I am not interested in
15   the outcome of the said action, nor connected with nor
16   related to any of the parties in said action, nor to
17   their respective counsel.
18             IN WITNESS WHEREOF, I have hereunto set my hand
19   this 6th day of February, 2023.
20   Reading and Signing was:
21   _____requested  _____waived  ___X___not requested
22
23                           Laura K Espinosa
24                           _____
25                           LAURA ESPINOSA, CSR NO. 11400
```