# Exhibit 6 to YH Decl.

# Peo v. Kuhaiki

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

# COUNTY OF SAN FRANCISCO

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA,<br><br>Plaintiff,<br><br>vs.<br><br>ANDREW KUHAIKI,<br><br>Defendant. | Case No. 22004424<br><br>**ORDER OF THE COURT** |

**JUDICIAL NOTICE:**

The Court takes judicial notice of all the findings and orders of the Governor of the State of California, the Mayor of the City and County of San Francisco, the Departments of Public Health for the State of California and the City and County of San Francisco, the Chief Justice of the California Supreme Court, the California Judicial Council, the San Francisco Superior Court's facilities, operating procedures, and court orders related to the COVID-19 global pandemic and incorporates them herein by reference. (Cal. Evid. Code §§ 452, subd. (c), (g) and (h).)

**GOOD CAUSE FINDINGS:**

Since January of 2020, the World Health Organization (WHO), the United States Centers for Disease Control and Prevention (CDC), the California Department of Public Health (CDPH), and the San Francisco Department of Public Health (SFDPH) have recognized that the world faces a life-threatening pandemic caused by the Coronavirus (COVID-19). As of the writing of this Order, the sweeping nature of the world-wide pandemic has caused over **85** million Americans to become infected with the virus and over **1,000,000** lives have been lost.

On March 4, 2020, the Governor of the State of California declared a state of emergency. On March 16, 2020, several California counties, including San Francisco, issued emergency shelter-in-place orders for its residents. On March 19, 2020, Governor Gavin Newsom issued Executive Order N-33-20, directing all Californians to stay at home. While some of these shelter-in-place orders loosened or ended over time, in April of 2020, the CDC, as well as, state and county public health officials ordered stringent social distancing requirements, the wearing of face masks in public, and instructed vulnerable individuals to avoid public places.

With the gradual re-opening of the State and County in May and June of 2020, the San Francisco Superior Court extending its operations, including jury trials. However, the social distancing requirements of health authorities continued to severely limit the operations of the Court from June of 2020 through June of 2021, especially criminal trials. The Court took, and continues to take, exhaustive care to follow the directives of State and County health officers, by ensuring that their directives are strictly adhered to by court staff, attorneys, parties, and the public to minimize COVID-19 exposures.

In response to these orders, the Supervising Judge of the Criminal Division at the time had to determine which judges were available to handle cases based on the COVID-19 pandemic and the health guidelines issued by the state and local health authorities. The number of available

judges that did not have pre-existing medical conditions, did not fall within the protected age range, did not have child-care issues related to school closures and did not have vulnerable individuals living in their homes went from 21 judges prior to the shelter-in-place orders to 8-10 judges after the orders. Based on the same criteria, the number of staff members for the courts prior to the shelter-in-place orders was reduced by approximately 75%. A similar number of judges and staff, if not more, were reduced at the Civic Center and Juvenile Justice courthouses. These adjustments caused by the global pandemic severely impacted the operating procedures of the San Francisco Superior Court.

Based on the social distancing orders, the Hall of Justice, which houses the Criminal Division of the San Francisco Superior Court, had to restructure the use of the building by attorneys, defendants, staff, and the public.  The number of persons required (the public, jurors, attorneys, and court personnel) to be in the courthouse was reduced to decrease the flow of traffic in and out of the courthouse as well as the flow of traffic in the back hallways, stairwells, and corridors of the Hall where inmates pass to get into the courtrooms.

The Hall of Justice is an extremely old and dilapidated building that prior to the social distancing orders had only 3 to 4 operational elevators on a good day. These elevators used to carry 10 to 12 people but have been reduced to 2 at a time. The stairwells were reduced to 2 (one for ascent and one for descent) and could only accommodate 4 to 6 people at any given time. The flow of traffic in and out of the Hall of Justice by the public, jurors, attorneys, and court personnel was substantially limited.

