**LAW OFFICE OF YOLANDA HUANG**
Yolanda Huang, SBN 104543
PO Box 5475
Oakland, CA 94605
Telephone: (510) 329-2140
Facsimile: (510) 580-9410
Email: yhuang.law@gmail.com

**GREENFIRE LAW, PC**
Rachel Doughty, SBN 255904
Richard Brody, SBN 100379
P.O. Box 9055
Berkeley, CA 94707
Telephone: (510) 900-9502
Facsimile: (510) 900-9502
Email: rdoughty@greenfirelaw.com
rbrody@greenfirelaw.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO/OAKLAND DIVISION

|  |  |
|---|---|
| MONTRAIL BRACKENS, TROY MCALLISTER, and JOSE POOT, on behalf of themselves individually and others similarly situated, as a class and subclass, <br><br> Plaintiffs, <br><br> vs. <br><br> CITY AND COUNTY OF SAN FRANCISCO, SAN FRANCISCO SHERIFF PAUL MIYAMOTO, <br><br> Defendants. | Case No.: 3:19-cv-02724 SK <br><br> **PLAINTIFFS' PROPOSED FINDINGS OF FACTS AND CONCLUSIONS OF LAW** <br><br> TITLE <br><br> HON. SALLIE KIM, PRESIDING |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................... 4

I.     INTRODUCTION AND PROCEDURAL HISTORY ...................................... 6

II.    FINDINGS OF FACT.................................................................................... 11

       A.   Plaintiffs .............................................................................................. 11

            1. Class Representative Montrail Brackens ...................................... 12

            2. Class Representative Troy McAlister ........................................... 13

       B.   CJ3 Physical Structure........................................................................ 15

       C.   Direct Supervision Model at CJ3 ....................................................... 18

       D.   Exercise, out of cell, and sunlight ..................................................... 19

       E.   Lack of valid excuse for denying detainees at CJ3 Outdoor Access............................. 22

            1. Comparison to other regional detention facilities ....................... 22

            2. Weather at CJ3 ............................................................................. 23

            3. Judicial recognition of self imposed burden ............................... 23

            4. No testimony showing impossibility ........................................... 23

            5. Demonstrated ability: the catwalk and the kennel ...................... 24

       F.   Scope of Sheriff's Authority & Responsibility ................................. 25

       G.   Staffing Deficiencies .......................................................................... 27

            1. Staffing Levels Of Sheriff's Office Custody Personnel Have Declined During the Past Four Years ............................. 30

            2. Insufficient staffing is the primary cause of lockdowns ............. 32

            3. Defendant City and County of San Francisco's Policy of Short Staffing Creates Lockdowns Which Puts Plaintiffs At Substantial Risk Of Suffering Serious Harm ............................. 34

            4. Reduced Staffing Levels Harm Sheriff Deputies........................ 34

       H.   Total denial of sunlight and excessive lockdown causes unacceptable health risk to detainees. ............................ 35

            1. Lack of Exposure to Direct Sunlight ........................................... 36

                 a)  The Injuries from Total Denial of Sunlight Are Compounded and Seriously Aggravated by Circadian Rhythm Disruption. .................................. 38

            2. Excessive lockdown is punishment and detrimental to the health of detainees.......... 45

                 a)  Defendants' Experts' Did Not Refute Nor Contradict Dr. Czeisler nor Dr. Zeitzer's Testimonies. ................................. 46

            3. Appropriate for Inmates to Receive One Hour Access, Daily................................. 49

**III.    CONCLUSIONS OF LAW** ..................................................................................**49**

      1.  Lack of Access to Out-Of-Cell Time and Exercise ....................................57

**Plaintiffs' Proposed Findings of Facts and Law-- Case No.: 3:19-cv-02724 SK**

**TABLE OF AUTHORITIES**

**Cases**

*Adarand Constructors, Inc. v. Slater*, 528 U.S. 216 (2000) ........................................... 61

*Atkins v. Virginia*, 536 U.S. 304 (2002) ......................................................................... 51

*Bell v. City of Boise*, 709 F.3d 890 (9th Cir. 2013) ........................................................ 60

*Bell v. Wolfish*, 441 U.S. 520 (1979) ................................................................ 50, 52, 59

*Castro v. Cnty. of L.A.*, 833 F.3d 1060 (9th Cir. 2016) .............................. 51, 53, 54, 55

*Cent. Delta Water Agency*, 653 F. Supp. 2d 1079 (2009) ............................................. 59

*Chafin v. Chafin*, 568 U.S. 165 (2013) .......................................................................... 60

*City of Erie v. Pap's A.M.*, 529 U.S. 277 (2000) ........................................................... 61

*City of Fresno v. Clovis Unified Sch. Dist.*, 204 Cal. App. 3d 417 (1988) ..................... 59

*City of San Diego v. Shapiro*, 228 Cal. App. 4th 756 (2014) ........................................ 59

*Forest Guardians v. Johanns*, 450 F.3d 455 (9th Cir. 2006) ........................................ 61

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167 (2000) ..................... 60

*Gary H. v. Hegstrom*, 831 F.2d 1430 (9th Cir. 1987) ............................................. 49, 52

*Gordon v. Cnty. of Orange*, 888 F.3d 1118 (9th Cir. 2018) .......................................... 51

*Gregg v. Georgia*, 428 U.S. 153 (1976) ........................................................................ 51

*Hernandez v. County of Monterey*, 110 F. Supp. 3d 929 (N.D. Cal. 2015) ........................... 51, 54, 60

*In re Palmdale Hills Prop., LLC*, 654 F.3d 868 (9th Cir. 2011) .................................... 61

*Inmates of the Riverside County Jail v. Clark*, 144 Ca. App. 3d 850 (4th DCA, 1983) .............. 53, 59

*Jones v. Cty. of Contra Costa*, 2014 U.S. Dist. LEXIS 23664 (N.D. Cal. Feb. 24, 2014) ............... 52

*Jones v. Johnson*, 782 F.2d 769 (9th Cir. 1986.) ......................................................... 50

*NASD Dispute Resolution, Inc. v. Judicial Council*, 488 F.3d 1065 (9th Cir. 2007) ....................... 59

*Norbert v. City & Cnty. of S.F.*, 10 F.4th 918 (9th Cir. 2021) ................................... 9, 10

*Nw. Envtl. Def. Ctr. v. Gordon*, 849 F.2d 1241 (9th Cir.1988) .................................... 61

*Pierce v. County of Orange*, 526 F3d 1190 (9th Cir. 2008) ........................................... 10

*Pierce*, No. 19-cv-07659-JSW, 2022 U.S. Dist. LEXIS 218869 (N.D. Cal. Dec. 5, 2022) .............. 59

*Rhodes v. Chapman*, 452 U.S. 337 (1981) ..................................................................... 51

*Spain v. Procunier*, 600 F.2d 189 (9th Cir. 1979) ................................................................ 50, 52, 54

**Regulations**

15 Cal. Code Regs. § 1065 ............................................................................................... 6, 55, 58

15 Cal. Code Regs. § 1065(a) ............................................................................................... 55

15 Cal. Code Regs. § 3343(h) ............................................................................................... 58

24 Cal. Code Regs. § 1231.2.10 ...................................................................................... 53, 58

**Local Authority**

San Francisco Ordinance 225-22 (2022) ............................................................................. 54

**Other Sources**

American Correctional Assoc., Performance-Based Standards and Expected Practices for
    Correctional Institutions, 5th ed. (March 2021) .............................................................. 56

American Correctional Assoc., Performance-Based Standards for Local Detention Facilities,
    4th ed. (2004) ................................................................................................................ 56

Convention for the Protection of Human Rights and Fundamental Freedoms, Art. 3 (1989) ........... 56

European Committee for the Prevention of Torture and Inhumane or Degrading Treatment or
    Punishment, 2nd General Report (1992) ....................................................................... 57

European Committee for the Prevention of Torture and Inhumane or Degrading Treatment or
    Punishment, 30th General Report (Jan. 1-Dec. 31, 2020) .............................................. 56

U.S. Marshalls, Federal Performance-Based Detention Standards Handbook, Rev. 11 (May
    2022) .............................................................................................................................. 56

**Constitutional Provisions**

Cal. Const., art. I, § VII ........................................................................................................ 6

Cal. Const., art. I, § XVII ...................................................................................................... 6

U.S. Const., amend XIV ....................................................................... 6, 7, 10, 11, 35, 50, 51, 52, 54

U.S. Const., amend. VIII ...................................................................... 6, 7, 49, 50, 51, 52, 54

1    I.      INTRODUCTION AND PROCEDURAL HISTORY

2           The Plaintiffs, all pretrial inmates at San Francisco County Jail #3 ("CJ3," formerly

3    designated as "CJ5"), located in San Bruno, California, brought this class action suit seeking

4    declaratory and injunctive relief, asserting that the San Francisco County Sheriff's Office and the

5    City and County of San Francisco, through their actions, have violated the Fourteenth Amendment

6    to the United States Constitution, sections 7 and 17 of Article I of the California Constitution (due

7    process of law and prohibition on cruel and unusual punishment, respectively), and 15 Cal. Code

8    Regs. § 1065 in that they have created serious and significant harm and the risk of harm to inmates

9    at CJ3, first because inmates are "completely denied all access to sunshine, and completely denied

10   any outdoor recreation," and second, as a result of the policy and practice of locking up inmates in

11   excess of 23 hours a day.[1] "Complaint," ECF 1, p. 1.

12          The defendants remaining in the case are the City and County of San Francisco (of which

13   the Sheriff's Office is deemed by this court to be a non-jural entity (ECF 110, p. 49), and Sheriff

14   Miyamoto, in his official capacity.[2]

15          This Court granted preliminary relief on January 31, 2020, finding that "confining inmates

16   in County Jail 4 who are in administrative segregation and confined to their cells for 23 ½ hours a

17   day violates . . . the Fourteenth Amendment." ECF 110, pg. 57:6-8. At that time, this Court

18   declined "to rule that an inmate generally has the right of access to direct sunlight, but the Court

19   [found] that depriving a pretrial detainee of lack of access to direct sunlight for more than four

20   years constitutes punishment." ECF 110, pg. 57:13-15.

21          In support of its findings, this Court noted:

22          San Francisco created the problem at issue by deliberately constructing a jail
23          without access to direct sunlight. Thus, San Francisco cannot create the problem
            and then claim a legitimate need for safety based on its choice about construction
24          of the jail. The Court finds that complete denial of outdoor exercise for an inmate
25          confined more than four years is punishment because the denial of outdoor

26   ───────────────
     [1] Plaintiffs' complaint originally included claims under the 8th Amendment to the U.S. Constitution and claims for
27   violation of the California Constitution and common law claims against individual defendants, which claims and
     individuals were dismissed, with the exception of Sheriff Miyamoto. ECF 110, pg. 57:20-25.

28   [2] Sheriff Miyamoto is automatically substituted for his predecessor in interest, former Sheriff Hennessy. Fed. R. Civ.
     Proc. 25(d).

exercise significantly exceeds and is independent of the 'inherent discomforts of confinement.' Although inmates expect to be deprived of access to the outdoors, they do not expect and society does not expect that inmates should be deprived of all access to the outdoors for a long period of time – up to eight years. Even if the evidence shows that access to direct sunlight is not medically necessary, forcing people to live without direct sunlight for many years is simply punishment. As a point of comparison, scientific studies cannot even create a scientific experiment in which people voluntarily deprive themselves of direct sunlight because such a study is unethical. If even a voluntary study of that nature is unethical, then inmates' involuntary confinement here amounts to punishment. However, depriving people of access to direct sunlight is not punishment if for a short period of time. Society expects that inmates will be deprived of many of the benefits of freedom.

The purpose of pretrial detention is to confine a criminal defendant to ensure that he appears for trial and that he does not create a risk to the public before trial. Stripped of its legalese, *Bell v. Wolfish* stands for the proposition that the conditions of confinement are merely to make sure that the criminal defendant remains ready to appear for trial in a safe manner in the jail. Thus, any condition of confinement that exceeds that goal constitutes punishment. Here, the condition of confinement that strips the ability to see direct sunlight for a period of years is not necessary to ensure that Plaintiffs are ready to appear for trial in a safe manner in County Jails 4 and [3]. For that reason, the Court finds that confining a pretrial detainee, an innocent person, in such a situation where he does not see direct sunlight for years is not rationally related to the non-punitive nature of confinement and violates the Fourteenth Amendment.

In this case, although there is no clear guidance from the appellate courts on this issue, the Court finds that depriving an inmate of access to direct sunlight for more than four years is punishment. For purposes of the preliminary injunction, the Court chooses the four-year mark for the Constitutional cut-off because *Spain* discusses that period of time as a lengthy time for incarceration. *Spain* addressed a situation in which inmates were incarcerated for four years without outdoor exercise, and its progeny discuss situations under the more difficult standard of the Eighth Amendment, in finding that deprivation of outdoor exercise for shorter periods with no alternative violates the Eighth Amendment. Although other courts discuss shorter periods of deprivation as constitutional violations, the Court anchors this decision to the bellwether opinion in *Spain*.

Although the Court realizes that any injunction draws an arbitrary line, the Court bases this decision to provide a certain amount of time in direct sunlight partially on Zeitzer, who recommends 30 minutes of sunlight per day. The Court also takes into consideration that the medical evidence is unclear because there are not readings for the light in the cells at night. And given that inmates receive sunlight, albeit filtered, throughout the day, it is unclear if Zeitzer's recommendation would be the same for them. Zeitzer also opined that 30 minutes of sunlight one to two times a week might suffice to re-set the Circadian rhythm. [ . . . ]

1  this amount of time spent in direct sunlight is slightly different from the amount
2  Zeitzer recommends, but the Court is also concerned about the practical ability of
   the City and County of San Francisco to provide access to direct sunlight.
3  ECF 110, p. 37:10-39:6.

4      This Court later clarified the ordered preliminary relief:

5      (1) The term "direct sunlight" is access to sunlight that is not filtered through a
6      window. Thus, to the extent that the louvered windows in County Jail 4 allow
       access to sunlight, not filtered through any obstruction such as glass, that access is
7      "access to direct sunlight." It appeared during the site visit that the louvered
       windows did allow sunlight without any obstruction, but the Court is not aware of
8      how often the louvered windows are open or closed.

9      [. . .]

10     (3) As the Court noted in the Order, there is conflicting evidence about the
11     amount of time inmates in administrative segregation for non-disciplinary reasons
       in [CJ3] receive for the "day room" and the gym. As noted in the Order,
12     Defendants claim that these inmates receive 30 minutes in the gym and 30
       minutes in the day room every day. That amount of access to the day room and
13     gym every day meets constitutional standards. However, if Defendants alter that
14     schedule, then at a minimum, the Court find that inmates in administrative
       segregation for non-disciplinary reasons in [CJ3] must receive at least one hour in
15     the gym, five days a week.

16     (4) Because the size of day rooms in County Jails 4 and [CJ3] differ, the Court
       finds that inmates in administrative segregation for non-disciplinary reasons in
17     County Jail 4 must have access to the gym for one hour a day, five days a week.
       As noted above, inmates in administrative segregation for non-disciplinary
18     reasons in [CJ3] can receive combined access to the day room (30 minutes) and
       the gym (30 minutes), seven days a week, or, if that schedule changes, they must
19     have one hour a day, five days a week, in the gym.

20     (5) Defendants must implement the Order or file a stay by February 28, 2020.

21  ECF 119, p. 2.

22     The January 31, 2020, Order was briefly stayed. ECF 138, 150, P. 2:1-3.  On April 30,

23  2020, the Court held that the preliminary relief ordered on January 31, 2020, and clarified in ECF

24  119 had expired under the Prison Litigation Reform Act ("PLRA"). ECF 190, p. 2:20-21. The

25  Court declined to grant further injunctive relief because of Plaintiffs' pending appeal of the 2020

26  Order, seeking to maintain the *status quo*, particular in the face of dramatically changed conditions

27  at CJ3 due to the Covid pandemic and the public interest in not interfering with efforts to prevent

28  the spread of Covid at CJ3. ECF 208.

