# EXHIBIT D

**Volume 4**

**Pages 652 - 872**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Sallie Kim, Magistrate Judge

```
MONTRAIL BRACKENS, et al.,      )
                                )
          Plaintiffs,           )
                                )
  VS.                           ) NO. C 19-02724 SK
                                )
CITY AND COUNTY OF              )
SAN FRANCISCO, et al.,          )
                                )
          Defendants.           )
_____ )
```

San Francisco, California
Friday, August 11, 2023

**TRANSCRIPT OF BENCH TRIAL PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

        LAW OFFICES OF YOLANDA HUANG
        2748 Adeline Street, Suite A
        Berkeley, California 94703
   **BY:** **YOLANDA HUANG, ATTORNEY AT LAW**

        GREENFIRE LAW, PC
        2748 Adeline Street, Suite A
        Berkeley, California 94703
   **BY:** **RICHARD A. BRODY, ATTORNEY AT LAW**
        **RACHEL S. DOUGHTY, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Ana Dub, RDR, RMR, CRR, CSR No. 7445
             Jennifer Coulthard, RMR, CRR, CSR No. 14457
             Official United States Reporters

1    **APPEARANCES**:   (CONTINUED)

2    For Defendant:

3                                OFFICE OF THE CITY ATTORNEY
                                 Sixth Floor, Fox Plaza
                                 1390 Market Street
4                                San Francisco, California 94102
                             BY:   **SABRINA M. BERDUX, ATTORNEY AT LAW**

5

6                                OFFICE OF THE CITY ATTORNEY
                                 1 Dr. Carlton B. Goodlett Place
7                                City Hall, Room 234
                                 San Francisco, California 94102
8                            BY:   **KAITLYN M. MURPHY, DEPUTY CITY ATTORNEY**

9

10   Also Present:         **Chief Deputy Sheriff Lisette Adams**
                           **Winnie Fong, Paralegal**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        I N D E X

 2

 3    Friday, August 11, 2023 - Volume 4

 4    DEFENDANTS' WITNESSES                          PAGE   VOL.

 5    PRATT, M.D., LISA (RECALLED)
      (PREVIOUSLY SWORN)                              659    4
 6    Direct Examination resumed by Ms. Berdux        659    4
      Cross-Examination by Mr. Brody                  663    4
 7    Redirect Examination by Ms. Berdux              750    4
      Recross-Examination by Mr. Brody                768    4
 8    Further Redirect Examination by Ms. Berdux      773    4

 9

10    ROSENTHAL, JAY
      (SWORN)                                         777    4
11    Direct Examination by Ms. Murphy                778    4
      Cross-Examination by Mr. Brody                  804    4

12

13    GOMEZ, JAMES
      (SWORN)                                         839    4
14    Direct Examination by Ms. Murphy                840    4

