# EXHIBIT H

Gregory B. Thomas (SBN 239870)
E-mail: gthomas@bwslaw.com
Temitayo O. Peters (SBN 309913)
E-mail: tpeters@bwslaw.com
Michael A. Slater (SBN 318899)
E-mail: mslater@bwslaw.com
BURKE, WILLIAMS & SORENSEN, LLP
1901 Harrison Street, Suite 900
Oakland, CA  94612-3501
Tel:  510.273.8780    Fax:  510.839.9104

Attorneys for Defendants
ALAMEDA COUNTY; ALAMEDA
COUNTY SHERIFF'S OFFICE; SHERIFF
GREGORY J. AHERN; ASSISTANT
SHERIFF D. HOUGHTELLING,
COMMANDER TOM MADIGAN; CAPTAIN
D. HESSELEIN, CAPTAIN TARA RUSSELL,
CAPTAIN D. SKOLDKVIST, DEPUTY
STINSON, DEPUTY SENSIBA, DEPUTY
SARTIN, DEPUTY KRANTAVILLE,
DEPUTY HENDERSON, DEPUTY GUERRA,
DEPUTY CRANDALL, DEPUTY CHANDRA

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| TIKISHA UPSHAW, TYREKA STEWART and ANDREA HERNANDEZ, on behalf of themselves and others similarly situated,<br><br>          Plaintiffs,<br><br>vs.<br><br>ALAMEDA COUNTY; ALAMEDA COUNTY SHERIFF'S OFFICE; SHERIFF GREGORY J. AHERN; ASSISTANT SHERIFF D. HOUGHTELLING, COMMANDER TOM MADIGAN; CAPTAIN D. HESSELEIN, CAPTAIN TARA RUSSELL, CAPTAIN D. SKOLDKVIST, DEPUTY WATSON, DEPUTY STINSON, DEPUTY SENSIBA, DEPUTY HENDERSON, DEPUTY GUERRA, DEPUTY CRANDALL, DEPUTY CHANDRA, DEPUTY BURBANK AND DOES 1 THRU 50,<br><br>          Defendants. | Case No.  3:18-cv-07814-JD<br><br>**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A LIMITED ISSUE CLASS CERTIFICATION**<br><br>Date:      August 1, 2019<br>Time:     10:00 a.m.<br>Dept.:     11<br>The Honorable James Donato |

Burke, Williams &
Sorensen, LLP
Attorneys At Law
Oakland

OAK #4815-5659-0236 v1                    - 1 -                    REQ FOR JUDICIAL NOTICE ISO OF OPP TO PLTFS'
MOTION FOR LIMITED ISSUE CLASS CERTIFICATION
CASE NO.: 3:18-CV-07814-JD

1       The County of Alameda Defendants, by and through their attorney, hereby request the

2 Court to take judicial notice, pursuant to Federal Rule of Evidence 201, of the following

3 documents:

4       1.      Order Granting Petition for Writ of Habeas Corpus filed on April 29, 2014 in *In Re*

5 *Andrew Hoeft-Edenfield,* Superior Court of the State of California, County of Alameda, Case No.

6 159202.  A true and correct copy of the foregoing is attached hereto as **Exhibit B.**

7

8 Dated:  July 11, 2019              BURKE, WILLIAMS & SORENSEN, LLP

9

10                      By:  */s/ Gregory B. Thomas*

11                         Gregory B. Thomas
                         Temitayo O. Peters

12                         Attorneys for Defendants
                         ALAMEDA COUNTY; ALAMEDA

13                         COUNTY SHERIFF'S OFFICE;
                         SHERIFF GREGORY J. AHERN;

14                         ASSISTANT SHERIFF D.
                         HOUGHTELLING, COMMANDER

15                         TOM MADIGAN; CAPTAIN D.
                         HESSELEIN, CAPTAIN TARA

16                         RUSSELL, CAPTAIN D.
                         SKOLDKVIST, DEPUTY STINSON,

17                         DEPUTY SENSIBA, DEPUTY SARTIN,
                         DEPUTY KRANTAVILLE, DEPUTY

18                         HENDERSON, DEPUTY GUERRA,
                         DEPUTY CRANDALL, DEPUTY

19                         CHANDRA

20

21

22

23

24

25

26

27

28

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
OAKLAND

OAK #4815-5659-0236 v1      - 2 -      REQ FOR JUDICIAL NOTICE ISO OF OPP TO PLTFS'
MOTION FOR CLASS CERTIFICATION
CASE NO.: 3:18-CV-07814-JD

# EXHIBIT B

FILED
ALAMEDA COUNTY

APR 29 2014

CLERK OF THE SUPERIOR COURT
By _____
                          Deputy

# SUPERIOR COURT OF THE STATE OF CALIFORNIA
## COUNTY OF ALAMEDA

|  |  |
|---|---|
| IN RE<br>ANDREW HOEFT-EDENFIELD,<br>on Habeas Corpus. | No. 159202<br>(Supreme Ct. No. S204745)<br><br>ORDER GRANTING PETITION FOR<br>WRIT OF HABEAS CORPUS |

## INTRODUCTION

This court has been called to determine whether Yolanda Huang deprived Petitioner Andrew Hoeft-Edenfield of the right to effective assistance of counsel and whether the second degree murder judgment by jury in this case should stand.

This court listened to the testimony of the witnesses who testified in the evidentiary hearing and observed their mannerisms and their demeanor while testifying. Additionally, this court has reviewed all the exhibits that were admitted into evidence, has reviewed the entire court file and transcripts, including sealed portions, of which it takes judicial notice, has read the writ of habeas corpus filed with the California Supreme Court on behalf of Petitioner, the informal response filed by the California Attorney General, and the pleadings filed in this court after the California Supreme Court issued the order to show cause (OSC), returnable to this court.

1

This court believes there is an issue that is critical to the determination of
the factual claims presented in this case that was not anticipated by the California
Supreme Court when it issued its order. That factor is the breathtaking level of
disingenuousness, evasiveness and apparent dishonesty exhibited by Ms. Huang
throughout her representation of Petitioner up to and including trial, after the trial
in her dealings with Judge Morris Jacobson on ancillary fee payments, and while
testifying in this court during the evidentiary hearing. Ms. Huang's lack of
qualifications to act as an attorney for Petitioner, coupled with her unexplainable
arrogance in dealing with the Alameda District Attorney's Office, Judge Jacobson,
and her own advisors, created a complex web of deception, misrepresentation,
disloyalty, and self-interest.

While testifying in the evidentiary hearing, Ms. Huang answered "I don't
remember," and "I don't recall," over 100 times. While some of these answers
were perfectly reasonable, a majority of these answers were neither reasonable nor
were they believable based on the totality of the circumstances and the testimony
of other witnesses. Listening to her testimony and observing her while testifying, it
is this court's finding that Ms. Huang's claim of lack of memory on many key
issues was not genuine but rather an attempt to be evasive and not truthfully
answer the questions posed to her. In addition, many of the times that she did
answer the questions, the answers were not believable in light of the facts
established by other witnesses who were credible.

In this case, Ms. Huang's conduct was so unreasonable that it completely
undermined the proper functioning of the adversarial process, including the ever
so critical plea bargaining stage. In addressing the three questions posed by the
California Supreme Court, this court would answer each of those questions in the
affirmative. Ms. Huang rendered ineffective assistance of counsel by representing
Petitioner and Adam Russell, a material defense witness, in a related civil suit
against the Inter-Fraternity Council. Ms. Huang created an actual conflict of
interest by representing Petitioner and Mr. Russell in a civil suit arising out of the

2

same incident as the criminal case that adversely affected Ms. Huang's performance as Petitioner's counsel at every stage of the criminal proceedings. In addition, Ms. Huang rendered ineffective assistance of counsel when, based on the totality of the circumstances presented to her, she failed to and refused to engage with the District Attorney's Office in attempting to negotiate a disposition favorable to Petitioner. Finally Ms. Huang rendered ineffective assistance of counsel by misleading Petitioner as to the risks and potential consequences of going to trial as opposed to negotiating a disposition to a lesser offense.

But for Ms. Huang's deficient performance, it is reasonably probable that the outcome in this case would have been different.

In sum, Petitioner is entitled to have his second degree murder conviction vacated based on all the three factual claims of ineffective assistance of counsel.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. *Factual Background*[1]

Petitioner, then 20 years old, and his friend Mr. Russell were walking home from a Berkeley party very early on the morning of May 3, 2008. Both had been drinking. Mr. Russell, in particular, was "obviously really drunk" and "couldn't walk straight." As the pair passed by a fraternity house near the University of California (UC) campus, Mr. Russell made brief, "friendly" conversation with one of a group of at least six young men standing in front of the house, most or all of them members of the fraternity. Among the group was the eventual victim, Christopher Wootton, a UC honors student. Mr. Wootton had been drinking on and off since lunch, and his blood alcohol level was later determined to be 0.21

---

[1]     The summary of facts of the underlying criminal action for the most part is taken from the unpublished opinion affirming the judgment, which only detailed the principal evidence in the trial. (See *People v. Hoeft-Edenfield* (Jun. 29, 2012, A128780) [nonpub. opn.].) The facts established at the evidentiary hearing on the Petition will be discussed in the body of the order where applicable.

percent. The conversation ended when another member of the fraternity group rudely told Mr. Russell to keep moving.

As Mr. Russell and Petitioner resumed walking, at least five of the fraternity group followed. Mr. Russell and Petitioner eventually turned to face them, and the confrontation escalated into a profane "yelling match." When other young men swelled the group aligned against the pair, Mr. Russell began swinging a bottle of liquor he had been carrying. Petitioner pulled out a four-inch pocketknife and vehemently threatened to use it. At the display of the knife, the members of the fraternity group retreated a few feet, and several made conciliatory remarks. Warning Mr. Russell and Petitioner he was calling the police, Mr. Wootton phoned 911.

Things might have ended there with the fraternity members' strategic withdrawal, but a new trio of young men, fresh from a different fraternity party, happened upon the scene. One of the three, Stephen Silveira, barged in and began provoking Mr. Russell and Petitioner, loudly taunting them and goading them to fight. At trial, Mr. Silveira acknowledged being "very" intoxicated at the time—so intoxicated that he had little recall of his conduct and repeatedly referred to the accounts of his conduct provided later by his friends. When Mr. Russell and Petitioner rose to Mr. Silveira's provocation, a brawl broke out.

Although Mr. Wootton was still on the telephone with the 911 operator when the fight began, at some point he grabbed Petitioner in a bear hug from behind, apparently trying to subdue him. During the clinch, Petitioner stabbed Mr. Wootton. Mr. Wootton collapsed onto the street and died en route to the hospital from a knife wound that pierced his heart.

At trial, Ms. Huang contended Petitioner acted in self-defense. However, Petitioner did not testify in his defense. The jury rejected the argument, convicting him of second degree murder and finding the personal use allegation to be true. Petitioner was sentenced to a term of 16 years to life imprisonment.

4

B-4

## II.  *Procedural Background*

In a complaint filed May 6, 2008, Petitioner was charged with murder (Penal Code, § 187, subd. (a)) with personal use of a deadly weapon (Penal Code, § 12022, subd. (b)(1)). On that same day, the court appointed Assistant Public Defender Tony Cheng, of the Alameda County Public Defender's Office, to represent Petitioner. Petitioner waived formal arraignment. The matter was put over to May 8, 2008, for plea and setting. At the next hearing date, the matter was again put over to June 12, 2008, for plea and setting. On June 12, 2008, the matter was again put over to July 15, 2008, for plea and setting. On July 15, 2008, the matter was put over again for a bail motion on August 19, 2008.

On August 8, 2008, a "Substitution of Attorney" was filed, requesting substitution of Ms. Huang for Mr. Cheng. On that same day, Ms. Huang filed a motion for bail. On August 13, 2008, the trial court granted the request for substitution of counsel, and the motion date of August 19, 2008, was vacated and replaced by August 18, 2008. Up to this point, the appearances had been scheduled at the Willey W. Manuel Courthouse. However, the bail motion was heard at the Rene C. Davidson Courthouse, in Department 11. All further proceedings were held at the Rene C. Davidson Courthouse. The bail motion was denied on August 18, 2008. Litigation followed, which resulted in bail being granted and set at $2 million on February 2, 2009. The bail continued to be litigated and after a *de novo* hearing, on March 24, 2009, the bail was increased to $2,510,000.

On May 18, 2009, the matter was assigned for preliminary hearing and Petitioner waived the one session rule. Deputy District Attorney Stacy Pettingrew of the Alameda County District Attorney's Office was assigned to conduct the preliminary hearing. The preliminary hearing began on May 19, 2009, and concluded on June 5, 2009. On June 5, 2009, Petitioner was held to answer on the charges, and bail was reduced to $999,999.99.

