**LAW OFFICE OF YOLANDA HUANG**
Yolanda Huang, SBN 104543
PO Box 5475
Oakland, CA 94605
Telephone: (510) 329-2140
Facsimile: (510) 580-9410
Email: yhuang.law@gmail.com

**GREENFIRE LAW, PC**
Rachel Doughty, SBN 255904
Richard Brody, SBN 100379
P.O. Box 9055
Berkeley, CA 94707
Telephone: (510) 900-9502
Facsimile: (510) 900-9502
Email: rdoughty@greenfirelaw.com
rbrody@greenfirelaw.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO/OAKLAND DIVISION

| | |
|---|---|
| MONTRAIL BRACKENS, et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>CITY AND COUNTY OF SAN FRANCISCO,<br>Defendant. | Case No.: 3:19-cv-02724 SK<br><br>**PLAINTIFFS' OPPOSITION AND OBJECTIONS TO DEFENDANTS' PROPOSAL (ECF 501) FOR COMPLIANCE WITH THE COURT'S POST TRIAL ORDER (ECF478)**<br><br>TIME:           9:30 A.M.<br>COURTROOM:   COURTROOM C<br>                     15TH FLOOR<br>                     450 Golden Gate Ave.,<br>                     San Francisco, CA 94102<br><br>TRIAL DATE:   August 8, 2023<br><br>Hon. Sallie Kim, presiding |

## I. SUMMARY

The proposal by Defendant San Francisco will not result in an appropriate remedy that is consistent with the order of this Court following trial (ECF 494, "ORDER"). San Francisco has ignored physics and its own admitted scheduling barriers. The proposed grated openings in each gym are perpendicular to the ground and face a single fixed direction. As anyone who has ever watched the shadows move across a room during the course of a day knows, the sun constantly moves and changes its position across the sky, and the angle of the sun varies by season. Thus, the amount of sunlight--and where it shines in each gym on a given day, if at all--depends upon: the facing direction of each gym's single wall grated openings, the season, the time of day inmates are allowed to access the gym, how occluded the light is by the covering for the opening. And all of this assumes that each detainee will understand the need for and be able to stand for 15 minutes in the parabola of any light that does enter. And that ability to stand in the rays of whatever sunlight enters the gym will also depend on how willingly others yield the exercise space.

In short, San Francisco's plan is not reasonably calculated to comply with the Court's order because it would require constant monitoring and schedule adjustment to work, and it will likely interfere with the detainees' right to exercise. Further, holes high on a wall are inconsistent with community standards of decency which call for actual outdoor access to direct sunlight. At the end of the day, it remains true that "Defendant provides no real reason why it cannot build an exercise yard for outdoor exercise that would allow inmates access to direct sunlight." ORDER, ECF 478, at p. 59:3-4. Plaintiffs respectfully request that this Court send Defendant back to the drawing board with specific instruction to offer each inmate who has been incarcerated for longer than a year the following: daily access to direct sunlight <u>in the out of doors</u>, weather permitting and in the absence of an emergency (including but not limited to a global pandemic or prison riot) for at least 15 minutes.

## II. STATEMENT OF FACTS

The only evidence in the record regarding light entering any gym at CJ3 is from Dr. Zeitzer, who stated that the light entering the gyms was indirect. (Transcript, p. 474:3-5). San Francisco's proposal is not accompanied with any light readings within any gym at CJ3. It is

accompanied only by photographs with no indication of the date, time of day, or conditions when taken (e.g., whether any artificial light was used or the duration, size, and location of any direct sunlight entry to any gym). *See* Berdux Declaration, ECF 494-5.

Each tier of each pod houses up to 24 inmates. Each pod has two tiers, and all inmates are served by the one gym on that floor of the pod. *See* ORDER, pp. 3, 6. While the Court found that the windows in the gyms allow entry of natural light, it did not find that they expose humans standing in or moving about in the gym to direct sunlight. ORDER, p. 6:20-21.

