1
2
3
4
5

UNITED STATES DISTRICT COURT

6

NORTHERN DISTRICT OF CALIFORNIA

7
8

MONTRAIL BRACKENS, et al.,

Case No.  19-cv-02724-SK

9

Plaintiffs,

10

v.

**ORDER REGARDING MOTION FOR ATTORNEY'S FEES AND COSTS**

11

CITY AND COUNTY OF SAN FRANCISCO,

Regarding Docket No. 480

12
13

Defendant.

14        Before the Court is the motion for attorney's fees and costs filed by Plaintiffs Montrail

15   Brackens, Jose Poot, and Troy McAllister (hereinafter, "Plaintiffs").  Having carefully considered

16   the parties' papers, relevant legal authority, and the record in this case, the Court hereby GRANTS

17   IN PART and DENIES IN PART Plaintiffs' motion for attorney's fees and costs for the reasons

18   set forth in this order.

19        Plaintiffs seek their attorney's fees and costs as the prevailing parties in this matter, as a

20   result of obtaining a favorable judgment regarding violations of the Fourteenth Amendment,

21   pursuant to 42 U.S.C. §§ 1988(b), 1997e.  Plaintiffs are incarcerated pre-trial detainees, and as

22   such, the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e, imposes certain

23   requirements in calculation of fees and costs, discussed in greater detail below.

24                      **FACTUAL AND PROCEDURAL BACKGROUND**

25        On May 20, 2019, Plaintiffs filed a class action complaint, alleging a myriad of claims that

26   centered around two legal themes.  Plaintiffs' first theme was that Defendants San Francisco

27   Sheriff's Department, San Francisco and County of San Francisco (hereinafter, "San Francisco"),

28   Sheriff Vicki Hennessy, Chief Deputy Sheriff Paul Miyamoto, Captain Jason Jackson, and Captain

*United States District Court*
*Northern District of California*

McConnell had, collectively, a practice of confining pretrial detainees for 23.5 hours a day at County Jail 3[1] in San Bruno, California, which violated Plaintiffs' Fourteenth Amendment rights. (Dkt. No. 1, ¶¶ 9-17, 74-82.)

Plaintiffs' second legal theme was that the level and type of confinement Defendants imposed deprived them of access to exposure to direct sunlight[2], because they never went out of the jail (other than for fleeting moments when they were transported to and from court).  (Dkt. No. 478, p. 52.)  Specifically, Plaintiffs alleged harm caused by "the harmful and inhumane effects of total denial of access to sunlight and sunshine; denial even to natural daylight; and isolation from the outdoors."  (Dkt. No. 1 at ¶ 81.)  It was undisputed throughout this litigation that Plaintiffs spent all their time indoors because County Jail 3 has no outdoor exercise yard and instead has only indoor gyms.  Plaintiffs alleged that deprivation of access to direct sunlight caused them harm.  (*See* Dkt. No. 478, p. 52.)

Plaintiffs brought six causes of action against all Defendants: 1) violation of the Eighth Amendment; 2) violation of the Fourteenth Amendment; 3) violation of Article I, Section 7 of the California Constitution; 4) violation of Article I, Section 17 of the California Constitution; 5) negligence; and 6) intentional infliction of emotional distress.  (Dkt. No. 1, pp. 19-23.)  Plaintiffs prayed for injunctive relief that would require Defendants to provide Plaintiffs with four hours of time outside their cells on a daily basis, no less than one hour of daily outdoor recreation, Vitamin D testing and treatment, and mental health screening and treatment.  (*Id*. at p. 24.)  Plaintiffs also sought compensatory and punitive damages.  (*Id*.)

In June 2019, Plaintiffs filed a motion for a preliminary injunction to require Defendants to provide all prisoners in County Jail 3 "with outdoor recreation and adequate time out of their cells."  (Dkt. No. 8-1, p. 1.)  While that motion was being briefed, Defendants moved to dismiss for failure to state a claim, and individual defendants moved to dismiss the claims against them,

---

[1] At the time of the filing of the Complaint, County Jail 3 was known as County Jail 5. *Norbert v. City & Cnty. of San Francisco*, 10 F.4th 918, 926 n.2 (9th Cir. 2021).  The Court will use its current name throughout this Order.

[2] For purposes of the litigation, the Court defined "direct sunlight" as "sunlight not through a window or other surface that blocks ultraviolet light."  (Dkt. No. 478, p. 1.)

United States District Court
Northern District of California

United States District Court
Northern District of California

based on a defense of qualified immunity.  (Dkt. No. 37.)  In November 2019, the Court held a hearing on the motion for preliminary injunction and motion to dismiss.  (Dkt. No. 83.)  On January 31, 2020, following post-hearing briefing, the Court granted in part and denied in part Plaintiffs' motion for preliminary injunction and granted in part and denied in part Defendants' motion to dismiss.  (Dkt. No. 110.)  Specifically, the Court "ordered that those inmates who had been incarcerated for more than four years must be given access to 'direct sunlight' at least one hour per week." *Norbert v. City & Cnty. of San Francisco*, 10 F.4th 918, 925 (9th Cir. 2021).  The Court also ordered Defendant to provide one hour of direct sunlight, defined as sunlight "not filtered through a window," per week.  *Id.*  Regarding Defendants' motion to dismiss, the Court "dismissed with prejudice the San Francisco Sheriff's Department because it [was] not a separate entity from [Defendant San Francisco]" and "dismissed with prejudice all the individual defendants based on qualified immunity." *Id.* at 926.  This left San Francisco as the sole defendant with only the Fourteenth Amendment and state constitution claims against it.  The Court gave Plaintiffs leave to amend to attempt to cure pleading deficiencies regarding state constitutional and common law claims against the individual defendants.  (Dkt. No. 110, p. 58.)

Defendants answered (Dkt. No. 125.) and soon thereafter appealed the Court's order regarding the preliminary injunction (Dkt. No. 127); Plaintiffs cross-appealed under the theory that the Court's order on the preliminary injunction was not broad enough.  (Dkt. No. 139.)  The Court of Appeals for the Ninth Circuit affirmed in part and dismissed in part.  *Norbert*, 10 F.4th at 926.  The Ninth Circuit observed that by the time of its decision, this Court's preliminary injunction had expired and therefore dismissed Defendants' appeal as moot.  *Id.* at 927.[3] Regarding Plaintiffs' cross-appeal, the Ninth Circuit limited its inquiry to only whether this Court erred "in denying plaintiffs greater preliminary injunctive relief than it already issued." *Id.* at 933. Within that context, the Ninth Circuit affirmed the Court's preliminary injunction.  *Id.* at 937.[4]

---

[3] In January 2021, Plaintiffs filed a second motion for a preliminary injunction, seeking to renew and expand the then-expired initial preliminary injunction.  (Dkt. No. 208.)  The Court denied this motion, noting that at that time, the parties' appeal was still pending in the Ninth Circuit and that the Sheriff's Department was "engaged in a thorough and specific analysis of the risks to the inmate population posed by COVID-19 on a daily basis."  (*Id.* at p. 10.)

[4] The Ninth Circuit dismissed that portion of Plaintiffs' cross-appeal seeking review of the

United States District Court
Northern District of California

1    In December 2022, the Court dismissed with prejudice all claims against the individual

2    defendants.  (Dkt. No. 313.)  The Court observed that it had allowed Plaintiffs time to amend their

3    complaint, but they had not done so in the intervening nearly three years.  (Dkt. No. 313.)  The

4    Court also granted the parties' stipulation to dismiss four individual Plaintiffs from the case.  (Dkt.

5    No. 317.)

6    The parties then cross-moved for summary judgment, and on April 5, 2023, the Court

7    issued an order granting in part and denying in part San Francisco's motion and denying Plaintiffs'

8    motion.  (Dkt. No. 325.)  Specifically, the Court granted that portion of San Francisco's motion to

9    strike Plaintiffs' demand for compensatory and punitive damages from the Complaint as well as

10   dismissing the claim for violation of Article I, Section 17 of the California Constitution.  (*Id*. at pp.

11   14-19, 34.)  The Court otherwise denied the cross-motions.  (*Id*. at pp. 34, 36.)