Based on these circumstances, and the number of available judges and courtroom staff, the Criminal Division was forced to reduce the number of operational courtrooms from 20 to 5 ½.  Two of the courtrooms in the Hall of Justice could not be used for any purpose because they were too small to safely accommodate staff, attorneys, bailiffs, and the public in accordance with

the health orders. The 5 ½ remaining courtrooms were used to handle essential calendar matters for felony and misdemeanor cases, such as hearings for release, arraignments, preliminary hearings, pleas and sentencings, mental health matters, motions to revoke probation, PRCS or Mandatory Supervision, and the parole calendar. Courtroom closures were due to large staff reductions because of the shelter-in-place orders, related child-care issues, and due to some staff or members of their household, being medically at high risk for the more serious or deadly effects of COVID-19.  After six weeks of the shelter-in-place orders, with more staff becoming available to work, 2 1/2 additional courtrooms were opened to hear the backlog of no time waiver preliminary hearings.  Shortly after that, the court was able to resume most of its functions, including jury trials, but with serious limitations.

Between April of 2020 and June of 2021, to comply with the vigorous social distancing requirements issued by health authorities, the Criminal Division had to vastly restrict the amount of available seating within each courtroom, the jury room, the public hallways, and the lobby area. The jury assembly room, which before the pandemic held 185 to 200 jurors was reduced to 40. Trial courtrooms that could seat 135 jurors (with jury box and gallery), was limited to 18-20 seats. Trial courtrooms that previously seated 85-90 jurors was reduced to 10-14. Given the social distancing restrictions and relocation of other courts to trial courtrooms, the Criminal Division was down from 10 to 4 trial courtrooms, each with a satellite courtroom to accommodate the efficiency of jury selection and to provide a public gallery to ensure an open and public trial for defendants. At the time, there was only one courtroom that could safety accommodate a co-defendant jury trial. There were no courtrooms at the Hall of Justice or the Civil Center Courthouse at the time that could safely conduct a multiple defendant jury trial.

These changes affected not only the length of jury trials, but the number of available courtrooms to conduct them. Jury selection takes two to three times longer than prior to the

4

pandemic. There are often delays during the trial due to jurors, witnesses, attorneys, and defendants becoming unavailable based on a positive test, or being in close proximity to, someone who has tested positive for the virus.

The Civic Center Courthouse, which has in the past been used for the overflow of mostly misdemeanor out of custody jury trials, is located over a mile away from the Hall of Justice and has insufficient security to safely accommodate the transfer and supervision of in-custody defendants. The Civic Center Courthouse has an insufficient number of holding cells and security personnel available to safety conduct in-custody or violent offense trials. The Civic Center has only three secure holding cells, which are specifically reserved for inmates attending Family and Dependency Court proceedings. In addition, there is an insufficient number of bailiffs at the Civic Center courthouse to cover each of the courtrooms and the Sheriff's Department is already stretched for staffing at the county jails and the Hall of Justice due to retirements, resignations, and staffing shortages caused by the global pandemic.

Moreover, most of the courtrooms at the Civic Center Courthouse are smaller than the ones at the Hall of Justice; and therefore, were not sufficiently equipped to accommodate trials based on social distancing requirements and courtroom security concerns. The Civic Center Courthouse lacks the security devices and systems to deter violent conduct in the courtroom and to prevent the escape of defendants that are incarcerated.[1] The few courtrooms that were available for jury trials were being used for non-violent misdemeanor out of custody defendants, civil preference trials, emergency unlawful detainer trials, and five-year statute of limitations trials. Furthermore, as mentioned above, there were severe courtroom staffing limitations at the Civic

---

[1] There are other, sensitive security issues, which also influence why the Civic Center Courthouse is not a viable location to simply transfer any criminal case, especially one involving dangerous felony defendants.

5

Center Courthouse to accommodate jury trials. Based on these circumstances, the Civic Center Courthouse has not been a viable option for either in-custody or violent out of custody criminal trials. However, with the lifting of shelter-in-place orders and the relaxing of social distancing requirements, in addition to the return of additional judicial officers, staff, and bailiffs, the Court has begun to send more non-violent out-of-custody trials to the Civil Center Courthouse. Judges at the Civic Center Courthouse have been instructed by the Presiding Judge of the Superior Court that no time waiver jury trials will be given the highest priority at that courthouse.

The Court also explored the possibility of the use of alternative public sites in the city for court operations; however, those options have not been fruitful due to a lack of access to the public, security limitations, and prohibitive costs.