**8**

Plaintiffs appealed the 2020 Order, seeking greater preliminary relief. This relief was denied based upon the assumption of certain facts, some of which were reexamined for clarification at trial, of which, upon further examination were found to no longer hold true or to have never been true. The pertinent facts assumed by the Court of Appeal upon which further evidence was taken at trial were:

(1) "Each cell has a window on the back wall, which looks onto a semitransparent wall consisting of stripes of clear and frosted panes, which in turn allows into cells natural light from the outside while providing visual access to the outdoors."

*Norbert v. City & Cty. of S.F.*, 10 F.4th 918, 922 (9th Cir. 2021).

(2) "The day rooms contain phones, a shower, a television, tables, and stools. The district court found that while the day rooms "are not large enough for vigorous exercise," they "do allow some space for some limited exercise."

*Id.*

(3) "Each gym has two large grates on the sidewall that allow in fresh air and provide an 'occluded sky view' that allows some light to enter the gym."

*Id.*

(4) "[CJ3] has no secure outdoor space for inmate recreation."

*Id.*

(5) "[CJ3] inmates in general population have access to the day room for 4.5 hours on weekdays and 8 hours on weekend days, which is organized around other educational and rehabilitative programming. They also are allowed at least 30 minutes in the gym each day, seven days a week."

*Id.*

(6) "Inmates in administrative segregation have less recreation time than those in general population; due to safety concerns, they cannot use the common areas as a group. [CJ3] instead provides administrative segregation inmates at least 30 minutes of gym time and 30 minutes of common room time each day, seven days per week, generally in groups of two. However, jail administrators try to create larger groups so that recreation time can be extended. In particular, the district court explained that if the jail could safely accommodate more administrative segregation inmates at once, their exercise time could then increase. Specifically, '[f]or each two inmates added to the total, the exercise time is increased by 30 minutes; e.g., four inmates in the gym together would get one hour of time, six would get one and a half hours, etc.'"

*Id.*

(7) The totality of the health data available to the Court as of review by the Court of appeals was a three page expert report from Dr. Jaime Zeitzer regarding interruption of circadian rhythms, the differential required, and the extent to which indoor light is able to provide "the proper differential" to calibrate the biological activities that rely upon a proper circadian clock.

*Id.* at 923-924.

Cross motions for summary judgement were filed.[3] ECF 259, 273. The Court also made certain findings of fact regarding Covid, light variation in detainees' cells, and the amount of time that inmates at CJ3 spend out of their cells.

Regarding Covid, this Court found that:

it is unclear how much time inmates in County Jail 3 spend out of their cells and whether that amount of time is Constitutionally sufficient. [. . .] The Ninth Circuit in this case reiterated the finding in *Pierce v. County of Orange*, 526 F3d 1190 (9th Cir. 2008) that allowing "only ninety minutes of exercise per week – less than thirteen minutes a day – does not comport with constitutional standards." *Norbert*, 10 F.4th at 930 (citing *Pierce*, at 1208, 1212). Here, because [sic] this Court has already found that the cells are too small for meaningful exercise. Thus, if the current policy is to allow inmates to be out of their cells only 90 minutes a week, that policy violates the Fourteenth Amendment unless there is some other reason to justify that amount of time. On the one hand, Defendant presented evidence about "walking groups" that potentially satisfy the Fourteenth Amendment, but Plaintiffs submitted evidence to the contrary. Because it is not clear whether inmates receive the amount of exercise found to comply with the Constitution, the Court cannot grant summary judgment to either side.

ECF 325, p. 23:21-24:9. Also, the parties disagreed whether the justification for the decreased out of cell time was in fact Covid, or wholly or partially due to staffing shortages. (*Id.* at p. 24:12-16)

A trial in this case was held on August 8, 9, 10, 11, 15, 16 and 17, 2023, in which this Court heard further evidence on (1) the material risk to human health arising from the deprivation of sunlight, (2) the material risk to human health as a result of interruption of circadian rhythms, (3) the current conditions at CJ3, including opportunities for recreation indoors, (4) further information about the physical structure of CJ3, including the windows and the gyms, (5) the outdoor spaces available at the San Bruno parcel where CJ3 is located and the past utilization of that space, (6) routine and chronic staffing shortages causing the inability to carry out routine tasks, (7) routine and chronic staffing shortages so that the Sheriff cannot fill positions that

---

[3] The Court struck Plaintiffs' prayer for damages. ECF 325, p. 14:9-12.

become vacant due to staff illness, vacations, training, and other routine reasons; and (8) chronic staff shortages leading to facility-wide lockdowns at CJ3 where inmates are denied out of cell time.

As addressed in detail below, based upon the further evidence heard at trial, this Court now finds that Defendants have created serious and significant harm and the risk of harm to inmates at CJ3, in violation of the Fourteenth Amendment, because it is uncontroverted that (a) Plaintiffs were denied access to outdoor recreation and natural sunlight from the date that CJ3 was built until August 19, 2022, and (b) Plaintiffs have been subjected to unnecessary and therefore excessive lockdowns in their cells at CJ3 up to August 19, 2022. This Court further finds reliable Plaintiffs' experts who opined that total denial to inmates of access to sunlight causes serious physiological injury including metabolic disruptions that result in rapid weight gain, hypertension and pre and full insulin dependent diabetes, digestive disorders, and headaches among other injuries. This Court finds that the metabolic injuries are serious, and can result in irreversible, chronic illness and that there is a serious threat of harm, there is no penological justification for such condition of confinement, and that such condition of confinement constitutes punishment, which is prohibited under the 14th Amendment for treatment of pretrial detainees. And thus, this Court grants Plaintiffs' request for declaratory, determining that defendants have violated class members' constitutional rights and orders injunctive relief,  requiring defendant City and County of San Francisco to make outdoor access available daily, for no less than one hour, to all inmates incarcerated at CJ3 for longer than one month.

## II.    FINDINGS OF FACT

### A.    Plaintiffs

1.    There are two classes of plaintiffs and two sub-classes certified in this case:

(a) Class 1 ("Outdoor Class"): All inmates who are pretrial detainees and have been incarcerated in San Francisco County Jail 3 (formerly known as County Jail 5) located in San Bruno, California, at any point during the time period May 20, 2017 to the present, and who do not have outdoor access as part of their incarceration at San Francisco County Jail 3.

(b) Class 2 ("Confinement Class"): All inmates who are pretrial detainees and have been incarcerated in County Jail 3 (formerly known as County Jail 5) located in San Bruno, California, at any point during the time period from May 20, 2017 to the present, and who have fewer than one (1) hour per 24 hour period of time out of their cells as part of their incarceration at San Francisco County Jail 3.

(1) Subclass 1 ("Confinement Subclass 1"): All inmates in the Confinement Class who are classified by the San Francisco County Sheriff's Office in general population housing.

(2) Subclass 2 ("Confinement Subclass 2"): All inmates in the Confinement Class who are classified by the San Francisco County Sheriff's Office in administrative segregation housing.

ECF 238.

## 1.    Class Representative Montrail Brackens

2.      Plaintiff Montrail Brackens was first incarcerated in December 2012.  Brackens Tr at 184:12-13.  Mr. Brackens' medical records reflect disease and disorder associated with lack of sunlight and inability to exercise, specifically, a trend toward obesity, high blood pressure, metabolic and digestive disorders which have developed into severe insulin dependent diabetes, and Vitamin D deficiency. Starting in December 2014, Mr. Brackens' medical records show that his blood pressure was high for a person of his age. Exh. 9 at pages 13-14, 00015, 0031, 0040-0041, 0043-0044, 0046, 0049, 0050, 0051, 0058, 0059, 0075, 0076, 0094, 00119, 0192-0194, 0235-0236, 0382, 0415-423, 487-488. Starting in February 2015, Mr. Brackens' medical records also show regular reporting of digestion and bowel issues, including blood in his stool (melena). Ex.9 at pages 0038, 0039, 0040, 0070, 0075, 0076, 109, 117, 118, 142, 260-262, 266, 281, 286, 479, 481, 490, 492, 495, 569, 595, 599, 600, 603, 608, 881. Montrail Brackens reported blood in his stool (melena) starting on 4/19/2015. Exh. 9 at 00077; 6/4/15 - continued report of melena. Exh. 9 at 115; Melena reported (made worse by eating) 7/25/16. Exh. 9 at 608. Montrail Brackens exhibited obesity and weight issues starting in December, 2014, which was two years after incarceration. Exh. 9, at 19. He was a young man in his early twenties. His medical chart repeatedly noted the need for improved diet and exercise. His medical chart also noted that he was in ad seg. There are no notations of improving or increasing his access to exercise or healthier foods such as fruits and vegetables. Montrail Brackens was diagnosed with chronic Vitamin D deficiency. Exh. 241 at 20-21. Montrail Brackens began

reporting headaches two years after incarceration. 12/18/14  His headaches were reported with a severity of level 5. Exh. 9 at 586-5587. Continued report of chronic headaches 7/16/16,7/19/16, 8/19/16, 8/31/16, 9/13/16, 9/14/16, 12/14/16. Exh. 9 at 597-598; 561; 614; 620-621; 627; 632-633; 663-664. Mr. Brackens reports multiple headaches a week. 4/12/17, Exh. 9 at 703-704. Headaches continued 4/21/22. Exh. 241 at 16

### 2.      Class Representative Troy McAlister

3.      Plaintiff Troy McAlister was initially incarcerated in a San Francisco Jail from 2009 to 2010.  In 2010 he was transferred to San Quentin State Prison, where he stayed for approximately four years.  He was later incarcerated from 2015 to 2020 at CJ3.  From December 2020 to the time of trial, he had continuously been in custody at CJ3.  McAlister, Tr at 266:5-268:2.

4.      Troy McAlister's medical records also documented his development of serious metabolic disorders which developed in custody in San Francisco County jails.   As documented in his medical records, in 2009, while incarcerated in a San Francisco County jail, where he had no access to sunlight, Troy McAlister developed high blood pressure and was prescribed blood pressure medication.  His medical records indicate that after his discharge from San Francisco County Jail, and his blood pressure returned to normal.  Troy McAlister testified that following his release from San Francisco County Jail he had ample access to the outdoors and direct sunlight.   McAlister Tr at 269:9-272:23. However, following McAlister's reincarceration in 2015, he developed rapid weight gain accompanied with significant hypertension within 6 months of his 2015 incarceration. The metabolic disorders also included digestive issues which appeared eight months into his 2015 incarceration. Exh. 9 at 3272, 3273, 3275.  T roy McAlister 's medical records also show melena (blood in his stools). Exh. 9 at pages 3272, 3273, 3275.

5.      A further demonstration of metabolic disorder is through Troy McAlister's weight gain upon incarceration in a San Francisco County Jail. When he was incarcerated starting July 27, 2015 his weight was 182 pounds. Jail Health Services noted concern over McAlister's weight and instituted regular and frequent monitoring of Troy McAlister's weight. In the first month of incarceration, Troy McAlister gained 8 pounds. Exh. 9 at 3034. By April Troy had gained almost 23

pounds. Exh. 9 at 003099. In two and half years, Troy gained almost 30 pounds. Exh. 9 at 004515. By July, 2019, Troy McAlister had gain 52 pounds. Exh. 9 at 5378.

6.  Jail Health Services instituted its own orders requiring regular monitoring of Troy McAlister's blood pressure. Between July 29, 2015, through September 16,2019, Jail Health Services measured Troy McAlister's blood pressure over 106 times. *See* Exh. 9 at 003022, 003060, 003111, 003177, 003201, 003231, 003242, 003299, 0003306, 003315, 003111, 003177, 003321, 003328, 003365, 003389, 003412, 003435, 003439, 003461, 003467, 003502, 003524, 003551, 003584, 003615 , 003644, 003673,, 003676, 003709, 003740, 003770, 003798, 003808, 003822, 003837, 003851, 003868, 003887, 00393, 003921, 003939, 003996, 004066, 004131, 004200, 004262, 004326, 004398, 004460, 004531, 004557, 004637, 004677, 004686, 004690, 004691, 004724, 004748, 004758, 004782, 004789, 004795, 004799, 004801, 004808, 004812, 004817, 004823, 004827, 004829, 004837-004838, 004846, 004856, 004874, 004880, 004933, 004936, 004944, 004955, 004959, 005133, 005167, 005173, 005174, 005177,005191, 005192, 005167, 005169, 005173, 005174, 005177, 005191-005192, 005350, 005355, 005358, 005360, 005361, 005362, 005364, 005366, 005371, 005373.

7.  The frequency and insistence of Jail Health to monitor Troy's blood pressure indicated the a concern by Jail Health Services over the seriousness of Troy Mcalister's high blood pressure.

8.  In many of the medical encounters documented in both Troy McAlister and Montrail Brackens' medical records Jail Health Services emphasized the need for "life style modifications," and encouraged both men to exercise and maintain a healthy diet as a means for effective control of their weight, and metabolic disorders. Exh. 9, Pages 0000082, 000115, 000164,000166, 000258, 000259, 000282, 000286, 000310, 000311, 000329, 000330, 000353, 000370, 000370, 000370, 000493, 000557, 000587, 000618, 000619, 000856.  While there was an emphasis on life style modifications, Jail Health Services never instituted any changes to Troy McAlister's diet, or access to or ability to engage in exercise, or access to direct sunlight.

### B.    CJ3 Physical Structure

9.     CJ3 was inaugurated in 2006.[4] ECF 448, p. 2, Stip. 3.

10.    CJ3 is designated by the California Board of State Community Corrections ("BSCC") as a Type II facility, defined as "a local detention facility used for the detention of persons pending arraignment, during trial and upon a sentence of commitment." 24 CCR §1231.1, ECF 448, p. 2, Stip. 16, Mirkarimi, Tr at 23:25-24:8.

11.    During the years 2019 through August 19, 2022, CJ3 had the largest number of inmates of any jail in the San Francisco jail system. During that same time period, approximately 90% of the inmates houses at CJ3 were pretrial detainees. Miyamoto, Tr at 904:13-22. ECF 448, p. 2, Stip. 4, 14.

12.    CJ3 resembles a four-leaf clover from above. Exh. 1071. It has two floors, with four housing units on each floor, comprising the "leafs" of the clover. Each housing unit is divided into two pods, A and B, which mirror each other. Ramirez, Tr at 1091:13-19.

13.    CJ3 has a rated bed capacity for 768 incarcerated individuals. ECF 448, p. 2, Stip. 2. Four housing units are located on the first floor (units 1-4) and four on the second floor (units 5-8), Tilton, Tr at 1114:23; 1116:17-22.

14.    Each housing pod has two tiers, with 12 individual cells on each tier. Each cell is designed to hold two people, so each housing pod has the capacity of 48 incarcerated individuals (and each unit the capacity to hold 96 individuals).

15.    One wall of each cell faces the deputy station and the common area. Plaintiffs' Ex. 28:1-3. This wall is constructed of clear polycarbonate. Mirkarimi Tr at 26:4-8. Each housing unit has a deputy station in the center-giving the deputy sheriff a line-of-sight view of the communal area into the two pods making up the unit and into every cell through the clear polycarbonate walls. Mirkarimi, Tr at 25:1-15, Exh. 1071.

---

[4] Originally, this case included the San Francisco jail at 850 Bryant Street ("CJ4"), which has closed during the pendency of this case. ECF 448, p. 2, Stip. 1. Inmates at 850 Bryant Street who were housed in administrative segregation were held in their cells for 23.5 hours per day. ECF 110, pg. 34:26-27. The 850 Bryant jail facility had no outdoor facility for inmates. ECF 110, pg. 12:16-18. The jail at 850 Bryant Street was closed in Fall, 2020, and all inmates moved to the San Bruno jail facility. ECF 448, pg. 2, Stip.1.

16.     The common areas are that areas that each cell faces that includes places for inmates to eat out of their cell. Miyamoto, Tr at 956:8-10, Exh. 1154.