15

16

17                      E X H I B I T S

18    TRIAL EXHIBITS                          IDEN   EVID   VOL.

19      9A                                            687    4

20      9B                                            690    4

21      9C                                            824    4

22      9D                                            824    4

23      9E                                            824    4

24      9F                                            824    4

25      9G                                            824    4
```

**PRATT - CROSS / BRODY**

1  was diagnosed with diabetes?

2  **A.**   No.

3  **Q.**   Do you have any personal knowledge whether Mr. Brackens

4  has been diagnosed with diabetes?

5  **A.**   I don't.

6  **Q.**   Okay.

7  **A.**   I don't recall having that knowledge.

8  **Q.**   And in that same section, Doctor, this also indicates that

9  Mr. Brackens was admitted to the hospital in April 2022;

10  correct?

11  **A.**   Correct.

12  **Q.**   And it indicates that he was admitted with DKA.  What

13  is -- what does that stand for?

14  **A.**   Diabetic ketoacidosis.

15  **Q.**   So is diabetic ketoacidosis, if I'm pronouncing it

16  correctly, or DKA, a condition or situation that can occur as

17  the result of an individual having diabetes?

18          ==MS. BERDUX:==   ==I'm going to object that this is beyond==

19  ==the scope of defendants' direct examination.==

20          ==THE COURT:==   ==Sustained.==

21  **BY MR. BRODY:**

22  **Q.**   Doctor, you've had a chance to leaf through the pages of

23  Plaintiffs' Exhibit 241; correct?

24  **A.**   I have leafed through some of these pages.

25  **Q.**   Okay.  And do these appear to be medical records either

PRATT - CROSS / BRODY

1   A.    Yes.

2   Q.    And going about halfway down on this page, Doctor, there

3   is a section called MDM.   Does that stand for "Medical Decision

4   Making"?

5   A.    It does.

6   Q.    And what does the term "Medical Decision Making," or MDM,

7   mean?

8   A.    It's a sort of a critical analysis and summary.   So how we

9   put the case together based on the presentation, the data that

10  we have, the physical exam, and then generating differential

11  diagnoses and management based on those generated differential

12  diagnosis.

13  Q.    And in the section MDM, this indicates, among other

14  things, that Mr. McAlister has -- that his vital signs are

15  notable for hypertension; correct?

16            MS. BERDUX:    Object.   Beyond the scope of the direct.

17  And Dr. Pratt was not disclosed as a medical expert in the

18  case.

19            THE COURT:    Sustained.

20  BY MR. BRODY:

21  Q.    You would consider the information that's contained in the

22  MDM section to be something that you or healthcare providers

23  employed by or under the supervision of Jail Health Services

24  could rely upon in any treatment of Mr. McAlister; correct?

25  A.    With the understanding of the context --

**PRATT - CROSS / BRODY**

1   **Q.**   And can you please take a look through, through

2   Plaintiffs' Exhibit 254.

3   **A.**   (Witness examines document.)  Okay.

4   **Q.**   Okay.  Dr. Pratt, you've had a chance to look through

5   Plaintiffs' Exhibit 254?

6   **A.**   Briefly.

7   **Q.**   Briefly.  I've asked Ms. Doughty to put page 3 of

8   Exhibit 254 on screen.

9        Do you have that in front of you?

10  **A.**   I do.

11  **Q.**   Okay.  And this appears to -- is this also a record from

12  Zuckerberg Hospital?

13  **A.**   It appears to be.

14  **Q.**   Okay.  And I haven't asked you this, but does "ZSFG" on

15  these documents stand for Zuckerberg Hospital?

16  **A.**   Zuckerberg San Francisco General.

17  **Q.**   And does this -- does page 3 indicate who the patient is?

18  **A.**   It does.

19  **Q.**   And who is the patient?

20  **A.**   Poot, comma, Jose.

21  **Q.**   And this appears to be a record of an office visit; is

22  that correct?

23  **A.**   Yes.

24  **Q.**   And it appears that on September 13, 2022, Mr. Poot was

25  seen in the medical and surgical specialties department; is

1    that correct?  Strike that.

2        It appears that he was seen in the neurology department,

3    according to the first paragraph?

4            MS. BERDUX:  Objection.  Calls for expert testimony,

5    and beyond the scope of Dr. Pratt -- of the direct examination.