On June 15, 2009, an information was filed charging Petitioner murder with personal use of a deadly weapon and a great bodily injury allegation, which was

5

later stricken. On June 18, 2009, Petitioner was arraigned on the information. He pleaded not guilty and denied the allegations, waived time for trial, and the matter was set for disposition and setting. On July 29, 2009, the matter was set in Department 11 for disposition and setting, Senior District Attorney Richard Moore appeared for the District Attorney's Office. The matter was again calendared in Department 11 on November 4, 2009, with Mr. Moore again appearing for the District Attorney's Office (there were three intervening dates in Department 11, two of which dealt with defense motions).

On November 20, 2009, the matter was set for disposition and setting in Department 11, with Deputy District Attorney Connie Campbell appearing on behalf of the District Attorney's Office. On that date, the matter was set for jury trial. On the date set for trial, Judge Jacobson granted Petitioner's motion to continue the trial. The case was eventually assigned to Judge Jeffrey Horner for trial. The trial began on February 23, 2010, with motions *in limine*. The actual trial began with jury selection on March 10, 2010. On May 13, 2010, the thirty-first day of trial, the jury rendered a verdict of second degree murder, with a finding that Petitioner personally used a knife in the commission of the murder. On June 10, 2010, the trial court sentenced Petitioner to 16 years to life in prison.

Petitioner timely appealed. (See A128780.) On November 7, 2011, while the appeal was pending, he also filed a petition for writ of habeas corpus in the Court of Appeal. (See A133643.) The Court of Appeal affirmed the judgment, and on the same date denied the habeas petition. (See *People v. Hoeft-Edenfield* (Jun. 29, 2012, A128780) [nonpub. opn.]), and A133643.)

On July 31, 2012, Petitioner sought a petition for review with our Supreme Court, which was denied on October 10, 2012. While the petition for review was pending, Petitioner filed a petition for writ of habeas corpus (Petition) with the Supreme Court on August 16, 2012. On February 22, 2013, after seeking informal responses, the Supreme Court issued an OSC, returnable to the Superior Court, "why petitioner is not entitled to relief based on his allegation that counsel

B-6

rendered ineffective assistance by representing petitioner and defense witness [Mr.] Russell in a related civil suit against the Inter-Fraternity Council (*People v. Doolin* (2009) 45 Cal.4th 390, 419-421), by refusing to enter into plea bargain negotiations at the plea bargaining stage, and by misleading petitioner about the risks and potential consequences of going to trial. (*In re Alvernaz* (1992) 2 Cal.4th 924.)"

Respondent filed the return on July 10, 2013. Petitioner filed his traverse to the return on August 14, 2013. The evidentiary hearing was held on March 3 through March 6, 2014. On March 11, 2014, the court ruled on the admission of exhibits introduced at the evidentiary hearing. On March 18, 2014, this court addressed the parties on the record highlighting questions it wanted the parties to address in their closing arguments. Closing arguments were delivered on March 19, 2014. On April 17, 2014, this court issued a written tentative ruling. On April 21, 2014, the parties notified the court by e-mail of an apparent error in the tentative ruling relating to the court's description of testimony of Mr. Moore in the hearing. The court has checked its notes and the transcript of the relevant testimony. The court concurs with counsel that there was an error in the description of that witness's testimony. The court has made corrections to the tentative ruling to rectify the error.

## DISCUSSION

The most basic duty that counsel owes to a client is one of loyalty, and a duty to avoid conflicts of interest. (*Strickland v. Washington* (1984) 466 U.S. 668, 689.) Additionally, counsel is required to act as an accused's advocate. (*United States v. Cronic* (1984) 466 U.S. 648, 656.) An important purpose of the Sixth Amendment guarantee of counsel is to ensure that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding. (*Strickland, supra,* 466 U.S. at pp. 691-692.)

7

"Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. ([Citation omitted)). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." (*Strickland, supra,* 466 U.S. at p. 689.)

As discussed below, Petitioner has demonstrated that he is entitled to relief based on his claims that Ms. Huang rendered ineffective assistance by (1) representing Petitioner and Mr. Russell in a related civil suit against the Inter-Fraternity Council, (2) by refusing to enter into plea bargain negotiations at the plea bargaining stage, and (3) by misleading Petitioner about the risks and potential consequences of going to trial.

## I.  *Ms. Huang Rendered Ineffective Assistance of Counsel by Representing Petitioner and Adam Russell in a Related Civil Suit Against the Inter-Fraternity Council*

### A.  *Factual Summary and Factual Findings*

The evidence is overwhelming that Ms. Huang intentionally created an actual conflict of interest during her representation of Petitioner. From the testimony received in the evidentiary hearing and from the information contained in the court file, it is reasonable to infer that from the very beginning of her

8

representation of Petitioner, Ms. Huang harbored a dual motive in representation. On the one hand she was representing Petitioner in his murder trial, but at the same time she was using Petitioner's criminal case, by way of at least one and possible two civil suits, to seek retribution, money and other sanctions from the Inter-Fraternity Council.

During the evidentiary hearing Ms. Huang testified that she could not remember whether she or Mr. Russell first brought up the idea of a civil suit against the Inter-Fraternity Council and the various fraternities associated with them. From viewing the totality of circumstances, this lack of memory is not credible. At the time the civil suit was first discussed, in early 2009, Mr. Russell was approximately 22 years old with no sophistication in regards to legal matters. The Waiver of Conflict Agreement,[2] which was presumably drafted primarily to address the conflict with regards to a civil suit, (since the Waiver of Conflict Agreement also had a place for Kaitlyn Hacker to sign, who was not a potential defendant as was Mr. Russell), was prepared by Ms. Huang. It was presented to Mr. Russell when he was at the home of Ms. Huang at her invitation. Mr. Russell testified that Ms. Huang offered to represent him in the criminal case even though she was already representing the Petitioner at the time. She then brought up the idea of a civil suit against the Inter-Fraternity Council and various fraternities associated with it. Ms. Huang indicated to Mr. Russell that it was a way to help fund the defense case for his friend, Petitioner. Mr. Russell testified that he wanted to do whatever would help Petitioner. Ms. Huang presented the Waiver of Conflict Agreement to Mr. Russell on April 5, 2009, (some 44 days prior to Petitioner's Preliminary Hearing in the criminal case), and he signed it that day. He testified that prior to signing the document, Ms. Huang did not discuss or explain the contents of the document, nor were there discussions about the conflict itself. Mr. Russell testified that Ms. Huang said in order for her to represent both Petitioner

---

[2]      See Petitioner's Exhibit D.

9

and Mr. Russell in the civil suit Mr. Russell would have to sign the document, which he did.

Ms. Huang testified that the Waiver of Conflict Agreement was basically a boiler plate form. In paragraph 2, the agreement lists Mr. Russell, Petitioner, and Ms. Hacker as the people to which a possible conflict of interest might exist relating to joint liability both civil and criminal. In paragraph 3, there is a reference to the events of May 3, 2008, involving various fraternities and the Inter-Fraternity Council. This is the total extent in the document describing any conflict of interest. There is nothing in the document that specifically sets out what the conflicts, if any, might be, or how any such conflict might impact or affect the rights or liabilities of each of the named parties. In particular, there is nothing in the document that sets forth how the conflict might impact Petitioner's criminal case.

It is of interest to note that Mr. Russell's mother, Kathleen Russell, testified that during this period she had two telephone conversations with Ms. Huang. Ms. Russell testified that in the first conversation, Ms. Huang told Ms. Russell that she would represent both Petitioner and Mr. Russell in the criminal case. Ms. Russell testified that she told Ms. Huang that she had already consulted an attorney on her son's behalf. Ms. Huang responded that Mr. Russell was over 18 years of age and he could make his own decision about who to represent him. Ms. Russell testified she made it clear to Ms. Huang that she wanted her son to have his own attorney if the need arose. Ms. Huang's response was that they would cross that bridge when they came to it. After Ms. Huang began to talk to Mr. Russell about a civil suit, and convinced him it was a good idea, Ms. Russell again called Ms. Huang. Ms. Huang said the civil suit would help pay for the criminal defense. Ms. Russell indicated that she was opposed to a civil suit involving her son because she felt it was morally wrong.

The testimony of Mr. Russell and Ms. Russell was credible. The testimony indicates that Ms. Huang had offered to represent Mr. Russell in any potential

criminal case against Mr. Russell while still representing the Petitioner in his murder trial. The testimony further indicates that early in 2009, within four to five months of becoming Petitioner's attorney of record in his criminal case, Ms. Huang was focusing on and actively promoting the idea of filing a civil suit against the Inter-Fraternity Council and associated fraternities. The civil suit would name Mr. Russell, a key defense witness in the criminal case, and Petitioner as plaintiffs. Ms. Huang would be the attorney of record for both Mr. Russell and Petitioner in the civil suit. The goal of the civil suit as explained by Ms. Huang was to finance the criminal defense of Petitioner.

There was additional testimony and facts introduced at the evidentiary hearing and contained in the court file that indicate that Ms. Huang was aware that an actual conflict existed and that she was aware that such conflict was improper. Mr. Russell testified that Ms. Huang met with him in the fall of 2009. Ms. Huang advised Mr. Russell not to cooperate with the prosecutors. She instructed him to stay away from subpoenas and to avoid being served with a subpoena for the trial. She gave him tips on how to avoid service of process. In addition, Mr. Russell testified as Petitioner's trial drew near, he met with Ms. Huang at least 10 times regarding his trial testimony, mostly at her home and once at a Berkeley coffee shop. During these meetings Ms. Huang instructed Mr. Russell that during his testimony at trial he should limit the number of contacts he had with Ms. Huang. If asked, he was to testify that Ms. Huang was not representing Mr. Russell in any way and that he knew nothing of a civil suit. Mr. Russell testified that he was aware that he was being instructed to lie while under oath. He testified that if following Ms. Huang's directions would help Petitioner he was willing to do so. This court, having observed Ms. Huang and Mr. Russell while testifying about these matters, finds that the testimony of Mr. Russell, when considered with all the other testimony and information available, is credible. In contrast, the testimony of Ms. Huang regarding these same matters is not credible.

B-11

In addition, the testimony of Rebecca Young, a veteran attorney who is presently employed as an Assistant Public Defender in San Francisco, further indicates that Ms. Huang was aware of the actual conflict of interest. Ms. Young testified that during a Summer Solstice Party in June 2009,[3] at Ms. Huang's home, Ms. Huang told Ms. Young about a civil suit against the Inter-Fraternity Council and various fraternities associated with it. This conversation also included a discussion about another potential suit involving Paul Ghysel who resided around "fraternity row" and had numerous complaints about fraternity activities. However, Ms. Huang then indicated that Mr. Russell would be a plaintiff in the civil suit arising out of the same facts as Petitioner's criminal case. Ms. Young testified she told Ms. Huang that having Mr. Russell as a plaintiff in the civil suit, while he was a key witness in the criminal case, was a conflict of interest. To demonstrate her point, Ms. Young conducted a "mock" cross examination by a prosecutor that Mr. Russell might be subjected to at the criminal trial if he were also a plaintiff in the civil suit. After listening to Ms. Young's admonition, Ms. Huang indicated to Ms. Young that she did not see a problem, nor did she believe a conflict of interest existed. This testimony by Ms. Young shows the level of disingenuousness by Ms. Huang even when speaking with friends and advisors. Ms. Huang voiced disagreement with Ms. Young about there being a conflict of interest in June 2009, even though she already had Mr. Russell sign a Waiver of Conflict Agreement on April 5 of that year. In addition, when asked about these events, Ms. Huang claimed to have no recollection about the Summer Solstice Party or this conversation with Ms. Young. Considering Ms. Huang's long term relationship with Ms. Young, and her having sought Ms. Young's counsel during Petitioner's case, her lack of recollection is not credible.

---

[3]    According to the National Oceanic and Atmospheric Administration, Summer Solstice in 2009 was on June 21. The court takes judicial notice of this fact pursuant to Evidence Code, section 452, subdivision (h).