A multitude of factors determine if and how much sunlight can enter a hole in a vertical wall. *See* Declaration of Charles Czeisler, filed herewith ("Czeisler Decl."), ¶¶ 4-17, 19-25. Time matters. The earth rotates around the sun in an elliptical orbit. So that at any point on earth, sunlight's direction changes moment to moment. *See* Czeisler Decl., ¶29. The momentary directionality is termed **solar hour angle**, expressed in angular measurement, usually degrees, from the solar noon. So, at any particular location, including the gyms at CJ3, the direction of sunlight at 10 am, is not the same as the direction of sunlight at 2 pm. *See* Decl. of Yolanda Huang, filed herewith, Ex. A thru D.

Season also matters. The angle of the sun to the plane of the earth's surface at any particular point on earth is affected by the tilt of the earth on its axis. This tilt alters the angle of sunlight reaching the earth, so that at latitudes other than the equator, the angle of the sun to the plane of the earth varies between the summer and winter equinox on a significant basis. San Bruno, California is at 37.630489 N.[1] Using the National Oceanic and Atmospheric Administration's ("NOAA") calculation of the **solar altitude angle**, the sun's declination on the Winter Solstice for San Francisco[2] in 2023 was -23.44°, will be -0.67° on the Spring Equinox, and +23.47° on the Summer Solstice in 2024. This represents a significant variation in the six month period. *See* Huang Decl., Ex. A thru C; Czeisler Decl. ¶¶ 21, 24.

Direction matters. Dr. Charles Czeisler, in his declaration, carefully and in detail, shows how at any particular moment, a number of the exterior gym walls where the windows are located

---

[1] https://www.latlong.net/
[2] San Francisco's latitude (37.774929; https://www.latlong.net/) is only 13 minutes further north

are either blocked from receiving direct sunlight either from the position of the sun, or from other obstructions, such as buildings, or do not receive any direct sunlight. Czeisler Decl. ¶¶ 4-17, 19-25. Exhibits 1 and 2 attached to the Declaration of Dr. Czeisler show shadowing on a February morning and a September afternoon, respectively. *See* Czeisler Decl. ¶¶ 8,9. At each time over half the windows are blocked from sun. *See* Czeisler Decl. ¶¶ 8, 9. Exhibit 3 to the Declaration of Dr. Czeisler shows shadowing near solar noon in June--close to the summer solstice. *See* Czeisler Decl. ¶ 3. Despite full sun exposure on the roof of CJ3--there is relatively little shadowing--the position of the sun, high in the sky at midday, would result in minimal sunlight entering the gyms. *See* Czeisler Decl. ¶ 10.

Dr. Czeisler describes in detail the effect of having sunlight admitted through windows mounted in vertical walls, so that the openings are perpendicular to the ground. See Czeisler Decl. ¶ 21. For windows facing east, the sunlight would either start high on the wall above the heads of inmates and then travel down to the ground, "becoming a sliver of light on the floor of the gym …before disappearing sometime before noon." *See* Czeisler Decl. ¶ 21. For west facing windows, there would be the opposite effect. Sunlight begins as a sliver on the floor, then travels up above the heads of inmates. *See* Czeisler Decl. ¶ 21. At no time, does direct sunlight fill any of the gyms, regardless of the direction of the windows, and for much of the day, any direct sunlight would be on the wall, inaccessible to inmates for the health intentions of the ORDER. *See* Czeisler Decl. ¶¶ 22-23, 26.

Height of the windows matters. CJ3 is two stories, with housing units on both floors. ORDER, p. 3. Therefore, the location of the gym windows relative to sunlight entry on the first floor differs significantly from the location of the gym windows on the second floor of each pod. *See* Czeisler Decl. ¶¶11-16.