12   Thus, by the time the Court held a bench trial in August 2023, the only remaining claims

13   against San Francisco were violations of the Fourteenth Amendment and Article I, Section 7 of the

14   California Constitution based on the hours of daily confinement and access to direct sunlight.  (*See*

15   Dkt. No. 443; Dkt. No. 478, p. 52 n.14.)

16   In October 2023, following a seven-day bench trial, the Court issued its findings of fact

17   and conclusions of law.  (Dkt. No. 478.)  Regarding the claim relating to pretrial detainees

18   remaining in their cells for 23.5 hours a day, the Court noted that the Ninth Circuit had already

19   concluded that "inmates must be allowed at least one hour of time out of cell at least five days a

20   week, absent other emergencies."  (*Id*. at p. 63.)  However, Plaintiffs claim arose from restrictions

21   put in place during the COVID-19 pandemic, and the Court observed that "[g]enuine emergency"

22   can serve as a rational basis for complete lockdown and deprivation of right to exercise with

23   deprivation of constitutional rights.  (*Id*. at pp. 63-64.)  Thus, the Court found that San Francisco's

24   restrictions on Plaintiffs' time out of cells based on the COVID-19 pandemic constituted a genuine

25

26

27   _____

28   Court's order granting Defendants' motion to dismiss because that order was not immediately
     appealable nor reviewable under that Court's pendant appellate jurisdiction.  *Norbert*, 10 F.4th at
     936-37.

1    emergency that did not deprive Plaintiffs of their federal or state constitutional rights.  (*Id*. at

2    p. 64.)[5]

3            Turning to access to direct sunlight, the Court noted that under the Fourteenth Amendment,

4    Plaintiffs were required to demonstrate that the challenged conditions of confinement were a

5    "punishment," meaning that the conditions must have produced a "harm or disability."  (*Id*. at p.

6    54.)  In contrast, San Francisco could prevail by demonstrating that its policy was rationally

7    related to a nonpunitive governmental interest that did not appear excessive in relation to that

8    interest.  (*Id*.)  The Court observed that there was no authority addressing whether access to direct

9    sunlight was a violation of the Fourteenth Amendment or Article I, Section 7 of the California

10   constitution.  (*Id*.)  Based on the evidence admitted at trial, the Court found that San Francisco's

11   failure to provide Plaintiffs with access to direct sunlight for several years was harmful.  (*Id*. at

12   p. 55.)  In particular, the Court found that "lack of direct sunlight was a causal factor in high blood

13   pressure, diabetes, myopia, and weight gain."  (*Id*. at p. 56.)  The Court otherwise found that

14   Plaintiffs had not demonstrated harm (*e.g*., psychological harm or harm to Plaintiffs' circadian

15   rhythm).  (*Id*. at pp. 56-57.)  While the Court acknowledged that San Francisco had provided a

16   valid governmental interest in restraining Plaintiffs, the Court concluded that there was "no valid

17   governmental interest in a complete denial of direct sunlight to Plaintiffs."  (*Id*. at p. 55.)

18   Moreover, though the evidence at trial did not demonstrate that San Francisco intended to punish

19   Plaintiffs by denying them access to sunlight, the Court found that San Francisco was nonetheless

20   recklessly indifferent to Plaintiffs' needs.  (*Id*. at pp. 58-61.)

21           Having concluded that San Francisco had violated Plaintiffs' rights through denial of

22   access to direct sunlight, the Court then addressed relief, noting that the PLRA controlled,

23   "restricting the equity jurisdiction of federal courts" and "create[ing] a more exacting standard for

24   federal courts to follow."  (Dkt. No. 478, p. 61), quoting *Gilmore v. California*, 220 F.3d 987, 999,

25   1007 (9th Cir. 2000).  Specifically, injunctive relief "[must] be supported by findings and

26

27           [5] The Court also concluded that Plaintiffs had not proffered evidence demonstrating that
28   San Francisco's general practice of allowing pretrial detainees in administrative segregation only
     one hour outside of their cell violated the federal or state constitutions.  (Dkt. No. 478, pp. 65-66.)

United States District Court
Northern District of California

precisely tailored to what is needed to remedy the violation of a federal right." (*Id*.), quoting *Miller v. French*, 530 U.S. 327, 347 (2000) (citations omitted).  Moreover, "[t]he relief must be 'narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right.'" (*Id*.), quoting 18 U.S.C. § 3626(a)(1)(A).  While Plaintiffs sought no less than one hour per day of outside recreation, the Court found there was no admissible evidence about the amount of time each person should have in direct sunlight.  (*Id*. at pp. 61-62.)  Moreover, the evidence was ambiguous as to how long a person could go without access to direct sunlight before medical harm occurred.  (*Id*. at p. 62.)  Despite this, the Court found that there was evidence demonstrating that harm occurred beginning approximately one year after Plaintiffs were incarcerated.  (*Id*.)  With the forgoing in mind, the Court granted Plaintiffs' demand for injunctive relief insofar as San Francisco "must offer to each inmate who has been incarcerated for longer than a year the following:  daily access to direct sunlight, weather permitting and in the absence of an emergency (including but not limited to a global pandemic or prison riot) for at least 15 minutes." (*Id*.)  The Court was careful to state that "[t]he amount of time – 15 minutes – is more than *de minimis* but less intrusive on the Defendant." (*Id*. at p. 62.)[6]

On October 31, 2023, Plaintiffs moved for attorney's fees and costs (Dkt. No. 480), which was fully briefed and set for hearing.[7]  However, the parties stipulated to continue the hearing, and asked that the Court set a briefing schedule on the issue of whether San Francisco's efforts following the trial satisfied the Court's injunction.  (Dkt. Nos. 491, 492.)  The parties briefed the issue through a motion for clarification of the Court's post-trial order, and the Court conducted a site visit at County Jail 3 to inspect San Francisco's progress.  (Dkt. No. 506.)  Following a

---

[6] The Court denied Plaintiffs injunctive relief seeking Vitamin D testing and treatment because Plaintiffs' own testimony demonstrated that San Francisco was already taking action, as well as Plaintiffs' expert had opined that Vitamin D would not necessarily solve problems related to lack of sun exposure.  (Dkt. No. 478, p. 62.)

[7] The Court notes that it granted the parties' motion for an order that Plaintiffs' timely motion for attorney's fees, made under Rule 54(d)(2), to have the same effect under Federal Rule of Appellate Procedure 4(a)(4)(A)(iii) as a timely motion under Rule 59.  (Dkt. No. 486), citing Fed. R. Civ. P. 58(e).  In other words, all parties' time to file an appeal runs from the entry of this order.

1   hearing, the Court granted in part and denied in part San Francisco's motion for clarification,

2   finding that San Francisco's efforts to place metal grates over certain windows allowed direct

3   sunlight to enter County Jail 3; however, this method did not allow for each inmate 15 minutes of

4   access to direct sunlight.  (Dkt. No. 512.)  Thereafter, the parties filed supplemental briefing on the

5   issue of attorney's fees.  (Dkt. Nos. 513, 516.)  The Court now, in its discretion, has determined to

6   dispose of the attorney's fees motion without oral argument.  Civil L.R. 7-1(b).

**ANALYSIS**

7

8   District "court[s] ha[ve] broad discretion in calculating attorneys' fees."  *Edmo v. Corizon,*

9   *Inc.*, 97 F.4th 1165, 1168 (9th Cir. 2024), citing *A.D. v. California Highway Patrol*, 712 F.3d 446,

10  450 (9th Cir. 2013).  A court "must 'fully explain[ ] its reasoning in making an award.'"  *Id.*,

11  quoting *McCown v. City of Fontana*, 565 F.3d 1097, 1102 (9th Cir. 2009).  Moreover, a Court's

12  findings cannot be "illogical, implausible, or without support in the record."  *Id.*, quoting *Gonzalez*

13  *v. City of Maywood*, 729 F.3d 1196, 1201-02 (9th Cir. 2013).

14  Plaintiffs argue that, as the prevailing party, they are entitled to "a fully compensatory fee

15  even though they did not prevail on all claims because of the relatedness of all their claims."  (Dkt.

16  No. 480, p. 11.)  Plaintiffs thus seek $2,070,208.94 in attorney's fees and $380,622.87 in costs.

17  (Dkt. No. 513, p. 8.)  Plaintiffs reason that such a fee would be proportional and reasonable to the

18  related relief they achieved.  (Dkt. No. 480, p. 12.)