During this time, the Chief Justice and the Judicial Council issued orders and rules to continue arraignments, preliminary hearings, and trials. They also issued orders and rules to allow for the use of teleconferencing technologies for conducting jury trials and preliminary hearings and provided guidelines for the courts to safely staff courthouses and maintain operations, as well as to actively engage with Justice Partners on how to approach reopening services.

In accordance with these directives, the then Supervising Judge of the Criminal Division met extensively with the San Francisco Justice Partners who all agreed that initially in-custody preliminary hearings would take priority and that the parties would coordinate getting those matters resolved either by way of settlement or hearing. After several weeks of shelter-in-place orders, with more judges and staff becoming available to work, the Court was able to open 2 ½ additional courtrooms to handle the backlog of no time waiver in-custody preliminary hearings. This allowed the Court to shift its focus to in-custody jury trials.

The Supervising Judge made several judges available via Zoom conference to attempt to settle cases prior to trial. The Court expended considerable time and resources to assist with

resolution of cases short of trial. The Court quadrupled the weekly hearing capacity of Penal Code Section 995 motions from 5 per week to 20. The Court expanded its capacity to have pre-trial motions to suppress heard in both misdemeanor and felony cases. It was the belief of the Court and its Justice Partners that determination of these issues would serve to assist in the resolution of cases short of trial. These efforts allowed the Court to catch up on the backlog of no time waiver in-custody preliminary hearings, and to begin to send out in-custody jury trials in a reasonably timely manner.

      The Court continued its weekly meetings with the Justice Partners to inform them of the Court's plans for reducing services, then re-opening services, and the limitations on court functions, including jury trials, to solicit their input on the resumption of services, and to obtain information on their staffing reductions and the re-organization of their operations due to COVID-19 related health orders. During the meetings with the Justice Partners, the then Supervising Judge solicited their input regarding which trials should proceed and in what order based on agreed upon priorities.  It was determined that in-custody felony trials were given the highest priority, followed by in-custody misdemeanor trials, and then out of custody defendants. To ensure equitable assignment of the cases to trial, the last days were maintained even when the Court made good cause findings to continue a particular case. These communications continued throughout the pandemic until the filing of a civil lawsuit by the Public Defender's Office.

      Based on the Justice Partner's meetings, the District Attorney's Office, the Public Defender's Office, the Conflicts Panel, as well as private counsel, were provided a list of felony and misdemeanor in-custody cases that would be given priority based on last days so the parties could prepare their cases for trial. The Court also purchased a Zoom video conference account and made Zoom appearances available for the courtrooms to conduct jury trials. The Court also utilized a live stream feed to YouTube to provide public access to the trials where the courtrooms

have limited space available for public viewing. After these discussions, jury trials were conducted in all four available courtrooms.

Between June of 2020 and June 18, 2021, the court assigned out 41 no time waiver in-custody jury trials to the initial four trial courtrooms.  Thirteen went to verdict. The others were settled, dismissed, or continued after having spent considerable time in a trial courtroom.  Also, during this time, four no time waiver out-of-custody misdemeanor cases were sent to the Civic Center Courthouse for jury trial. All four went to verdict.

However, on December 4, 2020, following several months of the reduction of shelter-in-place restrictions, the State and San Francisco County Health Officers issued a new shelter-in-place order for San Francisco and surrounding counties to begin on December 6, 2020. On December 30, 2020, the San Francisco County Health Officer extended the shelter-in-place order indefinitely. As a result, the Court suspended jury trials because it was unable to summons jurors in compliance with the shelter-in-place orders. However, on January 8, 2021, the Presiding Judge of the Superior Court, based in part on a need to conduct emergency civil unlawful detainer trials, decided to lift the suspension on criminal jury trials as well. The Court again began sending out jury trials based on custodial status and last day. Beginning on June 18, 2021, with the lifting of the social distancing requirements, the Court reopened all courtrooms, including trial courtrooms at the Hall of Justice and the Civic Center Courthouse, and began assigning out no time waiver jury trials that were ready to proceed.

Nevertheless, even with the reopening of the courtrooms, isolation and quarantine requirements persisted in San Francisco, surrounding counties, the State, and under CDC guidelines. These requirements caused significant delays during the trials that were in session as well as hampered the Court in sending out trials at a similar pace prior to the pandemic.