17.     Within the individual cells there are no gaps in the cell doors, meaning that there is no meaningful flow of fresh air through the door. Mirkarimi, Tr at 24:25-26:11. The air in the cells comes in through two small vents along the wall shared with a plumbing chase. Plaintiffs' Ex. 29:4 There is a window in each cell, approximately 2 to 3 feet tall, and the width of a palm wide. These windows look into the plumbing chase. Ramirez, Tr at 1083:24-1084:6. Plaintiffs' Ex. 29:8-9. On the opposite wall of the plumbing chase into which these "exterior" windows face is glazing opaqued with horizontal white stripes, obscuring the view out the window. Mirkarimi, Tr at 32:14-33:2. Defendants' Ex. 1153 Thus, these "exterior" windows do not allow cells any access to direct sunlight.

18.     Inmates have no control over the lighting in their cells. Miyamoto, Tr at 903:5-16. The lights in the cells are on all the time.  In addition, light comes into the cell through the plastic front of each cell.  McAlister, Tr at 311:4-24. Artificial light is on at all times—24/7.

19.     Each housing pod (capacity 48 individuals) contains an indoor recreation area/gym with a basketball hoop. The indoor gym for each housing pod is approximately 600 square feet in size. Mirkarimi, Tr at 28:18-29:3.

20.     The first floor of CJ3, housing units 1-4, holds the segregated housing including administrative segregation (renamed to be administrative separation), the psych units, and the worker's pod. Tilton, Tr at 1233:7-9, Exh. 1071. The second floor holds, housing units 5-8, holds the general population housing pods which are built around a corridor that operates as a classroom. Tilton, Tr at 1232:21-1233:6.

21.     It is uncontroverted that CJ3 was designed and constructed with no outdoor space for detainees. ECF 360, p. 3, Stip. 3.

22.     The only space for meaningful exercise is the gyms in each housing pod. Miyamoto, Tr at 918:6-13. "[T]he cells are too small for meaningful recreation." ECF 110, 11-12.

23.     As of August 2022, the Sheriff's Office did not offer outdoor space for the use of inmates at CJ3. Miyamoto, Tr at 1009:22-1010:5.

24.     There is no reason why a secure outdoor area cannot be provided at CJ3. Mirkarimi, Tr at 40:12-14. When Chief Deputy Sheriff Tilton became the facility commander, he received grievances about the lack of outdoor recreation, and he wanted outdoor space to be provided there. He asked for it to be there. Tilton, Tr at 1236:24-1236:25. Giving inmates outlets is important in order for inmates to be more cooperative and compliant with rules. Tilton, Tr at 1236:5-17.

25.     CJ3 replaced a historic jail, which was also located on the Moorland Drive, San Bruno property.  The old jail was activated in 1934 and operated for seven decades ("1934 Jail"). The 1934 Jail was retired due to disrepair and seismic instability. Mirkarimi, Tr at 34:23-35:4.

26.     The City and County of San Francisco owns the land where CJ3 is sited— approximately 242 acres. Mirkarimi, Tr at 34:10-16. That property includes the large area that was used as the outdoor exercise yard for the 1934 Jail ("San Bruno Yard"). Miyamoto, Tr at 907:9-908:18; Mirkarimi, Tr at 35:11-36:1. The San Bruno Yard was approximately the size of one and a half football fields. Tilton, Tr at 1238:3-4.

27.     The footprint of the 1934 Jail remains visible. Tilton Tr at 1228: 21-24. The fencing for the San Bruno Yard also remains. Tilton, Tr at 1230:1-2.

28.     The San Bruno Yard is approximately 300 feet from CJ3. Miyamoto, Tr at 908:1-18.

29.     Inmates at the 1934 Jail were allowed into the San Bruno Yard to have outdoor exercise. Mirkarimi, Tr at 35:11-36, Miyamoto, Tr at 979:3-15. Pretrial detainees as well as individuals convicted of criminal offenses had access to outdoor recreation in the San Bruno Yard. Miyamoto, Tr at 979:3-25. In the San Bruno Yard, four deputies monitored 200 inmates who were out in the yard at one time. Tilton Tr at 1238:5-13. The San Bruno Yard had a volleyball net and a softball field. Tilton Tr at1210: 2-3. Chief Deputy Sheriff Tilton testified, "I loved walking the yard. It was fun." Tilton, Tr at 1208:15-1209:1.

30.     Inmates at the 1934 Jail generally had access to the outdoor area during daytime hours, usually from mid-morning through early afternoon. When weather was bad, there would still be the option for inmates to go outside, unless there was something that could become a safety risk for individuals outside. Miyamoto, Tr at 1040:12-1041:22.

31.     Farming at the 1934 Jail also took place downhill from CJ3. Tilton, Tr at 1231:8-14.

32.     There was also another building, physically placed between the footprint of the 1934 Jail and CJ3 which was known as CJ6 or the Annex. Inmates at the Annex also had access to the outdoors. Mirkarimi, Tr at 36:2-15. The outdoor space at the Annex was used for an aquaponics class. Mirkarimi, Tr at 98:18-23 In additional to aquaponics, the space was used for a bicycle repair program. Ramirez, Tr at 1104:9-24.

**C.     Direct Supervision Model at CJ3**

33.     The CJ3 facility was designed for operation under the "direct supervision model." Mirkarimi, Tr at 42:9-16, Miyamoto, Tr at 911:22-24. Direct supervision replaced the old model of cell blocks with linear rows of cells. Direct supervision is the current penological norm. Tilton, Tr at 1145:9-10. Sheriff Miyamoto believes that the principles of direct supervision are appropriate. Miyamoto, Tr at 918:3-5.

34.     CJ3's clover leaf design anticipates implementing direct supervision through the staffing of each housing unit with 3 deputies, one posted on each side, A & B, and one to rotate between to assist as needed. Miyamoto, Tr at 915:1-11. There is a door in each housing unit between the A and B pods allowing the deputies access to both sides. Miyamoto, Tr at 915:23-916:6.

35.     One of the principles of direct supervision is to give inmates as much as possible out-of-cell time. The principles of direct supervision call for the presence of staff to be part of the housing community and are similar to community policing. Having deputies present among inmates provides a number of beneficial effects, including providing for more stability and safety, giving inmates a sense of inclusion, and providing inmates with a greater sense of security and protection against assaults and other harmful behavior. Miyamoto, Tr at 911:22-913:14.

36.     Direct supervision requires staff to develop rapport and walk amongst the incarcerated and to be an active role model. Lomba, Tr at 526:14-23. Direct supervision allows staff to handle issues, such as a medical emergency or a fight, very quickly. Tilton, Tr at 1145:22-1146:14.

37.     One goal of the direct supervision model is to reduce recidivism. Lomba, Tr at 527:1.

38.     It is more demanding for a deputy to be employed in the direct supervision model and more stressful. Direct supervision requires more alertness and skills to develop relationships with the detainees. Lomba, Tr at 527:5-14.

**D.     Exercise, out of cell, and sunlight**

39.     It is uncontroverted that Plaintiffs, all pretrial detainees at CJ3, were denied access to outdoor recreation and natural sunlight from the date that CJ3 was built through August 19, 2022. Miyamoto, Tr at 905:4-10, 953:22-954:2.

40.     Due to CJ3's systems classification system, there were not enough hours in a day for all inmates in an administrative segregation housing pod to be able to receive out of cell time. Tilton, Tr. at 1149-24:1155-1, Exh. 1192.

41.     From 2017 through August 19, 2022, Defendant San Francisco Sheriff's Department failed to provide detainees held in administrative segregation at CJ3 with any established minimum out of cell time. Poot, Tr at 129:21-130:13; Brackens at 192:11-17, Tilton, Tr. at 1150:14-18 Tilton, Tr 1153:21-1154-10; Exh. 1192.

42.     From 2017 through August 19, 2022, Defendant San Francisco Sheriff's Department failed to provide detainees held in administrative segregation at CJ3 with any established minimum exercise time. Poot, Tr at 129:21-130:13; Brackens, Tr at 192:11-17 ; Exh. 1192.

43.     From 2017 through August 19, 2022, Defendant San Francisco Sheriff's Department failed to provide detainees held in administrative segregation at CJ3 with any established minimum recreation time. Poot, Tr at 129:21-130:13, Brackens, Tr at 192:11-17, Tilton, Tr. at 1149-24:1151-3; Exh. 1192.

44.     Prior to March 2020, inmates in general population received at least the minimum amount of out of cell time specified in the Court's preliminary injunction. Tilton, Tr at 1147:25-1148:20.

45.      From March 2020 through August 19, 2022, Defendant San Francisco Sheriff's Department failed to provide general population detainees held at CJ3 with any established minimum out of cell time.  Exh. 1192.

46.     Beginning on March 15, 2020, "SFSO suspended recreation at County Jail [3] to prevent the spread of COVID-19." ECF No. 296 at 6. And during Covid, pod gyms were closed entirely from approximately March 15, 2020, until February 2021. Miyamoto, Tr at 955:3-24, 965:13-16; Pratt, Tr at 720:1-10; ECF 325:14-17.

47.     Sheriff Miyamoto is aware that there were various public health advisories during Covid that said that socializing and exercising outdoors was safer than doing the same sort of socializing and exercise activities indoors with others. Miyamoto, Tr at 954:3-13. Despite being aware of these public health advisories, Sheriff Miyamoto did not recall having any discussions with Dr. Pratt during Covid about the possibility of giving inmates access to the outdoors for exercise and recreation during Covid. Miyamoto, Tr at 955:3-13.

48.     While gyms were closed, inmates could only attempt to exercise in their cells. Pratt Tr at 720:1-10, Beloy, Tr at 1583:15-1584:8.

49.     Detainees were locked in their cells, for the most part, upwards of 23 hours a day. Lomba, Tr at 513:1-2.

50.     Joshua Beloy, who was in general population, testified that he was locked in a cell 21 days, 3 weeks, maybe a little longer during Covid. Beloy, Tr at 1583 4-5. Joshua Beloy was locked in a cell during 2020 for 3 days, sometimes five days, sometimes a week. Then there was a 10 day period in 2021, that's when he started filing grievances. Beloy, Tr at 1583: 17-20.

51.     Starting on April 23, 2020, walk groups of no more than eight general population inmates were permitted. Exh. 1267, Tilton, Tr. at 1174:24-1175:5.

52.     Exhibit 1192, a snapshot of January 1, 2021, page 3, shows that administrative segregation cells were receiving half hour walks. Tilton, Tr at 1248:21-1250:7. And not all cells received walk time or out-of-cell time. In 1B, on that date, ten of the 24 cells received walk time. Tilton, Tr at 1249:8-1250:16.

53.     The activities inmates were allowed to do during Walk Time was controlled by the Sheriff's Department. What inmates were permitted to do was never before and never since, including in 2020, in the purview of Jail Medical. Pratt, Tr at 734:9-15.

54.      Dr. Lisa Pratt is the Director of Jailhouse Services for the City and County jails of San Francisco, which is a division of the Department of Public Health. Pratt, Tr at 616:1-4. During Covid, Dr. Pratt never considered the risk to inmates of being in isolation and not being able to go outside to exercise. Pratt, Tr at 740:22-741:6. Because going outside to exercise was not an option, and has never been an option, consideration of taking inmates outside to exercise would have to be a proposal on the part of the Sheriff's Department, not Jail Medical. Pratt, Tr at 741:12-23.

55.      Dr. Pratt did not know what a walk group consisted of during Covid. A walk group, what it consisted of, and how walk groups were conducted was not her purview. Pratt, Tr at 728:3-15.

56.      Dr. Pratt testified regarding Covid that "we are still in it." Pratt, Tr at 719:20-22. She testified that she never discussed inmate access to the out of doors "because it wasn't an option at CJ3." Pratt, Tr at 740:22-741:6.

57.      After the shelter-in-place orders were lifted, inmates in administrative segregation were only receiving one hour of out-of-cell time, at least 3 days a week, maybe 5 days a week. Tilton, Tr at 1169: 6-12.

58.      In February 2021, after Covid restrictions were eased, detainees continued to be denied adequate out of cell time–often as the result of Level 4 lockdowns. Miyamoto, Tr at 926:6-17. A Level 4 lockdown is a facility-wide lockdown. During a Level 4 lockdown, all inmates at CJ3 are required to be locked in their cells for the entire length of the Level 4 lockdown. Miyamoto, Tr at 924:24-925:9.

59.      During the six months to one year period prior to July 2022, there were 39 Level 4 lockdowns at CJ3. Miyamoto, Tr at 926:11-22.

60.      As of August 2022, the use of administrative segregation or solitary confinement at CJ3 has tripled from the years when Ross Mirkarimi was Sheriff (2012-2016) largely due to the lack of deputy staff at CJ3. Mirkarimi, Tr at 55:2-22.

61.      From April 2021 to August 2022, inmates in administrative segregation at CJ3 were limited to three days of out of cell time per week, for no more than one-half hour per time.  This was the only time that an inmate in administrative segregation could shower.  Miyamoto, Tr at 967:9-13.

E.      **Lack of valid excuse for denying detainees at CJ3 Outdoor Access**

       1.      **Comparison to other regional detention facilities**

62.     Other Bay Area penal institutions provide inmates with access to natural sunlight and outdoor recreation. (Paragraphs 63-67, below).

63.     Sheriff Miyamoto testified regarding the San Quentin State Prison ("San Quentin"), located at the north end of San Francisco Bay in Marin County. Miyamoto, Tr 968 at 10-12. San Quentin is near Larkspur and other small towns in Marin County. Miyamoto, Tr at 970:16-19.

64.     Sheriff Miyamoto testified that San Quentin has multiple outdoor exercise yards, and that inmates at San Quentin use those exercise yards and also used them prior to the onset of Covid. Miyamoto, Tr at 971:4-9, 974:2-5. Troy McAlister testified that he used the outside yards, every day, for 8 or more hours a day, during his four years incarcerated at San Quentin.[5] McAlister, Tr at 271:14-272:23.

65.     Unlike CJ3, San Quentin does not have a large pretrial detainee population, which is presumed innocent. Instead, San Quentin houses inmates who have been convicted of very serious crimes, including rape, murder and assault. San Quentin also houses rival gang members at the same time. San Quentin has also housed a Death Row. Miyamoto, Tr at 969:4-22.

66.     Sheriff Miyamoto is also familiar with the Santa Rita Jail and jail facilities there. Miyamoto, Tr at 974:15-975:4. The Santa Rita Jail houses individuals who have been charged with very serious or violent crimes. The Santa Rita Jail is within a mile of residential neighborhoods, schools and parks. The Santa Rita Jail has several outdoor exercise yards that its inmates use. Each of

---

[5] Outdoor access is provided inmates at San Quentin notwithstanding the other duties that law enforcement must fulfill at that facility. Law enforcement officials are responsible for the distribution of medication. They are also responsible for the transportation of inmates to court, to medical appointments and to hospitals (if necessary). Law enforcement officials have responsibility for the processing of laundry for inmates, ensuring that count time is performed and done correctly, facilitating visits from attorneys or other legal representatives of inmates at San Quentin, supervising programs and education time, helping oversee the commissary, facilitating visits from family and members of the public, and they also are responsible for jail inspections, as needed. Miyamoto, Tr at 983:12-20.

Law enforcement officials at the Santa Rita Jail and at the West County Detention Center also have the same responsibilities as are set out in the immediately preceding footnote. Miyamoto, Tr at 984:2-21.

the separate buildings that house inmates at the Santa Rita Jail has an outdoor exercise yard that is available to its inmates. Miyamoto, Tr at 976:4-24, 977:3-6.

67.     The West County Detention Facility in Contra Costa County also houses pretrial detainees. Similar to CJ3, a majority of the inmates at the West County Detention Facility are pretrial detainees. The West County Detention Facility is also built near to residential neighborhoods. Miyamoto, Tr at 977:7-10, 978:11-17, 21-24.

## 2.     Weather at CJ3

68.     The Weather in San Bruno is temperate, with the lowest monthly average temperatures in the range of 50-55 degrees, and in September, which had the highest temperatures, an average high of a little bit less than 80 degrees. Rosenthal, Tr at 812:3-17.

69.     The area and climate's suitability for outdoor access is demonstrated by the multitude of outdoor recreation spaces in San Bruno including Pacific Heights Park to the east, Fairway Park to the west, Skyline College to the northwest has three athletic fields within a mile of CJ3. Rosenthal, Tr 818:1-820:14. On the west is large park, Sharp Park, and past that near Highway 1 is Sharp Park Golf Course. Rosenthal, Tr at 808:5-12.