6            THE COURT:  Sustained.

7    BY MR. BRODY:

8    Q.   Doctor, is page 3 of Plaintiffs' Exhibit 254 the type of

9    document that you would find in the -- in your computer system

10   for medical records?

11   A.   Likewise with the emergency department documentation, I

12   don't believe the clinic notes from the specialty clinics were

13   available during this time through our access to San Francisco

14   General medical record system, electronic access in the

15   Lifetime Clinical Record, but I cannot be certain of that.

16   Q.   Okay.  Do you have any reason to believe that this is not

17   a medical record that would be currently found in the computer

18   system used by Jail Health Services?

19   A.   Today?

20   Q.   Yes.

21   A.   Through Epic, we would have this record.

22   Q.   Okay.  And so if you saw a record of this type in your

23   Epic system, would you consider it to be a reliable and usable

24   document?

25   A.   I would.

1  **A.**  I believe that's correct for a part of that time.  And it

2  changed over the course of -- you know, once vaccinations were

3  available.  So I don't remember -- again, visiting is not the

4  purview of my work or activities.  So I don't know the dates

5  that visiting was available to people.  But certainly, as we

6  had more tools in our toolkit, as I said, restrictions were

7  relaxed.

8  **Q.**  But certainly, up until the time that vaccinations were

9  generally available to your inmate patients at the San Bruno

10  Jail, no in-family -- no in-person family visits were allowed?

11  **A.**  That is my understanding.

12  **Q.**  And similarly, prior to the general availability for your

13  inmate patients at the San Bruno Jail, there were no in-person

14  visits with attorneys that were allowed?

15  **A.**  I believe there were some exceptions to that.  People in

16  trial, the defense attorneys felt it was important to meet in

17  person to review documents.  But in general, no, there were not

18  legal visits, in-person legal visits.  Again, not my purview.

19  **Q.**  Okay.  And, Doctor, as a physician in your field of

20  medicine, would you agree that in general, it is harmful for a

21  human being to be confined to a small cell for 23 hours a day

22  for months or even years at a time?

23      **MS. BERDUX:**  Objection.  Incomplete hypothetical,

24  beyond the scope of direct examination, and calls for expert

25  testimony which Dr. Pratt was not disclosed or retained for.

1            THE COURT:   Sustained.

2   BY MR. BRODY:

3   Q.   And, Doctor, one more question which may be objected to

4   is, again, you're responsible and Jail Health Services is

5   responsible for providing medical services and mental health

6   services for your inmate patients at the San Bruno Jail.  And

7   so would you agree with me that in that role, it is generally

8   not good for human beings to be confined to small enclosed

9   spaces for months or years at a time?

10           MS. BERDUX:   Same objection.   Calls for expert

11  opinion, beyond the scope of direct.

12           THE COURT:   Sustained.

13  BY MR. BRODY:

14  Q.   Looking -- we still have Exhibit 29 in front of us.  Do

15  you see that, Doctor?

16       Okay.  What is your understanding of the source of

17  ventilation in those cells?

18  A.   HVAC system.

19  Q.   Okay.  And so I see what appear to be two air vents on the

20  wall there.

21       To your personal knowledge, is that the source of air in

22  cells at the San Bruno Jail?

23  A.   I have no personal knowledge of the location of the vents.

24  I mean, I've seen cells.  I don't -- those appear to be air

25  vents, in this photograph, to me, and perhaps to other people

**PRATT - CROSS / BRODY**

 1  what you've called fresh air?

 2  **A.**   Outdoor air.

 3  **Q.**   And you had -- you testified earlier that you didn't know

 4  what the air would be like in a cell when someone exercised; is

 5  that correct?

 6          **THE COURT:**  No, that -- wasn't there an objection to

 7  this?

 8          **MR. BRODY:**  There was, and I'm trying to go back -- I

 9  believe the Court sustained the objection, and I want to come

10  back and take another shot at it, Your Honor.

11          **THE COURT:**  No.

12  BY MR. BRODY:

13  **Q.**   Doctor, during -- strike that.

14      We talked a little bit this morning about diabetes and