B-12

While there was no direct testimony at the evidentiary hearing regarding any conversations between Ms. Huang and Petitioner regarding the conflict of interest, this court would note the following testimony by Ms. Huang: that based on her knowing the Petitioner since he was in high school, she knew Petitioner was a special needs person who had difficulty with reading and expressing himself; that Petitioner was a person who could be easily lead; that the Waiver of Conflict Agreement was signed by Petitioner on June 18, 2009, the same day as his arraignment on the information charging him with murder; that the arraignment department, Department 11, was very busy, there was a lot of cross talking, and that it was hard to communicate with a client in that setting. In her testimony, Ms. Huang failed to provide any specifics about what she discussed or explained to Petitioner about any conflict of interest with her representation of Mr. Russell and Petitioner, or her pursuing a civil suit with Mr. Russell as plaintiff while representing Petitioner in his criminal matter. In fact, Ms. Huang testified that when she presented the Waiver of Conflict Agreement to Petitioner in the jail, she did not think he read it prior to signing it. She further testified she did not remember whether Petitioner asked any questions about the document, did not remember if Petitioner indicated he understood the document or its purpose, did not have any recollection of their discussion about the document. She also did not think she discussed how the financial motivation of the civil suit might impact Petitioner's criminal defense. She further testified that she did not recall whether she told Petitioner that the existence of the civil suit would give her a financial interest in the criminal case going to trial to seek an acquittal to preserve Petitioner's plaintiff status in the civil matter.

Finally, it is clear from the testimony of Judge Jacobson and the trial record from the jury trial presided over by Judge Horner, that Ms. Huang never revealed to either judges her dual representation of Mr. Russell and Petitioner. Ms. Huang never revealed that she had Petitioner and Mr. Russell execute a Waiver of Conflict Agreement. Ms. Huang did not disclose to either of the judges that she

13

intended to file a civil suit based on the same facts as the criminal case with Mr. Russell and Petitioner as plaintiffs. She never disclosed the reason for the suit was to raise money for the criminal defense. Rather, by her silence and her instructions to Mr. Russell to lie in his trial testimony, she actively sought to conceal her actions and intentions from the judges involved in Petitioner's case. Being made aware of the conflict of interest and the proposed waiver of that conflict would have raised a red flag. It would have given either of these judges the opportunity to make the inquiries set forth by our Supreme Court, to satisfy themselves that Petitioner, (1) had discussed with his own counsel, or with an outside attorney if he wished, the potential drawbacks of representation by counsel who may have a conflict of interest, (2) had been advised of the dangers of conflicted representation in his case, and (3) voluntarily wished to waive that right. (*People v. Hung Mai* (2013) 57 Cal.4th 986, 1010.) It is clear from the testimony about Ms. Huang's actions and beliefs about the civil suit, that such an inquiry from the bench was an inquiry Ms. Huang did not want to occur.

Thus, it is clear from the testimony of witnesses and the court record that an actual conflict of interest existed. It is also clear that this conflict impacted the performance of Ms. Huang in her representation of Petitioner. Ms. Huang wanted to pursue the civil suit to obtain funds to pay her for the work on the criminal case and to satisfy her obvious philosophic desire to take on the fraternities. Ms. Huang's conflict and dual representation impacted her representation of Petitioner in various ways. Ms. Huang could not negotiate a favorable disposition for Petitioner that involved any admission of criminal liability. Such a result would have meant the end of the civil suit as it related to Petitioner as a plaintiff. Thus, Ms. Huang had a financial interest in having the Petitioner's matter proceed to trial in hope of achieving an acquittal so he could remain a plaintiff in Ms. Huang's civil suit against the Inter-Fraternity Council.

In addition, from the discovery provided, there was evidence that on May 3, 2008, Mr. Russell had been a provocateur prior to the physical fight and had been

14

an instigator of the physical confrontation that lead to the homicide. Mr. Russell was intoxicated, was carrying a liquor bottle that he began to swing as a potential weapon when the confrontation with the fraternity members occurred. This information could have been used by the defense in Petitioner's criminal trial. It was not inconsistent with Petitioner's defense of self-defense. However, Ms. Huang was prevented from "going after" Mr. Russell during his trial testimony because of his status as plaintiff in the civil suit. Ms. Huang was obliged to "pull her punches" when questioning Mr. Russell about the events of May 3, 2008, to preserve his "clean" status as a plaintiff who was not responsible or liable for the events of that evening.

Finally, Ms. Huang had another financial interest in keeping the criminal case going without an early disposition from a negotiated plea. That was the fact that Ms. Huang was apparently using her access to Alameda County funds for ancillary services for the criminal matter to pay for services that were provided for the civil case. In one particular incident, Ms. Huang instructed Sabrina Siskind, who had done work on the criminal case, but who had also done work on the civil case involving Paul Ghysel against the Inter-Fraternity Council, to change the cover sheet for all of her invoices, and to put "People v. Hoeft-Edenfield" on the cover sheets. All of these invoices, including the invoice for work on the civil case, were then submitted to the court for payment as ancillary services on the criminal matter. It is also apparent from the testimony of Judge Jacobson, the exhibits submitted and the contents of the court file, that Ms. Huang engaged in multiple incidents of improper conduct in the procedures she used in securing services of experts and professionals and in her billing of the county for ancillary services. It is reasonable to infer from the volume of requests she made and the nature of some of the services provided that this information was being sought to assist with pursuing the civil case or as a source of funds for herself. Thus, as long as Petitioner's criminal case was ongoing, Ms. Huang had potential access to the "deep pockets" of Alameda County.

15

Thus, on multiple levels, the fact of dual representation, the existence of the civil suit with Mr. Russell and Petitioner as plaintiffs and Ms. Huang's involvement in the Paul Ghysel civil suit, all created an actual conflict of interest. This conflict impacted and was detrimental to Ms. Huang's representing Petitioner's best interests in his criminal matter. The conflict provided Ms. Huang with an incentive to see Petitioner's case proceed to trial to seek an acquittal regardless of the disadvantages to Petitioner of going to trial. At the trial, she was handicapped by the fact that a key defense witness in the criminal trial was one of her plaintiffs in her civil case and had to be protected. The conflict was a disincentive to Ms. Huang to engage in meaningful plea negotiations to resolve Petitioner's case short of trial by way of negotiated plea involving Petitioner's admission of criminal liability. It was also an incentive for her to misrepresent to Petitioner the risks and possible consequences of going to trial so that he would acquiesce to her desire to try his case to seek an acquittal.

## B. *The Law*

"A criminal defendant is guaranteed the right to the assistance of counsel by the Sixth Amendment to the United States Constitution and article I, section 15 of the California Constitution. This constitutional right includes the correlative right to representation free from any conflict of interest that undermines counsel's loyalty to his or her client." (*Doolin, supra,* 45 Cal.4th at pp. 417-18.)

"For both state and federal purposes, a claim of conflicted representation is one variety of claim that counsel provided ineffective assistance. Hence, to obtain reversal of a criminal verdict, the defendant must demonstrate that (1) counsel labored under an actual conflict of interest that adversely affected counsel's performance, and (2) absent counsel's deficiencies arising from the conflict, it is reasonably probable the result of the proceeding would have been different." (*Mai, supra,* 57 Cal.4th at pp. 1009-1010.)

16

"It has long been held that under both Constitutions, a defendant is deprived of his or her constitutional right to the assistance of counsel in certain circumstances when, despite the physical presence of a defense attorney at trial, that attorney labored under a conflict of interest that compromised his or her loyalty to the defendant." (*People v. Rundle* (2008) 43 Cal.4th 76, 168.)

"As a general proposition, such conflicts 'embrace all situations in which an attorney's loyalty to, or efforts on behalf of, a client are threatened by his responsibilities to another client or a third person or his own interests. [Citation.]'" (*People v. Cox* (1991) 53 Cal.3d 618, 653, quoting *People v. Bonin* (1989) 47 Cal.3d 808, 835.) One common factual context in which conflicts of interest commonly arise is in cases of "simultaneous representation, where an attorney seeks to represent in a single action multiple parties with potentially adverse interests." (*In re Charlisse C.* (2008) 45 Cal.4th 145, 159.)

"Multiple representation of criminal defendants is not per se violative of constitutional guarantees of effective assistance of counsel." (*People v. Mroczko* (1983) 35 Cal.3d 86, 103, disapproved of on another ground by *Doolin, supra,* 45 Cal.4th 390].) However, our Supreme Court has recognized that multiple representation cases are rife with potential for conflicts. (See *Doolin, supra,* 45 Cal.4th at p. 415; *Mroczko, supra,* 35 Cal.3d at pp. 103-104.) "The primary value at stake in cases of simultaneous or dual representation is the attorney's duty-and the client's legitimate expectation-of loyalty, rather than confidentiality." (*Flatt v. Superior Court* (1994) 9 Cal.4th 275, 284.) "The principle of loyalty is for the client's benefit...." (*Flatt, supra,* at p. 286, fn. 4.)

" '[I]n every case of multiple representation, there exists a likelihood, if not a certainty, that the strategic maneuvers of the criminal defense attorney will adversely affect the interests of at least one defendant at some point in the trial process.'" (*Mroczko, supra*, 35 Cal.3d at p. 103.) "Because a conflict involving an attorney's duty of loyalty is '[t]he most egregious' kind of conflict, the disqualification standards we have developed for simultaneous representation

cases are 'more stringent' than those that apply in successive representation cases; '[w]ith few exceptions, disqualification [in a case of simultaneous representation] follows automatically, regardless of whether the simultaneous representations have anything in common or present any risk that confidences obtained in one matter would be used in the other. [Citation.]' " (*Charlisse C., supra,* 45 Cal.4th at p. 160.)

In *Mickens v. Taylor* (2002) 535 U.S. 162, the high court stated that in the context of a conflict of interest claim, deficient performance is demonstrated by a showing that defense counsel labored under an actual conflict of interest "that affected counsel's performance- as opposed to a mere theoretical division of loyalties." (*Mickens, supra,* 535 U.S. at p.171.) " '[I]nquiry into actual conflict [does not require] something separate and apart from adverse effect.' (Citation omitted.) An 'actual conflict,' for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance.' (*Ibid.*)" (*Doolin, supra,* 45 Cal.4th 390, 417-18.)

"The defendant may voluntarily, knowingly, and intelligently waive a conflict of interest. But the court must take steps to ensure that any waiver of a possible conflict meets those standards. If, after inquiry, the court determines that a waiver is necessary, it must satisfy itself that the defendant (1) has discussed with his or her own counsel, or with an outside attorney if he or she wishes, the potential drawbacks of representation by counsel who may have a conflict of interest; (2) has been advised of the dangers of conflicted representation in his case; and (3) voluntarily wishes to waive that right. Where the court fails to fulfill these duties, reversal is required if the defendant can establish that counsel's performance was deficient, that an actual conflict of interest was the reason for the deficiency, and that it is reasonably probable the deficiency adversely affected the outcome of the case." (*Mai, supra,* 57 Cal.4th at p. 1010.)

//

//

18

## C. *Analysis*

In this case, Petitioner contends that there two separate theories of conflict of interest. First, Ms. Huang labored under a financial and personal interest in the civil suits against the Inter-Fraternity Council, which created an actual conflict of interest. Second, the dual representation of Petitioner and Mr. Russell in the civil suit arising out of the same facts as Petitioner's criminal matter, while Petitioner's criminal matter was pending, created an actual conflict of interest. These conflicts of interest, Petitioner contends, violated his state and federal rights to conflicts free counsel. Both of Petitioner's contentions have merit.

It is clear from the testimony of witnesses and the court record that an actual conflict of interest existed. It is further clear that this conflict of interest impacted the performance of Ms. Huang in her representation of Petitioner. Ms. Huang wanted to pursue the civil suit to obtain funds to pay her for the work on the criminal case. In addition, the criminal case created a source of funds that Ms. Huang used to bill for services provided for the criminal case but also her civil cases. Ms. Huang's conflict and dual representation adversely impacted her representation of Petitioner in various ways.

### 1. *Actual Conflict of Interest that Adversely Affected Counsel's Performance*

"An actual '[c]onflict of interest between jointly represented clients occurs whenever their common lawyer's representation of the one is rendered less effective by reason of his representation of the other.' (Citation omitted)." (*Blue Water Sunset, LLC v. Markowitz* (2011) 192 Cal.App.4th 477, 488-489.) "'[I]n a case of joint representation of conflicting interests the evil - it bears repeating - is in what the advocate finds himself compelled to *refrain* from doing ...." (*Mroczko, supra*, 35 Cal.3d at p. 109, citing *Holloway v. Arkansas* (1978) 435 U.S. 475, 490, italics in original.)

Additionally, "a determination of whether counsel's performance was 'adversely affected' under the federal standard 'requires an inquiry into whether counsel "pulled his punches," i.e., whether counsel failed to represent defendant as vigorously as he might have, had there been no conflict. [Citation.] In undertaking such an inquiry, we are ... bound by the record. But where a conflict of interest causes an attorney not to do something, the record may not reflect such an omission. We must therefore examine the record to determine (i) whether arguments or actions omitted would likely have been made by counsel who did not have a conflict of interest, and (ii) whether there may have been a tactical reason (other than the asserted conflict of interest) that might have caused any such omission.' (Citation omitted.)" (*Doolin, supra,* 45 Cal.4th at pp. 418-419.)