Dr. Czeisler, upon reviewing the proposed compliance plan from San Francisco, reached the opinion that "modified pod gyms will not comply with the Court's order to offer inmates 'daily access to direct sunlight . . . for at least 15 minutes. . .without any mediation through glass or plastic or other solid substance that blocks ultraviolet light.'" Czeisler Decl. ¶27, *see also Id*. at ¶28-32. He noted that:

> Because of the configuration of CJ3 and the pod gyms, in order for inmates to be exposed to direct sunlight on the skin, even in the minority of gyms that would have windows through which direct sunlight would pass for a few hours each day, an inmate would need to stand at a specific time of day in a specific spot within the gym. The location of that spot would vary with both the time of day and the season of the year, and the inmate would have to move slowly as the sun traversed the sky to keep that beam of direct sunlight on their skin. Moreover, if one inmate were to stand in that beam of light, the shadow from that inmate would block other inmates in the same gym from being exposed to direct sunlight on their skin. That is because of the directionality imposed by the relatively small and very high window openings in the gym walls, which occupy less than 5 percent of the total square footage of the gym walls, even before taking into account the occlusion of the grates over the windows.

Czeisler Decl. ¶29. Further, Dr. Czeisler estimates that approximately 20 percent of entering light will be occluded by the proposed grating. Czeiserl Delc. ¶25.

And, further, Dr. Czeiselr opines:

> Defendant's proposal is grossly inefficient and difficult to manage compared to providing each inmate with 15 minutes of access to direct sunlight in an outdoor yard. The indoor plan would require Defendant to account for the narrowness of the beams of direct sunlight that could come through the high vertical windows on the walls of the gyms, the potential blocking of a given beam of direct sunlight by another inmate seeking such exposure, and the complexity of the algorithm required to identify in which gyms and where in each gym direct beams of sunlight would be located on a given date and time.

Czeisler Decl. ¶31.

San Francisco does not address any of the physical or logistical complexities of implementing its proposed compliance plan. But San Francisco *is* aware of the significance of the impct of the height of the windows to the availability of sunlight. *See* Declaration of Darryl Geyer ¶4.

San Francisco states that "[a]ll inmates covered by the injunction in County Jail 3 currently have access to at least 15 minutes per day in a redesigned gym." ECF 494, p. 2:2-3. No mention is made of whether this 15 minutes per day (or any greater time allowed) corresponds with the time when direct sunlight enters the gym at an accessible height, nor of any competing uses for the gym at that time (e.g., exercise or meetings, other inmates also using the gym at that time for sunlight exposure),

nor the size of the area of direct sunlight at floor level at the time they gym is made available, nor how the schedule will adjust day-by-day as the angle of the sun changes.

Current inmates testify that even on bright sunny days, they do not have access to the gym at the time that the sunlight comes into the gym (if it ever does), either because others are using the gym, or because of jail scheduling. *See* Declaration of Leonard Colville ("Colville Decl."), ¶¶4-12 (even on bright days, lighte entering gym is reflected, not direct, and only six inmates allowed in gym at a time); Declaration of Erick Garcia-Pineda ¶15 (offered the gym on sunny day, but no sun shining into gym when he was there), Declaration of Jose Alvarez, ¶5-10 (scheduling and competition for space prevents him from accessing direct sunlight), Declaration of Zuri Wilson ("Zuri Decl.") ¶ 8 (jail staffing and scheduling prevents him from accessing sunlight).

Current inmates also testify that the gym, when open, is primarily used for exercise, and if one were to stand in a ray of sunlight, this would cause conflict. *See* Colville Decl., ¶12, Alvarez Decl ¶7.

Inmates report wide variation in the amount of light entering the different housing pods. *See* Declaration of Troy McAlister ("McAlister Decl.") ¶¶4, 7. When Troy McAlister was taken to Pod 2A, which has southwest-facing windows, he was able to experience direct sunlight. *See* McAlisetr Decl. ¶4; *accord* Czeisler Decl., ¶16, Ex. 4E. But in Troy McAlister's Pod, 6B, which is on the second floor above 3B, his gym is shadowed. *See* Czeisler Decl., ¶14, Ex. 4A & 4D.

San Francisco's proposal relies upon inmates being able to access direct sunlight in a gym, during as little as 15 minutes allotted time in a gym a day. ECF 494, p. 2:2-3; Zuri Decl., ¶6, Exhibit A.