19  San Francisco argues that the PLRA limits the hours the Court may compensate Plaintiffs.

20  (Dkt. No. 487, pp. 5-6.)  In addition, San Francisco asserts that the hourly rate that Plaintiffs seek

21  is inaccurate and not supportable by law.  (*Id.*)  San Francisco then contends that Plaintiffs'

22  request includes excessive, unnecessary, and vague hourly entries, which requires further

23  reduction.  (*Id.* at p. 10.)  Finally, San Francisco argues that Plaintiffs' counsel is not entitled to an

24  enhancement.  (*Id.* at p. 16.)  San Francisco argues that the Court should award $433,206.36 in

25  attorney's fees and $51,731.97 in costs.  (Dkt. No. 516, p. 10.)

26  **A.       Lodestar and PLRA**

27  In the Ninth Circuit, a district court in awarding attorney's fees and costs must first

28  "determine the presumptive lodestar figure," which consists of "tallying the number of hours an

United States District Court
Northern District of California

attorney reasonably expended on the prevailing party's case . . .[and] then multipl[ying] the number of hours by a reasonable hourly rate, based on evidence of the market rate for the services provided." *Edmo*, 97 F.4th at 1168, citing *Gonzalez*, 729 F.3d at 1202.  "The result of this equation is the lodestar figure, which is treated as a presumptively reasonable award." *Id*.

Because Plaintiffs are pretrial detainees, the PLRA is controlling on the issue of attorney's fees.  *Id.* at 1169; 42 U.S.C. § 1997e(h).[8]  Section 1997e(d) provides that "[n]o award of attorney's fees . . . shall be based on an hourly rate greater than 150 percent of the hourly rate established under section 3006A of Title 18 for payment of court-appointed counsel."  42 U.S.C. § 1997e(d)(3).  In other words, "Section 1997e(d) provides the district court the 'authority to award attorney's fees up to 150 percent of the hourly rate for counsel established in the Criminal Justice Act, 18 U.S.C. § 3006A.'"  *Parsons v. Ryan*, 949 F.3d 443, 464 (9th Cir. 2020), quoting *Perez v. Cate*, 632 F.3d 553, 555 (9th Cir. 2011).  Thus, the following rates apply to this case:

| 42 U.S.C. § 1997e(d)(3) – PLRA Hourly Rate Cap | | |
|---|---|---|
| For Service Performed | Maximum CJA Rate | Maximum PLRA Rate |
| 1/1/2024 to present | $172 | $258 |
| 1/1/2023 to 12/31/2023 | $164 | $246 |
| 1/1/2022 to 12/31/2022 | $158 | $237 |
| 1/1/2021 to 12/31/2021 | $155 | $232.50 |
| 1/1/2020 to 12/31/2020 | $152 | $228 |
| 2/15/2019 to 12/31/2019 | $148 | $222 |

### 1.  Application of Different Rate for Each Year

Plaintiffs argue that they are entitled to attorney's fees for 4,336.4 hours at $258 an hour for all attorneys and senior paralegals and $239 for all other non-attorneys, which include paralegals, assistants, and student clerks.  (Dkt. No. 513, pp. 5-6; *see also* Dkt No. 480, pp. 11-12.)

---

[8] A "prisoner" defined under the PLRA "means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program."  42 U.S.C. § 1997e(h).

United States District Court
Northern District of California

Here, Plaintiffs calculate the lodestar using the rate for 2024 for all work going back to 2019. Plaintiffs' approach is wrong. The Ninth Circuit has made clear that a court must calculate the lodestar based on the correct rate for each year that the work was completed. *Parsons*, 949 F.3d at 474. The Court thus rejects Plaintiffs' approach and instead has calculated the lodestar based on the rate applicable for each year that the work was performed, as set forth in the detailed Appendices I and II.[9]

### 2. Rates for Employees Who Are Not Attorneys

The only remaining issue to consider before calculating the lodestar is the rate for Plaintiffs' non-attorney staff. It appears that Plaintiffs seek the maximum rate under the PLRA for senior paralegals and $239 for all other employees who are not attorneys. The only evidence submitted on this subject is a statement by Plaintiffs' expert Richard T. Drury, who opines, with no supporting evidence or explanation, that all non-attorneys should receive an hourly rate of $246. (Dkt. No. 483, ¶ 24.) Plaintiffs offer no other support for the rate for employees who are not attorneys. Plaintiffs do not even offer the resumes of their non-attorneys, and one student clerk is not even identified by name. Given the lack of support supporting Plaintiffs' requested hourly rate for employees who are not attorneys, the Court agrees with San Francisco to apply the maximum PLRA rate from 2019, which is $222, to all non-attorneys for all hours in all years. *See Parsons*, 949 F.3d at 466 (discussing that paralegals are entitled to the PLRA maximum rate for paralegal work if the prevailing party demonstrates the paralegal market rate exceed the PLRA cap). Even this is a stretch under *Parsons*, because Plaintiffs did not show that the market rate for paralegals exceeds the maximum under the PLRA.

With the foregoing in mind, the Court calculates the total amount incurred to be $1,028,799.75. The detailed analysis is provided in Appendices I and II.

### 3. Award Only for Successful Claims

Plaintiffs seek an award of fees for all the time they spent on this case, even though they

---

[9] After the initial briefing for this motion, the Court ordered Plaintiffs to provide a yearly breakdown of the hours billed by attorneys and non-attorneys, and Plaintiffs did so. (Dkt. Nos. 519, 520.) This order is based on that additional information.

obtained victory on only one issue.  Plaintiffs' approach is incorrect, as the Ninth Circuit made clear in *Edmo*, after Plaintiffs completed their briefing on this motion.  "[T]he PLRA explicitly limits awards to fees 'directly and reasonably incurred in proving an actual violation of the plaintiff's rights.'"  *Edmo*, 97 F.4th at 1169, quoting *Balla v. Idaho*, 677 F.3d 910, 918 (9th Cir. 2012).  Thus, under the PLRA, "only fees incurred litigating successful claims are compensable, and time attorneys spend on unsuccessful claims must be excluded from the lodestar calculation." *Id.*, citing *Dannenberg v. Valadez*, 338 F.3d 1070, 1075 (9th Cir. 2003).  In other words, "the PLRA excludes unsuccessful claims [from an award of attorney's fees] even if they are based on related legal theories or share a 'common core of facts' with a successful claim."  *Id.*, citing H.R. Rep. No. 104-21 at 28.  Thus, in no uncertain terms, "time attorneys spend on unsuccessful claims must be excluded from the lodestar calculation." *Id.* (internal quotation omitted).

The question then for the Court is how to evaluate the number of hours Plaintiffs spent on their successful theory, access to direct sunlight, compared to their failure to obtain relief on the other theory for more time out-of-cell.  As Plaintiffs note, these claims shared a common core of facts and witnesses such that they were entangled.  (Dkt. No. 480, pp. 11-12.)  Recognizing that disentanglement might prove impossible under certain circumstances, the Supreme Court of the United States has advised that "[t]he district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success." *Hensley v. Eckerhart*, 461 U.S. 424, 436-37 (1983).  "The court necessarily has discretion in making this equitable judgment." *Id.* at 437.

Here, the Court has reviewed Plaintiffs' detailed logs and finds it impossible to delineate which hours were spent on which theories.  Because the theories and hours were intertwined and because Plaintiffs obtained relief on only one of the two theories, the Court agrees with San Francisco that the lodestar must be reduced by fifty percent to account for Plaintiffs' limited success.  *Edmo*, 97 F.4th at 1169.  The Court notes that a reduction of fifty percent (or more) in attorney's fees is not uncommon among other courts under appropriate circumstances.  *See, e.g., Steward v. Cnty. of Santa Clara*, No. 18-cv-04119-SI, 2022 WL 94911, at *2 (N.D. Cal. Jan. 10, 2022); *Zeigler v. Cnty. of San Luis Obispo*, No. CV 17-9295-MWF (AFMx), 2023 WL 3432238,

United States District Court
Northern District of California

at *1 (C.D. Cal. Mar. 1, 2023); *Dunlap v. Liberty Natural Products, Inc*., No. 3:12-cv-01635-SI, 2016 WL 591759, at *6 (D. Or. Feb. 12, 2016).

Accordingly, the Court reduces the lodestar to $514,399.88.