Since the recent emergence of the delta and omicron variants of the coronavirus, the Court has again had to balance the safety of the public, the staff, the defendants, and the attorneys with the right to a speedy and public trial. The increase in infections due to these new variants has caused concerns with potential jurors, affected the readiness of witnesses, and decreased the appearances of defendants. The delta and omicron variants have impacted both the unvaccinated and the vaccinated. On December 13, 2021, the State reinstituted the indoor mask mandate in all public settings regardless of vaccination status. San Francisco has not been immune from the spread, and as of January 3, 2022, it had the third highest transmission rate in the state. Governor Newsom extended the state of emergency to March 31, 2022.

The massive spread of these new variants has had a substantial impact on court staff and sheriff's deputies. In early January of 2022, numerous sheriff's deputies were unavailable due to the new variants. Trial judges were forced to make good cause findings to continue active trials adequate deputies became available. For example, on one particular day, the Sheriff's Department was short 13 deputies at the Hall of Justice. Some trials were forced to have dark days during the trial because there were not enough bailiffs to staff the courtrooms. This, of course, lengthened the time of each trial, contributing to the backlog. This also hampered sending new cases out to trial because there were not enough deputies to secure open courtrooms. The Court was informed by the Sheriff's command staff that the bailiff shortage is anticipated to continue through March of 2022. The number of sheriff deputies has diminished by over 200 members since the onset of the pandemic. This bailiff shortage, which has been a problem since the beginning of the pandemic, has substantially increased since the emergence of the delta and omicron variants. The shortage has also impacted the ability of the courts to conduct anything more than one or two misdemeanor non-violent criminal cases at a time at the Hall of Justice.

The recent spread of the variants also impacted court staff and judicial officers. In January of 2022, there was a mistrial declared after two jurors and a deputy public defendant, who was 32-weeks pregnant tested positive for the virus. In addition, the judicial officer and the entire courtroom staff assigned to the case were forced to stay home due to potential exposure, eliminating the use of the courtroom for other trials. In a separate case, a judge tested positive during a trial and had to isolate for close to two weeks causing a delay in the proceedings. Other judges who have either tested positive, been exposed to someone who has tested positive, or live with vulnerable individuals have been forced to remain home requiring the Court to shift judicial resources to cover those judges in their absence, or to designate a courtroom dark. These circumstances have substantially impacted the Court's functioning and operating ability.

Due to the spread of the delta and omicron variants, and the recent orders by San Francisco health officials, the Presiding Judge of the Superior Court ordered the Criminal Courts to reduce the number of potential jurors during voir dire from an average of 85 to 20 per courtroom and 185 to 50 in the jury assembly room. The Presiding Judge did so rather than suspend jury trials to continue to ensure access to justice while balancing the safety of those who participate in it. This was not done in several surrounding counties and jurisdictions, including San Mateo, Contra Costa, Riverside, San Bernardino, Santa Barbara, Los Angeles, and the Northern and Central Districts of the Federal District Court, where jury trials were suspended.

After thinking we were moving pass the impact of the virus, in May of 2022, the Bay Area again began experiencing a massive spike in positive cases impacting the courts. There were numerous judges, staff, attorneys, jury trial witnesses, and jurors unable to appear in court from May of 2022 until the present. During this same time period, the Court's Human Resource Department declared all three floors of the Hall of Justice in "outbreak" status in accordance with

applicable law and CalOSHA guidelines. The virus continues to disrupt our everyday lives, the judicial process is no exception.

Nevertheless, since the June 18, 2021, reopening of all trial courtrooms, the court has advanced **419** felony no time waiver trials to be assigned to trial courtrooms.  Of those, **264** have been either settled, dismissed, or continued at the request of one or both of the parties; or the defendant has waived time, then re-asserted their speedy trial right, or entered a *Johnson* waiver; in **3** of the cases, the Public Defender declared a conflict despite the case having been on the trial calendar for several months; and in **5** of the cases the defendant failed to appear and bench warrants were issued. The remaining **128** were assigned to a trial courtroom.  Of those, **38** were settled, dismissed, continued, or resulted in a mistrial after having spent time in the assigned trial courtroom.[2]  At this time, **44** are currently in trial or have been completed (reached a verdict). This does not account for the numerous misdemeanor cases that have been advanced for trial or sent to a trial courtroom.