70.     Sheriff Miyamoto testified that normal weather conditions have very little effect on the Sheriff's Office's operation of CJ3. Miyamoto, Tr at 982:4-7.

## 3.     Judicial recognition of self imposed burden

71.     This Court has previously held, in reference to the failure to provide outdoor exercise area at CJ3 that "the City and County of San Francisco created the problem and cannot justifying denying outdoor exercise with this self-created situation." ECF 110, pg. 33:11-12.

## 4.     No testimony showing impossibility

72.     It is undisputed that Defendant City and County of San Francisco has the ability to provide outdoor access to inmates at CJ3. Mirkarimi, Tr at 34:5-16, 34:23-35:4, 35:11-36:15, 40:12-41:4, Miyamoto, Tr at 909:6-10.

73.     Defendant City and County of San Francisco has failed and refused to provide outdoor access to inmates at the San Bruno County Jail. Miyamoto, Tr at 905:4-10, 909:6-15.

74.     Intentional Decision. It is undisputed that Defendants had control over the design and construction of CJ3 and made the decision to construct a jail without providing outdoor access. Mirkarimi, Tr at 34:23-35:4,

75.     Defendant City and County of San Francisco are aware of state laws governing the construction of a jail. Mirkarimi, Tr at 37:15-38:14.

76.     Defendant City and County of San Francisco's awareness of the requirement to provide inmates with outdoor recreation and exercise is demonstrated by the prior jails at the 1 Moreland Drive address, where the 1934 Jail and the Annex (CJ6) both had outdoor exercise space and outdoor access for inmates. Mirkarimi, Tr at 36:2-15. Tilton, Tr at 1208:5-11.

77.     The San Bruno Yard for the 1934 Jail is still at 1 Moreland Drive. Miyamoto, Tr at 907:9-908:18.

78.     The Annex (CJ6) is still at 1 Moreland Drive, and the outdoor patios are still in existence. Ramirez, Tr 1073:24-1075:1.

79.     Prisoners previously worked outdoors in the Garden Project. Ramtirez, Tr at 1007:11-18. Sheriff Mirkarimi had an outdoor aquaponics project for inmates. Mirkarimi, Tr at 100:15-19.

80.     One function of managing the yard at the old 1934 Jail was its physical layout. Tilton, Tr at 1238:16-1239:5. The San Bruno Yard could be reconfigured and the functionality improved. Tilton, Tr at 1239: 3-10.

81.     A person's classification in and of itself does not prevent outdoor access. Tilton, Tr at 1239:25-1240:3

### 5.     Demonstrated ability: the catwalk and the kennel

82.     Sometime after August 2022, subsequent to the period establishing current conditions of confinement for this case, Defendants have provided some limited access for some detainees to the out of doors in a "catwalk" and in a facility described as a "dog kennel." Poot, Tr at 178:17-180:18. While Plaintiffs describe the experience of using these facilities as singularly degrading and unpleasant (Poot, Tr at 167:21-168:5), it does show that it is possible to move detainees through the facility and to design secure outdoor space.

83.     The kennel was created in the outdoor space at the defunct Annex. Ramirez, Tr at 1074: 1-6.

84.     Captain John Ramirez testified that the work required to make the Annex's outdoor yards available was minimal: additional fencing and a 10-foot by 10-foot concrete pad. Ramirez, Tr at 1075:5-14. His estimate of the cost to do this work was roughly $65,000.00 to $70,000.00. Ramirez, Tr at 1105:9-12.

85.     Captain Ramirez testified that inadequate staffing was a barrier to using the Annex' outdoor yards. "[A] lot of the answers to the issues is more staffing." Ramirez, Tr at 1075:24-1076.

86.     However, no action was taken to provide outdoor access until trial seemed inevitable. This Court issued a preliminary injunction on January 31, 2020, where it held that there is no penological justification for denying pretrial defendants all access to the outdoors. ECF 110, pp. 32:16-33:12. From January 31, 2020, until around August 2022, Defendants took no action to provide any inmate in CJ3 with outdoor access.

### F.     Scope of Sheriff's Authority & Responsibility

87.     The operation of the San Francisco Jails is the primary job of the Sheriff's Department. The operation of the jail system in San Francisco County is the single largest priority for the Sheriff's Office in terms of allocated resources, both in terms of staff assigned and money directed. Miyamoto, Tr at 897:3-11. Custody staff is 80% of the Sheriff's Office. Custody is "the meat and potatoes of the entire Sheriff's Office." Tilton, Tr at 1242:24 – 1243:2. The Sheriff of San Francisco is first in command. Everyone in the Sheriff's Department is under the command of Sheriff Paul Miyamoto. The facility commander at CJ3's job and duties are to implement the Sheriff's goals and objections. Tilton, Tr at 1111:13-23.

88.     Sheriff Miyamoto has final authority over all staffing decisions and all recruiting decisions. He also has final authority over the operation of the jails in San Francisco that are staffed by the Sheriff's Office, including the day-to-day operations of those jails. One of Sheriff Miyamoto's other jobs as Sheriff is to ensure compliance with local, state, and federal mandates. Miyamoto, Tr at 896:4-897:2.

89.     Sheriff Miyamoto confirmed at trial that one of his jobs as Sheriff is to ensure compliance with local, state, and Federal mandates. Miyamoto, Tr at 896:25-897:2.

90.     The Sheriff's Office is responsible for the safety and general well-being of all individuals being held in detention at CJ3, including pretrial detainees. The Sheriff's Office controls all day-to-day activities of individuals incarcerated in the jails of San Francisco County. The Sheriff's Office has complete control over whether and for how long pretrial detainees at CJ3 are allowed out of their cells. Miyamoto, Tr at 900:19-901:25. The Sheriff's Office controls the areas outside of the cell where inmates are allowed to exercise at CJ3. The Sheriff's Office has control over where, when, and how inmates receive their food. The Sheriff's Office has control over the amount of light in inmates' living quarters at all times, day and night. Miyamoto, Tr at 902:17-903:19.

91.     The Sheriff's Office is responsible for the distribution of medication at CJ3, in partnership with Jail Health Services. It is responsible for the transportation of inmates to court, to medical appointments and to hospitals, as necessary. The Sheriff's Department oversees the processing of laundry for inmates, ensures that count time is performed and done correctly, facilitates visits from attorneys or other legal representatives of inmates at CJ3, supervises programs and education time, helps oversees the commissary, facilitates visits from family and members of the public, and is also responsible for jail inspections. Miyamoto, Tr at 980:1-17.

92.     The Sheriff controls the inmates' environment at CJ3 including the temperature, the lighting, and the jail food. Pratt, Tr at 672:1-17. Inmates do not control the jail schedule. They do not control when they are allowed out of cell and cannot go outdoors unless they are being transported to court. Pratt, Tr at 673:23-674:6.

93.     Sheriff Miyamoto testified that the San Francisco Sheriff's Department is more progressive and humane in its treatment of people that it detains for a year or more than other jails or prisons that he knows about. Miyamoto, Tr at 984:22-985:10.

94.     Sheriff Miyamoto agrees that incarcerated people should have access to at least one hour of outdoor time each day, weather permitting. Miyamoto, Tr at 986:4-21.

95.      Sheriff Miyamoto testified that CJ3 inmates' ability to go outside in natural sunlight and walk around and exercise outdoors "would be conditional on our abilities to make that happen," which he testified was whether or not there is an outdoor facility available for inmates. He acknowledged that there was an outdoor recreation area at the 1934 Jail, which allowed inmates to go outside in natural sunlight. Miyamoto, Tr at 986:22-987:18.

96.      Sheriff Miyamoto also testified that he was aware that on January 31, 2020, this Court had issued an order in this case that stated that the complete denial of outdoor exercise for a pretrial detainee inmate confined for more than four years is simply punishment and is unconstitutional. Miyamoto, Tr at 988:8-20.

### G.      Staffing Deficiencies

97.      As of August 2022, the Sheriff's Department's had a staffing shortage of 153 deputies and 20 senior deputies. This represented a 21% understaffing ratio. Mirkarimi, Tr at 45:7-46:11. CJ3 was allocated 187 fulltime positions, but only had 132 custody positions filled, with a shortfall of 55; rendering the jail custody staff at CJ3 operating at only 71% of required staffing. Exh. 209, p. 4.

98.      The Sheriff's Office operates under an annual budget. Each year the Sheriff's Office submits a proposed budget for the upcoming fiscal year to the San Francisco Mayor's Office. The Mayor then reviews the proposed budget and provides it to the San Francisco Board of Supervisors for review. The Mayor's Office has declined to fully fund the Sheriff's Office, including its decision in 2015 to forfeit $80 million in matching grant money largely because of political pressure to reduce the number of people incarcerated. Miyamoto, Tr at 898:6-900:5.

99.      The Sheriff's Office operated under a hiring freeze imposed by the City and County of San Francisco during the years 2011 to 2015. Miyamoto, Tr at 945:9-25, Exh. 256. There was also a nine-month hiring freeze in 2020 and 2021, imposed by the City and County of San Francisco. Miyamoto, Tr at 946:18-20, 1018:15-21. As of August 2022, the Sheriff's Office was trying to catch up with the attrition rate because of the impacts of the nine months that the Sheriff's Office was not allowed to fill any of its open requisitions. Miyamoto, Tr at 1019:3-10.

100.     Defendants City and County of San Francisco and Sheriff Miyamoto have actual knowledge of and have been given direct notice of the deleterious effects of its budget decisions on the Sheriff's Office and the inmate population supervised by the Sheriff's Office. Sheriff Miyamoto has personally notified the City in the past that the Sheriff's Office needs additional funds to carry out its official duties, including providing adequate supervision and living space for pretrial detainees at CJ3. Miyamoto, Tr at 900:6-13.

101.     On December 26, 2019, then-Sheriff Vicki Hennessey and Sheriff-Elect Paul Miyamoto were sent a letter from the San Francisco Deputy Sheriffs' Association in which concerns were expressed concerning the Mayor's Office having asked City departments to reduce their budgets, and the detrimental effects that would be caused by budget reductions in the Sheriff's Department. Miyamoto, Tr at 935:12-937:11, Exh. 63, Miyamoto, Tr at 940:19-23).

102.     On November 20, 2020, Sheriff Miyamoto sent a letter to Supervisor Sandra Fewer of the San Francisco Board of Supervisors. In this letter, Sheriff Miyamoto advised Supervisor Fewer of the proposed cuts in staffing that would be necessary to address an $11.5 million projected fiscal deficit for the Sheriff's Office. Miyamoto, Tr at 931:2-20, Exh. 61.

103.     On January 26, 2022, Sheriff Miyamoto wrote to San Francisco Mayor London Breed. Miyamoto, Tr at 933:3-934:17, Exh. 256. This letter confirmed that the Sheriff's Office was put on a hiring freeze during Fiscal Years 2019-2020. Sheriff Miyamoto stated that "the unrealistic budget cuts, use of backfill for staffing demands from lack of hiring, and staffing-intensive Covid-mitigation strategies are driving an enormous over-spend above budget in overtime."  Sheriff Miyamoto further stated that "the current loss of personnel is unsustainable and will need an immediate financial intervention along with a long-term five-year budget planning strategy to respond adequately to public safety demands across the city." Exh. 256, p. 2.

104.     Between January 2020 and December 2021, the number of authorized positions for the San Bruno jail increased, with the need for deputies increased by 24. Lomba, Tr at 552:1-5. But the actual number of basic line custody staff deputies between January of 2020 and December 2021 decreased by an additional 41 empty positions. Lomba, Tr at 555:24-556:9

105.     At the same time, the staffing levels in the divisions of field operations and planning and projects did not suffer significant reductions of staffing, and in fact, planning projects had an increase. Lomba, Tr at 556:20-557-1. Field operations had an increase of 5 positions. Lomba, Tr at 557-5:11

106.     Administration and programs had an increase in staffing of 10 positions in January of 2020. Lomba, Tr at 557-17:21.

107.     Staffing shortages have doubled since 2019. Lomba, Tr at 528:7-10.

108.     The department created part of the staffing problem by converting senior deputy positions into additional sergeant positions. Senior deputies and deputies are line staff. By stopping the testing for senior deputies, reducing their positions and funding more sergeant positions, the department short staffed the line staff. Lomba, Tr at 559:3-10

109.     By eliminating or promoting the senior deputy position, and taking away front line staffing, the Sheriff's policy caused more drafts or mandatory overtime. And deputy sheriffs are exhausted. Lomba, Tr 559:14-22. Phasing out of senior deputies did not result in the hiring of more sheriff's deputies because the funding was split to fund sergeants as well. Lomba, Tr at 591:16-23.

110.     Much of the recruitment used to be referrals, not advertising. Lomba, Tr at 560:23-25. But so much mandatory overtime affects the willingness of deputies to refer people for the sheriff deputies job. Lomba, Tr at 563: 7-9.

111.     The problem with the staffing shortage for Defendant City and County of San Francisco is not the national issue with recruitment for law enforcement. A large part of the staffing shortage is due to the mayor and recruiting and hiring system. Lomba, Tr at 562:19-20.

112.     As of April 2022, the Sheriff's Office relied heavily on the use of overtime to staff its operations. Miyamoto, Tr at 948:17-20.

113.     In April 2022, there was a reallocation of funds in the Sheriff's Office based upon a reduction in its budget by the Board of Supervisors. It was Sheriff Miyamoto's view "in April 2022 that to continue to meet the needs of the community for public safety and provide adequate staffing in

the department, the City of San Francisco needs to fund the Sheriff's Office fully and staff all its operations." Miyamoto, Tr at 949:8-950:2.

114.    The staffing issues are not novel, unpredictable, or the result of recent events. During the entire 27-year time that Sheriff Paul Miyamoto has been employed by the Sheriff's Office, there has never been a time where the Sheriff's Office was fully staffed. Miyamoto, Tr at 895:2-11, 1017:24-1018:3, 1035:13-15.

### 1.    Staffing Levels Of Sheriff's Office Custody Personnel Have Declined During the Past Four Years

115.    During the time period January 2020 through September 1, 2022, the San Francisco Sheriff's Office prepared monthly staffing reports. Miyamoto, Tr at 920:20-24. The actual staffing for the San Francisco jails is contained in the staff reports. Miyamoto, Tr at 921:21-922:3.

116.    The Court admitted into evidence and has considered staffing reports dating from January 2020 through August 2022. Exhs. 177-209.

117.    As of July 2022, there were 790 deputies on duty, and there were also 137 unfilled sworn staff positions. Approximately 400 of the 790 deputies on duty were assigned to the Custody Division, which is the division which operates and controls the San Francisco jails, including CJ3. As of July 2022, there was approximately 24% understaffing of the Custody Division. Miyamoto, Tr at 922:10-923:5.

118.    In July 2022, the total number of unfilled positions in the Custody Division increased compared to the total number of unfilled positions in the Custody Division as of 2019. Miyamoto, Tr at 923:11-924:19.

119.    Personnel shortages can have a negative impact on inmates. Miyamoto, Tr at 929:7-9. One of the consequences of understaffing at CJ3 has been the lockdown of inmates in their cells. Miyamoto, Tr at 924:20-23. By locking down inmates unnecessarily because of avoidable staffing shortages caused by underfunding, pretrial detainees at CJ3 are deprived of the beneficial effects of being out of their cell and being able to exercise out of their cells-- to reduce inmate stress. Miyamoto, Tr at 927:2-5.

1  120.    Sheriff Miyamoto testified that CJ3 would not be able to meet its minimum staffing

2  requirements without the imposition of mandatory overtime on sheriff's deputies. Miyamoto, Tr at

3  929:13-16, 930:6-9.

4  121.    The Sheriff's Office staffing reports indicates that custody has the greatest percentage

5  of unfilled positions compared to the other divisions within the Sheriff's Office. Miyamoto, Tr at

6  922:10-22, 923:1-5. This chart reflects the staffing levels based upon the data in the Staff Reports

7  admitted into evidence at trial:



**Plaintiffs' Proposed Findings of Facts and Law-- Case No.: 3:19-cv-02724 SK**

## 2.     Insufficient staffing is the primary cause of lockdowns

122.     The uncontroverted evidence is that staffing shortages are a reason for basewide lockdowns, and denial of out-of-cell time and exercise for inmates at CJ3. Miyamoto, Tr at 924:20-23. If staffing of deputies falls below a certain level, there is the potential for a stop to out-of-cell time for inmates at CJ3. Mirkarimi, Tr at 49:12-15,53: 1-11.