15  individuals with diabetes and, as a general matter, it's one of

16  the ways that someone can reduce the risk of diabetes getting

17  worse is to exercise, right?

18          **MS. BERDUX:**  Objection.  This is beyond the scope of

19  direct and calls for an expert opinion, which Dr. Pratt was not

20  retained or disclosed as.

21          **THE COURT:**  Sustained.

22          **MR. BRODY:**  Your Honor, I'm asking not as an expert,

23  but in her role as the director of Jail Health Services.

24          **THE COURT:**  This is also beyond the scope of direct,

25  and it is an expert opinion.

PRATT - CROSS / BRODY

1   **BY MR. BRODY:**

2   **Q.**   So you don't know?

3         **MS. BERDUX:**  Objection.

4         **THE COURT:**  The question was sustained.  The Court

5   objection was sustained, so she doesn't have to answer the

6   question.

7         **MR. BRODY:**  I withdraw the question, Your Honor.

8   **BY MR. BRODY:**

9   **Q.**   And so in terms of -- is it correct that during the time

10  period 2020, you would defer to someone from the Sheriff's

11  Department to be able to testify as to what sorts of activities

12  inmates at the San Bruno Jail were allowed to do during the

13  walk time?

14  **A.**   Correct.  That is not my purview and never before and

15  never since, so including 2020.

16  **Q.**   Let's turn to a little bit different topic, Dr. Pratt.

17        As the director of Jail Health Services, is it important

18  that you educate yourself on current science?

19  **A.**   Indeed.

20  **Q.**   Okay.  And you do your best to keep up on current science

21  on issues that pertain to your inmate patients at the San Bruno

22  Jail and others in the San Francisco jail system, correct?

23  **A.**   Correct.  And it is a requirement of my board

24  certification to do so.

25  **Q.**   Are you aware of articles in the scientific literature

PRATT - CROSS / BRODY

1    that talk about the physical harm to the human body caused by

2    lack of regular exposure to outdoor sunlight?

3              MS. BERDUX:  Objection, calls for speculation --

4    excuse me.

5         Calls for an expert opinion, beyond the scope of the

6    direct examination.

7              THE COURT:  Sustained.

8              MR. BRODY:  Your Honor, if I may, I'm asking questions

9    not as an expert, but in her role as the director of Jail

10   Health Services treating inmates at the jail.

11             THE COURT:  This is also beyond the scope of the

12   direct.

13   BY MR. BRODY:

14   Q.   Doctor, it would -- we discussed this earlier, but it

15   would be important to you, as the director of Jail Health

16   Services, in your treatment and diagnosis of inmate patients at

17   the San Bruno Jail, to know about conditions that might

18   increase the risk of serious diseases in those individuals,

19   which include diabetes, hypertension and certain forms of

20   cancer?

21   A.   As I responded, I believe, it depends on the severity of

22   the threat and the acuity of the threat, the duration of

23   exposure to the threat or whatever the condition is, you know.

24        My role, my job is healthcare.  What you're talking about

25   is a little bit different, and it's health, so -- health and

1    You can answer this one question, and then we'll move on.

2              THE WITNESS:  So the question is -- I'm sorry,

3    please --

4              THE COURT:  Would you consider exposure to sunlight

5    and natural -- exposure to sunlight to be an environmental

6    factor that could impact someone's healthcare status?

7              THE WITNESS:  It depends.

8    BY MR. BRODY:

9    Q    And what does it depend on?

10             MS. BERDUX:  Objection, calls for expert opinion,

11   beyond the scope of direct.

12             THE COURT:  Sustained.

13   BY MR. BRODY:

14   Q.   Dr. Pratt, you testified yesterday and I believe today

15   that you conducted a risk-benefit analysis and a continuing

16   risk-benefit analysis during COVID, correct?

17   A.   Correct.

18   Q.   And that was in terms of formulating protocols that should

19   be used with the inmate patients at the San Bruno Jail,

20   correct?

21   A.   Correct.

22   Q.   Okay.  What risks did you consider to the inmates at the

23   San Bruno Jail during COVID other than the risk that they could

24   acquire COVID?

25   A.   Generally, the risks of harm to them that could result