In this case, the Petition allows this court to go beyond the record of the trial to make its determination of whether Ms. Huang's performance was adversely affected by the conflict of interests. Based on the entire record as presented to this court, the court makes the following findings:

Ms. Huang had a financial interest in the civil suit against the Inter-Fraternity Council that created an actual conflict with her duties and responsibilities as attorney for Petitioner in his criminal case.

Ms. Huang's dual representation of Mr. Russell and Petitioner created an actual conflict of interest with her duties and responsibilities as attorney for Petitioner in his criminal case.

This actual conflict of interest resulted in Ms. Huang "pulling her punches" in her questioning of Mr. Russell in Petitioner's criminal trial. The court has read the transcript of Mr. Russell's testimony at Petitioner's trial. Ms. Huang consistently kept Mr. Russell "clean," portraying him throughout as a victim of an unprovoked group beating. In his testimony on direct examination by Ms. Huang, Mr. Russell, without provocation on his part is pursued, pushed to the ground and, while in a fetal position, punched and kicked all over his body by the members of the fraternities. Respondent argues that portraying Mr. Russell as a victim was

20

merely a trial strategy and not the result of the conflict. However, based on the totality of Ms. Huang's actions regarding the conflict she created, it is more reasonable to conclude her questioning of Mr. Russell was done with an eye toward the civil case wherein he was a plaintiff, rather than a trial strategy done for Petitioner's benefit. There is nothing strategic about instructing a witness to lie about your representing that witness in the civil suit that arose from the same facts as Petitioner's criminal case. A competent and non-conflicted defense attorney would have vigorously questioned Mr. Russell about his involvement. Painting a realistic picture of his involvement, which would have been consistent with the numerous prosecution witnesses, would have enhanced Mr. Russell's overall credibility with the jury and his ability to establish facts that would have assisted Petitioner. However, to do so would have created a transcript that would be used against Mr. Russell in the civil suit.

This court finds that a non-conflicted counsel would have performed differently and more vigorously in the examination of Mr. Russell and that there was no strategic reason for failing to do so. As a result, Ms. Huang's conflict of interest adversely affected her performance as Petitioner's trial counsel.

### 2. *No Waiver of Conflict of Interest*

Respondent contends that by executing the Waiver of Conflict Agreement Petitioner waived any conflict that may have arisen out of Ms. Huang's dual representation of Petitioner and Mr. Russell in the civil suit. According to Respondent, that conflict is *expressly* stated in the Waiver of Conflict Agreement and has been waived. Additionally, according to Respondent, Petitioner waived Ms. Huang's personal conflicts, because the Waiver of Conflict Agreement specifically said that Petitioner was waving "any" potential or actual conflicts. The court rejects Respondent's contentions because Petitioner lacked informed consent

to waive the conflicts of interest and the waiver was not knowingly, voluntarily, and intelligently made.

There was no waiver of the conflict of interest created by Ms. Huang's actions. The duty of undivided loyalty is entwined in any attorney-client relationship, and is mandated by the California Rules of Professional Conduct. (*City and County of San Francisco v. Cobra Solutions, Inc.* (2006) 38 Cal.4th 839, 846.) Rule 3-310(c) of the Rules of Professional Conduct prohibits attorneys from accepting or continuing concurrent representation of clients whose interests potentially and/or actually conflict, absent the "informed written consent" of each client. "Informed written consent" is defined as "the client's or former client's written agreement to the representation following written disclosure..."(Rules Prof. Conduct, Rule 3-310(A)(2)). "Disclosure" is defined as "informing the client or former client of the relevant circumstances and the actual and reasonable foreseeable adverse consequences to the client or former client." (Rules Prof. Conduct, Rule 3-310 (A)(1).) "Divergence in interest requires counsel to disclose to each of his jointly represented clients whatever is necessary to enable each of them to make intelligent, informed decisions regarding the subject matter of their joint representation." (*Spindle v. Chubb/Pacific Indemnity Group* (1979) 89 Cal App. 3d 706, 713.)

The record is abundantly clear that these requirements were not met. During her testimony, Ms. Huang was unable or unwilling to provide any details about what if anything she discussed with Petitioner about the Waiver of Conflict Agreement or the conflict of interest itself. She further testified that she did not think Petitioner read the document, did not recall any discussion they may have had about the contents of the Waiver of Conflict Agreement, and did not think she discussed how her financial interest in the civil suit might impact her representation of Petitioner in the criminal case. Mr. Russell testified that when Ms. Huang presented the Waiver of Conflict Agreement to him, she did not discuss the contents nor explain the contents of the agreement to him. Ms. Huang

testified that the document is a boilerplate document. The document contains nothing specific about the conflict of interest or the potential consequences of the conflict for any of the people covered by the document. Similar to the waiver that was used in *People v. Baylis* (2006) 139 Cal App. 4th 1054, 1068, the language in the Waiver of Conflict Agreement does not apprise Petitioner or Mr. Russell of the "nature and seriousness of the conflict involved" as required by the rule 3-310 of Rules of Professional Conduct.

Given the lack of specificity in Ms. Huang's written disclosure contained in the written Waiver of Conflict Agreement informing each client of the known "actual and reasonable foreseeable" conflict of interest, it cannot be said that Petitioner gave his informed consent to the concurrent representation of himself and Mr. Russell. Or for that matter, of any conflict of interest that was caused by Ms. Huang's own interest in pursuing the civil matters. The Waiver of Conflict Agreement was deficient because the written disclosure as required by Rule of Professional Conduct 3-310(A)(1) was lacking. Additionally, the lack of evidence that Petitioner read and understood the document, and discussed it with Ms. Huang, does not support Respondent's contention that this was a valid waiver. Consequently, any purported informed consent of the conflict of interest and waiver of the conflict of interest was also lacking and was otherwise ineffective.

Ms. Huang not only failed to inform the pre-trial and trial court of the conflict, she actively concealed the existence of the conflict. Trial counsel who seeks to continue as conflicted counsel has duty to notify the court to the existence of a conflict, and assist the court in determining whether the waiver of that conflict is valid. (*Mroczko, supra,* 35 Cal.3d at p. 112.) "When an attorney addresses the court regarding a potential or actual conflict, he is obligated to do so forthrightly and honestly. He may not interfere with the court's attempts to inquire of the defendants, and must assist the court by bringing potential and actual conflicts to its attention." (*Ibid.*) Counsel's cooperation is "essential to assure that a proper inquiry is made" and they are likely the only person aware of the conflict. (*Ibid.*)

23

In *Mroczko,* our Supreme Court found that when counsel's actions blocked the trial court's inquiry as to the validity of the waiver, the wavier of conflicts had not been knowingly and intelligently made. (*Mroczko, supra,* 35 Cal.3d at p. 112.) In *Mroczko,* instead of cooperating with the trial court in exploring the conflict, counsel refused to admit there was a conflict, interceded in the court's questioning of defendant and arguing that appointing new counsel would jeopardize defendant's rights. (*Id.* at p. 112-113.)

Ms. Huang's conduct in this case was more egregious than that the one by counsel in *Mroczko,* in which counsel merely blocked the trial court's inquiry attempts. In this case, Ms. Huang never revealed to either Judge Jacobson or Judge Horner her dual concurrent representation of Mr. Russell and Petitioner. Additionally, she told Mr. Russell not to reveal that she was his attorney if asked at trial, thereby subordinating perjury. She blatantly eschewed her obligation to alert the court of the existence of a conflict, and also actively ensured that the court would not find out about the conflict by instructing Mr. Russell not to reveal that she was his counsel in the civil case.

In sum, Ms. Huang prevented the trial court from ensuring that the waiver was voluntarily, knowingly, and intelligently made. Ms. Huang actively concealed the conflict of interest and the Waiver of Conflict Agreement from the trial court. Having so determined, this court finds that the Waiver of Conflict Agreement failed to adequately explain to Petitioner (and Mr. Russell for that matter) the consequences of the conflicts. Therefore, this court finds that Petitioner did not knowingly and intelligently waive the conflicts of interest.

3.  *Petitioner was Prejudiced by Ms. Huang's Deficient Performance*

    a.  Evidence Presumed for Actual Conflict Based on Dual Representation

In *Mickens,* the high court suggested that a presumption of prejudice need not attach to every conflict, but was appropriate for conflicts giving rise to a high

24

B-24

probability of prejudice and corresponding difficulty of demonstrating such prejudice. (*Mickens, supra*, 535 U.S. at p. 175.) However, with regard to the prejudice requirement in cases where counsel "actively represented conflicting interests," the U.S. Supreme Court has recognized a presumption of prejudice applies. (*Id.* at p. 166.) The California Supreme Court has adopted the federal constitutional standard in evaluating claims of conflict of interest under the California constitution. Therefore, the presumption of prejudice applies to multiple concurrent representation conflict of interest claims as well, and had been applied before adopting the federal standard. (*Doolin, supra*, 45 Cal.4th at pp. 419-420.) Having determined that Ms. Huang's actively and simultaneously represented the conflicting interests of Mr. Russell and Petitioner, and that the dual simultaneous representation created an actual conflict of interest that adversely affected Ms. Huang's performance, prejudice here is presumed.

   b.   Petitioner has Established Prejudice for Actual Prejudice Based on Ms. Huang's Own Financial and Personal Interest

   *Strickland* provides the appropriate analytic framework for assessing prejudice arising from attorney conflicts of interest outside the context of multiple concurrent representation. (*Doolin, supra*, 45 Cal.4th at p. 428.)

   In terms of Petitioner having established prejudice under *Strickland*, Petitioner has demonstrated a reasonable probability that he would have obtained a more favorable result in the absence of the actual conflict that adversely affected Ms. Huang's performance. Suffice it to say, that but for Ms. Huang's deficient performance caused by the actual conflict of interest, Petitioner would have pled to a voluntary manslaughter with use of a knife for a determinate term of 12 years.

   One of the answers that Ms. Huang gave during the evidentiary hearing is truly revealing in describing her true interests and motivation in her representation of Petitioner. When asked by Petitioner's counsel, "Okay if you were so worried about the conflict of interest, why did you agree to represent both of them?" Ms.

B-25

Huang answered, "Because I felt that the community of interest outweighed the potential conflict." Aside from this answer being an admission that she did in fact represent both Petitioner and Mr. Russell in the civil suit, this answer demonstrates that her personal abhorrence and distain of the Inter-Fraternity Council and what it stands for. It reveals her political and philosophical desire to target these people through her civil suit, was more important to her than Petitioner's right to have a conflict free, unencumbered defense counsel to represent him in his criminal trial.

## II. *Ms. Huang Rendered Ineffective Assistance of Counsel in the Critical Plea-Bargaining Stage*

Plea bargaining is an integral component of the criminal justice system and essential to expeditious and fair administration of the courts. (*Alvernaz, supra,* 2 Cal.4th at p. 933; see also *People v. Segura* (2008) 44 Cal.4th 921, 929.)

Counsel has an "overarching duty to advocate the defendant's cause." (*Strickland, supra,* 466 U.S. 668, 688.) Additionally, counsel has more particular duties to keep the defendant informed of important developments in the case, and to consult with the defendant on important decision in the case. (*Ibid.*) Finally, "[c]ounsel also has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process." (*Ibid.*)

"The pleading-and-plea bargaining-stage of a criminal proceeding is a critical stage in the criminal process at which a defendant is entitled to the effective assistance of counsel guaranteed by the federal and California Constitutions." (*Alvernaz, supra,* 2 Cal.4th at p. 933.) The United States Supreme Court has reached the same conclusion. (See *Padilla v. Kentucky* (2010) 559 U.S. 356, 373 ["we have long recognized that the negotiation of a plea bargain is a critical phase of litigation for purposes of the Sixth Amendment right to effective assistance of counsel"]; see also *Lafler v. Cooper* (2012) 132 S.Ct. 1376, 1384; and *Missouri v. Frye* (2012) 132 S.Ct. 1399.)

B-26

"To demonstrate that a defendant has received constitutionally inadequate representation by counsel, he or she must show that (1) counsel's representation was deficient, i.e., it fell below an objective standard of reasonableness under prevailing professional norms; and (2) counsel's deficient performance subjected the defendant to prejudice, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant." (*Alvernaz, supra*, 2 Cal.4th at p. 936.)

### A. *Ms. Huang's Rendered Ineffective Assistance of Counsel by Refusing to Enter into Plea Bargain Negotiations at the Plea Bargaining Stage*

Did Ms. Huang render ineffective assistance of counsel by refusing to enter into plea bargain negotiations at the plea bargaining stage?

Again, the question posed by the California Supreme Court must be answered in the affirmative. The testimony presented in the evidentiary hearing clearly indicates that Ms. Huang had absolutely no interest or intentions to, in good faith, become involved in any plea bargaining negotiations.