CJ3 sits on a large property with a yard, 1.5 times the size of a football field, previously used for out of door exercise. *See* Czeisler Decl. ¶32, Exh. 4A; ORDER, p. 2:13-18.

### III.   DISCUSSION

San Francisco has failed to demonstrate that allowing inmates 15 minutes a day of access to the gyms, with windowpanes removed, but security screening remaining, will provide access to direct sunlight. First, merely removing a grate on a perpendicular wall does not equate with

sunlight in the interior. Second San Francisco offered nothing regarding coordinating a gym access *schedule* with movement of the sun to ensure that access and direct sunlight overlap.

The gyms are also the only space inmates have for large muscle sports. Any sunlight which does enter the gym would be accessible only in a small area relative to the size of the gym (assuming sunlight reaches a location accessible to inmates and not, say, high on the wall). *See* Alvarez Decl. ¶7 (the space is only large enough for 3 men to stand next to the concrete wall where the sunlight shines). Inmates foreseeably would be forced to choose between engaging in exercise or standing still in (and competing for) the sunlight. *See* McAlister Decl., ¶4 ("we just gathered into the square [on the basketball court] and stood there for the 15 minutes they let us be inside the gym"), Colville Decl. ¶12 (trying to stand in sunlight will cause conflict with those using gym for exercise, likely to lead to fights, injury, and discipline).

*If* the 15 minutes, or longer, that San Francisco allows inmates to access a gym overlaps with a time when direct sunlight may enter the gym at a location that is humanly accessible, an inmate should not be forced to choose between one constitutional right and another. *Jones v. Cty. of Contra Costa*, No. C-13-2722 EMC(pr), 2014 U.S. Dist. LEXIS 23664, at *9 (N.D. Cal. Feb. 24, 2014); accord *Grizzle v. Cty. Of San Diego*, No. 17-CV-813-JLS, 2018 U.S. Dist. LEXIS 131014, at *24-25 (S.D. Cal. Aug. 3, 2018)(holding that implementing a schedule that has the consequence of forcing detainees to choose between constitutionally protected sleep and exercise violated their rights.) Since the gyms are used for exercise as well, and direct sunlight would never fill the entire gym it is unclear how San Francisco intends to ensure that it is not substituting one constitutional right for another. The declarations of current inmates suggest so far it has utterly failed to address this issue.

Defendant's latest sleight of hand underscores and recapitulates its continual refusal since the initiation of this lawsuit to comply with community standards of for conditions of confinement (*see* Request for Judicial Notice, ECF 449)--including the San Francisco Building Code (*see* Request for Judicial Notice, ECF 430), and this Court's 2020 preliminary injunction (ECF 119); and, now the Court's Judgment following trial. San Francisco's conduct in continuing its pattern and practice of depriving inmates of direct sunlight results in pre-trial inmates enduring conditions

which cause chronic health injuries to inmates. Just as this Court rejected the Sheriff's Department's initial assertion that the "occluded" views in the gym sufficed as sunlight access, this Court should reject the Sheriff's false narrative that grated wall openings in the gym are sufficient for providing the necessary direct sunlight that inmates need for basic health. *See* ECF 119.

The obvious solution, and the one most consistent with the ORDER, is to provide direct sunlight to detainees is to provide outdoor space. This Court found that:

> Defendant provides no real reason why it cannot build an exercise yard for outdoor exercise that would allow inmates access to direct sunlight. Defendant relies upon tautological reasoning: it created the problem by building a jail without a secured outdoor exercise yard and then relies upon that problem to claim that it cannot provide a secure way for inmates to have access to direct sunlight. This type of tautological reasoning does not show a rational reason for failing to provide outdoor access. Other jails and prisons in the same geographical area, such as San Quentin State Prison and other counties' jails, are able to provide outdoor exercise yards for their inmates. Defendant's arguments are similar to the ones made by the jails and prisons in *Pierce*, *Lopez v. Smith*, and *Allen v. Sakai* above. Defendants created a situation in which they cannot securely allow inmates to go outside, and they cannot hide behind that reason when the denial creates harm.
>
> Furthermore, standards in the community show that Defendant's actions are not rational and not reasonably related to a valid penological purposes. First, the California Board of State and Community Corrections ("BSCC") sets minimum standards for the physical structure within which detainees can be housed. The BSCC promulgates regulations governing these minimum standards, which are found in Title 24 of the California Code of Regulations, which is the State Building Code.18 BSCC's Building Code regulations require outdoor exercise areas for all Type II facilities. The regulation states in relevant part:
>
>> An outdoor exercise area or areas must be provided in every Type II and Type III facility. The minimum clear height must be 15 feet (4572 mm) and the minimum number of square feet of surface area will be computed by multiplying 80 percent of maximum rated population by 50 square feet (4.7 m2) and dividing the result by the number of one-hour exercise periods per day.
>
> 24 Cal. Code Regs. § 1231.2.10.
>
> Other sources also state the need for exercise outdoors. The fifth edition of Performance-Based Standards and Expected Practices for Correctional

>Institutions published in March 2021 by the American Correctional Association ("ACA"), a national association that sets forth standards used by correctional institutions across the United States, recommends: "Both outdoor and covered/enclosed exercise areas for general population inmates are provided in sufficient number to ensure that each inmate is offered at least one hour of access daily. Use of outdoor areas is preferred, but covered/enclosed areas must be available for use in inclement weather." (Dkt. No. 449-4 at 23.)19 The ACA also states: "Exercise/recreation spaces are not the same as dayrooms." (Id.) The fourth edition also contained a similar provision (Dkt. No. 449-1 at 2, 55), which the U.S. Marshals Service has adopted in its handbook.
>
>Foreign countries have also adopted a similar position. See, e.g., The Thirtieth Annual Report of the European Committee for the Prevention of Torture and Inhumane or Degrading Treatment or Punishment. That report states: "The [European Committee for the Prevention of Torture and Inhumane or Degrading Treatment or Punishment] has repeatedly emphasised [sic] that all prisoners must benefit from a minimum of access to one hour's daily outdoor exercise and/or time in the open air, and two hours in the case of juvenile inmates. This remains a fundamental right for all prisoners, including during the Covid-19 pandemic." (Dkt. No. 449-2 at 40.) Even as far back as 1992, the European Committee for the Prevention of Torture and Inhumane or Degrading Treatment or Punishment wrote in its Second Annual Report:
>
>>Specific mention should be made of outdoor exercise. The requirement that prisoners be allowed at least one hour of exercise in the open air every day is widely accepted as a basic safeguard (preferably it should form part of a broader programme [sic] of activities). The CPT wishes to emphasise [sic] that **all prisoners without exception** (including those undergoing cellular confinement as a punishment) should be offered the possibility to take outdoor exercise daily. It is also axiomatic that outdoor exercise facilities should be reasonably spacious and whenever possible offer shelter from inclement weather.
>
>(Dkt. No. 449-3 at 2-3 (emphasis in original).)

ORDER, ECF 478, pp. 59:3-61:1.

## IV. CONCLUSION

Plaintiffs request that the Court reject San Francisco's proposal. Plaintiffs request that this Court clarify that San Francisco must provide all entitled inmates a space where unimpeded sunlight is available for fifteen minutes daily—not shaded, blocked, or otherwise limited. Plaintiffs request that any space provided for sunlight access not have conflicting use and demands for that space, to the extent that detainees would be required to trade their own or the constitutional rights of others, most importantly the right to exercise. Plaintiffs submit that the most logical solution to an order requiring direct sunlight is to allow detainees daily time out of doors.

Respectfully Submitted by:

Dated: 1/30/24                              LAW OFFICE OF YOLANDA HUANG

                                    By:  */s/ Yolanda Huang*
                                         Yolanda Huang


Dated: 1/30/24                              GREENFIRE LAW, PC


                                    By:  */s/ Rachel Doughty*
                                         Rachel Doughty

                                         *ATTORNEY FOR PLAINTIFFS*