### 4. Further Reduction

San Francisco then argues that the detailed hourly descriptions by Plaintiffs include hours that are not compensable, which requires further reduction. (Dkt. No. 487, pp. 10-16.) These non-compensable hours include clerical task performed by attorneys, block billing, vague and ambiguous descriptions of work performed, and time related to exclude evidence or unsuccessful motions. (*Id*.) Instead of requesting that the Court conduct a line-item reduction for such non-compensable hours, San Francisco proposes that the Court further reduce the lodestar by ten percent. (*Id*. at 15.) Plaintiffs generally disagrees. (Dkt. No. 488, pp. 11-13.) The Court finds, in its discretion, that a ten percent reduction is warranted.

To begin, Plaintiffs are correct that attorney's fees have traditionally included paralegal services, but attorneys should not bill an attorney's hourly rate for clerical tasks. *Boconvi v. Velocity Express, LLC*, No. 17-cv-02623-JST, 2018 WL 2248988, at *3 (N.D. Cal. May 17, 2018). While San Francisco has pointed to some clerical tasks completed by non-attorneys, the only entries San Francisco notes where an attorney has completed clerical tasks is for attorney Yolanda Huang, which amount to 2.1 hours. (Dkt. No. 487, p. 11.)

Next, the Court notes that there are many entries that consist of block billing. (*Id*. at p. 12.) For example, Plaintiffs' counsel spent two hours on "Review/revise Joint Exhibit List, phone calls with RSD and RB re: Joint Exhibit List, Joint Witness List and Trial Brief, revise Joint Exhibit List, Joint Witness List and Joint Depo Designations, finalize and forward to defense counsel, review/revise Joint Pretrial Statement and forward to Defense Counsel." (*Id*. at p. 13.) In addition, Plaintiffs' counsel spent 1.5 hours on "prep subpoena, locate witnesses, and TC process server – subpoena of trial witnesses." (*Id*.) Without specifying how much time was spent on each distinct task, the Court finds it difficult to determine whether such time was reasonable.

While Plaintiffs state that San Francisco did not directly point to entries that are vague, the Court notes that San Francisco did provide certain entries by Plaintiffs' counsel that the Court

United States District Court<br>Northern District of California

11

finds vague.  (*Id*. at pp. 12-13.)  For example, Plaintiffs' counsel spent 2.5 hours on "Jail Letter to CJ#," and then later on the same day spent another 8.2 hours on "Jail Letter to CJ#."  Thus, in total Plaintiffs' counsel spent 10.7 billable hours (or approximately 642 minutes) on a letter that the Court is unsure how to interpret or attribute to which aspect of the case.  Also, two entries on the same date for "pretrial schedule" that amount to 6.2 billable hours (or approximately 372 minutes) are unclear.  (*Id*.)  Without more explanation, the Court is unable to determine whether these time entries are reasonable.

Finally, the Court agrees with San Francisco that Plaintiffs included hours that were billed for unsuccessful motions and hours related to evidence that was ultimately excluded.  In particular, the Court notes that Plaintiffs included a request for fees for time related to the inmate sleep survey that the Court excluded from evidence, for time related to witnesses that the Court excluded from trial, and for time preparing government claims forms for future litigation.  (*Id*. at pp. 14-15.)

In light of the foregoing, the Court finds, in its discretion, to impose a ten percent reduction from the lodestar to account for the issues in Plaintiffs' billable hours described above.  *Moreno v. City of Sacramento*, 534 F.3d 1106, 1112 (9th Cir. 2008).  Therefore, the final lodestar in this case is $462,959.89.

### B. Enhancement

Plaintiffs argue that they are entitled to an enhancement for attorneys and non-attorneys with multipliers ranging from 1.2 to 2.0.  The Court agrees that an enhancement is appropriate but applies a multiplier of 1.3.  In determining fees, a court can, after calculating the lodestar, consider whether to enhance the award.  *Yahoo!, Inc. v. Net Games, Inc.*, 329 F. Supp. 2d 1179, 1182 (N.D. Cal. 2004); *see Kelly v. Wengler*, 822 F.3d 1085, 1102 (9th Cir. 2016); *see also Parsons*, 949 F.3d at 466 (9th Cir. 2020) (discussing that a court is authorized to enhance attorney's fees in civil rights cases governed by the PLRA).  Factors, sometimes known as *Kerr* factors, include:

> (1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or

the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the 'undesirability' of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases.

*Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975).

That said, the lodestar is "presumptively sufficient" for attorney's fees in civil rights cases. *Perdue*, 559 U.S. at 552.  In determining whether to grant an enhancement, courts begin with the propositions that "the lodestar figure includes most, if not all, of the relevant factors constituting a 'reasonable' attorney's fee" and that "an enhancement may not be awarded based on a factor that is subsumed in the lodestar calculation."  *Id.* at 553, quoting *Delaware Valley*, 478 U.S. at 566.  For example, the Supreme Court has "held that the novelty and complexity of a case generally may not be used as a ground for an enhancement because these factors 'presumably [are] fully reflected in the number of billable hours recorded by counsel.'"  *Id.*  Other factors courts have determined to be subsumed in the lodestar, and therefore cannot serve and an independent basis for an enhancement, are the special skill and experience of counsel; the quality of representation; the results obtained; and the contingent nature of the fee agreement.  *See Morales v. City of San Rafael*, 96 F.3d 359, 364 n.9 (9th Cir. 1996), citing *Cabrales v. Cnty. of Los Angles*, 864 F.2d 1454, 1464 (9th Cir. 1988), *reinstated*, 886 F.2d 235 (1989).  However, an attorney's performance can be the basis for an enhancement, in the rare and exceptional case, when a party provides "specific evidence that the lodestar fee would not have been 'adequate to attract competent counsel.'"  *Perdue*, 559 U.S. at 554, quoting *Blum v. Stenson*, 465 U.S. 886, 897 (1984).  In addition, the amount involved and the results obtained may serve as a basis but only in tandem with at least one other independent basis.  *See Edmo*, 97 F.4th at 1170.

If an enhancement is justified, then a district court "may adjust the lodestar upward . . . using a 'multiplier.'"  *Van Gerwen v. Guarantee Mut. Life Co.*, 214 F.3d 1041, 1045 (9th Cir. 2000).  "A multiplier must be supported by 'specific evidence' of the typical hourly rate for comparable services in the relevant forum."  *Edmo*, 97 F.4th at 1169, quoting *Van Gerwen*, 214 F.3d at 1041.  "Specific evidence is often provided by expert testimony."  *Id.*  Unless the moving party presents evidence that a different rate should apply, "the general rule is that the rates of

United States District Court
Northern District of California

attorneys practicing in the forum district . . . are used." *Gates v. Deukmejian*, 987 F.2d 1329, 1045 (9th Cir. 1992).  In determining whether to grant an enhancement, there appears to be no specific formula for calculation or weight given to any one factor, since this decision is left to the Court's discretion.

### 1.  Factors Subsumed into PLRA

The first factor, time and labor required, is subsumed into the rate set by the PLRA.  *Kerr*, 526 F.2d at 70.  Plaintiffs argue that the time and labor expended on the case was unnecessarily exacerbated by San Francisco's "baseless defenses and refusal to engage in good faith resolution of the matter," but other than the fact that the parties attended several settlement conferences, there is no evidence to support this allegation.  The fact that Plaintiffs took this case on a contingency basis, as well as the novelty and difficulty of the questions involved are also subsumed into the lodestar.  *Morales,* 96 F.3d at 365 n.9; *see also Perdue*, 559 U.S. at 553.  Thus, these factors do not support an enhancement of the lodestar.

### 2.  Factors with No Evidence

Plaintiffs have provided no evidence to support an enhancement based on several *Kerr* factors not subsumed by the lodestar:  the fourth factor – preclusion of other employment because the attorney took the case; the seventh factor – time limitations imposed by the client or circumstances; and the eleventh factor – the nature and length of the professional relationship with the client.  Thus, these factors cannot support an enhancement of the lodestar.