The problem with assigning defendant's trial to a courtroom within the statutory period is compounded by the fact that there is a large backlog of no time waiver cases caused by the pandemic. Currently there are **398** felony no time waiver cases of which **213** concern defendants who are in custody, and an additional **341** misdemeanor no time waiver cases, of which **22** concern in-custody defendants.

**S**ince June 18, 2021, of the **839** felony arraignments which have taken place, **748** cases have been set for trial on a no time waiver basis, only **91** defendants have waived time. Along these lines, it should be noted that from January 1, 2019 to July 13, 2019, about 58.9% of the defendants arraigned on a Felony Information set their cases for trial on a no time waiver basis,

---

[2] This number includes cases in which the defense declared a doubt under Penal Code section 1368 after being assigned to a trial courtroom.

asserting their right to a speedy trial. From January 1, 2021 to July 13, 2021, during the height of the pandemic, the number of felony defendants who asserted their right to a speedy trial increased to 81.1%. Since the reopening, the number of felony defendants who have asserted their right to a speedy trial has grown to approximately 96%. At the same time, felony dispositions have significantly decreased. From 2019 to 2021, criminal case dispositions fell by a total of 52.9%. The current backlog exists because the Court has difficulty filling all 11 available trial courtrooms consistently with either in-custody or out-of-custody felony trials because most of the cases sent to trial end up resolving, being continued, resulting in a covid related mistrial, or being dismissed prior to verdict.

While it is "'fair to expect the state to provide the machinery needed to dispose of the usual business of the courts promptly, it does not appear feasible to impose the same requirements when certain unique, nonrecurring events have produced an inordinate number of cases for court disposition.'" (*Rhinehart v. Municipal Court* (1984) 35 Cal.3d 772, 782; see also *People v. Johnson* (1980) 26 Cal.3d 557, 571, citing The American Bar Association's Project on Standards for Criminal Justice Standards Relating to Speedy Trial (Approved Draft 1968) pp. 27-28.) Cases whose arraignments occurred after June 18, 2021, now comprise well over half the cases in the backlog. And since January 11, 2022, the Court has addressed all no-time-waiver felony cases whose defendants were arraigned between March 2020 and June 18, 2021, advancing them for assignment to a trial courtroom. This judicial officer is unaware of any time in recent history prior to the global pandemic when the San Francisco Superior Court, Criminal Division, was responsible for chronic court congestion.[3] In short, the current court congestion is anything but routine. There were no issues with court congestion in February of 2020. It is the combination of

---

[3]. The dissent in *Hernandez-Valenzuela v. Superior Court* (San Francisco) (2022) 75 Cal. App.5th 1108, 1143, refers to court congestion in San Francisco in 1954.

12

Order of the Court

the circumstances caused by the global pandemic and the "inordinate number of [felony] cases" which have simultaneously been scheduled for no time waiver jury trials that has caused the backlog, not routine court congestion. (*Johnson*, *supra*, 26 Cal.3d at 572.) There are six individual public defenders responsible for approximately 35% of the entire trial backlog, their unavailability contributes significantly to the delay in getting trials out and reducing the backlog. Moreover, the recent practice of the Public Defender's Office in assigning deputy public defenders to "second chair" cases (including in one instance, a supervising attorney sitting as "second chair") has diminished the number of cases that can be sent out to trial due to the "second chair" attorney's unavailability. The Court finds the circumstances here distinguishable from the circumstances in *Arreola v. Municipal Court* (1983) 139 Cal. App.3d 108, 111-116 (where the court found that the policies and procedures of the district attorney and the master calendar judge resulted in the defense counsel advising their clients to proceed to trial, and in turn caused a large backlog of cases, did not constitute exceptional circumstances to excuse the delay).

Throughout the entire pandemic, the Criminal Division of the San Francisco Superior Court has not closed. It has remained open, balancing the needs and rights of those accused of criminal offenses with the expectation to safely conduct hearings and trials with minimal risks to the defendants, attorneys, staff, and the public. The continued access to the courts and constitutional due process requirements to provide defendants with timely jury trials is of the utmost importance to this Court, but the exceptional and extraordinary circumstances caused by the global pandemic, which has severely limited this Court in doing so, constitutes good cause to continue the defendant's jury trial beyond the statutory last day.