123.     San Bruno Jail is staffed every day, 24 hours a day. There are 3 shifts, day time from 7:00 a.m. to 3 p.m., swing, from 2:45 p.m. to 11 p.m., and graveyard from 10:45 to 7:00 a.m. Lomba, Tr at 518:16 – 519:23.

124.     The four general criteria for determining staffing levels for a jail are the physical plant design, safety and security, the activities that are supposed to occur inside and outside the particular jail, and the budget. Mirkarimi, Tr at 41:8-19.

125.     The Sheriff has responsibility for staffing and maintaining staffing levels for all the San Francisco Jails including CJ3. Mirkarimi, Tr at 42:2-6.

126.     Maintaining the staffing level influences the jail's ability to provide out-of-cell time for inmates. Mirkarimi, Tr at 42:24-43:1.

127.     Maintaining the staff level is important for the safety of Sheriff's deputies at CJ3. Mirkarimi, Tr at 43:2-12.

128.     Maintaining the staffing level allows a Direct Supervision Jail such as CJ3 to effectively operate. Maintaining the staffing level also influences how many activities and the level of activities inmates can be afforded, including reentry programs. Mirkarimi, Tr at 42:7-23.

129.     Custody is 80% of the sheriff's staff. It's the meat and potatoes of the entire Sheriff's Office. Tilton, Tr at 1242:24 – 1243:2. And more custody deputies were drafted to other areas than vice versa, because the custody staff was the largest body. Tilton, Tr at 1243:9-19

130.     In recent years, there has been a fundamental shift so that CJ3 has more instances where there are minimum staffing levels, while deputies who would be assigned to work in the jails have been assigned to do other kinds of sheriff work, including patrol or fieldwork. Mirkarimi, Tr at 54:14-55:1.

131.    From January 1, 2019, through April 1, 2020, there were Level 4 lockdowns at CJ3 that were caused by understaffing. Miyamoto, Tr at 924:24-925:12.

132.    During the period from 2019 through August 2022, there were times when the San Francisco Sheriff's Office did not have enough deputies available to meet the minimum staffing levels at CJ3. One of the consequences of understaffing at CJ3 has been the lockdown of inmates in their cells. From January 1, 2019, through April 1, 2020, when the Covid pandemic arose, there were Level 4 lockdowns at CJ3 that were caused by understaffing. Miyamoto, Tr at 924:15-23, 925:13-16.

133.    When a department falls below minimum staffing, there is a request for volunteers and if there are no volunteers, then staff is ordered to work involuntarily, which is called drafting Lomba, Tr at 521:12-28. Most days, there are not enough volunteers to cover shifts, so drafting is required. Tilton, Tr at 1242:19-20.

134.    Conducting routine responsibilities such as pod searches required a Level 4 lockdown because there is insufficient staff to replace those deputies in their regular jobs and duties Tilton, Tr at 1241:10-18. Mirkarimi, Tr at 49:12-15,53: 1-11.

135.    It is uncontroverted that the Sheriff's Office has no relief staff. When staff members have a medical leave or family issues, vacation or even work related activities such as mandated training; deputies have to be moved from other areas to assist custody operations. Tilton, Tr at 1242:13-1242:10. Lomba, Tr at 520: 4-21.

136.    Lockdowns were constant, weekly, sometimes daily. Tilton, Tr at 1277:19-25

137.    Population fluctuations in a housing pod does not affect staffing assignments. Lomba, Tr at 532:22.

138.    Even if Defendants provided sufficient space for outdoor access for inmates at the San Bruno jail, insufficient staffing which leads to basewide lockdowns, would prevent Defendants from making the outdoor space available to inmates at CJ3. Miyamoto, Tr at 948:17-20, 949:8-950:2, 953:15-21.

139.    Having more staff, including replacement staff would have eased the problem. Tilton, Tr at 1241:19-22.

**3.      Defendant City and County of San Francisco's Policy of Short Staffing Creates Lockdowns Which Puts Plaintiffs At Substantial Risk Of Suffering Serious Harm**

140.    Lockdowns can cause an increase in tensions, as well as physiological and psychological distress in an inmate population. Mirkarimi, Tr at 51:12-25.

141.    With inmates locked in a cell, "it's a lot of idle time, so it creates a lot of stress, a lot of anxiety, a lot of -- it gets pent up a lot, so they're easily angered, easily upset, sometimes volatile. Inmates locked down are more argumentative, less cooperative, more combativeness and there are more fights." Lomba, Tr at 513:612-15; 22-24.

142.    Chief Deputy Sheriff who was the commander of CJ3 during the Covid lockdowns, testified that the problems of inmate misbehavior during his command, including inmates throwing feces and urine or "gassing" occurred daily. Tilton, Tr at 1185: 15-18. And those inmates who "gassed" would be placed in administrative segregation, which caused the administrative segregation population to increase. Tilton, Tr at 1235:24-1236: 4. The administrative segregation population increased from two housing pods to four, from 90 inmates to 135 inmates. Tilton, Tr at 1232 13-17. With an inmate population of around 575, 135 ad seg inmates was 23.4% of the population of CJ3. Tilton, Tr at 1116:9.

**4.      Reduced Staffing Levels Harm Sheriff Deputies**

143.    Staffing shortages are caused by vacation leave, disability leave, sick leave, and if other activities and staffing needs divert staff away. Lomba, Tr at 520: 4-21.

144.    When a department falls below minimum staffing, there is a request for volunteers and if there are no volunteers, then staff is ordered to work involuntarily, which is called drafting. Lomba, Tr at 521:12-28.

145.    Staffing shortages have resulted in the involuntary drafting of sheriff's deputies. Miyamoto, Tr at 927:6-8.

146.    Sheriff deputies who are drafted would work 16 hours, have time to go home, shower, sleep and then have to report back to work. This was mandatory. Lomba, Tr at 522:22- 523:2.

147.    Drafting negatively disrupts the lives of deputies. It is last minute. It exhausts them. Lomba, Tr at 524:16-22.

148.    Prior to August 2022, sheriff's deputies were subject to working three 16-hour shifts per workweek. As of August 2022, sheriff's deputies were subject to working two mandatory overtime shifts per workweek. Miyamoto, Tr at 928:4-6.

149.    There were sheriff's deputies assigned to CJ3 who were involuntarily drafted to work all or part of a second daily shift during the years 2019 through August 2022. Sheriff's deputies working at CJ3 have regularly been involuntarily drafted to do overtime duties for the five years preceding the trial of this matter. Miyamoto, Tr at 927:9-21.

150.    Understaffing is the fault of the City, the Sheriff's Office and their hiring process and recruiting process. Lomba, Tr at 524:23-525:1.

**H.    Total denial of sunlight and excessive lockdown causes unacceptable health risk to detainees.**

151.    This Court has previously found that "under the Fourteenth Amendment, '[e]ven if the evidence shows that access to direct sunlight is not medically necessary, forcing people to live without direct sunlight for many years is simply punishment,' unless the deprivation is 'for a short period of time.'" *Norbert v. City & Cnty. of S.F.*, 10 F.4th 918, 925 (9th Cir. 2021). Trial testimony offered uncontroverted scientific opinion that forcing people to live without sunlight, even for short periods of time, presents a health risk similar to smoking, and that interruption of the circadian rhythm is also harmful to the health of detainees. Czeisler, Tr at 357:7-358:23.

152.    Plaintiffs' experts were Dr. Charles Czeisler and Dr. Jaime Zeitzer. Dr. Czeisler was qualified in this case as an expert in the field of sleep medicine, circadian rhythm, and sunlight and light on human physiology. Czeisler, Tr 331:3-8. Dr. Zeitzer was qualified as an expert in circadian rhythm, the function of light and light levels, the measurement of light, light sources, and the valuation and recording of light in the human environment at the trial in this case. Zeitzer, Tr at 424:22-425:1, 468:22-469:3.

153.    Dr. Charles Czeisler is a preeminent medical doctor. Dr. Czeisler is currently a full Professor of Medicine at the Harvard Medical School. He is also the Frank Baldino, Jr. Professor of

Sleep Medicine, as well as a Professor of Molecular and Cellular Biology and a senior faculty member in the College of Arts and Sciences at Harvard University. Dr. Czeisler is also the Director of the Division of Sleep Medicine at the Harvard Medical School. Dr. Czeisler is a senior physician and chief of the Division, in the Division of Sleep Medicine, Department of Medicine at the Brigham and Women's Hospital in Boston, Massachusetts. Forty faculty compose the division. Czeisler, Tr at 317:1-319:21, 320:19-25. Dr. Czeisler is also the Division Chief for the Department of Neurology at the hospital. Czeisler, Tr at 319 15-18. In 2007, Dr. Czeisler was inducted into the Royal College of Physicians in London, England. Czeisler, Tr at 325:17-20. In 2010, Dr. Czeisler was elected to the Institute of Medicine of the National Academies, an award given to 65 physicians out of the 800,000 physicians in the United States. Czeisler, Tr at 326:8-12. Dr. Cziesler is also the recipient of the Stanford University School of Medicine's Wallace Sterling Lifetime Achievement Award in medicine. Czeisler, Tr at 327:10-19.

### 1.      Lack of Exposure to Direct Sunlight

154.     Dr. Czeisler's offered his opinion that, to a reasonable degree of scientific and medical certainty, the conditions of confinement at CJ3 that include chronic deprivation of skin exposure to natural sunlight are a causal factor in the complaints expressed by the plaintiffs, Czeisler, Tr at 383:23 – 384:4, and the chronic deprivation of sunlight has increased or exacerbated inmates' risk of obesity, as well as metabolic syndrome, diabetes, cardiovascular disease, hypertension and gastrointestinal diseases. Czeisler, Tr at 382:13-384:22. It is Dr. Czeisler's opinion that the conditions of confinement, and specifically the deprivation of sunlight, are the reasons that the Plaintiffs suffered the injuries listed in the complaint in this action. Czeisler, Tr at 384:23-385:22, 389:17-391:10.

155.     Metabolic syndrome, which is a constellation of illness including including obesity, diabetes and hyperglycemia the condition that hasn't quite gotten to diabetes, Czeisler, Tr at 360:18-361:1. Gaining weight, metabolic syndrome, high blood pressure and diabetes are all consistent with the illnesses that would be anticipated -- that would be of greatly increased risk for individuals deprived of sunlight. Czeisler, Tr at 390:8-11.

156.    Deprivation of sunlight greatly increases risk of all-cause mortality. Czeisler, Tr at 357:7-359:14, 360:13-22, 361:3-10, 15-20. The major mechanism by which all-cause mortality is increased in individuals who get insufficient sunlight is due to the fact that sunlight converts nitric oxide derivatives into nitric oxide which causes the blood vessels to relax and lowers blood pressure for 24 hours. Czeisler, Tr at 357: 20-25. And high blood pressure is the leading cause of preventable deaths in the world because of its impact on heart attacks, strokes and cardiovascular disease. Czeisler, Tr at 357: 14-19.

157.    Dr. Czeisler testified that the effects of insufficient sunlight are not small. The impact is estimated to be equivalent to the impact of smoking. Czeisler, Tr at 358:1-5.

158.    For every 10 units of Vitamin D in the blood that is lower, all-cause mortality increases by 10 or 11 percent. Czeisler, Tr at 359:8-11.

159.    Dr. Czeisler also testified that treatment with Vitamin D does not resolve the issue in terms of changes in mortality. Czeisler, Tr at 359:15-360:12. Supplementing with Vitamin D does not confer the same beneficial effects as direct sunlight exposure. Czeisler, Tr at 361:21-362:8.

160.    Dr. Czeisler testified that, in terms of spectrum of light, ultraviolet light is the most important for preventing the illnesses caused by insufficient exposure to natural sunlight. Human beings cannot get exposure to ultraviolet light through glass or plastic. In order to have a beneficial effect, sunlight must come directly onto the skin without an intervening or obscuring material. Czeisler, Tr at 376:23-377:1; *accord* Mayer, Tr 1422:8-11 (sunlight and light through a window are not the same as a matter of physics).

161.    Dr. Czeisler testified that it was inconceivable to him that people would be held for years in the United States without the ability to be exposed to outdoor light. Czeisler, Tr at 354:21-23, 356:7-21, 357:2-6.

162.    Dr. Czeisler testified that inmates should have access to outdoor exposure to light. Czeisler, Tr at 416:19-22.

163.    Dr. Czeisler also testified that exposure to natural sunlight must occur every day. Czeisler, Tr at 421:11-13.

164.     Vitamin D deficiency is an indication of lack or insufficient skin exposure to sunlight. However, supplementing with oral Vitamin D is not a replacement for skin exposure to sunlight. Supplementing with oral Vitamin D does not prevent or ameliorate most of the physiological harms caused by the lack of sunlight including the increased risks of hypertension and cardiovascular disease, inflammatory bowel disease, multiple forms of cancer, metabolic syndrome, diabetes, death from COVID-19 and all-cause mortality. In other words, Vitamin D deficiency is a marker of sunlight deprivation, but amelioration of Vitamin D deficiency does not address the other impacts of sunlight deprivation. Czeisler, Tr 359:15-360:12.

165.     Dr. Czeisler testified that scientists cannot ethically create an experiment in which people voluntarily deprive themselves of direct sunlight because such a study is unethical. Czeisler, Tr 368:7-10; *accord* Mayer, Tr 1390:7-10 (discussing study design and stating that depriving prisoners of sunlight in an experiment "would run afoul of the laws regarding what kind of treatments you can do with prisoners or people incarcerated in general"); Zeitzer, Tr 503:1-12.

**a)     The Injuries from Total Denial of Sunlight Are Compounded and Seriously Aggravated by Circadian Rhythm Disruption.**

166.     Dr. Jaime Zeitzer holds a Ph.D in Neurobiology from Harvard University. He is currently a Professor of Psychiatry and Behavioral Sciences at Stanford University. He is also the Co-Director of the Sleep and Circadian Sciences Center at Stanford University. Dr. Zeitzer has spent almost 30 years studying sleep circadian rhythms and light. That research into circadian rhythms involves research into light levels, as well as also involving regular monitoring and recording of light levels. Zeitzer, Tr at 423:25-424:16.

167.     Dr. Zeitzer took light measurements at CJ3 on three occasions in July and August 2022. He made light recordings in a jail cell using a light meter that had been calibrated and traceable to the National Institutes of Standards. He took an instantaneous recording and then also installed light meters that took week-long recordings in the cell. Zeitzer, Tr at 425:4-426:2. The sources of light in the cell were a single overhead light in the cell, as well as light from the main hallway on which the cell was exposed, as well as a small amount of light coming through the interior window of

the cell. Zeitzer, Tr at 427:6-17. The overhead light was the only light fixture in the room. Zeitzer, Tr at 428:10.

168.    Dr. Zeitzer testified that he viewed three cells at the San Bruno jail, but in one of the cells, the inmates had applied a sticky resin to the overhead lighting, so that cell was not adequate for looking at the cell. Zeitzer, Tr 474-14-22

169.    The light meters were installed in the room, one on the wall at eye height, at approximately 6 feet; a second and a third light meter at the approximate location of the pillow in both the upper and lower bunk. Zeitzer, Tr at 430:17- 431:3. After retrieving the light meters, Dr. Zeitzer took them back to his laboratory and downloaded the data, which is stored on the actual devices, and entered the data into his report. Zeitzer, Tr at 431:5-10.

170.    This first set of light recordings started on July 21, 2022, and those recordings were admitted into evidence as Exhibit 33. Zeitzer, Tr at 433:16-19.

171.    Dr. Zeitzer did a second set of light recordings from cells at the San Bruno jail in August 22, 2022 through August 25, 2022. Zeitzer, Tr at 445:4-9. This second set of light recordings was for the new LED lights. Zeitzer, Tr at 444:21-23. The actual light recordings were admitted into evidence as Exhibit 32.