PRATT - CROSS / BRODY

1    Q.    Okay.   One of the mitigation strategies urged on the

2    general public as a way to deal with shelter-in-place rules was

3    to try to go outside and get exercise outside, correct?

4              MS. BERDUX:   Objection.   Beyond the scope of direct.

5              THE COURT:   Sustained.

6    BY MR. BRODY:

7    Q.    Dr. Pratt, isn't it true that government officials during

8    COVID were telling people that it was good for a person's

9    physical and emotional health to get outside, get exercise,

10   whether it was walking or running or some other form of

11   exercise?

12             MS. BERDUX:   Objection, beyond the scope of direct.

13             THE COURT:   Sustained.

14   BY MR. BRODY:

15   Q.    Dr. Pratt, do you believe that it would have been

16   beneficial for your inmate patients who were locked up 23 hours

17   a day at the San Bruno Jail during COVID to have been able to

18   get outside and be able to exercise in the fresh air?

19             MS. BERDUX:   Objection, beyond the scope of direct.

20             THE COURT:   Overruled.

21             MS. BERDUX:   And calls for an expert opinion for which

22   Dr. Pratt was not disclosed or requested for.

23             THE COURT:   Why don't you ask a different question,

24   Mr. Brody.   I think you could get it correctly without having

25   the objection sustained.

BY MR. BRODY:

Q.   Dr. Pratt, you talked about trying to put protocols in place to not only deal with COVID but to help mitigate the effects of isolation during COVID, correct?

A.   Correct.

Q.   Okay.   And you talked about walk groups, for example.

     My question to you is, would it -- would it have been good for your inmate patients to be able to walk outside and be in fresh air and natural sunlight at some point in time during a day during COVID?

     MS. BERDUX:   Objection, beyond the scope of direct and calls for an expert opinion which Dr. Pratt was not disclosed or solicited for.

     THE COURT:   Sustained.   Let me ask Dr. Pratt a question.

Dr. Pratt, did you consider the option of allowing inmates to go outside to get exercise outside during 2020?

     THE WITNESS:   That is not my purview.   I have no role in determining whether people can go outside or where they can move, with the exception of to the hospital or to a medical bed inside the jail.

     THE COURT:   When you were weighing the risks and benefits of having people in isolation, did you consider a risk of not being able to go outside to exercise as part of your risk-benefit calculation?

PRATT - CROSS / BRODY

BY MR. BRODY:

Q.   And if I can follow up on Judge Kim's last question, when you say that outdoor access was not an option for you, for people at the San Bruno Jail, why was that not an option?

MS. BERDUX:   Calls for speculation, incomplete hypothetical.

THE COURT:   If you know.

THE WITNESS:   Why doesn't the Sheriff's Department?   I don't know.

My understanding is, the security of the -- again, this is all speculative -- the security of the yard, the fencing, the -- I don't -- those things.

BY MR. BRODY:

Q.   Dr. Pratt, I have one last area to explore with you, and then we'll be done with me.

I imagine your job as director of Jail Health Services requires you to put in long hours at times, correct?

A.   All the time, yes.

Q.   And during the years 2020 through 2022, during COVID and then as COVID spiked and went down, I imagine you were having to put in long hours; is that correct?

A.   Yes.  We all were.

Q.   And like you just said, you all were.  Your employees, folks with Jail Health Services, were also working long hours during the pandemic, correct?

1          **MS. MURPHY:**  May the witness be excused for the day?

2          **THE COURT:**  Yes, for today.

3              (Proceedings adjourned at 2:17 p.m.)

4

5                  **CERTIFICATE OF REPORTERS**

6          We certify that the foregoing is a correct transcript

7      from the record of proceedings in the above-entitled matter.

8

9      DATE:  Saturday, August 12, 2023

10

11

12

13      _____

14              Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
                CSR No. 7445, Official United States Reporter

15

16

17

18      _____

19              JENNIFER L. COULTHARD, RMR, CRR

20                  Official Court Reporter

21                    CA CSR#14457

22

23

24

25