#### 1. *Factual Summary and Factual Findings*

Ms. Huang testified she was admitted to the California State Bar in 1982. Her testimony and the exhibits admitted show she had been inactive in the Bar during two periods from her admission to the time she undertook to represent the Petitioner in his murder case. The last period of inactive status was from January 1, 2000, to September 1, 2007. Prior to accepting Petitioner's case, Ms. Huang had tried two or three felony criminal jury trials (her testimony ranged from three to four felony trials; however, the exhibits indicate she tried two felony jury trials). All of her prior felony trials had taken place in the 1990s. Since her final re-admission to the Bar she had not tried any felony jury trials. She had never tried a murder case. Based on this minimal criminal experience, a reasonable attorney would in all likelihood not take a case such as Petitioner's in the first place

27

without at least having the assistance of co-counsel. However, if an attorney did accept the case, common sense and an attorney's ethical and legal obligation to the client would include researching the law of homicide, the possible sentencing exposures for the degrees of murder, the determinate sentencing ranges for lessor crimes, and the procedures followed by the jurisdiction where the trial was to occur. Ms. Huang apparently failed to take any of these steps.

Ms. Huang's testimony about the plea bargaining process was mind boggling. There are only two conclusions that can be drawn from her testimony. One conclusion is that Ms. Huang was not being truthful when she testified about the statements she attributed to Judge Jacobson and members of the District Attorney's Office. The other conclusion is that she was totally ignorant about the possible punishments for murder and voluntary manslaughter at the time she represented Petitioner and remained ignorant through her testimony in the evidentiary hearing.

Judge Jacobson testified that an offer of 12 years state prison was made by the District Attorney's Office during a plea bargaining session. It was presented to Ms. Huang that if she agreed to that plea and had her client agree, then the District Attorney would present the deal to the victim's family. There was further testimony from Judge Jacobson, that when an offer was done in this fashion and a client is signed up for a deal, the deal is not withdrawn. The testimony of Mr. Moore corroborated the testimony of Judge Jacobson about this plea bargaining procedure used in Alameda County. Judge Jacobson testified that Ms. Huang indicated Petitioner would only plead for a promise of straight probation. This response is so unrealistic that it can only indicate that Ms. Huang was not responding in good faith to the offer because she had no intention of attempting to negotiate a disposition to the case. Both Judge Jacobson and Deputy District Attorney Allison Danzig testified that during all of the pre-trial hearings in chambers that Ms. Huang sat looking down at her lap and refused to engage in any dialogue. Ms. Danzig testified that Judge Jacobson continually tried to engage Ms.

28

Huang and to get her to begin talking about the case, to no avail. Judge Jacobson also testified that on November 20, 2009, he was so concerned that Ms. Huang was not communicating offers to Petitioner that he did so in open court to ensure Petitioner was aware of the offer.

Petitioner's Exhibits "U" and "F" also indicate that the District Attorney's Office was willing to negotiate in Petitioner's case and was offering voluntary manslaughter. Exhibit "U" is a copy of the "Blue Card" used by the District Attorney's Office in pretrial discussions. Under the "Offers" section it states, "we would have resolved this case to a Vol + Use, but defense counsel Yolanda Huang refused to negotiate. Huang insisted this was a justifiable/excusable homicide, and refused to engage in any meaningful discussion re resolution. Reviewed 6/9/09 DANZIG."

Ms. Danzig further testified that in this case an offer by Petitioner to plead to voluntary manslaughter was something that would not be considered laughable, but would be given serious consideration by the District Attorney's Office.

In Exhibit "F" which is a transcript from a pre-trial hearing held on November 20, 2009, Ms. Campbell, made a statement, on the record, which in context with the "Blue Card" and the testimony from the evidentiary hearing, indicates that as of that date the District Attorney's Office was still willing to entertain a serious, good faith offer to resolve Petitioner's case for a determinate rather than indeterminate sentence. Judge Jacobson also again tried to engage Ms. Huang with regards to plea negotiations. However, again there was no meaningful response from Ms. Huang. It should be noted that when these discussions were taking place, in chambers and in open court, Ms. Huang had already taken the following actions: she had Mr. Russell sign the Waiver of Conflict Agreement and had talked to Mr. Russell about being a plaintiff for the civil case against the Inter-Fraternity Council; she had Petitioner sign the Waiver of Conflict Agreement; she had talked to Paul Ghysel about another civil suit against the Inter-Fraternity Council; she had solicited assistance from Ms. Siskind to work on both the

29

Petitioner's case and the Paul Ghysel suit; and she had been warned by attorney Ms. Young that having Mr. Russell as a plaintiff in the civil suit and a defense witness at the same time was a conflict of interest.

Based on Ms. Huang's total unwillingness to enter into any good faith discussions, the existence of her actual conflict of the certainly would have raised a troubling issue for Judge Jacobson and the deputy district attorney's working on the case. It is eminently reasonable to assume and infer that had his conflict been revealed it would have helped explain Ms. Huang's conduct in refusing to negotiate a plea offer in good faith. Had this information been known by Judge Jacobson, combined with his distrust of representations made by Ms. Huang based on her past conduct on this case,[4] it is most definite Judge Jacobson would have held a full and complete hearing into Ms. Huang's actions and her continued representation of Petitioner.

In addition to the fact that the evidence shows that the District Attorney's Office was willing to negotiate Petitioner's case for a plea to a voluntary manslaughter and a sentence of 12 years in state prison, there is also ample evidence that demonstrates that Petitioner would have accepted such an offer. As early as July 8, 2008,[5] Petitioner wrote, "I was thinking today I don't want to take my case to trial...I just don't want to take my case to trial and get smoked...but I just want to let you know if a good deal is offered I'm taking it...I don't want to lose my case in trial and get 25 years or life its like a 50/50 chance I'm take with my life. If they said five years I'm taking it...I'm not taking a deal no time soon, so I still might change my mine but I just have to be real with you mom with what I have been thinking today. I look at the good side I will be out when I'm 28, 27 so I have light at the end of the tunnel."

---

[4]    See Petitioner's Exhibit W, and Judge Jacobson's testimony in the evidentiary hearing.
[5]    See Petitioner's Exhibit R.

In a phone conversation between Petitioner and Ms. Young there is a discussion about a plea negotiation.[6] It is interesting to note that in this conversation Petitioner talks about the "open plea" offered by Judge Jacobson. It can be reasonably inferred from this that Ms. Huang communicated an "offer" to Petitioner that was never made by the District Attorney or Judge Jacobson. One can only speculate Ms. Huang's motivation for doing this, but again a reasonable inference would be that her motivation was not the best interests of Petitioner. In the conversation with Ms. Young Petitioner states, "I haven't seen nobody get anything here except life. I see people going from the cell to the hole-that's it;" "Petitioner stated he had seen this happen, "six or seven times." He further indicates, "I just want the best deal possible...Yeah. Now that's what she told me like the very first time but I said I'm-I'm not taking the deal. I said, I'm not taking it. And then they offered it again the last I wen-when I went to court this time. And I just got to thinking, you know, Yolanda been told me. She said, 'I can get you like ten' And I'm thinking we can do a little better if we can get like-at least like eight or some -somewhere close to that. And my mom and dad ain't feeling it at all. I just talked to them today. They're like 'No you should go to trial, (this statement by Petitioner corroborates the testimony by Petitioner's mother that she and her ex-husband went to the jail at Ms. Huang's request to talk Petitioner out of taking a deal). But I'm like, I don't want to-this-Alameda County is you know, it's not joke. They're playing for keeps... I am going to try to get the best deal possible...I'm like, you know, I'm at that point where I-I just –I need-I need a out date. I need a light at the end of my tunnel. I don't want to gamble with this." It is apparent that Petitioner did not want to take his case to trial. He sought advice and counsel about how to get the best deal. The unfortunate reality was that his attorney, Ms. Huang was not interested in resolving his case by way of negotiated plea. Nor was she interested in presenting Petitioner with the true picture of his

---

[6]     See Respondent's Exhibit 1 and 1A.

31

situation to assist and enable him to make an informed decision to accept the offered negotiated plea.

In the phone call with Bill Harris there is again talk of an open plea.[7] That the highest sentence Petitioner could get was 12 years and he did not want 12 years. Petitioner indicates that people are getting convicted, and getting life sentences, that the District Attorney on his case has had four convictions and he doesn't want to be the fifth, (a probable reference to the statements made in open court by Judge Jacobson on November 20, 2009 when he was again trying to get Ms. Huang to engage in in plea negotiations). This conversation shows Petitioner vacillating about a plea deal, but overall Petitioner makes it clear, "I need an out date. I need light at the end of the tunnel. I don't want to gamble with this."

As the conversation goes on, it becomes clear that Petitioner does not want to go to trial. In this call Mr. Harris makes some reference of Ms. Huang's lack of experience. Petitioner responds that, "So-so but what I've been tryin to say is that I've already made my mind that I'm-I'm gonna punt and shoot for this deal and I'll-whatever yo-whatever the best I can get, that 's what I'm taking, I've already decided that's-that's what I wanna do, cause I just...I don't like the gambling aspect, too many people getting life sentences-I don't want to deal with that. I can't, you know-you know what I'm sayin, I still got-if I get out-I mean c'mon now, even 12, I still get out I'll be like 30, 29, 28, you know, I still got my whole life ahead of me, I've got another 40 years to live, you know?"

However, even more troubling in this area, is the testimony of Petitioner's mother. Ellen Hoeft-Edenfield testified prior to this case she did not know Ms. Huang. That she did know Ms. Huang's son as being a friend of her son's and the son of Ms. Young. She testified she first met Ms. Huang at the Berkeley jail the day her son was arrested. Thereafter, Ms. Huang was seen coming to the court appearances that were scheduled for Petitioner. Ms. Hoeft-Edenfield testified she

---

[7]     See Respondent's Exhibit 1 and 1A.

was aware that Ms. Huang had offered to assist the Mr. Chang who had been assigned to Petitioner's case. However Mr. Chang declined her assistance. Ms. Hoeft-Edenfield testified she told Ms. Huang she could not afford to pay her much for her representation. Ms. Huang said she would represent Petitioner for little money. Ms. Hoeft-Edenfield did not know anything about Ms. Huang but trusted her because their sons were friends. From August 13, when Ms. Huang became Petitioner's attorney of record, to May 2009, she talked with Ms. Huang once or twice per week. During these talks there was never any discussion of a negotiated disposition to the case. Ms. Hoeft-Edenfield had no idea plea negotiating was even part of the process. Ms. Huang never discussed the weaknesses of Petitioner's defense nor did she discuss the risks of going to trial. After the preliminary hearing when Petitioner was held to answer on the murder charge, Ms. Huang kept reassuring Ms. Hoeft-Edenfield that her son had a good defense and the case was definitely winnable. Again there was never any discussion about the risk of going to trial or the possibility of a negotiated plea. Ms. Hoeft-Edenfield testified that in late November 2009, she received a call from Ms. Huang. Ms. Huang said that an offer had been conveyed to Petitioner and he wanted to take the deal. Ms. Huang asked Ms. Hoeft-Edenfield and her ex-husband to go to the jail and talk Petitioner out of taking the deal. Ms. Huang told Ms. Hoeft-Edenfield that even if she messed up the trial, that the worst that could happen was that Petitioner would be convicted of voluntary manslaughter and receive a sentence of 12 years, which was the same as the offer. Ms. Hoeft-Edenfield and her ex-husband went to the jail on that Sunday. She testified that Petitioner stated he wanted the deal. He said people from the jail were coming back from court and they were all losing their cases and getting life. Ms. Hoeft-Edenfield said Petitioner was very animated and insistent on taking the deal. Ms. Hoeft-Edenfield testified she and her ex-husband told Petitioner that Ms. Huang had said that even if Ms. Huang messed up in trial the worst that would happen was he would be convicted of voluntary manslaughter. However Petitioner just kept saying he wanted the deal. Ms. Hoeft-

33

Edenfield left the jail thinking they had failed Ms. Huang and that their son was going to take the deal. It was obvious from her testimony that Ms. Hoeft-Edenfield was not very sophisticated when it came to legal matters. However her testimony was credible. It was consistent with the testimony of the other witnesses that demonstrate the level of manipulation and deceit Ms. Huang was willing to go to further her own agenda at the expense of Petitioner's right to effective, non-conflicted, competent counsel.

Ms. Huang when questioned about the various conversations she had with Petitioner's mother, testified that she did not recall the content of the conversations. She did not recall telling Ms. Hoeft-Edenfield to talk her son out of taking a plea deal. Such a convenient lack of memory simply is not credible. Ms. Huang was representing a person she had known since he was a teenager; she expressed concern for his wellbeing; it was her first murder case and first trial case in over 15 years; the District Attorney's Office and Judge Jacobson went out of their way to try to engage Ms. Huang in plea discussions. It is simply absurd to claim to have no recall of telling her client's mother to go to the jail and convince Ms. Hoeft-Edenfield not to take the deal offered by the prosecution.