### 3.  Amount Involved and Results Obtained

This factor, in combination with other factors discussed below, generally weighs in favor of an enhancement.  This factor is one that the Court can consider.  *Edmo*, 97 F.4th at 1170 (affirming enhancement of award under PLRA because the case achieved excellent results).  This case is one of first impression.  However, the ultimate award in this case was simply injunctive relief.  Although Plaintiffs initially sought damages (Dkt. No. 1), they stipulated to certification of a class under Fed. R. Civ. P. 23(b)(2), which limited them to injunctive relief and a very narrow class of damages.  After briefing, the Court ruled that Plaintiffs were not entitled to damages. (Dkt. No. 389.)  Thus, Plaintiffs obtained injunctive relief only based on one theory.  The result

1    was favorable on one of the two theories Plaintiffs advanced.  Thus, this factor weighs in favor of

2    an enhancement, but not a higher enhancement of 2.0.

3          In addition, the Court finds Plaintiffs achieved good results that ended with an arguably

4    landmark ruling.  To the Court's knowledge, Plaintiffs are the first people to obtain a court order

5    compelling a jail to offer pretrial detainees, who have been incarcerated a year or longer,

6    reasonable access to direct sunlight for fifteen minutes a day.  San Francisco has again attempted

7    to downplay this by noting that Plaintiffs did not achieve success on all of their claims and did not

8    receive monetary damages.  This familiar tactic has previously been rejected.  *See Edmo*, 97 F.4th

9    at 1171.  The Court looks to the quality of the results achieved, not merely the quantity of claims

10   won.  *Id*.  To the extent that Plaintiffs did not prevail on their other theory, the Court already

11   deducted that amount from the lodestar.  Therefore, the Court finds that an enhancement is

12   warranted.

13         **4.  Customary Fee and Awards in Similar Cases**

14         The fifth and twelfth factors – customary fee and awards in other cases – support an

15   enhancement.  These factors are also ones that the Court can consider.  *Id.* at 1170 (affirming

16   enhancement of award under PLRA based on customary fee and awards in similar cases).

17   Plaintiffs submit evidence that they have obtained fees higher than the PLRA rate in other cases

18   for civil rights.  Specifically, Huang states that in 2021 she was awarded $675 per hour in a case

19   challenging conditions of the San Francisco jail when sewage was in cells.  (Dkt. No. 481 (Huang

20   Decl.) ¶ 14.)  Attorney Rachel Doughty also provides information showing that she has received a

21   rate of $720 per hour, but not for cases for civil rights by inmates, and Richard Brody provides no

22   information.  (Dkt. No. 482, ¶¶ 5, 7.)  Plaintiffs also provide the declaration of Drury, who is a

23   local attorney with experience in public interest lawyering and litigating fee awards.  (Dkt. No.

24   483, ¶¶ 2-3, 5.)  Drury notes that his firm pays partners hourly rates ranging from $700 to 900 and

25   pays associates hourly rates ranging from $375 to $550.  (*Id*. at ¶ 6.)  Drury then lists his own

26   cases where he has received an enhancement and multiplier, as well as various cases in this

27   District where an enhancement and multiplier have been awarded.  (*Id*. at ¶¶ 9-17.)  For example,

28   in *Wynn v. Chanos*, an attorney's fee award was approved where a partner with forty years of

United States District Court
Northern District of California

experience received an hourly rate of $1,085, a partner with twenty years of experience received an hourly rate of $920, and associates received hourly rates ranging from $640 to $710.  No. 14-cv-04329-WHO, 2015 WL 3832561, at *2-*3 (N.D. Cal. June 19, 2015).  Other cases from this District have partners' hourly rates ranging from $355 to $1,250 and associates' hourly rates ranging from $325 to $925.  *See Nat'l Abortion Fed'n v. Ctr. For Med. Progress*, No. 15-cv-03522-WHO, 2024 WL 1286936 (N.D. Cal. Mar. 25, 2024); *Banas v. Volcano Corp.*, 47 F. Supp. 3d 957 (N.D. Cal. 2014); *Hefler v. Wells Fargo & Co.*, No. 16-cv-05479-JST, 2018 WL 6619983 (N.D. Cal. Dec. 18, 2018); *Dept. of Fair Emp. & Hous. v. Law Sch. Admission Council Inc.*, No. 12-cv-01830-JCS, 2018 WL 5791869 (Nov. 5, 2018); *Ridgeway v. Wal-Mart Stores, Inc.*, 269 F. Supp. 3d 975 (N.D. Cal. 2017); *see also Prison Legal News v. Schwarzenegger*, 608 F.3d 446 (9th Cir. 2010).  The Court finds that the PLRA rate severely undervalues attorney hourly rates in the Bay Area.

The Court finds Drury's declaration credible insofar as it describes hourly rates and enhancements in this District, but the Court agrees with San Francisco that Drury did not include information in PLRA cases specifically and has not reviewed trial transcripts or many relevant court filings in this case.  (Dkt. No. 483.)  Therefore, this factor weighs in favor of an enhancement, but not a higher enhancement of 2.0 as recommended by Drury.

**5. Undesirability of Case**

The Court agrees that an enhancement is warranted in order to attract future competent counsel in prisoners' rights cases.  As the Ninth Circuit explained in *Kelly v. Wengler*, "[w]hen the lodestar figure based on the PLRA rate is insufficient to induce competent attorneys to accept appointment in meritorious civil rights cases, it is by definition not a reasonable fee."  822 F.3d at 1104.  The Court continued that, if a prevailing party can demonstrate with "specific evidence that no competent attorney is willing to take on a meritorious civil rights case because of insufficient fees, the district court furthers the PLRA's purpose by enhancing the lodestar figure by an amount reasonably calculated to induce competent lawyers in the relevant community to take such cases."  *Id.*, citing *Perdue*, 559 U.S. at 554.

Here, Plaintiffs offer the declaration of Plaintiffs' counsel, who stated that there are few

United States District Court
Northern District of California

1    lawyers who take on prisoners' rights cases that litigate chronic conditions.  (Dkt. No. 481, ¶ 6.)

2    This reluctance is caused in part by the costs of litigating these types of cases as well as the cap

3    under the PLRA.  (*Id*. at ¶ 8.)  Plaintiffs' counsel stated that in her experience, she did not know of

4    any other cases in the country with counsel litigating prisoners' right to sunlight.[10]  (*Id*. at ¶ 9.)

5    Plaintiffs' counsel continued that without an enhancement, it would "significantly deter and

6    dissuade attorneys from undertaking litigation of these types of cases."  (*Id*. at ¶ 12.)  Plaintiffs'

7    counsel also described her difficulty in finding co-counsel for this case and the unusual

8    arrangement she reached in order to retain co-counsel to help her with this case.  (*Id*. at ¶ 11.)

9              **6.  Experience, Reputation, and Ability of Attorneys**

10             Plaintiffs' lawyers are experienced lawyers.  However, their ability in this case does not

11   support enhancement.  There are many issues with Plaintiffs' counsel's performance at trial.  One

12   of the reasons that Plaintiffs' counsel's performance is relevant here to the enhancement is that the

13   Court is concerned that Plaintiffs' counsel spent time and effort on matters that were unnecessary

14   and that a more skilled set of lawyers would have avoided.  Below is a more detailed description

15   of the Court's concerns with Plaintiffs' counsel in this case.

16             **a.  Survey and Blood Test**

17             Most disturbing among the issues is Plaintiffs' counsel's attempts to take a survey of

18   inmates in County Jail 3 and to obtain blood samples from those inmates.  There was a significant

19   amount of briefing and several orders on this issue, starting in October 2019.  (Dkt. Nos. 63, 64,

20   77, 80, 86, 107, 251.)  Early in this case, on October 15, 2019, Plaintiffs' counsel sought to

21   conduct a blood test and psychiatric survey of hundreds of inmates.  (Dkt. No. 63.)  The Court

22   made clear that, if Plaintiffs collected such information, the parties would be required to have

23   equal access to any evidence obtained from inmates.  (Dkt. No. 86.)  After Plaintiffs failed to meet

24   their burden to show that this request was appropriate, the Court offered Plaintiffs the opportunity

25

26             [10] Defendant points to two cases, both in this District.  Both were filed after this case was
27   filed.  *Pierce et al. v. City and Cnty. of San Francisco et al*., Case No. 4:19-cv07659-JSW (N.D.
     Cal. filed May 1, 2020) and *Vincent v. City and Cnty. of San Francisco*, Case No. 1:20-cv-03129
28   (N.D. Cal. filed Dec. 14, 2020).  It appears that neither of those cases resulted in a ruling from the
     Court favorable to the plaintiffs in those cases.

to provide additional information to justify the request, but they did not do so.  (Dkt. No. 87.)  The Court solicited input from the public defenders of both San Francisco and this District, and they submitted *amicus curiae* briefs indicating their concerns.  (Dkt. Nos. 93, 95.)  The Court also made clear that, for Plaintiffs to obtain medical information in the form of blood draws from inmates, the parties would be required to submit a consent form for the inmates to inform them specifically of the risks and rewards of participating and to warn them that the information would not be collected anonymously.  (Dkt. No. 107.)  The Court also ordered Plaintiffs to provide more information about any survey or psychological information and thus denied Plaintiffs' motion to collect that information, without prejudice to a renewed motion.  (Dkt. No. 107.)  Later, Plaintiffs renewed their motion and argued that they had a right to medical treatment, and the Court denied the request again without prejudice.  (Dkt. No. 251.)  Plaintiffs did not again ask the Court for permission to conduct psychological testing or surveys until two years later, at the close of fact discovery, and without curing the problem of failing to obtain informed consent from the inmates. (Dkt. Nos. 244, 244-1, 246, 322.)  The Court again rejected the request.  (Dkt. No. 322.)