There is precedent for doing so under both State and Federal case law where, when faced with medical quarantines, government declared states of emergency, epidemics, pandemics, or natural disasters that have crippled courts' abilities to conduct operations, courts have found good

cause to continue trials beyond their statutory last days. The Court relies upon *Elias v. Superior Court* (San Diego) 78 Cal. App.5th 926 (no violation of defendant's right to a speedy trial where there was good cause to continue the case fifteen months due to COVID-19 and witness unavailability), *Hernandez-Valenzuela v. Superior Court* (San Francisco) 75 Cal. App.5th 1108 (which found good cause based on the totality of circumstances that the court's backlog which delayed petitioners' trials was the result of exceptional circumstances arising from the COVID-19 pandemic and not routine chronic court congestion) and *Stanley v. Superior Court* (2020) 50 Cal. App.5th 164, and the cases cited therein, *In Re Venerable* (1927) 86 Cal. App. 585; *People v. Tucker* (2011) 191 Cal. App.4th 1313; *Furlow v. U.S.* (9th Cir. 1981) 644 F.2d 764; *U.S. v. Correa* (S.D.N.Y. 2001) 182 F. Supp. 326; *U.S. v. Scott*, 245 Fed. Appx. 391 (5th Cir. 2007); *U.S. v. Richman* (1st Cir. 1979) 600 F.2d 286. See also *United States v. Olsen* (9th Cir. 2021) 995 F.3d 683.

The Court has made every effort to combat the circumstances caused by the global pandemic with an exceptional response by keeping every available trial courtroom in trial or open to receive a trial that was ready to proceed. The only time a trial courtroom is not handling a trial is when the courtroom is handling settlement conferences, awaiting assignment of a trial with an older last day or higher priority, there are clerical or deputy staffing storages due to the pandemic, or the court is needed temporarily to cover time-sensitive preliminary hearings or other matters that take precedence over a particular defendant's matter. Prior to *Hernandez-Valenzuela*, the Court had already assigned all available courtrooms a trial. Since the consolidated decision, the Court has added an additional trial courtroom at the Hall of Justice, utilized judicial officers and additional clerical staff from the Civic Center Courthouse and the visiting and retired judges' programs to assist with trials, and sought the assistance of a retired judge for additional settlement conferences. In addition, based on extensive discussions with the Sheriff's Department, the Court

will begin to send three to four misdemeanor cases to the Civil Center Courthouse by the end of July of 2022. The Court is still working on trying to get the Sheriff's Department to a staffing level to handle out of custody felony matters. It does not appear they will be able to handle in-custody felony matters at any time in the foreseeable future.

The court in the *Hernandez-Valenzuela* case determined that "the pandemic was not a thing of the past nor had the court returned to business-as-usual when petitioner's cases were called for trial." (*Hernandez-Valenzuela*, *supra*, at p. 1129.) While the state and federal governments move beyond governmental mandates, emergency orders, and health guidelines, the ramifications of the two-year pandemic continue to impact the judicial system. We live with Covid-19. We have not eliminated it or its impact.

The Court will continue to review the status of no time waiver cases on a regular basis and assign them to an available trial courtroom as priorities dictate in accordance with Penal Code section 1048. If a trial courtroom becomes available before the review date, the Court will notify counsel and advance that case onto the trial calendar to be assigned out.

**GOOD CAUSE APPEARING:**

The Court finds that due to shelter-in-place orders, social distancing requirements, insufficient courtroom staff and security, and the unavailability of adequate alternative locations to conduct defendant's trial, there is good cause to continue defendant's jury trial past the statutory last day. These circumstances were not caused by chronic court congestion nor the neglect or failure of the Court or the People to adequately provide court services, but solely based on a global pandemic constituting exceptional and extraordinary circumstances warranting a good cause finding. Based on the totality of the circumstances, the Court finds good cause to continue the jury trial in this case and that the length of the continuance is reasonable under the circumstances, the delay is minimal, and the defendant has failed to present evidence of prejudice by the delay. (*People v. Engram* (2010) 50 Cal.4th 1131, 1162-1163, citations omitted.) As such, the Court finds good cause to continue the jury trial until a courtroom becomes available.

**IT IS HEREBY ORDERED.**

Dated: 8/5/22

*Christopher C. Hite*

The HONORABLE CHRISTOPHER C. HITE

JUDGE OF THE SUPERIOR COURT