172.    Photos were taken of the different locations in the cell. These photos were admitted into evidence as Exhibit 29, pages 1 through 7 and 10.

173.    Dr. Zeitzer also made a drawing with arrows showing the direction that the handheld meter was pointing, showing that readings in the cell were different in different locations. Tr 453:14-25.

174.    The spectrum of fluorescent light is a five-phosphor system, and is not the same spectrum as sunlight. Zeitzer, Tr 455:15-19.

175.    Flourescent light during the day is not the functional equivalent of sunlight for the purposes of circadian rhythm. Zeitzer, Tr 457:15.

176.     In the cell for the August measurements, Dr. Zeitzer also compiled handheld light readings, at similar views as for the July cell. And the light readings at different locations for the LED lights also showed significant variation. Zeitzer, Tr 458:6-15.

177.     In the LED lit cell, the LED lighting were significantly brighter both day and night. Zeitzer, Tr 459:18-21.

178.     Dr. Zeitzer testified that there was very indirect access to sunlight from the exterior windows at County Jail 3. Zeitzer, Tr 473:18 And if one craned their neck, you see a sliver of exterior light. Tr 475:7-7.

179.     Lighting levels are zero lux is complete darkness. Zeitzer, Tr 460:3. The full moon is 0.5 lux. Zeitzer, Tr 460:5. A very dim room is 10 lux. Zeitzer, Tr 460:7. 50 lux is a low light room. Zeitzer, Tr 460:9. The courtroom ranged from 30 to 40 lux to 150 lux if actually looking at the light. And if one was looking at the ground, the light level could be lower than 30 to 40 lux. Zeitzer, Tr 460:14- 461:24. A brightly lit living room, looking horizontally is 100 lux. Zeitzer, Tr 461:6. A well lit office would be 200 lux. Zeitzer, Tr 461:13. doctor's examination room is about 500 lux. Zeitzer, Tr 461:19. Sunrise or sunset of 10,000 lux. Zeitzer, Tr 461:24. And on a foggy San Francisco day at mid day, one would expect to find 10,000 lux. Zeitzer, Tr 462-2. A moderately bright daylight, partly cloud would be 50,000 lux, and a bright day would be 75,000 to 100,000 lux. Zeitzer, Tr 462:3-7

180.     Two Hundred and fifty to 300 lux during the day would be sufficient to set the circadian rhythm, unless the night time lighting was elevated. Zeitzer, Tr at 480:10-20. Light pollution in San Francisco at night is considered a couple of lux. Nighttime lighting in the 20-30 lux range is much higher and is not considered light at night as light pollution. Night lighting at levels of 30 to 50 lux continuously hurts the system. Zeitzer, Tr at 496:14 – 497:3.

181.     The reason continuous night light hurts the system is because even with closed eyelids, everyone spontaneously wakens at night, multiple time, one opens your eyes, look around, and even 50 lux of light is going to have a greater chance of disrupting sleep. Zeitzer, Tr at 497: 4-16.

182.     With daytime lighting of 250-300 lux, night time lighting has to be between zero and 5 lux. Zeitzer, Tr at 497: 21-24

183.    Simply increasing the level of daytime lighting does not change the disruption of night time light at 30-50 lux. Zeitzer, Tr at 498: 4-13.

184.    Under the LED lighting, at night the level on the bottom bunk was around zero lux, but the top bunk was at 30 lux. And if someone on the lower bunk woke up t night and got up to use the toilet, they would be exposed to 30 lux. Exposure at night and opening your eyes and seeing 30 lux would be sufficient to disrupt the circadian rhythm. Zeitzer, Tr at 499: 1:21.

185.    Under the fluorescent lighting, the bottom bunk was close to zero and the lighting at night on the top bunk was around 15 lux. And 15 lux of continuous lighting at night, even with 250-300 lux daytime lighting disrupts the circadian rhythm. Zeitzer, Tr at 500:6-17

186.    Dr. Zeitzer has been an expert in two cases involving inmates, the present case, and Upshaw v. Alameda County Sheriff's Office. His declarations for Upshaw and Norbert stated similar short term deficits because disrupted circadian clock looks very much like the result of disrupted sleep because when the circadian clock is disrupted, sleep is disrupted. The effects and injuries are similar. Zeitzer, Tr at 500: 21-501:17. And that holds true for long term deficits as well. Zeitzer, Tr at 500:20.

187.    Short term deficits include difficulty regulating mood, changes in appetite and hormones, reduced memory, cognition and impaired immune function. Zeitzer, Tr at 502:9-11

188.    Long term deficits include depression, anxiety, development or worsening of diabetes, dementia like symptoms and increased incidence or recurrence of breast or colon cancer. Zeitzer, Tr at 502:13-16.

189.    Exposure to night time light, with any variability as to the time, even a few minutes, would disrupt the circadian clock. Zeitzer, Tr at 505:8 – 506:13

190.    Dr. Zeitzer has not charged for work as an expert in this case because he considered intentionally keeping people from getting direct sunlight for years to be unethical. Zeitzer, Tr at 503:1:12.

191.    This testimony is consistent with prior testimony of Dr. Zeitzer in 2020, which the court is considering as part of the record. Court, Tr 438:21-25; ECF 110, pp. 18-19, quoted at ECF 325, pp. 26-28.

192.    Sleep medicine is an established field of medicine. Czeisler, Tr at 324:4-8. Sleep medicine often includes circadian science as well because the circadian system, the internal clock in the brain, regulates the timing of when human beings sleep and wake. Czeisler, Tr at 321:1-5.

193.    Sleep medicine involves the impact and significance of sunlight and light on human physiology. Studies conducted in the field of Sleep Medicine have shown that human bodies are reset each day by exposure to light and that the intensity and the duration of the light are critical for that resetting response. Czeisler, Tr at 328:6-329:16.

194.    Light is the most powerful synchronizer of the human internal biological clock. Czeisler, Tr 331:15-20. The light-dark cycle synchronizes the internal clock, which regulates behavior and the timing of eating. Czeisler, Tr at 338:16-19. Virtually every organ system in the human body has an internal clock mechanism for maintaining circadian rhythms. Approximately 10% of the genes in each organ of the human body are driven by the circadian clock. Czeisler, Tr at 338:20-339:2. Each of these organs in the human body has an internal clock which needs to be reset on a daily basis. Czeisler, Tr at 340:8-12. The organs in the human body which have an internal clock include but are not limited to the liver, kidney, heart, brain, lungs, pancreas, digestive organs, the gut, the testes, ovaries and eyes. Czeisler, Tr at 340:8-12, 17-25.

195.    Misalignment of the human circadian rhythm, for example people eating late at night, causes the body's normal functioning to be impaired. For people who eat at night, their blood glucose levels go much higher. Czeisler, Tr at 341:3-342:13.

196.    Ailments that can be caused by circadian misalignment include the following:

    a)    Mood disorders and impaired cognition,

    b)    Cardiovascular disease,

    c)    Hypertension,

    d)    Diabetes,

e)      Obesity,

f)      Gastrointestinal disorders,

g)      Immune disorders,

h)      Cancer,

i)      Reproductive disorders, and

j)      Sleep disorders.

Czeisler, Tr at 345:22-346:8.

197.    In addition to misalignment of the circadian rhythm, the circadian rhythm can also be disrupted. That can occur if individuals are exposed to light at night, including ordinary room light. When the circadian rhythm is disrupted, it resets the human circadian system. Czeisler, Tr at 346:9-348:9.

198.    The resetting effect of light as it pertains to the human circadian system is a product of the intensity of the light, the duration of the light, the timing of the light and the wavelength of the light exposure. If a person is exposed to light during the day, it resets the human circadian system to an earlier hour, in the morning. If a person is exposed to light in the evening, it resets the human circadian system in the completely opposite direction, to a later hour. If a person is exposed to light typically in the middle of the night, it suppresses the amplitude of the oscillation more than resetting of the circadian system. Light exposure during the night can crush the amplitude of the oscillation of the circadian system, even ordinary room light exposure at night. Czeisler, Tr at 346:12-350:4.

199.    Dr. Czeisler testified that even a single night of exposure to ordinary room light, while people are asleep with their eyes closed increases their heart rate, adversely affects their glucose sensitivity and their metabolism of glucose, can cause weight gain and other health problems because the light is still going through their eyelids. Czeisler, Tr at 352:6-22, 353:1-7.

200.    Light exposure at night also disturbs sleep, which in turn interacts with the adverse health effects of deprivation of sunlight. Czeisler, Tr at 353:15-20.

201.    Dr. Czeisler testified that lighting conditions within the jail cell should include the ability to enhance the intensity and optimize the wavelength of ambient light exposure to enhance alertness and facilitate circadian synchronization to the jail schedule. Czeisler, Tr at 419:15-18.

202.    Other elements of the conditions of confinement exacerbate the effects of sunlight deprivation in class members. Excessive night light disrupts the circadian rhythm and human metabolic Zeitzer Tr at 498:4-13. Circadian rhythm and sleep and highly related. Deficits in one will result in deficits of the other. If there is long term disrupted sleep, you're going to also get disrupted circadian rhythm. Zeitzer Tr at 499:21-500:5.

203.    The circadian clock controls the release of the hormone melatonin by the pineal gland, the timing of the daily release of cortisol by the adrenal gland, and other hormonal and neural processes that then inform all the different oscillators in the rest of the body. Czeisler, Tr at 334:11-15.  The timing of the release of melatonin affects the release of insulin and cortisol.  So the release of melatonin in the day time can lead to insulin resistance and increased glucose level and cause the transition to diabetes for people who are susceptible. Czeisler, Tr at 341:23-342:13.

204.    The short term deficits of sleep are difficulty regulating mood, changes in appetite and hormones, reduced memory, reduced cognition and impaired immune function. Zeitzer Tr at 502:9-11.  The long term deficits from sleep are depression, anxiety, development or worsening of diabetes, dementia-like symptoms, and increased incidence or recurrence of breast or colon cancer. Zeitzer Tr at 502:13-16.

205.    Light at night increases the heart rate and blood pressure. It impairs cardiometabolic function in terms of glucose metabolism. Czeisler, Tr at 353:1:7.

206.    Light exposure at night disturbs sleep and interacts with the adverse health effects of deprivation of sunlight. Czeisler, Tr at 353:15-20.

207.    It is Dr. Czeisler's opinion that to a reasonable degree of scientific and medical certainty, chronic deprivation of skin exposure to natural sunlight increases or exacerbates inmates' risk of obesity, metabolic syndrome, diabetes, cardiovascular disease, hypertension and gastrointestinal illness. Czeisler, Tr at 382:13-385:22.

208.    Dr. Czeisler was shocked upon learning that inmates at San Francisco are completely denied access to sunlight. Czeisler, Tr at 356:7-11; 357:2-6.

### 2.    Excessive lockdown is punishment and detrimental to the health of detainees.

209.    Dr. Rogers confirmed that there are a number of symptoms associated with depressive disorders or major depressive disorders. Those symptoms include an individual not feeling like moving a lot, appetite changes, weight gain and weight loss, persistent lower depressed moods and sleep disturbances. Rogers, Tr at 1542:8-18.

210.    Dr. Rogers confirmed that many inmates confined to a cell for a period of 20 or more hours per day and separated from the general population of the jail facility would experience emotional distress. Rogers, Tr at 1569:8-1570:16.

211.    Dr. Rogers testified that isolation can lead to the development of psychiatric or psychological issues. He testified that, generally speaking, the longer a person is kept in isolation, the greater the risk of developing symptoms as a result of being kept in isolation. He testified that one of the factors in determining whether someone is in isolation has to do with the number of hours per day they spend in their cells. As part of the materials he reviewed in this case, Dr. Rogers reviewed various depositions that stated that inmates at CJ3 had been confined to their cells approximately 22 to 22 ½ hours per day. Rogers, Tr at 1564:24-1565:20.

212.    It is the opinion of Dr. Rogers, the defense psychiatrist, that being locked in a cell for 22 or more hours per day for days or weeks at a time can cause emotional distress. Rogers, Tr 1565:21-1566:3.

213.    Dr. Rogers has also examined individuals who were being kept in isolation at the San Quentin State Prison. Dr. Rogers testified that those individuals had complained to him about serious conditions as a result of being kept in isolation. Those conditions included auditory hallucinations, visual hallucinations, sensory deprivation, cutting on their bodies and suicide attempts by hanging. Rogers, Tr at 1563:22-1564:23.

214.    Dr. Rogers testified that he encourages people to go outside when it is available to them. People have told him that they like sunlight and they like the feeling of air on their skin. Rogers, Tr 1559:25-1560:13, 1575:17-21.

a)      **Defendants' Experts' Did Not Refute Nor Contradict Dr. Czeisler nor Dr. Zeitzer's Testimonies.**

215.    Dr. Lawrence Mayer was qualified as a defense expert in the areas of biostatistics, epidemiology, and public health. The opinion Dr. Mayer offered was that he found "no relationship in any of his literature between the kind of variables looking in those outcomes." Mayer, Tr at 1349:4-9.

216.    Dr. Mayer's methodology was limited, and Dr. Meyer could provide no specifics on his methodology, making his results impossible to verify, and calling into question Dr. Mayer's opinions. Dr. Mayer testified that he searched the literature "to answer the question of whether there are any studies that support or refute the allegations by plaintiffs regarding the effects of the conditions of confinement on plaintiffs in this case" Mayer, Tr at 1395:8-13. Dr. Mayer was looking "for papers that looked at the conditions of confinement -- around the conditions of confinement here to see if anyone had studied the effects of minor changes in those conditions on, let's say, vitamin D deficiency." Mayer, Tr at 1399: 9-22.

217.    But Dr. Mayer failed to include in his report the names of the databases he searched. Mayer, Tr at 1395:14–1396:16. Dr. Mayer did not record the "exact terms" or the "search strings" he used. Mayer, Tr at 1386:19. Dr. Mayer "never takes notes" Mayer, Tr at 1397:24- 1398:1-3. And Dr. Mayer's failure to record the "search string" prevents someone else from being able to test Dr. Mayer's search and therefore his conclusions regarding the scope of literature available. Mayer, Tr at 1387: 16-19. Dr. Mayer admitted he is not an expert on circadian rhythm or the impact on human physiology of the deprivation of sunlight. Mayer, Tr at 13802-12. Dr. Mayer did not seek the assistance of anyone with such expertise in determining what search terms would be appropriate for a literature search in a field in which he lacked expertise. Mayer, Tr at 1392:7-16.

218.    Dr. Mayer asserted in his deposition that he remembers "almost all the statistical details or datasets." Mayer, Tr at 1402:15-23 At trial, when asked, Dr. Mayer testified that he

remembers statistical details but not data sets. Mayer, Tr at 1401:22-24. He then further testified that he could not remember the data sets of either of two papers cited in his report that he was queried about. Mayer, Tr at 1402:18–1403:13. Dr. Mayer also could not remember the databases searched or the search terms he used, and could not define how he conducted his search terms. Mayer, Tr at 1398:11-12.

219.    Dr. Mayer does not take notes of his work because he does not want his notes to be "discoverable". Mayer, Tr at 1440: 6-7

220.    Dr. Michael Rogers, the only medical expert called by Defendants, admitted that he does not hold himself out as an expert on circadian rhythms and the effect of that on human health. Rogers, Tr at 1557:2-5.

221.    Dr. Rogers, the defense psychiatric expert, confirmed that beneficial physiological effects on the human body of getting Vitamin D from being outdoors was outside the scope of his expertise. Rogers, Tr 1556:21-1557:5.

222.    Dr. Rogers also confirmed that he had never conducted a study of inmates at CJ3 to determine whether a high percent of individuals incarcerated there were predisposed to sleep disorders. Rogers, Tr at 1560:15-1561:5.

223.    Dr. Rogers also confirmed that just because a person may not meet all of the DSM criteria for a particular diagnosis that does not mean that the person is not suffering emotional distress. Rogers, Tr 1563:6-10.

224.    Dr. Rogers also confirmed that he was not an expert on the issue of and could not offer an opinion as to whether being locked in a cell for 22 or more hours per day with a light on constantly can cause headaches. Rogers, Tr 1567:15-25.