Finally, Ms. Huang testified that she did not recall whether Petitioner ever told her that he was afraid to go to trial. She did not recall him saying he wanted the offer. She did not recall if Petitioner ever said he was scared of spending the rest of his life in prison. It is simply not believable that Ms. Huang would not remember these types of conversations or statements by her client.

### 2. *The Law*

As to the first prong "defense counsel must communicate accurately to a defendant the terms of any offer made by the prosecution, and inform the defendant of the consequences of rejecting it, including the maximum and minimum sentences which may be imposed in the event of a conviction. (Citations omitted.) We caution that a defense attorney's simple misjudgment as to the

strength of the prosecution's case, the chances of acquittal, or the sentence a defendant is likely to receive upon conviction, among other matters involving the exercise of counsel's judgment, will not, without more, give rise to a claim of ineffective assistance of counsel. (Citations.) Such claim 'depends as an initial matter, not on whether a court would retrospectively consider counsel's advice to be right or wrong, but on whether that advice was within the range of competence demanded of attorneys in criminal cases.' " (*Alvernaz, supra*, 2 Cal.4th at p. 937.)

" 'In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances.' " (*Hinton v. Alabama* (2014) 134 S.Ct. 1081, 1088.)

"In determining whether a defendant, with effective assistance, would have accepted the offer, pertinent factors to be considered include: whether counsel actually and accurately communicated the offer to the defendant; the advice, if any, given by counsel; the disparity between the terms of the proposed plea bargain and the probable consequences of proceeding to trial, as viewed at the time of the offer; and whether the defendant indicated he or she was amenable to negotiating a plea bargain. In this context, a defendant's self-serving statement ... [regarding whether] with competent advice he or she would have accepted a proffered plea bargain, is insufficient in and of itself to sustain the defendant's burden of proof as to prejudice, and must be corroborated independently by objective evidence. A contrary holding would lead to an unchecked flow of easily fabricated claims." (*Alvernaz, supra*, 2 Cal.4th at p. 938.)

An additional factor pertinent (although not dispositive) in determining prejudice may be the defendant's stance at trial. For example, a defendant's trial protestations, under oath, of complete innocence may detract from the credibility of a hindsight claim that a rejected plea bargain would have been accepted had a single variable (sentencing advice) been different. The reviewing court in the habeas corpus proceeding may take judicial notice of the trial proceedings, and, depending upon the circumstances of each case, a defendant's trial stance and

particular testimony may be viewed as favorable or unfavorable to his or her habeas corpus claim. (*Alvernaz, supra,* 2 Cal.4th at p. 940.)

"In addition to proving that he or she would have accepted the plea bargain, a defendant also must establish the probability that it would have been approved by the trial court. Such a requirement is indispensable to a showing of prejudice because ' "[j]udicial approval is an essential condition precedent to any plea bargain" ' negotiated by the prosecution and the defense (Citation omitted), and a plea bargain is ineffective unless and until it is approved by the court...." (*Alvernaz, supra,* 2 Cal.4th at p. 940.) The habeas court cannot presume that the trial court would have automatically accepted the proffered plea bargain. (*Alvernaz, supra,* at p. 940; see also *Lafler, supra,* 132 S. Ct. at p. 1385 ["To establish prejudice under these circumstances, a defendant must show "that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (i.e., that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed."].)

"If a plea bargain has been offered, a defendant has the right to effective assistance of counsel in considering whether to accept it. If that right is denied, prejudice can be shown if loss of the plea opportunity led to a trial resulting in a conviction on more serious charges or the imposition of a more severe sentence." (*Lafler, supra,* 132 S.Ct. at p. 1387.) A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. (*Strickland,* supra, 466 U.S. at p. 694; see also *Richardson v. Superior Court* (2008) 43 Cal.4th 1040, 1050-1051 [reasonable probability means "a reasonable chance and not merely an abstract possibility"].)

//

//

3. *Analysis*

  a.  Deficient Performance

Ms. Huang did not accurately communicate the offer to Petitioner as is required by the first prong of ineffective assistance of counsel. (See *Alvernaz, supra,* 2 Cal.4th at p. 936.) In her testimony, Ms. Huang claimed that Judge Jacobson offered an "open plea" to the charges for a sentence of between 12 and 15 years. As stipulated by counsel during the evidentiary hearing, such a plea deal is legally impossible. An open plea would have been a plea to murder. A conviction by plea to murder must result in an indeterminate life sentence of 25 years to life or 15 years to life. It is obvious Judge Jacobson would not have made such an offer. In fact Judge Jacobson testified he never made such an offer. Any reasonable competent attorney would know such a plea deal would be legally prohibited.

Further, in answering other questions about the plea bargaining process, Ms. Huang testified she had told a member of the District Attorney's Office that Petitioner was "on board" with a deal for six to eight years for voluntary manslaughter. However, Ms. Huang could not recall who she told this to or when she had made this indication, (apparently Ms. Huang took no notes of her discussions, and had nothing to review to refresh her recollection about these discussions). These sentences do not exist for voluntary manslaughter. Voluntary manslaughter carries determinate terms of three, six, or 11 years, with the use of a deadly and dangerous weapon clause, Petitioner's exposure would have been four, seven or 12 years, (unless the District Attorney struck the use clause in which case a six year sentence would be possible).

Given her lack of knowledge, to this day, as to the sentencing law of homicide, it is also reasonable to conclude that Petitioner's performance was deficient as she failed in her basic duty of researching the law. Importantly, Ms. Huang had no experience in homicide cases. She had tried, by her own admission,

at most three felony trials, all in the 1990s. Ms. Huang had just returned to practice after a seven year break from practicing law. "An attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under Strickland. (*Hinton, supra*, 134 S.Ct. at p. 1089.) Accordingly, because of her lack of experience in homicide cases, her failure to research the basic homicide sentencing law, and the fact that she repeatedly ignored the advice of her more experienced and seasoned advisors, Ms. Huang could not offer an informed opinion as to what plea should be entered in this case.

Most troubling is Ms. Huang's failure in her duty to advocate for a favorable plea bargain for Petitioner. Ms. Huang testified she had no specific recollection about any plea bargain discussions, except for her claim that Judge Jacobson offered an open plea to murder for a 12 to 15 year sentence, and her of claim that at some unknown time to some unknown prosecutor she had made an offer to have Petitioner plead to manslaughter for a six to eight year sentence. Ms. Huang's testimony as to the plea negotiations is not credible. It is readily apparent from the testimony of Judge Jacobson, Ms. Danzig, Mr. Moore, and from the exhibits,[8] that Ms. Huang refused to engage in good faith plea negotiations despite repeated attempts by the District Attorney's Office and Judge Jacobson to engage her in serious discussion about a possible negotiated disposition. Ms. Huang claimed that could not recall conversations with Petitioner regarding the plea deal. Yet in spite of these efforts, the evidence clearly shows Ms. Huang failed and refused to negotiate a plea favorable to Petitioner.

Respondent argued during closing arguments that similar to *Burt v. Titlow* (2013) 134 S.Ct. 10, although Ms. Huang may have done some unethical things in this case, it did not automatically make her ineffective. The court disagrees with Respondent that this case is similar to *Titlow*.

---

[8]     See Petitioner's Exhibit U, copy of the Blue Card, and Petitioner's Exhibit F, reporter's transcript of proceeding of November 20, 2009.

In *Titlow,* the defendant fired his attorney, who had negotiated a plea agreement where the defendant would plead guilty to manslaughter. (*Titlow, supra,* 134 S.Ct. at 13.) The defendant retained substitute counsel, withdrew the plea, and went to trial on a claim of innocence. (*Id.* at pp. 13-14.) After he was convicted of second-degree murder, he appealed his conviction based on his claim that second counsel's inadequate advice about the withdrawal of the guilty plea. (*Id.* at 14.) The Michigan Court of Appeal rejected the claim finding that the attorney "acted reasonably in light of his client's innocence …[, given that defendant's] decision to hire [the new attorney] was set in motion by [her post-guilty-plea] statement to a sheriff's deputy that [defendant] did not commit the offense." (*Ibid.*) The federal district court denied defendant habeas relief. However, the Sixth Circuit reversed on two grounds, i.e., (1) the fact finding of the Michigan Court of Appeals—that the withdrawal of the plea was based on defendant's post-guilty-plea assertion of innocence—was an unreasonable factual determination in light of the record, and (2) there was no evidence that the new attorney fully informed defendant of the consequences of withdrawing the plea. (*Ibid.*)

The Supreme Court reversed the Sixth Circuit on both grounds. The Supreme Court found that the record supported the Michigan Court of Appeals factual finding that replacement counsel had advised the withdrawal of the guilty plea only after defendant proclaimed his innocence. (*Titlow, supra,* 134 S.Ct. at p. 16.)

Unlike the defendant in *Titlow,* Petitioner had not proclaimed his innocence. Petitioner has presented credible evidence to the contrary- that he was willing to take a deal and was afraid of going to trial. Further, the record and evidence reveals that this is one of those rare cases in which the prosecution was willing to entertain a plea deal on a murder case. Consequently, Ms. Huang was under a duty as Petitioner's advocate to engage in plea negotiations on Petitioner's behalf.

In sum, Petitioner has proved that Ms. Huang's representation of Petitioner was deficient under the circumstances.

b. Prejudice

This is not a case where Petitioner is claiming prejudice on his own self-serving testimony. Instead, he presented corroborating independent evidence to prove his suffered prejudice from Ms. Huang's deficient performance.

It is clear from the evidence presented to this court that as early as the preliminary hearing stage, the District Attorney's Office was willing to offer a plea deal to voluntary manslaughter plus use of a knife for a determinate sentence. It is equally clear from evidence that Petitioner was willing to take a plea deal as early as July 2008.[9] The evidence has established that as late as November 2009, the District Attorney's Office and Petitioner were both willing to negotiate a plea bargain. From the two phone calls between Petitioner and Mr. Harris and Ms. Young, it is readily apparent that Petitioner was willing to take a plea deal, and for a determinative term of 12 years if that is the best offer he could get. The comments by Ms. Campbell at the hearing held on November 20, 2009, also evidences the District Attorney's office willing to resolve the case by a plea deal to a determinative prison sentence. However, instead of advocating for the best plea bargain for Petitioner, Ms. Huang actively sought to dissuade Petitioner by using his own parents to discourage him from seeking a plea deal. Another important factor for the court to consider is whether Petitioner ever professed complete innocence under oath at the time of trial. (See *Alvernaz, supra*, 2 Cal.4th at p. 940.) As discussed *ante,* Petitioner never claimed innocence under oath at pre-trial or during trial, or in the statements made in the jail calls. Furthermore, based on the evidence presented, this court finds that there were no intervening circumstances that would have caused the prosecution to not offer a plea to a voluntary manslaughter plus the use of the knife for a determinative term of 12

---

[9]     See Petitioner's Exhibit R, letter from Petitioner to Ms. Hoeft-Edenfield.

years. Petitioner has established that there is a reasonable probability that, but for Ms. Huang's deficient performance, he would have accepted the offer. (*Alvernaz, supra*, 2 Cal.4th at p. 937; *Lafler, supra*, 132 S. Ct. at p. 1385.)

Finally, Petitioner has also established based on Judge Jacobson's testimony, that the trial court would have approved a plea bargain for voluntary manslaughter plus use of a knife for a determinative term of 12 years. (*Alvernaz, supra*, 2 Cal.4th at p. 937; *Lafler, supra*, 132 S. Ct. at p. 1385.) Instead, the loss of this plea opportunity caused by Ms. Huang's deficient performance led to a jury conviction of second degree murder and a finding that Petitioner used the knife in the commission of the murder and a sentence of 16 years to life. Therefore, Petitioner has proven that the offer's terms were less severe than the conviction and sentence actually imposed after trial. (*Lafler, supra*, 132 S. Ct. at p. 1385, 1387.)

In conclusion, it is obvious that, if represented by a non-conflicted, competent attorney with even a modicum of experience, that Petitioner's case would have resolved short of trial for a plea to voluntary manslaughter plus use of a deadly weapon for a determinate term of 12 years in state prison.

## B. *Ms. Huang's Rendered Ineffective Assistance of Counsel by misleading Petitioner about the Risks and Potential Consequences of Going to Trial*

Did Ms. Huang render ineffective assistance of counsel by misleading Petitioner about the risks and potential consequences of going to trial?