Despite this rejection and unbeknownst to the Court or to Defendant, Plaintiffs then distributed a survey to inmates in violation of the restrictions the Court created to protect the inmates' rights.  Plaintiffs' counsel worked with expert witnesses Charles Czeisler, M.D., and Jess Ghannam, Ph.D., a clinical professor of psychiatry and global health services at the University of California – San Francisco School of Medicine, to oversee a graduate student in psychology from the Wright Institute, Juliana di Miceli, to collect data.[11]  (Dkt. No. 325.)  Di Miceli and a group of 18 other unidentified graduate students, all from the Wright Institute, "were recruited and paid to interview inmates . . . via videoconference (Zoom) during the month of August 2022."  (*Id*.)  The Wright Institute graduate students interviewed a total of 26 inmates.  (*Id*.)  They then collated the information in an anonymous matter so that Czeisler did not have the names of the individual inmates.  (*Id*.)

The Court found that Plaintiffs violated the Court's previous orders regarding the ability to

_____

[11] The Court described this process in detail in an order dated April 5, 2023.  (Dkt. No. 325.)  The citations in this section are to that order.

survey inmates.  (Dkt. No. 325.)  For example, the Wright Institute graduate students obtained an unidentified "verbal consent" from the inmates who participated in the surveys and testing, and there was no indication that the Wright Institute graduate students who spoke with inmates gave any warning about the manner in which the information would be used other than a vague description that they told the inmates the "purpose of the interview."  (*Id*.)  This violated the Court's earlier order that inmates were required to give informed consent.  One of the concerns that the Court had expressed earlier was how the information from the evaluation and testing would be used; in their *amicus curiae* briefs, both the Federal Public Defender and San Francisco County Public Defender stated that they were concerned of the potential effect of those tests on pending criminal cases.  (Dkt. No. 325, citing Dkt. Nos. 107, 93, 95.)  There was no indication that the graduate students warned the subjects of the possible use of their data in any ongoing criminal cases.  Because of Plaintiffs' violations of the Court's orders, the Court thus excluded any expert opinion based on that data and put in place other measures to protect the inmates.  (Dkt. No. 325.)

Plaintiffs' action in conducting the survey in violation of the Court's orders was both a waste of attorneys' time and led to a sanction of exclusion of Czeisler's evidence based on those surveys.  Plaintiffs also potentially put inmates at risk in their ongoing criminal trials and ignored the safeguards the Court put in place both to protect inmates and to provide equal access to Defendant to the information.  These are not the actions of competent counsel.

Counsel for Plaintiffs did not reveal that Plaintiffs had engaged in this survey until they filed briefs on the motions for summary judgment and long after the Court appointed Plaintiffs' counsel to represent the class.  Had the Court known of these actions – which put inmates at risk – at the time the Court was considering the appointment of counsel, the Court would have had serious reservations about appointing Plaintiffs' counsel as class counsel.

### b.  Discovery Issues and Other Unsuccessful Motions

Plaintiffs also needlessly made discovery difficult.  Plaintiffs also twice demanded, and did not obtain, an order requiring in-person deposition appearances from San Francisco witnesses during COVID-19.  (Dkt. Nos. 209, 210, 235, 236.)  Plaintiffs' counsel also refused to appear for depositions more than once per week, all of which required the parties to spend extensive time

1    meeting and conferring to complete basic discovery.  (Dkt. Nos. 211, 212.)  Plaintiffs additionally

2    filed discovery disputes without first meeting and conferring with Defendant as required by the

3    Court, and that failure increased the amount of time required to litigate this matter.  (*See, e.g.*, Dkt.

4    Nos. 224, 225, 252.)

5         Plaintiffs filed many unsuccessful motions on substantive issues.  Plaintiffs permitted the

6    Court's initial preliminary injunction to expire and then unsuccessfully attempted to renew it.

7    (Dkt. Nos. 197, 203, 205, 208.)

8         Plaintiffs failed to file a reply brief for their motion for class certification, but the Court

9    ultimately allowed them to file a late reply and then denied the motion.  (Dkt. Nos. 191, 218.)

10        In addition, Plaintiffs filed many motions for reconsideration which they labeled as

11   administrative motions or motions for clarification, and they were usually not successful.  (*See,*

12   *e.g.*, Dkt. Nos. 330, 332, 333, 387, 394, 419.)  This pattern of conduct was so egregious that the

13   Court admonished Plaintiffs.  But the admonishment had no effect, as Plaintiffs continued to file

14   inappropriate motions for reconsideration.  (Dkt. No. 395.)  Plaintiffs' actions finally led the Court

15   to order that no motions could be filed during trial without permission from the Court.  (Dkt. No.

16   487-2, Tr. at 6:25-7:20; Dkt. Nos. 430, 430-1 through 430-12; Dkt. Nos. 431-437, 439-442.)

17                    **c.   Mistakes in this Motion**

18        Even in moving for attorney's fees, Plaintiffs' counsel made major mistakes.  Plaintiffs'

19   counsel seeks reimbursement of fees paid to an expert witness (Czeisler) and failed to cite the

20   statute listing compensable fees and controlling authority from the Supreme Court and the Ninth

21   Circuit that a prevailing plaintiff cannot obtain the fees for expert witnesses.  *See*, *e.g*., 28 U.S.C. §

22   1920 (defining recoverable costs); *West Virginia Univ. Hosp. Inc. v. Casey*, 499 U.S. 93, 102

23   (1991); *Gates*, 987 F.2d at 1407 (holding it is reversible error to award expert fees to the

24   prevailing party in a civil rights case).

25                    **d.   Plaintiffs' Counsel's Performance at Trial**

26        The performance at trial by Plaintiffs' counsel does not support an enhancement.  On

27   numerous occasions, Plaintiffs' counsel failed to properly lay a foundation for questions or

28   documents.  (Dkt. Nos 487-2, 487-7, Tr. at 35:7-9; 39:13-18; 534:5-17; 971:14-21; 1260: 3-5.)

20

Plaintiffs' counsel attempted to admit documents into evidence that were not timely produced or not identified on Plaintiffs' exhibit list. (Dkt. Nos. 487-4, 487-5, Tr. at 596:5-598:15; 974:9-11; 464:25-465:25-466:23.) Plaintiffs' counsel also sought to introduce evidence that was beyond the scope of direct examinations or witness disclosures. (Dkt. Nos. 487-1 through 487-7, Tr. at 1321:1-12; 112:14-21; 377:8-14; 377:20-378:2; 378:8-13; 378:23-379:15; 3921:22-393:1; 418:11-15; 456: 3-7; 704:18-20; 710: 3-19; 712:24-713:6; 723:19-724:1; 742: 3-12; 727:13-21; 734:25-735:7; 737:4-12; 739:1-5; 739:7-13; 740:6-15; 1321:1-5; 1321:25-1322:9; 1324:6-10; 1325:5-11; 1328:17-24.) Finally, Plaintiffs' counsel attempted at times to solicit testimony beyond that disclosed in their expert reports. (Dkt. No. 487-8, Tr. at 1382: 3-8; 1382:22-1383:3; 1407:23-1408:4; 1413:21-1414:16; 1415:15-23.)