225.    Dr. Rogers also has no knowledge as to whether inmates held in administrative segregation at CJ3 are isolated from other inmates. Rogers, Tr 1568: 19-22.

226.    Defendants offered no expert testimony that library books, programming, or video visits are the equivalent of, compensate for, or remedy the harms caused by the total denial of outdoor access, or the health impacts of sunlight deprivation and circadian rhythm disruption. Defense

witness Alyssa Ryker testified that programs for inmates existed, but offered no testimony on the issue of sunlight's effects on inmates. Ryker, Tr at 1043:9-14. She did testify that programs can be offered outdoors, if outdoor space were available. Ryker, Tr at 1023:19, 23.

227.    Television sound in each cell has been installed. Ramirez, Tr at 1099:2-98. There was no evidence nor any testimony that the television is visible in every cell. Nor was there any evidence or testimony that the sound from the television in a cell is a functional equivalent or substitute for outdoor access or out of cell time.

228.    An unquantified amount of outside air is not the equivalent of, does not compensate for, nor remedy the harms caused by the total denial of outdoor access. CJ3's air handler system supplies outside air and mixes it with return air, for the closed system that is CJ3. Ramirez, Tr at 1100:11-14. Fans in the air handler move the air. Ramirez, Tr at 1100:15-17. One air handler unit of the HVAC system services two housing pods, one on the first floor and one on the second floor, for 48 cells in total. Ramirez, Tr at 1091: 17-24. Capt. Ramirez has no personal knowledge nor ability to understand the air handler nor HVAC system and any questions have to be directed to the vendor or superintendent or vendor. Ramirez, Tr at 1096:2-8. Capt. Ramirez knows that the system's sensors reports back repairs or maintenance issues, but does not know how many or even where these sensors are. Ramirez, Tr at 1096:11-1097:4. The purpose of the air handler is to move air from the outside into the cells. Ramirez, Tr at 110:1-4. Capt. Ramirez says that aftermarket fans–outside of the air handler–could move air into inmates' cells, but he does not know if CJ3 has aftermarket fans. There are four fans in each of the air handlers for CJ3. Ramirez, Tr at 1102:4-12. One air handler is supposed to handle two pods, 48 cells as well as the common area. Ramirez, Tr at 1102:7:17. Captain Ramirez does not know the cubic volume of air that has to be moved from the 48 cells and two common areas. Ramirez, Tr at 1102:18-21. Captain Ramirez has no information on the air exchange rate. Ramirez, Tr at 1102:22-24. Captain Ramirez has never asked for a report documenting the air exchange rate. Ramirez, Tr at 1103-6-8. And Defense Exhibit 1035 has no information on the air exchange rate, it only tells that the fans are on. Ramirez, Tr at 1103:17-20. There has been no measurement of the air exchange rate in any cell at CJ3. Ramirez, Tr at 1103:21-23. And there's no

measurements of the amount of air that actually comes into the gym from the grates. Ramirez, Tr at1105:1-8.

229.    Testimony was allowed regarding a catwalk and a kennel-like structure constructed by Defendants some time after August 2022. That catwalk has a roof and sunlight cannot go through the roof. Ramirez, Tr at 1106:10-14.

230.    Defendants installed LED lighting in CJ3. Ramirez, Tr at 1097:18-1098:22. Defendants did not provide any evidence that the LED lighting is the functional equivalent of sunlight. Dr. Zeitzer provided uncontradicted evidence that the LED lighting is not the functional equivalent of sunlight because LED lighting has a very different light spectrum from sunlight. Zeitzer, Tr 463:7-9. And the lighting in the jails at night from the LED is too bright and disrupts the circadian rhythm. Zeitzer, Tr 498:18-21, 500:14-17.

### 3.    Appropriate for Inmates to Receive One Hour Access, Daily.

231.    Dr. Czeisler testified that humans need to be exposed to sunlight daily. Czeisler, Tr at 419:10-11. Sheriff Miyamoto stated that he agreed that incarcerated persons should receive one hour per day of outdoor time in which to recreate and exercise. Miyamoto, Tr at 986:18-21.

## III.    CONCLUSIONS OF LAW

### A.    Under the Fourteenth Amendment, Defendants' May Not Punish Detainees Nor May They Subject Detainees to Conditions that Pose a Substantial Risk of Serious Harm[6]

The Plaintiffs seek relief based upon Defendants' violation of the 14th Amendment, which provides:

> No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

The Ninth Circuit has explained that the "status of the detainees determines the appropriate standard for evaluating conditions of confinement." *Gary H. v. Hegstrom*, 831 F.2d 1430, 1432 (9th Cir. 1987). The Eighth Amendment, which prohibits cruel and unusual punishment, "applies

---

[6] Plaintiffs' rights also are evaluated under Section 7 of Article 1 of the California Constitution. The analysis for Section 7 is identical to that for the 14th Amendment.

to convicted prisoners." *Id.* (internal citation and quotation omitted). "By contrast, the more protective fourteenth standard applies to conditions of confinement when detainees . . . have not yet been convicted." *Id.* (internal citation omitted). Although the Fourteenth Amendment governs the rights of a pretrial detainee, the Eighth Amendment provides a "minimum standard of care." *Jones v. Johnson*, 782 F.2d 769, 771 (9th Cir. 1986.) The distinction between the two amendments is nonetheless "critical because the Fourteenth Amendment prohibits all punishment of pretrial detainees, while the Eighth Amendment  only prevents the imposition of cruel and unusual punishment." *Demery v. Arpaio*, 378 F.3d 1020, 1029 (9th Cir. 2004). An independent constitutional violation is not required to find that punishment exists. *Id.* at 1030.

Accordingly, a pretrial detainee has a constitutional right under the Fourteenth Amendment to be free from conditions that amount to punishment. *Bell v. Wolfish*, 441 U.S. 520, 534-536 (1979). A court must evaluate whether a condition "is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." *Id.* at 538. Where it is not reasonably related to a legitimate purpose, it can be inferred that the purpose behind a condition is punishment. *Id.* at 539.

As this Court has already held:

> The purpose of pretrial detention is to confine a criminal defendant to ensure that he appears for trial and that he does not create a risk to the public before trial. Stripped of its legalese, *Bell v. Wolfish* stands for the proposition that the conditions of confinement are merely to make sure that the criminal defendant remains ready to appear for trial in a safe manner in the jail. Thus, any condition of confinement that exceeds that goal constitutes punishment. Here, the condition of confinement that strips the ability to see direct sunlight for a period of years is not necessary to ensure that Plaintiffs are ready to appear for trial in a safe manner in County Jails 4 and 5. For that reason, the Court finds that confining a pretrial detainee, an innocent person, in such a situation where he does not see direct sunlight for years is not rationally related to the non-punitive nature of confinement and violates the Fourteenth Amendment.

ECF 110 at 37:26-38:7.

Defendants may not rely upon general averments that concerns for safety underlie the conditions nor may they defend their actions as necessary due to the "cost or inconvenience of providing adequate facilities." *Spain v. Procunier*, 600 F.2d 189, 200 (9th Cir. 1979).

A constitutional violation also can be demonstrated where jail conditions demonstrate a deliberate indifference to a substantial risk of serious harm to the health and safety of detainees. *Hernandez v. County of Monterey*, 110 F. Supp. 3d 929, 934 (N.D. Cal. 2015). "Inmates have a right to adequate care for serious medical and mental health needs. Conditions that significantly affect an inmate's daily activities or cause chronic and substantial pain constitute serious medical needs, even if they are not life-threatening." *Id.* In this regard, "noncompliance with generally accepted guidelines for inmate health strongly indicates deliberate indifference to a substantial risk of serious harm."[7] *Id.* at 943.

The Ninth Circuit analysis of deliberate indifference under the Fourteenth Amendment is based upon an objective standard. *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1124-25 (9th Cir. 2018); *Castro v. Cnty. of L.A.*, 833 F.3d 1060, 1070-1071 (9th Cir. 2016). Courts must examine whether "there [was] a substantial risk of serious harm to the plaintiff that could have been eliminated through reasonable and available measures that the [government] did not take." *Castro*, 833 F.3d at 1070. Pretrial detainees need not address "subjective elements about the [government's] actual awareness of the level of risk." *Id.* at 1071.

### 1. Lack of Access to Outdoor Sunlight

This Court has previously found *in this case* that "under the Fourteenth Amendment, '[e]ven if the evidence shows that access to direct sunlight is not medically necessary, forcing people to live without direct sunlight for many years is simply punishment,' unless the deprivation is 'for a short period of time.'" *Norbert v. City & Cnty. of S.F.*, 10 F.4th 918, 925 (9th Cir. 2021). In ruling upon Plaintiffs' preliminary injunction, this Court "ordered that those inmates who had been incarcerated for more than four years must be given access to 'direct sunlight' at least one hour per week." *Id.* That ruling was based on the four-year mark identified in *Spain v. Procunier*,

---

[7]Relatedly, the Eighth Amendment also allows for consideration of "objective indicia" in determining whether a challenged condition violates standards of decency associated with punishment. *Gregg v. Georgia*, 428 U.S. 153, 176-187 (1976). Such "objective indicia" include history, action by state legislatures, common law, fact, and the court's own judgment. *Rhodes v. Chapman*, 452 U.S. 337 (1981). "[T]he clearest and most reliable objective evidence of contemporary values is the legislation enacted by the country's legislatures." *Atkins v. Virginia*, 536 U.S. 304, 312 (2002).

600 F.2d 189 (9th Cir. 1979) and a concern that Defendants might not have the "practical ability . . . to provide access to direct sunlight."[8] *Id.*

Upon evidence since produced, the Court now affirms that deprivation of sunlight constitutes a violation of the Fourteenth Amendment and recognizes that detainees, who have been in custody for one month or more are entitled to no less than daily access to the outdoors and the opportunity for outdoor exercise, for no less than one hour per day.

First, the four-year mark identified in *Spain* was based solely on the Eighth Amendment  as applicable to convicted inmates assigned to the adjustment center at San Quentin Prison, which was used primarily to segregate and discipline disruptive prisoners. *Spain*, 600 F.2d at 192-193 and n. 1. The Fourteenth Amendment affords broader protections. *Gary H.*, 831 F.2d at 1432. And here, pretrial detainees are being deprived of any and all outdoor light, with such deprivation being unrelated to issues of safety.

Under *Bell*, the Court must examine whether the lack of access to sunlight serves any legitimate governmental purpose outside of punishment.[9] *Bell*, 441 U.S. at 538-539. This Court finds that it does not. Rather, this condition solely exists because San Francisco deliberately constructed a jail without access to direct sunlight. ECF 110, p. 37:10-11; 448, no. 3 (stipulation of Defendants that CJ3 "was not designed to include secure outdoor space."). From this, it can be inferred that the purpose behind the condition is only punishment. *Bell*, 441 U.S. at 538-539.

Specifically, in this case, the California legislature has spoken. California Penal Code § 4015 (adopted 1941) states:

---

[8] But, the lack of an outdoor area is insufficient to demonstrate a lack of practical ability. "San Francisco created the problem at issue by deliberately constructing a jail without access to direct sunlight. Thus, San Francisco cannot create the problem and then claim a legitimate need for safety based on its choice about construction of the jail." ECF 110 at p. 37:10-13.

[9] Defendants questioned Plaintiff McAlister if he had waived his right to a speedy trial. McAlister, Tr at 284:8-12, and Sheriff Miyamoto testified that his office does not control how long pre-trial detainees stay at CJ3 or whether an individual criminal defendant chooses to waive time. Miyamoto, Tr at 1014:4-21 (and Court overruled relevance objection). Therefore, the ability of Plaintiffs to control how long they spend at CJ3 is relevant to counter any argument or inference invited by Defendants that waiver of a speedy trial somehow allows Defendants to offer less out of cell and outdoors time. But, an inmate should not be forced to choose between one constitutional right and another. *Jones v. Cty. of Contra Costa*, No. C-13-2722 EMC(pr), 2014 U.S. Dist. LEXIS 23664, at *9 (N.D. Cal. Feb. 24, 2014). This is not a legitimate defense.

(a) The sheriff must receive all persons committed to jail by competent authority. The board of supervisors shall provide the sheriff with necessary food, clothing, and bedding, for such prisoners, which shall be of a quality and quantity *at least equal to the minimum standards and requirements prescribed by the Board of Corrections for the feeding, clothing, and care of prisoners* in all county, city and other local jails and detention facilities.

(emphasis added).

For decades California has lodged authority under Penal Code § 4015 solely with the California Board of State and Community Corrections ("BSCC") to set minimum standards for the physical structure within which detainees can be housed (Title 24), including the availability of sizeable outdoor space at all Type II detention centers, without exception. The BSCC promulgates regulations governing these minimum standards, which are found in Title 24 of the California Code of Regulations, which is the State Building Code.[10] BSCC's Building Code regulations require outdoor exercise areas for all Type II facilities, of which CJ3 is one (ECF 448, no. 16):

An outdoor exercise area or areas must be provided in every Type II and Type III facility. The minimum clear height must be 15 feet (4572 mm) and the minimum number of square feet of surface area will be computed by multiplying 80 percent of maximum rated population by 50 square feet (4.7 m2) and dividing the result by the number of one-hour exercise periods per day.

The exercise area must contain or provide free access to a toilet, wash basin, and drinking fountain as provided in Section 1231.3.

There must be at least one exercise area of not less than 600 square feet (55.7 m2). The design shall facilitate security and supervision appropriate to the level of custody.

24 Cal. Code Regs. § 1231.2.10.

The City and County of San Francisco are aware of state laws governing the construction of a jail. Mirkarimi, Tr at 37:15-38:14. California Courts have affirmed utilizing the standards established by the BSCC for the Legislature's intentions on the "minimum standards" in addition to "objective indicia" in assessing the constitutionality of jail conditions. *Castro*, 833 F.3d at 1076-1077; *Inmates of the Riverside County Jail v. Clark*, 144 Ca. App. 3d 850, 861 (4th DCA, 1983).

---

[10] Title 24 In 1978, California mandated that building standards be unified in a single code designated as Title 24, the California Building Standards Code. (SB 331, Robbins - https://www.dgs.ca.gov/BSC) *see* California's Health and Safety Code §18938(b) (Uniform Building Codes "shall" apply to all occupancies throughout the state), §18941.5 (localities may adopt more restrictive building standards).

In *Castro v. City of Los Angeles*, the 9th Circuit held that Los Angeles's adoption of the California Building Code, which contained certain requirements for "sobering cells" which were not complied with at a Los Angeles jail, was "substantial evidence" supporting a finding "that the County knew that its cell design might lead to a constitutional violation among its inhabitants. 833 F.3d at 1076-1077. Here San Francisco also has adopted the Building Code, which contains Title 24's requirement for outdoor recreation facilities at all detention facilities. San Francisco Ordinance 225-22 (2022).

The Court takes judicial notice that CJ3 does not have an outdoor recreation area and that this is a violation of the Building Code. ECF 387, p. 2:24-26. This Court previously acknowledged the modern sensibility is that deprivation of sunlight is punishment, ruling that even if the Eighth Amendment  does not require outdoor exercise for inmates held for lengthy periods of time, the Fourteenth Amendment does. This Court, after a site visit to CJ3, ruled that:

> Even if the evidence shows that access to direct sunlight is not medically necessary, forcing people to live without direct sunlight for many years is simply punishment. As a point of comparison, scientific studies cannot even create a scientific experiment in which people voluntarily deprive themselves of direct sunlight because such a study is unethical. If even a voluntary study of that nature is unethical, then inmates' involuntary confinement here amounts to punishment.

ECF 110, p. 37:18-23.

Second, Defendants do have the practical ability to provide access to direct sunlight as evidenced by their use of a catwalk and kennel since August of 2022. The City and County of San Francisco owns the land where CJ3 is sited—approximately 242 acres. At this same site, the 1934 Jail included an outdoor yard approximately the size of one and a half football fields—the San Bruno Yard. Thus, there is plenty of outdoor space available for detainees. To the extent that Defendants assert that financial considerations continue to limit outdoor access, such considerations do not serve as a defense under the Fourteenth Amendment. *Spain*, 600 F.2d at 200.