Yet again, the question posed by the California Supreme Court must be answered in the affirmative. The testimony and evidence again indicates that Ms. Huang actively mislead Petitioner about the risks and potential consequences of going to trial because she had no interest in resolving the case short of a trial.

//

//

//

*1.  Factual Summary and Factual Findings*

The combination of her lack of trial experience; her lack of knowledge of
the substantive law of murder, manslaughter, self-defense, imperfect self-defense,
and heat of passion; her lack of knowledge and apparent lack of interest in
learning the sentencing ranges for murder and voluntary manslaughter; her lack of
knowledge of the criminal procedures used in Alameda County; her lack of
understanding of the practices followed in the Alameda County District Attorney's
Office relating to plea negotiations; her close personal ties to Petitioner; the
conflict of interest she created by her dual representation of Petitioner and Mr.
Russell; her continued failure and refusal to accept or follow the advice of her
own, more experienced advisers, including Ms. Young, Gerald Schwartzbach and
Lois Haney; her failure to heed the statements made by Judge Jacobson in
chambers and on the record in open court; her financial interest in seeing
Petitioner's case going to trial, (in hope of an acquittal to maintain Petitioner as a
plaintiff in the civil suit and to continue to have access to County funds for
services); her activities involving the Paul Ghysel civil suit during her
representation of Petitioner; and Ms. Huang's apparent obsession with the
fraternity system of the University of California, all lead to the unquestionable
conclusion that Ms. Huang did in fact render ineffective assistance of counsel in
that she did give Petitioner inadequate, incorrect and misleading information and
advice about the risks and consequences of taking his case to trial.

As indicated earlier, Ms. Huang had either two or three felony trials prior to
accepting Petitioner's case. She had never tried a murder case. Her criminal trial
experience was virtually non-existent. She apparently "made up" an offer which
consisted of an open plea to murder with a 12 to 15 year sentencing range. She
continually discussed with her client and her advisors, and testified in the
evidentiary hearing about sentence terms that are not within the statutory
sentences for murder and voluntary manslaughter. One could at this point simply

pose the question, 'How could someone with such a lack of experience and knowledge accurately present the risks and consequences of taking a case to trial?' However, this only begins the examination of the factors involved.

As previously discussed, the actions of Ms. Huang in her involvement with Mr. Russell created an actual conflict of interest and created a financial interest for Ms. Huang in proceeding with the civil suit that was inconsistent with Petitioner's best interests. It was in Ms. Huang's financial and philosophical interests for Petitioner's case to go to trial. If Petitioner is acquitted, he remains a plaintiff in her civil suit and Ms. Huang believed she would obtain funds through a settlement or civil verdict. Obviously, if Petitioner negotiated his case, he would be dropped as a plaintiff, lessening her potential earnings from the civil suit. Also as long as Petitioner's case was pending or was being litigated, Ms. Huang was able to retain various services and bill the County for payment of these services whether they were for the criminal case or not. If the case dealt, there would no longer be access to County funds. It is reasonable to infer from these conflicts, that any advice Ms. Huang gave Petitioner about the risks of trial would be tainted by her own self interests.

However, the most telling factor in analyzing this issue is the fact that an attorney cannot give competent and accurate advice about the risks and consequences of going to trial if the attorney does not know the true risks and consequences of going to trial. It was abundantly apparent from the testimony of various witnesses at the evidentiary hearing, and the words and actions attributed to Ms. Huang, that either she did not know what the actual risks and consequences of going to trial were, or she refused to acknowledge the actual risks and concealed them from her client.

Petitioner's mother, Ms. Hoeft-Edenfield testified that Ms. Huang consistently told her that her son had a good self-defense case. She stated that she never had any discussions with Ms. Huang about the risks of having her son go to trial. When Ms. Huang talked to her and asked her and her ex-husband to go to the

43

jail to talk Petitioner out of taking a deal, Ms. Hoeft-Edenfield testified Ms. Huang repeatedly said Petitioner could not be convicted at trial. Ms. Hoeft-Edenfield further testified that Ms. Huang told her that even if she messed up the trial the worst that could happen was that Petitioner would be convicted of manslaughter.

Ms. Danzig testified that during the various pre-preliminary hearing conferences in Judge Jacobson's chambers that Ms. Huang continually asserted that Petitioner's case was a "self-defense" case and that he would never be convicted. Ms. Danzig testified that at the first conference Ms. Huang simply sat there, looking at her lap and refused to participate in any discussions. When Judge Jacobson tried to engage her in conversation her response was that her client's case was self-defense and Petitioner would never be convicted. Ms. Danzig further testified that at subsequent conferences that Ms. Huang's response to any type of discussion was that her case was winnable on the theory of self-defense and that her client would never be convicted.

Ms. Young, who is an Assistant Public Defender in San Francisco and who is part of the homicide unit, testified that based on Ms. Huang's lack of experience she was shocked that Ms. Huang was going to represent Petitioner. As previously discussed, at the Summer Solstice Party in June 2009, Ms. Young discussed at great length with Ms. Huang that there was a conflict of interest with Ms. Huang representing Petitioner in his criminal case and Mr. Russell in a civil case based on the same facts, since he was going to be a defense witness in the criminal case. Ms. Young then testified about a meeting arranged by Ms. Huang and Ms. Haney in December 2009 to discuss Petitioner's case. Four people, including Ms. Huang, who were present at the meeting, testified at the evidentiary hearing. With the exception of Ms. Huang, the testimony is consistent. Ms. Young said that during the meeting Ms. Huang's close personal relationship with Petitioner was revealed to the participants. When asked by the others how she would feel if Petitioner was convicted, Ms. Huang responded she did not think about it because she did not think she could lose. She stated that Petitioner could not be convicted of murder.

44

Ms. Young further testified that it appeared Ms. Huang did not understand the importance of Petitioner testifying at the trial if she was going to pursue a pure self-defense theory. It also appeared Ms. Huang did not fully understand the concept of self-defense.

Mr. Schwartzbach has been an attorney since 1969. He has practiced primarily criminal defense during that time. He has represented various high profile defendants in a number of homicide cases. He was also present at the December 2009 meeting. After being briefed on the facts of Petitioner's case Mr. Schwartzbach was of the opinion that it was a defensible case on the theory of self-defense if Petition testified. He further testified he told Ms. Huang that if petitioner did not testify or if he did not testify credibly, he would likely be convicted of murder. Ms. Huang's response was that Petitioner was a nice person, but not very intelligent, and would be easily lead if he testified. Mr. Schwartzbach then told Ms. Huang that if she was not going to have Petitioner testify, she should take the District Attorney's offer to resolve the case. He further pointed out to Ms. Huang that just because the District Attorney Office had discussed a disposition to a voluntary manslaughter, that once the case went to trial the District Attorney's Office would be seeking a murder conviction (this comment came in response to the memo drafted by Ms. Huang for this meeting, Petitioner's Exhibit I). Mr. Schwartzbach testified that at the meeting he learned of Ms. Huang's close relationship with Petitioner. He advised her that based on that relationship she should not be his attorney. The closeness would compromise her ability to perform and exercise objective judgment regarding on how to proceed with the case. When asked how she would feel if she lost the case, Ms. Huang responded that Petitioner could not be convicted of murder.

Ms. Haney has been a jury consultant since 1979. She assisted Ms. Huang in organizing the December meeting. Ms. Haney testified that on November 19, 2009, she went with Ms. Huang to the Glen Dyer County Jail to visit Petitioner. She said during that visit Petitioner appeared nervous about going to trial.

Petitioner questioned Ms. Huang whether he had to go to trial and whether there were other options. Ms. Huang responded it might be possible to resolve the case but that the worst that could happen after a trial was a manslaughter conviction. Ms. Haney's testimony about what was discussed at the December 2009 meeting was consistent with the testimony of Ms. Young and Mr. Schwartzbach, including the discussion about Ms. Huang's close relationship to Petitioner and the importance of Petitioner testifying for a self-defense defense to be viable. She further testified about the memo Ms. Huang had drafted for the meeting.[10] Under the section titled "Issues" Ms. Huang wrote: "1. Accident & Self defense vs. DA's goal of Voluntary Manslaughter." Ms. Haney testified that Ms. Huang appeared to believe that since the District Attorney had discussed a negotiated plea to a voluntary manslaughter that that would be their goal if the case went to trial. All the other parties at the meeting, Ms. Young, Mr. Schwartzbach and Ms. Haney told Ms. Huang that if the case went to trial the District Attorney would be seeking a murder conviction, not a manslaughter conviction. All these witnesses expressed the belief that Ms. Huang did not seem to understand or comprehend that fact.

Mr. Moore is a Senior District Attorney. He has been a Deputy District Attorney for 29 years. He is the supervisor of the felony trial staff in Oakland. Mr. Moore testified that beginning in July 29, 2009 and at every meeting he had with Ms. Huang thereafter, whenever there was any discussion about Petitioner's case Ms. Huang's response was always the same. She would say things like, "there's no way you can prove murder," "you can't prove an intent to kill," "you can't prove malice," "this is a self-defense case." Mr. Moore said Ms. Huang never deviated from these statements.

Throughout the evidentiary hearing, Ms. Huang consistently testified she did not recall ever telling Petitioner or Petitioner's mother that the worst that could happen after a trial would be Petitioner would be convicted of voluntary

---

[10]   See Petitioner's Exhibit I, Memo entitled "Confidential Memo."

manslaughter with a sentence of 12 years state prison. She also did not recall ever
telling Petitioner, Petitioner's mother or her advisors that if she "messed up" the
trial the worst that would happen would be a conviction for voluntary
manslaughter. When Ms. Huang testified about the December 2009 meeting, she
began by stating that she had no recollection about the subject matter of the
meeting. She had no recollection of Mr. Schwartzbach telling her it was dangerous
for her to be representing someone she was close to. She had no recollection of
being asked how she would feel if Petitioner was convicted. She did not remember
stating that she did not consider Petitioner being convicted because she believed it
would not happen. She did not recall the discussion about Petitioner having to
testify for the self-defense theory having a chance to succeed. She did not recall
Mr. Schwartzbach telling her if Petitioner did not testify or testify credibly he in
all likelihood would be convicted of murder. She did not recall Mr. Schwartzbach
telling her if defendant was not going to testify then she should resolve the case
with a negotiated plea. She testified that the place on Petitioner's Exhibit I that
indicated the, "DA's goal of Voluntary manslaughter," was a typo error or
mistake. Ms. Huang further testified she had no notes of this meeting. Again the
court, having heard this testimony and observed Ms. Huang while testifying, finds
that this was yet another example of Ms. Huang's selective memory and that her
failure of recollection was untrue. It is simply not believable that she would have
no memory and/or no notes from a key strategy meeting that she set up, with
advisors she helped recruit and which centered around a memo she drafted. This
was her first murder case. The case involved a client she knew since his teenage
years. The facts of the case led to two civil suits in which she was centrally
involved. The issues of her relationship to Petitioner and her belief that the District
Attorney was only seeking a manslaughter conviction after trial were the main
items discussed in the December 2009 meeting. It is just not reasonable, nor
credible that she would have no memory at all about any of these events or topics.

47

However, in a rare moment of candor, Ms. Huang did testify that she did not paint a realistic picture for Petitioner of the risks of going to trial. That she herself did not have a realistic enough view of the risks due to this being her first murder case and lack of trial experience. That in the meeting with Petitioner and Ms. Haney she had told Petitioner he should not take the 12 year offer because he would never be convicted of anything more than voluntary manslaughter and the 12 years was the worst he could get after trial.

Thus, Ms. Huang repeatedly expressed her belief to others that Petitioner could not be convicted of murder. She believed his case was defensible on a self-defense theory. She repeatedly told Petitioner's mother, Ms. Young, Mr. Schwartzbach, Ms. Haney that the worst case scenario would be a conviction of voluntary manslaughter after trial with a 12 year state prison sentence. She wrote the memo for the December 2009 meeting expressing her belief that the District Attorney would be seeking a conviction for voluntary manslaughter if the case went to trial. More importantly she repeatedly told Petitioner not to accept a negotiated plea disposition because the worst consequences he would face after trial was a 12 year sentence for a conviction of voluntary manslaughter. Thus, according to Ms. Huang, there were no risks to Petitioner for going to trial because he would end up with the same result as a plea to voluntary manslaughter for a 12 year sentence.

### 2. *The Law*

"The crucial decision to reject a proffered plea bargain and proceed to trial should not be made by a defendant encumbered 'with a grave misconception as to the very nature of the proceeding and possible consequences.'" (*Alvernaz, supra*, 2 Cal.4th at p. 936.)