### 7. Calculation with Enhancement

After considering the factors listed above, the Court has decided to grant a multiplier of 1.3 for all attorneys in this case. The Court will not offer an enhancement for non-attorneys because Plaintiffs have offered no specific evidence to support an enhancement or multiplier. The Court has arrived at the 1.3 based on the factors described above. After applying the multiplier of 1.3 to the portion of the lodestar that encompasses attorneys' work of \$409,573.33, the result is \$532,445.33. The portion of the lodestar that encompasses work by employees who are not attorneys is \$53,386.56. Taking both numbers leads to a final award of attorney's fees in the amount of \$585,831.89.

### C. Costs

Under Federal Rule of Civil Procedure 54(d), "costs – other than attorney's fees – should be allowed to the prevailing party." Fed. R. Civ. P. 54(d). In turn, the "[t]he types of costs that may be awarded under Rule 54(d) are limited to those enumerated in 28 U.S.C. § 1920." *Ancora Tech., Inc. v. Apple, Inc.*, 2013 WL 4532927, at *1 (N.D. Cal. Aug. 26, 2013), citing *Taniguchi v. Kan Pacific Saipan, Ltd.*, 566 U.S. 560, 572-73 (2012). Those costs include:

> (1) Fees of the clerk and marshal;
>
> (2) Fees for printed or electronically recorded transcripts necessarily obtained for use in the case;

United States District Court
Northern District of California

(3) Fees and disbursements for printing and witnesses;

(4) Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case;

(5) Docket fees under section 1923 of [Title 28];

(6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.

28 U.S.C. § 1920.

### 1. Undisputed Costs

The Court begins with the costs the parties do not dispute. These costs, identified below, are GRANTED.

| Item | Cost |
|------|------|
| Delivery costs | $458.75 |
| Filing fee | $400.00 |
| Court interpreter costs | $1,483.50 |
| Reproduction and bindings costs | $10,031.31 |
| Subpoena service fee: Dr. Pratt | $300.00 |
| IT-Courtroom setup | $250.00 |
| Transcript fees | $35,690.45 |
| PACER charges from Greenfire Law 2023 | $61.90 |
| 2024 Correspondence costs | $601.96 |
| **TOTAL** | $49,277.87 |

### 2. Expert Fees

The parties dispute whether expert fees are compensable costs. Plaintiffs argue that the Court has discretion to award expert fees and should do so here because of the necessity of Czeisler and complexity of the case. Defendant argues that Plaintiffs are not entitled to expert fees because neither statute nor precedent provides for them in this context. Defendant is correct.

Certain sections of Title 42 of the United States Code provide causes of action where if a party is successful in litigating or defending such an action, the "prevailing party" may generally

1    seek reasonable attorney's fees and costs from the losing party.  42 U.S.C. § 1988(b).  As relevant

2    here, 42 U.S.C. § 1983 is such a section that allows the prevailing party to seek reasonable

3    attorney's fees and costs, pursuant to 42 U.S.C. § 1988.

4         In *Casey*, the Supreme Court concluded that 42 U.S.C. § 1988 does not authorize the

5    shifting of expert fees in civil rights cases to the losing party.  499 U.S. at 102.  As a result,

6    "prevailing parties cannot recover more than the witness fees authorized by § 1920 for experts

7    who testified; they can recover nothing for the services of experts in a non-testimonial capacity."

8    *Sanchez v. Cnty. of San Bernardino*, No. CV 10-09384 MMM (OPx), 2014 WL 12734756, at *20

9    (C.D. Cal. Mar. 10, 2014), citing *Gates*, 987 F.2d at 1407.  While Congress amended § 1988

10   following the Supreme Court's opinion in *Casey*, the amendment allowed for recovery of expert

11   fees in cases brought to enforce only provisions 42 U.S.C. § 1981 (equal rights under the law) and

12   42 U.S.C. § 1981a (intentional employment discrimination).  *See* 42 U.S.C. § 1988(c).  Because

13   Plaintiffs brought their claims through § 1983, *Casey* applies and does not allow for recovery of

14   Plaintiffs' expert fees under § 1988.  *See Gates*, 987 F.2d at 1408.

15        While Plaintiffs may not seek expert fees, they are entitled to witness expenses for any

16   experts that testified at trial.  Regarding how to calculate such witness costs, the District Court's

17   Local Civil Rules provide:

18           **Witness Expenses.** Per diem, subsistence, and mileage payments for
19           witnesses are allowable to the extent reasonably necessary and
             provided for by 28 U.S.C. § 1821.  No other witness expenses,
20           including fees for expert witnesses, are allowable.

     Local Civ. R. 54-3(e).

21        In turn, § 1821 provides that a witness shall be paid $40 for each day's attendance.  28

22   U.S.C. § 1821(b).  Within certain parameters, witnesses who must travel by common carrier shall

23   be paid the actual expenses of travel.  28 U.S.C. § 1821(c)(1).  Relatedly, "[t]oll charges for toll

24   roads, bridges, tunnels, and ferries, taxicab fares between places of lodging and carrier terminals,

25   and parking fees (upon presentation of a valid parking receipt), shall be paid in full to a witness

26   incurring such expenses."  28 U.S.C. § 1821(c)(3).  In addition, witnesses who are required to stay

27   overnight shall be given a "subsistence allowance" (which includes lodging along with meals and

28

United States District Court
Northern District of California

United States District Court
Northern District of California

1    incidental expenses).  28 U.S.C. § 1821(d)(1).  This allowance shall not exceed the maximum per

2    diem allowance prescribed by the Administrator of General Services.  28 U.S.C. § 1821(d)(2).

3         From the summary of costs (Dkt. No. 481-3), it appears that Czeisler is the only trial

4    witness for which Plaintiffs seek renumeration and only for per diem and subsistence, but not

5    travel.  (Dkt.  No. 488, 16 n.8.)  Czeisler traveled to San Francisco from Cambridge,

6    Massachusetts and was present in court and testified on August 9, 2023.  Thus, the Court finds that

7    Czeisler required lodging and finds it appropriate to include a day on either side of his testimony

8    date for travel.  The General Services Administration Fiscal Year 2023 per diem rates for San

9    Francisco in August 2023 were $270 a day for lodging, $79 a day for meals and incidental

10   expenses, and $59.25 for first and last day of travel meals and incidental expenses.[12]  Therefore,

11   the recoverable witness costs for Czeisler are $40 for his one day of attendance and testimony in

12   court, $810 for three days of lodging, and $197.50 for meals and incidental expenses (this includes

13   one full day of meals and incidentals with a first and last day).  In total, the costs recoverable for

14   Czeisler are $1,047.50, which the Court GRANTS.

15        As discussed above, Plaintiffs' remaining expert fees, which includes many non-

16   testimonial experts, are not compensable, and the Court DENIES those costs.  This includes the

17   expert fees attributed to Czeisler in the most recent supplemental briefing.

18        **3.  Other Costs**

19        Much of the remaining costs Plaintiffs seek are not authorized by § 1920.  Indeed,

20   Plaintiffs did not truly engage with San Francisco's arguments in their reply to the motion for

21   attorney's fees or in supplemental briefing, dedicating only three pages to the issue.  (*See* Dkt.

22   Nos. 488; 513.)  That said, the Court will GRANT the process server fees, which are allowable

23   under Local Civil Rule 54-3(a)(2).  The Court will also GRANT Plaintiffs remaining PACER

24   costs, pursuant to 28 U.S.C. § 1920(4).[13]  The remaining costs are DENIED, as outlined in the

25   table below.

26   _____

27   [12] https://www.gsa.gov/travel/plan-book/per-diem-rates/per-diem-rates-results?action=perdiems_report&fiscal_year=2023&state=CA&city=San%20Francisco&zip=

28   [13] Defendant did not oppose Plaintiffs' other PACER costs related to their supplemental briefing.  (Dkt. No. 516, p. 9.)

| Item | Amount | Ruling |
|---|---|---|
| Hotel for local counsel | $6,673.58 | Deny |
| Process Server costs for Gantor and Mirkarimi | $280.00 | **Grant** |
| Photography for site visits | $1,100.00 | Deny |
| Purchase of evidence book | $8.75 | Deny |
| Lexis research fees | $850.00 | Deny |
| Costs for creation of medical record summaries | $1,700.00 | Deny |
| PACER fees | $264.20 | **Grant** |
| Parking and tolls (not witness related) | $620.49 | Deny |
| Postage (unspecified) | $60.00 | Deny |
| Non-trial or courtroom, tech support | $2,719.00 | Deny |
| **TOTAL GRANTED** | **$544.20** | |

In sum, the Court awards Plaintiffs $50,869.57 in total costs – the sum of the undisputed costs ($49,277.87), the witness fees for Czeisler ($1,047.50), and the costs awarded to Plaintiffs over Defendant's objection ($544.20).