Third, the lack of access to outdoor sunlight demonstrates a deliberate indifference to a substantial risk of serious harm to the health and safety of the Plaintiff detainees. *Hernandez*, 110 F. Supp. 3d at 934. Both Dr. Cziesler testified regarding the substantial risk of serious harm from

sunlight deprivation, including metabolic syndrome, diabetes, cardiovascular disease, hypertension and gastrointestinal diseases—is equivalent to smoking. Czeisler, Tr at 358:1-5;

In analyzing whether the condition amounts to deliberate indifference, this Court examines what reasonable measures were available that defendants did not take. *Castro*, 833 F.3d at 1070. In so doing, this Court may consider "generally accepted guidelines." *Hernandez*, 110 F. Supp. 3d at 943.

As noted above, Defendants do have the practical ability to provide detainees with access to direct sunlight. There is no evidence that such provision cannot be provided to both general population and administrative segregation detainees. Further, there is no evidence that such provision cannot be provided to all detainees starting upon their initial incarceration at CJ3.

BSCC regulations governing Type II facilities provide that detainees in general population should, at a minimum, receive three hours of exercise per week. 15 Cal. Code Regs. § 1065[11]. The BSCC requires that inmates in administrative segregation[12] at a minimum:

> shall be permitted a minimum of one hour per day, five days a week, of exercise outside their rooms or cells unless security and safety considerations preclude such activity. When [Administrative Segregation Unit] or [Segregated Program Housing Units] are equipped with their own recreation yard, the yard periods may substitute for other out of cell exercise periods, providing the opportunity for use of the yard is available at least three days per week for a total of not less than 10 hours a week.

Thus, when such special units are not equipped with their own recreation yards, yard time may not substitute for other out of cell time. None of the pods at CJ3 is equipped with its own recreation yard.

Had CJ3 been constructed to include an outdoor exercise area, as required by Title 24 of the California Code of Regulations, detainees at CJ3 would have the opportunity to be outdoors during the mandated exercise time of three to five hours.

---

[11] At the time this case was filed, 15 Cal. Code Regs. § 1065(a) required "[t]he facility administrator of a Type II or III facility shall develop written policies and procedures for an exercise and recreation program, in an area designed for recreation, which will allow a minimum of three hours of exercise distributed over a period of seven days." This was amended to the current requirements, effective April 1, 2023.

[12] Administrative Segregation is the same as Administrative Separation.

Additionally, frequent provision of outdoor exercise has been addressed by the U.S. Marshalls Service in Federal Performance-Based Detention Standards Handbook, which was created for use in reviewing non-federal facilities that house federal prisoners to ensure these facilities are safe, humane, and protect prisoners statutory and constitutional rights." The Handbook, updated in May 2022, incorporates relevant standards from the Performance-Based Standards for Local Detention Facilities (4th ed.) published by the American Correctional Association, including a requirement that "Prisoners have access to exercise opportunities and equipment, including at least one-hour daily of physical exercise outside the cell and outdoors, when weather permits. (Access to the housing unit's dayroom does not satisfy the standard's requirement.)" ECF 449-1, pp. 2, 55.

The fifth edition of Performance-Based Standards and Expected Practices for Correctional Institutions published in March 2021 by the American Correctional Association ("ACA"), a national association of correction practitioners that promulgates standards used by correctional institutions across the United States, recommends: "Both outdoor and covered/enclosed exercise areas for general population inmates are provided in sufficient number to ensure that each inmate is offered at least one hour of access daily. Use of outdoor areas is preferred, but covered/enclosed areas must be available for use in inclement weather." ECF 449-4, p. 23. Further, the ACA states that "Exercise/recreation spaces are not the same as dayrooms." *Id.*

Forty-six European nation members of the Council of Europe, a consultative body distinct from the European Union, have ratified the "European Convention for the Prevention of Torture and Inhuman or Degrading Treatment or Punishment" (1989) to implement Article 3 of the "Convention for the Protection of Human Rights and Fundamental Freedoms." Article 3 provides that "no one shall be subjected to torture or to inhuman or degrading treatment or punishment." The European Committee for the Prevention of Torture and Inhumane or Degrading Treatment or Punishment ("CPT") was established as a monitoring and advisory committee that promulgates standards, conducts visits and issues public reports concerning places of incarceration in member states. The Thirtieth Annual Report of the CPT, specifically includes direction regarding the need to allow outdoor exercise in jails and prisons notwithstanding COVID-19 restrictions, as well as

other standards concerning conditions of incarceration. Specifically, the CPT stated: "The CPT has repeatedly emphasised that all prisoners must benefit from a minimum of access to one hour's daily outdoor exercise and/or time in the open air, and two hours in the case of juvenile inmates. This remains a fundamental right for all prisoners, including during the Covid-19 pandemic." ECF 449-2, p. 40, no. 80. The CPT noted that this decency directed applied to "prisoners held under all types of regimes (protection, removal from association, disciplinary, separation, etc.)." *Id.* at fn. 13. The CPT's standard regarding conditions of imprisonment, extracted from CPT's Second Annual Report, *published in 1992*, stated:

> Specific mention should be made of outdoor exercise. The requirement that prisoners be allowed at least one hour of exercise in the open air every day is widely accepted as a basic safeguard (preferably it should form part of a broader programme of activities). The CPT wishes to emphasise that **all prisoners without exception** (including those undergoing cellular confinement as a punishment) should be offered the possibility to take outdoor exercise daily. It is also axiomatic that outdoor exercise facilities should be reasonably spacious and whenever possible offer shelter from inclement weather.

ECF 449-3, pp. 2-3, no. 48 (emphasis original).

Finally, The *Babu* CD provides standards for out of cell time for inmates housed in administrative segregation. *Babu* divides inmates in administrative segregation into two categories, Step 1 and Step 2. Step 1 is the most restrictive housing unit where for a multitude of articulated reasons, an inmate must recreate and be housed alone. Declaration of Yolanda Huang, filed herewith, Exhibit 3, p. 26. Step 2 are those inmates in administrative segregation who can recreate and be housed with others. *Id.* at 27. Step 1 inmates are provided two hours of out of cell time per day, or 14 hours per week. *Id*. at p. 26:16-18. Step 2 inmates are to be provided 3 hours of out of cell time per day, or 21 hours per week. *Id*. at p. 27:8-10. All inmates, regardless of classification, are to be provided outdoor recreation time. *Id.* at p. 32:4.

### 1.      Lack of Access to Out-Of-Cell Time and Exercise

BSCC standards provide that for detainees in general population:

(a) The facility administrator of a Type II or III facility shall develop written policies and procedures for a minimum of 10 hours of out of cell time distributed over a period of seven days to include:

   (1) an opportunity for three hours of exercise. and

**57**

(2) an opportunity for seven hours of recreation.

15 Cal. Code Regs. § 1065. As regards those in administrative segregation, they

> shall be permitted a minimum of one hour per day, five days a week, of exercise
> outside their rooms or cells unless security and safety considerations preclude
> such activity. When [Administrative Segregation Unit] or [Segregated Program
> Housing Units] are equipped with their own recreation yard, the yard periods may
> substitute for other out of cell exercise periods, providing the opportunity for use
> of the yard is available at least three days per week for a total of not less than 10
> hours a week.

15 Cal. Code Regs. § 3343(h).

Here, Defendants have adopted no policy to ensure that these minimum standards are

followed. And, while the testimony at trial was sometimes contradictory, Defendant's own

documents--the housing logs--showed that the inmates in administrative separation were receiving

a half hour of out of cell time, and not every day. Tilton, Tr at 1248:21-1250:7; Tilton, Tr at

1249:8-1250:16.

As noted above, California Courts have affirmed utilizing the standards established by the

BSCC for the Legislature's intentions on the "minimum standards" in addition to "objective

indicia" in assessing the constitutionality of jail conditions. *Castro*, 833 F.3d at 1076-1077. *Castro*

was relied upon by *Grizzle v. Cty. Of San Diego*, in which the court ruled in favor of detainee

plaintiff, holding:

> Taking Plaintiff's allegations as true, Sheriff Gore, as the relevant policymaker,
> had actual and constructive notice that the implemented schedule violated
> Plaintiff's right to outdoor yard time. *See* CAL. CODE REGS., tit. 24 § 1231.2.10
> (2018) ("An outdoor exercise area or areas must be provided in every Type II and
> Type III facility."). Like in *Castro*, where the county's failure to conform to
> approved ordinances constituted as deliberate indifference, Plaintiff's allegations
> that Sheriff Gore's failed to conform to the approved requirements suggests the
> County was deliberately indifferent. Similarly, Plaintiff has sufficiently alleged
> that Sheriff Gore knew from Plaintiff's notice, and should have known, that the
> implemented schedule's consequence of forcing detainees to choose between
> constitutionally protected sleep and exercise violated their rights. Plaintiff alleges
> sufficient facts that the County, through its schedule and customs derived from it,
> was deliberately indifferent to his constitutional rights. Plaintiff adequately
> alleges the County is liable for these claims.

No. 17-CV-813-JLS, 2018 U.S. Dist. LEXIS 131014, at *24-25 (S.D. Cal. Aug. 3, 2018).[13]

The Northern District of California, in *Pierce v. City and Cnty. of San Francisco*, relied in part upon Title 15 of the Code of Regulations, which are also promulgated by the BSCC to establish minimum standards for local detention facilities, to determine the constitutionality of conditions of confinement in another San Francisco detention facility.[14] *See Pierce*, No. 19-cv-07659-JSW, 2022 U.S. Dist. LEXIS 218869, at *8 (N.D. Cal. Dec. 5, 2022).

Additionally, the California Attorney General issued an opinion that the BSCC's standards do not impose an unfunded mandate or a "new program" on localities, but simply establish what is objectively "suitable" for conditions of confinement in California.[15] California Attorney General Opinion 99-1214 (May 2, 2000). Put another way, the BSCC's standards simply memorialize current community standards of decency. The Attorney General's opinion cited to *Riverside* for the principle that "minimum standards set by Board for local detention facilities reflect constitutional requirements." *Inmates of the Riverside County Jail v. Clark*, 144 Cal. App. 3d 850 (4th DCA, 1983).[16] *Id.* That 2000 Attorney General opinion, which dealt with juvenile facilities, noted that the BSCC's "minimum standards" "constitute objective criteria which are needed to ensure that facilities remain suitable places for the confinement of minors." *Id.*

To impose conditions that do not conform to the BSCC standards, this Court must determine whether Defendants have offered any legitimate government purpose that excuses them from providing mandated recreation and exercise time. *Bell*, 441 U.S. at 538-539. This Court finds that no such purpose exists, and therefore, the conditions amount to unconstitutional punishment.

---

[13] Notably, the Court also held that the *Grizzle* "Plaintiff has alleged a constitutional violation in being denied outdoor exercise for eight months." 2018 U.S. Dist. LEXIS 131014 at 13. Eight months is far less time than what has been served by many of the class members in this case.

[14] In other respects, the circumstances of *Pierce* are distinguishable, fact based, and offer at most, persuasive authority. *See NASD Dispute Resolution, Inc. v. Judicial Council*, 488 F.3d 1065, 1069 (9th Cir. 2007) ("a district court opinion does not have binding precedential effect")

[15] Opinions of the Attorney General, while not necessarily controlling, should be accorded "great weight" as to the meaning of a constitutional provision or statute. *City of San Diego v. Shapiro*, 228 Cal. App. 4th 756, 773 (2014); *City of Fresno v. Clovis Unified Sch. Dist.*, 204 Cal. App. 3d 417 (1988); *Cent. Delta Water Agency*, 653 F. Supp. 2d, 1066, 1079 (2009) (such opinions are "judicially noticeable persuasive, but non-binding authority").

[16] It appears that the court was referring to the California Constitution.

**B.  Absent an order the conditions complained about can be reasonably expected to reoccur.**

Here, there is a reasonable expectation that the conditions complained of will continue or reoccur absent an order of the Court. San Francisco has long underfunded the Sheriff's Department and has elected to build a jail without outdoor space in violation of State law.

"It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *Hernandez v. County of Monterey*, 110 F. Supp. 3d 929, 955 (NC Cal 2015). Defendants have a "heavy burden" to show "that the challenged conduct cannot reasonably be expected to start up again." *Id.* (opinion regarding constitutional violations in conditions of confinement for ADA inmates in Monterey County jails); *See also Prison Legal News v. Cnty. of Ventura*, Case No. 14-cv-0773-GHK, 2014 U.S. Dist. LEXIS 84574, 2014 WL 2736103, at *9 (C.D, Cal. June 16, 2014) (holding that because the defendants failed to make a "sufficient showing that there is no longer any threat of continuing . . . violations, a court order is necessary to ensure that Defendants will not revert to their past practices"); *Bell v. City of Boise*, 709 F.3d 890, 900 (9th Cir. 2013) (noting that "a case is not easily mooted where the government is otherwise unconstrained…").

Because the Sheriff can terminate, alter, delete or otherwise change any alleged changes he claims to have implemented, and the fact that the Sheriff, after litigation for four years, belatedly makes some effort to implement changes to comply with this Court's preliminary injunction, indicates that just as easily the changes can be terminated.

Any changes Defendants have recently made have been voluntary and cannot moot Plaintiffs' case. The Supreme Court has explained that "a case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (emphases added) (internal quotation marks omitted). Thus, "[a]s long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot" if any relief whatsoever remains available to redress their alleged injuries. *Id.* (emphasis added) (internal quotation marks omitted); *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000). A case is moot only when "the challenged

1   conduct ceases such that there is no reasonable expectation that the wrong will be repeated" in

2   circumstances where "it becomes impossible for the court to grant any effectual relief whatever to

3   the prevailing party." *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000) (internal quotation

4   marks omitted). "The party asserting mootness has a heavy burden to establish that there is no

5   effective relief remaining for a court to provide." *In re Palmdale Hills Prop., LLC*, 654 F.3d 868,

6   874 (9th Cir. 2011); *see also Forest Guardians v. Johanns*, 450 F.3d 455, 461 (9th Cir. 2006)

7   (burden of establishing mootness "is heavy; a case is not moot where any effective relief may be

8   granted") (emphasis in the original) (internal quotation marks and citation omitted).

9       In *Friends of the Earth, Inc.*, the Court cautioned that dismissing a case as moot in the late

10   stages of appeal could be "more wasteful than frugal." *Friends of the Earth, Inc. v. Laidlaw Envtl.*

11   *Servs. (TOC), Inc.*, 528 U.S. 192, 120 S.Ct. 693. Doing so is justified only when it is "absolutely

12   clear" that the litigant no longer has "any need of the judicial protection that it sought." *Adarand*

13   *Constructors, Inc. v. Slater*, 528 U.S. 216, 224 (2000) (*per curiam*). The party asserting mootness

14   bears a "heavy" burden; a case is not moot if any effective relief may be granted. *Forest*

15   *Guardians v. Johanns*, 450 F.3d at 461 (*citing Nw. Envtl. Def. Ctr. v. Gordon*, 849 F.2d 1241,

16   1244 (9th Cir.1988)).

17       Here, at any time, the Sheriff can terminate, delete, alter, or otherwise change any alleged

18   changes he claims to have implemented. The Sheriff's claims that he has implemented changes--

19   under the subject to repetition exception–does not deprive this court of jurisdiction. Nothing stops

20   the Sheriff, at any moment, from reverting to the complained of practices.

21

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

**Plaintiffs' Proposed Findings of Facts and Law-- Case No.: 3:19-cv-02724 SK**

Respectfully Submitted by:


Dated: September 7, 2023                    LAW OFFICES YOLANDA HUANG

                                            */s/ Yolanda Huang*

                                            Yolanda Huang, Esq.

                                            GREENFIRE LAW, PC

                                            */s/ Rachel Doughty*
                                            Rachel Doughty, Esq.

                                            *ATTORNEY FOR PLAINTIFFS*


        Under N.D. Cal. Local Rule 5-1(i)(3), in lieu of a signature, I attest that I obtained

approval, on September 7, 2023 from  for the filing of this document.

                                            */s/ Microsoft Office User*

**Plaintiffs' Proposed Findings of Facts and Law-- Case No.: 3:19-cv-02724 SK**