"Before entering his plea, petitioner was 'entitled to rely upon his counsel to make an independent examination of the facts, circumstances, pleadings and

48

laws involved and then to offer his informed opinion as to what plea should be entered.' (Citation omitted.) The attorney's role in investigating the facts and researching the applicable law prior to advising the petitioner to plead becomes particularly important because of the serious consequences of a guilty plea." (*In re Williams* (1969) 1 Cal.3d. 168, 175; see also *People v. Stanworth* (1974) 11 Cal.3d 588, 611- 612.)

"Most criminal defendants are faced with the crucial decision whether to plead guilty pursuant to a plea bargain or instead proceed to trial. Although this decision ultimately is one made by the defendant, it is the attorney, not the client, who is particularly qualified to make an informed evaluation of a proffered plea bargain. The defendant can be expected to rely on counsel's independent evaluation of the charges, applicable law, and evidence, and of the risks and probable outcome of trial. (*Alvernaz, supra*, 2 Cal.4th at p. 933.)

3.   *Analysis*

a.   Deficient Performance

Ms. Huang again failed in her duty to properly counsel Petitioner, after examining and independently investigating the facts, and researching the law, of the risks and potential consequences of going to trial.  (See *Williams, supra*, 1 Cal.3d. at p. 175; see also *Stanworth, supra*, 11 Cal.3d at pp. 611-612 and *Alvernaz, supra*, 2 Cal.4th at p. 936.) Ms. Huang's failure is egregious because here the failure is not one of omission, but one of actively misleading her client because of her striking lack of experience, lack of knowledge of criminal law and procedure, and the actual conflict of interest that she created.

During closing arguments, Respondent again citing *Titlow, supra*, 134 S.Ct. 10, highlighted the presumption that counsel has rendered adequate assistance and made decisions in the exercise of reasonable professional judgment. The Supreme Court in *Titlow* found that the Sixth Circuit had turned the presumption of

49

effectiveness on its head when it found that "the record in this case contains no evidence that" he gave constitutionally adequate advice on whether to withdraw the plea. (*Id.* at p. 17.) Instead, the Supreme Court found that because there was no evidence that counsel failed to give material advice, defendant had not established that counsel's performance was deficient. (*Ibid.*) Here, unlike the defendant in *Titlow*, Petitioner has presented independent evidence that Ms. Huang actively mislead him about the risk and potential consequences of going to trial, before deciding to take his chances in trial. Therefore, Petitioner has overcome the presumption of effective performance.

On November 19, 2009, according to the testimony of Ms. Haney, Ms. Huang herself told Petitioner that although there was an option to resolve the case, the worse that could happen after trial is that he would be convicted of manslaughter.

From the beginning of her representation of Petitioner, Ms. Huang told Ms. Hoeft-Edenfield that Petitioner had a good self-defense case. Ms. Huang's representations about Petitioner's case to Ms. Hoeft-Edenfield became more troublesome after Petitioner wanted to reach a plea bargain following the court appearance of November 20, 2009. Ms. Huang asked Ms. Hoeft-Edenfield to talk Petitioner out of taking a plea deal, telling her that the worse that Petitioner would get if he proceeded to trial was voluntary manslaughter and a 12 year sentence, which was what the prosecution was offering. Furthermore, it is apparent from the testimony of Ms. Young and Mr. Schwartzbach that Ms. Huang did not fully understand the concept of self-defense and the importance of Petitioner testifying.

Ms. Huang's ill-founded belief, as evidenced in the memo she drafted for the December 2009 meeting [11] and discussions with the various District Attorney's on the case, was that the District Attorney was going for a conviction of voluntary manslaughter. Despite Ms. Huang's erroneous conclusion that the District

---

[11]     See Petitioner's Exhibit I.

Attorney's Office would only seek a voluntary manslaughter conviction, she was told otherwise by the more seasoned attorneys and consultant that were advising her. Ms. Young, Mr. Schwartzbach, and Ms. Haney all told Ms. Huang that if the case went to trial, the District Attorney would be seeking a murder conviction, and not just manslaughter. At the December 2009 meeting, Mr. Schwartzbach made it clear to Ms. Huang that without the testimony of Petitioner or if Petitioner did not testify credibly at trial, that a murder conviction was likely based on the facts.

It is reasonable to infer from the totality of all the testimony and exhibits that Ms. Huang ignored the advice of her advisors when she met with Petitioner after the December 2009 meeting. She did not tell Petitioner that if he took the case to trial was that he could get convicted of murder. Instead, it is reasonable to infer that she continued to mislead Petitioner into thinking that the worst possible consequence of going to trial is that he would get a voluntary manslaughter conviction for the same 12 year prison sentence that the District Attorney was willing to offer.

This is not a case in which the court is retrospectively determining whether Ms. Huang's advice was right or wrong. (*Alvernaz, supra,* 2 Cal.4th at p. 937.) As required, this court has made every effort to "eliminate the distorting effects of hindsight," has "reconstructed the circumstances of [Ms. Huang's] challenged conduct," and has evaluated "the conduct from [Ms. Huang's] perspective at the time. (*Strickland, supra,* 466 U.S. at p. 689.) Given the facts of the case; the fact of Ms. Huang's lack of experience in criminal law and apparent lack of understanding of the law of homicide and self-defense; the fact that the District Attorney's Office was willing to negotiate a deal in a homicide case, which it seldom does; the fact that Ms. Huang ignored the advice of her more seasoned advisors, Ms. Huang's advice was not within the range of competence demanded of attorneys in criminal cases. (*Alvernaz, supra,* 2 Cal.4th at p. 937.) This is not a case of "a defense attorney's simple misjudgment as to the strength of the

prosecution's case, the chances of acquittal, or the sentence a defendant is likely to receive upon conviction." (*Alvernaz, supra,* at p. 937.)

In short, she misled Petitioner about the risks and potential consequences of going to trial, and thus failed in her duty to properly counsel Petitioner in this regard.

    b.  Prejudice

As discussed *ante,* Petitioner has established the following by independent evidence: (1) that throughout the pendency of his case and up to trial, he was willing to take a plea deal and would have taken the voluntary manslaughter with use clause for a determinative term of 12 years if that is the best offer; (2) that the District Attorney's Office throughout the pendency of the case and up to trial was also willing to take a plea deal for the voluntary manslaughter with use clause for a determinative term of 12 years; and (3) that the trial court would have approved of such plea bargain given the facts of the case.

It is readily apparent that Ms. Huang by not only failing to engage in plea negotiations as was her duty, but also in actively misleading Petitioner as to the risk and potential consequences of going to trial, convinced Petitioner that there was nothing to lose by going to trial. Instead, of being convicted of voluntary manslaughter as Ms. Huang told him, he was convicted of second degree murder.

Thus, Petitioner has established that Ms. Huang's deficient performance subjected him to prejudice, i.e., there is a reasonable probability that, but for Ms. Huang misleading Petitioner about the risks and potential consequences of trial, the result would have been more favorable to Petitioner as he would have pled to a voluntary manslaughter with use of a knife plea for the determinative term of 12 years instead of being convicted of second degree murder with use for a 15 years to life in prison term after a jury trial. (*Alvernaz, supra,* 2 Cal.4th at p. 936.)

//

//

52

B-52

C. *__Remedy__*

The U.S Supreme Court discussed the remedy and left the boundaries open
and to be defined by the decisions of state and federal courts: "Sixth Amendment
remedies should be 'tailored to the injury suffered from the constitutional violation
and should not unnecessarily infringe on competing interests.' " (*Lafler, supra,*132
S.Ct. at p. 1388.) "The specific injury suffered by defendants who decline a plea
offer as a result of ineffective assistance of counsel and then receive a greater
sentence as a result of trial can come in at least one of two forms. In some cases,
the sole advantage a defendant would have received under the plea is a lesser
sentence. This is typically the case when the charges that would have been
admitted as part of the plea bargain are the same as the charges the defendant was
convicted of after trial. In this situation the court may conduct an evidentiary
hearing to determine whether the defendant has shown a reasonable probability
that but for counsel's errors he would have accepted the plea. If the showing is
made, the court may exercise discretion in determining whether the defendant
should receive the term of imprisonment the government offered in the plea, the
sentence he received at trial, or something in between. [¶]  In some situations it
may be that resentencing alone will not be full redress for the constitutional injury.
If, for example, an offer was for a guilty plea to a count or counts less serious than
the ones for which a defendant was convicted after trial, or if a mandatory
sentence confines a judge's sentencing discretion after trial, a resentencing based
on the conviction at trial may not suffice." (*Lafler, supra,*132 S.Ct. at pp. 1388-
1389.)

"In implementing a remedy in both of these situations, the trial court must
weigh various factors; and the boundaries of proper discretion need not be defined
here. Principles elaborated over time in decisions of state and federal courts, and
in statutes and rules, will serve to give more complete guidance as to the factors
that should bear upon the exercise of the judge's discretion." (*Lafler, supra,*132

B-53

S.Ct. at pp. 1388-1389.) "Today's decision leaves open to the trial court how best to exercise that discretion in all the circumstances of the case." (*Id.* at p. 1391.)

The California Supreme Court has already provided guidelines for trial courts on the remedy for this situation. "[W]here ineffective assistance of counsel causes a defendant to reject the offer of a plea bargain, the remedy of specific enforcement of the plea offer following trial and conviction is neither constitutionally compelled nor consistent with the exercise of the trial court's broad discretion in determining the appropriate sentence for a defendant's criminal conduct. [¶] Moreover, mandatory reinstatement of the prosecution's offer of a plea bargain, although subject to court approval, would be inconsistent with the legitimate exercise of the prosecutorial discretion involved in the negotiation and withdrawal of offered plea bargains. Following a fair trial and conviction, the prosecutor may well view the case in a different perspective and determine that the sentencing contemplated in the pretrial plea offer no longer is consistent with the public interest. Given the changed complexion of the case after trial and conviction, the prosecutor should not be locked into the proposed pretrial disposition, appropriate as it may have been at the time." (*Alvernaz, supra*, 2 Cal.4th at p. 943.)

"We conclude that neither specifically enforcing the offered plea bargain, nor compelling the prosecutor to reinstate the offer, is the appropriate remedy for a constitutional deprivation of the type allegedly suffered by petitioner. [¶] Instead, we hold that the appropriate remedy for ineffective assistance of counsel that has resulted in a defendant's decision to reject an offered plea bargain (and to proceed to trial) is as follows: After the granting of relief by the trial court (on a motion for new trial or in a habeas corpus proceeding) or by an appellate court, the district attorney shall submit the previously offered plea bargain to the trial court for its approval, unless the district attorney within 30 days elects to retry the defendant and resume the plea negotiation process. If the plea bargain is submitted to and

54

approved by the trial court, the judgment shall be modified consistent with the terms of the plea bargain." (*Alvernaz, supra*, 2 Cal.4th at p. 944.)

Therefore, the court vacates the judgment, and remands the matter to the Executive Criminal Judge in Department 11 to set a new trial and "to resume the plea negotiation process," unless the District Attorney's Office within 30 days elects to submit the contemplated offer of voluntary manslaughter with use of a knife for a determinative term of 12 years. (*Alvernaz, supra*, 2 Cal.4th at p. 944.)

## IV.   DISPOSITION

The Petition is granted. The judgment of conviction is vacated and the matter is remanded to the Executive Criminal Judge in Department 11 to set a new trial and "to resume the plea negotiation process," unless the District Attorney's Office within 30 days elects to submit the contemplated offer of voluntary manslaughter with use of a knife for a determinative term of 12 years. This order is final in this court 30 days after it is filed.

Pursuant to Business and Professions[12] Code section 6086.7, this court is required to report the reversal of a judgment on the ground of ineffectiveness of counsel to the State Bar of California for investigation of the appropriateness of initiating disciplinary action against trial counsel. (See *In re Sixto* (1989) 48 Cal.3d 1247, 1265, fn. 3; *People v. Singer* (1990) 226 Cal.App.3d 23, 48; see also California Rules of Court rule 10.609; and canon 3D(2) of the California Code of Judicial Ethics.) The court herein has ordered the judgment be vacated based on three separate claims of ineffectiveness of counsel, which essentially is the same as reversing the judgment.

Further, pursuant to section 6086.7, subdivision (a)(2), and California Rules of Court rule 10.609 (a), rule copy of this opinion will be sent to the State Bar for such disciplinary action, if any, it may deem appropriate, once the remittitur

---

[12]   All further references are to the Business and Professions Code unless otherwise indicated.

issues. Further, once the remittitur issues, the clerk shall also serve a certified copy of this order upon Ms. Huang, which will served as notification to Ms. Huang that the matter has been referred to the State Bar in compliance with the notice requirements of section 6086.7, subdivision (b), and California Rules of Court rule 10.609(c).

IT IS SO ORDERED.

DATED: _April 29, 2014_

_____
HON. LARRY J. GOODMAN
JUDGE OF THE SUPERIOR COURT

56

B-56