## CONCLUSION

Based on the forgoing, the Court GRANTS IN PART and DENIES IN PART Plaintiffs' motion for attorney's fees and costs.  Plaintiffs are awarded $585,831.89 in fees and $50,869.57 in costs.

**IT IS SO ORDERED**.

Dated: July 2, 2024

_____

SALLIE KIM
United States Magistrate Judge

United States District Court
Northern District of California

25

**APPENDIX I – ATTORNEYS**

| Name | Title | Year | Total Individual Hours[14] | Maximum PLRA Rate | Yearly Total |
|---|---|---|---|---|---|
| Rachel Doughty | Attorney | 2021 | 4.6 | $232.50 | $1,069.50 |
| | | 2022 | 145.1 | $237 | $34,388.70 |
| | | 2023 | 374.2 | $246 | $92,053.20 |
| | | 2024 | 36.2 | $258 | $9,339.60 |
| TOTAL | | | | | $136,851 |

| Name | Title | Year | Total Individual Hours | Maximum PLRA Rate | Yearly Total |
|---|---|---|---|---|---|
| Alexandra Monson | Attorney | 2021 | 9.8 | $232.50 | $2,278.50 |
| | | 2022 | 6.7 | $237 | $1,587.90 |
| TOTAL | | | | | $3,866.40 |

| Name | Title | Year | Total Individual Hours | Maximum PLRA Rate | Yearly Total |
|---|---|---|---|---|---|
| Ariel Strauss | Attorney | 2021 | 2.5 | $232.50 | $581.25 |
| | | 2022 | 0 | $237 | $0 |
| | | 2023 | 8.7 | $246 | $2,140.20 |
| TOTAL | | | | | $2,721.45 |

| Name | Title | Year | Total Individual Hours | Maximum PLRA Rate | Yearly Total |
|---|---|---|---|---|---|
| Christian Bucey | Attorney | 2022 | 1.6 | $237 | $379.20 |
| | | 2023 | 2.1 | $246 | $516.60 |
| TOTAL | | | | | $895.80 |

---

[14] As relevant here, the Court utilizes Plaintiffs' "Total Hours Individual Rate Judgment," which includes billing judgment reductions from Plaintiffs. Total hours (and Plaintiffs' requested enhancement multipliers for each individual) are available on the docket. (Dkt. No. 520.)

United States District Court
Northern District of California

United States District Court
Northern District of California

| Name | Title | Year | Total Individual Hours | Maximum PLRA Rate | Yearly Total |
|---|---|---|---|---|---|
| **Jessica Taylor** | Attorney | 2022 | 9.6 | $237 | $2,275.20 |
| **TOTAL** | | | | | $2,275.20 |

| Name | Title | Year | Total Individual Hours | Maximum PLRA Rate | Yearly Total |
|---|---|---|---|---|---|
| **Richard Brody** | Attorney | 2022 | 188.5 | $237 | $44,674.50 |
| | | 2023 | 428.4 | $246 | $105,386.40 |
| | | 2024 | 1.1 | $258 | $283.80 |
| **TOTAL** | | | | | $150,344.70 |

| Name | Title | Year | Total Individual Hours | Maximum PLRA Rate | Yearly Total |
|---|---|---|---|---|---|
| **Susann Bradford** | Attorney | 2022 | 74.4 | $237 | $17,632.80 |
| | | 2023 | 7.1 | $246 | $1,746.60 |
| **TOTAL** | | | | | $19,379.40 |

| Name | Title | Year | Total Individual Hours | Maximum PLRA Rate | Yearly Total |
|---|---|---|---|---|---|
| **Jessica Blome** | Attorney | 2022 | .3 | $237 | $71.10 |
| | | 2023 | 4 | $246 | $984 |
| **TOTAL** | | | | | $1,055.10 |

| Name | Title | Year | Total Individual Hours | Maximum PLRA Rate | Yearly Total |
|---|---|---|---|---|---|
| **Rae Lovko** | Attorney | 2023 | 92.4 | $246 | $22,730.40 |
| | | 2024 | .4 | $258 | $103.20 |
| **TOTAL** | | | | | $22,833.60 |

| Name | Title | Year | Total Individual Hours | Maximum PLRA Rate | Yearly Total |
|---|---|---|---|---|---|
| **Lily Rivo** | Attorney | 2023 | 8.5 | $246 | $2,091 |
| **TOTAL** | | | | | $2,091 |

| Name | Title | Year | Total Individual Hours | Maximum PLRA Rate | Yearly Total |
|---|---|---|---|---|---|
| **Yolanda Huang** | Attorney | 2019 | 261 | $222 | $57,942 |
| | | 2020 | 286.6 | $228 | $65,344.80 |
| | | 2021 | 284 | $232.50 | $66,030 |
| | | 2022 | 729.3 | $237 | $172,844.10 |
| | | 2023 | 816.1 | $246 | $200,760.60 |
| | | 2024 | 19.1 | $258 | $4,927.80 |
| **TOTAL** | | | | | $567,849.30 |

**APPENDIX II – NON-ATTORNEYS**

| Name | Title | Year | Total Individual Hours | Hourly Rate | Yearly Total |
|---|---|---|---|---|---|
| **Erica Plasencia** | Paralegal / Translation | 2021 | 2.1 | $222 | $466.20 |
| | | 2022 | 24 | $222 | $5,328 |
| **TOTAL** | | | | | $5,794.20 |

| Name | Title | Year | Total Individual Hours | Hourly Rate | Yearly Total |
|---|---|---|---|---|---|
| **Carla Barraez** | Paralegal | 2022 | 2.6 | $222 | $577.20 |
| | | 2023 | 2.9 | $222 | $643.80 |
| **TOTAL** | | | | | $1,221 |

| Name | Title | Year | Total Individual Hours | Hourly Rate | Yearly Total |
|---|---|---|---|---|---|
| **Nuria de la Fuente** | Legal Assistant/ Translation | 2022 | 18.2 | $222 | 4,040.40 |
| | | 2023 | 88.9 | $222 | $19,735.80 |
| | | 2024 | 6.6 | $222 | $1,465.20 |
| **TOTAL** | | | | | $25,241.40 |

| Name | Title | Year | Total Individual Hours | Maximum PLRA Rate | Yearly Total |
|---|---|---|---|---|---|
| **Nuria de la Fuente** | Senior Paralegal | 2023 | 44.5 | $222 | $9,879 |
| **TOTAL** | | | | | $9,879 |

| Name | Title | Year | Total Individual Hours | Hourly Rate | Yearly Total |
|---|---|---|---|---|---|
| **"Student Clerk"** | Student Clerk | 2023 | 40 | $222 | $8,880 |
| **TOTAL** | | | | | $8,880 |

United States District Court
Northern District of California

| Name | Title | Year | Total Individual Hours | Hourly Rate | Yearly Total |
|---|---|---|---|---|---|
| **Adirah Rodriguez** | Student Clerk | 2023 | 14.5 | $222 | $3,219 |
| **TOTAL** | | | | | $3,219 |

| Name | Title | Year | Total Individual Hours | Maximum PLRA Rate | Yearly Total |
|---|---|---|---|---|---|
| **Pat Giacommetti** | Senior Paralegal | 2021 | 4 | $222 | $888 |
| | | 2022 | 129.3 | $222 | $28,704.60 |
| **TOTAL** | | | | | $29,592.60 |

| Name | Title | Year | Total Individual Hours | Hourly Rate | Yearly Total |
|---|---|---|---|---|---|
| **Joshua Paiz** | Student Clerk | 2023 | 152.4 | $222 | $33,832.80 |
| | | 2024 | 4.4 | $222 | $976.80 |
| **TOTAL** | | | | | $34,809.60 |

30